IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COMCAST CABLE COMMUNICATIONS, LLC, TV WORKS, LLC, and COMCAST MO GROUP, INC.,**<br>  Plaintiffs,<br><br>           v.<br><br>**SPRINT COMMUNICATIONS COMPANY, LP, SPRINT SPECTRUM, LP, and NEXTEL OPERATIONS, INC.,**<br>  Defendants. | CIVIL ACTION<br><br><br><br><br>NO.  12-859 |
| **SPRINT COMMUNICATIONS COMPANY, LP, and SPRINT SPECTRUM, LP,**<br>           Counterclaim-Plaintiffs,<br><br>           v.<br><br>**COMCAST CABLE COMMUNICATIONS, LLC,  COMCAST IP PHONE, LLC, COMCAST BUSINESS COMMUNICATIONS, LLC, and COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC,**<br>           Counterclaim-Defendants. | |

**DuBois, J.**                                                                                              **November 21, 2016**

**M E M O R A N D U M**

### I.     INTRODUCTION

This case involves claims of patent infringement between Comcast Cable Communications, LLC, and related entities (collectively "Comcast"), and Sprint Communications Company, L.P., and related entities (collectively "Sprint"). After withdrawal of several claims of infringement, what remained in the case were Comcast's claim for infringement of its U.S. Patent Number 6,885,870 ("the '870 patent") against Sprint and Sprint's

1

counterclaims for infringement of its U.S. Patents Numbers 6,754,907 and 6,757,907 ("the '907 patents") against Comcast. The Court granted summary judgment in favor of Comcast as to Sprint's counterclaims by Memorandum and Order dated August 24, 2016. *See Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, No. CV 12-859, 2016 WL 4478756 (E.D. Pa. Aug. 25, 2016). That Memorandum and Order also construed certain claim terms and resolved certain *Daubert* motions, but the Court deferred ruling on Comcast's Motion to Exclude the Expert Testimony of Alan Cox and Sprint's Motion to Exclude the Expert Testimony of Michele Riley. Those motions are addressed in this Memorandum.

In its Motion to Exclude, Comcast argues that the opinions of Sprint's expert on damages for infringement of the '870 patent, Dr. Alan Cox, must be excluded. Sprint, in its Motion to Exclude, seeks to exclude the opinions of Michele Riley, Comcast's expert on damages for infringement of the '870 patent. For the reasons that follow, both Motions are denied.

## II.    PROCEDURAL BACKGROUND

On February 17, 2012, Comcast filed a Complaint against Sprint alleging infringement of four of its patents, including U.S. Patent Number 6,885,870 ("the '870 patent").[1] Sprint filed an Answer and Counterclaims on May 14, 2012,[2] alleging infringement of seven of its patents, including the '907 patents.[3] The Court has jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1338.

---

[1] In addition to the '870 patent, Comcast alleged infringement of its U.S. Patents Numbers 7,684,391, 5,987,323, and 6,112,305.
[2] Sprint's counterclaims are permissive counterclaims asserted under Federal Rule of Civil Procedure 13(b) and are unrelated to Comcast's claims.
[3] In addition to the '907 patents, Sprint alleged infringement of its U.S. Patents Numbers 7,602,886, 7,043,241, 7,054,654, 6,727,916, and 6,965,666.

On June 6, 2012, Comcast filed a First Amended Complaint asserting claims for infringement of the '870 patent and three other patents.[4] Sprint filed an Amended Answer and Counterclaims on June 25, 2012, asserting infringement of the same seven patents. Both parties withdrew their claims with respect to several patents prior to claim construction.[5]

In January and February 2014, the Court conducted five days of *Markman* hearings, which included technology tutorials and oral argument on the five patents remaining in the case at that time. On August 15, 2014, the Court issued a Memorandum and Order construing the claim terms in dispute. *See Comcast Cable Commc'ns, LLC, et al. v. Sprint Commc'ns Co., LP, et al.* (*Comcast v. Sprint I*), 38 F. Supp. 3d 589 (E.D. Pa. 2014). Subsequently, Comcast withdrew all claims except those alleging infringement of the '870 patent and Sprint withdrew all claims except those alleging infringement of the '907 patents.

On August 5, 2015, following the completion of almost all discovery, the parties filed a Joint Motion to Stay in light of ongoing global settlement negotiations between Comcast and Sprint involving this case and litigation in other courts over claims for infringement of unrelated patents. The Court granted the Motion by Order dated August 13, 2015, and stayed the case for six months. Following the parties' report of the failure of the global settlement negotiations, the Court, by Order dated February 12, 2016, returned the case to the active docket and set a briefing schedule for motions for summary judgment, *Daubert* motions, and supplemental claim construction on the additional disputed terms in the '870 patent.

---

[4] In its First Amended Complaint, Comcast withdrew its claims for infringement of U.S. Patent Number 7,684,391 and asserted new claims for infringement of U.S. Patent Number 5,991,271.
[5] Comcast withdrew its claims with respect to U.S. Patents Numbers 6,112,305 and 5,991,271. Sprint withdrew its claims with respect to U.S. Patents Numbers 7,602,886, 7,043,241, 7,054,654, and 6,965,666.

Pursuant to the Order dated February 12, 2016, the parties filed Motions for Summary Judgment, *Daubert* Motions, and Supplemental Briefs on Claim Construction of the disputed terms of the '870 patent. Supplemental *Markman* hearings and oral argument on the pending Motions for Summary Judgment and *Daubert* Motions were held on June 22, 23, 24, and 29, 2016. In its Memorandum and Order of August 24, 2016, the Court decided all of the pending motions, excepting only the two *Daubert* motions at issue—Comcast's Motion to Exclude Testimony of Alan Cox and Sprint's Motion to Exclude the Expert Testimony of Michele Riley. For the reasons stated below, those Motions are denied.

### III.   DAMAGES EXPERTS REGARDING COMCAST'S '870 PATENT

The '870 patent, titled "Transferring of a Message," claims a method "for inquiring about information relating to a [wireless] terminal of a cellular network from the cellular network, from a messaging server external to the cellular network." '870 patent, at 2:45–48. The patent covers both text messaging ("short message service" or "SMS") and multimedia messaging ("multimedia messaging service" or "MMS") systems. The patent application was filed on February 22, 2001, and was issued on April 26, 2005. The inventor is Outi Aho, who assigned the patent to Nokia Mobile Phones, Ltd. ("Nokia"). On June 30, 2010, Comcast and Nokia entered into a Patent Purchase Agreement (hereinafter "Nokia-Comcast Agreement") wherein Comcast purchased 36 patents, including the '870 patent.

A.   Applicable Law

1.   *Federal Rule of Evidence 702 and* Daubert *Issues*[6]

Federal Rule of Evidence 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

---

[6] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

4

an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Faced with a proffer of expert scientific testimony . . . the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. This gatekeeping function extends beyond scientific testimony to testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). To determine the admissibility of expert testimony, the United States Court of Appeals for the Federal Circuit applies the law of the regional circuit. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1360 (Fed. Cir. 2010).

"Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)); *see also Daubert*, 509 U.S. at 590 ("the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability"). The party offering the expert opinion must prove each of these requirements by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999). Rule 702 has "a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). As such, the "rejection of expert testimony is the exception and not the rule." Fed. R. Evid. 702 advisory committee's note.

The parties' motions challenge only the reliability of the expert opinions in question. The reliability requirement "means that the expert's opinion must be based on the 'methods and

5

procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). The test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141–42. In determining whether the reliability requirement is met, courts examine the factors identified in *In re Paoli*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citing *In re Paoli*, 35 F.3d at 742 n.8). These factors are neither exhaustive nor applicable in every case. *Kannankeril*, 128 F.3d at 806–07.

Under the *Daubert* reliability requirement, parties "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Paoli*, 35 F.3d at 744. "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Mitchell*, 365 F.3d at 244 (citations and quotations omitted).

### 2.     *Damages in Patent Infringement Cases*

Damages in a patent infringement case shall be "no less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. "An exhaustive list of factors relevant to the determination of a reasonable royalty" is set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 612 F.2d 1353, 1357 (3d Cir. 1980); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("This court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry."). The *Georgia-Pacific* factors include, among others, "[t]he rates paid by the licensee for the use of other patents comparable to the patent in the suit," "[t]he portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer," and the result of a hypothetical negotiation to determine "the amount that a licensor . . . and a licensee . . . would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement." *Georgia-Pacific*, 318 F. Supp. at 1120. Any "hypothetical negotiation" would have occurred on the alleged date of first infringement—in this case, on or about April 26, 2005, the date the '870 patent was issued.

Establishing a reasonable royalty "is not an exact science," and "there may be more than one reliable method for estimating a reasonable royalty." *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1313–26 (Fed. Cir. 2010). Thus, the Federal Circuit rejects challenges to expert testimony when the parties disagree as to an expert's "conclusions, not [the expert's] methodology." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

        B.      <u>Comcast's Motion to Exclude Opinions of Dr. Alan Cox</u>

Comcast seeks to exclude part of the expert opinion of Sprint's expert, Dr. Alan Cox. Sprint offers Dr. Cox's opinion to show that a reasonable royalty for the '870 patent would be in the range of $300,000 to $1,500,000. Cox Report ¶¶ 101, 122. In support of that opinion, Dr. Cox relies primarily on the Nokia-Comcast Agreement, in which Comcast purchased the '870 patent. He corroborates his opinion by use of forward citation analysis and other agreements. Comcast challenges the reliability of Dr. Cox's use of (1) forward citation analysis and (2) "non-comparable agreements" to support his opinions. Comcast Mot. to Exclude at 13, 16. For the reasons that follow, the Court denies Comcast's Motion to Exclude Dr. Cox's opinions on both grounds.

                *1.*      *Forward Citation Analysis*

Forward citation analysis is a method of estimating the value of a particular patent based on the number of times the patent is cited by later patents. Comcast Mot. to Exclude, Ex. 19, Expert Report (Corrected) of Alan J. Cox in Connection With *Comcast Cable Communication et al. v. Sprint Communications Company L.P. et al.* (hereinafter "Cox Report") ¶ 103. Dr. Cox uses forward citation analysis to corroborate his conclusion regarding the reasonable royalty for the '870 patent. Cox Report ¶ 102. Citations are only a comparative indicator of value— "[p]atents in different technologies tend to be cited at different rates, and patents that are older tend to have more citations than patents that were issued more recently." Cox Report ¶ 105. Thus, to ascertain the relative value of the '870 patent, Dr. Cox compiled a pool of patents that are technologically similar to the '870 patent, based on International Patent Classification system

labels, and published within six months before and after publication of the '870 patent. Cox Report ¶ 106. Dr. Cox next determined how many times each patent in the resultant pool was cited by later patents. Cox Report ¶ 107. Using this data, Dr. Cox determined the "percentile ranking" of the '870 patent—that is, "the percentage of categorically similar patents that had less forward citations" than the patent in question. Cox Report ¶ 107.

Dr. Cox performed the same analysis for each of the U.S. granted patents that were part of the Nokia-Comcast Agreement, under which Comcast purchased 36 patents from Nokia, including the '870 patent. Cox Report ¶ 108. Utilizing this process, Dr. Cox determined the percentile ranking of each patent in the Nokia-Comcast Agreement, based on which he approximated the value of each patent purchased under that Agreement relative to the other patents covered by the Agreement. Cox Report ¶¶ 108–109. This process resulted in Dr. Cox's opinion that the '870 patent "represent[ed] 2.5 percent of the total value of all patents in the Nokia-Comcast [Agreement." *Id.* ¶ 109. Dr. Cox then multiplied that 2.5 percent by the total purchase price of the Nokia-Comcast Agreement ($600,000) to estimate the value of the '870 patent at $15,000. Dr. Cox uses this value to "corroborate" his overall opinion on the value of a reasonable royalty for the '870 patent. Cox Report ¶ 102.

Comcast first argues that the Court should exclude Dr. Cox's reliance upon forward citation analysis altogether because that method has been "discredited" and therefore fails *Daubert*'s reliability requirement. Comcast Mot. to Exclude at 13–14. In advancing this argument, Comcast relies on a recent trial court decision which it claims rejected the forward citation method as unreliable under *Daubert*. Comcast Mot. to Exclude at 14; *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 4272870 (N.D. Cal. July 14, 2015). But *Finjan* does not reject forward citation analysis outright—rather, that case recognizes that "a

9

qualitative analysis of asserted patents based upon forward citations may be probative of a reasonable royalty in some instances." *Finjan*, 2015 WL 4272870 at *8. Comcast also points to a recent paper published by researchers at the University of Pennsylvania in support of its argument. Comcast Mot. to Exclude at 14, Ex. 21 ("Penn Paper").[7]

The authors of the Penn Paper conclude some of the patents with the highest lifetime revenues have fewer citations than patents with median revenues. Penn Paper at 1. However, the forward citation method of analysis has been recognized in the academic literature as reliable since the 1990s.[8] Indeed, one meta-analysis of published research on forward citation analysis, which included the Penn Paper, found "forward citation intensity is, in fact, correlated with economic value."[9] In short, courts have not rejected forward citation analysis outright. This Court determines that a single academic paper—the Penn Paper—is not sufficient to rebut decades of literature supporting forward citation analysis.

Comcast argues in the alternative that, even if forward citation analysis is sometimes reliable, Dr. Cox's use of forward citation analysis should be excluded in this case because he did not reliably apply the method. Comcast Mot. to Exclude at 15. In particular, Comcast notes that Dr. Cox only counted citations to the fully published patent; he did not consider citations to the patent application or the patent's international counterparts. That, claims Comcast, renders

---

[7] David S. Abrams, Ufuk Akeigit, and Jillian Popadak, *Patent Value and Citations: Creative Destruction or Strategic Disruption?*, U. Penn. (2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2351809.

[8] *See*, *e.g.*, Dietmar Harhoff, Frederic Scherer, and Katrin Vopel, *Citation, family size, opposition and the value of patent rights*, Research Policy, 1596 (2002); Bronwyn H. Hall, Adam Jaffe, and Manuel Trajtenberg, *Market Value and Patent Citations*, RAND Journal of Economics 36 (1) (Spring 2005); Manuel Trajtenberg, *A Penny for Your Quotes: Patent Citations and the Value of Innovations*, RAND Journal of Economics 21 (1) (Spring 1990).

[9] Adam B. Jaffe and Gaétan de Rassenfosse, *Patent Citation Data in Social Science Research: Overview and Best Practices*, Nat'l Bureau of Econ. Research Working Paper Series (2016), *available at* http://www.nber.org/papers/w21868.

Dr. Cox's opinion unreliable. Comcast Mot. to Exclude at 15. The Court disagrees. Dr. Cox's method of counting citations to the published patent itself, and not citations to the application or international counterparts, is supported by the academic literature. Penn Paper at 1 n.3 ("Forward citations is the number of citations received *by a particular patent* by subsequent patents.") (emphasis added); *see also Better Mouse Co., LLC v. SteelSeries ApS*, No. 2:14-CV-198-RSP, 2016 WL 3611528, at *2 (E.D. Tex. Jan. 5, 2016) (finding the expert "conducted his analysis in a manner that is consistent with the academic literature" by counting only citations to the published patent in question).

Comcast cites two cases in support of its argument—*Finjan* and *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 877125 *2 (N.D. Cal. Mar. 15, 2012). However, both of these cases are distinguishable. In *Finjan*, the expert was excluded because he failed to "tie the methodology to the facts of the case" and failed to consider "potential problems" with his method of forward-citation analysis. *Finjan*, 2015 WL 4272870 at *8. For example, "many of the [p]laintiff's patents reference one another," and the court observed that patent value should not be based on "the number of times an inventor cites himself in prosecuting related patents." *Id*. In contrast, Dr. Cox tied his analysis to the facts in this case by adjusting the forward citation method to account for the age and category of the '870 patent and the other patents covered by the Nokia-Comcast Agreement. Cox Report ¶¶ 105–110. And in *Oracle*, the District Court excluded expert testimony based on forward citation analysis because the expert failed to count citations to a patent's two predecessor patents. *Oracle* at *2. But on this issue Comcast does not argue that Dr. Cox ignored any predecessors of the '870 patent. Thus, in contrast to *Finjan* and *Oracle*, Dr. Cox's individualized analysis is sufficiently "tied to the facts in the case," and his method is supported by the literature. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283,

1295 (Fed. Cir. 2015). Dr. Cox's use of forward citation analysis in his expert opinion is therefore reliable under *Daubert*.

                2.        *Comparison to the Sprint-Celltrace Agreement*

To corroborate his damages opinion, Dr. Cox considered a 2010 agreement between Sprint and Celltrace (hereinafter "Sprint-Celltrace Agreement"), granting Sprint a perpetual license to use the technologies encompassed in three patents owned by Celltrace in exchange for a lump sum payment of $1.5 million. Cox Report ¶ 73. One of these patents, U.S Patent No. 6,011,976 ("the '976 patent"), shares an IPC code with the '870 patent, meaning it is technologically similar. Cox Report ¶ 122. According to Dr. Cox, that similar patent could therefore account for an equal portion of the total price, $500,000, or, though less likely, the full $1.5 million price. Cox Report ¶ 74. Dr. Cox conducted a forward citation analysis of these three patents, and using their comparative value, he approximated the portion of the Sprint-Celltrace Agreement purchase price attributable to the '976 patent at $1,000,000. Cox Report ¶ 122. Dr. Cox states that this corroborates his overall opinion that a hypothetical negotiation for a license for the '870 patent would be in the range of $300,000 to $1,500,000. Cox Report ¶¶ 101, 122.

Comcast argues that Dr. Cox's use of the Sprint-Celltrace Agreement is not reliable because the circumstances of the Sprint-Celltrace Agreement are not comparable to those of the '870 patent. Comcast Mot. to Exclude at 17. In support of this argument, Comcast states that the United States Court of Appeals for the Federal Circuit has held that experts may consider settlement agreements only when they constitute "the most reliable license in the record." *Id*. (citing *LaserDynamics, Inc. v. Quanta Comput. Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012)). But Comcast's interpretation of *LaserDynamics* strains the Federal Circuit's decision. In *LaserDynamics*, the Federal Circuit did not limit experts to consideration of "the most reliable

12

license in the record." *LaserDynamics* at 77–78. Rather, that Court reversed the trial court because it admitted into evidence "the least reliable license [in the record] by a wide margin" where there were twenty-nine other licenses involving the patent-in-suit, many of which were "far more reliable." *Id*.

Most importantly, the decision in *LaserDynamics* concerned the admissibility <u>at trial</u> of the settlement agreement under Federal Rule of Evidence 403. *LaserDynamics*, 694 F.3d at 77. Thus, even if the Sprint-Celltrace Agreement were itself inadmissible under *LaserDynamics*, Federal Rule of Evidence 703 permits an expert such as Dr. Cox to rely on inadmissible evidence if experts in the field would reasonably rely on such evidence.

In contrast to the excluded license in *LaserDynamics*, the Sprint-Celltrace Agreement is not the "least reliable license" in the record, and the record is not replete with "far more reliable" licenses. *LaserDynamics* at 77–78. Rather, there are many similarities between the Sprint-Celltrace Agreement and the hypothetical negotiation—for example, the patents are technologically comparable; that Agreement involved a lump-sum payment, and Sprint has a preference for such payments; and both involve a non-exclusive license agreement. Cox Report ¶¶ 73–80. And although the comparison is not perfect, Dr. Cox acknowledges and "account[s] for" the differences. Cox Report ¶¶ 47–48, 81–87.

For example, Comcast notes that in negotiating the Sprint-Celltrace Agreement, Sprint argued invalidity and noninfringement, whereas the hypothetical negotiation requires Dr. Cox to assume the negotiating parties consider the patent at issue to be valid and infringed. Comcast Mot. at 18; Cox Report ¶ 85. Comcast argues that the Sprint-Celltrace Agreement is therefore a "non-comparable agreement." Comcast Mot. at 17. But by concluding that the hypothetical negotiation would result in "the upper range" of the Sprint-Celltrace Agreement, Dr. Cox has, in

13

effect, accounted for this difference. Cox Report ¶ 85. This conclusion is based on the fact that, because Sprint argued invalidity and noninfringement in negotiating the Sprint-Celltrace Agreement, Sprint was likely motivated to seek a lower license price than a reasonable licensee who, as in the hypothetical negotiation, admitted validity and infringement. Therefore, a reasonable licensee in the hypothetical negotiation would be less motivated to negotiate a lower price than Sprint was in the Sprint-Celltrace Agreement. Because a reasonable licensee would be less motivated to seek a lower license price, Dr. Cox concludes that such a licensee "would have negotiated a price in the upper range of the $500,000 - $1,500,000 spread" of the Sprint-Celltrace Agreement. *Id*.

Whether the Sprint-Celltrace Agreement is "sufficiently comparable such that [Dr. Cox's] calculation is a reasonable royalty goes to the weight of the [expert testimony], not its admissibility" under *Daubert* and Federal Rule of Evidence 702. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014) (overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)). The Court concludes that Dr. Cox's use of the Sprint-Celltrace Agreement is therefore reliable.

### 3. *Comparison to the Comcast Agreements*

Finally, Dr. Cox cites three Comcast patent licensing agreements to support his expert opinion that Comcast has a preference for lump-sum payments. Cox Rep. ¶ 123. In 2014, Comcast entered into two license agreements with Allied Security Trust and one with RPX Corporation (hereinafter "Comcast Licensing Agreements"). *Id*. Dr. Cox cites the Comcast Licensing Agreements for the sole purpose of illustrating that Comcast has a "historical practice of lump-sum licensing." Cox Report ¶ 123. Dr. Cox argues that this, in turn, supports his opinion that Comcast would prefer a lump sum in the hypothetical negotiation. *Id*. Comcast argues that

the Comcast Licensing Agreements are not comparable to the hypothetical negotiation, and therefore Dr. Cox's reliance on the Comcast Licensing Agreements, even for this limited purpose, is not reliable. Comcast Mot. to Exclude at 16.

As with the Sprint-Celltrace Agreement, the Court is not determining the admissibility of the Comcast Licensing Agreements; and in any event, Sprint states that it will not seek to have the Comcast Licensing Agreements admitted into evidence. Sprint Resp. at 13 ("Dr. Cox will only discuss [the Comcast Licensing Agreements] to show that Comcast historically has preferred lump sum royalties."). Rather, the Court must only determine whether, under Federal Rule of Evidence 703, Dr. Cox may properly consider the Comcast Licensing Agreements to support his opinion that Comcast has a preference for lump sum payments. The Federal Circuit has recognized that "the patentee's usual licensing approach should be considered in assessing a reasonable royalty." *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1568 (Fed. Cir. 1988). Although *Dart Industries* did not decide a *Daubert* issue, it supports a determination that a damages expert may consider the usual licensing approach of a party to the hypothetical negotiation in reaching his or her conclusion. This Court concludes that Dr. Cox's use of the Comcast Licensing Agreements to support Comcast's claimed preference for lump sum royalty payments is reliable.

For these reasons, Comcast's Motion to Exclude the opinion testimony of Dr. Cox with respect to the forward citation method, the Sprint-Celltrace Agreement, and the Comcast Licensing Agreements is denied without prejudice to Comcast's right to object at trial to any questions, testimony, or other evidence deemed inadmissible.

C.      Sprint's Motion to Exclude Opinions of Michele Riley

Sprint seeks to exclude the expert testimony of Comcast's damages expert, Michele Riley. Comcast introduces Ms. Riley's opinion to show the value of a reasonable royalty for the '870 patent, which she estimates to be $123,352,162. Sprint Mot. to Exclude, Ex. B, Expert Report on Damages by Michele M. Riley (hereinafter "Riley Report") ¶ 11. Sprint challenges Ms. Riley's use of apportionment based on counting steps as unreliable, arguing (1) apportionment based on counting steps is *per se* unreliable; and, in the alternative, (2) Ms. Riley's use of the step-counting process of Dr. Robert Akl, Comcast's technical expert, is not reliable. Sprint Mot. to Exclude at 5–6. For the reasons that follow, Sprint's Motion to Exclude Ms. Riley's testimony is denied.

*1.      Apportionment Based on Counting Steps*

"Damages awarded for patent infringement must reflect the value attributable to the infringing features of the product and no more. This principle—apportionment—is the governing rule where multicomponent products are involved." *Commonwealth Sci. and Indus. Research Org. v. Cisco Sys. Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015). Because of the complexity of the '870 patent and Sprint's alleged infringing process, Ms. Riley uses apportionment as part of her reasonable royalty determination. Comcast alleges that several of Sprint's SMS and MMS[10] systems infringe various claims of the '870 patent. Therefore, to calculate a reasonable royalty, Ms. Riley first calculated the profitability of Sprint's SMS and MMS systems. Riley Report ¶¶ 122–133. Ms. Riley then referred to Dr. Akl's report in which he "separated the overall process of each specific messaging call flow into steps" based on infringing and non-infringing steps. Sprint Mot. to Exclude at 7–8. Finally, using Dr. Akl's steps, Ms. Riley apportioned the share of

---

[10] These terms are explained on page four, *supra*.

16

Comcast's SMS and MMS profitability that can be attributed to the alleged infringement of the '870 patent. Riley Report ¶¶ 134–135.

Sprint argues that the Court should prohibit Ms. Riley from using apportionment based on counting steps as unreliable under *Daubert* because courts have rejected similar methods. Sprint Mot. to Exclude at 12. For example, Sprint notes that the Federal Circuit has observed that apportionment "cannot be reduced to a mere counting of lines of code." *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009). But that observation is taken out of context—the *Lucent Tech.* court goes on to observe that "the glaring imbalance between infringing and non-infringing features must impact the analysis of how much profit can properly be attributed" to the infringing technology. *Id*. The *Lucent* court does not state that counting lines of code is *per se* unreliable; rather, it recognizes that such simplistic apportionment alone is not probative of value.

Sprint cites three other cases for the proposition that an expert's opinion is not reliable when the expert apportions damages based on the features in the patent at issue, as Ms. Riley did in this case. Sprint Mot. to Exclude at 12–13; *Stragent, LLC v. Intel Corp.*, 2014 WL 1389304, at *3 (E.D. Tex. Mar. 6, 2014); *Good Tech. Corp. v. MobileIron, Inc.*, 2015 WL 4090431 (N.D. Cal. July 5, 2015); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 775 F. Supp. 544, 571–72 (E.D.N.Y. 1991). These cases are no more persuasive than *Lucent*. In *Stragent*, the court focused on the fact that the expert's apportionment relied on "arbitrary assumptions that have no basis in the facts of [the] case." *Stragent* at *4. In *Good Tech*, the court excluded the expert's opinion because the expert had conducted "no investigation into whether any of the criteria is more important than others, or how strongly each criterion is tied to the patents." *Good Tech* at *7. And *Computer Associates* mentions the counting of lines of code only in passing. None of the

17

cases support Sprint's assertion that counting components or features is *per se* unreliable, and this Court declines to so hold.

### 2.     *Ms. Riley's Use of Dr. Akl's Expertise*

Sprint argues in the alternative that, even if apportionment is not *per se* unreliable, Ms. Riley's apportionment opinion should be excluded because she improperly relied upon the allegedly flawed step-counting analysis of Dr. Akl. Sprint Mot. to Exclude at 7, 15. Ms. Riley's apportionment is based in part on a step-counting process outlined in Dr. Akl's expert opinion. Riley Report ¶ 135; Riley Report Exh. 15; Sprint Mot. to Exclude, Ex. C, Expert Report of Dr. Robert Akl, D.Sc., Regarding Infringement of U.S. Patent No. 6,885,870 ¶¶ 194–286 (hereinafter "Akl Report"). Specifically, Sprint argues that Ms. Riley improperly relied on Dr. Akl's opinion because his method of step-counting process "manipulated" Sprint's call flow diagrams by combining certain steps into a single step and omitting certain steps so as to reduce the number of non-infringing steps; and simultaneously adding steps to increase the number of infringing steps. Sprint Mot. to Exclude at 7–11, 16. In addition, Sprint claims that Ms. Riley's opinion is not reliable because she improperly considered Dr. Akl's opinion which gave equal weight, and therefore equal value, to each step that he identified. Sprint Mot. to Exclude at 11–12.

Sprint cites a case involving Sprint and Comcast in a different court, in which the court struck the opinion of Sprint's damages expert because it was based on a technical expert's counting of functions. *Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*, No. CV 12-1013-RGA, 2015 WL 410342, at *3 (D. Del. Jan. 29, 2015). But in that case, the damages expert relied upon a technical expert who "fail[ed] to provide any scientific methodology that [could] be relied upon for how the patented features add value" to the infringing technology. *Id*. at *3. In addition, the technical expert's opinion on which the damages expert relied in that case was itself

excluded. *Id*. Dr. Akl's opinion on this issue has not been excluded[11]; and, in any event, in contrast to *Sprint Communications*, Dr. Akl has adequately supported and explained in detail the reasoning behind each part of his step-counting process on which Ms. Riley relied. Dr. Akl Report ¶¶ 194–286.

The Court notes that "there may be more than one reliable method for estimating a reasonable royalty." *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1313–26 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011). Sprint has presented one method, and Ms. Riley, relying on Dr. Akl's opinion, has proposed another. The Court concludes that Ms. Riley's use of Dr. Akl's opinion is reliable. For these reasons, Sprint's Motion to Exclude the opinion testimony of Ms. Riley with respect to damages as to the '870 patent is denied without prejudice to Sprint's right to object at trial to any questions, testimony, or other evidence deemed inadmissible.

An appropriate order follows.

---

[11] On October 12, 2016, Sprint filed a Motion *in Limine* as to Dr. Akl. Doc. No. 322. Sprint argued in the Motion that Dr. Akl's testimony should be excluded because it is premised on Comcast's narrow construction of the term "cellular network," which the Court rejected. That Motion was granted by Memorandum and Order dated November 8, 2016, to the extent that Dr. Akl based his opinions on Comcast's construction of the term cellular network, and denied in all other respects. That ruling does not impact the issues presented in the present Motion.