IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

COMCAST CABLE              : CIVIL NO. 12-859
COMMUNICATIONS, LLC,       :
et al.,                    :
                Plaintiff  :
                           :
                           :
                           :
                           :
      v.                   :
                           :
                           :
                           :
                           :
                           :
SPRINT COMMUNICATIONS      : Philadelphia, Pennsylvania
COMPANY L.P., et al.,      : January 30, 2017
                Defendant  : 9:44 a.m.

- - -

TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 1
BEFORE THE HONORABLE JAN E. DUBOIS
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104

2

APPEARANCES:          (Continued)

For the Defendant:    DAVID E. FINKELSON, ESQUIRE
                      BRIAN C. RIOPELLE, ESQUIRE
                      McGuire Woods, LLP
                      Gateway Plaza
                      800 East Canal Street
                      Richmond, VA 23219

                      COLLEEN H. SIMPSON, ESQUIRE
                      Harkins Cunningham, LLP
                      4000 Two Commerce Square
                      2001 Market Street
                      Philadelphia, PA 19103

                            - - -

Audio Operator:       Michael Cosgrove

Transcribed By:       Michael T. Keating

                            - - -

        Proceedings recorded by electronic sound
recording; transcript produced by computer-aided
transcription service.

                            - - -

1          (The following was heard in open court at

2    9:44 a.m.)

3          THE COURT:  Good morning, everyone.

4          ALL:  Good morning, Your Honor.

5          THE COURT:  Please be seated.

6          (Pause in proceedings.)

7          THE COURT:  We have several issues to

8    address this morning.  The first is Sprint's recently

9    filed motion, the motion filed Friday.  But there are

10   some preliminary matters that I think we can address

11   and dispose of rather quickly, so let's start with

12   those.

13          First, I call the case of Comcast -- now

14   we're starting to abbreviate -- Cable Communications,

15   LLC, versus Sprint Spectrum L.P., civil action number

16   12-859.  I have an order, a proposed order,

17   reflecting the caption change.  I'm going to

18   distribute it.  Ian, why don't you get this?  The

19   two -- yeah.  No, we're going -- I think we can --

20   we'll give you three or four, two each.  It basically

21   follows what is set forth in Mr. Harkins' letter.

22   And the question is is that appropriate?

23          MR. HANGLEY:  It is, Your Honor.

24          THE COURT:  There was a question though --

25   I'll let Mr. Finkelson finish reading.

4

1          MR. FINKELSON:  Thank you, Your Honor.

2          (Pause in proceedings.)

3          MR. FINKELSON:  Sprint has no objection.

4          THE COURT:  Okay, fine.  In terms of the

5     second page, do we want the -- what, in essence, is

6     the counterclaim in the caption for now?  It

7     certainly is still in the case because there's been

8     no appeal.  It's interlocutory.  But the question is

9     whether we cut it off after Comcast Cable

10    Communications, LLC, Plaintiff, versus Sprint

11    Spectrum L.P., Defendant.

12         MR. HANGLEY:  I would remove it.

13         MR. FINKELSON:  Your Honor, we would submit

14    that it should stay in there for the exact reasons

15    Your Honor just mentioned.  It's still in the case

16    and --

17         THE COURT:  Well, I think -- well, I don't

18    want to keep --

19         MR. HANGLEY:  We will stipulate that

20    removing it has no effect, of course, on the appeal.

21         THE COURT:  I really think we're not going

22    to trial in that part of the case and so I'm going to

23    remove it.  I think that's the best thing to do.  It

24    still is in the case for purposes of appeal.  So I'll

25    issue that order deleting the reference to the

5

1   counterclaim.

2           MR. HANGLEY:  Thank you for bringing that

3   to our attention.

4           THE COURT:  There's a second --

5           MR. HANGLEY:  I hadn't even noticed that,

6   Your Honor.

7           THE COURT:  There's a second order that we

8   discussed on Friday relating to joint infringement.

9   I thought that was a done deal until Mr. Hangley

10  raised a question, and I'll hear from you now.

11          MR. HANGLEY:  Certainly, Your Honor.  As I

12  think I made clear to Mr. Finkelson and I hope to the

13  Court, it is our intention that those claims that we

14  talked about, the Syniverse claim, be dismissed with

15  prejudice.  What we don't know because Sprint has

16  made clear to us and to the Court that it is going to

17  introduce evidence regarding Syniverse, we don't know

18  what they're going to do with that evidence, and we

19  think there is no harm in asking the Court to hold

20  onto that order of dismissal with the understanding

21  that it will be entered at the end of the case, which

22  in the event something unanticipated happens, if

23  Sprint does something -- and I don't know what it

24  would be -- that makes it pertinent to the case, we

25  will not have to go through the business of reopening

6

1    the case and having all of the necessary follow up.

2         Again, I stress that what we want, what

3    Comcast wants in accordance with the agreement we

4    made by way of streamlining the case, is ultimately

5    to dismiss the case with prejudice, as against -- as

6    involved the Syniverse situation.

7         THE COURT:  Comcast doesn't intend to offer

8    any evidence of Syniverse?  That's a question.

9         MR. HANGLEY:  We do not.

10        THE COURT:  Fine.  Thank you.  Mr.

11   Finkelson?

12        MR. FINKELSON:  Good morning, Your Honor.

13   Thank you.

14        THE COURT:  Good morning.

15        MR. FINKELSON:  As Your Honor knows, we

16   painfully took steps to reach agreement on the

17   Syniverse issue.  And from Sprint's perspective, we

18   don't see what the purpose of the reservation is for.

19   We're proceeding to trial in this case.  There will

20   be evidence of Syniverse.  We certainly don't want

21   that evidence coming in with the threat of a

22   potential claim against Syniverse still hanging over

23   our heads.  I think Your Honor's order appropriately

24   captures the agreement of the parties.  The claims

25   should be dismissed with prejudice at this point in

1    time.

2          Your Honor has indicated that you will

3    provide the jury with a limiting instruction at the

4    appropriate time which will make clear to them that

5    the Syniverse -- issue of Syniverse infringement is

6    not theirs to decide.  And from Sprint's perspective,

7    that is the appropriate way to deal with the case.

8          THE COURT:  Well, except that it doesn't

9    provide a remedy, as you phrased it, if Sprint

10   introduces evidence that undoes this agreement.  A

11   lot of what we're going to address this morning

12   before we get to picking a jury is, in my judgment,

13   peripheral.  But it all turns on Sprint's trial

14   strategy.  I don't know what it is.  And I'm

15   referring, of course, to the pending motion regarding

16   Sprint's effort to preclude Comcast from introducing

17   any evidence of its patent acquisition policy.

18         MR. FINKELSON:  And I'm happy to address

19   that motion as well, Your Honor, at the appropriate

20   time.

21         THE COURT:  No, we're --

22         MR. FINKELSON:  But with --

23         THE COURT:  We will, and --

24         MR. FINKELSON:  -- respect to Syniverse, it

25   stems from a claim that Comcast brought in this case.

8

1     They brought an allegation against Syniverse.  They

2 have agreed to drop that allegation.  It's really an

3 issue as to how they're going to put on their case,

4 and they've agreed not to put forward proof that

5 Syniverse is infringing.  They have agreed not to

6 allege that Syniverse --

7           THE COURT:  All right.

8           MR. FINKELSON:  -- isn't infringing.

9           THE COURT:  Well, then the only person --

10 the only side of the case that can undo that is

11 Sprint.  I think what I'm going to do, Mr. Hangley,

12 is sign the order subject to what I'm -- what I'm

13 about to say, and that is that if there is evidence

14 with respect to Syniverse that you think should --

15           MR. HANGLEY:  Relieve me.

16           THE COURT:  -- should grant -- that should

17 lead to the granting of some relief for Comcast, I'll

18 certainly consider it.

19           MR. HANGLEY:  Thank you very much, Your

20 Honor.

21           THE COURT:  And so we'll do that.  I don't

22 have a loose copy of the proposed Syniverse order.

23 It was sent to counsel on -- I'm just looking.

24           MR. HANGLEY:  I think it was on Friday.

25           THE COURT:  I think it was Friday.  But my

 1   email chain doesn't have a date.  I want a copy of

 2   that order that's dated today.  I'll sign it.  And I

 3   want a copy of the order on the caption change with

 4   the -- what we'll do is eliminate from the caption of

 5   the case going forward, at least for purposes of the

 6   trial, reference to Sprint Spectrum as a plaintiff.

 7   All right, that's quickly two things.

 8              Secondly -- thirdly, with relate -- with

 9   regard to the anticipation issue -- and I think this

10   was my doing and I just want to be sure that I'm

11   right.  We've inserted the appropriate date for

12   anticipation as December 23rd, 1999.  And I think

13   that was -- that's the court priority date of the 870

14   patent.  I need help on that issue.  What is it?

15              MR. HANGLEY:  I'm told that's correct, Your

16   Honor.

17              THE COURT:  Yes, but what is it?

18              MR. HANGLEY:  Oh.

19              MR. RIOPELLE:  Do you have the jury -- it's

20   in the jury instructions.

21              MR. HANGLEY:  It's in the jury

22   instructions.

23              MR. RIOPELLE:  Do you have it?

24              THE COURT:  You don't know that, Mr.

25   Hangley?

10

1          MR. HANGLEY:  No.

2          (Pause in proceedings.)

3          MR. RIOPELLE:  Yes, December 23rd, 1999.

4          THE COURT:  Well, yes, I know that.  I got

5  the date.

6          MR. HANGLEY:  I believe it was December

7  23rd --

8          MR. RIOPELLE:  Yes, I was --

9          MR. HANGLEY:  -- 1999, Your Honor.

10          MR. RIOPELLE:  I was confirming it from --

11          MR. HOFFMAN:  -- from the jury instructions

12  that you issued, Your Honor.

13          THE COURT:  Yes.

14          MR. HANGLEY:  Now I remember.

15          THE COURT:  And I think I got it.  It was a

16  date I picked out of the Federal Circuit Bar

17  Association instructions, but I'm not sure and I

18  don't have it marked.  I'm not sure what it is.  What

19  is the priority date?  Is that the date when Nokia

20  first applied for the -- for the patent abroad?

21          MR. HANGLEY:  Yes.

22          MR. FINKELSON:  Yes, Your Honor.

23          THE COURT:  Okay.  Good.  And now we'll

24  address the issue relating to the motion.  I refer to

25  the motion that Sprint filed on Friday, motion to

11

1  exclude evidence of Comcast patent acquisition

2  policies.  Mr. Finkelson?

3          MR. FINKELSON:  Thank you, Your Honor.  As

4  Your Honor has noted, Sprint has filed a motion to

5  exclude evidence of Comcast patent acquisition

6  policies, and this was really tied, Your Honor, at

7  least from a 402 and 403 perspective, to the issue of

8  Your Honor's enforcement of the joint stipulation

9  between the parties.

10          THE COURT:  Except that this issue has been

11  in the case from the very beginning, and I went

12  through all of the documents that have been filed,

13  starting with the motion to compel that Sprint filed

14  in December of 2014 and all of the motions in limine,

15  even the motions that sought to take out of the case

16  the cross licenses with AT&T, Verizon, and IBM.  And

17  there was no reference at all to the Comcast

18  acquisition -- patent acquisition policy.  The first

19  reference was in the motion filed on Friday, the

20  27th.  Now, correct me if I'm wrong, but that's my

21  read of the documents that have been submitted to me.

22          MR. FINKELSON:  I reviewed those documents

23  again, Your Honor, over the weekend and there is no

24  mention in those documents of a general patent

25  acquisition policy.

12

1          THE COURT:  Okay.

2          MR. FINKELSON:  The reason for that is

3    because we have been focused on the specific issues

4    as it relates to the acquisition of the 870 patent,

5    as reflected in the -- in the motion of limine we

6    filed with respect to that.

7          THE COURT:  Except that as early as

8    January, I think it was 6th, when I came up with the

9    alternative -- there was a pending motion in limine

10   that I ruled on finally.  But at that time, January

11   6th, there was a motion in limine, and that's when I

12   came up with the alternative proposal that Comcast

13   not call the two witnesses who had been in the case,

14   and instead, pick a third witness, a non-lawyer, and

15   have him testify as to the patent acquisition policy.

16         MR. FINKELSON:  You did, Your Honor.  You

17   came up with -- the concept of general patent

18   acquisition policy and testimony about it I think was

19   first put into focus by Your Honor's alternative,

20   allowing Comcast to put forward Mr. Finnegan, who had

21   not previously been on their witness list for this

22   case.  And they put forward Mr. Finnegan, and it's

23   the statements that Mr. Finnegan made in his

24   deposition with respect to what the patent

25   acquisition policy is that raised the red flags for

1   us as to how that ties in to and might, as we noted

2   in our brief, be an end run around to the same result

3   that Your Honor --

4           THE COURT:  Well, it can only be an end run

5   if we get into the issue, and it's tangential.  But,

6   conceivably, it can only be an end run if the patent

7   acquisition policy focuses on value.  Is that what

8   you're challenging?

9           MR. FINKELSON:  I think if the patent

10  acquisition policy focuses on value, it would

11  conceivably be an end run.  And just to be more -- I

12  think Your Honor has properly captured it broadly,

13  but just so you know why we've raised the motion,

14  they put forward Mr. Finnegan on patent acquisition

15  policy, as Your Honor suggested, and he's now their

16  lead witness at trial.  He's their number one

17  witness.  And when we asked him at the deposition

18  what is that policy, that general patent acquisition

19  policy -- and this is in our papers -- he said,

20  "General patent acquisition policy, which was to

21  acquire high quality, litigation grade patents."  And

22  that language looked awfully similar to us with what

23  Mr. Finnegan or nobody else at Comcast is allowed to

24  say, specific to the 870.  And that was the concern,

25  that if Mr. Finnegan can come in and in a general

14

1      statement basically say all we do is acquire high

2      quality, litigation grade patents, then to it, the

3      870 patent was one of those and that's what they're

4      not allowed to say under the stipulation.  That's

5      what caused our concern and prompted --

6                THE COURT:  Have you read --

7                MR. FINKELSON:  -- our motion.

8                THE COURT:  -- I'm sure you have, the

9      submission -- I received it this morning -- from Mr.

10     Hangley, his letter of January 29th, 2017, which

11     accompanied his response, Comcast opposition to

12     Sprint's motion to exclude evidence of the Comcast

13     patent acquisition policy?  You've read it?

14               MR. FINKELSON:  I have, Your Honor.

15               THE COURT:  The block quote on page two, is

16     there anything problematic about that block quote?

17     This is a quote of the testimony previously given by

18     David Marcus.

19               (Pause in proceedings.)

20               MR. FINKELSON:  Subject to the statements

21     we have previously made to Your Honor both with

22     respect to Mr. Marcus and Mr. Finnegan as it relates

23     to privilege issues, which I'm not going to get into

24     today -- I know that we're done with that.  But

25     subject to the comments we've made about Mr. Marcus

1    using this testimony in the way we thought he did and

2    was at the deposition, the substance of the

3    paragraphs, to answer Your Honor's question, Sprint

4    would not object -- provided there's an appropriate

5    limiting instruction, which Your Honor noted on the

6    record last week, we would not object --

7              THE COURT:  You know --

8              MR. FINKELSON:  -- to the substance of

9    this.

10             THE COURT:  You know, there's another way

11   to handle this and I thought of it this morning.

12   Comcast has choices now.  One is to anticipate

13   Sprint's arguments and put in some of this evidence

14   in its case in chief.  That presents a myriad of

15   problems because Comcast doesn't know what Sprint is

16   going to say.  The other is to wait and see how I

17   rule on what Sprint has to offer on the subject,

18   keeping in mind that they might -- I think Mr.

19   Hangley knows where I'm going -- keeping in mind that

20   Sprint might open the door to a more broad Comcast

21   response and to handle it in rebuttal.  That would

22   really eliminate the majority of the problems.

23             I have some guidelines though, and the

24   guidelines would be that because I've taken the value

25   of the 870 patent, high value, litigation worthy

1    description of the 870 patent, I think that language

2    should go out of the patent acquisition policy

3    testimony whether it is offered in Comcast's case in

4    chief or in rebuttal.

5           MR. FINKELSON:  We would agree that that

6    language should come out regardless of --

7           THE COURT:  I'm sure you would

8           MR. FINKELSON:  Well, Your Honor, we --

9           THE COURT:  Thank you.

10          MR. FINKELSON:  -- do -- in fairness, we do

11   it because it all does -- that stipulation and

12   language all does stem out of the broader dispute

13   that we tried to resolve that way.

14          THE COURT:  Except that you sat on your

15   hands for over a month.  This all was in the case via

16   Dellinger and Marcus I think years ago, and it wasn't

17   surfaced as an issue for me until Friday, January

18   27th, eve of trial.  But we can make this a short

19   argument.  Do you agree to that, Mr. Hangley?

20          MR. HANGLEY:  No.

21          (Pause in proceedings.)

22          MR. HANGLEY:  Your Honor, we are -- let me

23   tell you what the patent policy -- the patent

24   acquisition policy evidence is as I contemplated

25   coming in.  I think we've talked about it

1    (indiscernible).  It's no secret.  It is that

2    Comcast, when it found itself on the brink of

3    entering into new fields and expanding and knowing

4    that people in other fields were expanding into

5    Comcast's fields, so that the what we call

6    convergence in the area might occur, was being and

7    worried about being approached by people using their

8    own patent portfolios as weapons to keep Comcast out

9    of the business or to extract money from Comcast.

10           The laity, the lay people at Comcast who

11   were hired to do this sort of thing, the non-lawyers,

12   Finnegan, Dellinger -- Finnegan developed a patent

13   acquisition policy, the aim of which was to -- not

14   only to harvest patents within Comcast in the areas

15   where it would naturally invent them because this is

16   what they do -- they do video and things like that --

17   but also to bring -- to acquire patents out in the

18   marketplace to allied fields so that if someone comes

19   knocking at the door brandishing their patents, you

20   can reach into your drawer and you can see gee, I

21   have some patents too in your field and I hope we can

22   have a civil conversation here and try to work things

23   out between us, which --

24           THE COURT:  Well, that patent strategy does

25   not trigger what is of concern to me and I think is

1    Sprint's primary aim in keeping this evidence out,

2    and that is high quality, litigation worthy.

3             MR. HANGLEY:  Yeah, not --

4             THE COURT:  And the reason why I'm troubled

5    by that proposed evidence is the fact that you've

6    interposed attorney-client privilege and work-product

7    privilege objections when asked for the basis of

8    those conclusions offered by Dellinger and Finnegan.

9    Now, if you're willing to keep that out, we can

10   proceed on that basis --

11            MR. HANGLEY:  I --

12            THE COURT:  -- in other words, high

13   quality, litigation worthy.

14            MR. HANGLEY:  I can keep that language out,

15   but I -- there was something I said to you in the

16   brief that I participate in --

17            THE COURT:  You must think I'm a fast read.

18   Although I got here at 7:30, I didn't receive your

19   documents until about 9:00, and they're -- it's

20   pretty thick.  It's I don't know, maybe 40 pages.

21            MR. HANGLEY:  That's really -- nobody looks

22   at exhibits.

23            THE COURT:  I got the --

24            MR. HANGLEY:  If we --

25            THE COURT:  -- impression you might have --

19

1          MR. HANGLEY:  If we go to page three --

2          THE COURT:  -- you might have served me

3     last.

4          MR. HANGLEY:  Pardon me?

5          THE COURT:  You might have served me last.

6     I learned in heavy duty litigation to put the copies

7     of the person -- the copies going to the person I

8     didn't want to spend a lot of time reading on a pony

9     going the wrong way and expedite everything else.

10          MR. HANGLEY:  No, what I -- what I said at

11     page three of the brief is that anything we say about

12     the program in Sprint's mind is a backdoor way of

13     getting Comcast's opinion on the value of a Nokia

14     patent into evidence.  We are not going to put

15     evidence of the value of the patent in through these

16     witnesses.  We're not even -- I'm perfectly willing

17     to say that we're not going to say we were looking

18     for high value patents.  I'm perfectly willing to say

19     that we were trying -- that we were not looking for

20     litigation worthy patents.  But, Judge, it's going to

21     be very clear from anything that we say, as I say in

22     the brief, if you go out and buy something, anybody

23     assumes that you put some value on it because people

24     don't go out and buy things that they don't want.

25     And you don't want something without having some

20

1   vague concept of value in your head.  That's how

2   people behave.

3            What I'm suggesting is I do not want to be

4   hamstrung by the -- by the logic -- sophistic logic,

5   I might say, that if it has anything to do with overt

6   action about buying patents or looking at patents to

7   separate the wheat from the chaff, that goes to

8   value, and, therefore, it goes to your opinion of

9   value, and, therefore, you can't put it in.  That I

10  will not agree to do.

11           THE COURT:  Well, I'm not asking you to

12  agree.  I've decided I'm going to have to rule, and

13  my ruling is -- I don't think we have to prolong

14  this -- is that you can anticipate what Sprint will

15  say, provided, however -- and I'm talking about with

16  evidence of Comcast patent acquisition policy --

17  provided that there be no reference to an acquisition

18  policy that is aimed at acquiring patents of high

19  value or litigation worthiness.

20           MR. HANGLEY:  Okay.  Now, we -- it's

21  understood I hope that we're going -- that they were

22  acquired with a view to having them there for use as

23  negotiating to --

24           THE COURT:  Well, I think this is all part

25  of your not being sure what Sprint is going to do

1   regarding --

2          MR. HANGLEY:  Oh, I'm pretty sure what

3   they're going to do.

4          THE COURT:  -- regarding Comcast as the

5   patent aggressor and targeting Sprint.  And so

6   whatever I'm ruling -- my ruling today, now, is

7   subject to reconsideration if Sprint opens the door.

8   And I thought I said as much in the order that I

9   issued when I thought I put this issue to bed.  I did

10  put it to bed with respect to evidence of value of

11  the 870 patent.  But the same reasoning applies to

12  the general issue that we're talking about now,

13  patent acquisition policy that focuses on the

14  acquisition of high value, litigation worthy patents.

15  So that's the way you'll start, but if Sprint opens

16  the door, you can seek reconsideration.

17         MR. HANGLEY:  Thank you, Your Honor.

18         THE COURT:  And that certainly is an

19  appropriate subject for rebuttal.  All right.  Is

20  there any issue that -- I think that takes care of

21  that issue.

22         MR. FINKELSON:  We understand your order,

23  Your Honor.

24         THE COURT:  All right.

25         MR. FINKELSON:  Thank you.

22

1          THE COURT:  I'll try to draft it sometime

2    today.

3          MR. HANGLEY:  Thank you, Your Honor.

4          THE COURT:  I haven't seen the jury binder

5    yet.

6          (Pause in proceedings.)

7          THE COURT:  And by the way, do I have --

8    and I don't think I'm going to include this in my

9    orders in the future.  I think I require that you

10   provide me with two copies of all exhibits.

11         MR. RIOPELLE:  Yes.

12         THE COURT:  You've made it impossible for

13   me to try criminal cases because the criminals enter

14   through the door that you've blocked with your boxes.

15   And it seems to me --

16         MR. HANGLEY:  No, Your Honor, some of them

17   come through the other door.

18         THE COURT:  The boxes come through the

19   other door.  The defendants come through the door to

20   which I'm pointing, and we're going to have to do

21   something.  But I've always ordered two copies of

22   exhibits.  I now realize that in a monster exhibit

23   case, that is not exactly a goal to be desired.  But

24   we'll work around it.  When I saw the exhibits, if

25   you really intend to offer them in evidence, my only

23

1    concern is that we're going to end up with far too

2    complex a presentation, and that increases the

3    likelihood of a hung jury, which I'm -- I must say

4    I'm a little worried about.  What do you have there,

5    Mr. Hangley?

6            MR. HANGLEY:  These are the two binders.

7            THE COURT:  Binders.

8            MR. HANGLEY:  We know you don't have enough

9    binders, Your Honor.  These are the binders that the

10   jury will get.

11           THE COURT:  Good.  Thank you.  Michael,

12   give one of them to Ian and Kevin.

13           MR. HANGLEY:  They have no identifying

14   marks on them at all.  I guess was that agreed upon?

15           MR. FINKELSON:  It was when we got the

16   copies that you all delivered to us.

17           THE COURT:  Well, you've got the program

18   for the video and that's good.  You've got the patent

19   and agreed upon definition of terms, and the

20   glossary.  And it's all agreed upon?

21           MR. HANGLEY:  Yes.

22           MR. FINKELSON:  It is, Your Honor.

23           THE COURT:  I think that's fine.

24           (Pause in proceedings.)

25           THE COURT:  All right, let me look and see

24

 1    if there are any other issues that we need to

 2    address.

 3              (Pause in proceedings.)

 4              THE COURT:  I think not.

 5              (Pause in proceedings.)

 6              THE COURT:  No, I have nothing else.  Where

 7    is Ms. Hull?  We'll get a jury of 50 jurors, which

 8    presents something of an issue.  I can't see from

 9    here -- do you have any boxes of exhibits on the

10    benches?

11              MS. HULL:  No.

12              MR. FINKELSON:  Just some underneath, but

13    not on the benches.

14              THE COURT:  So the proposed jurors will be

15    sitting on your exhibits?  Is that what you're --

16              MR. FINKELSON:  Not our exhibits.

17              THE COURT:  Okay.

18              MR. FINKELSON:  I don't believe we have any

19    in the courtroom, Your Honor, back there.

20              MR. GOETTLE:  Your Honor, they're on the

21    floor underneath, not in the way of their legs.

22    They're underneath the floor, but we'll be happy --

23    if you want us to move them --

24              THE COURT:  No, I don't know where you're

25    going to put them --

25

1          MR. GOETTLE:  Yeah.

2          THE COURT:  -- since you've already stacked

3     them rather high.

4          MR. GOETTLE:  We can -- we can move them

5     quite quickly, Your Honor.

6          THE COURT:  How about -- no, you can leave

7     them.  What about the people?  What do you propose to

8     do with --

9          MR. GOETTLE:  We will -- we will empty the

10    benches on the -- from the Comcast side, we will

11    empty the --

12         THE COURT:  Well, we're not emptying the

13    benches on one side.  We're emptying the benches on

14    both sides.  We're going to have five rows of ten

15    jurors each.  There are only five rows in the

16    courtroom.

17         MR. HANGLEY:  Your Honor, I do -- will have

18    one more matter of business to raise with the Court.

19         THE COURT:  All right.  Let's first decide

20    where we're going to put everybody.

21         MR. HANGLEY:  Can we pull some of the seats

22    up and put some --

23         THE COURT:  Why have we stacked some chairs

24    in the back, Michael?

25         COURTROOM DEPUTY:  I'll be moving those.

1          THE COURT:  But that's not enough for

2     everybody, so -- well, you have a little time to

3     figure this -- it will take about oh, 20 minutes or

4     maybe a little bit more to get a jury out.

5          (Pause in proceedings.)

6          THE COURT:  Well, when we actually do jury

7     selecting we can -- we can empty the jury box then.

8     See, in the Court of Appeals I asked Kevin Hanson,

9     last year's super clerk on the case, to come down and

10    kind of let us know what will happen upstairs when

11    one of you appeals.  He doesn't have any input on

12    what we do with the spectators in the courtroom.  I

13    suggest -- we've got 16 seats in the jury box.  Let's

14    do that, but they'll have to vacate those seats --

15          MR. FINKELSON:  When we start seating

16    people.

17          THE COURT:  -- when we start seating.  So

18    we'll do that.  All right, is there any -- Hangley,

19    you have another issue?

20          MR. HANGLEY:  Yes, Rule 615, sequestration.

21    Now, Your Honor, we intend to request sequestration,

22    but I wanted to make sure that I was clear on what

23    the sequestration rules would be.  The rule itself

24    doesn't speak clearly to the point, and Wright &

25    Miller does.  Wright & Miller says that, for example,

1  in a case where parties are getting daily copy of

2  transcript the intention of the rule is not only to

3  keep witnesses from listening to one another's

4  testimony, but to keep witnesses from reading one

5  another's testimony.  That language is not anywhere

6  in the rule.  If that is the Court's interpretation

7  of the rule, we would invoke Rule 615 and request

8  sequestration.  If, in fact, witnesses would be

9  entitled to read testimony at the end of the day and

10 accomplish the same thing as having been there, than

11 there is -- it's just a botherance to raise Rule 615.

12 So we really need guidance from the Court as to what

13 your interpretation is.

14         THE COURT:  You're right, 615 doesn't

15 address reading transcripts.

16         MR. HANGLEY:  Right.  Wright & Miller says

17 it's the way to go, says it's the better practice.

18         THE COURT:  Mr. Finkelson?

19         MR. FINKELSON:  Your Honor, we have no

20 objection to what Mr. Hangley described.  In other

21 words, sequestered witnesses, fact witnesses, can't

22 listen to testimony in the courtroom, nor can they --

23         THE COURT:  Read it.

24         MR. FINKELSON:  -- read others' testimony.

25         THE COURT:  That's my view.

1          MR. HANGLEY:  Excellent.  Then we do --

2          MR. FINKELSON:  Your Honor, on the same

3    issue of witnesses, I take it with respect to

4    witnesses that are on the stand overnight, our

5    general practice is that you can't speak with those

6    witnesses while they are still on the stand and have

7    not been released.

8          MR. HANGLEY:  That is not my interpretation

9    of the -- of Eastern District practices, nor is it

10   one I've ever followed before Your Honor.  When

11   there's a question pending or perhaps when a witness

12   is on cross -- actually, I -- my personal rule is

13   when a question is pending you can't talk to the

14   witness about his testimony.  When there's not a

15   question pending you can talk to him about it.  And

16   that is why -- what we used to affectionately refer

17   to as the (indiscernible) practice.  It was never

18   adopted bench-wide in the Eastern District of

19   Pennsylvania.

20         THE COURT:  Well, we can agree on what's

21   appropriate.  First, with respect to parties -- and

22   that raises a question of who is --

23         MR. HANGLEY:  Who's the party

24   representative?

25         THE COURT:  -- parties.  With respect to

1　parties, the rule is different, generally, than with

2　respect to witnesses.

3　　　　　MR. FINKELSON:  And I was actually going to

4　clarify that on the comments I just made.

5　　　　　THE COURT:  The party rule is a party can

6　always be available to discuss things with his

7　lawyer.

8　　　　　MR. FINKELSON:  And we intend to have our

9　party representative here, who is also a witness, but

10　he's our corporate rep.  He'll be here during the

11　course of the case.

12　　　　　THE COURT:  Now, the question is if that

13　happens, if we have a party witness on the stand, and

14　there's a break or -- a break during the day or an

15　overnight break, is the witness -- well, can opposing

16　counsel ask the witness did you discuss the case with

17　your opponent during the break?

18　　　　　MR. HANGLEY:  My earliest experience with

19　that rule was before Judge Fuller, and I requested

20　that instruction, and he said certainly, Mr. Hangley,

21　what rule is that?  And I fumbled around for a while

22　because there isn't any such rule.

23　　　　　THE COURT:  Well, except that we --

24　　　　　MR. HANGLEY:  And by the way, he denied my

25　request.

1          THE COURT:  We've been -- I'm aware of a

2    different rule, and I think the first time it

3    surfaced was in a case I tried before Judge Joseph

4    before he became Chief Judge.  And the bottom line,

5    it's been written about a lot.  And what is your

6    position?  Party -- and we'll define a party

7    witness -- on the stand speaks to his or her lawyer

8    over a break, either a break during the day or an

9    overnight break.  Is it appropriate for opposing

10   counsel to ask the witness what did you -- did you

11   meet with your counsel or talk to your counsel?  Yes?

12          MR. HANGLEY:  I --

13          THE COURT:  What do you say?

14          MR. HANGLEY:  I think it's not.  I also

15   think it's not a big deal.  I've never heard of a

16   harmful answer to that party come -- in response to

17   that question.

18          THE COURT:  Oh, like he told me to tell the

19   truth --

20          MR. HANGLEY:  Yeah, that's what you get.

21          THE COURT:  That kind of an answer, yes.

22          MR. HANGLEY:  Right.  That's what you get.

23          THE COURT:  Okay.  Well, that's what I

24   instructed my witnesses to say if they were

25   questioned when --

1          MR. HANGLEY:  (Indiscernible).

2          THE COURT:  -- I was a lawyer.

3          MR. FINKELSON:  That practice is still in

4    place, Your Honor.

5          THE COURT:  Well, do we agree?  I'd like to

6    reach some agreement since you raised it, Mr.

7    Hangley.  Indirectly, you raised it.

8          MR. HANGLEY:  I have no objection to Mr.

9    Finkelson or counsel on either side saying did you

10   talk to your attorneys about (indiscernible)

11   questions on that.  It will not become the --

12         MR. FINKELSON:  And I agree.  With respect

13   to party witnesses, which --

14         THE COURT:  Well --

15         MR. FINKELSON:  -- as Your Honor said,

16   you'll define, we have a lot of corporate rep --

17         THE COURT:  Non-party witnesses.

18         MR. FINKELSON:  With respect to non-party

19   witnesses --

20         THE COURT:  And that doesn't -- by a party

21   witness, I'm not referring to employees.

22         MR. FINKELSON:  I understood you to be

23   referring to the corporate representative --

24         THE COURT:  Yes.

25         MR. FINKELSON:  -- is here for all

32

1    testimony.

2            THE COURT:  Yes.

3            MR. FINKELSON:  And we're fine with that.

4            THE COURT:  Well, either the corporate

5    representative -- but, for example, if someone who is

6    not the corporate representative, but who is

7    obviously identified with the corporation, such as --

8            MR. HANGLEY:  That's my definition of a

9    party witness, somebody whose --

10            THE COURT:  Well, the CEO, for example.

11            MR. HANGLEY:  Yeah, or a vice president.

12            THE COURT:  Yes.

13            MR. FINKELSON:  But not a -- not a regular

14    employee, as Your Honor --

15            THE COURT:  Not a regular employee.

16            MR. FINKELSON:  -- pointed out?  We have no

17    objection to that.

18            THE COURT:  If we have an issue with that,

19    we can address that.

20            MR. FINKELSON:  I don't -- I don't think

21    we're --

22            THE COURT:  All right.

23            MR. FINKELSON:  Yeah, I think --

24            THE COURT:  Non-party witnesses.

25            MR. FINKELSON:  I think that --

33

1          THE COURT:  Do you have a different --

2          MR. FINKELSON:  Well, my practice has

3     always been when the witness is on the stand over a

4     break or overnight, still under examination, that

5     there aren't communications, particularly on cross-

6     examination.  So if the witness is on the stand in

7     that context, we would ask that that witness not be

8     speaking with counsel.

9          MR. HANGLEY:  I've never followed that

10    rule.  If there are jurisdictions where it is the

11    rule, (indiscernible).  I've never followed that

12    rule.  And, you know, there are I think one federal

13    case -- and I don't have them with me now -- and a

14    couple of state cases saying specifically that that

15    is not a requirement.

16         THE COURT:  Well, it's not required.  And

17    maybe we should draw a distinction between direct

18    examination and cross-examination.

19         MR. FINKELSON:  It's really cross that is

20    the focus of my comment.  If the parties want to come

21    to an agreement that on direct, a witness is still on

22    the stand, they can consult and -- we don't have an

23    objection to that.  But on cross, I'd be interested

24    in seeing Mr. Hangley's cases.  I don't doubt that

25    they exist, but --

34

1          THE COURT:  Well, I don't think the

2     guidance -- we'll get it from the Court of Appeals.

3     It will be -- it's discretionary I'm sure.  And the

4     bottom line.

5          MR. FINKELSON:  That is correct.

6          THE COURT:  And the bottom line, I think

7     we'll adopt the rule.  But with regard to direct

8     examination, there can be discussion.

9          MR. FINKELSON:  With all witnesses?

10          THE COURT:  No, I'm -- well, I'm drawing

11     the distinction between -- and maybe we shouldn't

12     draw a distinction.  Where I'm going on non-party

13     witnesses is on direct examination, there can be a

14     discussion, but not on cross-examination.  The cross-

15     examiner should not be disadvantaged by the fact that

16     there's a recess, particularly if the recess is over.

17     And so with respect to both party and non-party

18     witnesses, on cross-examination, if the lawyer,

19     proponent of the witness, talks to the -- either the

20     witness, non-party or party witness, that's fair game

21     for --

22          MR. HANGLEY:  So you can do it, but expect

23     them to be asked about it?

24          MR. FINKELSON:  So you -- okay, that's a

25     little -- that was different than what I was

1   suggest -- so Your Honor is saying that you can, in

2   fact, talk to them on cross-examination?

3          THE COURT:  No.  Well --

4          MR. FINKELSON:  Because I think that's --

5   for party witnesses, I agree that it should be fair

6   to talk to them and fair to ask the question, if

7   someone desired, did you talk to somebody?  I don't

8   think either of us -- you'll see either of us doing

9   that.  But for a witness on cross-examination, I

10  think the appropriate course --

11         THE COURT:  Is no con --

12         MR. FINKELSON:  -- is no -- is no

13  discussions for exactly the reasons Your Honor

14  mentioned in terms of disadvantaging the cross-

15  examining party.

16         THE COURT:  All right.  I was debating

17  whether to apply the same rule on cross-examination,

18  but I -- and we can do it either way.  I have a pile

19  of stuff on my desk that addresses this issue, and

20  the courts go all over the place.

21         MR. HANGLEY:  I'm totally confused.  I have

22  no idea what the current state of the bidding is.  I

23  apologize.

24         THE COURT:  So party witnesses, if you want

25  to talk to your witness on cross-examination, you

1    open the door to a question by the cross-examiner as

2    to did you talk to your attorney?  Yes.  What did you

3    say?  What did he say?  On non-party witnesses, on

4    cross-examination, no contact.

5              MR. FINKELSON:  No conversation.

6              THE COURT:  Okay.

7              MR. FINKELSON:  That makes sense, Your

8    Honor.

9              THE COURT:  I think so.  Ian just handed me

10   a note regarding the transcripts, which is an issue

11   that you raised.  Are they going to be filed under

12   seal?

13             MR. HANGLEY:  I think so.

14             THE COURT:  I think so.  That's what --

15             MR. FINKELSON:  I think they are, Your

16   Honor.

17             THE COURT:  -- you've been talking about.

18             MR. HANGLEY:  Transcripts under seal?

19             (Pause in proceedings.)

20             MR. HANGLEY:  We're not -- we are not

21   sealing the courtroom.  We may have to clear the

22   courtroom on occasion, but I -- if we're not sealing

23   the courtroom, I don't see why across the board the

24   transcripts need to be sealed.

25             MR. FINKELSON:  And, honestly, we're of the

1    same mind.  I mean, generally, the courtroom is going

2    to be open.  We don't plan on asking to seal the

3    courtroom.  Maybe there is a very limited

4    circumstance that --

5              MR. HANGLEY:  No.

6              MR. FINKELSON:  -- we don't anticipate.

7    But as a general practice, the view would be that the

8    transcripts would not be filed under seal.  If a

9    particular issue comes up, we just ask Your Honor for

10   leave to raise it at that time.

11             THE COURT:  Okay.  Good.  All right.  Now,

12   is there anything else?

13             MR. FINKELSON:  Nothing from us, Your

14   Honor.  Thank you, Your Honor.

15             (Pause in proceedings.)

16             MR. FINKELSON:  Experts, Your Honor, I take

17   it --

18             THE COURT:  I'm not sequestering.

19             MR. FINKELSON:  Experts are subject to the

20   same -- with respect -- if the expert are not

21   sequestered --

22             MR. HANGLEY:  Agreed.

23             MR. FINKELSON:  -- and with respect to

24   cross-examination, are subject to the same rules that

25   Your Honor described for non-party witnesses.

1          MR. HANGLEY:  Oh, I would have thought that

2    they would be like a party witness.

3          MR. FINKELSON:  We were this close, Your

4    Honor.  You were doing a -- I saw you.  You were even

5    about to stand.  Experts are -- they're the

6    quintessential example of why --

7          MR. HANGLEY:  (Indiscernible).

8          THE COURT:  So I think for experts -- our

9    position would be that for experts, you shouldn't be

10   talking to your experts on cross-examination.

11         MR. HANGLEY:  Let me huddle with my -- talk

12   to my people.

13         (Pause in proceedings.)

14         MR. HANGLEY:  Okay.  We're good on that,

15   Your Honor.

16         THE COURT:  Okay.

17         MR. FINKELSON:  Thank you, Your Honor.

18         THE COURT:  Anything else?

19         MR. FINKELSON:  Nothing from us.

20         THE COURT:  Well, then what we'll do, we're

21   going to get 50 jurors, five rows of ten each.

22   You're going to move your chairs.  And I'll begin the

23   voir dire.  I'm going to go through the entire set of

24   questions.  I might change some of them.  You should

25   have your copies in front of you.  And then we'll go

39

1    to sidebar and we'll call them up probably starting

2    with juror number 1, and we'll keep calling them up

3    until we have ten --

4              MR. HANGLEY:  16 who have --

5              THE COURT:  -- plus six.

6              MR. HANGLEY:  -- not been excused for

7    cause.

8              THE COURT:  And we'll rule afterwards.  No

9    advocating at sidebar.

10             (Pause in proceedings.)

11             THE COURT:  I'm going to change the

12   (indiscernible), so I don't think it's necessary.

13   The one question about cell phones and smart phones,

14   I might ask it the flip side.  I think we're going to

15   get more people who say they have them than not.

16             MR. FINKELSON:  I suspect so, Your Honor.

17             THE COURT:  So to keep the people --

18             MR. HANGLEY:  And I think I have

19   (indiscernible) cause.

20             THE COURT:  We'll ask how many of you --

21   after introducing the question, how many of you do

22   not have either a cell phone or a smart phone?  And

23   we'll mark those.  And we might not call them up.

24   You can if you wish, but we'll certainly call up all

25   the people who have --

1          MR. FINKELSON:  That's a --

2          THE COURT:  -- cell phones and smart

3     phones.

4          MR. FINKELSON:  That's a reasonable

5     approach.

6          THE COURT:  With respect to the sidebar

7     questions, I think we'll cover who was your provider?

8     If Sprint or Comcast, is there anything about your

9     relationship with Sprint or Comcast that would --

10    that might make it impossible for you -- I'll pick up

11    the language of the -- that's not the precise

12    language -- might make it difficult for you to be

13    fair and impartial in deciding the case?  Are there

14    any other questions you're going to propose that be

15    asked at sidebar of the witnesses -- of the

16    witnesses -- of the jurors, the proposed jurors, who

17    have cell phones or smart phones?

18          (Pause in proceedings.)

19          MR. FINKELSON:  Not from our side, Your

20    Honor.

21          THE COURT:  Well, we'll see what happens.

22          MR. FINKELSON:  Obviously, we'll see what

23    they say, and other questions --

24          THE COURT:  All right.

25          MR. FINKELSON:  -- may arise.

Voir Dire                    41

1          THE COURT:  With that, I'm going to go off

2     the bench.  Ms. Hull, are you sitting or --

3          MS. HULL:  I'm (indiscernible).

4          THE COURT:  I'm caught, but I'm okay now.

5     We'll get 50 jurors.  And soon as we have them,

6     they'll be lined up in the hallway.  You should be in

7     your seats.  I guess we'll put many of you in the

8     jury box.  And we'll move -- Michael, we'll move

9     those chairs to counsel table.  And on that note, I

10    don't think there's anything else we have to do --

11         MR. HANGLEY:  Thank you, Your Honor.

12         MR. FINKELSON:  Thank you, Your Honor.

13         THE COURT:  -- until we get the panel.  You

14    may go about your business.

15         (Recess taken from 10:34 a.m. to 12:06

16    p.m.)

17         THE COURT:  Good afternoon, everyone.

18    Please be seated.

19         (Pause in proceedings.)

20                    VOIR DIRE

21         THE COURT:  We are going to begin jury

22    selection in the case of Comcast Cable

23    Communications, LLC, against Sprint Spectrum L.P.

24    It's civil action 12-859.  We'll start the jury

25    selection.  I know it's been a long morning.  We'll

Voir Dire                                    42

1   let you go for lunch at around 12:45 and we'll resume

2   after an hour.  I expect to complete jury selection

3   today.

4           Let me explain a little bit about how we

5   will conduct the jury selection.  I know you've seen

6   the video.  This will amplify and explain some of the

7   things that were shown to you in the video.  What

8   we're going to do is called a voir dire examination.

9   The term "voir dire," a french term, means "to speak

10  the truth."

11          In a civil case like this, it is a

12  preliminary examination of jurors to determine a

13  little bit more about them.  The questions -- and I'm

14  going to ask the questions -- are not designed unduly

15  to inquire into your private affairs.  Rather, the

16  questions are intended to supply information and

17  identity of experience so that the lawyers may

18  exercise more intelligently what we refer to as

19  peremptory challenges.  They are challenges for

20  whatever reason.  It's the right of a party to have a

21  certain number of peremptory challenges.

22          Some of you might be unduly concerned about

23  reference to these peremptory challenges.  Let me

24  explain a peremptory challenge is no reflection

25  whatsoever on a juror who is excused.  It simply

1    means that an attorney in the case, based on his or

2    her trial experience, his or her knowledge of the

3    case, and the answers that you give in this voir dire

4    examination, has decided that someone else should sit

5    in that place.  It is the goal of what we're going to

6    do this morning -- well, the morning is gone -- this

7    afternoon to obtain a fair and impartial jury, a jury

8    that will try the case based solely on the evidence

9    presented in the courtroom and the law, as I instruct

10   you on the law.  The parties in the case are

11   certainly entitled to that.

12          Now, here's how we will conduct the

13   examination.  As I said, I will ask the questions.

14   Ms. Hull, do the jurors have their placards?

15          MS. HULL:  Yes.

16          THE COURT:  If you have an answer to give,

17   we're not going to refer to you by name.  That gets a

18   little confusing and there's no need to do that.  You

19   all have a placard and the placard corresponds to

20   your juror seat numbers, and that's the way we will

21   refer to you during the voir dire.  I'm going to ask

22   the questions, and if you have an answer to give,

23   hold the placard up.

24          In the old days, before we decided to use

25   these placards, jurors would be sitting there with

1  their arms up and that got a little tiresome.  Just

2  make certain that I see you, and if I miss you, then

3  by all means, wave the placard.

4            Some of the questions I will tell you will

5  be answered at sidebar.  Sidebar is this area off to

6  my left, your right.  We do that because we don't

7  want the answers to be shared with all of you.  We're

8  not trying to keep secrets, but if we ask a question

9  about bias, if any of you had any good or bad

10 experiences with either of the parties, we don't want

11 that prospective juror to have to say in front of all

12 the other jurors anything about that very good

13 experience or that very bad experience.  That

14 information will be provided to me and to counsel at

15 sidebar.

16           Everything we say in the courtroom is

17 recorded.  There will be a record made of everything

18 said in open court and everything said at sidebar.  I

19 want you to know that at the outset.  Now, if I ask

20 any questions that you would prefer to answer at

21 sidebar, simply say so and we'll do that.  There

22 might be some answers, for example, about disability,

23 that you prefer to give at sidebar, and that's fine.

24 We'll do it that way.

25           We're going to start, as I said, now.  You

Voir Dire

 1   don't have to raise your placard unless you have an

 2   answer to give.  And we'll go for about a half hour

 3   and then we'll recess for lunch.  We'll recess for

 4   about an hour and reconvene in this courtroom, same

 5   seats.  All right.

 6              (Pause in proceedings.)

 7              THE COURT:  First question.  Tell you a

 8   little bit about the case and then I'll ask you

 9   whether you know anything about the case.  This is a

10   civil lawsuit involving a dispute between two

11   corporations.  The plaintiff is Comcast Cable

12   Communications, LLC, which I will refer to as

13   Comcast.  Comcast has sued the defendant, Sprint

14   Spectrum L.P., which I will refer to ask Sprint.

15   It's a patent infringement case.

16              Comcast owns a patent that it purchased

17   from Nokia Corporation.  The patent has the number --

18   and it's a long number -- 6885870.  I'm not going to

19   repeat that long number each time I refer to the

20   patent, and instead, we'll refer to it as "the 870

21   patent."

22              Comcast alleges that Sprint's messaging

23   services, which are referred to as SMS and MMS,

24   infringe the 870 patent.  SMS, which is an acronym

25   for "short message service," allows mobile phone

1    subscribers to exchange short text messages.  You may

2    simply know SMS as text messaging.

3           MMS, which is an acronym for "multi-media

4    messaging service," allows mobile phone subscribers

5    to exchange pictures, audio, or video.  Sprint denies

6    infringement of the 870 patent and separately alleges

7    that the 870 patent is invalid.  The jury in the case

8    will be asked to decide if any of the claims,

9    Comcast's claims of infringement and Sprint's claims

10   of invalidity, have merit.  That's the role of the

11   jury.

12          First question, do any members of the jury

13   panel know anything about the case?  Let the record

14   show no hands.

15          Now, the jurors who sit in the case will be

16   given a pamphlet, booklet.  I'm holding it up.  Among

17   other things -- and what is in it will be explained

18   to you, but among other things, there is a glossary

19   of these abbreviations, and I've referred to two of

20   them, SMS and MMS.  I don't want you to think you

21   have to memorize these things.  That would be a very

22   well, I think difficult chore, but you'll be given

23   the tools to enable you to better understand the

24   evidence as it's received, including what each

25   acronym means.

Voir Dire

1          All right.  Second question, I'm going to

2     ask counsel for plaintiff, and there's a big group of

3     them, to introduce themselves, their law firm, and

4     their representatives, and all witnesses who will

5     testify on behalf of the plaintiff, Comcast.  Before

6     they do though, we're doing this so that you can know

7     the witnesses who will be called and tell us -- the

8     question at the end of this introduction will be do

9     any of you know any of these people?  We want to know

10    whether you know any of the people who are involved

11    in representation of the plaintiff, Comcast, and

12    whether you know any of the witnesses who will

13    testify.  Mr. Hangley?

14          MR. HANGLEY:  Good afternoon.  I am Bill

15    Hangley from the Philadelphia Law Firm of Hangley,

16    Aronchick, Segal, Pudlin & Schiller.  Sitting next to

17    me is Dan Goettle from the Philadelphia law firm of

18    Baker Hostetler.  Sitting next to him is George

19    Medlock, who -- I hope I have your title right,

20    George -- is the general counsel responsible for

21    patent and other intellectual property technology at

22    Comcast.  I know that's not the right title, but it's

23    the one I'm using right now.

24          Now, the various people behind me are

25    Andrew Erdlen, Larry LaBella, Kim Ferrari, and Ann

1    Greeley.  They will be -- they will be coming and

2    going from time to time, and you will see other

3    people from one of our two law firms who will be here

4    with the -- the witnesses --

5             THE COURT:  I think, Mr. Hangley, in view

6    of the numbers, I'm going to first ask whether any of

7    the members of the jury panel know any of the

8    attorneys who were just introduced by Mr. Hangley.

9             MR. HANGLEY:  That's always disappointing.

10            THE COURT:  Do any of you know anything

11   about any of the law firms to which Mr. Hangley just

12   referred?  Let the record show no hands in response

13   to either question.  Mr. Hangley, now you may

14   introduce your witnesses.  And what I want you to do

15   is tell me at the end of this introduction whether

16   you, members of the jury panel, know any of these

17   witnesses.  And I should say the list will probably

18   be long and I should quickly add it will be longer

19   than the number of witnesses who are actually called.

20   Mr. Hangley?

21            (Pause in proceedings.)

22            MR. HANGLEY:  It is going to be a long

23   list.  I apologize.  Dr. Robert Akl, a professor from

24   Dallas, Texas; Satisha Bassama; Christy Buckendahl;

25   Byron Cahoun; Michael Carrie; Mark Dellinger; Jeffrey

1   Dwoskin, that's D-W-O-S-K-I-N; Ramesh Golla; Sean

2   Hotzel; Christopher Holmes; Scott Kalinoski; Mark

3   Lipford; David Marcus; Stephanie Miller; Mike Moss;

4   Charles Carson Peters; Dan Pope; Michelle Reilly;

5   John Rousnick; Will Souder, that's S-O-U-D-E-R; Bruce

6   Stoner; Plarent Tirana; James Weber; Patrick Wilson;

7   Sean Wilson; Mark Yarkovsky; and James Finnegan.

8           THE COURT:  Thank you, Mr. Hangley.  Do any

9   members of the jury panel know any of the people just

10  mentioned by Mr. Hangley?  Let the record show no

11  hands.  Mr. Riopelle or Mr. Finkelson, who will speak

12  for Sprint?

13          MR. FINKELSON:  I will, Your Honor.

14          THE COURT:  Mr. Finkelson, will you

15  introduce yourself, your legal team, your client

16  representative, and then give me a chance to inquire

17  of the panel, followed by the introduction of your

18  witnesses.  You may proceed.

19          MR. FINKELSON:  Thank you, Your Honor.  It

20  would be my pleasure.  Good afternoon, everyone.  My

21  name is Dave Finkelson of the law firm of McGuire

22  Woods.  With me is my partner, Brian Riopelle, also

23  of the law firm of McGuire Woods, and Colleen Simpson

24  from the Philadelphia law firm, Harkins Cunningham.

25          Here for Sprint is the Vice President of

Voir Dire                                   50

1   Wholesale at Sprint.  He'll be our corporate

2   representative throughout this trial, Mr. Scott

3   Kalinoski, and also Lee Lauridsen, who is in the

4   legal department at Sprint.  And as was the case with

5   Comcast, a number of other individuals who you will

6   see coming and going throughout the case, Christina

7   Marinakis, Meghan Rachford, and Chad DeBeau.

8            THE COURT:  Thank you, Mr. Finkelson.  Do

9   any members of the jury panel know any of the

10  attorneys -- well, Mr. Finkelson or any of the

11  attorneys he just introduced?  Let the record show

12  now hands.

13           MR. FINKELSON:  May I?

14           THE COURT:  Yes.

15           MR. HANGLEY:  I should mention one other

16  attorney who will be here and I know will be

17  examining a witness, so you will see her in fairly

18  short order.  That is my partner, Rebecca Melley,

19  formerly known as Rebecca Santoro.  And it should

20  have occurred to me to mention that.

21           THE COURT:  Do any of you know Rebecca --

22           MR. HANGLEY:  Oh, and another named Dale

23  Heist, that's H-E-I-S-T, will also be examining a

24  witness or two.

25           THE COURT:  Do any of you --

1            MR. FINKELSON:  I thought he was going to

2    say somebody on the panel knows me.  That's what I

3    thought he was going to --

4            THE COURT:  Well, that would be a good way

5    to get you disqualified.

6            MR. FINKELSON:  It sure would, Your Honor.

7            THE COURT:  Do any of you know the two

8    witnesses -- two attorneys rather, just identified by

9    Mr. Hangley?  Let the record show no hands.  Mr.

10   Finkelson, you may now proceed to introduce your --

11   I'm going to call them prospective witnesses.  Not

12   all of these people will be called.

13           MR. FINKELSON:  I think that's the good

14   news on both sides, Your Honor, that not all of these

15   people will be called and some of these will overlap

16   with names you've just heard, but I'll take you

17   through the list: Robert Ozzie, Harley Ball, Satisha

18   Bassama, Christy Buckendahl, Dr. Allen Cox, Mark

19   Bellinger, Dr. Christian Depain, Nicholas Gurdicci,

20   Ramesh Golla, Andrew Heartvelt, Sean Hotzel, Scott

21   Kalinoski, Even Koch, Mark Lanning, Mark Lipford,

22   David Marcus, Stephanie Miller, Mick Moss, Rosemary

23   Pierce -- we're at the Ps -- Nathaniel Polish, Dan

24   Pope, Brian Synogels, Plarent Tirana, Patrick Wilson,

25   Sean Wilson, Mark Yarkovsky, Jing Yu Jo, and Greg

Voir Dire                                    52

1    O'Conner.

2            THE COURT:  Do any members of the jury

3    panel know any of the prospective witnesses just

4    identified by Mr. Finkelson?  Let the record show no

5    hands.

6            I told you there are two parties in the

7    case.  Comcast is the plaintiff; Sprint is the

8    defendant.  And the patent in question was purchased

9    by Comcast from Nokia Corporation.  So I'm going to

10   ask you whether you, members of the panel, your

11   immediate family, or any close friends ever worked

12   for, been a customer of, owned stock in, or done

13   business with Comcast, Sprint, or Nokia.  I debated

14   about whether I should ask that question.  In the

15   flip side, any of you haven't, what I think we'll do

16   is get your numbers -- and I can tell you from up

17   here, all of a sudden, a sea of white, these cards --

18   and I think what we'll do is just get your numbers,

19   and we'll start with the juror in the number 1 seat

20   and go row by row.  But I can tell you I -- it's the

21   first time I've seen that kind of a response, and I

22   saw a sea of white.

23           So, again, let me repeat the question.  I

24   think you know it, but I'll repeat it.  Have you or

25   any members of your immediate family or any close

1   friends ever worked for, been a customer of, owned

2   stock in, or done business with Comcast, Sprint, or

3   Nokia?  And we'll just get your numbers.  Start in

4   the first row.

5            (Pause in proceedings.)

6            THE COURT:  Looks like almost all of you.

7   All right, then we'll take the second row.

8            (Pause in proceedings.)

9            THE COURT:  Third row?

10           (Pause in proceedings.)

11           THE COURT:  Fourth row?

12           (Pause in proceedings.)

13           THE COURT:  We're up to 31.  You can put

14  yours down.  I was told that it's much better that I

15  tell you that I've recognized your number so that you

16  don't have to sit there like the student in the back

17  row of a local schoolhouse with his arm propped up or

18  her are propped up.  33, 34, 35, 36, 37, 38, 39, 40.

19  And the final row, fifth row?

20           (Pause in proceedings.)

21           THE COURT:  Well, someone in the fifth row

22  hasn't held their hand up.  Who -- why don't you

23  guys -- yes, why don't you guys put your hands down?

24  Who hasn't?  Thank you.

25           (Pause in proceedings.)

Voir Dire                                      54

1          THE COURT:  All right, we'll get the answer

2     at sidebar.  Thank you.  Next question, have you or

3     any members of your immediate family or any close

4     friends ever worked for -- and these are a number of

5     other companies in the same general business which

6     will be identified in the testimony.  And these

7     companies are Acision, Comverse, Syniverse, Openware,

8     Nokia Siemens, Ericsson, Nortel, or Alcatel-Lucent.

9     It's a company that merged with Lucent.  And I'll

10    repeat those -- I'll repeat the question.  Have you

11    or any members of your immediate family --

12          (Pause in proceedings.)

13          THE COURT:  Okay.  Have you, any members of

14    your immediate family, or any close friends ever

15    worked for these companies: Acision, Comverse,

16    Syniverse, Openwave -- I'm told I pronounced it

17    Openware the first time -- Nokia Siemens, Ericsson,

18    Nortel, or Alcatel-Lucent?  Number 6, 7 --

19          (Pause in proceedings.)

20          THE COURT:  -- 10.  Next row, 19, 32, 34,

21    and 40.  49.

22          (Pause in proceedings.)

23          THE COURT:  All right, we'll get the

24    answers at sidebar.  Next question, have you, any

25    members of your immediate family, or any close

1   friends ever had any experience, either good or bad,

2   with Comcast or Sprint that might prevent you from

3   being a fair and impartial juror in this case?  Have

4   you, any members of your immediate family, or any

5   close friends, ever had any experience, either good

6   or bad, with Comcast or Sprint that might prevent you

7   from being fair and impartial as a juror in this

8   case?  Okay, we'll get the answers.  5.  Next is --

9   you have a glare on -- is it 31?  Yes.  No, 12.

10            MR. FINKELSON:  13.

11            THE COURT:  30.

12            MR. FINKELSON:  13.

13            THE COURT:  But I'm seeing -- all right.

14   Thank you.  13.  Next row?  And that number is 34?

15   24.  24.  32.  This isn't working so well.  I need

16   binoculars up here.  33.  35.  Not 35?

17            MR. FINKELSON:  No.

18            THE COURT:  Oh.

19            (Pause in proceedings.)

20            THE COURT:  46, 47, 49.  Anyone I missed?

21   What?  Okay.

22            (Pause in proceedings.)

23            THE COURT:  Anyone else?  As I said a few

24   moments ago, the case involves a dispute over alleged

25   patent infringement.  Have any of you served as a

1  juror in a civil case that involved a claim of patent

2  infringement?  Let the record show no hands.

3          Have you ever served as a juror in any

4  other type of civil case or a criminal case or as a

5  member of a grand jury?  And I'm sure many of you

6  will raise your hands.  I'm getting a lot of hands.

7  What I want to know from all of you folks who have

8  served on other types of juries, whether there was

9  anything about that prior jury service that might

10 prevent you from being fair and impartial as a juror

11 in this case.  So the question is for those of you

12 who have served as jurors in cases other than patent

13 infringement cases, was there anything about your

14 jury service that might prevent you from being fair

15 and impartial in deciding this case?  Let the record

16 show no hands.

17         Next, have you, any members of your

18 immediate family, or any close friends had any

19 training in the law or any work experience in a law-

20 related field?  And I'm sure I'm going to get a lot

21 of hands.  I think what we'll do, I'll -- I'm going

22 to get some answers in open court.  And I want you

23 to -- you can keep your cards down until I'm finished

24 with the person I'm speaking -- the prospective juror

25 I'm speaking with.  And we'll start with juror number

1.  Will you stand, please?  Tell me about your
answer to that question, and I'll repeat it.  Have
you, any members of your immediate family, or any
close friends had any training in the law or any work
experience in a law-related field?

JUROR NUMBER 1:  Yes, I have a brother-in-
law that's a police officer.

THE COURT:  And he has nothing to do with
patents.  Would that be --

JUROR NUMBER 1:  No.

THE COURT:  -- a fair statement?

JUROR NUMBER 1:  No.

THE COURT:  Anything about your
relationship with your brother that would prevent you
from being -- brother-in-law, you said?

JUROR NUMBER 1:  Uh-huh.

THE COURT:  -- that would prevent you from
being fair and impartial in deciding this case?

JUROR NUMBER 1:  No.

THE COURT:  Thank you.  Next juror?  Yes?
Juror number 2.

JUROR NUMBER 2:  Yes, I have a close friend
that's a lawyer.

THE COURT:  Does he practice or she
practice patent law?

1          JUROR NUMBER 2:  I honestly don't know.  I

2     don't think so.

3          THE COURT:  If you're selected to sit on

4     this jury, do not find out whether that lawyer

5     practices patent law and do not talk to that lawyer

6     about patent law.

7          JUROR NUMBER 2:  Okay.

8          THE COURT:  Would the fact that you have a

9     friend who is an attorney prevent you from being fair

10    and impartial in deciding this case?

11         JUROR NUMBER 2:  No.

12         THE COURT:  Thank you.  Next?

13         JUROR NUMBER 3:  I serve on a board with a

14    patent attorney.

15         THE COURT:  Well, you're -- I ought to

16    identify.  You're juror in seat 3.  Do you talk to

17    that person about patent-related matters?

18         JUROR NUMBER 3:  No.

19         THE COURT:  If you're selected to sit on

20    this jury, I instruct you not to have any discussions

21    with this lawyer about patent-related matters.  Would

22    the fact that you know this lawyer prevent you from

23    being fair and impartial in deciding this case?

24         JUROR NUMBER 3:  No.

25         THE COURT:  Thank you.  Next juror with an

1    answer to that question?

2            JUROR NUMBER 4:  My wife worked for

3    numerous law firms most of --

4            THE COURT:  And you're --

5            JUROR NUMBER 4:  -- throughout her career.

6            THE COURT:  I have to be a little more

7    careful.  You're in seat number 4.

8            JUROR NUMBER 4:  Oh, 4.

9            THE COURT:  No, that's me.  I should have

10   identified you.  Don't lose your card.

11           JUROR NUMBER 4:  My wife is a paralegal and

12   she's worked for numerous attorneys over a good part

13   of her career.  And then also, our associate's

14   company I work for, the company attorney, I know him

15   as a professional acquaintance, and one of my

16   responsibilities was to, you know, fly him out to

17   Pittsburgh and places that do cases in federal court.

18           THE COURT:  What about patent law?  Have

19   you ever been involved in discussions with any of

20   these people --

21           JUROR NUMBER 4:  No.

22           THE COURT:  -- with --

23           JUROR NUMBER 4:  Not --

24           THE COURT:  -- involving patents?

25           JUROR NUMBER 4:  No, just normal

Voir Dire                           60

1   conversation, but not with respect to the details of

2   patent law.

3              THE COURT:  Would your relationship with

4   these attorneys prevent you from being fair and

5   impartial in deciding this case?

6              JUROR NUMBER 4:  No.

7              THE COURT:  Thank you.  Next juror?  Anyone

8   else in the first row?  Yes?  Juror seat 5.

9              JUROR NUMBER 5:  I hold a patent for my

10  business and I've worked with a patent attorney on

11  the patent that I currently own.

12             THE COURT:  I think we'll call you up to

13  sidebar.  We'll get your answers at sidebar at the

14  end of the questioning of the entire panel.

15             (Pause in proceedings.)

16             THE COURT:  Anyone else in the first row?

17  Second row?  Juror -- I'm sorry.  Yes?

18             JUROR NUMBER 10:  Yes.  Well, I worked for

19  attorneys for ten years.  I was a paralegal.  Now my

20  husband and I own a company now and, of course, we

21  have an attorney with our -- that works with our

22  firm, so --

23             THE COURT:  Have you been involved in

24  patent law at all?  Would the relationships you have

25  with -- have had with attorneys prevent you from

1    being fair and impartial in deciding this case?  You

2    have to answer yes or no.

3              JUROR NUMBER 10:  I said no.

4              THE COURT:  Thank you very much.

5              JUROR NUMBER 10:  You're welcome.  Thank

6    you.

7              THE COURT:  Second row?  Yes?  Seat number

8    15.

9              JUROR NUMBER 15:  My wife was a -- is an

10   attorney, nothing with patent law at all.

11             THE COURT:  Would the fact that your wife

12   is an attorney prevent you from being fair and

13   impartial in this case?

14             JUROR NUMBER 15:  No, sir.

15             THE COURT:  I would instruct you that

16   because you live with an attorney and can get a lot

17   of free legal advice, if you're selected to sit on

18   this jury, you are not permitted to talk to your wife

19   or, indeed, anyone else regarding the case.  Do you

20   understand that?

21             JUROR NUMBER 15:  Understood, Your Honor.

22             THE COURT:  Thank you.  Next second row?

23   18.

24             JUROR NUMBER 18:  I have two friends that

25   are attorneys.  One is basically for real estate and

Voir Dire                                    62

1    the other one is an estate attorney.

2              THE COURT:  Would those relationships

3    prevent you from being fair and impartial in deciding

4    this case?

5              JUROR NUMBER 18:  No, Your Honor.

6              THE COURT:  Thank you.  Anyone else?  Yes?

7    19.

8              JUROR NUMBER 19:  19.  I have a former,

9    long-term girlfriend who was -- is a patent attorney.

10   I have several friends who are paralegals, close

11   friends.

12             THE COURT:  The operative word in your

13   answer was "former."  Do you talk to this former

14   girlfriend who is the patent attorney from time to

15   time?

16             JUROR NUMBER 19:  About patent law.

17             THE COURT:  About patent law?  We'll see

18   you at sidebar.

19             (Pause in proceedings.)

20             THE COURT:  Anyone else in the second row?

21   Seeing no hands.  Third row?  Seat 21, yes?

22             JUROR NUMBER 21:  My daughter just got --

23             THE COURT:  Keep your voice up, please.

24             JUROR NUMBER 21:  Okay.

25             THE COURT:  No, I got that.  I need your

Voir Dire                                        63

1    voice.

2              JUROR NUMBER 21:  Oh, okay.  My daughter

3    just passed the Delaware Bar and is working at the

4    Delaware Supreme Court.

5              THE COURT:  Well, congratulations.  Does

6    she handle patents at all or don't you know?

7              JUROR NUMBER 21:  No.

8              THE COURT:  Would the fact that your

9    daughter just passed the Delaware Bar prevent you

10   from being fair and impartial in deciding this case?

11             JUROR NUMBER 21:  No.

12             THE COURT:  And if you're selected to sit

13   on the jury, you promise you won't go back to your

14   daughter and ask her questions?

15             JUROR NUMBER 21:  I do.

16             THE COURT:  Thank you.  We'll continue in

17   the second row.  Yes?  Juror in seat number 30.

18             MS. HULL:  24.

19             THE COURT:  I'm sorry, I missed you.  Yes?

20             JUROR NUMBER 24:  My son is currently

21   serving in the U.S. Army.

22             THE COURT:  I'm sorry, I didn't hear you.

23             JUROR NUMBER 24:  My son is currently

24   serving in the U.S. Army.

25             THE COURT:  Oh.  I don't think that would

1   prevent you from being fair and impartial, is that

2   correct?

3            JUROR NUMBER 24:  Yes.

4            THE COURT:  Okay, thank you.  27.

5            JUROR NUMBER 27:  27.

6            THE COURT:  Yes?

7            JUROR NUMBER 27:  In a former career I used

8   to serve as an expert witness in circuit courts.

9            THE COURT:  Expert witness in?

10            JUROR NUMBER 27:  Forensic sciences.

11            THE COURT:  And did you get involved in

12   patent cases?

13            JUROR NUMBER 27:  No.

14            THE COURT:  Would your experience as an

15   expert witness in forensic science prevent you from

16   being fair and impartial in deciding this case?

17            JUROR NUMBER 27:  No.

18            THE COURT:  Thank you.  Anyone else in that

19   row?  Yes?  I need your number.  I can't --

20            JUROR NUMBER 30:  My son's friend is a

21   patent attorney.

22            THE COURT:  Do you talk to him about patent

23   law?

24            JUROR NUMBER 30:  No.

25            THE COURT:  If you're selected to sit on

1   this jury, you will be instructed that you cannot

2   talk to this friend of your son's who's a patent

3   lawyer.  Could you follow that instruction?

4           JUROR NUMBER 30:  Yes.

5           THE COURT:  Thank you.  Third -- fourth

6   row?

7           JUROR NUMBER 32:  32.

8           THE COURT:  Yes?

9           JUROR NUMBER 32:  I work in T-mobile's

10  legal department as a compliance officer, which is

11  wire taps.  And I also work with, like you mentioned

12  before, Ericsson, Alcatel, Nortel, and Nokia.

13          THE COURT:  I think we might want to talk

14  to you at sidebar.

15          JUROR NUMBER 32:  Okay.

16          THE COURT:  But thank you very much.

17          JUROR NUMBER 32:  You're welcome.

18          THE COURT:  Anyone else in the third --

19  fourth?  Yes?  Juror number 40.

20          JUROR NUMBER 40:  My current employer was a

21  general counsel for Kimber America.

22          THE COURT:  Did you get involved in patent

23  discussions with this gentleman?

24          JUROR NUMBER 40:  We've never discussed

25  patent law, but I'm sure that he -- part of his job

Voir Dire                                    66

1   was patent law.

2           THE COURT:  And that was a former employer?

3           JUROR NUMBER 40:  Yes.  No, no, he's my

4   current employer, but --

5           THE COURT:  Oh.

6           JUROR NUMBER 40:  -- his former job was a

7   patent -- was general counsel.

8           THE COURT:  If you're selected to sit on

9   this jury, you'll be instructed that you cannot

10  discuss the case with anyone until after you reach a

11  verdict.  Could you follow that instruction?

12          JUROR NUMBER 40:  Yes.

13          THE COURT:  Thank you.  Finally, last row?

14  Yes?     JUROR NUMBER 44:  I worked in the corporate

15  legal --

16          THE COURT:  I need -- I --

17          JUROR NUMBER 44:  I'm sorry, 44.

18          THE COURT:  Yes.

19          JUROR NUMBER 44:  I worked in the corporate

20  legal department advising our internal business on

21  tax-related matters.

22          THE COURT:  Did you get involved in patent

23  matters at all?

24          JUROR NUMBER 44:  Not at all.

25          THE COURT:  If you're selected to sit on

1  this jury, could you be fair and impartial in

2  deciding this case?

3          JUROR NUMBER 44:  Yes.

4          THE COURT:  Thank you.  And finally, 48.

5          JUROR NUMBER 48:  48.

6          THE COURT:  Yes?

7          JUROR NUMBER 48:  Our family business was

8  involved in a legal dispute over a copyright.

9          THE COURT:  Over a copyright?

10         JUROR NUMBER 48:  Right.

11         THE COURT:  Did you get into any discussion

12 about patents?  I don't think it --

13         JUROR NUMBER 48:  No, sir.

14         THE COURT:  -- would happen normally.

15         JUROR NUMBER 48:  No.

16         THE COURT:  Would the fact that you had a

17 dispute over a copyright prevent you from being fair

18 and impartial in deciding the case?

19         JUROR NUMBER 48:  No.

20         THE COURT:  Thank you.  All right, we're at

21 the time I said we would break for lunch.  We have

22 some more questions, and what I'm going to do is

23 recess for now for an hour until about 1:50.  I want

24 you to leave these white placards on your seats.  Try

25 to remember your seat number because that's the only

1   way we're identifying you right now.  And if you have

2   any questions, Ms. Hull, who is seated in the middle,

3   or any of my court officers will be able to help you.

4   Mr. Cosgrove, on my right, you're left, is going

5   to -- his job is to record everything that we say.

6   He's called an Electronic Sound Recording Operator.

7   You can talk to him.  The gentleman on my left, your

8   right, is Ian Peterson, my law clerk who is working

9   with me on this case.  And you can talk to any of

10  them if you have any issues.  But we're going to be

11  in recess now.

12          You know very little about the case.  I

13  don't want you to discuss it with anyone, even among

14  yourselves, and I'll explain that in a bit.  Take

15  your belongings with you, leave your placards on your

16  seats, and we'll see you -- do you want them lined up

17  outside or -- they can come in.  Come in the

18  courtroom.  When you come back you can come in the

19  courtroom and return to your seats.  We'll pick up

20  the jury selection at about 1:50.

21          (Jury out, 12:52 p.m.)

22          THE COURT:  Be seated, everyone, as soon as

23  the jurors leave.  And we'll be very brief.  I've got

24  three orders that I will give you, one covering the

25  dropping of the claims against the unnecessary Sprint

Voir Dire

1   companies, the other addressing the joint

2   infringement claim, and the third granting in part

3   and denying in part the motion we -- that I ruled on

4   this morning.  Everything is in accordance with my

5   rulings with one exception.  I'm told that if we drop

6   the counterclaim in the caption, the court clerk will

7   drop Sprint as a party plaintiff.  You'll remain as a

8   defendant.  And I suspect that's not a goal to be

9   desired.

10          So what we're going to do is this.  On

11  every order we'll put both captions.  On everything

12  going to the jury, so as not to confuse them, we'll

13  only use the Comcast versus Sprint caption.  And with

14  that, let me distribute these three orders.

15          (Pause in proceedings.)

16          THE COURT:  All right.  With that, we're in

17  recess until about 1:50.  You may go about your

18  business.

19          (Luncheon recess taken, 12:55 p.m.)

20

21                     *  *  *

22

23

24

25

70

<u>I N D E X</u>

<u>VOIR DIRE</u>                                <u>PAGE NUMBER</u>

 By Judge Dubois                              41

* * *

1

2

3

4

5

6                          CERTIFICATION

7

8          I, Michael Keating, do hereby certify that

9     the foregoing is a true and correct transcript from the

10    electronic sound recordings of the proceedings in the

11    above-captioned matter.

12

13

14

      1/31/17

15    _____            _____

16    Date                         Michael Keating

17

18

19

20

21

22

23

24

25