```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                      - - -

COMCAST CABLE            : CIVIL NO. 12-859
COMMUNICATIONS, LLC,     :
et al.,                  :
             Plaintiff   :
                         :
                         :
                         :
                         :
                         :
      v.                 :
                         :
                         :
                         :
                         :
                         :
SPRINT COMMUNICATIONS    : Philadelphia, Pennsylvania
COMPANY L.P., et al.,    : January 31, 2017
             Defendant   : 9:56 a.m.

                      - - -

   TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 2
       BEFORE THE HONORABLE JAN E. DUBOIS
            UNITED STATES DISTRICT JUDGE

                      - - -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104
```

2

1    APPEARANCES:            (Continued)

2    For the Defendant:      DAVID E. FINKELSON, ESQUIRE
                             BRIAN C. RIOPELLE, ESQUIRE
3                            McGuire Woods, LLP
                             Gateway Plaza
4                            800 East Canal Street
                             Richmond, VA 23219
5
                             COLLEEN H. SIMPSON, ESQUIRE
6                            Harkins Cunningham, LLP
                             4000 Two Commerce Square
7                            2001 Market Street
                             Philadelphia, PA 19103
8
                                    - - -
9
     Audio Operator:        Michael Cosgrove
10
     Transcribed By:        Michael T. Keating
11
                                    - - -
12
             Proceedings recorded by electronic sound
13   recording; transcript produced by computer-aided
     transcription service.
14
                                    - - -
15

16

17

18

19

20

21

22

23

24

25

Voir Dire                          3

1          (The following was heard in open court at

2     9:56 a.m.)

3               (Note:  Transcript contains indiscernibles

4     because participants could not be heard clearly at

5     sidebar.)

6               THE COURT:  Good morning, everyone.  Please

7     be seated.

8               MR. HANGLEY:  Good morning, Your Honor.

9               THE COURT:  It's good to see all of you

10    jurors here.  I'm sure at least some of you might not

11    feel that way, but we'll get started.  And we hope to

12    finish the jury selection this morning.

13              We received a report from juror number 14,

14    a letter from juror number 20, and a statement from

15    juror number 41.  We haven't voir dired juror number

16    41.  We will take into consideration the report from

17    juror number 14 and the letter from juror number 20.

18    All right.  Counsel, join me at sidebar.

19              (Pause in proceedings.)

20              MR. FINKELSON:  Good morning, Your Honor.

21              THE COURT:  Good morning.

22              MR. FINKELSON:  How are you?

23              THE COURT:  Well, a voice helps.  My voice

24    helps.

25              (Pause in proceedings.)

Voir Dire                              4

1        THE COURT:  Juror number 14 reported orally

2   to my deputy, Milahn Hull, that he only gets paid for

3   ten days.

4        MR. FINKELSON:  Is he the one who put he

5   only got paid for one day?

6        THE COURT:  Ten days.  And he's

7   complaining.  I think that does not change our

8   analysis.  Everyone agree?

9        MR. RIOPELLE:  Yes.

10        THE COURT:  Juror number 14.  Juror number

11   20, the last juror, we had -- no, next to last, who

12   is also --

13        (Pause in proceedings.)

14        THE COURT:  We considered this and

15   (indiscernible) same -- same position (indiscernible)

16   motion.

17        COURTROOM DEPUTY:  Judge, can I also -- can

18   I just also add to that letter that he stated that he

19   was the single breadwinner for his household?  That's

20   all I wanted to add.

21        THE COURT:  He --

22        COURTROOM DEPUTY:  That he's the single

23   breadwinner for his household.  His fiancé is not

24   employed.

25        THE COURT:  Well, until Congress amends the

Voir Dire                                    5

1   law applicable to payment of jurors, that's a fact of

2   life.

3            (Pause in proceedings.)

4            THE COURT:  And we'll address juror number

5   41 when we get to him.  Juror in seat 22.

6            (Pause in proceedings.)

7            THE COURT:  How are you?

8            JUROR NUMBER 22:  Good morning, Your Honor.

9            THE COURT:  Good morning.  Come a little

10  closer.  You said you had a hardship and I'd like you

11  to tell me about it.

12           JUROR NUMBER 22:  Well, (indiscernible).

13  That's why I (indiscernible).  And I was afraid that

14  if I'm over here, my (indiscernible) 100 percent.  At

15  the same time I feel like I don't drive myself during

16  the day because (indiscernible) 100 percent.

17           THE COURT:  Do you have any -- do you take

18  any medication for your sleep apnea?

19           JUROR NUMBER 22:  No, I don't take any --

20           THE COURT:  Can you --

21           JUROR NUMBER 22:  Well, over the counter, I

22  use (indiscernible) sleep at night.

23           THE COURT:  Your --

24           JUROR NUMBER 22:  (Indiscernible).

25           THE COURT:  You work as a driver?

1          JUROR NUMBER 22:  I work as a driver

2  (indiscernible), you know, I greet the customers in

3  the morning.  They set up --

4          THE COURT:  Oh, you drive cars?

5          JUROR NUMBER 22:  Yes.  But it doesn't

6  bother me with my sleep apnea because I'm active

7  during the day.  During the day I work

8  (indiscernible).  But like driving myself --

9          THE COURT:  What we do, if you have a need

10  to stand up, for example, that's perfectly

11  appropriate.  Just raise your hand and I will grant

12  you that.  That is if you're selected to serve on the

13  jury.  And if you need a break and you're on the

14  jury, you just raise your hand and we will take a

15  break.  Our idea is not to penalize a juror for a

16  disability, to --

17          JUROR NUMBER 22:  Uh-huh.

18          THE COURT:  -- the word is accommodate the

19  juror to do whatever we can to address the juror's

20  disability.

21          JUROR NUMBER 22:  Okay.

22          THE COURT:  Now, you've told us about your

23  sleep apnea.  I haven't noticed you sleeping in the

24  courtroom.

25          JUROR NUMBER 22:  No, because

1  (indiscernible) are talking.

2          THE COURT:  Well, we don't -- we don't

3  generally have the jurors drinking coffee, but --

4          JUROR NUMBER 22:  (Indiscernible).

5          THE COURT:  You also said that you had some

6  contact with Comcast, Sprint, and Nokia.

7          JUROR NUMBER 22:  No, I didn't have

8  nothing -- no contract with Comcast.

9          THE COURT:  But would you have a contract

10  with Comcast?

11          JUROR NUMBER 22:  No, I used to.  I used

12  to, but what happened was that the wire -- I did that

13  at the cable company.  The wire got -- was in the

14  street, they were hanging (indiscernible).  I have

15  tried --

16          THE COURT:  Knock it down?

17          JUROR NUMBER 22:  -- knock it down, yeah.

18  And I was (indiscernible) --

19          THE COURT:  So it's UPS you have it with.

20          JUROR NUMBER 22:  The other one is --

21          MR. HANGLEY:  FedEx.

22          JUROR NUMBER 22:  -- FedEx.

23          MR. HANGLEY:  They're not in this case.

24          JUROR NUMBER 22:  So what happened was I

25  called them so many times and I -- they

Voir Dire                          8

1    (indiscernible) rates are up and they didn't do it,

2    so I went to (indiscernible) Verizon.  But

3    (indiscernible) UPS and FedEx.

4           THE COURT:  That's a modest comment about

5    Comcast.  Would that -- if you're selected to serve

6    on the jury, would that interaction, I'm going to

7    call it, with Comcast prevent you from being fair and

8    impartial in deciding this case?

9           JUROR NUMBER 22:  No, I don't think so.

10   (Indiscernible).  They don't have the wire across the

11   street from (indiscernible).

12          THE COURT:  And you switched for that

13   reason.

14          JUROR NUMBER 22:  Yeah, we (indiscernible).

15          THE COURT:  Do you have a cell phone or a

16   smart phone?

17          JUROR NUMBER 22:  I have a cell phone, yes.

18          THE COURT:  And who is your provider?

19          JUROR NUMBER 22:  T-Mobile.

20          THE COURT:  Are you satisfied with

21   T-Mobile?

22          JUROR NUMBER 22:  I'm fine with T-Mobile,

23   yeah.

24          THE COURT:  All right.

25          JUROR NUMBER 22:  Yeah.

```
                          Voir Dire                      9
```

1           THE COURT:  No problems with this phone?

2           JUROR NUMBER 22:  No, I -- (indiscernible)

3    we had Sprint, but --

4           THE COURT:  Who had Sprint?

5           JUROR NUMBER 22:  My daughter.

6           THE COURT:  Oh.  Does she live with you?

7           JUROR NUMBER 22:  Yes.

8           THE COURT:  Does she have any problems with

9    Sprint?

10          JUROR NUMBER 22:  No, no, she doesn't have

11   any problems.

12          THE COURT:  All right.  I'm going to let

13   counsel ask questions if they have any.  Mr. Hangley,

14   do you?

15          MR. HANGLEY:  I don't.

16          THE COURT:  Okay.  Mr. Riopelle?

17          MR. RIOPELLE:  No questions.  Thank you.

18          THE COURT:  Thank you.

19          JUROR NUMBER 22:  Thank you.

20          THE COURT:  No excuse for cause and no

21   hardship.

22          MR. HANGLEY:  Agreed.

23          THE COURT:  Juror in seat 23.

24          (Pause in proceedings.)

25          JUROR NUMBER 23:  Good morning.

Voir Dire                    10

1          THE COURT:  Good morning.  I'm going to

2    follow up on some of your questions --

3          JUROR NUMBER 23:  Sure.

4          THE COURT:  -- answers to my questions.

5    First, the hardship question.

6          JUROR NUMBER 23:  Okay.  Which one was

7    that?

8          THE COURT:  That's the one that said you

9    didn't have a hardship.

10          JUROR NUMBER 23:  Okay.  The last question

11    you had asked was would we be able to work -- be here

12    two to three weeks.

13          THE COURT:  Yes.

14          JUROR NUMBER 23:  Part of the reason I, you

15    know, a hardship in terms of --

16          THE COURT:  You're right, the last

17    question -- I refer to that as the hardship question.

18          JUROR NUMBER 23:  Okay.  Okay.

19          THE COURT:  Obviously --

20          JUROR NUMBER 23:  So let me explain my

21    situation to you.  I work for IBM.  I work in

22    mobility.  I work with cell phones and tablets.  We

23    have security that provides that.  I'm a general

24    manager, so I work with AT&T, Verizon, and by

25    coincidence, Sprint.

1              THE COURT:  And Sprint.

2              JUROR NUMBER 23:  Sprint, sorry.

3              MR. RIOPELLE:  That's all right.

4              JUROR NUMBER 23:  What I do is I build --

5    I'm a vertical account manager so I build

6    relationships with -- I work with Nokia, other public

7    device manufacturers, Apple, Samsung, all that.  I

8    work -- I do road shows with Apple and Sprint, and I

9    do them with AT&T, I do them with Verizon.  So I'm

10   kind of, you know, stuck in the middle, if you will,

11   because I work with Sprint on a daily basis.  I work

12   with the sales reps, bring in some new opportunities,

13   we sell to their customers.

14              As far as what I do, as far as a hardship

15   goes to your last question, I'm on the road.  I just

16   got back from my honeymoon.

17              THE COURT:  From where?

18              MR. HANGLEY:  Congratulations.

19              JUROR NUMBER 23:  My honeymoon.  Thank you.

20              THE COURT:  Okay.

21              JUROR NUMBER 23:  Just got back two weeks

22   ago.

23              THE COURT:  Congratulations.

24              JUROR NUMBER 23:  Thank you.  We have our

25   sales kickoff meetings January, February, rolling

Voir Dire                                    12

1   into March.  I'll be on the road, New York,

2   Massachusetts, Vermont, Maine, just going up the east

3   coast doing several different shows over the next

4   couple weeks.  I start next week.

5            THE COURT:  And these shows are pre --

6            JUROR NUMBER 23:  Yes.

7            THE COURT:  -- pre-planned?  They're not --

8            JUROR NUMBER 23:  Yeah, so --

9            THE COURT:  -- just meetings?

10           JUROR NUMBER 23:  No, these are meetings

11   that I arrange.  So what I do is I do a lunch and

12   learn.  I bring lunch, I train people on the product,

13   teach them how to bring us new opportunities, and

14   then I go to the next office.  So in Manhattan, I'll

15   do 7th Avenue, I'll do Flat Iron Building, I'll do

16   another office, and then I'll head to Westchester,

17   and then I'll head to White Plains, just kind of move

18   all around and work my way up.

19           THE COURT:  Who does this when you're not

20   there?

21           JUROR NUMBER 23:  Nobody.  I'm the -- it's

22   my -- it's my relationship.  I'm the dedicated

23   account resource for these different sales offices

24   that sell to businesses for (indiscernible).

25           THE COURT:  How big is the office from

Voir Dire                                      13

1   which you operate?

2            JUROR NUMBER 23:  Well, we have a bunch of

3   offices.  As far --

4            THE COURT:  Which one --

5            JUROR NUMBER 23:  -- as IBM?

6            THE COURT:  Yes.

7            JUROR NUMBER 23:  So we have one here at

8   16th and Cherry that I don't work at.  When I'm in

9   the office I don't normally work -- this isn't in my

10  office.  This is in their offices.  I work out of an

11  office in Blue Bell, PA.

12           THE COURT:  An IBM office?

13           JUROR NUMBER 23:  An IBM office.

14           THE COURT:  How many people are there?

15           JUROR NUMBER 23:  We have three floors.

16  Maybe 200.  But they don't do what I do.  There's

17  only about four reps that cover four different

18  regions.  I handle the northeast.

19           THE COURT:  And you have no backup?

20           JUROR NUMBER 23:  No.  It's a brand new

21  role.

22           THE COURT:  You mentioned contacts with

23  Sprint.  Do you have any contacts with Comcast?

24           JUROR NUMBER 23:  I personally don't.  I

25  work with a team that does.  So I'm part of IBM

1   security.  They're an IBM security customer.  So if

2   they were to -- say they needed mobile security, they

3   would bring me in.  That's not -- and I know that our

4   Global Technology Services Team that I work with,

5   which is like a consultant to organizations to

6   provide them with software and hardware, we're

7   assisting them in building their carrier business.

8   So I work with the team that helped -- that's helping

9   them build their carrier business.  But I don't -- I

10  haven't worked with them directly, to answer your

11  question, Your Honor.

12          THE COURT:  All right.  I think you

13  answered several other questions (indiscernible), and

14  you might have answered one of these.

15          JUROR NUMBER 23:  Uh-huh.

16          THE COURT:  The first, have you, any

17  members of your immediate family, or close friends

18  ever worked for, been a customer of, owned stock in,

19  or done business with Comcast, Sprint, or Nokia?

20  You -- have you answered that?

21          JUROR NUMBER 23:  Yes, I was a customer of

22  both.

23          THE COURT:  No, this is not

24  (indiscernible).

25          JUROR NUMBER 23:  Oh, yes, I have friends

Voir Dire                                  15

1   who work for Comcast --

2            THE COURT:  But this is --

3            JUROR NUMBER 23:  -- and Sprint, obviously.

4            THE COURT:  That wouldn't prevent you from

5   being fair and impartial, right?

6            JUROR NUMBER 23:  With them, no.  They sell

7   cable.

8            THE COURT:  What about your role?  Have you

9   had any personal dealings with Comcast, Sprint, or

10  Nokia, other than your business-related dealings?

11           JUROR NUMBER 23:  I mean outside,

12  personally as a customer?

13           THE COURT:  Yes.

14           JUROR NUMBER 23:  Yes, with both.  I was

15  a -- I used to be a Sprint customer.  I wasn't happy.

16  I switched with Verizon, then I went to AT&T.

17  Comcast I switched my cable.  I wasn't unhappy with

18  them.  I just got a better deal, so --

19           THE COURT:  So unhappy with Sprint, unhappy

20  with Comcast for service reasons.

21           JUROR NUMBER 23:  At the time -- I'll say

22  at the time I wasn't happy with Sprint's service is

23  why I switched.  I switched my cable when I bought my

24  house and decided I could get a better deal and get a

25  $200 gift card, so I use Verizon Fios.

Voir Dire                                    16

1          THE COURT:  Would your relationship with

2   Sprint prevent you from being fair and impartial in

3   deciding this case, your personal relationship?

4          JUROR NUMBER 23:  It's a -- well, my

5   personal relationship is my business relationship

6   with them, you know.  I wouldn't say I --

7          THE COURT:  Well, you left Sprint.

8          JUROR NUMBER 23:  Oh.

9          THE COURT:  That's what I'm talking about.

10         JUROR NUMBER 23:  Oh, you mean not -- okay.

11  No, it would not cause me to be.

12         THE COURT:  And how about Nokia?  Any

13  contact with Nokia on a personal level?

14         JUROR NUMBER 23:  No, just on a business

15  level.  I see them all the time.  I know their

16  product offering managers.  We do shows together.

17         THE COURT:  I think you answered one of the

18  questions that I had --

19         COURTROOM DEPUTY:  I had 11 and 13.

20         THE COURT:  Yes, and 13.  I have them both.

21  I think you've answered all of our questions.  Cell

22  phone -- not -- there's one about cell phone and

23  smart phone.  Who is your provider?

24         JUROR NUMBER 23:  Now?

25         THE COURT:  Yes.

1          JUROR NUMBER 23:  Well, I have two.  I

2    work -- I have my own phone and I have it with AT&T.

3    And then I have a work phone for Verizon.

4          THE COURT:  Any problems with the phones?

5          JUROR NUMBER 23:  No.

6          THE COURT:  All right.  Counsel, do you

7    have any questions?

8          MR. HANGLEY:  Yeah.  The Judge asked you

9    whether it would be difficult for you to

10   (indiscernible) in a case involving Sprint.  If you

11   were asked -- if you were asked to remain a

12   substantial (indiscernible) Sprint, including

13   (indiscernible) relationship with them, would that be

14   a problem for you?

15         JUROR NUMBER 23:  I think it's a little bit

16   of a conflict of interest for me because I work with

17   them on a daily basis.

18         MR. HANGLEY:  IBM itself was not on the

19   list of people that we asked about, but IBM in its

20   dealings (indiscernible) has potential

21   (indiscernible) one of the parties is willing to come

22   into evidence, ways that may not be flattering to

23   IBM, will that create any issues for you?

24         JUROR NUMBER 23:  Personally, I think it

25   would.  I don't like to mix business work with, you

Voir Dire                              18

1   know, a case like this, if that makes sense.  I

2   realize that what happens here stays here, but with

3   all due respect, if IBM is part of the case and I

4   work for IBM, partner with Sprint, Comcast

5   (indiscernible) accounts, I'm kind of like -- excuse

6   my French here -- I'm sleeping with everybody.  So

7   does that make sense?

8           MR. HANGLEY:  Yes, I understand.

9           THE COURT:  Yes.  Thank you.  Any

10  questions?

11          MR. RIOPELLE:  What -- and what is the

12  product that you're selling?

13          JUROR NUMBER 23:  The product is called

14  NAZ-360.  I work within IBM security, so anything

15  that has to do with mobility, application

16  development, end point security, and big data and

17  analytics.

18          MR. RIOPELLE:  So it's like a -- it's a

19  software.  It's not a -- you're not selling any

20  hardware, right?

21          JUROR NUMBER 23:  Well, one of our products

22  is still doing hardware, but mostly everything is

23  software-driven.  My concentration most of the time

24  is in software, cloud-based.  So my solution partners

25  with the device manufacturers.  They give us what's

Voir Dire                                  19

1  called BPIs to give customers the ability to lock

2  their -- you know, a company can lock their phone,

3  wipe it, lock email, things like that, at a high

4  level.

5          MR. RIOPELLE:  Right.  Right.

6          THE COURT:  All right.  Thank you very

7  much.

8          JUROR NUMBER 23:  My pleasure.

9          MR. HANGLEY:  Thank you.

10          THE COURT:  I think we have to strike him.

11          MR. RIOPELLE:  I think so.

12          MR. HANGLEY:  Darn.  I like him.

13          (Pause in proceedings.)

14          MR. HANGLEY:  We're both going to put him

15  on our potential expert witness list.

16          (Pause in proceedings.)

17          THE COURT:  Juror in seat 24.

18          (Pause in proceedings.)

19          THE COURT:  Hi, how are you?

20          JUROR NUMBER 24:  Good morning.

21          THE COURT:  I'm going to follow up on some

22  of your answers to my questions and I'm going to

23  start with the hardship question.  Can you tell me

24  what your hardship is?

25          JUROR NUMBER 24:  On (indiscernible), I'm

Voir Dire                                    20

1   going on an inhouse training (indiscernible) for my

2   certification (indiscernible) next month.

3           THE COURT:  And when are you leaving?

4           JUROR NUMBER 24:  No, it's a training

5   within my company.

6           THE COURT:  And your company is?

7           JUROR NUMBER 24:  Beneficial Bank.

8           THE COURT:  And what kind of training is

9   it?

10          JUROR NUMBER 24:  It's a certification for

11  we call it the Beneficial Conversation.  Every

12  employee is required to be certified.

13          THE COURT:  And how often is this training

14  given?

15          JUROR NUMBER 24:  It's a (indiscernible)

16  one hour per day.

17          THE COURT:  For how long?

18          JUROR NUMBER 24:  For 30 days.

19          THE COURT:  And how often is this program

20  given, this 30 day program?

21          JUROR NUMBER 24:  Every employee has to go

22  on that, so this time it's my time to go for that

23  training.

24          THE COURT:  Yes, but how often does this

25  program repeat?  And if you miss this 30 day program,

Voir Dire                        21

1    when will you next be able to participate in the

2    program?

3              JUROR NUMBER 24:  The succeeding month.

4              THE COURT:  Pardon me?

5              JUROR NUMBER 24:  The following month.

6              THE COURT:  Oh.  Do you have any other

7    problems with sitting as a juror?

8              JUROR NUMBER 24:  Say that again.  I'm

9    sorry.

10             THE COURT:  Any other problems with sitting

11   as a juror?  Is that the hardship?

12             JUROR NUMBER 24:  Yeah, so far.

13             THE COURT:  All right.  You answered one

14   question.  Did you, any members of your immediate

15   family, or any close friends ever have any

16   experience, either good or bad, with Comcast or

17   Sprint that might prevent you from being fair and

18   impartial?

19             JUROR NUMBER 24:  I do.

20             THE COURT:  Can you tell me what that is?

21             JUROR NUMBER 24:  Well, for my daughter's

22   program at school they were giving this

23   (indiscernible) discounted service, so I signed up my

24   daughter.  But as soon as I received the package, I

25   don't think it will work with how my daughter will

Voir Dire                          22

1   use the program, so I sent it back right away.  But I

2   was charged.  I didn't know why I was charged.  So

3   until now, I'm fighting for that bill that why am I

4   being charged if I didn't activate that program or

5   that service and I returned the package the following

6   day as soon as I found that this will not work with

7   how my daughter will use the service.

8               THE COURT:  And which -- Comcast or Sprint,

9   which one?

10              JUROR NUMBER 24:  Comcast.

11              THE COURT:  And do you still have this

12  issue with Comcast?

13              JUROR NUMBER 24:  Yes, they're still

14  sending me the bill for it.  I know it's a little

15  amount of $20 and some change, but it's the

16  principle.  I didn't use the program, I didn't use

17  the service.

18              THE COURT:  I'm sure you did all the right

19  things.

20              JUROR NUMBER 24:  Yeah, I think so.

21              MR. HANGLEY:  And what was it?  What kind

22  of --

23              THE COURT:  It was -- it was a program --

24  pardon me for smiling.  I can't help but balance the

25  issue here, a $20 or so refund, is that what you

Voir Dire                              23

1    said?

2            JUROR NUMBER 24:  No, no, no.  I'm being

3    charged --

4            THE COURT:  -- or no bill.

5            JUROR NUMBER 24:  No, I'm being charged for

6    $20.57 after they -- for I don't know -- for what?  I

7    returned the box that they sent me and I

8    (indiscernible) --

9            THE COURT:  I'm sure you did all the

10   right -- all the right things.

11           JUROR NUMBER 24:  -- let them know that no,

12   this will not work for us.

13           THE COURT:  Well, if you're asked to serve

14   on this jury, do you think that would bother you and

15   that you would not be able to judge Comcast fairly

16   because of what they did to you?

17           JUROR NUMBER 24:  I don't know because like

18   we were told that we have to judge based on the

19   evidence presented, but it's just I have a kind of

20   hard feelings with Comcast, like why I'm being billed

21   for this, but --

22           THE COURT:  Well, you're being very --

23           JUROR NUMBER 24:  -- (indiscernible).

24           THE COURT:  You've been very frank and I

25   think you.  Do you have any questions?

1          MR. HANGLEY:  Yes, for my own purposes, can

2    you tell me again the name of this device?

3          JUROR NUMBER 24:  I (indiscernible).

4          MR. HANGLEY:  Okay.

5          JUROR NUMBER 24:  (Indiscernible).

6          MR. HANGLEY:  Several years ago, you said?

7          JUROR NUMBER 24:  I think it's been a

8    couple of years now.

9          THE COURT:  How many years?

10         JUROR NUMBER 24:  A couple of -- a couple

11   of years now that -- it's been a year that I'm

12   getting this $20.57 bill every month.  And I know

13   it's a small amount, but it's (indiscernible).

14         MR. HANGLEY:  I have no more questions.

15         MR. RIOPELLE:  But when you were answering

16   the question about could you be fair, do you think

17   though you could be fair and based it on the evidence

18   in the case?

19         JUROR NUMBER 24:  I think so.

20         MR. RIOPELLE:  Who is your -- you have a

21   cell phone I assume?

22         JUROR NUMBER 24:  Yes.

23         MR. RIOPELLE:  Who is -- who is your

24   carrier?

25         JUROR NUMBER 24:  Sprint.

1          MR. RIOPELLE:  Is it?

2          JUROR NUMBER 24:  Yes.

3          MR. RIOPELLE:  And have you had any issues

4    with Sprint?

5          JUROR NUMBER 24:  I don't think so.

6          THE COURT:  Thank you very much.

7          JUROR NUMBER 24:  You're welcome.

8          MR. RIOPELLE:  Thank you.

9          MR. HANGLEY:  Thank you.

10          JUROR NUMBER 24:  You're welcome.

11          MR. HANGLEY:  I think it's cause.

12          MR. RIOPELLE:  She just -- we don't, and

13    she said she thought she could be fair.

14          THE COURT:  That's her last word.  I've

15    forgotten the phrase that's used to describe that

16    kind of question.  Sometimes judges are accused of

17    asking that question after the juror expresses doubt.

18    Well, notwithstanding all that, do you think you can

19    be fair and impartial, and the juror says yes.

20          MR. HANGLEY:  And I put not trust in it

21    whatsoever.

22          THE COURT:  Where are you on this issue?

23          MR. HANGLEY:  We think she's a cause

24    objection.  We also think that somebody ought to give

25    her her $20.40.

1      MR. RIOPELLE:  She was looking at us as

2  though (indiscernible).

3      MR. HANGLEY:  (Indiscernible).

4      THE COURT:  Well, I went like this.

5      MR. RIOPELLE:  Again, I don't think it's --

6  I don't think it's cause.

7      THE COURT:  I do.  I really do.  I'm on a

8  jury committee.  It's an issue that I've lectured on.

9  I think that -- and I've forgotten the phrase.  I'll

10  find it during -- it's a judge who usually asks the

11  juror --

12      MR. RIOPELLE:  Yeah.

13      THE COURT:  -- prospective juror the

14  questions to rehabilitate the juror.  You did a fine

15  job.

16      MR. RIOPELLE:  (Indiscernible).

17      MR. HANGLEY:  It worked with her.  It just

18  didn't work with you, Your Honor.

19      THE COURT:  But let me just point out that

20  this was Comcast.  If we run out of jurors and

21  someone's got to give some, I'm going to turn first

22  to the Comcast.  This is a $20 issue in a case that

23  you say is worth a zillion dollars.

24      MR. RIOPELLE:  $25.

25      THE COURT:  So we'll strike her for cause.

```
                        Voir Dire                    27
```

 1           (Pause in proceedings.)

 2           THE COURT:  But see if you can't fix that.

 3           (Pause in proceedings.)

 4           THE COURT:  Juror in seat 25.

 5           (Pause in proceedings.)

 6           THE COURT:  Hi, how are you?

 7           JUROR NUMBER 25:  Fine, thanks.

 8           THE COURT:  I'm going to follow up on your

 9   answers to two questions -- one question, the

10   hardship question.  Can you tell me what it is,

11   please?  And come a little closer.

12           JUROR NUMBER 25:  Yeah.  What was that?

13           THE COURT:  You said jury service for two,

14   two and a half weeks, maybe a little more, would

15   present an extraordinary hardship.

16           JUROR NUMBER 25:  Okay.  First of all, I --

17   sometimes I don't understand English.  I'm reading

18   like, you know, (indiscernible).  And the second

19   thing, I'm working -- I'm postal worker, so I'm the

20   only one who works in post office as a clerk.  The

21   second clerks, she (indiscernible) down.

22           THE COURT:  What?

23           JUROR NUMBER 25:  She work -- she had an

24   injury in work so she's out.

25           THE COURT:  Okay.

```
 1              JUROR NUMBER 25:  And I'm the only one -- I
 2    told my boss that I had two days jury duty.  He asked
 3    is there (indiscernible) for other people
 4    (indiscernible).  He (indiscernible) everyday.  You
 5    know, finally, he got one person for today.  His wife
 6    is sick too with cancer, so I don't know how long he
 7    can (indiscernible).  So -- and postmaster can't do
 8    more than 50 hours.  Otherwise, as a union
 9    (indiscernible), they have got to pay up, you know.
10    So he's got to (indiscernible).  And, as I said, I
11    don't know anything about these (indiscernible), lot
12    of stuff, knowledge about anything.  And as I have
13    commute from and essentially drive in the city and --
14              THE COURT:  Oh, we could arrange for that.
15    We would arrange to put you up --
16              JUROR NUMBER 25:  Yeah.
17              THE COURT:  -- at a hotel very close by.
18    We do that for jurors.
19              JUROR NUMBER 25:  No.
20              THE COURT:  Okay.
21              JUROR NUMBER 25:  I --
22              THE COURT:  Let me see where -- how far
23    away?
24              JUROR NUMBER 25:  It's I guess 30 miles.
25              THE COURT:  No, I don't think that calls
```

Voir Dire                              29

1   for (indiscernible).

2            JUROR NUMBER 25:  And main thing about my

3   work problem, they might have to close the office

4   sometimes because if they --

5            THE COURT:  I think the United States

6   Postal Service is going to figure that out.

7            JUROR NUMBER 25:  Yeah, but they have a

8   (indiscernible) regulation that --

9            THE COURT:  I know that.

10            JUROR NUMBER 25:  -- they can call clerk

11   except (indiscernible), and there is no, you know --

12   they have only few (indiscernible) for people there.

13   If they call other people, then they have to pay for

14   it, (indiscernible) and stuff like that.

15            THE COURT:  I think we can work that out,

16   but we'll address all of your issues and decide what

17   we're going to do.  All right.

18            JUROR NUMBER 25:  Sometimes I don't, you

19   know, understand everything, so I might not -- you

20   know, because half of your question I don't

21   (indiscernible) sitting like what he said,

22   (indiscernible) like, you know, not making --

23   understanding all of it.

24            THE COURT:  I understand.

25            JUROR NUMBER 25:  Yeah.

1          THE COURT:  And we'll discuss that.  Do you

2    have any questions?

3          MR. HANGLEY:  I do.  Do you have a cable

4    carrier at home?  Do you have -- do you have cable at

5    home?

6          JUROR NUMBER 25:  Yeah.

7          MR. HANGLEY:  Who's it with?

8          JUROR NUMBER 25:  We are Verizon I think.

9    I'm not sure because --

10          MR. HANGLEY:  Okay.

11          JUROR NUMBER 25:  -- my husband

12    (indiscernible).

13          MR. HANGLEY:  Do you have any relationship

14    with Comcast of any kind?

15          JUROR NUMBER 25:  No, we haven't

16    (indiscernible).  We do have a (indiscernible).

17          MR. HANGLEY:  Okay.

18          JUROR NUMBER 25:  We can't (indiscernible).

19          MR. HANGLEY:  What was your experience?

20          JUROR NUMBER 25:  I have no idea because my

21    husband -- and I (indiscernible).

22          MR. HANGLEY:  Oh, okay.  Now, how about

23    Sprint?  Do you have any -- do you have a Sprint

24    phone?

25          JUROR NUMBER 25:  No.

Voir Dire                                          31

1          MR. HANGLEY:  I don't think I have any

2    other questions.

3          MR. RIOPELLE:  I don't have any questions,

4    Your Honor.

5          THE COURT:  Thank you very much.

6          JUROR NUMBER 25:  Thanks.

7          THE COURT:  I think we have to let her go

8    for English reasons.  I don't think -- I've had the

9    United States Postal Service in court a lot.  They

10   can work around that.

11         MR. HANGLEY:  They can work around that,

12   but --

13         THE COURT:  But I'm concerned that she's

14   not going to understand.

15         MR. HANGLEY:  She's not going to

16   understand.

17         MR. RIOPELLE:   She was telling you she

18   didn't understand, but she seemed to be

19   understanding.

20         THE COURT:  How about when he said bad

21   experience with Comcast?  That's what you heard.

22         MR. RIOPELLE:  She didn't even know what it

23   is.

24         MR. HANGLEY:  She didn't even know.

25         MR. RIOPELLE:  That was -- that truly

1    wasn't (indiscernible).

2             THE COURT:  I didn't ask you what you

3    thought.  What do you think?

4             MR. GOETTLE:  No, it's going to be hard for

5    a primary English speaker to understand this case.  I

6    agree with you.

7             MR. HANGLEY:  Judge, it's hard for me to

8    understand.

9             MR. RIOPELLE:  I mean she seemed to be

10   understanding fine when you were talking to her.

11            THE COURT:  Well --

12            MR. RIOPELLE:  I mean I know she said --

13            (Pause in proceedings.)

14            THE COURT:  Juror in seat 26.

15            (Pause in proceedings.)

16            THE COURT:  Hi, how are you?

17            JUROR NUMBER 26:  Good morning.

18            MR. HANGLEY:  Good morning.

19            JUROR NUMBER 26:  Good morning.

20            THE COURT:  You answered some questions.

21   I'm going to follow up on those answers.  First, the

22   question about the hardship serving on a jury --

23            JUROR NUMBER 26:  Yeah.

24            THE COURT:  -- for the two and a half weeks

25   or so.

Voir Dire                                    33

1          JUROR NUMBER 26:  Uh-huh.  So I just

2    started a training program, a brand new job really.

3    I'm not -- I don't think I'm even ten weeks into it,

4    and there's two other guys that are doing it with me.

5    And, you know, it's a huge setback that even the past

6    two days being here, missing training basically, and

7    I don't think that they're just going to stop

8    training because I'll be out of the office.  So it's

9    just like something that I don't even think -- if I

10   was to be here for two and a half weeks, my head

11   wouldn't even be in it just because it's like my

12   career right now.

13         THE COURT:  Well, I -- the information with

14   which we were provided says you're a student at

15   Bloomsburg.

16         JUROR NUMBER 26:  Uh-uh, no, that's -- I've

17   been actually out of college -- I had a couple jobs

18   after college.  I graduated in 2015, but this is like

19   my first career move really.

20         THE COURT:  And you're -- we didn't update

21   this.

22         COURTROOM DEPUTY:  I don't ask every juror

23   if their information is --

24         THE COURT:  Okay.  What is your employer's

25   name?

Voir Dire                    34

1          JUROR NUMBER 26:  Chubb Insurance.  And I'm

2    also studying to take exams to further my insurance

3    career.  AIMS it's called.

4          THE COURT:  When were you hired by Chubb?

5          JUROR NUMBER 26:  My hire date was November

6    7th.

7          THE COURT:  What's your position?

8          JUROR NUMBER 26:  Business Development

9    Specialist.

10          (Pause in proceedings.)

11          JUROR NUMBER 26:  I think there's even

12    travel coming up to the home base in Alpharetta,

13    Georgia.

14          THE COURT:  When is the next training

15    program?

16          JUROR NUMBER 26:  When is the next one?

17          THE COURT:  Yes.

18          JUROR NUMBER 26:  My position there is not.

19    We're the only three people in my division.  It's

20    kind of like a startup.  They're not going to hire

21    until we get promoted basically to the next position,

22    which is Business Development Manager.

23          THE COURT:  And how long is this training

24    program?

25          JUROR NUMBER 26:  Well, the expected time

Voir Dire                            35

1   that I'll be in the position is a year and a half.

2           THE COURT:  No, the training program.

3           JUROR NUMBER 26:  The training program, I

4   would say we'll be training for another five weeks

5   probably.

6           THE COURT:  All right.  You said you also

7   had some relationship with Comcast --

8           JUROR NUMBER 26:  Yeah, they're my --

9           THE COURT:  -- or Sprint.

10          JUROR NUMBER 26:  -- carrier for my --

11  what's it called -- TV provider.

12          THE COURT:  Oh.  And are you satisfied with

13  them?

14          JUROR NUMBER 26:  I mean I've had some bad

15  customer service experiences, but --

16          THE COURT:  You're talking about Comcast

17  issues?

18          JUROR NUMBER 26:  Comcast.  But I mean I

19  don't know if that would cause me to be like bias.  I

20  just think that my head wouldn't be in it if I were

21  to be a juror.

22          THE COURT:  Because of your training?

23          JUROR NUMBER 26:  Yeah.

24          THE COURT:  Cell phone (indiscernible)?

25          JUROR NUMBER 26:  I have Verizon.

Voir Dire                                        36

1        THE COURT:  Are you satisfied with them?

2        JUROR NUMBER 26:  Uh-huh.

3        THE COURT:  Any problems with the phone?

4        JUROR NUMBER 26:  Uh-uh.

5        THE COURT:  All right.  Questions from

6  counsel?

7        MR. HANGLEY:  (Indiscernible) you were on

8  the Dean's List?

9        JUROR NUMBER 26:  Yeah.

10        MR. HANGLEY:  Okay.  So you're a hard

11  worker?

12        JUROR NUMBER 26:  I'm what?

13        MR. HANGLEY:  A hard worker.

14        JUROR NUMBER 26:  Absolutely.

15        MR. HANGLEY:  Could you work hard even if

16  this was a pretty technical case?  Would you work

17  hard to understand it?

18        JUROR NUMBER 26:  I mean, like I said,

19  I'm -- my head is not here.  I want to be at work

20  right now learning to further my career, but I mean I

21  guess.

22        MR. HANGLEY:  Okay, thank you.

23        MR. RIOPELLE:  I think you also answered

24  the question that you worked for a company that does

25  some work with patents?

Voir Dire                                 37

1              JUROR NUMBER 26:  I think that my company

2    right now has like systems that are in place that are

3    patented.

4              MR. RIOPELLE:  Chubb?

5              JUROR NUMBER 26:  Yeah.

6              MR. RIOPELLE:  Okay.  Okay.

7              JUROR NUMBER 26:  Like I don't know that

8    much about it though.

9              MR. RIOPELLE:  I think that's all the

10   questions I have.

11             JUROR NUMBER 26:  Okay.

12             MR. RIOPELLE:  Thank you so much.

13             THE COURT:  Thank you.

14             JUROR NUMBER 26:  Uh-huh.

15             THE COURT:  Thank you.

16             JUROR NUMBER 26:  Thank you.

17             THE COURT:  Are we star-crossed?

18             MR. RIOPELLE:  I'm not sure -- I don't

19   see -- I mean I feel for her.  I do.  I feel for her.

20   But I don't see how that's any different than number

21   5 yesterday.

22             THE COURT:  Yeah, you keep talking about 5.

23   We're going to have to back again.

24             MR. RIOPELLE:  Well, he -- I mean he's been

25   working on a deal for five years (indiscernible).  I

Voir Dire                          38

1    mean I understand, but I'm just trying to --

2            MR. HANGLEY:  Yeah, but --

3            MR. RIOPELLE:  I want to be consistent

4    across -- consistent across the board of how we do

5    it.

6            THE COURT:  Do you want to come back to

7    her?

8            MR. HANGLEY:  Well, it wasn't so much the

9    hardship with me.  It's the -- I said look, you would

10   have to work very hard on this, and she said no, I

11   wouldn't.

12           THE COURT:  What's --

13           MR. RIOPELLE:  Well, no, she said -- she

14   said her head wouldn't be in it.

15           THE COURT:  Oh, that's what she said.

16           MR. RIOPELLE:  But I --

17           MR. HANGLEY:  Yeah.

18           MR. RIOPELLE:  But I --

19           THE COURT:  Her head wouldn't be in it

20   here --

21           MR. HANGLEY:  Yeah.

22           THE COURT:  -- because of the job.

23           MR. RIOPELLE:  But I mean I think if we

24   asked number 5 or if you asked any juror --

25           MR. HANGLEY:  No, I asked him that kind of

Voir Dire                                     39

1    a question and he said yeah.

2              MR. RIOPELLE:  No, we didn't ask number 5

3    that.  So this is a hold?

4              THE COURT:  Yes.

5              MR. HANGLEY:  Yeah.

6              THE COURT:  Juror number 27.

7              (Pause in proceedings.)

8              JUROR NUMBER 27:  Good morning, Your Honor.

9              THE COURT:  How are you, sir?

10             MR. HANGLEY:  Good morning.

11             JUROR NUMBER 27:  Good morning.

12             MR. RIOPELLE:  Good morning.

13             JUROR NUMBER 27:  Good morning.

14             THE COURT:  I just want to follow up on

15   some of the answers you gave.

16             JUROR NUMBER 27:  Uh-huh.

17             THE COURT:  First, you said you had a

18   hardship.

19             JUROR NUMBER 27:  Yes, sir.

20             THE COURT:  Will you tell me about that?

21             JUROR NUMBER 27:  Just before the holidays,

22   my daughter, who lives with me, sustained a severe

23   fracture to her leg, something referred to as a pilon

24   fracture.

25             THE COURT:  What?

Voir Dire                                    40

1          JUROR NUMBER 27:  Something referred to as

2     a pilon fracture.  She's -- she had multiple

3     fractures in the tibia -- here tibia and fibula, and

4     has had to undergo some surgeries.  I brought some

5     paperwork to document that.

6          THE COURT:  How old is your daughter?

7          JUROR NUMBER 27:  She's 23.  And right now,

8     she lives with me.  I live alone and I care for her.

9     I work from home.  I'm working virtually right now.

10    But she's -- she has to go to physical therapy, she's

11    on crutches, so she's incapacitated.  That's really

12    the situation that I'm in.

13         THE COURT:  How does she get to physical

14    therapy?

15         JUROR NUMBER 27:  I bring her.  Well, she

16    was -- she's starting physical therapy this week.

17    She was -- she needs to start it now, according to

18    the paperwork.

19         THE COURT:  How far is the therapy from

20    your home?

21         JUROR NUMBER 27:  It's about a mile and a

22    half.

23         THE COURT:  Is there any other person who

24    could provide transportation services?

25         JUROR NUMBER 27:  That's a bit of a

1    challenge.  There may be my mother-in-law, but she

2    cares for a 95-year-old husband, so it's difficult

3    for her.  And apart from that, I don't have anyone

4    else that's living close to us.

5              THE COURT:  All right.  I'm going to ask

6    you some other questions.  First, the con -- you said

7    you had some contact with Sprint, Comcast, or Nokia.

8              JUROR NUMBER 27:  Yes.  I have -- I have a

9    TV and internet service with Comcast.

10             THE COURT:  Any problems?

11             JUROR NUMBER 27:  No problems.

12             THE COURT:  Do you have a cell phone or a

13   smart phone?

14             JUROR NUMBER 27:  I do.

15             THE COURT:  Who is your provider?

16             JUROR NUMBER 27:  Verizon.

17             THE COURT:  Any problems with the phone?

18             JUROR NUMBER 27:  No problems.

19             THE COURT:  You said you were involved in

20   forensic sciences as an expert witness.

21             JUROR NUMBER 27:  That's correct.

22             THE COURT:  Tell me a little bit about

23   that.

24             JUROR NUMBER 27:  In my 20s, I was working

25   for the Bureau of Forensic Sciences in Richmond,

Voir Dire                            42

1   Virginia as a forensic scientist.

2           MR. HANGLEY:  (Indiscernible)?

3           JUROR NUMBER 27:  (Indiscernible).  And I

4   worked with them, provided expert testimony for about

5   four years in that rule throughout the various court

6   systems in the State of Virginia.

7           THE COURT:  Did you get involved in any

8   work that had to do with telecommunications,

9   particularly cell phones or smart phones?

10          JUROR NUMBER 27:  No.

11          THE COURT:  What is your employment now,

12  sir?

13          JUROR NUMBER 27:  I'm a clinical

14  pharmacologist.  I work for Pfizer Oncology.

15          THE COURT:  And where do you work?

16          JUROR NUMBER 27:  The office is based out

17  of Collegeville, Pennsylvania.

18          THE COURT:  But you work out of your --

19          JUROR NUMBER 27:  I work -- I work from

20  home.  I work virtually.  I'm doing that now to take

21  care of my daughter.  And, in fact, she's been

22  offered an interview -- this may not be relevant, but

23  she's been offered an interview or medical school at

24  George Washington University in a couple of weeks,

25  and she's already had to postpone that appointment.

Voir Dire                    43

1   It was supposed to have occurred this week.  Because

2   of the surgery and everything, she's postponed that

3   interview until I think February 14th.  I'll have to

4   take her down with the wheelchair.

5           THE COURT:  Does she move around your house

6   on crutches?

7           JUROR NUMBER 27:  She does move in the

8   house with crutches, yes.

9           THE COURT:  And how about outside?

10          JUROR NUMBER 27:  She doesn't go outside.

11          THE COURT:  When she goes outside do you

12  take her in a wheelchair, is that it?

13          JUROR NUMBER 27:  I assist her.  If we have

14  to get in the car, I bring the car as close to the

15  front door as I can.

16          THE COURT:  All right, you've answered my

17  questions.  Counsel?  Comcast first?

18          MR. HANGLEY:  No questions.

19          THE COURT:  Mr. Riopelle?

20          MR. RIOPELLE:  Yes, you had -- I think you

21  answered this question.  You said you worked with a

22  company (indiscernible).  Is that Pfizer you were

23  talking about?

24          JUROR NUMBER 27:  Actually, yes.  It was

25  actually formerly Wyeth first, Wyeth Research --

Voir Dire                                    44

1          MR. RIOPELLE:  Right.

2          JUROR NUMBER 27:  -- before they were

3   acquired by Pfizer.  In fact, I had forgotten because

4   (indiscernible) for some work that we had done about

5   22-23 years ago.

6          MR. RIOPELLE:  Okay.  Did you have -- do

7   you remember the patent process?  Did you have any

8   interaction with the U.S. Patent Office?

9          JUROR NUMBER 27:  Personally, no.  All of

10  that work was administered through our corporate

11  patent attorney.

12         MR. RIOPELLE:  And any -- what's your

13  opinion -- do you have any opinion (indiscernible)?

14         JUROR NUMBER 27:  No, no, I really don't.

15         MR. GOETTLE:  May I ask just a couple of

16  questions?

17         THE COURT:  Yes.

18         MR. GOETTLE:  Does your daughter driver?

19         JUROR NUMBER 27:  She's not able to drive.

20  She's not able to put any weight bearing on this leg

21  probably for a couple of months.

22         MR. GOETTLE:  Okay.  And may I read the

23  documentation?

24         THE COURT:  Let me see the document.  This

25  is --

Voir Dire                              45

1          JUROR NUMBER 27:  This is -- this --

2          THE COURT:  -- documentation of your

3     daughter's physical condition?

4          JUROR NUMBER 27:  Yeah, this is the

5     discharge instruction from Jefferson Hospital I think

6     from January 9th, which also describes her condition.

7     And on the last page is the prescription for her

8     physical therapy.

9          THE COURT:  Where is the physical therapy

10    to be provided?

11         JUROR NUMBER 27:  It can be provided

12    anywhere that has an appropriate program.  We have a

13    facility about a mile and a half from our home called

14    Bounce Back Therapy at -- in Radnor.  It's actually

15    in Strafford.  And we think that that should be a

16    suitable place to take her.

17         (Pause in proceedings.)

18         JUROR NUMBER 27:  But no, she -- it would

19    be illegal for her to drive, actually, because she's

20    got a -- she's got a cast on her foot.

21         THE COURT:  Cast on her left --

22         JUROR NUMBER 27:  Well, it's her -- it's

23    her right let.  It's her right leg.  She had -- she

24    had mult -- it was a very significant injury that she

25    sustained.  She's got plates, she's got multiple

Voir Dire                                  46

1   scars.

2           THE COURT:  Do you wish to see this?

3           MR. HANGLEY:  Thank you, Your Honor.

4           MR. RIOPELLE:  Oh, my.

5           (Pause in proceedings.)

6           THE COURT:  Those are Jefferson records.

7   She's being treated at the Rothman Institute.

8           JUROR NUMBER 27:  Yes.

9           THE COURT:  The last page deals with the

10  therapy.

11          (Pause in proceedings.)

12          THE COURT:  Thank you.  Well, I don't think

13  we have need for this.  We've examined it, and thank

14  you very much.  I hope your daughter has a speedy

15  recovery.  Are there any other questions?

16          MR. RIOPELLE:  No.

17          MR. HANGLEY:  No, Your Honor.

18          MR. GOETTLE:  No.

19          THE COURT:  Thank you.  Thank you very

20  much.

21          JUROR NUMBER 27:  Thank you.

22          (Pause in proceedings.)

23          THE COURT:  I know why you gave me all

24  the -- are those Sprint or Comcast?

25          MR. RIOPELLE:  That's Comcast.

1          THE COURT:  You're using that as a desk?

2          MR. HANGLEY:  Yes.

3          THE COURT:  By the way, I checked my

4    orders.  I don't see where I ordered you to provide

5    two copies of all the exhibits.

6          MR. HANGLEY:  You asked for it over the

7    phone.

8          THE COURT:  I'm not going to do that

9    anymore.

10          MR. GOETTLE:  Your Honor, we actually

11   considered asking you if you're sure you wanted them

12   and --

13          THE COURT:  You should have.

14          MR. GOETTLE:  -- it's my fault.  I should

15   have.  It kept slipping --

16          THE COURT:  You should --

17          MR. GOETTLE:  -- my mind.

18          THE COURT:  -- have done it.  That's a knee

19   jerk reaction.  We always ask.

20          MR. GOETTLE:  I should have asked.

21          THE COURT:  Yes.  All right.  Jury number

22   27.

23          MR. RIOPELLE:  I really like this juror,

24   but I just don't -- that's a hardship.  I mean what

25   are you going to do?  I feel bad for the guy.

Voir Dire                                        48

1          THE COURT:  Just keep all the names that we

2     both --

3          MR. RIOPELLE:  I have them all.

4          THE COURT:  I don't -- maybe I'm too easy

5     on hardships.  At the rate we're going we won't --

6          MR. RIOPELLE:  Well, I think that's --

7          THE COURT:  Recruit your legal teams.

8          MR. RIOPELLE:  But, Judge, you've had -- I

9     don't know (indiscernible) you had an organ donor

10    transplant helicopter, you've had a single caretaker

11    for (indiscernible), (indiscernible), you get this

12    gentleman.  I mean it's just --

13         THE COURT:  (Indiscernible) at least.  What

14    do you want to do?

15         (Pause in proceedings.)

16         THE COURT:  Don't laugh.

17         COURTROOM DEPUTY:  You said you have eight.

18         THE COURT:  Yes.

19         MR. RIOPELLE:  That would leave us with

20    two, Your Honor.

21         THE COURT:  The majority of two?

22         MR. RIOPELLE:  (Indiscernible).

23         THE COURT:  We might.  Juror number 28.

24         (Pause in proceedings.)

25         JUROR NUMBER 28:  Good morning, Your Honor.

1        THE COURT:  How are you, sir?

2        JUROR NUMBER 28:  Good.

3        THE COURT:  I'm going to follow up on your

4   answers to some of my questions.

5        JUROR NUMBER 28:  Sure.

6        THE COURT:  First, the hardship question.

7        JUROR NUMBER 28:  I run a very small

8   business.  We're a three person company: myself, we

9   have a part-time employee, and one warehouse person.

10   If I'm not there, we're not doing any business.

11   We're a small import company.  We live and die by me

12   being there.  Okay, (indiscernible) --

13        THE COURT:  What do you do?  What product?

14        JUROR NUMBER 28:  Yoga mats.  We also

15   import bedding and (indiscernible) fabrics.  We

16   import them from Germany.  We have some made here

17   domestically in the United States.

18        THE COURT:  And when you're not there what

19   happens?

20        JUROR NUMBER 28:  There's really nobody

21   there.  Like I said, we have one part-time employee

22   who answers the phone.  She also manages the office.

23   Other than that, there's really nobody there that has

24   any knowledge about the product or the ability to

25   sell.  I do have some salespeople out in the field,

1   but the majority of the calls come to the office and

2   I handle them.  (Indiscernible) new business for

3   existing business.

4           THE COURT:  All right, I have some other

5   questions.  You said you have some contacts with

6   Sprint, Comcast, or Nokia.

7           JUROR NUMBER 28:  Well, a Comcast customer

8   for years.  I actually worked for the Philadelphia

9   Flyers for three seasons.  At that time they were

10  owned by the Comcast Corporation.

11          THE COURT:  Any issues with Comcast?

12          JUROR NUMBER 28:  Not particularly, no.  I

13  was a Comcast stockholder as well.  I don't know if

14  that's an issue.

15          THE COURT:  Are you a Comcast stockholder

16  now?

17          JUROR NUMBER 28:  Now?  No.  I say that,

18  but there's mutual funds that I own that could

19  potentially (indiscernible).  I don't know

20  specifically.

21          THE COURT:  All right.  There are some

22  other questions.  Well, I think you've answered it.

23  Members, have you ever worked for a company that had

24  patented products or processes?  These are patented

25  products --

Voir Dire                                    51

1        JUROR NUMBER 28:  Some of the products that

2   I sell.

3        THE COURT:  -- that you sell?

4        JUROR NUMBER 28:  That's correct.

5        THE COURT:  You never got involved in the

6   patent process, did you?

7        JUROR NUMBER 28:  It's hard to say yes

8   definitively.  One of the products that I developed

9   for a customer (indiscernible).  We basically just

10  built a (indiscernible) to their steps.  We actually

11  own the patent on the material.

12       THE COURT:  Is that a mat like?

13       JUROR NUMBER 28:  yes.

14       THE COURT:  Okay.

15       JUROR NUMBER 28:  It was a yoga mat.

16       (Pause in proceedings.)

17       THE COURT:  The next question relates to

18  dealings with the United States Patent and Trademark

19  Office.  You personally or others?

20       JUROR NUMBER 28:  Well, through them

21  bringing us this material, we had to sign a contract

22  basically specific -- you know, saying that we

23  wouldn't infringe on their patent because we could

24  develop other yoga mats that are similar to what

25  their specifications were.  So we didn't have to be

Voir Dire                              52

1  very specific as to what we did outside of the

2  business for this particular company.

3          THE COURT:  Was there experience, albeit

4  through others, with the Patent and Trademark Office?

5          JUROR NUMBER 28:  Directly, no.

6          THE COURT:  Was there any either bad

7  experience or any very good experience that might

8  present a problem with you trying to be air and

9  impartial?

10         JUROR NUMBER 28:  No.  Specifically,

11  there -- your question, the one you asked, was, you

12  know, whether or not I've dealt with a patent and,

13  you know --

14         THE COURT:  And you said yes.

15         JUROR NUMBER 28:  Yes.

16         THE COURT:  All right.  Comcast?

17         MR. HANGLEY:  This business of yours --

18         JUROR NUMBER 28:  Uh-huh.

19         MR. HANGLEY:  -- (indiscernible) --

20         JUROR NUMBER 28:  Yes, sir.

21         MR. HANGLEY:  -- is that -- is that the

22  name of your company or is that also based upon a

23  product that you --

24         JUROR NUMBER 28:  Well, it's one and both.

25  That is our (indiscernible) company.  It is also one

Voir Dire                                  53

1    of the products that we do carry.

2            MR. HANGLEY:  And that's made by

3    (indiscernible)?

4            JUROR NUMBER 28:  It is made by us, that's

5    correct.

6            MR. HANGLEY:  Okay.

7            JUROR NUMBER 28:  So we're a wholesale

8    distributor.

9            MR. HANGLEY:  Okay.  Now, do you have a

10   retail showroom?

11           JUROR NUMBER 28:  Well, no.  Because we're

12   a wholesale distributor, we have this very small

13   office.  We bring it into our warehouse and then

14   break it down and redistribute it to retail

15   locations.

16           MR. HANGLEY:  Okay.

17           JUROR NUMBER 28:  We don't deal direct to

18   the public.

19           MR. HANGLEY:  And how do the retail -- your

20   customers are retailers?

21           JUROR NUMBER 28:  That's correct.

22           MR. HANGLEY:  Okay.  And do they buy from

23   you online, by telephone?

24           JUROR NUMBER 28:  Mostly by telephone.  We

25   have an online presence.  Mostly, it's direct contact

1   by me.  You know, I will solicit retailers and

2   inquire about what products they're using and how I

3   might fit into their pipeline.

4           MR. HANGLEY:  How do you do that?

5           JUROR NUMBER 28:  Through trade shows,

6   through emailing lists, contacts, references.

7           MR. HANGLEY:  Do you have any trade shows

8   scheduled in the next couple weeks?

9           JUROR NUMBER 28:  No, I do not

10          MR. HANGLEY:  Okay.

11          JUROR NUMBER 28:  And --

12          MR. HANGLEY:  Can you --

13          JUROR NUMBER 28:  Right.

14          MR. HANGLEY:  It sounds to me kind of like

15  you're a business where a lot of the business can be

16  done in the evening?

17          JUROR NUMBER 28:  Not typically, no.  If

18  you want to go back into the hardship, I stopped with

19  just the business.  I have a ten-year-old son.  My

20  wife does travel.  She has business travel for next

21  week and the following week -- or, excuse me, this

22  week and next week.  So that presents a problem.  I

23  don't have extended care for my son.  To be here in

24  the morning at the appropriate time, I wouldn't be

25  able to get him on the bus.  So there's other things,

Voir Dire                                              55

1   other circumstances, that --

2            MR. HANGLEY:  Do you own -- do you own a

3   cell phone?

4            JUROR NUMBER 28:  Yes, I do.

5            MR. HANGLEY:  Who's your cell phone

6   provider?

7            JUROR NUMBER 28:  AT&T.

8            MR. HANGLEY:  Have you ever used Sprint?

9            JUROR NUMBER 28:  No.

10            MR. HANGLEY:  Have you had any questionable

11   dealings with the United States Patent Office?

12            JUROR NUMBER 28:  No.  Like I said, it was

13   just enforcing some of the directions (indiscernible)

14   this person's patent.  They have gone through all

15   that process.

16            MR. HANGLEY:  May I ask just a couple more,

17   Your Honor.

18            THE COURT:  Yes.

19            MR. HANGLEY:  First of all, you live kind

20   of far.  You live (indiscernible)?

21            JUROR NUMBER 28:  Malvern.

22            MR. HANGLEY:  Okay.  So that's

23   (indiscernible).

24            JUROR NUMBER 28:  I don't know.  I thought

25   the same thing when you came in.  Do you -- I play a

1  lot of golf.  I'm an avid golfer.

2          MR. HANGLEY:  Something I do not do at all.

3          JUROR NUMBER 28:  Do you (indiscernible)?

4          MR. HANGLEY:  No.  No.

5          JUROR NUMBER 28:  All right.  Those are two

6  things --

7          MR. HANGLEY:  But my father-in-law did.

8          JUROR NUMBER 28:  Okay.  Do you look like

9  him?

10          MR. RIOPELLE:  You met each other's

11  doppleganger?

12          JUROR NUMBER 28:  Well, (indiscernible) of

13  my father.  My father has lived in the Mainline for

14  quite a number of years.

15          MR. HANGLEY:  (Indiscernible).

16          JUROR NUMBER 28:  Oh, you don't?  Well,

17  then nevermind.  I've lived in the Philadelphia area

18  my whole life.

19          MR. HANGLEY:  And the other question, if

20  you don't mind my asking, is you --

21          JUROR NUMBER 28:  Uh-huh.

22          MR. HANGLEY:  -- worked for the Flyers.

23  Was that Comcast Spectacor?

24          JUROR NUMBER 28:  Yes.

25          MR. HANGLEY:  Why did you leave?

1           JUROR NUMBER 28:  It was choice.  Yeah,

2    there was nothing -- there was no -- no, it was not

3    particular reason other than opportunity.

4           MR. HANGLEY:  Okay.  Nothing else.

5           MR. RIOPELLE:  Nothing else from us, Your

6    Honor.

7           THE COURT:  Thank you.

8           MR. RIOPELLE:  Thank you so much.

9           JUROR NUMBER 28:  Okay.  Thank you for your

10   time.

11          THE COURT:  Okay.

12          MR. HANGLEY:  I don't think we have much.

13          THE COURT:  No, I don't think so either.

14          MR. HANGLEY:  Think he's good?

15          THE COURT:  There's no cause.  Juror in

16   seat 29.

17          (Pause in proceedings.)

18          THE COURT:  She's coming up with some

19   documents.

20          JUROR NUMBER 29:  Good morning.

21          THE COURT:  Good morning.  How are you?

22          JUROR NUMBER 29:  As I would love to be on

23   your jury, my problem is I am going to be traveling

24   between February 14th and the 21st.  My daughter is in

25   a residential treatment program in Idaho and it's a

1  therapeutic meeting to go out and see her.  I haven't

2  seen her since November.  I have airline tickets and

3  I have the explanation of what there -- the purpose

4  of our trip is.

5          THE COURT:  You and your husband is it?

6          JUROR NUMBER 29:  My husband, yes.

7          THE COURT:  And your daughter is in therapy

8  for an addiction or --

9          JUROR NUMBER 29:  No.  Well, mental health

10 issues, not an addiction.  Depression.

11         THE COURT:  And you've made the

12 arrangements, airline tickets?

13         JUROR NUMBER 29:  Yeah.  Yeah, I have

14 everything.

15         THE COURT:  It says its going to go see the

16 worlds.  You're not going to see the world though,

17 are you?

18         JUROR NUMBER 29:  I'm not going to see the

19 world, no.

20         THE COURT:  All right.

21         JUROR NUMBER 29:  You know, I mean, like I

22 said, I haven't seen here since November and so it's

23 pleasurable in that effect, but I'd rather she wasn't

24 there and I'd rather we weren't going there to see

25 her.

```
                        Voir Dire                    59
```

1        THE COURT:  Of course.

2        JUROR NUMBER 29:  So --

3        MR. HANGLEY:  I don't have any questions.

4        MR. RIOPELLE:  No, I don't.

5        THE COURT:  Thank you.

6        JUROR NUMBER 29:  All right, thank you.

7   Thank you very much.

8        THE COURT:  I don't think (indiscernible).

9   We missed that one.  I thought we touched all the

10  boxes.

11       MR. RIOPELLE:  That's the hardship one.

12       THE COURT:  Yes.

13       (Pause in proceedings.)

14       THE COURT:  Juror in seat 30.  30.  She's a

15  little hard of hearing unless I wasn't clear.

16       (Pause in proceedings.)

17       THE COURT:  Good morning.  Can you come a

18  little closer?  I'm going to ask you some questions

19  about the answers that you gave.  First, cell phone,

20  smart phone, do you have one?

21       JUROR NUMBER 30:  Yes.

22       THE COURT:  And who is your supplier?

23       JUROR NUMBER 30:  Verizon.  Comcast

24  (indiscernible).

25       THE COURT:  Comcast is not?

Voir Dire                                60

1          JUROR NUMBER 30:  Yes, (indiscernible) yes,

2     to provide (indiscernible) Verizon.

3          THE COURT:  Can you speak up?

4          JUROR NUMBER 30:  It's a TV/phone package

5     together.

6          THE COURT:  Do you have any problems with

7     Comcast?

8          JUROR NUMBER 30:  We've had to go to

9     (indiscernible).  They rectified the (indiscernible)

10    and the goods have been good.

11         THE COURT:  Is there any reason, based on

12    your relationship with Comcast, that you couldn't be

13    fair and impartial if you're selected?

14         JUROR NUMBER 30:  I think I could be, yes.

15    It's nothing extreme.

16         THE COURT:  You said your son's friend is a

17    patent lawyer.

18         JUROR NUMBER 30:  Yes.

19         THE COURT:  Do you speak to him about

20    patent-related matters?

21         JUROR NUMBER 30:  No.  He lives in D.C.  I

22    saw him for his wedding last week and that's

23    (indiscernible).

24         THE COURT:  Well, if you're selected to

25    serve on the jury, you cannot talk to this friend of

Voir Dire                                   61

1    your son's --

2            JUROR NUMBER 30:  Of course not.

3            THE COURT:  -- about patent matters until

4    after the case is over.

5            JUROR NUMBER 30:  After, yes.

6            THE COURT:  Yes.

7            JUROR NUMBER 30:  He'll probably be very

8    curious afterwards.

9            THE COURT:  I'm sure he would be.  Any

10   questions from counsel?

11           MR. HANGLEY:  Do you -- are there any

12   physical conditions that would make it difficult for

13   you to serve?

14           JUROR NUMBER 30:  No.

15           MR. HANGLEY:  Okay.  I don't think I have

16   any other questions.

17           JUROR NUMBER 30:  Thank you.

18           THE COURT:  Mr. Riopelle?

19           MR. RIOPELLE:  I just -- I was -- you said

20   you have Comcast.  Do you have Verizon as your cell

21   phone provider?

22           JUROR NUMBER 30:  Yes.

23           MR. RIOPELLE:  Okay.

24           JUROR NUMBER 30:  And we are -- we already

25   have a Comcast and Verizon package with phone and TV

```
                    Voir Dire                    62
```

1   (indiscernible) get reduced rates and additional

2   benefits if you (indiscernible).

3            MR. RIOPELLE:  Okay.  All right.

4            THE COURT:  Thank you very much.

5            JUROR NUMBER 30:  Thank you.

6            MR. HANGLEY:  Thank you.  Oh, may I ask one

7   more?

8            THE COURT:  Yes.

9            MR. HANGLEY:  Where did you teach?

10           JUROR NUMBER 30:  In Lancaster.

11           MR. HANGLEY:  What level?

12           JUROR NUMBER 30:  A high school.

13           MR. HANGLEY:  Thank you.

14           THE COURT:  I didn't hear.

15           MR. HANGLEY:  She was a high school teacher

16   in Lancaster.  She's (indiscernible).

17           THE COURT:  We got no reason to excuse her

18   for cause.

19           MR. HANGLEY:  So it must have been you.

20           THE COURT:  Juror 31.

21           (Pause in proceedings.)

22           THE COURT:  Hi, how are you?

23           JUROR NUMBER 31:  Good.

24           THE COURT:  I'm going to follow up on some

25   of the questions that you've answered.

Voir Dire                                         63

 1          JUROR NUMBER 31:  Okay.

 2          THE COURT:  First, have you, any members of

 3  your immediate family, or any close friends ever had

 4  any experience, good or bad, with Comcast or Sprint

 5  that might prevent you from being fair and impartial?

 6          JUROR NUMBER 31:  I mean I have to -- I

 7  mean I have a family member that worked for Comcast

 8  for many years and I have a Comcast -- we have

 9  Comcast as our provider for over 20 years, but I

10  don't know if that actually --

11          THE COURT:  Well, it's good that you told

12  us.

13          JUROR NUMBER 31:  Yeah.

14          THE COURT:  But that wouldn't prevent --

15          JUROR NUMBER 31:  No.

16          THE COURT:  -- you from being fair --

17          JUROR NUMBER 31:  From being fair.

18          THE COURT:  -- and impartial?

19          JUROR NUMBER 31:  I can't say that.

20          THE COURT:  You answered a number of other

21  questions, and I'm going to cover them very briefly.

22  Worked in the following fields: patents, trademarks,

23  cell phone, computers, science?

24          JUROR NUMBER 31:  I work for a

25  pharmaceutical company.  So I mean I can't say

Voir Dire                                      64

1    computer science.

2              THE COURT:  No.  Do you get involved in

3    patented products?

4              JUROR NUMBER 31:  Well, I mean we have

5    plenty of patented products.

6              THE COURT:  But you're not involved in the

7    patents at all?

8              JUROR NUMBER 31:  R&D, but not anything to

9    do with patents.

10             THE COURT:  Cell phone, smart phone --

11             JUROR NUMBER 31:  Yeah.

12             THE COURT:  -- you have one?

13             JUROR NUMBER 31:  Yes.

14             THE COURT:  Your provider is?

15             JUROR NUMBER 31:  AT&T.

16             THE COURT:  Have you ever --

17             JUROR NUMBER 31:  AT&T cell phone.

18             THE COURT:  -- had a cell phone or a smart

19   phone provider Comcast or Sprint?

20             JUROR NUMBER 31:  No.

21             THE COURT:  Any problem with the cell phone

22   you -- or smart phone that you have?

23             JUROR NUMBER 31:  No.

24             THE COURT:  And do you use it for text

25   messaging and --

Voir Dire                                    65

1           JUROR NUMBER 31:  Yes.

2           THE COURT:  -- (indiscernible) messaging?

3           JUROR NUMBER 31:  Yes.

4           THE COURT:  All right.  I have no further

5    questions.

6           MR. HANGLEY:  What does a regulatory

7    associate of J&J do?

8           JUROR NUMBER 31:  (Indiscernible)

9    operations, so we -- I do more the planning for

10   (indiscernible).

11          MR. HANGLEY:  Okay.

12          JUROR NUMBER 31:  So make sure that we

13   (indiscernible) the regulations and more timelines,

14   getting documents (indiscernible), making sure that

15   they're filed on time.

16          MR. HANGLEY:  Okay.  Do you have a

17   scientific background?

18          JUROR NUMBER 31:  No, I'm working with

19   another J&J employee.

20          MR. HANGLEY:  I see.

21          THE COURT:  You'll be a business

22   (indiscernible) --

23          JUROR NUMBER 31:  In the design field,

24   yeah.

25          THE COURT:  Okay.

1          JUROR NUMBER 31:  Yeah.

2          MR. RIOPELLE:  You said you had a family

3  member who worked for Comcast?

4          JUROR NUMBER 31:  Yes.

5          MR. RIOPELLE:  Do you know what they did

6  for Comcast?

7          JUROR NUMBER 31:  I really don't, no.

8          MR. RIOPELLE:  Okay.

9          JUROR NUMBER 31:  I just know that he

10  worked for Comcast for probably over ten years.

11          MR. RIOPELLE:  Do you ever talk to him

12  about his experience at Comcast?

13          JUROR NUMBER 31:  No.  No.

14          MR. HANGLEY:  Okay.  I don't -- and there's

15  nothing in Comcast -- your relationship with Comcast

16  that would get (indiscernible)?

17          JUROR NUMBER 31:  No.

18          MR. HANGLEY:  Okay.

19          JUROR NUMBER 31:  I could imagine.

20          THE COURT:  Thank you very much.

21          JUROR NUMBER 31:  Thank you.

22          MR. HANGLEY:  Thank you.

23          MR. RIOPELLE:  Thank you.

24          THE COURT:  No cause, no hardship.  Juror

25  32.

1          MR. HANGLEY:  I think that may be our first

2   two wins back to back.  It's a big day when that

3   happens to the Sixers this year.

4          THE COURT:  Except I don't -- I don't want

5   to jinx --

6          JUROR NUMBER 32:  Your Honor.

7          THE COURT:  How are you?

8          JUROR NUMBER 32:  Good morning.

9          THE COURT:  Good morning.  I'm going to

10  follow up on some of the answers that you gave.

11         JUROR NUMBER 32:  Sure thing.

12         THE COURT:  Have you, any members --

13         MR. HANGLEY:  (Indiscernible).

14         JUROR NUMBER 32:  Yes, sir,

15  (indiscernible).

16         THE COURT:  Have you, any members of your

17  immediate family, or close friends ever worked for a

18  series of companies: Acision, Comverse, Syniverse,

19  Openwave, Nokia Siemens, Ericsson, Nortel, and

20  Alcatel-Lucent?

21         JUROR NUMBER 32:  Yeah, I work with people

22  from Ericsson every single day.  I work -- I work

23  with Ericsson every -- people from Ericsson everyday.

24         THE COURT:  Well, they're not involved as a

25  party.

```
                        Voir Dire                    68
```

 1          JUROR NUMBER 32:  Sure.

 2          THE COURT:  They're involved in some of the

 3   background.

 4          JUROR NUMBER 32:  Uh-huh.

 5          THE COURT:  Would that involvement that you

 6   have prevent you --

 7          JUROR NUMBER 32:  With Ericsson, no.

 8          THE COURT:  That wouldn't prevent you --

 9          JUROR NUMBER 32:  With Sprint, yeah.

10          MR. RIOPELLE:  He works (indiscernible),

11   Your Honor.

12          JUROR NUMBER 32:  They're a direct --

13   they're a direct competitor of mine.

14          THE COURT:  Okay.

15          MR. HANGLEY:  And he's in the legal

16   department --

17          JUROR NUMBER 32:  And I'm in the legal

18   department of --

19          MR. HANGLEY:  -- for T-Mobile.

20          JUROR NUMBER 32:  -- T-Mobile.  So if --

21   you know, I mean --

22          MR. FINKELSON:  You may want to skip past

23   the answers to all the other questions.

24          JUROR NUMBER 32:  They lose customers, I

25   win.  I'm sorry, I don't mean to be --

Voir Dire                                69

1          THE COURT:  I must have missed something.

2     I must have missed something.  He's wearing the

3     jacket.

4          JUROR NUMBER 32:  (Indiscernible).

5          THE COURT:  You did that on purpose.

6          JUROR NUMBER 32:  I wore it yesterday.  I

7     didn't (indiscernible).  I mean (indiscernible).

8          THE COURT:  Do you have any relationship --

9     maybe we can balance this out.

10         MR. FINKELSON:  You might be the solution

11    to (indiscernible).

12         THE COURT:  I gather your relationship with

13    Sprint is a fairly close one?

14         JUROR NUMBER 32:  Well, not close.  It's

15    adversarial.

16         THE COURT:  Well, but you're in touch with

17    them a lot?  That's what I --

18         JUROR NUMBER 32:  No, I don't talk with

19    Sprint at all.  They're a competitor of ours, sir.

20    We go after the same customers.

21         THE COURT:  And you have no direct dealings

22    with Sprint?

23         JUROR NUMBER 32:  No direct dealings, no.

24         THE COURT:  Any similar relationship with

25    Comcast?

Voir Dire                                                70

1          JUROR NUMBER 32:  I have no relationship

2   with Comcast whatsoever.

3          THE COURT:  Do we need to ask anymore

4   questions?

5          MR. HANGLEY:  I don't think so.

6          MR. RIOPELLE:  I don't think so.

7          JUROR NUMBER 32:  I'm sorry.

8          THE COURT:  No.

9          JUROR NUMBER 32:  As soon as I heard that,

10  I was like --

11         MR. RIOPELLE:  Luck of the draw.

12         MR. FINKELSON:  Luck of the draw.

13         THE COURT:  Okay.

14         JUROR NUMBER 32:  Okay, thank you.

15         THE COURT:  I see no problem.  The record

16  will reflect that I was -- that's my only -- that

17  gentleman was wearing a T-Mobile jacket.  I didn't

18  pick it up.

19         MR. FINKELSON:  Not only was it a T-Mobile

20  jacket, it said "Legal Enforcement" on the side.

21         MR. RIOPELLE:  I know.

22         THE COURT:  This is cause.  18.

23         (Pause in proceedings.)

24         THE COURT:  Juror in seat 33.  So now we

25  have 11.  Good morning.

Voir Dire                              71

1        JUROR NUMBER 33:  Good morning.

2        MR. HANGLEY:  Good morning.

3        THE COURT:  Good morning.  How are you?

4        JUROR NUMBER 33:  I'm okay.

5        THE COURT:  I'm going to follow up on some

6   of your answers.  The first, the hardship, will you

7   tell me what it is, please?

8        JUROR NUMBER 33:  Well, I'm a project

9   manager and I've got three projects going on right

10  now and one that's due to be completed this month.  I

11  (indiscernible) the end of the month and some things

12  going on through the early (indiscernible).  And one

13  of my associates is out of the office for the month

14  of February, so a lot of work to be done and not a

15  lot of people to do it.

16       THE COURT:  I'm going to ask some -- thank

17  you for that.  I'm going to ask you some other

18  questions.

19       JUROR NUMBER 33:  Sure.

20       THE COURT:  One, have you, any members of

21  your immediate family, or any close friends ever had

22  any experience, good or bad, with Comcast or Sprint

23  that might prevent you from being fair and impartial?

24       JUROR NUMBER 33:  We had Comcast cable

25  service when I first moved to Pennsylvania, and I

Voir Dire                                72

1   switched because rates were going up and their

2   service was going down.

3           THE COURT:  How long ago was that switch?

4           JUROR NUMBER 33:  Ten years ago, eight

5   years.

6           THE COURT:  Would you be able to put that

7   aside if you were selected to serve on the jury and

8   treat Comcast fairly and impartially?

9           JUROR NUMBER 33:  For that, yes, but I

10  don't deny I have some opinions already.

11          THE COURT:  Well, tell me about them.

12          JUROR NUMBER 33:  I don't understand why

13  they're suing.  I mean Comcast isn't currently in the

14  cell phone business.

15          THE COURT:  Pardon me?

16          JUROR NUMBER 33:  Comcast doesn't currently

17  provide cell phone business.  Sprint has been in it

18  for decades.  So if they bought some technology from

19  another company that never sued Sprint for this

20  infringement, why is Comcast?

21          THE COURT:  Well, there might be an answer

22  to that.  I'm sure we'll hear some answers.  Comcast

23  owns the patent and they're charging Sprint with

24  infringement.

25          JUROR NUMBER 33:  Well, I understand that.

1          THE COURT:  And Sprint says they didn't

2     infringe, number one, and number two, the patent is

3     invalid for several reasons.

4          JUROR NUMBER 33:  Uh-huh.

5          THE COURT:  Now, would that view that you

6     just expressed --

7          JUROR NUMBER 33:  Uh-huh.

8          THE COURT:  -- prevent you from being fair

9     and impartial?

10         JUROR NUMBER 33:  I don't know.

11         THE COURT:  Well, I think it's -- it will

12    be agreed that Comcast never practiced the patent,

13    but you don't have to practice a patent in order to

14    use a patent to protect yourself, to protect the

15    patent.

16         JUROR NUMBER 33:  I know IBM used to play

17    that stuff when my father worked for IBM.  I just --

18    I'm not impressed with that (indiscernible).

19         THE COURT:  Are you saying you could not be

20    fair?

21         JUROR NUMBER 33:  I don't know that I

22    could.  I honestly don't know that I could.

23         THE COURT:  All right.  Any questions?

24         MR. HANGLEY:  No questions.

25         MR. RIOPELLE:  No.

```
                        Voir Dire                    74
 1              MR. FINKELSON:  No questions.

 2              THE COURT:  Thank you very much.

 3              JUROR NUMBER 33:  Thank you.

 4              MR. GOETTLE:  I like that.  Very direct.

 5              THE COURT:  She certainly had a grasp of

 6   the issue.

 7              MR. GOETTLE:  I don't --

 8              THE COURT:  I assume --

 9              MR. GOETTLE:  -- know what issue you're

10   talking about, Your Honor.

11              THE COURT:  I assume (indiscernible)?

12   (Indiscernible) change it to cause.  Juror 34.

13              (Pause in proceedings.)

14              JUROR NUMBER 34:  Good morning.

15              THE COURT:  Good morning.  How are you,

16   sir?

17              JUROR NUMBER 34:  I'm well.  How are you?

18              THE COURT:  I'm going to follow up on some

19   of the answers that you gave here.

20              JUROR NUMBER 34:  Okay.

21              THE COURT:  And we're going to start with

22   the hardship question.  Will you tell me about it,

23   please?

24              JUROR NUMBER 34:  Sure.  I'm the Vice

25   President of Account Management and Client Management
```

Voir Dire                                    75

1   for my company, and so I'm ultimately responsible for

2   maintaining relationships and maintaining the

3   business.  And in the next three weeks I have huge

4   meetings already scheduled with large hospital

5   systems, Tenet, HCA, and there are a lot of folks,

6   high level, that have committed from those

7   organizations to attend.  So if I were to have to

8   cancel those, that would not help our relationship

9   with them.  So I have two of those next week, another

10  one the next week already scheduled.

11          THE COURT:  With what institutions?

12          JUROR NUMBER 34:  I have St. Barnabas

13  Health next week.  I have HCA and Tenet the following

14  week.  And that's in Nashville and Dallas.

15          THE COURT:  Barnabas is in North Jersey?

16          JUROR NUMBER 34:  Yeah.

17          THE COURT:  And Tenet is based --

18          JUROR NUMBER 34:  Tenet is Dallas and HCA

19  is Nashville.

20          THE COURT:  And do you have travel

21  arrangements already booked?

22          JUROR NUMBER 34:  Yes.

23          THE COURT:  Is there anyone who can fill in

24  for you if you're unavailable?

25          JUROR NUMBER 34:  Barnabas is my

1    relationship so there's no one who can fill in.

2    There's no one who's familiar enough with that

3    business to fill in.  That would have to be

4    rescheduled.  The HCA is my relationship also.  The

5    Tenet one, there's other people going from my

6    company, but I'm the main contact person, so I would

7    probably push to reschedule that one.

8            THE COURT:  Okay.  Let me ask some other

9    questions and then I'll (indiscernible) counsel to

10   ask.

11           JUROR NUMBER 34:  Okay.

12           THE COURT:  You said you had some contacts

13   with Sprint, Comcast, or Nokia.  Can you tell me

14   when?

15           JUROR NUMBER 34:  I'm a Comcast customer.

16           THE COURT:  Are you satisfied with --

17           JUROR NUMBER 34:  Yeah.

18           THE COURT:  -- the Comcast service?

19           JUROR NUMBER 34:  Yes.

20           THE COURT:  Does Comcast provide your cell

21   phone, your smart phone service?

22           JUROR NUMBER 34:  No.

23           THE COURT:  Who provides that service?

24           JUROR NUMBER 34:  That's verizon.

25           THE COURT:  Any problems with that service?

Voir Dire                              77

1          JUROR NUMBER 34:  It's really expensive.  I

2    used to pay $10 to have a telephone.  Now I pay $500.

3          THE COURT:  I'm reminded of the current

4    Verizon -- anti-Verizon ad.  I don't know who's

5    running it, but getting a smile, it might very well

6    be --

7          MR. FINKELSON:  Sprint and Verizon.  It's

8    the former Verizon spokesman.

9          JUROR NUMBER 34:  Oh, right, right.  Quite

10   effective I might say.

11         MR. FINKELSON:  Oh, it's good.

12         JUROR NUMBER 34:  It's got me thinking --

13   it's got me thinking about it.

14         THE COURT:  What?  Is that the one with the

15   bugs?

16         MR. FINKELSON:  No, it's the one --

17         MR. RIOPELLE:  No.

18         MR. FINKELSON:  -- with the former "Can you

19   hear me now" guy.

20         THE COURT:  Oh.

21         MR. FINKELSON:  It's the one that --

22         THE COURT:  He's not there anymore?

23         MR. FINKELSON:  He's now with Sprint and

24   now you can hear him.

25         MR. HANGLEY:  Well, a little less.

Voir Dire                            78

1          THE COURT:  Some other questions.  Close

2    friends, family, or perhaps you work for Acision,

3    Comverse, Syniverse, Openwave, Nokia Siemens,

4    Ericsson, Nortel, or Alcatel-Lucent?

5          JUROR NUMBER 34:  Yeah, I worked for

6    Alcatel directly back in the 80s.  I was an employee

7    of their business telecom sales force.  And I worked

8    for them for three years, and then they pulled out of

9    the United States market because Alcatel is a French

10   company.  So they left a whole bunch of us unemployed

11   for a while.

12         THE COURT:  They're not parties -- or it is

13   not a party.  Alcatel is not a party.  But they're

14   mentioned and they're involved in some of the

15   proceedings, so you'll hear their name.  That

16   wouldn't present a problem for you, would it?

17         JUROR NUMBER 34:  I don't have a real

18   good --

19         THE COURT:  Pardon?

20         JUROR NUMBER 34:  I don't have a real good

21   feeling for them, but I don't --

22         THE COURT:  Because of what they did?

23         JUROR NUMBER 34:  Yeah.

24         THE COURT:  Well, they're not -- do they

25   emerge on one side or another in your case?

1          MR. HANGLEY:  Your Honor, (indiscernible)

2     in terms of someone being accused of (indiscernible).

3          MR. FINKELSON:  And one of our witnesses

4     was at one time employed in electrical engineering

5     for Alcatel-Lucent.

6          MR. RIOPELLE:  I think that name would have

7     been read.  Just so your comfortable that he doesn't

8     know him, it was James Finnegan.

9          MR. FINKELSON:  James Finnegan.

10          MR. RIOPELLE:  Yeah.

11          MR. FINKELSON:  No, you wouldn't -- no, he

12     wouldn't --

13          THE COURT:  What were the years?

14          JUROR NUMBER 34:  I was with them -- that

15     would have been probably '85, '86, '87.

16          THE COURT:  And where?

17          JUROR NUMBER 34:  In King of Prussia is

18     their office.

19          THE COURT:  All right.  Do you have any

20     other questions?

21          MR. HANGLEY:  Yeah, I do.  You are a

22     healthcare accountant?

23          JUROR NUMBER 34:  We're called account

24     managers.

25          MR. HANGLEY:  Account manager.  And for

Voir Dire                                    80

1    what company?

2            JUROR NUMBER 34:  It's Optim.  It's part of

3    Optim, which is UnitedHealth Group.

4            MR. HANGLEY:  UnitedHealth Group is a huge

5    company, right?

6            JUROR NUMBER 34:  Yes.

7            MR. HANGLEY:  Okay.  How about Optim?

8            JUROR NUMBER 34:  Optim is half of

9    UnitedHealth Group, so Optim is about the same size

10   as UnitedHealthcare.  Those are the two companies

11   that are under UnitedHealth Group.

12           MR. HANGLEY:  Okay.  And how many -- how

13   many people are there who share your title throughout

14   the company would you -- would you estimate?

15           JUROR NUMBER 34:  Well, in the division

16   that I work for, which is based in Newtown Square,

17   and we're the ones that deal with the hospitals and

18   the services to the hospitals --

19           MR. HANGLEY:  Nationwide?

20           JUROR NUMBER 34:  Yes.  I'm the only one in

21   that position.  I have a bunch of people underneath

22   me, but they handle the smaller hospital

23   relationships.  I handle all the corporate

24   relationships.

25           MR. HANGLEY:  I see.

Voir Dire                                    81

1          JUROR NUMBER 34:  So that's why this is a

2     little bit of an issue.

3          MR. HANGLEY:  When you go to these meetings

4     over the next couple weeks how many people from Optim

5     are going to be going?

6          JUROR NUMBER 34:  Barnabas --

7          MR. HANGLEY:  I think you said they were

8     different numbers.

9          JUROR NUMBER 34:  Yeah, I mean the Barnabas

10    meeting is probably going to be myself and one other

11    person, someone from our IT group that can explain

12    some of the IT things that I can't explain.  The HCA

13    meeting is just myself.  And then the Tenet meeting

14    is probably going to be four of us.

15         MR. HANGLEY:  Okay.

16         JUROR NUMBER 34:  Now, I mean --

17         MR. HANGLEY:  And then how about what do

18    the gangs look like on the other side of the table?

19         JUROR NUMBER 34:  The Barnabas meeting will

20    be probably four or five on their side.  HCA will be

21    two on their side.  And then Tenet will probably be

22    five or six executives.

23         MR. HANGLEY:  Okay.

24         JUROR NUMBER 34:  The Tenet is obviously

25    the biggest one.  I think we have $16 million at risk

Voir Dire                                    82

1    (indiscernible).  If I have to reschedule that, that

2    will be damaging.

3             MR. HANGLEY:  Okay.  That's all.  Thank

4    you.

5             MR. RIOPELLE:  No questions, Your Honor.

6             THE COURT:  Thank you.

7             MR. HANGLEY:  Thank you very much.

8             JUROR NUMBER 34:  You're welcome.  Thank

9    you.

10            THE COURT:  Mr. Hangley?

11            MR. HANGLEY:  I guess I'm trying to decide

12   with the liability of the last question because

13   that's the one that turns it, which is his Tenet deal

14   is in jeopardy (indiscernible).

15            THE COURT:  All right.

16            MR. HANGLEY:  What did you guys think?

17            MR. RIOPELLE:  I don't know.  I think -- I

18   think he's also in the same boat as those other two.

19   I mean I feel for the guy.  Don't get me wrong.

20            MR. HANGLEY:  That's fine with me.

21            MR. RIOPELLE:  But there's (indiscernible).

22            MR. HANGLEY:  Okay.  So I think they're --

23   I think we're asking that you put a sticky note.  I

24   was between -- I was between that and saying no

25   cause.

1          MR. RIOPELLE:  Yeah.

2          THE COURT:  Well, it's hardship.

3          MR. RIOPELLE:  It's a hardship.

4          MR. HANGLEY:  I'm sorry, no hardship

5   justification.

6          THE COURT:  Okay.  Juror number 35.

7          MR. HANGLEY:  Are we going to be taking a

8   break at some point?

9          THE COURT:  Do you want to?

10          MR. HANGLEY:  Well, in a few minutes I

11   think I'll need one.

12          THE COURT:  Okay.

13          JUROR NUMBER 35:  Gentlemen.  Your Honor.

14          THE COURT:  How are you?

15          JUROR NUMBER 35:  Fine.  Yourself?

16          THE COURT:  I'm going to follow up on some

17   of the questions that you answered.

18          JUROR NUMBER 35:  Okay.

19          THE COURT:  First, the hardship, will you

20   tell me what it is?

21          JUROR NUMBER 35:  Pardon me, sir?

22          THE COURT:  The hardship question.

23          JUROR NUMBER 35:  I manage facilities and

24   fleet maintenance for a trucking company, facilities

25   in Olney, Pennsylvania; Lexington, Kentucky; Ocala,

Voir Dire                                     84

1   Florida.  I fired my shop manager last weekend in

2   Lexington, last Wednesday, and the beginning of this

3   week I was out (indiscernible) taking down on Monday

4   to look (indiscernible).  The end of next week my

5   wife and I were planning to go to Vermont for our

6   30th anniversary for a couple days.  (Indiscernible)

7   year.

8           THE COURT:  Do you have prepaid tickets for

9   either of those things?

10          JUROR NUMBER 35:  Well, no, the couple --

11  well, for Kentucky, sure.  I drive down to Lexington

12  because it's nine hours from Vermont.  The couple

13  that we go with has a condo that we spend with them.

14  We have summer deals that we take and get some -- and

15  (indiscernible).

16          THE COURT:  Okay.

17          JUROR NUMBER 35:  So (indiscernible)

18  prepaid.

19          THE COURT:  All right.  I'm going to ask

20  you some other questions.  You said you had contacts

21  with Nokia, Comcast, or Sprint.

22          JUROR NUMBER 35:  We used to have Comcast

23  for home service and we -- for Sprint, I used to have

24  Sprint Nextel for cellular service.

25          THE COURT:  Any problems with either?

Voir Dire                                85

1          JUROR NUMBER 35:  Well, we switched from

2   Comcast to Verizon because of the, you know, service

3   and quality we felt was better with the fiberoptic

4   than cable.

5          THE COURT:  Would that prevent you from

6   being fair and impartial?

7          JUROR NUMBER 35:  No, that would not.

8          THE COURT:  You answered some other

9   questions.

10          (Pause in proceedings.)

11          THE COURT:  Have you, any members of your

12   immediate family, or any close friends had any

13   training, education in, or been employed in the

14   following fields: patents, cell phones, computer

15   science?

16          JUROR NUMBER 35:  Well, the company that I

17   worked for before for Clemens Markets I handled real

18   estate development.  We had a patent for a

19   refrigerated salad bar top, which I worked with an

20   attorney to get that patent.  I also worked with

21   (indiscernible).  We had a corporate office building

22   in Kulpsville which I negotiated with Nextel at the

23   time to put a cell tower -- a cell building, but that

24   never would have happened -- never happened because

25   then (indiscernible) to get on the tower.  I believe

Voir Dire

1    it was AT&T, and then they decided not to go on our

2    (indiscernible).

3              THE COURT:  Anything about that experience

4    that would prevent you from being fair and impartial?

5              JUROR NUMBER 35:  No.

6              (Pause in proceedings.)

7              THE COURT:  Have you had any very good or

8    very bad experience with the United States Patent and

9    Trademark Office?

10             JUROR NUMBER 35:  No, they were

11   (indiscernible).

12             THE COURT:  All right, I'll let counsel

13   follow.

14             MR. GOETTLE:  So you just -- you worked

15   with an attorney in your pre -- in your previous job

16   you worked --

17             JUROR NUMBER 35:  Yeah.

18             MR. GOETTLE:  -- with an attorney on a

19   patent?

20             JUROR NUMBER 35:  Yeah.

21             MR. GOETTLE:  Can you tell me about it?

22             JUROR NUMBER 35:  We had a refrigerated --

23   we were in the supermarket business.  We had salad

24   bars.  And one of our gentleman in merchandising came

25   up with an idea to put a refrigerated drink top on

Voir Dire                                    87

1    top of the salad bars, okay?

2            MR. GOETTLE:  Oh.

3            JUROR NUMBER 35:  It was nothing that was

4    ever done.

5            MR. GOETTLE:  Uh-huh.

6            JUROR NUMBER 35:  So I worked with him

7    because he was a merchandiser.  I handled the

8    (indiscernible), the construction, the development of

9    the idea, and the actual property that was going to

10   sit on top of the salad bar.

11           MR. GOETTLE:  I see.

12           JUROR NUMBER 35:  Then I worked with the

13   patent attorney that our corporate had to get the

14   patent.

15           MR. GOETTLE:  So you -- who was -- who was

16   the inventor on the patent?  Was it you or --

17           JUROR NUMBER 35:  He --

18           MR. GOETTLE:  -- this gentleman?

19           JUROR NUMBER 35:  This gentleman, but he

20   really -- the patent went into Clemens Markets.  He

21   had an idea, but he had --

22           MR. FINKELSON:  (Indiscernible)?

23           JUROR NUMBER 35:  Clemens --

24           MR. FINKELSON:  To Clemens --

25           THE COURT:  Clemens Market.  It's a local

Voir Dire                                88

1   market.

2            MR. FINKELSON:  I just couldn't hear you.

3            JUROR NUMBER 35:  Understood.

4            MR. GOETTLE:  So you built -- I see.  You

5   built sort of like an implementation of this idea?

6            JUROR NUMBER 35:  Correct.

7            THE COURT:  Okay.  And then you worked with

8   the attorneys to get a patent on it?

9            JUROR NUMBER 35:  That's correct.

10           THE COURT:  Do you know what happened with

11   the patent (indiscernible)?

12           JUROR NUMBER 35:  Well, we were -- we then

13   were looking to license the patent to other retailers

14   to put that on, but then the owner pulled back and

15   didn't want to do that.  And then Clemens Markets was

16   sold in 2006 to (indiscernible) and the patent -- the

17   owner actually then gave the patent to the gentleman

18   who had the idea (indiscernible).

19           MR. GOETTLE:  I see.

20           MR. HANGLEY:  What's the company you worked

21   for -- ask him what's the company he worked for

22   (indiscernible)?

23           MR. GOETTLE:  Is this whisper down the

24   lane, guys?  Come on.  Are you qualified to ask a

25   question?

Voir Dire                               89

1          MR. HANGLEY:  (Indiscernible).  What's the

2     other company you work for now?

3          JUROR NUMBER 35:  (Indiscernible) Brothers

4     LLC out in Chicago.  It says (indiscernible)

5     transportation, expressway, and expressway

6     (indiscernible).  I manage facilities

7     (indiscernible).

8          THE COURT:  You don't have any other

9     questions.

10          MR. RIOPELLE:  You also said that you were

11     a former Sprint customer.

12          JUROR NUMBER 35:  Yeah.

13          MR. RIOPELLE:  Why did you leave Sprint?

14          JUROR NUMBER 35:  Because we got rid of

15     Nextel and then just moved to Verizon because

16     Verizon's -- I travel with Verizon and I get service

17     across the country.

18          MR. RIOPELLE:  Do you have any issues with

19     Sprint?

20          JUROR NUMBER 35:  No.

21          MR. RIOPELLE:  On the -- in getting the

22     patent, did you have any opinion on the patent office

23     or how they --

24          JUROR NUMBER 35:  No.  No.  It was handled

25     very professionally.  It wasn't -- you know, they

1   were just looking for facts and why we were doing

2   what we were doing and the questions about how --

3   well, how -- I was more involved with the operation

4   of how the -- how the piece of equipment was

5   (indiscernible).  That's what a lot of money

6   (indiscernible) how the process would work.

7           MR. FINKELSON:  Do I have the same rule, so

8   I can't ask a question?

9           THE COURT:  Yes, the same rule.  Only

10  one -- only one lawyer per side.  You don't want them

11  to gang up on me or you.

12          JUROR NUMBER 35:  I don't know.  I'm ready.

13          MR. RIOPELLE:  You also talked about you

14  negotiated with a license with Nextel?

15          JUROR NUMBER 35:  We were -- we were in the

16  process of what -- of negotiated a license with

17  Nextel.  We put a cell -- not tower, but cell --

18          MR. RIOPELLE:  Cell site?

19          JUROR NUMBER 35:  Yeah, (indiscernible)

20  because in the Kulpsville area there was one tower,

21  they (indiscernible), but I think AT&T had

22  (indiscernible), and we started negotiating the cost

23  to put something on top of the building, which we

24  were in favor of doing because I (indiscernible)

25  structural engineering and (indiscernible).  But in

1    those negotiations I think (indiscernible) and then

2    they pulled back from us.

3              MR. RIOPELLE:  Any issue with Nextel

4    because of that?

5              JUROR NUMBER 35:  No.

6              MR. GOETTLE:  Can I ask one more, Your

7    Honor?

8              THE COURT:  Yes.

9              MR. GOETTLE:  What's your -- what's your

10   educational background?

11             JUROR NUMBER 35:  I have almost an

12   Associate's Degree in Business from Penn State.

13             MR. GOETTLE:  Okay.

14             JUROR NUMBER 35:  I've got 48 credits.

15             MR. GOETTLE:  Thank you.

16             THE COURT:  Thank you so much.

17             MR. RIOPELLE:  Thanks.

18             JUROR NUMBER 35:  Thanks.

19             THE COURT:  I don't see cause or hardship.

20   I think he can defer Lexington, Kentucky business

21   trip.

22             MR. HANGLEY:  That's kind of what I

23   thought.

24             THE COURT:  I think he's okay.

25             MR. HANGLEY:  Yeah.

Voir Dire                                    92

1          THE COURT:  Do you want to have a recess

2    now?

3          MR. HANGLEY:  Sure.  Yeah.

4          THE COURT:  I'm the one who needs -- who

5    should need one.

6          MR. FINKELSON:  (Indiscernible) serious

7    back issues.

8          THE COURT:  We're going to take a -- it's

9    almost mid-morning.  We're going to take a short

10   break.  You're going to -- I would say ten minutes.

11   And we'll reassemble in the courtroom.  Remember

12   where you're sitting.  Ten minute break.

13         (Recess taken from 11:31 a.m. to 11:52

14   a.m.)

15         THE COURT:  Be seated, everyone.  We will

16   continue with our sidebar conferences with members of

17   the jury panel.  Counsel?

18         (Pause in proceedings.)

19         THE COURT:  Juror 36.

20         (Pause in proceedings.)

21         THE COURT:  How are you, sir?

22         JUROR NUMBER 36:  Hello.

23         THE COURT:  Step forward.  I'm going to

24   follow up on the answers you gave to two questions.

25   The first is the hardship question.  Will you explain

Voir Dire                                    93

1    the basis for that answer?

2              JUROR NUMBER 36:  The basis for that is I

3    only get paid three days at work.  So anything else

4    they won't pay me for.

5              THE COURT:  And your employer is Freedom --

6              JUROR NUMBER 36:  Yes.

7              THE COURT:  -- (indiscernible).

8              JUROR NUMBER 36:  Yes.

9              THE COURT:  Well, there's not much I can do

10   about that.

11             JUROR NUMBER 36:  No.

12             THE COURT:  I think it's unfair.  The

13   federal government requires jurors to serve, pays

14   them $40 a day.  Some employers pay their employees;

15   others don't.  It's not a violation of the law --

16             JUROR NUMBER 36:  Right.

17             THE COURT:  -- for them not to pay, but

18   it's not fair.  Any other basis for the hardship?

19             JUROR NUMBER 36:  It just -- that's about

20   it.  Trying to work -- trying to works some overtime

21   (indiscernible).

22             THE COURT:  You also answered the question

23   about contacts with either Comcast, Sprint or Nokia.

24             JUROR NUMBER 36:  Yes.

25             THE COURT:  Tell us about that.

1           JUROR NUMBER 36:  My parents, grandparents,

2    both deal with Comcast, not necessarily Sprint.  But,

3    basically, any of my immediate family deal with

4    Comcast.

5           THE COURT:  Do you deal with Comcast?

6           JUROR NUMBER 36:  I do not.  I had a --

7           THE COURT:  Do your parents or grandparents

8    or others in your family who deal with Comcast have

9    any problems with Comcast?

10          JUROR NUMBER 36:  Yes.  Yes, they do.  But

11   it is what it is.  I've only contacted them once for

12   a random question.  Outside there was a wire hanging

13   out across my deck, and Comcast said basically it's

14   not ours.  It ended up being theirs.  They had to

15   send someone out --

16          THE COURT:  And they took care of it?

17          JUROR NUMBER 36:  For the most part, yes.

18          THE COURT:  Would that experience with

19   Comcast --

20          JUROR NUMBER 36:  Uh-huh.

21          THE COURT:  -- prevent you from being fair

22   and impartial in deciding this case?

23          JUROR NUMBER 36:  Hopefully not.  But my

24   mind does unfortunately have the memory of the

25   negatives versus the positives.

1          THE COURT:  Well, if you're selected to

2    serve on the jury, you would have to agree --

3          JUROR NUMBER 36:  Right.

4          THE COURT:  -- to follow my instruction.

5    The decision of the jury must be based on the

6    evidence in the courtroom and my instructions on the

7    law and not on any experience that you've had --

8          JUROR NUMBER 36:  Right.

9          THE COURT:  -- such as the experience with

10   the wire --

11         JUROR NUMBER 36:  Yes.

12         THE COURT:  -- which I think you have to

13   admit in retrospect wasn't that -- it was annoying --

14         JUROR NUMBER 36:  Well, yeah.

15         THE COURT:  -- but not that significant.

16         JUROR NUMBER 36:  No, it wasn't anything

17   major, but --

18         THE COURT:  Well, again, would you try if

19   you're --

20         JUROR NUMBER 36:  Yes.  Yes, I would try.

21         THE COURT:  To be fair and impartial?

22         JUROR NUMBER 36:  Yes.

23         THE COURT:  Is there any doubt in your

24   mind?

25         JUROR NUMBER 36:  No.

1      THE COURT:  All right.  I'll let counsel

2  question you.  Mr. Hangley -- Comcast first.

3      MR. HANGLEY:  I just want to follow up on

4  this is there doubt thing because I represent

5  Comcast.

6      JUROR NUMBER 36:  Okay.

7      MR. HANGLEY:  Okay.  It sounds like -- am I

8  right thinking that you're uncomfortable with the

9  (indiscernible)?

10     JUROR NUMBER 36:  It's more of the personal

11  experience with Comcast, talking to customer service,

12  talking to the technicians.  I just -- it's a

13  personal preference.  I don't --

14     MR. HANGLEY:  Okay.

15     JUROR NUMBER 36:  I don't like Comcast.

16     MR. HANGLEY:  Okay.

17     THE COURT:  So are you going to be rooting

18  for Comcast witnesses?  The people that you talked to

19  at Comcast, did you come up with the impression that

20  maybe they weren't so believable?

21     MR. FINKELSON:  I'm sorry, what was the

22  question?

23     THE COURT:  That maybe the people he talked

24  to about the telephone wire weren't terribly

25  believable, credible.  Do you think that's going to

1    spill over into hearing testimony from Comcast?

2              JUROR NUMBER 36:  I don't think so.

3              THE COURT:  Okay.  Okay.

4              MR. HANGLEY:  There's a saying you have to

5    know how to deal with (indiscernible).  Is there a

6    consequence (indiscernible)?

7              JUROR NUMBER 36:  No.  No.

8              MR. HANGLEY:  And what is your role at

9    Freedom (indiscernible)?

10             JUROR NUMBER 36:  Yes, I repair hospital

11   equipment.

12             MR. FINKELSON:  Sorry, you repair hospital?

13             JUROR NUMBER 36:  Equipment.

14             MR. FINKELSON:  Equipment.

15             JUROR NUMBER 36:  Ventilators, incubators,

16   and things like that.  I'm the only one certified for

17   certain things.

18             MR. HANGLEY:  That's exciting.  Job

19   security.  No further questions.

20             THE COURT:  You mentioned your parents and

21   your grandparents.  Was it that they had unhappy

22   experiences as well?

23             JUROR NUMBER 36:  My parents have, yes.

24             THE COURT:  Okay.  And did you get involved

25   in those?

1              JUROR NUMBER 36:  No.

2              THE COURT:  Okay.

3              JUROR NUMBER 36:  No.

4              THE COURT:  And do you know what that was

5       about?

6              JUROR NUMBER 36:  There was something with

7       installation and bills  and something

8       (indiscernible).

9              THE COURT:  Okay.

10             JUROR NUMBER 36:  That's all I remember.

11             THE COURT:  Are you starting out this

12      case -- will we have a level playing field?

13             JUROR NUMBER 36:  Yes.

14             MR. HANGLEY:  All right, no further

15      questions.

16             MR. RIOPELLE:  No further questions.

17             THE COURT:  Thank you.

18             MR. HANGLEY:  Thank you.

19             MR. RIOPELLE:  Thank you, sir.

20             MR. HANGLEY:  I don't think cause or

21      hardship.

22             THE COURT:  No, I don't think there's any

23      basis for cause or hardship.

24             MR. HANGLEY:  Okay.

25             THE COURT:  Juror 37.

1                (Pause in proceedings.)

2          THE COURT:  Hi, how are you?  Can you come

3    forward, please?  I'm going to follow up on two of

4    the answers you gave.  First, the hardship question,

5    will you explain what it is?

6          JUROR NUMBER 37:  Well, I'm just a

7    construction worker and the nature of that work is

8    temporary, and just like, you know, two or three week

9    trials is a lot of income to lose.  I'm the sole

10   provider for my family and I don't get vacation very

11   easily, sick days or anything like that.  And I

12   realize it's just an average hardship, but --

13         THE COURT:  Well, it's a hardship for you,

14   but, unfortunately, there's little we can do about

15   it.  The law is for people who are in their own

16   business that are not paid a salary, what they get as

17   a juror is $40 a day.  I don't believe in 2017 that's

18   necessarily enough.  It's not enough.  But Congress

19   hasn't done that yet.  So we're kind of stuck with

20   it.

21         JUROR NUMBER 37:  I understand.

22         THE COURT:  I'm stuck with it.  And I hate

23   to say this to you, but you're stuck with it too, but

24   I thank you for sharing it with us.  Your other

25   answer, the question that dealt with contacts with

Voir Dire                                              100

1   Comcast, Sprint, or Nokia.

2           JUROR NUMBER 37:  I don't -- I'm not

3   sure --

4           THE COURT:  Any contracts?

5           JUROR NUMBER 37:  No, no contracts.  I

6   just, you know, use Comcast service.

7           THE COURT:  That's it.  That's --

8           JUROR NUMBER 37:  Yeah, that's just my --

9           THE COURT:  Any problems with the Comcast

10  service?

11          JUROR NUMBER 37:  My remote is not working

12  right now, but I don't think that's germane to -- no,

13  really, not any -- not any terrible experiences or

14  anything like that.

15          THE COURT:  Any other questions?

16          MR. GOETTLE:  So in terms of the

17  construction work that you're doing, does it -- do

18  you have jobs already lined up and if you're not at

19  any of those jobs, the people hiring you to do the

20  work (indiscernible)?

21          JUROR NUMBER 37:  Well, I work for a

22  contractor that's got a job at Sunoco

23  (indiscernible), and the job is to put in 140,000

24  feet of pipe.  It's supposed to be mechanically

25  complete by March 31st.

```
                        Voir Dire                      101
```

1           MR. GOETTLE:  I see.

2           JUROR NUMBER 37:  My job is to go out and

3    to look at the drawings and look -- generate a punch

4    list and see what that project -- you know, maybe go

5    to the next phase, which would be testing

6    (indiscernible).  So I'm kind of -- they --

7           MR. GOETTLE:  (Indiscernible)?

8           JUROR NUMBER 37:  Again, that's not

9    really --

10          MR. GOETTLE:  Okay, thank you.

11          JUROR NUMBER 37:  If I'm not there, I'm not

12   giving them any value, and they'll just get someone

13   else to do it.

14          THE COURT:  Yes, sir?

15          MR. RIOPELLE:  Can I ask who provides your

16   cell phone service?

17          JUROR NUMBER 37:  AT&T.

18          THE COURT:  Have you ever had a cell phone

19   (indiscernible)?

20          JUROR NUMBER 37:  (Indiscernible).

21          MR. HANGLEY:  No further questions from us,

22   Your Honor.  Thank you, sir.

23          THE COURT:  Thank you very much.

24          JUROR NUMBER 37:  Thank you.

25          THE COURT:  What do you think?

Voir Dire                                    102

1          MR. HANGLEY:  I mean I feel bad for the

2    guy.

3          MR. RIOPELLE:  Yeah.

4          THE COURT:  Yes.

5          MR. RIOPELLE:  I feel the same, but I'm not

6    sure it's a hardship.

7          THE COURT:  Well, it is.

8          MR. RIOPELLE:  Well, (indiscernible) from

9    (indiscernible) point of view.

10         THE COURT:  No, I think that's the kind of

11   hardship that isn't actionable.  So I think he's

12   okay.

13         MR. HANGLEY:  I think so

14         THE COURT:  Juror number 38.

15         (Pause in proceedings.)

16         MR. RIOPELLE:  Good morning.

17         THE COURT:  How are you, sir?

18         JUROR NUMBER 38:  Good afternoon, Your

19   Honor.

20         THE COURT:  I'm going to ask you some

21   followup questions based on your answers.  First,

22   your contacts with Comcast or Sprint.  Do they

23   provide you services?  Have they in the past provided

24   services?

25         JUROR NUMBER 38:  Yeah, I had Comcast up

Voir Dire                                    103

1   until last July for my cable television.

2           THE COURT:  And you left Comcast?

3           JUROR NUMBER 38:  Oh, no, no, as a

4   consumer.

5           THE COURT:  As a consumer, that's what I

6   meant.

7           JUROR NUMBER 38:  Yes.

8           THE COURT:  You left Comcast then?

9           JUROR NUMBER 38:  I opted with Fios when it

10  became available.

11          THE COURT:  Anything about the Comcast

12  service that would prevent you from being fair and

13  impartial?

14          JUROR NUMBER 38:  No.

15          THE COURT:  Any other contacts with either

16  Comcast -- I ought to tell you these are the Comcast

17  lawyers.  These are the Sprint lawyers.  Any other

18  contacts with Comcast or Sprint?

19          JUROR NUMBER 38:  No, I don't.

20          THE COURT:  You answered yes to the

21  question have you, any members of your immediate

22  family, or any close friends ever worked for a

23  company that had patented products or processes.

24          JUROR NUMBER 38:  My dad worked for Filco

25  (indiscernible) and he had -- he's deceased now --

Voir Dire                                    104

1    over 20 patents.  They had a lot of patents.

2           THE COURT:  Did you get involved in any of

3    the patenting process?

4           JUROR NUMBER 38:  I don't remember any of

5    the specifics.  I was just a kid or teenager at the

6    time.

7           THE COURT:  And there's a related question.

8    Have you, any members of your immediate family, or

9    any close friends had any dealings with the United

10   States Patent and Trademark Office?  That's your

11   father as well?

12          JUROR NUMBER 38:  Yes, that's a similar

13   answer.

14          THE COURT:  Okay.  Finally, cell phone,

15   smart phone, do you have one?

16          JUROR NUMBER 38:  I was one of the last

17   holdouts.  I didn't get one until August of 2015.  I

18   was a late conversion.

19          THE COURT:  What company provides your

20   service?

21          JUROR NUMBER 38:  Verizon.

22          THE COURT:  Any problem with the phone or

23   Verizon service?

24          JUROR NUMBER 38:  No.

25          THE COURT:  All right, I have no further

1    questions.  Comcast questions?

2          MR. HANGLEY:  Was this the City of

3    Philadelphia offices you did your planning

4    (indiscernible)?

5          JUROR NUMBER 38:  (Indiscernible) mayor's

6    office for transportation.

7          MR. HANGLEY:  Okay.

8          JUROR NUMBER 38:  Depending on who is

9    mayor, the organization is set up differently.

10          MR. HANGLEY:  And how long were you there?

11          JUROR NUMBER 38:  Well, I was with the city

12    in one capacity or another from 1970 until 2010.

13          MR. HANGLEY:  Okay.

14          (Pause in proceedings.)

15          MR. HANGLEY:  Any dealings at all with my

16    law office, a firm called Hangley, Aronchick or

17    Hangley (indiscernible)?

18          JUROR NUMBER 38:  The only thing that comes

19    to mind I think Mark Aronchick was the city solicitor

20    at one time, but I never --

21          MR. HANGLEY:  Yes, he was --

22          JUROR NUMBER 38:  -- I never had any direct

23    dealings with him --

24          MR. HANGLEY:  Okay.  Okay.

25          JUROR NUMBER 38:  -- during his tenure.

1          MR. HANGLEY:  Okay.  So that would not get

2    in the way?

3          JUROR NUMBER 38:  No.

4          MR. HANGLEY:  All right, good.  How about a

5    Joseph Turetsky?  Do you remember him?

6          JUROR NUMBER 38:  Yes, I do.

7          MR. HANGLEY:  Okay.

8          JUROR NUMBER 38:  But, again, it was

9    ongoing, so I didn't --

10          MR. HANGLEY:  Okay.  Because he's a partner

11    of mine too.  Okay.

12          (Pause in proceedings.)

13          MR. HANGLEY:  And Sozi Tulante I believe

14    who is the present city solicitor?

15          JUROR NUMBER 38:  Postdates my tenure.

16          MR. HANGLEY:  Maybe you were gone before

17    then.

18          JUROR NUMBER 38:  Yes.  Yes.

19          MR. HANGLEY:  That's all I have.

20          MR. RIOPELLE:  So you just got a smart

21    phone last year?

22          JUROR NUMBER 38:  A year and a half, yes.

23          MR. RIOPELLE:  Do you do texting?

24          JUROR NUMBER 38:  Yes.  Yes, I do.

25          MR. RIOPELLE:  And --

Voir Dire                              107

1          JUROR NUMBER 38:  Not as much as most

2    people, but --

3          MR. RIOPELLE:  Right.

4          JUROR NUMBER 38:  -- I do do it.

5          MR. RIOPELLE:  Not as much as my teenage

6    children.  Also, you said your dad had 20 patents.

7    Do you have any sense of your dad's good experience,

8    bad experience, anything like that, with the

9    Trademark Office?

10         JUROR NUMBER 38:  (Indiscernible).  He was

11   in refrigeration and air conditioning.  Those were

12   his fields.

13         MR. RIOPELLE:  No further questions.

14         THE COURT:  Thank you.

15         JUROR NUMBER 38:  Thank you.

16         MR. HANGLEY:  Thank you.

17         JUROR NUMBER 38:  Thank you.

18         MR. FINKELSON:  What is the firm -- what's

19   the firm connections (indiscernible)?

20         MR. HANGLEY:  We have -- my firm has a

21   (indiscernible).  It's really not me.  We represented

22   the mayor (indiscernible), most recently, the soda

23   tax.  And (indiscernible) planning.  I have no idea

24   exactly what they do.  Three of my partners -- well,

25   two of my partners and one guy who is no longer with

Voir Dire                    108

1   the firm because he's the city solicitor.  I've known

2   city solicitors.  I just wanted to make sure that --

3            MR. FINKELSON:  No, (indiscernible).

4            THE COURT:  I see no basis for us to excuse

5   for cause and no hardship, so he's okay.  And we're

6   now up to --

7            COURTROOM DEPUTY:  15.

8            THE COURT:  -- 15.  I can hardly believe

9   it.  Juror number 39.

10           (Pause in proceedings.)

11           THE COURT:  Good afternoon.

12           JUROR NUMBER 39:  Hi.

13           THE COURT:  How are you?

14           JUROR NUMBER 39:  Good.

15           THE COURT:  I'm going to follow up on some

16  of your answers --

17           JUROR NUMBER 39:  Uh-huh.

18           THE COURT:  -- to my questions, and the

19  first is the question about the hardship, jury

20  service (indiscernible).

21           JUROR NUMBER 39:  Okay.  Okay.

22           THE COURT:  Explain.

23           JUROR NUMBER 39:  Sure.  I'm a VP of

24  Operations and on the 13th, 14th, 15th, I have a

25  meeting with the sales group, as well as about 20 of

1   my people down in Bradenton and --

2           THE COURT:  Down where?

3           JUROR NUMBER 39:  Bradenton.

4           THE COURT:  All right.

5           JUROR NUMBER 39:  Down in Florida.  Down in

6   Bradenton and --

7           THE COURT:  And your company is?

8           JUROR NUMBER 39:  Certainteed.  It's

9   building products, makes insulation, and I'm VP of

10  Operations (indiscernible).

11          THE COURT:  How many people

12  (indiscernible)?

13          JUROR NUMBER 39:  About 80-90.

14          THE COURT:  Okay.  And the date is 13 --

15          JUROR NUMBER 39:  It starts on the 13th,

16  runs 14th, 15th, and in that time the sales group is

17  meeting my --

18          THE COURT:  Who's in charge --

19          JUROR NUMBER 39:  -- meeting my ops --

20          THE COURT:  -- of the meeting?

21          JUROR NUMBER 39:  My president.

22          THE COURT:  President of Certainteed?

23          JUROR NUMBER 39:  No, of our division.

24          THE COURT:  If you're unable to attend, who

25  would participate on your behalf, in your stead?

Voir Dire                                    110

1          JUROR NUMBER 39:  I'm the only one from

2   operations.  I mean I have some other people that I

3   could ask them to cover some things, but I'm running

4   part of the session.  I have a day and a half of my

5   time with my people.  I moved over to this group in

6   April of last year.

7          THE COURT:  How long have you been with

8   Certainteed?

9          JUROR NUMBER 39:  11 years.

10          THE COURT:  You answered some questions --

11          JUROR NUMBER 39:  Uh-huh.

12          THE COURT:  -- about relationships with

13   Comcast, Sprint, Nokia, one question.  What is your

14   relationship, not necessarily in (indiscernible).

15          JUROR NUMBER 39:  Yeah.  Yeah.

16          THE COURT:  Contract or provider of --

17          JUROR NUMBER 39:  They just -- they provide

18   cable service.  Like we have a condo in State College

19   and Comcast provides cable service, that's all.

20          THE COURT:  Which one, Comcast or Sprint?

21   Comcast?

22          JUROR NUMBER 39:  Oh, Comcast.  Yes.

23          THE COURT:  All right.  Are there any

24   problems with that service?

25          JUROR NUMBER 39:  No.

Voir Dire                              111

1          THE COURT:  You also answered yes to the

2    question have you been involved in the development of

3    a new product or process?

4          JUROR NUMBER 39:  Uh-huh.  Yes, part --

5    yes, in my career I've been in product development.

6    When I worked for Armstrong I worked with our

7    technical people --

8          THE COURT:  All right.

9          JUROR NUMBER 39:  -- so I did new product

10   development.  I've been in new product development

11   with --

12         THE COURT:  With Armstrong.

13         JUROR NUMBER 39:  -- (indiscernible).

14         THE COURT:  Do you have any

15   (indiscernible)?

16         JUROR NUMBER 39:  Yeah.  Yeah.

17         THE COURT:  Did you have any experience

18   with the United States Patent and Trademark Office?

19         JUROR NUMBER 39:  Not -- just cursory.

20         THE COURT:  When you say cursory, was it

21   good or bad or was it --

22         JUROR NUMBER 39:  It was -- I mean the

23   president would talk.  It was nothing

24   (indiscernible).

25         THE COURT:  All right.  Cell phone, smart

Voir Dire                                    112

1    phone, do you have one?

2              JUROR NUMBER 39:  Absolutely.

3              THE COURT:  Can I have your --

4              JUROR NUMBER 39:  Two.

5              THE COURT:  -- your provider or providers?

6              JUROR NUMBER 39:  Personal, Verizon, and

7    AT&T for work.

8              THE COURT:  Any problems with either of

9    those providers?

10             JUROR NUMBER 39:  No.

11             THE COURT:  And the phones, no problems?

12             JUROR NUMBER 39:  No.  I mean I've had

13   phones over the years (indiscernible).

14             THE COURT:  Do you use them to text and to

15   send (indiscernible) messages?

16             JUROR NUMBER 39:  Yes.  Yeah, I mean all

17   the combinations.

18             THE COURT:  All right.  All right, I have

19   no further questions for him.

20             JUROR NUMBER 39:  Sure.

21             THE COURT:  (Indiscernible) Comcast counsel

22   and Sprint counsel --

23             JUROR NUMBER 39:  Sure.

24             THE COURT:  -- questions for you.

25             MR. HANGLEY:  Can I ask what your

Voir Dire                                                113

1   educational background is?

2            JUROR NUMBER 39:  Sure.  B.S. in Economics

3   from Penn State (indiscernible), Master's from

4   University of Oregon, M.B.A.

5            MR. HANGLEY:  No further questions.

6            MR. FINKELSON:  I think you answered a

7   question (indiscernible) purchasing individual

8   property?  Can you explain what that was?

9            JUROR NUMBER 39:  Sure.  At Certainteed, we

10  work to get assigned a product and buy it from the

11  provider.  They were getting -- they were never in

12  the (indiscernible).  So --

13           MR. FINKELSON:  You drop the side job --

14           JUROR NUMBER 39:  Yes, drop the side job,

15  so we bought -- procured data (indiscernible).

16           MR. FINKELSON:  (Indiscernible) Comcast?

17           JUROR NUMBER 39:  Yeah.  Yes, we

18  (indiscernible).

19           MR. FINKELSON:  And you (indiscernible)?

20           JUROR NUMBER 39:  It was just a few pieces

21  of equipment.  It was tech -- basically, the

22  technical capability of what they're using.

23           MR. HANGLEY:  How many people are further

24  down the --

25           JUROR NUMBER 39:  Food chain?

Voir Dire                              114

1          MR. HANGLEY:  -- food chain in the company?

2          JUROR NUMBER 39:  I don't --

3          MR. HANGLEY:  Which I mean your reports and

4   do you have reports of reports?

5          JUROR NUMBER 39:  Yeah, so I have plant

6   managers, technical people report to me, production

7   operators.  Up the food chain, I have my president

8   and then the CEO.

9          MR. HANGLEY:  Okay.  That's all I have,

10  Your Honor.

11         MR. FINKELSON:  No further questions from

12  us, Your Honor.

13         THE COURT:  Thank you very much.

14         MR. FINKELSON:  Thank you very much.

15         JUROR NUMBER 39:  Yes, sir.

16         THE COURT:  Doesn't look like cause.

17         MR. HANGLEY:  No.

18         THE COURT:  Doesn't look like hardship, I'm

19  sorry.

20         MR. HANGLEY:  We agree, no hardship, no

21  cause.

22         THE COURT:  That's 16.  Now, is there any

23  that we've okayed.  We have some to come back to, so

24  we'll take care of that.  I gather it's your view

25  that with all the "come back to"s we can excuse them?

Voir Dire                                    115

1           MR. FINKELSON:  If we keep all of the "come

2   back to"s we can --

3           THE COURT:  Why don't we have all --

4           MR. HANGLEY:  We have 16 now.

5           MR. FINKELSON:  Well, we've got 19.

6           MR. HANGLEY:  Counting --

7           THE COURT:  No, no.  No.  We've got -- with

8   juror 39 we've got a total of 16 jurors --

9           MR. HANGLEY:  Plus the three.

10          THE COURT:  -- plus the three "come back

11  to"s.

12          MR. HANGLEY:  Okay.

13          THE COURT:  And that's important because if

14  we put one of the "come back to"s on the jury, then

15  one of these people in the last two or three would be

16  off.  So we have to decide what to do with the "come

17  back to"s and we also have to decide --

18          MR. HANGLEY:  We should do that before --

19          THE COURT:  What?

20          MR. HANGLEY:  We should do that before we

21  dismiss the rest of the jury.

22          THE COURT:  We're not going to dismiss

23  anyone now --

24          MR. HANGLEY:  Yeah.

25          THE COURT:  -- until we get through the

Voir Dire                                    116

1    jury selection.  We also have to decide whether we

2    want to continue because we said okay to some people

3    who are marginal.  Are there any people in that

4    category?

5              MR. HANGLEY:  (Indiscernible).

6              MR. FINKELSON:  (Indiscernible) marginal

7    exceptions.  I haven't been (indiscernible).

8              THE COURT:  Well, what we can do is excuse

9    the jury for lunch.  We're not going to -- well, we

10   might get a jury before lunch or we can excuse them.

11   I don't want to lose anybody.

12             MR. HANGLEY:  (Indiscernible) excuse them

13   for lunch.

14             THE COURT:  The choice is excuse them for

15   lunch and decide what we're going to do, or decide

16   right now that we're going to eliminate the "come

17   back to" category --

18             MR. HANGLEY:  Okay.

19             THE COURT:  -- and excuse them.  I think it

20   was, for the most part, hardship.  I don't think

21   there was any cause for not coming back.

22             MR. HANGLEY:  Well, they're not coming back

23   (indiscernible).

24             THE COURT:  (Indiscernible) hardship issue.

25   We can do that and proceed with jury selection.

Voir Dire                              117

1          MR. HANGLEY:  Yes.

2          THE COURT:  All right.  The -- passing the

3    strike sheet.

4          MR. FINKELSON:  I don't think -- I don't

5    think -- to let them go to lunch now, I think we

6    would agree they can go to lunch and then we'll come

7    back and deal with the next steps.

8          THE COURT:  All right.

9          (Pause in proceedings.)

10         THE COURT:  At some point will you tell the

11   jury the age old thing about how if the lawyers don't

12   make eye contact --

13         MR. HANGLEY:  I'm (indiscernible).

14         THE COURT:  -- with them or talk to them --

15   okay.  Because we (indiscernible).

16         MR. HANGLEY:  Yeah.  It's easier -- it's

17   easier when there's only 16 (indiscernible).

18         THE COURT:  Yes.

19         (Pause in proceedings.)

20         THE COURT:  All right.  Ladies and

21   gentlemen, what we're going to do is this.  The

22   lawyers think we might have finished the individual

23   questioning of jurors at sidebar, but they want an

24   opportunity over the lunch recess to look at their

25   notes.  It might very well be that we're at the point

Voir Dire                                    118

1    now where they make their peremptory challenges.

2    Remember I told you that each side has the right to

3    strike three prospective jurors, three panel members,

4    under what is called a peremptory challenge.  That's

5    what remains to be done with respect to jury

6    selection.  And that will be done right after lunch

7    unless counsel tell me they want to question some

8    more of you.  And I rather think we'll probably move

9    right to the selection process.

10            That's done by passing a list back and

11   forth.  You'll see counsel with what is referred to

12   as a jury list or a strike list, and they'll exercise

13   their peremptory challenges by passing this paper

14   back and forth.

15            The long and the short of it, the good news

16   is that we're almost finished with jury selection and

17   we will be able to complete the jury selection right

18   after lunch or soon thereafter.  And with that, I

19   think what we'll do is recess for an hour.  It's

20   12:20.  We'll recess until 1:20.  Don't discuss the

21   case among yourselves.  Don't discuss the case with

22   anyone else.  Ian, give me my water, please.

23            If anyone tries to talk to you about the

24   case, please say nothing to them and report that to

25   me.  With that, have a good lunch.  Be back here by

Voir Dire                                    119

1    oh, 1:15 so that you're in you seats at 1:20.

2    Remember your seats -- your seat numbers.

3            (Jury out, 12:20 p.m.)

4            THE COURT:  Be seated, everyone.  You can

5    turn your chairs around.  This is what I want you to

6    do.  Look over the list.  We have three prospective

7    jurors that we said we would come back to and we have

8    to decide what we're going to do with those jurors,

9    number one.  Number two, if there are any jurors who

10   we've passed and have said okay to, no -- we haven't

11   done that with respect to any challenges for cause.

12   We have done it with some marginal hardships.  If you

13   want to go back and revisit them, we can continue

14   with the jury sidebar conferences because we have 11

15   additional jurors.  We're up to juror I think 40 -- I

16   think 41.  Let me look.  Yes, our last juror -- no,

17   40.  Our last juror is juror 39, so that if there are

18   any you wish to come back to, we can certainly do

19   that after lunch.

20           COURTROOM DEPUTY:  (Indiscernible).

21           THE COURT:  Yes?

22           COURTROOM DEPUTY:  (Indiscernible).

23           THE COURT:  I see that.  Thank you.

24           (Pause in proceedings.)

25           THE COURT:  I leave that to you.  For

Voir Dire

1   example, the next juror on the list is juror 40.

2   He's an IT manager.  I haven't looked to see for whom

3   he works.  No hardship.  And there might be others on

4   the list, several without hardships, 41, 42, 43, 44,

5   46, 48.  So that's a choice.  You make those

6   decisions and we'll proceed.  I'd like you here a

7   little earlier.  It's 12:25 now.  The jury will be

8   here by 1:20.  I don't think it will take us more

9   than oh, ten minutes.  So be back by 1:15.  And we'll

10  go to sidebar if there are jurors in the courtroom.

11         Two other issues unrelated to jury

12  selection.  One, Comcast filed an omnibus motion this

13  morning with respect to admission of exhibits as to

14  which there was no challenge.  Has Sprint gotten

15  that?

16         MR. FINKELSON:  We have gotten the motion

17  and we have no objection to it.  I think under the

18  pretrial order, the parties agreed that --

19         THE COURT:  Yes.

20         MR. FINKELSON:  -- exhibits that weren't

21  objected to would be moved into evidence in that

22  fashion.

23         THE COURT:  Which gives rise to something

24  else.  I don't know how many exhibits you proposed to

25  offer into evidence, but I certainly hope -- I think

Voir Dire                          121

1    Comcast is up to -- Ian, what was it, 800 and

2    something?

3              LAW CLERK:  Uh-huh.

4              THE COURT:  And Sprint 200 and something.

5    I hope you're going to offer far, far fewer exhibits

6    than those numbers.  And what I want you to do, your

7    exhibit list doesn't exactly work for me.  We want to

8    try to keep track of the exhibits --

9              MR. HANGLEY:  You want three copies.

10             THE COURT:  -- of the exhibit list.  That's

11   what I asked for and you misunderstood and thought I

12   meant exhibits.  If we got three sets of exhibits, we

13   probably wouldn't be able to enter the courtroom at

14   all.  But what I want -- and there's nothing wrong

15   with keep the bates number, beginning and end, and

16   the objections.  But I want a column -- I want

17   someone working on this before the first exhibit -- a

18   column that says ID, which is the date the -- well,

19   it will enable me to plug in a date the witness --

20   the exhibit is first identified, the date received in

21   evidence.  We're going to be using the computer, so

22   they'll all be shown to the jury.  They don't need

23   to -- I'll be able to mark the exhibit list in the

24   rare event an exhibit is not shown to the jury,

25   although we'll see that.  But I want a column for

Voir Dire                                          122

1    date identified, date received, and a column for

2    witness.  I want to know who is laying the foundation

3    for the exhibit, if at all.

4           We've looked at the issue of business

5    records under 803(6), and I think the analogy to the

6    nurse is inept.  It doesn't work.  I think, for the

7    most part -- I haven't studied each and every

8    declaration in support of the -- or certification in

9    support of the admissibility that Sprint has just

10   filed, but it seems to me that, generally speaking,

11   the Comcast objection might surface in some of your

12   exhibits, but not with respect to one of your major

13   arguments, which is it says "core network," but how

14   do we know what that core network means?  That's a

15   subject for cross-examination and I want you to keep

16   that in mind.

17          I have a quote -- I'm not going to go there

18   until the issue is presented -- a quote from a

19   learned hand opinion that addresses this clearly.

20   And the is triggered only when the report itself or

21   the document itself makes reference to what someone

22   else has said, like hospital record, "nurse stated,"

23   "patient felt," example.  That would be hearsay

24   within a hospital record, hearsay within hearsay.

25   But not everything else in the hospital record, and

1    certainly not everything in all these diagrams, and

2    certainly not a statement that describes something on

3    a diagram.  To rule otherwise would be to really

4    eliminate from the case the business records

5    exception to the hearsay rule.  So keep that in mind.

6    Those are the two issues that I wish to present.

7              MR. GOETTLE:  Your Honor, I just want to

8    make sure that I've got it on -- in terms of what you

9    want added to the exhibit list.  The first three

10   columns you want three blank columns added --

11             THE COURT:  Well, you can put I -- first,

12   is "ID."

13             MR. GOETTLE:  "ID."

14             THE COURT:  Then "Witness" and "Received."

15             MR. HANGLEY:  That should be all you need,

16   right --

17             THE COURT:  Yes.

18             MR. HANGLEY:  -- if we're doing it

19   electronically?

20             THE COURT:  Yes.  And we want three, one

21   for Michael Cosgrove, one for Ian, and one for me.

22             MR. GOETTLE:  Do you want us to --

23             THE COURT:  And I have no objection if the

24   list is limited to, what would you say, 20 or 30?

25             MR. GOETTLE:  Actually --

Voir Dire                                    124

1              THE COURT:  That was said, so the record is

2     complete, with a smile on my face.

3              MR. GOETTLE:  Well, just so the Court is

4     clear, the omnibus motion I think has probably about

5     75 percent of the exhibits just off the top of my

6     head, and we have some exhibits that are objected to

7     by Sprint.  I think your guidance just now will --

8     might alleviate those objections, but --

9              THE COURT:  We're all --

10             MR. GOETTLE:  -- we're pretty close to

11    being there, I'm guessing 75 percent.  Although, if

12    the Court --

13             THE COURT:  I hope so --

14             MR. GOETTLE:  -- has an alternate --

15             THE COURT:  -- because we're off to kind of

16    a slow start.

17             MR. GOETTLE:  Yes.

18             THE COURT:  This is not the speediest jury

19    selection process.  Although I really don't see how

20    we could have speeded it up.  The one question where

21    I questioned the jurors in the courtroom could have

22    been eliminated because we had to question them at

23    sidebar anyway, and I thought the sidebar questioning

24    was as complete as it needed to be.  I think it was

25    I'll say more complete than in many cases.

Voir Dire                              125

1          MR. HANGLEY:  Mr. Riopelle and I were

2    talking about this just a moment ago and we agreed

3    that while it wasn't the fastest, it might have been

4    the fairest.

5          THE COURT:  Well, and that's my goal is not

6    to run a race and win.  My goal is to provide a level

7    playing field and to get this case tried.

8          MR. HANGLEY:  And I think we both thank you

9    for that.

10          THE COURT:  Well, you're welcome.  All

11   right.  Your -- you'll be back at --

12          MR. GOETTLE:  I'm sorry, Your Honor.  I

13   just want to make sure that I'm doing what you're

14   asking us to do on the exhibit list.  Do you want us

15   to remove columns that are on the current exhibit

16   list?

17          THE COURT:  No, you can leave them.

18          MR. GOETTLE:  Just add on three more.

19          THE COURT:  Yes.

20          MR. GOETTLE:  Okay, thank you.

21          MR. RIOPELLE:  1:15?

22          THE COURT:  Yes.  So are you on your feet

23   because you have something to say?

24          MR. FINKELSON:  I was just -- I was just

25   standing up in anticipation of you doing so, Your

Voir Dire                                126

1    Honor.  I have nothing to add.

2              THE COURT:  We're stretching.  All right,

3    you may go about your business, everyone.

4              MR. FINKELSON:  Thank you.

5              THE COURT:  1:15.

6              (Luncheon recess taken, 12:31 p.m.)

7

8                          *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

127

<u>I N D E X</u>

<u>VOIR DIRE</u>                                    <u>PAGE NUMBER</u>

By Judge Dubois                                    3

*   *   *

1

2

3

4

5

6                          <u>CERTIFICATION</u>

7

8          I, Michael Keating, do hereby certify that

9    the foregoing is a true and correct transcript from the

10   electronic sound recordings of the proceedings in the

11   above-captioned matter.

12

13

14
     1/31/17
15   _____        _____

16   Date                        Michael Keating

17

18

19

20

21

22

23

24

25