```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                          - - -

COMCAST CABLE            : CIVIL NO. 12-859
COMMUNICATIONS, LLC,     :
et al.,                  :
              Plaintiff  :
                         :
                         :
                         :
                         :
                         :
      v.                 :
                         :
                         :
                         :
                         :
                         :
SPRINT COMMUNICATIONS    : Philadelphia, Pennsylvania
COMPANY L.P., et al.,    : February 1, 2017
              Defendant  : 9:52 a.m.

                          - - -

     TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 3
          BEFORE THE HONORABLE JAN E. DUBOIS
             UNITED STATES DISTRICT JUDGE

                          - - -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104
```

2

```
1    APPEARANCES:              (Continued)

2    For the Defendant:        DAVID E. FINKELSON, ESQUIRE
                               BRIAN C. RIOPELLE, ESQUIRE
3                              McGuire Woods, LLP
                               Gateway Plaza
4                              800 East Canal Street
                               Richmond, VA 23219
5
                               COLLEEN H. SIMPSON, ESQUIRE
6                              Harkins Cunningham, LLP
                               4000 Two Commerce Square
7                              2001 Market Street
                               Philadelphia, PA 19103
8
                                        - - -
9
     Audio Operator:          Michael Cosgrove
10
     Transcribed By:          Michael T. Keating
11
                                        - - -
12
             Proceedings recorded by electronic sound
13   recording; transcript produced by computer-aided
     transcription service.
14
                                        - - -
15

16

17

18

19

20

21

22

23

24

25
```

1             (The following was heard in open court at

2      9:52 a.m.)

3             THE COURT:  Good morning, everybody.

4      Please be seated.  We're going to proceed with

5      opening statements and then the evidence this

6      morning.  But before we do, I want to explain very

7      briefly what the situation was with juror number 7.

8      I don't want you to think jurors meet with me at the

9      end of the day and then they disappear.

10            Juror number 7 shared with us at the end of

11     the day things that he should have shared with us, as

12     you all did, at sidebar when we had the individual

13     voir dire at sidebar.  Had he shared with us what he

14     told us at the end of the day at the beginning of the

15     day, we would have excused him.  He had a very, very

16     compelling family situation.  And so at the end of

17     the day I decided I would excuse him and we'll

18     proceed with a jury of nine.  And with that, are you

19     ready to proceed, sir?

20            MR. GOETTLE:  I am, Your Honor.

21            THE COURT:  All right.  Mr. Goettle will

22     open for Comcast.

23            MR. GOETTLE:  Your Honor, do you want me

24     behind the podium or can I be in front of the podium?

25

Plaintiff's Opening Statement                4

1        THE COURT:  Not too close to the jury.  You

2   can be in front of the podium or behind the podium.

3        MR. GOETTLE:  Thank you, Your Honor.

4        THE COURT:  I see you've rearranged my

5   courtroom a little bit.  I don't think that's my

6   regular lectern.

7        AUDIO OPERATOR:  I moved that.

8        THE COURT:  Oh.  Overruled again.  You

9   didn't remove it completely?  It's still around

10   somewhere, is it not?

11        AUDIO OPERATOR:  Yes.

12        THE COURT:  All right.  Thank you.  You may

13   proceed, Mr. Goettle.

14        PLAINTIFF'S OPENING STATEMENT

15        MR. GOETTLE:  Good morning.  Speed.  Speed

16   is one of the most important things we report in our

17   cell phones.  Speed.  When we want to connect our

18   phone to other phones, to other networks, one of the

19   things we want is speed.  And if we don't get speed

20   in our phones and other carriers can provide that

21   speed, we might think about switching.  That's how

22   important speed is to us.  That's what the evidence

23   in this case is going to show.

24        The patent at it's core is about speed.  I

25   said the word "core" on purpose because that's going

1    to be a word that you're going to hear a lot in this

2    case, "core," and specifically, "core network

3    elements."  Speed is at the core of this patent.  And

4    this patent is what Sprint has been infringing since

5    at least 2006.  Sprint has been getting the benefit

6    of this invention and the speed characteristics from

7    this invention since 2006, and that's what brings us

8    into this courtroom here today.

9            Good morning.  My name is Dan Goettle.  My

10   team represents Comcast.  At counsel table we have

11   Mr. Bill Hangley and we have Mr. George Medlock.  Mr.

12   Medlock is the Chief Patent Counsel of Comcast based

13   here in Philadelphia.  Mr. Medlock was promoted to

14   that position just a few short weeks ago from the

15   ranks of Comcast on January 13th to Chief Patent

16   Counsel of Comcast.  We have Mr. Dale Heist and Ms.

17   Rebecca Melley.

18           In terms of who you will see on their feet

19   examining witnesses today, that will be Mr. Heist,

20   Ms. Melley, Mr. Hangley, and myself.  The -- at the

21   computer we have Mr. Ricky Dyer, so he will be

22   controlling the graphics that you see while we're

23   doing the presentation of our case.  He will be doing

24   the highlighting, making sure that we're bringing out

25   evidence to you in as clear and concise and as speedy

Plaintiff's Opening Statement                    6

1   manner as we can.  And then the oil that keeps our

2   wheels spinning quickly so that we can put this case

3   on quickly and succinctly through you so that you can

4   get to your deliberations and go back to what you had

5   been planning on doing, that oil is Mr. Larry LaBella

6   and Ms. Kim Ferrari.  You will see them handing us

7   documents, whispering in our ears, all in an effort

8   to make sure that we, the lawyers, stay focused to

9   put this case on quickly and succinctly.

10              Okay, back to speed and the patent.  Mr.

11  Dyer, can you put up PX-2?  And go to page two of

12  PX-2.

13              (Pause in proceedings.)

14              THE COURT:  Are your screens all working?

15  Well, you can use the screens in front of you or the

16  big screens.  You can't use the one across the

17  courtroom.  Use that one.

18              MR. FINKELSON:  That's not on.

19              THE COURT:  Not on?

20              (Pause in proceedings.)

21              THE COURT:  Thank you, Michael.

22              AUDIO OPERATOR:  You're welcome.

23              MR. GOETTLE:  Mr. Dyer, can you highlight

24  the 1999 date on that PX-2 at page two?

25              (Pause in proceedings.)

Plaintiff's Opening Statement                    7

1          MR. GOETTLE:  The invention, ladies and

2     gentlemen, was invented in 1999.  That's what's shown

3     on the patent that you are going to be learning about

4     in this case.  So I would like you to do is imagine,

5     if you can, and remember what cell phones were like

6     in 1999, and as you imagine it, I'm going to tell you

7     what the evidence is going to show you.

8          What the evidence is going to show you in

9     this case is that in 1999, unlike today, not

10    everybody had cell phones, in 1999, unlike today,

11    when people that had cell phones didn't always turn

12    them on.  They left them in their purse, they left

13    them in their pockets, they were used for emergency

14    purposes only.

15         In 1999, cell phone coverage wasn't what it

16    is today.  In 1999, cell phone coverage was decent in

17    the cities, the evidence will show you, but as you

18    moved outside of the cities, cell phone coverage

19    became worse and worse.  The cell networks just were

20    not that -- not as good as they are today.  And the

21    cell phones themselves were vastly different than

22    they are today.  Today, the smart phone is

23    ubiquitous.  We see it all the time.  We know what it

24    looks like.  They're more like mini computers than

25    they were like the house phone.

Plaintiff's Opening Statement                    8

1           That wasn't the case in 1999.  In 1999, the
2   evidence will show you that cell phones were like the
3   house phone.  They had a speaker that you could hear
4   in, they had a microphone that you could talk in, and
5   they had a numbered keypad.  What was the numbered
6   keypad for?  Well, you probably remember, but the
7   evidence is going to show you anyway, that numbered
8   keypad was for dialing phone numbers.  That was for
9   making phone calls.  That's how cell phones were in
10  1999 and that's how they were used.  They were
11  thought of as cell phones.
12          Now, in 1999, the inventor on this patent,
13  the evidence will show you, was dealing with what she
14  foresaw as a problem that was coming.  That problem
15  related to volume of messages, messaging volume.
16  We've heard a little bit about what this patent is
17  about.  I know you've been instructed on it and I
18  think you already know, but the patent is about
19  messaging, text messaging, MMS messaging.
20          So I just said the first acronym of many
21  acronyms you're going to hear in this case.  MMS,
22  that stands for Multi-media Service Messaging, MMS.
23  The other acronym you're going to hear a lot in this
24  case is SSM, Short Message Service Messaging, SMS.
25  Those are text messaging features.  That's what

Plaintiff's Opening Statement                    9

1  people think of today as -- colloquially, you call it

2  text messaging.

3          Skilled artisans in the field at the time

4  of this invention and today, they were proof that

5  text messaging was SMS or MMS.  In your binder, your

6  jury binder -- and Judge Dubois mentioned this to you

7  yesterday -- you have a list of acronyms in there.

8  This industry is acronym-driven.  They like they're

9  acronyms.  They're like friends.  And so the

10  witnesses will be speaking in terms of the acronyms.

11  The lawyers are going to do their best to make sure

12  that we're speaking to you in plain English, but if

13  an acronym slips out and you're not sure what it is,

14  if we've done our jobs right, you'll be able to go

15  through that tab in your binder and you'll see what

16  the acronym stands for.

17          So in 1999, here's what the evidence will

18  show you about the state of messaging.  SMS messaging

19  was already known by 1999.  It had been developed by

20  the industry prior to that starting around, the

21  evidence will show you, 1995 time frame.  And what

22  the industry did was they got together so that the

23  companies that make cell phones would know how to put

24  the technology on the phone to do SMS in a way so

25  that it would connect inside cellular networks with

Plaintiff's Opening Statement                    10

1   the various components inside cellular networks and

2   it would work.

3          The evidence will show you that because the

4   industry had gotten together to do that, the cell

5   phone manufacturers would know all I got to do is I

6   got to make sure that when I put my technology on

7   this phone for SMS I got to make sure it sends out

8   the signals in this right format so that the

9   equipment in the cellular network will know how to

10  deal with that signal when it receives it so that

11  they will communicate.  And then this way the

12  industry knew that cell phone manufacturers, you make

13  your phones this way; cellular network operator, you

14  buy this equipment and have it set up this way, and

15  then we know it will work when they're put together.

16  That had already happened for text messaging for SMS

17  messaging by 1999.  But the standard text messaging

18  in 1999 was not -- wasn't a hugely used product,

19  the -- or service.

20         The evidence will show you that it was very

21  new and not heavily used.  Why?  Well, it goes back

22  to what we've already talked about.  Cell phones at

23  that time were largely viewed as extensions of the

24  house phone.  And the evidence will show you that

25  house phones were not -- were not used for messaging.

1   House phones, the wire phones, the phone hanging in

2   the kitchen, was not a phone that you used for

3   messaging.  It never -- would never come up.  And so

4   cell phone and text messaging hadn't quite caught on

5   yet.

6           The reason for that -- one of the reasons

7   for that, the evidence will show you, goes back to

8   that numbered keypad.  It's hard to send a message

9   using a numbered keypad.  You might recall, and the

10  evidence will show you that, for example, the numbers

11  were assigned letters.  Number two on the phone --

12  not number one for some reason, but number two on the

13  phone was assigned the letters A, B, and C.  So if

14  you wanted to type in a letter on a phone, on a

15  numbered pad, and you wanted to type the letter A,

16  well, that was easy.  You pushed the number two one

17  time.

18          If you wanted to type in the letter C on

19  that same phone, you had to toggle to C.  You had to

20  push the number two one time, you had to push it

21  again to get B, and that will get you -- two times

22  would get you B.  Three times would get you C.  It's

23  not super conducive for text messaging, and the

24  evidence will show you that the numbered keypad on

25  the phone was the predominant type of cell phone at

1    the time.

2            So in 1999, the vol -- the message volume

3    wasn't a big problem that the inventor was thinking

4    about at that time.  It hadn't become a big problem

5    yet.  But what the evidence will show you is that the

6    patent describes and the inventor describes -- in her

7    patent, she describes that message volume is going to

8    be a problem, and here's why.  We want speed in our

9    cell phones.  We want our phone to connect to other

10   phones, to connect to other networks, fast.  And if

11   we're taking those core components in our cellular

12   network and distracting them by having to deal with

13   an increasing volume of messaging, increasing volume

14   because multi-media messaging with the bigger

15   messages that can send video, that can send audio,

16   that can send pictures, those were being developed in

17   1999, and the inventor talked about that in her

18   patent.

19           So the inventor describes that message

20   volume is going to increase and that's going to be a

21   problem, and here's why.  Cell phones are sometimes

22   off.  Cell phones sometimes are not in the range of

23   the cellular network operator.  They're out of range.

24   Maybe they're in a rural area.  Maybe it's just not

25   good cell phone coverage.  Sometimes those messages

Plaintiff's Opening Statement                13

1   that need to be delivered can't be delivered.  Those

2   messages that need to be delivered can't be

3   delivered.  And what that means is those components

4   that are charged with the duty of insuring that that

5   phone can connect to that other phone, that phone can

6   connect to this network, now they're going to be

7   distracted.  They need to speedily make these

8   connections, and now they're also going to have to

9   keep track of messages.

10          They're going to receive a message from the

11  phone and they're going to be sitting there and they

12  have to check is the phone on?  Where is the phone?

13  Has the subscriber paid for the service to receive

14  these types of messages?  It's going to need to be

15  checked.  And if the phone is off, if the phone can't

16  be found, now those components are distracted because

17  now they're not focused on the duty of speedily

18  connecting phones to other phones.  They're now

19  distracted with the duty of managing these messages,

20  holding onto these messages, waiting for the phone to

21  turn back on, and then saying that phone is back on,

22  I think I have a message for that phone, I do have a

23  message for that phone, now I'm going to deliver it.

24          The inventor in this patent describes, and

25  the evidence will show you, that the inventor of this

Plaintiff's Opening Statement                    14

1    patent was facing that problem of this potential

2    increase in message volume, and here was the solution

3    that she came up -- or part one of the solution.

4    There's a two part solution.  Here's part one.

5           Part one was that, you know what, let's not

6    bog the network down with these messages.  Let's not

7    bog down that computer with that core technology

8    that's needed to get the phone to connect to other

9    phones and to other networks, let's not bog it down

10   with messaging.  Instead, let's have specialized

11   computer equipment, server computers, that handle

12   these messages.  So instead of the message getting

13   sent right in to those -- to those core network

14   functions that are dealing with connecting calls,

15   let's keep it away from that.  Let's set it up in a

16   specialized computer system so that that deals with

17   the messages.  She called those -- that specialized

18   computer servers messaging servers.  Those are the

19   servers that are going to receive the message first.

20          Now, part of this -- this part of her

21   solution was with the notion that look, they'll

22   receive a message and they're going to hold onto the

23   message and they're going to keep the message until

24   the network -- until those components that are

25   charged with that duty of connecting the phone to

Plaintiff's Opening Statement                    15

1   other networks and to other phones, until they tell

2   the messaging server you can receive them, you can

3   send a message on, the phone is on, the phone can

4   receive, the subscriber has paid her bills, you can

5   go ahead and send the message.  And then, and only

6   then, is the message sent into those core components

7   through the network where it sails right out like

8   butter to the recipient phone.  That was part one of

9   her invention, messaging server away from those core

10  components, not distracting those core components

11  with messages that can't be delivered, when the

12  mess -- when the messaging server receives

13  notification we found the phone, you can send a

14  message, the message gets sent into the message --

15  into the network where it can just sail right

16  through, and now those components charged with the

17  duty of speedily connecting the phone to other

18  networks, the phone to other phones, don't have to be

19  distracted with the network -- sorry, with the volume

20  of the messages.  That will be maintained outside.

21          If it turns out that the phone is not on,

22  if the phone can't be found, then that messaging

23  server will be told by those four components hang

24  onto the message, try again later, we can't find the

25  phone right now.  And now it's the messaging server's

Plaintiff's Opening Statement                     16

1   job to hold onto the messages and not bog down those

2   core network components.  Part one of her invention.

3           Second part of her invention is now, since

4   you don't have those core components dealing with the

5   messages and, instead, have a separate messaging

6   server dealing with the message, how is that separate

7   messaging server supposed to know is the phone on,

8   can the phone receive this message?  Because it's not

9   part of the other process, it doesn't know.

10          So the inventor made a compromise.  The

11  compromise is this, and the evidence will show you

12  this, and I'm going to walk through the claim and

13  show you where this is in the claim.  But the

14  inventor made a compromise.  The core components

15  charged with the duty of making the connections to

16  phones, one phone to another phone, one phone to a

17  network, they're not off the hook completely.

18  They're going to have to play a rule.  And here's the

19  role they're going to have to play.

20          You, messaging server, when you receive the

21  message do not send the message to us.  This is from

22  the perspective of these core elements.  Do not send

23  the message to us.  But you can interrupt us a little

24  bit.  Interrupt us with a question.  You can send in

25  an inquiry to us, tell us what the phone number is of

1    the phone you're trying to find out about and we'll

2    do a lookup in our database that we use to track

3    phones.  We'll do a lookup, we'll find out where the

4    phone is, we'll find out if the phone can receive it,

5    and we'll let you know.

6              So those components that are dealing with

7    the connections have a role to play and they're going

8    to be a little distracted.  But they don't have to

9    keep track of the messages.  They just receive them.

10   An inquiry is the claim term, an inquiry, and they

11   send a response.  And now the messaging server can

12   hold onto the message and wait for a response.  And

13   the inventor said -- and this is shown in the patent

14   and the evidence will show you the inventor said if

15   the components that deal with connecting the phone to

16   other networks, if those components do not store the

17   information by the phone number, but store it by some

18   other identifier for the phone, like a serial number,

19   if that's how the network stores its information,

20   that's okay too.  Here's how it will work.

21             You, messaging server, when you receive the

22   message keep the message.  Don't send us the message.

23   We don't want it yet.  Send an inquiry to the

24   cellular network.  You, core network components, you

25   do a lookup in your database and find out if the

1  phone is on, find out where it is, find out if the

2  subscriber has paid for the service.

3          If you, cellular network -- you, core

4  components, that are charged with the duty of

5  connecting the phone to other networks, if you don't

6  store the information by phone number, the

7  information that you got from the messaging server,

8  but, instead, store the information by serial number,

9  that's okay.  Cellular network, you do a mapping.

10  You just take the phone number in, map it to the

11  information you need, your internal identifier of the

12  phone, and do the lookup using the internal

13  identifier, and send back the response.

14          So, ladies and gentlemen, that's the

15  invention that -- of the patent.  That's what the

16  evidence will disclose.  We will have testimony later

17  on to flesh it out.  I know I walked through that a

18  little bit quickly.  But I do want to walk through

19  the claim and give you a grounding in the claim so

20  you know kind of the target that we're shooting at

21  here.

22          Judge Dubois explained yesterday that

23  you're going to be tasked with the job of comparing

24  the asserted claims in the patent to Sprint's network

25  and deciding whether Comcast has proven that Sprint's

Plaintiff's Opening Statement                    19

1   network practices the elements of the claim.  And

2   since that's the target you're going to be shooting

3   at, I think it's worth the time to just kind of walk

4   through it.  I'm going to walk through it in a

5   relatively fast fashion, but I want to walk through

6   the patent claims so that you know the target we're

7   shooting at.

8            So, first of all, Mr. Dyer, can you pull up

9   page 13 and blow up claim one?

10           (Pause in proceedings.)

11           MR. GOETTLE:  Actually, let me make sure

12  there's no confusion here.  I think there's going to

13  be a little confusion.  We're going to talk a little

14  bit about a re-examination that happened to this

15  patent.  So what you're looking at on the slide and

16  what's on page PX-2.013, that's claim one of the

17  patent, of the originally issued patent.  And I'm

18  going to explain that Comcast asked the Patent Office

19  to re-examine the patent after Comcast bought it from

20  Nokia.  And so the Patent Office did re-examine the

21  claim and then -- Mr. Dyer, can you pull up page 17?

22           MR. GOETTLE:  -- and issued what's called a

23  re-examination certificate.  That's page -- on page

24  17.  Behind that page there is a repetition of claim

25  one, one of the asserted claims.  That's on page 19.

Plaintiff's Opening Statement                    20

1   And then -- and you don't need to show this, Mr.

2   Dyer.  And then other claims that got added during

3   the re-examination process that are in -- italicized.

4   You can tell what got added because it's in italics.

5   And that goes up through claims 113.

6          So that -- the new claims are from pages 19

7   to page 23 of PX-2.  And, as Judge Dubois said

8   yesterday, we are -- Comcast is asserting claims one,

9   seven, and 113.  Okay.  So I'm -- like I said, I'd

10  like to walk through claim one.  Mr. Dyer, can you

11  pull of just the first paragraph of claim one?

12         (Pause in proceedings.)

13         MR. GOETTLE:  So where I'm going to go with

14  this, ladies and gentlemen, is I'm going to read it

15  quickly to you, but I'm going to explain how what

16  I've already told you is what's in the claim.  So the

17  preamble of the claim, the first paragraph of the

18  claim, says, "A method for inquiring about

19  information relating to a wireless terminal of a

20  cellular network from the cellular network by a

21  messaging server external to the cellular network

22  wherein the method comprises."  The evidence is going

23  to show you, ladies and gentlemen, that what that is

24  saying is you have a messaging server that's away,

25  that's separate from the core network elements that

Plaintiff's Opening Statement                    21

1   are charged with the duty -- charged with the duty of

2   speedily connecting phones to other phones, phones to

3   other networks.  You have a messaging server away

4   from that.  That's why there's a reference there to

5   external messaging server.  And that messaging server

6   is attempting to get information about a phone.

7   Okay?  That's the preamble in a nutshell.

8            Now we go through just a four step claim

9   that are four steps that I've actually already walked

10  through.  The first step is sending an inquiry from

11  the messaging server to the cellular network to

12  determine said information relating to the terminal,

13  the inquiry comprising a first identifier,

14  identifying said terminal, the first identifier being

15  a specific identifier external to the cellular

16  network.  That is a lot of words to get across a

17  simply point, ladies and gentlemen.  The evidence

18  will show you that what that means is sending in an

19  inquiry from this messaging server that's separate

20  from the core functions, sending in an inquiry about

21  a phone, the phone with the phone number.

22            So the messaging server is requesting

23  information about a phone and it's ending in the

24  phone number to get that information.  That comes up

25  with the part first identifier, identifying said

Plaintiff's Opening Statement                    22

1  terminal, the first identifier being a specific

2  identifier external to the cellular network.  The

3  evidence is going to show you that that first

4  identifier, that's the phone number.

5        Okay.  Next step, mapping.  Mapping said

6  first identifier to a specific second identifier in

7  the cellular network, the second identifier being an

8  internal identifier of the cellular network.  That's

9  mapping the phone number to, for example, a serial

10  number of a phone for whatever identifier the network

11  uses to uniquely identify each phone.  If it doesn't

12  do -- if it doesn't store its information according

13  to phone number, but uses, again, for example, the

14  serial number of the phone or some other identifier,

15  the cellular network, the components charged with the

16  duty of fast connections, will do a mapping from the

17  first identifier, the phone number, to a second

18  identifier, an internal identifier used in the

19  network.

20        The third step, determining said

21  information relating to the terminal with the said --

22  with the aid of said second identifier.  The evidence

23  will show you that means a database inside the

24  network, and in this case Sprint's network, does a

25  lookup in a database using the internal identifier.

Plaintiff's Opening Statement                    23

1   It will look up where is the phone?  It's a cellular

2   network.  Phones move around.  They're mobile.  It

3   needs to keep track of where is the phone?

4              Is the subscriber signed up to receive an

5   SMS or an MMS message or any other kind of

6   information that the messaging server might need or

7   the cellular network needs to send a message through?

8   That's going to be determined at the third step.

9              Then the last step is a long paragraph to

10  get across a relatively straightforward point.

11  Sending a response message in response to said

12  inquiry from the cellular network to said messaging

13  server external to the cellular network, in which

14  response message the information relating to said

15  terminal is indicated with the aid of said first

16  identifier.

17             The evidence will show you, ladies and

18  gentlemen, that that's a long way of saying -- of

19  saying those components involved with fast

20  connections ensuring speedy connections between the

21  phone and other phones, the phone and other networks.

22  They send back the information to the messaging

23  server and the indicate the information they're

24  sending back with the aid of, for example, the phone

25  number.  You asked me about questions -- you asked me

Plaintiff's Opening Statement                    24

1   about a phone that you need to send a message to.

2   Here's the information you requested along with, for

3   example, the phone number so that the messaging

4   server knows oh, that's Bob's phone and I asked about

5   Bob's phone and now I know this is the information

6   about Bob's phone.  It includes or needs to be --

7   that information needs to be identified with the aid

8   of that phone number.

9           Okay, so that's the claim.  You'll notice

10  in this claim that quite a few times I use the term

11  "cellular network."  It's in the claim.  And

12  yesterday, Judge Dubois told you that he has

13  construed some claim terms, including "cellular

14  network."  What that means is the Court has -- Judge

15  Dubois has looked at some of the claim terms in here

16  and defined those terms in accordance with what is

17  disclosed in this patent.  That process, as he

18  explained, is called construction.  It's kind of like

19  the definition of the claim term as that claim term

20  is used in this patent.  And, Mr. Dyer, can you pull

21  up the claim constructions.  And I think it's the

22  second tab in your binder, you have all of the

23  definitions, all of the constructions, that the Court

24  has defined for us for this case.  And can you blow

25  up the cellular network?

Plaintiff's Opening Statement                    25

1          I'm only going to talk about one now.

2     We're going to be talking about all of them as the

3     evidence unfolds, but I'm going to talk about one now

4     because I think it's the most important one in terms

5     of the issues in this case.  You might find this a

6     little bit -- a little bit hard to believe, but we're

7     actually going to be talking about what is Sprint's

8     cellular network?  What is Sprint's cellular network

9     under this construction, under this 1999 patent?

10    What constitutes Sprint's cellular network?

11         The evidence is going to show you what

12    Sprint's cellular network is and what it is not,

13    according to this 1999 patent.  And where I'm going

14    with this -- well, let me -- let me walk through it

15    and then I'll explain.  The Court has construed,

16    defined for the purposes of this patent, has

17    construed cellular network as having three main

18    components.  Number one -- and if you could highlight

19    these as I go.  Number one are wireless terminals.

20    The Court has said that a cellular network must

21    include wireless terminals in order to qualify as a

22    cellular network under this patent.  That makes sense

23    because the whole purpose of a cellular network is to

24    connect mobile phones cellularly -- and we will

25    explain that that means -- connect mobile phones to

1   other phones and to other networks.  So the cellular

2   network would, of course, include the wireless

3   terminals, which is another name for the mobile

4   phones -- the cellular phones.

5           Next, a cellular network has to include bay

6   station systems.  We don't need to belabor this

7   point.  Bay station systems are the cell antennas and

8   specialized computer controllers that control those

9   cellular antennas, cellular antennas, cell towers,

10  the cell towers we see all over the place.

11          Then the last thing, which is the important

12  part -- the last thing in the Court's -- well,

13  they're all important parts, but for this case and

14  for the issues that you're going to be asked to

15  decide, the important part for this case is core

16  network elements.  So that's the third of the three

17  boxes.  We had wireless terminals, bay station

18  systems, and now we have core network elements.  And

19  I want to point out two things -- two things that I

20  think are very important for you to keep in mind as

21  the evidence unfolds, and the evidence is going to

22  show you this.

23          Number one, the Court did not -- did not

24  define what core network elements are or are not.

25  There's a long list of things that follow the phrase

Plaintiff's Opening Statement                    27

1    "core network elements" in the construction, but

2    before that phrase, it says "may include."  Instead

3    of defining the term, the Court has left it to you to

4    decide what are core network elements in Sprint's

5    network, okay?  And then the Court has gone on and

6    said -- given a list of certain things that may or

7    may not be core network elements in a cellular

8    network.  And it's going to be your task, one of your

9    tasks, to decide what are Sprint's core network

10   elements.  That's point number one.

11           Point number two about core network

12   elements is the word "core."  The word "core" is in

13   the phrase "core network elements."  That's

14   significant, ladies and gentlemen, because Sprint has

15   a lot of components under its domain, and Sprint

16   witnesses generically -- and you will here this in

17   the case -- generically refer to Sprint's wireless

18   network or wired network.  The wireless network

19   obviously is where we're focused.  The wireless

20   network has a lot of computers in it, a lot of

21   different functions.  You can get voicemail, you can

22   do messaging, you can do a lot of things with

23   Sprint's wireless network.  That doesn't matter.

24           The evidence will show you that what

25   matters is what are the components in Sprint's

Plaintiff's Opening Statement                    28

1   wireless network that are core network elements to

2   Sprint's cellular network under this construction

3   from a patent that was written in 1999?  So Sprint

4   has many computers, many different functions of

5   network computers, computers that talk to each other,

6   computers that talk directly to each other or

7   indirectly to each other.  That doesn't matter.

8           The evidence will show you, Comcast's case

9   will show you, what's important is the word "core."

10  The Court didn't define the word "core" and the Court

11  instructed you yesterday that if a term is not

12  defined, you are to apply its ordinary meaning.  The

13  ordinary meaning of the word "core" the evidence will

14  show you is essential, essential network elements.

15  So the question -- and the evidence will show you

16  that the -- the answer to the question, but the

17  question that you are being asked to answer is in

18  Sprint's cellular network what are the elements that

19  are core network elements to get the cellular network

20  to work for its purpose?  What are the core elements

21  that you need to get the phone to talk to other

22  phones?  What are the core network elements?  Which

23  network elements do you need to get Sprint's cellular

24  network to have the phone talk to other networks?

25  Those are the elements that are core network

1   elements.  And the evidence will show you that

2   Sprint's messaging servers, which is the last part of

3   the -- of the claim construction, while the Court has

4   said messaging servers may be core network elements

5   under this patent in 1999, the question for you to

6   answer is Sprint has messaging servers; are they core

7   to the operation of the cellular network or are they

8   not core?

9        If you find that Sprint's messaging servers

10  are core to the cellular network, then you find no

11  infringement, right?  Because the claim requires that

12  the messaging server be external to the cellular

13  network.  If you find, however, that -- from the

14  evidence, in particular, the evidence that Comcast is

15  submitting that you will find -- if the evidence

16  shows -- excuse me, if the evidence shows you that

17  Sprint's messaging servers are not core, are not

18  essential to Sprint's cellular network, then that

19  would mean that those messaging servers are not part

20  of the cellular network, and, therefore, are external

21  to the cellular network.

22       So what I want to flag on this is the

23  evidence will show you that messaging is perhaps a

24  core business.  It is a -- for Sprint, it is a hugely

25  profitable, hugely popular service that Sprint

1   provides to its customers.  It's a core business.

2   It's important to Sprint.  But the question for you

3   is not to decide as a matter of business whether

4   messaging is core, and, therefore, whether the

5   messaging server is core.  That's business.  Whether

6   someone would purchase a cell phone be -- make a

7   decision on purchasing a cell phone or using Sprint

8   depending on whether it offers text messaging, the

9   evidence will show you that's a business decision.

10  The question for you to decide is as a matter of the

11  technology of this patent in 1999, whether Sprint's

12  messaging servers constitute core network elements.

13          Okay.  So I'm going to leave the patent

14  now.  Can you put up the Powerpoint, slide one?  I

15  have two more areas to cover and I will be much

16  quicker on the other two areas to cover.

17          The first thing I'm going to talk about is

18  why Comcast has this patent in the first place and

19  then why Comcast is suing Sprint, and then I'm going

20  to talk to you about the damages that we seek you to

21  award Comcast for Sprint's use of the invention.

22          Okay.  Why does Comcast have this patent?

23  Ladies and gentlemen, we have seven witnesses to put

24  on for you in our direct case, seven live witnesses,

25  and the first three are shown up on the screen in the

1   order that they will be presented to you.

2          Mr. Finnegan is a Comcast employee and what

3   Mr. Finnegan is going to explain to you is that in

4   2007, late 2007, he was hired by Comcast to develop a

5   patent strategy at Comcast, okay?  By 2007, Comcast

6   was -- had grown very quickly from a mom and pop

7   cable company to a leader and an innovator in the

8   cable industry.  And being a leader in a -- leader in

9   an industry makes you a popular company for other

10  people to talk to about their patents.  Other people

11  come to you -- the evidence will show you other

12  people come to you with their patents and they say

13  hey, we think you might be infringing our patents.

14  And at that point in time, in 2007, Comcast did not

15  have, as sophisticated as it was, sophisticated in

16  the industry of the cable business, did not have a

17  sophisticated patent strategy.

18          So Comcast hired Mr. Finnegan to come in

19  and develop a patent strategy because that's what his

20  background is in.  And you'll hear evidence about

21  what he did in terms of setting a strategy, but

22  there's one part of the strategy that I'm going to

23  touch on right now.  That strategy is this.  Mr.

24  Finnegan came in with the knowledge that a common

25  practice for companies like Comcast is to have a

1  large patent portfolio, and here's why.  When those

2  other companies come to Comcast with their patents

3  and they put them down on the table and they say

4  you're going to -- you have a problem with our

5  patents, you need to take a license to our patents,

6  Mr. Finnegan's experience told him that the way you

7  meet that is you open up your drawer, you pull out

8  your patents, and you put them on the table next to

9  the patents from the other party.  And the reason you

10  do that is you say look, you have patents and we have

11  patents, but we don't want to be in the patent war

12  business.  We want to sell products, we want to sell

13  services to customers, we want to compete in the

14  marketplace.  So you pull those patents out of your

15  drawer, you put them on the table so that you can

16  wipe the patents aside and deal with business issues

17  as a matter of business.

18          You develop a patent portfolio for

19  defensive purposes.  When the other companies come to

20  you on offense you play defense.  You get out your

21  patents, you put them up there, you say it's a wash,

22  the patents are a wash.  If we have a dispute, let's

23  just deal with it as a matter of business, let's

24  compete in the marketplace for customers as a matter

25  of business.  Let's not deal with patent litigation,

Plaintiff's Opening Statement                    33

1   let's not involve courts and involve juries and take

2   people away from what they want to be doing to dis --

3   to resolve business issues in litigation.  That's

4   what Mr. Finnegan is going to explain to you.

5           Mr. Dellinger was hired two and half -- in

6   fact, Mr. Finnegan hired Mr. Dellinger, our second

7   witness.  Mr. Dellinger was specifically involved in

8   purchasing the patent that's at issue in this case.

9   Mr. Dellinger will explain to you that in 2008, he

10  contacted Nokia, who he had dealt with at his

11  previous jobs and brokered deals regarding Nokia

12  patents.  He contacted Nokia and asked Nokia if they

13  would be willing to sell patents in the telecom

14  space, and they were.  And that started a negotiation

15  that took about two and a half years and resulted in

16  the buying of this patent and two other U.S. patents

17  from Nokia, along with the foreign like European

18  counterparts to the U.S. patents.  But Comcast bought

19  three patents, and Mr Dellinger is going to explain

20  to you that when they bought the three patents Nokia

21  asked for $1.5 million for the three patents, and he

22  was successful in negotiating, and Comcast bought the

23  patent for $600,000.

24          Mr. Marcus, our third witness, will

25  testify, as I alluded to early, about re-examination.

Plaintiff's Opening Statement                    34

1    He will testify that after Comcast bought the patent,

2    Comcast noticed that certain prior art patents,

3    certain prior art publications, had not been

4    considered by the Patent Office originally during

5    prosecution during the original issuance of the

6    patent.  And what Mr. Marcus will tell you is that he

7    sent those -- that -- this patent and that prior art

8    back to the Patent Office and he said, Patent Office,

9    we think this patent is still good, but we notice

10   that you didn't consider this prior art.  Can you

11   please consider it and let us know what you think?

12          Mr. Marcus will explain to you that the

13   Patent Office looked at that prior art and looked at

14   the claims again and confirmed that the claims were

15   patentable and agreed with Comcast that the patent

16   was still good.  Okay.  Can you go to the next slide?

17          Okay.  Our next two witnesses, we have Dr.

18   Robert Akl and Dr. Jeffrey Dwoskin.  They will be

19   talking about Sprint and Sprint's infringement in

20   this case.  So now, after I've just talked to you

21   about how Comcast buys patents for defensive

22   purposes, now I'm going to talk to you about why we

23   are suing Sprint for infringing this patent.

24          The evidence will show you -- in fact, I'm

25   sorry, can you flip back a slide?  The evidence will

1  show you from the testimony of Mr. Finnegan that

2  Sprint and Comcast were longtime partners.  They

3  bought and sold services of each other and they

4  actually invested together in new technology.  And as

5  evidence of this, when Mr. Finnegan decided to go on

6  this patent acquisition spree to go out and buy

7  patents that it could then have in its drawer in case

8  other competitors came to it, one of the first phone

9  calls that Mr. Finnegan made was to Sprint.  That's

10  significant, ladies and gentlemen, because Mr.

11  Finnegan will explain to you you don't go to just

12  anybody to buy their patents.  Once you pick up that

13  phone and say hey, do you have any patents that

14  would -- that you would be willing to sell us, well,

15  if you don't go to the right person, they could hang

16  up the phone from their end, start looking at their

17  patents, and start thinking we're not going to sell

18  these patents to the -- to the other party, we're

19  going to accuse them of infringement.  We're going to

20  see if we can exact licensing fees for the use of our

21  invention.  So you have to be careful when you go

22  about buying patents from other parties.

23          I told you Mr. Dellinger contacted Nokia.

24  From his prior experience, he knew -- he knew

25  Nokia -- for reasons that will be explained, he knew

Plaintiff's Opening Statement                    36

1    Nokia was willing to sell patents.  And then based on

2    the relationship between Comcast and Sprint, this

3    longtime business partnership, Mr. Finnegan felt

4    trusting enough of Sprint to go to Sprint and say

5    will you sell us any patents?

6            January 1st, 2010 -- actually, I might be

7    wrong on the actual day.  January of 2010, Sprint

8    called Comcast and told Comcast that Comcast was

9    infringing Sprint patents, January of 2010.  Sprint

10   didn't sue right away, but then, eventually, Sprint

11   sued Comcast for patent infringement.

12           MR. FINKELSON:  Your Honor, objection, I'm

13   not sure that there's any relevance to lawsuits that

14   are not before this Court.

15           THE COURT:  Overruled.

16           MR. GOETTLE:  Eventually, Sprint sued

17   Comcast for patent infringement in another court and

18   that's what led to this countersuit, this

19   counterclaim, against Sprint.  And that's what brings

20   us here today.  That's why -- that I've explained to

21   you of why Comcast has the patent, again, for

22   defensive purposes, and why Comcast is suing Sprint.

23           Comcast wants to compete in the

24   marketplace.  That's what you're going to hear from

25   these witnesses.  Comcast doesn't want to compete in

Plaintiff's Opening Statement                    37

1  a courtroom in front of juries.  Comcast wants to

2  compete in the marketplace, but that's why Comcast is

3  here today.

4           Okay.  And the last thing that I want to

5  touch on very briefly -- I'm almost done -- is

6  damages.  The -- Judge Dubois instructed you a little

7  bit on damages yesterday and you're going to hear

8  more instructions and you're going to hear testimony

9  about this.  Can you flip to the next slide?

10          What the law says is if a party is

11  infringing a patent, the owner of that patent -- you

12  know what, let me step back.  I forgot to say one

13  piece that I wanted to say because this might be a

14  little bit foreign.  Patents are property.  They're

15  like your house and they're like your car.  Okay?

16  You can buy and sell your house, you can buy and sell

17  your car, and just -- and you can do that with

18  patents too.  So when you buy a patent, and the --

19  and the evidence will show you in this case when

20  Comcast bought this Nokia patent it paid Nokia for

21  the right to sue for infringement, whether that

22  infringement happened after the date that Comcast

23  bought the patent in 2010 or before 2010.  And that's

24  the law and Comcast has the right to bring this

25  lawsuit.  This patent is Comcast's patent.  Okay.  I

1   forgot to mention that and I wanted to make sure I

2   mentioned that.  And the evidence will show you that.

3            Back to damages, the law -- Judge Dubois

4   instructed you on this earlier and you will be

5   instructed on it again, that the law provides that

6   Comcast, as the patent owner, is entitled to no

7   less -- no less than a reasonable royalty for the use

8   made of the invention by Sprint.  Comcast is entitled

9   to no less than a reasonable royalty for Sprint's use

10  of the invention.

11           Ladies and gentlemen, Sprint's use of this

12  invention since 2006 has resulted in 2.6 trillion --

13  2.6 trillion text messages.  All text messages,

14  2.6 -- all 2.6 trillion of those messages involved

15  using those four steps in the claim that I've

16  already -- that I've read to you, 2.6 trillion.  A

17  trillion is 1,000 billion.  So that's 2,600 billion

18  acts of infringement of the patent just for text

19  messaging.  And then the evidence will show you

20  there's another billion, more than a billion of the

21  multi-media messaging acts of infringement.  And

22  Comcast, under the law, is to compensate Com -- or,

23  excuse me, Sprint, under the law, is to compensate

24  Comcast for Sprint's use made of the invention.

25           For that use made of the invention, Comcast

Plaintiff's Opening Statement                39

1    is seeking a little bit more than $153 million.  And

2    here's what I would like you to pay attention to

3    during the expert testimony on damages.  You're going

4    to hear from Ms. Reilly and Mr. Weber, our last two

5    witnesses.  And what I would like you to pay

6    attention to when you hear their analysis of Sprint's

7    infringement, I would like you to pay attention to

8    every time they had a choice to make in trying to

9    determine Sprint's use made of the invention.  Every

10   time that those experts had a choice to make on some

11   sort of range of values they could select on one end

12   would be really good for Comcast, on the other end

13   would be really good for Sprint, or somewhere in the

14   middle, they always selected the Sprint number.  They

15   erred on the side of Sprint throughout their

16   calculations every time.  You will hear that in the

17   evidence if you're listening for it.  Every time they

18   had a choice to make they went with Sprint.  They

19   made a conservative damages estimate of $153 million.

20            That $153 million, ladies and gentlemen,

21   the evidence will show you amounts to a little bit

22   more than five one-thousandths -- five one-

23   thousandths of a penny for each infringing act, for

24   each message sent, five -- a little bit more than

25   five one-thousandths of a penny.  And the evidence

Plaintiff's Opening Statement                    40

1   will show you that at least in the early days of

2   Sprint offering SMS services, there were times where

3   subscribers were paying as much as 15 pennies, 15

4   cents per message.  And what we are seeking is a

5   little bit more than five one-thousandths of one of

6   those pennies.  It just so happens that when the use

7   amounts to 2.6 trillion messages that number can

8   get -- can get large quickly.  $153 million is a

9   large number, but the use made of the invention, as

10  these experts will disclose to you, warrants a

11  damages award of that amount.

12          So I've concluded my opening statement.  I

13  very much appreciate your time.  I submit to you that

14  we heard you loud and clear yesterday.  We will -- we

15  will endeavor to put our evidence on as quickly and

16  as concisely and as completely as we need to to make

17  sure that you have the information you need to -- for

18  your deliberations.  Thank you.

19          THE COURT:  Thank you, Mr. Goettle.  We

20  will now hear Sprint's opening statement.

21          MR. FINKELSON:  Your Honor, I'm happy to

22  proceed or we can take a short break just to organize

23  and let everybody stretch their legs.

24          THE COURT:  All right.  It's a little

25  early, but we can take a short break.  Ten minute

Defendant's Opening Statement                     41

1   break.

2           MR. FINKELSON:  Thank you, Your Honor.

3           (Jury out, 10:41 a.m.)

4           THE COURT:  We're in recess for ten

5   minutes.

6           MR. HANGLEY:  Thank you, Your Honor.

7           MR. FINKELSON:  Thank you.

8           (Recess taken from 10:43 a.m. to 10:59

9   a.m.)

10          THE COURT:  Be seated, everyone.  We will

11  now hear from Sprint.  Mr. Finkelson?

12          MR. FINKELSON:  Thank you, Your Honor.

13              DEFENDANT'S OPENING STATEMENT

14          MR. FINKELSON:  Good morning, ladies and

15  gentlemen of the jury.  My name is Dave Finkelson and

16  it's my privilege to represent Sprint in this case.

17  It's also my privilege to have the opportunity to

18  speak with you.

19          We're here because Comcast Cable wants to

20  make its move into the cell phone business.  Comcast

21  cable wants to expand into cellular and it wants you,

22  this jury, to clear the way for that expansion by

23  finding that a patent that Comcast bought from Nokia

24  for $600,000 gives Comcast control over the whole

25  universe of SMS and MMS messaging, what you know as

Defendant's Opening Statement                    42

1  sending a text message on your phone or sending a

2  picture.

3          Comcast wants you, this jury, to fund that

4  expansion into cellular by giving it over $153

5  million and by taking that $153 million from Sprint,

6  a company that has been a pioneer in the cell phone

7  business from the beginning.

8          The evidence in this case, ladies and

9  gentlemen, is going to show you that Comcast itself

10 doesn't actually use the 870 patent to provide SMS

11 and MMS services to Comcast customers.  Yet Comcast

12 is going to ask you to find that every single time a

13 Sprint subscriber sends a text message or a picture

14 on his or her phone or even gets one, as we all do,

15 that we don't want or weren't expecting, a little bit

16 more money should go in Comcast's pocket.  And that's

17 what this case is about.

18         Now, you heard yesterday, ladies and

19 gentlemen, in the video that a patent is like a deed

20 to a piece of property.  A patent has precise

21 measurements.  It has boundaries, boundaries that

22 explain what the patent covers and how useful it is.

23         The Nokia 870 patent that Comcast purchased

24 is no different.  It too has boundaries, and the

25 evidence is going to show you that it is not the keys

Defendant's Opening Statement                    43

1   to the whole cellular community.  You're not going to

2   hear any witness say to you in this trial that the

3   Nokia 870 patent invented cell phones.  It didn't.

4   You're not going to hear any witness say to you in

5   this trial that the 870 patent invented making a

6   voice call on your telephone, surfing the internet

7   for data, or sending and receiving messages.  It

8   didn't.

9              You're going to be listening over the

10  coming days and what you're going to hear is that SMS

11  messaging was around for a long time before the 870

12  patent.  The 870 patent didn't invent SMS messaging.

13  You're also going to hear that the 870 patent didn't

14  invent MMS messaging either.  Other people did that.

15  Patents have boundaries.  And what you're going to

16  hear is that the boundaries of the 870 patent, what

17  Nokia invented in the 870 patent, is directed to a

18  very specific, a very particular way of doing SMS and

19  MMS messaging, and it is a very specific, a very

20  particular way of doing SMS and MMS messaging that my

21  client, Sprint, the defendant in this case, doesn't

22  do.

23             Now, I'm going to be talking to you today.

24  I'll give you a road map.  I'm going to talk to you

25  about three issues that you're going to be hearing

Defendant's Opening Statement                    44

1    about over the course of this case.  The first issue

2    and the first question for you is can Comcast meet

3    its burden of proving that Sprint infringes the 870

4    patent?  The evidence is going to show you it cannot

5    because Sprint doesn't infringe.

6         The second issue I'm going to be talking

7    about is whether the 870 patent is valid, and the

8    answer to that is it's not because another company in

9    Europe came up with the same idea before Nokia did.

10        The third issue I'm going to talk to you

11   about is Comcast's calculation of damages.  Now,

12   that's an issue that we think by the end of the case

13   will not be one that you need to reach.  But if you

14   do, closely examine how that calculation is done.

15   Closely examine how that calculation ignores the

16   price at which Nokia actually sold the patent to

17   Comcast, and how it's a profit-driven model that

18   ignores all of the costs that go in to SMS and MMS

19   messaging.  So those are the three issues I'm going

20   to cover.

21        I'm going to start with the issue of

22   infringement, how does the Nokia 870 patent say to do

23   SMS and MMS messaging, and how the evidence is going

24   to show you that Sprint does just the opposite.  Now,

25   let me start with two words, and I wish they were a

Defendant's Opening Statement                45

1    sexier two words than they are, but they're the words

2    you're going to hear over and over and over in this

3    case, and they are "messaging server," "messaging

4    server."  You heard them in Comcast's presentation.

5    And the messaging server is very important to what

6    the invention of the Nokia 870 patent is and to the

7    issue of infringement that you must decide in this

8    case.

9            I have two teenage daughters.  There's a

10   lot of texting going on in my house, unsurprisingly.

11   So let me give you an example.  My wife sends me a

12   text.  It says, "Honey, please pick up some milk on

13   your way home from work."  How does that text message

14   get to me?  The evidence is going to show you it gets

15   to me by going through the messaging server.  Picture

16   a big cabinet like this with rows of computer

17   equipment stacked on top of each other.  That's the

18   messaging server.  And my wife's text message,

19   "Please bring home some milk," it actually goes to

20   the messaging server.  It stores the message.

21           Then in a period of time that we don't

22   recognize because we're so used to sending and

23   receiving messages, the messaging server actually

24   figures out whether I'm set up to receive text

25   messages from my wife, which, of course, I am, where

Defendant's Opening Statement                46

1   I am, and how that message can get to me.  And then

2   what the messaging server does is it routes my wife's

3   text message to me.  That's the messaging server.

4   Without the messaging server there's no text message,

5   and in my example, there's no milk in our house.

6           So why is the messaging server important to

7   the issues that you have to decide in this case?

8   Well, it's critical to the issues that you have to

9   decide because the Nokia 870 patent says that the

10  messaging server for SMS and MMS messaging must be in

11  a particular location.  It must be located outside of

12  the cellular network.  And you're going to see those

13  words in a few minutes.  They're in black and white

14  in the 870 patent.  The messaging server must be

15  located external to the cellular network.

16          (Pause in proceedings.)

17          MR. FINKELSON:  So the patent says that the

18  messaging server has to be external to the cellular

19  network, but the evidence is going to show you that

20  that's not how it works at Sprint.  Sprint witnesses

21  will explain to you that Sprint is a cellular

22  carrier.  It owns and operates its messaging servers

23  inside of its cellular network, in fact, what is

24  known as inside of the core network of its cellular

25  network, inside, not outside.  Why inside?  Because

Defendant's Opening Statement                47

1    that is the most efficient way for Sprint to do it

2    and that's what ensures the best quality of SMS and

3    MMS messaging for Sprint cell phone customers across

4    the United States.

5            That's what Sprint's witnesses will explain

6    to you.  How are you going to know whether to believe

7    them or not?  Well, that's also what you'll see from

8    Sprint's technical documents that we show to you in

9    this case.  What do those technical documents say

10   about the messaging servers?  They describe them as

11   being in network, they describe them as being

12   internal, they describe them as being part of

13   Sprint's core, they describe them as being located at

14   Sprint's core sites, and they describe them as being

15   fully-owned core network equipment.  That's what the

16   documents say.

17           You're going to also see in those Sprint

18   technical documents that Sprint actually tried it the

19   other way for a period of time for MMS.  Sprint used

20   to use a messaging server for MMS called Syniverse

21   Picture Mail, Syniverse Picture Mail.  And what that

22   was was a messaging server that was fully owned and

23   operated, posted and located externally by another

24   company, a company named Syniverse.  The messaging

25   server didn't belong to Sprint.  It was part of

Defendant's Opening Statement                    48

1    Syniverse's proprietary Picture Mail system.

2            Now, as His Honor is going to tell you in

3    this case, you do not need to decide whether those

4    Syniverse Picture Mail messaging servers infringe the

5    870 patent.  So why do I mention them?  Why do I

6    bring them up?  Why are you going to be hearing about

7    them during the course of this trial?  Because

8    you're -- if you're asking yourself what is an

9    external messaging server?  What does it look like?

10   How am I going to know one when I actually see one?

11   The Syniverse Picture Mail messaging servers, the

12   evidence will show, were the classic example of what

13   external messaging servers look like.

14           Picture dropping your clothes off at the

15   laundromat instead of washing them in a washing

16   machine that is in your own basement.  That

17   laundromat, that was Syniverse Picture Mail, outside

18   of Sprint, external to Sprint's cellular network.

19   And you're going to hear from Sprint's witnesses all

20   of the problems that that external Syniverse Picture

21   Mail messaging server caused and why Sprint stopped

22   using them and why Sprint moved its MMS messaging

23   servers inside the core network of its cellular

24   network, just like its messaging servers for SMS

25   messaging have always been.

Defendant's Opening Statement                49

1         So for all of the messaging servers, ladies

2    and gentlemen, that Comcast is asking you to decide

3    on, the evidence in this case is going to show you

4    that Sprint does not use the 870 patent because

5    Sprint owns and operates those messaging servers

6    inside the core network of Sprint's cellular network.

7         So where did the 870 patent's requirement

8    of an external messaging server come from?  What's

9    the background you're going to hear?  And you've

10   heard me say it, but where are you going to see that

11   language in the actual claims of the 870 patent?

12   Well, Nokia, the original owner of this patent, is a

13   company in Finland, and back in the 1990s, Nokia was

14   active in an industry standard-setting group called

15   the European Telecommunications Standards Institute.

16   And the evidence will show you that back then, Nokia

17   and the European industry standards group were

18   working on a third generation of cellular networks in

19   Europe.  You'll hear terms like 3G and 4G.  That's

20   3G, third generation.

21        You're going to see acronyms, and they're

22   already in your glossary, like GSM and GPRS.  You're

23   going to see those all over the Nokia 870 patent.

24   When you see them just know that those are referring

25   to the networks that came out of this European

Defendant's Opening Statement                    50

1    Standards Group.  GSM and GPRS, that's the European

2    Standards' way of doing things.  And the evidence is

3    going to show you that back in the early days, these

4    European standards for these GSM, GPRS networks, they

5    had a preference for putting the messaging equipment

6    outside of the cellular network for reasons that the

7    evidence is going to show you long ago became

8    obsolete.  And the 870 patent talks about that old

9    school European preference.  And here is the key,

10   ladies and gentlemen.  Here is the key.  In the

11   claims of the 870 patent, Nokia turned that old

12   school European preference into a rule, into a

13   requirement.

14            Now, on your screens is claim one of the

15   Nokia 870 patent.  You looked at it earlier this

16   morning as well.  This is one of the claims that

17   Comcast must prove to you that Sprint infringes.  And

18   remember that the Judge told you yesterday that the

19   claims of the patent are what set forth the clear and

20   specific terms of the patent.  The claims are where

21   you need to focus in your analysis of infringement or

22   no infringement.

23            Look first at the introduction to this

24   claim.  What is the claim about?  It's about a way

25   for a messaging server that is external to the

Defendant's Opening Statement                    51

1    cellular network -- again, not my words, the patent's

2    words -- external to the cellular network to ask

3    about information from the cellular network.  That's

4    what the claim is about.

5          Then look at what the messaging server has

6    to do.  The messaging server has to send an inquiry,

7    a request, to the cellular network, from the external

8    messaging server on the outside to the cellular

9    network on the inside.  And you see that in the

10   portion of the claim that is highlighted on your

11   screens in yellow.

12         Then what must happen to complete this

13   process, the claimed process?  And you see that in

14   the last limitation of the claim.  The cellular

15   network sends a response to the messaging server that

16   is external to the cellular network, external to the

17   cellular network.  Here, you see it, ladies and

18   gentlemen, in black and in white and in a little bit

19   of orange and yellow too.

20         Comcast can't dispute that this is what

21   claim one requires.  It also can't dispute that it is

22   what the other claims at issue in the case require,

23   claim seven and claim 113.  And Dr. Akl, who is

24   Comcast's expert in this case, won't disagree with

25   that.  He can't.  To do SMS and MMS in the way that

Defendant's Opening Statement                    52

1    the 870 patent says, in the way based on Nokia's work

2    in Europe, the messaging server must be put external

3    to the cellular network.  They must be outside to

4    infringe.  And there, ladies and gentlemen, is the

5    problem for Comcast, because as you will learn from

6    the evidence in this case, Sprint's third generation

7    cellular network, its 3G, the one Comcast asked you

8    to say infringes, it wasn't built in the European

9    Standards' way.  It's not a cellular network like the

10   one Nokia and the European Standards Group came up

11   with.  It's not a cellular network built like the 870

12   patent claims.

13           Instead, Sprint built its third generation

14   cellular network in the United States according to a

15   standard put out in the late 1990s by the American

16   National Standards Institute.  That standards group

17   is called ANSI for short.  Now, you already have a

18   lot of acronyms in your notebooks, but this one is

19   important and you may want to actually add it -- and

20   I'd encourage you to do so -- to the glossary that

21   you have behind tab three.  ANSI, A-N-S-I-, it stands

22   for American National Standards Institute.

23           (Pause in proceedings.)

24           MR. FINKELSON:  Ladies and gentlemen, as

25   you're going to see in the documents that Sprint

Defendant's Opening Statement                    53

1   presents to you, and as you're going to hear from

2   Sprint's expert, Mr. Mark Lanning, a cellular network

3   like Sprint's that is based on the American National

4   Standards Institute blueprint doesn't work the same,

5   doesn't look the same as a cellular network like the

6   one that the claims of the Nokia 870 patent talks

7   about.  And one of the most important ways that it is

8   different is when it comes to SMS and MMS messaging,

9   and in particular, when it comes to the location of

10  that critical piece of equipment, that messaging

11  server that makes sure my wife's text message gets to

12  me.

13          As Mr. Lanning will explain, the American

14  Standard, the ANSI standard, A-N-S-I, recommends that

15  a cellular carrier like Sprint put its messaging

16  servers for providing messaging to its customers

17  inside of its cellular network, inside, not outside.

18  That's what the American standard recommends and

19  that's what Sprint has done, American standard style

20  inside of what is known as Sprint's CDMA 2000

21  cellular network.

22          Now, you may be asking yourselves if your

23  job is to decide whether Sprint's messaging servers

24  are inside or outside of its cellular network, how do

25  you know what the cellular network is?  How do you

Defendant's Opening Statement                    54

1   know what a cellular network is so you can decide

2   whether Sprint's messaging servers are inside of it

3   or outside of it?  Here's the good news.  The good

4   news is you have help.  You have help.  And that's

5   because the Judge in this case has already defined

6   "cellular network" for you.

7           I'd ask you please to take a look behind

8   tab two of your binders.  That's the Judge's

9   definition of claim terms, and I'll give you a moment

10  to find it.  Take a look at the very first definition

11  on that list.  That's the Judge's definition of the

12  term "cellular network" that you, ladies and

13  gentlemen, are to apply in this case.  And if you

14  want to, put a star next to it.  You heard Comcast

15  talk about it this morning.  It is one of the most

16  important pieces of information you have in deciding

17  this case.  You've read it.  Now I've had the

18  opportunity to put it up on your screens.  And I put

19  a red box around the last three words.  Those are the

20  key words for you.  Those are the key words for you?

21  Why?  Because the Judge in this case has already

22  decided that a cellular network may include a

23  messaging server.  The Judge in this case has already

24  decided that a messaging server may be one of the

25  elements that is included in the core network of a

Defendant's Opening Statement                          55

1    cellular network.

2            In other words, ladies and gentlemen, a

3    cellular carrier like Sprint, it doesn't have to do

4    SMS and MMS how the 870 patent claims.  You don't

5    have to put the messaging server inside -- outside,

6    rather, of the cellular network.  You can do it a

7    different way.  And the evidence is going to show you

8    that different way is the way Sprint does it, the

9    American standards style way where the messaging

10   server is part of the core of Sprint's cellular

11   network.  And Sprint's cellular network looks just

12   like -- it looks just like the Court's definition on

13   your screen.

14           Now, I'd like to draw you a picture -- Your

15   Honor, do you mind, so I have a place to put this, if

16   I just approach the witness box and lean this up

17   there just for a couple of minutes while I make this

18   drawing?

19           THE COURT:  No, you may do that, but I want

20   Comcast -- I don't want the whole team.  The

21   courtroom will tilt if the whole team moves.

22           MR. FINKELSON:  Absolutely.

23           THE COURT:  I want whoever -- I guess it

24   would be you, Mr. Goettle, to position yourself so

25   that you can see what's being done.  And I would

Defendant's Opening Statement                    56

1    suggest you might want to move over and stand

2    somewhere in the area of the clock.  Yes, Mr.

3    Finkelson, you --

4             MR. FINKELSON:  Thank you, Your Honor.

5             THE COURT:  -- may proceed.

6             MR. FINKELSON:  Mr. Goettle, if you can't

7    see, just say the word.

8             THE COURT:  We have --

9             MR. FINKELSON:  Your Honor, I will turn it

10   around so you can see it as well.

11            THE COURT:  Michael, where is our easel?

12            MR. GOETTLE:  We actually -- Your Honor, we

13   actually have one we can set up.

14            MR. FINKELSON:  I think I can sit it right

15   here, Your Honor, and I'll be able to turn it to you.

16   I'll just be up here for a moment.

17            THE COURT:  All right.

18            MR. FINKELSON:  You're going to -- you're

19   going to find very shortly it's not going to be a

20   very valuable piece of art.  If my wife knew I was

21   drawing --

22            THE COURT:  All right.  And we'll find the

23   easel sometime over the noon recess.

24            MR. FINKELSON:  Thank you, Your Honor.

25            THE COURT:  Along with the real lectern.

Defendant's Opening Statement                    57

1   You may proceed.

2          MR. FINKELSON:  Sprint's cellular network,

3   it looks just like the Court's definition of

4   "cellular network" that was on your screen.

5          (Pause in proceedings.)

6          MR. FINKELSON:  Sprint's cellular network.

7          (Pause in proceedings.)

8          MR. FINKELSON:  What does it have?  What

9   does it have in it?  Just like the Court's definition

10  of "cellular network" that's on your screens, it has

11  what's known as wireless terminals.  You know what

12  wireless terminals are.  Those are those things the

13  Judge made you shut off before you entered the

14  courtroom today.  If mine goes off, I'm going to be

15  in big trouble.  Sprint's cellular network has

16  wireless terminals.  It has phones.  In fact, it has

17  lots of them.

18         How do those wireless terminals communicate

19  within Sprint's cellular network?  Well, they

20  communicate through what are known as bay station

21  systems.  And those bay stations systems, those are

22  just those towers that you see as you drive down the

23  street.  Those are bay station systems just like you

24  see in the Court's definition of "cellular network,"

25  bay station systems.

Defendant's Opening Statement                    58

1              How do the phones communicate within

2     Sprint's cellular network?  They communicate through

3     core network elements that are responsible for

4     routing communications within that cellular network.

5     And just like the Court's definition of "cellular

6     network" that's on your screen, Sprint's cellular

7     network has what is called a core network.  As you're

8     going to hear during the course of this case, that

9     core network has a lot of equipment in it.  But some

10    of the pieces of equipment that it has in it, the

11    ones that are relevant to you, are first, what you

12    see on your screen in the Court's definition of

13    "cellular network," mobile switching centers,

14    switches.

15             Sprint's cellular network also has what is

16    known as packet switching nodes.  Acronym soup, and

17    you don't have to remember the acronyms, it's a

18    packet switching node, but a Sprint, it's called a

19    PDSN.  And just like the Court's definition of

20    "cellular network" that's on your screen, Sprint's

21    core network of its cellular network also has what

22    are known as subscriber databases, subscriber

23    databases.  One of those is known as an HLR.  And if

24    you're drawing the core network of Sprint's cellular

25    network correctly and the right way, one of those

Defendant's Opening Statement                59

1   elements, one of those subscriber databases, is also

2   known as an SPS.  That's something you're going to

3   hear about in this case as well, Sprint's SPS

4   database.

5          Now, you're asking where are those

6   messaging servers he's talking about?  Where are

7   those messaging servers that you're going to hear

8   about for the coming days.  Those messaging servers,

9   the evidence is going to show, are in the core

10  network of Sprint's cellular network as well, just as

11  the Court's definition of "cellular network" on your

12  screen says it can be.

13         (Pause in proceedings.)

14         MR. FINKELSON:  Messaging servers.  What

15  are they called.  What are these messaging servers

16  called?  Well, if you're sending a text message,

17  they're known as short message service centers, short

18  message service centers, sometimes abbreviated as

19  SMSCs.  And for MMS, as you might expect, it's an

20  MMSC.  That's what the messaging servers are.

21         These messaging servers at Sprint are

22  located in Sprint's most secure facility.  What are

23  those facilities called?  They're called core sites.

24  They're called core sites.  And what else is at those

25  core sites?  These SPS databases.  They're in the

Defendant's Opening Statement                    60

1    same building, in the same facility, in the same core

2    site, as the messaging servers.  But you're actually

3    going to hear from Comcast's expert in this case, Dr.

4    Akl.  He is going to tell you that these SPS

5    databases, they're a part of Sprint's core network,

6    but these messaging servers that are sitting there in

7    the same building, in the same facility, that are

8    responsible for making routing decisions, to send an

9    SMS or MMS message from this phone to that phone,

10   he's going to tell you that they are not part of

11   Sprint's core network.  In fact, Comcast is going to

12   tell you that these messaging servers are somewhere

13   outside of Sprint's cellular network altogether.

14            This is the Sprint cellular network that

15   Comcast is accusing in this case.  These are the

16   messaging servers that Comcast is going to tell you

17   are external.  Your Honor, just so you have the

18   pleasure of my fine drawing talent.

19            THE COURT:  Thank you.  I think we ought to

20   mark that.  And I don't know whether it's been

21   pre-marked.

22            MR. FINKELSON:  It hasn't been pre-marked

23   just because I --

24            THE COURT:  Just created it.

25            MR. FINKELSON:  -- drew it on the fly.

Defendant's Opening Statement                    61

1          THE COURT:  Mark it.

2          MR. FINKELSON:  Bad Drawing Number 1.

3          THE COURT:  Fine.  Sprint Drawing Number 1.

4          MR. FINKELSON:  Thank you, Your Honor.

5          (Pause in proceedings.)

6          MR. FINKELSON:  Again, Comcast expert,

7    through Dr. Akl, is going to tell you that those

8    messaging servers I just drew for you are external.

9    But that's not what the evidence is going to show.

10   And, ladies and gentlemen, that is also not what

11   Comcast itself said outside of this courtroom before

12   it brought this lawsuit, before it hired Dr. Akl.

13          The evidence is going to show you, ladies

14   and gentlemen, that in 2008 -- in 2008, during the

15   very time period that Comcast accuses of infringement

16   in this case, Comcast entered into a contract with

17   Sprint -- a contract with Sprint, and you're looking

18   at that contract on your screens.

19          As you're going to hear, Comcast was

20   interested in marketing Sprint's cellular network

21   services, like voice and data and messaging, to

22   Comcast's own customers under the Comcast brand.

23   Essentially, what the evidence is going to show you

24   is Comcast wanted to lease Sprint's cellular network

25   for that purpose.  And because Comcast wanted to

Defendant's Opening Statement                    62

1   lease Sprint's cellular network, the evidence will

2   show, and it's not going to surprise you, that it was

3   pretty darn important for the parties to accurately

4   define the technical meaning of Sprint's core network

5   in that contract.  In fact, the evidence is going to

6   show that that's what the wheel turned on, the

7   technical accuracy of how "core network" was defined.

8   And, in fact, as you're going to hear the question

9   that was on the table then between Sprint and Comcast

10  were the very same questions that you're being asked

11  to answer now.  What is in the core network of

12  Sprint's cellular network, and are Sprint's messaging

13  servers for SMS messaging inside or not?  The

14  evidence is going to show you, ladies and gentlemen,

15  that Comcast, these same people, Comcast, they

16  answered those questions accurately and unambiguously

17  in this contract -- accurately and unambiguously, and

18  in a way that you should keep in the front of your

19  mind as you listen to Comcast present its case

20  through Dr. Akl in the coming days.

21          Here, ladies and gentlemen, are Comcast's

22  own answers to those questions.  This contract had a

23  set of operative terms.  This contract had a set of

24  definitions.  And the first question that this

25  contract asked and answered in those operative terms,

Defendant's Opening Statement                    63

1    the evidence will show, is what is Sprint's core

2    network?  Here is what Comcast itself agreed to in

3    2008 during the very same time period that it's

4    accusing in this case about the very same equipment

5    that it is accusing in this case.  Comcast said that

6    "core network," it doesn't just mean voice, it

7    doesn't just mean voice and data.  Comcast said that

8    "core network" means the wireless voice, SMS, and

9    data service infrastructure that provides

10   connectivity and transmission via the Sprint network.

11   Voice, SMS, and data service infrastructure,

12   Comcast's own words.

13          What does SMS mean?  What is the SMS

14   infrastructure that is part of Sprint's core network?

15   Here's what Comcast said it was back then before it

16   brought this lawsuit.  It said that SMS is messages

17   using Sprint's short message gateway and Sprint's

18   short message service center.  Remember my drawing.

19   Those messaging servers for SMS, what did I tell you

20   that they're called?  What's the evidence going to

21   show you?  They're called short message service

22   centers, or SMSCs.  That's exactly what this contract

23   is talking about.  Sprint's short message service

24   center is inside the core network.

25          The evidence is going to show you that

Defendant's Opening Statement                    64

1    these short message service center, these SMSCs that

2    this contract is talking about, are the very same

3    messaging servers that Comcast accuses of

4    infringement in this case, the exact same ones that

5    Dr. Akl is about to tell you in the coming days are

6    external to Sprint's core network.

7              Comcast gave its word on these definitions.

8    It gave its word in this contract.  Here is its

9    signature on the page.  There's Sprint's signature,

10   there's Comcast's signature.  In 2008, ladies and

11   gentlemen, Comcast answered the question by saying

12   Sprint's messaging servers are inside, the same

13   answer Sprint will be proving to you through the

14   evidence presented to you in this case.

15             So where does that all leave you on the

16   question of infringement?  As the Judge has already

17   instructed, for Comcast to prove infringement to you,

18   it must show that Com -- that Sprint practices, and

19   here are the key words, practices each and every --

20   each and every limitation of a claim of the 870

21   patent.  That's what you heard from His Honor

22   yesterday, each and every limitation.

23             Now, if you haven't figured it out already,

24   you're going to figure it out very soon.  Patent

25   lawyers love to make things sound much more

Defendant's Opening Statement                    65

1    complicated than they are, so we word -- we used word

2    like "limitation."  All a limitation is is a required

3    ingredient, a required ingredient.  That's what

4    limitation means.  And "each and every" means for

5    Comcast that two out of four of those ingredients

6    doesn't cut it, three out of four of those

7    ingredients doesn't cut it.  In order to prove Sprint

8    infringes, it must prove that Sprint practices, that

9    Sprint does, each and every ingredient that's set

10   forth in the claim.  That's what Comcast needs to do

11   to meet its burden of proof to you.  And if Sprint

12   doesn't have one of those ingredients, then Comcast

13   can't prevail because that means that Sprint is not

14   using Comcast's property.

15          Remember, ladies and gentlemen, as you hear

16   the evidence, remember what the 870 patent claim

17   requires.  The evidence will show that Sprint does

18   not do what is on your screens, that Sprint's

19   messaging servers are inside of its core cellular

20   network, not external, and that even Comcast, as I

21   just showed you, has admitted it.  Inside, not

22   outside, and that means no infringement.

23          That's the issue of infringement.  But

24   Comcast has a second problem, ladies and gentlemen,

25   that is also yours to decide, that that's called

Defendant's Opening Statement                    66

1   invalidity and that's what I want to turn to next.

2   But before I do, want to take a moment to introduce

3   you to some of the people that you'll be seeing and

4   hearing from over the course of this case.  I'm not

5   going to ask you if the feeling is mutual.  I know

6   the answer.  But I can tell you that we're looking

7   forward to spending the coming days to you and

8   presenting the evidence to you during the course of

9   this trial, and I want to say on behalf of all of our

10  team and, frankly, on behalf of all of Comcast's team

11  as well, how much we appreciate your service as

12  jurors.

13        First, let me introduce my client

14  representative who is here for us during the course

15  of the trial, Mr. Scott Kalinoski.  You see him here

16  at the table.  Mr. Kalinoski is a vice president at

17  Sprint, and you're going to hear directly from him

18  when it's our turn to present our case to you.  Mr.

19  Kalinoski was actually at the table with Comcast in

20  2008 when Comcast agreed in that contract I just

21  showed you that Sprint's SMS messaging servers are

22  part of the core network of Sprint's cellular

23  network.  Thanks, Mr. Kalinoski.

24        Also, the lawyers who are at the table with

25  me, Brian Riopelle, my law firm colleague, who will

Defendant's Opening Statement                    67

1  be appearing before you during the course of this

2  trial, and also, Colleen Simpson, our colleague from

3  here in Philadelphia, who you'll also be hearing

4  from.  And then some of the other members of our team

5  who are here, Mr. Noah Baird is hiding behind me.

6  He's the one whose job it is to make sure that the

7  graphics you see on the screen look much prettier and

8  better than the one I just drew for you.  And also, a

9  number of the members of my firm are here, Chad

10  Bebout,, Meghan Rachford.  These are the people

11  staying up to all hours behind the scenes to make

12  sure that this runs smoothly.  Their counterparts are

13  on the Comcast side as well and they all deserve a

14  lot of credit for helping us put this case together

15  for you.

16          We also have several experts who are going

17  to join us over the course of the trial, and two of

18  them are here today.  I want to introduce you to them

19  in person.  The first is Mr. Mark Lanning.  The

20  evidence is going to show that Mr. Lanning has been

21  immersed in the telecommunications field since the

22  1970s.  Before he even went to college, he joined the

23  Army and was responsible for encrypted voice and data

24  communications worldwide for the Army and for the

25  U.S. government as part of the Army Signal Corps.

Defendant's Opening Statement                    68

1   And after he got his college degree in computer

2   science, Mr. Lanning was actually on the ground floor

3   himself actually designing cellular networks and

4   actually implementing messaging server components

5   that go into the cellular networks.  He did it

6   himself.  And Mr. Lanning will walk you step by step

7   through his analysis of Sprint's messaging servers

8   and his opinion that Sprint's messaging servers are

9   inside of Sprint's cellular network, not external, as

10  the 870 patent requires, and that Sprint does not

11  infringe the 870 patent for that reason.

12          Let me also introduce Dr. Nathaniel Polish

13  who is with us.  Dr. Polish has a Ph.D. in Computer

14  Science form Colombia University where he is

15  currently a senior research scientist.  And back

16  around the time of this patent, Dr. Polish started

17  his own company involving SMS messaging.  And Dr.

18  Polish, when it's our turn, will walk you through his

19  opinion that the Nokia 870 patent is invalid, that

20  it's not entitled to protection, because another

21  company in Europe came up with Nokia's idea first.

22          So let's talk about that some more.  As you

23  heard in the video, Comcast has the burden to prove

24  to you that Sprint infringes.  That's Comcast's

25  burden.  But when it comes to invalidity, the burden

Defendant's Opening Statement                    69

1    is on us.  It's Sprint's burden to show you -- to

2    prove to you that the claims of the 870 patent are

3    invalid and we need to show you that by what's known

4    as clear and convincing evidence.

5           Now, we don't get to put on our case on

6    invalidity until Comcast goes first.  But when we do

7    you will see and you will hear that Nokia wasn't the

8    only company in Europe thinking back in 1999 about

9    how to deal with messaging in a network that was

10   based on the European standards, again, not the

11   American standards, like Sprint's cellular network,

12   but on networks like the European standards networks,

13   those GSM and GPRS style networks that I talked to

14   you about earlier and that you'll see referenced all

15   over the 870 patent.

16          The evidence is going to show you that

17   another telecommunications company in Europe, in

18   fact, in Finland, was working on the same exact

19   thing, and that company was named Sonera, S-O-N-E-R-

20   A, Sonera.  And in June 1999, several months before

21   the Nokia 870 patent application was filed -- several

22   months before the Nokia 870 patent application was

23   filed, Sonera itself published an international

24   patent application on the same GSM, GPRS-based idea

25   that Nokia didn't come up with until later in 1999.

Defendant's Opening Statement                    70

1   And this earlier Sonera patent application was made

2   available for people skilled in the field to read.

3   In fact, the evidence is going to show you that the

4   Sonera patent application was published by what is

5   known as the World Intellectual Property

6   Organization.  And you're going to hear from the

7   evidence that when it comes to whether a U.S. patent

8   is valid, a foreign patent application may be just as

9   relevant, in fact, in this case more so, as a U.S.

10  patent application is.

11          So Dr. Polish is going to walk you through

12  the published Sonera application step by step.  And

13  what he is going to explain is that the Sonera patent

14  application, it was in the very same field as the 870

15  patent, text messaging in a cellular network.  And,

16  in fact, the Sonera patent application had the same

17  focus on those European GSM, GPRS-based networks as

18  the Nokia 870 patent has.  And Dr. Polish will help

19  show you that the Sonera patent application, it was

20  confronting the very same problem as the 870 patent

21  was trying to confront, that is if you have an

22  external messaging server in one of these European

23  style GSM, GPRS networks, how do you get information

24  to it?

25          Finally, Dr. Polish will explain to you,

Defendant's Opening Statement                     71

1   and he's going to show it to you in Sonera itself and

2   in the claims, he's going to explain that Sonera

3   solved that same problem in the very same way as the

4   Nokia 870 patent does, by mapping two different

5   numbers, two different identifiers, together to

6   determine the information that the messaging server

7   needs.

8              Now, in formal terms, the word is

9   "anticipation."  You heard it yesterday.  The

10  evidence in this case will show that Sonera

11  anticipates the 870 patent because it has each and

12  every element that the 870 patent claims have.  And

13  that means that the 870 patent is invalid because

14  Sonera came up with the very same idea first.

15             Dr. Polish is also going to explain to you

16  the related concept of how a patent can be invalid

17  for what is called obviousness -- obviousness, and

18  why the 870 patent is also invalid in light of -- is

19  also obvious in light of Sonera and other information

20  that was known by people skilled in this field before

21  the 870 patent application was filed in 1999.

22             Now, you may be asking yourselves how can

23  you, this jury, get passed the fact that the Nokia

24  870 patent has already said -- I'm sorry, that the

25  U.S. government has already said that the Nokia 870

Defendant's Opening Statement                    72

1    patent is valid?  How can you get past that fact?

2    How can you reach a different conclusion than the

3    government has reached?

4            First, it's important to remember you've

5    got to keep the issues of infringement and invalidity

6    separate.  The Patent Office doesn't get involved in

7    questions of infringement at all -- at all.

8    Infringement is only for courts and for juries, like

9    you, to decide.  And the Patent Office has not said

10   anything about infringement in this case, and you

11   won't hear anything to the contrary.  The Patent

12   Office doesn't get involved in issues of

13   infringement.  But questions of validity are

14   different.

15           Every patent that issues does go through

16   government review at the Patent Office for validity,

17   and the Nokia 870 patent did as well, and as you've

18   heard, it also went through a re-examination brought

19   by Comcast.  But remember, as you heard in the patent

20   video, the question of whether a patent is valid or

21   not does not end at the government's doorstep.  It

22   ends with you.  It ends with you.  And that's for

23   very good reasons that the video itself described.

24           One reason that you, the jury, have the

25   ability and the power to decide whether a patent is

 1   valid, whether the 870 patent is valid in this case,

 2   is because sometimes there are facts or arguments

 3   that the patent office did not consider, did not have

 4   the chance to consider, because the most relevant

 5   information was not provided to the government.

 6              Here, in this case the evidence is going to

 7   show you that when the government considered whether

 8   the 870 patent is valid, both the first time around

 9   and when Comcast brought the re-examination, the

10   government did not have the benefit of considering

11   the Sonera patent application.  We have a written

12   record of what happened at the Patent Office.  We're

13   going to show it to you.  You're going to see it.

14   And the written record shows that the examiner,

15   that's the individual at the Patent office who

16   considers a patent application, was not aware of and

17   did not consider Sonera when Nokia originally filed

18   the patent application.  And the written record shows

19   that when Comcast -- when Comcast filed its own

20   re-examination of the 870 patent after Comcast bought

21   it, Comcast chose the information they gave the

22   government to consider.  Comcast chose it.  And that

23   information, again, did not include Sonera.  You,

24   ladies and gentlemen, are the very first people to

25   look at the Sonera patent application and compare it

Defendant's Opening Statement                    74

1    to the claims of the 870 patent.  You're the first

2    ones to do it.

3           Now, another reason you have the ability

4    and the power to decide whether the 870 patent is

5    valid is because when the Patent Office makes its

6    own -- its decision it only has the chance to

7    consider one side of the story.  The evidence will

8    show that Comcast filed the re-examination itself.

9    It's what's called an ex parte re-examination, and

10   all that means is that the other side isn't there.

11          Comcast was the only party that got to

12   participate in the government re-examination of the

13   870 patent, not Sprint.  Well, here in this court

14   it's not ex parte.  Sprint is here too.  And you, the

15   jury, will be the first to hear both sides of the

16   story regarding whether the 870 patent is valid and

17   decide which you believe.

18          Let me end very briefly with Comcast's

19   request for damages.  At the end of this case Comcast

20   is going to ask you to give it over $153 million,

21   over $153 million on a patent that the evidence is

22   going to show Nokia valued and sold to Comcast in

23   2010 as part of a package of patents for a grand

24   total of $600,000.  In fact, you've already heard

25   this morning that Nokia's opening offer, it's home

1   run scenario, for selling the 870 patent was $1.5

2   million.  But Comcast expert, Ms. Reilly, is going to

3   tell you in this case that had Sprint been at that

4   negotiation table with Nokia, Nokia would have

5   charged Sprint over $153 million, not even to buy the

6   patent, just to use it, just to rent it, and that

7   Sprint would have agreed to that number.  Just think

8   about that.

9           Sprint will present testimony to you from

10  not one, but two Ph.D. economists who will take you

11  through the many ways that Ms. Reilly has gotten it

12  wrong, including by failing to account for the

13  purchase price of the 870 patent, and by failing to

14  account for the vast majority of Sprint's costs in

15  providing messaging service.  They're going to ask

16  you for over $153 million, ladies and gentlemen, on a

17  patent that Comcast does not itself use to provide

18  SMS or MMS to its customers, over $150 million on a

19  patent covering a European standards-based idea, as

20  we've just talked about, the evidence is going to

21  show you Nokia wasn't even the first European company

22  to conceive of.  Sonera came first.

23          Then back to where we started today, on a

24  patent that the evidence will show applies to one

25  particular way of doing SMS messaging, a patent that

Defendant's Opening Statement                    76

1    claims that the messaging server must be, has to be,

2    external to the cellular network, a patent that the

3    evidence is going to show you, ladies and gentlemen,

4    Sprint doesn't use.  Why?  Because it has installed

5    its messaging servers inside the core of Sprint's

6    American standards-based cellular network, not

7    outside of it.  Sprint's messaging servers are

8    inside.  They're not outside.  And if you agree that

9    that's what the evidence shows, that's it.  Outside

10   is what the patent requires.  Inside equals no

11   infringement.

12          The evidence will show you, ladies and

13   gentlemen, that Comcast is not entitled to any

14   payment at all from Sprint for the messaging servers

15   that Sprint has installed inside the core network of

16   its cellular network to provide SMS and MMS messaging

17   to Sprint's customers, no payment at all.  And when

18   we're all done here and we stand before you at the

19   end of this trial and at the conclusion of the

20   evidence that is the verdict that Sprint will ask

21   you, the jury, to reach.

22          Again, thank you for listening, thank you

23   for your time this morning, and thank you on behalf

24   of all of us for your service.

25          THE COURT:  Thank you, Mr. Finkelson.

77

1          MR. FINKELSON:  Thank you, Your Honor.

2          THE COURT:  I think what we'll do, we'll

3   all stand up before we proceed with the first of the

4   Comcast witnesses.  Let's stand up and kind of

5   stretch.

6          (Pause in proceedings.)

7          THE COURT:  Who is going to examine the

8   first witness?

9          MR. HANGLEY:  I am, Your Honor.

10         THE COURT:  All right, Mr. Hangley.

11         MR. HANGLEY:  William Hangley.

12         THE COURT:  Yes.

13         (Pause in proceedings.)

14         THE COURT:  I do this -- I borrowed it from

15  a movie that some of you might have seen.  The movie

16  is Crocodile Dundee.  He went for walkabouts.

17  Instead of walkabouts to clear the head, we do

18  standups.  And if I see you kind of looking at the

19  lights or not paying attention, we're going to do

20  more of these.  The information you're going to be

21  receiving is, at least in some instances, a little

22  difficult to receive and to comprehend.  So we'll

23  take frequent standups just to make sure you're on

24  track.  But I watched you during the openings and you

25  were paying rapt attention, which is exactly what

78

1    you're supposed to do.

2            Now we're going to sit down and Mr. Hangley

3    will present his first witness.

4            MR. RIOPELLE:  Your Honor, as he's calling

5    the first -- before he calls his first witness, can

6    we meet at sidebar for a quick second?

7            THE COURT:  Yes.

8            (Sidebar discussion as follows.)

9            MR. RIOPELLE:  Assuming that he's calling

10   Mr. Finnegan and Mr. Finnegan is going to testify

11   about the patent acquisition policy, you had asked me

12   to prepare a limiting instruction in the hearing we

13   had last week, and here's the transcript.  And so I

14   have a proposed limiting instruction, and there's a

15   copy for these guys.

16           THE COURT:  I have not been shown this.

17           MR. RIOPELLE:  Yeah.  I tried to track the

18   language that you used in the hearing last week.

19           (Pause in proceedings.)

20           THE COURT:  I don't think this is

21   appropriate at all.

22           MR. HANGLEY:  Thank you, Your Honor.

23           MR. RIOPELLE:  Oh, you -- I'm sure you

24   participated in the drafting.

25           THE COURT:  I imagine Mr. Goettle would

1  like that.

2          MR. GOETTLE:  Oh, I can --

3          MR. RIOPELLE:  Why don't you share that?

4  And this is what you said in the transcript last

5  week.

6          (Pause in proceedings.)

7          THE COURT:  At that time I was focused on

8  the graveling of your motion, which was to exclude

9  evidence relating to the value of patents in general

10  because we had already ruled on the -- and excluded

11  the -- any evidence on the value of the 870 patent,

12  or at least what Comcast thought of the value of the

13  870 patent.  And I was also concerned at the time of

14  this hearing on January 25th with the testimony of

15  Mr. Finnegan that the acquisition policy called for

16  the obtaining of high value patents and litigation

17  worthy patents.

18          MR. HANGLEY:  Which he is not going to do.

19          THE COURT:  Well, I'm not going to give

20  this limiting instruction now.  I don't know that

21  there will be a need for it.  Certainly, it's in the

22  case, but I think he's going to argue and present

23  evidence that Comcast is a patent investor.  In any

24  event, I see no problem with Comcast's evidence of

25  its patent acquisition policy as long as it doesn't

80

1    get into issues relating to the value of patents to

2    be acquired and the litigation worthiness of patents

3    to be acquired.  And the reason for that

4    limitation -- there would be no such limitation had

5    Comcast not imposed the attorney-client privilege and

6    the work-product privilege.  That's the only reason

7    Comcast is not permitted to offer evidence in those

8    two categories.  So I'm not going to give it now.

9    I'll keep this.

10            MR. RIOPELLE:  Okay, that's fine.

11            THE COURT:  And if the need --

12            MR. HANGLEY:  Thank you, Your Honor.

13            THE COURT:  Well, just a moment.  If the

14   need arises, bring it to my attention.

15            MR. RIOPELLE:  Thank you, Your Honor.

16            (Sidebar discussion concludes.)

17            MR. HANGLEY:  Comcast calls James Finnegan.

18            (Pause in proceedings.)

19            JAMES FINNEGAN, Plaintiff's Witness, Sworn.

20            COURTROOM DEPUTY:  Please be seated.

21   Please state your full name and spell it for the

22   record, please.

23            THE WITNESS:  Sure.

24            THE COURT:  Good morning, Mr. Finnegan.  I

25   want to be sure the juror in the 6 seat can see Mr.

Mr. Finnegan - Direct                    81

1    Finnegan, and she can.  Yes.

2             THE WITNESS:  Yes, good morning.  My name

3    is James Finnegan, J-A-M-E-S F-I-N-N-E-G-A-N.

4             THE COURT:  You may proceed.

5                   DIRECT EXAMINATION

6    BY MR. HANGLEY:

7    Q    Mr. Finnegan, by whom are you employed?

8    A    I work for Comcast.

9    Q    And what is your title at Comcast?

10   A    Sure, my title is Vice President, Strategic

11   Intellectual Property.

12   Q    Mr. Finnegan, where is the office of Comcast that

13   you work at?

14   A    The office of Comcast is downtown in

15   Philadelphia, 1700 JFK Boulevard.

16   Q    Okay.  That's the huge building?

17   A    That's the -- yeah, the tall building.  We're

18   also building a second building next door, 1800 Arch

19   Street.  That's our new Comcast Technology Center.

20   Q    Now, sir, tell me your educational background.

21   A    Sure, I graduated in 1985 from Lehigh University

22   in Bethlehem, PA with a Bachelor's of Science Degree

23   in Electrical Engineering.  And then after I began

24   working, I went to school at night and received a

25   Master's of Science Degree in Electrical Engineering

Mr. Finnegan - Direct                    82

1   in 1990.  And in 1993, I received a Master's -- I'm

2   sorry, an M.B.A., also at Lehigh University.

3   Q   Where were you born, sir?

4   A   I was born here in Philadelphia at Temple

5   University Hospital.

6   Q   And for the benefit of the jury, where do you

7   live?

8   A   I live in Allentown, Pennsylvania.

9   Q   And do you commute to Philadelphia everyday?

10  A   Yes, I do.  I commute to Philadelphia.

11  Q   Tell us a little bit, sir, about how it is that

12  you come to be an Allentown resident commuting to

13  Philadelphia.

14  A   Well, sure.  After I began work, I worked in

15  Allentown for AT&T in their semiconductor factory as

16  a factory engineer.  I was a production engineer.

17  And so my wife and I established our home in

18  Allentown.  It's kind of the center of the universe

19  for the family.  And as a result, kind of I -- I live

20  in Allentown, I have to deal with the long commute to

21  Philadelphia.

22  Q   And I'd like to -- I'd like to kind of go through

23  the various steps.  You say you started at Lucent

24  making semiconductors?

25  A   Well, yes.  At the time it was called AT&T.

Mr. Finnegan - Direct                    83

1   Q    It was AT&T?

2   A    Yes, it was.  And that was in 1985.  And I worked

3   as a semiconductor production engineer from '85 to

4   '92.  In 1992, I moved to AT&T's international

5   licensing group, which was located about an hour away

6   in Liberty Corner, New Jersey.  And so I worked there

7   for about nine years, part of the licensing team.

8   And during that period of time, in 1994, AT&T spun

9   out Lucent Technologies, so then it separated from

10  AT&T.

11          When it separated Lucent Technologies

12  retained Bell Laboratories, probably the premier

13  research institute at the U.S. at the time, the

14  inventor of the transistor, the inventor of the

15  laser, also, the inventor behind the Big Bang Theory,

16  the actual theory, not the TV show.  And I worked

17  with the licensing team on primarily -- to start,

18  with semiconductor licensing issues because I had

19  been recruited from the semiconductor group, but then

20  expanded.

21  Q    Great.  Let me --

22  A    Sorry.

23  Q    Let me stop you there --

24  A    Okay.

25  Q    -- because you talked about the licensing.  First

1    of all, Bell Labs and Lucent and AT&T, did they all

2    have patents?

3    A    Yes, they did.

4    Q    And you talk about licensing the patents.  What

5    do you mean by that?

6    A    Sure.  So in AT&T's role and then also Lucent's

7    role, Lucent had a fundamental -- a large collection

8    of patents Bell Laboratory Ph.D.s and scientists were

9    constantly creating, and, in fact, it was a

10   requirement of the government back in 1956 that AT&T

11   at the time, with the invention of the transistor,

12   broadly licensed that invention to the world.  So it

13   became a -- it started a culture of licensing.  And

14   by licensing, I mean that the company would go to

15   other -- Lucent or AT&T would go to other companies

16   and begin a licensing discussion and present to that

17   company the patents that Lucent owned that it thought

18   the company on the other side may need a license to,

19   or should take a license to.

20   Q    And would they have to pay a royal -- or be

21   expected to pay a royalty for it?

22   A    And the negotiation usually went where the other

23   company would then most often speak to the pile of

24   patents that they had and say here's -- so Lucent

25   would say here's the pile of patents that we think

1    are of interest to you, and the other company would

2    say well, here's the patents that we think are of

3    interest to you, Lucent, and then we would usually

4    resolve it with a license -- some kind of licensing

5    arrangement.

6    Q    Cross-licensing?

7    A    Yes, it would be a cross-license.  So a license

8    would be extended from both parties to the other.

9    Effectively, we would call it patent peace.  And by

10   that, it would mean that both parties could then go

11   back to doing the business that they do and know

12   that -- I think yesterday we kind of described patent

13   as being a boundary condition or kind of a piece of

14   property.  It allowed you to cross over that property

15   to use that technology and go about your business.

16   Q    Now, how long were you with Lucent in that

17   business, that licensing?

18   A    Sure.  And I apologize if I get the dates a

19   little bit off, but I think that was 1992 to about

20   2001.

21   Q    Okay.  And, you know, you left Lucent at some

22   point?

23   A    Yes, in 2001, a group of Lucent executives left

24   to form a company called Thinkfire Services.  And

25   Thinkfire Services was a patent consulting company.

Mr. Finnegan - Direct                    86

1    So we had recognized at the time at Lucent that our

2    skill set was kind of unique.  A lot of companies did

3    not understand this business, a lot of companies did

4    not understand the relationship between cross-

5    licensing, and we thought there was an opportunity

6    for us to form a company which could provide these

7    same patent perspective and experience to support

8    their companies as they both create new IP and as

9    they deal with licensing issues.  So most of our

10   companies, our clients were very similar to Lucent in

11   terms of large, multinational companies that we then

12   provided some support to.

13   Q    And did you consult with companies on defending

14   themselves against license claims as well as

15   licensing itself?

16   A    Yes.

17   Q    Now, so when was it that you finished your tenure

18   at that company?

19   A    I think that was in 2004, 2004 or 2005.  And then

20   I did a little bit of consulting for a short time,

21   and then I took a job in Munich, Germany working for

22   a company called Qimonda, and that's Q-I-M-O-N-D-A.

23   And Qimonda is a semiconductor company.  They made --

24   or they made DRAM semiconductor devices, and DRAMs

25   are kind of the memory of the -- the memory chips.

1   Qimonda was a $5 billion company.  It had been spun

2   out of Siemens and then Infineon, so it wasn't a

3   small company.  It was actually quite large.  And

4   there I managed the entire patent function, a team of

5   about I think 60 or 70 people.

6   Q    And then there came a time when you were offered

7   a position at Comcast?

8   A    Yeah, that's correct.  So I was at Qimonda for

9   just about a year, or I was there even less than

10  that --

11  Q    And you were not commuting from Allentown?

12  A    No.  No, for that job I -- we moved to Munich.

13  But -- no, I was contacted by a recruiter who's --

14  who asked me if I was a fan of the Eagles and I liked

15  cheesesteaks, please give him a call back.  And so I

16  discovered that this opportunity was with Comcast.

17  Q    You took the job at Comcast?

18  A    Yes, I did, in September of 2007.

19  Q    Okay.  And, again, the title -- why don't you

20  tell the jury what it is?

21  A    Sure, my title -- my title is Vice President,

22  Strategic Intellectual Property.

23  Q    Now, who -- thinking about what your job is

24  today, what your work is today, who created the

25  strategic intellectual property enterprise within

Mr. Finnegan - Direct                    88

1  Comcast?

2  A    Humbly, I can say it was me.  I was the first

3  person hired at Comcast whose sole responsibility was

4  patents, intellectual property.  I was the first

5  businessperson hired in this -- in this role.

6  Q    Now, let me back up a little bit and talk a

7  little bit about Comcast.  Comcast we know as a cable

8  company.  Has it grown as a cable company over the

9  years?

10  A    Sure.  So Comcast was first founded in 1963 by

11  Ralph Roberts when he purchased a cable franchise in

12  Tupelo, Mississippi, and from that, grew the company

13  to the size that it is today.  His son, Brian

14  Roberts, is now our Chairman.

15  Q    And what other business activities did Comcast

16  add over the years?

17  A    Sure.  As the company has evolved and as

18  technology has evolved, Comcast has gone from just

19  offering cable television services.  It's offered

20  internet services to the home, it offered home -- it

21  offers home phone services, it offers home security

22  services.  In 2011, it began the purchase of NBC

23  Universal, so it owns the NBC family, it owns the NBC

24  television channels, it owns Universal Studios, and

25  it owns the Universal amusement parks.  So the

1    company has continued to grow year after year.

2    Q   Now, you mentioned that -- you testified that you

3    had worked for at least -- more than one company, but

4    at least one with large patent portfolios?

5    A   Yes.

6    Q   When you got to Comcast did you find that this

7    company had a large patent portfolio?

8    A   Relatively speaking, no.  I think we probably had

9    about 200 U.S. patents at the time in 2007.

10   Q   And were they concentrated in any particular

11   area?

12   A   As you can imagine, they were concentrated in the

13   place that they were focused in doing business at the

14   time, which was mostly in the video space.

15   Q   Okay.  Now, you then have Comcast as a company of

16   some size with patents concentrated in one area.  Was

17   that a healthy picture?

18   A   No.  No, I don't think so from my perspective,

19   and I believe, from what I've been told, was the

20   reason for creating the position, was that as Comcast

21   had grown in size, it recognized that maybe it needed

22   to pay a little bit more attention to patent issues

23   and needed to have a business perspective just kind

24   of overseeing what it thought its next steps might

25   be.

1   Q    Was -- did you develop a program within Comcast

2   for generating patents internally?

3   A    Yes, I did.  So one of the first things I noticed

4   in my experience from Lucent and Qimonda and then

5   also as a consultant to various companies was there

6   was sort of a play book, sort of a perspective that

7   you could build about what we sometimes -- I'm sorry,

8   I'm going to throw some terminology around.  We call

9   it patent harvesting or invention capture.  And the

10  issue there is that while Comcast was quite

11  sophisticated in developing new products, it really

12  didn't have in place the processes to capture those

13  ideas.

14          So in the first year in 2007 into 2008, we

15  developed what most sophisticated technology

16  companies have, which is a patent committees process,

17  and we, instead of having a single attorney kind of

18  sitting in his room waiting for engineers to come to

19  him, what we did is we took the story out to the

20  street, or out to the company.  And so we established

21  a communication plan with our inventors, we made sure

22  that they knew about the patent program, we included

23  an incentive reward so that inventors would be paid

24  for their inventions, we made sure that senior

25  management was recognizing it better so the CEO would

Mr. Finnegan - Direct                           91

1    sign a letter of thanks as those inventors invented.

2    And I think in the first year, we probably went from

3    about 20 years that we evaluated from a patenting

4    perspective up over to about 130 ideas.  And, again,

5    that's not speaking to -- I didn't cause the level of

6    innovation to uptick.  We just simply put in place a

7    process for -- a place for the inventors to come that

8    would be more conducive to collecting those ideas.

9    Q   By the way, before I follow up on that, are these

10   technology people, are these the ones who are going

11   to be in this new building?

12   A   Yeah, so -- and the other -- I think the

13   interesting thing when you think about Comcast's

14   growth, I think at the time I started in 2007, the

15   technology and products group was only about 50

16   people big.  And now what we have within Comcast

17   thinking about new ideas is -- that team is 5,000

18   people big.  And they're currently deployed in all

19   sorts of buildings around the Philadelphia area, so

20   they're going to consolidate into that single

21   building at 1800 Arch Street.

22   Q   Okay.  How big is that building going to be?

23   A   It's going to be the tallest building in

24   Philadelphia and the tallest outside of New York and

25   Chicago.

1  Q    Now, getting back to this question of developing

2  the patents, how have you done over those nine or so

3  years that you've been (indiscernible) intellectual

4  property that you've done in generating internally

5  patents?

6  A    Sure.  So I think in 2007, our number was around

7  20 patents issued in the U.S. Patent Office, and this

8  past year our number was almost 200, 200 per year.

9  And we now own a -- we have a patent portfolio of

10  1,000 U.S. patents and about an additional 800 patent

11  applications.  And that's the -- that's the

12  inventions that are in the Patent Office being

13  considered.  I think they talked yesterday about

14  sometimes that's a three year or five year process

15  for the Patent Office to evaluate those ideas and

16  decide if they're patentable.

17  Q    Now, Mr. Finnegan, those internally generated

18  patents, are they in fields where Comcast presently

19  operates?

20  A    That's correct, yes.

21  Q    For example, does -- are these folks generating

22  cellular phone patents?

23  A    Primarily, it's in --

24  Q    Well, first, the answer, is that a yes or no?

25  A    No.

Mr. Finnegan - Direct                    93

Q    Okay.  Explain.

A    Sure.  So, primarily, in the business, as we

currently operate -- and I paused only a little bit

because some of the base networking features of the

telecom system you could say possibly relate to

cellular technology, but primarily in the business as

we currently operate, video, internet delivery, et

cetera.

Q    And wired phone?

A    Yeah, exactly.  Yes.

Q    But not cellular, in general?

A    Correct.

Q    Okay.  So the answer is no, they are not

generally -- would a company be interested -- a

company like Comcast be interested in getting patents

outside its own fields?

A    It could be.  And, in fact, that was part of the

strategy I introduced to the company was the idea of

thinking about what companies you may -- what

companies may approach you, what companies may

approach Comcast, in a -- wanting to start a

licensing discussion, to have a patent discussion.

And it's the profile of those companies that sort of

dictates what patents you might want to have.  And I

hope that's not too confusing, but to kind of

Mr. Finnegan - Direct                           94

1   describe it a little bit further, if -- and I'll go a

2   little bit sideways here -- but if Comcast were

3   having a patent discussion with a medical company,

4   Comcast's portfolio of video patents wouldn't really

5   look very valuable to a medical company.  So what

6   Comcast would need in a discussion with a medical

7   company would be patents related to the medical

8   field.  I hope that -- so yes, so Comcast thinks and

9   I think about places where Comcast may need to have

10  patents outside of the field that it operates in

11  today.

12  Q   Because you want to be able to tell that medical

13  company to do what?

14  A   So --

15  Q   To use your patent?

16          MR. RIOPELLE:  Objection, Your Honor,

17  getting a little leading.

18          MR. HANGLEY:  I'll withdraw.  And that is

19  leading.  I apologize.

20  BY MR. HANGLEY:

21  Q   What is it that you want to be able to say to the

22  hypothetical medical company when you negotiate with

23  your medical patent?

24  A   Sure.  In very simple terms, I think what you're

25  trying to do is understand -- what you're trying to

1    say to the medical company is I have -- I own some

2    technology that's in your space, you own some

3    technology that may be in my space, so let's first

4    talk about that.  And secondly, let's see if we can

5    get to a place where maybe we can -- we can just get

6    past this problem, and, you know, going back to sort

7    of let's clear the decks, let's go back to, you know,

8    do some kind of cross-license, and let's go back to

9    competing in the marketplace.

10   Q   Now, we've talked about how Comcast had moved

11   into phone technology.  Is Comcast, by the way,

12   moving into cellular technology, cell phone

13   technology?

14   A   Sure, it's been announced that we're going to be

15   moving into cellular technology --

16   Q   Okay.

17   A   -- cellular services.

18   Q   Okay.  Now, let's see, Sprint is a cell phone

19   company?

20   A   Yes, it is.

21   Q   Verizon is another one?

22   A   Yes, it is.

23   Q   Has Verizon in any way moved into areas in which

24   Comcast conducts business?

25   A   Sure.  Yes, Verizon offers home video service

Mr. Finnegan - Direct                           96

1   today.

2   Q    And what's that called?

3   A    Fios.

4   Q    Now, let me show you, if I may -- Mr. Dyer, may

5   we see Exhibit 803?

6            MR. RIOPELLE:  Your Honor, I would object

7   to the document being published to the jury until

8   they establish -- it's hearsay, so they need to

9   establish admissibility under 803(6) to 901 before

10  they can show it to the jury.  I mean he can show it

11  to the witness --

12           THE COURT:  No.

13           MR. RIOPELLE:  -- and let him establish

14  that.

15           THE COURT:  He has to lay a foundation

16  first.  That's the way we will proceed unless there

17  is an agreement.

18           MR. HANGLEY:  I thought it was already

19  accepted.  I thought you and I discussed it this

20  morning, Mr. Riopelle.

21           MR. RIOPELLE:  No, no, we're --

22           MR. HANGLEY:  But let's -- but let's not

23  waste time.

24           THE COURT:  No, wait a minute.

25           MR. RIOPELLE:  We were talking about a

                    Mr. Finnegan - Direct                    97

1    different agreement, Mr. Hangley.

2              MR. HANGLEY:  Let's not waste any time,

3    Your Honor.  I'll just let the witness look at it

4    here.

5              THE COURT:  Fine.  And what we'll do, the

6    exhibit will show on counsels' screens and on my

7    screens, but not on your screens, until the document

8    is authenticated and offered into evidence.  Mr.

9    Hangley?

10   BY MR. HANGLEY:

11   Q   I'm showing you a copy of PX-803001, which I will

12   describe as a document captioned, "Intellectual

13   Property Business at Comcast as Presented to Tony

14   Werner and Art Block," and it's got a date on the

15   first page of November 5, 2007.  Do you recognize

16   that document?

17   A   Yes, I do.

18   Q   Is it a document that you prepared?

19   A   Yes, it is.

20   Q   Is it a document you prepared at or about the

21   time of its first page date, which is November of

22   2007?

23   A   Yes, it is.

24             MR. HANGLEY:  Offer it into evidence, Your

25   Honor.

1          MR. RIOPELLE:  Objection.  Under 803(6),

2     the made us go through all of those three points

3     under 803(6) and they should have to do it now too.

4          THE COURT:  The witness who created the

5     document is here in court.

6          MR. RIOPELLE:  That is correct, but under

7     803(6), there are two other requirements that the

8     witness needs to testify to before it becomes

9     admissible under the hearsay exception.

10          THE COURT:  That's if a record custodian

11     offers it.

12          MR. RIOPELLE:  No, I believe it's -- the

13     document is itself hearsay unless it's going to be

14     used as a business record.

15          (Pause in proceedings.)

16          THE COURT:  (Indiscernible).

17          MR. HANGLEY:  Does that make any sense to

18     you, Mr. Riopelle?

19          MR. RIOPELLE:  This is what you made us go

20     through before this trial.

21          MR. HANGLEY:  No, that was not --

22          THE COURT:  No, no, no.

23          MR. HANGLEY:  -- what I made you go

24     through, Mr. Riopelle.

25          THE COURT:  No.  We're going to take a

Mr. Finnegan - Direct                    99

1    timeout on that.  I don't want any arguments in

2    court.  We'll talk about it.

3              THE COURT:  Is this a document that you

4    created?

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  I don't think 803(6) refers to

7    or covers a document where the author of the document

8    is testifying.  803(6) covers documents where a

9    custodian is testifying with respect to other

10   documents which are considered business records, and

11   the question is whether they are admissible as

12   business records.

13             The reason for all this, let me explain it.

14   You've heard the term "hearsay" in this exchange.

15   Hearsay is where something is created by someone out

16   of court.  Most often it relates to statements made

17   out of court.  A statement made by someone out of

18   court cannot be offered in evidence in court unless

19   the witness is here and then the witness is here to

20   tell us about it, or under certain circumstances, and

21   I hate to tell you how many exceptions there are.

22   About 24 exceptions to this hearsay rule.  We're not

23   going to get involved in all of them, but there are

24   certain exceptions to the hearsay rule and they're

25   based on indicia of reliability of the hearsay

Mr. Finnegan - Direct                              100

1   statement.  I'm not going to give you examples except

2   to say that in my judgment, when the author of the

3   document is in the courtroom this book doesn't apply.

4   You don't have to learn the book.  I do, and I'll do

5   my very best to keep these exchanges short.  And now

6   the objection is overruled and you may proceed.

7            MR. RIOPELLE:  Thank you, Your Honor.

8            MR. HANGLEY:  May we publish this to the

9   jury now?

10            THE COURT:  Yes, you may.  It should be on

11   your screens.

12            MR. HANGLEY:  Mr. Dyer, I'd like to see

13   803.  Is it up?

14            MR. DYER:  Yes, it is.

15            (Pause in proceedings.)

16   BY MR. HANGLEY:

17   Q   What was this document, sir?

18   A   So this is a document that I presented to my

19   bosses, Tony Werner and Art Block, just less than 60

20   days after I had joined the company --

21   Q   Okay, let me ask you --

22   A   -- after I joined Comcast.

23   Q   Let me ask you first, who is Tony Werner?

24   A   So Tony Werner is -- at the time he was the Chief

25   Technology Officer of Comcast Cable.  He's now the

Mr. Finnegan - Direct                                    101

1    President of Technology and Products.  And then --

2    and then Art Block?

3    Q   I'll ask you about Art Block as well.

4    A   And then so Art Block is the general counsel of

5    Comcast Corporation.

6    Q   Now, I'm not going to ask you to look at all of

7    the pages, but please go to page two.  Now, what --

8    was this -- how long have you been (indiscernible)?

9    A   I think, as I said, less than 60 days.

10   Q   Okay.  And this was your first flight of

11   recommendation for a global program?

12   A   Yes, that's correct.

13   Q   Okay.  And on this page, have you sketched out

14   the areas that are -- that you want the company to go

15   into?

16   A   Yes, so these are the first things I thought we

17   should focus on.

18   Q   Okay.  Did the company buy in to what you wanted

19   to do with the Strategic Intellectual Property

20   Program?

21   A   Yes, they did.

22   Q   Now, I see -- if we can go to page 16 -- that

23   you've got a heading that says, "Our portfolio needs

24   to grow three ways."  Run through them for me, will

25   you?

1  A    Sure.  So this speaks to -- the white section on

2  top, which is organic growth, speaks to what I found

3  at Comcast when I arrived, which was that, and no

4  disrespect intended, but the role was from the patent

5  attorney who was there was really a reactive role,

6  and so he would sort of wait for inventors to come to

7  him and say I think I have an idea, and then he would

8  go about his business of trying to see if it was a

9  patent.

10          I wanted to address one -- and it shifted a

11 little bit.  It's broader than just invention on

12 demand.  But I wanted us to have a more proactive

13 approach towards patenting within the company.  And

14 so the patent team, which includes some people that

15 work for me, as well as the patent legal team, as I

16 mentioned earlier, goes out and gets the word out

17 within the -- within the Comcast engineering

18 communities that patents are important to the company

19 and we should attempt to capture those ideas and file

20 them for patent consideration.

21 Q    All right.  I see that the comment is that it's

22 time consuming, but it does (indiscernible)?

23 A    Yes, it does.

24 Q    Now, the next column is -- or the next row is

25 patent acquisition, which you describe as an option

Mr. Finnegan - Direct                         103

1   to quickly grow a portfolio.  Why is that and what

2   was the difference?

3   A   So patent acquisition was the idea of buying

4   patents from other companies.  And, you know,

5   obviously, if you can buy a patent immediately, you

6   would then have that patent in your portfolio, where

7   the effort by the inventors was a long-term effort

8   and was something we needed to do immediately, but

9   its impact wasn't going to -- wasn't going to play

10  out until many years later.

11            Through patent acquisition, you could go

12  out and actively buy patents that were available for

13  sale.  And from my experience at other companies, I

14  knew that this was something that was kind of really

15  beginning in the marketplace at that time.

16  Q   And I see your comment was what?

17  A   So my comment says, "Best pursued for patents of

18  interest to aggressors and outside of cable."

19  Q   Aggressors, meaning who?

20  A   So aggressors would be those companies that would

21  be approaching Comcast asking us to talk about

22  patents, asking to talk about whether or not we

23  needed a patent license to their inventions.

24  Q   In the interest of time, I'm going to ask that

25  you move up to page 24.  If we can put that on the

Mr. Finnegan - Direct                                    104

1   screen?  Good.  This page is called "IP

2   Efforts/Necessary Resources," and I see you've got on

3   the left a column called "Portfolio Creation?"

4   A    Yeah, so the topics that we just talked about,

5   which was the internal efforts -- well, not the

6   internal efforts, but the idea of how to strengthen a

7   patent portfolio, were represented in those two

8   boxes.

9   Q    Okay.  Patent creation and patent acquisition?

10  A    Correct.

11  Q    Now, I see you've got on the other side, the

12  right side, "Licensing and Litigation."  What do you

13  mean by that?

14  A    So there -- what I was speaking to is that sort

15  of companies have a choice as to -- I found some big

16  companies in my consulting days to be rather passive

17  with respect to where licensing discussions may take

18  place.  So, again, in my first 60 days at the

19  company, what I said was, as we are in this space, in

20  cable and in the telecom space and my background was

21  in telecom, we should at least be thinking about do

22  we have a strong portfolio to use as a counter

23  assertion should we get into any patent discussions

24  with any of the types of companies listed.

25  Q    Okay.  Am I -- tell me -- you referred to people

Mr. Finnegan - Direct                      105

1   as -- companies like this as aggressors earlier?

2   A    Yes, I did.

3   Q    Okay.  And I see that the first bullet point, is

4   that "Preparation?"

5   A    That's "Preparation."

6   Q    For Verizon, Sprint, AT&T.  Why were companies in

7   those fields, cellular phone companies, why were they

8   at the top of your list?

9   A    Well, as I said, I think, you know, there was a

10  convergence between cable and telecom.  Handsets were

11  doing more things that you might do in your home in

12  terms of, you know, just -- the technology was

13  starting to get similar, and so they were three

14  companies that we should be prepared for possibly to

15  have a discussion with, and also competing with us

16  sort of at the service provider level.

17  Q    Okay.  Now, you said -- you used the term

18  "countersue."  What do you mean by that?  Why is --

19  why is it important to counter?

20  A    Sure.  So my recommendation to the company, based

21  on my experience at both Lucent and Qimonda, is that

22  I recommended to Comcast that we think about this as

23  playing strong defense, that we think about this as

24  having a strong patent portfolio to react to

25  aggressors, and not as a program.  There are some

Mr. Finnegan - Direct                      106

1  companies -- and we did it at Lucent -- I would
2  describe Lucent as an aggressor -- where Lucent went
3  out and talked to companies they actually expected
4  some level of compensation when they did a cross-
5  licensing deal.  I view this more as sort of playing
6  defense.
7  Q   Okay.  Then I think the only reason why I wanted
8  to ask you about this is the opening statements,
9  which you were here for.  There was a remark that
10 Sprint and Comcast have a friendly, cooperative,
11 (indiscernible) relationship during this time period,
12 but you're describing them here as an aggressor?
13 A   Well, yes, I did, and this -- and I changed my
14 opinion shortly after -- maybe not shortly after, but
15 sometime after, as this -- I was still 60 days in.  I
16 think I was still speaking to different leads from
17 the different business groups, different leads from
18 the different engineering groups, and I came to
19 realize that Sprint was, you know, a business partner
20 of Comcast and it was less likely that we were going
21 to have an issue of a patent discussion between
22 Comcast and Sprint.
23 Q   But --
24 A   I thought -- I thought it was less likely.
25 Q   When did that opinion change?  That is -- let me

Mr. Finnegan - Direct                         107

1    be clear on that.  When did you decide that, in fact,

2    there was a friendly relationship with Sprint?

3    A   I think, you know -- again, I was there two

4    months.  I want to say over the next few months, I

5    learned that Comcast and Sprint were working together

6    developing new wireless businesses and were investing

7    together.  And so from my discussions with the

8    corporate development people who are the people that

9    kind of do the company to company business deals, I

10   came to learn that we were fairly cordial in our

11   business discussions and fairly friendly.

12   Q   Okay.

13   A   I'm sorry, I shouldn't use the word "fairly."  We

14   were.  I'm putting a caveat on that.

15   Q   Okay.  Let me show you another document which I

16   will not asked to be published to the jury just yet.

17   This is PX-802.  Can you identify that for the jury?

18   A   Sure.  So this document is title "Strategic

19   Intellectual Property Monthly Update, February 2008,"

20   and it was a document I created for my bosses in

21   February of 2008.

22   Q   And is this -- I'm going to switch with you.

23           MR. HANGLEY:  Move it's admission, Your

24   Honor.

25           THE COURT:  Any objection?

Mr. Finnegan - Direct                    108

1          MR. RIOPELLE:  Just the same objection,

2   Your Honor.

3          THE COURT:  Well, it's not -- it is a

4   business record, but the author is here.  And the

5   rule to which you keep referring is applicable when a

6   record custodian seeks to move into evidence business

7   records without the author of the record being in the

8   courtroom.

9          MR. RIOPELLE:  I'm not sure that I agree

10  with you, Your Honor.

11         THE COURT:  Fine.  Well --

12         MR. RIOPELLE:  But --

13         THE COURT:  -- that's your --

14         MR. RIOPELLE:  -- you're the Judge and I'm

15  not --

16         THE COURT:  That's your privilege.  The

17  objection is overruled.  You may proceed.

18         MR. HANGLEY:  May we show that on the

19  screen, please?

20         (Pause in proceedings.)

21  BY MR. HANGLEY:

22  Q   Now, did you do these kinds of reports

23  periodically?

24  A   I did.  The intention was monthly.  Sometimes it

25  wasn't every month, just based on people's

Mr. Finnegan - Direct                      109

1   availability, but yes.

2   Q   And I'm showing you this particularly to draw

3   your attention to page four.  Now, we're still here

4   and, once again, you're talking about patent

5   acquisition?

6   A   Yes.

7   Q   "Corps to approach," is that "corporation?"

8   A   That's "corporation, yes."

9   Q   Okay.  And you've got two columns across the top,

10  "Approach Directly" and "Approach via Third Party?"

11  A   Yes.

12  Q   What's -- why would you draw the distinction?

13  A   Well, there is a distinction between trying to --

14  so what I -- so what I was trying to do with this was

15  identify companies that would -- that I wanted to

16  start a conversation with about whether or not they

17  were willing sellers of patents.  As we talked about

18  a few minutes ago, I thought this was a way for us to

19  expand our patent portfolio.  But the patent world

20  can be a little bit aggressive sometimes.  And so I

21  recognized that there was some companies out there

22  that if I said are you interested in selling me any

23  patents, what they might say is no, but, instead,

24  let's talk about the patents that you need to take a

25  license to and that you should pay me royalties on.

Mr. Finnegan - Direct                    110

1          So I didn't want to have that conversation

2    directly.  I actually wanted to try to approach them

3    sort of from a third party's -- if you think about --

4    think about, you know, an old story about Disney

5    building Disney World in Orlando, you know, they

6    bought that real estate by using a third party.  I

7    kind of wanted to at least introduce the concept of

8    conversation, just not through me, from an

9    independent company just to take -- kind of take

10   their temperature.

11   Q   Okay.  And now, over on the left are companies

12   that you'll talk to directly?

13   A   Yes.  So over on the left what I've done is I've

14   sort of prioritized high, medium, and low, those

15   companies that I felt was opportunities for me to

16   approach directly, and I prioritized them, and I

17   have -- yes, and so that's what you're seeing on that

18   slide.

19   Q   Okay.  Is that a high degree of confidence that

20   you can talk to them without running into this kind

21   of problem?

22   A   Yes.  So the belief there is it's probably less.

23   There's probably some consideration on might they

24   have interesting patents that I would care about,

25   because at this time I'm still a very small team.  I

1    really hadn't grown my team out yet in February.

2    Q    (Indiscernible).

3    A    Okay.  So it was still a small team, so this was

4    really about who did I feel we could even have a

5    conversation with?  And I do list Sprint there on the

6    high side.

7    Q    Okay.  That's -- that's a complete turnaround

8    from where you were earlier when you had them listed

9    as an aggressor (indiscernible)?

10   A    Yes, and I -- in February, by this time I

11   recognized that Sprint and Comcast were business

12   partners, and so I felt with that cordial business

13   relationship, this was a company that I wanted to

14   approach.  I think at the time -- I don't think at

15   the time, but I know at the time we had had an issue

16   with Verizon.  And so I saw Sprint as potentially a

17   place maybe that would have interesting patents for

18   us to at least consider acquiring.

19   Q    I'd like to know a little more about how this

20   strategic intellectual property part of Comcast's

21   business works.  You don't do it all by yourself?

22   A    No, I don't.

23   Q    Okay.  What are the three or more areas in

24   which -- that get involved in (indiscernible)?

25   A    Sure.  I think in the previous slide we spoke to

Mr. Finnegan - Direct                    112

1   this idea of different resources.  And so on my team

2   we have Mr. Mark Dellinger, who sort of leads our

3   outwardly facing patent acquisition efforts, and as a

4   business person, as a negotiator, he's in charge of

5   thinking about where -- sort of doing this work with

6   me about acquisition, thinking about where we might

7   go, and actually being involved in the engagement

8   with companies.

9           In addition, I have a team that spends its

10  time on the internal patent harvesting part, and

11  those people are -- one is a previous patent

12  examiner, a woman who worked at the Patent Office for

13  a period of time, one person is an engineer who I

14  hired from within the Comcast engineering community

15  because that person has a great insight into the

16  operations of the engineering team and lots of

17  connections to help, again, get the -- do this

18  function of getting the word out.  I also have a

19  person in that group that manages sort of the

20  communication with the engineering community, and

21  that's website announcements and recognition

22  programs, et cetera.

23          Then the other kind of third part of my

24  team is this team of patent engineering, and patent

25  engineering are the group -- a group of three

Mr. Finnegan - Direct                          113

1    engineers today that work on sort of the technical

2    analysis of patents, not the legal analysis, but sort

3    of the -- whether it's inventions inside the company

4    or outside the company.  But under my direct purview,

5    there is no -- the legal team doesn't sit underneath

6    me.  The legal team is a separate --

7    Q   You hadn't --

8    A   -- separate group.

9    Q   You hadn't mentioned that and I was

10   (indiscernible).

11   A   I'm sorry.

12   Q   You do get the lawyers involved?

13   A   Yes, the lawyers -- the lawyers work closely with

14   us, yes.

15   Q   Okay.  Is this after or before you've done these

16   other things?

17   A   Sometimes it's together, sometimes it's the very

18   beginning, and sometimes it's -- it depends.

19   Sometimes we're not involved in issues.  Our role is

20   greatly reduced when we get to the point of

21   litigation and then maybe in some of the initial --

22   the internal marketing of inside things, the legal

23   team is, you know, less involved in that.

24   Q   Oh, okay.  Who's primarily reviewing -- I mean

25   you do receive proposals of companies to sell you

Mr. Finnegan - Direct                    114

1   portfolios of patents, is that correct?

2   A    Yes, we do.

3   Q    And who reviews them initially?

4   A    Sure.  So the process of reviewing patents that

5   we are considering buying includes three kind of -- I

6   always call it sort of the three-legged stool for the

7   patent licensing business.  One is evaluating the

8   technical components of the patents that are offered.

9   The second part is the business part of it.  Do the

10  patents apply to an industry that's growing or

11  shrinking?  And then the third part is the legal

12  role, which is that idea of, you know, legally, does

13  this patent feel like it's the -- an interesting

14  thing for us to buy?  So -- but the pro -- the way

15  the process works -- sorry, long-winded answer.

16  Q    It is.

17  A    The way the process works is we start with the

18  technical team.  The technical team looks at the

19  patents first.  They begin the process.

20  Q    Okay.  Now, how many patents have -- has your

21  team reviewed in your nine or ten years?

22  A    Sure.  So in the nine or ten years we've -- I

23  think -- loosely speaking, I think we may have

24  reviewed as many as 100,000 patents.

25  Q    And how many have you decided to buy?

1  A    About 200.

2  Q    Now --

3              (Pause in proceedings.)

4          THE COURT:  Maybe this is an appropriate

5  time to break.

6          MR. HANGLEY:  That's fine for us, Your

7  Honor.

8          THE COURT:  Good.  I thought I picked a

9  time that would work.  Let me -- you may return to

10 your seat, and you, Mr. Finnegan, may return to your

11 seat.  We'll continue the direct examination after

12 lunch.

13         Let me tell you a little bit about our

14 schedule.  I haven't said that -- mentioned that to

15 you.  We generally recess for lunch somewhere between

16 12:30 and 12:45.  I try to recess at a break in the

17 testimony, or if a witness is about to finish his

18 testimony, we might go a little later.  But,

19 generally, we recess at 12:30 or 12:45.

20         We have a mid-morning break.  It was a

21 little early today.  We take about an hour for lunch

22 and recess mid-afternoon, and recess at day-end at

23 around 4:15.  In my experience, that should enable

24 everyone to be able to catch trains or busses or

25 rides and get home at a reasonable hour.  If those

116

1    times don't work for you -- and I'm particularly

2    turned about the day-end time.  If you've got

3    problems making a train or a bus, report that to one

4    of my court officers.  Mr. Cosgrove is going to be in

5    court most of the time.  I take my law clerk back

6    into chambers.  But tell him and we'll work with you.

7    We'll try to work it out.

8            I generally give instructions every

9    noontime and every day-end about not talking about

10   the case among yourselves, and I'm going to give you

11   that instruction very briefly now.  This is what I

12   covered yesterday in my preliminary jury

13   instructions.  No discussions about the case among

14   yourselves.  You got to wait until all the testimony

15   is in.  No discussions with anyone else.  If anyone

16   tries to talk to you about the case, say nothing,

17   report that to me.  And remember, counsel have been

18   instructed not to have any contact with you at all,

19   and I'm instructing you not to have any contact with

20   counsel.

21           With that, we're recessed for lunch until

22   about 1:45.  Be sure to take your juror notebooks and

23   the portfolios, or binders, into the jury room and

24   leave them there.  Have a good lunch.  See you back

25   oh, a little before 1:45.

117

1                (Jury out, 12:45 p.m.)

2           THE COURT:  Be seated everyone.  We have

3     something to cover -- some things to cover very

4     briefly.  The Comcast acquisition policy for patents,

5     when I made that statement at the hearing, oral

6     argument, at issue in the case were the patent

7     policies that implemented value of the patents and

8     whether the patents were litigation worthy.  Instead

9     of permitting that testimony, in a general way, but

10    not referring specifically to the 807 -- or 870

11    patent, which was covered by the joint stipulation

12    that I approved in February of 2015, I excluded from

13    the patent acquisition policy evidence anything

14    relating to the value of patents in general and the

15    litigation worthiness of patents in general, pursuant

16    to the patent acquisition policy.

17           So I see no need to read the proposed

18    limiting instruction.  Now, if that changes, if that

19    situation changes based upon additional questioning,

20    I'll expect you to renew the request, Mr. Riopelle.

21           MR. RIOPELLE:  Thank you, Your Honor.

22           THE COURT:  Secondly, Comcast filed this

23    morning another motion, a motion to amend order

24    regarding Comcast Cable Communications, LLC's omnibus

25    motion and proposed order to admit unobjected to

118

1  exhibits into evidence.  What was the reason for

2  that, Mr. Goettle?

3          MR. GOETTLE:  Your Honor, I realized last

4  night that we had made a mistake in that motion.  I

5  had a mis -- I misunderstood Sprint's position on

6  some 901 objections to documents.  I thought we had

7  reached agreement that we would not oppose on auth --

8  that we would not object on authenticity grounds and

9  Sprint would not object on authenticity grounds.  I

10 misunderstood the bidding and realized it last night,

11 and, therefore, re-filed the omnibus motion to

12 eliminate the exhibits from that motion that included

13 Sprint 901 objections.  So that's a smaller list, not

14 by much.  I think it -- I think it was about ten or

15 15 documents that Sprint maintains its authenticity

16 objections.  And I removed them from the list.  And I

17 apologize for filing the original omnibus motion.  I

18 misunderstood.

19         THE COURT:  No, that's all right.  But I

20 can tell you one thing we're not going to do.  We're

21 not going to go through an 803(6) foundation laying

22 process for every exhibit on your exhibit list.  Not

23 going to happen.  If that does happen, we'll never

24 finish the case in two and a half weeks.  It might

25 take two and a half months.  That will not happen.

119

1          I think I heard for the first time that

2     Comcast is willing to agree to all of Sprint's

3     exhibits, business records, or -- and I think Sprint

4     had previously agreed or is willing to agree to all

5     of Comcast's bus -- I'm referring to business

6     records.  Is that true, Mr. Goettle?  And then I'll

7     turn to you, Mr. Finkelson.

8          MR. GOETTLE:  Your Honor, I think by and

9     large, that's true.  I don't think there's -- I'm

10    worried about the lawyers sitting behind me that

11    might know more than me.  I think that is by and

12    large true.  I suspect it is 100 percent true.  I

13    don't know if there's outliers there where they're

14    just a little bit too far afield.  But in terms of --

15    I think the majority, based on Your Honor's comments

16    over the past few weeks about Comcast's objection to

17    those documents, I think that what you just said is

18    true and we will not be standing on the majority of

19    our business record objections or authenticity

20    objections.

21          THE COURT:  All right.  Mr. Finkelson?

22          MR. FINKELSON:  Well, Your Honor, I

23    apologize that I don't have the correspondence

24    between the parties and the Court's instructions to

25    set a pretrial conference handy, but the Court was

120

1    very clear.  It gave Comcast an option during the

2    pretrial conference to agree to Sprint's proposal

3    that there weren't going to be either business

4    records or authenticity objections, and Your Honor

5    stated that Comcast needed to agree to both of those

6    in order for us to have an agreement.  And Comcast

7    did not agree to that.  It put us to our paces to

8    prove every single business record, which Your Honor

9    knows with respect to exhibits, we've submitted it.

10   It elected not to accept that proposal.  We proved up

11   our business records, and there are a number of

12   documents in the case, Your Honor, that Comcast we

13   believe does have an authentication or hearsay

14   problem with.  It's not a situation like Your

15   Honor -- like was presented today, Your Honor, with a

16   live witness on the stand.  It would be a different

17   situation.

18            THE COURT:  Well, Mr. Riopelle seems to

19   disagree with me on 803(6).  He can do that.

20            MR. FINKELSON:  And I wasn't -- and I

21   wasn't -- and I may disagree as well, Your Honor, but

22   I was just staying that --

23            THE COURT:  You do?  I can still hear my

24   evidence professor at law school covering this

25   subject.  And I've just looked at 803(6) and it just

121

1   simply does not apply when the author of the document

2   is in the courtroom.  You don't need the business

3   records exception.

4           Now, if there's hearsay within the

5   document, and there might be, then that's different.

6           MR. FINKELSON:  Understood.

7           THE COURT:  And the time to object is when

8   the witness refers to other things in the documents,

9   and then I will rule.  But I am not going to require

10  an 803(6) declaration with respect to each document,

11  particularly since Comcast has -- were in the 800s

12  already.  I thought it very interesting that we

13  didn't start with Exhibit Number 1.  We started with

14  Exhibit Number 803.  That's a little disquieting for

15  the Court.  But we're not going to do that.

16          MR. FINKELSON:  And we don't -- we don't

17  plan to do that, Your Honor.  There are a number of

18  exhibits on Comcast's exhibit list to which we have

19  objected.  They're not in the scenarios like Your

20  Honor has addressed today where there's going to be a

21  live Comcast witness on the stand.  There are

22  documents that, for example, Comcast wants to

23  introduce that are Sprint documents that Comcast has

24  not authenticated or has not established an exception

25  to the hearsay rule.  We've objected to those.  There

122

1    are not many of them.

2          THE COURT:  They're Sprint documents.  Did

3    you produce them?

4          MR. FINKELSON:  We did and they were not

5    authenticated by any witness, Your Honor.  Comcast

6    did not -- was -- did not authenticate the document

7    with --

8          THE COURT:  Well, this is --

9          MR. FINKELSON:  -- any witness.

10          THE COURT:  We're just not going there.

11    We're going to get -- we're going to try this case on

12    the merits.  We're not going to try this case on the

13    rules I'm looking at here.  You're going to agree to

14    one another's documents.

15          MR. FINKELSON:  Your Honor --

16          THE COURT:  Now, there might be exceptions.

17    There might be some exceptions.  But I'm telling you

18    I'm going to come down hard if I think there are

19    objections that are hypertechnical and are not

20    designed to advance the course of the trial.

21          MR. FINKELSON:  And I understand that, Your

22    Honor.  But just to be fair and clear, what Your

23    Honor just expressed was exactly Sprint's position

24    from the outset.  It's exactly what Sprint proposed

25    at the pretrial conference.

123

1          THE COURT:  Well, then why isn't that the

2     deal?

3          MR. FINKELSON:  Comcast wouldn't agree to

4     it, Your Honor.

5          THE COURT:  Are they --

6          MR. FINKELSON:  Comcast wouldn't agree to

7     it.

8          THE COURT:  Are they willing to agree to it

9     now.

10          MR. GOETTLE:  As I stated before, Your

11     Honor -- first of all, Your Honor, I understand where

12     Sprint is coming from on this.  Our focus was on the

13     documents where we were contending -- we didn't

14     appreciate the word matching of "core network" in the

15     document.

16          THE COURT:  Well, what you -- I understand

17     that and --

18          MR. GOETTLE:  So I should have been more

19     clear with Sprint that that didn't extend to every

20     one of their documents.  They did do substantial work

21     to submit these certifications, and I really -- when

22     they came in I really hadn't thought about the

23     ramification of all of that.  So I understand what

24     they're saying, but what I said earlier, Your Honor,

25     stands.  By and large -- there might be a few

124

1   exceptions I don't know of right now, but by and

2   large, we are not objecting on the grounds that we

3   had raised before in light of what the Court has told

4   us over the past few weeks.

5           THE COURT:  Well, what you were requiring I

6   don't think is required by 803(6) to allow

7   admissibility of a document as a business record.

8   You were requiring testimony, for example -- and you

9   touched on the example -- when the phrase "core

10  network" is used in a Sprint document you were

11  requiring someone who would testify that "core

12  network" in that document means the same thing as the

13  "core network" definition that was ruled upon by the

14  Court.  That's not going to happen.  You'll cover

15  that in cross-examination.

16          MR. GOETTLE:  Yes, Your Honor.

17          MR. FINKELSON:  And we understand your

18  instructions, Your Honor, as well.  We'll revisit our

19  list of objections and --

20          THE COURT:  So that means I can put away

21  the 803(6) book?

22          MR. FINKELSON:  I think if I --

23          THE COURT:  I think I know --

24          MR. FINKELSON:  I think if I say anything

25  else about 803(6), Your Honor --

125

1          THE COURT:  You're in trouble.

2          MR. FINKELSON:  -- I'm in trouble.  I may

3     already be in trouble, but I'm --

4          THE COURT:  No, you're not.

5          MR. FINKELSON:  -- not going to say

6     anything else about it.

7          THE COURT:  No, you're not.  This was --

8          MR. HANGLEY:  Anybody notice what my

9     exhibit number was?

10          THE COURT:  803.

11          MR. HANGLEY:  That's why I --

12          THE COURT:  That was --

13          MR. HANGLEY:  -- picked it.

14          THE COURT:  That was beautiful, Mr.

15     Hangley.

16          MR. HANGLEY:  Thank you.

17          THE COURT:  Thank you.  Thank you very

18     much.  And I assume about 700 of those exhibits are

19     not coming into evidence.  And the next time I tell

20     you I want two copies of all of your exhibits that

21     you've boxed for me, remind me that I'm not going to

22     do that again.  I'll sign the order granting the

23     amended motion and we'll be back -- I don't think

24     there are any issues.  I'm still a little nervous

25     about juror number 5.  Nervous.

126

1          MR. HANGLEY:  He stayed awake.

2          MR. FINKELSON:  I saw him awake during Mr.

3   Goettle's presentation.  He seemed to be slipping a

4   little bit during mine.  Well, that's -- I don't

5   think that's the juror's fault, Your Honor, but --

6          THE COURT:  His body language tells me that

7   he's just there.

8          MR. FINKELSON:  I didn't see him -- at

9   least I didn't see any sleepiness, but I --

10          THE COURT:  Well, watch --

11          MR. FINKELSON:  I'll keep a watch out for

12   it.

13          THE COURT:  Watch the jury.  And I might

14   have a standup if I see them losing interest.  But

15   the other eight of them are, in my judgment giving

16   rapt attention to what's going on, and that's exactly

17   what I want.

18          On that note, do we have anything else to

19   address?

20          MR. HANGLEY:  I think not.

21          THE COURT:  Thank you.  Then we're in

22   recess until 1:45.  Have a good lunch.

23          (Luncheon recess taken, 12:56 p.m.)

24

25                          *  *  *

I N D E X

PLAINTIFF'S OPENING STATEMENT              PAGE NUMBER

By Mr. Goettle                                    4


DEFENDANT'S OPENING STATEMENT              PAGE NUMBER

By Mr. Finkelson                                 41


PLAINTIFF'S WITNESSES    DIRECT CROSS REDIRECT RECROSS

James Finnegan

  By Mr. Hangley         81

* * *

1

2

3

4

5

6                              <u>CERTIFICATION</u>

7

8          I, Michael Keating, do hereby certify that

9    the foregoing is a true and correct transcript from the

10   electronic sound recordings of the proceedings in the

11   above-captioned matter.

12

13

14

15   2/1/17

     _____        _____

16   Date                       Michael Keating

17

18

19

20

21

22

23

24

25