```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                           - - -


COMCAST CABLE COMMUNICATIONS, :  CIVIL ACTION NO. 12-0859
LLC, et al.,                  :
              Plaintiffs      :
                              :
         v.                   :  Philadelphia, Pennsylvania
                              :  February 1, 2017
SPRINT COMMUNICATIONS         :  1:51 o'clock P.m.
COMPANY L.P., et al.,         :
              Defendants      :
. . . . . . . . . . . . . . . :


                 AFTERNOON SESSION - DAY THREE
               BEFORE THE HONORABLE JAN E. DUBOIS
             SENIOR UNITED STATES DISTRICT COURT JUDGE


                           - - -


APPEARANCES:

For the Plaintiffs:      DANIEL J. GOETTLE, ESQUIRE
                         DALE M. HEIST, ESQUIRE
                         Baker & Hostetler, LLP
                         Cira Centre, 12th Floor
                         2929 Arch Street
                         Philadelphia, PA  19104-2891

                         WILLIAM T. HANGLEY, ESQUIRE
                         REBECCA SANTORO MELLEY, ESQUIRE
                         Hangley Aronchick Segal & Pudlin
                         One Logan Square, 27th Floor
                         Philadelphia, PA   19103

                         GEORGE MEDLOCK, ESQUIRE
                         Comcast Cable Communications
                         Chief Patent Counsel


              Laws Transcription Service
                 48 W. LaCrosse Avenue
                 Lansdowne, PA  19050
                    (610)623-4178
```

2

APPEARANCES: (Continued)

For the Defendants:        DAVID E. FINKELSON, ESQUIRE
                           BRIAN C. RIOPELLE, ESQUIRE
                           JUSTIN R. LOWERY, ESQUIRE
                           McGuire Woods, LLP
                           Gateway Plaza
                           800 East Canal Street
                           Richmond, VA  23219

                           COLLEEN H. SIMPSON, ESQUIRE
                           Harkins Cunningham, LLP
                           4000 Two Commerce Square
                           2001 Market Street
                           Philadelphia, PA  19103

                                - - -

Audio Operator:            Michael Cosgrove

Transcribed by:            Geraldine C. Laws, CET
                           Tracey Williams, CET
                           Paula Curran, CET

(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.)

1                       <u>AFTERNOON SESSION</u>

2           (The following occurred in open court at 1:51

3    o'clock p.m.)

4           THE COURT:  Good afternoon, please be seated.  I

5    gather there's a question?

6           MR. FINKELSON:  We just raised question, your Honor,

7    about procedure in terms of attorney location during

8    questioning and again, it's purely a question.  We didn't

9    want to interrupt Mr. Hangley's examination, but we just

10   wanted to make sure we understood what your Honor's

11   preference is in terms of lawyer placement.  We have

12   practiced in a number of courts, where it you take one or two

13   steps to the left or right, that's too far.  So, we just

14   wanted guidance.

15          MR. HANGLEY:  I'm a walk-a-rounder.

16          THE COURT:  Well, I'm not in favor of walking

17   around, but I also don't require counsel to remain at the

18   lectern.  I just don't counsel to get close to the witness

19   and particularly on cross-examination.  I still have memories

20   of my opponents hovering over a witness.  Look at this

21   document and tell me where you said that and the witness is

22   turning sheet-white, my witness.  And the long and the short

23   of it was in the old federal courthouse.  And I decided

24   that's not right, I objected and the judge moved the lawyer

25   back.  So, reason is the way to approach the problem, be

4

1    reasonable.

2             MR. FINKELSON:  Thank you, your Honor.

3             THE COURT:  Again, Mr. Hangley, on direct, was

4    getting close to the witness. Although, the theory, at least

5    the theory when I was teaching advocacy, is that in direct

6    examination, you let the focus be the witness and you stay

7    back.  On cross-examination, the goal is to hammer the

8    witness and to get close.  I don't approve of the and reject

9    the getting close to the witness on cross.  So, you can both

10   hover around the lectern, that's not the lectern, that's

11   really the Elmo, that's the computer in the courtroom.  And

12   it seems to work, but we'll proceed on that basis.

13            MR. HANGLEY:  I don't know what it meant in that

14   sense, what works?  The Elmo?

15            THE COURT:  The Elmo works --

16            MR. HANGLEY:  Oh.

17            THE COURT:  -- but using that --

18            MR. HANGLEY:  I thought you meant hovering over the

19   witness.

20            THE COURT:  That doesn't -- that's much larger than

21   the lectern that we waited so long to get.

22            MR. FINKELSON:  I think what's nice about it, at

23   least, from our perspective and maybe from personnel's as

24   well, is that you can see the monitor on it.  So, it helps

25   there.

5

1          THE COURT:  The second issue and we're checking, two

2    jurors have said they catch a Lancaster train at 4:45 and

3    would like to recess at 4:20.  I'm thinking two weeks times

4    20 minutes, I don't like that.  That's almost a day.  So,

5    I've asked Milahn to check, but in the meanwhile, we might

6    have to recess early today.  I don't want jurors sitting in

7    the jury box worrying and looking at their watches, worrying

8    about catching trains.  But I thought we'd encountered this

9    before and the 4:45 recess time was appropriate.  We'll

10   check.  But for now, today, I think and I'll say this when

11   the jury is seated, we'll recess at 4:20.  Who is going to

12   bring the jury in?  Good.

13          (Pause.)

14          (Jury enters.)

15          THE DEPUTY CLERK:  All rise.

16          THE COURT:  Good afternoon, everyone, please be

17   seated.

18          Two of you have requested that we recess a little

19   earlier than I ordinarily recess.  We ordinarily recess at

20   4:45.  Two of you have requested an earlier recess, 4:30

21   recess.  We're going to do that today and I have Ms. Hull

22   checking to see if there's a way you can still get home at a

23   reasonable hour and go until 4:45 or so.  I'm anxious to

24   complete the case within the framework that I told you about

25   during the voir dire examination on Monday and Tuesday.  And

1   25 minutes or so doesn't sound like a great deal of time, but

2   when you multiply it times two weeks, it gets close to a day.

3   In any event, for today, 4:20 and we'll see what comes, but

4   we are not going to have you getting home at 9:00 o'clock at

5   night.  That is too late.  You've got to get up early in the

6   morning to get here.  So, we'll work with your schedule.

7           And now, Mr. Hangley, you may continue your direct

8   examination.

9           MR. HANGLEY:  Thank you, your Honor.

10                          DIRECT EXAMINATION

11  BY MR. HANGLEY:

12  Q    Good afternoon, Mr. Finnegan.

13  A    Good afternoon.

14  Q    We talked about your change changed appreciation of the

15  relationship between Sprint and Comcast earlier.  Did you

16  consider Sprint as someone from whom the company might be

17  able to acquire patents?

18  A    Yes, I did, as indicated in that attachment.

19  Q    That we talked about before lunch?

20  A    Yes, before lunch, yes.

21  Q    Now, did you ever approach Sprint about acquiring

22  patents?

23  A    Yes, I did.

24  Q    Would you please tell the jury about that sequence of

25  events?

1    A    Sure, so in the summer of 2008, I reached out to our

2    business executives within Comcast and asked if they thought

3    it was okay if I contacted Sprint about possibly buying

4    patents.  That message was passed over to Sprint's business

5    team and I received back the phone number of a Mr. Harley

6    Ball, who was the head of IP for Sprint, at the time.  And

7    so, in the summer, I made a phone call to him and to the best

8    of my recollection, without going into many details, I simply

9    said Comcast has an issue.  I know we're business partners.

10   Would Sprint be interested in selling patents to Comcast?  To

11   the best of my recollection, it was maybe a week later and he

12   said I'll get back to you.  And it was maybe a week later

13   when he called and just said, I don't think Sprint's

14   interested in selling patents to Comcast.  And that was the

15   sort the conversation.

16   Q    Okay, now, another company, Nokia --

17   A    Yes.

18   Q    Did you reach, well, first of all, did you have any basis

19   for considering Nokia a friendly the way you considered

20   Sprint?

21   A    Yes, I did.

22   Q    Okay, what was that?

23   A    Well, I was under -- I knew that they had been selling

24   patents, that Nokia was actively selling.  So, that was

25   probably the primary reason to think that we could possibly

1   buy some patents from them.

2   Q    And how did you go -- I'm sorry -- did you contact them?

3   A    Well, we did, but it wasn't -- initially, it wasn't me.

4   In the spring of 2008, April -- in April of 2008, I hired

5   Mark Dellinger to come aboard the Comcast team as the head of

6   Patent Acquisition for me.  Mark had had a previous

7   relationship with the Nokia team and I asked him to set up an

8   introductory meeting with the Nokia team.

9   Q    And?

10  A    So, in the -- also in the summer of 2008, Mr. Dellinger

11  and I met with a Mr. Thomas Westerlund from Nokia and I

12  expressed to him -- I wanted to do it so that I could

13  introduce Comcast to him.  I knew Mark and Mr. Dellinger and

14  Mr. Westerlund already had a relationship, so I wanted to

15  take the opportunity, because I had never met Thomas, to

16  introduce myself and speak a little bit about what Comcast's

17  perspective was on the patent market.  So, I told him that

18  Comcast was a willing buyer.  Comcast was interested in

19  buying primarily for defensive reasons.  With that in mind,

20  we were fairly selective and we weren't interested in paying

21  extremely high prices.  And that was the extent of that

22  conversation.

23  Q    Okay and did your group then receive proposed packets of

24  patents?

25  A    Yes, but I sort of got out of the way, at that point.  I

1   had hired Mr. Dellinger to run the acquisition program.  I

2   received some updates.  But as best I can recall, there was a

3   gap between when we started actually receiving patents to

4   look at from Nokia.  What happened was Mr. Westerlund left

5   Nokia and but there was still members of the Nokia team that

6   Mr. Dellinger was familiar with.  And so it seemed that there

7   was probably some internal issues going on at Nokia and so

8   the conversation took a little bit of a pause before, I

9   think, we actively started receiving patents from them.

10  Q    Okay and did your people do both technical and business

11  review with respect to any of those or to at least some of

12  those patents?

13  A    Yes, we did.

14  Q    Now, as you've heard in the opening statements, there was

15  a decision ultimately to pursue one of the patents.  There's

16  a legal requirement that's involved to, is there not?

17  A    Yes, there is.

18  Q    And who is the gentleman who was responsible in that

19  area?

20  A    That was David Marcus.

21  Q    And what was David's title, to the best of your

22  recollection?

23  A    I think it was assistant general counsel.

24  Q    Okay and he has recently been promoted?

25  A    Yes, he has.

1    Q    Now, when did Mr. Marcus, relative to you, join the

2    company?

3    A    I think Mr. Marcus joined just a little bit ahead of me,

4    so that would have been 2006.

5    Q    Did he or his department review patents that the company

6    was considering buying from a legal standpoint?

7    A    Yes, but the process was, we first looked at it from -- I

8    think I spoke about this, yes.

9    Q    Yes and I don't want to ask you any details about that.

10   A    Okay.

11   Q    I just wanted to know the chronological order, they do it

12   after you've done those first steps?

13   A    Yes, they do.

14   Q    Okay.  Now, were you involved in the negotiation of the

15   price terms of the Nokia patent?

16   A    No, I was not.

17   Q    Who did that?

18   A    That was Mr. Dellinger, Mark Dellinger.

19   Q    And what about the language of the contract once there

20   was a handshake?

21   A    That would have been Mr. Marcus.

22   Q    Now, you talked earlier about how you originally had the

23   idea that Sprint was a patent aggressor, I think it's called.

24   And then you changed it and you were then in the friendly

25   pile?

Finnegan - Direct                                          11

1    A    Yes and that led to my phone call to them in the summer

2    of 2008.

3    Q    Okay, did there come a time when your original

4    understanding that they were an aggressor came back into

5    line?

6    A    Yes.

7    Q    When was that?

8    A    That was in January of 2010.

9    Q    And will you tell the jury what happened?

10   A    I was told that, through the Comcast business executive--

11            MR. RIOPELLE:  Objection.

12            THE COURT:  Yes, that's hearsay.

13   BY MR. HANGLEY:

14   Q    Did you ever meet with Sprint before -- withdraw the

15   question.  Today, would you offer patents to Sprint or I'm

16   sorry, ask Sprint if they had patents to sell?

17   A    No, I would not.

18   Q    Thank you.  I have no further questions.

19            THE COURT:  You may cross-examine.

20                     CROSS-EXAMINATION

21   BY MR. RIOPELLE:

22   Q    Good afternoon, Mr. Finnegan, how are you?

23   A    Good, good afternoon.

24   Q    I actually think I only have one question for you.  I

25   listened this morning and for the last ten minutes to all of

                         Finnegan - Cross                    12

1    your testimony.  Did you give any testimony, at all, about

2    the 870 Patent that this jury is here to decide on?

3    A    I'm not sure -- I answer any questions you propose -- I

4    don't know what you mean?

5    Q    In your question, the questions that Mr. Hangley asked

6    you, did you testify, at all, about the 870 Patent that this

7    jury is here to make a decision about?

8    A    I think I spoke to the purchase efforts by Comcast and

9    how we acquired the patent.

10   Q    That's it?  That's all you testified about, right, on the

11   870 Patent?

12   A    I believe so, yes.

13             MR. RIOPELLE:  I have no further questions.

14             THE COURT:  There's no redirect.

15             MR. HANGLEY:  No redirect.

16             THE COURT:  Fine, that concludes your testimony.

17   Thank you very much.

18             THE WITNESS:  Thank you, thank you, your Honor.

19             (Pause.)

20             MS. MELLEY:  Your Honor, Comcast calls Mark

21   Dellinger.

22             THE COURT:  Thank you.  Mr. Dellinger.

23             MARK DELLINGER, Witness, Sworn.

24             THE DEPUTY CLERK:  Please state your full name and

25   spell it for the record.

1           THE WITNESS:  Sure, Mark Dellinger and it's spelled

2     D-E-L-L-I-N-G-E-R.

3           THE COURT:  Good afternoon.

4           MS. MELLEY:  Good afternoon.

5           THE WITNESS:  Hi, good afternoon.

6                      DIRECT EXAMINATION

7     BY MS. MELLEY:

8     Q   Would you introduce yourself to the jury, please?

9     A   Hi, good afternoon, I'm Mark Dellinger.  I'm from Comcast

10    Corporation.

11    Q   Before your testimony begins, you can pour yourself a

12    glass of water, that will be fine, just let us know if you

13    need water.

14    A   Okay, thank you very much.

15    Q   What's your role at Comcast?

16    A   My role at Comcast is I'm Vice President of Strategic

17    Intellectual Property.

18    Q   And how long have you held that job?

19    A   Since April, 2008.

20    Q   And do you live and work for Comcast in Philadelphia?

21    A   Yes, I live in Newtown, Pennsylvania and I work here in

22    Philadelphia at Comcast Headquarters.

23    Q   What were you hired to do at Comcast?

24    A   I was hired by Jim Finnegan, to be part of his new

25    Strategic Intellectual Property team and to help him to

1    develop and innovate a patent acquisition program.

2    Q    Okay, what's your primary role on his team?

3    A    My primary role is to lead the patent acquisition

4    efforts.

5    Q    Has that been your role from the time you were hired in

6    2008 to the present?

7    A    Correct.

8    Q    Prior to joining Comcast, did you do any other work

9    involving patent acquisitions?

10   A    I did.  Six years prior to that, I worked for a company

11   called Fincfire (ph) Services, which was an IP consulting

12   firm.  I was a vice president of IP Strategy.  I worked on

13   licensing matters and I also brokered patents on behalf of

14   our clients.  Meaning,  I actually, I was actively out

15   selling patents on behalf of companies like Hewlett-Packard

16   and other companies like that.

17   Q    And prior to your work at Fincfire, did you do any other

18   work relating to patents?

19   A    Yes. Prior to that, for six years, I worked for AT&T

20   Lucent.  I was a district manager and I worked on patent

21   licensing matters.

22   Q    Turning back to Comcast, can you give the jury just a

23   brief summary of your understanding of Comcast's strategy

24   with respect to patent acquisitions?

25   A    Sure, so our strategy is to be proactive.  It's a

1  defensive strategy where we actively, we go out, we talk to

2  different sellers to see if they're interested in selling

3  patents in technology areas of interest to Comcast.  As part

4  of that process, we have a very rigorous process where we

5  look at it from a -- the patents from a business, a technical

6  and a legal analysis.  And we're very selective in terms of

7  the patents that we purchase.

8  Q   You mentioned in technological areas of interest to

9  Comcast, I think was the phrase you used.  What areas are

10 those?

11 A   There's many different areas in the telecomm space.  One

12 of the areas is wireless.  We also look at other areas in

13 routing and switching.  We also look at areas such as home

14 automation, because Comcast is moving into places like home

15 security.

16 Q   One of the areas you mentioned was wireless.  Can you

17 just give the jury a brief summary of why wireless in

18 connection with the patent acquisition strategy?

19 A   Sure, when I first joined Comcast and one of the first

20 things that we set as part of our strategy was, Comcast as

21 you can imagine, is a video company.  We had a very video

22 centric portfolio.  It wasn't very broad and so, as we were

23 looking at companies who may approach Comcast, an AT&T or a

24 Verizon or someone like that, we decided if we wanted to be

25 in the best defensive position, we wanted to identify patents

1  where the bulk of the revenues may be, so in the event we got

2  into a cross-licensing discussion, we could pull wireless

3  patents out in the event that they approached us, to have a

4  meaningful discussion.

5  Q   And could you just give the jury a little bit of deeper

6  understanding of what you mean by defensive?  You mentioned

7  defensive a couple of times.

8  A   Sure, so Comcast's strategy is defensive.  Our portfolio

9  has been built for defense of -- excuse me -- I apologize.  I

10  apologize, your Honor, I thought I had shut that off.  Sure,

11  so Comcast's portfolio was built for defensive purposes only

12  in the event that we got into a cross-licensing discussion or

13  someone were to initiate a litigation against us.  The whole

14  idea behind the portfolio was to be prepared in the event we

15  sat across from somebody, our portfolio is not for offensive

16  use, that is that we're actively not out trying to extract

17  royalties or knock on other company's doors.  We just want to

18  be prepared in those situations and we're not offensive.

19  That's not who we are and that's not what we do.

20  Q   And I guess, do you have an understanding of when Comcast

21  implemented this strategy?

22  A   Our strategy started shortly after the time, at least, I

23  got there.  I engaged with Jim Finnegan, who had an idea and

24  a vision of what he wanted to do.  Because of my experience

25  at Fincfire and also with Lucent Technology, I overlaid some

1    of my thoughts on top of that and we immediately began to

2    implement our strategy.

3    Q    Would that be the 2008 time period?

4    A    Yes, 2008.

5    Q    And since that time, how many patent acquisitions has

6    Comcast completed pursuant to this strategy?

7    A    We've completed 14 patent acquisitions, which is

8    approximately 200 U.S. patents, but that's a tiny percentage

9    of the tens of thousands of patents that we're looking at

10   every year.  Since I've been at Comcast, we've looked at well

11   over 100,000 U.S. patents and yet, we've only acquired about

12   200.  Again, we're very selective in the portfolios that we

13   purchase.

14   Q    Have any of those acquisitions been from Nokia?

15   A    Yes.

16   Q    Okay, I want to turn to that now.  Did you personally

17   participate in that acquisition from Nokia?

18   A    Yes, I did.

19   Q    All right, just so we know where you're headed, what did

20   Comcast acquire from Nokia?

21   A    In 2010, Nokia -- Comcast acquired from Nokia, three U.S.

22   Patents, including the foreign counterparts and one U.S.

23   application related to messaging.

24   Q    And I guess let's start at the beginning.  How did

25   Comcast come to be engaged with Nokia?

Dellinger - Direct                          18

1   A    So, I actually had a relationship with Nokia from a

2   previous life.  As I worked at Fincfire Services, I knew that

3   they had a very robust portfolio and a telecomm space.  I

4   know they had spent billions of dollars in research and

5   development and had a fairly good feeling that they would

6   patents that may be of interest to Comcast.

7   Q    After you identified Nokia as a potential source of

8   patents for Comcast, what happened?

9   A    I reached out to my contact at Nokia to let them know

10  that Comcast was active buyers, to see if they would be

11  interested.  That began the discussion.  Shortly after that,

12  Nokia began to send different portfolios to Comcast for us to

13  look at and we have then taken those portfolios and sent them

14  on to our engineering team for their review.

15  Q    Let's situate this in time, as best as you can recollect.

16  Do you recall when you had an initial contact with Nokia?

17  A    It was sometime in late-2008 when I first reached out to

18  Nokia.

19  Q    And do you have any recollection of when information

20  about patents that Nokia was offering for sale, began coming

21  into Comcast?

22  A    Portfolios and some of the materials started coming in in

23  the fall of 2009.

24  Q    And do you recall the subject matter of the portfolios

25  that Nokia sent?

1    A    Not all of them, I recall a few.  There was messaging and

2    there was billing, there was routing and switching.

3    Q    And when you say portfolio, I guess you and I have both

4    been using that word.  Would you explain to the jury what you

5    mean by portfolios of patents?

6    A    Sure.  So, a company will gather a portfolio of patents

7    in a specific technology area.  They'll compile those, they

8    may put them in an Excel file, they may put them in a

9    Powerpoint.  These are patents that they have approved for

10   sale.  They will then take those files and then they will

11   provide them over to me.  And then I will then take those

12   files and them provide them to our engineering team for their

13   review.

14   Q    Did Nokia send any other information about its patents,

15   other than these lists and perhaps presentations that you

16   described, at that time.

17   A    No.

18   Q    All right, that time being late 2009 time period?

19   A    Correct.  They sent nothing else.

20   Q    All right.  Are you familiar with a document called an

21   invention disclosure report or document?

22   A    Yes.

23   Q    Okay, can you tell the jury what that is and how you've

24   come to learn about them?

25   A    Sure, in layman's terms, an invention disclosure document

Dellinger - Direct                          20

1   is when an engineer may have an idea they've come up with,

2   they'll fill out a piece of paper with their idea.  That idea

3   then may go to inside to -- at least, in Comcast, to one of

4   our attorneys.  They'll evaluate it and it actually starts

5   the process of what may become a patent application or

6   eventually become an issued patent, but not in all cases.  It

7   is the starting point of something that may happen.

8   Q   Did you see any documents of that type in the materials

9   that Nokia sent?

10  A   No.

11  Q   So, I think you've brought us up to the process of

12  sending the Nokia patent portfolios into the technical

13  review, correct?

14  A   Correct.

15  Q   Okay what were the results of the technical review of the

16  Nokia patent portfolios?

17  A   Sure, so our engineer, Ginny Joe (ph), went through all

18  the different materials and at the end of the all the

19  different portfolios he evaluated, we politely turned down

20  the bulk of the materials and the patents with the exception

21  of three messaging patents.

22  Q   Was that the entirety of the messaging portfolio?

23  A   No, the messaging portfolio was broader, but the three --

24  three of the patents are the ones that doubled up.

25  Q   And then are those patents that Comcast ultimately

Dellinger - Direct                              21

1  acquired?

2  A    Yes.

3  Q    Okay, what was your role once Comcast determined it

4  wanted to purchase those three patents?

5  A    So, once we determined we wanted to acquire those, I

6  began to create what was called a white list.  And what a

7  white list is, is it's a list of unlicensed companies.  That

8  being companies who do not have licenses to practice the

9  invention of those three messaging patents.  I would have

10  provided that list to Nokia.  Nokia would have taken the list

11  and during the course of our discussions, they would have

12  removed some companies.  I would have gone back and added

13  some companies just for completeness and then continued to

14  follow through that process.

15  Q    All right, let's talk about the white list a little bit

16  more right now.  What's the purpose of a white list?  Why do

17  a white list?

18  A    The white list is important because you want to

19  understand which companies are unlicensed.  So, if there's

20  specific companies that you may be concerned about, that may

21  approach you in the future, you want to understand whether

22  they're licensed or they're not licensed to that particular -

23  - those particular sets of patents.  So, the unlicensed --

24  the white list is the unlicensed companies that they provide

25  to you.

1    Q    Why a list of unlicensed companies?

2    A    Okay, unlicensed, because if there's a license between

3    another company, that is, they have the right to practice the

4    invention.  Those license or license agreements are

5    confidential.  They're typically confidential.  So, in our

6    space, the term white list was coined with a seller, we put

7    together lists of unlicensed companies that they feel

8    comfortable representing are unlicensed to that patent.

9    Q    So, to avoid confidentiality concerns?

10   A    Correct.

11   Q    And now, what's your goal in putting together a white

12   list?  What's your goal on behalf of Comcast?

13   A    So, my goal is -- is to look at the market, in this case,

14   within wireless and messaging.  I put together a list of the

15   companies that claim that space.  I also look at the

16   equipment providers.  Thinking to the future, I mail

17   something for other companies that may eventually play in

18   that space, that may not be in the space today.  And I want

19   to make sure that list is as comprehensive as possible,

20   because a company who may be friendly today or a non-IP

21   aggressor, in the future could be aggressor.  So, you want to

22   make sure you have a very complete list.  And eventually,

23   that white list will go into what's known as the patent

24   purchase agreement, which I'm sure we'll talk about later.

25   Q    Right, let's turn not to price negotiations.  Were you

1   involved in price negotiations for these messaging patents?

2   A    Yes.

3   Q    Okay, how did price negotiations begin?

4   A    They began where I took the three U.S. patents I

5   mentioned earlier in the one application.  I went back to

6   Nokia and I asked them for a price for those patents.

7   Q    And what happens next?

8   A    Nokia came back and offered a million and a half dollars

9   as purchase price for the patents.

10  Q    And so, what did you do?

11  A    I countered with approximately $400,000 or $500,000.

12  Q    How did you pick that number?

13  A    I actually just cut it by two-thirds and went back to

14  them and I'm always trying to cut the best possible deal and

15  pay as least as possible.

16  Q    I was going to ask you, do you have a strategy when you

17  go into price negotiations?

18  A    Yes, never pay full price.

19  Q    That's it?

20  A    That's it.

21  Q    What happened after you countered with $400,000 or

22  $500,000?

23  A    As best I can recall, Nokia countered.  I then countered

24  with $600,000 and I held firm.

25  Q    Okay, why did you hold firm at $600,000?

Dellinger - Direct                          24

1    A   I held firm because it was very well known, at that time,

2    that Nokia was not in the best financial health back in 2010.

3    They weren't doing very well and there's theories as to why,

4    but possibly it had something to do with something involving

5    IPhone that had come along several years earlier.  One of the

6    bigger products lines that Nokia had was a cellphone

7    business. And so, Nokia wasn't doing good and I felt that

8    they would -- they might take the $600,000.

9    Q   Okay and what time was it, at this point, when you were

10   negotiating prices?

11   A   April, 2010.

12   Q   Okay and now, you told the jury one reason why you held

13   firm at $600,000, were there any other reasons?

14   A   I held firm at $600,000 and also because Nokia had

15   mentioned to me that maybe this could be the basis of some

16   additional negotiations in the future.  Maybe we could talk

17   about doing some other transactions in the future.

18   Q   And how did that relate to your holding firm at $600,000?

19   A   Well, it made me thing that yes, there's other deals that

20   possibly they could be done and this sort of sets the table

21   for the next negotiations.  If I hold firm at $600,000,

22   that's where we start with our next negotiations.

23   Q   And was there agreement reached on price?

24   A   Yes.

25   Q   At that $600,000?

1   A    Yes.

2   Q    Okay and then what happened after the price that you

3   agreed upon?

4   A    After the price was agreed upon, at that point, the

5   attorneys began to negotiate the written agreement, the

6   patent purchase agreement.  I continued to stay involved with

7   my business contact from Nokia, because we're both motivated

8   to want -- to both want to try and get a deal done and make

9   sure that we're striving toward specific date.  At that time,

10  it was toward the end of June and truth be told, that Finnish

11  like their vacation times and so, at that time of the year,

12  they wanted to make sure that deal was behind them, that they

13  had it in for their quarter.  And they just wanted to be done

14  with it as much as I did.

15  Q    You brought the Fins and their vacation, just in case

16  there is any confusion, you were negotiating with folks in

17  Finland?

18  A    Yes.

19  Q    Is that where Nokia is?

20  A    Yes.

21  Q    Now, you mentioned the patent purchase agreement a couple

22  of times now.  Is that something you've seen before, did you

23  get a copy?

24  A    I did get a copy.

25  Q    Okay and did you have any involvement in negotiating the

1   specific terms of it?

2   A   I did not, other than making sure that the white list,

3   which was part of it, was updated and I added some companies

4   as time was going on during the acquisition.

5   Q   After the patent purchase agreement was negotiated and

6   some of the lawyers had finalized, did you review it?

7   A   No, other than looking at the white list.

8   Q   Do you have a copy of it in your files that you maintain?

9   A   I do maintain a copy of it, yes.

10  Q   Would you recognize it if you saw it?

11  A   Yes.

12          MS. MELLEY:  Your Honor, may I come with this copy?

13          THE COURT:  Yes, you may.

14          MS. MELLEY:  And I'm giving the witness PX-8.  It's

15  objected to and I think it was included in the omnibus

16  motion, so I don't think there's any reason not to let him

17  have a copy while we speak.

18          MR. RIOPELLE:  Can this be shown to the jury, your

19  Honor?

20          THE COURT:  There's no objection.  I didn't hear,

21  did you offer it into evidence?

22          MS. MELLEY:  I offer Exhibit 8 into evidence.

23          MR. RIOPELLE:  No objection.

24          THE COURT:  PX-8 is received in evidence.

25          (Plaintiff's Exhibit 8 received in evidence.)

1   BY MS. MELLEY:

2   Q   Mr. Dellinger, is the patent purchase agreement you

3   recognize from the Nokia transaction we've been discussing?

4   A   Yes.

5   Q   All right, I want to got through a few provisions of it,

6   do this pretty quickly just to orient everybody.  Can you

7   take a look at the agreement -- that's great.  So, we know

8   where we are chronologically, can you point out the date of

9   the agreement?

10   A   Sure, at the very top, June 30, 2010.

11   Q   Okay and there's a background portion of the agreement,

12   do you see that?

13   A   I do.

14   Q   It begins, "seller owns the assigned assets as defined

15   below."

16   A   Yes.

17   Q   Okay, the word seller is there, can you help the jury

18   identify who is referred to as seller?

19   A   Sure, the seller would at the top of the page, second

20   row, it would say Nokia Corporation.

21   Q   Right and the next line in background, "Seller wishes to

22   sell and assign to purchaser, all rights, title and interest

23   in and to such assigned assets."  Do you see that?

24   A   Yes.

25   Q   Okay, purchaser, can you define that for the jury?

Dellinger - Direct                          28

1    A    Sure, about the third line down in the middle, it says

2    Comcast Cable Communications, LLC.

3    Q    And the third line of background, "the purchaser wishes

4    to buy and receive assignment from seller of all rights,

5    title and interest payment to such assigned assets." Do you

6    see that?

7    A    Yes.

8    Q    Okay, does that background fairly characterize what you

9    and I just discussed about the acquisition?

10   A    Yes.

11   Q    Having been lawyered some?

12   A    Yes.

13   Q    All right, in what we've just reviewed, there's a phrase,

14   assigned assets capitalized, do you see that?

15   A    Yes.

16   Q    Do you know why it's capitalized?

17   A    Because it's defined.

18   Q    Okay, so, Mr. Dellinger, let's go to the definition

19   section at the bottom.  You can put away the top.  And Mr.

20   Dellinger, do you see a definition for assigned assets?

21   A    Yes, second from the bottom.  Assigned assets means the

22   assigned patent rights together with any and all causes of

23   action arising thereunder, including without limitation, the

24   right to bring any cause of action in any jurisdiction, in

25   pursuit of any damages or remedy at law or in equity,

1    including pursuit of injunctive relief, royalties, profits

2    due or accrued or other payments for past, present or future

3    infringements or misappropriations or like violations of the

4    assigned patent rights.

5    Q    Okay and I don't want you to read any other full

6    provisions of this agreement, so we can all keep this moving.

7    A    Okay by me.

8    Q    All right, now I see assigned patents, assigned assets

9    refers to assigned patents, right, is that another defined

10   term?

11   A    Yes.

12   Q    All right.  And do you see "Assigned Patent Rights" here

13   in the definition section?

14   A    I do.

15   Q    All right.  Could you just give us an idea of what

16   assigned patent rights refers to?

17   A    Sure.  The assigned patent rights means the assigned

18   patents as part of this agreement.

19   Q    Okay.  And then the contract language continues on?

20   A    Yes, and it continues on, yes.

21   Q    All right.  So assigned patent rights is another

22   capitalized defined term; is that defined in this agreement?

23   A    Yes.

24   Q    All right, let's take a look at that.  And what does

25   assigned patents mean?

Dellinger - Direct                          30

1  A   It means the patent applications and patents listed in

2  Exhibit A.

3  Q   All right.  Let's turn to Exhibit A.

4        MS. MELLEY:  And let's just put both pages up on the

5  screen.

6  BY MS. MELLEY:

7  Q   What do you understand this Exhibit A to encompass?  Take

8  your time to get there, let us know when you're there.

9  A   Thank you, I'm there.

10 Q   Okay.  What do you understand this Exhibit A to include?

11 A   Exhibit A is a list of all the patents that would have

12 been a part of this transaction, including the family

13 members.

14 Q   Okay.  During your testimony you primarily spoke about so

15 many messaging patents; can you identify them for the jury

16 here in this list?

17 A   Sure.  Under the grant number column, the first one is

18 5987323.

19 Q   Okay.  And Mr. Dios (ph) just highlighted that for us.

20 You've got a little screen next to you if you want to double

21 check it.

22 A   Okay, yes, it's there.  Yep.

23 Q   Okay.

24 A   The second one is almost three quarters of the way down,

25 it is 6904026.

Dellinger - Direct                                    31

1    Q   Okay.  And the third?

2    A   And the third patent is on the last page, it is 6885870.

3    Q   In your testimony you also mentioned an open application,

4    is that on this list?

5    A   Yes, it is.  Actually, if you go back to the 026 patent

6    or the one that was three quarters of the way down, the line

7    above it, that's the U.S. application number.

8    Q   Now, there are a lot of other rows on this chart.  What's

9    in those other rows?

10   A   The other rows, this is the family members for all the

11   associated U.S. patents.  This could be patents and also

12   applications.

13   Q   Okay.  Why when you specifically talked about what was

14   acquired, why have you emphasized the three U.S. patents?

15   A   I emphasized the three U.S. patents because that's where

16   the bulk of -- the way I view it, the bulk of where the U.S.

17   telecom revenues are with respect to these patents.  So as I

18   think of the telecom service providers in the country, the

19   vast majority of the revenue is here in the United States of

20   America.

21   Q   I think that does it for Exhibit A.  Let's take a look at

22   one more portion of this agreement, Exhibit C, please.

23           MS. MELLEY:  Let's put up the two pages of that

24   exhibit.

25   BY MS. MELLEY:

Dellinger - Direct                                32

1    Q    What is this Exhibit C?

2    A    As I mentioned earlier, this is what's referred to as the

3    white list.  This is the unlicensed third parties, that is

4    companies who do not have the right to practice these

5    inventions.

6    Q    And again, what sorts of companies did Comcast aim to

7    have included on this list?

8    A    So again, when we were looking at this, we were looking

9    at this from companies who were involved in the wireless

10   space, including global service providers, as well as

11   equipment providers.

12   Q    Taking you back to 2008 when you initiated contact with

13   Nokia, were any of these companies in particular in your mind

14   at that time?

15   A    At that time two jump out at me, one would be AT&T, the

16   other would be Sprint -- I'm sorry, not Sprint, Verizon.

17   Q    Okay.  Just to clarify so there's no confusion, in 2008

18   was Sprint in your mind in terms of reaching out to Nokia?

19   A    No.  And Sprint was actually a friendly company.

20   Q    What do you mean by a friendly company?

21   A    Friendly in the sense that there was a good relationship

22   between the companies.

23   Q    Between -- when you say between --

24   A    Between Comcast and Sprint.

25   Q    Okay.  And what was different about potentially companies

Dellinger - Direct                                33

1   like Verizon that you mentioned?

2   A    At that time AT&T and Verizon were known to aggressive in

3   our space, as well as with other cable television providers,

4   and they actually had licensing programs that were active.  I

5   would know, I was at AT&T at one point when we were out

6   asserting patents, so that shouldn't come as a surprise, and

7   Verizon was actively out speaking to some of the cable

8   companies as well.

9            THE COURT:  Keep your voice up, if you would.

10           MS. MELLEY:  Just a little bit louder or pull the

11  microphone a little bit to you --

12           THE WITNESS:  Sure.  I apologize.

13           MS. MELLEY:  -- everybody will hear you.  Just shout

14  them out when you know them.

15           THE WITNESS:  Sure.

16  BY MS. MELLEY:

17  Q    When you say was active -- I don't remember your exact

18  words, I'm going to try and remind you.

19  A    Uh-huh.

20  Q    You were talking about having active licensing programs

21  or being actively out of the space when you were referring to

22  AT&T and Verizon, what did you mean by that?  Can you just

23  clarify that for the jury?

24  A    Sure.  By that I know that AT&T was actively out talking

25  to other companies in the space with their patent portfolio.

Dellinger - Direct                              34

1    When I mentioned the word offensive, someone is out

2    offensively asserting their patents, AT&T would have been one

3    of those companies, and Verizon as well was actually out

4    actively asserting their patent portfolio as well.

5    Q    Okay.  And you mentioned that in 2008, you caught

6    yourself and you clarified, Sprint was not in your mind as in

7    the same category as AT&T and Verizon at that time, correct?

8    A    No, Sprint was not on my mind.

9    Q    Okay.  Did that change, did there come a time when that

10   changed?

11   A    Yes.

12   Q    Okay.  Can you just give us a brief overview of what

13   happened to make that change?

14   A    Sure, so during the due diligence and the negotiations of

15   trying to acquire these patents, sometime in January of 2010,

16   a Sprint executive reached out to a Comcast executive.

17          MR. RIOPELLE:  Objection, hearsay, I think.

18          THE COURT:  Yes, if you did it, that's one thing.

19   But if you're reporting on what someone else did, that's

20   hearsay and it's objectionable.  So, if you had contact and

21   can answer the question from personal knowledge, you may

22   proceed.

23          THE WITNESS:  I did not have contact with that

24   Comcast executive.

25          THE COURT:  With the Comcast or the Sprint

                        Dellinger - Direct                    35

1    executive?

2              THE WITNESS:  Either.

3              THE COURT:  Fine.

4    BY MS. MELLEY:

5    Q    Did there come a time when in your mind Sprint was in the

6    same category as AT&T and Verizon as you described

7    previously?

8    A    My understanding was, yes, there was a time --

9    Q    Oh --

10   A    Yes.

11   Q    That's fine.  And when was that time?

12   A    It was sometime again in the winter or spring of 2010.

13   Q    Was that prior to the time that the patent purchase

14   agreement was finalized?

15   A    I'm sorry, can you repeat the question?

16   Q    Was the time that Sprint changed from a friendly, as you

17   testified, to more in the category of the AT&T and Verizon in

18   your mind.  Did that happen before the patent purchase

19   agreement was finalized?

20   A    Yes.

21   Q    Okay, did that happen before you agreed to complete this

22   deal with Nokia, you personally, in your negotiations with

23   Nokia?

24   A    We were already in negotiations with Nokia when the

25   situation or when Sprint, in my mind, became aggressive.

1   Q    Okay and even if that had not happened, would you have

2   worked to complete this deal on behalf of Comcast?

3   A    Yes.

4   Q    Why is that?

5   A    We have a very rigorous process in terms of trying to

6   identify these patents and I mentioned earlier, we had to go

7   through a very rigorous business, technical and legal due

8   diligence process.  These types of patents are very, very,

9   very difficult to find.  They're hard and they're hard to do,

10  so regardless of any specific threat, assuming they've made

11  it through our filter, which they did, we would have

12  purchased these assets.

13  Q    Okay.

14          MS. MELLEY:  Nothing further at this time.

15          THE COURT:  Thank you.  You may cross-examine.

16          MR. RIOPELLE:  Thank you, your Honor.

17                      CROSS-EXAMINATION

18  BY MR. RIOPELLE:

19  Q    Good afternoon --

20  A    Good afternoon.

21  Q    -- Mr. Dellinger, how are you?

22  A    Good, how are you?

23  Q    Good.  So, let's go back to the beginning.  I'm correct,

24  aren't I, that Comcast approached Nokia about buying the

25  patents, right?

Dellinger - Cross                                    37

1    A    That's correct.

2    Q    Right, it wasn't Nokia that contacted Comcast, right?

3    A    That's correct.

4    Q    And I'm also correct, aren't I, that Comcast approached

5    Nokia because Comcast understood that Nokia had a very robust

6    patent portfolio, right?

7    A    Yes.

8    Q    And I think you said Comcast contacted Nokia in the

9    summer of 2008?

10   A    It was sometime in 2008.

11   Q    And then eventually bought the patents in June of 2010,

12   right?

13   A    That's correct.

14   Q    So, it took about two years from the time that you

15   contacted Nokia to eventually get the patents purchased,

16   right, about two years?

17   A    Approximately.

18   Q    Now, after and I think you said Nokia identified patents

19   for Comcast so they could look at, right, is that what you

20   said?

21   A    Nokia did provide us some patents for us to look at, yes.

22   Q    And then you said, I think you testified, I just want to

23   make sure you and I are on the same page.  And then you

24   testified that you got those patents and you gave them to the

25   technical people to start doing some research or

1  investigation into them, right?

2  A   Yes, our engineering -- our engineering, our technical

3  review.

4  Q   Right and this is known as due diligence, right?

5  A   Well, yes.

6  Q   Could we call up DX-278?

7        MS. MELLEY:  Not to the jury, right?

8        MR. RIOPELLE:  I'm cross-examination.

9        THE COURT:  Pardon me?  You're objecting?

10       MS. MELLEY:  Yes, we're objecting.

11       THE COURT:  And the ground?  We might have to go to

12  sidebar, I haven't seen that exhibit.

13       MS. MELLEY:  I think we probably should.

14       THE COURT:  Pardon me?

15       MS. MELLEY:  I think we probably should meet at

16  sidebar, your Honor.

17       THE COURT:  Yes, we're not going to discuss exhibits

18  in open court.  We'll go to sidebar.  I should tell the jury,

19  if exhibits are in the boxes that you can see or maybe you

20  can't see, but when you stand up, you can see the boxes.

21  Hopefully, we're not going to go through all of those

22  exhibits.  We'll have the exhibits in those boxes.

23       (Sidebar discussion as follows:)

24       MR. RIOPELLE:  He's testified about the due

25  diligence and this is the due diligence checklist for the

1   purchase of the Nokia patent.

2           MS. MELLEY:  We objected to it on relevance grounds

3   because a lot of it has to do with evaluation issues that

4   we've been careful to not inject into the case, pursuant to

5   your Honor's rulings.  Additionally, it's been fairly heavily

6   redacted and if it comes -- if the jury sees the redactions,

7   we're going to need an instruction on that.

8           THE COURT:  Well, the instruction would be to the

9   extent that it's privileged.

10          MS. MELLEY:  To the extent that they shouldn't give

11  any weight to the fact that it's redacted.

12          THE COURT:  All right, I certainly will do that.

13  Keep in mind, you open a door to value questions and it all

14  comes in.

15          MR. RIOPELLE:  Understood.

16          THE COURT:  In response.  For what purpose are you

17  offering this?

18          MR. RIOPELLE:  I'm going to get a precision focus

19  right on that part.

20          MS. MELLEY:  I'm sorry, which did you say?

21          THE COURT:  It says SMS-MMS.

22          MS. MELLEY:  Thanks.

23          THE COURT:  Service revenues.  It's the last --

24          MR. RIOPELLE:  Estimates, coordinates our potential

25  impact and the service recommendation to go by, that's what

Dellinger - Cross                    40

1   I'm asking.

2             MS. MELLEY:  I'm not sure, but that's not valuation?

3             MR. RIOPELLE:  No, I would actually --

4             MS. MELLEY:  I didn't direct that to you.

5             MR. RIOPELLE:  I would think the evaluation record,

6   for my benefit, would be calculated for potential royalties.

7   I'm not going to ask about that on the next page.  But he's

8   talked about how he's now, that his impression of Sprint has

9   changed.  They went from being a friend not to an aggressor.

10            THE COURT:  Yes.

11            MR. RIOPELLE:  And I'm going to be fine with that

12  and go --

13            THE COURT:  Well, I think that's their surprise.  It

14  came back in some of the earlier arguments on the various

15  motions.  So, I'll overrule the objection.  This is not being

16  offered in evidence.

17            MS. MELLEY:  True.

18            THE COURT:  It's being used in cross-examination,

19  it's inappropriate.

20            MS. MELLEY:  We do -- I'm sorry, I didn't mean to

21  interrupt you.  There is one additional point.  The parties

22  agreed in the final pre-trial order that nothing would be

23  published -- the parties agreed in their pre-trial order that

24  nothing would be published to the jury until it was admitted

25  into evidence.

 1          THE COURT:  Until?

 2          MS. MELLEY:  Admitted into evidence, your Honor.

 3   The pre-trial order limited it.

 4          MR. FINKELSON:  There is also pre-trial language

 5   that doesn't deal with cross-examination and not putting the

 6   documents on the exhibit list of being used solely for cross-

 7   examination.

 8          MR. RIOPELLE:  That's fine, that's fine.

 9          MS. MELLEY:  That's not in there.

10          MR. RIOPELLE:  That's fine, the issue is though it's

11   not to get published to the jury.  We're not -- this is

12   separate, right, this is the issue of whether it can be shown

13   to the jury.

14          THE COURT:  Well, documents used on cross-

15   examination are not generally received in evidence.

16          MS. MELLEY:  Sure.

17          MR. RIOPELLE:  Yes.

18          THE COURT:  What is in evidence is the part of the

19   document that is used in the cross-examination.  So, we'll

20   see how it goes.  But this will not be offered in evidence,

21   but this portion of the document certainly can be covered.

22   And I see no way to redact all the rest of it for the jury.

23   But you can certainly read it.

24          MR. RIOPELLE:  Well, what I can do, I mean, I can

25   instruct Mr. Barry, because it's the front page until he

Dellinger - Cross                         42

1   authenticates this -- and now we just have Mr. Baird, on the

2   next page, just call that part out, the part there, so he

3   doesn't have to look -- they don't have to see anything of

4   that.  No, I won't say it.  Can I ask him questions?

5              THE COURT:  Yes.

6              MR. RIOPELLE:  Okay, well, those are his initials

7   and if he can authenticate this document.

8              THE COURT:  Yes, absolutely.

9              MR. RIOPELLE:  Why can't I submit this into evidence

10  if he authenticates it, because I don't have a witness who

11  can do it.  It's not my document.

12             THE COURT:  This doesn't come into evidence.

13             MR. RIOPELLE:  Why not, that's what I'm trying to

14  get at.

15             THE COURT:  Because it's used on cross-examination.

16             MR. RIOPELLE:  I don't --

17             THE COURT:  The entire document doesn't come into

18  evidence if you use one part of it on cross-examination.  The

19  part of the document in evidence is what you obtain from the

20  witness on cross-examination.

21             MS. MELLEY:  It's effective in the transcript.

22             MR. RIOPELLE:  That's not my understanding.  I mean,

23  I will say in the 28 years that I've been doing it, I've

24  never -- I've always been allowed to put in documents on

25  cross-examination, if the witness can authenticate it.  I

Dellinger - Cross                        43

1    don't get to put a document if he doesn't know about it.

2              THE COURT:  If you're going to cover everything in

3    the document.

4              MR. RIOPELLE:  I see, okay.  So, you're just saying

5    that this -- that's fine with me right now.

6              THE COURT:  And let just think -- yes, a different

7    rule would obtain if you're going to use an entire document

8    of it all.  But much of this has been excluded and what is, I

9    don't know what else is relevant.  But this last line is

10   relevant.  Everything you need to cover with the witness --

11             MR. RIOPELLE:  Unless I --

12             THE COURT:  -- can identify that it's the only

13   document.  You've identified the document and you can

14   certainly show the cover page.

15             MS. MELLEY:  Is the purpose for impeachment?  I

16   don't understand, because it sounds like he's seeking to

17   elicit testimony totally consistent with what he's already

18   testified to.

19             MR. RIOPELLE:  I want further explanation --

20             THE COURT:  He's trying to address your issue with

21   we just were very defensive about it, our use of that.  That

22   doesn't -- he's arguing that that's not the --

23             MS. MELLEY:  Sure, the witness has testified that --

24             THE COURT:  No.

25             MS. MELLEY:  Understood.

1          MR. GOETTLE:  Your Honor, I'm sorry, a point of

2    clarification, just so I know how we're going to proceed.

3    This paragraph says unless a document is received into

4    evidence, it's not to be published to the jury.  To me, I

5    would think that would mean putting it up on the screen for

6    the jury.  And I just want to know as we go forward what --

7          MR. FINKELSON:  That certainly wasn't the -- that

8    certainly was no intent that you couldn't use a document on

9    cross-examination.

10         MR. GOETTLE:  Okay, I'm not saying to use a document

11   on cross-examination.

12         MR. FINKELSON:  And publish it to the jury.

13         MR. GOETTLE:  Okay, this says the exact opposite,

14   that's why I'm asking for a clarification.

15         THE COURT:  Well, I must tell you, that inch and

16   half thing -- final pre-trial order.

17         MR. GOETTLE:  Okay, I didn't measure it.

18         THE COURT:  Was received and it was prepared in

19   accordance with my instructions -- my order, scheduling

20   order.  I haven't read each and every word.

21         MR. GOETTLE:  Okay, this is how we'll proceed, your

22   Honor, with that --

23         THE COURT:  No and let's decide what's appropriate,

24   because what's appropriate for Sprint on cross, will also be

25   appropriate for Comcast on cross.

Dellinger - Cross                      45

1          MR. FINKELSON:  We certainly understand that and our

2    understanding was there was a separation agreement between

3    documents that you were getting into evidence and cross-

4    examination.  And that's how we interpret it and we're happy

5    to have that be the rule for both sides.

6          THE COURT:  Well, technically, documents used

7    solely, solely on cross-examination don't even have to be

8    identified.

9          MR. FINKELSON:  Exactly and that's why would we have

10   read that provision the way we did, because they don't need

11   to be identified at all.

12         MR. GOETTLE:  The issue -- the question that I'm

13   raising --

14         THE COURT:  Yes, but not withstanding that very

15   interesting explanation, it conflicts with what it sets forth

16   in the order.  What do you think is appropriate, considering

17   it will be used by both sides.  Whatever you decide --

18         MR. GOETTLE:  That's why I'm asking, your Honor.

19   So, if your Honor's preference is that documents that are not

20   admitted, but used on cross, can be published on the screen.

21         THE COURT:  Not published to the jury.  No,

22   documents that are used, then the whole document goes in.

23   No, they can't be published in that way.  The purpose of --

24         MR. GOETTLE:  But they can be -- maybe I don't

25   understand what the word published means.

1          THE COURT:  Published means showing to the jury.

2          MR. GOETTLE:  Okay.

3          THE COURT:  And the document can't be shown to the

4     jury.

5          MR. GOETTLE:  Okay.

6          THE COURT:  In it's entirety, but I see nothing

7     wrong with identifying the document as it being a checklist,

8     with the corporation patent acquisition and then talking --

9     questioning the witness about some of the things that appear

10    on the document.

11         MR. RIOPELLE:  Thank you.

12         THE COURT:  And what is in evidence are the

13    questions and the answers, not the document.

14         MS. MELLEY:  So, the document would be shown to the

15    witness.

16         MR. RIOPELLE:  Can I show this page and that one

17    block to the jury so they can follow the document.

18         MR. GOETTLE:  Even though it's not admitted into

19    evidence.

20         MR. RIOPELLE:  I think for purposes -- he's going to

21    testify about it or not.  And I think I suppose all I'm

22    trying to do here is get the jury to understand that both

23    sides, not just Sprint --

24         THE COURT:  Well, what -- again, we're adopting a

25    rule that will be applicable to Comcast on cross-examination.

Dellinger - Cross                                47

1   And the entire document is not going to be received in

2   evidence.  And my rule has always been that evidence on

3   cross-examination, that which you elicit for the jury, is the

4   evidence.  And documents don't go in, exhibits don't come in

5   until your case in chief.  Now, if you want to abide by that

6   rule, that means that if he can identify the document and can

7   testify to it and then the portion of the document received

8   in evidence could come in during Sprint's case in chief.  Is

9   that what --

10          MR. GOETTLE:  No, my question is a little bit

11   different, your Honor.  My question he is -- I understand

12   that he can cross-examine the witness with this document, but

13   what they want to do is publish it to the jury even though

14   it's not admitted or even just publish the portion they're

15   cross-examining on to the jury and I just wanted to have

16   clarification that we can publish to the jury part of an

17   exhibit that's not admitted in evidence.

18          MR. FINKELSON:  For cross-examination purposes only.

19          MR. GOETTLE:  For cross-examination.

20          THE COURT:  Do you agree to that?  Is that something

21   that Comcast wants?

22          MR. GOETTLE:  We can do it either way, I just wanted

23   it to be abundantly clear.

24          THE COURT:  Well, it works with some documents.

25   With depositions for example, the deposition doesn't come

1    into evidence if you're cross-examining.  It's based on the

2    deposition.  You can read the parts of the deposition that

3    are relevant.  But I see nothing wrong with identifying the

4    document in this way, showing the cover sheet and directing

5    the witness' attention to the one line that you're going to

6    cover on cross-examination.

7                MR. RIOPELLE:  Okay, fair enough.

8                THE COURT:  And that would be ruling that applies to

9    both sides.

10                MR. RIOPELLE:  I'll instruct my graphics person to

11   flag the --

12                THE COURT:  Fine.

13                MR. RIOPELLE:  This will only show the one part on

14   the second page.

15                MS. MELLEY:  Okay, that's the redaction.

16                MR. RIOPELLE:  Thank you, your Honor.

17                THE COURT:  And if there's a need to explain what

18   you addressed, I will explain it.

19                MS. MELLEY:  All right.

20                (End of sidebar discussion.)

21                THE COURT:  Counsel shall proceed as directed at

22   sidebar.

23                MR. RIOPELLE:  Thank you, your Honor.

24   BY MR. RIOPELLE:

25   Q   Can we call it the front page of what has been previously

1   marked DX-278.  And, Mr. Dellinger, I have a paper copy of

2   this, if you would prefer to look at it in paper, also, so

3   you can see the whole thing.  Would you prefer that?

4   A   Sure, that would be helpful to me, thank you.

5           MR. RIOPELLE:  May I approach the witness?

6           THE COURT:  Yes.

7           THE WITNESS:  Thank you.

8           THE COURT:  Is this listed in -- I'm looking at the

9   numbers.  My numbers go from 263 to 325.  This is a Sprint

10  exhibit?

11          MR. RIOPELLE:  This is a defendant's Sprint exhibit,

12  yes.  DX-278.

13          THE COURT:  Oh, and Sprint has requested permission

14  to submit its exhibit list just before it offers exhibits.

15  If you're going to use Sprint exhibits, I want a Sprint

16  exhibit list as soon as you can get it to me.

17          MR. RIOPELLE:  And I think we tried to, yes, we'll

18  take care of that.

19          THE COURT:  Keeping in mind that exhibits used

20  solely on cross-examination don't have to be included in the

21  exchange of exhibits before trial.

22          MR. RIOPELLE:  Correct.

23          THE COURT:  But again, solely for use in cross-

24  examination.  Okay.

25          MR. RIOPELLE:  Thank you, your Honor.

1            THE COURT:  DX-278.

2            MR. RIOPELLE:  Okay.

3            THE COURT:  Do you have a paper copy, Mr. Dellinger,

4    a paper copy in front of you?

5            THE WITNESS:  I do.  Thanks, your Honor.

6            THE COURT:  Good.

7    BY MR. RIOPELLE:

8    Q    All right.  So before we had our little confab over

9    there, I had asked you about the due diligence, do you recall

10   that?

11   A    Yes.

12   Q    And then so I was showing you 278, which is labeled "Due

13   diligence checklist, Nokia Corporation patent acquisition."

14   Is this the due diligence checklist that Comcast used for

15   when they were going through the process of looking at and

16   then purchasing the patents from Nokia?

17   A    Yes.

18   Q    And then if you could turn -- and we're only going to

19   show part of it on the screen, but if you could turn to the

20   second page of the exhibit to the very bottom.  It should be

21   on the very bottom entry on the second page of your paper

22   exhibit right there?

23   A    I'm just looking up here on your screen, I apologize.

24   Q    No, if that helps you get there, that's fine.

25   A    Okay, yes.

1    Q    And you see it says, "Estimate, Sprint, Nextel, potential

2    impacted, SMS/MMS service revenues, and develop model."  Do

3    you see that?

4    A    Yes.

5    Q    And that's your name next to it, correct?

6    A    That's my name.

7    Q    And those are your initials and I assume you put that

8    check in there?

9    A    Yes.

10   Q    Okay.  And is it safe to assume that you since you

11   checked it, that you did do an estimate and a model of

12   Sprint's SMS/MMS service revenues?

13   A    I would have put together, as best I can recall, some

14   model relative to Sprint.

15   Q    So you can put that aside, you can put that document

16   aside if you don't want to look at it anymore.

17            So after you started the due diligence, then you

18   started to negotiate with Nokia, correct?

19            (Pause.)

20   Q    I'm not trying to trick you, Mr. Dellinger.

21   A    No, I'm just trying to remember what came before or

22   after, to be honest with you.

23   Q    Let me rephrase the question, because I think I was

24   confusing the way I asked it.  After Comcast decided which

25   patents it was interested in, you then started negotiating

1  with Nokia over the price, correct?

2  A   Correct.

3  Q   And do you recall who you were negotiating with at Nokia?

4  A   I was negotiating with a Carolina; I don't remember her

5  last name, but Carolina.

6  Q   And Carolina was a business person at Nokia, correct?

7  A   Yes.

8  Q   And then weren't you also negotiating -- and I may

9  completely botch this name -- it's spelled J-u-k-k-a, is it

10 Jukka or Jukka?

11 A   Jukka.

12 Q   And you were negotiating with a gentleman, right, named

13 Jukka?

14 A   Well, I was speaking with Carolina, Jukka was Carolina's

15 boss.  I was dealing directly with Carolina.

16 Q   But towards the end of the negotiations didn't you also

17 speak with Jukka?

18 A   I may have -- at -- it's hard to say.  At the end there

19 would have been discussion possibly between the two of them,

20 but it was primarily with Carolina.

21 Q   But Jukka, you understood Jukka to be the head of IP

22 Portfolio Management and Licensing at Nokia, correct?

23 A   Correct.

24 Q   And that means, just so everybody understands, that means

25 he was in charge of managing Nokia's patent portfolio for

1   licensing; is that correct?

2   A    Correct.

3   Q    So after Comcast made the selection of the patents, I

4   think you said that Nokia offered the first price?

5   A    I went back to Nokia and I asked them for a price for the

6   patents.

7   Q    And so Nokia's price, Nokia's -- what they thought the

8   highest amount they could get, they asked you for, was $1.5

9   million, right?

10  A    I have no idea how they put together their evaluation;

11  they came back with a million and a half dollars.

12  Q    And then as you said, you eventually agreed to $600,000,

13  right?

14  A    At the end the agreed-upon price was -- for the purchase

15  price was $600,000.

16          MR. RIOPELLE:  Okay, if we could put up PX-8?

17  BY MR. RIOPELLE:

18  Q    And if you recall, this is the patent purchase agreement

19  you were talking about with Comcast counsel earlier?

20  A    Yes.

21  Q    And, you know, I also have -- actually, I think I have

22  copies of the DX versions.  Do you have a paper copy?  Would

23  you prefer a paper copy?

24  A    I have a paper copy --

25  Q    Good.

Dellinger - Cross                                        54

1   A   -- right in front of me.  Thank you.

2   Q   All right.  And so one of the things that Comcast counsel

3   was going over with you were some of the definitions in the

4   patent purchase agreement, right?

5   A   Correct.

6   Q   And definitions, they matter in a contract, don't they?

7   A   Well, I'm not a lawyer, but I would say they matter.

8   Q   And also when you were negotiating with Nokia, Nokia told

9   you, didn't it, that Nokia had never asserted any of the

10  patents, including the 870 Patent, they had never asserted

11  this patent against anybody, right?

12          THE COURT:  Before you answer --

13          MR. RIOPELLE:  Oh, I'm sorry.

14          MS. MELLEY:  Hearsay, your Honor.

15          THE COURT:  I'm sorry, you were on your feet?

16  Hearsay.

17          MS. MELLEY:  Yes, your Honor.

18          THE COURT:  I think the answer is yes.  If there's

19  an exception, I'm not aware of it.  If you want to share it

20  with me --

21          MR. RIOPELLE:  I can do it a different way.

22          THE COURT:  Fine, thank you.  Objection sustained.

23  And that's an example again of something that was said

24  outside of the courtroom and it's hearsay, that is not

25  admissible unless that person is brought to the courtroom to

1    testify, generally speaking, although there are all those

2    exceptions that I told you about.

3            You may proceed, Mr. Riopelle.

4            MR. RIOPELLE:  Thank you, your Honor.

5    BY MR. RIOPELLE:

6    Q   May I direct your attention to paragraph 6.2.1 of the

7    agreement?

8            THE COURT:  And we're talking about PX-8?

9            MR. RIOPELLE:  That's correct.

10   BY MR. RIOPELLE:

11   Q   And do you see that section 6.2.1 says, "Neither seller

12   nor its affiliates have brought any suit, action or other

13   legal proceeding for infringement of or for breach of any

14   license or other agreement involving the assigned patent

15   rights against any third party"?  Do you see that?

16   A   Yes.

17   Q   And you understand that seller here means Nokia?

18   A   Yes.

19   Q   And the assigned patent rights means the patents that

20   Nokia was selling to Comcast?

21   A   That's my understanding.

22   Q   And that includes the 870 Patent that brings you and me

23   here today?

24   A   Yes, we're here for the 870 Patent.

25   Q   Right.  And so this says that Nokia had never asserted

1    the 870 Patent against anybody, isn't that correct?

2    A    In reading this, again not being a lawyer, but that seems

3    to be my understanding.

4    Q    And if we could turn to Exhibit A?  And I think -- and if

5    you want to -- I'll wait until you get there.

6              THE COURT:  You're talking about Exhibit A to

7    this --

8              MR. RIOPELLE:  To PX-8.

9              THE COURT:  PX-8, the exhibit we're talking about?

10             MR. RIOPELLE:  Yes.

11             THE COURT:  All right.

12             MR. RIOPELLE:  Just so the record is clear, your

13   Honor, it's Exhibit A to the patent purchase agreement.

14   BY MR. RIOPELLE:

15   Q    Mr. Dellinger, are you there?

16   A    I'm looking at Exhibit A right now.

17   Q    Okay.

18   A    Thank you.

19   Q    And this is the list of patents and patent applications

20   that Nokia sold to Comcast, right?

21   A    Correct.

22   Q    And if you count it up, that's 36 patents and patent

23   applications, right?

24   A    I'll take your word for it.

25   Q    Okay.  And so Comcast paid $600,000 for those 36 patents

1   and patent applications?

2   A   That was the purchase price.

3   Q   Yes, correct.  Now, some of those are -- I think you had

4   said earlier some of those are foreign patents, right?

5   A   Correct.

6   Q   But the foreign patents are worth something, aren't they?

7   A   The way I look at patents when I'm purchasing them, I

8   look at them from the U.S. perspective.  I look at them,

9   especially if I'm looking in the telecom service provider

10  space where Comcast participates, as well as many of the

11  other companies, I focus on the U.S.

12  Q   Right.  But you understand, right, that if Comcast owns

13  for example a European patent, Comcast could go to Europe and

14  assert that patent, correct?

15  A   They could.

16  Q   And that would actually in this sense, in this -- with

17  this patent, that would make a lot of sense since the 870 is

18  a European -- was originally a European patent based on a

19  European system, it would make sense they might want to

20  assert it in Europe; isn't that correct?

21  A   I understand what you're asking, but I'm also saying to

22  you that when I view this and I viewed this transaction, I

23  was looking at telecom service providers in the United States

24  of America and that's where I was putting when I looked at

25  this the cost of the $600,000.  Me personally, that's how I

Dellinger - Cross                                    58

1    looked at this.

2    Q    Okay.  All right.  Now, you also said, I think, that you

3    thought Nokia was willing to sell this for $600,000 because

4    you didn't think Nokia was doing that well in 2010; did I say

5    that right?

6    A    Financially, they were not doing very well.

7    Q    But you're aware, right, that in 2010 Nokia was still the

8    number-one provider of handsets in the entire world, right?

9    A    They may have been, but I also know that Nokia was

10   beginning to slip as iPhones were beginning to become more

11   online.  I understood that Nokia was not doing very well.

12   Q    You're aware, aren't you, that in 2010 Nokia had profits

13   of $2.5 billion?

14           MS. MELLEY:  Objection, your Honor, hearsay.

15           MR. RIOPELLE:  It's not hearsay.  I'm asking if he's

16   aware if in 2010 Nokia had profits of $2.5 billion?

17           THE COURT:  He's asking a question, that's not

18   evidence, it's the question and the answer.  Now, if the

19   witness knows, he can state the answer.

20   BY MR. RIOPELLE:

21   Q    Do you want me to ask again?  Sure.

22   A    Yeah.

23   Q    You're aware, aren't you, that in 2010 Nokia had profits

24   of $2.5 billion?

25   A    I was not aware that they had -- taking your word for it

Dellinger - Cross                          59

1    they had profits of $2.5 billion, but I was aware that the

2    company as a whole their revenues were beginning to slip and

3    I understood that the company was beginning to lay off

4    employees, and I also understood that the morale was not very

5    good inside Nokia at that time.

6    Q    But $600,000, which is what they charged you for these

7    patents, isn't very much compared to $2.5 billion, is it?

8    A    What I can say to you is --

9    Q    No, I just -- I'm just asking you the question, $600,000

10   isn't very much compared to $2.5 billion?

11           THE COURT:  Well, there's no evidence of the $2.5

12   billion.  That's an example, ladies and gentlemen, where you

13   have to take the question and the answer together; the

14   question is not evidence.  The question was, do you know that

15   in 2010 Nokia had income of whatever that figure was, and the

16   witness says, no, I don't know that.  So that's not in

17   evidence and that question is objectionable, even though

18   Comcast didn't object.

19           MR. RIOPELLE:  Is it an objection, is there an

20   objection?

21           THE COURT:  It's -- yes, I'm --

22           MR. RIOPELLE:  You're objecting?

23           THE COURT:  The question you've asked --

24           MR. RIOPELLE:  Okay.

25           THE COURT:  -- yes, I'm interposing an objection.

Dellinger - Redirect                               60

1   The -- well, I'm not interposing it, I'm telling you --

2              (Laughter.)

3              MS. MELLEY:  I can interpose the objection, your

4   Honor.

5              THE COURT:  Yes, you're a little late.  But I'm

6   telling you, you treated the $2.5 billion figure as though it

7   was in evidence.  Your question was and would you agree that

8   $2.5 billion is a lot more than $600,000, that's an

9   objectionable question.

10             MR. RIOPELLE:  Okay.  Then I have no further

11  questions, your Honor.

12                      REDIRECT EXAMINATION

13  BY MS. MELLEY:

14  Q   Mr. Dellinger, in connection with this patent acquisition

15  and perhaps others at Comcast, why focus on

16  telecommunications in the United States?

17  A   I focused on telecommunications in the United States, and

18  again going back to what I described earlier, as we had a

19  proactive approach for Comcast, which at the time had a very

20  video-centric portfolio.  And with a very centric video

21  portfolio, our objective was to build across many different

22  technologies, areas we may be moving into, areas where other

23  companies, I mentioned AT&T and Verizon, may come to approach

24  us.  So in those situations and because those revenues are in

25  the U.S. for Verizon and AT&T, if I was approached in a

Dellinger - Redirect                    61

1    cross-licensing discussion it made sense for myself and for

2    Jim Finegan as we looked at other areas, if someone came to

3    see us I would like to have the strongest set of patents I

4    could that would impact the vast majority of their revenues,

5    which were in wireless.  And again, this was in the U.S.

6            So you want to have a position when you're sitting

7    across the table from somebody in a cross-licensing

8    discussion and they come in and they say, I have all this

9    impact against you in your video business, I may have a lot

10   of video patents, but someone like Fios may only have a

11   billion dollars' worth of revenue.  But if I worked hard and

12   I did my work right and I've acquired wireless patents, I

13   then can turn around to someone like a Verizon and say, well,

14   let's make things equal because now I impact $40 billion's

15   worth, hypothetically, of your business with my wireless pt.

16           So you're trying to level the playing field and

17   typically this happens in the U.S., we're a U.S. company, and

18   that's why I focused there.

19   Q   Mr. Dellinger, at this time taking you back to the 2008

20   to 2010 time period, what did you understand the size, if you

21   have understanding, of the U.S. wireless markets to be?

22   A   The U.S. at that time, billions of dollars, billions.

23   Q   And now turning to Nokia, what made you think that Nokia

24   was not doing so well financially in the 2010 time period?

25   A   I knew that because I saw that.  The company itself --

Dellinger - Redirect                                    62

1          MR. RIOPELLE:  Objection.  I would think this would

2     be based on hearsay, unless he knows it personally from

3     working at Nokia.

4          THE COURT:  Well, you can't testify on what you've

5     been told by others --

6          THE WITNESS:  What I have been told by --

7          THE COURT:  -- but you can testify -- you can answer

8     the question based on your personal knowledge.

9          THE WITNESS:  My personal knowledge was having

10    looked -- because they're a publicly traded company, I was

11    able to look at their annual reports, I was able to see how

12    the company was doing.  There were articles that were out

13    there by members of Nokia that were actually speaking on how

14    bad the company was and how bad things were going.  And if

15    I'm allowed to speak and I can be stopped, one of my contacts

16    who was at --

17         THE COURT:  I don't think we're going there.

18         THE WITNESS:  Okay.

19         (Laughter.)

20         THE WITNESS:  Okay, I just figured I'd try.

21    BY MS. MELLEY:

22    Q    That's fine.  Turning back to Nokia though, do you have

23    knowledge of whether Nokia sells anything other than

24    handsets?

25    A    They do sell other forms of telecommunications equipment.

Dellinger - Redirect                     63

1   Q   Was that true in the 2008 to 2010 time period?

2   A   Yes.

3   Q   And do you know whether at any time Nokia has been a

4   vendor to Sprint?  A vendor, sold things to Sprint?

5   A   I have no idea.

6           MS. MELLEY:  Nothing further.

7           THE COURT:  There's no further examination, is

8   there?

9           MR. RIOPELLE:  I don't believe I get recross.

10          THE COURT:  Oh, you can, if there's a need to, at

11  least in this court.

12          MR. RIOPELLE:  Oh.  I wasn't prepared for that.

13          (Laughter.)

14          THE COURT:  Can you handle it?

15          MR. HANGLEY:  You don't have to do it.

16          MR. RIOPELLE:  I don't have to?  Okay, I won't do it

17  then.

18          THE COURT:  Good, good.  And I'm sure you're unhappy

19  to hear that your testimony is concluded, Mr. Dellinger.

20          THE WITNESS:  Thank you, your Honor.

21          THE COURT:  Thank you very much.

22          THE WITNESS:  It's a pleasure, thank you.

23          THE COURT:  I think we'll take a short recess.  It's

24  quarter after 3:00, we'll be in recess for ten minutes.

25          (Jury out at 3:13 o'clock p.m.)

64

```
1              THE COURT:  Be seated for just a minute.  First of
2     all, we do allow recross and I thought there was a potential
3     for recross -- oh, Mr. Dellinger, you may step down -- when
4     the witness was talking about the basis for his comments
5     about Nokia.  If they were based on reports, an argument
6     could be made that if they were offered, the evidence could
7     be received even though it was hearsay to show his state of
8     mind, but I didn't think it was that significant, obviously
9     you didn't either.  That's why I asked the question.  But if
10    a need arises in the future for recross, applicable to both
11    sides, just ask --
12              MR. RIOPELLE:  Thank you, your Honor.
13              THE COURT:  -- and -- but you handled it very well,
14    Mr. Riopelle.  I'll remember that as a lesson in no recross.
15              (Laughter.)
16              THE COURT:  On that note, we're in recess for ten
17    minutes.
18              (Court in recess; 3:15 to 3:35 o'clock p.m.)
19              THE COURT:  You may proceed.
20              MR. HANGLEY:  We call David Marcus.
21              THE DEPUTY CLERK:  Please raise your right hand.
22              DAVID MARCUS, Plaintiffs' Witness, Sworn.
23              THE DEPUTY CLERK:  Please be seated.  Please state
24    your full name for the record.
25              THE WITNESS:  David Lee Marcus.
```

1          THE COURT:  Good afternoon.

2                          DIRECT EXAMINATION

3    BY MR. HANGLEY:

4    Q    Mr. Marcus, congratulations on your promotion.  What is

5    your current promoted title?

6    A    My current title is Senior Vice President, Deputy General

7    Counsel and Chief Litigation Counsel for Comcast Cable.

8    Q    And what was your title prior to January 1st?

9    A    It was Senior Vice President, Deputy General Counsel and

10   Chief Patent Counsel.

11   Q    You work for Comcast in Philadelphia?

12   A    I do, yes.

13   Q    And where were you born, sir?

14   A    I was born in Allentown, Pennsylvania, just about an hour

15   north of here.

16   Q    And were you raised in the Allentown area?

17   A    My whole family was in the Allentown-Bethlehem-Easton

18   area, but I was actually raised in the suburbs of Pittsburgh.

19   Q    Suburbs, was that Beaver?

20   A    Beaver, Pennsylvania, yes.

21   Q    And what college did you attend?

22   A    I attended Moravian College in Bethlehem, Pennsylvania,

23   where I got a Bachelors in Science in mathematics and a minor

24   in physics.

25   Q    Now, after -- by the way, let me jump ahead and ask which

1   law school you attended.

2   A    I attended Temple School of Law here in Philadelphia.

3   Q    Now, what did you do between college and law school?

4   A    So between college and law school, I was accepted into

5   the U.S. Navy's Nuclear Power Program.  So when I first

6   graduated, about a day after I graduated from college, I

7   reported to Officer Candidates School in Newport, Rhode

8   Island for basic training.  And after I was commissioned as

9   an Officer, I went through the Naval Nuclear Power Program.

10  It's about a year and a half of schools, it's the equivalent

11  of a Masters degree in nuclear engineering.

12          Then I went to submarine school in Groton,

13  Connecticut, where I learned everything else about submarines

14  and, you know, weapons systems and communications and that

15  kind of stuff.  And then I was assigned to the U.S.S. Helena,

16  it's SSN-725, it was a Los Angeles-class (indiscernible) in

17  Pearl Harbor, Hawaii.

18  Q    And how long did you serve on the -- you named the ship

19  and I lost it already --

20          THE COURT:  U.S.S. Helena.

21          (Laughter.)

22  BY MR. HANGLEY:

23  Q    -- U.S.S. Helena?

24  A    It was just shy of four years.  During -- so I did

25  Western Pacific deployments, including one to the Middle East

1  during the first Gulf War.  So --

2  Q   And then you came back and did you go directly to law

3  school after that?

4  A   I took -- because of the timing of me getting out of the

5  Navy, I took a temporary job for about ten months and then

6  started law school full-time.

7  Q   Smart move.  Now, sir, when did -- where did you work

8  after law school?

9  A   So after law school I joined a law firm here in -- well,

10  at least the Pittsburgh officer of a very large law firm by

11  the name of Reed Smith, I was there for a little while.  I

12  had a brief stint at Motorola and then I joined a law firm by

13  the name of Woodcock Washburn, which was a large intellectual

14  property boutique firm here in Philadelphia.

15  Q   And you rose to partnership in that firm?

16  A   I did, yes.

17  Q   And then what happened?

18  A   And so after I was a partner for a year or two, I got the

19  itch to do something a little different and I decided to go

20  in-house, and that's when I joined Comcast in April of --

21  April 7th, 2007.

22  Q   Now, Woodcock was and its successor Baker Hostetler is

23  primarily or largely an intellectual property firm --

24  A   Yes, that --

25  Q   -- Woodcock certainly was?

1    A    Yes, that's correct.  When I was there I focused

2    principally on patent matters, primarily patent litigation.

3    Q    And was that the area in which you joined Comcast?

4    A    So when I was initially hired at Comcast, it was about

5    six months before Jim Finegan joined and my job was to handle

6    patent litigation, patent licensing and sort of related

7    matters.

8    Q    Were he and you hired sort of as part of the same

9    maturation of Comcast?

10   A    Yes, that's my understanding.  Yes.

11   Q    Now, going through to today, do you continue to work with

12   Mr. Finegan on patent acquisitions?

13   A    I do, yes.

14   Q    How would you define your respective roles?

15   A    So I guess what I'll say is prior to January 1st, because

16   I'm in kind of a different role now, but prior to January

17   1st, you know, Mr. Finegan has his group, which is a business

18   group, and they're devoted to looking at intellectual

19   property assets, patent assets from a business standpoint.

20   They set their strategy and in various different things, and

21   in relation to acquisitions in particular they have sort of a

22   whole process that they do that is entirely business or sort

23   of engineering related.  And then at a certain point, if

24   they're interested in a patent portfolio, they will -- and

25   they've done their various things that they do, they will

Marcus - Direct                                      69

1   bring it then to the legal department to conduct legal due

2   diligence on the portfolio or patent, you know, it could be

3   many, it could be a few.  And at a certain point if it passes

4   through that process, then you would move into a transaction,

5   and myself or somebody on my team would usually lead the

6   contract negotiation.

7   Q   The papering of the transaction once you know the price?

8   A   Yes.

9   Q   Are you aware that Comcast purchased patents from Nokia

10  in June of 2010?

11  A   Yes.  I was involved in that process.

12  Q   Now, you were not involved in setting the price?

13  A   I was not involved in setting the price.

14  Q   Were you involved in doing the legal due diligence after

15  the price had been set?

16  A   Yes.  There was one person on my team by the name of Pete

17  Viceman (ph) who was involved in it at the beginning and then

18  both he and I worked on it as it progressed.

19  Q   Okay.  And also involved in drafting a formal agreement?

20  A   Yes.  I was the principal person that was drafting and

21  negotiating the agreement with the Nokia side, and we also

22  had an outside counsel that was assisting with that.  So --

23  Q   Okay.

24          MR. HANGLEY:  Can we put PX-8 up, please?  This has

25  already been shown, it's the agreement with Nokia.

1          THE WITNESS:  So my screen is not working, I can't

2     see whatever it is.

3          UNIDENTIFIED SPEAKER:  It's not up yet.

4          UNIDENTIFIED SPEAKER:  Nobody has it yet.

5          MR. HANGLEY:  Nobody has it yet.

6          THE COURT:  What?  Mr. Cosgrove --

7          THE DEPUTY CLERK:  Yes.

8          THE COURT:  -- what's the issue with -- we're good.

9          THE DEPUTY CLERK:  We're getting an error message on

10    the screen, it's saying that it's out of range.

11         THE COURT:  Out of range?  Mine is on.  They're two

12    feet apart.

13         (Laughter.)

14         (Discussion off the record.)

15    BY MR. HANGLEY:

16    Q    With respect to --

17         THE COURT:  Is the agreement on the jurors' screen?

18         MR. HANGLEY:  No.

19         THE DEPUTY CLERK:  No.

20         MR. HANGLEY:  Well, with respect to this exhibit,

21    the patent purchase agreement --

22         THE COURT:  It's been on the screen.

23         MR. HANGLEY:  -- it's been on the screen in the past

24    and I'm inclined to just have the witness -- rather than slow

25    people down, just have the witness read the particular

```
                        Marcus - Direct                    71
```

 1    paragraph that I'm about to ask him about.

 2            THE COURT:  That's fine.

 3            MR. HANGLEY:  And if somebody wants to --

 4            UNIDENTIFIED SPEAKER:  There it is.

 5            UNIDENTIFIED SPEAKER:  Here it is.

 6            THE WITNESS:  No, there it is.

 7            THE COURT:  It's on the screen, Mr. Hangley.

 8            THE WITNESS:  I like paper too, so that's good.

 9            THE COURT:  Do you want to give him a paper copy, is

10    that --

11            MR. HANGLEY:  I think he has one.

12            THE WITNESS:  I have one.

13            THE COURT:  Okay.  Then -- are you a hoverer, Mr.

14    Hangley, or are you going to step back?

15            MR. HANGLEY:  Am I hovering?

16            THE COURT:  Yes.

17            (Laughter.)

18            THE COURT:  But he's your witness, Mr. Hangley.

19            MR. HANGLEY:  I know.  So you may allow it, but he

20    may not.

21    BY MR. HANGLEY:

22    Q   If I can ask you, please, to look at --

23            THE COURT:  What is the number?

24            MR. HANGLEY:  Oh, it's PX-8.

25    BY MR. HANGLEY:

1    Q    And what was the effective date of this agreement, sir?

2    A    So it's on the front page.  It says, "This patent

3    purchase agreement is made as of June 30, 2010 effective

4    date."  So that was the effective date of the agreement.

5    Q    Okay.  Now, was there a closing on June 30, 2010 or did

6    that come later?

7    A    So the way this agreement was set up was there was a

8    signing and then followed by a closing no more than 30 days

9    later.

10   Q    Okay.  So that the signing date, was that the effective

11   date, the June 30 date?

12   A    Yes.

13   Q    Okay.  And then by July, the end of July, you actually

14   formally closed it?

15   A    Yes, that's correct.

16   Q    And were documents promised in the agreement to be

17   delivered during that one-month period, if you recall?

18   A    Yes.  If you go to the second page of the exhibit in

19   Section 2.1, part of what we agreed on with Nokia was that

20   after the signing, but before the closing they would deliver

21   certain documents to us, if they had them, and they did do

22   that.  They sent I believe it was either one or two CDs with

23   various documents on them such as the assignments that they

24   had gotten from the inventors, assignments between two

25   different companies at Nokia, I believe there were invention

1    -- the original invention disclosure documents, which is this

2    document that typically is -- an inventor will disclose what

3    they think is a new invention to whoever is going to be

4    considering it for patenting, things like that.

5              MR. HANGLEY:  Can we highlight and blow up the

6    sentence that begins, "Unless agreed otherwise," it begins on

7    the fourth line down -- the fifth line down?

8              (Pause.)

9              MR. HANGLEY:  And take us through the sentence that

10   begins with "The disclosure."  There we are.

11   BY MR. HANGLEY:

12   Q   Is that generally the category of things that they were

13   supposed to give you?

14   A   Yeah, that was the types of things that they were

15   supposed to send to us.

16   Q   And at that point, just to be clear on it, was --

17   assuming they gave you those documents, but you were bound as

18   of June 30th, that is the company had signed and was bound to

19   contract on June 30th?

20   A   Yeah.  The way this was again set up is -- and I think

21   it's Section 2.3 on the next page, which is page 3 -- unless

22   -- so there were certain conditions for the closing, so as

23   long as all these conditions were met, one of which was for

24   them to deliver those documents.

25   Q   That's 2.3(e), I think.

1   A    I believe that's -- yes, yeah.  As long as those

2   conditions were met, we were obliged to close, which was

3   basically send them the money.

4   Q    So that's paragraph 2.4?

5   A    Yes.  And I guess I would add is, you know, we were

6   obliged to send them the money and we were then allowed to

7   record the assignments of the inventions at the various

8   Patent Offices.

9   Q    Okay, and you said the word assignment.

10          MR. HANGLEY:  May we see PX-1, please?

11  BY MR. HANGLEY:

12  Q    That's the original patent; is that correct?  Is that 870

13  patent?

14  A    I can't tell from this.  I think you'd need to see the

15  next page.

16  Q    Okay.

17  A    So -- or maybe the next -- yeah, there we go.  Yes, so

18  that would be the original U.S. patent, 870 patent.

19  Q    Okay.  And PX-5, can you tell the jury what that is?

20  Again the next page, I think --

21          (Pause.)

22  A    Okay.  So this document is the recordation page where --

23  in the U.S. Patent and Trademark Office where they were

24  recording the assignment from the inventor, and I'm not sure

25  I'm going to say this right, Uti Abo (ph), she was assigning

Marcus - Direct                        75

1    to I believe it was her employer at the time, Nokia Mobile

2    Phones, Limited.  And this is a recordation page for an

3    assignment that files where they were recording that against

4    the application that became the 870 patent in the United

5    States Patent Office.

6    Q   Okay.  And I'll show you --

7              MR. FINKELSON:  Your Honor -- Mr. Hangley, if you

8    could just do me a favor and step back a tiny bit, just so I

9    can see the witness as he's testifying.

10             MR. HANGLEY:  Sure.

11             MR. FINKELSON:  Thank you.

12   BY MR. HANGLEY:

13   Q   And that's PX-6 and will you tell us what that is?

14   A   Okay.  So what this document is is it's an assign -- it's

15   an assignment by merger as opposed to -- so it first went

16   from the inventor to Nokia Mobile Phones, Limited, and then

17   Nokia Mobile Phones, Limited merged into Nokia Corporation.

18   And so they were recording a copy of that merger agreement to

19   show that title to the patent had moved into Nokia

20   Corporation, so that's what this document is.

21   Q   Okay.  Now, after the closing and after the delivery of

22   these documents, was that the end of your involvement as

23   David Marcus and the lawyers at Comcast with the patents

24   acquired from Nokia?

25   A   So, no.  You know, we then took the assignments, the

1   assignment that Nokia Corporation had made to Comcast and we

2   recorded that at the U.S. Patent and Trademark Office to

3   perfect our ownership in the patent.

4   Q   I'm going to show you Exhibit 7, Plaintiff's 7.  Will you

5   confirm, please, that that is the assignment to Comcast?

6   A   So, yes, this is the assignment from Nokia corporation to

7   Comcast Cable Communications, LLC, which transferred all

8   right, title and interest in the 870 patent and other patents

9   to Comcast Cable.

10  Q   Thank you.

11            MR. HANGLEY:  Your Honor, I move into evidence, if

12  they're not already in, I thought they were, PX-1, PX-5,

13  PX-6, and PX-7.

14            THE COURT:  And there's no objection, they're

15  received.  Is that correct, Mr. Finkelson?

16            MR. FINKELSON:  No objection, your Honor.  I think

17  all of those are part of our omnibus motion that I recall.

18            THE COURT:  Those exhibits --

19            MR. HANGLEY:  Yes, they are in fact part of the

20  omnibus motion, that's --

21            THE COURT:  Oh --

22            MR. HANGLEY:  -- why I'm a little confused about it.

23            THE COURT:  -- well, then they are received in

24  evidence.

25            (Plaintiffs' Exhibits PX-1, PX-5, PX-6, and PX-7

1    were received in evidence.)

2              THE COURT:  I think because I don't want to have to

3    go back to the omnibus motion and the 800 exhibits listed,

4    move them into evidence at this time.  I don't they're

5    offered in evidence, there's just a statement that there's no

6    objection to offering them in evidence, going back to the

7    omnibus motion.  I don't think you moved that they are all

8    received in evidence, I don't have that order now.

9              MR. HANGLEY:  I don't know.

10             THE COURT:  So move them, and you have and they are

11   received.

12             MR. HANGLEY:  Have I done so?

13   BY MR. HANGLEY:

14   Q   Okay.  So now you get the assignment -- oh, and I want to

15   ask you to look at page 4 of PX-7 and paragraph (d) on page

16   4.

17             (Pause.)

18   Q   I'm sorry, it's paragraph (d), Mr. Marcus, of Exhibit B

19   to Exhibit 7.

20   A   Uh-huh.

21   Q   And I see --

22   A   I see it, yep.

23   Q   -- you were assigned certain rights by Nokia, including

24   the rights in subparagraph (d), correct?

25   A   That is correct.

1    Q    Could you read to the jury the rights that were so

2    transferred in the assignment?

3    A    So it's "all rights to bring any cause of action in any

4    jurisdiction in pursuit of any damages or remedy at law or in

5    equity, including pursuit of injunctive relief, royalties,

6    profits due or accrued, or other payments for past, present

7    or future infringement, or misappropriation or like

8    violations of the foregoing."

9    Q    Thank you.  Okay, now you've got the assignment of the

10   patent, are you -- now are you done with the Nokia patent?

11   A    So, no.  During our due diligence process we had become

12   aware of certain prior art documents that had not been

13   specifically considered by the Patent Office when they were

14   originally granting the 870 Patent and so we put together

15   what's called a reexamination petition or petition for

16   reexamination to provide all that material, prior art to the

17   Patent Office and have them determine whether or not the

18   claims of the patent were in fact patentable over that prior

19   art.

20   Q    Okay.  Now, first of all, I think the jury has already

21   heard this in the video, but could you explain what prior art

22   means to a patent lawyer?

23   A    It -- I sat through the video too -- it's essentially

24   just anything in a printed publication, which could include a

25   patent -- a patent, you know, is considered like a printed

1   publication -- that exists prior to the effective filing date

2   of a patent.  And for most situations the effective filing

3   date is the filing date of the patent and here it was

4   sometime in 1999.  It was based on a Finnish application, I

5   believe.  So basically any publications or printed -- or

6   patents that were pre whatever that date is in 1999, that's

7   prior art.

8   Q    And so your due diligence search in connection with this

9   had disclosed or unearthed some things that you thought might

10  be prior art that had not been considered by the United

11  States PTO?

12            MR. FINKELSON:  Objection, your Honor, leading.

13            THE COURT:  Sustained.

14  BY MR. HANGLEY:

15  Q    What had your due diligence found with respect to prior

16  art, if anything?

17  A    Well, I think as I just stated, we -- during our due

18  diligence process we became aware of several pieces of prior

19  art to the 870 Patent that had not been considered

20  specifically during the original examination of the patent

21  when they originally granted it.

22  Q    Now, did you hear Mr. Finkelson this morning in his

23  opening remarks talking about how this was an ex parte

24  reexamination (indiscernible) --

25  A    I did, yes.

1  Q   Okay.  Is that the equivalent of its being a sub rosa

2  proceeding, or a secret or occult proceeding?

3  A   Well, I'm not sure I know what all those things are,

4  but --

5           (Laughter.)

6           MR. FINKELSON:  Actually, me too, your Honor.

7           THE COURT:  I'm sure some of us don't, I don't know

8  whether all the jurors do, but why don't you define your

9  terms.

10          (Laughter.)

11  BY MR. HANGLEY:

12  Q   Are these proceedings kept secret from the public?

13  A   No, no, they're public proceedings.

14  Q   And is there a record made of them, does the patent world

15  know what you've done?

16  A   Yes.  And ex parte reexamination is just like the

17  original examination, you've got the patent owner or in the

18  original patent sense it's the applicant who's trying to get

19  a patent basically filing something with the Patent Office,

20  and then they go back and forth about whether or not it's

21  patentable or not.

22  Q   Is there anything sneaky about the proceeding?

23  A   Not that I'm aware of.

24  Q   In this case was -- what was the outcome of the

25  reexamination?

1   A    So the outcome of the reexamination was -- well, one,

2   they instituted -- you know, they don't have to institute a

3   reexamination, they instituted a reexamination, there was

4   some back forth and in the end --

5   Q    I'm sorry, let me stop you there.  You say they don't

6   have to grant the reexamination; is that correct?

7   A    That's correct.

8   Q    Okay.  So in theory you could -- a company could -- a

9   patent owner could go to them and say please reexamine and

10  they could say no?

11  A    Yes, that's correct.

12  Q    Okay.  Here they did say yes, we will reexamine?

13  A    Yes, they did.  Yes.

14  Q    When you present the reexamination papers, do you tell

15  them -- is it your obligation to tell them why this prior art

16  might be relevant?

17  A    Yes.  You have to -- in the petition for the

18  reexamination you have to lay out a very sort of detailed

19  mapping of, you know, here's the prior art and here's how it

20  relates to the claims that we want reexamined and say where

21  the teachings of the pieces of prior art, you know, might be

22  relevant.  And from my recollection, in this instance for the

23  870 Patent we did that and there were at least two

24  limitations in the existing claims, like Claim 1 where we say

25  we don't think they're in the prior art, but here it is.

Marcus - Direct                                        82

1    Q    But we want you to think about it?

2    A    Yes, that's correct.

3    Q    And when you do that, when a company does that, when a

4    patent owner does that, is his patent put at risk?

5    A    Yes.  I mean, if the Patent Office had determined that

6    they didn't think it was patentable, the entire patent would

7    have gone away.  So, you know, we could have lost the old

8    patent.

9    Q    Now, the outcome was?

10   A    So the outcome was that all of the original claims in the

11   patent, which I believe were 1 through 19, were confirmed as

12   patentable over all that additional prior art.  But to be --

13   because I'm a patent attorney, to be, you know, completely

14   accurate, I believe it was Claim 1 and another, it might have

15   been another independent claim, there was a slight

16   typographical error in them or something, so they got

17   corrected through that.  But other than the typographical

18   error, they were confirmed as patentable.

19   Q    Okay.  And then you also added other particular claims at

20   that time?

21   A    Yes.  So when you put a patent back into reexamination

22   you can ask the Patent Office to grant new additional claims

23   and we did that.  And I guess I should say, they granted

24   them.

25   Q    Okay.  And let me show you, if I may, PX-2.  Can you tell

1    the jury what it is?

2              (Pause.)

3    Q    You've got --

4    A    So this is -- I just wanted to make sure it was all there

5    -- this is a copy of what we've been calling the 870 Patent,

6    which also includes the reexamination certificate that was

7    issued by the Patent Office after the reexamination that we

8    instituted.

9              MR. HANGLEY:  Move its admission, your Honor.

10             MR. FINKELSON:  No, objection, your Honor.

11             THE COURT:  PX-2 --

12             MR. FINKELSON:  I believe it too is part of the

13   omnibus motion.

14             THE COURT:  PX-2 is received.

15   BY MR. HANGLEY:

16   Q    Now, did Sprint sue Comcast?

17   A    Yes.

18   Q    Do you know when that was?

19   A    In December of 2011.

20   Q    And do you recall when, if ever, before being sued --

21   before suing Sprint approached Comcast about how you might be

22   infringing their patents?

23   A    I'm sorry, can you repeat the question?

24   Q    My question (indiscernible) that was a (indiscernible)

25   question that I asked.  When did you first -- if ever, did

Marcus - Direct                                    84

1    Sprint first approach Comcast stating that Sprint thought

2    Comcast was infringing patent rights of Sprint?

3    A    If I recall correctly, January 21st, 2010.

4    Q    Were you involved in the response to that event?

5    A    I was.

6    Q    Now, did the fact that -- did this come as a surprise to

7    the company that Sprint rattled sabers about infringement?

8                MR. FINKELSON:  Objection, your Honor,

9    argumentative.

10               THE COURT:  Overruled.

11               THE WITNESS:  Yes, it was quite a shocking,

12   startling event.  They had been a long-time sort of strategic

13   partner of Comcast, so that really was surprising.

14   BY MR. HANGLEY:

15   Q    Had you done a development of some VOIP offering early on

16   with them?

17   A    There were a number of relationships with Sprint dating

18   back many, many years prior to that.

19   Q    I'm going to show you --

20               MR. HANGLEY:  -- and please give us just the cover

21   page of Exhibit 278?  D-278.

22               (Discussion off the record.)

23               MR. HANGLEY:  I just want to show it to the witness

24   and he was shown the cover page.  Can you show us the cover

25   page of 278?

1   BY MR. HANGLEY:

2   Q    Can you see what that is?

3   A    Yes.

4   Q    That's the document that's called a due diligence

5   checklist?

6   A    Yes.  It says, "Due diligence checklist, Nokia

7   Corporation patent acquisition."

8   Q    And when did -- were you involved in preparing basically

9   the format of this?

10  A    Yes, I was.

11  Q    Okay.  And when was this document created?

12  A    It was -- if I recall correctly, it was at the time we

13  were doing the approvals to proceed with the transaction, so

14  it was sometime around April of 2010.

15  Q    As usual, my friends have pointed out that I forgot to

16  ask at least one important question and that important

17  question is this:  if you go to the Patent and Trademark

18  Office with a reexamination petition, they grant the

19  reexamination, you show them the prior art of which they're

20  aware, does the Patent and Trademark Office and its

21  examiners, do they then go out and do their own independent

22  examination and search for other prior art?

23  A    So sometimes they do, sometimes they don't as part of the

24  reexamination.  They certainly did during the original --

25  Q    Okay.

Marcus - Direct                                    86

1   A   -- I just don't recall as I sit here whether they did or

2   didn't during the re-exam.

3   Q   But it's certainly some of the process that they're

4   entitled or authorized to do once you initiate a

5   reexamination proceeding?

6           MR. FINKELSON:  Objection, your Honor, leading.

7           THE COURT:  Yes, it is leading.

8           MR. HANGLEY:  Is it?

9           THE COURT:  It is.

10          MR. HANGLEY:  Okay.

11  BY MR. HANGLEY:

12  Q   Can you tell us whether or not that's part of one of the

13  things they can do?

14          MR. FINKELSON:  Objection, your Honor, leading and

15  so far as it incorporates the first leading question.

16          THE COURT:  What if anything is the U.S. Patent and

17  Trademark Office permitted to do or what does it customarily

18  do with reexamination in connection with examining the prior

19  art?  Do they examine the prior art, do they not?

20          THE WITNESS:  So -- I'm sorry -- they certainly

21  examine the prior art that the person requesting the re-exam

22  puts in in the request.

23          THE COURT:  And did you put in a request that

24  certain prior art be examined?

25          THE WITNESS:  We did, your Honor.

Marcus - Direct                         87

1          THE COURT:  And is that prior art identified on the
2   cover page of the reexamination?
3          THE WITNESS:  Yes, your Honor.
4          THE COURT:  What is it?
5          THE WITNESS:  I'm sorry, your Honor?
6          THE COURT:  What is that prior art?  You have the
7   patent in front of you --
8          THE WITNESS:  Oh, okay, I don't have it in front of
9   me.
10          THE COURT:  It's a challenge to pronounce them,
11   but --
12          THE WITNESS:  There's a whole --
13          THE COURT:  I thought there were three.
14          THE WITNESS:  Oh, no, no, there's -- if you turn to
15   page 17 of --
16          THE COURT:  I'm there.
17          THE WITNESS:  -- I guess it's PX-2, you'll see on
18   there reference -- it's 56 on the left side, "References
19   cited," and there are three U.S. patents, there are five
20   foreign patent documents, one of them I believe was a
21   Japanese application, and then the other one is with the WOs,
22   those are WIPO-published PCT applications.
23          THE COURT:  What are they?
24          THE WITNESS:  They're published patent applications
25   from the World Intellectual Property Organization.  And then

Marcus - Direct                                    88

1    if you go further down it says, "Other publications," okay?

2    And the first one listed is Savanto Jarko (ph) --

3              THE COURT:  Right, there are a number of them and

4    they --

5              THE WITNESS:  Right, and it continues on to the next

6    column, those are all individual -- there's one -- there's a

7    whole bunch here named Wireless Application Protocol Push

8    Proxy Gateway, that's one.  There's another one --

9              THE COURT:  You don't have to read them all.

10   They're all on the -- is that the cover page that's page 17?

11   PX-2.17, is that correct?

12             THE WITNESS:  That's the cover page of the ex parte

13   reexamination certificate and it -- the list continues on to

14   the next page.

15             THE COURT:  All right.  You may continue, Mr.

16   Hangley.  I'm sorry, you said the list -- I withdraw that

17   invitation -- the list continues onto -- yes, it does.

18             THE WITNESS:  So that's the list of all -- the list

19   of all the prior art that we took to the Patent Office and

20   that they examined continues on the back of that.

21             THE COURT:  And it's interrupted by something called

22   "Abstract"?

23             MR. HANGLEY:  Yeah, it says "Continued," and then it

24   says "Abstract."

25             THE WITNESS:  Oh, I'm sorry, yes.  So on page 17 it

1    says "Continued," then it says "Primary Examiner Roland

2    Foster," then there's a part that says "Abstract."  But if

3    you go to the next page --

4            THE COURT:  And the list continues on?

5            THE WITNESS:  -- the list of prior art that we took

6    to the Patent Office and that they examined, reexamined on

7    continues there.

8            THE COURT:  All right, thank you.  Now Mr. Hangley.

9    And, Mr. Hangley, keep in mind that we're going to recess

10   today at 4:20 and give me a few -- at least a minute or two

11   to give the jury concluding instructions.

12           MR. HANGLEY:  Okay, let me move very quickly.

13           THE WITNESS:  I guess one other thing I would say

14   about -- that's different about reexamination versus the

15   original examination processes, when you do the original

16   examination process there's only a single examiner, but when

17   you do a reexamination they have three primary examiners.  So

18   you have to convince three very senior examiners, that they

19   do the reexaminations.

20   BY MR. HANGLEY:

21   Q   Complete change of topic and I'll be very brief.  Did

22   Comcast enter into a cross-licensing agreement with Verizon?

23   A   Yes, I believe in September of 2008.

24   Q   2008?

25   A   Eight.

1    Q    Okay.  And basically would you summarize what that

2    agreement was all about, what the parties gave up?

3    A    So we each -- it's -- not to complicate things, but it's

4    a -- again, I'm a patent attorney, I can't help myself --

5    Q    Cross-licensing agreement.

6    A    -- it's a covenant not to sue, we each covenant to each

7    other not to sue for patent infringement.  And there's a

8    whole -- essentially, to boil it down, it was basically in

9    every area in which we were operating, so all of our business

10   lines.  So we -- you know, I kind of refer to it as patent

11   peace as in, you know, peace, summer of love kind of thing,

12   but that's what it was.  And, you know, it starts to resemble

13   a license, because in addition to this covenant not to sue

14   there are releases of past damages that spring.  So if you

15   get three years through the agreement without anybody

16   breaching it or suing each other, then, you know, damages are

17   released going backwards for any patent infringement that had

18   been happening and so forth as you go on.  So --

19              MR. HANGLEY:  I have no further questions, your

20   Honor.  I see that it's 4:17 by my watch.

21              THE COURT:  Are you -- well, we still have cross-

22   examination of this witness --

23              MR. HANGLEY:  Of course.

24              THE COURT:  -- which we'll begin tomorrow morning.

25              MR. FINKELSON:  Absolutely, your Honor.

1            THE COURT:  And you may step down, Mr. Marcus.

2            THE WITNESS:  Thank you, your Honor.

3            MR. FINKELSON:  And I take it the direct examination

4    is concluded, Mr. Hangley, is that correct?

5            MR. HANGLEY:  Yes.

6            THE COURT:  Have you finished the direct?  Fine.

7            Ladies and gentlemen, it's about 17 minutes after

8    4:00, we're going to recess a little early.  We're going to

9    check to make certain there's no other way of getting the

10   two, I'll refer to them as the 4:20 jurors home at a

11   reasonable hour, and if not we'll accommodate their schedule.

12           I'm going to give you my day-end instructions.  You

13   heard them yesterday, I think you heard a little bit of them

14   on Monday and you heard a little bit of them on lunch -- at

15   lunch, at the recess.  If anything is broadcast on radio or

16   television about the case, do not view it and do not read it

17   -- listen to it rather.  If anything is printed in any

18   newspaper that deals with the case, do not read it.

19           The reason, you've got to decide this case based

20   solely on what you hear and see in this courtroom.  You can't

21   be influenced by the spin a reporter might put on the case.

22   Also do not discuss the case with anyone at home for the same

23   reason.  You might say something to a spouse or a friend or a

24   child and the response might give you an idea; that would be

25   improper and that's why you cannot discuss the case with

1   anyone, anyone at all, until the trial gets to the stage

2   where closing statements have been made, you've heard my

3   instructions on the law, and then you can begin your

4   deliberations and begin discussing the case.

5           I have no further instructions.  We'll start

6   tomorrow at 9:30.  Have a safe trip home.  We'll have some

7   refreshments for you to make getting up as early as you have

8   to get up a little more tolerable and we look forward to

9   seeing you tomorrow morning.  Be sure to leave your juror

10  notebooks and the binders in the jury room.

11          Have a safe trip home.

12          (Jury out at 4:19 o'clock p.m.)

13          THE COURT:  Be seated, everyone.

14          I want you to be thinking about an issue that came

15  up at cross-examination and that's the way in which exhibits

16  are handled on cross-examination.  In view of the technical

17  nature of many of the exhibits, I'm flexible and whatever we

18  decide is applicable to both sides, so I want the evidence

19  presented to the jury in a way that makes the most sense.  So

20  discuss that provision of the final pretrial order.  I'm

21  looking at my copy of it.  It's not -- yes, it is -- it's

22  voluminous and most of you have seen it, many of you have put

23  it together, it's voluminous.  And if there's something in

24  here that needs changing, we're flexible, keeping in mind

25  that whatever we decide would be applicable to both sides.

1    So discuss that, you don't have to reach a conclusion now.

2            Right now what we're doing is we're covering what is

3    set forth in exhibits used on cross-examination.  In this

4    case up to this point, it's occurred once with DX-278 and

5    we've shown the jury the cover sheet and the limited portion

6    of the document used in cross-examination.  I think that

7    works, but you'll tell me tomorrow.

8            MR. FINKELSON:  I think we have agreement on that

9    point as we said at sidebar, your Honor.

10           THE COURT:  All right, I think that works.

11           Next, at noon we were handed -- I think I left it on

12   my desk, did you take --

13           UNIDENTIFIED SPEAKER:  That was Mike.

14           THE COURT:  -- objections to deposition

15   designations.  I want to hear brief argument on that tonight.

16   We'll recess I think for about 15 minutes, I want to catch up

17   on what's doing in chambers, and I'd like brief argument.  I

18   might be able to rule on all of these issues tonight.  The

19   way you're teeing this issue up, the issue of objections to

20   deposition designations, seems to work as long as we're

21   limited, as in the case of tomorrow's depositions, to in this

22   case five sets of objections.

23           So let's take a 15-minute recess.

24           MR. GOETTLE:  Your Honor?

25           THE COURT:  Yes?

1          MR. GOETTLE:  I'm sorry, I just wanted to alert the

2    Court, if it works for the Court, we also have objections to

3    four exhibits that will be come into play when Dr. Akl

4    testifies, if your Honor would entertain discussion on that.

5          THE COURT:  Absolutely, absolutely.  And because I'm

6    not too happy with recessing at 4:20 and I've asked Milahn

7    Hull to see if there's another way to get these folks to

8    Lancaster.  We can send them by something like Dave's

9    Limousine, that's the limousine service we use, but it's

10   pricey and -- that's what we will do if we get into late

11   nights during deliberation, but not right now.

12          Is there anything else we ought to talk about before

13   we recess?

14          MR. GOETTLE:  No, your Honor.

15          MR. FINKELSON:  No, your Honor.

16          THE COURT:  All right.  I said 15 minutes, let's

17   recess until quarter of 5:00, 4:45.

18          (Recess taken from 4:23 p.m. until 4:45 p.m.)

19          THE COURT:  Be seated, everyone.

20          THE COURT:  An update on our scheduling.  Milahn has

21   resolved the issue with regard to one juror who was looking

22   at an out-of-date train schedule, and is working on a

23   resolution of the problem with respect to the other juror.  I

24   don't really want to recess at 4:15.  I don't want to lose 30

25   minutes of a day.

1          Okay, we'll start with deposition designations and

2    objections.

3          MR. LOWERY:  Your Honor, I think we have resolved

4    the ones with respect to Plarent Tirana.  Sprint has

5    withdrawn those objections, so the only remaining ones are

6    the Chris Holmes objections.  Now, I mean I'm just

7    (indiscernible) Sprint, your Honor.

8          THE COURT:  Who will argue?

9          MR. GOETTLE:  Your Honor, the designated testimony

10   for Mr. Holmes is starting at page 147, line 9 through 148,

11   line 13.  And the reason that that deposition is designated

12   there is to lay a foundation for the admissibility of a

13   Sprint-produced document that I have a copy of.  I could hand

14   it up to you if you'd like to see it.  A Sprint-produced

15   document that's entitled Messaging Network Components -

16   Terminology.  And it's a document produced by Sprint, relied

17   on by our expert and what we're designating is the testimony

18   to lay the foundation for that.

19         MR. LOWERY:  And we object first because it was not

20   established that the witness had any personal knowledge of

21   this document.  He essentially read what was in the document

22   for him.  He was not asked if he had ever seen the document

23   before.  In fact this witness' role at Sprint is not even

24   related to messaging, it's related to other components.  So

25   essentially he put this document in front of him.  He looked

1    at it and said yes, this document say messaging network.

2    Yes, it says that there are these components here.  I don't

3    even know what one of them is, but it says that here.  We

4    don't think that's proper foundation to authenticate the

5    document.  It was not shown to any of our messaging

6    witnesses, for example, and they need to have somebody with

7    actual personal knowledge of the document to authenticate it

8    under the Rules.

9         THE COURT:  I think I ought to look at the document

10   first.

11        Mr. Goettle?

12        MR. GOETTLE:  Yes, sir.

13        THE COURT:  Do you have a copy for my --

14        MR. GOETTLE:  I do over there.  Do you want to grab

15   it out, sir?

16        THE COURT:  No.  Out of the box?

17        MR. GOETTLE:  Yes.  It could reduce --

18        THE COURT:  Thinking out of the box is generally

19   good, but we're not disturbing the boxes.  Oh my gosh.

20        Well, the issue has been framed, I must say.  I

21   don't, just looking at the document doesn't really give me

22   much of a clue about the document.  So why don't we start

23   with Comcast explaining the document and explaining why less

24   of it is -- well, the witness' testimony certainly isn't

25   (inaudible).  Christopher Holmes' testimony satisfactorily

1  lays a foundation.  And then I'll hear the objection.

2          MR. GOETTLE:  Your Honor, the document was produced

3  by Sprint.  It says on it it's a list of the components of

4  Sprint's messaging network.  And Mr. Holmes testified in

5  response to a question at the deposition that on the document

6  are components of the messaging system.  It's shown in that

7  table.

8          THE COURT:  I don't see that.

9          MR. GOETTLE:  It's at page 147, line 19.

10          THE COURT:  I see the answer.  Where's the -- oh,

11  the question.

12          MR. GOETTLE:  I'm sorry, the question is --

13          THE COURT:  Is this table showing a list of the

14  components of the messaging network of Sprint?

15          Answer:  There are components of the messaging

16  system in this cable, messaging network in this cable.

17          This is a Sprint witness?

18          MR. GOETTLE:  Yes.

19          THE COURT:  And Sprint is objecting to the document?

20          MR. LOWERY:  Yes, your Honor.  Because they did not

21  lay any proper foundation of the witness --

22          THE COURT:  It's your document.

23          MR. LOWERY:  Yes, your Honor, but they didn't lay

24  any foundation that this witness had knowledge either for

25  what he was speaking from for the document or that he had

1    seen the document itself.  And in order to authenticate the

2    document, he at least has to have some knowledge of the

3    document itself.  He has to have seen it in some capacity.

4    He can't just be asked in the abstract.

5            THE COURT:  That would be true if it were a Comcast

6    document, but it's your document.  You're asking Comcast to

7    lay a foundation for introduction of your documented

8    evidence.

9            MR. LOWERY:  Yes, your Honor, in terms of

10   authenticity verifying that this is an authentic document, as

11   I said.

12           THE COURT:  You produced it.  Did you produce

13   something that was not authentic?

14           MR. LOWERY:  Well, at the time, your Honor, as you

15   know we didn't have an agreement on any either authenticity--

16           THE COURT:  I understand that.

17           MR. LOWERY:  Yes, your Honor.

18           THE COURT:  If it were a Comcast document, I can see

19   the issue.  They'd have to lay a foundation.  But you're

20   requiring Comcast to lay a foundation for a Sprint document.

21           MR. LOWERY:  Well, I think we have two issues.  One

22   is with the document, one is with Mr. Holmes' testimony where

23   they didn't establish foundation for Mr. Holmes --

24           THE COURT:  Who prepared this document?

25           MR. LOWERY:  I'm not aware.  I don't think that's

1    been established.

2           THE COURT:  You might have to establish it if you

3    persist with this objection.  And you'll produce him.  He

4    might be in -- I don't know where he might be.

5           MR. HANGLEY:  Kansas.

6           THE COURT:  Could be in Kansas.  Maybe he's moved to

7    Nokia.  (Laughter.)  I've never had an objection like this.

8    Ever.  And that covers many times your age in years.  28

9    years on the bench and 30 years trying cases.  I've never had

10   the proponent's -- well, a document produced by one side

11   objected to on the ground that there's no foundation for the

12   document.  At one point Sprint was willing to agree, and I

13   thought they were still in agreement.  The agreement is

14   rather diaphanous.  That means filmy, if any of you are

15   hanging on that word.  I thought the agreement was all Sprint

16   documents come into evidence and all Comcast documents come

17   into evidence.  Now I understand there's some exceptions to

18   this rule.

19          MR. FINKELSON:  May I address that, your Honor?

20          THE COURT:  It's called the exception where Comcast

21   wants to use a Sprint document.

22          MR. FINKELSON:  Your Honor, may I address that?

23          THE COURT:  You may.

24          MR. FINKELSON:    That is not what has occurred.

25   What has occurred is Sprint offered to Comcast, and I don't

1   have the transcript in front of me, but it's on the

2   transcript from the pretrial hearing.  You said to Mr.

3   Hangley, "Mr. Hangley, either you agree Comcast to Sprint's

4   offer that every document's authentic and you're not going to

5   raise hearsay objections.  You told Comcast, either you agree

6   to Sprint's offer to do that or every single document is

7   going to need to be proved up at trial for authenticity and

8   hearsay purposes.

9        THE COURT:  And I think I talked about the need to

10  continue the trial because we can't try this case using that

11  approach in two and a half weeks.

12       MR. FINKELSON:  Your Honor, that is why we again,

13  because I do feel like, your Honor, that we're the focus of

14  your attention and it appeared --

15       THE COURT:  Right now because of this motion.

16       MR. FINKELSON:  I understand.

17       THE COURT:  Tomorrow Comcast might be the focus.

18  And I thought we agreed just before the noon recess that you

19  would go back to that original agreement.

20       MR. FINKELSON:  We agreed that we would revisit

21  certain of our objections to see whether they could be

22  removed or not.  What you said, your Honor, to Mr. Hangley.

23  You said, you've got their position.  They'll agree, i.e. us.

24  They'll agree to authenticity and admissibility under 8036,

25  the business records rule, if you do the same thing.  And

1    apparently you're unwilling to do the same.

2              And Mr. Hangley said we will agree to authenticity.

3              And your Honor said, no, that's not what I said.

4              I understand, said Mr. Hangley.  And my answer is, I

5    guess another way to put it is no.

6              And then your Honor said I'm going to require both

7    parties either to agree to authenticity and business records

8    or comply with the rule regarding authenticity and business

9    records.

10             They didn't accept your Honor's proposal.  They only

11   agreed to authenticity and they challenged us on every single

12   business record and still do.

13             THE COURT:  And you've provided additional

14   declarations and certifications, and that's good.  When I saw

15   them I concluded that was really make work, and I was very

16   unhappy with it, with that choice.  And we're not locked into

17   what was agreed to at one time by one side, and now -- and

18   I'm going to put these words in quotes -- "appears to be

19   agreed to by both sides."

20             MR. FINKELSON:  Your Honor, as I said, in fact after

21   the sidebar today we've revisited a number of the objections

22   that had been raised that were set to be argued today and

23   removed them.  What we're talking about now, your Honor, is

24   sticking a document in front of a witness who has no personal

25   knowledge of it --

1          THE COURT:  Who presented the witness?

2          MR. FINKELSON:  Sprint presented the witness

3    pursuant to a deposition from Comcast.

4          THE COURT:  Was this a 30(b)(6) dep?

5          MR. FINKELSON:  It was not, your Honor.  And it was

6    one of over 20 depositions that Comcast took in the case.

7    They just took the document, they stuck it in front of the

8    witness, essentially said read it to me, and now they want to

9    put it into evidence and that's not establishing a foundation

10   with somebody with personal knowledge.  I mean the personal

11   knowledge requirement doesn't have an exception if you

12   produce the document.  The proponent of the document --

13         THE COURT:  All right.  I think the way we'll cut

14   it, you'll either agree or you'll produce the proponent of

15   the document.  And if you can't produce the proponent of the

16   document, the document comes in.  Now, I don't know that it

17   comes in with this witness.  I don't see -- what were the

18   stipulations under which you took this deposition?

19         MR. LOWERY:  I believe it was just a personal

20   deposition.

21         MR. FINKELSON:  Personal deposition, objections to

22   form either to be made on the record and other evidentiary

23   objections were --

24         THE COURT:  Reserved.

25         MR. FINKELSON:  -- reserved, yes, your Honor.

1          MR. LOWERY:  That's correct.

2          THE COURT:  You weren't thinking ahead to trial

3   depositions then, were you?

4          MR. FINKELSON:  It was not a trial deposition, it

5   was a fact deposition.  And in fact it was -- to be candid,

6   your Honor, they knew once they depose this individual that

7   he didn't know about the document.  They just had him read it

8   and that's where they elected to end it.  But I understand

9   your Honor's ruling, and that we will either document, as I

10  understand, your Honor will either come into evidence or will

11  produce a witness to address it.

12         THE COURT:  He certainly doesn't lay a foundation

13  for the document.

14         MR. FINKELSON:  He does not, your Honor.

15         THE COURT:  There's a missing question or three,

16  like are you familiar with the process to which reference is

17  made in the document?  Are you familiar with the document.

18  You're right, they stuck a document in front of him and said

19  is this a list of components.  And he read it and said yes,

20  it's a list of components.

21         MR. FINKELSON:  That's exactly right.

22         THE COURT:  But the answer is it probably is a list

23  of components nd you'll produce the author of the document,

24  or agree.  I don't quite -- I see a lot of abbreviations.

25         MR. FINKELSON:  It appears to be a document that

1  Comcast -- since we have had the benefit of the demonstrative

2  exhibit that they plan to have their expert speak to.  I

3  think it appears in the slides that you provide numerous

4  times.  So I think the plan from Comcast's perspective is to

5  introduce it through their expert witness tomorrow.  In other

6  words, flash the document up on the screen and also Mr.

7  Holmes' testimony.  And then I think they use it with quite a

8  high degree of frequency in their exert presentations.

9        MR. GOETTLE:  That's actually inaccurate, your

10  Honor.

11        MR. FINKELSON:  Is that it?

12        MR. GOETTLE:  No.  I mean it's in -- it's one slide

13  of Dr. Akl's presentation.

14        THE COURT:  Well, the document has only been an

15  issue since, as I read the notes, since May 14th, 2015.  So

16  you've only had -- I'm looking at the top of it.  It says

17  Christopher Holmes, volume one, May 14th, 2015.  Is that the

18  date of the deposition?

19        MR. FINKELSON:  It is, your Honor.

20        THE COURT:  Well, you've only had almost two years

21  to resolve this problem.  Good going.  I want it resolved.

22  And tell me the significance of the document.  I don't want

23  to read all of these acronyms.  I see LDAP is mentioned.

24  Tell me what --

25        MR. GOETTLE:  Your Honor, the document -- Dr. Akl's

1    relying on the document to show that Sprint has a network,

2    call it a messaging network.  And that messaging network as

3    distinct from Sprint's cellular network includes SMSC's

4    messaging servers for SMS and MMSC's I believe is in that

5    chart, too, messaging servers for MMS.  That's why Dr. Akl's

6    relying on it.

7              THE COURT:  I think I have two copies of the same

8    exhibit.

9              MR. GOETTLE:  That's the way the document was

10   produced, your Honor.  I don't understand that either.  It's

11   like a document in a Powerpoint slide or something.

12             THE COURT:  I have -- I don't have SMS, I have SMSC,

13   the Short --

14             MR. GOETTLE:  Yes.

15             THE COURT:  -- Messaging Service Center.

16             MR. GOETTLE:  Right.  Yes, your Honor, that is --

17             THE COURT:  And the same thing for the Multi-Media

18   Messaging Service Center, MMSC.

19             MR. GOETTLE:  Yes, sir.  Those are the messaging

20   servers.  SMSC stands for SMS Center.

21             THE COURT:  Yes, I get it.

22             MR. GOETTLE:  Oh, I'm -- so that's the messaging

23   server for SMS.  That's part of Sprint's messaging network.

24             THE COURT:  All right.

25             MR. LOWERY:  And I think we would disagree with that

1   interpretation of the document.  We don't think it

2   demonstrates that Sprint has any sort of messaging network

3   and we disagree that Sprint Net does not have a messaging

4   network, it has a cellular network.  This is just an isolated

5   document that happens to use the term messaging network.

6           THE COURT:  Well, you had almost two years to

7   prepare for it.  You knew it was in Akl's -- well, the scope

8   of Akl's testimony, so I'm sure you're prepared to meet it.

9   And when are you planning on putting Akl on the stand?

10          MR. GOETTLE:  Tomorrow morning, your Honor.

11          THE COURT:  First?

12          MR. GOETTLE:  Right after Mr. Marcus is off the

13  stand, yes, sir.

14          THE COURT:  How much more time do you have with Mr.

15  Marcus?

16          MR. GOETTLE:  Well, the direct is done with Mr.

17  Marcus so we have cross and then any redirect.  I imagine it

18  will be short.

19          THE COURT:  Are you handling the cross?

20          MR. FINKELSON:  I am, your Honor.

21          THE COURT:  It doesn't seem to me it's going to be

22  long

23          MR. FINKELSON:  I wasn't here.  It's going to be

24  longer.

25          THE COURT:  Well, you've got a little bit of a time

1  problem.  Is this witness close by?

2          MR. FINKELSON:  Your Honor, I don't know who the

3  author is of the document.  We're going to take your Honor's

4  instructions and confer following this hearing, and I suspect

5  given the choices we've been given we'll make a decision that

6  is most appropriate for the circumstances and --

7          THE COURT:  Well, my ruling certainly wouldn't be

8  the same if the document hadn't been produced by Sprint.  And

9  since the issue was presented almost two years ago, 21 months

10 ago, it should have been if it's significant, which I suspect

11 it is, it really should have been addressed.

12         MR. FINKELSON:  We agree, but I don't understand,

13 your Honor, why it would have had to have been addressed by

14 us.

15         THE COURT:  Well, it's your document.

16         MR. FINKELSON:  It's them that wants to use it in

17 evidence.

18         THE COURT:  Yes, you're right.  Your document in

19 evidence.

20         MR. FINKELSON:  A Sprint document that they want to

21 use in evidence.  And the personal knowledge requirement,

22 your Honor, they need to present it through a witness with

23 personal knowledge.  And just as your Honor said, and we've

24 seen it in hundreds of other documents in this case, you ask

25 the basic questions to establish that the witness knows the

1  document.  And they didn't do that on this document, and

2  respectfully, from our perspective that's a choice that

3  Comcast has made.  They've made the decision they can come in

4  here and get it in that way, and we've objected under the

5  rules.  But again, I'm not belaboring the issue.  I

6  understand your Honor's --

7         THE COURT:  And certainly you'd win if this document

8  were not a Sprint document.  But I think the rule is

9  different.  And if you think I'm wrong, get some cases.  But

10  I think this document is coming in.  I think if the document

11  were certainly a Comcast document and it worked the other

12  way, it favored Sprint, then you'd have an argument.  They

13  need to have someone with personal knowledge or they'd have

14  to comply with 8036.  But I don't think that applies to a

15  document of the producing party

16         MR. FINKELSON:  And we're not raising -- just to be

17  clear, we're not raising a hearsay objection.  I think they

18  would say it was a document --

19         THE COURT:  No, you're raising an objection based

20  on, you know, what is it.  And I have no idea what it is.

21  But it appears to be fairly significant.  And that being so

22  there should have been -- you know, I'm talking -- I've never

23  tried a patent case as a lawyer.  But if I had a damaging

24  document, and I suspect this is from Sprint's position, I

25  certainly would have a fallback position. I would have the

1    author of the document available if the Judge ruled contrary

2    to my position.

3            So right now my ruling is you produce the author or

4    it comes in.  If you can produce a case that says

5    notwithstanding the fact that the document we're challenging

6    is our document, they didn't lay a proper foundation, it

7    doesn't come in.

8            MR. FINKELSON:  We'll look for that authority.

9            THE COURT:  I had that precise point.

10           Hangley, have you get them?

11           MR. HANGLEY:  I thought it was a no-brainer that it

12   could come in, your Honor.  I could be wrong.

13           THE COURT:  Yeah, but the way this witness is

14   reading the document.  You have no one trying to lay any kind

15   of a foundation.  No one, I don't know who --

16           MR. HANGLEY:  But, your Honor, if that document had

17   never been the subject of a deposition, I think it would

18   still come in.  It's a statement of an opposing party,

19   produced by them.  It's got the SPR stamps all over it.  We

20   know where it came from.  It came from their files.

21           I mean the other day you ruled that statements that

22   were authored by some third party probably, that is Erickson,

23   could come in even though we weren't quite sure who had

24   written them or what he knew about them.  And now they're

25   making -- the same people are making the argument that this

110

1    one can't come in.

2              MR. FINKELSON:  Your Honor, again --

3              MR. HANGLEY:  And this is their writing.

4              MR. FINKELSON:  We'll look for authority, your

5    Honor, and if there isn't any, we'll be the first one to

6    admit it to the Court and we'll move forward.

7              THE COURT:  How are we going to handle Dr. Akl's

8    deposition?

9              MR. FINKELSON:  We're going to get it resolved in

10   advance of that, I hope, and if we find the authority that we

11   think supports our position further --

12             THE COURT:  Get it to us.

13             MR. FINKELSON:  -- we'll get it to you immediately,

14   your Honor.

15             THE COURT:  All right.  Anything else?

16             MR. FINKELSON:  I believe there's one other issue,

17   but I'll let Mr. Goettle speak to you first and then Mr.

18   Lowery.

19             MR. GOETTLE:  There's no more issues on deposition

20   designations as I understand it.

21             MR. LOWERY:  Well, I think we've resolved -- well,

22   we are going to go back and look in terms of the objection to

23   the document.  I don't know if your Honor's resolved the

24   objection to the deposition designations as well, if those

25   rise and fall or if those would be treated separately in

1   terms of admitting Chris Holmes' testimony, given that your

2   Honor seems to think that proper foundation for him knowing

3   this stuff has not been laid.

4           THE COURT:  No.

5           MR. LOWERY:  I think that presents a separate issue

6   and his testimony should still be excluded.

7           MR. GOETTLE:  Your Honor, if the document comes in

8   where --

9           THE COURT:  You don't need.

10          MR. GOETTLE:  -- we don't need the deposition

11  testimony.

12          THE COURT:  No, I agree.

13          MR. GOETTLE:  That's fine.

14          THE COURT:  But who took that deposition?

15          MR. GOETTLE:  One of my colleagues, who is an

16  excellent lawyer.

17          THE COURT:  I'm sure there's a lot of excellent

18  lawyers.  I'm just smiling because that was just a read.  No

19  foundation laid for his knowledge of the document.  Maybe he

20  wasn't focused on that. No, I'm not --

21          MR. GOETTLE:  I've made the same mistake.

22          THE COURT:  I probably have, too.  But raised as an

23  issue it had to be addressed.

24          MR. GOETTLE:  Yes.

25          THE COURT:  And it's been hanging out there for a

1    long time and it wasn't.

2           Well, we'll see what comes of this.  But I don't

3    think, based on what I've read of the transcript, and I

4    haven't read the whole thing, so I don't know what his job

5    was, I'm handing you a document.

6           Is this a table?  And he reads it, yes.

7           Are these components?  There are components of the

8    messaging system in this table.

9           MR. FINKELSON:  I don't recall --

10          THE COURT:  And then he goes a little further on,

11   based on one of those components is the MMSC, right?  And his

12   answer is, based on this document, it's showing that it's

13   there.

14          MR. GOETTLE:  Your Honor, we don't need to belabor

15   the point.  We will not play the deposition testimony.

16          THE COURT:  All right.  Well, I think the document

17   will probably come in.  I'm not sure on what grounds, but it

18   seems to me that that which distinguishes this document from

19   many others we've addressed is it, it was produced by Sprint.

20   I don't know that it qualifies it as an admission.  If you

21   think there are cases out there that say that, you might

22   present those to us.  Maybe we should convene a little

23   earlier tomorrow to address this.  Quarter after 9:00.

24          All right, anything else?

25          MR. GOETTLE:  Your Honor, not on deposition

1  designations, but there's two -- there's objections to two

2  other documents that Dr. Akl -- that we intended to get into

3  evidence during Dr. Akl's testimony.  They fall into a little

4  bit different category than the document you just looked at.

5  These were not produced by Sprint, they were produced by

6  third parties.  So to explain the reason that we're seeking

7  the admission of them, these are documents related to the

8  operation of Sprint's subscriber database, the HLR, the home

9  location register.

10      Sprint doesn't make the home location register.  The

11  Home Location Register is made by Alcatel Lucent and before

12  that by Lucent.  We took the depositions of two Sprint

13  employees after we subpoenaed the documents from Alcatel

14  Lucent to find out how the HLR worked.

15      THE COURT:  Okay.

16      MR. GOETTLE:  And so we have deposition testimony

17  essentially saying yes, these documents that we subpoenaed

18  and got from Alcatel to find out how Sprint's HLR works, the

19  witness has testified at deposition, yes, those are the types

20  of documents we, Sprint employees, would look at to figure

21  out how our HLR works.  And Sprint objects to these on the

22  grounds of hearsay.  And I'm not sure, I think it's just

23  hearsay.

24      MR. LOWERY:  I think it's both hearsay and

25  authenticity.

1           MR. GOETTLE:  So hearsay and authenticity.

2           THE COURT:  And the documents are produced by the

3   manufacturer of the HLR?

4           MR. GOETTLE:  Exactly, your Honor.  They were

5   produced by the manufacturer and shown to Sprint witnesses

6   that work with the manufacturer on the HLR.  And I have --

7           THE COURT:  I'm looking at Rule 703 which states

8   that "If experts in the particular field would reasonably

9   rely on those kinds of facts or data in forming an opinion on

10  the subject, they need not be admissible for the opinion to

11  be admitted."

12          MR. LOWERY:  Yes, your Honor.  I think we would have

13  no issue with Dr. Akl relying on the evidence.  I think the

14  issue would be at entering in and being published to the jury

15  or otherwise going back with the jury.

16          THE COURT:  Well, Dr. Akl can opine what it is

17  you're talking about.

18          MR. GOETTLE:  He can, yes, your Honor.  I understand

19  that.  I think the issue is that this is a dense technology

20  area and we have to prove that the HLR does mapping.  And the

21  best way we think to prove that to make it clear to the jury

22  is to use, in particular, in PX-172 to use a diagram in the

23  document to walk through how the HLR does the mapping side by

24  side with show the diagram next to the deposition testimony

25  that is explaining the diagram of how the mapping is

1  performed in the HLR.  And if we don't have -- my

2  understanding is if we don't have the document in evidence,

3  we can't publish it to the jury, which means we can't show

4  the jury this figure, which we would like to do.

5          We could make it demonstrative and sort of not use

6  the figure from the document, but I'd like to show --

7          THE COURT:  And the precise issue is that is an HLR

8  manufacturer different from the one that Sprint uses?

9          MR. GOETTLE:  No, it is the one that Sprint uses.

10 They bought it from Alcatel.  They put it in their network.

11 And we had to subpoena Alcatel to get documentation about it.

12 And so we got to documentation about it, then we took the

13 documentation from the deposition of Sprint witnesses.  And

14 we said, is this the type of document you would look at from

15 Alcatel to find out how your -- the HLR you bought --

16         THE COURT:  The type of document or is this the

17 document?

18         MR. GOETTLE:  Well, the witnesses didn't know if

19 this was "the" document.  They never knew if it was the

20 document.  This was the best we could get.  No witnesses knew

21 what "the" document is because there's all sorts of different

22 versions.  This is release 8.2.  And so the witnesses didn't

23 know if this was "the" document, but then when we walked

24 through the document, they said yes, this is how the HLR we

25 have works.

1           So I can have Dr. Akl testify to it as just a kind

2    of dumbed-down streamlined demonstrative.  I would prefer to

3    show the jury the actual document --

4           THE COURT:  Is that the document you're holding?

5           MR. GOETTLE:  This was one of the two, yes, your

6    Honor.

7           THE COURT:  It's an inch thick.

8           MR. GOETTLE:  It is an inch thick, your Honor.  I

9    certainly can cut it down to just the parts we would want to

10   rely on.  This is actually one of the thinner ones.

11          THE COURT:  That's encouraging.

12          MR. GOETTLE:  Hence --

13          THE COURT:  The boxes.

14          MR. GOETTLE:  Yes.  So I can do that, your Honor,

15   but it seems to me when the Sprint witness looks at the

16   document and then verifies that what it says is how their HLR

17   works, I should be able to get the document in and show it to

18   the jury.

19          THE COURT:  Well, I haven't read the testimony, the

20   precise testimony.  I'm sure you have it.  Did you take the

21   deposition of the witness at Alcatel Lucent?

22          MR. GOETTLE:  We did not, your Honor.  There was an

23   issue, so we did not.

24          THE COURT:  An issue?  They didn't want to appear or

25   --

1          MR. GOETTLE:  My recollection is that my firm took

2     over the case from another firm, and they had already deposed

3     Alcatel, and therefore we couldn't get a second deposition.

4     I forget if they deposed him or if they had already issued

5     the subpoena and then didn't follow it through and Alcatel

6     objected.  To be candid, your Honor, we didn't push after

7     they refused, but we had already subpoenaed them and --

8          THE COURT:  How long is the testimony, the

9     deposition testimony, of the Sprint witness?

10         MR. GOETTLE:  There's two different witnesses, your

11    Honor.  It's about five Q and A's from one witness and about

12    the same from the other.

13         THE COURT:  Well, let me look at that.

14         MR. GOETTLE:  Okay.  This has my writing on it, do

15    you mind?

16         I could actually get a clean copy -- all I wrote on

17    there was to sort of circle the parts I thought were

18    relevant.  I'm happy to hand this up to you or I could read

19    it to you.

20         THE COURT:  Whichever you prefer.

21         (Pause.)

22         THE COURT:  There's a certain sameness in the

23    questions that were asked of the witness.  You could have

24    gotten so much more out of this witness.

25         MR. GOETTLE:  Yes, your Honor.

1          THE COURT:  This examination doesn't quite flunk,

2    but boy.  It seems clear from the deposition that the exhibit

3    accompanied the HLR when it was sold by Alcatel to Sprint.

4    Is that objected to?

5          MR. LOWERY:  This particular exhibit?  I don't think

6    --

7          THE COURT:  Well, or one like it to explain the

8    workings of the Alcatel HLR that was provided to Sprint.

9          MR. LOWERY:  And I think there are similar or there

10   are other such documents that were produced by Sprint in this

11   case.  These were produced by Alcatel and therefore --

12         THE COURT:  Is there a similar document produced by

13   Sprint?

14         MR. GOETTLE:  I'm checking, your Honor.

15         I'm assuming the answer is no since we went through

16   the process of subpoenaing.

17         No.  This document was not produced by Sprint.

18         THE COURT:  I know that.  You said that.  This is an

19   Alcatel document.

20         MR. GOETTLE:  Your Honor, I'm sorry, I didn't mean

21   to --

22         THE COURT:  But I thought counsel for Sprint said

23   this is the kind of document that would have accompanied,

24   that would have been provided to Sprint when Alcatel provided

25   the HLR.

1        MR. GOETTLE:  Your Honor, Sprint did not produce

2    another document related to the HLR that shows the mapping

3    that's shown in this document.  So yes, they produced

4    documents related to this HLR or various releases associated

5    with this HLR, but they didn't produce this one.  And the

6    Sprint witness walked through this one and said "Yes, this

7    shows how the HLR does mapping."

8        THE COURT:  That would be great if the witness said

9    that.  That would have iced it.

10        MR. GOETTLE:  See, the witness --

11        THE COURT:  Did the witness say that?

12        MR. GOETTLE:  We didn't include it in there.  We

13    were trying to lay a foundation.  The witness did go on, and

14    we have this in Dr. Akl's presentation.  The witness went on

15    and during the deposition the question and answer followed

16    through the mapping so that we could make sure we understood

17    how the mapping went.  So that's not included in the snippet

18    I gave you, but Sprint knows about it because it was included

19    in the slide presentation that we served --

20        THE COURT:  My question is did any Sprint witness

21    admit that the document described, the mapping process of the

22    Sprint HLR?

23        MR. GOETTLE:  Yes.  That witness did.  Mr. Moss.

24        THE COURT:  Well, doesn't that answer the question?

25    Isn't that a proper foundation?

120

 1          MR. GOETTLE:  That would have been a good thing to

 2     include in what I handed up to you.

 3          THE COURT:  I don't want to get too good at patent,

 4     handling patent cases, but it sounds like you have the

 5     ingredients for a favorable ruling, pretty close here.  But

 6     that's the question I thought was missing.  And that's why

 7     I've said you've given me back to back the excerpt from the

 8     deposition -- no, it's not the same witness.

 9          (Pause.)

10          THE COURT:  How voluminous is the Moss deposition?

11     How long is the Moss deposition?

12          MR. LOWERY:  Two, and I think they were both very

13     lengthy.

14          MR. GOETTLE:  Oh, the length of the full day

15     deposition, your Honor, or just the piece that ...

16          THE COURT:  Was it?  I can figure out the length of

17     a full-day deposition.  I was hoping this was something less.

18     (Laughter.)

19          MR. GOETTLE:  Your Honor, we're a little

20     disorganized here, and I hate to take up more of your time.

21          THE COURT:  Let's pick it up tomorrow.  I'm inclined

22     to admit the document even based on what's here.  Because the

23     witness says, and I'll hear Sprint's response, this is a

24     summary guide to the HLR and Sprint.  So I believe you showed

25     a similar document for the SVM where it shows a summary of

1   all the components and features.  Was that the one, the first

2   issue of the -- no.

3            MR. GOETTLE:  This is unrelated to the other.

4            THE COURT:  Yes, yes, I see it's unrelated.  This is

5   the vendor provided documentation that provides high-level

6   overview of those.  So it is non-specific for Sprint, that

7   makes sense.  So if there are specific questions you have on

8   a feature, I could answer them on behalf of Sprint and if

9   they're on or not.

10           That part of the deposition on this issue doesn't

11  quite nail the issue.  But it tells me practically enough.

12  I'll defer ruling for now.  See if you can come up with

13  anything else.

14           Any other issues?

15           MR. GOETTLE:  That's it, your Honor, thank you.

16           THE COURT:  Shall we start a little earlier?  Shall

17  we start at 9:00?

18           MR. GOETTLE:  Sure.

19           THE COURT:  I want to keep the case going.  Can you

20  give me some idea -- so we'll start at 9:00.

21           MR. GOETTLE:  Can I give you some idea?

22           THE COURT:  Of how you're proceeding timewise?  It

23  sounds like you're getting through the witnesses quickly.

24           MR. GOETTLE:  I think that's right.  We're on the

25  schedule that we're hoping to be on.  Tomorrow Dr. Akl's

 1   direct testimony will take maybe a little bit more than half

 2   the day, and he is by far our longest witness.

 3           THE COURT:  When do you expect to finish?

 4           MR. HANGLEY:  The case?

 5           THE COURT:  No, just Comcast.

 6           MR. GOETTLE:  Dr. Akl?

 7           THE COURT:  No, Comcast.

 8           MR. GOETTLE:  Comcast, by the end of Friday.  That

 9   would be my hope.

10           MR. HANGLEY:  I'm thinking that we might be able to

11   do it by the end of Thursday.

12           COUNSEL:  No.

13           MR. GOETTLE:  Friday's a good bet, your Honor, if

14   they proceed the way they did today, there's no juror

15   problems, nothing.

16           THE COURT:  Well then, the rebuttal, you're at least

17   going to have to rebut Sprint's evidence on validity.  So it

18   will be a long --

19           MR. GOETTLE:  I'm talking about our case in chief.

20           THE COURT:  Are you going to cover some in your case

21   in chief?

22           MR. GOETTLE:  No.  I'm sorry, I thought you meant

23   when we were going to be done our case in chief.

24           THE COURT:  Yes, I did mean that.

25           MR. GOETTLE:  I think that Friday is a good guess

123

1  right now.

2          THE COURT:  All right, so we're still pretty much on

3  target, two and a half weeks.

4          Yes.  You don't know what they're going to do on

5  validity.

6          MR. GOETTLE:  I think they're going to drop it, your

7  Honor.  (Much laughter.)

8          THE COURT:  I didn't realize there was quite so much

9  on invalidity.  I didn't realize all of those references to

10  documents, to studies, reports were reviewed.  I looked at

11  the three patents --

12          MR. HANGLEY:  You mean in the reexam application?

13          THE COURT:  Yes.  And Mr. Marcus certainly explained

14  that.  And I missed the part that said continued on a lot of

15  prior art.

16          All right, is there anything else we have to do?

17          MR. FINKELSON:  I don't believe so.

18          MR. GOETTLE:  No, your Honor.

19          MR. FINKELSON:  Have a nice evening.

20          THE COURT:  Have a good evening.  See you tomorrow

21  morning at 9:00.  You may go about your business.

22          (Court concluded for the day at 5:00 o'clock p.m.)

```
 1                          INDEX
 2    WITNESSES                   D      C      RD      RC
 3    James Finnegan, Continued
 4      By Mr. Hangley             6
 5      By Mr. Riopelle                  11
 6    Mark Dellinger
 7      By Ms. Melley             13             60
 8      By Mr. Riopelle                  36
 9    David Marcus
10      By Mr. Hangley            65
11                              - - -
12    EXHIBITS                  RECEIVED IN EVIDENCE
13    PX-8                              26
14    PX-1, PX-5, PX-6, PX-7            76
15                              - - -
```

CERTIFICATION


        I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET          Date 2/1/17
Laws Transcription Service