IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

COMCAST CABLE            : CIVIL NO. 12-859
COMMUNICATIONS, LLC,     :
et al.,                  :
              Plaintiff  :
                         :
                         :
                         :
                         :
                         :
     v.                  :
                         :
                         :
                         :
                         :
                         :
SPRINT COMMUNICATIONS    : Philadelphia, Pennsylvania
COMPANY L.P., et al.,    : February 2, 2017
              Defendant  : 9:06 a.m.

- - -

TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 4
BEFORE THE HONORABLE JAN E. DUBOIS
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104

2

```
1    APPEARANCES:              (Continued)

2    For the Defendant:     DAVID E. FINKELSON, ESQUIRE
                            BRIAN C. RIOPELLE, ESQUIRE
3                           McGuire Woods, LLP
                            Gateway Plaza
4                           800 East Canal Street
                            Richmond, VA 23219
5
                            COLLEEN H. SIMPSON, ESQUIRE
6                           Harkins Cunningham, LLP
                            4000 Two Commerce Square
7                           2001 Market Street
                            Philadelphia, PA 19103
8
                                  - - -
9
     Audio Operator:       Michael Cosgrove
10
     Transcribed By:       Michael T. Keating
11
                                  - - -
12
              Proceedings recorded by electronic sound
13   recording; transcript produced by computer-aided
     transcription service.
14
                                  - - -
15

16

17

18

19

20

21

22

23

24

25
```

1          (The following was heard in open court at

2     9:06 a.m.)

3          THE COURT:  Good morning, everybody.

4          ALL:  Good morning, Your Honor.

5          THE COURT:  Please be seated.  We recessed

6     yesterday after having started discussions on two

7     objections, both involving exhibits.  Let's address

8     the first objection that concerned the -- with the

9     document PX-174.

10          MR. FINKELSON:  Your Honor, Dave Finkelson

11     for Sprint.  Heeding Your Honor's instructions or

12     guidelines at the end of the day yesterday, Sprint

13     has withdrawn its objection to PX-174 so that we can

14     proceed in an orderly fashion with Dr. Akl today

15     without any delay.

16          THE COURT:  All right.  I can tell you when

17     I researched the question -- we were here fairly

18     late, and I don't want to keep blurting it over you,

19     but there was absolutely no basis, none, for the

20     position you took.  A document produced by a party

21     opponent -- well, courts have said it differently,

22     but the Ninth Circuit said it best.  I'll get it.

23          (Pause in proceedings.)

24          THE COURT:  "Documents produced by a party

25     in discovery were deemed authentic when offered by a

4

1  party opponent," Ninth Circuit, <u>Orr versus Bank of</u>

2  <u>America</u>, 2002.

3           (Pause in proceedings.)

4           THE COURT:  I don't know that Circuit Judge

5  Sneed.  But in the Third Circuit, one of my

6  colleagues got it wrong and excluded a document.  And

7  my good friend and classmate, now deceased, Judge

8  Becker, got it right.  The case was <u>McQueeney versus</u>

9  <u>Wilmington Trust Company</u>.  "We hold that

10  circumstantial evidence may, in principle, suffice to

11  authenticate a document.  All that is required is a

12  foundation from which the fact finder could

13  legitimate infer that the evidence is what the

14  proponent complains it to be."  My colleague kept the

15  evidence out.  Chief Judge Becker said wrong.

16           For future reference, I don't -- I'm not

17  sure that all your work is in the Third Circuit.  I

18  suspect you travel.  But I think the general -- well,

19  the general rule is that party opponent documents

20  come in without going through an authentication

21  unless the party opponent says it's a fraud -- it's a

22  fraudulent document.  And that's true with respect to

23  business records.  Earlier in the trial, the argument

24  was that the requirements of Rule 803(6) were not

25  met.  The objector was the party whose document was

5

1  at issue.  I don't think that's good law and I so

2  rule.  But I'm glad we've resolved the problem.  I

3  wish we had resolved it yesterday.  We all could have

4  gotten home a little earlier.  The one advantage you

5  have over me is you have a very, very, very short

6  drive to your destination at day-in, and I don't.

7          All right, the second issue, the HLR issue.

8  Okay.  We've got a few bits of deposition transcripts

9  this morning.

10         MR. GOETTLE:  Yes, Your Honor.  I can -- I

11 can briefly summarize --

12         THE COURT:  Okay, good.

13         MR. GOETTLE:  -- and I can also take you to

14 the really salient part of that deposition.

15         THE COURT:  Do we still have an objection

16 to the -- we're talking about the Alcatel-Lucent

17 document.

18         MR. FINKELSON:  I think, Your Honor, from

19 our perspective, it stands where it has yesterday.

20 We didn't receive from Comcast the deposition

21 testimony, the additional deposition testimony,

22 that --

23         THE COURT:  You didn't?

24         MR. FINKELSON:  -- they're relying on.  I

25 think the particular --

6

1          MR. GOETTLE:  I handed it to counsel this

2     morning, Your Honor.

3          THE COURT:  Well, I didn't get it in

4     advance so --

5          MR. FINKELSON:  I haven't -- I haven't had

6     a chance to read it, Your Honor.

7          THE COURT:  Well, yesterday's deposition

8     transcript, which is summarized in the first of the

9     two exhibits, PX-172 at page 191, that part of the

10    transcript is the same.  It's a little longer -- much

11    longer, but it starts in the same place.  Go ahead.

12         MR. GOETTLE:  So, Your Honor, Mr. Moss, who

13    is the deponent for -- I'm going to focus on PX-172.

14         THE COURT:  Yes, that's where I am.

15         MR. GOETTLE:  Mr. Moss, who is the

16    deponent, was the corporate representative.  He was a

17    30(b)6 witness.  And the document that we put in

18    front of --

19         THE COURT:  30(b)6 from Alcatel?

20         MR. GOETTLE:  I'm sorry.  No, from Sprint,

21    Your Honor.  So let me step back and we'll --

22         THE COURT:  I'm sorry.  Okay.  All right.

23         MR. GOETTLE:  So Alcatel-Lucent was the

24    supplier.  We subpoenaed them, we got the documents,

25    and then we put the documents in front of the

7

1   Sprint --

2           THE COURT:  Okay.  Got it.

3           MR. GOETTLE:  -- 30(b)6 witness.

4           THE COURT:  Fine.

5           MR. GOETTLE:  The document, like I said,

6   was received from Alcatel in response to our

7   subpoena.  It's a summary guide on how one of the

8   HLRs in Sprint's network worked.  Over the course of

9   the damages period, they moved from one version of

10  Alcatel HLR to another, so this was an earlier

11  version.  And the witness on -- in the transcript at

12  192 said that the document was a high level

13  explanation of BH -- SDHLR that's --

14          THE COURT:  What line?

15          MR. GOETTLE:  -- that's in Sprint's

16  network.

17          THE COURT:  What line?

18          (Pause in proceedings.)

19          MR. GOETTLE:  It is at --

20          THE COURT:  I don't see that --

21          MR. GOETTLE:  Where is it?

22          THE COURT:  -- at page --

23          MR. GOETTLE:  Oh, I'm sorry, 191, line 18,

24  question,

25          Question:  "And does this relate to the

1    SDHLR that's implemented at Sprint?"

2           Answer:  "This is a summary guide to the

3    SDHLR in Sprint."

4           THE COURT:  All right, good.

5           MR. GOETTLE:  And I guess -- I think the

6    salient part is at page -- is on page 217, going to

7    the end.  It's a lot of technical speak.  But what's

8    going on here, Your Honor -- it's at page 217.  As I

9    mentioned yesterday, what's going on here is Mr. --

10   the witness, the 30(b)6 witness, is walking through

11   how the SDHLR in Sprint's mapping works with respect

12   to messaging.

13          Dr. Akl today is going to show the diagram

14   that there's -- that is being discussed at the

15   deposition on these pages.  Dr. Akl is going to show

16   the diagram, is going to explain the diagram to the

17   jury, to show how the SDHLR maps.  And next to that

18   diagram on the slide is snippets from this testimony

19   confirming Dr. Akl's understanding of

20   the -- of the diagram.  So that's why we want to

21   show -- we want to show the diagram in its native

22   habitat from the document on the screen and then have

23   Dr. Akl show he looked at the diagram, he understood

24   what it meant, and he confirmed it through the

25   deposition testimony of the witness, that is

9

1   describing how the device works in Sprint's network.

2   That's what's shown on 217 through 222.

3            THE COURT:  What part of the Moss

4   deposition do you plan to offer?

5            MR. GOETTLE:  Well, Your Honor --

6            THE COURT:  Or none?

7            MR. GOETTLE:  None, if we get the doc --

8   none.  None.  This -- we're focused on the

9   admissibility of the document, and we think it is

10  admissible because it's been adopted by the employee

11  who has -- looking at the document -- granted, not

12  produced by Sprint, but looking at it and saying yes,

13  this is a high level summary of our device we have in

14  our network that we bought from Alcatel, and here's

15  how it works.

16           THE COURT:  And what you want me to do is

17  rule that the document comes in?

18           MR. GOETTLE:  Yes, Your Honor.

19           THE COURT:  But you have to offer -- if

20  there's no agreement, you have to offer the

21  deposition.

22           MR. GOETTLE:  We can -- we have it

23  designated and we can certainly play it for the jury.

24  It seems like in the need for speed for this case --

25           THE COURT:  Yes, it's not --

10

1          MR. GOETTLE:  -- but we're happy to do it.

2          THE COURT:  It's not going to advance the

3    issue of speed.  I seem to recall one of you focused

4    on speed at the very beginning of the trial.  That's

5    very good for the Court because the Court is not

6    exactly overwhelmed by speed, but speed is

7    significant.  I'm playing on your words.

8          MR. GOETTLE:  Yes, Your Honor.  I'm glad

9    you're playing on them that way because it sounded

10   positive.

11         THE COURT:  I hope I haven't been too

12   negative.

13         MR. GOETTLE:  Oh, no.  I didn't mean to

14   suggest that.

15         THE COURT:  At the beginning of the trial

16   and at the end of the trial, rest assured you know

17   more about the patent involved in this case than I'll

18   ever know.  I'm not going to comment on your

19   collective knowledge of the rules of evidence, unless

20   you're just testing me to see if I know the rules of

21   evidence.  But the bottom line, let me turn to Sprint

22   and see what Mr. Finkelson has to say on this issue.

23         MR. FINKELSON:  Your Honor, thank you.  Our

24   position with respect to PX-172 is that this was a

25   document produced by Alcatel-Lucent pursuant to a

11

1   subpoena.  Comcast, for reasons that are not

2   completely clear to me, but made a decision not to

3   take the deposition of Alcatel-Lucent, which is what

4   you do when you get documents from a third party to

5   establish that they are that third party's business

6   records.

7           THE COURT:  Well, they explained that, Mr.

8   Finkelson.  Apparently, a prior law firm took an

9   Alcatel-Lucent deposition and there was a little

10  friction, and maybe there's no well, love lost

11  between -- or was not at the time any love lost

12  between Alcatel-Lucent and Comcast.  But in any

13  event, he explained, Mr. Goettle explained, why a

14  second deposition was not taken.

15          MR. FINKELSON:  And I understand that, and

16  I don't begrudge Mr. Goettle, nor Comcast for its

17  decision, but that's not an exception, Your Honor, in

18  our mind, to the rules of evidence as they apply to

19  having to establish --

20          THE COURT:  No, what you have to do -- and

21  I'm sure you've read this moss deposition.  He's your

22  witness.  And what you have to decide is is Moss --

23  is the Moss testimony sufficient to establish with

24  reasonable certainty that the exhibit is what Comcast

25  says it is.  It's the Alcatel-Lucent -- I don't know

12

1   what you call the exhibit.  I haven't seen it yet

2   except from a distance of 30 feet and I can't read it

3   at that distance.  But the bottom line, is it what

4   Comcast says it is?  And if so, can we avoid putting

5   the Moss deposition in evidence?  If not, we'll have

6   to put the Moss deposition in evidence unless -- I'm

7   just thinking.  No, I don't think there's a way under

8   Rule 702 -- is it 702?

9           MR. GOETTLE:  I believe it's 703, Your

10  Honor.

11          THE COURT:  I think you're right.  Under

12  Rule 703, an expert can rely on documents that are

13  not in evidence if experts in the field regularly

14  rely on such documents.  So the deposition is not

15  necessary and the document itself need not be offered

16  into evidence to get into evidence what it is I think

17  Dr. Akl is going to say about this exhibit.  But

18  Comcast wants to offer the exhibit.  It's Rule 703.

19  You were right.

20          MR. FINKELSON:  And we don't have an

21  objection, Your Honor, to Dr. Akl relying upon it

22  under Rule 703, as distinguished from admitting the

23  document into evidence.  That's always been our

24  position.

25          THE COURT:  All right.  Well, then what we

13

1    will do -- that's a choice you have to make.

2            MR. GOETTLE:  Thank you, Your Honor.

3            THE COURT:  The document does not come in

4    unless you read this part of the deposition or play

5    this part of the deposition.  And Dr. Akl is

6    testifying by video or live?  He's here?

7            MR. GOETTLE:  He's here, Your Honor.

8            THE COURT:  So he's not going to testify by

9    video.

10           MR. GOETTLE:  No, he's not.

11           MR. FINKELSON:  That would make me -- would

12   make it very difficult for me to cross-examine him

13   this afternoon.

14           MR. GOETTLE:  Well, then maybe he'll play

15   by video.

16           THE COURT:  If we were going to use video,

17   the idea would have been you would have done that

18   before.

19           MR. FINKELSON:  I understand.

20           THE COURT:  All right.  Well, this ought

21   not to slow us down --

22           MR. GOETTLE:  Okay.

23           THE COURT:  -- very much.  So we'll

24   read -- that part of the deposition has to come in.

25   That's what you want, Mr. Finkelson, is that correct?

14

1          MR. FINKELSON:  I believe that --

2          THE COURT:  I'm going to -- I'm going to

3    let the exhibit in if the -- if there's no agreement

4    provided the pertinent parts of the deposition are on

5    the record.  And you could --

6          MR. FINKELSON:  I understand.  I

7    understand.

8          THE COURT:  And that's a point that you can

9    take and --

10          MR. FINKELSON:  I think Your Honor just

11    clearly stated what -- clearly stated that you're

12    going to let the document in.  If that happens --

13          THE COURT:  Well, because I've read it and

14    it --

15          MR. FINKELSON:  And --

16          THE COURT:  -- seems clear to me that Moss,

17    your witness, says yes, this is the document that we

18    use in our HLR, and it was provided by Alcatel-

19    Lucent.

20          MR. FINKELSON:  And what I was just going

21    to say, Your Honor, is if that's the ruling of the

22    Court, that the document can come in that way, I am

23    not going to belabor the proceedings by asking

24    Comcast to play the deposition testimony.

25          THE COURT:  All right.

15

1          MR. FINKELSON:  I think there's a different

2     issue, Your Honor, with respect to PX-181, which is

3     the other Alcatel-Lucent document.

4          THE COURT:  Oh, I haven't seen that.

5          MR. GOETTLE:  That's -- Your Honor, we're

6     going to -- we're not going to -- we're not going to

7     seek to admit the document.  So we'll call it right

8     here and --

9          MR. FINKELSON:  I was sure I was right on

10    the rules of evidence on that one.

11         THE COURT:  Do you want to check it?

12         MR. GOETTLE:  There might be a reason that

13    I'm agreeing to this compromise, Your Honor.

14         MR. FINKELSON:  Let the record reflect.

15         THE COURT:  In other words, Comcast didn't

16    convince you and you don't think they would convince

17    me.

18         MR. GOETTLE:  So, no, the other exhibit we

19    will not be offering into evidence, Your Honor.

20         THE COURT:  I'm not going to -- I don't

21    think we have to touch it.  And we're right on time.

22         MR. GOETTLE:  Your Honor, there is

23    another -- there is another issue that I don't think

24    will derail us, but another challenge that we seek

25    the Court's guidance on.

16

1        THE COURT:  Derailing is not --

2        MR. GOETTLE:  Right.

3        THE COURT:  -- going to happen in this

4   case.

5        MR. GOETTLE:  Can we take that up now, Your

6   Honor?

7        THE COURT:  Absolutely.

8        MR. GOETTLE:  Okay, Your Honor, we're going

9   to or we would like to read into the record some

10  Sprint admissions obtained during discovery in

11  response to Comcast's request for admissions.

12       THE COURT:  Okay.

13       MR. GOETTLE:  And I think probably the

14  easiest way to -- the speediest way to explain the

15  issue is to hand up what I've already provided to

16  Sprint counsel, kind of a color-coded summary of what

17  we think should get read in and what we think should

18  not get read in.

19       THE COURT:  These are requests for

20  admissions and responses?

21       MR. GOETTLE:  They are, Your Honor.

22       THE COURT:  Overall, before you hand

23  anything up, what's the issue?

24       MR. GOETTLE:  The issue is that Com --

25  Sprint asked -- Comcast asked Sprint to admit, for

1    example, that Sprint's database called the SPS is a

2    core network element under Sprint's proposed

3    construction, which this Court largely adopted.  And

4    the first part of the Sprint response admits that

5    it's a core network element.  But the second part of

6    the response goes on with the second sentence that

7    says, "Sprint admits that it is further Sprint's

8    position that any construction of cellular network

9    that would exclude Sprint's current SMSCs and MMSCs

10   would also exclude the SPS, this database."

11          So what they're saying is under any

12   construction -- because at this time we didn't have

13   the Court's construction -- under any construction

14   that would per se exclude Sprint's messaging servers

15   would also exclude Sprint's subscriber database

16   called the SPS.  That part should not be read to the

17   jury because it is contrary to the Court's

18   construction.  The Court's construction does not per

19   se exclude Sprint's messaging servers.  That's what

20   both parties told the jury yesterday.  It's up to the

21   jury to figure that out.  So the construction does

22   not exclude it per se.  That sentence should not be

23   read to the jury.

24          THE COURT:  You better hand it up.  I'll

25   look at it and give you a chance to respond.

18

1          MR. FINKELSON:  And Ms. Rachford, Your

2   Honor, is going to respond to the issue on behalf of

3   Sprint.

4          (Pause in proceedings.)

5          MS. RACHFORD:  Good morning, Meghan

6   Rachford.

7          THE COURT:  Good morning.

8          MS. RACHFORD:  Sprint's position on this is

9   that to not include what Comcast has highlighted here

10  in green would be very misleading and incomplete.

11  The response does not say that if the SMSCs or MMSCs

12  are per se excluded form the construction, that the

13  SPS or LDAP would be out.  What Sprint is saying here

14  is we qualified our answer.  The Court had not

15  construed the term "cellular network" when we

16  responded to this RFA.  It said that under what it

17  believes to be the proper construction, the SPS or

18  LDAP is part of the cellular network --

19          THE COURT:  Yes, but that's not the proper

20  construction.  I ruled otherwise.

21          MS. RACHFORD:  Correct.  And that's why

22  it's very misleading for Comcast to put in a single

23  sentence when, as our expert is going to testify in

24  this case, if the SMSCs and MMSCs are outside the

25  network, then so are the SPS and the LDAP.

19

1          THE COURT:  Well, I don't -- my initial

2    reaction is what is underscored and parenthesized in

3    yellow is not admissible -- not admissible because

4    the proper construction of cellular network is not

5    the one to which the admission applies, and it will

6    further confuse the jury.

7          MR. GOETTLE:  I'm sorry, Your Honor, I'm

8    not following.

9          THE COURT:  I'm not into the yellow-green.

10         MR. GOETTLE:  Yes.

11         THE COURT:  I don't think the yellow part

12   of the admission is admissible.

13         MR. GOETTLE:  Oh, I see, because Sprint's

14   construction was a little bit different than what the

15   Court adopted?

16         THE COURT:  It's different.

17         MR. GOETTLE:  Okay.

18         THE COURT:  It's not the same as my

19   construction.

20         MR. GOETTLE:  Okay.  Understood, Your

21   Honor.  And that was not an objection that Sprint was

22   raising.

23         THE COURT:  Oh.

24         MR. GOETTLE:  But I understand the Court's

25   position.  Thank you.

20

1    THE COURT:  So that's evidence and

2 objections that we go back to?  I'm looking at Mr.

3 Finkelson.  He's not smiling.

4    MR. FINKELSON:  I'm happy to -- I'm happy

5 to smile and respond.  Your Honor, we tried to

6 reach -- there were other -- there were other RFAs

7 that they asked us about and, frankly, we tried to

8 reach an accommodation with them so that they could

9 present what they wanted to present on other RFAs

10 with respect to the yellow.

11    THE COURT:  I can sympathize with you, Mr.

12 Finkelson, and Comcast as well, when addressing

13 requests for admissions.  As a lawyer, I found out

14 that that's the single most difficult thing to do, to

15 handle, in litigation.  I disliked them intensely.

16    MR. FINKELSON:  But we -- but we do agree

17 that the yellow portions, given the reference to the

18 proper construction, that those shouldn't be shown to

19 the jury either.

20    THE COURT:  Except you didn't say that.

21 But in any event, that's my ruling.  So --

22    MR. FINKELSON:  Thank you.

23    THE COURT:  -- the first issue is a non-

24 issue.  Is there another issue?  There's another.

25    MR. GOETTLE:  They're the same -- they're

1    the same issue, Your Honor, so ruling on one rules on

2    both.

3              THE COURT:  Okay, good.

4              MR. GOETTLE:  I'm just pausing now, Your

5    Honor, because we have a listed of unobjected to RFAs

6    that we have been planning to read to the jury, and

7    maybe we need to revisit that in light of the Court's

8    guidance this morning.

9              MR. FINKELSON:  We're happy to confer with

10   you on that on the break.

11             MR. GOETTLE:  I don't want to read them

12   into the record and do anything to offend the Court

13   based on this morning's ruling.

14             THE COURT:  To offend the Court?

15             MR. GOETTLE:  Well --

16             THE COURT:  No, don't worry about offending

17   the Court.  Present the case as you see fit.

18             MR. GOETTLE:  Okay.

19             THE COURT:  I'm --

20             MR. GOETTLE:  Thank you, Your Honor.

21             THE COURT:  Well, I think you know the

22   rules of evidence, at least someone on your team

23   does.  And if there's no problem, then you need not

24   clear it with me first.

25             MR. GOETTLE:  Oh, okay.

1          THE COURT:  If there's a problem, if Sprint

2     objects, then we'll address them.  I think it's best

3     to address them in this fashion before call the jury

4     in.  I'd prefer to keep the sidebar conferences to a

5     minimum.  They're important and if we need to go to

6     sidebar, we will.  But issues that we can address, as

7     we're addressing these, I'd prefer to do it the way

8     we've done it this morning.

9          MR. GOETTLE:  Thank you, Your Honor.

10          MR. FINKELSON:  Thank you, Your Honor.

11          THE COURT:  Are we through with the --

12          MR. HANGLEY:  No, there's one more matter,

13     Your Honor.  Yesterday, in my rush to meet the 4:20

14     adjournment and get the witness done his direct, I

15     kind of overshot the runway on a couple of things, at

16     least maybe five or ten minutes of testimony that I

17     would like to put on on direct.  Mr. Finkelson has

18     said -- suggested that I put it off to redirect,

19     but --

20          MR. FINKELSON:  If it's within the scope of

21     the cross.

22          MR. HANGLEY:  -- he says it's got to be, of

23     course, within the scope, and I don't know -- that's

24     in his control.  I would --

25          THE COURT:  I think if we were in the

23

1  middle of cross, that's what we would do.  But since

2  we haven't begun the cross, your request is granted.

3          MR. HANGLEY:  I appreciate that and I

4  apologize for --

5          THE COURT:  No.

6          MR. HANGLEY:  -- jumping the gun that.

7          THE COURT:  No need to apologize.  Very

8  little discretion involved.  That's sort of a

9  no-brainer.

10          MR. HANGLEY:  Thank you, Your Honor.

11          THE COURT:  You may continue the direct

12  examination.  Are we ready to begin?

13          MR. FINKELSON:  We are, Your Honor.

14          MR. HANGLEY:  I just got to go find the

15  witness.

16          THE COURT:  That would be good.

17          COURTROOM DEPUTY:  All of the jurors are

18  here as well.

19          THE COURT:  Okay, that's good.  We'll wait

20  until the witness is available.

21          (Pause in proceedings.)

22          THE COURT:  We'll bring the jury in.  Good

23  morning, Mr. Marcus.

24          MR. MARCUS:  Good morning, Your Honor.

25          (Pause in proceedings.)

Mr. Marcus - Direct                          24

1          (Jury in, 9:36 a.m.)

2          THE COURT:  Good morning, everybody.

3   Please be seated.  Yesterday, when we recessed Mr.

4   Hangley had reported that he finished his direct

5   examination.  This morning, he requested permission

6   to ask additional questions.  So instead of going to

7   cross-examination by Sprint, we'll hear additional

8   questioning from Mr. Hangley, and that will be direct

9   examination in Comcast's case.  When Mr. Hangley

10  finishes Sprint will cross-examine Mr. Marcus.  Mr.

11  Hangley?

12         MR. HANGLEY:  Thank you, Your Honor.

13              <u>DIRECT EXAMINATION</u>

14  BY MR. HANGLEY:

15  Q   Good morning, Mr. Marcus.

16  A   Good morning.

17  Q   There was testimony yesterday with respect to an

18  agreement with Verizon, what I'll call the Verizon

19  peace agreement.  Do you recall when that was entered

20  into?

21  A   I believe it was in September -- sometime in

22  September of 2008.

23  Q   And how did that agreement come about?  What led

24  to it?

25  A   So I joined Comcast in it was April of 2007, and

1   shortly after that, or maybe it was in the beginning

2   of 2008, Verizon approached Comcast --

3           MR. FINKELSON:  Objection, Your Honor,

4   hearsay.

5           THE COURT:  Do you have knowledge of the

6   Verizon approach to Comcast, personal, direct

7   knowledge?

8           THE WITNESS:  I do, Your Honor.

9           THE COURT:  overruled.

10  BY MR. HANGLEY:

11  Q   Continue.

12  A   So Verizon approached Comcast and alleged that we

13  infringed --

14          MR. FINKELSON:  Objection, Your Honor,

15  hearsay.  He's referring to out-of-court statements

16  made by Verizon.

17  BY MR. HANGLEY:

18  Q   Same question, do you have personal knowledge of

19  this?

20  A   Yes, I was in the room when they made them.

21  Q   Thank you.

22          MR. FINKELSON:  Your Honor, I'd ask that

23  that response be struck and the question called for

24  hearsay.

25          THE COURT:  Why am I having trouble with

Mr. Marcus - Direct                              26

1    this ruling?

2            MR. HANGLEY:  Darned if I know.  It sounds

3    to me --

4            MR. FINKELSON:  Your Honor, the witness is

5    referring to --

6            THE COURT:  Maybe we ought to go to

7    sidebar.

8            (Sidebar discussion as follows.)

9            MR. HANGLEY:  Your Honor, know what, Your

10   Honor, why don't I just move on to the next question.

11           THE COURT:  No, I'm going --

12           MR. HANGLEY:  Okay.

13           THE COURT:  -- to rule (indiscernible).

14           (Pause in proceedings.)

15           MR. HANGLEY:  I don't understand the

16   objection.  He said he was in the room when the

17   statements were made.

18           MR. FINKELSON:  If it was made by Sprint,

19   it's an admission, but it's made by Verizon.

20           MR. HANGLEY:  Pardon me?

21           THE COURT:  Well, how can Comcast get into

22   the record an approach by Verizon stating that we

23   think you're infringing, is what he's trying to do.

24           MR. HANGLEY:  How can we get it into the

25   record?

Mr. Marcus - Direct                    27

1        THE COURT:  No, without --

2        MR. HANGLEY:  Without -- if that went to

3  the truth of anything that was hearsay, that was

4  excludable, it would be that we're infringing.

5  That's the truth that's unreliable for.  And, in

6  fact, nobody is arguing that out of this witness.

7  He's simply saying our state of mind --

8        THE COURT:  All right.  If your -- if it's

9  offered -- and I'm trying to think whether it could

10  be offered not to establish the truth, but only to

11  establish that it was said.

12        MR. HANGLEY:  Of course.  The last thing we

13  want to do is --

14        THE COURT:  Establish --

15        MR. HANGLEY:  -- establish the truth of

16  what -- of what they were accusing us of.

17        MR. FINKELSON:  The truth --

18        MR. HANGLEY:  That's the last thing I want

19  to do.

20        MR. FINKELSON:  The statement is

21  (indiscernible) to bring in the statement is for the

22  truth of the matter asserted, which is we allege

23  (indiscernible).

24        MR. HANGLEY:  That's (indiscernible).

25        MR. FINKELSON:  It's not for his state of

Mr. Marcus - Direct                28

1    mind.  It's (indiscernible) statement by a third

2    party for which there is no exception to the hearsay

3    rule.  (Indiscernible).

4         MR. HANGLEY:  The truth of the matter

5    that -- the truth of the fact that Verizon said it,

6    that's not hearsay.  He was there.

7         THE COURT:  Goettle is smiling.  He thinks

8    you finally stumped me on an evidentiary question.

9         MR. GOETTLE:  No, not at all, Your Honor.

10        THE COURT:  I think it comes in.  Not --

11   and I'll explain to the jury it doesn't come in to

12   establish the truth of the statement, but only that

13   there was --

14        MR. HANGLEY:  You mean it doesn't come in

15   to establish the truth of the accusation?

16        THE COURT:  Yes.

17        MR. HANGLEY:  I hope you'll use that word

18   because that will make it clear.

19        (Sidebar discussion concludes.)

20        THE COURT:  Ladies and gentlemen, this is

21   an objection based on hearsay that we went to sidebar

22   to address.  There's an exception to the hearsay rule

23   if a statement is offered not to establish the truth

24   of what was said.  And in this case it -- the answer

25   about Verizon approaching Comcast and stating you've

Mr. Marcus - Direct                                    29

1   infringed our patents is offered only to show that it

2   was said -- it was said to this witness, and not to

3   establish the truth of the allegation.  So this

4   witness' state of mind is that according to Verizon,

5   we are -- we, Comcast, are infringing a Verizon

6   patent or Verizon patents.  Does that address the

7   issue?

8            MR. HANGLEY:  Yes, it does, Your Honor.

9            THE COURT:  All right.

10           MR. HANGLEY:  Thank you very much.

11           THE COURT:  And now -- I don't think the

12  question has been answered.

13  BY MR. HANGLEY:

14  Q   How do you know that they made that statement?

15  A   I was in the room when they made the statement.

16  Q   Okay.  And just to be clear, to follow up on what

17  the Judge said, you're not saying that they were

18  right in making such an accusation?

19  A   No, we believe they were wrong.

20  Q   Okay.  Thank you.  Now, how did you arrive at

21  peace?

22  A   So after a series of negotiations and meetings

23  with Verizon, we eventually entered into -- we came

24  up with an arrangement by which we could resolve the

25  allegations, and that's the September 2008 agreement.

Mr. Marcus - Direct                              30

1    Q   Okay.  Now, you -- let me ask you a question

2    about your relations with AT&T.  We've heard Mr.

3    Finnegan's testimony that AT&T was an aggressor.  Was

4    that correct at some point?

5              MR. FINKELSON:  Objection, Your Honor.

6    Your Honor, may we approach at sidebar with respect

7    to that question?

8              MR. HANGLEY:  I'm not going to be using any

9    documents, Your Honor.

10             THE COURT:  Apparently, there's an --

11             MR. FINKELSON:  I believe it's getting into

12   issues that Your Honor has -- or perhaps getting into

13   issues that Your Honor has already decided with

14   respect to --

15             THE COURT:  That contract is out of the

16   case.

17             MR. HANGLEY:  And I'm not asking about a

18   contract.

19             THE COURT:  All right.  Well, thanks for

20   alerting me, Mr. Finkelson, and maybe we'll have to

21   address an objection, but that objection is

22   overruled.

23             MR. FINKELSON:  Thank you, Your Honor,

24   understood.

25             THE COURT:  You have to repeat the

1    question.

2    BY MR. HANGLEY:

3    Q    Was AT&T also an aggressor at one point?

4    A    It was, yes.

5    Q    Now, there is not now any agreement, written

6    agreement, between Comcast and AT&T that is still

7    within its contractual term, is that correct?

8    A    That is correct.

9    Q    Okay.  Is AT&T still an aggressor?

10   A    We consider it still to be a potential aggressor,

11   yes.

12   Q    Okay.  And have there been any further saber-

13   rattlings by AT&T in recent times?

14   A    Not since our last interaction with them, no.

15   And I -- you know what I would say is the reason I

16   think they have not come back is because of our

17   acquisition strategy in that we now have a very large

18   patent portfolio.

19   Q    Okay.  And how are you using that portfolio?  Are

20   you going out and selling to people?

21   A    No, we've never affirmatively approached any

22   other company or person, and we've never -- for

23   licensing, and we've never in the first instance sued

24   anybody for patent infringement.

25   Q    Does Comcast have a policy in that regard?

Mr. Marcus - Direct                                    32

1   A    When I hear policy I think of a written document

2   and --

3   Q    No.

4   A    -- so I would say there's no written document,

5   but our policy or practice is that it's -- these are

6   defensive assets.

7   Q    Okay.  And I'd like to talk to you just briefly

8   about the chronology of some things that I think

9   we've already talked about.  The agreement with Nokia

10  as to the price of the acquisition of the patents,

11  when was that?

12  A    So the effective date was June 30th, 2010.

13  Q    That's of the documented deal, correct?

14  A    Yes.

15  Q    Okay.  How about when you got word from your

16  colleagues that they had agreed to the price of the

17  purchase?  Do you recall?

18  A    Well, it had to be before that.  I don't remember

19  the exact date that they agreed on the price, but,

20  you know -- but when we signed the agreement,

21  obviously, we had agreed on it.  So it happened

22  before that.

23  Q    Okay.  And then you signed the patent purchase

24  agreement on June 30?

25  A    June 30th, 2010.

Mr. Marcus - Direct                          33

1   Q    Okay.  And by that time, had Sprint already begun

2   what I call saber-rattling about its patents?

3   A    Yeah, I believe I testified yesterday the very

4   first time they approached us was January 21st, 2010.

5   Q    Okay.  And they did sue you in Kansas, didn't

6   they?

7   A    They did, yes, subsequently.

8   Q    Okay.  And when was that?

9   A    December of 2011 I believe.

10  Q    Was that suit based on these claims by Sprint

11  that you were -- that Comcast was infringing its

12  patents?

13  A    I don't know.  I'd assume so.

14  Q    Okay.  And did you countersue at any point?

15  A    Yes, we did.  This was one of those lawsuits and

16  it was filed in January or February of 2011, a couple

17  months later.

18            THE COURT:  2011?

19            THE WITNESS:  I'm sorry.

20            MR. HANGLEY:  2012.

21            THE WITNESS:  2012, sorry, Your Honor.

22  BY MR. HANGLEY:

23  Q    Now, you heard Mr. -- you were here for opening

24  statements yesterday I believe?

25  A    I was, yes.

Mr. Marcus - Cross                           34

1   Q   Okay.  Mr. Finkelson began his remarks telling

2   this jury that this was all part of a plan, this

3   lawsuit is part of a plan, to enter the cellular

4   market.  Did you hear that statement?

5   A   I did.

6   Q   How much truth is in it?

7   A   None.

8           MR. HANGLEY:  No further questions.

9           THE COURT:  Mr. Finkelson, you may begin

10  your cross-examination.

11          MR. FINKELSON:  Thank you, Your Honor.

12          (Pause in proceedings.)

13                  CROSS-EXAMINATION

14  BY MR. FINKELSON:

15  Q   Good morning, Mr. Marcus.  How are you?

16  A   I'm doing good.  We'll see how I'm doing in a

17  while.

18  Q   I think you'll do just fine.  Now, Mr. Hangley

19  was just asking you questions, Mr. Marcus, with

20  respect to an agreement between Comcast and Verizon,

21  is that right?

22  A   Yes.

23  Q   And you agree that Verizon paid no money to

24  Comcast to license any Comcast patents under that

25  agreement, right?

Mr. Marcus - Cross                          35

1    A    Yes, neither party paid any money for the patent.

2    Q    And the agreement with Verizon was in 2008,

3    correct?

4    A    Yes, that's when we signed it, yeah.

5    Q    And that was two years before Comcast bought the

6    870 patent that has us here today, correct?

7    A    Yeah, approximately.

8    Q    Now, you testified yesterday, Mr. Marcus, about

9    an invention disclosure document that Comcast

10   required Nokia to provide to you as part of the

11   closing of the 870 patent purchase agreement.  Do you

12   recall that testimony?

13   A    Yeah.  What I think I said was they were obliged

14   to give it to us if they had it.

15   Q    In fact, that's what the contract said, correct?

16   A    Yeah.

17   Q    Okay.

18   A    Yes.

19   Q    And I couldn't help but notice that you weren't

20   asked to show that Nokia invention disclosure

21   statement to the jury yesterday, so I'd like you to

22   take a look at it today, if you would, please.

23            MR. FINKELSON:  Your Honor, may I approach

24   with a copy of DX-150?

25            THE COURT:  You may.

Mr. Marcus - Cross                    36

1          MR. HANGLEY:  Objection.  Objection, before

2     it's shown --

3          THE COURT:  What --

4          MR. HANGLEY:  -- to the jury.  It's

5     hearsay.

6          THE COURT:  Let me see a hard copy of it.

7          (Pause in proceedings.)

8          MR. HANGLEY:  There is also a relevancy and

9     authenticity objection, Your Honor.

10         MR. FINKELSON:  Your Honor, Comcast raised

11    this exact document with the witness during its

12    direct examination, but did not show it to him.

13         THE COURT:  Let's go to sidebar.

14         (Pause in proceedings.)

15         THE COURT:  Ladies and gentlemen, if you

16    wish to stand and stretch, you may do so.  I really

17    hadn't planned to send this much time at sidebar, so

18    take advantage of it.  You can't hear -- all right?

19         (Sidebar discussion as follows.)

20         MR. FINKELSON:  Your Honor, this was a

21    document that we previously raised with the Court

22    during the pretrial motion proceedings.  Your Honor

23    took it under advisement.  And Mr. Hangley

24    specifically asked the witness about this document

25    during direct examination.

Mr. Marcus - Cross                               37

1          THE COURT:  I took --

2          MR. FINKELSON:  You took the issue under

3    advisement.

4          THE COURT:  Can you get me a copy?

5          MR. FINKELSON:  Comcast had raised a

6    hearsay objection to the document, and we had argued

7    that we weren't offering it for the truth of the

8    matter asserted.  And Your Honor did not rule.  You

9    heard argument on it and said you either took it

10   under advisement or you said we deal with it in the

11   ordinary course, I think is actually what you said.

12   This is --

13         THE COURT:  Now, I -- so I -- it was raised

14   as an issue, but I never ruled on it?

15         MR. FINKELSON:  Correct, you stated that

16   you would deal with it in the ordinary course of the

17   trial.

18         THE COURT:  In what context did it -- was

19   it raised?

20         MR. FINKELSON:  It was raised because it

21   was one of the hearsay objections that we brought to

22   Your Honor's attention in the course of identifying

23   ones that would be helpful to resolve before the

24   trial.  So this is the (indiscernible) put forth

25   because Nokia used it for contracts --

Mr. Marcus - Cross                    38

1          THE COURT:  It's referred to in -- and it's

2    referred to in the purchase agreements.

3          MR. FINKELSON:  Right.  And Comcast

4    produced it to us in this litigation out of its

5    files, and if I may borrow Mr. Hangley's words about

6    the truth of the matter asserted a moment ago, this

7    is -- this goes, from our perspective, in that bucket

8    and --

9          THE COURT:  Oh, no, this is -- this is one

10   that I think is easy.  A document that is in your

11   file is not an admission if the document was not

12   written by you.  This is a document -- the agreement

13   said -- as Mr. Marcus just testified, the agreement

14   said after signing, you will send us within 30 days a

15   variety of documents if you have them.  Okay?

16   These -- this is in the bucket of documents that we

17   received from Nokia and those aren't in our files.

18         MR. FINKELSON:  But you mentioned this --

19   this was mentioned in his (indiscernible).

20         THE COURT:  And I'm -- and he can say we

21   received this document -- he identified -- I forget,

22   did he refer to the particular document?  I don't

23   recall whether he did or not, actually.

24         MR. RIOPELLE:  Oh, I think -- he said the

25   admission disclosure.

Mr. Marcus - Cross                    39

1          MR. FINKELSON:  He said admission

2     disclosure.

3          THE COURT:  Okay.

4          MR. FINKELSON:  And, again --

5          THE COURT:  Okay.

6          MR. FINKELSON:  -- this was contractually

7     required.  And not only can we say that this is the

8     document, he can speak to the portions of the

9     document, including portions that I think are behind

10    Comcast's objection, which are the portions on the

11    very last page of the document where there is a

12    provision of the document that talks about value of

13    the 870 patent, and which we presented to Your Honor

14    previously.  We think that evidence comes in because

15    it doesn't go to the truth of the matter.

16    (Indiscernible) we're not using it to show that is

17    the actual value.  We're using it to show that that

18    would have been -- this document and this information

19    would have been on Nokia's mind when it came to the

20    hypothetical negotiation with Sprint.  We're not

21    offering it for the truth of the matter asserted.  We

22    also argued to Your Honor previously --

23          THE COURT:  The last page of the document?

24          MR. FINKELSON:  Yes.  Right here, Your

25    Honor, there's a section called the value

1   (indiscernible).  This was where Nokia indicated that

2   the invention had a modest value.  And I think that's

3   what's behind Comcast's objection.  Again, we're not

4   offering it for the truth of that statement.  We are

5   offering it to show that information would have been

6   on Nokia's mind.  In fact, under the hypothetical

7   negotiation rules, it would have been one of the --

8            MR. HANGLEY:  Is this everybody's table?

9   I'm trying to (indiscernible).  No, go ahead.

10           MR. FINKELSON:  (Indiscernible) had this

11  information at its disposal.  So, therefore, it's not

12  hearsay.  We also argued (indiscernible) -- that

13  Comcast adopted because it had requested a document

14  and received it.  And I believe Your Honor's comments

15  are something along the lines of you're on better

16  footing on option one than you are on the party

17  admission, or something along those lines.

18           MR. HANGLEY:  But not much.

19           THE COURT:  It's not a party admission.

20           MR. HANGLEY:  It's not a party admission.

21  It is probably with respect to this page, which says

22  "To be completed by a manager," okay?  We don't know

23  who that manager was.  We don't know whether or

24  not -- you will remember that Sprint tried to depose

25  belatedly --

Mr. Marcus - Cross                    41

1           THE COURT:  I understand.

2           MR. HANGLEY:  -- Nokia to authenticate that.

3           THE COURT:  You don't have to remind me.

4   And there were -- there were no depositions.

5           MR. HANGLEY:  There were not depositions.

6   And this document tells you what some unknown person

7   said with respect --

8           THE COURT:  At Nokia --

9           MR. HANGLEY:  At Nokia.

10           MR. FINKELSON:  It's the manager.

11           MR. HANGLEY:  It's not --

12           MR. FINKELSON:  It's the manager, Your

13   Honor, and (indiscernible) --

14           THE COURT:  All right.

15           MR. HANGLEY:  No, we (indiscernible).

16           MR. FINKELSON:  -- (indiscernible) of the

17   truth.

18           THE COURT:  I'm going to allow the document

19   and I'll give a limiting instruction stating that

20   it's not offered to establish the truth of what it

21   said, but only to show that it was in Nokia's state

22   of mind and it was to be considered as part of the

23   hypothetical negotiation (indiscernible).

24           MR. FINKELSON:  Thank you, Your Honor.

25           MR. HANGLEY:  Your Honor, it's the state of

Mr. Marcus - Cross                          42

1   mind of an unknown individual at Nokia.

2          THE COURT:  It's part of the contract --

3   the documents, that were provided pursuant to the

4   contract.

5          MR. HANGLEY:  It's a document that was

6   provided with what we call the document dump.  After

7   signing, we take the files.  We got them.  That's

8   what it is.  It was not relied on by anyone --

9          THE COURT:  Well --

10         MR. HANGLEY:  -- in negotiating the

11  transaction.

12         THE COURT:  -- you don't know that.

13         MR. HANGLEY:  No, we don't know that.  And

14  that's why it's not evidence.

15         THE COURT:  Except it was -- it's evidence

16  of what Nokia was thinking.

17         MR. HANGLEY:  Not at the time of any

18  transaction.

19         THE COURT:  It's part of the -- it's part

20  of it.  The documents were provided -- I don't know

21  that there's a --

22         MR. HANGLEY:  There's a date.

23         THE COURT:  I don't see a date.

24         MR. FINKELSON:  It's 1999.

25         MR. HANGLEY:  It's '99.

1          MR. FINKELSON:  And the documents in

2   (indiscernible) --

3          MR. HANGLEY:  In other words, it's 11 years

4   before.

5          MR. FINKELSON:  He's already testified --

6          THE COURT:  All right.  The document comes

7   in.

8          MR. FINKELSON:  Thank you, Your Honor.

9          MR. HANGLEY:  Very well, Your Honor.

10          (Sidebar discussion concludes.)

11          THE COURT:  We have another --

12          MR. HANGLEY:  Your Honor, it's not going to

13   be admitted.  It's --

14          THE COURT:  What?

15          MR. HANGLEY:  It's not going to be

16   admitted.  They're on cross.

17          THE COURT:  Yes.  There was a hearsay

18   objection to something that was noted in a document.

19   As with the prior objection, the one I just

20   addressed, this question and answer, and there might

21   be more than one, but the questions relating to this

22   document, and in particular, the answers, are not

23   offered to establish the truth of what was said.

24   They're offered only to show -- and this is a Nokia

25   document.  They're offered only to show that this

1  was, among other things, what Nokia was thinking.

2  Not offered to prove it, offered to show that it was

3  in their favor.  And this relates to the hypothetical

4  negotiation -- remember, that's a damages issue -- in

5  2005 -- '05?

6          MR. FINKELSON:  2005, that's correct, Your

7  Honor.

8          THE COURT:  -- between Nokia, as the then

9  owner of the patent, and Sprint, as the alleged

10  infringer.  That's the way you start on the damages

11  calculation, the negotiations in 2005.  And this

12  issue that we're going to hear about is related to

13  Nokia's thinking at that time, but still for you to

14  decide whether to believe it or not to believe it.

15  Your call.  You may proceed.

16          MR. FINKELSON:  Thank you, Your Honor.

17          (Pause in proceedings.)

18  BY MR. FINKELSON:

19  Q  Mr. Marcus, you have --

20          MR. RIOPELLE:  Is it on their screens?

21          MR. FINKELSON:  I believe it is.

22          (Pause in proceedings.)

23  BY MR. FINKELSON:

24  Q  Mr. Marcus, you have what has been marked as

25  DX-150 in front of you, correct?

Mr. Marcus - Cross                          45

1    A    I do, yes.

2    Q    And you've seen it before, right?

3    A    Well, give me a chance to look at it.

4    Q    Sure.

5    A    I guess I should have brought my glasses, but --

6    Q    Do you need --

7    A    No, I'm all right.

8    Q    -- us to retrieve them?

9    A    I'll just hold it out a little bit.

10            (Pause in proceedings.)

11   A    So yeah, I think I've seen this document before.

12   Q    And you see "Nokia" at the top left-hand corner

13   of the page?

14   A    Yes, uh-huh.

15   Q    And you see how it's entitled "Invention Report?"

16   A    Yes, I do.

17   Q    And you know that DX-150 is the invention report

18   for the 870 patent, correct?

19   A    So the way I would describe it is it's what I

20   understand to be the invention disclosure report for

21   a -- for some inventions, one of which ended up

22   becoming the 870 patent.

23   Q    So it's the invention report for an invention

24   that ended up becoming the 870 patent, correct?

25   A    Yeah, one of them.  There was a -- there was more

1    than one invention disclosed in it, as I recall, and

2    so there was a whole separate family of patents that

3    came off of it.

4    Q   And you reviewed this invention report for the

5    870 patent when you received it from Nokia, correct,

6    Mr. Marcus?

7    A   Yes, they sent a CD with documents on it and I

8    believe this was one of them, and I reviewed it.

9    Q   Can you please turn to the last page of DX-150?

10              MR. FINKELSON:  And, Mr. Baird --

11              THE COURT:  Before you do, Mr. Marcus, did

12   this report apply only to the 870 patent or did it

13   apply to all of the patents that were acquired in

14   2010 by Comcast from Nokia?

15              THE WITNESS:  So it didn't apply to any of

16   the -- well, it -- there were three families of -- I

17   believe there were three -- three families of patents

18   that we acquired in the June 2010 acquisition and,

19   you know, there was one U.S. patent in each one of

20   those, and this applied to the 870 patent family.  It

21   also applied --

22              THE COURT:  What do you mean by "patent

23   family?"  Are you talking about the three U.S.

24   patents?

25              THE WITNESS:  No.

Mr. Marcus - Cross                    47

1           THE COURT:  Is that the family?

2           THE WITNESS:  No.  So what happened was

3    originally -- what typically happens is you file a

4    first application and that might be -- you know, in

5    the U.S. for a U.S. inventor.  Here, it was in

6    Finland.  And then what they do is they -- if they

7    want to pursue patent -- patents in the rest of the

8    world, in other places, they will then go file patent

9    applications in other places, and that's what they

10   call a family.  So you'll have maybe a Finish patent

11   and a U.S. patent, and a European patent, and

12   that's -- they're all relating or covering the same

13   invention.  They have a family of patents.

14           THE COURT:  What -- are you saying that

15   this document, DX-150, refers to the 870 patent

16   family, as you've described it?

17           THE WITNESS:  Yes, and one other that was

18   not part of our acquisition.

19           THE COURT:  All right.

20           MR. FINKELSON:  Thank you, Your Honor.  Mr.

21   Baird, if you'll put the last page of DX-150 on the

22   screen?

23   BY MR. FINKELSON:

24   Q    And if you'll turn to that, Mr. Marcus?

25   A    Okay.

Mr. Marcus - Cross                        48

1    Q    And do you see on the last page of DX-150 a

2    section entitled "Value of the Invention?"

3    A    I do.

4    Q    And do you see where the number two is circled,

5    sir?

6    A    I do.

7    Q    And that's two on a scale of zero to five,

8    correct, Mr. Marcus?

9    A    Yeah.  It says, "Describe the strategic

10   importance to Nokia by rating it zero to five," and

11   this is -- says at the top, "To be completed by the

12   manager."

13   Q    Zero being the lowest, five being the highest,

14   correct, Mr. Marcus?

15   A    It says, "Strategic Importance, zero equals none

16   and five equals key strategic value, reads on the

17   standard specification."

18   Q    So zero being the lowest, five being the highest,

19   correct?

20   A    Right, but you need to define what it's talking

21   about.

22   Q    Number two is circled and it says next to it,

23   does it not, Mr. Marcus, "Modest, easy to design

24   around or modest potential for standard

25   specification," is that right?

Mr. Marcus - Cross                              49

1   A    Yep, that's what it says.

2   Q    You can put that exhibit to the side, sir.

3   A    I guess I would also --

4   Q    Now, you made reference -- you made --

5   A    I would also point out that --

6   Q    And you can raise that, Mr. Marcus.  My question

7   was finished and I --

8            THE COURT:  Well, the question might have

9   been finished.  Have you finished your answer, Mr,

10  Marcus?

11           THE WITNESS:  Not really.

12           THE COURT:  Well, then you can finish your

13  answer.

14           THE WITNESS:  Okay.  So I -- this is -- you

15  know, when it's talking value of the invention, you

16  know, all of these ratings are relative to whether or

17  not it's going to be in a standard.  That's the way I

18  read these.  And at the time that's what this person

19  thought, so -- apparently.

20  BY MR. FINKELSON:

21  Q    And that person circled it as a two, as modest,

22  correct, Mr. Marcus?

23  A    That's what it says, yes.

24  Q    With the hammer sound effects too.

25           THE COURT:  I have to apologize.

1    Apparently, they're doing some construction.

2              MR. FINKELSON:  I just didn't want Mr.

3    Marcus to think I had brought in the hammers to

4    assist my examination.

5    BY MR. FINKELSON:

6    Q   Now, you made reference yesterday and again

7    today, Mr. Marcus, to a lawsuit that was brought by

8    Sprint against Comcast in 2011, right?

9    A   Yes.

10   Q   And you're familiar with that lawsuit, aren't

11   you, sir?

12   A   I am.

13   Q   And you know that the patents that Sprint has

14   asserted against Comcast in that lawsuit were

15   invented by Sprint employees, right?

16   A   That's what I understand, yeah.

17   Q   And Sprint didn't -- you understand that Sprint

18   didn't buy those patents from somebody else, correct?

19   A   That's my understanding, yeah.

20   Q   Now, you also talked a lot yesterday, Mr. Marcus,

21   about re-examination and ex parte re-examination.  Do

22   you recall that testimony, sir?

23   A   I do.

24             MR. FINKELSON:  Mr. Baird, can you pull up

25   the first page of PX-4?  Your Honor, PX-4 has already

Mr. Marcus - Cross                    51

1   been admitted.  That page, thanks.

2           (Pause in proceedings.)

3           MR. FINKELSON:  PX-4, Your Honor, has

4   already been admitted into evidence through Comcast's

5   omnibus motion.

6           THE COURT:  Did that motion serve to admit

7   all of those exhibits?  I didn't go back and read the

8   order.  I have it.

9           MR. FINKELSON:  I think you asked if

10  Comcast ultimately then moved to do it, which I

11  believe that they did at the end of the day

12  yesterday.

13          THE COURT:  Well, if we can speed it up

14  that way, that's great.

15          MR. FINKELSON:  We're happy to do that.

16          THE COURT:  All right, then all of the

17  documents in the -- listed in the amended Comcast

18  motion are deemed received into evidence.  I'm not

19  going to go over the list now.

20          MR. FINKELSON:  Thank you, Your Honor.

21  BY MR. FINKELSON:

22  Q   Do you see what has been marked as PX-4 on your

23  screen, Mr. Marcus?

24  A   I mean I see something.  I see something on the

25  screen.

Mr. Marcus - Cross                                    52

1    Q   Can you tell --

2    A   It doesn't say PX-4, but I --

3    Q   Well, let me go ahead and --

4    A   Oh, okay.  There you go.  All right.

5    Q   Do you recognize what PX-4 is, Mr. Marcus?

6              (Pause in proceedings.)

7    Q   And let me do this.  It's not a memory test, so

8    let me come and --

9              MR. FINKELSON:  If I may approach, Your

10   Honor --

11             THE COURT:  You may.

12             MR. FINKELSON:  -- and hand the witness --

13             THE COURT:  You may.

14             THE WITNESS:  Yeah, I think I know what it

15   is.  It's -- I think it's the back and forth -- it's

16   the file history of the re-examination.  It's like

17   the cover page.  When you ask them for a copy of it

18   they typically put something like that on it.

19             MR. FINKELSON:  Thank you.  Here's a copy

20   of it, sir.

21             THE WITNESS:  Okay.

22             MR. FINKELSON:  (Indiscernible).

23             (Pause in proceedings.)

24   BY MR. FINKELSON:

25   Q   I didn't want you getting out of here without any

Mr. Marcus - Cross                    53

1    luggage today, Mr. Marcus, so there you go.  This is

2    a copy of the ex parte re-examination file for the

3    870 patent, correct, Mr. Marcus?

4    A    You know, it's obviously a very large stack of

5    documents.  Based on the coversheet, that's what it

6    appears to be, so --

7    Q    And what the re-examination file is, that's the

8    official record of the Patent Office of what happened

9    at the re-examination of the 870 patent, right?

10   A    Again, that's -- it's all available to the

11   public, yeah.

12   Q    Is that your understanding of what this is, sir?

13   A    That's my understanding of what it is, yeah.

14   Q    And if you could turn to page PX-4.  And it's up

15   on your screen, Mr. Marcus, if it's easier to refer

16   to that way.

17   A    So it's page four of PX-4, sir?

18   Q    Yes, sir.

19   A    Okay.  All right.

20   Q    Do you have that?

21   A    I do, yep.

22   Q    And on that page, sir, at the bottom of the page,

23   do you recognize that as your signature?

24   A    Yes, that is, unfortunately, my signature, yeah.

25   Q    The jury saw how I drew yesterday.  So now they

Mr. Marcus - Cross                          54

1   see how you sign and we're even.

2   A    It's not the best writing, but yeah, that's my

3   signature.

4   Q    And, in fact, you supervised the re-examination

5   proceeding for the 870 patent on behalf of Comcast,

6   right?

7   A    I did, yes.

8   Q    And in the re-examination, claim one of the 870

9   patent -- I believe you alluded to this yesterday --

10  it was amended only to correct minor, obvious

11  informalities, right?

12  A    That's right, yeah.

13  Q    And in the re-examination, Comcast also told the

14  Patent Office that new claim 112 includes all the

15  features of original claim one of the 870 patent,

16  correct?

17  A    That I don't remember.

18  Q    And --

19  A    Yeah, I'd have to look at that to --

20  Q    Sure.  I'm happy to refer you to an exact page

21  from PX-4 if that will help you.  If you'll turn to

22  page 1612, Mr. Marcus?  It's also on your screen.

23  A    Yeah, maybe I'll look at it there.

24              (Pause in proceedings.)

25  A    Okay.  So at the very bottom, is that what you're

Mr. Marcus - Cross                              55

1  referring to?

2  Q    Yes, sir.

3  A    So, "New independent claim 112 includes the

4  features of claim one, and is thus, allowable for the

5  same reason to claim one.  Claim 112 further recites

6  that the mapping" --

7  Q    And you -- you're welcome to keep reading if you

8  want, but it was the first sentence that I was

9  focused on.

10  A    Okay.  I wouldn't mind seeing the rest of it, if

11  you don't mind --

12  Q    Sure.

13  A    -- just so I know what it says.

14           MR. FINKELSON:  Can we turn to the next

15  page?

16           (Pause in proceedings.)

17           THE WITNESS:  Okay.  Yeah.

18  BY MR. FINKELSON:

19  Q    Do you see how in this document it says that

20  Comcast told the Patent Office that new claim 112

21  includes all the features of original claim one of

22  the 870 patent, and then goes on to provide the

23  additional information that you just read?

24  A    Yeah, I see what it says.

25  Q    And in the re-examination, the Patent Office also

Mr. Marcus - Cross                                56

1    found new claim 113 was narrower than every original

2    independent claim, is that right, sir?

3    A    I don't know.

4    Q    Can you turn to page 1633 -- or better yet, look

5    on your screen at page 1633 of the exhibit?  And look

6    at the bottom section, sir.  Do you see where it

7    says, "Furthermore" --

8              MR. HANGLEY:  Can you allow him to get to

9    that, please?

10   BY MR. FINKELSON:

11   Q    Do you see where it says, sir, that,

12   "Furthermore, newly added claims 20" --

13             MR. FINKELSON:  Do you have it?

14             MR. HANGLEY:  I do, thank you.

15             MR. FINKELSON:  I thought you were asking

16   the witness.

17   BY MR. FINKELSON:

18   Q    "Furthermore, newly added claims 20 through 113

19   are narrower than every original independent claim."

20   Do you see that, sir?

21   A    Yeah, I see that.  Yep.

22   Q    And that's a statement by the patent examiner,

23   correct, sir?

24   A    Yeah, as I -- I mean this is -- because it's in

25   the examiner's reasons for patentability, so --

Mr. Marcus - Cross                           57

1    Q    Now, was Sprint a participant in the 870

2    re-examination, 870 patent re-examination, Mr.

3    Marcus?

4    A    Not to my knowledge.

5    Q    It was just Comcast and the Patent Office, right?

6    A    As far as I'm aware, yeah.  So --

7    Q    And isn't it true, Mr. Marcus that nobody at

8    Comcast ever spoke with the inventor of the 870

9    patent regarding the re-examination proceeding?

10   A    I believe that's correct.  We never spoke to the

11   inventor as part of the re-exam, yep.

12   Q    Now, you would agree, Mr. Marcus, wouldn't you,

13   that the ex parte re-examination process is very much

14   tilted in favor of the patent owner?

15   A    I would not agree with that.

16   Q    You would not agree with that?  Mr. Marcus, in

17   2015, you participated in a panel in the Patent

18   Office proceedings in Washington, D.C. hosted by the

19   Duke Law Center for Innovation Policy?

20   A    Yep.

21   Q    You remember that, right, sir?

22   A    I do.

23            MR. FINKELSON:  Your Honor, I'd like to

24   play the videotape of what Mr. Marcus had to say

25   about the ex parte re-examination process when he

Mr. Marcus - Redirect                          58

1  spoke on that panel, if I may.

2          (Videotape is being played at this time.)

3  BY MR. FINKELSON:

4  Q   Mr. Marcus, Comcast put the 870 patent through ex

5  parte re-examination, correct?

6  A   We did.

7          MR. FINKELSON:  I have no further

8  questions, Your Honor.

9          THE COURT:  I gather you have some

10  redirect, Mr. Hangley?

11          MR. HANGLEY:  I do.

12          THE COURT:  You may proceed.

13                  REDIRECT EXAMINATION

14  BY MR. HANGLEY:

15  Q   With respect to the -- first things first, this

16  document --

17          MR. HANGLEY:  Could we put the first page

18  of DX-150 on the screen, please?

19          (Pause in proceedings.)

20  BY MR. HANGLEY:

21  Q   Now, first of all, I see that this is a form

22  completed by a manager, is that -- is that correct?

23  I'm looking at the coversheet.  Can you read the name

24  of the manager?  It's in -- it's in the box that

25  says, "Completed by the manager," and maybe we can

1   blow that up.  Is that somebody named Markiev Niemi

2   (ph)?

3   A   Yeah, to the best I can -- it's Markiev Niemi or

4   Neil.

5   Q   Okay.

6   A   Something like that.

7   Q   Okay.  And --

8   A   It's in Finish I'm presuming.

9   Q   Okay.  Now, that person was not the inventor, is

10  that correct, so far as you can tell from the form?

11          MR. FINKELSON:  Objection, Your Honor,

12  leading.

13  BY MR. HANGLEY:

14  Q   Can you tell from the form whether that person

15  was the inventor?

16  A   Yeah, that's not the inventor.  The inventor was

17  Huti Aho (ph).

18  Q   Okay.  Okay.

19          MR. HANGLEY:  Now, let's go to that back

20  page, please, and blow up block two.

21          (Pause in proceedings.)

22          MR. HANGLEY:  Can we do that?

23          MR. DYER:  The last page?  What page did

24  you say?

25          MR. HANGLEY:  The last page.  And blow up

Mr. Marcus - Redirect                                    60

1   the area that's called "Value of the Invention."

2              (Pause in proceedings.)

3              MR. HANGLEY:  And, actually, if we could

4   blow up one to begin with.

5   BY MR. HANGLEY:

6   Q   Now, this invention that they were talking about,

7   do you know -- you've testified that there were

8   actually two different inventions involved here,

9   discussed in this form?

10  A   Yes, that was my understanding.

11  Q   Okay.  Now, in block one it says, "Is this

12  invention going to be used by Nokia," and this

13  manager, not the inventor, checked in "Possibly?"

14             MR. FINKELSON:  Objection, Your Honor, Mr.

15  Hangley is leading the witness.

16             MR. HANGLEY:  I'm reading from a form, Your

17  Honor.  Okay.  Let's do it this way.

18             THE COURT:  Ask the witness to say it.

19             MR. HANGLEY:  Pardon me?

20             THE COURT:  The form has been used by

21  Sprint, so ask the witness, instead of leading the

22  witness.

23             MR. HANGLEY:  Thank you, Your Honor.

24  BY MR. HANGLEY:

25  Q   What does -- what does the invention -- what does

Mr. Marcus - Redirect                    61

1    the form say in block one with respect to the

2    possibility that Nokia will ever have a use for the

3    invention?

4    A   Well, it has a question that says, "Is this

5    invention going to be used by Nokia," and whoever

6    filled this out, presumably, the manager, checked

7    "Possible."

8    Q   Okay.  Can you tell from this which invention he

9    was talking about?

10   A   No.

11   Q   Okay.  And then he says "Development Status of

12   the Invention."  Do you see that next block down and

13   the next question?

14   A   I do.

15   Q   And what is the response by the manager?

16   A   It says that that status of the invention is that

17   it is being developed further.

18   Q   Okay.  And, again, do you know what invention

19   he's talking about?

20   A   I do not.

21   Q   Okay.  Now --

22   A   You can't tell from this form, so --

23   Q   Can you tell from this form what area?  I see

24   that there's a block that says, "In which products,"

25   and then under that there's a parentheses, "(Business

Mr. Marcus - Redirect                        62

1    Unit)."  Do you see that on the form?

2    A    Oh, yes.

3    Q    And it says what?

4    A    It -- as far as I can read it, it says "36."

5    Q    Okay.  So now we know, right, what they were

6    going to do with it?

7    A    I don't think you can tell what they were going

8    to do with it.

9    Q    Okay.  Would there be a relationship between what

10   they were thinking about possibly doing with it, as

11   they've said on the form, and their assessment of the

12   value of whatever invention they're talking about?

13   A    I would think that would be directly related,

14   yeah.

15   Q    Okay.  And do you know the answers to any of

16   those?

17   A    No, you can't tell from this form.

18   Q    Okay.  Now, they say that the strategic -- I'm

19   now down to block two where the manager, not the

20   inventor, is asked with respect to some invention,

21   what the strategic importance to Nokia of it is.

22   Have I read that correctly?

23   A    Yes, it says, "Describe the strategic importance

24   to Nokia by rating zero to five under 'Value of the

25   Invention.'"

Mr. Marcus - Redirect                              63

1   Q    Okay.  Now, was Nokia in a variety of businesses

2   at the time?

3   A    Yes, my understanding is that they were in a

4   large number of different businesses.

5   Q    Okay.  Was one of them being a cell phone

6   company?

7   A    Not that I'm aware of.

8   Q    Okay.

9   A    No, I don't believe -- they were more in the

10  equipment business or services.

11  Q    Okay.  So when they talk about the strategic

12  importance to Nokia, can we read this to determine

13  the value or strategic importance that the document

14  might have to a cell phone carrier, a business in

15  which Nokia was not engaged?

16  A    I don't believe so.

17  Q    Now, did Comcast place any importance on this

18  document?  I know you said you read it after you

19  received those CDs.  Did you place any importance on

20  it in deciding the purchase price?

21  A    No, the purchase price was already agreed upon in

22  the agree -- in the acquisition agreement signed

23  prior to ever receiving these documents.

24  Q    Okay.  That answer leads me to another question.

25  Did this document have any -- other than the fact

Mr. Marcus - Redirect                    64

1   that they had to dump all these documents on you, as

2   you read yesterday, did this -- getting this document

3   couldn't have had any effect on whether or not you

4   were bound to the agreement, Comcast was bound to the

5   agreement, that it has already signed?

6   A   Well, as I testified yesterday, there was a

7   signing and a closing.  And so, you know, one of the

8   reasons we wanted to receive documents was to make

9   sure there wasn't anything in there that sort of

10  contradicted what Nokia had told us or some other

11  reason that would make us concerned.  And, you know,

12  I don't know technically whether the agreement -- you

13  know, it said closing conditions.  I think it

14  technically said they only had to deliver the stuff.

15  But if we had seen a problem that really concerned

16  us, we probably would have gone back to them and

17  said, you know, in view of this, we don't want to buy

18  these.

19  Q   Okay.

20  A   So --

21  Q   And did anything like that happen?

22  A   There were two things, one unrelated to the 870

23  patent, that I saw, and then that was how I kind of

24  learned that two inventions -- from the material they

25  sent, we hadn't realized until they sent that that

1    there were actually two inventions that came off the

2    original invention disclosure.  So I -- as I recall,

3    I went back to them and wanted to know just what had

4    happened to make sure that we shouldn't also be

5    getting the others.  And we determined that we

6    weren't supped -- you know, that it was a separate

7    invention.

8    Q    Okay.

9    A    So --

10   Q    Did anything about this raise problems in your

11   mind?

12   A    No.

13   Q    This document, this DX-150.

14   A    No.

15   Q    Okay.  Now, we've just seen some entertaining

16   video clip from you.  How long ago was that?

17   A    You know, I don't remember.  A couple years ago?

18   Q    Okay.  And what was the event?

19   A    It was an event down -- and they held it in

20   Washington, D.C., at a law firm's office down there,

21   to just talk about patent stuff.  They had inhouse

22   people, outside counsel, all kinds of various people.

23   Q    Okay.  Now, in that you talked about the ease of

24   getting claims listed in a re-examine proceeding?

25   A    Yes, uh-huh.

Mr. Marcus - Redirect                             66

1   Q   Okay.  Is it, in fact, a practice to have a lot
2   of more precise claims in when you are putting a
3   patent through re-examination?
4   A   Yeah, that's standard practice is to add more
5   claims, assuming they're patentable.  So --
6   Q   I saw -- I saw a statement that Mr. Finkelson
7   pointed out to you in the file record that said each
8   of the new claims was I think you said narrower than
9   all of the original claims?
10  A   Yes.  Yeah.
11  Q   Will you explain to the jury the importance of
12  that?
13  A   Well, I think -- you know, one of the
14  requirements for a patent re-examination is that you
15  can't add broader claims.  They have to be narrower.
16  That's just part of that procedure.  You're not
17  allowed to broaden the claims in a re --
18  Q   You can't expand them?
19  A   You can't expand what you're claiming under the
20  patent.  You can only add claims of the same scope or
21  narrower.
22  Q   Okay.
23  A   And getting back to the video, I mean I -- what I
24  was off -- what I was testifying to about there -- or
25  not testifying -- I was speaking about -- what I was

Mr. Marcus - Redirect                              67

1    speaking about there was that it used to be very easy

2    to go into re-exam and to do -- so what typically

3    would happen is a defendant would get sued and then,

4    you know, people -- patent owners would learn about

5    stuff and then go to the patent office and do

6    re-examinations and -- to basically, you know, take

7    all this stuff in there or whatever.

8              The way re-examinations used to be

9    conducted, they were done by the original examiner.

10   So there was this vested interest in the original

11   examiner not saying they made a mistake.  So -- and I

12   testified I think it was yesterday that the way

13   re-exams are done now, there were three primary

14   senior examiners.  That was why -- that was one of

15   the reasons they changed it.

16             So the re-exams that they do now, they

17   created a central re-examination unit so it doesn't

18   go back to the original examiner.  It goes to three

19   specialists now to address this problem.  And it's

20   very -- much more difficult now to go into re-exams.

21   It's not the same thing it used to be.  And, you

22   know, Sprint has put our patents into re-exam in

23   other instances, so it must not be that slanted in

24   favor of the patent owner.

25   Q    Well, let me -- let me -- when did we put this

1    one -- when did we put the 870 into re-exam?

2    A    I believe it was November of 2011.

3    Q    Okay.  And is that the old regime, the new

4    regime, what?

5    A    That's the new regime.

6    Q    Oh.  Now, can a -- can a patent be put into

7    re-exam if all you're doing is adding amended claims?

8    A    No.  No, no, you -- the requirement to be able to

9    do a re-examination is that they have this thing

10   called a significant new question of patentability.

11   That's the standard.  So, basically, you have to

12   prove to the Patent Office in your petition for

13   re-examination that there's a -- certain pieces of

14   prior art raise a substantial new question of poss --

15   a substantial new question of patentability.  So the

16   acronym -- lots of acronyms -- is called an SNQ just

17   because it's long to say that.

18           So you basically propose these substantial

19   new questions of patentability, and you have to

20   specifically lay out, right, here's the piece of

21   prior art, here's the -- you know, the limitation of

22   the claim and how you think it relates to it or

23   doesn't relate to it or, you know, that kind of

24   thing.  And for each one of those, the Patent Office

25   decides whether or not they think it does raise a

Mr. Marcus - Redirect                    69

1    substantial new question of patentability, and then

2    they decide, if they say yes, to institute a

3    re-examination.  They can say no, and they do

4    sometimes.  And then, you know, if they say now,

5    right, then, you know, obviously, there's no chance

6    to add claims.  And -- but even if they do institute,

7    you know, you have the right to present claims for

8    consideration, but they don't have to accept them.

9    Q    And now --

10   A    So --

11   Q    -- I asked you yesterday whether under this --

12   and I was asking you to think perhaps without

13   realizing it, but I was asking under the current

14   regime, the one that's been in effect since 2011,

15   whether or not you were putting your patents at risk

16   by doing a re-examination petition.  Is -- to what

17   extent is it a fact that you are putting it at risk?

18   A    Yeah, I mean we -- you are putting the entire --

19   every claim in the patent at risk by going in and

20   asking for re-examination.  The Patent Office could

21   have looked at what we proposed, the substantially

22   new questions of patentability, declared a re-exam,

23   issued a rejection like they did, and then not agreed

24   with us when we tried to point out how it was that

25   they indeed were patentable.  And then the patent

1   would have just been nullified, so it would have been

2   worth nothing.  So --

3   Q   Now, I think you mentioned just a couple of

4   minutes ago that Sprint has attempted to put some of

5   your -- Comcast's patents into re-exam?

6           MR. FINKELSON:  Objection, Your Honor, 402,

7   403 (indiscernible).

8           THE COURT:  Objection based on?

9           MR. FINKELSON:  402 and 403, other

10  re-examinations that don't relate to this proceeding

11  have no relevance here.

12          MR. HANGLEY:  So if it is relevant, then

13  have the jury (indiscernible).

14          THE COURT:  All right.  No, no, the

15  objection is overruled.

16          THE WITNESS:  I'm sorry, ask the question

17  again.

18          MR. HANGLEY:  And I hope we don't get

19  another objection.

20  BY MR. HANGLEY:

21  Q   You testified earlier that Sprint had attempted

22  to put some of Comcast's patents into re-examination?

23  A   Yes, they put eight or nine of our patents into

24  re-examination.

25  Q   Now, do you know whether that was to put your

Mr. Marcus - Recross                    71

1    patents at risk?

2    A    Well, the point of that is to try to invalidate

3    them, yes.  And we prevailed in all of those.  They

4    were all found valid.

5    Q    Thank you very much.

6              MR. HANGLEY:  No further questions.

7              MR. FINKELSON:  May I have a brief recross,

8    Your Honor?

9              THE COURT:  Yes.

10             (Pause in proceedings.)

11             MR. FINKELSON:  Mr. Baird, would you mind

12   putting DX-150 back up on the screen, and

13   specifically the first page, left-hand column, if

14   you'll highlight that.  So on the very first page of

15   DX-150.  Thank you.

16                  RECROSS-EXAMINATION

17   BY MR. FINKELSON:

18   Q    Mr. Marcus, do you see you have the first page of

19   DX-150 in front of you, sir?

20   A    I do, yes.

21   Q    Okay.  And you see where it says "Inventor's

22   Name" at the top?

23   A    Yes.

24   Q    And it says Huti Aho, correct, the inventor of

25   the 870 patent?

Mr. Marcus - Recross                          72

1    A    That is what it says, yeah.

2    Q    Okay.  And if you go further down in that column,

3    there's an acknowledgment by the inventor, and it

4    says "Signature of Inventor," and that appears to be

5    a signature of "Huti Aho," correct?

6    A    I guess so, yeah.

7    Q    No reason to disagree, correct?

8    A    It looks like it, yeah.

9    Q    And, as you talked about, this invention report,

10   DX-150, it covered the invention that led to the 870

11   patent and also another invention?  That's your

12   testimony, right, sir?

13   A    I just know what they told me.

14   Q    That's what they told you, right?

15   A    That's what they told me.

16   Q    And they also told you the other patent that was

17   covered by this invention report, that was valued as

18   part of this invention report, that also related to

19   messaging, correct?

20   A    All I know is that they told me there was a

21   separate one.  I'm assuming it related to messaging.

22   Q    Do you also assume, or better put, do you

23   remember that Comcast asked to buy the other patent

24   as well from Nokia, and that Nokia said no because it

25   was the more valuable of the two patents to them?  It

Mr. Marcus - Recross                          73

1    was --

2              MR. HANGLEY:  Objection, hearsay.

3    BY MR. FINKELSON:

4    Q    -- more valuable than the 870 patent?

5              MR. HANGLEY:  Objection, hearsay.

6              THE COURT:  The objection is overruled.

7              THE WITNESS:  Okay.  That's not what I

8    remember them telling me.  Do you want to know what I

9    remember them telling me?

10   BY MR. FINKELSON:

11   Q    Sure.

12   A    They told me they didn't own it.  They said that

13   a different company owned it.

14   Q    So that wasn't a patent that you asked to buy

15   from them that they told you was too valuable for

16   Nokia to sell?  That was a different patent?

17   A    No, it was a -- I'm not understanding your

18   question.

19   Q    Fair enough.

20   A    I -- well, hold on.  I went back to Nokia and I

21   said hey, would you be willing to sell that patent?

22   And they said we don't own it.  And they gave me the

23   contact for a related company that owned it.  So --

24   Q    You were asked, again, about your statements with

25   respect to re-examine.  You gave some additional

Mr. Marcus - Recross                                74

1   testimony with respect to re-examine.  And you

2   referred to re-examinations, ex parte

3   re-examinations, that had been brought by Sprint.  Do

4   you recall that testimony in response to Comcast's

5   questions a moment ago?

6   A   I do, yeah.

7   Q   And Sprint didn't own the patents that it was

8   challenging in re-examination, did it?

9   A   No, they were Comcast patents, so --

10  Q   They were Comcast patents, right?  And when a

11  party who doesn't own a patent, like Sprint, brings

12  an ex parte re-examination certificate or

13  re-examination request, and that re-examination

14  proceeds, the initiating party, Sprint, it doesn't

15  get to participate in the re-examination, does it?

16  A   No, which is indicative of why it's not all that

17  patent owner friendly, or else they wouldn't have

18  done it.

19  Q   In fact, they weren't the patent owner.  They

20  initiated the re-examination, correct?

21  A   Sprint, yes.

22  Q   Okay.  And once it got initiated, it was Comcast

23  and the government only that got to participate in

24  those re-examinations to which you were referring,

25  correct?

Mr. Marcus - Recross                    75

1   A    Right.  And --

2   Q    Right.

3   A    -- the inventor.

4   Q    And the inventor didn't participate in the 870

5   patent re-examination because you didn't contact her,

6   correct?

7   A    I didn't know how to contact her, no.

8   Q    Okay.  Now, you were making a distinction I think

9   between time periods and two regimes, and Mr. Hangley

10  asked you about the timing of what we saw on the

11  video.  In fact -- and you were very close I think --

12  it was in 2015 when you participated on that panel

13  discussion, correct?

14  A    That's right, yep.

15  Q    And that was several years --

16  A    Well, wait a second, I shouldn't say -- I don't

17  remember.  I really don't remember.

18  Q    You have no reason to disagree, correct?

19  A    I don't know, so --

20  Q    Okay.  Well, the re-examination request related

21  to the 870 patent that Comcast filed, I believe you

22  said it was in 2011.  It was either in 2010 or 2011,

23  correct?

24  A    Oh, it -- actually, I probably got the date

25  wrong.  It's November -- it was November of the same

Mr. Marcus - Recross                    76

1   year we bought it, so that would have been 2010.

2   Q   Okay.  And that was --

3   A   So --

4   Q   -- certainly several years before you spoke on

5   the video that we just saw, correct?

6   A   Right, but we're not seeing the rest of it, and

7   that's what I was referring to was the old regime.

8   Q   And that's --

9   A   It's very different now.

10  Q   Okay.  Well, and --

11  A   So --

12  Q   So the video speaks for itself and you didn't say

13  old regime there, but I'm going to ask you --

14  A   Well, you didn't show the whole video.  I spoke a

15  lot more too, so --

16  Q   Well, I'm sure your counsel will show us if they

17  believe that there is more there that you said other

18  than what we showed.  And you were asked about the

19  event.  In fact, it was a panel on which there were

20  other panelists as well, correct?  You weren't the

21  only one?

22  A   Oh, yeah, there were -- there were multiple other

23  people.

24  Q   And it was put on by Duke Law School, one of the

25  most prestigious law schools in the country, correct?

Mr. Marcus - Recross                    77

1   A   I don't know.  I think it's a good law school.

2   Q   Nobody -- there's nobody from Duke in the

3   audience.  They're not going to hold your testimony

4   against you.

5   A   So --

6   Q   Other people on the panel with you, they included

7   inhouse counsel from Qualcomm, a company that's in

8   the cell phone industry, correct?

9   A   I just don't remember.

10  Q   Do you remember that inhouse counsel from Google

11  was also on the panel with you?

12  A   I remember a woman by the name of Michel I think

13  is here last name, who I think was at Google.

14  Q   Do you also remember that on the panel with you,

15  sir, was the former chief judge of the highest patent

16  court in this country, former Judge -- Chief Judge

17  Michel?

18  A   Yeah, uh-huh.  I've been on -- I've been on

19  several panels with him.

20  Q   Including this one, correct?

21  A   Including that one.

22          MR. FINKELSON:  No further questions.

23  Thank you, Your Honor.

24          MR. HANGLEY:  No questions, Your Honor.

25          THE COURT:  Mr. Marcus, your testimony is

78

1    concluded.  You may step down.

2            THE WITNESS:  Okay.  Thank you, Your Honor.

3            (Witness excused.)

4            MR. GOETTLE:  Your Honor, our next witness

5    is Dr. Akl.

6            (Pause in proceedings.)

7            DR. ROBERT AKL, Plaintiff's Witness, Sworn.

8            COURTROOM DEPUTY:  Please be seated.

9    Please state your full name and spell it for the

10   record.

11           THE WITNESS:  Robert Akl, A-K-L.

12           THE COURT:  Good morning, Dr. Akl.

13           THE WITNESS:  Good morning, Your Honor.

14           (Pause in proceedings.)

15           MR. GOETTLE:  Good morning, Your Honor.

16   I'm sure you're going to be thrilled that I'm going

17   to ask to approach the witness with these three

18   binders.  I have a set for you, sir, and for Sprint's

19   counsel as well.  Would you like them or would you

20   like them if you want to look at them later?

21           THE COURT:  Oh, three binders?  And you

22   have two sets for us?

23           MR. GOETTLE:  I do.

24           THE COURT:  I think we better have them

25   now.

                        Dr. Akl - Direct                    79

1              MR. GOETTLE:  Okay.  May I approach the

2    witness, Your Honor.

3              THE COURT:  Michael --

4              AUDIO OPERATOR:  Yes?

5              THE COURT:  -- will you take them?

6              (Pause in proceedings.)

7              MR. GOETTLE:  Apparently, I was --

8              THE COURT:  We have one copy.

9              MR. GOETTLE:  I'm sorry.  Yes, Your Honor.

10             THE COURT:  That will --

11             MR. GOETTLE:  I --

12             THE COURT:  That will suffice.

13             MR. GOETTLE:  Okay.

14             (Pause in proceedings.)

15             THE COURT:  Maybe what we ought to do is

16   you keep it.  If I need it --

17             (Pause in proceedings.)

18             THE COURT:  You may proceed.

19                      DIRECT EXAMINATION

20   BY MR. GOETTLE:

21   Q   Dr. Akl, would you mind -- can you put the

22   binders maybe on the floor behind you?  I'd like the

23   jury to be able to see you completely?  Would that be

24   all right with you?

25             (Pause in proceedings.)

Dr. Akl - Direct                                    80

1   Q    Good morning, Dr. Akl.

2   A    Good morning.

3   Q    Would you please introduce yourself to the jury?

4   A    My name is Robert Akl.  I was born in Lebanon.

5   My parents fled to the U.S. in 1976.  I was four.  I

6   went to school in Maryland, I went to college in St.

7   Louis, and I've been a professor in North Texas now

8   for 15 years.

9   Q    Okay.  Thank you, Dr. Akl.  Dr. Akl, did you and

10  I work together to create a presentation for the jury

11  so that they would understand your testimony, your

12  analysis, and your conclusions today?

13  A    Yes.

14  Q    Okay.

15            MR. GOETTLE:  Can we please put up PD-2?

16            THE COURT:  I'm sorry, I didn't hear the

17  number.

18            MR. GOETTLE:  Sorry.  PD, PAUL, DAVID, 2,

19  PD-2.

20  BY MR. GOETTLE:

21  Q    Does this look like the first page of that

22  presentation, sir?

23  A    Yes.

24  Q    Okay.  Do you have a slide that would tell the

25  jury -- well, actually, let's step back.  You're the

Dr. Akl - Direct                                        81

1   first expert to testify in this case.  So would you

2   please explain to the jury what your role is in a

3   case like this and whether it's typical to use an

4   expert like you in a case like this or atypical?  Can

5   you give the jury a sense of that?

6   A    Sure.  Whenever there is a complicated matter

7   with technical issues, it is common for each side to

8   hire a technical expert.  So I was the technical

9   expert hired by Comcast.  As a technical expert, I

10  have no financial stake in this matter.  I provide

11  unbiased opinion.  I am only compensated for my time

12  in this case.  And the outcome of this case has no

13  financial stake as far as my compensation.  I do my

14  own analysis and I tell counsel my opinions.

15  Sometimes they like it, sometimes they don't.  And

16  Sprint will have their own experts, but that's how

17  the expert system works.

18  Q    Thank you.  You said the word "bias."  Did you

19  say "unbiased" or "bias?"

20  A    Unbiased.

21  Q    I wanted to make sure that the "un" was there.

22  Okay.

23  A    I'm just a little nervous, but yes.

24  Q    Did you prepare a slide that would indicate to

25  the jury what you were asked by Comcast to do in this

Dr. Akl - Direct                                        82

1   case?

2   A    Yes.

3   Q    Okay.  Are we -- is that what is up on slide two?

4   A    Yes.

5   Q    Okay.  What were -- what were you asked by

6   Comcast to do in this case?

7   A    So I was asked to look at Sprint, what Sprint was

8   doing, and when I say Sprint I mean Sprint

9   subscribers, Boost subscribers that are under Sprint,

10  and Virgin Mobile subscribers.  So Sprint is just a

11  short name for the subscribers in the Sprint

12  umbrella.  And to look whether Sprint infringed

13  claims one, seven, and 113 of the Comcast patent

14  through the use of SMS, which is the text messaging,

15  and MMS, which is the multi-media messaging, in their

16  CDMA-based messaging in the time frame 2006 to the

17  present.

18  Q    And what did you conclude from your analysis?

19  A    I concluded that Sprint did infringe through the

20  use of SMS and MMS claims one, seven, and 113 of the

21  Comcast patent.

22  Q    Okay.  And I take it the purpose of your

23  testimony today is to explain to the jury your

24  analysis and your conclusion?

25  A    Yes.

Dr. Akl - Direct                                    83

1    Q    Okay.  Before we go into that, why don't we first

2    walk through your background information?  So I see

3    you have a slide that's called "Work Experience."

4    Can you please describe for the jury what your work

5    experience has been?

6    A    Yes.  I am a tenured associated professor at the

7    University of North Texas in the computer science and

8    engineering department.  I'm also the Associate Chair

9    of Graduate Studies.  I've been at UNT for over 15

10   years, and over that time I've taught over 100

11   courses that deal with wireless communication.

12             Prior to that, I was a professor at the

13   University of New Orleans.  I was also a senior

14   systems engineer when I worked in industry at

15   Comspace Corporation.  I've also worked in the 90s at

16   MinMax Corporation, TeleWare corporation I did

17   consultancy work, and I also was a research assistant

18   when I was going to school at Washington University.

19   Q    So from this work experience, have you had

20   experience with messaging?  And you referred to text

21   messaging and multi-media messaging.  Have you had

22   experience with that?

23   A    Yes, the focus of my work over the last 20 years

24   has been on wireless communication, different aspects

25   of wireless communications, including messaging.

Dr. Akl - Direct                                          84

1   Q    Okay.  Okay.  Well -- and please tell the jury

2   about your educational background.

3   A    So, like I said, I went to college in St. Louis.

4   I went to Washington University in St. Louis.  I have

5   a Bachelor of Science in Computer Science, a Bachelor

6   of Science in Electrical Engineering, my Master's in

7   Electrical Engineering, and my Doctorate in

8   Electrical Engineering.  And my dissertation for my

9   Doctorate was on CDMA, which is the technology that

10  Sprint uses.

11  Q    Okay.  And what are your specialties?

12  A    So my specialties are cellular communication, and

13  under the umbrella of cellular communication, over

14  the years I've looked at the different generations.

15  So 2G means second generation, like GSM, CDMA, and

16  I'll explain those acronyms.  3G, which is the third

17  generation, and 4G, now LTE, which is the fourth

18  generation that is being employed.  I also worked on

19  different aspects of wireless communications like

20  Wi-Fi, Bluetooth, sensor networks.  With my

21  background in both computer science and electrical

22  engineering, I can look at a problem from both a

23  software and a hardware perspective and do an

24  analysis.

25  Q    So I think we heard a little bit about, or at

Dr. Akl - Direct                          85

1    least the acronyms, 2G and 3G and 4G, but could you

2    just in a little bit of detail explain to the jury

3    what does that mean?

4    A    Yes.  So in second generation there are two main

5    cellular communications technologies: GSM, which came

6    out of Europe, and CDMA, which was pioneered by

7    Qualcomm in the United States.  Both were used all

8    around the world.  So, for example, in the U.S. we

9    have four major carriers.  AT&T uses GSM and T-Mobile

10   uses GSM.  Verizon uses CDMA and Sprint uses CDMA.

11   Those two technologies evolved to 3G and there were

12   two standard-setting bodies.  GSM became WCDMA.  It's

13   kind of confusing because CDMA was -- part of aspects

14   of CDMA's second generation was good, so it was

15   adopted for the third generation of GSM and it was

16   called wideband CDMA.  While the third generation of

17   CDMA is referred to as CDMA2000.

18           With the fourth generation, the different

19   standard-setting bodies agreed on a single standard,

20   and that's LTE, that basically now all four major

21   carriers use.

22   Q    Dr. Akl, were you in the room yesterday during

23   the opening statement of Sprint's lawyer?

24   A    Yes, I was.

25   Q    Okay.  And do you recall Sprint's lawyer

Dr. Akl - Direct                86

1   referring to the old school, European cellular
2   network?
3   A    Yes.
4   Q    What -- do you know what cellular network or what
5   technology the Sprint attorney was referring to?
6   A    I believe he was referring to GSM, which came out
7   of Europe.
8   Q    And in terms of timing -- well, and then do you
9   recall Sprint's lawyer during his opening statement
10  referring to the American standard.  What technology
11  was -- if you understand it, what technology was
12  Sprint's attorney referring to?
13  A    I believe he was referring to NC41, which is
14  CDMA.
15  Q    Okay.  So in terms of timing, is GSM, which is
16  what the attorney referred to as the old school,
17  European standard, was that a lot earlier, a lot
18  older, than the American -- the American standard
19  which you referred to as CDMA?
20  A    No, they're both around the same time and they
21  were -- they're both competing technologies that were
22  developed around the same time and they're both
23  considered second generation.  And both are
24  actually -- were adopted around the world.  And then
25  both evolved into third generations.

1   Q    Okay.  So in terms of the American standard

2   cellular network, which you referred to as CDMA, is

3   that only used in America?

4   A    No, CDMA is used all around the world.  It's

5   actually also used in Europe, like Germany and

6   Poland, it's used in Asia, in China, in Japan, it's

7   used in India, it's used in South Africa.  So the

8   standard itself, there is -- the two main standards

9   are used -- both of them, they're used all around the

10  world.

11  Q    Well, okay.  So how about GSM, which I think was

12  referred to yesterday as the old style, European

13  standard?  Is that used worldwide?  Is that used in

14  the United States?

15  A    Yes, and it's common.  Just like in the U.S., you

16  have different cellular providers, and for different

17  cellular providers to use one or the other.

18  Q    Okay.  Okay.  So let's go back to your

19  background.  Can you explain to the jury about your

20  publications?

21  A    Yes.  So being a professor, of course, you're

22  expected to publish and to do research, which I do.

23  I have master's and Ph.D. students that I supervise.

24  And over the years, I've published journal papers,

25  conference papers, technical papers, book chapters.

Dr. Akl - Direct                                          88

1    I've also designed mini courses, like Voice-over IP,

2    Intro to Wireless Communication, Advanced Wireless

3    Communication.  The most recent course is on LTE that

4    I teach my Ph.D. students.  And I've received

5    multiple funded proposals, both educational and

6    research-oriented.

7    Q   You mention LTE.  Can you put that into the

8    framework of this 2G, 3G, 4G, just so the jury gets a

9    sense of these acronyms?

10   A   Yes.  So LTE stands for long-term evolution,

11   which is the fourth generation cellular standard.  So

12   this is what's all for -- AT&T, Verizon, T-Mobile,

13   and Sprint now have LTE in their networks.

14   Q   Okay.  Can you tell the jury about your honors

15   and awards and any one that you're particularly proud

16   of?

17   A   Sure.  So over the years I've received different

18   honors and awards.  The two that I am very proud of

19   is the IEEE Professionalism Award from the Forth

20   Worth Chapter.  IEEE stands for the Institute of

21   Electrical and Electronics Engineers.  It is the most

22   prestigious professional society in the U.S. and

23   maybe worldwide.  I received that award for the work

24   that I was doing in promoting engineering among high

25   school students.

Dr. Akl - Direct                    89

1          I've also received the UNT College of

2    Engineering Outstanding Teacher Award that I'm also

3    very proud of.

4    Q    Thank you.

5          MR. GOETTLE:  Your Honor, I offer Dr. Akl

6    as an expert in the field of the invention of

7    cellular technology and messaging.

8          MR. FINKELSON:  No objection, Your Honor.

9          THE COURT:  What we've done up to this

10   point, ladies and gentlemen, we've heard about Dr.

11   Akl's qualifications, and he's been offered as an

12   expert in cellular technology and wireless

13   communications, is that --

14         MR. GOETTLE:  General -- I offer him as an

15   expert in the field of the invention, which relates

16   to cellular technology and messaging in particular.

17         THE COURT:  And messaging.  And the defense

18   has an opportunity to cross-examine.  They opted not

19   to do so.  So I will accept Dr. Akl as an expert and

20   you will hear is opinions.  The weight to be given to

21   his opinions is for you to determine, and I will give

22   you some instructions on that in my jury charge at

23   the end of the case.  But keep in mind you may accept

24   his testimony, or reject it for that matter.  He is

25   being offered as an expert in the field of the

Dr. Akl - Direct                    90

1    invention.  You may proceed.

2           MR. GOETTLE:  Thank you, Your Honor.

3    BY MR. GOETTLE:

4    Q   So before we -- before we go into your analysis

5    and your conclusions, Dr. Akl, please describe for

6    the jury how you went about performing your

7    investigation.

8    A   So I was originally retained three or four years

9    ago.  So I've been working on this case for a few

10   years.  And over the course of those years I've

11   looked at thousands and thousands of pages and

12   hundreds of documents.

13          The first thing, of course, when I was

14   first retained was I was given the patent.  So I read

15   the patent, the 870 patent or the Comcast patent, I

16   looked at the -- and read the prosecution history,

17   the re-examination, understood the patent.  And then

18   there are a lot of court documents that becomes

19   available at different points in time.  In your

20   binder I believe there's a court claim construction.

21   So these are the definitions that the Court gives us.

22   So those definitions I have used and adopted in my

23   analysis.

24          There are also a lot of documents that

25   Sprint produced in this case.  I looked at all these

1  documents.  There are testimony of Sprint engineers

2  and third party engineers that were deposed outside

3  of this courtroom, and the transcripts become

4  available so I read that.  So all of that helps put

5  the case together, in a sense.  I also relied on Dr.

6  Dwoskin, who is another expert.  He did analysis on

7  databases.  And I will -- when we get to that part

8  I'll point out what I relied on him for.  Industry

9  standards like the CDMA standards, GSM standards --

10  in this case the CDMA standards are more relevant,

11  and the different documents that were produced.  So

12  all of that over multiple years I have gone through

13  in order to get to the point that we are today and to

14  come up with the conclusions that I have today.

15  Q   Thank you.  Okay, I just put up slide nine.  Are

16  these the topics that you're -- is this showing the

17  topics that we're going to walk through for the jury?

18  A   Yes.  So I'm going to talk about five major

19  topics.  The first one -- so that we're all on the

20  same page, I'm going to provide a background on

21  cellular networks and we're going to talk about the

22  messaging in 1999.  Then we're going to switch gears

23  a little bit.  We're going to talk about the patent

24  and the 870, the invention.  And then we're going to

25  talk about Sprint's documents that I read and

Dr. Akl - Direct                    92

1    analyzed.  And then the last part, probably the most

2    important, where we're going to look at infringement,

3    where we have to look at the claims and look at what

4    Sprint does.  So we're going to walk through these

5    one at a time, starting with the background.

6            THE COURT:  I'm thinking that before we get

7    into the first of these five topics, we ought to talk

8    our mid-morning break so as not to interrupt, to the

9    extent we can avoid it, his testimony on these five

10   topics.  So it's 11:00.  We'll be in recess for ten

11   minutes.  We'll reconvene ten minutes after 11:00.

12            (Jury out, 11:00 a.m.)

13            THE COURT:  We're in recess for ten

14   minutes.  You may stay there.

15            (Recess taken from 11:01 a.m. to 11:14

16   a.m.)

17            THE COURT:  Be seated, everyone.  You may

18   proceed.

19            MR. GOETTLE:  Thank you, Your Honor.

20   BY MR. GOETTLE:

21   Q    So, Dr. Akl, are you going to first speak

22   about -- explain to the jury the background of 1999

23   cellular networks?

24   A    Yes.

25   Q    Okay.  Please go ahead.

Dr. Akl - Direct                                       93

1   A    So a cellular network starts out with a mobile

2   phone.  That's the greatest thing, is having a phone

3   that you can take around with you.  What that means,

4   no wires, the communication between the phone over

5   the air.  So the phone has antennas and the cellular

6   network has what we call towers.  So these are very

7   large towers that the antennas are on.  So like here,

8   those would be the cellular towers.  Then the area

9   that is covered by -- where you have coverage by a

10  specific antenna would be called a cell.

11  Q    Okay.  Just so point of clarification.  I know we

12  wrote "1999 Cellular Technology" at the top, but is

13  this the same, true, today?

14  A    This has not changed, yes.

15  Q    Okay.

16  A    And how do delete --

17           (Pause in proceedings.)

18           MR. GOETTLE:  Sorry, Your Honor.

19  BY MR. GOETTLE:

20  Q    Okay.  What are you showing on this slide?  Sorry

21  for the interruption.

22  A    Okay.  So to build the network we have multiple

23  towers, and multiple towers would cover an area.  And

24  what's important is even though you may have two cell

25  phones in the same house next to each other or across

Dr. Akl - Direct                                    94

1    the street, the two cell phones never communicate

2    directly with each other.  So regardless of where

3    they are, whether you're talking to somebody in the

4    same house, both of you on your cell phone, or

5    talking to somebody across the country, all

6    communication takes place between the cell phone and

7    the cell tower.  And we have hundreds of these towers

8    that would cover the different areas.

9             So back in '99, what has changed between

10   that and today is really the amount of towers and the

11   coverage.  So as the networks were being built, the

12   major cities had really good coverage, and maybe

13   outside in, you know, in between states and stuff

14   where you're driving in the middle of nowhere, you

15   wouldn't have as much of a coverage.  Now pretty much

16   most of the U.S. has good coverage.

17   Q   So in looking at slide 11, are these cell phones

18   that you have on there where you have a cell, where

19   there's two phones talking to the tower, can the cell

20   phones talk to each other through the tower the way

21   this diagram might be misinterpreted?

22   A   So they talk to each other through the tower and

23   the backbone network, but the phones never talk

24   directly to each other.  So what I have next is a

25   slide expanding on this idea.  So what you see here

1   is we have user A, and he is making a phone call and

2   he -- the signal travels over the air from the phone

3   to the cell phone tower, and he says I need a ride.

4   And then the telecom networks, so the back network,

5   is going to carry the traffic and the signaling to

6   user B, whether it's in the same cell or a different

7   cell.  And then user B's phone is going to ring and

8   it's just going to hear a message.

9          So what we need to keep in mind is that we

10  classify the channels in two categories.  So we say

11  we have traffic channels.  And that's like user voice

12  or use data.  We call that traffic.  And we classify

13  the other type as control channels.  So control

14  channels are the signaling, everything else that

15  needs to take place in the background for the call to

16  complete.

17  Q   So just to go back, I see that the -- on slide 15

18  there's purple -- you have a purple arrow, and then

19  on slide 16 you have a -- I don't know what color

20  that is, brown or orange-ish arrow.  Is there a -- is

21  that a significant -- are you trying to signify

22  there's differences?

23  A   Yes.  So even if you're not on your phone

24  directly making a call, there is going to be

25  signaling traffic and control traffic that's taking

Dr. Akl - Direct                                    96

1    place.  So even when your phone is on standby, every

2    so often the phone is going to communicate with the

3    network and it's going to say hey, I am here.  The

4    network is going to -- the phone is going to register

5    with the network every so often so that when you're

6    driving around the network knows even though you're

7    not on a call, there is signaling traffic, there is

8    control traffic that happens that knows where your

9    phone is.

10   Q   Okay.  Are there -- are there more pieces of a

11   cellular network than what you've shown the jury so

12   far?

13   A   Yes, and we're going to go through those.

14   Q   Okay.  So I just put up slide 23.  Can you go

15   through those -- go through those other pieces?

16   A   Yes.  So far, we've talked about the phone, we've

17   talked about the cellular tower, and there are

18   specialized computers at the bottom of those towers.

19   It's called a bay station controller because the

20   tower is normally called the bay station.  And so

21   this is the two aspects.  The third is the core

22   network elements.  And that's probably the most

23   important.  That's what -- that's what allows the

24   phone to communicate to each other and the phones to

25   communicate to outside networks.  So the core network

Dr. Akl - Direct                          97

1    elements are those essential components that are part
2    of the cellular network that makes the magic happen.
3    Q    And what do the core network elements do to make
4    that magic happen?
5    A    Yes.  So core network elements are what do the
6    switching, the lookup.  So I have an analogy here,
7    and this is -- I'm dating myself, but some of you may
8    know Lily Tomlin back in the 50s, and she played the
9    switchboard operator.  So this is an analogy from the
10   regular phone lines where you had users that would
11   connect the call.  So this is the core essential
12   functionality.  So the essential functionality is
13   being able to connect the call, to route the call.
14            So in a cell phone -- in a cellular
15   environment, in a cellular network, you do have the
16   core network elements that allow the phones to
17   communicate with each other and with outside networks
18   like, for example, the wired networks.  So someone on
19   a cell phone can call somebody on a land line or
20   connect to the internet and so on.  So --
21   Q    So in this -- in this analogy that you have, what
22   are the switchboard operators doing?
23   A    So in this analogy, what they're doing is they
24   have the wires and they -- you know, a call comes in
25   and they plug it in and complete the call, and the

1  way to know how to plug it in is they have the

2  notebooks in front of them, so they look it up and

3  they see what call is going to be connected to what

4  user and they manually do it.

5          Now, this functionality, this essential

6  functionality is now being done by computers.  But

7  the idea and the analogy is still the same.

8  Q   Okay.  So what are you showing on slide 25?

9  A   So to recap what I was saying, is those core

10 network elements are going to be very important and

11 we're going to -- we are going to look at the Court's

12 construction, and you already saw that earlier.

13 We're going to talk about this essential

14 functionality that allows these elements to -- for

15 the phones to talk to each other an to talk, for

16 example, to a wired phone line, to the public switch

17 telephone network, which is abbreviated PSTN.  That

18 stands for public switch telephone network.  These

19 are just the regular land lines that have been around

20 for 100 years.

21 Q   And does the cellular network, or particularly

22 the core network, does it communicate with other

23 types of networks?

24 A   Yes.  On your cell phones you can also talk to

25 the internet, for example, and the ability to connect

Dr. Akl - Direct                                    99

1   the phone -- even back in '99, the internet was

2   phone, you had very basic email on your phone, but it

3   was a capability.  And the ability to switch and to

4   connect those phones to the internet was handled by

5   the core network elements.

6   Q   And in 1999, sir, was it -- was it known to have

7   other services that could connect to the cellular

8   network and take advantage of the core network

9   elements?

10  A   Yes.  There are adjunct services like fax.  You

11  can receive a fax on your phone, voicemail, and

12  messaging.  So those are additional adjunct services

13  that are great in terms of the -- you know, some of

14  them took off, some of them, you know, didn't take

15  off as much, but those are all additional services

16  that the core network element facilitated by allowing

17  the phone to communicate with the outside networks

18  and offer additional services.

19  Q   All right.  So, Dr. Akl, are we right in seeing

20  that we're done one out of five topics already?

21  A   Yes.  So this is the overview, very high

22  overview, of a cellular network.

23  Q   Okay.  So now you're going to talk about

24  messaging in 1999?

25  A   Yes.

Dr. Akl - Direct                              100

1    Q    Okay.

2    A    So in '99, we had text messaging, and text

3    messaging wasn't very prevalent.  It was -- they were

4    able to offer it because already you had the

5    infrastructure in place.  You had the towers, you had

6    the phones, you had the signaling, you had the

7    control.  The protocol that was used is called SS7.

8    It's another acronym we throw in.  But the

9    infrastructure was there.

10           So because we already had, in a sense, the

11   technology and the infrastructure, you could be able

12   to use the signaling, the control channels, to send a

13   very short text message.  It wasn't very prevalent

14   because the phones at the time weren't conducive.

15   The phones in 1999 looked like the phones that you

16   had at home except they were smaller -- or they

17   started out being bigger, and then gradually they

18   became a little smaller.  But as far as their

19   functionality, you had the numeric keypad.  And so in

20   order to send a text message, if you recall back in

21   the -- in '99, you had to use your numeric keypad to

22   type the word.  So the letter A, B, C are attached to

23   the number two.  So if I want to type "apple," I

24   would have to two, and if I want the letter B, I have

25   to press it a couple times.

Dr. Akl - Direct                    101

1          So for me to type a little phrase, you

2     know, was horrible.  I mean it was a horrible

3     process.  And also, the phones weren't used the way

4     they're used today.  They weren't as ubiquitous.  In

5     '99, you -- you know, those -- the plans were

6     expensive.  You would have your phone more for

7     emergency purposes.  Most often it was, you know,

8     just turned off or you just carry it with you in case

9     there is an emergency.  You would turn it on, you

10    would make a call.

11         So this was the state of the calling and

12    the messaging back in '99.  And things changed.  And

13    what changed is -- one big change is really the

14    phones themselves.  And so a company called

15    Blackberry -- they weren't the first, but a company

16    called Blackberry pioneered phones with keyboards,

17    and you had -- some people loved their Blackberrys

18    because of the keyboard.  They had a physical

19    keyboard in your phone.  And what the physical

20    keyboard allowed you to do is to send email, it made

21    it easier to text, and originally, it was geared

22    towards business users, and it was expensive, but

23    they -- but they caught up and business users loved

24    their Blackberry phones.  And this was around 2002.

25         Fast forward a little bit later to 2007.

Dr. Akl - Direct                                        102

1   2007, Apple did something similar in terms of they

2   created the iPhone where instead of having a physical

3   keyboard, you had a virtual keyboard.  So now you had

4   a bigger screen that if you wanted to text, the

5   keyboard would pop up and then you can type your text

6   message, you can type your emails, and then they

7   keyboard would go away, and that's the smart phone

8   that we have today.

9             So there were a lot of factors, both in

10  terms of who would carry phones in the late 90s, the

11  generation of people that just used them for calling

12  and the generation that, you know -- several years

13  later, the young generation, that basically texts

14  like crazy, they don't like calling, everything is

15  done through text.  And the devices that made it a

16  lot more conducive to send texts, and so what we saw

17  is texting become this huge business, and now we have

18  trillions and trillions of text messages that are

19  being sent today.

20  Q   So that's today, but in 1999, was that the case?

21  A   No.  So in '99, texting wasn't as much of an

22  issue because one, the messages themselves were

23  small, and two, you didn't have that many of them so

24  the network can handle them.  So it wasn't as much of

25  an issue back then.

1   Q   Okay.  Okay.  On to topic number three, the

2   invention of the 870 patent.

3   A   Yes.  So now we're going to switch gears a little

4   bit and I'm going to talk about the Comcast patent.

5   And, actually, do you want me to use --

6   Q   Yeah.

7   A   -- the whiteboard?

8   Q   Yeah.

9        MR. GOETTLE:  Your Honor, I'd ask that --

10  if the witness could step down and write on the

11  whiteboard.  I think I would like to do the first

12  part of the examination about the patent using the

13  whiteboard.

14       THE COURT:  That's fine.

15       (Pause in proceedings.)

16  Q   So, Dr. Akl, can you please step over here?

17  A   Yes.

18       (Pause in proceedings.)

19       THE COURT:  Mr. Finkelson, you can

20  certainly move your position --

21       MR. FINKELSON:  Thank you, Your Honor.

22       THE COURT:  -- so that you can see what the

23  doctor is writing on the whiteboard.

24       MR. GOETTLE:  Your Honor, is that placement

25  okay for you or --

Dr. Akl - Direct                    104

1          THE COURT:  That is, and at the conclusion,

2    I want this marked as an exhibit.

3          MR. GOETTLE:  Absolutely, Your Honor.

4    BY MR. GOETTLE:

5    Q   So, Dr. Akl, I think -- I think what would be a

6    good start -- what would be a good start is let's

7    talk about the problem that the inventor was trying

8    to solve.

9    A   So we've talked -- we've given you a little

10   history in '99 on the cellular network and the

11   messaging network, and so the -- so the problem that

12   was being -- that the inventor was trying to solve is

13   message volume.  So -- and so message volume comes

14   into play in two ways.  When we think of text

15   messages, text messages are small.  So in terms of

16   the size of the message itself, it's not an issue.

17   But when you have not millions, not billions, but

18   trillions of text messages, then the issue of speed

19   and congestion becomes an issue in terms of those

20   messages, that they're being routed in the cellular

21   network, they're going to bog down the network.

22          Message problem also comes into play when

23   we think of MMS messaging, and this is the multi-

24   media messaging.  Now, the SMS -- and that's short

25   message service, which is the same as text message.

Dr. Akl - Direct                                    105

1    Those standards were done before '99, but MMS was

2    not.  So MMS, back in '99, people were talking about

3    yes, we want to be able to instead of just sending a

4    text message, we want to send a multi-media message,

5    we want to send a file, we want to send a picture, we

6    want to send a video.  So there is already a problem

7    in terms of the size of those files.  The size of an

8    MMS is going to be (indiscernible).  And so --

9    Q    Could you -- but why is the size of a message

10   bigger -- I take it that an MMS message is bigger.

11   Why is that?

12   A    Yeah.  So because of its sheer size, if you have

13   those messages being routed in a cellular network and

14   they can lower the speed, they can cause congestion,

15   if they're just going back and forth and trying to be

16   delivered.  And so we have to look at what the

17   cellular network is doing when we have millions and

18   billions and trillions of text messages.  But even

19   when we don't have those large numbers, when we have

20   the multi-media messages, just because of the size of

21   that message it's going to cause congestion because

22   it needs additional bandwidth.

23   Q    Thank you.

24   A    And --

25   Q    So I take it the inventor had a solution to this

Dr. Akl - Direct                    106

1   problem?

2   A    Yes.  So the solution to this problem was why

3   don't we keep the messages out of a cellular network

4   until phone is ready to receive.  And so what this

5   means is -- what the inventor conceived of is instead

6   of having those messages, you text -- you generate

7   the message.  It's in the cellular network.  It's

8   going to be routed in the cellular network, it's

9   going to be routed by these core network elements.

10  And like we were saying in '99, the phone may be on,

11  the phone may not be on, you may have coverage, you

12  may not have coverage, and the network is trying to

13  see is the phone ready or not.  If the phone is read,

14  it delivers it, if the phone is not ready, the

15  message is still in the network.

16          This may not be as much of an issue in '99

17  with text messages, but with multi-media messages

18  this is already going to be a problem with those

19  messages in the cellular network causing congestion,

20  lowering speed.  And then we have millions and

21  billions and trillions of text messages, that is also

22  going to be a problem.  And so what the inventor came

23  up with, let's -- once we generate the message let's

24  take it out of the cellular network until the phone

25  is ready to receive it, and then we can just deliver

Dr. Akl - Direct                107

1   that message.

2          Now, this caused another problem.  So now

3   we have --

4   Q   Before we -- before we go to the other problem,

5   why -- what did most of the time the network -- why

6   didn't most of the time the message be able to sent

7   right through the phone?  Like why would it cause

8   congestion if in the end the message still has to go

9   through the network to get to the other phone?

10  A   Because if you go back to the analogy of -- that

11  I had of the operators that are connecting the call,

12  the cellular network -- and the purpose of a cellular

13  network is to have these calls connected.  So it's

14  already handling all this call volume.  And now we

15  want the core network elements, in addition to

16  handling the regular calls and the switching of those

17  calls, to also do the switching of the messages.

18         So if you think of the analogy of the

19  people sitting, and if I -- you know, on a little

20  post-it I give a text messages, if it's one or two,

21  yes, I an go ahead and read the text message and

22  route a text message.  But when I have billions and

23  trillions of text messages then all these text

24  messages are going to clog down those operators or

25  the core network elements that are switching and

Dr. Akl - Direct                           108

1    doing their job with the caller.

2    Q    You said you were going to talk about another

3    problem?

4    A    Yes.  So now I'm going to call this problem one,

5    solution one, and I'm going to call this now problem

6    two.  So problem two is we have now the messaging

7    server, and the messaging server only knows the phone

8    number.  So by taking the message out of the cellular

9    network and storing it in a messaging server, the

10   messaging serve now doesn't know what is happening in

11   the cellular network, doesn't know if the phone can

12   receive a message.  It doesn't know anything about

13   the phone.  That information is in the cellular

14   network.  And so this is now going to cause a

15   problem.

16          So the patent anticipated that and came

17   with a solution to the second problem.  So solution

18   two to this problem is now the cellular network is

19   going to map the phone number to an internal

20   identifier -- and I'll talk a little bit about

21   that -- until -- and then send a response -- and send

22   a response.  Thank you.

23          So by taking the functionality of the core

24   network elements and then having them just

25   concentrate on the functionality which we've been

Dr. Akl - Direct                          109

1   talking about, that's essential functionality, not

2   having that functionality be bogged down by the

3   messages.  The messaging server now only knows the

4   phone number.  How can the message be delivered?

5           The messaging server, having only the phone

6   number, is going to ask the cellular network.  It's

7   going to say okay, is this phone ready to receive?

8   And the cellular network is going to map the phone

9   number to an internal identifier like an ID, a serial

10  number for a phone, or another identifier that

11  uniquely identifies the phone.  It's going to look up

12  is the phone ready to receive?  And once the phone is

13  ready to receive it's going to send a message saying

14  yes, the phone is ready to receive.

15          If the phone is not ready to receive, it's

16  going to also send a message, no, don't send the

17  message.  And the messaging server is going to hold

18  on to that message.  And once it gets notification

19  that it's ready to receive, that's when the message

20  is going to leave the messaging server and now it can

21  be handled by those core network elements.  So the

22  core network elements aren't going to be doing the

23  same task multiple times, aren't going to be trying

24  to route a message multiple times.  They're only

25  going to do it once and this is going to help with

Dr. Akl - Direct                    110

1   the speed and the congestion of the network.

2           Yeah, I'm done with this and we're going to

3   now look a the patent.  I'm going to show you how

4   this is in the patent.

5           THE COURT:  How do you want to identify

6   that?

7           MR. GOETTLE:  Why don't I -- I'll write

8   right on it "Plaintiff's Drawing 1," Your Honor?

9           THE COURT:  All right.

10          MR. FINKELSON:  No objection if you don't

11  have an objection.

12          MR. GOETTLE:  No, unfortunately, I got to

13  write it.

14          MR. FINKELSON:  Maybe "Problem 1" and

15  Problem 2" would be easier.

16          (Pause in proceedings.)

17          MR. GOETTLE:  I was worried I was going to

18  misspell "plaintiff's."

19          (Pause in proceedings.)

20  BY MR. GOETTLE:

21  Q   Okay.  So, Dr. Akl, are you going to now talk

22  about how the patent describes the two problems and

23  the two solutions that you've described?

24  A   Yes.  So we had the coversheet of the patent.

25  Q   Oh, do you want me to go back to that?

Dr. Akl - Direct                          111

1   A    That's fine, I'll just --

2   Q    Why don't we -- why don't we go back to it?

3   What -- who was the -- do you know who the inventor

4   was?

5   A    So the inventor on the patent is Ms. Aho.  The

6   assignee is Nokia.  And, you know, at the time back

7   in '99, Nokia was a giant in the field.  They had

8   excellent technology, they had great phones.

9   Unfortunately, things changed, you know, a decade

10  later.  But this was originally, as you had seen, a

11  Nokia patent.  And in the -- I don't know if we --

12  Q    Actually, before we do that, it just occurred to

13  me.  So yesterday, we heard some testimony about

14  Nokia and the state of Nokia a decade after 1999.

15  What is your understanding of the state of Nokia a

16  decade after 1999?

17  A    So, as somebody in the cellular field, I follow

18  companies and I was a huge Nokia fan.  I think -- you

19  know, my -- I had a Nokia phone back in the late 90s

20  and it was an excellent phone.  What had happened

21  was, you know, they made great phones.  They had an

22  operating system called Symbian.  And when we saw

23  in -- you know, the Blackberry launched, and Nokia

24  had phones with keyboards and they were good phones.

25  And then the iPhone launched.  With the launch of the

Dr. Akl - Direct                112

1    iPhone what had happened was people loved the iPhone.

2    And Google, you know, some argue copied or not --

3    that's a different story -- had their Android

4    operating system.  So now we have the Android phones

5    and different manufacturers, and we have Apple and

6    their operating system.  And those smart phones

7    just -- people loved.

8              So Nokia, you know, had their Symbian

9    phones.  They tried to compete in the smart phone

10   market, but, unfortunately, they didn't.  When you

11   look at worldwide, you had a lot of, you know, third

12   world countries that were still buying, you know, the

13   old traditional phones.  So, you know, we -- I heard

14   testimony that -- I don't know what year, like 2010,

15   they were number one.  They may have been number one

16   worldwide in terms of number of phones because you

17   have a lot of the very inexpensive like flip phones

18   that were still being sold worldwide.  But that was

19   not the case in the U.S.

20             If you look at their market share, 2010 was

21   really like the beginning of the end for them.  It

22   was where they peaked in market share in terms of

23   smart phones, and then it started falling.  In 2011,

24   it was actually half of that.  It was like around

25   maybe 40 percent in 2010, dropped to 20 percent.  In

Dr. Akl - Direct                                    113

1   2012, it was like ten percent.  And if you, you know,

2   read the news and -- I mean I do -- Microsoft tried

3   to help them.  They had a pact with Microsoft.  Nokia

4   was supposed to carry the Windows platform that was

5   supposed to be the third.  It never really took off

6   and, virtually, you know, Microsoft bought the Nokia

7   handset market.  The market share never was like more

8   than one or two percent.  And really, what we have no

9   is just the iPhone ecosystem and we have the Android

10  ecosystem.  So this is a brief history of what

11  happened.

12  Q   Okay.  I wasn't -- I wasn't ready for all that,

13  but okay.  Thank you.  So let's turn -- now let's go

14  back to the patent and talk about the -- where the

15  patent discloses the two problems and the two

16  solutions that you reference.

17  A   Yes.  So going back to the invention and what

18  Nokia -- what the inventor came up with.  So you see

19  the specification.  This is the bottom of the patent

20  that's describing the invention.  It's talking about

21  that what we want to do is we want to speed up the

22  network, we want to have the message only delivered

23  when the phone is ready to receive it.  And so this

24  is the problem-solution, the first problem-solution

25  that I described.

Dr. Akl - Direct                                        114

1    Q    Okay.  And does the patent also describe the

2    second problem and second solution?

3    A    Yes.  And so the -- and having the messaging

4    server not knowing what's happening in the cellular

5    network is introducing the second problem, and so the

6    solution is now we want to have like a first

7    identifier.  And the first identifier is like a phone

8    number.  It's a number that the messaging server

9    would know because when you text, the phone number

10   goes with that.  And then that's what's used in the

11   cellular network to map to the second identifier,

12   that unique ID that describes a specific phone.

13           Those is important on a lot of different

14   levels.  It's important because you may have

15   different phones at different points in time, but you

16   want to keep the same phone number.  And so the

17   network needs to have something other than your phone

18   number that identifies your phone so that when you

19   keep your number and you change phones the network

20   can know that you have a different phone.

21           So in the cellular network phones are

22   identified by a unique number.  You also have phones

23   with different capabilities.  So some phones can

24   receive videos, some phones can receive large files,

25   some phones can receive small files.  So the network

Dr. Akl - Direct                                    115

1   maintains and knows the capabilities of the phone.

2   So this is exactly the solution to not having the

3   messages keep going through the cellular network and

4   having the second identifier tell the messaging

5   server yes, these are the capabilities of the phone

6   and the phone is now ready to receive.

7   Q    Dr. Akl, back in 1990 -- you just referred to the

8   ability to keep your phone number but change your

9   phones?

10  A    Yes.

11  Q    Okay.  So meaning if you update -- you update and

12  get a new phone, you don't have to get a new phone

13  number?

14  A    Correct.

15  Q    In 1999, was that a requirement?

16  A    No, that was not a requirement, but this patent

17  solved that issue as part of the invention.  And the

18  idea of mapping was actually a very good solution to

19  that problem.

20  Q    When did -- when did that become a requirement,

21  to be able to change your phone and update it and

22  keep your same phone number?

23  A    2003.  So the number portability isn't really

24  mentioned in the patent, but the solution that the

25  patent gave applies very well to the number

Dr. Akl - Direct                              116

1    portability.

2    Q    Okay.  Number portability, can you explain that?

3    A    Yes, so the term "number portability" is the

4    ability -- so this is something from the FCC.  So

5    this is the government telling the network operators

6    don't take users hostage in the sense that, you know,

7    if you're changing -- if you want to switch from AT&T

8    to Verizon or you want to move, you lose your phone

9    number because it was a way for, you know, customers

10   to kind of stay locked in.  And so the ability to

11   take your number with you, the ability to maintain

12   the same phone number, not have to change it, had to

13   be decoupled from the phone and from the operator.

14   So the same requirement actually applied to the

15   original wired phone I think in the late 90s.

16          Then in 2003, cellular operators like AT&T,

17   you're with them, you're not happy, you want to move

18   to Verizon.  You should be able to take your phone

19   number with you and then you would need a different

20   phone number on a different network.  That's called

21   number portability.

22   Q    Okay.  Okay.  Are you now going to talk --

23   explain to the jury the claim -- oh, I skipped a

24   slide.  I apologize.  So I take it the patent applies

25   to what you referred to as MMS messages?

Dr. Akl - Direct                                117

1  A    Yes.  So the patent is -- describes the MMS
2  messages and gives examples like a picture, a fax, a
3  video, but the patent is restricted to MMS and it
4  equally applies to SMS, and these are the short text
5  messages.  So it applies to both.
6  Q    Okay.  Okay.  Are you now going to explain the
7  claim one to the jury?
8  A    Yes.
9  Q    Before you go into that, just to be clear, are
10  you -- right now, are you only going to explain claim
11  one?
12  A    Yes.  So what I'm going to do is -- we're still
13  talking about the patent and I'm going to walk
14  through claim one, but in talking about claim one I'm
15  going to introduce the jury to something in a couple
16  seconds that's called the call flow.  And this is
17  important because when we look at Sprint documents
18  later there's going to be a lot of call flow.  So I'm
19  going to try to help you understand what a call flow
20  is.  But now I'm not looking at a Sprint document.
21  I'm just looking at the claim.  But I'm going to map
22  the language in the claim to a call flow, just to
23  kind of give you an idea of where we're headed.
24  Q    Okay.  So I just put up slide 41.  What is slide
25  41 showing?  First of all, what is the numbered

Dr. Akl - Direct                                    118

1   paragraph I see at the top on the --

2   A    Okay.

3   Q    -- on the right?

4   A    So this is claim one.  And as you may have heard

5   before, the first couple lines are called the

6   preamble of the claim.  And so in the preamble of the

7   claim it says we have a method for inquiring about

8   information about -- relating to a wireless terminal.

9   So the wireless terminal is just the phone, the

10  mobile phone, and this is what I have drawn on the

11  left -- of a cellular network, so we need a cellular

12  network and I'm using my graphic still on the right

13  part of the -- left part of the slide.  And the

14  cellular network, that's the phone, and the bay

15  station system, and the core network elements from a

16  cellular network by a messaging server that is

17  external to the cellular network.  And what I drew in

18  the middle is the messaging server.  And in a -- in a

19  couple slides down I'm going to explain -- the Court,

20  just like they gave us a definition for "cellular

21  network," they also gave us a definition for a

22  "messaging server," and what I'm showing you here is

23  that definition, but I'm going to go into that in

24  detail, and there's two functionalities that the

25  messaging server needs to have, but I don't want to

Dr. Akl - Direct                                    119

1   overwhelm everything on one slide, but we're going to

2   get there.

3   Q   Okay.  So what happens to sort of instigate the

4   method of claim one?

5   A   Yes.  So the first thing that needs to happen is

6   someone needs to send a text message or someone needs

7   to send an MMS message.  So what I'm showing you --

8   so this is called the call flow and it's read left to

9   right, top to bottom, and it shows arrows on like

10  vertical lines.  Sometimes it's called like a ladder

11  diagram because eventually, it will look like a

12  ladder.

13          So this is just a symbol that we have a

14  message that's going to go from a wireless terminal,

15  from the cell phone, to the messaging server, and it

16  can be a text message or it can be a multi-media

17  message.  It doesn't make a difference.

18  Q   Okay.  And then now, after that message is

19  received at the messaging server, now is -- are the

20  four steps in the claim -- did they follow?

21  A   Yes.  So we're going to look at -- so now I have

22  this big number one, and this is the first

23  limitation, or the first step, in claim one.  So the

24  little "1" on top is claim one and the big "1" is I'm

25  numbering the steps.

Dr. Akl - Direct                              120

1        So the first step says, and it's a lot of
2    language, "Sending an inquiry from the messaging
3    server to the cellular network to determine sent
4    information relating to the terminal."  So you're
5    going to send an inquiry, the inquiry comprising a
6    first identifier.  Like a phone number, you're going
7    to have an identifier, the first identifier being a
8    specific identifier external to the cellular network.
9    And so it's a lot of language that we have an
10   inquiry -- and this is what I've shown on the left --
11   going from the messaging server to the cellular
12   network that needs to include a first identifier.
13   Q    Okay.  And later on, when we look at Sprint's
14   network and Sprint's documents are we going to parse
15   the language of this claim in more detail?
16   A    Yes.
17   Q    Okay.  Is the purpose right now just to give a
18   high level summary?
19   A    Yes.
20   Q    Okay.  So what happens next?
21   A    So next, we're going to have step two, step
22   three, and step four, and those steps happen in the
23   cellular network.  So the cellular network is going
24   to receive this inquiry, and the first thing it's
25   going to do, it needs to do a mapping from the first

Dr. Akl - Direct                                    121

1    identifier to a second identifier.  So there is a

2    mapping that needs to happen in the cellular network,

3    and then there's language that the second identifier

4    is internal.  We're also going to have definitions

5    from the Court.  We're going to go through that

6    later.  So this is step two.

7    Q    Okay.

8    A    This is the mapping.

9    Q    Okay.

10   A    The third step is the determining, determining

11   information, sent information, relating to the

12   terminal with the aid of the second identifier.  So

13   the cellular network needs to take the second

14   identifier and find something about the phone,

15   determine the -- you know, anything that's con --

16   that's information, whether, you know, the phone can

17   receive a message, the phone is on, you know.  Any

18   information that needs to be determined has to be

19   done with the aid of the second identifier and needs

20   to be done in the cellular network, which then gets

21   us to step four.

22         The cellular network has determined that,

23   and now it's going to go back and tell the messaging

24   server -- it's going to send in a response.  So we're

25   going to have a response that's now going to go as a

Dr. Akl - Direct                              122

1   result of this inquiry to the messaging server, and

2   it's going to contain -- it's going to relate to the

3   terminal and it's going to be with the aid of sent

4   first identifier.

5   Q   Okay.  So you described this type of diagram as a

6   call flow?

7   A   Yes.

8   Q   And, again, can you just slowly explain to the

9   jury how you read a call flow?

10  A   Yes.  So I drew the diagram on the left.  This is

11  me explaining the steps graphically in what we call a

12  call flow diagram.  And so this is read normally top

13  to bottom.  So you look at the arrows and you -- the

14  arrow that's on top comes first and you read it left

15  to right.  So even if I don't look at the claim, if I

16  just have the figure on the left, I can say okay, so

17  one, I send a message; two, I have an inquiry and I

18  can see that it's going from the messaging server to

19  the cellular network; and then, for example, you know

20  step three isn't shown here, but step four, I have a

21  response that goes back.  So this is how you read a

22  call flow.

23              (Pause in proceedings.)

24  Q   Okay.  Are --

25              THE COURT:  I think we're going to try to

Dr. Akl - Direct                    123

1   keep that to a -- that noise to a minimum.  If any

2   juror cannot hear, I want to see a hand.

3   BY MR. GOETTLE:

4   Q   All right.  So are you now going to show the

5   figures of the patent and explain the Court's

6   construction of "cellular network?"

7   A   Yes.  So we're still trying to understand the

8   patent and we're still looking at the patent.  And so

9   in the specification of the patent there are figures

10  that explain the invention.  But the Court also gave

11  us definitions, and those definitions I understand

12  are in your folder, and there are multiple

13  definitions.

14          The first definition, which I think you've

15  seen, is an important definition.  They're all

16  important, but this is specifically related to the

17  definition of a cellular network.  And as an expert,

18  I take the definitions that the Court has provided

19  and that's what I apply in all my analysis.  So I

20  have looked at this definition and now I'm just going

21  to go over the definition.

22          So it talks about a cellular network needs

23  to have three main things.  Of course they need to

24  have the wireless terminal, we need to have a cell

25  phone, and I don't think that's disputed.  You need

Dr. Akl - Direct                    124

1    to have a bay station system.  And so this is in

2    figure one, you have the figure -- you have the

3    patent in your binders.  So the -- you have the BSS.

4    Those are the towers and the computers at the bottom

5    of the towers that communicate with the wireless

6    terminal.  And the next thing is you need to have the

7    core network elements.

8             The Court says core network elements may

9    include, and it gives us a list, like subscriber

10   databases, mobile switching centers, packet switching

11   nodes, and messaging servers.

12   Q    Okay.  And I see that you have on slide 48 a

13   picture of those switchboard operators.  Could you

14   explain to the jury why you have that on there?

15   A    Yeah.  So this is just my analogy, trying to

16   remind the jury the core network elements -- and it's

17   easy to visualize the cell phone.  And the tower --

18   if you're driving on the highway you actually see

19   sometimes -- if you're looking for them, you see the

20   cell phone towers.  The core network elements are the

21   component that you don't see.  Those are the ones

22   that are in -- you know, in data centers, they're

23   underground, those are what perform core

24   functionality.  And this core functionality, we have

25   to look at the definition.  They're core network

Dr. Akl - Direct                                    125

1    elements in a cellular network.  So not just that

2    they're important or they're essential, they are

3    essential to a cellular network.

4              So in my analogy, those are what allows the

5    call to communicate with each other and the call to

6    connect to the internet or connect to the land lines.

7    This is what allows the phones to communicate with

8    outside networks.

9              THE COURT:  Let's hold it.  Michael --

10             COURTROOM DEPUTY:  Yes.

11             THE COURT:  -- ask how long they're going

12   to be.

13             COURTROOM DEPUTY:  Yes.

14             (Pause in proceedings.)

15             THE COURT:  We are going to get the

16   representative of the clerk's office -- the clerk

17   manages the building -- and get that stopped.

18             MR. GOETTLE:  Do we have like a really long

19   broomstick?

20             THE COURT:  It would have to be a pretty

21   long broomstick.  I'm debating whether we should

22   recess early.  I don't like to do that.  I like to

23   break up the day.

24             MR. GOETTLE:  Your Honor, we're getting to

25   the good part.

Dr. Akl - Direct                          126

1          THE COURT:  I'm concerned that the jury

2    won't be able to hear.  Is everyone hearing the

3    witness?  Everyone -- anyone not hearing the witness?

4    I think we ought to go forward.

5          MR. GOETTLE:  Okay.

6          THE COURT:  It's a little distracting, but

7    if it gets to the point where you are distracted and

8    are having trouble, let's see a hand and we will

9    recess.  And we'll see how much influence I have

10   around here --

11         MR. GOETTLE:  Judge --

12         THE COURT:  -- with whether we can stop the

13   noise.  What they're doing, they're reconfiguring

14   another courtroom.  This one was done very recently.

15   I hope when they did the work here they didn't

16   disturb any other judges.  But the courtroom just

17   above ours is being done now and it's something of an

18   intrusion.  So let's try to proceed.

19         MR. GOETTLE:  Okay, Your Honor.

20         THE COURT:  And in the meantime, I'm going

21   to try to do something.  You may proceed.

22         MR. GOETTLE:  Thank you.

23   BY MR GOETTLE:

24   Q   Dr. Akl, just to be absolutely clear -- I may

25   have just asked you this, but I'm not sure.  Can you

Dr. Akl - Direct                                127

1    explain to the jury what a core network element is

2    under the Court's construction of this 1999 patent?

3    A    So we're looking at a core network element in a

4    cellular network and it has to -- the Court doesn't

5    define, doesn't give us a definition of "core network

6    elements," so we use the ordinary meaning for the

7    word "core," which means "essential."  That's what

8    "core" means.  The Court's definition gives us

9    examples of what it may include, so the list here

10   says, "...which may include subscriber databases,

11   such as home location registers," and those are going

12   to be like subscriber databases that include the

13   location of the phone, "mobile switching center,

14   packet switching nodes, and messaging servers."

15   Those are examples that may be in the list based on

16   what a core network element.

17          So you have to look at the functionality.

18   Is a device essential in a cellular network?  The

19   context is also very important.  And when we look at

20   what "essential" or what "core" is in a cellular

21   network in order for the phone to communicate with an

22   external network or the phone to complete the call

23   with a land line or with another cell phone.  And so

24   that is what defines an element.  And a decision is

25   that element a core network element or not?

Dr. Akl - Direct                                    128

1   Q    Okay.  So does the patent disclose any elements

2   that qualify as being core network elements?

3   A    Yes.  So what you're looking at now are figures

4   one and figure two from the patent, and what I've

5   done is I've just added the green highlighting,

6   giving you examples of in the patent, how the patent

7   gives you example of core network elements.  So the

8   MSC, that's another acronym, mobile switching center.

9   A mobile switching center is what does the switching

10  for the calls.  So it is a core network element.  It

11  is essential.

12          An SGSN or GGSN, I'm looking here, those

13  are packet switching nodes.  So in a cellular you can

14  have what we call like the old-fashioned -- even in

15  the cellular, like the circuit switch calling or the

16  packet switching calling, which means the call itself

17  does -- is divided into packets the way, for example,

18  you have internet traffic as packets.  Those would be

19  handled by packet switching nodes.  And the

20  traditional calling in a cellular network can be

21  handled by switching in a mobile switching center

22  where you create a connection and the connection is

23  maintained -- it's called connection -- while the

24  call is going on, versus you can have packets that

25  you don't necessarily need to maintain the

Dr. Akl - Direct                      129

1   connection, but you have the packets.

2          So the -- these are essential because both

3   of them do the switching of the call and do the

4   switching of the packets.  So this is an example in

5   figure one.

6   Q   Before you go to figure two, Dr. Akl, could I

7   interrupt you for a second?

8   A   Sure.

9   Q   So I just want to make sure I understand it.

10  The -- you referred to two different types of

11  technology it sounds like, circuit switching and

12  packet switching?

13  A   Yes.

14  Q   Okay.  In the -- in the old wired phone systems

15  of our phones that were hanging on the wall in the

16  kitchen and we would use those to make phone calls,

17  was that one of those two types of technologies?

18  A   Yes.  So that was circuit switch.  And even when

19  they started building the cellular network like first

20  generation and second generation, it's similar

21  technology.  It as mobile.  You can take the phone

22  with you.  But it still had a similar connection

23  orient called circuit switch all.

24  Q   Okay.  And then so the mobile switching center,

25  the box that's labeled MSC, that is a computer or a

Dr. Akl - Direct                                    130

1   set of computers specialized for what kind of

2   technology?

3   A    For the circuit switching capability.

4   Q    Okay.  Can an MSC, a mobile switching center,

5   handle the switching that is needed for a packet

6   switching network like the internet?

7   A    Those are usually handed by packet switching

8   nodes.

9   Q    Okay.

10  A    And those are what we see also in the diagram.

11  Q    Okay.  And those nodes, the MM -- MSC, mobile

12  switching center, and then what you have labeled as

13  the packet switching nodes, do they make decisions in

14  terms of how to connect the phone to other phones or

15  the phone to other networks?

16  A    Yes.  This is why they're core.  This is why

17  they're essential.  This is why they are core network

18  elements in a cellular network because they are

19  making the decisions of how to connect the phones in

20  a cellular network to the other phones, to the land

21  lines, and to the internet.

22  Q    Now, how do those components, those computers,

23  that are making those decisions correlate to your

24  analogy to the network operators in the picture that

25  you have on the slide?

Dr. Akl - Direct                          131

1    A    So in my slide of the operators, that's like the

2    switchboard.  So when you connect the -- when you

3    take a wire and when an operator plugs it in and --

4    plugs it in, what Lily Tomlin is doing, the

5    connections, that's what those nodes are doing.

6    Q    Okay, thank you.

7    A    It's completing the call, completing the switch.

8    Q    Okay.  And you -- I interrupted you.  You were

9    about to explain figure two of the patent?

10   A    Yes.  So in figure two we have additional core

11   network elements.  And we see the packet switching

12   nodes that we looked at before, but there is a

13   subscriber database and it's labeled "HLR," which is

14   actually home location register, and this is a

15   subscriber database that is a core network element

16   because it maintains, among other things, the

17   location of the mobile phone.  As a mobile phone,

18   you're going to be moving around, and the network

19   needs to know the location of the phone, it needs to

20   know if the phone is registered, it needs to know if

21   the phone is on, so when you get a call you can

22   deliver that call.  And that information is

23   maintained in the HLR, the home location register.

24   Q    Okay.  And do cellular networks typically have

25   more subscriber databases than just the home location

Dr. Akl - Direct                                    132

1    register, HLR?

2    A    Yes.  You can have other essential databases.

3    The HLR in itself has a standard, and a lot of times

4    if a network wants an additional subscriber database

5    to maintain additional information that is essential,

6    they don't want to overload the HLR, so there could

7    be another subscriber database.  Not every subscriber

8    database is going to be core.  So you have to look at

9    it on a case by case basis.  You have to look at the

10   functionality of the subscriber database and ask

11   yourself the same question for every one of these, is

12   it core?  Is it essential to a cellular network?  If

13   it is, it would fall in this list.  If it's not, it

14   would not.

15   Q    Okay.  So how do subscriber databases, and in

16   particular, the home location register, how do

17   subscriber databases correlate to your analogy of the

18   network operators shown in the picture?

19   A    So going back to my picture, it may be hard to

20   see, but in front of every person there's a white

21   little notebook.  And for the operator to connect the

22   call they actually have to do a lookup, like they

23   don't memorize which one goes where, of course.  So

24   you get a call, they listen to it, they look in their

25   flip book, they look up the subscriber information,

Dr. Akl - Direct                        133

1    and then they know what to connect.  So the act of

2    looking up to determine what to connect to what is

3    what the subscriber database now does in computers.

4    Q   Okay.  Okay.  So looking at the Court's

5    construction, and just the part of the Court's

6    construction on core network elements, you have

7    talked about subscriber databases such as a home

8    location register, right?

9    A   Yes.

10   Q   And you have talked about -- with reference to

11   the figure of the patent, you have just talked about

12   mobile switching centers?

13   A   Yes.

14   Q   And you have just talked about packet switching

15   nodes?

16   A   Yes.

17   Q   Okay.  But you haven't yet touched on messaging

18   servers?

19   A   Correct.

20   Q   So --

21   A   We're going to do that next.

22   Q   Okay.  Are messaging servers in the patent

23   disclosed as core network elements?

24   A   No, the patent describes -- if you want to get

25   rid of my highlighting.

Dr. Akl - Direct                                    134

1   Q   Oh.  Oh, yes, let me do that.

2   A   So in figure two, this is the MMSC, which is the

3   multi-media messaging server for MMS, and in the

4   patent it's described as -- it can be internal, it

5   can be external.  So it can be core.  You have to

6   look at its functionality to determine if it is going

7   to be a core element or not.  And in the patent the

8   invention is we're not going to make it core.  We are

9   going to have it not be a core network element

10  because when you go back to the problem we don't want

11  congestion in the cellular network, so we don't want

12  the messages congesting the cellular network.  So we

13  want in the patent, the preferred environment, is the

14  MMSC be not a core network element.

15  Q   Okay.  And looking at the slide, the Court has

16  given us a construction, so a meaning of "messaging

17  server" under this patent?

18  A   Yes.  So just like the Court gave us a definition

19  for "cellular network," the Court gave us a

20  construction for "messaging server," and the

21  messaging server needs to have two functionalities.

22  The first functionality is store and forward

23  messages.  The second functionality, it needs to be

24  able to send an inquiry for information relating to a

25  wireless terminal.

Dr. Akl - Direct                                    135

1   Q   So let's just take the first box.  And could you

2   please explain to the jury what it means by storing

3   and forwarding messages?

4   A   Yes.  So when you text that text is going to go

5   first to a messaging server where it's going to store

6   it and hole on to it.  So this functionality, the

7   storing and then when the phone is ready be able to

8   deliver it, this store and forward functionality,

9   this is not a core network functionality in a

10  cellular network.  And that's what this functionality

11  means.  You're going to store and then you're going

12  to forward.

13  Q   Okay.  And the second part of a messaging server,

14  it has to send an inquiry for information relating to

15  a wireless terminal.  Can you explain that to the

16  jury?

17  A   Yes.  So the messaging server needs to know

18  something about the phone.  It only knows the phone

19  number.  It needs to know about the phone that's

20  going to be -- that the message is going to, for

21  example.  And so it needs to have the functionality

22  of being able -- of sending an inquiry that is asking

23  the cellular network information about the phone

24  that's going to receive it.  So it's going to give

25  it, for example, the phone number and it's going to

Dr. Akl - Direct                                    136

1    tell it okay, what do you know about this phone.

2           So, again, this second functionality is not

3    a core functionality on its own because sending an

4    inquiry for information relating to the wireless

5    terminal is not an essential functionality in a

6    cellular network.

7    Q    Okay.  Dr. Akl, could you explain to the jury how

8    then if the Court has construed a messaging server as

9    a potential core network element, how then a

10   messaging server would be a core network element if

11   the two functions there are not core functions of a

12   cellular network?

13   A    Yes.  So the -- those functionalities are not

14   core essential functionalities.  And one reason is if

15   we look at the definition, the definition says, "Core

16   network elements may include...," so having just

17   these two definitions doesn't make it core because

18   otherwise, it would always be a core network element.

19   So these definitions on their own does -- if we look

20   at those definitions and those functionalities, it

21   doesn't make a messaging server a core network

22   element.  But the Court told us that the messaging

23   server may be a core network element.  So for a

24   messaging server to be a core network element we have

25   to take the messaging server and we have to have core

Dr. Akl - Direct                     137

1    functionality being performed in this messaging

2    server.

3              So in addition to these two

4    functionalities, the messaging server needs to be

5    able to do, for example, something that is essential

6    in a -- in a course -- in a cellular network, core

7    functionality.  So if I take my messaging server and

8    I take, for example, my mobile switching center, and

9    I take the functionality of switching, of a mobile

10   switching center, and I put it in my messaging

11   server, then my messaging server becomes a core

12   network element.  But if I only have these two

13   functionalities in a core -- in a messaging server,

14   then it is not a core network element.

15   Q   So, Dr. Akl, back in -- back at the time of the

16   invention was it known that you could have

17   switching -- by "switching," are you referring to the

18   mobile switching center?

19   A   Yes.

20   Q   Was it known back at the time of the invention

21   that you could have your mobile switching center also

22   performing messaging server functions or other types

23   of functions?

24   A   Yes, so -- and I -- and it is.  So for -- we have

25   to go back to -- thinking back to 1999 when the

Dr. Akl - Direct                    138

1   patent was written, and we go back to even before

2   that, in the mid-90s.  In the mid-90s, text messages

3   were small and they weren't even that prevailing and

4   they weren't used that much.  So it was not uncommon

5   or unfeasible or unviable to take -- to have a server

6   that's going to do the switching and that's also

7   going to do the messaging server functionality.

8           So what we have here, as an example, this

9   is an Ericsson patent.  This patent was filed in'95,

10  so it was filed, you know, four years before the

11  patent in question, the Comcast patent.  And it was

12  issued in August '99.  So it was filed and it was

13  issued before the current patent.  And this Ericsson

14  patent actually describes -- if you go to the next

15  slide -- describes a mobile switching center that

16  includes a messaging center.  And it also says

17  alternatively, they can be implemented in standalone

18  fashion.

19          So back in the mid-90s, you could have a

20  messaging -- a messaging server that is also doing

21  core functionality like mobile switching where they

22  have them all on one computer, or you could have them

23  separate.  So you have -- this is a very, very

24  important point.  So you have to look at the

25  functionality of what they are doing.  If a device is

Dr. Akl - Direct                                    139

1    doing core network functionality, it is a core

2    network element in a cellular network.  So we have to

3    look at the functionality, we have to determine is it

4    core, is it essential, and not just essential, in

5    general, or essential for business, it has to be

6    essential for a cellular network in '99.

7    Q   And going to slide 53, what -- are you showing

8    another quote form the patent?

9    A   Yes, so now we're switching.  So we're done with

10   the Ericsson patent.  I just had two slides on it.

11   So this is back to the Comcast patent.  This is the

12   patent in question here.  So the specification of

13   this patent, let's say we want the messaging server

14   would preferably be located outside.  And this is

15   exactly what we're saying, we're going to take the

16   functionality of the messaging server.  It's only

17   going to be doing two things: store and forward, and

18   it's going to be asking an inquiry.  By only doing

19   these two things, it's no longer a core network

20   element.  And so it is outside.

21           So when we talk about outside and inside or

22   external, we're not talking about geographic

23   location.  It doesn't matter where it's located.

24   That doesn't make it outside or inside.  We talk

25   about functionality.  Is it core or is it not core to

Dr. Akl - Direct                    140

1    a cellular network?  This is probably the most

2    important concept in this case.

3    Q   So yesterday, you were -- you were at the opening

4    argument of Sprint's attorney?

5    A   Yes.

6    Q   Okay.  And did you hear Sprint's attorney talking

7    about the location of Sprint's messaging servers in

8    Sprint's network?

9    A   Yes.

10   Q   Can you tell the jury what the attorney said, if

11   you can remember?

12   A   Yeah, you know, he drew a picture and he -- I was

13   here, and he put the messaging server in the middle

14   of the picture and he said, oh, see, it's inside.

15   And he said Dr. Akl is going to move it.  I'm not

16   moving it.  He was wrong.  He was mischaracterizing

17   what I'm going to be saying.  And what he said is

18   irrelevant to the analysis.  The geographic location

19   is irrelevant.  The -- when the patent is describing

20   location we're not talking geography, we're not

21   talking where does Sprint put a messaging server,

22   where does -- we are talking about is a messaging

23   server core network element in a cellular network.

24            So from a business point of view, it may be

25   very important.  For a messaging network -- we

Dr. Akl - Direct                                141

1    haven't talked about messaging network yet -- it may

2    be important.  That's all irrelevant.  We have to

3    look at is it -- not where it's physically located,

4    but we have to look at the functionality.  Is it a

5    core network element in a cellular network?

6    Q    Would a skilled artisan -- trying to decide what

7    makes up a cellular network under the Court's

8    construction would a skilled artisan look at the

9    geography of where Sprint has placed its messaging

10   servers in relation to where Sprint has placed its

11   other elements of its cellular network?

12   A    No, that would be completely irrelevant to the

13   analysis.

14   Q    So when the -- when the patent and the claim

15   refers to a messaging server being external to a

16   cellular network can you please explain to the jury

17   how that correlates to the Court's construction of

18   "cellular network?"

19   A    Yes.  So the -- so going back to the Court's

20   construction, the Court gave us a definition of

21   "messaging server."  You need to have these two

22   functionalities.  Those on its own don't make it core

23   because, again, the Court's construction says it may

24   be.  So if those two functionalities makes it core,

25   then it would always be the case.

Dr. Akl - Direct                                    142

1          So because the Court's construction says it
2    may be -- so, again, we need to have core
3    functionality, additional core functionality, that is
4    other than the two functionalities of a messaging
5    server, that's in the messaging server and that's the
6    only way for the messaging server to be a core
7    network element.  And in that case it's internal,
8    it's part of the cellular network.  Otherwise, it's
9    external to the cellular network.  But its physical
10   location is irrelevant.
11   Q    Dr. Akl, while we're on the subject of
12   yesterday's openings, did you hear Sprint's lawyer
13   characterize the Nokia patent, as it got referred to
14   yesterday, as being centric to what was termed
15   yesterday as the old style, European standard, which
16   I think you talked about earlier today as being --
17   meaning GSM?
18   A    Yes.
19   Q    And did you get a sense of what Sprint's lawyer
20   was telling the jury in that -- when he was talking
21   about that?
22   A    Yeah, he was -- he was wrong.  He was really
23   mischaracterizing what's in the patent.  The patent
24   itself is not limited to just GSM.  And, in fact, on
25   the first column of the patent, the background, it

Dr. Akl - Direct                                   143

1    talks about CDMA, it talks about CDMA2000.  CDMA and

2    GSM were developed around the same time.  The --

3    those were both second generation.  CDMA2000, which

4    is third generation, was developed around the same

5    time as third generation GSM.  And the patent itself

6    mentions both.  So his characterization was

7    incorrect.

8    Q   I'm sorry, Dr. Akl, I didn't mean to distract

9    you.

10            MR. GOETTLE:  But we just put up on the

11   screen PX-2, Your Honor.  This is the patent that's

12   in evidence already.

13   BY MR. GOETTLE:

14   Q   Can you --

15   A   If we go to column one --

16   Q   Column one.  What -- you don't have the patent up

17   there, do you?

18   A   No, but I know if you zoom in like to the kind of

19   like lines -- it's hard to see.  The third part --

20   like down.  A little further down.

21   Q   Around line 29.

22   A   Yes.  Okay.  And go up more.  So starting on,

23   "For a long time..."  It's the last two lines

24   actually on this, so blow up the body part.

25            (Pause in proceeding.)

Dr. Akl - Direct                          144

1   A    Yes.  So here, you see the patent --

2              THE COURT:  What column?  Why don't we --

3              MR. GOETTLE:  I'm sorry.

4              THE COURT:  -- identify it?

5              MR. GOETTLE:  I'm sorry, Your Honor.  We're

6   at column one of PX-2, which is on page seven of

7   PX-2, and we're at approximately line 29.

8              THE COURT:  Fine.

9              THE WITNESS:  Well, actually, right now

10  we're at lines like 55 to 60.

11  BY MR. GOETTLE:

12  Q    Is that where you want to be?

13  A    Well, we can -- we can move back and forth.

14  Q    No, no, no.  Okay.

15             MR. GOETTLE:  I'm sorry, Your Honor, we're

16  at lines 55 to 60.

17             THE WITNESS:  But we can -- we can start at

18  29.

19  BY MR. GOETTLE:

20  Q    I might be wrong.  Oh, you know what, I was

21  misreading it.  I was misreading it.  I'm sorry.

22  Please.  And I'm sorry to interrupt you, Doctor.

23  A    Okay.

24  Q    Please go ahead.

25  A    Okay.  So go back to lines -- go back to the

Dr. Akl - Direct                      145

1    part -- 55 to 60.  There we go.  And if you --

2    counsel, if you could please remove my highlighting.

3    Thank you.  Okay.  So this is the background of the

4    patent.  This is -- you have the patent.  This is the

5    first column.  It talks about the background of the

6    invention.  And lines 57 start -- it describes, you

7    know, GPRS networks, third generation mobile, such as

8    CDMA2000, and it says code division, multiple axes,

9    and WCDMA.  So it is equally applicable to both CDMA,

10   CDMA2000, and wideband CDMA, which is -- so CDMA2000

11   is the technology that Sprint uses.

12   Q   Okay.  And I think it would be good to tell the

13   jury what part of the patent we're in.

14             MR. GOETTLE:  So can you -- can you go up

15   and show line 30?

16             (Pause in proceedings.)

17             MR. GOETTLE:  And blow up where it says

18   "Background of the Invention."

19             (Pause in proceedings.)

20   BY MR. GOETTLE:

21   Q   So what is this section of the patent?  This is

22   one of the section of the 870 patent, correct?

23   A   Yes.

24   Q   What is this section?

25   A   So this is the background section of the

Dr. Akl - Direct                                    146

1   invention.  This is where the inventor talks about

2   the background, what the -- what the invention is

3   about in terms of where it may be applicable and what

4   it's used for.  So this is the background section,

5   and the background section very clearly describes and

6   says that it is -- you know, it's equally applicable

7   to CDMA, to GSM, to CDMA2000.  It's not dependent on

8   the things that differentiate, for example, CDMA from

9   GSM.  It's -- what we're looking at, the

10  functionality of having a messaging server, moving

11  those messages, sending an inquiry, this is equally

12  applicable to both technologies.

13  Q   Okay.  And so you referred to CDMA2000 and

14  earlier today you were talking about 2G or 3G.  Where

15  does CDMA2000 fall in?

16  A   CDMA2000 is third generation.  So it's what CDMA,

17  which was second generation, evolved to, CDMA2000, so

18  it's 3G.

19  Q   And what kind of network does Sprint have?

20  A   This is the network Sprint has.  Sprint has a 3G

21  CDMA2000.

22  Q   Okay.  And does the patent refer to the

23  application of the invention in 3G type of networks?

24  A   Yes.  So if we go, for example, to column four,

25  there is another -- line 30 --

1    Q    Oh, by the way, I have a copy of the patent.

2    Would you like a hard copy?

3    A    Okay.

4            MR. GOETTLE:  Is it okay if I approach the

5    witness, Your Honor?

6            THE COURT:  Yes.

7            (Pause in proceedings.)

8            THE WITNESS:  So if we can please blow up

9    from line like 25 to 40?

10            (Pause in proceedings.)

11            THE WITNESS:  "In connection with the

12    present application the concept of cellular network

13    should be interpreted broadly."  And it goes on and

14    it describes, for example, you can have GPRS, GSM,

15    and network elements of the core network of a third

16    generation network.  So it's equally applicable to

17    different third generation networks.  CDMA2000 is one

18    type of third generation network, so the patent is

19    applicable to both.

20            MR. GOETTLE:  Okay.  Can we go back to the

21    slide, please?

22            (Pause in proceedings.)

23            THE COURT:  When you're ready to break --

24    just keep it in mind.

25            MR. GOETTLE:  Your Honor, the timing is

148

1    good.  We are now going to the fourth of only five

2    topics that Dr. Akl is going to cover, but that would

3    be -- seems like a good time to break, or I think we

4    could be through this section I'm thinking in 15

5    minutes.  So whichever you would prefer.

6            THE COURT:  Why don't we take a break?

7    It's 12:30.  We've been at it since 9:30.  I think a

8    break is appropriate.  So we'll recess for lunch for

9    one hour.  Be back in the jury room oh, about 25

10   minutes after 1:00.  We hope to start promptly at

11   1:30.  Take your books with you.  And remember my

12   instructions.  I'm not going to repeat them.

13            (Jury out, 12:29 p.m.)

14            THE COURT:  Be seated, everyone.  You

15   may -- no, you may step down, Doctor.  Several

16   things.  First, I want a hard copy of DX-150.  I

17   don't need it right now.

18            Secondly, how are we going to handle Dr.

19   Akl's slides if the jury requests copies?  Do you

20   have hard copies?

21            MR. FINKELSON:  Our view -- oh, go ahead,

22   Dan.

23            MR. GOETTLE:  The answer to your question

24   is yes, I have hard copies.  And we are fine with the

25   jury having a copy of the slides.

149

1          MR. FINKELSON:  Our view would be they are

2     demonstrative evidence, Your Honor.  The same rules

3     would apply when we present our expert testimony and

4     those wouldn't go back with the jury.

5          THE COURT:  His testimony is too

6     intertwined with the slides.  The same rule would

7     apply for your slides as well.

8          MR. FINKELSON:  We're happy to proceed

9     however the Court would like.  I haven't had an

10    instance before where demonstratives go back, but if

11    that's the Court's preference and it's going to be

12    the case for both sides, then obviously that's how

13    we'll proceed.  And I'm going to -- I'm going to grab

14    you a copy of 150.  We have it.  Okay.

15          THE COURT:  Well, you don't have to do it

16    right away.  Fine.

17          MR. GOETTLE:  Your Honor, I had a case in

18    front of Judge Robinson in the District of Delaware,

19    and she had the demonstratives go back for the very

20    same reasons that you just said, so it is fine with

21    us to do that.

22          THE COURT:  Well, some demonstratives will

23    not go back, for example, demonstratives used in

24    closings --

25          MR. GOETTLE:  Sure.

150

1          THE COURT:  -- where you're summarizing the

2    evidence.

3          MR. GOETTLE:  Yeah.

4          THE COURT:  That's a demonstrative that

5    does not go back.

6          MR. GOETTLE:  Right.

7          THE COURT:  But where there's a close

8    connection between the testimony and the exhibit, I

9    think the exhibit should go back.  And I think that

10   makes it easier for the jury to comprehend the

11   testimony.

12         MR. FINKELSON:  And, Your Honor, as I said,

13   we have no problem with this.

14         THE COURT:  Fine.  And the rule applies, of

15   course, to both sides.  I gather that your experts

16   are going to do the same things?

17         MR. FINKELSON:  Our experts will certainly

18   do the same thing.

19         MR. GOETTLE:  They are now, Your Honor.

20         THE COURT:  All right.

21         MR. FINKELSON:  Although I will say that

22   these graphics are nicely prepared --

23         MR. GOETTLE:  All right.

24         MR. FINKELSON:  -- and well done.

25         THE COURT:  Is there anything else that we

151

1    need addressed?  I think not, but I'll hear from you.

2              MR. GOETTLE:  You know what, Your Honor,

3    I'm just thinking, I meant to take a picture of Mr.

4    Finkelson's opening drawing and --

5              MR. FINKELSON:  We took one for you.

6              MR. GOETTLE:  Okay, thank you.  And okay,

7    so we'll take a picture and I guess we'll just

8    exchange that and --

9              MR. FINKELSON:  Okay, certainly.

10             MR. GOETTLE:  I think the picture should go

11   back as well, Your Honor.  It's a demonstrative

12   that's -- for the same reason that the slide deck --

13             MR. FINKELSON:  We have no objection to

14   both of those going back, Your Honor.

15             THE COURT:  Well, if that's the case, then

16   I'm not going to rule.  You ought to take a picture

17   of -- how did you identify it?

18             MR. FINKELSON:  "Bad Drawing Number 1" was

19   mine yesterday, but I amended it at Your Honor's

20   request.  I think we did "Defendant's Drawing Number

21   1."

22             THE COURT:  All of the drawings that are

23   not recorded elsewhere I want photographed.

24             MR. FINKELSON:  Yes, sir.

25             THE COURT:  Including the one Dr. Akl drew.

152

1    I've forgotten how you identified that.

2              MR. GOETTLE:  "Plaintiff's Drawing Number

3    1."

4              THE COURT:  All right.  Well, it's a good

5    idea not to have different sets of numbering when

6    you're talking about one side numbering exhibits.

7    It's always good to keep the exhibits flowing in

8    relatively close chronologic order so that we don't

9    have one set of exhibits and then drawings and then

10   other numbers.  It makes it a little hard to track

11   the record.  So keep that in mind.  So photographs

12   though -- the moral of the tale, I want photographs

13   of all these exhibits that have been used, such as

14   Dr. Akl's whiteboard.  Anything else?

15             MR. FINKELSON:  Not for us, Your Honor.

16             THE COURT:  All right.  We're in recess

17   until 1:30.  You may go about your business.

18             (Luncheon recess taken, 12:34 p.m.)

19

20                     *  *  *

21

22

23

24

25

153

1                              I N D E X

2

3     PLAINTIFF'S WITNESSES      DIRECT CROSS REDIRECT RECROSS

4     David Marcus

5        By Mr. Hangley           24              58

6        BY Mr. Finkelson                 34

7

8     Robert Akl

9        By Mr. Goettle           78

10

11                              *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                            <u>CERTIFICATION</u>

7

8        I, Michael Keating, do hereby certify that

9   the foregoing is a true and correct transcript from the

10  electronic sound recordings of the proceedings in the

11  above-captioned matter.

12

13

14

15  ___2/2/17___                _____

16  Date                        Michael Keating

17

18

19

20

21

22

23

24

25