```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                            - - -

COMCAST CABLE COMMUNICATIONS, :  CIVIL ACTION NO. 12-0859
LLC, et al.,                  :
            Plaintiffs        :
                              :
         v.                   :  Philadelphia, Pennsylvania
                              :  February 2, 2017
SPRINT COMMUNICATIONS         :  1:29 o'clock p.m.
COMPANY L.P., et al.,         :
            Defendants        :
. . . . . . . . . . . . . . .
```

```
              AFTERNOON SESSION - DAY FOUR
          BEFORE THE HONORABLE JAN E. DUBOIS
         SENIOR UNITED STATES DISTRICT COURT JUDGE

                            - - -
```

APPEARANCES:

```
For the Plaintiffs:      DANIEL J. GOETTLE, ESQUIRE
                         DALE M. HEIST, ESQUIRE
                         Baker & Hostetler, LLP
                         Cira Centre, 12th Floor
                         2929 Arch Street
                         Philadelphia, PA  19104-2891

                         WILLIAM T. HANGLEY, ESQUIRE
                         REBECCA SANTORO MELLEY, ESQUIRE
                         Hangley Aronchick Segal & Pudlin
                         One Logan Square, 27th Floor
                         Philadelphia, PA   19103

                         GEORGE MEDLOCK, ESQUIRE
                         Comcast Cable Communications
                         Chief Patent Counsel
```

```
              Laws Transcription Service
                 48 W. LaCrosse Avenue
                 Lansdowne, PA  19050
                    (610)623-4178
```

2

APPEARANCES: (Continued)

For the Defendants:      DAVID E. FINKELSON, ESQUIRE
                         BRIAN C. RIOPELLE, ESQUIRE
                         JUSTIN R. LOWERY, ESQUIRE
                         McGuire Woods, LLP
                         Gateway Plaza
                         800 East Canal Street
                         Richmond, VA  23219

                         COLLEEN H. SIMPSON, ESQUIRE
                         Harkins Cunningham, LLP
                         4000 Two Commerce Square
                         2001 Market Street
                         Philadelphia, PA  19103

                              - - -

Audio Operator:          Michael Cosgrove

Transcribed by:          Geraldine C. Laws, CET
                         Tracey Williams, CET
                         Paula Curran, CET

(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.)

1           (The following occurred in open court at 1:29

2   o'clock p.m.)

3           THE COURT:  Good afternoon, everyone.  Please be

4   seated.  An update on the travel situation with one of our

5   jurors, Juror No. 1, he lives in Lancaster, the Lancaster

6   area.  He prefers the bus, two buses, the 4:45 gets in around

7   7:00, the next bus, 6:45, gets in around 9:00.  The later bus

8   is not an option.

9           Other ways of getting here:  trains, a little

10  shorter; driving, a little shorter; or a hotel.  Again, he

11  prefers the bus, but is willing to take other means of

12  transportation or staying overnight, if we decide that.

13          And finally he said, if we decide to keep the

14  regular departure time, 4:45, he prefers an early departure

15  only one day a week, Friday.  It's an awesome decision.  I

16  don't know who to go to.

17          MR. FINKELSON:  I mean, we're -- I mean, I think

18  what makes the most sense is to accommodate him so that he

19  can be here as late as possible as often as possible.  And

20  the parties have already talked, if it's a matter of the

21  parties sharing the cost of a car, I don't know exactly what

22  that costs, but I imagine --

23          MR. HANGLEY:  We're pretty much wide open.

24          MR. FINKELSON:  -- yeah, we'll do it.  So --

25          THE COURT:  I would not like to do that --

4

1              MR. FINKELSON:  Okay.

2              THE COURT:  -- because I think other jurors have

3      similar issues -- let me get the list --

4              MR. HANGLEY:  But, your Honor, as David said to me

5      last night, the cost of a day at trial is enormous enough

6      that if we can avoid picking up an extra day, we're really

7      happy about it.  So nobody ever wants to say money is no

8      object, but we -- I think we're both prepared to --

9              MR. FINKELSON:  I don't know if I said money is no

10     object.

11             (Laughter.)

12             MR. HANGLEY:  I didn't either, I didn't either.

13             THE COURT:  So let me hear the vote.

14             MR. FINKELSON:  We will do whatever makes the most

15     sense for him and for the Court to spend -- you know, so that

16     we have the longest court days possible.

17             THE COURT:  Well, he's very flexible.  He's waiting

18     for us to give him the word.

19             MR. FINKELSON:  Ms. Hull had noted yesterday he

20     didn't really want to stay in a hotel and I know that's the

21     option that's generally provided.  And we don't want to do

22     anything that he doesn't want to do, so --

23             THE COURT:  Well, I think we should tell him at

24     least for one day to try the one of the alternate means of

25     transportation to see how it works and we'll ask him if he

5

1   can do that today, because tomorrow he has requested that we

2   recess early.  So we'll recess tomorrow at about 3:00 -- 4:00

3   rather, I would say 4:20ish, but today see if he can go to

4   the regular time.

5           MR. FINKELSON:  That works, your Honor.

6           THE COURT:  And see how it works.  I don't like to

7   single him out, I don't like to pull a juror out, it -- I

8   think I'll mention it in open court.  We'll do it that way,

9   perhaps not identify him, although he probably has shared

10  this with others.

11          MR. HANGLEY:  And we haven't heard anything from

12  other jurors?

13          THE COURT:  No -- well, yes, one other juror using

14  an outdated train schedule.

15          MR. HANGLEY:  Oh, yes, I forgot about that.

16          THE COURT:  These issues are not reported in any

17  books, but --

18          (Laughter.)

19          THE COURT:  -- and yet they're very --

20          MR. HANGLEY:  Very important.

21          THE COURT:  -- very significant when it comes to

22  results and my goal is to have the jury accommodated to the

23  extent we can.  I want to make it easy for them to focus on

24  the trial.

25          (Pause.)

6

1          THE COURT:  We're missing a juror.  And I've re-read

2     the note that Milahn gave me with respect to Juror No. 1, it

3     doesn't say anything about train on here, although I know

4     there are trains that run to Reading, and I'm not so sure we

5     can change his method of transportation in midday.  In other

6     words, if he's driven to the bus terminal, he can't drive

7     from Reading to Philadelphia.  So I'll have to talk to him

8     during the mid-afternoon recess.

9          I didn't realize we were missing a juror and it's

10    Juror No. 5.

11          (Pause.)

12          THE COURT:  All right.  I think what we should do is

13    -- I heard --

14          THE DEPUTY CLERK:  That was me, I'm sorry.

15          THE COURT:  -- we'll be in recess.  No need to keep

16    everybody in here.  Call me as soon as it's resolved.

17          THE DEPUTY CLERK:  All rise.

18          THE COURT:  We're in recess.

19          (Court in recess; 1:43 to 1:48 o'clock p.m.)

20          (Jury in at 1:49 o'clock p.m.)

21          THE COURT:  Be seated, everyone.  Good afternoon.

22          I want all of you to make an effort to be back in

23    court on time.  You've done very well in the mornings, you

24    had a slippage today at lunch, but when we say an hour, it's

25    almost an hour and a half and that's not appropriate.  I will

1    say no more for now.

2            All right, we'll resume the direct examination of

3    Dr. Akl.

4            ROBERT AKL, Plaintiffs' Witness, Previously Sworn,

5    Resumed.

6                    CONTINUED DIRECT EXAMINATION

7    BY MR. GOETTLE:

8    Q   Dr. Akl, are you now going to talk about Sprint's

9    cellular and messaging networks?

10   A   Yes.

11   Q   And are those networks different, the same, overlapping?

12   What are they, Sprint's cellular network versus Sprint's

13   messaging network?

14   A   So what I'm going to be doing next is describing Sprint's

15   cellular network and Sprint has a messaging network, and I

16   will show documentation.  I have looked at deposition

17   testimony of Sprint engineers, I have looked at CDMA

18   standards, there were thousands of pages of documentation

19   that I looked at to prepare and come up with the conclusions

20   that I have in terms of Sprint's cellular network and

21   Sprint's messaging network.

22   Q   And are those different networks or --

23   A   Yes, they are two different networks that work together,

24   but they're different networks.

25   Q   Okay.  So how did you go about determining what Sprint's

1    -- what composes Sprint's cellular network?

2    A    Yes.  So we have a claim construction from the Court of

3    what a cellular network means and I adopt, and I use the

4    Court's definition for a cellular network and I compare that

5    definition with the documents that I received from Sprint in

6    terms of what their network does.

7    Q    Okay.  So you have a document up on -- or at least the

8    first page I should say of a document up on the screen, PX-

9    120; is this the only document that you looked at in

10   determining what Sprint's cellular network is?

11   A    No.  I looked at a lot of documents, I've looked at the

12   CDMA standards, I've looked at deposition transcripts of

13   Sprint and third party testimony, but this is one document,

14   it has some good figures.  I need something to work with the

15   jury and this is a good example.

16   Q    Okay.  So what are we seeing on slide 56 of Plaintiffs'

17   Demonstrative 2?

18   A    So the document is PX-120 and in this document under

19   Section 3 there is a figure that says "Logical Network

20   Design," and this is a Sprint document.  The only thing I

21   have done is I have circled in green the phone.  So going

22   back to -- what I have to do is I have to look at what the

23   Court provided as a definition and I have to look at what

24   Sprint has and match them up.

25              So the cellular network definition includes three

1    things and the first thing, you need to have a cell phone.

2    Now, it's not disputed that the Sprint network has cell

3    phones, but I still have to make the case, it's Comcast's

4    burden.  So Sprint, surprisingly, does have cell phones and

5    the cell phones are what's circled in green.

6    Q    And you're being facetious when --

7    A    I know, I'm just -- we have to wake the jury up now.  So,

8    yes, Sprint had cell phones, that's the point.

9    Q    Okay.  Next?

10   A    Next.  So the second item in the definition is a base

11   station system and the base station system that communicates

12   with the wireless terminals, those are the towers, the

13   antennas at the towers and the computers at the bottom of the

14   towers, the base station controllers.  So looking at the

15   Sprint document, an example of that is the BTS and the BSC,

16   those are the base station transceivers, the antenna towers

17   and the base station controller.  So what I've circled in

18   green matches the Court's construction for a base station

19   system that communicates with the wireless terminals.

20   Q    And did we see those now more acronyms, BTS and BSC, did

21   we see those acronyms when we were walking through the

22   patent?

23   A    Yes.

24   Q    And combined those make the base station system?

25   A    That is correct.

1    Q    Okay.  So now turning to "Core Network Elements."

2    A    Turning to "Core Network Elements," the Court has

3    provided examples of what core network elements are.  And

4    again, to determine if an element is a core network element,

5    we look at its functionality; is it essential, is it core?

6    And those components may include subscriber databases such as

7    the home location register.  Sprint's network does have a

8    subscriber database that is a home location register and its

9    acronym is HLR, which is what I circled in green.

10   Q    So what is contained in the home location register in

11   Sprint's network?

12   A    So the home location register contains subscriber

13   information about the phone.  One of the things that's very

14   important that's located there is the location of the phone.

15   So for a phone to be able to receive any communication the

16   HLR or the home location register database is looked there to

17   see if the phone is active and what was the last location of

18   the phone.

19   Q    And, Dr. Akl, in your opinion is the home location

20   register, which is a subscriber database, is that a core

21   network element in Sprint's network?

22   A    Yes.  So going back to the definition of what makes

23   something core, it has to be able to be essential in the

24   cellular network, and essential or core means it has to be

25   able to do the switching, to be able to connect the phones to

1   the other phones and to the outside network, and to be able

2   to do the lookup.  To do the switching, you need to do the

3   lookup.  So the lookup in the subscriber database is

4   essential for the functionality, so the HLR or the home

5   location register subscriber database is a core network

6   element.

7   Q   Does Sprint's network include other subscriber database

8   that qualify as a core network element?

9   A   Yes, there is other databases.  Note in this diagram at

10  the bottom it says, "Update drawing to include SPS."  Those

11  words I did not add, those words were actually in the

12  document.  I have just put a green circle around those words,

13  so I just to be clear.  The SPS is -- the words SPS and I put

14  in the database that says LDP (ph).  And we saw in the

15  opening that Sprint's counsel did, he did say Sprint's

16  network has an HLR, so there's not a dispute, and the SPS, he

17  also gave the examples of other subscriber databases like

18  SPS.  So there isn't a dispute that the SPS -- at least I

19  don't believe that there is -- that the SPS is another

20  database, it's a subscriber database, it is used in order to

21  do the switching.  So when you want to connect to the

22  Internet, you look up information to see in that subscriber

23  database and that is a core network element.

24  Q   What does the SPS have to do with connecting to the

25  Internet?

1    A    So it includes information on the subscribers, for

2    example it includes lists that are not in the home location

3    registers.  So additional attributes about phones that are

4    essential like which phones can -- which phone numbers can a

5    specific device connect to or which phone numbers are

6    forbidden from connecting to a specific device.  So there are

7    what's called like white lists and black lists that are

8    maintained in the SPS.  Other information like for

9    authentication or billing can also be -- are included in the

10   SPS.

11            So the SPS is a subscriber database that is also

12   used and it is essential, because the lookup into the SPS is

13   essential; it also tells you if the phone can receive

14   information.

15   Q    Okay.  Does Sprint's network include any other core

16   network elements?

17   A    Yes.

18   Q    Excuse me, I missed a slide of yours on -- what are we

19   looking at on slide 60 before we turn to other elements?

20   A    So when I was forming my analysis, not only did I look at

21   documents from Sprint, but I've also looked at deposition

22   testimony and a couple names are going to come up, Mr.

23   Hoelzle and Mr. Moss. Mr. Hoelzle, I believe is in charge of

24   Sprint's messaging network and so there's a lot of, during

25   his deposition, he confirmed a lot of the opinions that I

1    formed when I was doing my analysis.   One of the questions

2    that he was asked was does the SBS store information related

3    to subscribes instance network and he answered, yes, it does.

4    So, this is a Sprint employee, under oath, in a deposition,

5    confirming my analysis.

6    Q    Okay, does Sprint's network have other core network

7    elements?

8    A    Yes, we talked about the mobile switching center and

9    that's what -- that's the switching for the calling.  That's

10   the MSC and Sprint's cellular network has MSCs or mobile

11   switching centers and this is what I've highlighted in green.

12   Q    And what is it about Sprint's mobile, well first of all,

13   did we see MSCs, mobile switching centers in the patent?

14   A    Yes.

15   Q    And what is about Sprint's mobile switching center, MSC,

16   that qualifies it as a core or essential network element?

17   A    Those are the elements that do the actual switching, so

18   when you want to connect the phone to another phone, in order

19   to connect those calls and when you want to connect the phone

20   to landlines or you want to connect a cellphone to the

21   outside networks, that switching is done in the MSCs, what

22   allows you to do that routing and that switching -- that

23   connection.

24          So, in our analogy of the '50s with a switchboard

25   and the connections, the connections is what the MSC does.

1    And the look-up, when the operator is looking in her notebook

2    to see what to connect, that's what the subscriber databases

3    do.

4    Q    Does Sprint's cellular network include any other core

5    network elements?

6    A    Yes.

7    Q    What are we looking at on Slide 62 of Plaintiffs

8    Demonstrative-2?

9    A    So, more acronyms, the FA, which stands for foreign agent

10   and HA, is home agent.  Those are packet switching nodes, so

11   you may have heard in the opening,  Sprint's counsel referred

12   to the PDSN as the packet switching nodes in Sprint's CDMA

13   network.  Those are what these components are.  So, they are

14   packet switching nodes.  They allow connection of the phones,

15   for example, to the internet.  And because of the core

16   essential functionality of being able to do the switching so

17   that the phones can connect to the internet, they are a core

18   network element.

19   Q    So, does that mean that FA and HA equals PDSM?

20   A    Yes.  I mean, it's different components have different

21   labels sometimes in different documents, but it's the same

22   functionality.

23   Q    Okay, so have you now described for the jury what

24   Sprint's core network elements are in the cellular network?

25   A    Yes, so this is, so again, this is the Sprint document.

1   What I've done now is I have just put a box in green around

2   Sprint's cellular network.  On the left are the phones, the

3   base station systems and then we have the inside circle,

4   which is the core network elements.  On the right, I believe

5   the internet was already there, that's an external network.

6   And the PSDN is what I've added, just to this figure to show

7   how the cellular network can connect to outside networks, so

8   I'm giving an example of the regular phone network.  This is

9   here.  But other than that, the annotation and the other

10  elements are in the document.

11  Q   Okay, so I'm on slide, you're on Slide, I should say,

12  your Slide 63.  I'm going to flip back to Slide 62 and now

13  your circle is empty, that's because you added on Slide 63,

14  you added PSDN?

15  A   Yes, this is another example.  The internet was already

16  there.  This is the internet as an example of an outside

17  external network.  That would be cellular network, Sprint

18  cellular network connects to.  I added just the phone network

19  as another example.  We've discussed how the cellular network

20  has to be able to complete calls to other cellphones and to

21  landlines.  That's for illustrative purposes.

22  Q   Okay, there is one box that looks like a computer there,

23  that's labeled AN/AAA/AAA, do you see that?

24  A   Yes.  It's a lot of letters and this is the AAA is

25  authentication, authorization, and accounting.  And it is a

1    core network element because it also looks at subscriber

2    information to determine if the phone or the subscriber is up

3    to date, authorized in order to make calls.  So, it is part

4    of the core network functionality of look-up that can be done

5    when a phone is connecting to the internet.

6    Q    Okay, are you now going to talk about Sprint's messaging

7    network that you talked about earlier?

8    A    Yes.

9    Q    What are we looking at, what document are we looking at

10   on Slide 64?

11   A    So, this is a Sprint document, this is PX-99 and it's the

12   second page of that document.  The colors and what you see in

13   this document is exactly how it was provided to me by Sprint.

14   So, the different colors, this is all done by Sprint and this

15   document is Sprint's messaging high-level architectural

16   diagram.

17   Q    Okay.  So, I guess, I just hit the clicker, I just went

18   back.  Now, I'm going to hit it again, what just happened?

19   A    So, I am just, the colors that were in the document, I'm

20   just highlighting because I want to walk with the jury and

21   focus on the components of Sprint's messaging network that

22   are important for the discussion that we're having today.

23   Q    Okay and in terms of this Sprint messaging high-level

24   architecture diagram, are there any elements of Sprint's

25   cellular network shown here?

1   A   Yes, so looking at this document, you see the HLR, which

2   is the home location register, again, that's the subscriber

3   database that includes the phone location, that is a core

4   network element in Sprint's cellular network.  And we see the

5   SPS in the middle, that is another subscriber database that

6   is essential.  So, Sprint has a cellular network, we've

7   discussed that.  It has elements that are core in Sprint's

8   cellular network.  Sprint also has a messaging network and

9   Sprint's messaging network communicates with Sprint's

10  cellular network.  And we're going to -- and that

11  communication, like the look-up that needs to happen, the

12  essential functionality is happening in Sprint's cellular

13  network.

14  Q   Okay, are there other elements of Sprint's cellular

15  network that the components of the messaging networks connect

16  to when messages are being sent or received?

17  A   Yes, so this document is showing the subscriber databases

18  and then those messages are then going to go over, after

19  look-up, they're going to go over, for example, the mobile

20  switching centers.  The switching is going to happen in the

21  MSC to be able to deliver those messages.  Those aren't shown

22  in this figure.  But we showed them in the previous figure.

23  Q   Okay, so if we removed the HLR and the SPS from this

24  figure, would that be showing a high level diagram of just

25  Sprint's messaging network?

1    A    Yes.

2    Q    And is that what you're showing on Slide 65?

3    A    Yes.

4    Q    Okay, so are you going to describe Sprint's messaging

5    network now?

6    A    Yes.  So, looking at what we are seeing here, this is

7    Sprint's high level architecture diagram for their messaging

8    network.  What you see in the middle and I'll actually have

9    the slide just on that.  Those aren't really very important

10   for the discussion that we have today, but I'm going to go

11   over them at a high level.  Content providers, these are

12   computers that provide prepaid content, for example.  Premium

13   content, like if you subscribe to your horoscope or your

14   subscribe to little messages about news.  Sprint was offering

15   a supplemental service, where you get information delivered

16   to your phone.  Those were handled by the messaging network

17   and by the content providers.

18        What we see in the middle, IT and OCS platforms,

19   these are for billing and at the bottom, we see like e-mail

20   and internet.  Again, these are part of the content that was

21   being provided to the subscribers as part of Sprint's

22   messaging network.  What's in this red right now, really

23   isn't important to the issues that the jury has to resolve.

24   So, what's very important is what's on the left and what's on

25   the right and that's the MMSC, which is the messaging server,

1    so the messaging server for the month you need your messages,

2    recall we have a claim construction that the Court provided,

3    that the messaging server needs to be able to have the two

4    functionalities of sort and forward and sending an inquiry.

5    That's Sprint has MMSCs that handles multi-media messages and

6    Sprint has an SMSC, that's the one on the right, for SMS

7    messaging.

8            The other things, in the top, you have inner-carrier

9    SMS and inter-carrier MMS.  Those are so you can send

10   messages to or receive messages from other carriers.  So,

11   somebody on AT&T's network communicating with a subscriber on

12   Sprint's network, those go through these components.  Those

13   components are not really at issue in this matter.

14   Q    Okay, so in MMSC, can you explain again what an MMSC is?

15   A    Yes, so it's the messaging server for the multi-media

16   messages.  So, it's the multi-media message center is --

17   multi-media messages are stored and forwarded in an MMSC.

18   Q    Okay and how about the SMSC?

19   A    So, the SMSC is for the text messages.  So, the short

20   text messages, the SMS, which is the short message service

21   center, which is the messaging service for texting is handled

22   by the SMSC.

23   Q    Slide 67, did you go over this?

24   A    Yes, so I've already gone over, I had a slide with the

25   red around it, I can do it here on the fly.  Again, what's

1   important in Sprint's messaging network is that Sprint has a

2   messaging network, that's number one, a very important point.

3   And that Sprint has messaging servers in their messaging

4   network, that's point number two.

5   Q   Okay and so we've been looking at PX-99 in the last few

6   slides?

7   A   Yes.

8   Q   Is this the only document you looked at to determine if

9   Sprint has a messaging network and what it contains?

10  A   No, there are other documents on the next slide, this is

11  PX-174.  It is a document that's titled, Messaging Network

12  Components New Terminology and it is a document that

13  describes also Sprint's messaging network.

14  Q   Okay.  And what are you showing on Slide 69 of

15  Plaintiff's Demonstrative-2?

16  A   So, after going through the documents that Sprint

17  provided and the testimony, my conclusion and the results of

18  my analysis is that Sprint, as a telecommunications network,

19  they have a cellular network, which is what I'm showing at

20  the bottom.  They have the components that the Court said a

21  cellular network based on the 1999 definition of the patent,

22  that needs to be available.  The phones, the base station

23  systems, the core network elements.  In addition, Sprint has

24  a messaging network.  The messaging network has components in

25  it.  Whether some of the components are core to the messaging

1    network is not something we need to worry about.

2              Again, the definition of core network elements, is

3    only in the cellular network context.  So, Sprint has a

4    messaging network and in Sprint's messaging network, you have

5    the messaging servers, ones that handle the multi-media

6    messages and ones that handle the text messages.  And those

7    messaging servers do the two functionalities that the Court

8    requires a messaging server to do.  And those two

9    functionalities are the storing and forwarding and sending an

10   inquiry.  And so, Sprint's messaging network communicates

11   with Sprint's cellular network for the inquiry and well,

12   we'll talk about that a little bit more later.

13   Q   Okay, so what is the relationship -- we talked earlier

14   about the CDMA-2000 standard.  What is the relationship

15   between that standard and what we're seeing on your Slide 69?

16   A   So, Sprint's network is a CDMA-2000 network.  So, in

17   addition to looking at Sprint's documents and testimony from

18   Sprint engineers, I've also looked at CDMA standards, because

19   that's the technology that Sprint implements and uses.

20   Q   Okay and did the CDMA standards, do they describe in

21   terms of what you have in your box labeled core network

22   elements?  I'm sorry, I did not say it correctly.  Do the

23   CDMA standards describe those elements?

24   A   The CDMA standard does not describe what is core.  So,

25   when we look at the standard, the standard -- we have the

1    slides on the standard or we can put a document up.  The

2    standard describes functionality of components.  So, very

3    similar to what we're doing in terms of looking at what

4    functionality elements do.  That's how the standard is

5    written and when you look at the standard, it will tell you -

6    - it will give you logical diagrams of functionality.  Of

7    what the different entities need to do as a matter of

8    function.  And I know, in the opening, I heard Sprint's

9    counsel saying, you know, the standard will -- the evidence

10   will show you that the standards say that the messaging

11   server needs to be inside.  I've looked at those standards

12   and actually, they do not.

13   Q   But you alluded to the opening, do you recall Sprint's

14   lawyer mentioning or stating that the CDMA-2000 standard

15   recommends, I think he used the word, recommends, that the

16   messaging server be internal to the cellular network?

17   A   Yes, I disagree with what he said.

18            MR. GOETTLE:  Your Honor, may I approach the

19   witness?

20            THE COURT:  Yes.

21   Q   Dr. Akl, do you have before you a document marked DX-3?

22   A   Yes.

23   Q   What is it?

24   A   This is one document from the 3GPP-2 standard and the

25   size of the document is -- this is going to come and meet

1   with those documents, there are thousands of pages in CDMA

2   and there are multiple document like this.  This one is

3   titled, Cellular Radio Telecommunication Inner-system

4   Operations.  And this is Version 1.0.

5   Q    Doctor, I forget to ask you earlier, when we were talking

6   about Sprint's attorney's opening and he was referring to the

7   American standard, do you recall that?

8   A    Yes.

9   Q    Is that this document or related to this document?

10  A    Yes.

11  Q    Okay and there is also reference to an acronym that is

12  not included on the jury's acronym sheet, called ANSI?  Do

13  you recall that from yesterday?

14  A    Yes.

15  Q    Do you know what ANSI stands for?

16  A    American National Standards Institute.

17  Q    And is the CDMA-2000 standard promulgated by ANSI?

18  A    No, there is actually, the group that looks at or one of

19  the standard-setting bodies is actually 3TPP-2.  There is

20  3GPP, which stands for Third Generation Partnership Project.

21  And there was a group of different companies that came

22  together after the second generation to come up with the

23  third generation cellular system and if you recall, with the

24  second generation, we had GSM, which was European and we had

25  CDMA, which was Qualcom, basically.  And they didn't decide

1   on a single standard, so 3GPP continued to work on GSM and

2   the evolution of the third generation version of GSM, 3GPP-2,

3   just the number two after it, worked on CDMA and the third

4   generation evolution of CDMA, which is called CDMA-2000.  And

5   the ANSI or ANSI-41 are also American standard setting bodies

6   and the documents sometimes, which have two names.  But the

7   official CDMA-2000 is really under 3GPP-2 and that's the

8   website you would go to to pull up the standards.

9   Q   So, back I had asked you if the CDMA-2000 standard

10  recommends placing messaging centers inside the site on

11  network and what was your answer for that question?

12  A   The answer is no and we're going to look inside this

13  document.  There is a figure and there's some description, if

14  we can put it up for the jury.

15  Q   Okay.  Do you recall where that figure is?

16  A   I believe Figure 2.1.

17  Q   Okay, can you flip to Figure 2.1?

18  A   I don't remember which page it's --

19  Q   Yes, I'm trying to figure it out, that's why -- I'm sorry

20  for the delay.

21          THE COURT:  Will you identify the exhibit?

22          MR. GOETTLE:  I will, your Honor.  Your Honor, the

23  witness is flipping through DX-3.

24          THE WITNESS:  So --

25          MR. GOETTLE:  You got that?

1              THE WITNESS:  So, 1-24.

2    Q    Are you there, sir?

3    A    Yes.

4    Q    Can we blow up the five network reference model at the

5    top down just to the bottom of P-15, so we can see the legal

6    figure, too.  Okay, can you describe what we're looking at

7    from DX-3.

8    A    So, this is a figure from the document in front of me,

9    this is the CDMA-2000 3GPP-2 standard.  And Figure 2 is

10   network reference model and looking at the boxes, a lot of

11   these acronyms we've gone over and I'll provide a very quick

12   refresher.  So, the MS on the left, that's the mobile

13   subscriber, that's the cellphone.  BS is the base station.

14   So, these are the antenna towers. MSC is the mobile switching

15   center.  That's what does the routing, the switching.  HLR is

16   a subscriber database, that's the home location register.

17   For example, PSDN, we talked about, that's the public switch

18   telephone network, that's the landlines network.

19           Now, looking at MC, is messaging center, so it

20   relates to the messaging.  This is where the one

21   functionality, the storing forward, is actually in the MC.

22   And if we look at the first paragraph, the description up

23   here, it says Figure 2 presents the functional entities and

24   this is important because again, in standards, things are

25   described in terms of function.  Functional entities of the

1   associated interface reference points, that may logically

2   comprise a cellular network.  And it's interesting, I don't

3   think it's an accident, but it's the Court's construction,

4   again uses the word, may, in the core network elements.  So,

5   the cellular standard, again, is consistent with the Court's

6   construction that you have to look at the functional entities

7   and they may logically comprise.  So, a standard never tells

8   you something has to be a specific way in terms of, here, it

9   says it may logically comprise.

10          A lot of times, implementation isn't specifically

11  specified.  It gives you recommendations and people use

12  standards so that they can build products that work together.

13  So, that's really the point of standards.  It may tell you

14  how you need to do something so that someone else, who

15  creates a product, works with the product that you're making.

16  When we look at Figure 2, all these components, they're not

17  made by a single person or a single vendor or a single

18  company.  You have multiple companies that make the phones,

19  different companies that make the base stations, different

20  companies that make the databases and so,  you need the

21  standards so that you buy a phone from a vendor which work

22  with this base station, with this database and that's how

23  networks are built.

24  Q   So, is Figure-2 laying out a recommendation for the

25  placement of the MC message center?

Akl - Direct                                      27

1    A    Yes.

2    Q    I'm sorry --

3    A    I'm sorry, what was the question?

4    Q    I said is DX-3 and what you're looking at here, is it

5    making a recommendation for the placement of a message

6    center?

7    A    No, it just says that the Figure-2 represents functional

8    entities that may comprise.  So, there is no recommendation.

9    You know, we're hearing the word, external, internal, that

10   does not appear in the -- in the standard.  There is no

11   recommendation on location and there wouldn't be.  Because

12   again, physical location is not something an engineer would

13   look at.  It's functional -- what the function is, is what

14   one skilled in the art, what an engineer would be looking at,

15   not where something physically is.

16   Q    And later on in that paragraph, there's a sentence,

17   actually the last sentence of that paragraph.  Can you read

18   that sentence and explain that to the jury?

19   A    Yes.  In cases where functional entities are combined in

20   the same physical equipment, the interface reference points

21   become internal and need not adhere to interface standards.

22   And that's the point that I was making is, things are

23   described from a functional point of view.  And you have

24   boxes that describe functionality.  And just like we saw, for

25   example in the Erickson Patent, where you can have an

1    implementation where you can take different functionalities

2    and put them on one computer.  That's what the standard is

3    saying.  So, I can take a messaging server and take the

4    functionality of a messaging server back in 1995 and put it

5    in a mobile switching center.  It was okay back then.

6    Messages were small, the switching can handle those text

7    messages.  In that case, the messaging server has core

8    functionalities.  Or I can have different computers

9    implementing the different functionality.

10           So and when they are in one computer, then you don't

11   -- they can immediately talk to each other, in a sense, so

12   you don't have to look at interface standards.  This is what

13   it's saying here.  Interface standard is when they are

14   different computers, you need to have someone who is a

15   vendor, who is building the messaging server, that needs to

16   now query the cellular network.  You're going to have a

17   different vendor that is providing the home location register

18   or that subscriber databases.  So, you need to have a

19   standard that tells you how they talk to each other and

20   that's how, that's what standards do, is they provide the

21   rules, so different companies can build different components

22   and a network, a very complicated network, can work.

23   Q    Dr. Akl, the DX-3 is a standard for CDMA cellular

24   networks?

25   A    Yes.

1   Q   Then wouldn't a standard on CDMA cellular networks tell

2   you what has to be part of the cellular network?

3   A   No, I mean, in this case and that's not necessary.  So,

4   if it tells you what functionality you can have or you may

5   have and different parts of the document is going to describe

6   those functionalities, but it doesn't force you, in an

7   implementation.  It doesn't force you to do it a specific way

8   and as far as the opening, where I heard that there is a

9   recommendation to have it inside, that is not true.  The

10  ANSI-41 is what we see here, TIA-BIA-41, so again, different

11  documents, different standard-setting bodies may refer to

12  different documents.  That's where the number 41 comes up.

13  But there is no recommendation to have it inside.

14          MR. GOETTLE:  Your Honor, would it be okay, if I

15  retrieved DX-3, just because it's a large stack in front of

16  Dr. Akl.

17          THE COURT:  Yes.

18          (Pause.)

19  Q   Okay, Dr. Akl, we are now going to turn to Topic 5 out of

20  5 Topics, Sprints?

21  A   Yes.

22  Q   Okay.

23  A   So, to orient the jury, we've talked about the background

24  of cellular networks and messaging in '99.  We've talked

25  about the patent.  We've talked about what Sprint has in

1    terms of they have a cellular network and they have a

2    messaging network.  So, the last part is now bringing it

3    together and we have to -- it's Comcast's burden to go

4    through the patent, limitation by limitation and to match up

5    what the patent says and what the invention is with Sprint's

6    network.  And that's what we're going to be doing next.

7    Q    Okay, so are we going to start with Claim 1?

8    A    Yes.

9    Q    Okay.  So, what are you showing on Slide 72 of your

10   presentation?

11   A    So this is similar to what we did before.  Previously I

12   walked through the claim but I was explaining the claim and I

13   was using my drawings.  Now we're going to walk through the

14   claim but we're going to match it to Sprint's network.  And

15   that's the infringement step or the infringement analysis.

16         So we look at the preamble.  The Court has provided

17   a definition for cellular network, and again to meet the

18   preamble I need to show that Sprint has the cellular network

19   which I believe I have, and this is now a figure from

20   Sprint's document from multiple documents that we've looked

21   at that Sprint does in fact have a cellular network.

22         We go back to the definition.  The definition has

23   three things.  And I need to show that Sprint meets that

24   definition, so Sprint does have a wireless terminal, Sprint

25   does have base station systems that communicate with the

1    wireless terminal, and Sprint does have core network elements
2    which is what I've discussed previously.
3    Q    Okay.  And so the preamble the claim says that there has
4    to be a cellular network and then a messaging server external
5    to the cellular network.  Does Sprint's cellular network
6    include any messaging server?
7    A    No.
8    Q    Okay.  And are you going to explain that to the jury?
9    A    Yes.  So I've explained that Sprint has a cellular
10   network.  And Sprint has a messaging network.  Sprint's
11   messaging servers that do this functionality of storing and
12   forwarding and sending inquiry are in Sprint's messaging
13   network.  They are not core network elements in its cellular
14   network.  So they meet the definition or they meet what the
15   claim requires that a messaging server be external to a
16   cellular network.
17         Again, this is not an issue about location, where is
18   it physically located.  It's an issue of functionality.  Is
19   it external to the cellular network?  And it is because the
20   messaging server is not a core network element.  Why is it
21   not a core network element?  It does not do core network
22   element functionality.  What is core network functionality?
23   It's the switching and the lookup that you have to do in the
24   cellular network to connect the phones to the other phones
25   and to the outside networks, like the landlines and the

Akl - Direct                              32

1    internet.

2            The messaging servers don't do that.  The messaging

3    servers store and query.  What is the brains behind the

4    delivery?  It's the cellular network.  So the messaging

5    servers don't do the routing.  I know we heard Sprint's

6    counsel at the opening say he was texting his wife and the

7    messaging servers do the routing and do the querying.  They

8    don't.  The querying and the routing is done in the cellular

9    network.  The messaging servers get a message, hold onto it.

10   And then they're going to ask the cellular network is the

11   phone ready?  The cellular network is going to do that

12   querying, it's going to check, it's going to return a

13   response to the messaging server and then the messaging

14   server is going to put the message in and the cellular

15   network is going to deliver it, is going to do the switching.

16   And we're going to walk through all the steps again, but this

17   is an overview of where we're headed.

18   Q   So you just referred to Sprint's counsel's opening

19   argument with respect to routing.  Could you explain what

20   routing means?

21   A   Yes.  Routing is the same as switching.  It's the ability

22   to deliver the information.  And what's doing the routing or

23   the switching are the packet switching notes and the mobile

24   switching centers.  That's what's doing the switching and

25   they do that in conjunction with the subscriber database that

Akl - Direct                                    33

1    gives them the lookout.

2            So going back to y analogy, that's the operator.

3    The switching is connecting the wires.  This is what Lily

4    Tomlin was doing in the '50s on those skits.  And the lookup

5    are the notebooks that you look up the subscriber

6    information.  The messaging servers don't do that.  And the

7    definition that the Court gave us for a messaging server does

8    not include that functionality.  It only includes the two

9    functionalities of storing and forwarding and sending an

10   inquiry.  And that's what they do.

11   Q   But Sprint's -- and I know we're going to go into detail

12   through the claims, but since you're talking about routing

13   Sprint's messaging servers do deliver the message, right, and

14   we're going to talk about the call flow but they do deliver

15   the message, and so doesn't that mean that those messaging

16   servers do routing?

17   A   No, because they're not doing the routing themselves.

18   That's the key functionality.  The routing is being done by

19   the cellular network.  The messaging servers are holding onto

20   the message.  Then they ask the cellular network, is the

21   phone ready?  Can the phone receive?  The cellular network

22   returns the message yes or no.  If the message is yes and

23   then the messaging service is going to forward.  The

24   forwarding isn't -- the forwarding part into the cellular

25   network, that's not the routing, that's not the switching.

1   That's what's done in the cellular network.

2   A    Well, what is the difference between forwarding and

3   switching, or forwarding and routing?

4   A    So forwarding is I'm giving you something and then

5   someone else is actually doing the work of delivering it.

6   That's what the cellular network is doing.  That's what the

7   packet -- packet switching notes are doing.  We have

8   identified core network elements.  The packet switching notes

9   are doing switching.  We've identified the mobile switching

10  center.  Those are the mobile switching center, the PDSN or

11  the FA and the HA.  We've already identified the core network

12  elements that are doing the switching.  It's not the

13  messaging servers.

14  Q    Okay.  During Sprint's counsel's opening argument, do you

15  remember, do you recall him saying that the messaging server

16  actually figures out whether the phone is set up to receive

17  the messages?

18  A    Yes.

19  Q    Is that your understanding of how Sprint's messaging

20  servers work?

21  A    No.  The messaging servers don't figure anything out.

22  The messaging servers can't figure it out because they don't

23  have that information.  The messaging server received the

24  message.  The have the phone number and that's all they do.

25  What they do is they send a query.  They ask the cellular

1    network.  And we're going to look at additional documents

2    that show how the messaging server are going to ask the

3    cellular network, they're going to sent that phone number in,

4    and they're going to ask it, tell me about the phone.  Is the

5    phone ready to receive?  And that query is going to be --

6    that information is going to be determined in the cellular

7    network and a response is going to go back from the cellular

8    network to the messaging server.  So the messaging server is

9    going to know the result, and then proceed.  But that's not

10   the one that's doing the determination. That's the key.  It's

11   not determining anything.  It's getting the result of the

12   determination that is happening in the cellular network.

13   Q    Okay.  I think you may have covered what's on your slide

14   74?

15   A    Yes.  So here I'm just showing that Sprint does have a

16   cellular network. Sprint does have a messaging network and

17   the two networks talk together.  They work together well.

18   But in how they are set up, in how they talk to each other,

19   they infringe the Comcast patent.  That's the point.

20   Q    Okay, well let's talk about that.

21   A    Okay.

22   Q    So I'm going to go to slide 76 and I take it this is our

23   ind of a roadmap of how you're going to walk through your

24   analysis?

25   A    Yes.  So to show infringement it's Comcast's burden.  And

1    what I have to do is present evidence to that effect.  And so

2    to make things as organized as possible, I'm breaking up the

3    analysis in terms of when a Sprint subscriber sends an SMS or

4    an MMS, so whether they send a text message or a multimedia

5    message we're going to talk about those together.  And then

6    later when we're filling this table we're going to talk about

7    when a Sprint subscriber receives.  And we're going to have

8    different scenarios because Sprint has different subscriber

9    databases.  So we need to talk about the inquiries with

10   regard to the SPS, which is one subscriber data, the MLDab

11   which we haven't talked a lot about, but it's basically a

12   precursor to the SPS and a lot of the analysis is going to be

13   similar, and you've heard me talk about the home location

14   register.  So we're going to have to look at now exactly what

15   happens in Sprint's network and why they fringe based on

16   their different equipment and what the network does.

17   Q   Okay.  So you're first going to talk about the SPS and

18   Sprint's infringement related to the SPS when a Sprint

19   subscriber sends an SMS message or an MMS message.

20   A   Yes.

21   Q   Okay.  And you're going to start with Claim 1?

22   A   Yes.

23   Q   And then you're going to refer to Claim 7 and 113?

24   A   Yes.  We have to now go through the asserted claims.

25   Q   Okay.  So what are we seeing on your slide 79?

1    A    So this is a PX-99.  This is a Sprint document and what

2    I've done is this is a call flow that was generated by

3    Sprint.  So this is their document that they gave to counsel.

4    And I've looked at from the many documents that I've looked

5    at, this is the call flow when you have a subscriber, a

6    Sprint subscriber sending an SMS.  So this is a Sprint

7    subscriber sending a text message.

8         And again to orient the jury how we read those, so

9    there's going to be arrows.  Again, these arrows were in the

10   document, this is a Sprint document, and we read this left to

11   right, top to bottom.  So the boxes on top, the handset

12   that's the phone and the SMSC, that's the messaging server,

13   the SPS, that's the subscriber database.

14        Now, what I've put above that, this is something

15   that I've added.  I haven't modified the document, I'm just

16   helping the jury remember.  But everything from here in the

17   body of the document, this is a Sprint document.  And I'm

18   going to annotate it as we walk through it, but it will be

19   clear what are my annotations and what's in the original

20   document.

21   Q    Now, this PX-99, is this the same document we saw before

22   with the high-level messaging architecture?

23   A    Yes, and this is page 6.  So PX-99.006 means page 6 of

24   that document.

25   Q    Is this the only Sprint document that you looked at in

1    forming your analysis of the -- kind of the call flow through

2    when a Sprint subscriber sends or receives messages?

3    A    No.  Again I've looked at many documents, I've looked at

4    deposition transcripts and I'm just putting something in

5    front of the jury because we have to put evidence, and this

6    is an example that walks through all the claims and clearly

7    describes the infringement.

8    Q    Okay.  So what happens first to trigger the infringement?

9    A    So the first thing that needs to happen is the user needs

10   to send a text message.  And so in the Sprint document this

11   is what is SMDPP, it's what's highlighted here.  So this here

12   is my annotation.  This is an example.  For example, someone,

13   MO is important.  MO means mobile originated.  So this is

14   someone sending a text.  And T means mobile terminated.  And

15   you'll see this acronym throughout call flows.  So MO, mobile

16   originated, MT, mobile terminated.

17          Right now we're looking at a Sprint subscriber

18   sending an SMS so we care about the MO.  And so here we have

19   a user.  As an example, I've picked a phone number.  And so

20   there is a text message that's going.  So this is an example

21   of a text message that's going from the phone to the

22   messaging server.  This is my annotation, but the arrow here,

23   this is what actually is in the call flow.  This is not an

24   infringing step yet, because this is what starts the process.

25   Q    So does the phone number that you have in your sample

1  text message there, do the from and to phone numbers match up

2  with the MO and MT phone numbers you have above?

3  A   Yes.  So this is in my example they do.  And again this

4  is what triggers the process.  This doesn't correspond to

5  direct step but it's like the preamble.  You have to have a

6  text message for these steps to kick in.

7  Q   So on your slide 82 what just happened?

8  A   This is just the next arrow.  It says there is an

9  acknowledgement back.  It's really not important to the

10  analysis.

11  Q   Okay.  All right.  Now we get to the first step of the

12  claim?

13  A   Yes.  So this is an infringing step because this step is

14  called MODIP, mobile originating DIP.  This is the inquiry,

15  so this matches the first step in the claim, which is you

16  need to send an inquiry from the messaging server to the

17  cellular network with information, with said information

18  relating to the terminal.  That's going to be the phone

19  number, and that comprises a first identifier, identifying

20  set terminal.  So that's the phone number that's included in

21  the MODIP message from the messaging server to the SPS in

22  this example.

23  Q   And did the Court construe the phrase that's shown in

24  your white box on step one, the phrase specific identifier

25  external to the cellular network?

1    A    Yes.  So far we've looked at two definitions from the

2    Court.  We looked at a definition for cellular network and we

3    looked at a definition for messaging server.  We have another

4    definition, so the Court has provided a definition for a

5    specific identifier external to the cellular network and the

6    Court said that means a specific identifier used outside and

7    inside the cellular network to identify a specific wireless

8    terminal.

9         So the phone number as it's referred to in these

10   documents, it's an MDN but it's basically a phone number,

11   that meets the Court's construction.  Because the phone

12   number is an external identifier.  It is used outside and

13   inside and it identifies a phone.

14   Q    Well, how is a phone number used outside in a cellular

15   network?

16   A    Because the phone number is what you give people so that

17   they can call you.  So it is a number -- it is an identifier

18   that's used to identify your phone, and it is external.  You

19   give it to people so it meets the Court's definition, and

20   it's also used in the cellular network as we will see.  So it

21   meets the Court's construction.

22   Q    Okay.  And then I believe you were referring to yet

23   another acronym called MDN.  What is that?

24   A    So MDN stands for mobile directory number.  Again that's

25   just the phone number, and looking at testimony from Sprint

1   engineer, this is Mr. Hoelzle.  He confirmed when he was

2   asked, Is MDN a mobile directory number and he answered yes.

3   And that would be like a user's telephone number, is that

4   fair to say?  And he answered yes.  So the testimony confirms

5   what I looked at in the documents, that the MDN is the phone

6   number and that is the first identifier.

7   Q    Okay.  And I meant to ask you because I think we're going

8   to see it a lot as we walk through the call flow, what does

9   MODIP mean again?

10  A    So MO means mobile originated.  And that's the label.  So

11  these labels, you know, somebody at Sprint when they created

12  the document they gave them labels.  And that's just the name

13  of the arrow.  It's MODIP.

14  Q    Okay.  And is an MODIP sent every time a Sprint

15  subscriber sends an SMS message?

16  A    Yes.

17  Q    And has that been true since the beginning of the use of

18  the SPS?

19  A    Yes.

20  Q    What are you showing with this deposition testimony on

21  your slide 86?

22  A    So the testimony that the Sprint engineer was asked is,

23  Would that be the MDN of both the originator and the

24  recipient, and he answered no.  And so he's asked, Would you

25  perform one query using the MDN of the originator and a

1   separate query for an MDN of the recipient, and he answered

2   yes.

3          Later we're going to look at when the -- there is an

4   MTDIP that we're going to look at later.  So this is

5   confirming that the MODIP is containing the one phone number,

6   and that's the originating phone number that's relevant to

7   what we're looking at.

8          When we are looking at the MT message, it's going to

9   have a second phone number, so this is testimony confirming

10  that.

11  Q   Okay, are we going to move on to step two?

12  A   Yes.  So the second step, now we need to have a mapping

13  from this first identifier, so we need to have a mapping from

14  this phone number to a specific second identifier in the

15  cellular network.  The second identifier being an internal

16  identifier of the cellular network.

17         So we have to now -- so this is our first step, so

18  this is step one.  And now in the SPS, and the SPS is the

19  subscriber database that has the MDN, the phone number, it's

20  going to be doing a mapping, because we need a mapping.  So

21  there is a mapping that's now taking the first identifier and

22  it is doing a mapping to a second identifier.

23  Q   And what is the second identifier called?

24  A   The second identifier is called Final DN and there's a

25  lot of information associated with that second identifier.

1    This second identifier meets the Court's claim construction.

2    And for the internal identifier we have another definition.

3    So the definition that the Court gave us says "An internal

4    identifier of the cellular network means an identifier used

5    inside the cellular network to identify a specific wireless

6    terminal which may, but need not be, revealed outside the

7    cellular network.

8            So for this analysis I have relied on Dr. Dwoskin.

9    You're going to hear from Dr. Dwoskin later.  He looked at

10   the SPS and the MLDAP databases.  And so he did his analysis.

11   I talked with him on the phone.  He wrote a report.  And in

12   his report, in his analysis that you're going to hear later,

13   he identifies the final DN as an identifier that identifies -

14   - that's used inside as an internal identifier that

15   identifies a specific wireless terminal.

16           So I took the analysis that he did and then I

17   applied it to the Court's claim construction.  And so my

18   conclusion is that the final DN meets the Court's claim

19   construction of being the second identifier because it's used

20   inside and it identifies a phone.

21   Q    Okay.  Step three?

22   A    Step three, now we need to be able to do the determining.

23   So we need to determine said information relating to the

24   terminal with the aid of said second identifier.  So the

25   second identifier, that's the final DN, we said that's the

1    second identifier, and there is a determination being done in

2    the SPS, and the SPS is going to return attributes,

3    attributes about the phone.  And there's going to be

4    different attributes.

5           An example is the SMS Allow (ph).  So, SMS Allow

6    message so that's an example of an attribute.  The claim

7    doesn't require what attributes.  It just says you need to be

8    able to determine information.  And there's information

9    that's being determined using the internal identifier.

10   That's a step three.

11          And then in step four we need to send the response.

12   So again the cellular network and the SPS is what's doing the

13   determination and now it's sending the response.  The fourth

14   step is the subscriber found, that's the label in Sprint's

15   document for the message going from the SPS back to the

16   messaging center.

17   Q   So, Dr. Akl, do you have an understanding of why Sprint's

18   network is doing the lookup for the phone that's sending?

19   We've heard a lot about why the cell network does a lookup to

20   find out where the phone is that's going to receive the

21   message, but why is Sprint's network doing a lookup to

22   determine information about the sending phone?

23   A   Because the network needs to make sure that when someone

24   is sending a text message that that person is authorized,

25   their account is up to date, their subscriber information is

1   current.  So that information -- and they're allowed to send

2   a text message.  So there is reason why this lookup is done

3   so that before the next step happens, you need to be able to

4   authorize that yes, check and make sure this user that is

5   sending a text is allowed to do so.

6   Q    Okay.  And with respect to the fourth step there's a

7   requirement in there that the response message contain or it

8   says "in which."  Do you see the "in which" sentence towards

9   the end of that paragraph?

10  A    Yes.

11  Q    It says in which response message the information

12  relating to said terminal is indicated with the aid of said

13  first identifier?

14  A    Yes.

15  Q    Did the Court help us with our claim construction with

16  respect to that portion?

17  A    Yes.  There is a Court construction and the Court's

18  definition which we adopt and we use in the analysis says

19  with the aid of first identifier means with the aid of the

20  first identifier where the first identifier -- and remember,

21  that was an example, it's like the phone number -- the first

22  identifier may but need not be included in the in the

23  response message.

24         So the response message needs to be able to tell the

25  messaging server that, you know, you've sent a phone number.

1    I'm going to give you a response.  And I may include that

2    phone number so you know to correlate my response with your

3    inquiry, but I don't necessarily need to include the phone

4    number as long as you can determine with the aid of the first

5    identifier you've met the Court's claim construction.

6    Q    And is the response message that Sprint SPS sends back to

7    Sprint's SMFC, does that meet the limitation --

8    A    Yes.

9    Q    -- under the Court's construction?

10   A    Yes, it does.

11   Q    Okay.  And is that because it's included in the message

12   itself?

13   A    Yes.  So here the phone number is included.

14   Q    Okay, so now I'll have you just explain to the jury your

15   analysis for your opinion that Sprint infringes the claim

16   when a Sprint subscriber sends an SMS message in conjunction

17   with the SPS?

18   A    Yes.

19   Q    Okay.  We're now going to turn to claim 7?

20   A    Yes.

21   Q    Okay.  The jury has not seen claim 7 before, I don't

22   think.  Can you explain it to the jury?

23   A    Yes.  So claim 7 is a dependent claim.  And what that

24   means is, it starts out by saying a method according to claim

25   1.  So it depends on claim 1.  We have already walked through

1    claim 1, all the steps of claim 1 are infringed.  And

2    additionally when you have a dependent claim it adds

3    additional restriction.

4         So the claim 7 now says wherein said inquiry, so

5    said inquiry is referring back to the inquiry in claim 1, is

6    sent to a specific network element of the cellular network,

7    and that said network element determines said information

8    relating to the terminal MS using said second identifier.

9         So it's a lot of words that is saying that the

10   inquiry in claim 1 in the cellular network is being done by

11   the network element.  And so in this case it's the SPS.  The

12   SPS received the first identifier.  It mapped it to the

13   second identifier.  It's doing the determining so it's

14   already meeting the determination of claim 7.  So this is all

15   we need to show that the SPS that we've already described

16   infringes claim 7.

17   Q    Okay.  Turning to claim 113.

18   A    Yes.

19   Q    Can you describe claim 113 for the jury, or maybe what's

20   different as between claim 113 and claim 1?

21   A    Yes.  So claim 113 is being asserted.  Claim 113 is very

22   similar to claim 7.  But claim 13 is a method claim of claim

23   112, which means we have to go through claim 112.  And this

24   is claim 112.

25        The good news is that claim 112 is very similar to

1    claim 1.  So instead of walking through all the steps,

2    they're going to all be the same.  I'm going to focus on

3    what's different.

4            So what's different in claim 112 is what I've

5    highlighted in yellow.  And for step two it says wherein the

6    mapping is not performed by a home location register.  That's

7    the only difference between claim 112 and claim 1.  So not

8    only do we have the mapping, but it's performed by something

9    other than the home location register.

10           We were talking about the SPS.  The SPS is different

11   than the home location register.  So the analysis that we've

12   done for claim 1, I don't need to go through it again, it

13   infringes claim 112.

14           And for claim 113 it says wherein the inquiry is set

15   to and the determining is performed, this is just like claim

16   7 which we've already described.  So I don't need to do

17   anything additional.  The analysis that I did for claim 1 and

18   claim 7 carries over and Sprint infringes claim 113.

19   Q   Has the Court given us a construction of home location

20   register?

21   A   No.

22   Q   So how do you know that this Sprint subscriber database

23   called the SPS subscriber profile system, how do you know

24   that is not a home location register as home location

25   register is used in the patent?

1    A    So there is a home location register.  And the home

2    location register contains location information about the

3    phone.  So there is a different subscriber database that is

4    the home location register that contains location

5    information.  The SPS is not such subscriber database.  It

6    does not contain location information, it is not a home

7    location register and so it infringes claim 113 and 112.

8    Q    Okay.  So are we looking at the same call flow that we

9    just looked at on your slide 98?

10   A    We're looking at a similar call flow.  What's different

11   here is this is a Sprint 2ICG.  So this is the intercarrier

12   gateway.  So at the beginning I said I'm going to divide it

13   into a Sprint subscriber sending a text.  They can send a

14   text to another Sprint subscriber which is what we've

15   described.  They can send a text to a subscriber on a

16   different network.

17          Now, the two steps that we've worked through are the

18   same so I don't have to repeat the analysis but they are

19   equally applicable when a Sprint user sends a message, a text

20   message, an SMS to somebody that is not on the Sprint

21   network.

22   Q    So the call flow you had just walked through and showed

23   the jury to show Sprint infringement of claims 1, 7 and 113,

24   what was that call flow directed to?

25   A    It was Sprint to Sprint.

1    Q    A Sprint subscriber sending an SMS message to another

2    Sprint subscriber?

3    A    Yes.  And this is why I've circled the heading here.

4    It's now Sprint to ICG, inter-carrier gateway.  So some of

5    these steps are going to be similar, some are going to be

6    different.  But what's the infringing step is going to be the

7    same.  So instead of walking through all the details it all

8    carries over.

9    Q    So this would -- a Sprint subscriber sending in SMS2, for

10   example a Verizon subscriber, the same steps that you just

11   walked through would be followed?

12   A    Yes.  The MODIP step, that's the infringing step.  This

13   is the querying, and then the mapping happens in the SPS just

14   like we walked through the determining happens in the SPS and

15   then the response goes back, just like we walked through,

16   those are the MODIP and subscriber found, these are the

17   infringing steps.

18   Q    Okay.  So I just put the slide to slide 99.  Are you now

19   going to talk about MMS?

20   A    Yes.

21   Q    Okay.  Before you talk about MMS, let me ask you, since

22   Sprint started using the SPS, every time a Sprint subscriber

23   has sent an SMS message, whether to another Sprint subscriber

24   or to a subscriber on another network, every time that has

25   happened has Sprint infringed claims 1, 7 and 113?

1    A    Yes.

2    Q    And is that for the reasons you laid out?

3    A    Yes.

4    Q    Okay.  So what are you showing on slide 99?

5    A    So slide 99, the difference is now we're going to look at

6    a Sprint subscriber sending an MMS before we're looking at

7    SMS.  So the difference is in sending, you're sending a text

8    message, you're sending a multi-media message.  So one thing

9    you're going to notice is now we have an MMSC.  This is the

10   messaging server for multi-media messages.  Before we had an

11   SMSC, see now it's sitting on this side, this is the SMSC.

12   But the MMSC is going to -- you're going to have the same two

13   infringing steps.  We have the MOLDAP before it was called

14   MODIP.  It's the same infringing step.  And we have the

15   subscriber found.  That's the response, and that's the

16   inquiry.

17        So for the same reasons that we have waled though in

18   terms of the first step, the mapping, the determination and

19   then the response, when a Sprint subscriber sends an MMS, the

20   MMSC sending and communicating with the SPS infringes the

21   claim 1.

22   Q    So in terms of the sending, and then what happens inside

23   the SPS for the mappng step, the determining step and the

24   responding step, you're saying that those are the same, it's

25   the same process, even though now we're talking about an MMS

1  message and not an SMS message?

2  A    Yes.  Because again, the message is still in the MMSC

3  messaging server and it's just sending an inquiry.  The

4  inquiry is going to be the same.  It's asking is the

5  subscriber, you know, with the subscriber's phone number it's

6  going to get a response, so the process is the same.  It

7  infringes claim one.  The determination is done in the SPS so

8  it infringes claim 7.  And the SPS is not a home location

9  register so it infringes claim 113.

10 Q    Okay.  Now we're looking at a Sprint subscriber sending

11 an SMS to the ICG again?

12 A    Yes.  So we looked at sending a multi-media message from

13 Sprint to Sprint, and we looked at one portion of it which is

14 the sending part.  Again it's if a Sprint subscriber is now

15 sending a multi-media message to somebody outside Sprint's

16 network so it's now to the ICG.  This is inter-carrier

17 gateway.  So the two steps, the two infringing steps of the

18 MMSC to the SPS, and then the mapping, the determination and

19 then the response, those are the same.  So the same reasons

20 we've talked about before, Sprint subscribers sending an MMS

21 to somebody outside Sprint's network infringes claims 1, 7

22 and 113.

23 Q    Okay.  Doctor, I forgot to ask you earlier, I think, but

24 Sprint's SMSC and Sprint's MMSC, are each of those messaging

25 servers under the Court's construction of messaging server?

                              Akl - Direct                      53

1    A    Yes.

2    Q    So what two functions do Sprint's MMSC and SMSC perform?

3    A    The Court's construction says the messaging server needs

4    to be able to storing forward and it needs to be able to do

5    an inquiry.  And Sprint's MMSC and the SMSC do the storing

6    and forwarding and then they do the inquiry.  Sometimes the

7    inquiry is done directly.  Sometimes it's done through a

8    router or a gateway like a -- more acronyms like OMG PDR SLP,

9    that doesn't really change the analysis.  Sprint still has a

10   messaging server that is meeting the Court's claim

11   construction.

12   Q    Okay.  So in terms of MMS, every time that a Sprint

13   subscriber sends an MMS message and there's a lookup to the

14   SPS, has every time that that has happened infringed, had

15   been an infringement of claims 1, 7 and 113 of the patent?

16   A    Yes.  So again for the MMSC it does meet the Court's

17   construction.  They do the sorting and forwarding and they do

18   the querying at different times either directly or through --

19   for the MMSC, the SLP or HSP and other acronyms, high speed

20   proxy.

21        So again the Court's construction is met by Sprint's

22   messaging servers.

23   Q    Okay.  So what are you showing on your slide 101?

24   A    So we are done with the first box.  It's going to go a

25   lot faster, but we have to walk through them.  So we've shown

                              Akl - Direct                        54

1    that when a Sprint subscriber sends an SMS or MMS, it doesn't

2    matter if it's to another Sprint subscriber or somebody

3    outside of Sprint's network, using the SPS it infringes

4    claims 1, 7, and 113.

5    Q   Okay.  So now you're going to switch gears and talk about

6    what happens when a Sprint subscriber is receiving an SMS or

7    MMS message in conjunction with the SPS?

8    A   Yes.

9              THE COURT:  I think before we do that we ought to

10   take a break.

11             Let's take a ten-minute recess.  I would like Juror

12   Number 1 to remain in the courtroom to discuss

13   transportation.  That's all we're going to do.

14             DEPUTY CLERK:  All rise.

15             THE COURT:  Counsel -- be seated, everyone.  Let's

16   go to sidebar and why don't you walk over.

17             (Sidebar discussion as follows:)

18             JUROR NUMBER 1:  Everything's fine.  It's your

19   courtroom, you're the boss.

20             THE COURT:  No, no, I want to make it easy for you.

21             JUROR NUMBER 1:  It's easy enough.

22             THE COURT:  For example tonight.

23             JUROR NUMBER 1:  We're good.

24             THE COURT:  Well, where's your car, at the bus

25   terminal?

                           Akl - Direct                         55

1              JUROR NUMBER 1:  Yes, sir.

2              THE COURT:  Well, how do you get from -- you can't

3    drive back so you'd have to take a train.  How would you get

4    from Philadelphia --

5              JUROR NUMBER 1:  Oh, from my house -- I mean the bus

6    terminal where I'm at, I'm about five miles away from where

7    that is.

8              THE COURT:  How would you --

9              JUROR NUMBER 1:  I'd take my car from the parking

10   lot there.

11             THE COURT:  That's in the bus terminal?

12             JUROR NUMBER 1.  Right.

13             THE COURT:  But how would you get back to Reading

14   tonight if we go to 4:45.  I'm not going to have you get home

15   at 9:00 o'clock.

16             JUROR NUMBER 1:  No, that's -- it's your courtroom.

17   You're the boss.

18             THE COURT:  I know that.  (Laughter.)

19             (Off the record discussion.)

20             THE COURT:  Tonight, the only way you can get back

21   to your car is by bus?

22             JUROR NUMBER 1:  Right.

23             THE COURT:  So we'll recess at 4:30 --

24             JUROR NUMBER 1:  No.

25             THE COURT:  No, no, we'll recess at 4:25.  All we'll

1    do, and tomorrow you've requested that we recess --

2              JUROR NUMBER 1:  Yeah.  That's the only night, you

3    know, I --

4              THE COURT:  For tomorrow.  But on Monday what we'd

5    like you to do is try another method of transportation.  Have

6    you considered the train?

7              JUROR NUMBER 1:  I wouldn't even know where to get

8    the train.  She said Norristown, that's a --

9              THE COURT:  We're not going to do that.  Then the

10   choice is driving.  Well, you can try that and then tell us

11   whether it works.  If it doesn't work, we're going back to

12   4:40.  You've got a busy day.  You've got to sit there and

13   listen.  We all have to sit and listen.

14             JUROR NUMBER 1:  Mm-hmm.

15             THE COURT:  And I don't want you worrying about

16   getting home.

17             JUROR NUMBER 1:  I'm not worried about getting home.

18             THE COURT:  We'll make it as easy as possible.

19             JUROR NUMBER 1:  Besides, in fact men our age

20   (indiscernible) he'd be here, we'd go up and see the auto

21   show.  So it's (indiscernible).

22             THE COURT:  Thank you for taking that approach.  But

23   tonight we'll recess either at 4:20 or 4:25 so you can catch

24   the early bus.  I do not want you catching the bus that gets

25   there at 9:00 o'clock.  You don't get home at 9:00 o'clock,

Akl - Direct                                        57

1   you've got to eat dinner.

2            JUROR NUMBER 1:  Well, yeah.

3            THE COURT:  What time do you get up in the morning

4   to get here?

5            JUROR NUMBER 1:  Oh, about ten of 5:00.  That's my

6   normal weekday work day.

7            THE COURT:  Okay.  But we're going to accommodate

8   you.  So today 4:20 or 4:25.  Your idea of leaving here at

9   4:30 and catching a 4:40 bus means you'd have to be in very

10  good shape, like sprint from here, Sprint, you know.  Sprint

11  from here to the bus terminal.  We're not doing that.

12           JUROR NUMBER 1:  I'm used to getting in -- I worked

13  7:00 to 5:00 every day it was like doesn't matter.

14           THE COURT:  I understand that.

15           JUROR NUMBER 1:  It's no big deal.

16           THE COURT:  You'll take the bus tonight at 4:45.

17  We'll do the same thing tomorrow.  On Monday try another way

18  of getting here and report to me at the end of the day how it

19  works.

20           JUROR NUMBER 1:  Okay.

21           THE COURT:  And we'll see what we're going to do

22  next week.

23           JUROR NUMBER 1:  All right.

24           THE COURT:  Everyone agrees.  Everybody wants to

25  make it easy for you.  Both sides, equally cooperative.

Akl - Direct                                                    58

1            JUROR NUMBER 1:  (Indiscernible) Friday, that's all
2    that matters, really.
3            THE COURT:  4:20 or 25 tonight and tomorrow.  And
4    you'll tell us what happens on Monday.
5            JUROR NUMBER 1:  Okay.  You know, I was watching the
6    way that he come down this morning, takes some kinds of back
7    ways sometimes.
8            THE COURT:  Okay.  Anything else?  I don't think so.
9    So thank you.
10           JUROR NUMBER 1:  Thank you, your Honor.
11           Gentlemen, thank you.
12           (End of sidebar discussion.)
13           (Recess taken from 3:12 p.m. until 3:26 p.m.)
14           (Jury in at 3:27 o'clock p.m.)
15           THE COURT:  Be seated, everyone.
16           You may continue.
17           MR. GOETTLE:  Thank you, your Honor.
18   BY MR. GOETTLE:
19   Q   So, Dr. Akl, are you now going to talk about Sprint's
20   infringement with respect to the SPS when a Sprint subscriber
21   receives an SMS message or an MMS message?
22   A   Yes.
23   Q   Okay.  So what did we just see -- let's do that again,
24   that was cool.  What are we seeing there?
25   A   So this is the call-flow diagram in Sprint's documents

Akl - Direct                                    59

1    and we were looking at these two, which is the MO-DAP and
2    subscriber found, this is the mobile originator.  And now
3    what we are looking at are two different exchanges between
4    the SM-SC and the SPS.  So we're going to look at MT-DAP.  MT
5    means mobile terminated.  So this is now -- this is going to
6    meet the sending step, the inquiry that's going to go between
7    the messaging server and the cellular network, which is going
8    to contain an external identifier.  The external identifier
9    in this case is now the phone number of the person that the
10   message is intended for.

11          So in this example we're going to have the inquiry
12   step and it's going to have the phone number.  We saw earlier
13   testimony from Mr. Hoelzle when he was asked about the MDN,
14   which is the phone number, and he did confirm that there are
15   two inquiries, each one has the phone number.  So we talked
16   about the first inquiry with the sending phone number, now
17   there is the second inquiry with the destination phone
18   number.  For the same reasons the phone number meets the
19   Court's construction for an external identifier, that is a
20   specific identifier to the cellular network.  In this case
21   also it meets the Court's construction.  It is a specific
22   identifier that's used outside and inside the cellular
23   network to identify a specific wireless terminal, in this
24   case it's the receiving phone number, the phone.
25   Q    Okay.  So you've completed your analysis of step one?

Akl - Direct                                                60

1   A    Yes.

2   Q    Now, is your analysis -- is it safe to say that your

3   analysis of the next three steps are very similar to what the

4   jury has already seen?

5   A    Yes.  So instead of now looking up based on the sending

6   phone number, there is going to be a mapping based on the

7   destination phone number, the same -- the values are going to

8   be different of course for the final DN, but the final DN is

9   going to be the second identifier for the same reasons I've

10  gone through before.  I've relied on Dr. Dwoskin, he did the

11  analysis on this database.  And then I looked at the final

12  DN, he told me it identifies a cell phone.  I compared that

13  with the Court's construction; it meets the Court's

14  construction as an identifier that's used inside the cellular

15  network to identify a specific wireless terminal and it may,

16  but need not be revealed outside the cellular network.

17          So the same analysis that I did before carries over

18  or is similar in this case.  And the final DN --

19  Q    Oh, I'm sorry.

20  A    -- is then used -- no, that's fine -- is then used.  I'm

21  sure the jury appreciates us going a little faster.  Now the

22  final DN is used into the third step, we need to do the

23  determining.  So for the determining set information, again

24  the search is run in the SPS, we have attributes.  Here the

25  attributes for example is did the receiving phone number can

                              Akl - Direct                    61

1    receive an SMS.

2            So we have attributes that go back and then we end

3    up with step four, where you send a response, and in the

4    fourth step is the subscriber found.  So very similar to the

5    first two steps but now they're geared with the destination

6    with the destination phone number instead of the originating

7    phone number.

8    Q    And for the same reasons that you described before with

9    respect to Sprint's subscriber sending an SMS, this response

10   message also includes -- identifies the information with the

11   aid of the specific -- with the first identifier?

12   A    Yes.  So the phone number is included, this is for the

13   last part of the fourth step.  We have the Court's

14   construction, it meets the Court's construction, also in

15   which the response message, the information relating to said

16   terminal is indicated with the aid of said first identifier.

17   Q    Have you completed your analysis of Claim 1?

18   A    Yes.

19   Q    So turning to Claim 7?

20   A    Yes.  With regards to Claim 7, again it's similar to what

21   we've looked at before.  The SPS is the one that is the

22   specific network element of the cellular network and said

23   network element determines that information.  The SPS is

24   what's doing the determination using said second identifier.

25   So it does meet the language and it does infringe Claim 7.

1   Q    Okay.  And Claim 113, sir?

2   A    The SPS is not a home location register.  We've talked

3   about the differences.  There is no phone location

4   information in the SPS, it's a different subscriber database

5   that is a core network element, but is not a home location

6   register.  And so there is infringement for Claim 112 and

7   113; 113 is what's asserted.

8   Q    Okay.  And so the claim that we're seeing up on your

9   slide 112 that's showing page 6 of PX-99, that's a call flow

10  when a Sprint subscriber is sending an SMS message to another

11  Sprint subscriber?

12  A    Yes.

13  Q    And so you were talking about the infringement that

14  happens when a Sprint subscriber receives from another Sprint

15  subscriber?

16  A    Yes.

17  Q    Okay.  And so on slide 113, are you addressing the call -

18  - showing the call flow for when a -- for example a Verizon

19  subscriber or another network subscriber sends a message to a

20  Sprint subscriber?

21  A    Yes.  So looking at the title, this is again a Sprint

22  document and the heading is "SMS ICG to Sprint."  So you have

23  a message coming from the inter-carrier gateway to the Sprint

24  subscriber.  And so we still have the two steps, a mobile

25  terminated DATABASE going from the SMSC to the SPS and the

1    subscriber found.  And so for the same reasons, when a Sprint

2    subscriber receives an SMS, whether it's coming from another

3    Sprint subscriber or it's coming from somebody outside the

4    network, the receiving steps infringe.

5    Q    Okay.  So since Sprint started using the SPS, since the

6    time that Sprint started using the SPS, for every SMS message

7    that a Sprint subscriber receive did Sprint infringe Claims

8    1, 7 and 113?

9    A    Yes.

10   Q    And actually I just noticed that -- I just noticed a typo

11   maybe, Dr. Akl, on your slides where it says 13 at the top,

12   that should be 113?

13   A    Yes, right here.

14   Q    Okay.  Now you're going to talk about MMS?

15   A    Yes.

16   Q    So the difference is we have a Sprint subscriber

17   receiving an MMS instead of an SMS.  So they are receiving a

18   multimedia message, this is from Sprint to Sprint multimedia

19   message, and we are focusing on the receiving part.  So we

20   still have the MTL-DAP and the subscriber found, instead of

21   an SMSC, we have the MMSC, this is the multimedia messaging

22   server that's doing the inquiry to the SPS and then it's

23   receiving a response back.  So the infringing steps are the

24   same as what we discussed before.

25   Q    So is it safe for the jury to think about it as if the

1   type of messages is not pertinent to the analysis, but it's

2   what happens after the message gets received by the messaging

3   server?

4   A    Yes.

5   Q    Okay.

6   A    Because the query is the same.  You're querying, you're

7   asking is the phone ready, can the phone receive, and we're

8   getting a response.  That querying, that lookup is done in

9   the cellular network, that's the point, it's not done in the

10  messaging server, and then the response is sent to the

11  messaging server.

12  Q    Okay.  So your slide 114 is talking about an MMS being

13  sent to a Sprint subscriber from another Sprint subscriber?

14  A    Yes --

15  Q    Okay.

16  A    -- Sprint to Sprint MMS --

17  Q    Oh, I'm sorry.

18  A    That's fine, the highlighting still stands.  Here we have

19  MMS ICG to Sprint, so we have an inter-carrier gateway.  So

20  you have a multimedia message coming from somebody outside,

21  like from AT&T or Verizon or T-Mobile or a different carrier,

22  texting a multimedia message to a Sprint subscriber.

23  Q    Okay.  So in sum, for MMS did Sprint infringe with

24  respect to the SPS every time a Sprint subscriber received an

25  MMS message for the reasons you just described?

1    A    Yes.

2    Q    And that's from the period of time when Sprint first

3    started to use the SPS?

4    A    Yes.

5    Q    So what -- your slide 116, what are you showing?

6    A    Yes.  So we've completed the first column under SPS and

7    we've shown that when a Sprint subscriber sends or receives

8    an SMS or an MMS there is infringement of Claims 1, 7 and 113

9    by the SPS.

10   Q    Okay.  So you alluded to this before, but we have a

11   column heading that says MLDAP; what is that?

12   A    This is a messaging LDAP. it is a subscriber database

13   like the SPS, it was used by Sprint before they switched to

14   the SPS.  A lot of the attributes and the functionality is

15   going to be very similar, I've confirmed that looking at

16   documents and looking at testimony and looking at the

17   analysis that Dr. Dwoskin has done, and so I'm going to focus

18   more on what's different for the analysis to go speedily

19   today.

20   Q    Okay.  So can you explain to the jury what the -- MLDAP

21   stands for messaging LDAP?

22   A    Yes.

23   Q    So before we talk about what is the messaging LDAP, what

24   is LDAP?

25   A    So LDAP is a protocol, it's a database protocol, so it's

1    an acronym for a protocol, for a database protocol.  And the

2    message LDAP is a database that's used for messaging --

3    Q    Okay.  And --

4    A    -- among other things.

5    Q    -- then what is -- what type of information is stored --

6    was -- is Sprint still using the messaging LDAP?

7    A    No.

8    Q    What type of data was stored in Sprint's messaging LDAP?

9    A    The attributes that we saw in the SPS, they're very

10   similar to the attributes that were in the messaging LDAP.

11   In fact looking at the testimony of Sprint engineers, they

12   took what the MLDAP was doing and they put those attributes

13   in the SPS and the SPS does more.

14   Q    Okay.  And how similar was the SPS and the messaging

15   LDAP?

16   A    They're very similar and there's testimony here.  "For

17   example, prior to the use of Sprint's SPS, Sprint had a

18   system called the messaging LDAP?"  The Sprint engineer Mr.

19   Hoelzle answered, "Yes.

20         "Sprint's SPS is used for user authentication?"  He

21   answered, "Yes.

22         "And was the messaging LDAP also used for

23   authentication?"  He answered, "Yes.

24         "And the messaging LDAP was a system that was used

25   that used and LDAP query" -- again, LDAP is a light

1    directory, the protocol -- "a query to retrieve subscriber

2    information?"

3          And he said, "The messaging LDAP was more or less

4    equivalent to the SPS in terms of function."

5          So again, the analysis that we have for the SPS and

6    what we've walked through with the jury carries over for the

7    messaging LDAP and I will highlight what's different in the

8    next couple slides.

9    Q   Okay.  So was the messaging LDAP, when it was used in

10   Sprint's cellular network, was the messaging LDAP a core

11   network element of the cellular network?

12   A   Yes.

13   Q   And why is that?

14   A   Because it contained information that allowed -- just

15   like the SPS, it contained information that was core in terms

16   of for you to be able to connect to the Internet, to have the

17   ability of the phones to communicate with the Internet in the

18   packet switching modes, the messaging LDAP contains

19   subscriber information that would allow you to see if the

20   subscriber can connect or not.  So there was authentication,

21   there was attributes that were used that was essential in

22   terms of to be able to do the switching, the ability to

23   connect the phone to the outside networks.

24   Q   Okay.  So we're looking at your slide 118 and I see that

25   we're still on page 6 of PX-99, but it no longer says SPS on

1   it.  Did you change the document?

2   A    Yes.  So the only difference here is instead of SPS it

3   says messaging LDAP.  The call flow is going to be the same

4   and the analysis is going to be the same, the only difference

5   I'm going to highlight on the next slide in terms of the name

6   of the mapping.

7   Q    Okay.  So is this slide 120 that you're referring?

8   A    Yes, so slide 120.  So the inquiry, which is step one, is

9   going to be the same.  The only difference is going to be the

10  mapping.

11  Q    Oh.

12  A    So if we go to the next -- to the mapping step.  In the

13  mapping step the external identifier is going to be the same,

14  it's still the phone number, which is the MDN, now it's going

15  to be -- the second identifier is what's different.  So the

16  second identifier is called entry ID with information

17  associated with it, that is the second identifier that's

18  internal to the cellular network.

19       Again I have relied on Dr. Dwoskin, who's going to

20  walk with the jury his analysis.  I looked at what he told me

21  and the work that he did and the report that he generated,

22  that the entry ID identifies, is an internal identifier and

23  it identifies the phone.  I compared that with the Court's

24  claim construction and it meets the Court's claim

25  construction that the -- it's an identifier, it's used inside

 1   the cellular network to identify a specific wireless

 2   terminal, which may, but need not be revealed outside the

 3   cellular.  So it meets the Court's claim construction based

 4   on what the entry ID does.

 5   Q   So from your analysis of the messaging LDAP, did Sprint

 6   infringe when a Sprint subscriber sent a message in

 7   conjunction with the messaging LDAP?

 8   A   Yes.

 9   Q   Okay.  And that's what you just walked through, you're

10   going to walk through on the receiving side now?

11   A   Yes.  So on the receiving side you also have

12   infringement.  Instead of MO, you have MT.  So instead of

13   mobile originating, you have the mobile terminating.  So

14   again the identifier is still the phone number, it's a

15   different phone number, it's the phone number of the

16   receiving.  So it's this phone number that's going to be in

17   the MT-DAP, but the analysis is going to be the same.  So

18   there's going to be a mapping of that phone number, if we

19   look at the next slide, to the entry ID.  The entry ID is the

20   internal identifier, it maps -- meets the Court's claim

21   construction, and then there's going to be the determining.

22        You're going to have attributes.  The attributes are

23   going to be the same.  The ones we talked about with the SPS,

24   the same attributes, more similar attributes are going to go

25   back and be in the response message.  So that's the only

1    difference with the MLDAP compared to the SPS.

2    Q    Dr. Akl, I just noticed on the slide on your slide 125

3    where we have the Claim 7 language above it --

4    A    Yes.

5    Q    -- just so there's no confusion, in the MDN box where --

6    in the big box called "Messaging LDAP, MLDAP," under that it

7    says MDN and that actually has the sending phone number,

8    right, in terms of your example?

9    A    Yes.  So this number here, the 215, it's actually the

10   sending, for this step it's going to be the receiving.  But

11   for Claim 7 you need to be doing the determining by that

12   network element.  So the SPS was meeting the language of

13   Claim 7 and the MLDAP will also meet the language of Claim 7

14   for the determining, yes.

15   Q    Okay.  Claim 113?

16   A    Claim 113 again is very similar.  The difference between

17   Claim 113 and Claim 1 is you need to have the mapping not

18   performed by the home location register.  The MLDAP is not a

19   home location register; it is a subscriber database, it is a

20   core network element.  It does not contain location

21   information of the phones like the home location register.

22   So it does meet the language of Claim 112 and so there is

23   infringement for Claim 113 for the reasons that we've walked

24   through.

25   Q    Okay.  And in terms of the messaging LDAP, so far what

1  the jury has seen is a call flow where it says Sprint

2  subscriber sending to another Sprint subscriber?

3  A   Yes.

4  Q   Okay.  So on the next slide you're referring to a Sprint

5  subscriber sending to another network's subscriber with

6  respect to the messaging LDAP?

7  A   Yes.  So we're going to walk through the scenarios, we're

8  going to be walking through them quickly, but it's the same

9  scenarios:  Sprint to Sprint, Sprint to non-Sprint, so this

10 is what you see here; we have an SMS message, Sprint to

11 inter-carrier gateway.  So this is a Sprint user sending a

12 text message to a user not on the Sprint network, the same

13 steps, the MLDAP and the subscriber found infringed.

14 Q   Okay.  So let me see, do we have one more?  We have one

15 more for the messaging LDAP.  So this is now when a Sprint

16 subscriber receives an SMS message from another network?

17 A   Yes.  So for the Sprint subscriber receiving SMS, so we

18 have an SMS coming from somebody out -- like on AT&T or

19 Verizon or T-Mobile and they're texting a Sprint customer, we

20 have the same two, MT-DAP and subscriber found infringing

21 steps the way that we talked about it before, they don't

22 change regardless whether it's Sprint to Sprint or non-Sprint

23 to Sprint.

24 Q   Okay.  And what are you showing on your next slide, Slide

25 129?

1   A    So Slide 129 is showing, this is a document that was

2   produced by Sprint and they talk about the open wave LDAP,

3   the MLDAP, the messaging LDAP.  They had two different

4   versions, one was from 2003 with Version 5, there was a

5   Version 6.2.1 in 2008.  It was used until 2011, November

6   30th, 2011, and it was located in Lenexa, Kansas.

7   Q    Okay.  So, sir, let's go to this next slide.  This is

8   your summary slide for the messaging LDAP and infringement?

9   A    Yes.

10  Q    Okay.  So since the messaging LDAP has been in use, at

11  least for the relevant time period for this case back to

12  February of 2006, for the period of time that the messaging

13  LDAP was used did Sprint infringe every time a Sprint

14  subscriber sent or received an SMS message?

15  A    Yes.

16  Q    Okay.  Turning to the HLR, what are we going to talk

17  about next, Dr. Akl?

18  A    Okay.  So the HLR is the third database.  The good news,

19  depending on how you look at it, is the first row is going to

20  be none, because the HLR contains location information about

21  the phone, you don't need to know the location of the phone

22  that is sending an SMS or an MMS.  So when a Sprint

23  subscriber sends an SMS or MMS there is no lookup in the HLR.

24  So this is no, we don't have infringement there.

25          We only have to look at when a Sprint subscriber

1    receives an SMS or an MMS, there is an inquiry.  The network

2    needs to know if the phone is on, if the phone is ready to

3    receive, the location of the phone, that information is going

4    to come from the home location register.  So we're going to

5    walk through the steps only for receiving and show

6    infringement.

7    Q    Okay.  So we're still looking at PX-99 at page 6?

8    A    Yes.

9    Q    Okay.

10   A    So now there are the title or the label in the call flow

11   from the SMSC, this is our messaging server, to the home

12   location register.  This is again a Sprint document.  It's

13   going to be called SMS-REQ and that's the inquiry that's

14   going to go from the messaging server to the home location

15   register.

16         And so it meets the first step, the inquiry, it's

17   going to contain a first identifier.  There is testimony,

18   I've looked at the documents and I've looked at the testimony

19   of the Sprint engineer.  He was asked, "What is an SMS

20   request?"  He said, "It's an MMS request-invoked message.

21         "What was the purpose of a SMS request-invoked

22   message?"  His response was, "The purpose is for the SMSC is

23   to get information from the HLR.

24         "And what information from the HLR is the SMSC

25   getting in response to the SMS request?"

Akl - Direct                                      74

1          And he goes, "The SMSC is looking for the point code

2    of the MSC."  And that's something we haven't talked about in

3    detail.

4          The MSC, if you recall, is the mobile switching

5    center.  So those are the core network elements that do the

6    switching, the connection.  So in order to know the location

7    of the phone, that's -- so the MSC knows where the phone is.

8    So when it says point code, that's -- the point code of the

9    MSC is the location of the phone, which MSC is serving the

10   phone.  So this statement means you're getting phone

11   location.

12   Q   And is the phone number included in that SMS request

13   message?

14   A   Yes, the phone number is included; there's also a

15   transaction ID that's included.

16   Q   So what are we seeing, is that PX-525 on your Slide 137?

17   A   Yes.

18   Q   What is this showing?

19   A   So PX-525 is called a trace and what it traces, it's a

20   very detailed dump of all the information that is in the SMS

21   request.  So for example here, this is my annotation, I'm

22   giving you like a highlight that it includes the transaction

23   ID, it's saying where is the phone and a phone number.  When

24   you look at the actual interaction it's a very detailed

25   message, but I've highlighted three elements of that message.

Akl - Direct                                    75

1   So this is an actual trace.  This trace PX-525 was done by a

2   Sprint engineer and provided in this matter and it includes

3   the transaction ID, so this is the transaction ID; it

4   includes the mobile directory number, that's the MDN, the

5   phone number; and it includes the actual phone number.

6          Now, again this is -- the 913 is the phone number in

7   that scenario, it's different than the one in my example, but

8   this is showing that the phone number and the transaction ID

9   are included in the SMS request message, looking at the

10  actual trace that's generated by the engineer.

11  Q   Okay.  So we're on to the mapping step, sir?

12  A   Yes.  So for the mapping step we need to go and see what

13  the HLR is doing.  So we have an MDN, we have a phone number

14  that is coming in, and looking at what the HLR is doing, we

15  need to have a mapping of the MDN to an internal identifier.

16  And for the case of the HLR, the internal identifier is going

17  to be an MSID.  This is another acronym we haven't seen

18  before.

19  Q   A lot of acronyms.

20  A   Yes.  So I'm going to have a document that explains --

21  Q   Oh.

22  A   -- yes.  So there is --

23  Q   What exhibit are we looking at on your Slide 140?

24  A   We are looking at PX-56, these are pages 118 and 119

25  describing the MSID.  So the MSID is defined as a ten-digit

1    MIN, M-I-N, and it's used by the MS, that's the phone, to

2    identify itself to the network.  And the document describes

3    how the MSID and the MDN separation, the MIN and the MDN are

4    two distinct numbers, cannot be used interchangeably.  So the

5    MSID is another number, it is an internal identifier, it

6    uniquely identifies the phone, and it meets the Court's

7    construction for an internal identifier.

8    Q    Dr. Akl, when you were just looking at PX-56 on the

9    slide, you read that there's -- it said "before MSID-MDN

10   separation," do you see that on the screen?  Can you circle

11   that if you see it?  It's in the very -- yeah -- oh, no --

12   well, okay, that will work.  So what does that mean, MSID-MDN

13   separation?

14   A    So if you recall earlier I was talking about number

15   portability and how the FCC wants carriers to separate and be

16   able to have a user if they're changing for example from AT&T

17   to Verizon being able to take their phone with them, or they

18   can have different phones at different points in time.  And

19   so you want to separate the phone number from the identifier

20   of the phone, the number that identifies the phone, so this

21   way you can take your phone number with you.  So this was a

22   requirement in 2003 that Sprint and the other carriers had to

23   do, so you have -- you're not locked in with a specific

24   carrier, you can go, you can keep your phone number.

25              And the ability to do that is inherently in the HLR,

1   having a separation between the phone number and the MSID

2   helps with the number portability.

3   Q   And how would that separation relate to mapping in an HLR

4   since 2003?

5   A   So since 2003 you're no longer using the phone number to

6   look up information.  You're mapping that phone number to a

7   different identifier, an internal identifier that's

8   associated with the phone, which is the MSID, and then the

9   MSID is used to determine information about a phone.

10  Q   So has that mapping from MDN to the MSID, has that

11  happened in Sprint's network with respect to Sprint's HLR

12  since February of 2006?

13  A   Yes.  Sprint has three different HLRs in different

14  periods of time.  They have what they call S-HLR, a

15  standalone HLR; they have an SD-HLR, a super-distributed HLR;

16  and an SDM-HLR, a subscriber data management HLR.  They all

17  work basically the same.  There is this mapping from the MDN

18  to the MSID in all three of them.

19         So as far as the analysis in terms of the mapping

20  and the determining, all three HLRs do the same thing.

21  Q   Okay.

22  A   And that was also confirmed looking at Document 10,

23  talking to Sprint engineers.

24  Q   Okay.  Now you're going to walk through one example of

25  the mapping in one of the HLRs that you mentioned?

1    A    Yes.

2    Q    But before we do that, we should first talk about whether

3    the MSID meets the Court's construction of an internal

4    identifier of the cellular network.

5    A    Yes.  So the MSID is an internal identifier, it

6    identifies a specific wireless terminal and it meets the

7    construction that's provided by the Court, an identifier used

8    inside the cellular network to identify a specific wireless

9    terminal which may, but need not be revealed outside the

10   cellular network.

11   Q    Okay.  So are we now going to talk about the mapping in

12   one of the S -- excuse me, in one of Sprint's HLRs?

13   A    Yes.  Now, remember with the SPS and the MLDAP I was

14   relying on Dr. Dwoskin, so I didn't have to go through a lot

15   of details, he's going to go through that.  With the HLR, I'm

16   going through the details myself.  This is why we're spending

17   a little bit more time on the HLR than we did on the other

18   two.

19   Q    So, Dr. Akl, what exhibit are you looking at on your

20   Slide 142?

21   A    So this is PX-172 and I'm on page 79.  And there are a

22   lot of diagrams and a lot of -- this is a flow chart, I'm

23   going to just focus on the information that's relevant what

24   we look at today.

25         So step 2 in the claim requires the mapping and I

1   said the mapping is from the MDN to the MSID.  And you see

2   there is the directory number, that's the phone number is

3   going to come in and then it's going to be used by the ICH

4   service profile.  And the ICH service profile is going to

5   then be used to get the MSID and that's what the testimony --

6   Q    Should I -- let me go back, because -- sorry about that.

7   A    No, that's fine.

8   Q    We're back on Slide 142 with some deposition testimony.

9   Who is the deponent?

10  A    So, here the person that's deposed is Mr. Moss.

11  Q    Okay.

12  A    Again, he's in charge of the HLRs and so, he was asked

13  when an SMS request is sent to the HLR, first it queries the

14  directory number table.  This is the directory number table

15  right here and he answers, yes, that's correct.  And then

16  does that based on the MDM, right?  And the query and his

17  response to the query, on the SMS request, it's coming in at

18  the MDN, so the MDN is the phone number that we looked at.

19  He was asked, then it finds the MDN and then translates that

20  to the IC Service Profile ID.  So, we have an IC Service

21  Profile ID and he goes, any by translates, so it locates the

22  entry in the directory number table.  It looks at the ICH --

23  that's is here -- the ICH profile, service profile for that

24  subscriber.  So, this is the first part of the process.

25  Q    Okay.

1    A    The second part is now, we have the ICH Service Profile

2    ID and then that's going to be used in an NCB profile.  So,

3    the question to Mr. Moss, again was, the ICH profile service

4    ID is then used to query the NCB profile table and he says

5    yes.  And then the NCB profile table masks the ICH profile ID

6    from here to the MIN, which is the MS ID, which is what we

7    saw in the previous document.  The MIN is used to query the

8    ANSI phone.  This is the next step.  So, now up to here, we

9    have the MS ID, which is what we need.  So, we've mapped the

10   phone number to an MS ID, which is the internal identifier.

11   Q    So, all those steps that you just walked through on those

12   two slides, all that culminates in your conclusion that the

13   HLR maps?

14   A    Yes, but I need to go through all the details, it's

15   Comcast's burden to show infringement, so that's why we're

16   here.  So, this is the second limitation of the claim.  The

17   third limitation in claim, you need to be doing, determine

18   said information related to the terminal with the aid of the

19   second identifier.  So, the second identifier is the MSID.

20   Now, with the MSID, we're going to get MSCID, the MSCID is

21   basically the location of the phone.  That's the point

22   though, that's the information that we're determining.

23   Q    How is that, how is an ID of a mobile switching center a

24   location on the phone?

25   A    So, with regard to the cellular network, the cellular

1    network doesn't need to know exactly where the phone is

2    located in terms of like on the map.  It needs to know which

3    mobile switching center is servicing the phone, so it can

4    page the phone, so it can deliver it.  So, it needs to know

5    which mobile switching center sent the one that's servicing

6    the phone.  That's the location in cellular technology with

7    respect to identifying where the phone is.  Not exactly where

8    they are, but enough so the network, the cellular network can

9    deliver to the phone.

10   Q   Okay.

11   A   So, we need to now show the determining step, so this is

12   my diagram of the determining step, but we need to know -- go

13   back to the actual Sprint document to look at the

14   determining.

15   Q   So, Slide 145?

16   A   Yes, so this is the same document and I'm highlighting

17   again, the part of the deposition that relevant.  So, after

18   we're done, where we got the MS ID in the NCB profile, the MS

19   ID, you can kind of see it here, is used in the NC-41 phone

20   table, to determine the location of the phone or to determine

21   the MSC ID, that's the point code.  So, and this is again,

22   PX-172 and looking at the document, looking at the testimony,

23   they're consistent.

24   Q   Okay.  And then what happens with that MSC ID?

25   A   So, now the third step is met, the determining has

Akl - Direct                                        82

1   happened in the HLR.  It has used the internal identifier to

2   determine -- this is the internal identifier -- to determine

3   the MSC ID, this is a three number point code.  Then the

4   fourth step is, it needs to send the response back to the

5   messaging server, which is what happens here.  So, the SMS

6   REQ ACK is the response message going back to the messaging

7   server with the MSC ID and it contains the transaction ID.

8   If you recall, the fourth limitation, you can send a response

9   message and responses that inquiry from the cellular network

10  to said messaging server, external to the cellular network in

11  which response message the information relating to said

12  terminal is indicated with the aid of said first identifier.

13  And we also have claim construction for that last term.

14          The transaction ID is sent back, the messaging

15  server looks at the transaction ID, if you remember the

16  transaction ID was in the inquiry.  It compares them, it can

17  correlate them.  It now knows that this response is for the

18  specific phone that I was asking and we are done with this

19  limitation.

20  Q   So, I have one or two follow-ups.

21  A   Oh, okay, that's fine.

22  Q   So, this SMS REQ acknowlegent message, unlike the

23  message, returned messages we've seen before, this one does

24  not contain the first identifier, the phone number, correct?

25  A   It doesn't contain the phone number, correct.  It

1   contains the transaction ID, which is used to correlate, but

2   that's consistent with the Court's construction.  The Court's

3   construction says, "with the aid of said first identifier,

4   means with the aid of the first identifier.  Where the first

5   identifier may, but need not be included in the response

6   message."  So, in this case, the phone number isn't included,

7   but the transaction ID is and so, using the transaction ID,

8   the messaging server can correlate that with the transaction

9   ID and the message that it sent and the phone number.  When

10  we looked at the trace, we had a trace of the SMS REQ, so it

11  meets the Court's construction.

12  Q    The transaction ID that's in this SMS REQ ACI message, is

13  that the same transaction ID that was sent in the SMS request

14  message that went from the messaging server to the HLR?

15  A    Yes.

16  Q    And because they're the same, that's how the correlation

17  can take place?

18  A    Yes.

19  Q    Okay, so Dr. Akl, what happens if the phone is not turned

20  on or the phone is not in the range of the cell network

21  towers?

22  A    So, when the phone is on and it's turned on, we get the

23  MSC ID, that's the location.  If the phone is not registered

24  or it's not turned on or it cannot be located, then what is

25  sent back is a flag, so you have a flag that's a response

1    back that says, do not send the message.  You have to wait,

2    the phone is not ready.  So, in both cases, there is in

3    information that's sent back.  So, either the location of the

4    phone is sent back or a flag is sent back.  But in both

5    cases, it is an infringing step, because it is information

6    relating to the phone.

7    Q    Dr. Akl, earlier today, it feels like maybe it was last

8    week, but it was just today, you talked about the notion

9    that, you know, back in 1999, cellphone reception wasn't as

10   good as it is today?

11   A    Yes.

12   Q    Right and then therefore, you would think that these

13   message -- these can't find the phone type of messages would

14   be sent back in 1999, is that correct?

15   A    Yes.

16   Q    So, today, is there the same problem where the phone

17   can't be found, not every, you know, we have better cellphone

18   reception?

19   A    Yeah, we have better cellphone reception, but this is

20   still an issue.  Because you can think of a lot of scenarios

21   where you may not be available.  For example, you go into a

22   big building, you may not have reception inside the building.

23   You go in an elevator, you get on a plane, you have to turn

24   your phone off and then you land and then you get all these

25   text messages suddenly, those are all examples where this is

1    still the case.  Where the HLR is queried and it will say, I

2    don't know where the phone is and then suddenly, you know,

3    the -- you land, you're available, the phone communicates

4    with the network.  All the signaling is happening and then

5    the HLR sends that, yes, the phone is now available.  So, it

6    is just as applicable today, because there are still lots of

7    scenarios where you kind of go off the grid for a little bit.

8    Q    Okay, so have you just walked through all of Claim 1 with

9    respect to the HLR and a Sprint subscriber receiving a

10   message from another Sprint subscriber?

11   A    Yes.

12   Q    Okay and is it your opinion and your conclusion that

13   Sprint infringes with respect to that modality?

14   A    Yes.

15   Q    Okay.  So, are you going to now talk about Claim 7, which

16   I have up on Slide 150?

17   A    Yes, so we've looked at Claim 7 before and Claim 7 says,

18   again, that's a dependent claim from Claim 1 and then wherein

19   said inquiry is sent to a specific network element of the

20   cellular network and that said network element determines the

21   information relating to the terminal.  So, what's doing the

22   determination is the HLR.  We just walked through that.  So,

23   for the same reasons that the HLR, it does the mapping and

24   then it does the determination, it meets the language of

25   Claim 7.

1  Q   Okay, so let's talk about when a Sprint subscriber

2  receives an SMS message from a non-Sprint subscriber, that's

3  what you're showing on your Slide 151?

4  A   Yes.  So, we have a SMS ICG to Sprint, so we have an

5  inter-carrier gateway to the messages coming from a different

6  carrier to a Sprint subscriber.  There is still an inquiry

7  going from the SMSC to the HLR and the evident knowledge spin

8  back, so there is still infringement.

9  Q   And does the process work exactly the same way that you

10  just described?

11  A   Yes.

12  Q   Okay, how about MMS, does Sprint infringe with respect to

13  the HLR and MMS?

14  A   Yes.

15  Q   What are you showing on your Slide 152?

16  A   So, when you have -- when a Sprint subscriber receives an

17  MMS and this MMS Sprint to Sprint, the way the process works

18  is the MMSC is going to message the SMSC and you're going to

19  have a request.  The SMSC is going to talk to the HLR, it's

20  going to get that information just like we saw and then it's

21  going to send the request.  The HLR is going to look up the

22  location of the phone.  It's going to tell the SMSC, the

23  phone is ready or it's going to tell the SMSC, I don't have

24  the location of the phone.  And then the SMSC is going to

25  send a response back to the MMSC, so there is still the same

Akl - Direct                                    87

1    infringing steps and communication when an MMS message from

2    Sprint to Sprint is received.

3    Q    So, Dr. Akl, we're talking about when a Sprint subscriber

4    receives an MMS message?

5    A    Yes.

6    Q    But you're referencing infringement with respect to SMS?

7    A    Yes.

8    Q    So, there's an -- when a Sprint subscriber receives an

9    MMS message, are they also receiving an SMS message?

10   A    Yes, the way that happens, when you send a multi-media

11   message, the MMSC, the messaging server for the multi-media

12   is going to need the help of the SMSC.  And what the SMSC,

13   this is the text messaging server.  The SMSC is going to do

14   the look-up and it's actually going to send the phone

15   notification that an MMS is waiting.  And then the phone is

16   going to go and pull the multi-media message from the

17   network.  So, you still have infringement, but you -- when

18   you're receiving a multi-message, but the multi-message, it

19   needs the messaging server, the texting messaging server to

20   send a notification for the phone and then the phone is going

21   to go and pull the MMS.  So, the infringing steps are still

22   the same, because the SMSC, the texting messaging server, it

23   still needs to query the HLR, know the location of the phone

24   and then get that information and when the phone's ready,

25   it's going to tell the phone you have an MMS, go pull it.

Akl - Direct                                          88

1    And that all happens and then the MMS is delivered.

2    Q    Okay and on your Slide 153, does the same happen when a

3    Sprint subscriber receives an MMS message from a non-Sprint

4    subscriber?

5    A    Yes, so the steps are the same.  This is a non-Sprint

6    subscriber sending a message to a Sprint subscriber and it's

7    the same process as with regard to the MMSC, the multi-media

8    messaging server is going to talk to the text messaging

9    server, the SMSC is going to query the HLR, it's going to get

10   a response and then it's going to tell the phone, you have an

11   MMS and go get it.

12   Q    Okay, so let's talk about the time periods when Sprint's

13   SMSCs were used in Sprint's network.  What are you showing on

14   Slide 154?

15   A    So, with regard to Slide 154, I'm showing there is a

16   converse SMSC and this looks like it's 1998.  So, this is

17   really old.  But it's mobile terminated only, so in '98,

18   Sprint subscribers could actually -- they did not have

19   two-way capability of texting.  But you could -- they had --

20   Sprint had an add-on service where you can send like your

21   horoscope.  So, you had premium content that can only be

22   delivered to the phone.  The phone cannot initiate the text.

23   But you can have premium content delivered to the phone.

24   This was done in '98.  It's not until 2004 that you have

25   two-way texting.  And the Ecision (ph) SMSC started in 2008

1   through the present.

2   Q   Okay, so the converse SMSC was in a start date of 1998,

3   but it was only for mobile terminated SMS?

4   A   Yes.

5   Q   So, could a Sprint subscriber in 1998 receive a text

6   message from another Sprint subscriber?

7   A   No.

8   Q   Could a Sprint subscriber in 1998 receive a text message

9   from a non-Sprint subscriber?

10  A   No.

11  Q   Okay.

12  A   It was just that premium content, like horoscope and

13  stuff, that you can sign up for and you would get those on

14  your phone.

15  Q   So, they're kind of like messages that come down from the

16  network as opposed to coming from other subscribers?

17  A   Yes.

18         MR. FINKELSON:  Objection, your Honor.

19         THE COURT:  Sustained.  It's leading, do you want to

20  ask it again?

21  BY MR. GOETTLE:

22  Q   How would a -- where would an SMS message come from if a

23  Sprint subscriber was to receive one back 1998?

24  A   So, it's the -- there were premium content servers that

25  would like, for example, generate your horoscope or you sign

1   up for snippets of news.  That premium content you sign up

2   for that service and you get those messages on your phone.

3   It was receive only.

4   Q   And did there come a time in Sprint's network where it

5   did offer the ability for subscribers to sent and receive SMS

6   messages?

7   A   Yes, this started in 2004.

8   Q   Turning to your Slide --

9            THE COURT:  Mr. Goettle?

10            MR. GOETTLE:  I'm sorry.

11            THE COURT:  Well, two minutes.

12            MR. GOETTLE:  I didn't hear you, your Honor, I'm

13   sorry.

14            THE COURT:  I thought you were going to turn to a

15   new issue.

16            MR. GOETTLE:  Yes, if this is a breaking point, I

17   really tried to get done and we have a little bit more to go.

18            THE COURT:  Well, for the reasons that I explained

19   yesterday, we're going to recess early.  We're going to try

20   to avoid this early recess, but not today and not tomorrow.

21   We're going to try next week to rearrange travel plans, so

22   that we can stay until about quarter of 5:00.  But for

23   tonight, we're recessing at about 4:20, which is like two

24   minutes from now.

25            We'll do the same thing tomorrow.  To give you some

91

1    idea of your schedules.  We'll start tomorrow morning at

2    9:30.  The schedule will be the same, mid-morning break,

3    lunch break.  Same on Monday, we'll start at 9:30.  I'll tell

4    you about recess time on Monday after I hear from our

5    traveler with the problem.

6          I'm going to give you my usual day-end instructions.

7    It's been awhile since I made this to you.  You've heard a

8    little bit more about the case and this will increase, you'll

9    learn more and more about the case as we go.  And there's be

10   a temptation to talk to others at home about the case. We're

11   not going to do that.  You're instructed not to do that, I've

12   explained why.  I haven't seen any reporters in the

13   courtroom, but everything we do here is recorded and they can

14   pick up a tape and report on it.  So, if there is a report on

15   radio or television, do not listen to anything that is

16   broadcast.  Do not view anything broadcast on television and

17   if a reporter happens to write anything in a newspaper, do

18   not read it.

19         The reason?  You've got to decide the case based

20   solely on the evidence presented in the courtroom and my

21   instructions on the law and not what any reporter, in any

22   newspaper, radio station or television station, might say

23   about the case.

24         Have a safe trip home. Be sure you leave your juror

25   notebooks and binders in the jury room.  I'll see you

1    tomorrow morning at 9:30.  Let's try to get here on time

2    tomorrow morning.

3             THE DEPUTY CLERK:  All rise.

4             (Jury exits.)

5             THE COURT:  Be seated, everyone.  You may step down,

6    Doctor.

7             THE WITNESS:  Thank you, your Honor.

8             THE COURT:  Is there anything else we have to

9    address?

10            MR. FINKELSON:  Not for Sprint, your Honor.

11            MR. GOETTLE:  Not for Comcast, your Honor.

12            THE COURT:  Good, good.  We're in recess until

13   tomorrow.  Are there hard copies of the slide?

14            MR. GOETTLE:  Yes.  May I approach, your Honor?

15            THE COURT:  Yes.  Now, how is this marked?

16            MR. GOETTLE:  Oh, you know what, your Honor, after

17   you talked about having the jury take it back, I realized I

18   need to have them marked.  What I'll do is I'll put

19   Plaintiff's Demonstrative-2 on it, I think.  Even though

20   we're not sending it back, my opening slides were labeled

21   Plaintiff's Demonstrative-1, so we'll do Plaintiff's

22   Demonstrative-2 and then if you flip to the next page, every

23   page is number with PD-2. - the page number.

24            THE COURT:  And what does that --

25            MR. GOETTLE:  PD, Plaintiff's Demonstrative-2. - the

1    page number, so you'll see that those -- what comes after the

2    dot increases on every page.

3            THE COURT:  Yes.

4            MR. HANGLEY:  Your Honor, may I confer with Mr.

5    Goettle on one other thing?

6            THE COURT:  Yes.  Anything else?

7            MR. HANGLEY:  Thank you, sir.

8            THE COURT:  What happens if the jury asks for this

9    exhibit?  Have we -- I think we've addressed that issue.

10           MR. FINKELSON:  Well, I think, yeah, I think we

11   talked about it, your Honor.

12           MR. GOETTLE:  When you say this exhibit, do you mean

13   the top of the presentation itself?

14           THE COURT:  Well, I'm talking PD-2.

15           MR. FINKELSON:  So, here's a question I'd like to

16   raise with the Court and we did talk about this earlier and

17   we're happy to follow the Court's guidance.  But the concern

18   that Sprint has is that on many of the pages of this

19   demonstrative, particularly once you get to the section that

20   has been labeled Sprint's Cellular and Messaging Networks.

21   They essentially take portions of an actual Sprint document

22   and then add text or other things to it, on each page in a

23   way that makes it nearly impossible, unless the jury was

24   given a script to know what is in the actual document versus

25   what is in the demonstrative and I'm not sure what the best

1    way to deal with that is, but I do have a concern about it.

2    So, for example, if your Honor looks at page PD-2 -- PD60 --

3    PD-2, sorry, Mr. Goettle's numbering is throw us a loop.  PD-

4    2.63.

5                THE COURT:  All right.

6                MR. FINKELSON:  An even better example, your Honor,

7    is PD-2.69, because that has two documents that appear time

8    and time again.  So, does your Honor have that one?

9                THE COURT:  I'm turning there -- I do.

10                MR. FINKELSON:  So, just so you can understand it,

11   if you're seeing this in hard copy, first of all, these are

12   portions to two separate Sprint documents that have been

13   appended one on top of another.  The box on the top is a

14   portion of document A and the box on the bottom is a portion

15   of document B.  And then the are actual sections of those

16   documents, at least, as to the top one, that are removed from

17   the document.  And by removed, I just mean in fact, no

18   nefarious intent.  Removed and then words, Sprint's Messaging

19   Network is appended in blue.  That's not in the document.

20   That's Dr. Akl's demonstrative.  And similarly, if you look

21   at the document on the bottom, Dr. Akl has taken the stuff

22   that's in black and white, that's in the actual document and

23   he's put a green box around what he's calling the core

24   network elements.  And then he's put in Sprint's cellular

25   network, that's not in the document.  And then he put in this

1    PSTN and internet clouds that are not in the document.

2            So, that's a concern we have in terms of how the

3    jury may be confused if it was handed the physical copies of

4    the demonstratives.

5            THE COURT:  Well, maybe we can come up with an

6    explanation that works.  I don't want and I'm reminded of

7    prior cases, where a situation like this comes up while

8    they're deliberating and we have to spend a good deal of time

9    trying to figure it out.  It's an issue that might come up.

10   We don't have to decide it today.  However I decide it, it

11   will be equally applicable to both sides.  And as I look at

12   that example, PD-2.63 and 69, it seems, at least, on those

13   exhibits, that Dr. Akl's additional or annotations are in

14   color and everything else is in black and white.

15           MR. FINKELSON:  In the top one, your Honor, just so

16   the record's clear, the top one, the coloration, the blue and

17   the red in the lines --

18           THE COURT:  Yes.

19           MR. FINKELSON:  -- those are in the actual document.

20   But the words, Sprint's Messaging Network, are not and then

21   he adds some other colors. But the actual document is in

22   color and all of those lines or many of those lines are in

23   blue.  And then there's other green components that are

24   actually in it that are not there.  So, that's the confusion.

25   It's a color document and it's got that language on top of

1  it.

2        THE COURT:  Well --

3        MR. FINKELSON:  So, we just -- I just wanted to

4  bring it to the Court's attention.  As long as we have some

5  way to address so there's not juror confusion.

6        THE COURT:  Well, I'm going to rely on you to work

7  with Comcast and try to address it.  You've explained the

8  blue and red annotations are in the original document.  There

9  are two other colors that I see, at first glance, green and

10  yellow.  Are they in the --

11        MR. GOETTLE:  The green was added by Dr. Akl and I'm

12  not sure what yellow --

13        THE COURT:  I'm looking at 63.

14        MR. FINKELSON:  Oh, I was looking for yellow, too.

15  The yellow is his highlighting and that's more -- that, in my

16  mind, your Honor, is more, I mean, that's highlighting, so I

17  don't think the jury is going to be confused by culling out a

18  particular diagram.  But the different issue like, for

19  example, on 69 and 64 is another example, where there's just

20  some coloration changes and it's hard to tell where the color

21  in the document starts and Dr. Akl's addition.  Again and to

22  be fair, I thought Dr. Akl was, in his testimony, made an

23  effort to point out to the jury --

24        THE COURT:  Oh, I think he did.

25        MR. FINKELSON:  -- when he was doing that.  I'm not

97

1    suggesting otherwise.  That is going to be distant memory,

2    however, to this jury by the time they see this

3    demonstrative.

4           THE COURT:  Well, let's look at P -- let's get the

5    P-269.  Is everything in blue and red at Sprint?

6           MR. FINKELSON:  So, blue and red is in the actual

7    Sprint document, your Honor, which is PX-99.  But that actual

8    document also has green in it, that Dr. Akl has removed for

9    purposes of the demonstrative.  So, there's actually green

10   lines in that same top box, it's in the actual document, that

11   he's taken out.  And then he's recreated the green below in a

12   separate document.

13          MR. GOETTLE:  We can add words like modified Sprint

14   document or something.  I would leave it to Sprint to propose

15   what would make them comfortable.  I don't think you need,

16   you know, I think we can come up with words.

17          THE COURT:  Well, we ought to decide and we can

18   decide it now and requests for transcripts.  Everyone has

19   ordered daily copy.  By the way, have you received daily

20   copy?

21          MR. HANGLEY:  Yes, we have.

22          THE COURT:  Michael, where is our daily?

23          MR. COSGROVE:  We did not.

24          THE COURT:  The expression on my face should tell it

25   all.  The rule is when anyone gets daily copy and so you will

98

1    quickly get daily.  Thank you.  All right, well, if they ask

2    for transcripts, we ought to be thinking about how you want

3    to handle that.  Normally, in short case, the answer is no.

4    In a longer case, it's just completely discretionary and in a

5    long, technical case, it seems to me there might be more of a

6    reason for providing transcripts.  I'm not going to decide

7    today.  Think about it and I'm sure there are lot of other

8    issues that will come up that I haven't anticipated, but

9    those are juror.

10         All right, on that note, we'll be in recess, 9:30

11   tomorrow morning.  Have a good evening.

12             THE DEPUTY CLERK:  All rise.

13             (Court adjourned 4:30 o'clock p.m.)

14                           _ _ _

```
1                           INDEX

2   WITNESSES                 D      C      RD     RC

3   Dr. Robert Akl, Continued

4     By Mr. Goettle          7

5                              -  -  -
```

CERTIFICATION

     I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET          Date 2/2/17
Laws Transcription Service