```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                            - - -

COMCAST CABLE            : CIVIL NO. 12-859
COMMUNICATIONS, LLC,     :
et al.,                  :
              Plaintiff  :
                         :
                         :
                         :
                         :
                         :
      v.                 :
                         :
                         :
                         :
                         :
                         :
SPRINT COMMUNICATIONS    : Philadelphia, Pennsylvania
COMPANY L.P., et al.,    : February 3, 2017
              Defendant  : 9:46 a.m.


                            - - -

     TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 5
        BEFORE THE HONORABLE JAN E. DUBOIS
           UNITED STATES DISTRICT JUDGE


                            - - -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104
```

2

1   APPEARANCES:              (Continued)

2   For the Defendant:     DAVID E. FINKELSON, ESQUIRE
                           BRIAN C. RIOPELLE, ESQUIRE
3                          McGuire Woods, LLP
                           Gateway Plaza
4                          800 East Canal Street
                           Richmond, VA 23219
5
                           COLLEEN H. SIMPSON, ESQUIRE
6                          Harkins Cunningham, LLP
                           4000 Two Commerce Square
7                          2001 Market Street
                           Philadelphia, PA 19103
8
                                - - -
9
    Audio Operator:        Michael Cosgrove
10
    Transcribed By:        Michael T. Keating
11
                                - - -
12
            Proceedings recorded by electronic sound
13  recording; transcript produced by computer-aided
    transcription service.
14
                                - - -
15

16

17

18

19

20

21

22

23

24

25

1            (The following was heard in open court at

2     9:46 a.m.)

3            THE COURT:  Good morning.

4            ALL:  Good morning, Your Honor.

5            THE COURT:  Be seated, please.

6     Notwithstanding my comments to the jury last night

7     about getting here on time, several didn't so we're

8     starting a little late.  One juror had some comments,

9     juror number 5.  He said I'm over 70; I don't have to

10    serve on the jury.  And, of course, jurors 70 who are

11    called can seek an excuse for the jury service.  He

12    didn't.  I thought I would share that with you.  Is

13    there an issue we have to address?  I think now.  But

14    I'll hear from Comcast.  Mr. Goettle?

15            MR. GOETTLE:  So is the juror going to be

16    sitting on the jury?

17            THE COURT:  He's sitting.

18            MR. GOETTLE:  Oh.

19            THE COURT:  The rule says jurors called for

20    jury duty, prospective jurors, over the age of 70 can

21    be excused, but not after their on a jury.

22            MR. GOETTLE:  Oh, okay.

23            THE COURT:  If he had raised this issue

24    earlier, I would have had to check the jury plan.  I

25    haven't looked at it in a while.  But I think they're

4

1   automatically excused if they request, but they're

2   not disqualified from jury service.

3           MR. GOETTLE:  Okay.  I --

4           THE COURT:  Unless you both feel

5   differently about this.  We'll do it by agreement of

6   the two of you, or he stays.

7           MR. GOETTLE:  Your Honor, is this something

8   we -- I'd like to confer with Mr. Hangley.

9           THE COURT:  Absolutely.

10          MR. GOETTLE:  Can we confer and --

11          THE COURT:  Just wanted to share it with

12  you.  Whenever we have any communication with the

13  jury my rule is I share it immediately, significant

14  or not significant, so you'll know whatever the

15  jurors have said to us.

16          MR. HANGLEY:  Your Honor, has he requested

17  to be relieved?

18          COURTROOM DEPUTY:  Yes and no.

19          MR. HANGLEY:  Okay.  I know what that

20  means.  I've met the man.  This isn't something that

21  we have to decide this minute?

22          THE COURT:  Absolutely doesn't have to be

23  decided.

24          MR. HANGLEY:  Okay.  I'd kind of like to

25  kick it around with my colleagues, but also with you

                        Dr. Akl - Direct                    5

1    folks to see if we can come to -- it's not an easy

2    decision.

3              THE COURT:  Sprint?

4              MR. FINKELSON:  We're happy to discuss it

5    with Comcast, but I suspect -- I suspect we'll -- we

6    would like the juror to continue to serve.

7              THE COURT:  All right.

8              MR. FINKELSON:  But we'll discuss it with

9    them and report back.

10             THE COURT:  All right.  Are you ready to

11   proceed?  Is Dr. Akl here?

12             MR. GOETTLE:  He is, Your Honor.

13             (Jury in, 9:51 a.m.)

14             THE COURT:  Good morning, everyone.  Please

15   be seated.  Mr. Goettle, are you ready to proceed?

16             MR. GOETTLE:  I am, Your Honor.

17             THE COURT:  Well, you may continue your

18   direct examination of Dr. Robert Akl.

19             MR. GOETTLE:  Thank you.

20                   DIRECT EXAMINATION

21   BY MR. GOETTLE:

22   Q   Good morning, Dr. Akl.

23   A   Good morning.

24   Q   Dr. Akl, yesterday, we handed you three binders

25   that I think are sitting on the floor next to you,

1   and kind of as a housekeeping matter, I'd like to

2   turn to those if we can.  Can you pull out -- well,

3   first of all, do you have those bind -- the binders

4   divided up in any way?

5   A   Yes, I have three binders.  The first one is for

6   the SPS and MLDAP, messaging LDAP.

7   Q   Okay.  And what is in -- what are in the binders?

8   A   It contains documents that I have considered and

9   looked at and analyzed, or at least some of the

10  documents, in reaching the conclusions that I have.

11  Q   Are those -- are those all of the documents that

12  you have reviewed in doing your analysis and coming

13  to your conclusions?

14  A   No, they're not.  They're just some of the

15  documents that we're asking to be submitted into

16  evidence I believe.

17  Q   And has the jury seen some of those documents

18  throughout your presentation over the course of

19  yesterday?

20  A   Yes.

21  Q   Okay.  Can you, please, for the record, could you

22  read in the PX numbers that are on each of those

23  documents?

24  A   PX-1, PX-2, PX-44, PX-94, PX-99, PX-114, PX-115,

25  PX-118, PX-120, PX-125, PX-127, PX-174, PX-186,

1   PX-218, PX-353, PX-526, and PX-547.

2   Q    Thank you.

3            MR. GOETTLE:  Your Honor, those -- most of

4   those exhibits are a part of our omnibus motion that

5   the Court had granted.  A few of them are exhibits

6   that are not part of the omnibus motion, but do not

7   stand objected to.  So I admit them into evidence to

8   the extent that they're not already.

9            MR. FINKELSON:  Your Honor, we're just

10  checking our list quickly to make sure that that is

11  correct, and then we'll --

12           MR. GOETTLE:  And note to the Comcast side,

13  we will get that list to the other side before this

14  happens in our other examinations.

15           THE COURT:  Thank you.

16           (Pause in proceedings.)

17           MR. GOETTLE:  Your Honor, I'll switch gears

18  and come back to this so that we don't have to pick

19  up --

20           THE COURT:  Are these exhibits -- I note

21  they have PX numbers.  Are they in your boxes of

22  exhibits?

23           MR. GOETTLE:  Yes, sir.  Yes, sir.

24           THE COURT:  With the same numbers?

25           MR. GOETTLE:  Yes.  This is essentially a

                        Dr. Akl - Direct                    8

1   subset of what was in the boxes that are --

2            THE COURT:  Fine.

3            MR. GOETTLE:  -- are not objected to.

4            THE COURT:  Fine.

5            (Pause in proceedings.)

6            MR. FINKELSON:  Your Honor, we have no

7   objection to any of the ones enumerated with the

8   potential exception of 97, and we'll check on that

9   one while Mr. Goettle is conducting his examination.

10            THE COURT:  97?

11            MR. GOETTLE:  I don't think he said --

12            MR. FINKELSON:  He didn't say 97?

13            MR. GOETTLE:  Do you have 4?

14            THE COURT:  97 is not among those

15   identified.

16            MR. FINKELSON:  That's why we're objecting

17   to it, Your Honor.

18            THE WITNESS:  94 to 99.

19            MR. GOETTLE:  94 and 99.

20            THE WITNESS:  Yes.

21            MR. GOETTLE:  Not to.

22            THE WITNESS:  I'm assuming so.

23            MR. GOETTLE:  Yes.  Okay. I'll --

24            THE COURT:  Well, why don't --

25            MR. GOETTLE:  I'm going to --

1          THE COURT:  -- we do this?  We'll move --

2    we'll --

3          MR. FINKELSON:  No objection.

4          THE COURT:  All right.

5          MR. FINKELSON:  And I apologize for the

6    delay, Your Honor.

7          THE COURT:  Well, and there's no reason

8    why, Mr. Goettle and -- well, both sides, if we're

9    going to do this again, let's exchange those lists --

10         MR. GOETTLE:  Yeah.

11         THE COURT:  -- before you present them to

12   the --

13         MR. GOETTLE:  I will do that, Your Honor.

14         THE COURT:  -- to the witness.

15         MR. GOETTLE:  I thought I had, but I will

16   do that.

17         THE COURT:  All right.  Well, those

18   exhibits, I'm not going to repeat them all, but all

19   of those exhibits are received into evidence.

20         (Plaintiff's Exhibits 1, 2, 44, 94, 99,

21   114, 115, 118, 120, 125, 127, 174, and 186,

22   documents, are received into evidence.)

23   BY MR. GOETTLE:

24   Q    Okay.  Doctor, we'll come -- Dr. Akl, we'll come

25   back to the other binder later after we clear --

1   reach the skids.  So let's go to -- back to your

2   presentation.  We were on slide 154 out of just

3   slide -- out of a total set of slides up to 161, so

4   we're very close.  So what are you showing on slide

5   154?

6   A   I'm showing there is an Acision SMSC -- Acision

7   is a vender -- Comverse SMSC -- again, Comverse is

8   another company that makes SMSCs.  And there are

9   dates, start dates and end dates and locations

10  associated with these messaging servers.

11  Q   You know what, that actually reminds me.  For all

12  of the components on all of the elements that you

13  have talked about over the -- over the course of your

14  testimony for the SMSCs, MMSCs, HLRs, and all the

15  various other ones, are they all in the United

16  States?

17  A   Yes.

18  Q   Okay.  And is -- has the Acision SMSC been used

19  in Sprint's network in conjunction with sending and

20  receiving SMS messages since 2008?

21  A   Yes.

22  Q   Okay.  And is the Acision SMSC, in your opinion,

23  a messaging server?

24  A   Yes, it is a messaging server.

25  Q   Okay.  And now let's go down to the Comverse

1  SMSC.  What is the difference between the Comverse

2  SMSC and the Acision SMSC?

3  A   So the Comverse SMSC was originally deployed in

4  '98, and I briefly touched upon it yesterday, when in

5  '98, it was mobile terminated only, which means at

6  the time in 1998, Sprint was not doing two-way text

7  messaging, but you had premium content like

8  horoscopes, for example, that can be delivered to the

9  phones.  So that was in '98 using mobile terminated

10  Comverse SMSCs.

11  Q   So in 1998, could a Sprint subscriber send a text

12  message to another Sprint subscriber?

13  A   No.

14  Q   And in 1998, could a Sprint subscriber receive a

15  text message from another Sprint subscriber?

16  A   No.

17  Q   How about from or two another sub -- a subscriber

18  on another network?

19  A   No.

20  Q   Okay.  When was that functionality added?

21  A   2004.

22         MR. GOETTLE:  Can we go to the next slide?

23  Oh, I have the clicker.  I forgot.

24  BY MR. GOETTLE:

25  Q   Okay.  So what are you showing on slide 155?

Dr. Akl - Direct                              12

1    A    So this is PX-386, and in the first quarter of

2    2004, Sprint launched two-way text messaging to all

3    their handsets.

4    Q    Okay.  And that -- you were -- you were looking

5    at PX-386?

6    A    Yes.

7    Q    Okay.  Dr. Akl, yesterday, you mentioned other

8    components that at times -- periodic times in

9    Sprint's network formed part of Sprint's messaging

10   servers, and I'd like to talk about that in just a

11   little more detail for a minute.  What was one --

12   what was one of those components?

13   A    So the messaging servers would sometimes -- or in

14   certain periods of time would query directly, or they

15   can query through a component.  And an example is the

16   SMS router or the PDR.  So if -- maybe if we can go

17   back to the previous slide, it may help --

18   Q    Okay.

19   A    -- because we have -- so for the Comverse SMSC,

20   the mobile terminated SMSC -- and at different points

21   in time, you know, after 2004, there was mobile

22   originated, so we had two-way text messaging.  But

23   with regard to the Comverse SMSC, the mobile

24   terminated, for example, after 2004, when there was

25   two-way text messaging the querying can be done

Dr. Akl - Direct                         13

1  directly, or in some cases the messaging server

2  queried through a PDR, which is a pre-destination

3  router.  Another name for it in some of the documents

4  is SMS router.

5          I was going to say for the mobile

6  originated Comverse SMSCs it did not, so now we're

7  kind of breaking down to the details of the different

8  components in -- so the PDR, or the SMS router is a

9  component in Sprint's messaging network that the

10  messaging server would query through.  We talked

11  about how the messaging server has the two

12  functionalities of storing a message and forwarding

13  the message -- that's the first functionality -- and

14  being able to query the cellular network.  So the

15  query sometimes went through this component, the PDR

16  or the SMS router, to the messaging LDAP, and the

17  messaging LDAP was one of the subscriber databases

18  that we described yesterday.

19  Q    Okay.  Are -- were there any other components in

20  Sprint's network that worked similar -- in a similar

21  fashion to the PDR over the course of time --

22  A    Yes.

23  Q    -- from 2004 --

24  A    So the Acision SMSC also used for a short period

25  of time a PDR, and then it used an SLP, and an SLP is

Dr. Akl - Direct                    14

1   a service logic processor.  So, again, it is another

2   component in Sprint's messaging network that was used

3   to query through, for example, the SPS, which was the

4   subscriber database that we have described.

5   Q   Were there any others?

6   A   There was one called OMG, which is the open

7   messaging gateway, and it was used only for prepaid

8   service in some periods of time.

9   Q   Okay.  Now let's switch gears.  I know we have

10  the SMSC slide up, but let's -- while were on this

11  subject let's talk -- let's talk about the MMSC.

12  Did -- were there any types of components used in

13  conjunction with Sprint's MMSC?

14  A   Yes, there are two components.  One we've heard.

15  This is the SLP.  And the second one is the HSP,

16  which is a high speed proxy.  Again, these are all

17  components in Sprint's messaging network that the

18  messaging server initiated a query through to the

19  subscriber database like the SPS or the messaging

20  LDAP that we talked about.

21  Q   Okay.

22          MR. GOETTLE:  Mr. Dyer, can you put up

23  PX-174?

24  BY MR. GOETTLE:

25  Q   And I believe, Dr. Akl, that you testified --

1  well, let me ask you, were these -- were these

2  components that you just referred to, were they

3  components of -- core network elements of Sprint's

4  cellular network or were they part of Sprint's

5  messaging network?

6  A    They are part of Sprint's messaging network.

7  This is a slide that I had shown yesterday.  This is

8  a document -- we've zoomed out, so I don't have the

9  PX number for that document.

10  Q    It's PX -- oh, it's on your screen now.

11  A    Okay, PX-174.  And now if we can zoom back in?

12  The title of the document is "Messaging Network

13  Components," and some of the acronyms that I've

14  described are on this list.  For example, we've been

15  talking about the SMSC.  We have an MMSC, the terms

16  "mobile originated" and "mobile terminated," and then

17  if we go back to the -- we have the SLP, I've talked

18  about that; the PDR, that's the pre-destination

19  router; OMG, the open message gateway.  I think

20  I've -- so these are all components of Sprint's

21  messaging network that the messaging server would

22  query through at different points in time the SPS and

23  the messaging LDAP.

24  Q    And is what you're looking at, is this a Sprint

25  document?

Dr. Akl - Direct                                    16

1   A    Yes, this is a Sprint document.

2   Q    Okay.  So in terms of what the messaging server

3   is in Sprint's network, for example, when it was

4   the --

5             MR. GOETTLE:  Can we go back to the slide

6   deck?  Thanks?

7             (Pause in proceedings.)

8   BY MR. GOETTLE:

9   Q    When we're -- when we're thinking about the use

10  of Comverse as a supplier of the SMSC after 2004, the

11  mobile originating Comverse SMSC, the SMSC that was

12  charged with dealing with the messages coming from

13  Sprint subscribers to go out to other people, did

14  those query through any of these other components

15  that you were talking about?

16  A    No.

17  Q    So for that period of time when that -- when that

18  SMSC from Comverse was being used what was Sprint's

19  messaging server?

20  A    The Comverse SMSC.

21  Q    Okay.  And then for the period of time where the

22  messaging server -- excuse me, when the Comverse SMSC

23  was being used to receive message -- SMS messages

24  from other people what was the messaging server when

25  that was being used?

Dr. Akl - Direct                                        17

1    A    So the Comverse SMSC with the PDR or with the SMS

2    driver.

3    Q    Now, is that -- is that common for skilled

4    artisans to think about the messaging server

5    functionality, as the Court has construed the term

6    "messaging server?"  Is that a common thing for

7    skilled artisans to think about, the combination of

8    two different computers as being the messaging server

9    or is that uncommon?

10   A    No, it is common.  When we talk about

11   functionality that functionality doesn't have to

12   reside in one computer.  And so if you have a

13   component that's assisting or the querying is going

14   through a component, that's perfectly fine.  You just

15   draw a box or a circle around both as the messaging

16   server.

17   Q    Okay.  And you referred to another component

18   called an OMG, yet another three letter acronym for

19   something?

20   A    Yes.  And so the combination of the SMSC with the

21   OMG would be the messaging server for that period of

22   time that the querying went through the OMG.

23   Q    Okay.  And then SL -- you referred to SLP with --

24   in conjunction with the SMSC.  What's the messaging

25   server there?

Dr. Akl - Direct                                    18

1   A    Yes.  So for the period of time that the SLP, as

2   a component, was used, the query went through it then

3   the messaging server would be the SMSC with the SLP.

4   So a lot of acronyms, but we have to get it on the

5   record.

6   Q    Okay.  Last one.  The MMSC, I believe you talked

7   about an HSP and an SLP at different periods of times

8   being used.  What as the messaging sever in Sprint's

9   network with respect to those periods of times?

10  A    So the messaging server would be the MMSC with

11  the HSP or the MMSC with the SLP.

12  Q    Okay.  Okay.  So let's turn and talk about the

13  MMSC just in terms of the dates on when the Acision

14  MMSC was used in Sprint's network.

15  A    Yes.  So for what we have to -- for the case in

16  question, it's May 2014 to the present.

17  Q    Okay.  And during that period of time when -- I

18  hadn't -- I forgot to ask you this yesterday, but

19  during that period of time when the -- when the MMSC

20  was being used for messaging in conjunction with the

21  SPS or the HLR were the steps that you walked through

22  followed every time that a Sprint subscriber sent or

23  received an MMS message?

24  A    Yes.

25  Q    Okay.  And yesterday, you also walked through

1   Sprint's infringement with respect to its HLRs?

2   A   Yes.

3   Q   Every time that a Sprint subscriber received an

4   SMS or an MMS message over the period of time

5   relevant to this case, back to 2006, did each one of

6   those receptions constitute an act of infringement by

7   Sprint?

8   A   Yes, because you needed to know the location of

9   the phone, and you would look in the HLR.  And since

10  we're -- we brought up the HLR, when the querying was

11  done those components I don't believe, looking at the

12  evidence, queried -- the messaging server did not

13  query through those components of the HLR.

14  Q   Okay.  Oh, I see.  So when the -- when the query

15  was being done from the HLR was the -- any of the

16  PDR, SLP, OMG, or HSPs, were those ever used?

17  A   No, it was for the messaging LDAP and the SPS,

18  but not to the home location register subscriber

19  database.

20  Q   Okay.  Then what component sent the query to the

21  HLR?

22  A   The messaging server, the SMSC or the M -- the

23  SMSC -- SM -- sorry, SMSC, correct.

24  Q   Okay.  And then was -- is that -- was that true

25  over the time period from the relevant time of

Dr. Akl - Direct                          20

1   February 2006 through today?

2   A    Yes.

3   Q    Okay.

4            (Pause in proceedings.)

5   Q    Okay.  So what are we going to talk about next,

6   Dr. Akl?  What do you have on slide 159?

7   A    So the last portion is really as a result of a

8   conversation that I had with a Comcast damages

9   expert, which you're going to hear from later, Ms.

10  Riley.  And Ms. Riley is going to discuss damages.

11  And as part of the math that she does, I was asked to

12  look at the steps and provide her with kind of like a

13  summary or a number of the infringing steps from a

14  technical point of view that she can use when she

15  does the math for damages, and that's what we're

16  going to look at on the next couple slides.

17  Q    Okay.  So what are -- what are we looking at

18  first?

19  A    So what we're looking at is I'm numbering the

20  steps.  So this is for Sprint to Sprint, and you see

21  we have step one where the message is sent from the

22  phone to the messaging server and then the

23  acknowledgment back, so this is two.  Three and four

24  are the steps that infringe.  We've talked about the

25  inquiry.  That's what reads on the first limitation

Dr. Akl - Direct                    21

1   in the claim.  And the four is the response, the

2   fourth limitation in the claim.  And then five is

3   another step.  So I'm counting here two out of five.

4   And if you recall my discussion from yesterday, there

5   are two steps that happen inside the SPS, the mapping

6   step in the claim and the determining step in the

7   claim.  And since they're not shown on this figure,

8   I'm not counting them.  And this is actually good for

9   Sprint.  So I'm being very conservative.  Instead of

10  saying four out of five steps infringe, which would

11  probably translate to more money, I'm saying two out

12  of five would infringe.  So any time there was a

13  decision that I had to make in terms of counting the

14  steps -- and I believe Ms. Riley is going to testify

15  when she had a decision to make in terms of what side

16  to favor, we always favored Sprint.  So the numbers

17  that you're going to see and the number of steps are

18  going to be the most conservative.

19  Q    So, Dr. Akl, I think you said that had you

20  counted the two steps that occur in the SPS, it would

21  be four out of five?

22  A    Oh, I misspoke.  It would be four out of seven.

23  Q    Okay.

24  A    Yes.

25  Q    And that would be -- that would be more favorable

Dr. Akl - Direct                    22

1  to Sprint than counting the steps as two out of five?

2  A   Yes.

3  Q   Okay.  Okay.  So this doesn't get confusing, can

4  you explain how -- what you -- what we're looking at

5  right now?  Because we're going to do more counting

6  as to other instrumentalities.

7  A   Yes.  So right now, we're just looking at the

8  Sprint to Sprint and for the messaging server

9  querying the SPS.  And so we have two infringing

10  steps out of five when sending for claims one, seven,

11  and 113.

12  Q   Okay.

13  A   And we're gong to have -- all the scenarios that

14  we walked through, the infringing scenarios, we're

15  going to walk through them, but very quickly.  So for

16  the --

17  Q   I apologize.

18  A   Sorry.

19  Q   Sorry about that.

20  A   Yeah.  So for the receiving, for claims one and

21  seven, there's four out of seven steps.  For the --

22  for claim 113, because if you recall, the HLR is

23  excluded -- the HLR does not infringe claim 113

24  because claim 112 says no HLR, the home location

25  register.  So we've broken them down to claims one

Dr. Akl - Direct                    23

1    and seven for receiving is going to be four out of

2    seven, and for claim 113, it's two out of seven.

3    Q    Okay.  And did you do that -- I think you

4    testified you did that for all the other --

5    A    Yes.  So for the text messaging, Sprint to

6    Sprint, this is the break down.  For SMS, between

7    Sprint and non-Sprint, I've provided the breakdown.

8    This is just counting the infringing steps that we've

9    already walked through in a lot of detail yesterday.

10   And then the same thing for the multi-media messages.

11   When you have multi-media Sprint to Sprint, again,

12   for sending, receiving, I have the break down.  And

13   for multi-media messages between Sprint and non-

14   Sprint for claims one, seven, and 113, and for claims

15   one and seven and claim 113, what are the infringing

16   steps.

17   Q    So, Dr. Akl, it's a lot to grasp because there's

18   a lot on that slide, but what is the lowest

19   percentage number on there for each of the scenarios?

20   A    22 percent.

21   Q    Okay.  Okay.

22           MR. GOETTLE:  Your Honor, I'd like to turn

23   back to getting -- to admitting the exhibits.  I

24   can't remember if there was an objection on the

25   exhibits from the first binder that --

Dr. Akl - Direct                           24

1          THE COURT:  No, they're in evidence.

2          MR. GOETTLE:  Okay.  Okay.

3    BY MR. GOETTLE:

4    Q   Dr. Akl, can you -- you have two other binders

5    back there?

6    A   Yes.

7    Q   Okay.  And one of those binders has just one

8    exhibit in it?

9    A   Yes.

10   Q   What exhibit is that?

11          (Pause in proceedings.)

12   A   So this is one document, one exhibit.  It's

13   PX-171.

14   Q   And does that -- does that document related to

15   the HLR or to the SPS?

16   A   It relates to the HLR.

17   Q   What is it?

18   A   It's an Alcatel-Lucent document.  It's titled

19   "Alcatel-Lucent 1440 Unified Subscriber Data Server

20   Release 8.2."

21   Q   Why are you looking -- in doing your analysis,

22   why are you looking at a document from a different

23   company named Alcatel-Lucent?

24   A   For the home location register subscriber

25   databases, they were provided by Alcatel-Lucent.  And

Dr. Akl - Direct                                25

1  so I believe as a vendor, they were subpoenaed.  They

2  provided documents.  Those documents were then placed

3  in front of Sprint engineers during their testimony,

4  and the Sprint engineer looked at the document and

5  said yes, this is the document for the HLR.  We use

6  the HLR.  And so I've looked at these documents to do

7  my analysis of the home location register.

8  Q   Okay.  Turning to the other binder, the third

9  binder, does -- do the doc -- what are the documents

10 in that binder in terms of subject -- general subject

11 matter?

12 A   Again, they are also for the home location

13 register.

14 Q   Okay.  And are those -- do -- have you seen those

15 documents before?

16 A   Yes.

17 Q   And what did you look at them -- why did you look

18 at them?

19 A   To be able to carry on my analysis and come up

20 with the conclusions that I've reached.

21 Q   Okay.  Would you please read the PX numbers of

22 those documents?

23 A   Yes.  PX-49, PX-56, PX-161, PX-163, PX-164,

24 PX-167, PX-168, PX-172, PX-177, PX-485, and PX-525.

25 Q   Dr. Akl, will the jury be able to look at those

Dr. Akl - Direct                          26

1    binders during their deliberations?

2    A    I believe so.

3    Q    Okay.

4            (Pause in proceedings.)

5            THE COURT:  Are you going to move those

6    documents into evidence?

7            MR. GOETTLE:  Oh, I should do that,

8    shouldn't I?  Yes, sir.  So -- well, again -- well,

9    yes, I move those into evidence, Your Honor.

10           MR. FINKELSON:  No objection, Your Honor.

11           THE COURT:  Those documents -- and I'll not

12   repeat the numbers, but will certainly record them --

13   are received into evidence.

14           (Plaintiff's Exhibits 49, 56, 161, 163,

15   164, 167, 168, 172, 177, 485, and 525, documents, are

16   received into evidence.)

17           MR. GOETTLE:  Thank you.

18   BY MR. GOETTLE:

19   Q    Dr. Akl --

20           THE COURT:  171, the Alcatel-Lucent

21   document dealing with the HLR provided, is that --

22   you didn't move that in evidence now.  Was it

23   previously received?

24           MR. GOETTLE:  Your Honor, I move PX-171

25   into evidence.

Dr. Akl - Direct                    27

1          THE COURT:  PX-171 is received.

2          (Plaintiff's Exhibit 171, document, is

3    admitted into evidence.)

4    BY MR. GOETTLE:

5    Q   Dr. Akl, during Sprint's attorney's opening

6    argument, do you recall him talking about a contract

7    between Comcast and Sprint that had a definition for

8    "core network?"

9    A   Yes.

10   Q   Did you -- did you look at that contract in

11   performing your analysis and forming your

12   conclusions?

13   A   Yes, it was a contract -- it was a business

14   contract between Comcast and Sprint.  It was provided

15   to me and I had looked at it as part of the analysis

16   that I have done.

17   Q   And in terms of when the patent issued in 1999,

18   how much later was that contract?

19   A   That contract was in 2008 and it was two years

20   before Comcast bought the 870 patent.  And it's nine

21   years after the patent was filed by Nokia at the time

22   in '99.

23   Q   Okay.  All right.  So now just setting aside the

24   timeline and the dates, would you look at a -- how

25   would you consider a contract between parties in

1    trying to decide whether an element of Sprint's

2    network is a core network element of Sprint's

3    cellular network?

4    A    So this is a business contract and it was between

5    two companies that wanted to lease resources.  So

6    Comcast wanted to rent, in a sense, Sprint's

7    telecommunications network and be able to provide

8    calls, SMS, didn't services, to Comcast subscribers

9    using Sprint infrastructure.  So from a business

10   point of view, the terms in the contract are very

11   general and very inclusive.  As an engineer, I would

12   not look at business definitions in a business

13   contract to find the definitions that I would use in

14   a technical sense.

15           Also, in this case -- so we have the

16   Court's construction.  We have definitions from the

17   Court that come from the patent from 1999.  And so

18   the definitions in this contract between the

19   companies is really irrelevant from an engineering

20   point of view and a technical point of view to take

21   those definitions and apply them to the patent.

22   Q    And, Dr. Akl, during Sprint's counsel's opening

23   argument, do you recall him saying that what Nokia

24   invented in the 870 patent is directed to a very

25   specific, a very particular way, of doing SMS and MMS

Dr. Akl - Direct                                    29

1    messaging?

2    A    Yes.

3    Q    Do you agree with that statement?

4    A    No.

5    Q    Why not?

6    A    Because looking at the patent, the patent is

7    equally applicable due to the different third

8    generation technologies, CDMA, CDMA2000, which is the

9    technology Sprint uses.  It is also -- it's

10   applicable to the network because what you want to do

11   is you want to make the cellular network faster, you

12   want to remove congestion, so regardless what

13   technology you're using the methods and the invention

14   of the patent -- and we've talked about the problem-

15   solution, problem-solution -- moving the messages

16   until the phone is ready to receive and this is where

17   the messaging server is going to query, and then the

18   message is going to be delivered, that is equally

19   applicable to CDMA, to CDMA2000, and to GSM and third

20   generation GSM.  So the invention itself is not

21   dependent on what makes CDMA different from GSM.

22   Q    So, Dr. Akl, in your opinion, in 1999, would it

23   have been straightforward to a company that -- if a

24   company wanted to avoid practicing the invention of

25   the 870 patent, would it have been a relatively

Dr. Akl - Direct                                    30

1    straightforward -- would there have been a relatively

2    straightforward way of doing that, of avoiding

3    practicing the patent?

4    A    In '99 -- in 1999, yes.  So if you recall when I

5    was describing messaging in 1999, you had text

6    messaging, they're small, the number of messages that

7    was being exchanged was not very high.  As an adjunct

8    service, it was not something that was very popular

9    at the time.  So it was very feasible to have the

10   messaging server include functionality like the

11   mobile switching center, like the home location.  We

12   saw, as an example, the Ericsson patent that did

13   that.  That would be an example of a cellular network

14   that does not practice this patent because you have a

15   core network element that does the functionality that

16   is core and it includes the storing and forwarding

17   and the querying.

18            This alternative, or this way of doing it,

19   would have been feasible in 1999, but would not have

20   been a feasible way of doing it later because even

21   though the size of the message is still small, we

22   went from millions to billions to trillions of text

23   messages, and so that would not have been a feasible

24   solution for the text messages later.  And when we

25   look at the multi-media messages, because of the size

1  of these messages it would not be a feasible

2  solution.

3  Q   Why not?

4  A   Because the size of the message itself is fairly

5  large.  So having those messages in the network,

6  checking if the phone is there, and causing

7  congestion would not have been feasible.  And you

8  have a lot of them.  I mean you don't have the

9  trillions of them, but there is still a significant

10  number and their size is significant.

11          MR. GOETTLE:  I have no further questions.

12  Thank you.

13          (Pause in proceedings.)

14          THE COURT:  You may cross-examine.

15          MR. FINKELSON:  Thank you, Your Honor.

16                CROSS-EXAMINATION

17  BY MR. FINKELSON:

18  Q   O-M-G, Dr. Akl, you know you're thinking it.

19          (Pause in proceedings.)

20  Q   Good morning, Dr. Akl.

21  A   Good morning.

22  Q   You agree, don't you, Dr. Akl, that claim one of

23  the 870 patent requires that the messaging server be

24  external to the cellular network?

25  A   Yes.

1    Q    And if this jury concludes that Sprint's

2    messaging servers are inside the core network of

3    Sprint's cellular network, you agree that claim one,

4    in that circumstance, would not be infringed,

5    correct?

6    A    Yes.

7    Q    And that's true even if Sprint does the other

8    steps of claim one, correct?

9    A    Yes.

10   Q    All of the other stuff you talked about

11   yesterday, right?

12   A    If the -- if you can just repeat the question?

13   Thank you.

14   Q    My question was and that's true even if Sprint

15   does all of the other steps of claim one, correct?

16   A    Yes.

17   Q    And that includes all of the other stuff you

18   talked about yesterday, right?

19   A    Oh, yes.

20   Q    It seems like -- it seems like ages ago, but it

21   was just yesterday.  Claim seven, Dr. Akl, also

22   requires that the messaging server be external to the

23   cellular network, doesn't it?

24   A    Yes.

25   Q    And that's because under the law, claim seven has

Dr. Akl - Cross                33

1    included within it all of the requirements of claim

2    one, right?

3    A    Yes.

4    Q    And if this jury concludes that Sprint's

5    messaging servers are inside the core network of

6    Sprint's cellular network, you agree that in that

7    circumstance claim seven would not be infringed,

8    correct?

9    A    Yes.

10   Q    And, again, that's true even if Sprint does all

11   of the other steps of claim seven, right?

12   A    Yes.

13   Q    All of the other stuff you talked about

14   yesterday?

15   A    Yes.

16   Q    And the same rules apply for claim 113, right,

17   Dr. Akl?

18   A    Yes.

19   Q    And that's because under the law, claim 113 has

20   included within it all of the requirements of claim

21   112, right?

22   A    Yes.

23   Q    Do you have a copy of the jury binder, Dr. Akl?

24   A    I don't think so.

25           MR. FINKELSON:  Your Honor, may I approach?

Dr. Akl - Cross                          34

1          THE COURT:  You may.

2    BY MR. FINKELSON:

3    Q   Dr. Akl, I'm just handing you a copy of the same

4    binder that this jury has.

5    A   Thank you.

6          MR. FINKELSON:  Mr. Baird, can we see tab

7    two up on the screen?

8          (Pause in proceedings.)

9    BY MR FINKELSON:

10   Q   If you could turn, Dr. Akl, to tab two of the

11   jury binder.  Do you have that, sir?

12   A   Yes.

13   Q   And that's the Judge's definition of claim terms,

14   right?

15   A   Yes.

16   Q   You don't dispute, Dr. Akl, that the Judge's

17   definition of "cellular network" in this case says

18   that a cellular network may include messaging

19   servers, do you?

20   A   No.

21   Q   In fact, you don't dispute that the Judge's

22   definition of "cellular network," the one that the

23   Judge has given to this jury, allows for a messaging

24   server to be inside the core network of a cellular

25   network, do you?

Dr. Akl - Cross                                35

1    A    No.

2    Q    Now, you used the word "essential" a lot

3    yesterday.  Do you remember that, Dr. Akl?

4    A    Yes.

5    Q    The Judge's definition of "cellular network," it

6    doesn't include the word "essential," does it?

7    A    No, it was the word "core."

8    Q    Right.  "Essential" is your word, right?

9    A    "Essential" is what I believe the word "core"

10   means.

11   Q    That's your opinion of what "core" means, right?

12   A    Yes.

13   Q    Now, you would agree, Dr. Akl, that a Sprint

14   subscriber cannot send a text message without a

15   messaging server, right?

16   A    Correct.

17   Q    And I'm talking about -- when I'm talking about a

18   Sprint subscriber and messaging I'm talking about

19   what is accused in this case and what you're opining

20   on -- what you're opining on.  Is that how you

21   understood my question?

22   A    I'm understanding your question if I take a

23   messaging server and I break it, a Sprint subscriber

24   is not going to be able to send a text message or an

25   MMS message?

Dr. Akl - Cross                              36

1    Q   And a Sprint subscriber also won't be able to

2    receive a text message or an MMS message without a

3    messaging server, right?

4    A   Yes.

5    Q   A messaging server you would agree is essential

6    to sending or receiving an SMS or MMS message, right?

7    A   Yes, it is essential to Sprint's messaging

8    network.

9    Q   And it's essential to sending or receiving an SMS

10   or MMS message, correct, sir?

11   A   Yes, it is essential to Sprint's messaging

12   network.

13   Q   You're answering a slightly different question,

14   and you're entitled to do that, but I would like an

15   answer to my question, sir.  A messaging server is

16   essential to sending or receiving an SMS or MMS

17   message, correct?

18   A   Yes.

19   Q   Now, you talked a lot yesterday, Dr. Akl, about

20   1999, and we heard a little bit of it today as well.

21   You would at least agree, wouldn't you, Dr. Akl, that

22   messaging servers are core network elements in

23   Sprint's cellular network today?

24   A   No, I disagree with that.

25   Q   Okay.  You don't think they're core network

1   elements today either?

2   A    No.

3   Q    And is that for the same reasons that you say

4   they weren't core network elements in 1999?

5   A    They are not core network elements in a cellular

6   network.  This is the definition.  They may be core

7   from a business point of view.  You wouldn't buy a

8   phone if it doesn't have texting.  I wouldn't buy a

9   phone if it doesn't have a camera.  That doesn't make

10  it a core network element in a cellular network based

11  on the construction that the Judge gave us.  This is

12  what we have to go by.

13  Q    And my question was is it your opinion -- well,

14  let me ask it differently.  Your opinion is that

15  messaging servers are not core network elements in

16  Sprint's core network today and you don't believe

17  that they were core network elements in '99 either,

18  right?

19  A    You are -- the answer to your question is no, but

20  you did not use the word "cellular network," and I

21  would like for the jury to be clear we are talking

22  about a core network element in a cellular network.

23  Q    And you --

24  A    That's very important.

25  Q    And you don't think Sprint's messaging servers

Dr. Akl - Cross                                    38

1    are core network elements today in a cellular

2    network, in Sprint's cellular network, and you didn't

3    think they were core network elements in 1999 either,

4    correct?

5    A    Yes.

6    Q    And that's for the very same reasons?

7    A    Yes.

8    Q    You didn't show this jury yesterday, Dr. Akl, any

9    Sprint documents, not a one, that use the word

10   "essential" or "non-essential" to define what is

11   inside or outside of Sprint's cellular network, did

12   you?

13   A    I don't think so.

14   Q    And, in fact, you know, Dr. Akl, that the word

15   "essential" doesn't appear anywhere in the 870

16   patent, does it?

17   A    I don't remember.  I believe the Judge's

18   instructions for words that are not defined, we go by

19   the plain and ordinary meaning, and the plain and

20   ordinary meaning of the word "core" is essential.

21   Q    In your opinion?

22   A    Yes.

23   Q    And I believe you testified yesterday looking at

24   the patent, that was the very first thing you did in

25   this engagement, correct?

Dr. Akl - Cross                                    39

1   A   Yes, this is what "core" means.

2   Q   And you looked at the patent first and you've

3   looked at it a number of times over the course of the

4   engagement, correct?

5   A   Yes.

6   Q   You know it -- you know it pretty well by now,

7   don't you, sir?

8   A   I hope so.

9   Q   And you --

10  A   Yes.

11  Q   And you would agree that the word "essential"

12  doesn't appear anywhere in the 870 patent, does it,

13  Dr. Akl?

14  A   I will take your word for it.

15  Q   You also talked a lot yesterday about core

16  functionality, right?

17  A   Yes.

18  Q   The Judge's definition of "cellular network" that

19  the jury has in its binders and up on its screens, it

20  doesn't use the phrase "core functionality," does it?

21  A   Those words do not appear directly.

22  Q   Right.

23  A   Correct.

24  Q   Instead, it uses the phrase "core network

25  elements," isn't that right, sir?

Dr. Akl - Cross                                    40

1   A    Yes.

2   Q    And it says that those core network elements may

3   include messaging servers, right?

4   A    Yes.

5   Q    And you know that and this jury knows that

6   because the Judge says the words "and messaging

7   servers" in his definition of "cellular network,"

8   right?

9   A    Yes.

10  Q    You didn't show this jury any Sprint documents

11  either yesterday or today, sir, that use the phrase

12  "core functionality" to define what is inside or

13  outside of the core network of Sprint's cellular

14  network, did you?

15  A    I don't -- I don't think so.

16  Q    And, again, Dr. Akl, you know that the 870

17  patent, the patent that we're here to discuss, the

18  patent that is in this jury's binders, it doesn't

19  ever use the phrase "core functionality," does it?

20  A    I don't remember if the word "core functionality"

21  appears next to each other --

22  Q    I'm sure --

23  A    -- but I don't think so.

24  Q    I'm sure your counsel will correct me if they

25  find it.  As you described in your testimony

Dr. Akl - Cross                    41

1   yesterday -- I think it was at the very beginning,

2   Dr. Akl -- you published numerous articles on CDMA,

3   correct?

4   A    Yes.

5   Q    And you consider yourself to be an expert on

6   CDMA, correct?

7   A    Yes.

8   Q    And I believe in the slide you showed yesterday

9   you actually listed your various publications, if I

10  recall.  Am I right on that?

11  A    Yes.

12  Q    And among those, you listed ten journal

13  publications, 35 conference proceedings, two

14  technical papers, and three book chapters, many of

15  which are on CDMA, correct, sir?

16  A    Yes.

17  Q    And in not a single one of those 40 publications,

18  Dr. Akl, have you ever stated that a CDMA2000

19  cellular network excludes messaging servers?

20  A    I haven't said one way or the other in those

21  publications.

22  Q    And in not a single one of those 40 publications

23  have you ever stated, Dr. Akl, that the only way that

24  a messaging server can be a core network element in a

25  CDMA2000 cellular network is if its functionality is

Dr. Akl - Cross                                    **42**

1    combined with the functionality of another core

2    network element, have you?

3    A    That's not the focus of the papers, so that

4    phrase would not be in those papers.

5    Q    Right.  In fact, that concept isn't in any of

6    those papers that you've written, correct?  Not one

7    of 40 have you ever stated the position you've told

8    this jury, correct?

9    A    Yes.

10   Q    And you would agree, Dr. Akl, that one of this

11   jury's tasks is to decide whether Sprint's messaging

12   servers are external to its cellular network, right?

13   A    Yes.

14   Q    "Cellular network," that's actually the phrase

15   that's in the 870 patent claims, right?

16   A    I'm sorry, could you repeat the question?

17   Q    Sure.  "Cellular network," that's actually the

18   phrase that's in the claims of the 870 patent, claims

19   one, seven, and 113, right, sir?

20   A    I'm sorry, the question before it because that

21   kind of -- this question was kind of -- if you could

22   repeat the previous question?

23   Q    I think we're going to agree on my first one, but

24   I'll ask it again.

25   A    Thank you.

Dr. Akl - Cross                              43

1   Q    Would you agree that one of this jury's tasks is

2   to decide whether Sprint's messaging servers are

3   external to its cellular network?

4   A    Yes.  Okay.

5   Q    And "cellular network," those two words, those

6   are the words that are in the claims of the 870

7   patent, right, sir?

8   A    Yes.  Now I'm following.  Thank you.

9   Q    And "core network," that's the phrase in the

10  Judge' definition of "cellular network," right?

11  A    Yes.

12  Q    Okay.  So we have the phrase "cellular network,"

13  we have the phrase "core network" that are in play,

14  right, sir?

15  A    We have the phrase, "cellular network," but we

16  have a definition for "cellular network."  So

17  whenever we see the term "cellular network" we always

18  have to adopt this definition.  I guess that's why I

19  was confused, because you made it sound like the two

20  things are different, but the words "cellular

21  network" in the claim, always we look at this.  So

22  this is the only thing we look at.

23  Q    The definition of "cellular network" that

24  includes as part of it "core network," correct?

25  A    Yes.

1  Q   Now, you showed this jury, Dr. Akl, a lot -- and

2  I do mean a lot -- of slides yesterday that said the

3  phrases "Sprint's cellular network" and "core network

4  elements" and "Sprint's messaging network," right?

5  A   Yes.

6  Q   And, in fact, you showed them over and over and

7  over again, right?

8  A   Yes.

9  Q   And isn't it true, Dr. Akl, that every single

10  time -- every single time that you showed the jury a

11  slide yesterday that said "Sprint's cellular network"

12  or "cell network" those were your graphics that you

13  prepared with Comcast's counsel, not words in the

14  actual Sprint documents?

15  A   I disagree.  There were Sprint documents that I

16  used for cellular network.

17  Q   That wasn't my question.  Every single time you

18  showed the jury a slide that said "Sprint's cellular

19  network" or "cell network" those were your graphics

20  that you added to the slides, they weren't the words

21  in the actual Sprint documents that were being

22  presented on the slides, correct?

23  A   Again, I don't think I understand the question

24  because what -- the figures that I have of Sprint's

25  cellular network are Sprint figures, so I'm not sure

Dr. Akl - Cross                              45

1   I understand the nuance of your question.

2   Q   I'm not talking about figures; I'm talking about

3   words.  I'm talking about the words on the slides

4   that you presented to this jury to express your

5   opinions in this case.  That's what I'm talking

6   about.  And my question is every time you showed the

7   jury a slide that had the words "Sprint's cellular

8   network" or "cell network" those were your words that

9   you put on the slides, they weren't words from the

10  actual Sprint documents that the slide was

11  discussing, isn't that right, sir?

12  A   I don't think I agree with that.

13  Q   Okay.  You think you could point me to -- in

14  those slides to where the actual documents that

15  you're talking about have those phrases in them?

16  A   I think so.

17  Q   Okay.  Well -- and by all means, if you think of

18  them as you're going through your materials, I'm

19  happy to discuss one of them with you.  Perhaps your

20  counsel will show you as well.

21  A   Okay.

22  Q   Every single time you showed the jury a slide

23  yesterday, Dr. Akl, that said the words "core network

24  elements" those were your graphics and not the words

25  in the actual Sprint documents that you were

1  discussing, correct, sir?

2  A   The graphics included Sprint documents, and I

3  circled in the Sprint documents the elements that are

4  core network elements in the Sprint document.  I

5  don't believe the words "core network element"

6  appeared in the Sprint document, but I applied the

7  Court's instruction and I circled in the Sprint

8  documents the core network elements.

9  Q   And then you put the words "core network

10  elements" in the slide, correct?

11  A   Yes.

12  Q   As part of expressing your opinion, as opposed to

13  words that were in the actual documents, right?

14          (Pause in proceedings.)

15  Q   And I'm not trying to trick you.

16  A   Right.  Right.  No, I --

17  Q   I want this jury to understand when they saw

18  slides from you repeatedly yesterday which parts of

19  the slides were your opinions in this case and which

20  parts of the slides were words or diagrams from

21  actual Sprint documents.  That's the purpose of my

22  questioning.

23  A   And I think I've made it clear when I was

24  generating my own figure I said this is my own

25  figure, when it was a Sprint document it was a Sprint

1   document, and when I circled something in a Sprint

2   document I said this is a Sprint document and the

3   highlighting is mine, so I don't think there is

4   confusion.

5   Q   And those slides may or may not go back with this

6   jury, and I just want it to be clear to the jury when

7   they're looking at those slides which parts come from

8   you as part of your opinion, which you're entitled to

9   render, and which parts are in the actual Sprint

10  documents.  And every time you showed the jury a

11  slide yesterday that said in blue letters the phrase

12  "Sprint's messaging network" those were your graphics

13  and not words that were in the actual Sprint

14  documents that you were discussing, correct?

15  A   No, I disagree.  I believe it was a Sprint

16  document that said "Sprint messaging network," and

17  there were multiple documents and those were words

18  from Sprint's document.

19  Q   In fact, I think you showed the jury one

20  document, and you saw it again today from counsel,

21  that said "messaging network components," and that

22  was the only document that you showed this jury that

23  had those words that were actually on the document

24  from Sprint's file, correct?

25  A   No, I disagree.  The other document that had the

Dr. Akl - Cross                                48

1   blue and the green and it said "messaging" --

2   Q    You think that document said "Sprint's messaging

3   network," is that your testimony, sir?

4            (Pause in proceedings.)

5   A    The document said "Sprint messaging high level

6   architecture diagram."

7   Q    Thank you.

8   A    Yes.

9   Q    Not "Sprint's messaging network?"  Those are your

10  words, correct, sir?

11  A    Yes, the document said "Sprint's messaging high

12  level architecture diagram," and then the other

13  diagram -- the other documents said "messaging

14  network components."  So these are Sprint documents

15  with those titles.

16  Q    Let's look at two of the documents, Dr. Akl, that

17  you relied upon yesterday and then prepared your

18  graphics on.  I'm going to first start with what has

19  been admitted as PX-99.

20           (Pause in proceedings.)

21  Q    Do you have a copy of that in your many binders,

22  Dr. Akl, or do you need another one?

23           (Pause in proceedings.)

24           MR. FINKELSON:  May I approach, Your Honor?

25           THE WITNESS:  I think I have it.  Just give

Dr. Akl - Cross                    49

1    me a second.  I can pull it up.  I think it's in this

2    one.

3              MR. FINKELSON:  If it's easier to just have

4    a standalone copy, I can give you that as well.

5              THE WITNESS:  Okay, that's fine.

6              MR. FINKELSON:  May I approach?

7              THE COURT:  Is there a copy on -- in the

8    computer?  All right.

9    BY MR. FINKELSON:

10   Q    And I encourage the witness to follow along

11   whichever way he would like.

12              (Pause in proceedings.)

13   Q    Do you recognize this, Dr. Akl, as PX-99?

14   A    Yes.

15   Q    And this is the actual document from Sprint's

16   files, correct?

17   A    Yes.

18   Q    And if the jury wants to see the actual document,

19   they should look for what is -- goes back to them as

20   PX-99, right?

21   A    Yes, and this is what I had in my slide.

22   Q    And this is at page two on your screen of PX-99

23   and this was what you were referring to earlier as

24   being entitled "Sprint's Messaging High Level

25   Architecture Diagram," right, sir?

Dr. Akl - Cross                               **50**

1   A    Yes.

2   Q    And this actual Sprint document entitled "Sprint

3   Messaging High Level Architecture Diagram" includes

4   elements of the cellular network, correct?

5   A    Yes.

6   Q    And that includes, for example, the wireless

7   terminal that are in blue here as subscriber devices,

8   right, sir?

9   A    Yes.

10  Q    And this actual Sprint document entitled "Sprint

11  Messaging High Level Architecture Diagram" includes

12  in the architecture elements that you, sir, opine are

13  within the core network of Sprint's cellular network,

14  such as the SPS and the HLR, right?

15  A    Yes, and that's exactly what I said yesterday.

16  Q    And the two ovals that you see here that are

17  using the SPS as a provisioning store, those are the

18  SMSC and the MMSC, right, Dr. Akl?

19  A    Yes.

20  Q    And you would agree, wouldn't you, Dr. Akl, that

21  the SMSC and the MMSC are CDMA network elements?

22  A    They are the messaging servers in a CDMA network.

23  Q    You would agree that they are -- that the SMSC

24  and the MMSC are CDMA network elements, correct, sir?

25  A    Sure.

Dr. Akl - Cross                    51

1    Q    And the CDMA network is a cellular network,

2    right?

3    A    The CDMA is the interface in Sprint's cellular

4    network, and the MMSC and the SMSC are the messaging

5    servers that are used in Sprint's messaging network

6    that work with Sprint's cellular network, which is

7    CDMA.

8    Q    And, in fact, the SMSC and the MMSC that are

9    using the SPS as a provisioning store, you would

10   agree that those are CDMA network elements, right,

11   Dr. Akl?

12   A    No, I wouldn't phrase it that way.

13   Q    You wouldn't?  Okay.

14         MR. FINKELSON:  Could you turn to page ten,

15   please, Mr. Baird, of this PX-99?  And if you could

16   highlight the definition, please, of SPS?

17         (Pause in proceedings.)

18   BY MR. FINKELSON:

19   Q    Do you have that in front of you, Dr. Akl?

20   A    Yes.

21   Q    This is the definition of "SPS" as used in this

22   document, PX-99, is it not?

23   A    Yes, but you were asking me a different question.

24   The SPS is the core cellular subscriber database, so

25   it is what we pointed to as the messaging server

1   query.

2   Q    You would agree that the SPS is itself a CDMA

3   network element, correct, Dr. Akl?

4   A    The SPS is the subscriber database in Sprint's

5   CDMA cellular network, yes.

6   Q    And can you read to the jury what PX-99 says the

7   SPS is and what it's used for?

8   A    It says, "Subscriber profile store used by many

9   CDMA network elements as a provisioning store."

10  Q    Now let's look, Dr. Akl, at how the actual Sprint

11  document PX-99 compares to some of the graphics you

12  showed, and specifically PD2.66.  And, again, my goal

13  here is just so it's clear to the jury what portions

14  of you presentation are your graphics versus what is

15  in the actual document.  Do you have up on your

16  screen a graphic that has a side by side of the

17  picture that is actually in the actual Sprint

18  document on the left and then your graphic on the

19  right, correct?

20  A    This is not the first slide that I showed the

21  jury.

22  Q    Absolute --

23  A    I want to be clear that --

24  Q    And I do too.

25  A    -- I started with this and then I removed

1  components, and I walked the jury through the

2  process.

3  Q   And I do too.  There is no question that in your

4  slide deck, the very first time you presented the

5  document you showed the full diagram.  I don't

6  disagree with that and I wasn't trying to suggest

7  otherwise.  But I do want the jury to know where you

8  go from there.  So I have actually put up an accurate

9  copy of what you presented as PD2, slide 66, haven't

10  I?

11  A   Yes.

12  Q   Okay.  And on this slide you put in the title

13  "Sprint's messaging network?"  Those are your words,

14  correct, sir?

15  A   Up here?  Yes.

16  Q   Okay.  As opposed to on the left side in the

17  actual document where it says "Sprint Messaging High

18  Level Architecture Diagram," right?

19  A   Which are still in the slides, yes.

20  Q   Okay.  And if you look -- and your graphic on the

21  right, it removes from the actual document the SPS

22  that is used for messaging from the center of this

23  document, correct?  That's gone and your graphic

24  PD2066?

25  A   Yes, and I walked the jury through that process.

Dr. Akl - Cross                                    54

1    Q    And your graphic also removes the HLR that is

2    used for messaging, right?

3    A    Yes, and I also walked with the jury that I'm

4    going to remove it before I did.

5    Q    And your graphic also removes the phone that is

6    used for messaging, correct?

7    A    Yes, and I also explained that to the jury --

8    Q    And you also --

9    A    -- before I did it.

10   Q    I'm sorry, I didn't mean to interrupt you.  And

11   you also explained to the jury that once you took all

12   of that stuff out of the actual document, then you

13   had what you, in your opinion, Dr. Akl, call Sprint's

14   messaging network, right?

15   A    And what Sprint calls a "Sprint Messaging High

16   Level Architecture Diagram," yes.

17   Q    Well, Sprint calls it -- to be fair -- because I

18   want to be fair to you, I'd ask that you would be

19   fair to me.  What Sprint calls a "High Level

20   Architecture Diagram" doesn't just include what's in

21   your graphic, it includes the HLR, it includes the

22   SPS, and it includes the wireless terminal, correct?

23   A    Yes.

24   Q    Let's look at another one of the documents that

25   you shared with the jury on numerous occasions

Dr. Akl - Cross                                    55

1    yesterday.  It would be PX-120, Dr. Akl.  And, again,

2    I have a hard copy for you if it makes it easier.

3    Would you like one, sir?

4    A    Sure, just in case.

5              MR. FINKELSON:  May I approach, Your Honor?

6              THE COURT:  You may.

7              MR. FINKELSON:  I'm sorry?

8              THE COURT:  Yes.

9              MR. FINKELSON:  I don't go unless I hear --

10             THE COURT:  I thought --

11             MR. FINKELSON:  -- unless I hear those

12   words.

13             THE COURT:  -- I said you may.

14             MR. FINKELSON:  Okay.

15             THE COURT:  I'm glued to the computer

16   screen.

17             (Pause in proceedings.)

18   BY MR. FINKELSON:

19   Q    Do you recognize what I've handed you, Dr. Akl,

20   as PX-120?

21   A    Yes.

22   Q    And if you look at the front page of PX-120, it

23   states that this document relates to what is called

24   the 3GAAA-SPS, correct?

25   A    Yes.

1    Q    And if you look at the front page, which we have

2    up on the screen, the document is dated March of

3    2009, correct?

4    A    Yes.

5    Q    Okay.  And you know, Dr. Akl, that the 3GAAA,

6    that's not used for messaging at all at Sprint, is

7    it?

8              (Pause in proceedings.)

9    A    No, I think it's used for packet switching for

10   the internet.

11   Q    And not for messaging?

12   A    Correct.

13   Q    And you also know, Dr. Akl, that as of March of

14   2009, the date that is on this document on which you

15   relied, Sprint's messaging servers, they weren't even

16   using the SPS at all, were they?

17   A    I'm sorry, repeat the question, please.

18   Q    As of the date of this document, March 2009,

19   Sprint's messaging servers were not even using the

20   SPS at all, were they

21              (Pause in proceedings.)

22   A    Sprint -- 2009 -- maybe.  I know if -- on page

23   seven -- if we can go to page seven of this document?

24   Q    Sure.

25   A    This is the figure that I had in my slides and

Dr. Akl - Cross                               57

1   this is what I pointed to the jury that the document

2   said, "Update drawing to include SPS."  So the SPS

3   was being used at some point after that I believe.

4   Q   But it was not being used for messaging at Sprint

5   as of March 2009, correct?

6   A   That may be correct.  I think the MLDAP was still

7   being used.

8   Q   And I can actually help you perhaps by reference

9   even to one of your own slides.

10              MR. FINKELSON:  If we could put up slide

11  PD2.158, Mr. Baird?

12  BY MR. FINKELSON:

13  Q   Do you recognize that slide, Dr. Akl, as one of

14  your own?

15  A   Yes.

16  Q   Okay.  And in it you have a column for SPS and

17  you include certain dates as to when Sprint started

18  using the SPS, correct?

19  A   When the SPS was started being queried in

20  messaging was in 2010.

21  Q   I appreciate the clarification.  That's the first

22  time that the SPS was being used for messaging, 2010,

23  correct?

24  A   Yes.

25  Q   Okay.  So that would be after the date of the

Dr. Akl - Cross                                    58

1   document PX-120, which is March 2009, right?

2   A    Yes.

3   Q    Okay.

4           MR. FINKELSON:  Let's look on PX-120 if we

5   could, Mr. Baird, at page seven.

6           (Pause in proceedings.)

7   BY MR. FINKELSON:

8   Q    Up on the jury's screen, Dr. Akl, this is the

9   diagram that appears in the actual Sprint document

10  PX-120, correct?

11  A    Yes.

12  Q    And this actual Sprint diagram doesn't say

13  anywhere the words "cellular network," does it?

14  A    It doesn't here.  I would have to look through

15  the whole document, which I don't necessarily want to

16  do right now.

17  Q    Fair enough.  And I'll represent to you at least

18  I can't find it anywhere in the document, but, again,

19  you have able counsel and if they disagree, I'm sure

20  they'll tell us.  The actual diagram though doesn't

21  say cellular network, right?

22  A    It says "logical network design."

23  Q    It doesn't "cellular network," correct?

24  A    Yes.

25  Q    And this actual Sprint diagram, it doesn't say

Dr. Akl - Cross                                    59

1   "core network," correct?

2   A   The words "core network" don't appear on this

3   diagram, yes.

4   Q   And they also don't appear anywhere in PX-120?

5   And, again, and your counsel can differ when they

6   have another chance to ask you questions.  And PX-120

7   also says nothing anywhere, Dr. Akl, does it, about a

8   "messaging network?"  Those words don't appear

9   anywhere in PX-120, do they?

10  A   Correct.

11  Q   Now, let's look at how the actual Sprint document

12  PX-120 compares to your graphic that you presented.

13  And, again, to be fair, when you first started with

14  the jury yesterday you showed this page just as I'm

15  showing it on the screen, the actual document.  You

16  did that.  But then you added your graphics and

17  that's what I want to look at.

18          MR. FINKELSON:  So if you could show us

19  PD2.63 side by side with this one, Mr. Baird?

20          (Pause in proceedings.)

21  BY MR. FINKELSON:

22  Q   Do you see that up on your screen, Dr. Akl?  On

23  the left-hand side, that's the actual Sprint

24  document, correct?

25  A   Yes.

Dr. Akl - Cross                                    60

1    Q    PX-120.  And then on the right-hand side, that is

2    your graphic, PD-263, right?

3    A    Yes.

4    Q    And your graphic adds the green boxes, right?

5    A    Yes.

6    Q    Your graphic adds the words "Sprint cellular

7    network," right, as part of your opinions?

8    A    Yes.

9    Q    Your graphic, as part of your opinions, adds the

10   words "core network elements," right?

11   A    Yes.

12   Q    Your graphic adds the word "SPS, or the acronym

13   "SPS," into the document, correct, into the diagram?

14   A    Yes.

15   Q    And your graphic also adds in the PSTN up on the

16   right?

17   A    Yes, and I explained all that to the jury as I

18   was doing it.

19   Q    And none of that is in the actual document

20   itself, as you can see by the comparison, correct?

21   A    Yes, this is exactly what I walked through with

22   the jury.

23   Q    Let's go to PD2.69.  This is what I call your

24   snow cone slide.  At least that's the way it looks to

25   me.  What you've done here on this slide, PD2.69, Dr.

Dr. Akl - Cross                        61

1   Akl, is you have put your two graphics that we've

2   just been looking at on top of -- one on top of the

3   other, right?

4   A    Yes.

5   Q    These two graphics -- each of these graphics is

6   your creation, right?

7   A    Yes.

8   Q    And then the putting of one on top of the other

9   is also your creation, right?

10  A    Yes, I was explaining to the jury that the

11  messaging network communicates with Sprint's cellular

12  network.

13  Q    And the Sprint -- there's no Sprint document --

14  to be clear again, just so the jury knows, there's no

15  Sprint document that looks like PD2.69, is there?

16  A    I think the jury understands that I walked them

17  to the two figures and how we got to this figure.  I

18  would hope so, yes.

19  Q    And the two documents that you used that we've

20  been talking about, PX-99 and PX-120, those two

21  documents make no reference to each other, do they?

22  A    Probably.  I mean I probably agree with your

23  answer.

24  Q    Probably they don't make any reference to each

25  other?

Dr. Akl - Cross                              62

1   A    Yes.

2   Q    And the grey lines that come down that form the

3   snow cone that are on your graphic PD2.69, those are

4   grey lines that you've drawn, right?

5   A    Yes.

6   Q    No Sprint document has anything like that?

7   A    Yes.

8   Q    Let's look, finally, Dr. Akl, at one of the

9   message flows on which you relied for your

10  infringement opinion.

11          MR. FINKELSON:  Can we look, Mr. Baird, at

12  PX-99 at page six?

13          (Pause in proceedings.)

14  BY MR. FINKELSON:

15  Q    What you have on your screen, that's the actual

16  PX-99, right, Dr. Akl?  That's what the actual Sprint

17  document looks like, right?

18  A    Yes.

19          MR. FINKELSON:  And then if we could

20  compare it side by side, Mr. Baird with PD2.119?

21  BY MR. FINKELSON:

22  Q    That's your graphic on the right?  That's your

23  creation, right, Dr. Akl, in explaining your

24  opinions?

25  A    Yes, and I walked through the jury how I've added

Dr. Akl - Cross                    63

1    this, because we had discussed it before, to remind

2    them, and we swapped the SPS with the MLDAP because

3    of the testimony, what's different when we got to the

4    messaging LDAP.  Originally, we used the figure on

5    the left --

6    Q    Okay.

7    A    -- so yes.

8    Q    And you answered all of my questions in once --

9    at once, which I -- which I appreciate.  You've added

10   the words "cell network?"  Those are your words,

11   correct?  Those aren't in the actual Sprint document?

12   A    Yes, on top here.

13   Q    Okay.  Let me have you --

14            MR. FINKELSON:  You can take that down, Mr.

15   Baird.

16   BY MR. FINKELSON:

17   Q    Let's look back to the jury binder if you still

18   have that in front of you, sir.  And, again, at tab

19   two, the definition of "cellular network."  This is

20   the white binder that you have, Dr. Akl, by your left

21   hand.

22            (Pause in proceedings.)

23   Q    Do you have that, sir?

24   A    Yes, thank you.

25   Q    Am I correct, Dr. Akl, that it's your opinion

Dr. Akl - Cross                          64

1    that as of 1999, the word "core" in "core network"

2    means "a basic essential or enduring part, or the

3    essential meaning?"

4    A    Sure.

5    Q    And would you agree with me, Dr. Akl, that the

6    meaning of "core," as used in "core network elements"

7    in the Court's definition on the screen, that hasn't

8    changed since 1999, right?

9    A    Sure.

10   Q    You expressed the view quite strongly yesterday,

11   Dr. Akl, that location doesn't matter when

12   determining whether the messaging server is internal

13   or external to the cellular network.  Do you recall

14   that testimony?

15   A    Yes, physical location.  Geography.

16   Q    Let's look at -- I'm going to ask you to look at

17   the document that is DX-198, and I'll bring you up a

18   copy of that.

19            (Pause in proceedings.)

20            MR. FINKELSON:  May I approach, Your Honor?

21            THE COURT:  Yes, you may.

22   BY MR. FINKELSON:

23   Q    I see you've gotten rid of everything else.

24   A    Thank you.

25   Q    You've seen DX-198 before, haven't you, Dr. Akl?

Dr. Akl - Cross                      65

1   A    I think so.

2   Q    You can see this is a Nokia patent, same as the

3   870 patent was a Nokia patent, correct, sir?

4   A    Yes, this is a Nokia patent.

5   Q    And this patent dates back to 1999, just as the

6   870 patent does, correct?

7   A    Yes.

8   Q    Can you turn, Dr. Akl, to column five of this

9   Nokia patent, DX-198?  And if I could direct your

10  attention to lines 60 through 62.  And we'll put

11  those up on the screen as well.  I'll give you a

12  moment to find them.

13            (Pause in proceedings.)

14  Q    Do you have it, Dr. Akl?

15  A    Yes.

16  Q    And this patent says, "The multi-media message

17  service center, MMSC, is a network element, a server,

18  which can be located, for example, in a cellular

19  network or in the internet."  Have I read that

20  correctly?

21  A    Yes.

22  Q    Can you please tell the jury who the inventor is

23  on this patent, Dr. Akl?

24  A    Ms. Aho.

25  Q    And that's the very one in the same Ms. Aho who

1    is the inventor on the 870 patent, correct?  Those

2    are her words?

3    A    Yes.

4    Q    You can put that document to the side, sir.  Now,

5    you agree, Dr. Akl, that the concept of cellular

6    networks has been around since at least 1973?

7    A    Yes.

8    Q    And, in general, a cellular network is a wireless

9    network distributed over land areas called cells,

10   right?

11   A    Yes.

12   Q    You're also familiar with ETSI, am I right, Dr.

13   Akl?

14   A    Yes.

15   Q    And ETSI, I said that right when I was presenting

16   my opening statement to the jury?  That's the

17   European Telecommunications Standards Institute,

18   right?

19   A    Yes.

20   Q    And that was the body, the standards body, that

21   was responsible for GSM and GPRS, right, Dr. Akl?

22   A    Yes.

23   Q    Do you have a copy of the patent in front of you?

24   I think it's PX-2.

25   A    Yes.

Dr. Akl - Cross                                              67

1    Q    And for the benefit of the jury, this is in your

2    notebook as well.  This is the 870 patent.

3              MR. FINKELSON:  Mr. Baird, could you put up

4    figures one and two?

5              (Pause in proceedings.)

6    BY MR. FINKELSON:

7    Q    Do you have in front of you figures one and two

8    of the 870 patent, sir?

9    A    Yes.

10   Q    And figures one and two of the 870 patent show

11   the elements of a GSM cellular network with GPRS

12   services and the oval is labeled "cellular network,"

13   correct?

14   A    Yes.

15   Q    And the acronyms that we see in figures one and

16   figure two, SGSN and GGSN, those are never referenced

17   by the CDMA2000 standards, are they?

18   A    Those letters are used in GSM.  CDMA has a

19   different set of letters for similar components.

20   Q    CDMA2000 doesn't use SGSN or GGSN, right, just to

21   be clear?

22   A    No, I believe they use PDSN.

23   Q    And you mentioned LTE yesterday.  Do you recall

24   that, sir?

25   A    Yes.

1    Q    And that's what's known as 4G technology?

2    A    Correct.

3    Q    And LTE is not accused by Comcast in this case,

4    right?

5              (Pause in proceedings.)

6    A    I'm not sure what you mean by "LTE is not

7    accused."

8    Q    Okay.  Well, let me -- let me --

9    A    Yeah.

10   Q    I can frame it differently.

11   A    Yes.

12   Q    And as opposed to Comcast, I'll just talk to your

13   opinion.  Your opinions in this case are directed at

14   what you've called Sprint's ANSI-41 CDMA2000 cellular

15   network, correct?

16             (Pause in proceedings.)

17   A    I have used those terms, yes.

18   Q    And you've offered no infringement in  -- you,

19   Dr. Akl, have offered no infringement opinion in this

20   case with respect to LTE, right?

21   A    With regard to the components that I looked at,

22   they are not LTE-specific.  So I've identified the

23   messaging servers, the home location registers, the

24   subscriber databases.  Whether these are also used in

25   LTE or not does not change the opinion that I'm

1    rendering.  The focus is not LTE.

2    Q    But you've offered no infringement in this --

3    opinion in this case with respect to LTE, correct?

4    A    I'm not sure I agree with that.

5    Q    You think you've offered infringement opinions in

6    this case against Sprint's LTE network?

7    A    I have not focused on LTE-specific components.

8    That's how I would phrase it.  But the messaging

9    servers are still being used today.  If there is a

10   component in Sprint's CDMA2000 network that may also

11   be used in LTE, then it would equally apply.  But I

12   have not distinguished LTE from CDMA2000.

13   Q    Right.  You focused on 3G, Sprint's 3G cellular

14   network, right?

15   A    Yes.

16   Q    And I'm not -- again, I'm not trying to trick

17   you.  You have reports in this case that you've put

18   forth.  I'm not trying to trick you.  They never

19   accuse Sprint's LTE network, right?

20   A    I'll take your word for it.

21   Q    Okay.  You've done that a lot.  I caution you,

22   you don't have -- you don't have to do that.  But I

23   think you'll find I'm correct.  Let's look, Dr. Akl,

24   at PX-174.

25           THE COURT:  Before we do that, it's 11:10.

Dr. Akl - Cross                          70

1    Let's take our mid-morning break.

2              MR. FINKELSON:  Absolutely, Your Honor.

3              (Jury out, 11:10 a.m.)

4              THE COURT:  We'll be in recess for ten

5    minutes.

6              MR. FINKELSON:  Thank you, Your Honor.  If

7    I can just remind the witness that pursuant to the

8    parties' agreement, discussions during --

9              THE COURT:  Yes, you --

10             MR. FINKELSON:  -- cross-examine

11             THE COURT:  -- can't talk to them.

12             THE WITNESS:  I understand.

13             (Recess taken from 11:11 a.m. to 11:27

14   a.m.)

15             THE COURT:  Be seated, everyone.  We have a

16   note from a jury -- not a jury, one juror.  We'll

17   refer to it as Court Exhibit Number 1, and I'm not

18   sure how we'll answer it.  "I am not sure of the verb

19   being used by the witness expert, Dr. Akl -

20   pronunciation - 'coury' - as in carrier or 'query,'

21   as in questioning.  Thank you."

22             MR. FINKELSON:  I think we'll stipulate

23   that you can tell the jury -- that juror or the jury,

24   in their whole presence, that Dr. Akl is using the

25   word "query."  Right?

Dr. Akl - Cross                          71

1          MR. GOETTLE:  Right.

2          THE COURT:  Q-U-E-R-Y?

3          MR. GOETTLE:  Q-U-E-R-Y, question.

4          MR. FINKELSON:  It did get my stomach

5     moving, Your Honor.  Curry would be nice.

6              (Pause in proceedings.)

7          THE COURT:  All right.

8              (Pause in proceedings.)

9          THE COURT:  I should add quickly that Dr.

10     Akl should feel good about the fact that that's the

11     only question the jury sent out.

12          MR. FINKELSON:  I was -- I was definitely

13     hoping it was something a little bit more monumental

14     like --

15          THE COURT:  Yes.  Yes.

16          MR. FINKELSON:  -- what are we doing here?

17     They -- yeah, they're clearly not doing it.  But the

18     rest of my examination is still --

19              (Jury in, 11:29 a.m.)

20          THE COURT:  Be seated, everyone.  We got a

21     question from one of you, juror number 7.  I'll read

22     the question.  "I am not sure of the verb being used

23     by the witness expert, Dr. Akl - pronunciation -

24     'coury' - as in carrier or 'query,' as in

25     questioning."  The answer is the word is query, Q-U-

1    E-R-Y.  All right.  We'll proceed with the cross-

2    examination.  Michael --

3               MR. FINKELSON:  Thank you, Your Honor.

4    Bless you.

5               THE COURT:  -- time it, today's date and

6    time.

7               MR. FINKELSON:  Mr. Baird, would you mind

8    putting back up on the screen PX-174?

9    BY MR. FINKELSON:

10   Q   Dr. Akl, you have PX-174 on your screen.  Do you

11   see that, sir?

12   A   Yes.

13   Q   And this is one of the documents you talked about

14   earlier today, as well as yesterday, right?

15   A   Yes.

16   Q   You don't know who authored this document,

17   correct?

18   A   Not off the top of my head, no.

19   Q   Now, you have used the term "voice network"

20   before, haven't you, Dr. Akl?

21   A   "Voice network?"  Yes.

22   Q   And a voice network, that's not a separate

23   network from the cellular network, is it?

24   A   I don't think I've used that term.  I think I --

25   I mean I don't remember using it.  I may have

1   referred to voice in a cellular network.  That would

2   be the correct way to describe if I -- if I've said

3   "voice network" before, I don't recall.

4   Q   And you did your dissertation on CDMA cellular

5   networks, correct?

6   A   Yes.

7   Q   And do you recall, Dr. Akl, that you had your

8   deposition in this case?

9   A   Yes.

10  Q   And that was our opportunity to ask you questions

11  under oath, just as you're under oath here today?

12  A   Yes.

13  Q   And you did your best to give complete and

14  truthful testimony during that deposition, which was

15  on March 23rd and March 24th of 2016, didn't you, sir?

16  A   Yes.

17          THE COURT:  Are you going to proceed with

18  the deposition?

19          MR. FINKELSON:  I am, Your Honor.

20          THE COURT:  Let me explain to the jury what

21  a deposition is.  In federal court, ladies and

22  gentlemen, each side can engage in what is called

23  discovery, and that term means exactly what it

24  suggests.  Each side can "discover" what the other

25  side's witnesses will say.  And there are two ways to

Dr. Akl - Cross                                    74

1  do this.  One is by deposition.  To schedule a

2  deposition, the lawyer for one side, in this case,

3  Sprint, would notify the lawyer for Comcast and say

4  please produce your expert for deposition.  And that

5  would be done.  A deposition is a question and answer

6  session under oath.  The witness is placed under

7  oath, as Dr. Akl was placed under oath, and the

8  attorney requesting the deposition then begins the

9  questioning.

10       The other method of obtaining information

11 or discovery about the other side's case is referred

12 to as interrogatories.  They're questions.  So one

13 side would serve the other side questions, and the

14 other side would answer.  All considered discovery,

15 all designed to avoid surprises at trial.  You may

16 proceed.

17       MR. FINKELSON:  Thank you, Your Honor.

18 BY MR. FINKELSON:

19 Q   Thank you, Your Honor.  Dr. Akl, I'm going to ask

20 Mr. Baird to put up on the screen a page from your

21 deposition on March 24th, 2016, so you can orient

22 yourself.

23       MR. FINKELSON:  Could you put up page 252?

24 BY MR. FINKELSON:

25 Q   And I'm showing this page to you first, Dr. Akl,

Dr. Akl - Cross                              75

1    just so you know where we are in the chain of the --

2    of the transcript and you and I are on the same page.

3    If you could look at the very top of the page, you're

4    being questioned with respect to your dissertation.

5    Do you see that, sir?

6    A    Yes.

7    Q    And, indeed, the title of your dissertation makes

8    reference to CDMA networks, correct?

9    A    Yes.

10           MR. FINKELSON:  And if we could turn to the

11   next page of the deposition, Mr. Baird, where the

12   questioning continues.

13   BY MR. FINKELSON:

14   Q    And you were asked about the focus of your

15   dissertation and what that focus was on.

16   A    Yes.

17   Q    And you said,

18           Answer:  "The focus is on capacity and

19   throughput, so the end result being you want a better

20   network.  And how do you get to a better network?"

21   And, again, I think you're talking about the CDMA

22   cellular network.  "You want a better voice network."

23           Do you see that, sir?  Is that your

24   testimony?

25   A    He was zooming in and out as you were reading, so

1    I wasn't able to follow.

2    Q   I'm going to have him zoom back in just so you

3    can see it carefully.  Do you see the reference in

4    your testimony, sir, to a voice network?

5            MR. FINKELSON:  It's in the next line, Mr.

6    Baird.  No problem.

7    BY MR. FINKELSON:

8    Q   "A better voice network."  Do you see that, Dr.

9    Akl?

10   A   Yes.

11   Q   And that's referring to a voice network that is

12   part of a CDMA cellular network, right?

13   A   Yes.  So what I meant there is the voice calling

14   capability in a cellular network when --

15   Q   And you --

16   A   -- I'm referring to my dissertation from 20 years

17   ago -- 16 years ago, sir.

18   Q   And you're calling that voice portion of the

19   cellular network a "voice network," right?

20   A   I did in that response.

21   Q   Yeah.  And you similarly referred to the data

22   portion of a cellular network in your deposition as a

23   data network in the very next sentence, right, Dr.

24   Akl?

25   A   Yeah, this is with respect to my dissertation, so

Dr. Akl - Cross                          77

1    the context is different.

2    Q    And that's why I showed you the context first,

3    but the context of your dissertation was CDMA

4    cellular networks, right?

5    A    Yes, that was what my research was on.

6    Q    And that's what your reference to data networks

7    here relates to, right, sir?

8    A    Yes, I'm describing my research.

9    Q    And you know, Dr. Akl, that the same is true of

10   the term "messaging network?"  It too is sometimes

11   used to refer to a subset of the cellular network,

12   right?

13   A    I disagree.

14   Q    You disagree.  Now, we talked earlier today about

15   your list of publications, all the various papers and

16   presentations you made.  You can't point the jury,

17   can you, Dr. Akl, to any instance -- any instance,

18   not one, in one of your publications where you said

19   that the word "messaging network" refers to a network

20   outside of the cellular network, can you?

21   A    No, and I can tell you why.

22   Q    Well, I -- no is the answer I was looking for.

23   Thank you, sir.

24            THE COURT:  But he can explain.

25   BY MR. FINKELSON:

Dr. Akl - Cross                                    78

1   Q   When I'm writing my research, when I'm doing my

2   work, the context is important.  So here, the Court

3   has defined the term "cellular network," and so there

4   is a construction by the Court, and it's a very

5   specific construction.  The cellular network has to

6   be the phone, the bay station system that

7   communicates with the phone, and the core network

8   elements.

9           In what we're doing this week and next

10  week, that definition is adopted by everybody in all

11  the analysis.  Outside of this courtroom, the term

12  may be used more loosely.  So of course in my papers

13  that I've published years ago I am not going to be

14  using the Court's definition that I hadn't seen.  So

15  this is why the question is really irrelevant.

16  Q   Could you turn, Dr. Akl, back to the Court's

17  construction of "cellular network?"  It's the one

18  that's in tab two of the jury's binders.

19           (Pause in proceedings.)

20  Q   Do you have that, sir?

21  A   Yes, sir.

22  Q   The Court's definition of "cellular network," it

23  doesn't refer to a messaging network, does it, sir?

24  A   No.

25  Q   "Messaging server" -- "messaging network," Dr.

Dr. Akl - Cross                                    79

1   Akl, that's your phrase, correct?

2   A    Yes.

3   Q    And that's a phrase that prior to this case, you

4   had never used before in any of the publications, the

5   papers, the presentations, the book chapters that you

6   told this jury about in introducing yourself,

7   correct?

8   A    I don't recall making a distinction or using the

9   term "messaging network" because my focus is on

10  cellular networks.

11          MR. FINKELSON:  Let's go back if we could,

12  Mr. Baird, to the Exhibit PX-174.

13  BY MR. FINKELSON:

14  Q    I think you referred to some of these acronyms

15  earlier in your testimony today.  You've opined in

16  this case, right, Dr. Akl, that Sprint's messaging

17  LDAP is internal to Sprint's cellular network,

18  correct?

19  A    Yes.

20  Q    Okay.  It's part of the cellular network, right?

21  A    Yes.

22  Q    And this document includes on its list of

23  components the acronym LDAP, correct, L-D-A-P?

24  A    Yes.

25  Q    Okay.  And this document -- you talked earlier

1  today about something called a PDR.  Do you recall

2  that testimony?

3  A   Yes.

4  Q   And I believe you said that the PDR was part of

5  what you're opining is Sprint's messaging server,

6  correct?

7  A   Yes.

8  Q   And what this document says about the PDR -- I

9  think you highlighted -- your counsel highlighted the

10  PDR part, but not the actual explanation of what the

11  PDR is.  And this document says that the PDR was

12  "used on the CDMA network," correct?

13  A   It says it's an "Openwave SMS router" -- which

14  I've used that term -- "that was used on the CDMA

15  network."  I see those words.

16  Q   And the CDMA network is the CDMA cellular

17  network, right, sir?

18  A   The cellular network uses CDMA.

19  Q   And then if you go the definition of SMSC --

20  again, you highlighted the acronym for the jury

21  earlier today, but in terms of the definition of

22  SMSC, the document says that the SMSC is "in Sprint."

23  Do you see that as part of the full description

24  provided for SMSC?

25  A   It says, "The vendor for the SMSC in Sprint is

                         Dr. Akl - Cross                    81

1   Acision."

2   Q   And you also pointed the jury earlier today to

3   the acronym MMSC in this document.

4          MR. FINKELSON:  Mr. Baird, would you

5   highlight that.

6   BY MR. FINKELSON:

7   Q   Now, in the explanation of this MMSC on PX-174 it

8   refers to it as an "iDEN platform."  Do you see those

9   words, sir?

10  A   Yes.

11  Q   Okay.  And, Dr. Akl, that's not even the MMSC

12  that you're offering an opinion on in this case, is

13  it?

14  A   iDEN is a network that existed separately from

15  Sprint and that Sprint purchased I believe in 2006

16  and then went through a process of consolidating what

17  they can from the iDEN network with what they had and

18  save costs.

19  Q   And you haven't provided an infringement opinion

20  in this case regarding the iDEN MMSCs, right, sir?

21  A   I'm not accusing the iDEN network, but to the

22  extent parts from the iDEN network were incorporated

23  in Sprint's cellular network, which happened over

24  different years and there was a conversion we've

25  walked through the jury the different vendors -- and

Dr. Akl - Cross                                    82

1    they went from Comverse to Acision -- then the

2    components of the messaging server or the messaging

3    servers that were used in Sprint's messages, in

4    Sprint's cellular network, regardless where they came

5    from, would infringe.

6    Q   The document refers to an iDEN platform, correct?

7    A   Yes, here, it does.

8    Q   And you are not providing an infringement opinion

9    to this jury with respect to the iDEN platform?

10   A   Yes, the iDEN network on its own is not something

11   that is included in infringement.

12   Q   Thank you very much.  I appreciate that

13   clarification, sir.  Now I want to talk a little bit

14   about -- go ahead, sir.

15   A   Yes.  I know you've highlighted something here,

16   but you haven't asked me on it, and I don't want it

17   to be confusing to the jury.  You highlighted LDAP.

18   Are we going to get to that?

19   Q   I think I asked you about LDAP earlier and I

20   think I asked the questions I had to ask about that.

21   A   I don't recall you did.  LDAP is different than

22   the messaging LDAP, so I don't want confusion.  When

23   I pointed to the subscriber database that was the

24   messaging LDAP.  It was MLDAP.  LDAP on its own is

25   the protocol of the database.  So I don't want the

Dr. Akl - Cross                               83

1   jury to be confused seeing the word "LDAP" with the

2   messaging LDAP, which is the database itself.  This

3   is just the name of the protocol.

4   Q   Okay.  So the messaging LDAP, that's the LDAP

5   database that's used only for messaging?

6   A   The messaging LDAP was one of the subscriber

7   databases that I pointed to that was a precursor to

8   the SPS.

9   Q   And it was used only for messaging, right?

10  A   It was used -- the messaging LDAP and the SPS are

11  used for messaging, but not only for messaging.  They

12  are also queried when phones need to connect to the

13  internet.

14  Q   And I wasn't asking about the SMS -- the SPS.

15  I'm just talking about the messaging LDAP.  Is it

16  your testimony to this jury, sir, that the messaging

17  LDAP is used for things other than messaging at

18  Sprint?

19  A   I don't remember rendering opinions one way or

20  the other.

21  Q   You don't know?

22  A   I don't remember.  But the messaging LDAP is not

23  what we see here highlighted as LDAP.

24  Q   I --

25  A   That's the important issue.

Dr. Akl - Cross                                    84

Q   And I appreciate that clarification.  But your

opinion is that the messaging LDAP, that is a core

network element, in your opinion, of Sprint's

cellular network, right, sir?

A   Yes, because that's what became the SPS, and even

in your opening you had the SPS as part of Sprint's

core network elements.  So that's one thing we agree

upon together.

Q   Let's see if we can find a point of agreement

with respect to routing.  It's your opinion, isn't

it, Dr. Akl, that routing of communications is a

central function of a cellular network, correct?

A   You have to look at context again, not just

routing in general.  In -- whenever I was describing

core network functionality I said the ability to

route a call from a phone to another phone, which is

what the mobile switching center is doing, or to be

able to connect a phone to the internet, which are

what the packet switching nodes were doing.  That's

the context of routing.

Q   And by "packet switching nodes," you're referring

to those PDSN?

A   Yes.

Q   Okay.  And those are used for surfing the

internet, correct?

Dr. Akl - Cross                                    85

1   A    It allows access to packets from the internet

2   onto the phone, correct.  It allows the phone to

3   connect to outside networks, so the internet in that

4   case.  And the mobile switching centers, for example,

5   the public switch telephone networks, so these are

6   the two external networks that we've highlighted.

7   Q    And so if a Sprint subscriber is using his or her

8   phone to surf the web, they're utilizing the PDSN to

9   do that, correct?

10  A    Yes.

11  Q    And it's your opinion that the PDSN, that's a

12  core network element of Sprint's cellular network,

13  correct?

14  A    Yes, and I don't think you disagree.  You had it

15  in your opening too in the figure that you drew to

16  the jury, so --

17  Q    And, actually, it might be a fun way to do this

18  if you and I just switch seats, but let's keep it

19  this way if we can, and we'll try to get through the

20  examination as quickly as we can, sir.  Again,

21  referring to this deposition in this case, you were

22  under oath.  I asked you the question at your

23  deposition, Dr. Akl,

24            Question:  "Would you say that routing of

25  communications is a central function of a cellular

1  network?"  And your answer was,

2          Answer:  "Yes," correct?

3  A   Yes.

4  Q   And that was truthful testimony, right?

5  A   Yes, based on the context that I've explained to

6  the jury today.

7  Q   And in your opinion, Dr. Akl, the function of the

8  core network of a cellular network is to route

9  communications between the bay station system and

10 external networks, right?

11 A   Between the phones, really, and the external

12 networks through the bay station system.

13         MR. GOETTLE:  Your Honor, I'm sorry.  I

14 just -- I missed writing down the page.  It was up

15 there so quick.  I missed writing down the page

16 number of that exhibit.

17         MR. FINKELSON:  Oh, we'll put it back up.

18         MR. GOETTLE:  I'm wondering if I can just

19 get the page number.  Thank you.

20         THE COURT:  Well, don't you have the page?

21 Someone has that page.

22         MR. FINKELSON:  I have the page.  Counsel

23 was just asking because he didn't have an opportunity

24 to write it down, sir.

25         MR. GOETTLE:  I have it.

Dr. Akl - Cross

1          THE COURT:  Well, why don't you give it to

2    him?

3          MR. GOETTLE:   He did.

4          MR. FINKELSON:  I did.

5          MR. GOETTLE:  I have what I need.  He told

6    me.

7          THE COURT:  I missed it.  Continue.

8          (Pause in proceedings.)

9    BY MR. FINKELSON:

10   Q   It's your opinion, correct, Dr. Akl, that the

11   function of the core network of a cellular network is

12   to route communications between the bay station

13   systems and external networks, correct?

14   A   Yes.  I would go one step further and say it's

15   really the phones that are connected to the bay

16   station systems.  If you just connect the towers, it

17   doesn't really get you very far.

18   Q   Fair enough.  But that's what the core network

19   does, in your opinion, correct?

20   A   Core network -- yes, it connects the phones to

21   each other and it connects the -- it allows the

22   phones to connect to the external network.  So in my

23   analogy, it was the operators that say at the

24   switchboard, the Lily Tomlin, that's the switching

25   and the lookup.  Those are the core essential

Dr. Akl - Cross                                    88

1   functionality.

2   Q    And it's your testimony that that was the case as

3   well in 1999, right?

4   A    Yes, except it was replaced by computers.

5   Q    But you would agree that not every core network

6   element communications directly with the bay station

7   system, correct?

8   A    Correct.

9   Q    In fact, the HLR is an example?  The HLR, which

10  you've testified is a core network element, it

11  doesn't communicate directly with the bay station

12  system, does it?

13  A    No, the HLR is the subscriber database, again,

14  that contains the location of the phone.  So there

15  needs to be a lookup in the HLR to know where the

16  phone is so you can deliver a call to a phone.

17  Q    And, similarly, not every core network element

18  communicates directly with external networks,

19  correct?

20  A    Correct.

21  Q    The HLR, again, it doesn't communicate directly

22  with external networks, does it?

23  A    No, you want the HLR to be as secure as possible

24  because it contains sensitive subscriber information.

25  Q    But in your opinion, the HLR is still a core

1   network element because it assists or plays a role in

2   routing of communications between the core network

3   and external networks, isn't that right, sir?

4   A    The HLR is an essential core network element

5   because you need to do the lookup in the HLR to know

6   the location of the phone so you can connect those

7   phones to the external network, yes.

8   Q    So the HLR is a core network element because it

9   assists or plays a role in routing of communications

10  between the core network and external networks, even

11  though it doesn't itself communicate directly with

12  the external networks, right?

13  A    You can't have the routing if you don't know what

14  to route, so the -- by saying "assist" -- it's a

15  crucial functionality, that lookup, yes.

16  Q    Okay.  And I asked you about the concept of

17  routing at your deposition.  Do you recall that, sir?

18  A    I'm sure you're going to refresh my mind.

19  Q    Okay.  Well, specifically, I asked you whether

20  each element in the core network actually itself

21  needs to route.  Do you remember that line of

22  questions?

23  A    No, but if you want to put the transcript, we can

24  look at it.

25  Q    Happy to.

Dr. Akl - Cross                                90

1          MR. FINKELSON:  If we could pull up, Mr.

2    Baird, page 112 starting at line four?

3              (Pause in proceedings.)

4    BY MR. FINKELSON:

5    Q   Do you have that testimony in front of you, Dr.

6    Akl?  That's from your deposition?  And take your

7    time, sir.

8              (Pause in proceedings.)

9    A   Yes, I read my answer.

10   Q   And in your deposition, Dr. Akl, you said,

11          Answer: "Each individual element doesn't

12   necessarily need to actively route, but it assists or

13   play a role in the routing of communication between

14   the core network and external networks," correct?

15   That's the function of a core network element?  That

16   was your testimony, right?

17   A   Yes.

18   Q   Okay.  And isn't it true, Dr. Akl, that Sprint's

19   messaging server, the ones that you have been

20   speaking to this jury about, its SMSCs and its MMSCs,

21   those help with routing communications, don't they,

22   sir?

23   A   No.

24          MR. FINKELSON:  Mr. Baird, can we look at

25   page 120 of Dr. Akl's deposition?

Dr. Akl - Cross                              91

1          (Pause in proceedings.)

2     BY MR. FINKELSON:

3     Q   And I'll try to do this as little as possible,

4     but if you and I have a disagreement, you don't think

5     I've fairly characterized what you've said, I'll drop

6     your testimony on the floor.  And then I'll ask you

7     about it.  And what I said to you at your deposition,

8     Dr. Akl, is,

9          Question:  "It's fair to say as a general

10    matter that Sprint's accused SMSCs and MMSCs help

11    with routing communications?"  Have I read that

12    question accurately as I posed it to you at your

13    deposition?

14    A   Yes, and --

15    Q   And by "accused SMSCs and MMSCs," I was referring

16    to the SMSCs and MMSCs that you are telling this jury

17    infringed the 870 patent, right?

18    A   Yes, the SMSCs and the MMSCs in this context is

19    correct, but this is a different question on routing

20    that we were talking about essential core elements

21    that do the routing of the phone to the external

22    network.

23    Q   Okay.

24    A   So that distinction is important.

25    Q   And I appreciate that.  But I asked you,

Dr. Akl - Cross                    92

1        Question:  "Is it fair to say as a general

2   matter that Sprint's accused SMSCs and MMSCs help

3   with routing communications?"  And I got a

4   straightforward answer.  And that answer was,

5        Answer:  "Yes, the SMSC and the MMSC in

6   Sprint's telecommunications system help in routing

7   communications."

8   A    Yes.

9   Q    That's what you told me, right?

10  A    In the context of as a general matter.

11  Q    And I've shown you the context.  It's in your

12  deposition and it's talking about the SMSCs and MMSCs

13  that you are asserting infringed the 870 patent,

14  right, sir?

15  A    Yes.

16  Q    And, in fact, you know, Dr. Akl, that Sprint's

17  accused messaging servers, its SMSCs and its MMSCs,

18  actually perform routing, right?

19  A    Routing of what?

20  Q    Routing of communications.

21  A    In what context?

22  Q    In the context that we're talking about here

23  today and yesterday, the context of Sprint's SMS and

24  MMS that Comcast is accusing of infringement in this

25  case and on which you are opining.

1    A    They have the functionality of they receive a

2    text message and then they forward it.  That is not

3    the routing in the context that we're describing.  So

4    we have to be careful how we use those terms, in a

5    specific context or generally.

6    Q    You would agree, wouldn't you, Dr. Akl, that

7    forwarding of an SMS or MMS message is an example of

8    routing communications?

9    A    Yes, in a -- in general.

10   Q    And you testified earlier today that Sprint's

11   messaging servers, in fact, at one point in time

12   included in them something called an SMS router,

13   right?

14   A    Yes.

15   Q    And you are aware, Dr. Akl, of what's called the

16   inter-carrier gateway, right?

17   A    Yes.

18   Q    And the inter-carrier gateway, that's not inside

19   of Sprint's cellular network, right?

20   A    No.

21   Q    It's external to Sprint's cellular network,

22   correct?  Do you want to refer to the picture in the

23   diagram?

24   A    I think it's good.

25   Q    Sure.

Dr. Akl - Cross                    94

1    A    Just for the jury's sake, PX-99?

2             MR. FINKELSON:  Mr. Baird, could you pull

3    up PX-99 so Dr. Akl can refer to it?

4             THE WITNESS:  So the inter-carrier -- we

5    have two inter-carrier gateways and we have an inter-

6    carrier MMS and SMS, so when I was describing earlier

7    when you have a text message from somebody outside of

8    Sprint's network coming in it comes through the

9    inter-carrier gateway to the messaging server.  This

10   is how someone outside of Sprint like from AT&T or

11   Verizon, T-Mobile, communicate with a subscriber with

12   Sprint, and, similarly, a subscriber with Sprint can

13   communicate with someone outside.  Yes.

14   BY MR. FINKELSON:

15   Q    And the inter-carrier gateway is external to

16   Sprint's cellular network, right?

17   A    Yes.

18   Q    And it --

19   A    It's not a core network element.

20   Q    And, in fact -- and I think you just described

21   this.  It essentially acts as a liaison between

22   different carriers so say a Sprint subscriber can

23   communicate with T-Mobile subscriber, right?

24   A    That is correct, that's what these are, so we can

25   have different carriers talk to each other, or send

1   text messages in this case, or MMS messages.

2   Q   When I, as a Sprint subscriber, which I'll state

3   for the sake of the record I'm not -- when I, as a

4   Sprint subscriber, send an SMS message to a T-Mobile

5   subscriber, as an example, it is Sprint's SMSC that

6   sends that SMS message to the external inter-carrier

7   gateway, correct, Dr. Akl?

8   A   Yes.

9   Q   It's not Sprint's mobile switching center that

10  does it, right?

11  A   Yes, it goes to the messaging server and it goes

12  out to the inter-carrier, and it doesn't even go in

13  Sprint's network.

14  Q   Correct.  It's not routed by Sprint's mobile

15  switching center, is it?

16  A   No, and that's a good thing.  You don't want to

17  bog the Sprint network.  That's the whole point.

18  Q   And it's not routed by Sprint's packet switching

19  node, is it?

20  A   Absolutely.  You don't want to do that.

21  Q   It's routed by the SMSC, correct?

22  A   No, the SMSC gets it and gets rid of it.

23  Q   Okay.  It gets rid of it by sending it along to

24  the T-Mobile subscriber, correct?  And that's -- it's

25  your testimony to this jury that delivering this

1   message so that it goes to the inter-carrier gateway

2   so that it can go to the T-Mobile subscriber, that's

3   not routing communication?  Is that your testimony,

4   sir?

5   A    That's not routing in the context of what

6   essential or core network element means.  So going --

7   we always have to go back to the Court's claim

8   construction.  We have "core network element," and

9   what does "core" mean?  It's "essential."  What does

10  it mean to be "essential?"  You're doing the routing

11  of the phones to the external networks.  This is

12  we're going to complete that call or we're going to

13  connect to the internet.  So there is routing.  There

14  is routing in Sprint's messaging network.  There is

15  routing in the cellular network.  But "routing," as a

16  term, is used just you're moving things around.  But

17  we are focusing on what is essential, and there is

18  essential routing or switching when you connect those

19  phones to the external networks.  So we want to be

20  very clear how we use those terms.

21  Q    And the way you use the term is that the routing

22  of communications to external networks is an

23  essential core network function, right?

24  A    The routing of the calls from the phones to the

25  external networks or the routing of the calls from

1    the phone to each other.  So the core network

2    elements, like the mobile switching center, like the

3    subscriber databases that are doing the lookup --

4    that's going back to the analogy, the switchboard.

5    These are the two functionalities.  You want to

6    connect the call.  You need to lookup to be able to

7    connect the call.

8    Q   We're not here talking about calls, are we?

9    A   We are talking about a Sprint cellular network.

10   So core -- calls are a huge part of Sprint's cellular

11   network.

12   Q   Is it your testimony, sir, that the only things

13   that are in Sprint's core network are those things

14   that relate to voice telephone calls like in your

15   Lily Tomlin switching example?

16   A   No, I don't believe I ever said that because we

17   in -- we talk about the mobile switching centers that

18   connect the call.  We also talk about the PDSN, the

19   packet switching component that allow you to connect

20   to the internet.  So I am including regular calls,

21   I'm including like packet calls, like voice over IP,

22   which is what we've moved to, I am including being

23   able to connect to the internet.  Those are the

24   switching -- the core functionality.

25   Q   Okay.

1    A    The other stuff are external.  Messaging,

2    voicemail, that's adjunct services.

3    Q    So core functionality, it's your testimony that

4    involves making voice calls and surfing the internet,

5    but it does not involve sending SMS or MMS messages?

6    A    This is based on the Court's construction, based

7    on the '99 patent, based on the specification, this

8    is what we're describing, yes.

9    Q    Okay.  Thank you.  I appreciate that.  Now,

10   you've also said, I believe, that another function of

11   a core network, of a cellular network, is connecting

12   subscribers within a cellular network, right?

13   A    Yes.

14   Q    And that's the example of a Sprint to Sprint, as

15   opposed to Sprint to T-Mobile?

16   A    Yes.

17   Q    And when a Sprint subscriber sends and SMS

18   message to another Sprint subscriber that message

19   goes through Sprint's SMSC, doesn't it?

20   A    Yes.

21   Q    And without that SMSC, would you agree that I

22   can't be connected to that other Sprint subscriber so

23   that she can receive my SMS message?

24   A    You cannot send a text message if you take out

25   the messaging server --

1    Q    And --

2    A    -- I agree.

3    Q    I didn't mean to cut you off.  I thought you were

4    done with your answer.  And the same is true of an

5    MMS message, correct?

6    A    Yes, you would not have a messaging network.

7    That's exactly -- your messaging network would break.

8    Q    Now, switching gears a little bit, Dr. Akl.  You

9    talked yesterday with counsel for Comcast about the

10   ANSI-41 standard.  Do you remember that, sir?

11   A    Yes.

12   Q    And the ANSI-41 standard, that's interchangeably

13   referred to as IS41, right?

14   A    Yes.

15   Q    And a person of ordinary skill in this field that

16   brings us here would look to cellular standards

17   documents to understand what "core network" means,

18   correct?

19   A    They may, yes.

20   Q    Yeah.  And that would have been true in 1999 as

21   well, right?

22   A    Yes.

23   Q    And you would agree that a person of ordinary

24   skill in the art would not use GSM standards when

25   implementing an IS41 telecommunications system,

Dr. Akl - Cross                               100

1   right?

2   A    Yes.

3   Q    Such a person would like to the IS41, also known

4   as ANSI-41 standards, right?

5   A    Yes.

6   Q    Okay.  Let's take a look at the ANSI standard.

7   It's the -- it's the big one from yesterday.  If you

8   still have it there, it's DX-3.

9            MR. FINKELSON:  And I believe, Your

10  Honor -- did you admit it into evidence?

11           MR. GOETTLE:  I did not and I took it back.

12  Do you need it?

13           MR. FINKELSON:  No.  Do you have any

14  objection to me moving it into evidence during my

15  examination?

16           MR. GOETTLE:  I think it's already on

17  (indiscernible) motion.

18           MR. FINKELSON:  Your Honor, I'd move the

19  admission of DX-3.

20           THE COURT:  There's no objection?

21           MR. GOETTLE:  No objection, Your Honor.

22           THE COURT:  DX-3 is received.

23           (Defendant's Exhibit 3, document, is

24  admitted into evidence.)

25           MR. FINKELSON:  Thank you, Your Honor.

Dr. Akl - Cross                    101

1          THE WITNESS:  Do you want to give me a copy

2     just in case?

3     BY MR. FINKELSON:

4     Q    I was actually trying to spare you that --

5     A    That's fine.

6     Q    -- in hopes you still had it, but I will get you

7     a copy.  Just give me one second.

8               (Pause in proceedings.)

9               MR. FINKELSON:  May I approach, Your Honor?

10              THE COURT:  You may.

11              THE WITNESS:  Thank you.

12              (Pause in proceedings.)

13    BY MR. FINKELSON:

14    Q    Are you settled?  Do you have DX-3?

15    A    Yes.

16    Q    All of it?

17    A    Yes.

18              MR. FINKELSON:  Mr. Baird, can you please

19    turn us to the page that ends with the numbers 867?

20              (Pause in proceedings.)

21    BY MR. FINKELSON:

22    Q    Do you see the history of the ANSI-41 standard

23    listed here, Dr. Akl?

24    A    Yes.

25    Q    And it actually makes specific reference to a

Dr. Akl - Cross                    102

1   July 1997 initial ANSI publication, right?

2   A    Yes.

3   Q    And that's the American National Standards

4   Institute, right?

5   A    Yes.

6   Q    Now, yesterday, I believe you also said that this

7   ANSI-41 standard was not a recommendation, right?

8   A    I believe I said it did not recommend, with

9   respect to the messaging server, if it's inside or

10  outside.

11  Q    You actually discussed with the jury portions of

12  what is found in this large document at chapter one,

13  which is entitled "Functional Overview," right?

14  A    Yes.

15  Q    Okay.

16        MR. FINKELSON:  Can you please highlight or

17  bring up, Mr. Baird, the page ended in 862?

18  BY MR. FINKELSON:

19  Q    And there, you see chapter one, "Functional

20  Overview," right, Dr. Akl?

21  A    Yes.

22        MR. FINKELSON:  And, Mr. Baird, could you

23  now please turn to the page ending in 866?  Sorry to

24  make you jump around.  And if you could highlight

25  right there, that would be perfect.  On the first

1    line.  Right about it, actually.

2    BY MR. FINKELSON:

3    Q   And here, in DX-3, Dr. Akl, which is the ANSI-41

4    standard, it says, "The recommendations included in

5    this series are," and then it makes reference to

6    chapter one, correct?

7    A   Yes.

8    Q   I'd like to show you --

9          MR. FINKELSON:  You can take that down.

10   BY MR. FINKELSON:

11   Q   I'd like to show you another document that I

12   don't believe you saw yesterday, and it's been marked

13   as DX-4.

14         (Pause in proceedings.)

15         MR. FINKELSON:  Your Honor, DX-4 has not

16   yet been admitted into evidence, but I would move it

17   into evidence if you have no objection.

18         MR. GOETTLE:  I don't even know what it is.

19         MR. FINKELSON:  Sure.

20         (Pause in proceedings.)

21         MR. GOETTLE:  Your Honor, I'd like to stick

22   to our plan of not moving evidence in during cross.

23         THE COURT:  Well, we --

24         MR. FINKELSON:  That's fine.  We can --

25         THE COURT:  -- sort of departed --

Dr. Akl - Cross                    104

1          MR. GOETTLE:  We just don't like doing this

2    on the fly and not having a chance to --

3          MR. FINKELSON:  That's fine.  I didn't mean

4    for that at all.

5          MR. GOETTLE:  Okay.

6          MR. FINKELSON:  We're happy to -- I'll use

7    it with the witness just for purposes of cross-

8    examination, Your Honor, and --

9          THE COURT:  Fine.

10          MR. FINKELSON:  -- then we'll move it into

11    evidence in our case in chief.

12          THE COURT:  Fine.  Now what we're talking

13    about is whether a defendant cross-examining the

14    plaintiff's witness can move documents into evidence

15    in the -- as has been done, or whether the defendant

16    should wait until the plaintiff rests and the

17    defendant begins its case.  It's all technical, but

18    that is what's going on now.  And I'm flexible on the

19    issue, but the way we're going to approach this from

20    now on, in cross-examination, you may refer to

21    documents, but you may not move them into evidence.

22          MR. FINKELSON:  Understood, Your Honor.  As

23    I said, we'll wait and so move during our --

24          (Pause in proceedings.)

25          MR. GOETTLE:  Counsel, do you have any

1   objection to me putting the first page of it up on

2   the screen as I present it to the witness?

3          MR. GOETTLE:  No.

4   BY MR. FINKELSON:

5   Q   Dr. Akl, I'm going to bring you a copy of DX-4.

6          MR. FINKELSON:  Your Honor, may I approach?

7          THE COURT:  Yes.

8   BY MR. FINKELSON:

9   Q   And I have to take this back because it's

10  (indiscernible).

11  A   Thank you.

12  Q   Dr. Akl, you recognize DX-4, correct?

13  A   Yes.

14  Q   And this is another CDMA2000 standards document?

15  A   Yes.

16  Q   It's entitled "Network Reference Model for

17  CDMA2000 Spread Spectrum Systems," right?

18  A   Yes.

19          MR. FINKELSON:  Mr. Baird, could you please

20  take those two -- the page ending in 821?

21  BY MR. FINKELSON:

22  Q   821 is where we're heading, Dr. Akl, and it's

23  going to show up on your screen as well.  Do you see

24  the section, Dr. Akl, entitled "Purpose and Scope?"

25  A   Yes.

1  Q   And it says that the purpose and scope of this

2  CDMA2000 standards document --

3              MR. GOETTLE:  Sorry to interrupt.  Your

4  Honor -- you have a page up.  I mean if we're going

5  to do that and it's okay, I'll do it in my case,

6  but --

7              MR. FINKELSON:  Sorry, what's the

8  objection?

9              MR. GOETTLE:  You have the whole page up

10  instead of just the snippet that you're crossing

11  with, right?

12              MR. FINKELSON:  It was faded into the

13  background, so I was just -- I was focused on this,

14  but --

15              MR. GOETTLE:  I know.

16              MR. FINKELSON:  -- I'm happy to show the

17  whole --

18              MR. GOETTLE:  I know you didn't do it on

19  purpose, but --

20              MR. FINKELSON:  Fair enough.  You have --

21  you have no objection to me showing him the specific

22  portion I'm asking about, do you?

23              MR. GOETTLE:  I think that's what we were

24  supposed to be doing.

25              THE COURT:  Yes, that's --

Dr. Akl - Cross                                107

1              MR. FINKELSON:  Understood.  Mr. Baird,

2      would you --

3              THE COURT:  -- the way we can do it.

4              MR. FINKELSON:  -- please put --

5              THE COURT:  That's the way we'll proceed

6      from now on.

7              MR. FINKELSON:  And, Your Honor, I was not

8      intending to do it any different way.

9              THE COURT:  I understand.

10             MR. FINKELSON:  So just the --

11             (Pause in proceedings.)

12     BY MR. FINKELSON:

13     Q   All right, with much (indiscernible), Dr. Akl,

14     "Purpose and Scope" in this CDMA2000 standards

15     document, do you see that in front of you, sir?

16     A   Yes.

17     Q   And it says, "This document recommends the basic

18     3G52 wireless network reference model," correct?

19     A   Yes.

20     Q   Okay.  Let's go back to the document you were

21     talking about --

22             MR. FINKELSON:  And you can take that down.

23     BY MR. FINKELSON:

24     Q   -- earlier today at the end of your testimony

25     when you were talking about the analysis you did with

Dr. Akl - Cross                          108

1  respect to the number of steps that you believe are

2  required to send an SMS message or an MMS message.

3  Do you recall that, sir?  And I think it's PX-99.

4            (Pause in proceedings.)

5            MR. FINKELSON:  And, actually, Mr. Baird,

6  if you could just take us to the very first of those

7  diagrams I think on page three?  That's perfect.

8  BY MR. FINKELSON:

9  Q   I just wanted to show you the first one just to

10 orient you, Dr. Akl, but I'm correct, right, that for

11 your opinions regarding the number of steps you

12 relied on this document PX-99, right?

13 A   Yes.

14 Q   And your opinions regarding the number of steps

15 were to assess the role that you think the 870 patent

16 plays in Sprint's provision of messaging services,

17 right?

18 A   Yes, as a result of conversation that I had with

19 the damages expert, Ms. Riley.

20 Q   Ms. Riley asked you to do a particular analysis

21 and you did it?

22 A   Ms. Riley asked me from a technical point of view

23 to look and provide her technical analysis that then

24 she can use to crunch the numbers.

25 Q   And that's a much longer way of saying exactly

Dr. Akl - Cross                                    109

1   what I was trying to ask you.  And then you conveyed

2   that information to Ms. Riley for her use, correct?

3   A   Yes.

4   Q   And as part of your analysis -- and I didn't hear

5   it today and I may just have missed it.  But as part

6   of the analysis, you identified certain steps that

7   you called primary, correct?

8   A   I don't think I used the word "primary" yesterday

9   or today.

10  Q   Correct, you didn't.  And I did want to make sure

11  I didn't mishear it.  You didn't use it yesterday or

12  today, but you did use it in the course of rendering

13  you opinions in your expert reports in this case,

14  correct?

15  A   Yes.

16  Q   Is there a reason you didn't use it in front of

17  the jury?

18  A   No, I didn't think it was necessary.

19  Q   You labeled certain steps as primary steps as

20  part of formulating this opinion for Ms. Riley's

21  usage, right?

22  A   In my report, you mean?

23  Q   Yes.  And you identified 12 steps if I'm correct,

24  right?

25  A   Yes.

Dr. Akl - Cross                                    110

1   Q    And those are the very same 12 what you call

2   primary steps that you identified for the jury

3   earlier today, correct, sir?

4   A    Yes.  Again, I didn't necessarily use the word

5   "primary," but we looked at the call flow diagram

6   that is a Sprint document and I counted the

7   infringing steps.

8   Q    And you counted 12 of them?  You counted 12 total

9   steps?

10  A    Depending on which one we were looking at.

11  Q    Fair enough.  In your opinion, all of the steps

12  that you have called primary and that you've

13  identified for this jury, all of those steps are

14  equally important to messaging, correct?

15  A    So two things.  If we can drop the word "primary"

16  because, again, that's not a word that I've used in

17  my testimony yesterday or today?  I put equal weight

18  on the steps, and even the ones that were not shown

19  like the communication -- there were two steps inside

20  the message -- the subscriber databases.  I didn't

21  even count those.  But I didn't put more weight to

22  more steps than others.  And then we looked at the

23  different scenarios and my understanding is Ms. Riley

24  took the most conservative number out of all the

25  different scenarios and that's the one that she used.

1    Q   So all of the steps that you've identified, you

2    weighted them equally, correct?

3    A   Yes.

4    Q   And in your view, that's because they're equally

5    important to messaging, right?

6    A   I did not want to bias one step versus another

7    and then go through why is this more important or

8    less important.  I think it's easier just looking at

9    Sprint's document.  They did not differentiate and I

10   did not make that distinction.

11   Q   But you did omit from your count of steps certain

12   what you called in at least your expert report in

13   this case sub-steps, right?

14   A   I did not omit based on this document.  So I

15   looked at this specific document and I counted what's

16   on this document.

17   Q   But you did identify in the course of rendering

18   your opinions in this case several what you called

19   sub-steps that are not shown in this document, right?

20   A   Not yesterday or today.

21   Q   In the course of rendering your opinions in this

22   case?

23   A   Yes.

24   Q   And is there a reason you didn't use the

25   terminology sub-steps with this jury even though you

Dr. Akl - Cross                              112

1  used them in the course of rendering your expert

2  reports in this case?

3  A   It was not necessary.  Looking at this document,

4  there are no primary and sub-steps and secondary,

5  so --

6  Q   In fact, right, none of -- none of these diagrams

7  that are in PX-99 use the word "sub-step" or "primary

8  step," do they?

9  A   That's correct.

10  Q   Okay.  In the course of rendering your expert

11  reports at least you came up with those labels

12  yourself, right?

13  A   When I was doing the analysis and doing the

14  expert report, for a specific context I wanted to

15  make a distinction.  That distinction wasn't

16  necessary for the information that I wanted to relay

17  to the jury.

18  Q   But just to be fair, the specific context in

19  which you related in your expert report is the

20  context of this case, right?

21  A   Yes.

22  Q   You would agree, wouldn't you, Dr. Akl, that in

23  sending SMS or MMS messages, Sprint can't send those

24  messages without the mobile switching center either?

25  A   The mobile switching center has to eventually

Dr. Akl - Cross                                    113

1    connect to the phone and it does for calls, for

2    everything really.

3    Q    Right, including messaging, correct?

4    A    Yes.

5    Q    And in sending an SMS or MMS message, Sprint

6    can't do that without the bay station system, the

7    towers, right?  It can't do it without the bay

8    station system?

9    A    Yes.  So you need the infrastructure, which you

10   do for a -- for a call.

11   Q    And it can't --

12   A    That's correct.

13   Q    Sorry, I thought you were done.  And it also --

14   in sending an SMS or MMS message, Sprint can't do

15   that without what's called the radio access network,

16   right?

17   A    Yes, those are steps that are done regardless of

18   what you're doing.  There is signaling and control,

19   if you recall in my introduction, that have to take

20   place for the phone to communicate with the antennas

21   and the cell phone tower and the bay station

22   controller, and then it goes to the mobile switching

23   center, that is correct.

24   Q    And in sending SMS or MMS messages, Sprint can't

25   do that without the communication between the radio

1   access network and the switch, correct?

2   A   Yes.

3   Q   And in sending SMS or MMS messages, Sprint can't

4   do so without communications between the switch and

5   the messaging server, right?

6   A   Yes, there are a lot of those routine steps that

7   have to take place just because you have a cellular

8   network.  In order to have a wireless mobile phone

9   that's going to connect, you need to be able to talk

10  to the antennas, yes.

11  Q   And you just used the term "routine steps" and

12  you didn't include any of those routine steps in your

13  count of steps that you presented to the jury here

14  today, right?

15  A   That is correct.

16  Q   Now, you were here, Dr. Akl, for Comcast's

17  opening statement on Wednesday?  I think I saw you in

18  the back, correct?

19  A   Yes.

20  Q   And you heard Comcast counsel talk over and over

21  again about speed?  Do you remember that?

22  A   Yes.

23  Q   Speed is at the core of this patent.  That was

24  the very first set of words that you heard from

25  Comcast counsel, and you heard that as well, right,

Dr. Akl - Cross                          115

1    Dr. Akl?

2    A    Yes.

3    Q    And as we've talked about, you've reviewed the

4    870 patent over and over in the course of forming

5    your opinions in this case, haven't you?

6    A    I have.

7    Q    And that's the 870 patent that is behind tab one

8    of this jury's binders, and it's in front of you

9    under that pile.  I'll give you a second to get to

10   it.

11   A    Yes.

12   Q    It's 23 pages long (indiscernible), Dr. Akl?

13   A    Yes.

14   Q    And you know, don't you, that nowhere, not once,

15   in the 23 pages of the 870 patent does the word

16   "speed" ever show up?

17   A    Actually, I think the word "expedient" shows up,

18   which is what I have in my slide, which means

19   "speed," but yes.

20   Q    No, the word "speed" never shows up, does it?

21          (Pause in proceedings.)

22   A    One second.

23          (Pause in proceedings.)

24   A    The word is "expedient," yes.

25   Q    The word -- the word "speed" --

Dr. Akl - Redirect                    116

1    A    Yes.

2    Q    -- never shows up, correct?

3    A    Yes.  Yes.  We have the word "expedient," which

4    means "speed."

5    Q    And the word "speedier" never shows up, the word

6    "fast" never shows up, the word "faster" never shows

7    up, the word "quick" never shows up, "quicker" never

8    shows up, right?

9    A    Yes.

10   Q    Thank you.  I have no further questions, Dr. Akl.

11           (Pause in proceedings.)

12           MR. GOETTLE:  May I proceed, Your Honor?

13           THE COURT:  You may.

14                   REDIRECT EXAMINATION

15   BY MR. GOETTLE:

16   Q    Dr. Akl, you were asked -- you were asked whether

17   you could send an SMS message without a messaging

18   server.  Do you recall that?

19   A    Yes.

20   Q    What was your answer?

21   A    No.

22   Q    Why not?

23   A    Because you need the two functionalities of the

24   messaging server.  You need the ability to be able to

25   store and forward, and you need the ability to do the

Dr. Akl - Redirect                    117

1  query.  So the messaging server is important to

2  receive the message and to do the query.

3  Q   Is the same true for both sending and receiving

4  SMS messages and sending and receiving MMS messages?

5  A   Yes.

6  Q   Okay.  If you don't have a messaging server at

7  all -- at all in Sprint's network, does the cellular

8  network work?

9  A   Yes, the cellular network is completely fine.

10  Nothing breaks in the cellular network.  You can make

11  calls and you can surf the internet.

12  Q   When did Sprint first have a cellular network?

13  A   In 1996.

14  Q   Did that network in 1996 include any messaging at

15  all?

16  A   No.

17  Q   Did Sprint's cellular network in 1996 work?

18  A   Yes.  That was actually -- I had a Sprint phone

19  back then.

20  Q   Do you recall during the cross-examination that

21  you were asked about whether you had shown the jury a

22  single document that used the word "core" or used the

23  word "core network?"

24  A   I remember the question.

25  Q   And what was your answer?

Dr. Akl - Redirect                                118

1    A    The answer -- I said I don't think so, no.

2    Q    Why not?

3    A    Because the standards don't force you in terms of

4    what needs to be inside or outside or what needs to

5    be core or not.  So the jury is deciding based on

6    this patent is the messaging server internal or

7    external?  And another way of phrasing that, the jury

8    is deciding is the messaging server a core network

9    element or not?  And the standards make

10   recommendations.  And you saw -- I didn't get a

11   chance to rebut because I'm only supposed to answer

12   yes or no -- when he was putting a lot of the CDMA

13   documents and it uses the word "recommends."  What I

14   was answering is yes, the word "recommends" are

15   there.  It recommends functionality.  It does not

16   recommend location.  It does not recommend internal

17   or external.  There is no document that tells you

18   what is -- what has to be inside the core network.

19   Q    So -- okay.  So and then --

20            MR. GOETTLE:  Could we put up DX-3, which

21   is already in evidence, Your Honor?

22   BY MR. GOETTLE:

23   Q    Is this one of the documents that counsel for

24   Sprint showed to you?

25   A    Yes.

Dr. Akl - Redirect                                      119

1    Q    And this is one of the CDMA documents you were

2    just referring to?

3    A    Yes.

4    Q    Okay.  And this document, does this say

5    anything -- well, I don't remember where it is, but

6    is this one of the documents where the word

7    "recommends" was included?

8    A    Yeah, I think he went to a page in it that said,

9    you know, chapters one, two, and three, and the

10   heading right before it said "recommends."  I'm not

11   disagreeing that there are recommendations of

12   functionality.  That's the figure that I had showed

13   the jury yesterday.  The issue is there is no

14   recommendation to have it inside or outside, and

15   that's what I believe Sprint's counsel made in their

16   opening.  He said the evidence is going to show the

17   standard recommends that it's inside, and that's not

18   correct.

19   Q    So -- and did the jury see this during -- this

20   document during your testimony yesterday?

21   A    Yes.

22   Q    Okay.

23         MR. GOETTLE:  Can we go to the page -- I

24   want to say it was 1-27.

25         THE WITNESS:  Or 24.

Dr. Akl - Redirect

1    MR. GOETTLE:  It may have been 1-24.

2    (Pause in proceedings.)

3    MR. GOETTLE:  Can we blow up -- can we just

4    blow it up, the heading of -- next to five down

5    through the bottom of the figure, including figure

6    two?  Thank you.

7    BY MR. GOETTLE:

8    Q    Dr. Akl, did you show this figure to the jury

9    yesterday?

10   A    Yes.

11   Q    Does this contain any recommendation -- well,

12   first of all, what component in this -- what box in

13   this figure has the functionality of storing and

14   forwarding messages?

15   A    The MC has the functionality of storing and

16   forwarding messages.

17   Q    Okay.  And based on what you've just seen on the

18   picture right now, do you -- can you tell one way or

19   the other whether the standard is recommending that

20   that MC, having that storing and functioning --

21   storing and forwarding functionality, is part of a

22   cellular network?  Is there a recommendation?

23   A    No.

24   Q    What does it say?

25   A    The -- it says at the top, it says, "Figure two

Dr. Akl - Redirect                    121

1   presents functional entities and the associated

2   reference points that may logically -- may logically

3   comprise a cellular network."  So, again, this is

4   consistent with the Court's construction for cellular

5   network, "may."  And we are looking at the different

6   components, and the jury is going to decide is it

7   core or not?  That's why we're here, in a sense.  The

8   standards don't force you one way or the other, they

9   don't recommend that it be internal.  And looking at

10  all the documents and the analysis that I did,

11  looking at the invention, you don't want it to be

12  inside.  In fact, the recommendation is to have it

13  external.  And, again, that's not physically

14  external.  You know, Sprint's network covers the

15  entire U.S.  I'm not going to put the messaging

16  server in Canada to be external.  It means its

17  functionality, it's -- external is not a core network

18  element.  That's what that means.

19  Q   Actually, just stepping back to make sure there's

20  no confusion, what is the correlation between what

21  we're hearing CDMA network, or CDMA, versus cellular

22  network?  Are they -- how do those fit together, if

23  they fit together?

24  A   Yes.  So the air interface -- and that sounds

25  very complicated.  If you put -- one of the slides,

Dr. Akl - Redirect                           122

1   like my intro slides on background of the cellular --

2   Q   Would you like us to put it up?

3   A   Yes, please, if we can.

4           MR. GOETTLE:  Can you put up Plaintiff's

5   Demonstratives Number 2, the slide presentation we

6   were using of Dr. Akl's?

7           (Pause in proceedings.)

8           THE WITNESS:  So the -- yeah.  Just like

9   the -- the first slide after when I said section one,

10  background, would be -- would be sufficient.  I have

11  it as slide ten, but it may be different.  Yeah, the

12  one right after this one.

13          So the hardest part over a lot of the

14  innovation we see between the different networks and

15  how they compete is this part with regard to

16  cellular.  So it's how the phone communicates with

17  the tower.  This is what we call the radio interface.

18  And going back to the Court's construction of a

19  cellular network, there are three components.  You

20  need the phone, you need the bay station systems, and

21  you need the core network.  So when reference to

22  CDMA, which stands for code division multiple access,

23  it's referring to how do you have all these phones

24  here, the hundreds of phones, communicate with the

25  tower?

Dr. Akl - Redirect                                    123

1          So this aspect for this case, the

2    communication between the phone and the tower isn't

3    really at issue.  But that's what makes it CDMA

4    because you want to have all these different users

5    communicate with an antenna.  And you have to use a

6    channel.  The channel is the air.  So the way you can

7    do it, you can either divide the channel into

8    frequencies, like your radio.  You have different

9    channels on you radio and you tune in to a specific

10   frequency.  That is FDMA, which is frequency division

11   multiple access.  You can have different time slots.

12   This is what GSM uses, for example.  You divide the

13   channel into channels and then you have little slices

14   of time that you assign to each user.  This is time

15   division multiple access, which is TDMA.

16          CDMA is code division multiple access, so

17   you assign different codes for different users, and

18   they all transmit at the same time.  And it sounds

19   crazy.  By using the codes, you can differentiate

20   between one user and another.  And the description

21   that I just gave you is the first lecture that I give

22   my seniors in engineering when they take my class,

23   Intro to Wireless Communication.  We talk about the

24   different methods of the phone communication.

25          When we talk about 2G we have GSM, we have

Dr. Akl - Redirect                                124

1    that time division, frequency division.  CDMA is code

2    division.  When we look at LTE with 4G they use a

3    combination.  It's very complicated, but you have

4    these very narrow frequency divisions called OFDM.

5    None of that is really the issue.  We're not arguing

6    how does the phone talk with the tower.  But that's

7    what CDMA is.  And so when a carrier uses a specific

8    air interface it's not uncommon to refer to their

9    network by their air interface.  So CDMA is the air

10   interface in Sprint, and so it's common to say, you

11   know, the CDMA network because that's the wireless

12   part.  And with AT&T, we would say it's, you know,

13   the TDMA.  And now with LTE, we can say it's the

14   OFDM.  But that's the air interface.  But here, we

15   have to go back to -- we have to be very precise.  We

16   are talking about Sprint's cellular network and we

17   look at the phone, the tower, and the core network

18   elements, and in that context we are classifying what

19   a cellular network is.

20          So this is the very long answer to why does

21   CDMA appear in so many documents?  What's its role?

22   Why is it important?  Because it's what makes the

23   phones -- the code division is what makes the phone

24   talk with the antennas.  That's what Qualcomm came up

25   with.

Dr. Akl - Redirect                          125

1   Q   So with what Qualcomm came up with called CDMA,

2   is that used after you get the signal to the tower

3   and onto a wire going out to the core network and

4   other networks?  Is CDMA technology used on those

5   wires?

6   A   No.  So we would still look at the standard

7   that's describing it, but the CDMA part is only here.

8   That's the code division multiple access, how we have

9   all these phones with different codes talking at the

10  same time.  And the analogy that I give my students

11  to understand it is frequency division, one person

12  talks, you have different channels.  Time division,

13  we can't talk at the same time.  I'm talking, you're

14  listening, you've raised your hand, then you can

15  talk.  Code division, we're all in a room, everybody

16  is talking at the same time, but each is talking in a

17  different language.  So two people are talking in

18  English, two people are talking in Spanish.  You

19  cannot hear the other person in the background, but

20  they don't interfere with each other and you

21  understand the conversation.  But this is the air

22  interface.  That's what CDMA is in a nutshell.

23              MR. GOETTLE:  Can you go to -- can you flip

24  to slide -- I think that says 53.

25              THE COURT:  I want you to be concerned

126

1    about a logical breaking point.

2              MR. GOETTLE:  We can break whenever you

3    want, Your Honor.

4              THE COURT:  It's 12:35.

5              MR. GOETTLE:  Now is --

6              THE COURT:  Is this a good --

7              MR. GOETTLE:  Now is fine.

8              THE COURT:  -- good time?

9              MR. GOETTLE:  Yes, sir.

10             THE COURT:  All right.  Let's recess for

11   lunch for an hour.  I'll give you my -- what will

12   become my usual instructions noontime and day-in.

13   You know more about the case now.  You might be

14   tempted to talk about the case among yourselves.  Do

15   not.  And do not talk to anyone else about the case.

16   I remind you about my instructions concerning

17   communications with the lawyers, the witnesses, and

18   the other people in the courtroom.  Have no contact

19   with them at all.  They are instructed to have no

20   contact with you.  They're not being rude.  I'll save

21   my radio, television, and newspaper comments for the

22   day in.  And with that, we're in recess for an hour.

23   Take your books and your binders with you.

24             (Jury out, 12:34 p.m.)

25             THE COURT:  You may be seated, everybody.

1    You may step down, Doctor.

2              THE WITNESS:  Thank you, Your Honor.

3              THE COURT:  Is there anything we have to

4    address?

5              MR. GOETTLE:  Not from Comcast, Your Honor.

6              MR. FINKELSON:  Not for Sprint, Your Honor.

7              THE COURT:  Something occurred to me.  It's

8    something we talk about in every case.  I don't know

9    how you're going to do it in this case.  Exhibits

10   during jury deliberations, have you given any thought

11   to that?

12             MR. FINKELSON:  Yes.

13             THE COURT:  Are you planning on giving

14   hardcopy --

15             MR. GOETTLE:  Yes, Your Honor.

16             MR. FINKELSON:  Yes, Your Honor.

17             THE COURT:  -- of every exhibit?

18             MR. GOETTLE:  Of the admitted exhibits,

19   yes, Your Honor.

20             THE COURT:  What about the three volumes?

21             MR. GOETTLE:  Those are admitted.  That was

22   my -- whether -- I don't have any high hopes that the

23   jury will actually go through them, but I think if

24   they're, the jury should have access to it.

25             MR. FINKELSON:  Well, just to be clear, the

128

1    documents in them are admitted, not the binders

2    themselves.

3          MR. GOETTLE:  Oh, the format of how we get

4    them to the --

5          THE COURT:  Oh, no, wait a minute.  No.

6    Are you talking about whether it goes out in a binder

7    or loose papers?

8          MR. FINKELSON:  I was just talking about

9    the exhibits, Your Honor, versus in a binder that is

10   entitled "Support for Dr. Robert Akl."  If you --

11         THE COURT:  Oh.

12         MR. FINKELSON:  If Your Honor prefers

13   binders that --

14         THE COURT:  (Indiscernible) Dr. Akl

15   (indiscernible).

16         MR. FINKELSON:  That just seems -- that

17   just seems a little bit --

18         THE COURT:  I haven't seen that.  Is that

19   what it says?

20         MR. FINKELSON:  Yes.

21         THE COURT:  That will not go out.

22         MR. GOETTLE:  Oh, I -- sorry, I apologize

23   for that.  Those labels were just for us to know

24   which binder.  I wasn't thinking about that.  I never

25   intended the jury to see the front cover --

129

1          MR. FINKELSON:  No.

2          MR. GOETTLE:  -- and I don't think they

3     did.

4          THE COURT:  Will we -- I don't know how

5     many exhibits we'll have, but -- will we need

6     something like a front-end loader to move the

7     exhibits?

8          MR. GOETTLE:  No, Your Honor, we have -- I

9     mean we have put in -- I think we've put in the

10    majority of our exhibits.  I think it's a quite

11    manageable volume.  It won't take up a wall.

12         THE COURT:  Oh.  Well, I've learned one

13    thing from this case.  In a case of this sort, do not

14    request two copies of all the exhibits.  All right,

15    just as long as we're on the same issue and we

16    understand one another.  Exhibits that are identified

17    as supporting a particular witness, the exhibits

18    themselves can go out, but not the -- not the

19    binders.  I haven't looked at --

20         MR. FINKELSON:  I was -- I was getting

21    ready, Your Honor.  You were looking at me like you

22    were going to tell me I was crazy, so --

23         THE COURT:  Well, I thought -- I thought we

24    were talking about something like this, and I'm

25    holding up a plain binder.  But just be concerned

130

1    about getting all of the exhibits to the jury.

2    That's generally my practice unless there's a reason

3    why an exhibit should not go out.  And I see none of

4    that at this -- in this case.

5              MR. FINKELSON:  Thank you.

6              THE COURT:  All right.  Recess until 1:40.

7              (Luncheon recess taken, 12:37 p.m.)

8

9                         *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

131

1                        I N D E X

2

3   PLAINTIFF'S WITNESSES     DIRECT CROSS REDIRECT RECROSS

4   Robert Akl

5     By Mr. Goettle            5          116

6     By Mr. Finkelson               31

7

8   PLAINTIFF'S EXHIBITS          ADMITTED INTO EVIDENCE

9   1, 2, 44, 94, 99,    Documents          9

10  114, 115, 118, 120   Documents          9

11  125, 127, 174, 186   Documents          9

12  49, 56, 161, 163     Documents          26

13  164, 167, 168, 172   Documents          26

14  177, 485, 525        Documents          26

15  171                  Document           27

16

17  DEFENDANT'S EXHIBITS          ADMITTED INTO EVIDENCE

18  3                    Document           100

19

20                          *  *  *

21

22

23

24

25

CERTIFICATION

    I, Michael Keating, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

2/3/17
_____

Date

_____

Michael Keating