```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                       - - -

COMCAST CABLE            : CIVIL NO. 12-859
COMMUNICATIONS, LLC,     :
et al.,                  :
              Plaintiff  :
                         :
                         :
                         :
                         :
                         :
      v.                 :
                         :
                         :
                         :
                         :
                         :
                         :
SPRINT COMMUNICATIONS    : Philadelphia, Pennsylvania
COMPANY L.P., et al.,    : February 6, 2017
              Defendant  : 9:35 a.m.

                       - - -

    TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 6
         BEFORE THE HONORABLE JAN E. DUBOIS
            UNITED STATES DISTRICT JUDGE

                       - - -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104
```

2

```
 1   APPEARANCES:            (Continued)

 2   For the Defendant:      DAVID E. FINKELSON, ESQUIRE
                             BRIAN C. RIOPELLE, ESQUIRE
 3                           McGuire Woods, LLP
                             Gateway Plaza
 4                           800 East Canal Street
                             Richmond, VA 23219
 5
                             COLLEEN H. SIMPSON, ESQUIRE
 6                           Harkins Cunningham, LLP
                             4000 Two Commerce Square
 7                           2001 Market Street
                             Philadelphia, PA 19103
 8
                                  - - -
 9
     Audio Operator:         Michael Cosgrove
10
     Transcribed By:         Michael T. Keating
11
                                  - - -
12
              Proceedings recorded by electronic sound
13   recording; transcript produced by computer-aided
     transcription service.
14
                                  - - -
15

16

17

18

19

20

21

22

23

24

25
```

1          (The following was heard in open court at

2     9:35 a.m.)

3              THE COURT:  Good morning, everyone.

4              ALL:  Good morning, Your Honor.

5              THE COURT:  Please be seated.  Mr.

6     Riopelle, I believe you have an issue?

7              MR. FINKELSON:  I think -- it's Mr.

8     Finkelson, Your Honor.  I'll present it I think

9     because it will be easier for me to get through than

10    Mr. Riopelle.

11             Unfortunately, similar to the situation we

12    had with one of the jurors over the weekend, Mr.

13    Riopelle's father-in-law died suddenly over the

14    course of the weekend, and we wanted to bring that

15    issue to the Court's attention.  We alerted Mr. Heist

16    to it yesterday evening.  We're doing our best to

17    kind of push through that circumstance, but wanted to

18    raise it with the Court and present a potential

19    schedule modification to accommodate the situation so

20    that Mr. Riopelle towards the end of the week into

21    the weekend can go home and be with his family for

22    the services and the like.

23             THE COURT:  We certainly will endeavor to

24    do that.

25             MR. FINKELSON:  Well, we were -- what we're

4

1    thinking about -- and, obviously, Your Honor, it will

2    depend on how the evidence plays out over the coming

3    days and how quickly we're able to proceed.  But if

4    we look at how we're putting on our case, we think it

5    will take up most of the week.  Obviously, Comcast

6    has to complete its case first.  Mr. Riopelle is

7    largely going to be handling the damages aspects of

8    the case, so that will be towards the end of our

9    presentation.

10           If the schedule breaks as we think it is

11   going to break -- and, obviously, we'll play this by

12   ear, but one thing that we were considering and

13   wanted to raise with the Court was whether we could

14   stop at kind of the half day point on Friday to

15   enable Mr. Riopelle to get home and be with his

16   family for the visitation that evening.  And then

17   there's services in Virginia over the weekend, and

18   then on Monday, there is a service in West Virginia

19   that Mr. Riopelle would like to attend.

20           So what it boils down to is essentially

21   asking the Court whether we might just do a half day

22   on Friday, take Monday off so that Mr. Riopelle can

23   be there.  And then he'll be back late Monday evening

24   and then we would be able to resume.

25           THE COURT:  On that schedule, would you be

1  able to finish during the week of the 13th?

2       MR. FINKELSON:  That would be our

3  expectation.  Obviously, we don't have -- we don't

4  know exactly what Comcast may put on in its rebuttal

5  case.  But our expectation has always been that the

6  jury would get the case on the pace we're proceeding

7  by no later than Wednesday.  So if we lose a day and

8  a half, that would put us -- put the case in the

9  jury's hands by Friday, as we kind of sketch it as

10 best we can.  And I don't know if the folks on the

11 other side see it the same way.

12      THE COURT:  Well, a little bit will depend

13 on whether you're going to offer evidence of both

14 obviousness and anticipation.  What is your plan?

15      MR. FINKELSON:  We plan to present both,

16 Your Honor.  I don't -- I don't believe that that

17 will raise a -- I don't believe that will come as a

18 surprise to the other side or raise a significant

19 additional time burden as the evidence comes in.

20 Obviously, it will raise some.  But I had that in

21 mind in speaking to the schedule.

22      THE COURT:  Well, I'm certainly going to do

23 our -- we'll do our very best to accommodate you, Mr.

24 Riopelle.  And I see no reason why we can't adopt a

25 modified schedule.

6

1          MR. RIOPELLE:  Thank you, Your Honor.

2          THE COURT:  First and foremost, you have

3    our condolences on your loss.  How long is your

4    rebuttal case?

5          MR. GOETTLE:  Well, because it's a rebuttal

6    case, it's going to depend on what we hear this week.

7    So I don't know that I can give you an estimate.  I

8    would imagine a day or two, but it's -- I think the

9    schedule, if it works out this way, that sounds right

10   to me, that the jury would have the case at the

11   latest, next Friday, maybe earlier, even with the day

12   and a half in the middle.

13         THE COURT:  At the latest, next Friday?

14         MR. GOETTLE:  Well, that -- at the latest,

15   yes, Your Honor.

16         THE COURT:  Oh, you mean next Friday?

17         MR. GOETTLE:  A week from -- yes.  After

18   Valentine's Day.  That's kind of what I've been

19   targeting as the end -- the end of this case, that

20   Friday right after.  But it could be sooner, Your

21   Honor.  Again, it just depends on how their case

22   unfolds.

23         THE COURT:  That doesn't raise my comfort

24   level.  You estimated it was a two and a half week

25   long case.

7

1      MR. GOETTLE:  We actually estimated -- I
2  think both parties estimated two weeks, Your Honor,
3  and I believe you gave a little grace period thinking
4  that maybe we were being optimistic.  So we have a --
5  we had a buffer built in from the beginning, as far
6  as Dan Goettle was concerned.  It seemed like we had
7  a little bit of a buffer.
8      THE COURT:  You're right.  And --
9      MR. GOETTLE:  I didn't want to speak for
10 anybody else in the room.
11      MR. FINKELSON:  The (indiscernible)
12 Valentine's Day buffer.
13      MR. GOETTLE:  Yes.
14      THE COURT:  But you're going beyond the
15 buffer?
16      MR. GOETTLE:  Well, I don't think so, not
17 in terms of trial days, no, Your Honor.
18      THE COURT:  All right.  Well, we'll --
19 certainly, we're going to accommodate Mr. Riopelle.
20      MR. GOETTLE:  Absolutely.
21      THE COURT:  And we'll see what happens.
22      MR. FINKELSON:  Thank you, Your Honor.
23      MR. RIOPELLE:  Thank you, Your Honor.
24      THE COURT:  All right.  Ms. Hull.
25      (Pause in proceedings.)

Ms. Riley - Direct                                    8

1              (Jury in, 9:41 a.m.)

2              THE COURT:  Good morning, everyone.  Please

3       be seated.  Mr. Heist, you may continue.

4              MR. HEIST:  Thank you, Your Honor.

5              THE COURT:  Good morning, Ms. Riley.

6              THE WITNESS:  Good morning, Your Honor.

7                        DIRECT EXAMINATION

8       BY MR. HEIST:

9       Q    Ms. Riley, just before we broke on Friday, we

10      were talking about the various steps in your damage

11      model under the income approach.  Very, very quickly,

12      I'd just like to go back and go through a few of the

13      slides we talked about on Friday so we can pick up

14      where we left off.  So we have slide 24 on the

15      screen.  Those are the five steps of your damage

16      model, correct?

17      A    That's correct.

18      Q    And then moving on to slide 25.

19              (Pause in proceedings.)

20      Q    Moving on to slide 25, we talked about

21      determining the apportionment percentage.

22      A    That's correct.

23      Q    And just remind the jury what apportionment was

24      again.

25      A    Well, we have "apportionment" defined in the

1   orange here on the slide.  So apportionment is

2   necessary because we want to separate the value of

3   the patented steps in Sprint's process for sending

4   and receiving messages from the value in the

5   unpatented steps.  And this is an acknowledgment that

6   not all of Sprint's messaging revenue and profit is

7   due to its infringement of the 870 patent.  So I'm

8   going to be using this word "apportionment" to

9   describe that concept, profit attributable -- revenue

10  and profit attributable to the 870 as compared to

11  revenue and profit attributable to non-patented

12  steps.

13  Q    Then moving on to slide 26, we determine the

14  apportionment percentage under various scenarios that

15  were provided to you by Dr. Akl, correct?

16  A    Correct.

17  Q    And what --

18  A    So we heard Dr. Akl discuss his review of the

19  call flow diagrams provided by Sprint in the case.

20  So here, we have the received SMS analysis of Dr. Akl

21  where, for example, if we look at the bottom, we're

22  analyzing infringement of claim 113, utilizing the

23  SPS, for messages coming from the inter-carrier

24  gateway to a Sprint customer where two out of nine of

25  those steps infringe.  And two divided by nine is 22

1   percent.  And then he also analyzed under claim 113,

2   a Sprint to Sprint message, where two out of seven of

3   those steps infringe.  Two divided by seven is 29

4   percent.  And then I calculated a weighted average

5   based on the percentage of messages that come from

6   other carriers to Sprint customers as compared to

7   Sprint to Sprint.  And that yielded at 24 percent

8   weight average.  So, again, that -- the way to think

9   about that is the percentage of steps that infringe

10  the 870 patent is 24 percent when we're looking at

11  claim 113.

12  Q   And then we did that for sent SMS messages.

13  That's slide 27, right?

14  A   That's correct.  Using Dr. Akl's analysis, we did

15  sent SMS in the same -- using the same methodology.

16  We also did the MMS messages.  Here, you have the

17  received MMS messages, same methodology, and the sent

18  MMS messages, using that same methodology.

19  Q   And then you looked at all of the percentages

20  from the various scenarios that Dr. Akl gave you and

21  selected the lowest percentage?

22  A   That's correct.  So all the percentages are shown

23  here based on my calculations that quantify Dr. Akl's

24  analysis, and I selected the 24 percent because it is

25  the lowest.  So that means 24 percent of the steps

1    infringe the 870 patent, and I applied that

2    throughout my analysis, picking the lowest number

3    just to be most favorable to Sprint.

4    Q   All right.  Then we went on to the next step.

5    You calculate the apportioned revenue per message.

6    And let's look at slide 33 again and then we'll move

7    on from where we left off.

8    A   Okay.  So yeah, briefly, we did see this on

9    Friday where we're taking the messaging revenue

10   earned by Sprint.  And I'll just focus on the SMS

11   column, the $17.226 billion in messaging revenue

12   earned during the damages period.  And I divided that

13   by the number of messages sent and received in order

14   to determine revenue per message of .85 cents per

15   message.  So that's just less than one penny per

16   message.

17           Now, this step brings in the apportionment

18   analysis that we just reviewed.  So we multiply the

19   24 percent by the revenue per message to get the

20   apportioned revenue per message.  So this is just the

21   revenue that relates to the 870 patent.  And that

22   calculation gives me .204 cents for each SMS message

23   and .240 for each MMS message.  So, again, revenue

24   attributable to use of the 870 patent for each

25   message.

1   Q   All right.  So now we're -- that's where we left

2   off on Friday, so now let's move forward to the next

3   step in your damage model.  It's step three.  Could

4   you explain what that is?

5   A   Well, now we're going to look to determine the

6   apportioned royalty rate.  So we'll multiply that

7   rate by the apportioned revenue per message to

8   proceed to the damages calculation.  So there are six

9   steps in determining the apportioned royalty rate,

10  and I'll walk you through each of those steps.

11  Q   So let's go to -- let's call them sub-steps

12  because it's -- we have a series of steps and this is

13  sub-steps within step number three.  So let's go to

14  the first of those sub-steps.  And what is that?

15  I'll show you slide 35.

16  A   In the first step, I determined Sprint's

17  messaging profitability percentage.  And another way

18  to refer to this percentage is a profit margin.  So I

19  reviewed Sprint's messaging revenue and the costs it

20  generated -- or the costs it incurred in generating

21  that revenue in order to determine this profitability

22  percentage.

23  Q   And what fed into that?  Let's go on to your next

24  slide, 36.

25  A   What fed into that is the revenue from messaging

Ms. Riley - Direct                    13

1    that we have just looked at, that $17 billion number

2    plus the MMS revenue number.  And then the costs

3    Sprint incurred are incremental costs of providing

4    messaging.  They also incurred costs related to

5    selling, general, and administrative expenses, which

6    I've shorthanded here to SG&A as an acronym.  And so

7    I subtract those costs and then divide through by the

8    same revenue number to calculate the profit margin

9    for messaging.  So this is just unique to messaging.

10   Q   So let's take a look at the numbers that fed into

11   that computation.  We'll look at slide number 37.

12   Could you explain that for us?

13   A   So here, down at the bottom of your slide, we

14   have the revenue again from the prior slide.  And

15   then the incremental costs are in yellow -- and this

16   was determined by Mr. Webber, who you're going to

17   hear from after I finish my testimony -- of $1.112

18   billion.  And that's based on his analysis of network

19   costs, data center costs, that he'll describe to you

20   during his testimony.  And then also subtracting

21   costs of $7.1 billion, which I obtained from my

22   analysis of Sprint's profit and loss statements for

23   the CDMA subscribers.  So those are the costs it

24   incurs from the selling and general and

25   administrative expense side.  Taking those numbers

Ms. Riley - Direct                    14

1   together, performing the calculation, I determined a

2   53.8 percent profit margin on messaging.

3   Q   So let's take a look at the next slide, slide 38.

4   What have you illustrated there?

5   A   This is just a pictorial way for us to think

6   about what I just said instead of looking at things

7   in a fraction.  So here's a dollar and we're -- the

8   calculation that I just described shows us that of

9   each dollar, Sprint pays costs of 46.2 percent, or

10  46.2 cents of the dollar go to cost, and the

11  remainder is profit, so that's the green portion of

12  the dollar.  So it's just a way to show you kind of

13  from a visual perspective what this profitability

14  looks like.  So there's my 53.8 percent that I

15  calculated for messaging profit.

16  Q   So this is a dollar of messaging revenue?

17  A   That's correct.

18  Q   Okay.  Let's discuss the second subset that you

19  carried out in determining the apportioned royalty

20  rate.

21  A   Well, the second sub-step relates to looking at

22  Sprint's profit on its services provided to CDMA

23  subscribers.  And so I have Paul, the actor, who

24  maybe you saw on the Super Bowl last night.  He

25  does -- he works for Sprint now.  He worked for

1   Verizon for a long time.  And he is encouraging

2   customers to switch to the Sprint network.  So Sprint

3   provides data, talk, and text, and other services to

4   its CDMA subscribers.  And I looked at financial

5   documents that demonstrated the profit Sprint earns

6   on providing all those services to CDMA subscribers.

7   And that profit is 23 percent during the period of

8   infringement.  So that's what I think about as

9   Sprint's normal level of profitability for services

10  it provides to CDMA subscribers.  And we're going to

11  compare that profit to the profit just on messaging

12  that I went through on the prior step.

13  Q   So let's go on.  What is the third sub-step?

14  A   The third sub-step, we go back to the dollar.

15  And you just saw this graphic where we have our

16  profit of 53.8 percent, but now we have to let Sprint

17  keep some of that profit because that's what it

18  normally earns in providing its services to the CDMA

19  subscribers.  So we have part of the green portion of

20  the dollar being kept by Sprint on the next slide.

21  Q   Looking at slide 41.

22  A   Right.  There's our normal level of profit, the

23  23 percent that Sprint earns on providing all the

24  services to its CDMA subscribers.  So now we have

25  30.8 percent of that dollar remaining as excess

Ms. Riley - Direct                          16

1    profit due to messaging -- on messaging revenue I

2    should say.

3    Q   Now, did that make sense to you, 30.8 percent

4    excess profit?  And if so, why?

5    A   It did make sense to me based on other

6    information, evidence in the record.  And so one

7    thing that I looked at, and I have it for you on the

8    next slide, as a reasonableness check for this excess

9    profit is the deposition testimony of Mr. Yarkosky,

10   who is a Sprint representative.  And he was asked at

11   the top,

12          Question:  "Did Sprint have to build say

13   more cell towers in order to offer text messaging?"

14   And he answered,

15          Answer:  "No, they did not."  And he was

16   asked,

17          Question:  "Why didn't they need to build

18   new cell towers to be able to offer text messaging?"

19   And he responded,

20          Answer:  "The way the text messaging is

21   delivered via the cellular network, or specifically,

22   across the RF network, is that the text messages --

23   and I will even be more specific to a CDMA network.

24   Text messages are delivered over the air interface

25   signaling channels.  So the existing cell towers were

Ms. Riley - Direct                    17

1   already in place, the necessary infrastructure at the

2   bay stations were already in place to support this.

3   So the RF technology supported text messaging as it

4   was defined in the standards and built by the

5   infrastructure suppliers for our bay stations.  So

6   there was no necessity to actually add infrastructure

7   at the cell towers or to add additional cell towers

8   to support it."

9           So when I look at this testimony and I

10  think about the excess profit I just calculated, it

11  agrees.  That's a good reasonableness check because

12  Mr. Yarkosky tells us that Sprint did not have to add

13  additional infrastructure to support messaging.

14  Q   Did you see any other documents or documents in

15  Sprint's file that were produced to you that

16  supported this idea?

17  A   Yes, there was another document from Gartner,

18  which is a large industry -- a group that studies the

19  industry, the cellular industry.  And Gartner had

20  published a study that stated, "Messaging was a cash

21  cow for carriers" -- and that was one of the quotes

22  from the study, if I recall correctly -- because it

23  had low bandwidth requirements and generated a lot of

24  revenue.  So that was another input that I could use

25  as a reasonableness check on my excess profit

Ms. Riley - Direct                                    18

1    calculation.  It made sense to me that the numbers I

2    was seeing based on Sprint's business documents that

3    it produced in the litigation, it made sense to me

4    that the calculation of profit related to messaging

5    was much higher than the calculation of profit

6    related to all CDMA services.

7    Q    Did you come up with an analogy to kind of

8    explain that concept to the jury?

9    A    I did.  So the next slide has a picture of a bus

10   lane, and you heard Dr. Akl talk about how the text

11   messages are traveling in the control channel.  So I

12   think about a bus lane, a dedicated bus lane, that

13   other cars can't drive in, and the buses carry the

14   messages for free.  They're free riders in that

15   control channel, which isn't used by the voice

16   communications -- or is seldom used, I should say.

17          This is another picture with the buses in

18   their bus lane, and the messages are just riding free

19   on the buses which are already in that bus lane,

20   because you recall Dr. Akl was mentioning how in that

21   control channel, just occasionally, the phones need

22   to say hello, I'm here, are you there, but it doesn't

23   have to be monopolized by voice communication.  It

24   just needs to find phones.

25          So the messages are piled on those buses

1    that are already transiting in that seldom used

2    control channel.  So that's kind of the way that I

3    visualize this level of profitability and where these

4    messages are in the network.  Of course, it's

5    completely simplified, but as a layperson -- I'm not

6    the technical expert, but this is just my

7    visualization of that concept.

8    Q    And what is the fourth sub-step that you used to

9    calculate the apportioned royalty rate?

10   A    Well, the fourth sub-step goes back to our

11   dollar, and we have our excess profit of 30.8

12   percent.  So Sprint gets to keep the yellow portion

13   of the dollar, the blue portion of the dollar goes to

14   pay the cost, and now we need to focus in on that

15   green portion of the dollar and figure out how much

16   of that would be paid as a royalty.

17            So the first thing I need to do is multiply

18   that green portion of the dollar, the excess profit,

19   by my 24 percent, which is my apportionment.

20   Remember that's the number -- percentage of steps

21   that infringe the 870 patent.  And that gives me 7.39

22   percent of the dollar.  So Sprint gets to keep that

23   yellow portion that represents the non-870 steps, and

24   I now have the excess profitability related to just

25   the 870 steps.

Ms. Riley - Direct                                    20

1    Q    And that's 7.39 percent?

2    A    That's correct.

3    Q    Now, what is the fifth sub-step that you went

4    through to determine the apportioned message --

5    A    The fifth sub --

6    Q    -- pardon me, the apportioned royalty rate?

7    A    The fifth sub-step takes us back to the table.

8    So we're at the bargaining table, we're at the

9    negotiating table.  And the parties are going to use

10   the information I just went through regarding the

11   profitability attributable to the 870 patent to

12   estimate a bargaining range.  And in order to do

13   this, I looked at the record to find studies that

14   related to customers' use of messaging from -- that

15   Sprint had taken, so customer surveys.  And you look

16   on Nokia's side of the table, Nokia is talking about

17   a study that showed half of Sprint's subscribers use

18   MMS.  So this is a study that was in the record as

19   PX-608.

20          Sprint, on the other side of the table, is

21   saying hold on, I have a study that shows 28 percent

22   of subscribers are heavy messaging users, so how

23   about rely on that number to set our bargaining

24   range?  And that study is found in the record at

25   PX-610.  So this is just using documents from

Ms. Riley - Direct                        21

1    Sprint's -- generated in Sprint's ordinary course of

2    business relating to the popularity of messaging to

3    frame this bargaining range so that we can figure out

4    how much of that profit will be paid as a royalty.

5    Q    So let's go to the next slide, 48.  Could you --

6    this is kind of a math computation.  Can you explain

7    what's shown on this slide?

8    A    Yeah, this is the math, that's correct, where

9    we're taking the study relating to MMS, and Nokia is

10   bringing that in to its negotiating position saying

11   please pay me half of that 7.39 excess profit as a

12   royalty.  Sprint says hold on a minute, that's too

13   much.  How about just 28 percent of that 7.39?  And

14   the next slide actually shows what the numbers would

15   be.  If we multiply 7.39 percent by 50 percent, that

16   gives us 3.7 percent.  And Nokia says hey, that's

17   pretty good.  What about 3.7 percent of the

18   apportioned messaging revenue?  And Sprint says I

19   prefer to think about 28 percent of that excess

20   profit.  And if I multiply those numbers together, I

21   get 2.07 percent.  So that's how the parties would

22   determine this bargaining range.  Again, based on

23   these documents showing customers' use of the

24   messages -- messaging, they come to this range of

25   2.07 percent to 3.7 percent.

Ms. Riley - Direct                            22

1    Q    All right.  What's the next sub-step?

2    A    The next sub-step is to determine the apportioned

3    royalty rate.  And so this is our last sub-step.  And

4    I applied the Georgia-Pacific factors.  And these are

5    factors from a very famous court case, patent

6    infringement case, from about 40 years ago, where

7    Georgia-Pacific, the paper company, was involved.  So

8    these are steps that I apply in every analysis of

9    patent damages, and I have a listing of all the

10   factors here.  There are 15 of them.  And I

11   considered all 15 of them.  But in coming to the

12   final apportioned royalty rate, I relied on two

13   particular factors to help me form my conclusion.

14           The first factor is shown here in yellow,

15   number 11, considering the extent of use by the

16   infringer and evidence probative of the value of that

17   use.  So I've been talking with you all a lot about

18   the number of messages and the profitability that

19   Sprint has earned on messaging over and above that on

20   its normal business -- normal CDMA services.  So that

21   extent of use is incorporated in the analysis, and

22   the evidence probative of the value of that use is

23   certainly the profit.  So that tends to weigh in

24   Nokia's favor.

25           Then the second factor that I think is very

Ms. Riley - Direct                          23

1  important is number 13, which is highlighted here,

2  and that's the portion of the realizable profit that

3  should be credited to the patented invention, as

4  distinguished from non-patented elements, business

5  risks, or improvements added by infringer.  So this

6  is where I take a look at what Sprint has contributed

7  to the provision of messaging.  And Sprint has -- you

8  know, does a lot of advertising, they had a Super

9  Bowl ad last night, they built out the voice network.

10 So there's negotiating power that comes with those

11 contributions.  So I think it's important to consider

12 that factor and note that it would weigh in Sprint's

13 favor as the parties are sitting at the negotiating

14 table.

15 Q   So based on your analysis of the Georgia-Pacific

16 factors, and in particular, the two that you

17 highlighted, number 11 and number 13, what was your

18 conclusion as to the rate?

19 A   My conclusion as to the rate is shown here on the

20 next slide.  In our negotiating range of 2.07 to 3.7,

21 if the parties meet in the middle, that's about 2.9

22 percent, but I think Sprint's negotiating power

23 brought by -- brought on by its contributions in, you

24 know, providing the CDMA services, would push the

25 rate down to 2.75 percent of apportioned revenue.  So

Ms. Riley - Direct                    24

1  that's my conclusion as to the apportioned royalty

2  rate.

3  Q   And let's translate that to the dollar image that

4  we looked at earlier.  Let's go to the next slide.

5  A   So here, we have the dollar, and you've already

6  seen this picture.  And there's the patent -- I'm

7  sorry, profit attributable to the 870.  And now we

8  can show the portion of the dollar that goes to pay

9  the royalty and what Sprint gets to keep.  So you can

10 see here the royalty, Nokia's portion of the dollar,

11 is 2.75 percent, and Sprint keeps 51.05 percent of

12 the apportioned message revenue as its profit.

13 Q   And that's the last of the six sub-steps that

14 went into the determination of the apportioned

15 royalty rate, correct?

16 A   That's correct.

17 Q   All right.  So let's go back to our list, and now

18 we're on to step number four.  Could you please

19 explain what that step is?

20 A   Well, now we're going to go back to the

21 chalkboard, as it were, and calculate the royalty per

22 message.  So we have a slide -- the next slide shows

23 that multiplication in a similar setup to what you've

24 already seen where we're taking the apportioned

25 revenue per message for SMS messages of .204 cents,

1   multiplying that number by the apportioned royalty

2   rate of 2.75 percent, to get the royalty per message

3   of 0.00561 cents.

4           So this is where I started out on Friday

5   with you all talking about this number, and if you

6   remember, I said if you had a penny divided into

7   100,000 pieces, 561 of those pieces represent the

8   royalty per message.  So now I've gone through with

9   you the steps and how I calculated that royalty per

10  message.

11          Similarly, for MMS, we have the apportioned

12  revenue per message of .240 cents.  I multiply the

13  MM -- excuse me, multiplying that by the apportioned

14  royalty rate of 2.75 percent give me the royalty per

15  message of 0.00660 cents.  So our penny divided into

16  100,000 pieces, 660 of those pieces represent the

17  royalty per message for MMS messages.

18  Q   All right.  Let's go back though.  Now we're on

19  to step number five of your damage model.

20  A   And step number five is the final step.  We're

21  going to calculate the total reasonable royalty

22  damages.  And, again, going back to the chalkboard on

23  the next slide, bringing forward the royalty per

24  message for SMS and MMS messages that I just reviewed

25  with you, multiplying the number -- the royalty per

1    message by the number of messages.  So for the SMS

2    messages, it's the 2.66 trillion messages that I

3    discussed with you on Friday, and for the MMS

4    messages, there are 61.5 billion messages, which

5    doing the math gives us reasonable royalty damages

6    for SMS messages of $149,572,805, and for MMS

7    messages we have $4,062,100.  So that's our

8    reasonable royalty damages adequate to compensate

9    Comcast for Sprint's use of the 870 patent.

10   Q   And then if we add those two numbers together, we

11   get the number you talked about at the beginning of

12   your presentation on Friday, is that right?

13   A   That's correct.  So you saw this slide at the

14   outset of my testimony on Friday.  Adding those

15   numbers together gives us $153,634,905 in damages.

16   And, again, that's through September 30th, 2016,

17   based on Sprint's messages sent and received.  And

18   there's the number of messages and the royalty per

19   message.

20   Q   Now, I don't think we addressed this on Friday.

21   There are three claims that are asserted here: claim

22   one, claim seven, and claim 113.  Does claim 113 have

23   the same start date for damages as claims one and

24   seven?

25   A   No, it doesn't.

Ms. Riley - Cross                    27

1   Q    Have you determined the amount of damages if the

2   jury were only to find infringement of claim 113?

3   A    Yes.  This slide shows -- claim 113, as you

4   recall, issued upon re-examination of the 870 patent,

5   and that patent issued on October 4th, 2011.  So if

6   you only find claim 113 infringed, the damages would

7   be $112,792,859, and that's because of the later

8   issuance date of the re-examined patent.

9   Q    And then one last question.  If the jury were

10  only to find infringement of claims one or seven

11  based on the HLR rather than the other databases,

12  what should the number be?

13  A    Well, the HLR only relates to received messages,

14  so you would divide the $153.6 million in half, which

15  would give you $76.8 million.

16  Q    Thank you very much, Ms. Riley.

17          (Pause in proceedings.)

18               CROSS-EXAMINATION

19  BY MR. RIOPELLE:

20  Q    Good morning, Ms. Riley.  How are you?

21  A    Good morning.

22  Q    So let's just start off, for you whole analysis,

23  right, you assumed infringement, right?

24  A    Yes.

25  Q    So if this jury finds that there is no

Ms. Riley - Cross                        28

1    infringement, that Sprint doesn't infringe the 870

2    patent, they can forget everything that you and I are

3    about to talk about, right?

4    A    That's correct.

5    Q    Good.  And they would probably like that.  All

6    right.  So let's start with your analysis.  One of

7    the things that you were trying to do, right, was

8    determine the profits for SMS and MMS?

9    A    Correct.

10   Q    And to do that, you started out by trying to

11   figure out what the revenue was for SMS and MMS,

12   right?

13   A    Correct.

14   Q    But I noticed during your discussions with Mr.

15   Heist, you didn't explain to the jury how you

16   determined the revenue that Sprint made on the SMS

17   and the MMS, did you?

18   A    Not in detail.  It was -- it involved a process

19   where we looked at a number of different categories

20   of revenue reported by Sprint in the financial

21   documents that they produced.

22   Q    Well, isn't it actually difficult to determine

23   Sprint's revenue on SMS and MMS because Sprint

24   doesn't track it as a standalone service?

25   A    Well, they did track it as a standalone service

Ms. Riley - Cross                              29

1    for many periods we looked at.  There are several

2    categories.  One is casual.  One is overage.  And so

3    that's the standalone service.  And then when it

4    reports revenue in a bundle, which is probably how

5    you all pay for your phone service, we were able to

6    use documents that Sprint produced that showed how

7    they report that revenue for separate services to the

8    tax authorities.

9    Q   But, in fact, right -- you've just mentioned the

10   bundle -- almost -- most Sprint customers pay one

11   price, both for the data and for their voice and for

12   their messaging, right?

13   A   Yes, many Sprint customers do pay one price.  But

14   it's funny, actually, some customers still do the a

15   la carte.

16   Q   But very few, right?

17   A   Very -- it's very few --

18   Q   Right.

19   A   -- but I was just surprised to see that, you

20   know, because you always think gee, everybody buys

21   the bundle.  Yes, but it's not impossible to

22   segregate out the messaging revenue.  Just based on

23   the documents that Sprint gave us from the -- from

24   the tax reporting, they gave percentages for how

25   they -- what revenue is attributable to message, what

Ms. Riley - Cross                    30

1   revenue is attributable to voice, and so on.

2   Q   But you had to try to figure it out and calculate

3   it out, right?  Sprint doesn't have -- doesn't report

4   revenue for SMS and MMS alone, does it?

5   A   What do you mean doesn't have revenue?

6   Q   No, it doesn't report it.  There's no -- there

7   was no document.  Sprint didn't hand you a document

8   and say here's the revenue for SMS and MMS?

9   A   No.  No, they most certainly did not.

10  Q   All right.

11  A   But that's very common in my work is, you know,

12  you have to do some calculations in order to

13  determine the revenue that you're focused on.  So,

14  you know, we only want to look at messaging revenue.

15  That's what we were able to determine from Sprint's

16  documents.

17  Q   All right.  Well, you and I can disagree on

18  whether you calculated the revenue correctly, but

19  that's where you started, right, trying to get to the

20  revenue?

21  A   Yes.

22  Q   Okay.  And then -- so then to determine profits,

23  you then had to determine costs, right, so you could

24  subtract the costs from the revenue?

25  A    Right.  Well, there were two different profit

1  calculations, one related to messaging and the other

2  related to CDMA profitability.  So the CDMA

3  profitability, which is that normal profit of 23

4  percent, that was taken from Sprint's profit and loss

5  statement that it prepares in its ordinary course of

6  business for the CDMA network.  For the messaging

7  costs, you're correct, I did have to determine costs.

8  Q   Right.  And that's -- I'm sorry, that's all I was

9  trying to get.  I'm just trying -- so the jury knows

10  we're on the same page.  You had to determine costs,

11  right?

12  A   That's correct.

13  Q   Okay.  And I'm right that you relied on the cost

14  analysis by Mr. Webber, right?

15  A   Yes, in part.

16  Q   And -- now, the jury hasn't heard Mr. Webber yet.

17  Presumably, he's going to tell them though he did his

18  cost analysis?  Do you agree?

19  A   I hope so.

20  Q   Okay.

21  A   Yes.

22  Q   But let's just summarize because you relied on

23  it.  You did not include cost -- as part of the costs

24  the spectrum costs, did you?

25  A   That's correct.

1  Q    Right.  And you understand the spectrum to be the

2  air interface between the cell phone and the tower?

3  A    Right, that's what Mr. Yarkosky testified

4  about --

5  Q    Right, but --

6  A    -- that --

7  Q    -- you agree, right, that you can't send a text

8  message without the spectrum?

9  A    Right.  It's just that Sprint did not have to

10  incur additional costs to provide messaging.

11  Q    Well, but let's also talk about some of the other

12  costs.  You also didn't include the costs of the bay

13  stations or the towers, did you?

14  A    Right.  So I showed Mr. Yarkosky's testimony that

15  relates to why that's not necessary.

16  Q    And we'll get to Mr. Yarkosky's testimony.  I'm

17  just trying to -- so the jury understands what costs

18  you didn't include.  So we know you didn't include

19  the costs for spectrum, and we know you didn't

20  include costs for the bay stations, and we know you

21  didn't include the costs for the towers.  And it's

22  also true, right, that you didn't include the costs

23  for the mobile switching centers?

24  A    Well, I think Mr. Webber is going to testify

25  about the costs he included.  I can certainly agree

1   with you that there are costs that are I guess what

2   we would characterize as sunk costs, again, based on

3   Mr. Yarkosky's testimony, who I know we will hear

4   from, so don't -- you know, I don't want to get you

5   going.  But yeah, these costs are not incremental to

6   the provision of messaging.

7   Q   Right.  So, again, I just -- just so the jury

8   understands, you didn't include the costs of the

9   spectrum, you didn't include the costs of the bay

10  stations, you didn't include the costs of the towers,

11  and you didn't include the costs of the mobile

12  switching centers, right?

13  A   Right, for the reasons I testified.

14  Q   And you agree, right, that you can't send a text

15  message with the spectrum, right?

16  A   I agree.  Now, from the -- from the technical

17  perspective, again, you know, I'm not the right

18  person to ask these questions of, but I do know that

19  in the record there are documents that demonstrate

20  all carriers are earning margins based on analyses

21  provided by, for example, Morgan Stanley, of 90

22  percent on messaging.  This is from a 2008 FCC study.

23  So this is not something that I'm kind of making up

24  out of thin air.

25  Q   Well, I think --

Ms. Riley - Cross                              34

1   A    There are doc -- you know, I went over the

2   Gartner analysis saying how messaging was a cash cow

3   for carriers.  And we have this FCC study with Morgan

4   Stanley saying the same thing.  So I do want to point

5   out that there is supporting evidence for the

6   calculation I determined --

7   Q    I know, but --

8   A    -- as to messaging --

9   Q    -- but, Ms. Riley --

10  A    -- profitability.

11  Q    And I appreciate that.  And your counsel is going

12  to have a chance to come back up and ask you

13  questions.  But really, my question was you agree,

14  right, that you can't send a text message without the

15  spectrum?

16  A    I'm pretty sure you need the spectrum to send a

17  text message.

18  Q    And you can't send a text message without the

19  tower?

20  A    I think that's correct as well.

21  Q    And you can't send a text message without the bay

22  station?

23  A    I'm not -- I think so.

24  Q    And you --

25  A    I agree.

Ms. Riley - Cross                           35

1  Q    -- can't send a text message without the mobile

2  switching center, right?

3  A    Agree.

4  Q    And so let's dig down into some of those costs.

5  You're aware, aren't you, that Sprint spent $17

6  billion on spectrum, right?

7  A    I'll take your word for it.  I -- spectrum is

8  extensive.

9  Q    All right.  And you -- well, there was documents

10 produced in this case that showed how much Sprint

11 spent on the spectrum, right?

12 A    I believe so.

13 Q    Okay.  So you didn't include that $17 billion in

14 your cost analysis for the profits, right?

15 A    Again, for the reasons I discussed, you're --

16 Q    Right.

17 A    -- I agree.

18 Q    And, in fact, one of the things you were talking

19 about was the free rider thing, right?  In fact, if

20 we could call up slide 44 I think from your

21 presentation.  This was the slide you put up on here,

22 right?

23 A    Yes, sir.

24 Q    And you were saying that one of the reasons --

25 this was -- you were explaining that's why you

1   wouldn't need to do the cost, because they're just --

2   they're just riding free on that, right?

3   A    That's a character -- well, that's basically what

4   I said.

5   Q    Right.

6   A    I mean I did take some costs out, but yes.

7   Q    Well, now --

8   A    This is why messaging is profitable, highly

9   profitable, is how I phrased it.

10  Q    According to your opinion, right.

11  A    Correct.

12  Q    But -- so to get into this lane though, there

13  would have to be an on ramp, wouldn't there?

14  A    Yes, we have to get the buses onto the lane.

15  Q    Right.  Just like you have to get in the lane --

16  an on ramp, in a text message sense, you have to get

17  on -- into the system of a spectrum, right?

18  A    Yeah, I mean the buses are already on the lane --

19  Q    And that on ramp --

20  A    -- right?  They're the like hello, I'm here, you

21  can call me.

22  Q    Right.  And that on ramp would cost money,

23  wouldn't it?

24  A    Yeah, the on ramp was -- is there.

25  Q    No, but to get --

Ms. Riley - Cross                              37

1    A    They don't --

2    Q    -- into the channel --

3    A    Well, isn't that -- that's what you're saying.  I

4    mean I'm not disputing that Sprint has spent a lot of

5    money putting together a network for voice calls and

6    that this control channel is in that network, it's

7    there, and the messages travel in it.  So I'm not --

8    you know, I agree --

9    Q    Right.

10   A    -- Sprint spent a lot of money --

11   Q    Okay.  And you didn't --

12   A    -- to build the network, but my point is just

13   that messaging is highly profitable because it uses

14   the infrastructure that's already there.

15   Q    Well, let's talk about some of the other costs

16   you didn't include, right?  You also said you didn't

17   include the towers and the bay stations, agreed?

18   A    Right, those are already there.

19   Q    All right.  And you're aware, right, that Sprint

20   has about 40,000 bay stations and towers around the

21   country, right?

22   A    I don't have the number memorized, but I'm sure

23   you're correct.

24   Q    And you're aware, right, that the average cost of

25   one of those cell towers or bay stations is about

1    $200,000?

2    A    Okay.

3    Q    So when you multiply that out that comes out to

4    $8 billion?  And you --

5    A    It's -- they've spent -- you know, I keep

6    agreeing with you, which I'm probably not supposed to

7    do, but they've spent a lot of money developing the

8    network.

9    Q    Right.  And they also in the mobile switching

10   centers -- you're aware that they have over 90 mobile

11   switching centers, right?

12   A    They have a lot of mobile switching centers.

13   Q    And each one of those mobile switching centers

14   costs about $1.2 million?  So --

15   A    Agree -- I agree.

16   Q    So when you do that multiplication, that's over

17   $100 million that you also didn't include?

18   A    I described my analysis, and I know we're going

19   to differ, but those costs go into the CDMA

20   profitability, Sprint gets to keep that profit,

21   messaging earns profit over and above that.  I'm not

22   the only one who came to that conclusion.  Gartner,

23   Morgan Stanley, came to the same conclusion.  And

24   that's the excess profit available to pay as a

25   royalty.

Ms. Riley - Cross                    39

1    Q    Well --

2    A    So I think we agree.

3    Q    I just wanted to -- I agree -- how do I say it?

4    I agree that we disagree, but I just want this jury

5    to understand what costs you included and what costs

6    you didn't.  And so I just wanted the jury to

7    understand that if you think about the $17 billion in

8    spectrum and the $8 billion on the towers and the bay

9    stations, and the additional $100 million on the

10   switching centers, that's about $25 billion that you

11   did not include when you were trying to figure out

12   the profits for messaging, correct?  Do you agree

13   with me on that?

14   A    For messaging.

15   Q    Right.

16   A    Can I -- but can I extend my -- can I answer the

17   question fully?

18            THE COURT:  The answer is yes, you can.

19            THE WITNESS:  Thank you, Your Honor.

20   There's a lot of revenue relating to voice that would

21   also use all of this infrastructure, and I have

22   not -- of course not included that.  That's not what

23   we're talking about here, just to kind of simplify

24   what Mr. Riopelle is talking about as compared to

25   what I'm talking about.

1   BY MR. RIOPELLE:

2   Q   So --

3   A   So those costs would relate to that revenue.  I

4   mean it's a separate calculation.

5   Q   But you would agree, right -- I mean you relied

6   on Mr. Webber's analysis?

7   A   I did.

8   Q   Right.  And so you would agree with me, right,

9   that if this jury concludes that he should have

10  included those costs, so that you should have

11  included those costs, that if they agree with me on

12  that, then that undermines your entire calculation

13  because you haven't included those costs, correct?

14  A   I'd agree.  I would just hope the jury would also

15  consider the corroborating evidence I discussed from

16  Morgan Stanley, the Federal Communications

17  Commission, and Gartner relating to the high level of

18  profitability associated with messaging.  But yes, I

19  agree.

20  Q   Now, you talked about Mr. Yarkosky's testimony.

21         MR. RIOPELLE:  In fact, could we put it up?

22  I believe it's on slide 42 of Ms. Riley's dep.

23  BY MR. RIOPELLE:

24  Q   And this was the testimony that you were talking

25  about Mr. Yarkosky said?

Ms. Riley - Cross                          **41**

1    A    That's correct.

2    Q    That they didn't -- he said that they didn't have

3    to build towers just for messaging, right?

4    A    Correct.

5    Q    All right.  Now, these questions on here, they

6    were asked during his deposition, right?

7    A    Yes.

8    Q    And they were asked by a Comcast lawyer, right?

9    A    I believe so.

10   Q    But Comcast lawyer didn't ask the next question,

11   did he?  Comcast lawyer didn't ask Mr. Yarkosky if

12   Sprint takes into account the costs of the towers and

13   the spectrum and other things when they're trying to

14   figure out the cost of a message, did he?

15   A    I got lost there.

16   Q    So he says they didn't -- he says they didn't

17   have to build additional towers for messaging.  Do we

18   agree with that?

19   A    Correct.

20   Q    Okay.  And you inferred from that that oh, so

21   there's no costs for the towers?

22   A    No, no, no, no.  No.

23   Q    You -- sorry, let me rephrase.  And I'm not

24   trying to trick you.  I'm just trying to make sure

25   that we're all on the same page so that the jury and

1   you understand my next question.  We agree, right,

2   that Mr. Yarkosky testified they didn't have to build

3   additional towers for messaging?

4   A    Correct.

5   Q    Correct.

6   A    I agree.

7   Q    And so you took from that that there is no cost

8   for the towers to be attributed to messaging?

9   A    I think that's fair enough.

10  Q    Right.

11  A    That -- yeah, that is what corroborates my

12  calculation of profitability --

13  Q    Right.

14  A    -- on messaging.

15  Q    They didn't ask Mr. Yarkosky that question?  They

16  didn't ask him do you attribute the cost of towers to

17  messaging when you're trying to figure out the cost

18  of sending a text message, did they?

19  A    In the deposition?

20  Q    Yes.

21  A    I don't -- I don't know.

22  Q    And don't you think if they asked Mr. Yarkosky

23  that question, he would have actually said of course

24  we attribute the cost of the towers and the cost of

25  spectrum and the cost of other things when we're

Ms. Riley - Cross                              43

1    trying to figure out the cost of what a sentence --

2    what it costs to send a message?

3    A    Right, and that's what's included in that 23

4    percent normal profit margin.  That's how Sprint

5    reports its profitability on the CDMA network in the

6    ordinary course of business.  So I've seen those

7    documents, and in my performance of the hypothetical

8    negotiation, I've given Sprint credit for the normal

9    profit.  It gets to keep that profit because it's

10   already, as you point out, incurred those costs --

11   Q    Well --

12   A    -- in building out the network.

13   Q    Let's go to that topic.  Let's talk -- you're

14   talking about the excess profits now, correct?

15   A    Yes, sir, I'm talking about, yes, the normal

16   profit from provision of CDMA services.

17   Q    Right.  And so -- and just -- again, just to make

18   sure the jury is on the same page that you and I are,

19   you calculated -- you said that the excess -- I'm

20   sorry, you said that the profit on messaging was

21   about 53.8 percent I think?

22   A    Exactly.

23   Q    Right.  And then you said that the profit

24   normally on the CDMA I think you had down as 23

25   percent?

Ms. Riley - Cross                          44

1    A    That's correct.

2    Q    And so you determined that there was an excess

3    profit of about 31 percent just from messaging,

4    right?

5    A    Correct.

6    Q    Okay.  And the overall profitability for CDMA,

7    which is the 23 percent, that includes voice and

8    messaging and data, right?

9    A    And some other services as well, but yes.

10   Q    Right.  And -- but we've already established that

11   when you were doing the profit margins for messaging

12   you didn't -- you didn't include the towers and the

13   switches and the spectrum, right?

14   A    Right, because the free rider effect, riding in

15   the control channel, the infrastructure is already

16   present --

17   Q    Right.

18   A    -- for the messages.

19   Q    But the overall profitability of 23 percent for

20   the data, the messaging, and the texting, that did

21   include the costs for spectrum and switches and

22   towers, right?

23   A    Well, it's the way that Sprint keeps its

24   profitability in the ordinary course of business.

25   Q    Well --

Ms. Riley - Cross                              45

1   A    So it's how they account for a CDMA network.  So

2   this is all the costs that Sprint aggregates and

3   applies to that CDMA revenue.

4   Q    So if you're comparing the profits for messaging

5   against the profits for the overall CDMA and you're

6   included that $25 billion of costs for overall CDMA,

7   but you've taken it out for messaging, isn't the

8   messaging profit going to obviously look much higher?

9   A    But the messaging profit -- I mean Sprint was

10  already offering voice services when it introduced

11  the messaging.  It had built out the network, it had

12  bought the spectrum, it tracks that profit in its

13  ordinary course on the CDMA network.  I don't -- I

14  don't know how else to explain it --

15  Q    Well --

16  A    -- other than --

17  Q    What is --

18  A    -- to keep repeating --

19  Q    What is --

20  A    -- sorry.

21          THE COURT:  Let her -- let her finish.

22          MR. RIOPELLE:  I'm sorry, Your Honor.

23          THE WITNESS:  -- other than to keep

24  repeating my analysis where Sprint is tracking its

25  profitability on the CDMA network for its

Ms. Riley - Cross                    46

1   subscribers, it earns 23 percent.  That's during the

2   damages period.  My calculation of profit on

3   messaging was 53.8 percent.  That agrees with

4   documents in the record that say messaging is highly

5   profitable.  Sprint did not have to add additional

6   infrastructure to offer messaging.  That is how we

7   determined the incremental profit.  So I'm not -- in

8   that 23 percent normal profit I'm taking Sprint's

9   numbers.  That's how they report it.

10  Q    Right.

11  A    Right.

12  Q    Right.  I'm not disagreeing with you.

13  A    Oh, okay.

14  Q    No, all I'm disagreeing -- I'm just trying to

15  point out, again, so the jury understands the

16  analysis is that when you -- when you had the

17  profitability for CDMA, which includes voice, data,

18  and messaging, you included the $25 billion for

19  spectrum and other things like that, but when you

20  compared it to the messaging you didn't include those

21  costs in the -- in the profits for messaging.

22  A    Right.

23  Q    So isn't it right then that obviously the profits

24  for messaging are going to be much higher if you

25  didn't include the same costs on both of them?

1  A    Yeah, for messaging, I deter -- I included the

2  incremental cost of providing messaging as well as

3  the selling, general, and administrative costs.

4  Q    Now, that 23 percent overall profitability, is it

5  fair to characterize that as an average

6  profitability?

7  A    That's fair.

8  Q    Okay.

9  A    It's over a period of time.

10  Q    So -- but I'm sorry.  You know, I'm not trying to

11  trick you.  I want to make sure you and I --

12  A    Well, it's one number for many years, so it has

13  to be, by definition, some average.

14  Q    Are you finished?  I didn't want to -- I don't

15  want to interrupt, sorry.

16  A    I'm finished.

17  Q    Okay.  I just want to make -- when I say average,

18  it's an average profitability from all the services,

19  right?

20  A    Yes, that's correct.

21  Q    Right.  So in your -- in your --

22  A    So, for example, the standalone casual message

23  subscriber -- and we've all been this person.  As

24  recently as 2013, people were still paying 15 cents a

25  message in the data that we saw.  So, you know,

Ms. Riley - Cross                          48

1  that's highly profitable for Sprint because, as you

2  saw, the average revenue per message is around a

3  cent, a little bit less than a cent.  So I had to

4  take different categories of information to determine

5  that average normal profit, you're correct.

6  Q    All right.  So if messaging you believe is the 53

7  percent?

8  A    I think it's 53.8 percent.

9  Q    Sorry.  I'm not trying -- yes, okay, 53.8

10  percent.  So something has to be lower than the -- so

11  there's an average, something has to be lower than

12  the 23 percent, right?

13  A    Yes.

14  Q    All right.  So let's -- just for purposes of our

15  conversation, let's assume that the voice profits are

16  lower, they're below 23 percent.

17  A    We don't have to assume.  We know what's lower.

18  Q    Is voice?  Do you agree?

19  A    Wholesale messages have --

20  Q    Okay.

21  A    -- a lower margin --

22  Q    All right.  Well --

23  A    -- as does prepaid subscribers, pay-as-you-go

24  subscribers, have a lower profit margin than post-

25  paid.  Like, you know, I have post-paid, so I just

Ms. Riley - Cross                    49

1  pay every month and I just use what I use, but people

2  who like to buy 100 minutes up front and only use

3  that much, they have a lower margin.  So that --

4  those categories are what combine -- yes, there are

5  different levels of profitability for different types

6  of services.

7  Q   So under your analysis of excess profits, if one

8  of those -- one of those categories was accused in

9  this case, because there would be no excess profits,

10  would your analysis have to come out that there would

11  be no damages?

12  A   You mean -- I'm not sure I followed you.  So

13  certain of the messages aren't infringing?

14  Q   Well, no.  You said you -- what you did, again,

15  just so we're on the same page, you believe that

16  messaging has a 53.8 percent profitability.  And so

17  then you subtracted out the average profitability of

18  23 percent to approximately 31 percent, correct?

19  A   Correct, excess --

20  Q   Do you agree?

21  A   -- profitability, yes.

22  Q   So if one of the services has profitability below

23  23 percent -- because that's an average

24  profitability, so some of the stuff has got to be

25  below it.  If there's profitability below that, there

1   would be no excess profits for that service, right?

2   So then doesn't your conclusion -- your analysis mean

3   there couldn't be any damages?

4   A    Well, that would actually increase the excess

5   profit if there's a service that has a lower normal

6   profitability lower than 23 percent.  Let's say its

7   20 percent.  If we subtract that from 53.8 percent,

8   it gives you more excess profitability.  I'm sorry if

9   I'm going the wrong way.

10  Q    You compared the average profitability of 23

11  percent to what you believe is Sprint's profitability

12  on messaging of 53 percent, correct?

13  A    Correct.

14  Q    If something here -- if some service -- other

15  service was accused, and let's say that had a

16  profitability of only 20 percent, using your excess

17  profitability of 23 percent, don't you agree that 23

18  minus 20 would mean that there was negative three?

19  A    No, you're actually backwards.  I'm sorry, I'm

20  not trying to be difficult, but that actually

21  increases the excess profit.

22  Q    Okay.  Let's try --

23  A    That's why it's important to average all the

24  services.  That's why I averaged all the services.

25  Q    Let's try this again.  Messaging is the accused

                    Ms. Riley - Cross                    51

1  service, right?

2  A    That's correct.

3  Q    All right.  And that was 53 percent, correct?

4  A    Correct.

5  Q    And the average profitability of Sprint is 23

6  percent, correct?

7  A    CDMA, yes.

8  Q    CDMA.  So you did 53 minus 23 to get your excess

9  profitability, right?

10 A    Correct.

11 Q    Let's say that another service was accused and it

12 was 20 percent, and then you had that --

13 A    Profit.

14 Q    20 percent profit.  And the average profitability

15 at Sprint is still 23 percent.  And so if you go 20

16 minus 23, wouldn't you get negative three?

17 A    Does the 20 percent go into the 23 percent --

18 Q    It's part --

19 A    -- calculation?

20 Q    It's part of it, yes.

21 A    Okay.  So why isn't the 23 percent calculation

22 good anymore?  Or what happened in your hypothetical?

23 I just want to follow it.

24 Q    The point I'm trying to make is that there would

25 be no excess profits.  So under your methodology,

Ms. Riley - Cross                          52

1   there could be no damages, right?

2   A    If -- yeah, if the numbers that Sprint has

3   produced relating to its CDMA network for provision

4   of all CDMA services are wrong and it's not making

5   any profit, then --

6   Q    But --

7   A    -- then my calculation would have to be different

8   based on different inputs.

9   Q    Well, that's actually --

10  A    There's a lot of information I reviewed in coming

11  to this calculation, so I'll just leave it at that.

12  Q    Well, and, actually, let's look at one thing you

13  did do in this case.

14          MR. RIOPELLE:  If we could call up Exhibit

15  14.2 from her report?

16          THE COURT:  What report?

17          MR. RIOPELLE:  From the reply report, I'm

18  sorry.

19          THE COURT:  14.2?

20          MR. RIOPELLE:  It was an exhibit.  It was

21  the schedule to her reply report.  It's not -- sorry,

22  it's not an exhibit in the trial, if that makes

23  sense.

24  BY MR. RIOPELLE:

25  Q    So this is the -- your analysis for MMS

Ms. Riley - Cross                              53

1   profitability, correct?

2   A    Correct.

3   Q    And you see at the bottom that it's -- you

4   determined that the profitability on MMS was 5.2

5   percent, correct?

6   A    Correct.

7   Q    And 5.2 percent I think you would agree with me

8   is less than 23 percent, correct?

9   A    That is correct.

10  Q    And so if you were just doing the -- your excess

11  profits on MMS alone, there would be no excess

12  profits on MMS alone, would there?

13  A    Yeah, MMS is less profitable than SMS.

14  Q    Correct.

15  A    So in that 53.8 percent, that includes MMS and

16  SMS.

17  Q    Right.  So if only MMS was accused in this case,

18  under your excess profit method, there would be no

19  excess profits and so there would be no damages under

20  your methodology, correct?

21  A    Yeah, under that calculation, you're correct.

22  Q    All right.  But, in fact, you couldn't let that

23  happen, and that's why you combined MMS with SMS so

24  that you could get that number above 23 percent,

25  correct?

Ms. Riley - Cross                          54

1   A    Well, it's my understanding that SMS and MMS are

2   both accused.

3   Q    So --

4   A    So I'm not, you know, doing anything nefarious.

5   I'm just taking the accused messages into account in

6   my analysis.

7   Q    But you agree if you had done the MMS alone,

8   there would be no damages?

9   A    There would be -- yes.  There would be no excess

10  profit for the parties to share as a royalty.

11  Q    All right.  So let's put aside the excess

12  profits.  Let's go to the next step in your analysis.

13  And, again, just so we're on the same page, after you

14  came up with the excess profits, you had to determine

15  what portion of the profits were attributable to the

16  870 patent, right?

17  A    Correct.

18  Q    And that's -- and that's what you called

19  apportionment?

20  A    Yes, that's correct.

21  Q    And for your apportionment, you relied on Dr.

22  Akl's analysis, correct?

23  A    I did, regarding the number of infringing steps

24  from the call flow diagram.

25  Q    Right.  And I think you testified on Friday that

Ms. Riley - Cross                              55

1    what you were looking for and what you asked Dr. Akl

2    was the percentage I'm talking about, or the

3    percentage of steps in sending the message that

4    infringed the 870.  Do you recall that?

5    A    Yes.

6    Q    Okay.  And -- but you were here for Dr. Akl's

7    testimony, right?

8    A    Yes, I was.

9    Q    And he didn't include all the steps in his

10   analysis, did he?

11   A    I don't know.

12   Q    Don't you --

13   A    I --

14   Q    Don't you recall Dr. Akl saying that he didn't --

15   he did not include the routine steps?

16   A    I think he was asked about -- I don't recall him

17   saying that.

18   Q    You don't recall Mr. Finkelson asking him on his

19   step analysis did you include a step from the handset

20   to the tower, and he said I didn't include that?

21   A    Okay.

22   Q    And --

23   A    So that would make sense based on my analysis.

24   Q    Well, but you were looking --

25   A    Right?  That's the CDMA 23 percent profit?

Ms. Riley - Cross                    56

1  Q    Sorry, I just -- I don't -- I keep thinking

2  you're finished and then you say something else, so I

3  don't want to step over you, so I want to make sure.

4  You were looking for all the steps to send and

5  receive an SMS or MMS message, right?

6  A    From the call flow diagram that's been produced

7  that showed the steps in the message, sending and

8  receiving --

9  Q    But you --

10 A    -- so I asked Dr. Akl to describe which of those

11 steps use the 870 patent.

12 Q    But you --

13 A    So that's just based on -- I just did it again

14 and I'm sorry.  But that's just based on Sprint's

15 document.

16 Q    But you agree, right, that when somebody sends an

17 SMS or an MMS message the first place it goes is from

18 their phone to the tower, right?

19 A    Right.  So, like I said, we've incorporated that

20 concept by letting Sprint keep the 23 percent normal

21 profit from the operation of the CDMA network.

22 Messaging is on top of that, highly profitable based

23 on what everybody knows in the industry.  And that's

24 how the calculation works.

25 Q    We're talking about the step analysis that Dr.

Ms. Riley - Cross                                    57

1   Akl performed at your request, correct?

2   A   Yes.

3   Q   And you are looking for what number of the steps

4   in sending or receiving an SMS message could be

5   attributable to the 870 patent, correct?

6   A   Correct.

7   Q   And he counted the steps that he believes

8   infringe the 870 from the call flow diagram, correct?

9   A   Correct.

10  Q   But he did not include all of the steps in

11  sending or receiving an SMS message, as he testified

12  last week?

13  A   I believe he testified about the call flow

14  diagram and the number of steps shown and which of

15  those steps read on the 870.

16  Q   Correct, but he did -- and the jury will remember

17  that he said I did not include the routine steps?

18  A   So I don't want -- I don't want to misremember

19  his testimony, but to the extent he said that, then

20  that would be incorporated in the 23 percent.

21  Q   But wouldn't your -- if he didn't include certain

22  of the steps, aren't your percentages then incorrect

23  because if he included more steps, your percentages

24  would go down?  Do you agree?

25  A   I agree with if you include more steps -- if the

Ms. Riley - Cross                                    58

1    denominator is bigger, the percentage decreases.

2    Q    Right.

3    A    Now, the question of whether those steps -- the

4    call flow diagram he's looking at only had so many

5    steps, and he told me which of those steps infringe.

6    Q    But that call flow diagram doesn't include all of

7    the steps for sending an SMS message from this

8    handset to this handset, does it?

9    A    It's a Sprint document.  I mean there were three

10   different witnesses who testified that it represented

11   the call flow diagram.  So, you know, I don't -- I'm

12   not the technical expert, but that's my

13   understanding.

14   Q    Well, you agree, right, if this jury believes Dr.

15   Akl didn't include all of the steps he should have

16   included and then you relied on that analysis, that

17   undercuts your calculations, doesn't it?

18   A    Well, assuming the jury does not agree that

19   Sprint gets to keep the 23 percent normal profit and

20   everything it provides to its CDMA customers is

21   included in that 23 percent, and that's off the table

22   for a royalty.  If they also don't agree with that

23   concept, then you're correct.

24   Q    All right.  I'd like now to turn to your

25   hypothetical negotiation and your consideration of

Ms. Riley - Cross                               59

1   the <u>Georgia-Pacific</u> factors, okay?

2   A    Okay.

3   Q    Okay.  Now, one of the things you claim is that

4   Nokia and Sprint would have known about the growth of

5   messaging in the future, right?

6   A    Correct.

7   Q    And do you recall -- remember Dr. Akl testifying

8   about the growth of messaging?

9   A    Yes.

10  Q    Right.  And he said that the growth of -- that

11  messaging took of because of the introduction of the

12  smart phones, right?

13  A    Well, he referenced the Blackberry in 2002, which

14  was kind of the first time that we all had messaging

15  capabilities in our hands.  So that was one of the

16  factors.  And then he referenced the smart phone

17  introduction, the iPhone, in 2007, which was a little

18  bit later in time.  But I would say certainly the

19  introduction of the Blackberry, as well as the

20  interoperability between carriers in 2004, was really

21  what launched these messages to the levels, you know,

22  that we saw over the last 12, 13 years.

23  Q    Right, because it was easier -- they had the --

24  if you remember on the Blackberry, it had the

25  keyboard, right?

Ms. Riley - Cross                                60

1   A    The physical keyboard --

2   Q    The phys --

3   A    -- yes.

4   Q    And so it was much easier for people to send

5   messages using that keyboard within the virtual

6   keyboard that came on the iPhone, right?

7   A    Yeah, I -- what's the question?  Is the

8   Blackberry easier to use than an iPhone?  I think so.

9   That's not your question.

10  Q    No.  It wasn't even close.

11  A    I missed the physical -- I miss my physical

12  keyboard.

13  Q    No, I'm just confirming that the reason messaging

14  became so popular was because of the smart phones

15  like the Blackberry and then the iPhone and stuff.

16  Do you agree with that?

17  A    I think that yeah, that -- I mean certainly the

18  introduction of the Blackberry and the iPhone really

19  brought messaging to new levels.

20  Q    But the 870 patent has nothing to do with the

21  Blackberry or the iPhone, does it?

22  A    No, I think it has to do with the provision of

23  messaging.

24  Q    Right.  So you can't say that the growth of

25  messaging is due to the 870 patent, can you?

Ms. Riley - Cross                    61

1    A    No, I don't think that's what I'm saying at all.

2    Q    Now, another one of the points that you made I

3    believe on the hypothetical negotiation is that

4    Sprint and Nokia when they were sitting down at the

5    table would have to assume that the patent is valid,

6    right?

7    A    Correct.

8    Q    And -- but that when Nokia sold the patent to

9    Comcast there were concerns about validity, correct?

10   A    I haven't seen -- well, what I said was I haven't

11   seen any evidence that Comcast and Nokia had a

12   similar understanding.

13   Q    Well, but didn't you know, right, because you did

14   look at some evidence that Comcast didn't really have

15   any serious concerns about the validity of the 870

16   patent when they bought it?

17   A    I'm not saying that they didn't believe the

18   patent was valid.  What I'm saying is that there is

19   not this absolute certainty between the parties as to

20   validity and infringement as we're required to assume

21   under the hypothetical negotiation.  So Comcast and

22   Nokia were operating at arm's length in a -- in their

23   deal for the patent, and they're not required to have

24   that same understanding.  They can walk away from the

25   deal.  They don't have to understand together the

Ms. Riley - Cross                    62

1  patent is valid and infringed, as the hypothetical

2  negotiation requires us to.

3  Q   But you didn't -- you don't -- you're not

4  testifying -- part of your opinion isn't that Comcast

5  had serious concerns about the validity of the 870,

6  are you?

7  A   No, no, I was just saying that I don't think

8  Nokia and Comcast had that same understanding that

9  Nokia and Sprint are required to have at the time of

10  the hypothetical negotiation.

11  Q   Okay.  I'd also like to turn now to Georgia-

12  Pacific factor three, and what I'd like to do is call

13  up slide 51 from your deck.  And this is just so you

14  can reference it and the jury can reference it.

15  These are the Georgia-Pacific factors that you talked

16  about, correct?

17  A   Yes, that's correct.

18  Q   And so if we're looking at Georgia-Pacific factor

19  three, that's the -- you would agree with me, right,

20  that's the nature and the scope of the license?

21  A   Yes, sir, correct.

22  Q   And so you would agree, right, that in this

23  hypothetical negotiation, Nokia would be giving a

24  license to Sprint, right?

25  A   Correct.

Ms. Riley - Cross                    63

1  Q   And, in fact, it would be a non-exclusive

2  license, right?

3  A   That's correct.

4  Q   And just so everybody understands, a non-

5  exclusive license means that Nokia could also license

6  to other people also, right?

7  A   Yes.

8  Q   But when Nokia sold the patent to Comcast it sold

9  it to them, right?  It didn't just license it?

10 A   I don't want to quibble with you, but it did have

11 a license granted back, Nokia.

12 Q   Comcast gave a license back to Nokia, but I'm

13 asking what -- Nokia sold the patent to Comcast,

14 right?

15 A   Yes, it did.

16 Q   Okay.  And you would agree with me, right, that

17 owning a patent is more valuable than just renting a

18 patent?

19 A   Well, I think in real life that is probably true.

20 But certainly we have in real life licensees who are

21 able to monetize patents.  They don't own the patent,

22 but they're granted a license.  And they, in turn,

23 grant licenses to others.  So they're able to enjoy

24 revenue streams related to royalties.

25         Here, in Comcast's case, we have Comcast --

1    well, that's probably enough.  So we don't know.  It

2    depends on the circumstance as to whether purchasing

3    a patent is more valuable than licensing a patent.

4    Q   So is -- I'm just trying to figure out what your

5    testimony is.  Is your testimony that it's not more

6    valuable to own a patent than it is to just rent it?

7    A   Well, when you're asking me in the abstract

8    outside the context of the hypothetical negotiation

9    and the analysis required by the law in determining

10   patent damages I was just pointing out that there

11   could be a licensee of a patent who doesn't own it,

12   who then sub-licenses to other parties and is able to

13   enjoy revenue from sub-licensing.  That would be

14   greater than what the patent owner is enjoying.  But

15   in the context of the hypothetical negotiation, those

16   types of considerations aren't relevant because the

17   law tells us we have to look at use made of the

18   invention by the hypothetical licensee, who is Sprint

19   in this case.

20   Q   But you agree, right, that the license under the

21   hypothetical negotiation that Com -- sorry, that

22   Nokia would give to Sprint would be non-exclusive,

23   right?

24   A   It would be, that's correct.

25   Q   And you understand under the law that a non-

1    exclusive licensee doesn't get to license the patent,

2    is that correct?

3    A    Under the law as set forth in determining patent

4    damages, it's just the use made of the patent.

5    There's no consideration, at least not in my

6    analysis, as to whether Sprint could then, in turn,

7    sub-license --

8    Q    Let me put --

9    A    -- to another party.

10   Q    Let me put it this way.  You agree that by buying

11   the patent, Comcast has a lot more rights to it than

12   Sprint would have just renting the patent under the

13   hypothetical negotiation?

14   A    I don't -- Comcast obtains the patent, but Sprint

15   is the licensee, the hypothetical licensee.  So

16   they -- you know, "a lot more" is the phrase you used

17   I think.  That's a little bit imprecise.  Sprint

18   gains the rights through the hypothetical negotiation

19   to utilize the patent to provide SMS and MMS

20   messaging.  So that's the rent it's paying as -- you

21   know, the damages are the rent that it's paying.

22   Q    Okay.  Let's -- again, I'm just -- I'm

23   actually -- well, nevermind.  Under the hypothetical

24   negotiation, Sprint would get the right to use the

25   patent, right?

Ms. Riley - Cross                    66

1    A    That's correct.

2    Q    When Comcast bought the patent from Nokia,

3    Comcast got the right to use the patent, right?

4    A    It did.

5    Q    When Comcast bought the patent from Nokia,

6    Comcast bought the right to assert the patent against

7    others, correct?

8    A    It did.

9    Q    Under the hypothetical negotiation, Sprint

10   doesn't get the right to assert that patent against

11   others, does it?

12   A    You're correct.

13   Q    And under -- when Comcast bought the patent from

14   Nokia, Comcast gets the right to license the patent

15   to others, correct?

16   A    Yes, it does.

17   Q    And under the hypothetical negotiation, Sprint

18   does not get the right to license the patent to

19   anyone else, does it?

20   A    No, it doesn't.  It just gets the right to use it

21   for --

22   Q    To use it.

23   A    -- the infringing messages.

24   Q    All right.  I'd like to turn now to Georgia-

25   Pacific number five on your screen.  And you agree,

1   right, that that's the commercial relationship

2   between the licensor and the licensee?

3   A   Yes, that's correct.

4   Q   So in other words, that's the commercial

5   relationship in this case between Nokia and Sprint?

6   A   Correct.

7   Q   Correct?  Now, you know that leading up to the

8   time of the hypothetical negotiation, Nokia had been

9   selling phones to Sprint, right?

10  A   They had been selling some phones to Sprint, yes.

11  Q   All right.  So Sprint was a customer of Nokia's

12  at the time of the hypothetical negotiation, right?

13  A   Yeah, I think the phones represented something

14  like four percent of their phones.  I mean they were

15  a small customer.  Nokia was a small customer.

16  Q   Well, you know that Sprint bought $750 million

17  worth of phones from Sprint.  Do you consider that a

18  small customer?

19  A   Percentage-wise, yes.  Sprint buys a lot of

20  phones.

21  Q   If we -- and I'll -- I want to also focus on --

22  or just touch briefly on Georgia-Pacific factor

23  number six.  I think when you were discussing

24  Georgia-Pacific factor number six in your report you

25  said that you understood from Dr. Akl there was no

Ms. Riley - Cross                    68

1    way to design around the 870 patent and, in fact, you

2    have to have the 870 patent to send and receive

3    messages?  Do you recall that?

4    A    That's correct.

5    Q    All right.  But you've been sitting in this

6    courtroom all week, right?

7    A    Yes, I have.

8    Q    And you understand that the 870 patent requires

9    that the server has to be external to the cellular

10   network, right?

11   A    I believe that's correct.

12   Q    All right.  So doesn't it make sense that the

13   obvious alternative to the 870 patent is to have the

14   messaging server internal to the cellular network?

15   A    You would have to ask Dr. Akl.

16   Q    All right.  I want to turn to another topic now.

17   It's your opinion, right, that Sprint and Nokia, the

18   hypothetical negotiation, would have agreed to a

19   running royalty, right?

20   A    Correct.

21   Q    Which means, obviously, that Sprint would have

22   paid Nokia a fee every time Sprint sent or received a

23   message?

24   A    That's correct.

25   Q    Well, let's look at some of the agreements that

Ms. Riley - Cross                                69

1   you reviewed in this case.  Excuse me, let's start

2   off with the Nokia-Comcast patent purchase agreement.

3   You agree there that Comcast paid, Nokia received, a

4   $600,000 lump sum payment, right?

5   A    That's correct.

6   Q    And let's look at some of the -- think about some

7   of the other agreements that you've seen in this

8   case.  You reviewed Sprint's agreement with a company

9   called Smart Call, right?

10  A    Yes, I think so.

11  Q    And that was a lump sum payment, wasn't it?

12  A    Yeah, I believe that payment was made in

13  settlement in litigation, and in my experience,

14  payments made in settlement of litigation tend to be

15  lump sum --

16  Q    It was a lump sum?

17  A    -- one time payments.

18  Q    Right.  And you reviewed Sprint's agreement with

19  CellTrace, right?

20  A    That's correct.

21  Q    And that was a lump sum also, right?

22  A    Yeah, similar to the agreement you just

23  referenced.  The name is escaping me.  That was also

24  entered into in settlement of litigation.  I think

25  the CellTrace agreement also had a unique feature in

Ms. Riley - Cross                         70

1   that it specifically said the amount paid could not

2   be used to determine a reasonable royalty.  So I knew

3   from looking at it that that was off the table for

4   the purposes of my analysis.

5   Q   And I wasn't asking you about that.  All I'm

6   asking you is, and I think you agreed, it was a lump

7   sum payment, right?

8   A   Right, paid in settlement of litigation.  I just

9   wanted to point out all the facts relating to the

10  agreement.

11  Q   And you reviewed Sprint's agreement with a

12  company called Intellect Wireless, right?

13  A   Yes.

14  Q   And that was a lump sum payment also, wasn't it?

15  A   Also entered into in settlement of litigation,

16  yes.

17  Q   Well, let's talk about some -- about Comcast's

18  agreement with RPX, right?  That wasn't in settlement

19  of litigation, was it?

20  A   No, RPX is a completely different animal --

21  Q   Right.  But --

22  A   -- which the -- so one thing you all haven't

23  heard about is part of Comcast's defensive strategy

24  that Mr. Finnegan and Mr. Marcus and Mr. Dellinger

25  talked about is that Comcast has entered into

1    agreements with a couple different companies.  One is

2    called RPX, where Comcast pays money to RPX and

3    receives a license to all the patents in RPX's

4    portfolio so that it can use those patents

5    defensively.  So, you know, when they were saying

6    AT&T comes in and puts down a pile of patents,

7    Comcast opens its drawer, puts out its patents, and

8    say let's figure this out, RPX patents are included

9    in that pile that Comcast can then use.  So that's

10   sort of a really different way of thinking about

11   patent protection and negotiating these types of

12   deals.  So it's different.

13   Q    Did Comcast pay a lump sum payment to RPX for

14   that license?

15   A    Yes, all of RPX's agreements are lump sum.

16   Q    And did Comcast pay a lump sum payment for its

17   agreement with Allied Security Trust?

18   A    Yeah, Allied Security Trust is another defensive

19   patent aggregator and they paid a lump sum as well

20   for coverage to their entire portfolio.

21   Q    So, in fact, all of the agreements that we've

22   looked at in this case were all lump sum payments,

23   weren't they?

24   A    All of the agreements are lump sum payments, yes.

25   The settlements of litigation are lump sum, the RPX

Ms. Riley - Cross                          72

1    and Allied Signal Trust are lump sum as well.

2    Q    Now, I'd like to turn back to the hypothetical

3    negotiation.  And, again, just so we're all on the

4    same page, you would agree with me, right, that what

5    we're trying to figure out and what the jury is

6    trying to figure out in the hypothetical is what

7    Sprint and Nokia would have agreed to for Sprint to

8    license the patent from Nokia, right?

9    A    Correct, for use made of the invention according

10   to the jury instructions.

11   Q    All right.  So let's look at Nokia.  Now, you're

12   aware, aren't you, that Nokia was involved in putting

13   together the GSM standard, right?

14   A    This -- the technical details I'm not as familiar

15   with, but we can keep going.  I mean I'm not

16   disputing it.

17   Q    Well, so you would agree, wouldn't you, that if

18   Nokia was involved in putting together the GSM

19   standard, they would probably have a pretty good idea

20   what the value of a patent would be that was using

21   that standard, right?

22   A    Well, I think it depends on at what point in time

23   we're talking about Nokia's involvement was with the

24   GSM standard work group --

25   Q    Well --

Ms. Riley - Cross                    73

1   A   -- as compared to when it sold this patent to

2   Comcast, because, as I testified on Friday, Nokia's

3   fortunes by 2010 had deteriorated.  I guess

4   "fortunes" is the wrong word.  Nokia's operating

5   results were declining.  It had almost zero market

6   share in the United States and it turned to a

7   strategy of monetizing its patents, which is what

8   resulted in this patent sale.  So, you know, we need

9   to consider at what point in time Nokia is involved

10  in the GSM standard-setting body as compared to the

11  circumstances -- its operating results in 2010 and

12  subsequently.

13  Q   And we'll -- and we'll get to that.  We'll get to

14  that.  I'm just trying to get you -- well, in fact,

15  Nokia did an evaluation of this patent, didn't it?

16  A   Well, I've seen a document that I think has come

17  up in court regarding from the inventor.

18  Q   Right.

19  A   Is that the document you're talking about?

20  Q   Yeah.  Is this the document that's on your

21  screen?

22  A   Yes.

23          MR. RIOPELLE:  And if we can go to the last

24  page?

25          THE COURT:  What document is on the screen?

Ms. Riley - Cross                      74

1          MR. RIOPELLE:  It's DX-150, Your Honor.

2          (Pause in proceedings.)

3          MR. RIOPELLE:  If we can go to the last

4   page?

5   BY MR. RIOPELLE:

6   Q    And do you see where it says "Value of the

7   Invention?"

8   A    Yes.

9   Q    And this was filled out by the inventor's

10  manager, correct?

11  A    I think that's right.

12  Q    Do you see it says at the top, "To be completed

13  by the manager?"

14  A    Yes.

15  Q    And you can see, right, that on a scale of zero

16  to five, the manager rated this invention as a two,

17  right?

18  A    Yes, I see that.

19  Q    Which means it was modest?  Right, that's what it

20  says?

21  A    Right.

22  Q    Okay.  Now, you also -- you were testifying a

23  couple seconds -- a minute ago about, you know,

24  Nokia's position in 2010, right?

25  A    Yes.

Ms. Riley - Cross                              75

1  Q   And I think on Friday, you called it "Nokia's

2  demise?"

3  A   I agree with that.  I haven't read the

4  transcript, but that would --

5  Q   All right.

6  A   -- probably be what I said.

7  Q   Now, you heard Mr. Dellinger testify that it was

8  Comcast that approached Nokia about buying patents,

9  right?

10  A   Yes.

11  Q   It wasn't Nokia that approached Comcast?

12  A   Right.  I think Mr. Dellinger said that he knew

13  someone at Nokia and wanted to see what they had.

14  Q   And he -- Mr. Dellinger testified that from the

15  time they approached Nokia to the time they actually

16  bought the 870 patent it was about two years?

17  A   I think that's right.

18  Q   All right.  I mean that's hardly a fire sale if

19  it takes two years to buy the patent, is it?

20  A   Well, these things take time.  Deals take time.

21  Q   Now, you were talking about how Nokia's operating

22  profits were not good in 2010.  Isn't it true that

23  Nokia had $2.5 billion of operating profits in 2010?

24  A   The number I've seen is actually 2.1 billion Euro

25  in 2010, so I don't know -- just the conversation, I

Ms. Riley - Cross                          76

1   want to make sure we're correct, which was half of

2   what it had earned in 2005.  And also, looking at

3   2011, '12, and '13, Nokia lost money.

4   Q    Well --

5   A    So this happens to be the end of a good run of

6   Nokia's profitability in 2010.  It just so happens

7   that's the time period we're focused on.

8   Q    Well, you say that, but you're aware, right, that

9   just last year, Nokia bought Alcatel-Lucent for $16

10  billion?  You're aware of that, right?

11  A    Nokia -- the Nokia handset -- well, this is --

12  Nokia spun off its handset business to Microsoft.  Do

13  you know that?  I mean that's what I'm talking about.

14  So you're talking about the assets remaining in

15  Nokia, and Nokia is now branding phones.  So you'll

16  see the Nokia brand.  If you go phone shopping,

17  you'll see them in the stores again.  Alcatel-Lucent

18  is manufacturing them.

19  Q    All right.  But it's still Nokia, right?

20  A    It's the name.

21  Q    It's the comp -- the original company, right?

22  A    No, sir --

23  Q    The --

24  A    -- which anyone can read that Nokia's handset

25  business was sold to Microsoft in 2014.  Microsoft

Ms. Riley - Cross                              77

1    attempted to develop the Windows phone with Nokia.

2    They never achieved more than a three percent market

3    share.  And Microsoft sold those assets in 2016.

4    Q   So those assets were part of Nokia at one time,

5    right?

6    A   Yes, they were.

7    Q   And then Nokia sold those assets, right?

8    A   I mean I think that's what we're talking about.

9    We're talking about what happened to Nokia.

10   Q   Right.

11   A   This is the tail end of the decline.

12   Q   Right, but I mean you have to -- if you're going

13   to buy something for $16 billion, you can't be in

14   such bad shape, can you be?

15   A   Are you talking about Microsoft?

16   Q   I'm talking about last year, Nokia buying

17   Alcatel-Lucent for $16 billion.

18   A   But it's -- that's not the operating business

19   that it sold to Microsoft.

20   Q   And you're aware, aren't you, that Nokia filed a

21   patent litigation against Apple just last -- just

22   about three months ago?

23   A   Yes, I am.

24   Q   And they --

25   A   I read about that.

Ms. Riley - Cross                     78

1  Q    Right.  And they -- so Nokia knows when it's got

2  good patents to sue for in litigation, right?

3  A    Well, I'm not exactly familiar with all the

4  intricacies of what it's claiming Apple has done, but

5  I mean we'll see how it turns out.

6  Q    All right.

7  A    That was an interesting filing.

8           MR. RIOPELLE:  Can we call up the patent

9  purchase agreement?  And if we can go to in the

10  appendix --

11           THE COURT:  What's the exhibit number?

12           MR. RIOPELLE:  It's PX-8, Your Honor.

13           THE COURT:  Thank you.

14  BY MR. RIOPELLE:

15  Q    And I think the jury has seen this before.  You

16  agree, right, Ms. Riley, that these are all the

17  assets that Comcast bought from Nokia in the 2010

18  purchase?

19  A    Is this the exhibit to the purchase agreement?

20  Q    It is.

21  A    Yeah, I agree.

22  Q    And you agree, right, that Nokia first offered to

23  sell these for $1.5 million, right?

24  A    I'm thinking about Mr. Dellinger's testimony.

25  Yes, that's correct.

Ms. Riley - Cross                          79

1  Q    And then -- and then Nokia and Comcast eventually

2  agreed that Nokia would sell them for $600,000,

3  right?

4  A    That's right.

5  Q    All right.  So -- and under the hypothetical

6  negotiation, you will agree, right, that we have to

7  assume that Sprint would have known that Nokia was

8  willing to sell the patent to Comcast for $600,000,

9  right?

10 A    That's a fair question, and I think that we would

11 have to understand that the parties would be aware of

12 that willingness, but not in the 2005 time frame --

13 Q    Wait.

14 A    -- when they conduct the negotiation.

15 Q    Well you --

16 A    It's just a question of what they knew as of

17 2005.

18 Q    Right, but under -- one of your slides up there

19 on the hypothetical negotiation talked about perfect

20 knowledge, right?

21 A    It did.

22 Q    And you said that Sprint would know that -- if

23 messaging was going to go way up, right?

24 A    Correct.

25 Q    So also under the perfect knowledge, Sprint would

Ms. Riley - Cross                      80

1  know that Nokia would sell the patent to Comcast for

2  $600,000, right?

3  A   Yeah, I think the question is whether that would

4  then be the determining factor in trying to measure

5  damages adequate to compensate Comcast or Sprint's

6  use of the invention.

7  Q   So --

8  A   Like whether that would override all the other

9  factors regarding profitability and revenue and

10 messaging volume that I discussed.

11 Q   But under your theory of the case, Nokia would

12 sell the patent in the real world to Comcast for

13 $600,000, but Nokia and Sprint would have agreed that

14 Sprint could license it for $153 million, right?

15 A   Right, as compensation for the trillions of

16 messages.

17         MR. RIOPELLE:  And if we could put up slide

18 seven from Ms. Riley's deck?

19 BY MR. RIOPELLE:

20 Q   And so this was -- this came from your deck that

21 you showed on Friday, correct?

22 A   Correct.

23 Q   So if we're looking at that, is that a house

24 there on that --

25 A   I'm thinking of it as an -- like an office

Ms. Riley - Cross                              81

1    building.

2    Q    An office building?  Okay.

3    A    Because we have a lease.

4    Q    So it's your opinion that Nokia would have sold

5    this office building to Comcast for $600,000, but

6    Nokia would have licensed like one of the offices in

7    there, leased it, to Sprint for $153 million?  That's

8    your opinion, right?

9    A    Well, I mean I think it's you -- the flaw in your

10   argument is that if someone buys an office building

11   for $1 million, can they collect no more than $1

12   million in rent on the building?  I mean that's

13   actually the premise of your question, and we know

14   that's not the case.  The patent is an asset, just as

15   this building is an asset.

16   Q    Well, let's flip it around though.  Your opinion

17   is that if Nokia thought it could have licensed the

18   patent for $153 million, why would Nokia ever have

19   sold the patent in the real world for only $600,000?

20   A    But we're not in the real world.  We're in the

21   hypothetical negotiation.  It's a negotiation that

22   never occurred in real life.  And it's -- this is how

23   the law tells us to determine patent damages.

24   Q    All right.

25   A    I just want to be sure you're clear.

Ms. Riley - Redirect                              82

1    Q   You agree that Nokia sold the patent in the real

2    world for $600,000, right?

3    A   Yeah, I don't think anybody is disputing that.

4    Q   All right.

5              MR. RIOPELLE:  No further questions, Your

6    Honor.

7              THE COURT:  You may proceed with redirect.

8    Well, it's 11:15, so let's take a recess first and

9    then proceed with redirect.  Ten minutes, ladies and

10   gentlemen.

11             (Jury out, 11:14 a.m.)

12             THE COURT:  We're in recess for ten

13   minutes.

14             (Recess taken from 11:15 a.m. to 11:32

15   a.m.)

16             THE COURT:  Be seated, everyone.  You may

17   continue, Mr. Heist.

18             MR. HEIST:  Thank you, Your Honor.  Mr.

19   (indiscernible), may we please have slide 40?

20             (Pause in proceedings.)

21                    REDIRECT EXAMINATION

22   BY MR. HEIST:

23   Q   Ms. Riley, you were asked some questions on

24   cross-examination by Mr. Riopelle about which costs

25   were included and were not included in your

Ms. Riley - Redirect                                  83

1   determination of the messaging profitability,

2   correct?

3   A   Correct.

4   Q   And you said that -- if I understood you, that

5   when you calculated this 53.8 percent messaging

6   profitability that that didn't include costs for

7   spectrum, bay stations, towers, and mobile switching

8   centers?  Did I get that right?

9   A   I think that's right.

10              MR. HEIST:  Could we turn to the next

11  slide, 41?  Back one, please?

12  BY MR. HEIST:

13  Q   From that messaging profit you subtracted the

14  normal profit, a part shown in yellow on the slide,

15  correct?

16  A   That's correct.

17  Q   And the normal profit was 23 percent?

18  A   Correct.

19  Q   And that profit was taken from the books and

20  records kept in the ordinary course of business from

21  Sprint, correct?

22  A   Yes.

23              THE COURT:  Except that she's your witness

24  and not on cross-examination, so those questions are

25  improper.  Ask non-leading questions.

Ms. Riley - Redirect                    84

1          MR. HEIST:  Thank you, Your Honor.  Will

2    do.

3    BY MR. HEIST:

4    Q   What costs were included in Sprint's books and

5    records in the normal profit?

6    A   There is -- there are costs of providing the

7    service to CDMA subscribers, including acquisition --

8    customer acquisition costs, operating costs, handset

9    subsidies to -- where you're given a break on your

10   phone so that you enter in to a contract, selling,

11   general, and administrative costs.  Those are all

12   included in Sprint's profit and loss statement for

13   the CDMA subscribers.

14   Q   Would those statements include costs for

15   spectrum?

16   A   As Sprint -- yeah, as Sprint captures those costs

17   in its ordinary course of business, yes.

18   Q   And would they include costs for bay stations and

19   cell towers?

20   A   Yeah, it would be all the costs of providing the

21   CDMA -- the services to CDMA customers.

22   Q   So to that extent, did you exclude -- did you

23   include those costs in the normal profit?

24   A   They're included in the normal profit right.

25   Q   And the royalty rate that you were calculating

Ms. Riley - Redirect                    85

1    here was a portion of what you've shown on this slide

2    as an excess profit.

3              THE COURT:  Objection is sustained.

4              MR. RIOPELLE:  Thank you, Your Honor.

5              MR. HEIST:  Sorry, Your Honor.

6    BY MR. HEIST:

7    Q    The -- what portion of this dollar bill did the

8    royalty percentage come from?

9    A    The green portion.  It comes from the excess

10   profit, which is what Sprint earns on messaging over

11   and above its normal profit on all services provided

12   to CDMA customers.

13   Q    Now, you were asked some questions about the

14   excess profit of 30.8 percent, and you mentioned --

15   you made a reference to a Morgan Stanley report.

16   Where is that that you say that?

17   A    That was in a 2008 study that the Federal

18   Communications Commission undertook looking at

19   profitability experienced by the carriers on

20   messaging, was one aspect of the report.  So in that

21   report, a Morgan Stanley study was referenced saying

22   that the carriers are experiencing 90 percent profit

23   on messaging.

24   Q    Which is higher than what you computed?

25   A    Oh, yes.

Ms. Riley - Redirect                    86

1   Q    You were also asked some questions about Sprint's

2   various lump sum agreements that Sprint had entered

3   into, patent agreements, correct?

4   A    Yes, that's right.

5   Q    Are you aware of any running royalties that

6   Sprint has sought?

7   A    Yes, there was a litigation matter a number of

8   years ago where Sprint had sued Vonage, which was

9   probably the first voice over IP provider.  And

10  Sprint sought -- well, was awarded a five percent

11  running royalty against Vonage in that matter.  So

12  I'm aware of that.

13  Q    All right.  Let's look at slide six, please.  We

14  looked at this slide on Friday and this is from the

15  Court's instructions that you talked about, correct?

16  A    That's my understanding, yes.

17  Q    And what does the law tell us about how the

18  reasonable royalty is to be determined on this slide?

19  A    Well, you can just read from the slide that,

20  "Comcast is entitled to recover no less than a

21  reasonable royalty for each infringing act."

22  Q    For each infringing act?

23  A    Yes.

24  Q    And in your analysis, how many infringing acts

25  were there?

Ms. Riley - Redirect                    87

1   A    Over 2.6 trillion.

2              MR. HEIST:  Can we see slide eight, please?

3              (Pause in proceedings.)

4   BY MR. HEIST:

5   Q    And what does this slide tell us about what a --

6   A    This --

7   Q    -- "reasonably royalty" is defined as?

8   A    This is from the jury instructions defining a

9   "reasonable royalty" as the amount of money Nokia and

10  Sprint would have agreed upon as a fee for use of the

11  invention at the time prior to when infringement

12  began.

13             MR. HEIST:  And can we -- can we see slide

14  nine, please?

15  BY MR. HEIST:

16  Q    And what does that slide tell us about how a

17  reasonable royalty is determined?

18  A    This tells us that the reasonable royalty is

19  determined by conducting the hypothetical negotiation

20  that I described.

21  Q    So at the hypothetical negotiation as you

22  considered it, Nokia and Sprint would be the two

23  parties?

24  A    That's correct.

25  Q    And at that hypothetical negotiation, would the

Ms. Riley - Redirect                              88

1    parties take into account Sprint's use of the

2    invention?

3              THE COURT:  Sustained.

4              THE WITNESS:  Yes.

5              THE COURT:  You've got to stop leading the

6    witness.  And I'm sustaining objections because Mr.

7    Riopelle is on his feet.

8              (Pause in proceedings.)

9    BY MR. HEIST:

10   Q   You were asked some questions about whether Nokia

11   would consider the fact that some years later there

12   would be a sale of the patent to Comcast, correct?

13   A   Yes.

14   Q   At that hypothetical negotiation, what would have

15   been known about Comcast's use of the invention?

16   A   Well, the parties would have known that Comcast

17   was not going to use the invention, that Comcast was

18   acquiring the patent for defensive purposes.

19   Q   And so at a hypothetical negotiation what would

20   the parties have known about Sprint's use of the

21   invention?

22   A   The parties would have known about Sprint's

23   extensive use of the invention as shown in the

24   records indicating how many messages they sent and

25   received.

Ms. Riley - Recross                    89

1  Q    And so based upon your analysis of the facts

2  surrounding the hypothetical negotiation back in 2005

3  between Nokia and Sprint, what is your opinion

4  regarding the correct measure of damages in this

5  case?

6  A    The correct measure of damages is a running

7  royalty that would represent damages adequate to

8  compensate Comcast for Sprint's infringement

9  calculated using the excess profit methodology that I

10 described to you determined -- resulting in the

11 determination of a 2.75 percent royalty multiplied by

12 the apportioned messaging revenue, which yields that

13 $153 million number.

14 Q    Thank you.

15       MR. HEIST:  No further questions.

16       (Pause in proceedings.)

17              RECROSS-EXAMINATION

18 BY MR. RIOPELLE:

19 Q    Ms. Riley, you were talking about a report from

20 Morgan Stanley?

21 A    Well, a Federal Communications Commission study

22 that references a Morgan Stanley report.

23 Q    Right.  And you haven't submitted that report

24 here for evidence, have you?

25 A    What do you mean?

Ms. Riley - Recross                     90

Q    You haven't given that report to this jury for
them to consider, have you?

A    Not personally.  Like --

Q    This jury --

A    -- I haven't handed them anything.

Q    This jury does not have that report, do they?

A    I don't know.

Q    Okay.  And that report was done back in 2008,
wasn't it?

A    Yes, it was.

Q    And it was done before all the bundling plans
came in, wasn't it?

A    Some might say it led to the creation of bundling
plans, yes.

Q    And that -- you were talking -- you were talking
earlier about well, you have to look at the
hypothetical negotiation.  That Morgan Stanley report
wasn't looking at a hypothetical negotiation, was it?

A    No, it wasn't.

Q    And that Morgan Stanley report wasn't looking at
how much Sprint would have agreed to with Nokia to
pay in 2005, was it?

A    No, it was just looking at profitability of
messaging as experienced by the carriers, of which
Sprint is one.

Ms. Riley - Recross                          91

1   Q    Now, you just brought up the Vonage verdict,

2   right?

3   A    Correct.

4   Q    And you said that you think that was a running

5   royalty, right?

6   A    Yes.

7   Q    Now, but you base that on a newspaper article you

8   read, right?

9   A    That's probably true.

10  Q    Right?  And --

11  A    I mean I've read the opinion, but in my report I

12  might have cited to an article.

13  Q    Right.  You cited to a newspaper article in your

14  report, right?

15  A    Okay.

16  Q    And don't you think it would be better researched

17  if you actually went to the court and looked at the

18  final judgment in the case?

19  A    Well, I had previously developed a database of

20  royalty rates.  That is one I had the occasion to

21  read the opinion relating to, and it is -- I have

22  read that opinion.

23  Q    Really?  So don't you know that if you looked at

24  the final judgment in that case, it was not a running

25  royalty; it was, in fact, a lump sum that was

Ms. Riley - Recross                    92

1    entered?

2    A    Based on agreement of the parties, yes.

3    Q    No.  No, not based on -- I agree that there was a

4    settlement, but the judgment entered by the court was

5    a lump sum, wasn't it?  It was not a running royalty?

6    A    And I agree with you that in settlement of

7    litigation, parties pay lump sums.  That's what --

8    it's true.

9    Q    You're --

10   A    You said it yourself, in settlement of the

11   litigation, they agreed to pay one lump sum.  That

12   doesn't change the fact that Sprint sought a running

13   royalty in that trial and achieved a running royalty

14   in the verdict.  They ultimately did settle for a

15   lump sum.

16   Q    Are you finished?

17   A    I'm finished.

18   Q    I believe you're intentionally misconstruing my

19   question.  The trial judgment entered by the court

20   before the parties ever reached any settlement was a

21   lump sum, isn't that right?  It was not a running

22   royalty?

23   A    I think I can agree with that --

24   Q    Thank you.

25   A    -- with the parties settle -- with the knowledge

Mr. Webber - Direct                    93

1   they were going to settle.

2   Q   The judgment was entered by the court, not -- and

3   the court had no knowledge at that point that the

4   parties were going to settle, did they?

5   A   I don't think so.

6           MR. RIOPELLE:  No more questions, Your

7   Honor.  Thank you.

8           MR. HEIST:  Nothing further, Your Honor.

9           THE COURT:  That concludes your testimony.

10  Thank you.

11          THE WITNESS:  Thank you.

12          (Witness excused.)

13          MS. MELLEY:  Comcast calls James Webber.

14          (James Webber, Plaintiff's Witness, Sworn.)

15          COURTROOM DEPUTY:  Please be seated.

16  Please state your full name and spell it for the

17  record.

18          THE WITNESS:  Yes, my name is -- excuse me,

19  my name is James Webber, that's W-E-B-B-E-R.

20          THE COURT:  Good morning.  Good morning,

21  sir.

22          THE WITNESS:  Good morning, Your Honor.

23          THE COURT:  You may proceed.

24                  DIRECT EXAMINATION

25  BY MS. MELLEY:

Mr. Webber - Direct                94

1  Q   Good morning.  I think we've just snuck in a good

2  morning.  Would you introduce yourself to the jury,

3  please?

4  A   Yes, my name is James Webber, as I've previously

5  stated.  I'm an economist and I'm here to talk about

6  some cost issues today on behalf of Comcast.

7  Q   Mr. Webber, have you worked on a presentation

8  that will help illustrate your testimony for the

9  jury?

10  A   Well, that was my intention, yes.

11  Q   All right.  Let's bring up the first page of

12  that.

13         (Pause in proceedings.)

14  Q   While we're doing that, can you tell the jury by

15  whom you're employed present?

16  A   Yes, I'm a Senior Vice President and a Partner at

17  QSI Consulting.

18  Q   And what's the business of QSI?

19  A   We provide financial, economic, technical, and

20  strategic advice to clients both in public and

21  private sector.  So one of my clients, for example,

22  in the public sector would be the United States

23  General Services Administration.  And then on the

24  private side we work with telephone companies,

25  electric and gas companies, cable companies, and

Mr. Webber - Direct                        95

1  people that are in sort of network industries.

2  Q   What's a network industry?

3  A   Well, I view telecommunications as a network

4  industry.  There are lots of various components of

5  networks that connect to one another within a single

6  company's network.  And then also, those networks are

7  connected into other networks with other people.

8  Q   How long have you been at QSI?

9  A   I've been at QSI since 2003, so that's about 13,

10  almost 14, years now.

11  Q   Okay.  And what do you do there?

12  A   My fruitions are really two-fold.  First of all,

13  I manage a lot of our client relationships.  So I'm

14  one of the individuals who will scope projects with

15  our clients to determine what the clients' needs are,

16  and the inside the firm I'll help to determine which

17  of the assets and consultants that we have are best

18  used to meet the clients needs.  And then once we've

19  made those determinations I typically manage the

20  projects until they're completion.  Another function

21  I have, ultimately, is I assist my partners as

22  they're managing their projects.  They may call on my

23  expertise where they need something from me.

24  Q   Would you tell us about your educational

25  background?

Mr. Webber - Direct                    96

1   A    Certainly.  I have a Bachelor's Degree in

2   Economics from Illinois State University.  I earned

3   that in 1990.  And then three years later, I acquired

4   a Master's Degree in Economics, also from Illinois

5   State University.

6   Q    After receiving your master's degree, did you

7   then enter the workforce?

8   A    I did.  At that point I had been a intern at the

9   Illinois Department of Natural Resources, and as soon

10  as I completed my degree they offered me a full-time

11  job.  And in that capacity I basically did benefit

12  cost analysis as it related to environmental or

13  pollution control type strategies, and then also in

14  the electric and gas area.

15  Q    And what did you do next?

16  A    From there, I moved to the Illinois Commerce

17  Commission which has responsibility over

18  telecommunications carriers, electric companies, and

19  gas companies.  I worked in the rates organization

20  analyzing (indiscernible) filings made by the

21  telephone companies that basically set their prices

22  for the services they offer.  And my job was at first

23  to review those filings and advise the Commission as

24  to whether the prices were consistent with the cost

25  information that the carriers were provided, and then

Mr. Webber - Direct                                97

1    I ultimately managed that group.

2            Now, while I was doing that work, the types

3    of costs that we looked at are much like what we'll

4    be talking about here today, and it breaks down

5    relatively simply.  We've got labor, whether it's

6    internal or external to a company; we've got capital,

7    so that's sort of like equipment; and then often

8    times, particularly in our industry, in the

9    communications industry, there are external vendors

10   who help carriers do their job, and those are treated

11   in a separate category of costs.

12   Q   Okay.  Before we get into the weeds of all we did

13   today, let's carry on.  Did you move on from the

14   Illinois Commerce Commission?

15   A   I did.  After the Illinois Commerce Commission, I

16   went to a small consulting firm in Chicago.  It's

17   name was CSG.  And I represented clients there mostly

18   in the telecommunications industry, but then also in

19   the financial services industry, and related to the

20   costs and pricing of telecommunications services.

21   Q   Okay.  And then?

22   A   From there, I went to work inhouse at one of my

23   larger clients.  That was AT&T.  I first worked in

24   their regulatory group, and my function there was to

25   look at the cost of providing services and to work at

1    the state level to make sure that the services we

2    bought from other carriers and that pricing in those

3    states was set based on cost standards pursuant to

4    the state's rules.

5    Q    Okay.  And after that?

6    A    Oh, yes, I had a second job within AT&T.  Thank

7    you.  I moved outside of that regulatory organization

8    and I went to an internal organization.  And then I

9    was given a team of individuals.  We had

10   responsibility over negotiating the rates, terms, and

11   conditions regarding services that we purchased from

12   all the other telecommunications carriers in the

13   industry.  And then when we couldn't work out our

14   deals, ultimately, sometimes we had to go work in

15   arbitration to get those issues resolved.

16   Q    Okay.  Did you move on from AT&T?

17   A    I did.  After that, I went to a company by the

18   name of CoreComm, which then bought a company by the

19   name of ATX.  So CoreComm was a midwest company.  ATX

20   was a company here.  In fact, their headquarters was

21   in Bala Cynwyd, so perhaps some of you know that

22   name.  I had a carrier relations function there, so I

23   helped negotiate the interconnection of our telephone

24   company with other companies.  Then I also had

25   regulatory affairs functions and I worked with the

1  finance group in order to do benefit analysis and

2  cost analysis to help us determine how we would buy

3  the services that we bought from other carriers and

4  produce our products profitably.

5  Q   Okay.  Does that bring us up to your work at QSI?

6  A   It does.  Thank you.

7  Q   All right.  During this time have you previously

8  served as an expert in court or other tribunals?

9  A   Yes, beginning in about 1994 where I first

10  testified before the Illinois Commerce Commission,

11  I've testified in 25 states, whether in state court

12  or federal court, I've testified at the Federal

13  Communications Commission, and I've testified before

14  state regulatory agencies throughout the midwest and

15  a good bit of the east and the southwest in the

16  southern part of the country.  I've also testified in

17  arbitration proceedings.  And if I didn't mention

18  state and federal court, I've done that as well.

19  Q   Okay.  And what has been the focus of your

20  testimony or your reports in those instances?

21  A   My focus really has been two-fold: first, on

22  rates and costs, and then secondarily, the

23  interconnection, if you will, of companies and how

24  they purchase assets from one another and how all

25  that stuff fits together.

Mr. Webber - Direct                    100

1    Q   Okay.  So all told, how long have you worked in

2    or been involved with the telecommunications sector?

3    A   This is tough to admit, but I guess its 23, going

4    on 24 years now.

5    Q   And how much of that work has involved pricing or

6    cost analyses?

7    A   I would say at least half.

8    Q   Okay.

9         MS. MELLEY:  Your Honor, I offer Mr. Webber

10   as an expert in costs and pricing analyses in the

11   communications industry.

12        MR. RIOPELLE:  I missed that.  What's

13   the -- specifically are you offering for?

14        MS. MELLEY:  Costs and pricing analyses in

15   the communications industry.

16        MR. RIOPELLE:  No objection, Your Honor.

17        THE COURT:  Fine.  We will receive Mr.

18   Webber's testimony on costs and pricing analyses in

19   the communications industry.  You may proceed.

20        MS. MELLEY:  Thank you.

21   BY MS. MELLEY:

22   Q   When were you first engaged in this matter?

23   A   November of 2014, so nearly two and a half years

24   ago.

25   Q   And were you asked to do a cost analysis?

Mr. Webber - Direct                         101

1   A    Yes.

2   Q    Okay.  Is you or your firm being compensated for

3   your work in connection with this case?

4   A    Oh, yes, we are.

5   Q    And is your or QSI's compensation affected in any

6   way by the outcome of this case?

7   A    No.

8   Q    So what's the purpose of your testimony today?

9   A    So, ultimately, you heard Ms. Riley testify on

10  Friday and then also this morning that she does an

11  analysis which relies in part upon some cost figures

12  that I've provided.  And so you'll see here on this

13  table, ultimately, I provide the cost of $1.112

14  billion.  And I'll read this for the record,

15  $759,959,674 of those dollars relate to SMS services,

16  and $352,035,006 of those dollars relate to MMS

17  services.  So if you recall, the total calculation

18  that Ms. Riley had identified, the $153 million

19  figure, the blue side, SMS, goes to about $149

20  million, and the green side goes to that remaining $4

21  or $5 million.

22  Q    Okay.  So you were in the courtroom when Ms.

23  Riley testified?

24  A    I was.

25  Q    Okay.  And just to make sure the jury

Mr. Webber - Direct                    102

1   understands, can you explain how your number fit into

2   the work that she did?

3   A    Yeah, so Ms. Riley testified, as I understand it,

4   that she created a profit pool from which she

5   calculated rev -- royalties, and that profit pool

6   determines -- is determined based on revenues less

7   costs.  And so my cost figure is in a portion of the

8   total costs that she has for her calculations.  She

9   also had added other costs on top of the ones that I

10  calculated.

11  Q    Okay.  And over what period of time did you

12  calculate costs?

13  A    So my analysis, as I show here, is from 2006

14  through 2014, and particularly in 2006, it starts in

15  February, which I understand to be the beginning of

16  the damages period.

17  Q    Now, looking at the slide I see the phrase

18  "incremental costs."  Can you explain that phrase to

19  the jury?

20  A    Certainly.  So anybody who's studied economics

21  knows there's a really long answer and a short

22  answer, so I'll try to give you the short answer

23  here.  An incremental cost is the additional cost

24  given everything else that's already happened that is

25  incurred as a result of a business making a

1  particular decision and then taking action.  So in

2  this case incremental costs that I'll be talking

3  about are either costs which are incremental to SMS

4  or MMS or both.

5  Q   Is there another way of thinking about the

6  concept of incremental costs?

7  A   Yes, in fact, I like to think about it this way.

8  It's actually a little bit more simple.  You just

9  think about avoided costs.  Economists say that the

10  best way to determine what the incremental cost is is

11  to determine the cost that a company or a person

12  would avoid had it not taken the action that we're

13  considering or had it not done the business or the

14  sales that we're considering.  So in this case the

15  avoided cost, also the incremental cost, would be the

16  cost related to SMS if Sprint lived in a universe

17  where it did not offer SMS, and likewise for MMS.

18  Q   Okay.  And now the balance of your testimony is

19  going to be taking the jury through how you

20  calculated these numbers?

21  A   That's true.

22  Q   All right, let's dive in.  Let's look at SMS

23  costs in an additional level of detail.  Can you tell

24  the jury what's represented by this slide?

25  A   I'm trying to figure out how to erase that.  I'm

Mr. Webber - Direct                    104

1    sorry.

2    Q    That's the problem with putting red on the

3    slides.  I can do it.

4    A    Oh, I got it.  I'm sorry about that.  Okay.  So

5    in this slide here, what I'm trying to show in this

6    slide number five is the information that I was given

7    right off the bat, sort of when I got involved in

8    this litigation.  Sprint had certain Microsoft Excel

9    workbooks that included references to scorecards and

10   margin and profitability analyses.  And so the

11   portions of those documents that relate to SMS are

12   sort of represented here.   Sprint had identified

13   costs here in two categories: vendor costs and then

14   customer care costs.  And in total, they had

15   identified, again, for the record $200,822,929 as it

16   relates to SMS.

17   Q    Looking across the bottom axis there I see

18   additional categories of costs.  Can you tell the

19   jury -- I guess can you walk the jury through the

20   buckets of costs that you've calculated just very

21   briefly so they have an understanding of how you

22   thought about this?

23   A    Sure.  So it's typical in our industry that labor

24   and capital are going to be large contributing costs.

25   And so customer care is a sub-segment of labor.  It's

Mr. Webber - Direct                    105

1  a special category that is tracked in our industry

2  separately.  What I had noticed is that there was no

3  labor cost in the analyses that Sprint had provided,

4  so I had to add those in.  Similarly, there weren't a

5  lot of capital costs that had been identified by

6  Sprint, so I had to add those into the analysis.  And

7  we'll talk about that in more detail later.  And then

8  I also captured vendor costs, which Sprint was

9  monitoring very closely.

10  Q   How did you determine the categories of costs to

11  include?

12  A   Well, I mean first of all, you know, my

13  experience in this industry, I know that I should be

14  looking for labor, I should be looking for equipment,

15  particularly, I should be looking for customer care

16  costs.  That's like when you call in and talk to a

17  representative about a problem or a billing question.

18  These are standard in our industry, and, you know, I

19  knew I had to go look for those costs.  And I used

20  what Sprint had provided and then also I was able to

21  find through other documents they had more costs, and

22  we'll talk about those.

23  Q   Okay.  So that's why there are bars on this graph

24  for two of the categories and not for the other two

25  categories?

Mr. Webber - Direct                   106

1   A    That's correct, thank you.

2   Q    Now, did you identify any additional costs in any

3   of the categories reflected on this chart?

4   A    I did, yes.

5   Q    Okay.  Let's take a look at the next slide.  Can

6   you tell us first the amount of additional costs --

7   A    Sure.

8   Q    -- that you captured for SMS?

9   A    So if you look at the right-hand side where it

10  says "Total," you'll see the total is now

11  $759,959,674.  That's because I've added in total

12  $559,136,745 to the figures that Sprint had given me

13  in its scorecard or profit worksheets, the $200

14  million figure below.

15  Q    Okay.  Can you point the jury to the key on this

16  chart where you distinguish your costs from the --

17  the additional costs you calculated from the costs

18  that had been identified initially?

19  A    Yes, certainly.  So the numbers that Sprint had

20  provided, that Sprint identified, are here, and mine

21  are in dark -- or theirs are in dark blue at the

22  bottom.  There's none here, there's none here.  And

23  then mine are light blue on top.

24  Q    Thank you.  And shortly, we'll get to how you

25  calculated each of these buckets of costs?

Mr. Webber - Direct                                    107

1   A    That's right.

2   Q    All right.  But before we do that, did you do a

3   similar analysis and overview for MMS?

4   A    I did.  And as we talk about what I've done here,

5   I mean it's basically the same thing for SMS and MMS.

6   So, hopefully, in the interest of time, we'll be able

7   to talk about SMS and then just transfer that

8   information over to MMS.

9   Q    Before we do that, can you explain to the jury

10  any differences with respect to MMS and your

11  categories of costs?

12  A    Yes.  I'm not sure if you can see it on your

13  screen, so I'll circle it here.  There's a category

14  called "network costs."  This category was identified

15  by Sprint -- and we'll talk about it in a little bit

16  more detail -- for a short period of time.  And so

17  that's the -- a difference between what we had for

18  SMS and MMS.  There were no network costs identified

19  for SMS.

20  Q    Did you identify additional costs beyond those

21  reflected on this slide for MMS?

22  A    I did.  Just like with respect to SMS, the

23  lighter green here, you'll see I've added costs and

24  vendor, customer care, capital and data center,

25  Sprint labor and network.  I've added a total of

Mr. Webber - Direct                     108

1    $179,941,296, which brings that total up to the

2    figure we saw on the first slide, $352,035,006.

3    Q    Now, what sorts of information did you rely on in

4    computing costs?

5    A    So the first category was the scorecard

6    documents, the PX-703 and 745.  So Sprint had already

7    done a lot of math and provided us really good

8    documents.  And so I started with that.  Then I

9    looked at vendor contract information, which gave me

10   a lot of information about the costs related to

11   capital purchases and investments that it had to make

12   in order to support messaging, SS and MMS

13   respectively.  I looked at messaging data detail,

14   which is volume by year.  It had customer care calls

15   by year and some other details that were valuable and

16   useful for me.  I looked at the profit and loss

17   information regarding CDMA.  You'll see that here.

18            Then, of course, I looked at a lot of

19   documents that were available in the record here in

20   this case.  I looked at deposition testimony of

21   several individuals.  I read the transcripts, I

22   attended some of the depositions.  I looked at the

23   exhibits that were offered up during those

24   depositions.  So these are day-long question and

25   answer sessions where everybody sits across the table

Mr. Webber - Direct                        109

1    and we share a lot of documents.  And so I sat

2    through many of those and looked at the documents

3    that were provided there.  Then, of course, I looked

4    at public information.

5    Q   All right.  You've -- on this slide there are a

6    lot of PX numbers, and I want to quickly go through

7    them and let you read into the record some of the

8    sources that you relied upon.  But before we do that,

9    does --

10   A   Sure.

11   Q   -- this capture every document that you relied

12   upon?

13   A   No.  No.  I mean, ultimately, there were

14   thousands of documents.  I've read thousands of pages

15   of information.  This is just to give you a highlight

16   of categories that I looked at in kind of an

17   understandable way.  And then these documents here

18   are items that I refer to quite frequently in my

19   written reports and that we may discuss today.

20   Q   Okay.  So let's, if you would, please, just read

21   in the messaging data, documents that you relied

22   on --

23   A   Sure.

24   Q   -- as reflected in this slide.

25   A   So these are all PX numbers.  PX-601, PX-602,

Mr. Webber - Direct                    110

1    PX-707, PX-708, PX-710, PX-711, PX-712, PX-714,

2    PX-715, PX-716, PX-718, PX-719, PX-720, PX-722,

3    PX-723, PX-724, PX-726, PX-727, PX-728, PX-730,

4    PX-731, PX-732, PX-734, PX-735, PX-736, PX-738,

5    PX-739, PX-740, PX-742.  Previously, I mentioned

6    PX-703 and PX-745.  We also have PX-743 and then all

7    the deposition transcripts and exhibits.

8              MS. MELLEY:  Okay.  Your Honor, there are a

9    handful here that have not yet been moved into

10   evidence, and so I would like to do that.  I'll read

11   them.  PX-708, 712, 716, 720, 724, 728, 732, 736, and

12   740.  I don't believe there's an objection to any of

13   these.

14             MR. RIOPELLE:  I don't know at this point.

15   I didn't know you were going to ask, so we'll have to

16   come back to it at some point.

17             THE COURT:  Well, I'll receive them in

18   evidence subject to a later argument on why they're

19   not admissible.

20             (Plaintiff's Exhibits, 708, 712, 716, 720,

21   724, 728, 732, 736 and 740, documents, are admitted

22   into evidence.)

23             MR. RIOPELLE:  Thank you, Your Honor.

24   BY MS. MELLEY:

25   Q   All right.  With that administrative item out of

Mr. Webber - Direct                    111

1   the way, could you just briefly, very briefly, for
2   the jury explain what sort of public data you were
3   referring to when you mentioned public data?
4   A   Certainly.  So as is the case whenever I look at
5   a case like this or a launch a new study for my
6   clients, I'll look at public documents related to the
7   issue that I'm looking at.  So I looked at some
8   information regarding SMS and MMS.  But then I think
9   critically here, I looked at information as it
10  relates to labor pricing and other government
11  statistics that I could use in order to help bolster
12  the cost analyses that I had to do.  So where I don't
13  have all the pieces of information that I need based
14  on the papers that I have from Sprint, I went to
15  public sources to obtain that data.  The Bureau of
16  Labor Statistics would be one of those organizations
17  that I went to.
18  Q   Great.  And with that, let's dive in to a deeper
19  level of detail.
20  A   Sure.
21  Q   Turning first -- thinking back to the bar graph,
22  can you tell us what's the first bucket of costs that
23  we'll talk about?
24  A   Sure, so this is Sprint's SMS incremental costs
25  as it relates to vendors.  And what you'll see here

Mr. Webber - Direct                          112

1   in that top row, that darker blue row, that's the

2   information that Sprint had provided.  And these

3   vendor costs here relate to what I'll refer to the --

4   is the alphabet soup that Dr. Akl talked about.  We

5   have the SMSC, which is the messaging center for SMS;

6   we have the MMSC, which is the messaging center for

7   MMS; we had something called the PSS -- or I'm sorry,

8   HSP; we had the HLR; he had LDAP; PDR; and a few

9   other things.  So these are vendors costs that relate

10  to many of those things.

11          Sprint had identified many of those costs

12  on an operating-type basis year over year.  And the

13  bottom row, I did a deeper dive and I found some more

14  of those costs and spread them over time and have

15  captured them here.

16  Q   Okay.  Could you give the jury the 50,000 foot

17  level analysis of how you captured the additional

18  costs?

19  A   Sure.  And, actually, let me -- let me back up.

20  So in addition to capturing some additional costs, I

21  did make a couple of mathematical corrections to

22  Sprint's spreadsheets.  Now, these aren't major

23  changes.  It didn't really change the numbers all

24  that much.  I just want to be clear that I did make a

25  couple of changes.  And, basically, there was one

1    circumstance where there was some volume information

2    that had not been transferred over in the electronic

3    version of their workbooks, and so I fixed that

4    error.  And then there was some pricing information

5    that wasn't translated properly, and I just fixed

6    that based on the papers that I had.  So it wasn't

7    like a new analysis that I created into their work.

8            As to the additional categories, I did two

9    things really.  First of all, I found Sprint papers

10   that had identified some vendor cost categories of

11   items that were not captured in their original work.

12   One of those relates to the SPS.  One of them relates

13   to the HLR.  These vendor documents identified that

14   the cost exists, that they hadn't been captured here,

15   so I put them into the studies in the appropriate

16   years based on when they were incurred.

17           All right.  And then second, you'll see

18   Sprint had not provided -- in the information it

19   provided here in 2010 through 2014, it had not

20   provided anything in this period.  So I used a simple

21   technique called backcasting.  Based on the

22   information that I had from 2010, I took the numbers,

23   divided them by the number of messages to come up

24   with the number per unit, and then I multiplied that

25   by the number of units back in time, 2009, 2008,

Mr. Webber - Direct                    114

1    2007, and 2006.  This type of work is pretty typical.

2    If you don't have all the relevant information, it's

3    one of your next best alternatives.  So I've employed

4    that backcasting here.

5    Q    And, very briefly, how do you do the backcasting?

6    A    So, essentially, in this case what I was able to

7    do was take the per unit cost figures based on these

8    data in 2010.  So I took the dollars, divided them by

9    the number of messages, came up with the cost per

10   message.  And then I was able to obtain the message

11   counts for all of the previous years.  So I simply

12   multiplied messages times dollars per message,

13   simply.

14   Q    And can you summarize for the jury the total

15   costs Sprint identified and the additional that you

16   calculated in the context of vendor costs for SMS?

17   A    Yeah.  So for vendor costs, I added $89,134,541.

18   So that's about 50 percent on top of what Sprint had

19   already calculated.  And so the new total is now

20   $260,001,493.  Again, so I added about 50 percent of

21   what Sprint had calculated and put that on top of

22   what they had calculated.

23   Q    And did you do a similar analysis for MMS?

24   A    I did.

25   Q    And let's take a look at the next slide.

Mr. Webber - Direct                     115

1  A   I'm having a hard time with this.  Oh, there we

2  go.  Okay.  So, basically, I did the same thing for

3  MMS as I did for SMS.  I had some missing volume data

4  in 2010, so I put that in the study and fixed it.  I

5  had some missing pricing information in 2013.  I put

6  that into the study just to fix it.  There were

7  additional vendor costs, again, for the HLR and the

8  SPS.  I've added those in.  And then I backcasted for

9  this period here, just like we had talked about

10  previously for SMS.

11  Q   Okay.  And so, again, the Sprint identified costs

12  are in the top row and the additional that you added

13  are in the lighter color in the second row?

14  A   That's right.  So I added $43,740,445, roughly 25

15  percent, on top of Sprint's numbers.

16  Q   Okay.  And now I -- we didn't talk about this

17  with respect to the last slide.  Let's pause here and

18  do it.  I see some little bubbles across the bottom

19  of the screen.  Can you explain to the jury why we've

20  put those there?

21  A   Oh, thank you.  That's good.  So this is a

22  reminder.  Earlier, we looked at some of the general

23  categories of papers that I looked out in order to

24  inform my analyses here.  You'll see messaging data

25  on the lower left-hand side.  I used messaging data

Mr. Webber - Direct                    116

1    pulled from other Sprint documents for 2009, 2008,

2    2007, and 2006 to come up with those quantities that

3    I then multiplied the dollar per quantity figure by

4    in order to do my backcasting.

5         The majority of the numbers that were

6    provided from Sprint and that are reflected in the

7    dark green came from their scorecard documents.

8    These are Microsoft Excel spreadsheets that they kept

9    in the ordinary course of managing their business

10   where they were tracking their profitability and the

11   contribution margin that they were providing to the

12   overall firm's profitability.

13        Vendor contracts obviously inform me

14   because they show prices and they also have many

15   purchase orders.  Although I didn't have invoices, I

16   had purchase orders indicating where dollars were to

17   be spent, and so I used those as a basis for adding

18   additional costs.  And then the profit and loss data

19   and some of the deposition transcripts also helped

20   inform my decisions here.

21   Q   Okay.  Now let's move on to the second bucket of

22   costs.  Customer care, correct?

23   A   Customer care.

24   Q   All right.  Let's pause for a moment, and would

25   you just tell the jury what you mean by customer care

Mr. Webber - Direct                    117

1  costs?

2  A    Certainly.  So in a -- in an industry which is

3  heavily geared toward customers, as you can imagine,

4  the customers spend a lot of time taking care of

5  their customers, whether it's answering telephone

6  calls, repairing technical issues, dealing with

7  billing problems, and that sort of thing.  It's

8  typical in the industries that I've studied over the

9  past 20 years or so that companies track these data

10 very diligently because they're areas where they

11 could have a lot of influence on the costs.  And so

12 Sprint had done a nice job of tracking their data

13 based on the type of call, the severity of the

14 information that needed to be addressed, et cetera,

15 and they had different price points based on what was

16 happening.

17            So those data are reflected in that top

18 row, which sums to about $29,955,977.  I guess that's

19 not about; it's exact.  And so I was able to use

20 those figures and data I had tracking back in time

21 regarding customer care calls and the severity or

22 level of the care activity that was required, and I

23 was able to compute those figures for the years

24 moving backward in time based on their data.

25 Q    Okay.  And what amount of costs did you identify

Mr. Webber - Direct                    118

1    in addition to those that were identified by Sprint?

2    A    So, for the record, I added $60,735,585, so I

3    added basically two times here as to what Sprint had

4    computed.

5    Q    When you add additional costs to the costs

6    identified by Sprint is that more favorable or less

7    favorable to Sprint's position on damages in this

8    case?

9    A    Oh, it's more favorable to Sprint because,

10   ultimately, the margin on which a royalty would be

11   based becomes small when the costs become higher.

12   Q    And going back to customer care costs, did you do

13   a similar analysis for MMS?

14   A    I did.

15   Q    And let's take a look at that.  And, again, can

16   you just briefly tell the jury what you did?

17   A    Yeah, I did exactly as I described for SMS.  And

18   in this case I added $40,906,160 to their previous

19   total, $22,115,956, so about double their numbers.

20   Q    Okay.  And on what sorts of documents did you

21   base your customer care costs analysis?

22   A    Again, it was based on the messaging detail that

23   Sprint had provided in other papers -- when I say

24   other papers I mean a lot of other papers -- their

25   scorecard documents, which were the financial

Mr. Webber - Direct                    119

1  documents that they used to track the profitability

2  of their messaging services and their costs, and also

3  some of the profit loss information, their financial

4  data.

5  Q   Was your next bucket of costs labor costs?

6  A   It was.

7  Q   All right.  Let's take a look at that.  First,

8  what did you intend to capture in the bucket of labor

9  costs?

10 A   So I intend to capture -- and you can see it on

11 the left-hand side.  Let's ignore for a minute the

12 top row which is highlighted in yellow.  I intended

13 to capture two categories of costs.  One is

14 management labor and the other one is non-management

15 labor, so this would be like technical support staff.

16 And, you know, I ultimately looked at details that

17 Sprint had provided, not only in their papers, but in

18 depositions.  And for management, I was able to get

19 an estimate of headcount by year for a good period of

20 time.  And I went to the Bureau of Labor Statistics

21 in order to provide information regarding how much

22 management was paid on an annual basis.  In

23 telecommunications, and management in particular, I

24 added in benefits to make sure that I was capturing

25 everything that was related to management labor

Mr. Webber - Direct                          120

1   costs, and then I was able to spread those over time

2   based on certain volumetric data that I had from

3   Sprint.

4          As it relates to labor, here, what we've

5   got is various categories of technicians, people who

6   make anywhere say between 15 and, on the higher end,

7   between $65-$70 per hour based on the hours that they

8   would work.

9   Q   Okay.  Now, you asked the jury to skip the first

10  line for the time being, so I want to focus you back

11  on it.  What does the first line of this chart

12  reflect?

13  A   So the first line of this chart reflects that

14  Sprint had not captured this data in the ordinary

15  course of its business, and so this wasn't included

16  in their own incremental costing analysis and margin

17  analyses when they were looking at messaging

18  profitability.  But I know from doing cost studies

19  for 20 years, you can't sell your services, you can't

20  manage your services without labor.  And it was

21  pretty obvious from the documents that there were a

22  lot of dollars that needed to be captured.  And so

23  I've done that here.  And, for the record, I've

24  captured $21,634,819 for the management labor.  And

25  then for non-management, I have $67,372,571, for a

Mr. Webber - Direct                    121

1   total of $89,007,390, again, from 2006 through 2014.

2   Q   Okay.  And then did you allocate those between

3   SMS and MMS?

4   A   I did and I used an allocator, which is just

5   basically the proportion of messages, SMS and MMS,

6   per year.

7           (Pause in proceedings.)

8   Q   Let's turn to your next bucket of costs.  Capital

9   and data center, correct?

10  A   That's correct.

11  Q   Okay.  What are capital costs?

12  A   So that's kind of a fancy economic or financial

13  word.  Here, it's computers and servers and hardware

14  that were purchased, and then also supporting labor

15  and supporting cap -- software for all those pieces

16  of equipment that were put into place in order to

17  support the messaging business.

18  Q   How is the bucket of capital costs different than

19  the bucket of vendor costs?

20  A   So the vendor costs are basically operating

21  expenses.  So these are service fees, if you will,

22  that are incurred on an annual or monthly basis.  And

23  here, this equipment is purchased one time, it's

24  installed into the network, and then it's used for

25  many years.  So think if you were to buy a car, what

Mr. Webber - Direct                    122

1   we do here ultimately is we capture the cost when it

2   was purchased, but obviously you use it for a long

3   period of time.  And so part of the process that we

4   go through to put these numbers up on the screen is

5   identify the initial going in price and then the cost

6   to manage that asset over time.

7   Q    Okay.  How did you identify the capital projects?

8   A    Well, what I did was look through vendor

9   contracts and scoping documents that described

10  projects as they were communicated back and forth

11  between Sprint and their vendors.  And where I was

12  able to identify dollars that were likely to be spent

13  and put into the network based on the project plans

14  of these documents, I recorded that by year and tied

15  it to the activity where I was able -- it could be

16  SMS, it could be MMS, or it could be both.  I

17  recorded all that information putting it in by year

18  and then reflected it over time.

19  Q    Okay.

20  A    And, again, it's based on the documents that

21  Sprint had provided.  I didn't go out to the public

22  domain in order to get the capital expenses related

23  to the company.  Rather, I used their data as it was

24  shared between them and their vendors and then

25  provided to us in discovery.

Mr. Webber - Direct                    123

Q    How many contracts did you look at?

A    Several hundred.  Thousands of pages of paper,
yeah.

Q    We didn't bring it to pile in front of you.

A    Thankfully.

Q    And now, how did you calculate the capital costs
that are reflected in the chart?

A    So as a simple matter, what we do -- and this is
typical in our industry.  If you have a dollar that's
spent on a particular day and the asset is going to
be used for say five years, you multiply that dollar
by a capital cost factor and then you repeat that
process for each of the next five years.  And so a
dollar over the course of five years really becomes
more $1.50 because of the capital cost treatment.
And what's inside of that capital cost factor?
Again, this is standard, fair for what we do in our
industry, but it includes the cost of equity of
Sprint.

        So Sprint goes to the market and it raises
money in order to buy things, and the investors
expect a return on their investment.  Sprint also
goes to the market and borrows money -- this is what
we would call debt financing -- that has a lower
cost, but a cost, nonetheless, that needs to be

Mr. Webber - Direct                    124

1    captured.  When you do that sort of thing there are

2    some tax consequences that need to be considered, and

3    the obviously you have the depreciation expense that

4    reflects the asset's value eroding over time before

5    it's actually pulled out of the network and replaced

6    with something else.  So these capital cost factors

7    take all of that into consideration, just like if you

8    were to buy a car in year one for $20,000 and have

9    your payments of $400 a month for five years, it's

10   that same concept.

11   Q    And beyond those capital costs, what else is

12   reflected in this chart?

13   A    So this is what I would typically refer to as

14   support assets or support costs.  The datacenter

15   costs that I've captured here reflect the fact that

16   all of this equipment -- now, remember, we're talking

17   about the SMSC, the MMSC, LDAP servers, connectivity

18   to the SS7 environment, all of this is really

19   technical and expensive hardware, and it has to live

20   somewhere that is clean, free of static, it's

21   properly air conditioned, it has fire suppression,

22   and, most importantly, it has backup power.  It has a

23   conversion from AC to DC power so that the power is

24   smooth.  And that supporting infrastructure is

25   bigger.  In other words, there are incremental

Mr. Webber - Direct                    125

1    expenses here because all this capital had to be put

2    somewhere and managed and maintained.  And so I

3    capture the cost for that here based on a survey that

4    my firm had done determining datacenter costs.  We've

5    put that into this model.

6    Q   And then you allocated?

7    A   We allocated it.  I allocated across SMS and MMS,

8    again, based on the proportional relationship year

9    over year between the two messaging types.

10   Q   Okay.  And so can you tell us your -- can you

11   summarize for us the Sprint identified costs in this

12   category and then your allocations of costs in this

13   category?

14   A   Certainly.  So Sprint had identified nothing in

15   this case.  I added $301,166,439 as it relates to the

16   capital, or the equipment costs.  I also added

17   $333,374,678 as it relates to those datacenter costs

18   to support all that hardware.

19   Q   Is that $33 million?

20   A   Yes, $33,374,678.  Thank you.  And the total

21   there is $334,541,116.  Shall I read the last two for

22   the record?

23   Q   Why don't you read the allocations so that we

24   line up across --

25   A   Okay.

Mr. Webber - Direct                    126

1    Q    -- our categories?

2    A    All right.  So for SMS, it was allocated

3    $322,080,129, and MMS was allocated $12,460,987.

4    And, again, that's from 2006 until 2014.

5    Q    Okay.  Anymore categories of costs?  Next bucket?

6    A    Yes.

7    Q    All right.  What do -- what do we show here?

8    A    Okay.  So here, we've got Sprint incremental

9    network costs.  There was a conversation that Dr. Akl

10   was engaged in for quite a while regarding what's in

11   the network, what's not in the network, and that sort

12   of thing.  I don't mean to opine on those issues or

13   retread that ground, but Sprint had identified, and I

14   think rightfully so, in 2010, that it incurred

15   network costs because they had to carry the payload,

16   if you will, of the information comprised in an MMS

17   on the network, just like they would carry data.  And

18   so after participating in the deposition process and

19   looking at discovery and looking into their cost

20   studies, it was clear that in 2010, they had captured

21   $5 million for these network components in that one

22   year.  And rather than not caring for that on a going

23   forward basis, even though we were told through the

24   discovery process and in deposition that the network

25   finance people would give that kind of data to the

Mr. Webber - Direct                127

1    messaging finance people who track this stuff, it --

2    those data didn't show back up in their studies.

3           So what I did here was take the data from

4    2010, I unitized it, so I took dollars divided by

5    messages, and then I multiplied by the appropriate

6    number of messages going backward in time and forward

7    in time so as to at least give some treatment for the

8    cost that the Sprint network team told, as I

9    understand it, the messaging product team that needed

10   to be captured in their studies.

11          Now, I'll add one note.  I did add $510,858

12   in 2010.  Earlier, I talked about there was some

13   volumetric information that was missing in certain

14   years, and so there was volume that was missing in

15   Sprint's calculations in that year even though it

16   included the network costs.  So I made sure to

17   multiple those figures by the volume that we knew

18   existed just to make sure I captured that, and that

19   was an extra $510,000.

20          So in total, Sprint had identified

21   $5,855,538 in these network costs.  I added an

22   additional $81,012,804, for a total network costs for

23   MMS only of $86,868,342.

24   Q    Did you identify any network costs for SMS?

25   A    Setting aside the argument of what the network

Mr. Webber - Direct                    128

1   is, I did not -- I did not calculate network costs

2   that would be considered, in my terminology, the

3   radio access network: the cell towers, the bay

4   stations, and the -- you know, that equipment.  But I

5   did capture obviously $300 or $400 million of capital

6   costs that relate to providing SMS.

7   Q    Sure.  And what was your basis for not including

8   the radio access costs that you just described?

9   A    So my basis is three-fold.  First of all, I had

10  seen public information that makes clear SMS

11  messaging travels in that signaling space, the SS7

12  space, that had already existed in the networks, and

13  that when those messages travel in that space they

14  don't kick anything out, they don't force the network

15  engineers to have to go build more equipment and buy

16  more equipment.  And so they're considered like a

17  free rider.  The reality is the network was built for

18  voice communications.  They were able to add

19  messaging into that free space.  I understood that

20  from the public documents.  I had a conversation with

21  Dr. Akl about that very thing.  He confirmed my

22  understanding there.  And then I think we saw clips

23  of the deposition of Mr. Yarkosky, who testifies on

24  behalf of Sprint as a -- as a fact witness.  He's a

25  manager in the company who sort of confirmed that

1   same thing, that is they didn't build extra towers,

2   they didn't buy extra spectrum, and they didn't --

3   they didn't add additional BTSs, et cetera, in order

4   to support the messaging services.  Everything was

5   already there.

6   Q   Okay.  Now, we've discussed vendor costs,

7   customer care costs, labor costs, capital costs, and

8   the associated datacenter costs, and these network

9   costs.  Are there any other categories of costs that

10  you believe should have been included in your

11  analysis?

12  A   Not unless there's a slide that comes next that I

13  have forgotten.

14  Q   All right.  So --

15  A   No, I mean in all seriousness, I've captured the

16  incremental costs for messaging: labor, vendor costs,

17  hardware, capital carrying costs over time.  I think

18  I've captured everything that is incremental or

19  additional because Sprint decided to sell messaging

20  services.

21  Q   And so after having gone through your analysis

22  with respect to each of these buckets, what did you

23  do?

24  A   I gave the numbers to counsel and Ms. Riley, I

25  totaled them up, and I understand they're used in Ms.

1   Riley's calculations.  But when you see here just

2   kind of as a summary for SMS messaging, I took a

3   figure which had been about $201 million and I turned

4   it into $759,959,674 based on my review of the cost

5   study information that Sprint had provided, my review

6   of the documents that they had provided, and

7   everything that I could find related to those

8   additional costs that the company had to spend in

9   order to sell those services.  Likewise, I added

10  $179,949,296 to MMS for a total of $352,035,006 for

11  MMS.

12  Q   Okay.  What's the impact on the profit margin

13  from which Ms. Riley calculated damages in this case

14  of your additional costs?

15  A   So for every additional dollar I add, the margin

16  percentage goes down and there's less money on which

17  Comcast could claim a royalty payment or request that

18  that be made through an order here.  So the bigger my

19  numbers are, the less money Comcast gets and the more

20  Sprint would keep.

21  Q   Now, remind the jury of the total amount of

22  incremental costs that you calculated.

23  A   $1.112 million.

24  Q   Thank you.

25          THE COURT:  Why don't we recess for lunch,

131

1  Mr. Riopelle?  It's 12:35.  We'll recess for an hour

2  until 1:35.  I'll give you my mid-day instructions.

3  Do not discuss the case among yourselves.  If anyone

4  tries to talk to you about the case, say nothing to

5  them and report that to me.  Make sure you take your

6  juror notebooks and your binders into the jury room

7  and leave them.  See you back here 1:35.

8             (Jury out, 12:36 p.m.)

9             THE COURT:  We'll fix that.

10             (Pause in proceedings.)

11             THE COURT:  We're in recess.  You may step

12  down.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Michael, will you fix that?

15             AUDIO OPERATOR:  Sure.

16             THE COURT:  All right.  We're in recess.

17             (Luncheon recess taken, 12:37 p.m.)

18

19                      *  *  *

20

21

22

23

24

25

132

1                        I N D E X

2

3    PLAINTIFF'S WITNESSES     DIRECT CROSS REDIRECT RECROSS

4    Michele Riley

5      By Mr. Heist              8            82

6      By Mr. Riopelle                27           89

7

8    James Webber

9      By Ms. Melley          93

10

11   PLAINTIFF'S EXHIBITS        ADMITTED INTO EVIDENCE

12   708, 712, 716      Documents        110

13   720, 724, 728      Documents        110

14   732, 736, 740      Documents        110

15

16                        *  *  *

17

18

19

20

21

22

23

24

25

CERTIFICATION

        I, Michael Keating, do hereby certify that
the foregoing is a true and correct transcript from the
electronic sound recordings of the proceedings in the
above-captioned matter.


2/6/17
_____                _____
Date                            Michael Keating