```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                          - - -

COMCAST CABLE COMMUNICATIONS, :  CIVIL ACTION NO. 12-0859
LLC, et al.,                  :
            Plaintiffs        :
                              :
         v.                   :  Philadelphia, Pennsylvania
                              :  February 6, 2017
SPRINT COMMUNICATIONS         :  1:39 o'clock p.m.
COMPANY L.P., et al.,         :
            Defendants        :
. . . . . . . . . . . . . . . .

                AFTERNOON SESSION - DAY SIX
             BEFORE THE HONORABLE JAN E. DUBOIS
           SENIOR UNITED STATES DISTRICT COURT JUDGE

                          - - -

APPEARANCES:

For the Plaintiffs:     DANIEL J. GOETTLE, ESQUIRE
                        DALE M. HEIST, ESQUIRE
                        Baker & Hostetler, LLP
                        Cira Centre, 12th Floor
                        2929 Arch Street
                        Philadelphia, PA  19104-2891

                        WILLIAM T. HANGLEY, ESQUIRE
                        REBECCA SANTORO MELLEY, ESQUIRE
                        Hangley Aronchick Segal & Pudlin
                        One Logan Square, 27th Floor
                        Philadelphia, PA   19103

                        GEORGE MEDLOCK, ESQUIRE
                        Comcast Cable Communications
                        Chief Patent Counsel


              Laws Transcription Service
               48 W. LaCrosse Avenue
               Lansdowne, PA  19050
                  (610)623-4178
```

2

APPEARANCES: (Continued)

For the Defendants:      DAVID E. FINKELSON, ESQUIRE
                         BRIAN C. RIOPELLE, ESQUIRE
                         JUSTIN R. LOWERY, ESQUIRE
                         McGuire Woods, LLP
                         Gateway Plaza
                         800 East Canal Street
                         Richmond, VA  23219

                         COLLEEN H. SIMPSON, ESQUIRE
                         Harkins Cunningham, LLP
                         4000 Two Commerce Square
                         2001 Market Street
                         Philadelphia, PA  19103

                              - - -

Audio Operator:          Michael Cosgrove

Transcribed by:          Geraldine C. Laws, CET
                         Tracey Williams, CET
                         Paula Curran, CET


(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.

1           (The following occurred in open court at 1:40

2   o'clock p.m.)

3           THE COURT: Good afternoon, everyone.  Please be

4   seated.  We will begin the cross-examination of Mr. Webber.

5           MR. RIOPELLE: Thank you, your Honor.

6                       CROSS-EXAMINATION

7   BY MR. RIOPELLE:

8   Q    Good afternoon, Mr. Webber.  How are you?

9   A    I'm fine, thank you, good afternoon.

10  Q    Now, before this case, you had never done any cost

11  modeling for the wireless industry, had you?

12  A    No, I haven't prepared cost analyses that deal with the

13  radio access network, and for good reason as I say here.  I

14  don't do the cost study as it relates to the radio access

15  network here.  But all the other components that we deal

16  with, whether it's in the cable industry, the wire line

17  industry, whether we're dealing with fiber, copper, what have

18  you, labor, capital, vendor costs, these are all the same

19  sorts of things and the same financial techniques that we

20  use.

21  Q    Right.  So you've done cost modeling in the wire line

22  industry, right?

23  ]I think I answered that, yes.

24  Q    And there's a difference, right, between a wireless and

25  a wire line system?

Webber - Cross                                    4

1  A    Not in a material way that would affect the studies I've

2  done here, no.

3  Q    Good.  I mean because a wireless system, right, I mean

4  you agreed with me includes spectrum?

5  A    I heard Dr. Akl talk about that the other day, yes.

6  Q    And you'd agree with me –

7  A    But that doesn't affect the cost studies that I've done.

8  Just so that you and I are correct.

9  Q    And you agree with me, right, that one difference

10  between the wire line and the wireless industry, the wireless

11  industry has towers in base station systems, right?

12  A    The wire line industry uses that stuff as well.  So I

13  wouldn't call that unique and specific only to wireless.  The

14  wire line industry has been using microwave since the 1960's.

15  Q    But they don't use base station systems using spectrum,

16  do they?

17  A    Well, they use spectrum.  I don't know the

18  configurations.  And that goes well beyond what I've done

19  here, and in fact those are items that I'm not costing in

20  this case.

21  Q    And in fact, I mean wire line networks, they don't offer

22  texting services, do they?

23  A    I was watching the Superbowl last night sitting in my

24  hotel room and I sent a text message to my kids from my

25  computer.  I'm not aware other than the WIFI connection that

1   it used any wireless network.  So I don't know if I could

2   agree with that.  Again, that's not within the scope of my

3   work here.

4   Q    So I think it's obvious, you've never done any cost

5   modeling for text messaging services, have you, before this

6   case?

7   A    That's true.

8   Q    Now, I know one of the things that you said you relied

9   on was data that was produced by Sprint, right?

10  A    Yeah.  We talked about a lot of data today and I've

11  looked at a lot of data, so yes.

12  Q    And I think you referred to this in your report as

13  Sprint studies, didn't you?

14  A    Well, I don't know when you say what this is, but I do

15  refer to documents provided by Sprint.  I've referred to at

16  least some of them as studies, yes, analyses, score cards,

17  that sort of thing.

18  Q    And you also referred to them as Sprint internal cost

19  estimates, didn't you?

20  A    Again I'm not sure which documents you're talking about

21  particularly, but I had referred to documents that I would

22  refer to as Sprint internal cost documents.

23  Q    Well, internal cost estimates I think was the term you

24  used in your report.

25  A    Sure.  You can use that phrase.  I'm not going to quibble

1   with you.  We could come up with a lot of synonyms, that's

2   fine.

3   Q    But you know these weren't really studies that were

4   performed by Sprint, right?

5   A    No.

6   Q    You don't know that?

7   A    I disagree.

8   Q    Weren't they just data points?

9   A    My understanding from looking at those documents and

10   reading the deposition transcripts and participating in the

11   depositions themselves is that these are the documents much

12   like I've seen with my own clients and much like I've done

13   with my own work that the company monitors the profitability

14   and the margin contribution of certain attributes with this

15   business.  So I wouldn't dismiss them as data points.  I

16   think that would be inconsistent with what I've seen for the

17   past 20 years.  So, no, I can't agree with that.

18   Q    Well, in some of those depositions didn't in fact Sprint

19   tell you that these weren't all the costs that had to do with

20   texting?

21   A    That's true, yes.

22   Q    And you added, I saw that you added a lot of costs and

23   you said that you were, you know, capturing costs that Sprint

24   hadn't even captured; right?

25   A    That's true.  And I think in most circumstances where I

Webber - Cross                                    7

1    had decisions to make where I was doing my cost studies

2    adding in data I tried to give the benefit if you will where

3    I had reasonable decisions to make.  I would give that

4    benefit to Sprint in my calculations.

5    Q    So but for example, you said that Sprint didn't even

6    ever include labor costs, right?

7    A    Well if I said that that would be unclear and inaccurate.

8    They didn't include their management and technical labor.

9    But when we talked about customer care there was certainly a

10   labor component there.  And so if I left you with the

11   impression that included no labor, that's not accurate

12   customer care.  These are the people who answer the telephone

13   and work the trouble tickets that include some Sprint labor.

14   So hopefully that's clear.

15   Q    But I take it you believe you have a better sense of

16   what Sprint's costs are than Sprint does, right?

17   A    Based on the information that I've gone through I've done

18   a certainly more thorough job at estimating those costs than

19   Spring did.  For example, we had asked, as it relates to

20   labor, we had asked for managerial head count, we had asked

21   for technical wage rates, technical labor hours and that sort

22   of thing.  We weren't provided that information, but we were

23   provided documents that allowed us to create enough

24   information to do the calculations where Sprint had not.

25   Now again, there is a labor of piece within customer care and

Webber - Cross                                    8

1    I didn't do anything to that other than back cast it.

2    Q    Right.  So let's again talk about some of the costs you

3    didn't include.  You did not include spectrum costs, correct?

4    A    So when you look at the $153 million figure that Ms.

5    Riley computes, there's two pieces of it.  One is SMS, that's

6    about 149 million, and then the remaining is MMS.  And it's

7    possible that the network costs that I captured within MMS,

8    just for that small piece, would include some spectrum

9    component.  Now, with respect to SMS, I would agree with your

10   calculation that I did not include any of these spectrum

11   costs that you talked with Ms. Riley about earlier, but as

12   she indicated she's captured those.

13   Q    You and I can agree or disagree about what Mrs. Riley

14   testified about, but you did not in your cost analysis, you

15   did not include the spectrum costs at least for SMS is what

16   you're saying, right?

17   A    Yeah, I think I've made that clear.

18   Q    And you agree, don't you, Ray, that you can't send or

19   receive an SMS message without using the Spectrum, right?

20   A    So again, let me make two points clear.  I won't agree

21   with that.  I sent a text message last night and I don't

22   believe I used any spectrum, but that's not why I'm here.

23   I'm not here to say what we can do inside or outside of the

24   network or anything like that.  What I'm here to do is

25   estimate the incremental costs and I captured the extra costs

1    related to SMS and MMS, and you're right, I did not capture

2    spectrum clearly as it relates to SMS.  So hopefully that

3    kind of clarifies that.

4    Q    And I think you also, you didn't include the costs of

5    any of the cell towers or the base station systems, right?

6    A    Yes, I had written in my report and we had discussed in

7    deposition, that's true, I did not add in extra spectrum,

8    towers or BTS, BSC.

9    Q    But you've seen the Judge's claim construction, right?

10   He includes towers in the base station systems in his

11   definition of the cellular network, right?

12   A    You know frankly I don't know if I read the claim

13   construction.

14   Q    Well, the jury has it in their notebooks so they can

15   certainly look at it if they want.

16   A    They can, and Dr. Axl testified to those issues at length

17   again.  That wasn't my role, to talk about those issues with

18   the jury.

19   Q    No, your role is to talk about the costs, right?

20   A    Yes.

21   Q    Right.  And all I'm trying to establish is what you

22   didn't include.  So we know you didn't include the spectrum,

23   you didn't include the cell towers, you didn't include the

24   base station systems.  You also didn't include the costs for

25   the mobile switching centers, did you?

1   A   Well, first of all, let me disagree with the first part

2   of your statement because it was pretty long.  We talked

3   about the difference between SMS and MMS.  And so as it

4   relates to the network component if that has the spectrum in

5   it, then the answer to your question in its totality is no,

6   okay.  But when we set that aside again as it relates to SMS

7   I did not add spectrum, I did not add towers and I did not

8   add base stations.

9           Now, with respect to the mobile switching centers,

10  you'll see in one of the exhibits that I filed, so before we

11  get to court, we file reports, we go to depositions, each

12  side has all that information.  I captured hundreds of line

13  items of costs, and there are components of equipment that

14  are included throughout the network.  And without parsing

15  through that and having a conversation with somebody like Dr.

16  Akl, I can't tell you definitively that nothing I've captured

17  there would be in the mobile switching center.  So I just

18  can't – I can't wholesale agree to that statement.

19  Q   Okay.  Now, I think the reason, and I'm not trying to

20  trick you, so if I'm wrong, tell me please, because I'm

21  trying to get on the same page so the jury understands where

22  you're coming from.  But I think one of the reasons that you

23  said you did include some of the costs of spectrum and the

24  radio access network if you want to call it that was that

25  because of something you called the cost causative basis; do

1  you remember that?

2  A    You're approximately paraphrasing something I've

3  described, yes.

4  Q    All right.  And that means I think if the network was

5  built for the purpose of offering a specific service then you

6  would include the costs, right?

7  A    You've got to be careful when you're starting to describe

8  these terms, because when you make assumptions you can get

9  off track pretty quickly.  Cost causation generally means

10 that a cost is incurred as a result of one particular

11 decision, or as I stated earlier, that same cost would be

12 avoided had that decision or action not been taken.

13      So if SMS went away, we didn't have SMS, cost,

14 causation principles would say you try to calculate it from

15 new directions.  One is what new things did I add to build

16 SMS, tally that all up and you have a number, and likewise if

17 I have MSM today and I get rid of it, what do I get rid of

18 and what do I avoid?  The things that I avoid are avoided

19 costs consistent with that cost causation principle.  And

20 that's the distinction I try and make throughout my written

21 documents and as I describe here today.

22      So the simplest way I would tell my 12-year-old who

23 most likely wouldn't listen, but my 10-year-old would, if I

24 said listen, sweety, if I'm trying to figure out what costs

25 go away, that's what I mean by avoided costs, cost causation,

1    she would get that.

2    Q    Is it fair to say that you didn't include something like

3    spectrum and some of the things we were talking about earlier

4    because your understanding is the network was built and then

5    SMS and MMS were added later?

6    A    I wouldn't say it that simple.

7    Q    Okay.

8    A    So economists will also look at it, and again let's make

9    sure that we separate the discussion between SMS and MMS.

10   Because there's a pretty important distinction there, and I'm

11   sure we'll talk about it later.  But as it relates to SMS, it

12   was a product that came along after the network was in place,

13   and that product is transmitted through, as Dr. Akl

14   described, preexisting control channels.  These are called SS

15   channels.  They've been in telecommunication networks,

16   whether in cable or landline with copper or landline with

17   fiber or in wireless for decades.  They're dedicated spaces

18   that are used for signaling.  When SS7 is used to support

19   messaging, the documents that I've read and the conversation

20   that I've had with Dr. Akl made clear that the messages fit

21   in that preexisting space that was already there.  They don't

22   force it to become any larger.  They don't force the

23   engineers to buy anything new in order to support this new

24   product.

25              So in that regard there's no additional cost caused,

1   and likewise if we said tomorrow we're no longer providing

2   SMS, we might get rid of the SMS-c's, we might make some of

3   other equipment smaller, but we're not going to go get rid of

4   the cell towers, we're not going to get rid of the base

5   stations and we're not going to give up the spectrum.  So

6   that's the fundamental, the most simple message that I'm

7   trying to convey.

8   Q    And just so I understand, so you're saying the SMS was

9   added later, right?

10  A    I said a lot of things.

11  Q    I know.  Well, I'm just trying to boil it down.  You're

12  not including the costs of various aspects on the SMS because

13  you said the network was built and then the SMS was added

14  later.

15  A    No, again I think - I don't want to seem argumentative

16  here, but you're simplifying an issue to a point where it's

17  just not accurate.  So the network was there, that's true.

18  We've added a service on top of the network, and we've

19  captured those additional costs that we've added, right?  Or

20  the costs that we would get rid of if we got rid of this

21  piece of the network.

22        And so it's not as simple to say well the network

23  was there and you just threw something on top of it.  Rather

24  we've captured the costs that come along with the top of the

25  network.  That's what I'm trying to convey.

1              So think of this.  Let's say you have a movie

2     theater and had occasion to take my kids and the nieces and

3     nephews to see the new Star Wars movie.  And it was where we

4     were visiting our in-laws.  They live in a very old town,

5     they live in a very tiny theater.  And I can imagine a day

6     when there was not a popcorn cart in that theater.  But there

7     was and a everybody was happy.  We bought these bags of

8     popcorn for 5 bucks apiece and the kids were all happy with

9     their popcorn.  But if I was trying to figure out what the

10    cost of the popcorn business was, I would be looking at the

11    popcorn cart and the kid who made the popcorn and the popcorn

12    and the salt and the butter and the little cups that they put

13    it in and the napkins.  I wouldn't be looking at the movie

14    that's rented in the theater in the building because I had

15    already been there, and the popcorn business didn't cause

16    those things to change. Now if they caused them to change

17    then we'd have to go in and look at additional costs in that

18    regard as well.  But that's the message that I'm trying to

19    convey.

20             And so when I answer your question, I'm trying to

21    answer it but I want to be clear, it's not as simple as well,

22    because it was there, because that's just not a fair

23    characterization of what columnists do when they're doing

24    cough studies.

25    A    Okay.  You relied on or reviewed, anyway, a bunch of

1    Sprint's 10K's, right?

2    A    Yes.

3    Q    And you – again so the jury understands, you understand

4    what a 10K is, right?

5    A    It represents financial performance data, and to be clear

6    I use the debt and some of total value of the company figures

7    to put into the development of capital cost factors.  We

8    talked about how you take dollars and smooth them out over

9    time, so I pulled data and put it in there.

10   Q    But I mean a 10K just so the jury understands, and if

11   you don't agree with me, please tell me, but a 10K is an

12   disclosure required by the Government from a company, and is

13   specifically required by the United States Securities and

14   Exchange Commission, right?

15   A    I'll take your word for it.

16   Q    And you have to be truthful in a 10K, right?  Because if

17   a company lies in its 10K, I mean there can actually be

18   criminal charges, right?

19   A    Again, I'll take your word for it.

20   Q    Well, you did all right, the 10Ks are audited by the

21   independent accounting firms?

22   A    That's my understanding, yes, sir.

23   A    All right, can we look at page 5 of Sprint's 2003 10K?

24           THE COURT: Is there an exhibit number?

25           MR. RIOPELLE: It is not an exhibit number, your

Webber - Cross

1   Honor.  It's a cross-examination that was relied on in this

2   report.

3           THE COURT: Well, you're going to identify it.  The

4   fact that you didn't prenumber it doesn't mean – we're not

5   going to refer to it now.  If you're referring to it in the

6   testimony you have to be able to identify it.

7           MR. RIOPELLE: Okay.

8           THE COURT: And I don't want to have to go scrambling

9   for the report.  So let's identify it separately.  Give it a

10  number.

11          MR. RIOPELLE: Defendant's Demonstrative – is it 2 or

12  3?

13          THE COURT: Just give it a regular exhibit number.

14  It's not a demonstrative exhibit.

15          MR. RIOPELLE: Oh, okay.  Let's call it DX-900.

16          THE COURT: And what year 10K?

17          MR. RIOPELLE: It's the 2003 10K, your Honor.

18          THE COURT: And for the jury, this is a statement

19  filed by Sprint for the year 2003.  It's filed with the

20  Federal Government.

21  BY MR. RIOPELLE:

22  Q   And so, let's look what Sprint said in its 2003 Form 10K.

23  It says, "Sprint launched nationwide third generation

24  capability in the 2002 third quarter."  And you understand

25  that to be the CDMA 2000 network that's being accused here,

1    correct?

2    A    I heard Dr. Akl testify to that and I have no reason to

3    think otherwise.

4    Q    And it says, "This capability allows more efficient

5    utilization of the network when voice calls are made using 3G

6    enabled handsets.  It also provides enhanced data services."

7    Now let's talk about voice and data.  Then it says, "The

8    service marketed as PCS vision allows consumers and business

9    customers to use their vision-enabled PCS devices to exchange

10   personal and corporate e-mail, take, send and receive

11   pictures, exchange instant messages and then play games with

12   full color graphics and polyphonic sounds."  Do you see that?

13   A    Yes, I think you've read that.

14   Q    And you, sir, do you see where it says take, send and

15   receive pictures, right?

16   A    I do.

17   Q    That's MMS, right?

18   A    I would prefer Dr. Akl answer that question, because I

19   recall in the earlier period, there is SMS and picture mail

20   and I don't know if there are any technical nuances that

21   need to be considered.  But from my perspective, as a user,

22   that's how I would think of it.

23   Q    And exchange instant messages, that's SMS, isn't it?

1    A    That then, I would have expected it to say SMS or short

2    messages, not instant messages.  So, I'm not sure what the

3    author intended that to convey.

4    Q    But doesn't this show that the CDMA 2000 network, which

5    was accused in this case and it was built by Sprint, back in

6    2002, was built to offer data, voice, SMS and MMS when it was

7    built?

8    A    If you accept that picture messages are MMS and instant

9    messages are SMS, I would say that it says the network is

10   going to carry these things just like the progenitor network.

11   And again, that doesn't impact the SS7 issue that we've been

12   talking about here.

13   Q    But it does show that the network was built for SMS --

14   SMS wasn't just added later as a free ride?

15   A    As I understand it, SMS is loaded into the signaling

16   space that had been reserved for signaling and had spare

17   capacity.  It's the best I can answer your question.

18   Q    And are you aware that in 2012, Sprint replaced all of

19   its base station systems throughout its entire network?

20   A    I heard you give testimony on that earlier today.

21   Q    Well, I don't get to testify.  Oh, as much as I'd like

22   to.

23   A    No, no, no, you asked a question assuming that.  Frankly,

1    I don't know if it's true or not.

2    Q    But you didn't include any of the costs of replacing all

3    the base stations, subsystems in 2012, right?

4    A    Yeah, for the reasons we've talked about, I did not

5    capture those.  But let me say here again, let's focus on

6    SMS.  There are network components that are grabbed for MMS

7    and then that's only four out of the 153 million and maybe

8    we'll have a conversation separately about that component.

9    Q    Right, you did get -- and we'll get to that in a couple

10   of minutes.

11   A    Sure.

12   Q    You did catch some costs for hardware for SMS and MMS,

13   but you didn't capture the rebuild of all the towers in 2012,

14   right?

15   A    No, not in my calculations, unless it's in the MMS

16   figures and like I said, Ms. Riley does capture that in her

17   normal profit.  So, I just don't want the jury to be left

18   with the impression that those things aren't accounted.  It's

19   just that they're not accounted for in the component of the

20   work that I do.

21   Q    Right, but she adopted your costs, so if you didn't

22   capture it, she didn't capture it?

23   A    I heard her testify this morning that all of that was

1    included in the normal profit, the 23 percent, that Sprint

2    keeps.  So, I can't agree with that answer.

3    Q    She didn't include it in the excess profit that she

4    calculated for messaging services, correct?

5    A    No, I think that is in the 23 percent that Sprint keeps,

6    not in the 53 percent.  But again, Ms. Riley is here.

7    Q    Let me -- let's get back into, because you're testifying

8    about your stuff.  You did not include it in your costs,

9    correct, we can agree on that?

10   A    Save for the piece with regard to MMS, we can agree with

11   that.

12   Q    Now, I think you also called this the cost avoidance, am

13   I correct about that?

14   A    I used that term, avoided cost.

15   Q    Right and just again, just to you and I are on the same

16   page, you're saying that if you dropped SMS, you wouldn't

17   necessarily have to take down the tower, the cell towers and

18   such so that you definitely don't include the cost of the

19   cell towers, but you still need them for other things if you

20   dropped SMS?

21   A    So, you're talking about SMS or MMS?

22   Q    I'm not talking about either one.

23   A    All right, well again, there's a distinction.  So, if

Webber - Cross                          21

1   you're going to talk about MMS, then I can't agree.  But with

2   regard to MMS --

3   Q    SMS?

4   A    -- excuse me, thank you.  With regard to SMS, my belief

5   is the cost of that captured are the costs that would be no

6   longer relevant.  They wouldn't have been incurred and they

7   would go away over time if the company didn't provide SMS.

8   And I've seen nothing but information that would suggest the

9   cell towers in the spectrum and the base stations would

10  remain in place as they are.  Now, there are some SS7

11  connections and high-speed links and things like that, that

12  connect between the messaging network and the rest of that

13  other network stuff.  I captured a lot of that stuff, so

14  those would go away, but the idea that the company would give

15  back its spectrum, I'm not suggesting that that would be the

16  case.

17  Q    I'm just trying to make it so you and avoid them.  We're

18  on the same page.  Am I correct in saying that if you didn't

19  include the costs of, for example, the towers because if

20  Sprint dropped SMS, Sprint would still need the towers for

21  voice and data?

22  A    That's a reasonable characterization.

23  Q    Is that fair?

1    A    Yes.

2    Q    So, if this was a case about voice services, you also

3    wouldn't drop the cell towers because you would say, well,

4    they would still need the cell towers for data and messaging,

5    right?

6    A    I'm sorry, repeat that?

7    Q    If this was a case about voice services, you also

8    wouldn't include the costs of the towers either it would be

9    your condition that if Sprint dropped voice, it would still

10   need the cell towers for data and massaging, correct?

11   A    I think with some nuance, if this were about voice I

12   would not say that towers are going to go away, because those

13   other things are there.  But SMS travels in the SS7 signaling

14   space and if we were studying voice that relied on SS7 to

15   begin with, I don't see what that would go away.

16   Q    All right, so you did include in your costs some

17   hardware, correct?

18   A    About $300,000,000.

19   Q    Okay and I think they were set forth in Exhibit 6 with

20   your report?  This is not a memory test, I'm going to call it

21   up.

22   A    Yes, sure.

23   Q    Okay, does this look like -- do you recognize this as

1    Exhibit 6 to your report?

2    A    Yeah, that's certainly part of it.

3    Q    Okay and do you see -- go down five lines, the fifth line

4    there?

5    A    Thank you.

6    Q    So, that's for, I think, two -- that's for an SMSC?

7    A    It looks like it, I can't see the whole thing and in

8    electronic form, there's a lot more information, right.

9    Q    But I'm just --

10   A    Just so we're clear.

11   Q    -- trying to identify what the -- under the description?

12   A    Yeah, it looks like the Phase I installation of the SMSC

13   that was managed by the vendor whose name is Ecision.

14   Q    Right, well, is it your testimony it was managed by

15   Ecision or they bought it from Ecision?

16   A    I don't mean to ascribe a particular meaning to either of

17   those words.

18   Q    All right, so you have listed here the SMSC and that's

19   in, as you say here, well, next to a lab in North Bunker,

20   right?

21   A    Yes and this particular line item might be for the lab

22   install rather than a live SMSC.  Because defender describe

23   when they were doing these projects, they put a lot of

1    capital in for testing purposes.  And so, I captured all that

2    stuff, as well.  So, just for that clarification.

3    Q   But let's back up.  You understand the SMSC is the SMS

4    messaging server, correct?

5    A   Yes.

6    Q   All right and North Bunker, you recognize the North

7    Bunker as one of Sprint's core data centers, right?

8    A   It was one that was mentioned frequently.  When you say

9    core data center, I don't know how to best interpret that,

10   but it is a name that I saw come up often.

11   Q   Okay and you also listed, if you go down to line 7, just

12   two down.

13   A   This my not be a memory test, but it is a vision test.

14   Q   Right.  You see that's an SMSC and that's in Reston,

15   right?

16   A   I see that, yes.

17   Q   And you understand Reston to be another one of Sprint's

18   core data centers, right?

19   A   You know, I saw Reston as a location where a lot of

20   equipment resides regarding the messaging network and that's

21   where I believe they placed it based on the vendor documents.

22   Q   And if you go down to line 25, do you see it says

23   multi-media service center notes?

1    A    Yes.

2    Q    You understand that, right, to be the MMSC?

3    A    I'm going to take your word for it, just based on the

4    description.  Like I said, I've got notes.  This document is

5    really big, it's electronic, it's got footnotes at the

6    bottom, but that's how I would interpret that, absent some

7    other explanation.

8    Q    And you have it listed there, it's in the North Bunker?

9    A    Yes, but frankly, I don't recall within North Bunker,

10   unless that's what's down there -- in that -- excuse me.

11   Q    You understand about the North Bunker is one of the core

12   data centers for Sprint, right?

13   A    Again, I understand it's a place where these vendor

14   documents had indicated they were installing their equipment

15   at Sprint's locations.

16   Q    Okay and just one or two more questions.  Ms. Riley

17   relied on your cost analysis, correct?

18   A    Yes.

19   Q    She incorporated it, right?

20   A    Yeah and then she added seven billion dollars on top of

21   the figures that I had, but yes, she relied on it.

22   Q    So, if this jury doesn't accept your cost analysis

23   because you left out numerous and a lot of money, the costs

1    that you didn't include in your thing, do you agree then that

2    Ms. Riley's calculations are no good because your intention

3    of this?

4    A   No, I mean, the reality is, in cases like this, there are

5    cost numbers moving back and forth.  It's not a binary thing

6    where if a figure is off by one percent that means it's no

7    good, right?  So, if it was identified, that's something was

8    missing -- I said all along, by the way, if we find

9    additional documents, we'd be happy to incorporate them into

10   the numbers.  It would say you would make adjustments rather

11   than throw the baby out with the bath water.  That just

12   wouldn't make sense to me.  So, no, I wouldn't agree.

13   Q   So, but it's not one percent, is it?  I mean, you

14   calculated a little over a billion dollars in costs, right?

15   A   $1.112 billion, yes.

16   Q   But by not including spectrum, towers, base stations and

17   the mobile service centers, you haven't included $25 billion

18   in costs.  You'd agree, right, that's more than a one percent

19   difference?

20   A   No, I wouldn't.  I think we'd have to do a lot of math.

21   So, $25 billion, if that's the right number, is the big

22   number, right?  And that equipment and the spectrum, so for

23   example, spectrum is an intimately lived asset according to

1    the FCC, it lasts forever.  So, when you put that into a cost

2    study, that has implications as to the numbers.  When you

3    look at the towers, they last for 20 and 30 years.  When you

4    put that into a cost study, these numbers stretch out over

5    time.  When you do the mobile switching centers, they last

6    for a long period of time.  And you have to do all that math

7    and then, if you were to do a fully distributed-type cost

8    study, which is another cost study that's sort of been

9    alluded to in this conversation, where you capture all the

10   costs and spread them on to everything, regardless of cost

11   causality, then you would have to take into consideration the

12   percentage, if you will, of all of those network costs that,

13   on that basis, with which I disagree, could be reasonably

14   attributed to these services.  And when I look at the

15   totality of the size of these services, SMS in particular, as

16   it weighs against the demand that voice and data would put on

17   the network, the total balance of all of that would be under

18   one percent of all the load if you wanted to ascribe it on a

19   load basis and fully distributed cost basis.  And so, at the

20   end of the day, I don't know how much these numbers would

21   change.  I suspect it would be very little.

22   Q   But you don't know, right, you didn't do that

23   calculation?

1    A    It's just not the proper kind of analysis to do here.

2    So, no, I didn't do that analysis.

3    Q    Thank you.

4              MR. RIOPELLE:  No further questions, your Honor.

5              THE COURT:  Before you leave, that exhibit you

6    didn't mark, Exhibit 6 to a report.

7              MR. RIOPELLE:  I call it DX-901.

8              THE COURT:  That's fine.  I want you to identify

9    every document to which you refer.  So that if we need to see

10   them, we can go to the exhibit list.

11             MR. RIOPELLE:  Thank you, your Honor.

12             THE COURT:  So, Exhibit 6 to the report, was that

13   your report?

14             THE WITNESS:  Yes, sir, your Honor, it was.

15             THE COURT:  How many reports did you submit?

16             THE WITNESS:  Initial and reply -- two.

17             THE COURT:  And this was appended to which?

18             MR. RIOPELLE:  I believe it was appended to the

19   original report.

20             THE WITNESS:  That's right, it was one of ten

21   exhibits, your Honor.

22             THE COURT:  Okay, good.  It's Exhibit DX-901.  Thank

23   you very much.

29

1          REDIRECT EXAMINATION

2     BY MS. MELLEY:

3     Q   Mr. Webber, we were just looking at your Exhibit 6 and I

4     think we just saw one page of it.  Do you recall how many

5     pages your Exhibit 6 included?  I should be more specific,

6     how many pages your Exhibit 6 listing of equipment?

7     A   Oh, there were 204 line items that referred to -- I mean,

8     ultimately, I looked at thousands of pages of paper.  So,

9     yeah, but there were 200 projects, capital projects that I

10    captured there.

11    Q   Okay, you spent some time talking about cost causation.

12    A   I did.

13    Q   Is that a concept you developed?

14    A   No, cost causation has been and used in economics for

15    decades.  I was at graduate school in the late '80s, early

16    '90s and it was very well known then and had been debated for

17    decades.  No, it's not new.  I didn't make it up.

18    Q   Thanks, that's something that's used frequently in your

19    industry?

20    A   It is, I mean, ultimately economists have taught our

21    industry based on these fundamental principles.  How to do

22    cost studies that are a little bit different than what we do

23    in the accounting world for financial reporting purposes and

1    profit loss statements, et cetera.  And a lot of that work,

2    the cost causation principle, in particular were cost

3    avoidance, if you want to describe it like that, end up as

4    rules in state public utility commissions and at the Federal

5    Communications Commission.  I have testified before the

6    Federal Communications Commission on these issues and at

7    state public utility commissions throughout half of this

8    country on these issues.  And it's generally the case that

9    costs are developed based on the cost causation principles or

10   cost avoidance principles.  Pricing discussions are separate

11   but sometimes related to those conversations.

12          Fully distributed cost is another type of

13   terminology and that's sort of when you try to take every

14   cost and just find a place for it, even though it's not

15   necessarily related and that's very particularly what I did

16   not do.

17   Q    And why did you not do that?

18   A    It's just not the proper analysis in a damages case and

19   certainly would be inappropriate here.

20   Q    Now, when you had that discussion with Mr. Riopelle about

21   when Sprint's network was built and looked at a document

22   about 2003, do you recall that?

23   A    Daily, yes, yes.

1    Q    Okay.

2    A    It's something from PNL.

3    Q    Now, based on your conversations, well, I should say,

4    you've alluded a couple of times to a conversation with Mr.

5    Akl.  Can you just explain to the jury what you're referring

6    to -- Dr. Akl.

7    A    Yeah, so, when I started -- when I started working this

8    case, I was looking at SMS in particular.  I had seen some

9    public documents that indicated to me that SMS traveled in

10   the pre-existing signaling space or the SS7 space that we

11   were talking about.  Now, at that time, I didn't know that's

12   how SMS messages were carried.  MMS messages are carried a

13   little bit differently and I had presumed, going in, that's

14   how SMS was carried.  What I learned was that these messages

15   are carried in the pre-existing SS& signaling space.  They

16   fit within that space and they don't push out any of the

17   other messaging that needs to be there.

18           Now, in the wire line business, which I've been in

19   since 1994, SS7 had been around for decades.  It's a common

20   set of channels that are dedicated for a signaling purpose

21   and they're hardly used.  And so, when I was looking at the

22   information that I originally came across, I thought, wow,

23   this is fantastic.  What you see is messages going into a

1    space that existed, that wasn't already filled up, that

2    wouldn't be filled up and I talked with Dr. Akl about it and

3    I said is it really true that SMS travels in the signaling

4    space, that it doesn't crowd it out, that you don't have to

5    get more of it to carry SMS messaging.  And he agreed and I

6    asked him the same question two or three times and although

7    he's a very pleasant man, I think by the third time I asked

8    the same question, he seemed frustrated.  It's like, look,

9    buddy, get it.  It goes in this space, you don't need

10   anything more.  And so, that was my understanding and I found

11   additional documents that corroborate that point and I'm

12   fully convinced that you don't have to make the network

13   bigger as a result of that.  Except for the things that we've

14   captured and it's $300 million or so.

15   Q   Okay and when you say you don't have to make the network

16   bigger, what specifically are you talking about?

17   A   Well, now I'm talking about the radio access network.

18   So, spectrum, cell towers, DTSCs, in fact, I saw testimony

19   before the United States Senate Antitrust Committee on this

20   very issue and they had an expert there, who basically said

21   the same thing.

22   Q   And now, in your analysis of this case and your analysis

23   in previous work that you've done, have you used the same

1   economic analysis throughout?

2   A    Yeah, I've done my work consistent with my economic

3   teaching, even when I was doing environmental and energy

4   work.  I did that for a little while, while I was in graduate

5   school.  I had an internship and then I moved into

6   telecommunications.  And the principles that I've applied are

7   the ones they taught me in graduate school and I've been

8   using consistently for, I hate to admit it, well over 20

9   years now.

10  Q    Thank you.

11          MS. MELLEY:  Nothing further.

12          THE COURT:  I think that concludes your testimony,

13  there's no further examination.  So, you may step down, Mr.

14  Webber.

15          THE WITNESS:  Thank you, your Honor.  Thank you to

16  the jury, as well.

17          MR. HANGLEY:  Your Honor, plaintiff rests.  Your

18  Honor, I may have to take that back.  We do have two

19  demonstratives that I think have not been moved or that have

20  not been accepted, PD-4 and PD-5.

21          THE COURT:  Is there any objection?

22          MS. MELLEY:  PD-5 is the slides we used with Mr.

23  Webber and PD-4 are the slides that we used with Ms. Riley.

34

1          MR. FINKELSON:  No objection.

2          THE COURT:  Will you describe these two exhibits

3    again?

4          MS. MELLEY:  Yes, your Honor.  PD-4, the slides that

5    were used with Ms. Riley.  PD-5, the slides that were used

6    with Mr. Webber.

7          THE COURT:  Good.  They are received in evidence.

8          (Plaintiff Exhibits PD-4 and PD-5 admitted in

9    evidence.)

10          THE COURT:  Do you have copies for the Court?

11          MS. MELLEY:  Absolutely.

12          (Pause.)

13          MR. HANGLEY:  Your Honor, to be on the safe side,

14    because we are not sure, we'd like to move in also PD-2 and

15    3, which are the slides to respectively Dr. Akl and Dwoskin.

16          THE COURT:  Any objection?  I have those exhibits

17    here, they're not marked.

18          MR. FINKELSON:  Again and I guess it's at the

19    Court's direction in terms of how these presentations are

20    going to be dealt with.  I said no objection before in terms

21    of at least being the demonstratives going back with the

22    jury, which I think the Court has indicated --

23          THE COURT:  Yes.

1          MR. FINKELSON:  -- is the way that the Court treats

2     those as actual exhibits like other exhibits that are marked.

3     I'll do it however the Court perceives.

4          THE COURT:  Well, I think this will help the jury.

5          MR. FINKELSON:  Absolutely.

6          THE COURT:  We're talking about the slides.  For

7     example, we've just completed Mr. Webber's testimony.  We

8     have slides and this is referred to as copies of a slide

9     deck. So, we have copies of slides and I think it would be

10    helpful for the jury and reflecting on Webber's testimony and

11    the testimony of the other witnesses.  We're talking about

12    Michelle Riley, Dr. Akl and the third --

13         MR. HANGLEY:  Jeffrey Dwoskin and Dr. Webber.

14         THE COURT:  Dr. Dwoskin, yes.  Helpful to have it.

15         MR. FINKELSON:  We certainly have no objection to

16    that, your Honor, we agree.

17         THE COURT:  All right, so these two exhibits are in

18    evidence and the numbers again PD 2 and 3?

19         MR. HANGLEY:  2 and 3.

20         THE COURT:  Will you identify them for the record,

21    please?  PD-2 is?

22         MR. HANGLEY:  Is the slide deck for the testimony of

23    Dr. Akl and PD-3 is the slide deck for the testimony of

1    expert witness, Jeffrey Dwoskin -- Dr. Dwoskin.

2              THE COURT:  Thank you.  They're received in

3    evidence.

4              (Plaintiff Exhibits PD-1 and PD-2 received in

5    evidence.)

6              MR. HANGLEY:  PD-1 or Plaintiff's Drawing-1.

7    Plaintiff's Drawing-1 is a drawing that Dr. Akl made during

8    his testimony.

9              MR. FINKELSON:  Your Honor, we have no objection to

10   Plaintiff's Drawing-1 going back.  I will say with respect to

11   the demonstratives, as your Honor has previously noted, the

12   parties are going to discuss the mechanism by which there's a

13   notation on the demonstrative so the jury knows what content

14   has been added by the parties to increase the visual

15   presentation as opposed to what's on the actual documents and

16   we still have as yet to finalize that, but I'm sure we will

17   well before we're --

18             THE COURT:  And what that's about, ladies and

19   gentlemen, some of the exhibits, particularly, Dr. Akl's

20   slides, included Sprint documents with additions made by Dr.

21   Akl when he explained his testimony.  And the defense wants

22   to make certain and I think it's a good idea and the same

23   rule will apply to both sides, make certain you know what is

1   the original Sprint document and what Dr. Akl added.  And the

2   same will be true with respect to the Comcast documents and

3   any additions made by Sprint experts.  Fine.

4          MR. FINKELSON:  Thank you, your Honor.

5          MR. HANGLEY:  Your Honor, I think that's everything,

6   but I'll say it again, last call.  Okay, we're done, your

7   Honor, we rest.

8          THE COURT:  If there are any other exhibits, we can

9   add them.

10          MR. HANGLEY:  We will raise them.

11          THE COURT:  When Comcast says it rests, that means

12   it's completed its presentation of evidence.  And now we turn

13   to Sprint and the defense will begin.

14          MR. RIOPELLE:  Your Honor, before we would start out

15   case, there would be a motion that would need to be made.  I

16   don't know if you want to handle it now?

17          THE COURT:  I want to handle it at the end of the

18   day, not with the jury sitting in the box.

19          MR. RIOPELLE:  Then I assume there would be no

20   waiver to our position obviously.

21          THE COURT:  Absolutely no waiver of your position.

22   We'll have argument at day end and it will be treated as if

23   made at the end of the plaintiff's case.

```
 1              MR. RIOPELLE:  Thank you.

 2              MR. HANGLEY:  And your Honor, is your first witness

 3    going to be Kalinsoki?

 4              MR. RIOPELLE:  Yes.

 5              MR. HANGLEY:  Okay, we have a motion with respect to

 6    that testimony to be made outside the hearing of the jury.

 7    Which I think does have to be made before the testimony.

 8              THE COURT:  All right.  We'll excuse you for not

 9    very long. I have a feeling this motion will be quickly

10    decided.  So, stand by.

11              THE DEPUTY CLERK:  All rise.

12              (Jury exits.)

13              (Pause.)

14              THE COURT:  All right.

15              MR. HANGLEY:  The purpose of this motion, your

16    Honor --

17              THE COURT:  Be seated, everyone.

18              MR. HANGLEY:  -- the purpose of this motion is to

19    put a fence around the scope of the witness Kalinoski's

20    testimony --

21              THE COURT:  Why don't you give me his full name.

22              MR. HANGLEY:  Scott Kalinoski, K-a-l-i-n-o-s-k-i.

23              THE COURT:  And who is he?

24              MR. HANGLEY:  He is a whole -- title?
```

| | |
|---|---|
| 1 | UNIDENTIFIED SPEAKER:  He's the vice president |
| 2 | UNIDENTIFIED SPEAKER:  He's the vice president -- |
| 3 | UNIDENTIFIED SPEAKER:  -- sorry. |
| 4 | THE COURT:  Is he in court? |
| 5 | MR. HANGLEY:  Yes, he's the corporate |
| 6 | representative. |
| 7 | THE COURT:  Kalinoski. |
| 8 | MR. HANGLEY:  And he is someone who was identified |
| 9 | to us as having knowledge with respect to one set of |
| 10 | relationships in the wholesale area, what have been called |
| 11 | MVNO agreements.  He was deposed with respect to MVNO |
| 12 | agreements and essentially not deposed with respect to |
| 13 | anything else. |
| 14 | In the pretrial disclosures the scope of his |
| 15 | testimony was changed dramatically to include, quote, |
| 16 | "Sprint's business and business activities," slash, |
| 17 | "operations; accused SMS/MMS, accused equipment, accused |
| 18 | functionality, Sprint's MVNO activities, Comcast's |
| 19 | infringement and damages claims, and Sprint's defenses." |
| 20 | In other words -- |
| 21 | THE COURT:  And when was that? |
| 22 | MR. HANGLEY:  That was after the completion of all |
| 23 | discovery. |
| 24 | THE COURT:  Give me a date about when it was done. |
| 25 | MS. MELLEY:  It was in the pretrial order. |

40

1          MR. HANGLEY:  It was in the pretrial order.

2          THE COURT:  Oh, this document that I have here.

3          MR. HANGLEY:  Yes, your Honor.

4          THE COURT:  It's probably dated, my recollection is

5   late December?

6          MS. MELLEY:  December 16th, I believe, your Honor.

7          MR. HANGLEY:  Yeah.

8          THE COURT:  Thank you.

9          MR. HANGLEY:  Now, the earlier disclosure, the far

10   narrower one, had been made while discovery was still going

11   on, but late in the fact discovery period.  It was made in I

12   think the summer of 2015.

13          MS. MELLEY:  That was just the supplemental, both

14   parties were updating as we went.

15          MR. HANGLEY:  Okay.  And so, your Honor, we think

16   that his testimony in fairness, because no discovery was

17   taken on the topic, his discovery should be limited to what

18   was disclosed in the Rule 26(a) disclosures back in the day.

19   You denied motions to that effect without prejudice, but said

20   that we can raise it at the time in the event that the

21   disclosures are inconsistent or broader -- I'm sorry, that

22   the pretrial order disclosures are broader than the 26(a)

23   disclosures have been and a party has been prejudiced.

24          We've been prejudiced because we had no discovery on

25   it.  He's their first witness.  They've got other people to

41

1   talk about all of this list of topics that they now say he's

2   going to talk about and on which we've had no discovery.  And

3   of course that list of topics, as I said before, is

4   everything in the case.

5         So we request, respectfully, that he be limited to

6   testimony regarding that which was disclosed in the 26(a)

7   disclosures.

8         MR. FINKELSON:  Thank you, your Honor.  I'm looking

9   for your Honor's order where your Honor has already disposed

10  of this motion by indicating that all witnesses in this case

11  are limited to speaking to information that was disclosed in

12  their initial disclosures or otherwise the subject of

13  discovery.  We sent the DI number to Comcast the other night,

14  we heard no objection along the lines of the one just

15  presented by Mr. Hangley.  I think the disclosures that are

16  keeping folks up at all hours of the night each night are to

17  avoid motions like this at the time.  But in DI-352, your

18  Honor, you indicated with respect to this motion that it was

19  overruled without prejudice --

20        THE COURT:  DI-352 is --

21        MR. FINKELSON:  -- to object at trial --

22        THE COURT:  -- now, what is that, an order?

23        MR. FINKELSON:  It was an order of the Court, your

24  Honor, it's --

25        THE COURT:  Give me a date.

1         MR. FINKELSON:  It's January 11th, 2017, and it's

2    Docket No. 352.

3         THE COURT:  Okay.

4         MR. FINKELSON:  And your Honor indicated that

5    Comcast could object during the course of trial to the extent

6    our testimony of Sprint witnesses extends beyond that set

7    forth in the initial disclosures under Rule 26(a)(1) as

8    supplemented and discovery from or related to the witness.

9         Obviously, Comcast is not privy to the testimony

10   we're about to introduce from Mr. Kalinoski.  I think once it

11   hears it, it will find that it is entirely within the scope

12   of the initial disclosures and discovery that was made

13   available in this case.

14        THE COURT:  Limited to MVNO agreements?

15        MR. FINKELSON:  It is limited to MVNO agreements and

16   related topics that were discussed during his deposition

17   taken by Comcast.  And, your Honor, we didn't revise the

18   witness list following the pretrial order.  I think Comcast

19   objected to a similar disclosure to the one they're objecting

20   to today with respect to all of our witnesses, and your Honor

21   provided us with your Honor's -- sometimes it's guidance,

22   this one was an order as to what the scope was going to be

23   and we intend to follow it --

24        THE COURT:  Ian, do you have the order.

25        MR. FINKELSON:  -- with respect to Mr. Kalinoski and

1  all other witnesses, and we said as much to Comcast last

2  evening.

3         (Pause.)

4         THE COURT:  It's paragraph -- oh, they're different

5  -- no, they aren't -- paragraph 7.  I thought they were

6  different numbering on it, there was different numbering in

7  the order.  It's the order dated January 9th, 2017.

8  "Comcast's objections to Sprint's witness list contained in

9  the final pretrial order based on lack of specificity are

10  overruled.  This ruling is without prejudice to Comcast's

11  right to object at trial to object to the scope of any

12  witness' testimony if such testimony or proposed testimony

13  extends beyond the description of the witness' proposed

14  testimony set forth in initial disclosure under Federal Rule

15  of Civil Procedure 26(a)(1) as supplemented and discovery

16  from or related to the witness."

17         So we'll proceed that way?

18         MR. FINKELSON:  That's our intention, your Honor.  I

19  think you'll find that this is a waste of the Court's time

20  and the witness will be speaking within the scope of his

21  disclosure and in accordance with your order, as we told

22  Comcast last evening.

23         MR. HANGLEY:  I wanted to put them on the record,

24  sir.  I'm happy that somebody from my team was told this last

25  evening, I was not told.

```
                          Kalinoski - Direct                    44
 1            THE COURT:  Told what?
 2            MR. FINKELSON:  Told that we were going to put on
 3   Mr. Kalinoski and all of our witnesses in accordance with
 4   your Honor's order --
 5            THE COURT:  All right.
 6            MR. FINKELSON:  -- which you just read.
 7            THE COURT:  Fine.  January 9th, 2017.
 8            MR. HANGLEY:  Thank you, your Honor.
 9            THE COURT:  Michael, do you want to bring the jury
10   in?
11            (Jury in at 2:40 o'clock p.m.)
12            THE COURT:  Be seated, everyone.
13            You may proceed.
14            MR. FINKELSON:  Thank you, your Honor.  Sprint calls
15   Scott Kalinoski.
16            SCOTT KALINOSKI, Defendants' Witness, Sworn.
17            THE DEPUTY CLERK:  Please be seated.  Please state
18   your full name and spell it for the record.
19            THE WITNESS:  Scott Kalinoski, and it's
20   K-a-l-i-n-o-s-k-i.
21            THE COURT:  Good afternoon, sir.
22            THE WITNESS:  Good afternoon, your Honor.
23                       DIRECT EXAMINATION
24   BY MR. FINKELSON:
25   Q   Good afternoon, Mr. Kalinoski.  You just said your name,
```

1    but can you please introduce yourself to the jury?

2    A    Sure.  As I said, Scott Kalinoski, I'm currently the vice

3    president of Sprint's wholesale services business unit.  By

4    way of background, I grew up in Cleveland, Ohio, then

5    attended Purdue University, of all things on a football

6    scholarship.  I went there, like most 18-year-olds, and had

7    the desire to play in the Superbowl, become the next Tom

8    Brady, but quickly figured out that I was a pretty good

9    college football player, but didn't have much of a chance to

10   play on Sundays.  So while I was there --

11   Q    So instead of seeing you in the Superbowl last night,

12   we're seeing you in the witness box?

13   A    Yeah.  I drew the short straw on that one.

14            (Laughter.)

15   A    So while I was there, I decided in my freshman year to,

16   you know, go into electrical engineering, and my four years I

17   learned an electrical engineering degree while I was playing

18   football.

19   Q    And what did you do after earning your electrical

20   engineering degree from Purdue?

21   A    So after four years at Purdue, I accepted a job to work

22   for Cincinnati Bell Telephone in Cincinnati, Ohio.  I was

23   down there six, seven years and while I was there, at night I

24   went to school to earn my MBA degree as well.

25   Q    And where do you reside today, Mr. Kalinoski?

1    A    I'm currently in Overland Park, Kansas, and that's right

2    outside of Kansas City, if you're not all that familiar with.

3    And after that six or seven years that I was with Cincinnati

4    Bell Telephone, I accepted a job with Sprint, and that would

5    have been the end of '95, early of '96.  And it was right

6    when -- you know, Sprint had been a long-distance company for

7    a long time and they were in the throes of launching their

8    cellular network.

9    Q    And about what year was that when you joined Sprint?

10   A    I think I officially started in January of 1996.

11   Q    And what did you do when you first joined Sprint in

12   January of 1996?

13   A    So I basically accepted a similar job that I had at

14   Cincinnati Bell, which was I was in a network planning

15   organization the six, seven years I was at Cincinnati, and

16   then when I moved into -- when I took the job with Sprint, I

17   spent probably about three or four years within the network

18   planning department there.

19         As I said, Sprint was just launching its cellular

20   network, so I was part of a number of teams that would

21   participate in what we called the RFP, request for proposals

22   from vendors for network element equipment, the ones that you

23   guys have heard throughout the trial.  So HLRs, MSCs.  I was

24   part of teams that helped make the decisions for Sprint as to

25   which vendors we should go with.

Kalinoski - Direct                    47

1   Q   And back in the 1990s, would that have been prior to

2   Sprint's launch of its third-generation cellular network?

3   A   That is correct.

4   Q   And can you give the jury a little bit of a better sense

5   of what your position is today and the work you've done as

6   part of the wholesale group at Sprint over time?

7   A   Sure.  So once we launched the network, probably around

8   the '99, 2000 time frame, we had a retail offer out there, so

9   Sprint decided that we wanted to also wholesale our service.

10  So I joined, it was a fledgling business unit at the time, I

11  was like the second or third person that was part of that

12  division.  And because I came from the network side, I was

13  kind of the operations technical representative within that

14  wholesale business unit at that time.

15          And to further define wholesale, what we mean by

16  that in the wireless space is that we sell or lease our

17  cellular network to other parties, we'd call them customers

18  or resellers, and those resellers then package our cellular

19  network up with their service and they sell it to consumers.

20  Now, there's probably two, 300 of them out in the marketplace

21  today, most of them are smaller players, but there are

22  several large resellers and names you may recognize,

23  especially if you shop at Walmart.  There's Straight Talk

24  Wireless, Consumer Cellular is another big reseller in the

25  marketplace.  But essentially these companies lease or buy

1  the cellular network from us and then they package it up in

2  their service offering to consumers.

3  Q    This jury needs more acronyms, but is there a team in the

4  industry that's used to describe wholesale relationships like

5  this?

6  A    Yes.  So first on behalf of the industry, I apologize for

7  acronyms and if I use them when I speak, I will try to give

8  the full definition.  As you've heard, in telecom it's very

9  common.  So in the wholesale space within wireless, the term

10 is called MVNO and it stands for mobile virtual network

11 operator.  The word virtual -- the phrase virtual network

12 within the name refers to the fact that these resellers don't

13 actually operate a cellular network.  So they have a virtual

14 network, if you will, and Sprint as the carrier, we sell or

15 lease our network to these customers.  And I will probably

16 refer to them as MVNOs in the discussion, so MVNO is

17 synonymous with a reseller as well.

18 Q    I meant to ask you, do you have children, Mr. Kalinoski?

19 A    I do, I do.  I have three kids.  I've recently, I guess

20 about a year or so ago become an empty-nester.  Two daughters

21 and a son, the oldest is working down in Atlanta.  My son was

22 fortunate enough to play basketball in college at Davidson

23 and now plays professionally over in Greece in the city of

24 Petra.  I just recently had the opportunity to go over there

25 for the time to visit him.  And then my youngest is still in

1   college, she's a sophomore at Duke University.

2              MR. FINKELSON:  Your Honor, may I approach the

3   witness --

4              THE COURT:  You may.

5              MR. FINKELSON:  -- as well as the bench with a

6   witness binder for Mr. Kalinoski?

7              THE COURT:  You may.

8   BY MR. FINKELSON:

9   Q   Mr. Kalinoski, I would ask you to take a look at the

10  witness binder I've given you and in it you'll find DX-16.

11             MR. FINKELSON:  Mr. Beard, it's not yet in evidence,

12  so if we could just put up the front page of it?  It was used

13  in the opening statement as well.

14  BY MR. FINKELSON:

15  Q   Do you have that full document in front of you, as well

16  as the page up on the screen, Mr. Kalinoski?

17  A   Yes, I do.

18  Q   Okay.  Do you recognize Defendants' Exhibit 16?

19  A   Yes, I do.

20  Q   Can you tell the jury what it is?

21  A   Yeah.  So this is an MVNO support agreement between

22  Sprint and Comcast.  As I mentioned, this is the document

23  that we use within our wholesale department with our

24  resellers or MVNOs that identifies --

25             MR. HANGLEY:  Your Honor, I'm going to -- before the

1    testimony goes on, I object to the introduction of the

2    document or the admission of the document on grounds that it

3    is irrelevant and potentially prejudicial.

4            MR. FINKELSON:  Your Honor, I believe that's a

5    renewal of the motion previously before --

6            MR. HANGLEY:  It is indeed, your Honor.

7            MR. FINKELSON:  -- this Court and previously decided

8    adversely.

9            THE COURT:  Well, not exactly, because we're not

10   talking about the scope of testimony.  That was within the

11   scope of the initial disclosure, as I understand it, under

12   Federal Rule of Civil Procedure 26(a)(1).  So there's another

13   ground and we'll go to sidebar.

14           MR. FINKELSON:  Thank you, your Honor.

15           (Sidebar discussion held as follows:)

16           MR. FINKELSON:  This is --

17           MR. HANGLEY:  This is my objection.

18           MR. FINKELSON:  Yes, go ahead.

19           MR. HANGLEY:  We have objected in the past, your

20   Honor, on the ground that they're going to try to interpret

21   cellular network, which they shouldn't be doing because the

22   Court has construed the claim, by reference to a document

23   that was negotiated several years before Comcast even bought

24   the patent to which the term is relevant.  Now, your Honor

25   has already ruled on this motion, you've denied it or at

1    least denied it provisionally, and we're making it again to

2    preserve the record.

3              THE COURT:  When did you make it for the first time?

4              MR. FINKELSON:  It was MIL, right?

5              UNIDENTIFIED SPEAKER:  During the course of --

6              MR. HANGLEY:  In our motion in limine.

7              MR. FINKELSON:  It was the MVNO agreement that was

8    one of the documents that was objected to on hearsay --

9    actually, this one wasn't hearsay, this one was relevance and

10   prejudice, and your Honor overruled it and denying -- you

11   know, one, I used it without objection in my opening

12   statement, having presented --

13             THE COURT:  Well, the objection is overruled.

14             MR. HANGLEY:  Thank you, your Honor.

15             MR. FINKELSON:  Thank you, your Honor.

16             (Sidebar discussion concluded.)

17             THE COURT:  Counsel will proceed as directed at

18   sidebar.

19             MR. FINKELSON:  Thank you, your Honor.

20   BY MR. FINKELSON:

21   Q    I've lost track of exactly where you were in your answer

22   and probably the jury has as well.

23             THE COURT:  He hadn't gotten very far.

24             (Laughter.)

25   BY MR. FINKELSON:

                          Kalinoski - Direct                    52

1    Q   So I was asking you to let the jury know, Mr. Kalinoski,

2    what DX-16 is?

3    A   Just to reiterate, it's an MVNO support agreement

4    between --

5              THE COURT:  Well, is it in --

6              MR. FINKELSON:  I'm just asking him to identify it

7    for the record and then I'm going to move it into evidence.

8              THE COURT:  But it's already on the jury's screens,

9    Michael.

10             MR. FINKELSON:  Just the first page, your Honor.

11             THE DEPUTY CLERK:  Just the first pages, not the --

12             THE COURT:  All right.

13             MR. FINKELSON:  I'm asking the witness to identify

14   it for the record and then it's my intention --

15             THE COURT:  Fine.

16             MR. FINKELSON:  -- in the very next point to move it

17   in.

18             THE WITNESS:  So the document is the MVNO support

19   agreement between Sprint and Comcast that was signed in 2008.

20             MR. FINKELSON:  Your Honor, Sprint moves DX-16 into

21   evidence.

22             THE COURT:  That exhibit is received.

23             (Defendants' Exhibit DX-16 received in evidence.)

24   BY MR. FINKELSON:

25   Q   When was this agreement entered into, Mr. Kalinoski?

1   A    May of 2008.

2   Q    And were you personally involved in negotiating this

3   agreement between Sprint and Comcast in 2008?

4   A    Yes, I was.  As I mentioned, I started in the wholesale

5   group in the 2000 time frame and between now and I think it

6   was two years ago I recently came into the current position I

7   am right now, which is I now currently run that business

8   unit, but throughout those years I had various roles.  As I

9   mentioned, I started in there as the technical operations

10  director within that business unit, I've had various sales

11  roles, and at the time of this agreement in 2008 I

12  represented Sprint's -- I was the technical support person

13  for Sprint's wholesale agreements.

14  Q    How did this agreement come about to your understanding?

15  A    Yeah.  So as I mentioned, in about the 2000 time frame we

16  decided to wholesale our network to MVNOs.  So in the 2007-

17  2008 time frame Sprint, we were looking for large partners to

18  become MVNOs of ours, and at the same time Comcast was

19  interested in offering a quad-play or a fourth service to

20  their -- what they called their Triple Play, and the Triple

21  Play is defined as their cable service, their land-line voice

22  service, and then their high-speed data service that they

23  offered at that time.  So we were actively out trying to find

24  partners and at the same time Comcast in that time frame was

25  actively looking for a network provider to lease cellular

Kalinoski - Direct                          54

1   services from.

2   Q   So specifically as relates to this agreement, DX-16, what

3   role did you play?

4   A   Yeah.  During the negotiations, my role -- we had -- both

5   parties had a large number of representatives at the table.

6   We had business folks who dealt with the financial terms of

7   how we were going to lease our network, we had lawyers there

8   to handle all the traditional things that you see in the

9   agreement, and my role on there was to be the technical

10  expert and fundamentally to make sure that the terms of the

11  agreement matched reality of how our cellular network worked

12  at that time.  It was important for both parties.  Comcast

13  wanted to understand completely in a technical sense what

14  they were leasing from Sprint, we absolutely wanted to make

15  certain they understood what they were leasing from us.

16        It's somewhat analogous to if you've ever leased an

17  apartment.  You know, it's a big building, but when you go to

18  lease your specific apartment you want to make certain that

19  everything on that contract matches what you agreed to.  So,

20  you know, what's the right room, are utilities included or

21  not, and all the other things that go with leasing an

22  apartment.  So my role within the negotiations was to make

23  certain that this document represented the cellular network

24  that we were leasing to Comcast.

25  Q   Did Comcast have a negotiation team as well in connection

Kalinoski - Direct                                    55

1   with this agreement?

2   A    Yes.  They -- all the entities that I mentioned, they had

3   similar entities on their side.  So they had finance, legal

4   support, and then technical support as well.

5   Q    And over approximately how long a period of time was this

6   agreement between Sprint and Comcast negotiated?

7   A    Ah, you know, I wish I could say it happened quickly, but

8   we probably spoke with them -- we had an early arrangement

9   with them in wireless that was separate from an MVNO that did

10   not work, so we continued to talk about wholesale

11   arrangements, but I would probably say that when we got down

12   to rolling up our sleeves and negotiating it was probably a

13   good four or five months of discussions.

14   Q    And were you involved in those discussions throughout?

15   A    Yes, I was.

16   Q    If I could have you turn, Mr. Kalinoski, to the page of

17   DX-16 that ends in the numbers 4223.

18          MR. FINKELSON:  Would you mind pulling yours up, Mr.

19   Beard?

20          (Pause.)

21   BY MR. FINKELSON:

22   Q    Can you tell the jury, Mr. Kalinoski, if you have it in

23   front of you on your screen or in your binder, what appears

24   on this page ending in numbers 4223?

25   A    Yes.  This is the signature page of the agreement -- and

1    actually I should say this is the first page of the signature

2    pages.  What was common in multi-party arrangements is to

3    have different signature pages and this is -- and then when

4    the contract was memorialized all the signature pages were

5    put together in the final document, and this page represents

6    the signature page for Sprint.

7    Q    Who signed the agreement on behalf of Sprint?

8    A    Jim Patterson.

9    Q    And what was Mr. Patterson's role?

10   A    He was the president of the wholesale services at that

11   time.

12   Q    Can you turn to the next page of DX-16 that ends in the

13   numbers of 224?

14   A    Yes, I'm there.

15   Q    Can you tell the jury what that is?

16   A    Yes.  So as I mentioned, this is one of the multiple

17   signature pages in the agreement and this is the signature

18   page signed by Comcast.

19   Q    And what is the Comcast company -- well, let me ask

20   first, who signed the agreement on behalf of Comcast?

21   A    Robert Pick.

22   Q    Do you have an understanding of what Mr. Pick's role at

23   Comcast was at the time?

24   A    Yes, he was senior vice president of business

25   development.

                           Kalinoski - Direct                    57

1   Q    What is the Comcast company that is listed here on this

2   signature page of this agreement?

3   A    It's Comcast MVNO-2 LLC.

4   Q    Can you tell the jury what that entity was to your

5   understanding?

6   A    Yeah.  In large corporations we have affiliate

7   organizations within our organizational structure and Comcast

8   MVNO-2 was just one of those affiliate organizations within

9   the Comcast Corporation.  I believe if -- I think it's

10  Section 17.1, it's a notification section, if we can turn --

11           MR. FINKELSON:  Let's see if we can get that up on

12  the screen, Mr. Beard.  I think it ends in 4215.

13           THE WITNESS:  And so it -- and as this is being put

14  up on the screen --

15           MR. FINKELSON:  Perfect.  Thanks.

16           THE WITNESS:  -- in these agreements is notification

17  provisions.  So any time you want to communicate corporation-

18  to-corporation you list out where documents are supposed to

19  go, and you can see under with copies to Comcast Corporation,

20  One Comcast Center.

21  BY MR. FINKELSON:

22  Q    And is that here in Philadelphia?

23  A    Yes.

24  Q    Let's look at the operative terms of the agreement.

25           MR. FINKELSON:  And why don't we start, if we could,

1    Mr. Beard, with the page ending in 151.

2    BY MR. FINKELSON:

3    Q   And give that a chance to load, Mr. Kalinoski.  And my

4    first question to you is if you can tell the jury what this

5    section is, the section that begins with, "Operative Terms

6    and Definitions"?

7    A   Yes.  And in all these big agreements, they always have

8    defined terms or what we often refer to as capitalized terms

9    and these are the key terms within the agreement.  They're

10   far more than just a glossary, they're not just, you know,

11   Webster's definition of terms, these are the key terms that

12   the contract basically is entered around.  I believe it was

13   Mr. Dellinger who testified as part of the Comcast-Nokia

14   agreement they had key terms or defined terms and in his

15   testimony as well he stated the importance of these words,

16   you know, within the agreement structure.

17   Q   Now, was one of the definitions that Comcast and Sprint

18   agreed on in 2008 the definition of Sprint's core network?

19   A   Yes, it was.

20   Q   And can you take the jury to that definition?

21   A   Yes.

22        MR. FINKELSON:  Mr. Beard, I believe that appears on

23   page beginning -- or ending in 4154.  As usual, Mr. Beard

24   gets there before I even say the numbers.

25        THE WITNESS:  Yes, thank you.  So as I mentioned,

1    when we sat down with Comcast, we both agreed that it was

2    very important to define technically what Sprint's core

3    network was.  And I'll read the definition for you here.  It

4    says, "Means the wireless voice, SMS and data service

5    infrastructure that provides connectivity and transmission

6    via the Sprint network, as the same may be modified, enhanced

7    or updated by Sprint, any of its controlled affiliates, or

8    any Sprint service provider affiliate from time to time."

9    BY MR. FINKELSON:

10   Q   And why do you say it was important to define this term

11   technically for both parties?

12   A   You know, plain and simple, it is what Sprint's core

13   network was at the time and that is -- and as I mentioned,

14   this agreement is all about what Sprint is leasing to

15   Comcast, what Comcast is getting for the fees that they will

16   be paying.  So the whole agreement basically hinged around

17   the definition of core network.  There are obligations

18   throughout this agreement that are driven by core network.

19   Q   And you've been sitting here throughout the course of the

20   trial as the corporate representative for Sprint, is that

21   right, Mr. Kalinoski?

22   A   Yes, I have.

23   Q   Okay.  And were you here during the course of Dr. Akl's

24   testimony when he spoke about this contract between Sprint

25   and Comcast?

1    A    Yes, I was.

2    Q    And did you hear him talk about this contract as simply

3    having business terms?

4    A    Yes, I did, and I completely disagree with it.  I mean,

5    it is a true statement, this is a business -- this agreement

6    is a business arrangement between Sprint and Comcast, but the

7    whole basis of this agreement was defining what Sprint was

8    selling to Comcast.  And, you know, we sat down with Comcast

9    many hours and made sure that everything in this agreement

10   was technically accurate and that both parties had agreed to

11   the terms that were defined in here.  So like I said, it was

12   certainly a business arrangement, but it was all based on

13   technical definitions.

14   Q    So from your perspective, why does the contract between

15   Comcast and Sprint define core network the way that it

16   appears up on the screen in front of the jury?

17   A    That was reality, plain and simple.  The voice data and

18   SMS service infrastructure was all part of Sprint's core.

19   Q    Prior to this Sprint-Comcast agreement in 2008, in your

20   work as a Sprint engineer were you familiar with the term

21   core network?

22   A    Yes, I was.  And as I mentioned, I spent time on our

23   network planning organization and this was just a common

24   understanding within Sprint.

25   Q    And when you say this was, what are you referring to?

1   A    The definition as listed here for core network.

2   Q    Now, does the definition of core network include other

3   words that are also defined terms in this agreement?

4   A    Yes, it does.  And I'd actually like to call attention to

5   two of them, they're -- I think there's three or four

6   capitalized words or important words within the definition,

7   that's quite common in these agreements.  The two I would

8   like to call out is the acronym SMS, that is also a defined

9   term within the agreement, and as well as in the next line it

10  says "Connectivity and Transmission via the Sprint Network."

11  So the capitalized term Sprint Network is also a defined

12  term.

13  Q    So let's take each of those in turn.  The definition of

14  SMS as incorporated in the core network definition, let's

15  turn to that first, if we could.

16           MR. FINKELSON:  For the record, I think that's on

17  page 14 of the agreement, pages ending in 4161.

18  BY MR. FINKELSON:

19  Q    Do you see in front of you, Mr. Kalinoski, the definition

20  of SMS in the Sprint-Comcast agreement of 2008?

21  A    Yes, I do, and I'll read that for everyone.  It's "SMS

22  means the alphanumeric or binary messages using Sprint's

23  short-message gateway and service center, as further

24  described in this agreement Schedule 1.0 in the Private Legal

25  Operations Manual."

1   Q    Do you have an understanding of what Sprint's short

2   message service center as used in this definition means?

3   A    Yes.  The short message service center, also referred to

4   as SMSCs, is referring to Sprint's SMS messaging servers.

5   And these are the same servers that are in question as part

6   of this trial.

7   Q    You also indicated that there's a definition -- or a

8   defined term Sprint Network within the term core network;

9   could you take the jury to that definition?

10  A    Yes.  It's farther down on the page.  So Sprint Network

11  means "The CDMA network owned and operated by Sprint, any of

12  its controlled affiliates and/or the Sprint service provider

13  affiliates."

14          So the way these three terms work together within

15  the agreement is the Sprint network, you can think of it as

16  the large, big Sprint cellular network that we're offering,

17  and then within Sprint's cellular network we get down to the

18  core network.  So then when we go to the core network

19  element, that defines the voice data and SMS infrastructure

20  within Sprint's core network.  So then you go look to the

21  definition of SMS and the SMS definition takes you to the

22  messaging -- the SMS messaging servers within our network.

23          So when you put it all together, these are the same

24  messaging servers that Comcast is accusing of being outside

25  of our network today or throughout the period of the patent

1  we're being accused of infringing on.  And I'm looking around

2  the room and I think I'm the only one in the room that sat

3  down with Comcast in 2007-2008 time frame and we actually

4  defined those as being part of our core network.  And it was

5  very important to both of us to make sure that was accurate

6  because Sprint had obligations relative to the network that

7  we were leasing them in our core elements.  And it's somewhat

8  astonishing to me that the claim that's on us right now is

9  saying these messaging servers are not part of Sprint's core

10 where in writing they agreed that they were part of our core

11 network back in 2008.

12 Q   A question for you within the Sprint Network definition

13 that's still up on the screen, you read it and it makes

14 reference to the CDMA network; what's your understanding of

15 what the CDMA network refers to?

16 A   Yes.  So the CDMA network refers to our cellular network

17 and it's the CDMA-2000 ANSI-41 network that you guys have

18 heard other prior testimony around.

19 Q   And do you know when ANSI-41 dates back to?

20 A   It was probably the early 1990s.

21 Q   Are there other ways in which this agreement, this

22 contract between Sprint and Comcast is technical in nature?

23 A   Yes.  And I won't go through all of it, but if you guys

24 have time during the deliberation too you can see throughout

25 the document it's acronym-laden.  So there's plenty of

1   references to HLRs, PDSNs, MSCs.  I can even -- if you go to

2   like Schedule line -- or Schedule 5 within the agreement,

3   you'll see a whole bunch of technical terms and pages and

4   pages of technical terms defining the relationship between

5   Sprint and Comcast.

6   Q   Now, we've talked about SMS, how does this agreement in

7   2008 handle MMS?

8   A   So if you notice in the core network definition MMS is

9   not included in the core network.  And at that time, if you

10  recall -- or you've heard in the testimony Sprint's MMS

11  servers or MMSCs we refer to as Picture Mail.  It was

12  actually outside of our network, Syniverse was the provider

13  of that network box and functionality.  So it fit right in

14  line with the conversation that, you know, the SMSCs or the

15  SMS messaging servers were part of our core because they were

16  within our network where the MMSCs, the multimedia server --

17  multimedia messaging servers were outside of our network,

18  they sat within the Syniverse network.

19  Q   What is the time period covered by this contract, Mr.

20  Kalinoski, between Sprint and Comcast that contains the

21  definition of core network?

22  A   As I mentioned, the agreement was signed in 2008, it has

23  a ten-year term on it.  The agreement is still in effect, so

24  it goes from May, 2008 to May, 2018.  And so essentially this

25  agreement covers the time period that we're being accused of

1    violating the patents and Comcast has agreed that the SMS

2    messaging servers were part of our core network within this

3    agreement and it doesn't fit that now they're taking the

4    other side and accusing our SMS messaging servers to be

5    outside of our network.

6    Q    I have no further questions.  Thank you, Mr. Kalinoski.

7              THE COURT:  I think what we'll do, it's 12 minutes

8    after 3:00, ladies and gentlemen, we'll take a ten-minute

9    break.  Michael?

10             THE DEPUTY CLERK:  All rise.

11             (Jury out at 3:11 o'clock p.m.)

12             THE COURT:  You may go about your business,

13   everyone.  We'll resume with your cross-examination.

14             MR. HANGLEY:  Your Honor, how long will we go today?

15             THE COURT:  We have to check with Milahn.  The juror

16   with the transportation issues, Juror No. 1, has not reported

17   to me, but I'll have her inquire.  We had thought he would

18   take an alternate means of transportation and we'd go to

19   quarter of 5:00, hopefully.

20             (Court in recess; 3:12 to 3:27 o'clock p.m.)

21             THE COURT:  Please be seated, everyone.

22             You may proceed with direct examination, Mr.

23   Hangley.

24             MR. FINKELSON:  I completed my direct examination,

25   your Honor, and --

1          THE COURT:  I'm sorry, I'm sorry, cross.

2          MR. FINKELSON:  He promised to treat him gently just

3    like it was direct, so --

4          (Laughter.)

5                          CROSS-EXAMINATION

6    BY MR. HANGLEY:

7    Q   Good afternoon, Mr. Kalinoski

8    A   Good afternoon.

9    Q   Now, you describe MVNO agreement as a partnership between

10   Sprint and Comcast?

11   A   It was a business arrangement between Sprint and Comcast,

12   yes.

13   Q   Well, I asked the term you used was partnering, wasn't

14   it?

15   A   In --

16   Q   In your direct testimony --

17   A   I may have --

18   Q   -- 20 minutes ago.

19   A   -- I may have said partner, but at the end of the day the

20   agreement was a business agreement.

21   Q   Of course it was, of course it was, as is any

22   partnership, correct?

23   A   Not necessarily, but --

24   Q   Now, sir, what in your -- as you understand it as one of

25   the negotiators is your contracting partner looking for?

1    What is a Bright House a TWC Wireless or a Comcast MVNO-2

2    looking for in that relationship?

3    A    They're leasing to -- they're looking to lease Sprint's

4    network services.

5    Q    Okay.  Fair to call it a turnkey operation that they're

6    seeking?

7    A    No.

8    Q    No?

9    A    No.

10   Q    Let's see what they are seeking or what you offer to give

11   them.  I take it that under an MVNO agreement, let's say

12   hypothetically a Comcast customer, I think you used the word

13   Quad Play?

14   A    Yes.

15   Q    Okay.  A Quad Play customer who also had a Comcast mobile

16   device, a phone or a laptop with a card, would be able to

17   connect to email or the Internet through Sprint's facilities,

18   correct?

19   A    Yes, they would be able to connect via Sprint's cellular

20   network as part of this agreement.

21   Q    Okay.  And so that means that they would whatever, push

22   the button or dial the number and it would go to the Sprint

23   antenna, the signal would go to the Sprint antenna?

24   A    If I'm understanding your question correctly, the device

25   that a customer was using would connect to the Sprint cell

1    tower --

2    Q    Cell tower --

3    A    Yes.

4    Q    -- and antenna?

5    A    Yes.

6    Q    And the signal would go to the base station?

7    A    Yes.

8    Q    And then onward to the various other apparatus that's

9    within the Sprint network?

10   A    Yeah, within the Sprint core network, yes.

11   Q    And you defined all that as the core network in the

12   agreement?

13   A    We defined the Sprint cellular network in the agreement

14   and we defined Sprint's core network in the agreement as

15   well, and there's a lot of other terms that are defined in

16   the agreement, yes.

17   Q    Sure.  And the core network meant the wireless voice SMS

18   and data service infrastructure according to the agreement

19   definition of, quote, "Core Network," is that right?

20   A    Correct, as it's listed here.

21   Q    Okay.  And of course those things we've been talking

22   about, the tower and the base station and the other things

23   are all part of that wireless voice SMS and data service

24   infrastructure, aren't they?

25   A    Yes, they are.

1   Q    Okay.  So then those antenna and the base station,

2   according to what you said in 2008, would be part of the core

3   network?

4   A    Can you --

5   Q    Pardon me?

6   A    Can you repeat that question again?  Sorry, I was -- when

7   you paused I lost track.

8   Q    I'm sorry, the antenna, the base station would be part of

9   the core network as you saw it in 2008?

10  A    So, yeah, they would be part of the Sprint cellular

11  network, the Sprint network that we defined in the agreement.

12  Q    And the core network that you defined in the agreement?

13  A    Yes.

14  Q    Okay.

15          (Pause.)

16          MR. HANGLEY:  This will just be a second, your

17  Honor.

18          (Pause.)

19  BY MR. HANGLEY:

20  Q    Are you familiar with these words, sir?

21          MR. FINKELSON:  Excuse me, Mr. Hangley, I think his

22  Honor said I could walk around so I could see as well.

23          MR. HANGLEY:  Oh, please, yes.

24          MR. FINKELSON:  I didn't want to interrupt your

25  question.

1    BY MR. HANGLEY:

2    Q    Are you familiar with those particular words?

3    A    Yes, I am.

4    Q    Okay.  Do you know what they are?

5    A    It's the Court's construction for this case.

6    Q    That's what a cellular network is, correct?

7              THE COURT:  What is on the board?

8              MR. HANGLEY:  The claim construction, your Honor,

9    and I quote --

10             THE COURT:  Just tell me what term.

11             MR. HANGLEY:  Cellular network claim construction.

12   BY MR. HANGLEY:

13   Q    And the Court has told us and therefore it is the law for

14   purposes of this case that a cellular network means "a

15   network comprised of a wireless terminal, a base station

16   system and core network elements," correct?

17   A    That's what it says.

18   Q    And so the things that we know because the Court used

19   "and" is that core network elements of the cellular system do

20   not include the base station system; is that correct?

21   A    By the Court's construction, correct.

22   Q    Okay.  And you understand that that's binding?

23   A    I understand that's the Court's construction when you --

24   for the --

25   Q    And you understand that that's binding?

1   A    Binding for --

2   Q    Everybody involved in this case, for purposes of this

3   case, including you?

4   A    Yes.

5   Q    Okay.  And of what you've just told the jury and me that

6   the core network included the base station system is

7   inconsistent with the Court's construction, isn't it?

8   A    Is inconsistent, but it's not inconsistent --

9   Q    Is it inconsistent with the Court's --

10          THE COURT:  He answered.  You said it's

11   inconsistent, but it's not inconsistent; is that correct?

12          THE WITNESS:  Yes.  I said but it's not inconsistent

13   with how our core network is defined.  So it includes the

14   elements that are listed there in the definition of core

15   network.

16   BY MR. HANGLEY:

17   Q    You understand that it's inconsistent with the binding

18   Court construction?  That's a yes or a no, sir.

19   A    I understand that it includes more than the Court's

20   construction, yes.

21   Q    No.  The question was, is it inconsistent?  Is this --

22   let's say that this is the base station, is it inside the

23   core elements or outside the core elements?

24   A    By the Court's construction, it's outside the Court's

25   elements.

1  Q   And by your construction it was inside, wasn't it?

2  A   Right, it included --

3  Q   Okay.

4  A   -- the base stations, as well as the core network

5  elements that are there.

6           MR. HANGLEY:  May I confer?

7           (Pause.)

8  BY MR. HANGLEY:

9  Q   Now, this document, this MVNO agreement, that was entered

10 into, negotiated and entered into in 2007-8?

11 A   Yes, and it was signed in May of 2008.

12 Q   Right, right.  Now, at that time, remembering now that

13 we're talking about a patent in this case, at that time do

14 you know whether Comcast owned the patent?

15 A   Comcast did not.

16 Q   Okay.  So nobody was thinking about using that language

17 for patent construction terms, nobody was thinking about the

18 patent at all at the time, were they?

19 A   We were defining what Sprint's core network --

20 Q   The answer to my question --

21 A   -- at the time.

22 Q   -- my question was:  was anybody thinking about the '870

23 Patent and the terms of that document when they negotiated

24 this MVNO agreement?

25 A   Correct.

1    Q    If you can answer that question, you can then go on and

2    explain.

3    A    I said correct.

4    Q    All right, okay.

5    A    And we at the time, with Comcast we defined what our core

6    network was at that time.

7    Q    For purposes of an MVNO agreement, correct?

8    A    To represent our core network, what we were selling to

9    Comcast at that time, so correct.

10   Q    And you were selling -- or maybe renting is a better

11   word, I'm not sure, but you were selling -- first of all, you

12   wanted Comcast to buy as large a range of your services as it

13   was willing to take and that you were in a position to offer,

14   correct?  The more you can sell, the more money?

15   A    Yes.

16   Q    Okay.  And likewise what Comcast wanted was, I used this

17   term earlier, a turnkey operation.  Comcast certainly wanted

18   something where it had as little of the responsibilities of

19   doing the things it didn't know how to do as possible, right?

20   A    I disagree.

21   Q    Okay.  Comcast wanted to do the billing for itself,

22   correct?

23   A    That is one of the items that they wanted to do.

24   Q    But Comcast wanted from the time that customer picked up

25   let's say his hypothetical Comcast cell phone and dialed a

1    number, they wanted all of the responsibility of getting the

2    call through to be in the hands of Sprint; is that right?

3    A    That is not correct.

4    Q    Okay.

5    A    And I can point to places in the agreement where Comcast

6    actually asked if we were capable of letting them have their

7    own core elements.

8    Q    Like?

9    A    HLR, messaging servers, MSCs.  If you want I can point to

10   the places in the agreement --

11   Q    But in fact what you wound up doing was defining all of

12   those things?

13   A    No, we defined what was in our core element and there's

14   other business terms that are referred to services in the

15   agreement, and we allowed Comcast to bring their own services

16   because they did not want a turnkey.  Voice mail is a great

17   example.  Voice mail is a core element, but it's listed in

18   the agreement as a non-core service because Comcast didn't

19   want a turnkey solution.  They wanted to use their own voice

20   mail solution because they had it for their wire-line service

21   as part of their Quad Play --

22   Q    Did you -- I'm sorry, I didn't mean to interrupt.

23   A    Yeah.

24   Q    Are you done?

25            THE COURT:  As part of their Quad Play --

1          THE WITNESS:  Yeah.  So Comcast wanted to offer more

2    -- they did not want just a turnkey, they wanted to use some

3    of their own network elements.

4    BY MR. HANGLEY:

5    Q   Did you say that you defined voice mail in your own mind

6    as one of the core elements, did you say that?

7    A   Yeah, it's included in that definition of core elements.

8    Q   Okay, okay.

9    A   Core network, sorry.

10   Q   So now just let me be very clear with what you're saying.

11   You are not saying to this jury that what you and Comcast and

12   Bright House and TWC said back in 2008 that that should be

13   considered at all in determining what the Court has set up as

14   the meaning of cellular network in this case, right, you're

15   not suggesting that?

16   A   I'm establishing --

17   Q   Please answer yes or no and then you can explain.

18   A   Okay, so go ahead and rephrase.

19   Q   You are not suggesting that the jury should take that

20   into account in deciding what a cellular network is because

21   the Court has already told us?

22   A   Yes, I am suggesting that the jurors should take that

23   into consideration, because Comcast agreed with us that the

24   messaging servers were part of our core network.

25   Q   And the Court's determination, the Court's construction

1    is binding, as you've just acknowledged; is that correct?

2    A    Yes.  So in our --

3    Q    Thank you.

4    A    -- definition of core network it includes as listed there

5    core network elements, as well as other things that the Court

6    defined separately, okay?  But our core network, because it

7    included the messaging server by definition of deductive

8    reasoning, it's included in core network --

9    Q    I'm not asking you about the messaging server --

10            THE COURT:  Let him finish.

11   BY MR. HANGLEY:

12   Q    -- I'm asking you about the basic --

13            THE COURT:  Let him finish.

14            MR. HANGLEY:  Oh, I'm sorry.

15            THE WITNESS:  Yeah, so to say it again is the

16   agreement that we had with Comcast included the core network,

17   as well as the base stations in that definition, which is

18   different than the Court's definition of it, right?  But it

19   does not mean that the messaging servers were not part of our

20   core network.

21   BY MR. HANGLEY:

22   Q    For purposes of that agreement?

23   A    No, for --

24   Q    For the business purposes --

25   A    -- no.

1    Q    -- of that agreement --

2    A    From reality, that's the way our network worked;

3    messaging servers were part of our core network.

4    Q    One more time.

5    A    Yes.

6    Q    Is this binding, is the Court's construction binding?

7    A    Yes, the Court's construction --

8    Q    Is the base station --

9    A    -- is binding.

10   Q    -- system or not, is it or is it not a core network

11   element under the Court's construction?

12   A    Under the Court's construction, no.  Okay?  But under our

13   agreement construction the core -- the base stations were

14   part of the core and additionally --

15   Q    Two years --

16   A    -- the messaging servers were also part of our core

17   because that's the way our network existed.

18   Q    In what you were careful to describe as a business

19   agreement entered into two years before anyone became

20   concerned with the '870 Patent, correct?

21   A    As I stated in my --

22   Q    Correct?

23   A    That is that correct.

24   Q    Thank you.

25   A    And as I stated in my testimony, that agreement reflected

1    reality --

2    Q    Thank you, Mr. Kalinoski.

3    A    -- of Sprint's --

4    Q    I have no --

5    A    -- core --

6    Q    -- further questions.

7           THE COURT:  Don't cut him -- no, no, Mr. Hangley,

8    you'll not cut him off.  You asked the question, he answers

9    the question.  If you want to keep asking the question, he'll

10   keep answering the question.

11          Now you may finish, Mr. Kalinoski.

12          THE WITNESS:  Let me see if I can restate that

13   again, is that agreement reflected the reality of our network

14   at that time and messaging servers were part of our core

15   network.

16   BY MR. HANGLEY:

17   Q    In your view in 2008 and not in this case, correct?

18   A    And in Comcast's view as well.

19   Q    Well --

20   A    There was a signed agreement between the two of us and

21   they agreed --

22   Q    I understand.

23   A    -- the messaging servers were part of our core network.

24   Q    Thank you, Mr. Kalinoski.  I have no further questions.

25   A    Thank you.

1                        REDIRECT EXAMINATION

2    BY MR. FINKELSON:

3    Q    You've been sitting here since the beginning, Mr.

4    Kalinoski?

5    A    Yes.

6    Q    Do you recognize this as the Court's construction of

7    cellular network that you understand the jury is being asked

8    to find in this case?

9    A    Yes, I do.

10   Q    Do you understand that one of the questions for the jury

11   in this case is whether Sprint's messaging servers from 2006

12   forward are core network elements under this Court's

13   definition of cellular network?

14   A    Yes, I do.

15   Q    Are Sprint's messaging servers from 2006 to the present

16   core network elements under this Court's definition?

17   A    Yes, they are.

18   Q    In 2008, which is during the time period from 2006 to the

19   present, did Sprint enter into a contract with Comcast?

20   A    Yes, we did.

21   Q    Did Sprint and Comcast define the term core network?

22   A    Yes, we did.

23   Q    Was that a business term or a technical term?

24   A    That was a technical term.

25   Q    And under Sprint and Comcast's definition of core network

                          Kalinoski - Recross                    80

1    in that agreement were Sprint's short message service

2    centers, it's short message messaging servers part of the

3    definition of core network upon which Sprint and Comcast

4    agreed?

5    A    Yes.

6              MR. FINKELSON:  No further questions, your Honor.

7                      RECROSS-EXAMINATION

8    BY MR. HANGLEY:

9    Q    What was your title again?

10   A    What was or what is?

11   Q    What is it now?

12   A    Vice President of Sprint Wholesale Services.

13   Q    And what was it in 2008?

14   A    It probably would have been Director of Wholesale

15   Operations.

16   Q    Okay.  Neither of those being a technical position?

17   A    As I mentioned, the latter was a technical position.

18   Q    The latter was a -- the -- what was that title again?

19   A    Director of Sprint Wholesale Operations.

20   Q    Director of Sprint Wholesale -- it sounds like a sales

21   operation, doesn't it?

22   A    No, it does not to me.  And if you want I can explain

23   what the position entitled, which is we have network

24   engineers, network planners, which I was part of in my

25   earlier career, that build and design our network, and we

1  have MVNO customers, resellers, who manage and operate their

2  operations.  And in cases, as I mentioned, Comcast not

3  wanting a turnkey solution, these MVNO customers want to

4  sometime connect things of their network to our network.  So

5  my job as a technical role was to be the liaison between our

6  MVNO customers and our subject matter experts within the

7  network.  So --

8  Q    As Director of Wholesale Operations?

9  A    Yes.

10          MR. HANGLEY:  No further questions.

11          MR. FINKELSON:  No further questions from me, your

12  Honor.

13          THE COURT:  That concludes your testimony, Mr.

14  Kalinoski.

15          THE WITNESS:  Thank you.

16          THE COURT:  You may step down.

17          THE WITNESS:  Thank you.

18          (Witness excused.)

19          MR. FINKELSON:  Your Honor, may I approach just to

20  take --

21          THE COURT:  You may.

22          MR. FINKELSON:  -- the binder away from the witness

23  stand.

24          (Pause.)

25          MR. FINKELSON:  Your Honor, my colleague Ms.

1  Rachford is going to introduce Sprint's next witness, which

2  will be by video deposition.

3          THE COURT:  Fine.  Let me explain to the jury what

4  you meant by that.  Some witnesses were deposed and I use

5  that phrase to describe the discovery process that we talked

6  about earlier.  The witness was called into in this case it

7  would be Sprint's office -- this is a trial deposition?

8          MR. FINKELSON:  This was, your Honor -- go ahead,

9  Ms. Rachford, my apologies.

10          MS. RACHFORD:  This was a deposition taken during

11  the course of discovery.  Mr. Koch was a 30(b)(6) corporate

12  designee of Comcast.

13          THE COURT:  The Sprint lawyers asked Comcast to

14  produce a witness with expertise and knowledge -- expertise

15  might be the wrong word -- with knowledge of certain subjects

16  -- and what were those subjects?  Is it a long list or --

17          MS. RACHFORD:  I don't have the specific list of

18  topics, I'd be happy to get that for you.

19          THE COURT:  He's a 30(b)(6) witness?

20          MS. RACHFORD:  He's a 30(b)(6) witness concerning --

21          MR. FINKELSON:  Specifically, your Honor, concerning

22  the --

23          MS. RACHFORD:  MVNO.

24          MR. FINKELSON:  -- MVNO agreement which Mr.

25  Kalinoski just spoke.

1          THE COURT:  And he's unavailable today.  Comcast --

2          MR. HANGLEY:  No, he's available.

3          MR. GOETTLE:  He's not unavailable, but he was the

4    corporate designee, he was the 30(b)(6) --

5          THE COURT:  So his statements are admissions.

6          MR. GOETTLE:  I'm sorry?

7          THE COURT:  His statements then are admissions as

8    far as Comcast.

9          MR. GOETTLE:  Yes, your Honor, that was our

10   understanding of how you would want us to proceed.  So he is

11   available, he could testify live, but this is 30(b)(6)

12   testimony.

13         THE COURT:  Fine.  And in the course of the

14   discovery a witness was presented by Comcast representing the

15   corporation.  He was asked to testify on certain subjects and

16   on those subjects he binds the corporation; it's as though

17   the corporation were talking.  The deposition was conducted

18   by questions and answers.  The Sprint attorneys asked the

19   questions, the Comcast corporate designee answered them.  And

20   you should treat this testimony -- you'll see it on the

21   screen -- you should treat this testimony in the same way as

22   you treat any other testimony.

23         And now you may proceed.

24         MS. RACHFORD:  And there's one thing I would note

25   for the record before we play the video clip, there's a

1   deposition exhibit that was used in the deposition that is

2   the MVNO agreement.  It is just the copy that was produced

3   from Comcast's files, it is otherwise the same substantively

4   as DX-16, which the jury has seen already today.

5           THE COURT:  Fine.

6           MS. RACHFORD:  Thank you.

7           (At this time the video deposition of Evan Koch was

8   played for the jury.)

9           MR. RIOPELLE:  Comcast would call its -- I'm sorry,

10  Sprint would call its next witness, Mark Yarkosky.

11          THE COURT:  Thank you.

12          MARK YARKOSKY, Defendants' Witness, Sworn.

13          THE DEPUTY CLERK:  You may be seated.  Please state

14  your full name and spell it for the record, please.

15          THE WITNESS:  Sure.  My name is Mark Yarkosky,

16  Y-a-r-k-o-s-k-y.

17                  DIRECT EXAMINATION

18  BY MR. RIOPELLE:

19  Q   I know you just said your name, Mr. Yarkosky, but could

20  you introduce yourself to the jury?

21  A   Sure.  My name is Mark Yarkosky.

22  Q   And, Mr. Yarkosky, what is your title at Sprint?

23  A   At Sprint I hold the role of director of product

24  development and product management.

25  Q   And how long have you been in that position?

1   A    I've been in that position since 2010.

2   Q    And how long have you been at Sprint?

3   A    I've been at Sprint since 1996, so coming up to 21 years.

4   Q    And what are some of the other positions you've had at

5   Sprint before you were made director of product development?

6   A    I managed a research and development group where I was

7   also a director of research and development for RF

8   technologies, and then I also was the director over our

9   national RF engineering team.

10  Q    And RF, what do you mean by RF?

11  A    RF is radio frequency, so the connection between the

12  mobile phone and the base station.

13  Q    And are you an engineer?

14  A    I've held that role of engineer, but I'm actually a

15  physicist.

16  Q    Let's get back to your current position.  As director of

17  product development, what are your responsibilities?

18  A    I'm responsible for and have been responsible for a

19  series of products that operate on the mobile phone.

20  Everything that we call value-added services, as well as core

21  services.  So, things like voice messaging data, S core

22  services and then value-added services are additional

23  services that we provide as a carrier that customers

24  subscribe to.

25  Q    Are you responsible for SMS and MMS?

Yarkosky - Direct                                    86

1   A    I have been, yes.

2   Q    And are they value-added or core services?

3   A    Those are core services.

4   Q    All right, in your role as being responsible for SMS and

5   MMS, have you come into contact with a company called

6   Synaverse?

7   A    Yes, I have.

8   Q    And can you explain to the jury who Synaverse is?

9   A    Yes, Synaverse is a services company that provides

10  various services to wireless carriers or carriers in general.

11  They provide things like inner-carrier messaging and they

12  also act as a clearing house for roaming when one carrier's

13  subscribers roam in another carrier's network.  They settle

14  up between roaming settlements for the carriers.

15  Q    Is Synaverse still operating?

16  A    Yes, they are, they're still an operating company.

17  Q    And to the best of your knowledge, does Synaverse have

18  other customers besides Sprint?

19  A    Yes, they do.

20  Q    Okay, is there a product or a service that Synaverse once

21  provided to Sprint?

22  A    Yeah, today they still provide inner-carrier connections

23  for SMS, allowing customers to connect from like a Sprint

24  customer to connect to a Verizon or T-Mobile or AT&T

25  customer, using SMS.  That's called inter-carrier messaging.

1  And they used to handle for us a product that we called

2  picture mail.

3  Q    And can you describe for the jury what picture mail is?

4  A    Yeah, sure.  Picture mail was basically a proprietary

5  version of MMS or multi-media messaging services.  And it was

6  one that had -- servers had developed that we had used.

7  Q    And when did Synaverse provide this picture mail service

8  to Sprint?

9  A    We had Synaverse provide picture mail service to us from

10  the years of around 2005 through 2013, when we stopped using

11  them.

12  Q    I think you just used the term, proprietary, could you

13  explain to the jury what you mean by proprietary?

14  A    Sure, proprietary means that a company, in this case for

15  like Synaverse owned all of the code and how the service

16  actually worked.  And so, anytime that we needed something

17  done on that, we had to go directly to Synaverse in order to

18  do any development work or modification work of that system.

19  Q    And where was the Synaverse system hosted?

20  A    I mean, Synaverse hosted it in their data centers.

21  Q    Did this service have a messaging server?

22  A    Yeah, I mean, the Synaverse system, the way picture mail

23  worked is there was a client and a server relationship and

24  this client that was call DMCL client and I don't remember

25  what MCL stands for, but that client did communicate to a

1   server that was a messaging server that Synaverse owned and

2   operated.

3   Q    Was that messaging server for the picture mail system,

4   was that messaging server in Sprint's core network?

5   A    No, it was not.

6   Q    Do you know where that messaging server was?

7   A    Somewhere that Synaverse owned and operated and ran it.

8   Q    All right, did Sprint experience any problems with the

9   Synaverse and picture mail?

10  A    Yeah, you know, due to the proprietary nature of that, we

11  did have issues or challenges as it related to the picture

12  mail service.  We experienced, in one year during my tenure

13  from 2010 to present or when we were using it through 2013.

14  In one year and I don't remember the specific year, but we

15  had as many as 40 outages of that service, where it was

16  customer impacting.  We also had other challenges around new

17  devices being launched.  Particularly, we launched the IPhone

18  on our network and there was, for the IPhone, for the

19  messaging services to support multi-media messaging,

20  Synaverse was going to have to do development on their

21  platform in order to support specific message types and file

22  for net types, for the IOS operating system.

23  Q    And when -- you spoke about outages, when you had the

24  outages, was this something that Sprint could fix?

25  A    No, it wasn't. In fact, you know, I spent many holidays

1   on conference bridges with Synaverse because we would start

2   getting customer care complaints about messages not being

3   delivered or sent and so, we would have to call Synaverse and

4   start working through a process of having them troubleshoot

5   their system to figure out where the breakdown was occurring.

6   Q   So, what did Sprint decide to do to address these

7   problems it was having with the Synaverse picture mail?

8   A   Well, we were going through a period of trying to

9   rationalize costs and everything else that is going on and we

10  had decided that we would install an MMS server that was part

11  of the same company that was doing our SMS server, Ecision

12  and that we would install an MMS server inside our core

13  network in order to serve our MMS traffic.  And at that

14  period of time, there was a standard called OMA or the Open

15  Mobile Alient that had standardized MMS.  So, it gave us the

16  opportunity to take what was running this proprietary traffic

17  on this Synaverse picture mail service and migrate all that

18  traffic on to our core network and our own MMS server.

19          MR. RIOPELLE:  Your Honor, may I approach to hand

20  the witness a binder?

21          THE COURT:  Yes, you may and I should remind

22  everyone that on Friday we talked about going later today.

23  Normally, at least, during our schedule last two days of last

24  week, we recessed at 4:20.  Juror in seat Number 1 who had

25  transportation problems has resolved them and so we will sit

1   until 4:45 which is the -- I don't want to say typical -- but

2   it's the recess time most of my colleagues and I have used

3   for a long time and we find that works.  Again, let me say

4   for any of you, recessing at 4:45 does not work, let us know

5   and we'll work around it.  I want to thank juror in seat

6   number 1 for working this out.  Thank you very much and now

7   you may proceed.

8               MR. RIOPELLE:  Thank you, your Honor.

9   Q   Mr. Yarskosky, I've placed in front of you is a binder.

10  It's got exhibits in it.

11  A   Okay.

12  Q   Can you open up and turn to the exhibit marked DX-219.

13  Yes, you can show the jury the cover right now.

14  A   Oh, okay, yup.

15  Q   Do you recognize this document?

16  A   Yes, I do.

17  Q   And can explain to the jury what this document is?

18  A   Yeah, this is -- this document is a typical document that

19  my group reviews.  It's a product claiming or product roadmap

20  document and typically, we would plan or we do plan six

21  quarters in advance, so this would be a very typical document

22  that might team uses on an ongoing basis to plan out what

23  we're going to do in terms of enhancements for the products

24  and services that we're responsible for.

25  Q   And what products and services was this specific planning

1   roadmap for?

2   A   This one is called text and imaging and that is SMS and

3   MMS.  So, we called it imaging because it was sending

4   pictures and videos and that kind of stuff, so.

5   Q   And when was this document prepared?

6   A   If you look down at the right -- or the lower left-hand

7   corner, it shows a fourth quarter of 2010.

8   Q   Okay and if I could have you turn to the second page of

9   the document?

10   A   Sure.

11   Q   And do you see where it says, about halfway through the

12   page, CDMA-MMSC?

13   A   Yes, I do.

14   Q   And can you tell the jury what a CDMA-MMSC is?

15   A   Yeah, that's the MMSC that was going to be installed in

16   the wireless network and our core network to support the MMS

17   traffic.

18   Q   And do you see right after the CDMA-MMSC where it says,

19   implement an Ecision MMSC within the CDMA network?

20   A   I do.

21   Q   And what does that mean?

22   A   Just as we stated, it would be building or implementing

23   and integrating the MMS server within our wireless network,

24   into the core of our wireless network.

25   Q   And just step back for a second.  What is Sprint's CDMA

1  cellular network system?

2  A    Well, when you think about a wireless network, it's

3  everything that includes the handset, the air interface, the

4  base stations, the connecting equipment at the base station

5  so that what we call a base station, plus the base station

6  controller.  And then those elements in the core network like

7  a mobile switching center, the packet data serving node, the

8  SMSC and the MMSC, the HLR and other things, Triple AAAs, et

9  cetera.

10 Q    So, is Sprint's CDMA cellular network just limited to the

11 air interface?

12 A    Oh, no, no.

13 Q    And when did Sprint launch its CDMA 2000 network?

14 A    We launched our CDMA 2000 network in late -- probably

15 right around the fourth quarter of 2002.

16 Q    And what was the CDMA 2000 network designed to do?

17 A    That network and what we did with it and when we

18 implemented it was really to support voice messaging and

19 data.

20 Q    And you mentioned data and I think you just mentioned, a

21 minute ago, the PDSN?

22 A    Yes.

23 Q    Can you just describe for the jury what's a PDSN?

24 A    Yeah, a PDSN is another core network element that

25 connects data sessions from the mobile terminal out to the

1    internet.

2    Q    And when did Sprint install its first PDSN?

3    A    That would have been around the same time period.  So, in

4    the 2002 time frame in order to launch the service in the

5    fourth quarter of 2002.

6    Q    All right and you mentioned messaging as part of the

7    cellular network.  Have you ever heard someone describe a

8    messaging network as being separate from a cellular network?

9    A    No, but -- no, when we talk about the network, it's

10   really the network that's supporting voice messaging and

11   data.

12   Q    Okay, let's get back to what we were talking about, the

13   Synaverse and moving.

14   A    Yes.

15   Q    Why did Sprint want to move it's MMS messaging service

16   from the external host into Sprint's cellular network?

17   A    Sure, there are a few reasons.  I mentioned one about all

18   the new devices that were coming out were compliant with this

19   Open Mobile Alient standard for MMS traffic.  So, all the new

20   handsets were coming out were capable of supporting a

21   standards-based solution versus having to have a proprietary

22   based solution.  So, in terms of like ongoing operations, it

23   certainly simplified our day-to-day operations, our own

24   troubleshooting.  And really, when you think about the

25   preceding year, I think it was, to where we started

1    implementing this.  So in the 2012 time frame, we had several

2    outages and my team and myself were tired on being conference

3    bridges on Halloween, Christmas, New Years, Mother's Day,

4    Father's Day, every holiday.  So, there was a performance

5    issue that we were really trying to address.  There was also

6    a cost issue and we were spending several millions of dollars

7    a year for this hosting service by Synaverse to host this

8    service to run picture mail.  And as part of the overall work

9    that was going on inside of Sprint, the implementation of an

10   MMS server within our core network was much more cost

11   effective.  And it gave us the ability then to also have our

12   own engineering staff running and operating that equipment.

13   So, anytime, if there were an outage and you know, to the

14   best that we plan, there's always something that may come up

15   for a customer.  But now we could rely on our own staff, our

16   own engineering, our own processes to be able to troubleshoot

17   and rectify any issue that might occur associated with the

18   messaging service, not having to call out to a third-party

19   partner to rely on them to resolve a problem.

20        So, there was performance cost.  There was, I

21   mentioned the challenges with IPhone.  The equipment that was

22   contemplated and being installed in our core network

23   supported IOS without any additional development costs that

24   was required.

25        And there was a fourth reason, too and the fourth

Yarkosky - Direct                                95

1    reason was really around customer privacy.  We, as a carrier
2    regulated around customer privacy information and the picture
3    mail required development in order to be in compliance with
4    our own privacy regulations and rules.  And so, there was
5    again going to need to be a development project that was
6    roughly a million dollars or so in order to bring the picture
7    mail service to be compliant with our privacy requirements.
8    The equipment that was being installed within our core
9    network was already compliant with these requirements.  So,
10   those were the big reasons why we wanted to move traffic.  We
11   already had an abundance of traffic that could be migrated.
12   There was a cost consideration or cost savings for us.  And
13   then there was a customer privacy issue that we didn't have
14   to spend dollars to develop to address it, it would already
15   be addressed.
16   Q    Can I get you to turn to the exhibit that's in your
17   notebook that's marked as DX-216?
18   A    Sure.
19   Q    And Mr. Yarskosky, do you recognize this document?
20   A    Yes, I do recognize it.
21   Q    And can you tell the jury what it is.
22   A    Yeah, this document would be a typical form that we would
23   use with our executives in terms of requesting funding for
24   beginning a project or continuing to move a project forward
25   through the processes that we have developed internally.  So,

1    this would have been a document used to justify why we needed

2    to spend money in order to do a project.

3    Q    And what does this request for funding proposal cover?

4    A    This specific one, based on the title, is a project

5    request form or funding approval form to migrate CDMA MMS

6    picture mail traffic.

7    Q    Migrate it from where to where?

8    A    From Synaverse to our core network, to the Ecision MMSC.

9    Q    And can I get you to turn to the second page?

10   A    Yes.

11   Q    And you see the first sentence where it says, "The

12   purpose of this project is to migrate all OMA MMS client

13   devices to the Ecision MMSC, a wholly-owned and Sprint

14   managed platform."  Do you see that?

15   A    Yes, I do.

16   Q    And what does that mean?

17   A    Well, just as I was saying, this was -- the purpose of

18   this project was to take that, any traffic that was already

19   standard-based MMS traffic and migrate it over on to our core

20   network into the MMSC that was in our core network.

21   Q    And if you go a little down the page into, I think

22   there's some notes further down?

23   A    Oh.

24   Q    Do you see where it says "deployed in Sprint network?"

25   A    Yes, I do.

1   Q   And what is it -- well, what do you understand "deployed

2   in Sprint network to mean?

3   A   In and out sections, it talks about deployed in the

4   Sprint network and managed by Sprint resources.  And you

5   know, just as I was saying, that means that MMSC would be

6   deployed inside our core network and that Sprint engineering,

7   Sprint resources would be responsible for managing and

8   maintaining that platform.

9   Q   And you see further down on the page and Mr. Baird's

10  smarter than I am, he found them on the next page and do you

11  see where it says further down, it says, "Picture mail

12  platform as hosted Synaverse, giving Sprint little visibility

13  to help in performance of the platform."

14  A   Yes.

15  Q   Is that what you were talking about earlier?

16  A   Yes, it is.

17  Q   And then, if you turn two pages.  Got it?

18  A   Yes.

19  Q   Yes, the microphone gets in the way.  If you look at the

20  top, you say, "This project will transition all CDMA, OMA

21  compliant MMS traffic to the Sprint MMSC in Reston."  Do you

22  see that?

23  A   Yes, I do.

24  Q   And can you explain to the jury what the Sprint MMSC in

25  Reston means?

1    A    Yeah, so that is the MMSC and in Reston, Virginia is one

2    of the locations for our core network, where our core network

3    equipment is installed and managed and operated.

4    Q    Okay, if you could turn to the last document, I believe

5    it's labeled DX-9.

6    A    Okay.

7    Q    And do you recognize this document?

8    A    I recognize an e-mail, that my name is on to my former

9    boss.

10   Q    I think if you turn to the third page of DX-9, do you

11   recognize the attachment there?

12   A    Oh, yeah, I absolutely do.

13   Q    And can you tell the jury what this attachment is?

14   A    Yeah, this was a one-page, basically approval to what is

15   called our LRC or Lauch Review Committee.  And this would be

16   a standing committee of executives across different impacted

17   areas of Sprint, like our customer care team and our network

18   team, as well as our sales team, et cetera, our chief

19   operating officer.  And we would come in when a project was

20   ready to launch or to commence with that project.  It meant

21   that we had gone through all the testing, all the work and

22   everything else.  And so, this is really just a request form

23   to ask to proceed forward with all the work that's been done,

24   to launch whatever we were doing, into the network and for

25   customers.

1   Q    And what was this form requesting?

2   A    I think it states it right here at the top probably

3   pretty good.  It says it's recommending LRC approval or

4   Launch Review Committee approval to migrate a majority of

5   Sprint and boost multi-media messaging service traffic from -

6   - there should have been a from there -- Synaverse hosted

7   picture mail platform to the fully-owned core network Ecision

8   multi-media switching center.

9   Q    And it says, fully-owned core network MMSC, can you

10  explain to the jury what means?

11  A    Yeah, I mean that's kind of what we've been talking

12  about.  It's something that we purchased, installed in our

13  core network and integrated into that core network so that

14  then we could start migrating traffic into something that's

15  fully-owned, fully-managed by our own resources.

16  Q    All right, thank you, Mr. Yarskosky.  If you can bear it,

17  I've got two more quick topics I'd like to cover with you.

18  A    Sure.

19  Q    The first is cost.  When Sprint started offering SMS

20  service, did Sprint have to install new towers just for the

21  SMS service?

22  A    No, we did not.

23  Q    And why not?

24  A    When the network and when we planned the network,

25  particularly CMA 2000 network and ongoing, you always plan

1  the network based on what traffic you're going to carry and

2  that traffic was always contemplated as being voice messaging

3  and data.

4  Q   When Sprint is figuring out how much it costs to send a

5  text message, does it take the towers and the spectrum and

6  the switches into account?

7  A   Yes, it does.

8  Q   All right, one more quick topic.  How long have you been

9  dealing with SMS and MMS?

10  A   Well, I mean, I knew about SMS MMS when I was in RF

11  engineering, but directly responsible for SMS and MMS since

12  2010.

13  Q   And before this case, had you ever heard of or seen the

14  '870 Patent?

15  A   No, I have not.

16  Q   Thank you.

17          MR. RIOPELLE:  That's all my questions, your Honor.

18          THE COURT:  Thank you and it's not quite 20 minutes

19  of 5:00.  I think we'll recess for the --

20          MR. RIOPELLE:  Before you recess, can I move in

21  DX-9, DX-219 and DX-216?

22          THE COURT:  Is there any objection?

23          MR. HANGLEY:  No objection.

24          THE COURT:  Those three exhibits are received.

25          (Defense Exhibits 9, 219 and 216 received in

1    evidence.)

2         THE COURT:  And now, we'll recess a few minutes

3    early.  My day end instruction.  I haven't recognized any

4    reporters in the courtroom, but that doesn't mean that they

5    won't be able to pick up the transcript of what we did today.

6    The bottom line, if anything is published in any newspaper or

7    broadcast on radio or television and it deals with the case,

8    do not read and do not listen to it, do not view it.  The

9    reason as I told you before, you can probably give these

10   instructions to yourself.  You've got to decide this case

11   based solely on the evidence we hear and see in the courtroom

12   and not on the basis of anything a reporter might have said

13   about it.

14        Also, do not discuss the case among yourselves.  The

15   reason, you've got to wait until all the evidence is

16   received, until the attorneys have made their closing

17   arguments, until I have instructed you on the law and then

18   you may begin your deliberations.  Starting to talk about the

19   case now would be to prematurely, that is, too early start

20   your deliberations before all the evidence is received.

21        Finally, do not talk to anyone about the case.  And

22   I'm sure people at home are going to wonder, what have you

23   been doing all week and now you're into the second week.

24   What's going on down there.  You've got to tell them can't

25   talk to you about it until the case is over.  It's hard, it's

102

1    going to get harder, but I'm going to keep giving you these

2    instructions and know that it is important that you follow

3    them.

4         Is there anything we need to do before the jury is

5    excused for the day?

6         MR. HANGLEY:  I think not, your Honor.

7         MR. RIOPELLE:  No, your Honor.

8         THE COURT:  Then Michael, the jury is excused until

9    9:30 tomorrow morning.

10        THE DEPUTY CLERK:  All rise.

11        (Jury exits.)

12        THE COURT:  Be seated, everyone.  Is there anything

13   we need do tonight?

14        MR. GOETTLE:  Your Honor, I see one issue on the

15   horizon for tomorrow to deal with -- that we would like to

16   deal with either today or tomorrow morning.

17        THE COURT:  No, let's do it today.

18        MR. GOETTLE:  So, you might recall, your Honor, that

19   we moved in limine with regard to the playing of deposition

20   testimony from a third-party person, who is a doctor of a

21   Ph.D from representative of a company that supplied equipment

22   to Sprint.  And the reason that we objected to the playing of

23   the testimony was because we are alleging that certain LDAP

24   equipment in Sprint's network, is part of our infringement

25   case.  That's why we took the deposition to find out how that

1    equipment worked.

2           At the end of the deposition, Sprint's attorney

3    examined the witness, not with respect to the infringement

4    case, with respect to what was in the prior art.  Perfectly

5    fine for Sprint to do that.  But Sprint's expert then did not

6    rely on that technology, LDAP technology on expounding on why

7    that patent was invalid and that technology was called LDAP.

8           You ruled on the motion granting in part and denying

9    in part, but the part that you granted on is what I want to

10   focus on.  You granted to say and this is in -- I don't have

11   a docket number -- it's in an order that you signed on

12   January 24th.  And in the order, you granted -- you said "the

13   motion is granted with respect to LDAP evidence offered to

14   prove prior art LDAP technology.  The granting of the motion

15   with respect to such evidence is based on the fact that

16   Sprint failed to identify LDAP technology as evidence of

17   prior art on which Sprint intended to rely in support of its

18   invalidity evidence as required."

19          Now, I know that Sprint is going to tell you.

20   They're going to tell you, no, we're not going to play this

21   testimony but --

22              THE COURT:  Well, you didn't read the entire order?

23              MR. GOETTLE:  That's right, I'm going to there now.

24   I'm going to read the next part.

25              THE COURT:  Okay.

1          MR. GOETTLE:  Because I know what's coming.  So, the

2     next part is, the motion is denied to the extent the

3     evidence, the LDAP evidence is offered as evidence of

4     background information that is to show knowledge of a person

5     or ordinary skill in the art and then you cited the <u>Jesus</u>

6     case, computer case for, I think, for both the first

7     paragraph and the second paragraph.  For both the part that's

8     granting and the part is denying.

9          Here's the issue,  your Honor, we just put forward

10     our evidence of how LDAP technology infringes a couple of the

11     steps of the claims, okay.  I did not pick up on it when I

12     was reading the testimony -- the deposition testimony that

13     we're seeking to exclude.  I did not pick up on this until

14     today.  The first time I ever heard the word, Sinera, was

15     during Sprint's opening argument, Sinera.  I don't know if

16     the Court has heard the word Sinera before, but the Court has

17     heard a prior art called Huoptanini -- that's the H-U-O-P-T,

18     weird spelled name.  The parties have never referred to that

19     prior art as Sinera, not once, in discovery.  Never once.

20     But in opening, I heard the word, Sinera, I didn't even know

21     what prior art reference it was talking about, I had to ask

22     somebody after the opening.  It turns out sinera owns or came

23     up with the Huoptanini reference.  I guess Mr. Huoptanini or

24     Ms. Huoptanini was an employee of Sinera.

25          It just so happens, your Honor, that part of the

1    best designated testimony for this third-party witness is

2    going to talk about his work in Sinera on LDAP.  And again,

3    your Honor, this is where I'm concerned about what the jury

4    is going to infer from that.  If LDAP infringes now, during

5    the damages period and the witness is talking about LDAP

6    during his work at Sinera in 1999, then the jury is going to

7    infer, well, if there can't be infringement, because then the

8    patent was already old.  It would have been fine for Sprint

9    to go ahead and present this in their expert report, to

10   present LDAP technology in their expert report.  They didn't

11   mention it once.  Counsel, at the pre-trial conference

12   admitted that it wasn't in there and they should not be able

13   to play this testimony and leave that cloud, hanging like a

14   bubble over the courtroom that no one's ever going to pop, no

15   one's ever going to address, because the expert didn't opine

16   about it.  If he had, we would not be raising this motion, we

17   would have taken discovery and found what it was about LDAP

18   that was actually known in 1999.  But we think it's unfair

19   that they are going to play this testimony and leave that

20   cloud and I think we're going to hear it in closing argument.

21              THE COURT:  Well, the order limits -- you've made

22   this argument before --

23              MR. GOETTLE:  I have.

24              THE COURT:  -- and quite frankly this is -- although

25   this is a Northern District of California case, it was based

1    on Federal Circuit law and it draws the distinction between

2    evidence of prior art and evidence that it's considered,

3    quote, "background on the issue of what would be known to a

4    person having ordinary skill in the art."

5            MR. GOETTLE:  Your Honor, procedurally this case is

6    not helpful to the Court to this issue because procedurally

7    in ASUS Computer the art had been disclosed in the expert

8    report, the art had been disclosed in the expert report.  The

9    reason that the Court excluded it was because it had not been

10   disclosed in invalidity contentions.  So that's why they were

11   allowed to talk about it as background information because it

12   had been disclosed.

13           THE COURT:  Well, and I understand --

14           MR. GOETTLE:  Okay.

15           THE COURT:  -- that there's that slight difference,

16   but I thought the disclosure as it was disclosed -- and I've

17   forgotten the doctor's name, it began -- it begins with a T,

18   Tirana or something --

19           MR. FINKELSON:  It's Dr. Tirana.

20           MR. GOETTLE:  Tirana.

21           THE COURT:  -- was sufficient.  You were on notice.

22   When was that deposition taken?

23           MR. GOETTLE:  During the discovery period.  I was on

24   notice, you're right, your Honor, but if Dr. Polish had put

25   it in his report we would have researched it and if we had a

1    good basis, which I think we would have, which is I think why

2    we're not having a full-blown LDAP discussion in the

3    invalidity case, if Dr. Polish had put it in his report we

4    would have responded to it.

5              MR. FINKELSON:  May I respond, your Honor?  Do you

6    need me to?

7              THE COURT:  Well, I disagree with you on one issue.

8              MR. FINKELSON:  Okay.

9              THE COURT:  You say this is an issue that the jury

10   will spot immediately as an issue that is raised with no

11   answer.  Have you been watching the jurors?  I think there

12   are lots of issues they're not going to get.  We had a

13   witness who spoke about nothing but LDAP and I'm not so sure

14   the jury got the significance of that testimony.  But you're

15   trying the case, you're presenting this hyper-technical case.

16   I haven't had very many patent cases, but I doubt that there

17   are any that are more complicated than this one.  And I'm

18   watching the jury and hoping that we don't end up with a

19   deadlocked jury or a jury that gets it dead wrong.  But

20   you're running that risk.  You've got -- well, you can see

21   what the jury -- how the jury is reacting.

22              As far as this issue is concerned, I'll hear from

23   Sprint and then decide, maybe I'll need something else, but I

24   don't think this is any different than the issue that I

25   addressed and decided.  And you've told me that it's -- and

1   I've forgotten the name, the new name that was --

2           MR. GOETTLE:  Sinara (ph).

3           THE COURT:  Yes.  You said that's related to

4   Waponemi (ph), which I did rule on.

5           MR. GOETTLE:  I did, your Honor.

6           THE COURT:  And did I rule in or out?  The orders in

7   this case are voluminous.

8           MR. FINKELSON:  In.  And I refer to it as Sinara

9   because I can't pronounce Waponemi over and over

10  again --

11          THE COURT:  Well, why -- if we pronounce it

12  Waponemi, do we have an objection?

13          MR. FINKELSON:  Well, I think I can even cure it

14  another way, because what Mr. Goettle is referring to is

15  literally a list of this witness offers a laundry list of

16  companies for which he provided LDAP services as a vendor and

17  I believe Sinara is on that laundry list and we'll take it

18  out.  The reference to Sinara is in there because it's in the

19  testimony and it's been there forever, it has nothing to do

20  with the Sinara prior art and we weren't using it that way.

21  It's literally a list of I did it for so-and-so, for so-and-

22  so, for so-and-so, for so-and-so.  This is a non-issue, we'll

23  take the Sinara sentence out of the clip, and it falls

24  directly within paragraph 2 of your Honor's order.

25          THE COURT:  Does that cure the problem?

1          MR. GOETTLE:  Respectfully, your Honor, it's not a

2    non-issue.  They are going to be raising this LDAP technology

3    not as background about what a skilled artisan would know,

4    they're going to say that it renders the claim invalid

5    because LDAP in combination with the Sinara reference

6    encompasses the claim.  It's not just for background.

7          THE COURT:  Well, that's what a person of ordinary

8    skill in the art would say.  The difference between offering

9    it as evidence of prior art and offering it as background is

10   -- well, the case made the distinction, I quite frankly -- I

11   can tell that there's a difference in the words, I don't know

12   that the result would be any different, but you're asking me

13   to reconsider the order; you didn't say that.

14         MR. GOETTLE:  Well, I'll be honest with you, your

15   Honor, I wasn't sure what the distinction is between 1 and 2

16   either and to me this fits into 1.

17         THE COURT:  Except that's the way you argued the

18   motion.  It was a Comcast --

19         MR. GOETTLE:  It was --

20         THE COURT:  -- motion in limine --

21         MR. GOETTLE:  -- yes.

22         THE COURT:  -- and that's the way you argued.

23         MR. GOETTLE:  Okay.

24         THE COURT:  And the cases say that although if you

25   don't list prior art specifically and put your opponent on

1    notice of the prior art on which you will rely based on court

2    orders then you cannot seek to offer that prior art as

3    evidence of prior art.  But it goes on to say -- the cases go

4    on to say that you can offer that evidence as background

5    information on what a person of ordinary skill in the art

6    would know.  That's what the cases say, is that correct?

7         MR. GOETTLE:  That is, your Honor, but when they say

8    prior art in the ASUS case what they're talking about is you

9    can't offer it for the invalidity basis.  You can offer it

10   because sometimes -- it's not coming up in this case, but in

11   patent cases sometimes there's a dispute between the parties

12   on what -- on who qualifies as a skilled artisan.  If there's

13   a dispute on who is qualifying as a skilled artisan, then the

14   background evidence comes in to prove that.

15        THE COURT:  I think I have -- I have these files

16   here.  They only measure, I don't know, six inches.  I

17   think --

18        MR. GOETTLE:  Okay.

19        THE COURT:  -- I think the distinction between

20   background information and evidence of prior art was

21   addressed in your motion, in your motion papers.  Now all

22   you've got to do is remind me of which one, Comcast motion

23   number 1 or number 2.

24        MR. GOETTLE:  It was number 2.

25        THE COURT:  What page?

1          MR. GOETTLE:  I don't know.

2          (Pause.)

3          THE COURT:  Well, there you've argued exactly as

4    you've argued today, but I don't think you make the

5    distinction you made just a few moments ago.

6          MR. GOETTLE:  It literally just popped into my head

7    on how background could possibly be relevant in a case.  So

8    if --

9          THE COURT:  Well, what you're saying today is

10   background cannot be offered on the issue of invalidity; you

11   didn't say that before.

12         MR. GOETTLE:  You're right.

13         THE COURT:  Well, I'll hear from you, Mr. Finkelson.

14   I'm looking, I'll see what you said.

15         MR. FINKELSON:  I think, your Honor, at the hearing

16   on the motion in limine the focus was on the very same

17   distinction between paragraphs 1 and 2 that are set forth in

18   your order when your Honor pointed to the ASUS case and that

19   is the difference between listing an item of prior art and

20   saying the patent is invalid over this piece of prior art,

21   which is paragraph 1 of your order, we can't do that and we

22   do not plan to use Dr. Tirana's testimony for that purpose.

23         And then paragraph 2 is if the testimony is

24   presented as evidence of background information to show the

25   knowledge of the person of skill in the art.  The knowledge

112

1    of the person of ordinary skill in the art are the eyes
2    through which the invalidity question is addressed, is it
3    invalid through the eyes -- or to one of ordinary skill in
4    the art at the time of the invention.  And that's the
5    distinction the cases make, that you could use the evidence
6    as background evidence that goes to as to what that knowledge
7    is as distinguished from prior art itself.

8            So for example, your Honor, if we were coming in and
9    saying to the Court and saying to this jury Dr. Tirana worked
10   on version X of LDAP technology in X year and we put that art
11   in front of the jury, we take the jury through that art and
12   show how it meets all of the elements of Claims 1-7 and 1-13,
13   that would be using that technology as prior art within the
14   scope of paragraph 1 of your Honor's order, that's not what
15   we're doing.  Dr. Tirana's --

16           THE COURT:  Well --

17           MR. FINKELSON:  -- testimony just speaks to what a
18   skilled artisan at that time would know about database
19   technology including LDAP.  And this is exact -- this is the
20   very same issue that was presented by the motion, the only
21   thing different is that somehow the reference in the
22   testimony which Comcast has known about, the deposition has
23   been around for a long time, the reference to Sinara and
24   somehow that we may be confusing the jury by linking Dr.
25   Tirana's testimony to Sinara, which is not our intention.

1          THE COURT:  Well, you make the point in your

2    response to the motion that the knowledge of skilled artisans

3    is relevant to Sprint's invalidity defense and it's under

4    that niche that you seek to offer Dr. Tirana's testimony.

5          MR. FINKELSON:  That's correct.

6          THE COURT:  You cite a number of cases.  I don't

7    recall reading them all, I know I read ASUS and Fuji Film.

8    Are there any cases that are more close to the issue that

9    we're presented with now?

10         MR. FINKELSON:  I think we've put forward in our

11   briefing, your Honor, the ASUS case and the other cases we've

12   cited are the issues we found that are closest, which is

13   those cases in which the Court draws the very distinction

14   that your Honor drew in Docket Entry 377, which is you can't

15   put it on as prior art, but you can put it on to show the

16   knowledge of a skilled artisan at that time.  That's what

17   those cases as we read them stand for, that's how we

18   understood your Honor's order, and that's exactly how we

19   intend to present --

20         THE COURT:  Well, the question that I have then is

21   this a distinction without a difference?  I relied on the

22   ASUS case, but now Mr. Goettle is arguing again that it's a

23   distinction without a difference, although now he says

24   background information should not be admissible on the issue

25   of invalidity.

1          MR. FINKELSON:  I don't think -- well, maybe Mr.

2     Goettle can say if that's what he's arguing.  I think he's

3     just saying that this testimony can't be introduced to show

4     the knowledge of a person of ordinary skill in the art,

5     because there's no question in the case law that you're

6     allowed to present testimony in an invalidity case about the

7     knowledge of a skilled artisan, I don't think there's any

8     case law that is contrary to that proposition.

9          THE COURT:  Well, I don't know that there's any case

10    law that says you can't bring it in as prior art, but you can

11    bring in the same evidence as knowledge of what a person of

12    ordinary skill in the art would know.

13         MR. FINKELSON:  I think it -- I mean, I don't have

14    ASUS in front of me and I don't want to misspeak, but I

15    believe it draws that distinction, your Honor.

16         THE COURT:  I do.  I have ASUS, KSR, and I think one

17    other case in front of me.

18         (Pause.)

19         MR. FINKELSON:  I apologize, your Honor, I did not

20    know this was going to be reargued and so I didn't have the

21    cases at my disposal this afternoon.

22         THE COURT:  Well, let me read what ASUS says.

23    "Because Wolf was not disclosed in ASUS's infringement

24    contentions" --

25         MR. GOETTLE:  And I think that means invalidity.

1   Sorry to interrupt you, your Honor, but just so it's clear.

2           THE COURT:  I think you're right, because that

3   doesn't -- it doesn't --

4           MR. GOETTLE:  Make sense.

5           THE COURT:  -- make sense -- "the Court strikes

6   Baker's report to the extent that Baker relied on Wolf as an

7   anticipation or obviousness reference."  That's the ability,

8   that makes sense.  "However" -- next sentence -- "However,

9   Baker may use Wolf for other purposes, e.g. to show the

10  knowledge of a person having ordinary skill in the art,"

11  which is exactly --

12          MR. GOETTLE: That is a fair outcome.  You know why,

13  your Honor?  Because it was in the expert report and so the

14  other party had the chance to take discovery on it, knew what

15  the expert was going to say.

16          THE COURT: You could have done the same thing with

17  Tirana.  And you could have asked Dr. Polish the same

18  question.  You spent a lot of time on Helvath (ph) in this

19  case.  And I don't think you were caught by surprise.  You

20  could plead surprise, you could have taken another deposition

21  –

22          MR. GOETTLE: Okay.

23          THE COURT:  – but I don't –

24          MR. GOETTLE: I certainly would never make a

25  misrepresentation to the Court.

1          THE COURT: Well, we're remedying the situation that

2     caused you to be on your feet, the situation of the prior art

3     reference.

4          MR. GOETTLE: Okay, thank you, your Honor.

5          THE COURT: Are you going to go back to Rothmini?

6          MR. FINKELSON: No.  I'd let the evidence reflect for

7     the reasons why.

8          MR. GOETTLE: We're fine with Scenarez (ph), your

9     Honor.

10         MR. FINKELSON: I'll take out the reference to

11    Scenarez.

12         MR. GOETTLE: We're fine with Scenarez.  I thought

13    that was a good idea.  I thought that's why it came up, but

14    ...

15         MR. FINKELSON: It's not.

16         MR. GOETTLE: Okay.

17         MR. FINKELSON: We'll take out that –

18         THE COURT: Let me see who authored that opinion.

19    Most of the decisions, I shouldn't say that before I read –

20    many of the decisions in the Northern District are by

21    Magistrate Judges.  Yes, I don't know Magistrate Judge

22    Cousins.  But I've ruled –

23         MR. GOETTLE: Okay.

24         THE COURT: And I based my ruling on ASUS.

25         MR. GOETTLE: Thank you, your Honor.

1          MR. FINKELSON: Thank you, your Honor.

2          THE COURT: Are there any other?

3          MR. RIOPELLE: Yes, your Honor.

4          THE COURT: Yes.

5          MR. RIOPELLE: There are two motions, one which my

6    colleague Mr. Lowery is going to argue which is a Jamal (ph)

7    motion now that they amended their case.  But before he does

8    that I need to renew one motion just for the record.  We had

9    moved to exclude Ms. Riley's testimony under Daubert, based

10   upon what we believe is an improper step counting

11   methodology.  The Court denied our motion, but said it was

12   without prejudice to raise based on the evidence as it came

13   into trial.  And just so the record is clear and I have a

14   definitive ruling –

15         THE COURT: You have a definitive ruling unless the

16   evidence changed.  What's the change in the evidence?  What

17   changed between I ruled and the time that you're making your

18   –

19         MR. RIOPELLE: I think the change in the evidence is

20   now definitive and clear and Dr. Akl – let me back up.

21   Ms.Riley said she wanted to come up with a percentage of the

22   steps using the '870 divided by all of the steps and sending

23   or receiving an SMS or an MMS message.

24         Dr. Akl said when he was testifying that he did not

25   include all the SMS, all the steps in sending or receiving an

1   SMS or an MMS message.  He did not include the routine steps,

2   for example, what he called routine steps, going from the

3   phone to the base station, going from the base station to the

4   mobile switching center.  So I think the evidence is clear

5   that he did not do all the steps and that's what she was

6   looking for.  So we believe that is an improper methodology,

7   and I'm just renewing the motion for the record.

8         THE COURT: In my ruling I said it was subject to

9   reconsideration if warranted by the facts presented at trial

10  and applicable law.  And I also said in ruling on the motion

11  that cross-examination was the way to address the issue that

12  you're raising now, and you raised it on cross-examination.

13  It's for the jury to decide.

14        MR. RIOPELLE: I understand.

15        THE COURT: Fine.

16        MR. RIOPELLE: It's just the appellate rules, I have

17  to have a definitive ruling.

18        THE COURT: Well, this gives you some way to fill out

19  the day.  It's only five after 5:00.

20        MR. LOWERY: I get to – right now I've got enough

21  stuff to talk for days.

22        THE COURT: The renewed motion to exclude the

23  testimony of Ms. Riley is denied.

24        MR. LOWERY: Your Honor, Justin Lowery for Sprint.

25        THE COURT: Yes, Mr. Lowery.

119

1        MR. LOWERY: Sprint is moving for judgment as a

2   matter of law under Rule 50(a) because we believe there's no

3   legally sufficient evidence for a reasonable jury to find for

4   Comcast for both issues of infringement and issues of

5   damages.

6        With respect to issues of infringement, Sprint first

7   believes that Dr. Akl who is the only witness for Comcast

8   that testified on behalf of issues of infringement, the only

9   person who put forward evidence used a legally improper

10  standard in judging infringement.  In particular he looked in

11  the abstract as to whether messaging servers as a concept was

12  essential to a 1999 (inaudible).  And the issue in this case

13  is whether Sprint's accused messaging servers are internal to

14  its cellular network and internal to its core network from

15  the years 2006to present.

16       Dr. Akl's analysis is legally flawed because you

17  have to construe claims as of 1999 but analyze infringement

18  from 2006 to present.  That wasn't what was done here, and in

19  fact Dr. Akl was clear in the testimony he gave to the jury

20  that he was basing his essentiality analysis of a 1999 view

21  of a cellular network as opposed to what was essential or

22  what Sprint had implemented from 2006 to present.  Dr. Akl's

23  analysis essentially relitigates issues of claims

24  construction that were decided in the 1999 lens as opposed to

25  putting the facts of Sprint's cellular network from 2006 to

1    present for the jury as should have been done.

2         Second, even granting Dr. Akl's premise, he did not

3    present sufficient evidence of what Sprint's messaging

4    servers actually did in terms of them being external to

5    Sprint's cellular network.  He primarily relied on three

6    documents.  None of the documents mentioned Sprint's cellular

7    network.  None of the documents mentioned Sprint's core

8    network.  None of the documents said Sprint's messaging

9    servers were external to Sprint's core network.  It was

10   instead his own interpretation of those documents drawing

11   boxes around various parts of those documents.

12         THE COURT: Well, he relied on functionality.

13         MR. LOWERY: Yes.  He relied on functionality which

14   goes back to his first 1990 analysis, but he also in terms of

15   looking at the documents kind of drew boxes and said you

16   don't have a messaging server here, here's a cellular

17   network, here's a core network in terms of his primary

18   document for cellular network when the evidence shows that

19   document has nothing to do with messaging.  It had nothing to

20   do with defining Sprint's cellular network.  And in terms of

21   the messaging documents he looked at, he looked at two

22   primary messaging documents: One, which he said define the

23   components of a messaging network, when in fact the document

24   when you looked at its text and said, said messaging

25   components are part of Sprint's cellular network.  And he

1    looked at a high level messaging architecture taking out

2    components he said were internal in order to establish a

3    messaging network that didn't exist in the document itself.

4    Those were his three primaries of evidence.

5              THE COURT:  I've forgotten.  Is this an argument

6    that was raised in Sprint's motion in limine or Daubert

7    motion?  There was a separate Daubert motion with respect to

8    Dr.Akl.

9              MR. LOWERY: Yes.  There was a motion in limine which

10   we filed with your leave a couple months ago with respect to

11   Dr. Akl in terms of his analysis going against the Court's

12   claim construction in terms of restricting a cellular network

13   to Comcast's old –

14             THE COURT: I invited that motion.

15             MR. LOWERY: Yes, you did, sir.

16             THE COURT: Thinking that it would, well, at least

17   address an issue that you said should be decided as a matter

18   of law, and I disagreed with you –

19             MR. LOWERY: Yes, your Honor.

20             THE COURT:  – and denied that motion as well.  I

21   think that was the last motion on liability that I – that was

22   done in December or even – when did we issue that opinion?

23             LAW CLERK: November 8th you ruled on it.

24             THE COURT: Before the final – I wrote on it before

25   the final pretrial conference.

1          All right, you may proceed.

2          MR. LOWERY: So with respect to the evidence that Dr.

3    Akl did present, we believe his opinions with regard to it

4    were conclusory, without support, without support of the

5    documents themselves and were just simply his own opinion

6    with nothing behind it in terms of what those documents said

7    and what those documents represented.  For that reason, an

8    expert's conclusory opinion is not enough to establish –

9    especially an expert's conclusory opinion on the ultimate

10   fact of infringement is not enough to establish or meet

11   Comcast's burden.  For that reason Sprint is entitled to

12   judgment as a matter of law with respect to issues of

13   infringement.

14          THE COURT: Thank you.

15          MR. LOWERY: Second with respect to issues of

16   damages, and this will at least touch on some of the issues

17   that Mr. Riopelle has addressed, Sprint moves for judgment as

18   a matter of law under Rule 50(a) because there is no evidence

19   upon which a reasonable jury could find a legally sufficient

20   evidentiary basis to adopt Comcast's damage analysis.  That

21   is both for the reasons that Mr. Riopelle noted in terms of

22   Ms. Riley's analysis not taking into effect the full scope of

23   the call flow of all of the parts that are involved in

24   sending an SMS –

25          THE COURT: She said she – yeah, she relied on the

1    call flow.  It was a Sprint document.

2           MR. LOWERY: Yes.  And that Sprint document left out,

3    as Mr. Riopelle noted, the mobile switching centers, the base

4    stations and other pieces that Dr. Akl admitted on the stand

5    were necessary for sending an SMS or MMS message.  And the

6    damages case law is clear that you need to, when

7    apportioning, when taking the entire profits for something,

8    such as SMS or MMS as Mr. Riley did, you need to apportion

9    down, you need to take into account the entire scope of the

10   call flow, the entire every step.  And what Dr. Akl admitted

11   in cross-examination is that's not what he did.  He left out

12   what he considered routine steps that happened every day,

13   that happened for voice, that happened for data, but you

14   still have to take those into account when apportioning down

15   to the appropriate damages number.  And Dr. Akl didn't do

16   that.  Ms. Riley relied on that when coming up with her

17   damages number, and therefore he damages number lacks

18   sufficient legal basis or evidentiary support.

19          And last, with respect to the issue of costs as was

20   addressed by Mr. Webber, given that Mr. Webber failed to

21   account for significant costs in terms of the radio axis

22   network which represent tens of billions of dollars to Sprint

23   in terms of coming up with this cost analysis, his analysis

24   also lacks evidentiary support, and Sprint is entitled to

25   judgment as a matter of law with respect to damages on that

124

1    issue.

2              THE COURT: On the last issue you're talking about

3    the fact that he did not allocate cost of the Spectrum, the

4    towers, the base station and the – there's one other item– to

5    the SMS MMS system because they didn't add any costs.  The

6    infrastructure was in place and they were added at no

7    additional cost.  And if they were shut down, there would be

8    no cost saving.  That was his basis for doing that.

9              MR. LOWERY: Yes, and we believe his basis for that

10   support, but in terms of that isn't a reason you could leave

11   those costs out.

12             THE COURT: Thank you.

13             MR. LOWERY: Thank you, your Honor.

14             MR. GOETTLE: Your Honor, you want an oral response

15   now?

16             THE COURT: As opposed to?

17             MR. GOETTLE: I didn't know if this was preservation,

18   oral preservation with followup with written briefing in

19   response.

20             THE COURT: No.  (Laughter.)  No.  I was about to

21   answer but I wanted to make it more emphatic.  No.  We're not

22   going to follow this up with briefing.  I don't generally do

23   that, and I'm not doing it in this case.  I don't need more

24   briefs.  I have quite a few briefs here, and this is only a

25   part of them, and I've got enough to do.  So yes, I want oral

1    argument and I'm going to rule before we leave the courtroom

2    tonight.

3              MR. GOETTLE: Can I approach, your Honor?

4              THE COURT: Yes.

5              MR. GOETTLE: Your Honor, as I understood it and as I

6    understood it from the presentation I just heard, the first,

7    Jamal is with respect to Dr. Akl.  The first reason under Dr.

8    Akl was because he only looked at the 1999 cellular network

9    and what a 1999 cellular network looked like and did not

10   compare to Sprint's network in the damages period here.

11             That is not what Dr. Akl said.  Dr. Akl testified in

12   detail about Sprint's Converse, prior Converse SMSE's which

13   were in the network from 2006 until about 2010, I think.

14   Then he testified about Sprint's decision SMSE's.  He

15   testified about Sprint's decision MMSE's.  And he at no point

16   said that his analysis of what a core network is, or I don't

17   believe I heard this at all, he nowhere said that his

18   analysis only applied in the 1999 time frame as opposed to

19   his analysis applying equally today as in 1999.

20             What he did say with respect to the time lag between

21   1999 and now is that today SMS is big business.  And so maybe

22   you don't buy a phone that doesn't offer an SMS service on

23   it, but that doesn't mean it makes it a core network element

24   for the operation of the cellular network.

25             I do think that this part is what was at play in the

1   Court's ruling on the motion in limine, the later one with

2   respect to Dr. Akl.  It kind of played part and parcel with

3   this.

4          THE COURT: Well, I ruled to the extent that Dr. Akl

5   did not accept the Court's definition of core network,

6   cellular network or adopted a construction of that term that

7   was inconsistent with the construction adopted by the Court.

8   I granted the motion to that extent.  And I heard cross-

9   examination questions on this issue.  But I don't believe Dr.

10  Akl's opinion was based on the construction of the term

11  cellular network that was different than the Court's

12  construction of that term, or that it was inconsistent in any

13  way with the construction adopted by the Court.  Again he was

14  questioned at length, but I agree with you on that issue.

15  And to that extent the motion is denied.  The first argument

16  is denied.

17         MR. LOWERY: Your Honor, I just wanted to get it into

18  the record so it's –

19         THE COURT: It's in the record already.  You made

20  this argument before.

21         MR. LOWERY: No, this particular sentence in terms of

22  him making the 1999 arguments, his counsel addressed that.

23  The cite we have is at page 139, lines 2 to 6 of the February

24  2nd, morning session before the Court.  Dr. Akl said we have

25  to look at functionality.  We have to determine is a core

1    essential, not just essential in general, but essential for

2    business.  It has to be essential for a cellular network in

3    1999.  That was what he told the jury.  That is what our

4    concern is, is basing that 1999 analysis with that.

5         MR. GOETTLE: Your Honor, he's not saying that

6    doesn't apply equally today.  But core network, what core

7    network elements are in 1999 can't change because if they

8    change, then the scope of the claim coverage would be

9    changing over the life of the patent.  And the whole purpose,

10   we saw the patent video, the whole purpose of the claim is to

11   set the metes and bounds.  Those metes and bounds cannot

12   change, so that's what Dr. Akl is saying.  But he wasn't

13   saying that it wouldn't apply equally today, and I don't know

14   what he would say, but I suspect he would tell you core

15   network elements are the elements that get the phone to talk

16   to other networks.  That's the same today as it was in 1999.

17        THE COURT: Well, the motion is denied in that

18   regard.

19        MR. GOETTLE: I think the second motion on Dr. Akl

20   had to do that, I think it was he didn't prove that Sprint's

21   messaging servers were external because he only looked at

22   three documents and drew boxes on those three documents.

23   That is not what Dr. Akl testified to whatsoever.  What he

24   did was he presented demonstrative slides for the jury so the

25   jury would understand this super technical case and why and

1  how he did his analysis, what Sprint's network looks like,

2  how he did his analysis.  He took documents and he used those

3  documents to make what I thought was very clear testimony

4  that I think the jury did understand.  But certainly he

5  testified over and over again that he looked at a lot of

6  documents.  We put a lot of them into evidence and he didn't

7  just take the documents and rely on the documents.  He also

8  reviewed deposition testimony that confirmed for him what was

9  in the documents.  For that reason we think the second motion

10  should be denied.

11          THE COURT: I agree with you with respect to the

12  second motion.

13          And the third motion, step counting and Ms. Riley

14  relying on Dr. Akl's steps, I don't think we need any more

15  argument on that issue.  That was argued initially either the

16  in limine motions or the Daubert motions.  And I ruled that

17  although there might be a quarrel without Dr. Akl counting

18  steps, it was not inappropriate to count steps as he did and

19  it was not inappropriate for Ms. Riley to rely on Dr. Akl's

20  step count.  Any differences can be addressed – were

21  addressed in cross-examination.

22          MR. GOETTLE: Thank you, your Honor.

23          THE COURT: The motion is denied.

24          MR. GOETTLE: And the last – there's one more damages

25  issue related to costs and taking into account the Spectrum

1   and the costs of the base station systems.  Fundamentally

2   what it boils down to is whether under Sprint's theory

3   whether it should have been those costs should have been

4   counted twice.

5          THE COURT: No, I think Sprint is arguing that those

6   costs should have been allocated to the SMS and MMS systems

7   and they weren't.

8          MR. GOETTLE: Respectfully, your Honor, I think they

9   were because they were taken into account in figuring out

10  Sprint's profit with respect to its voice, its overall

11  operating profit.

12         THE COURT: What would the result have been had these

13  costs been allocated over all of Sprint's operations?

14         MR. GOETTLE: I don't know, your Honor.  I don't know

15  if we –

16         MR. HANGLEY: There was testimony on it today.  I

17  think it was Mr. Webber said he thought the difference in the

18  bottom line on this allocation would have been one percent or

19  less.

20  Because those costs are already allocated somewhere what

21  happens is you would have to take them out of the – what'll I

22  call it? – credit against profit that an expense

23  characterizes in one area and move it into another area.  But

24  the amount of money wouldn't increase.  The amount of the hit

25  on profitability overall wouldn't increase, it would stay

1   exactly the same.

2          THE COURT: Well, because of the different categories

3   I'm not sure how that would impact on damages.

4          MR. HANGLEY: Well, what Mr. Weber and I think it was

5   a guesstimate, but what he said was he thought it would be

6   the one percent neighborhood, as I recall the testimony.  We

7   don't have the transcript yet so I can't look it up but I

8   think that's what he said.

9          THE COURT: No, he did say, he did mention one

10  percent.  But I thought he was talking about – well, if he

11  was talking about costs, he had to be talking about profits

12  as well.

13         MR. HANGLEY: Sure.

14         THE COURT: But the way the profits were divided, I'm

15  just – I'm sitting up here trying to learn the technology.

16  I'm not so focused on those spreadsheets.  And the bottom

17  line, I'm not certain that the result is the same.  But

18  having said that, I think there's a basis for the allocation

19  is made by Mr. Webber and relied on by Ms.Riley.  The defense

20  doesn't agree with him, and I've forgotten the phrase, but

21  the issue is whatever the phrase is it deals with the fact

22  that the SMS and MMS service didn't cost any more in the way

23  of infrastructure other than the infrastructure that was in

24  place.

25         MR. HANGLEY: No, implemental costs of

1   THE COURT: And if the SMS and MMS services were

2   discontinued, there would be no cost saving.  I've forgotten

3   the phrase that –

4   MR. HANGLEY: Was it avoidable cost?

5   THE COURT: Maybe.  Cost causation is the phrase that

6   he used.  Added cost of a system.  Reduced cost when you cut

7   out the system.  And so there's evidentiary support for what

8   he said.  The jury might not agree.  And again, I'm not

9   certain that the result is the same.  I'm not saying that.

10   What I am saying is there's evidentiary support for the

11   position taken by Comcast.  So the motion is denied in its

12   entirety.

13   MR. GOETTLE: Thank you, your Honor.

14   MR. LOWERY: Thank you, your Honor.

15   MR. HANGLEY: Thank you, your Honor.

16   THE COURT: All right, is there anything else we

17   have?

18   Ian tells me we have binders for all the other

19   witnesses.  We have one for Mr. Kalinoski.  But not one for

20   the last Sprint witness that's coming.

21   MR. FINKELSON: May I approach, your Honor?

22   THE COURT: Yes, you may.

23   MR. FINKELSON: That's for Mr. Yarkosky.

24   THE COURT: Anything else we have to put on the

25   record?

132

1            MR. HANGLEY: I think not.

2            MR. FINKELSON: No, sir.

3            THE COURT: Let's go off the record.

4            (Court adjourned for the day at 5:24 o'clock p.m.)

133

```
 1                           INDEX
 2   WITNESSES               D        C        RD        RC
 3   James Webber
 4     By Mr. Riopelle                3
 5     By Ms. Melley                           29
 6   Scott Kalinoski
 7     By Mr. Finkelson      44                79
 8     By Mr. Hangley                 66                 80
 9   Mark Yarkosky
10     By Mr. Riopelle       84
11                           - - -
12   EXHIBITS                        RECEIVED IN EVIDENCE
13   PD-, PD-5                               34
14   PD-1, PD-2                              36
15   DX-16                                   52
16   DX-9, DX-219,DX-216                    100
17                           - - -
18
```

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET          Date 2/6/17
Laws Transcription Service