IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| COMCAST CABLE COMMUNICATIONS, LLC, et al., Plaintiff | : | CIVIL NO. 12-859 |
| v. | : | |
| SPRINT COMMUNICATIONS COMPANY L.P., et al., Defendant | : | Philadelphia, Pennsylvania February 7, 2017 9:36 a.m. |

- - -

TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 7
BEFORE THE HONORABLE JAN E. DUBOIS
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:

WILLIAM T. HANGLEY, ESQUIRE
Hangley, Aronchick, Segal, Pudlin & Schiller
One Logan Square
27th Floor
Philadelphia, PA 19103

DANIEL J. GOETTLE, ESQUIRE
Baker & Hostetler, LLP
Cira Center
12th Floor
2929 Arch Street
Philadelphia, PA 19104

APPEARANCES: (Continued)

For the Defendant: DAVID E. FINKELSON, ESQUIRE
BRIAN C. RIOPELLE, ESQUIRE
McGuire Woods, LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219

COLLEEN H. SIMPSON, ESQUIRE
Harkins Cunningham, LLP
4000 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

\- - -

Audio Operator: Michael Cosgrove

Transcribed By: Michael T. Keating

\- - -

Proceedings recorded by electronic sound recording; transcript produced by computer-aided transcription service.

\- - -

(The following was heard in open court at 9:36 a.m.)

THE COURT: Good morning, everyone.

ALL: Good morning, Your Honor.

THE COURT: Please be seated.

MR. RIOPELLE: Would you like Mr. Yarkosky back on the stand?

THE COURT: Yes, that would be good.

(Pause in proceedings.)

THE COURT: Good morning.

THE WITNESS: Good morning.

CROSS-EXAMINATION

BY MR. HANGLEY:

Q Good morning, Mr. Yarkosky.

A Good morning.

Q Will you remind us of your title at Sprint?

A Yes, I'm the Director of Product Development and Management for Value-added Services and Core Services.

Q Okay. Now, when did you get that title?

A My -- I've had the title of Product Development Management for those services since 2010.

Q I'm sorry. You've had the title for -- the identical title since 2010?

A I've had the title of Director of Product

Development and Management for --

Q Since 2010?

A Yes.

Q And then when did it change?

A Change?

Q You added something about value-added products and core services?

A The value-added services over the course of the last couple of years, there's been more of an emphasis on value-added services.

Q Okay.

A That's been added to my title.

Q And when was core -- when were core services added to your title?

A Core services have always been part of the responsibility of my title.

Q I didn't ask about the responsibility, sir. I asked when your title was changed to include core services. This year?

A No.

Q Last year?

A It -- as we -- my title in the last few years has evolved, so in the --

Q But there comes a time --

A Yeah.

Q -- when they give you a new business card, doesn't there? I'm sorry I interrupted. I don't intend to.

A Yep.

Q It's a contest between my following the rules and my inherent rudeness.

THE COURT: I would suggest following the rules.

MR. HANGLEY: Rudeness is (indiscernible).

THE WITNESS: Yeah, my official title is Product Development and Management -- Director of Product Development and Management, and we add in to provide distinction to that, of Core Services and Value-added Services.

BY MR. HANGLEY:

Q Now I'm -- how I'm confused. Is this core services business part of your title or not?

A Yes, it is.

Q Formally on your job description, on the organizational charts, et cetera, is this your title?

A That's my title.

Q And it became your title within the last year or so?

A It's been my title for -- since around -- I'll go back, about 2014 time frame.

Q Okay. Now, sir, I had the opportunity to read your testimony from yesterday earlier this morning. You used the word "core" a number of times, didn't you?

A Yes.

Q If I said the number was 29 times, would that surprise you?

A I don't recall how many times I said it, but no, probably not.

Q Okay. And, sir --

(Pause in proceedings.)

Q -- did you rehearse your testimony?

A I met with my attorneys. I --

Q I'm not asking you to tell me about --

A Yeah.

Q -- meeting with your attorneys. I don't want to know about your conversations with attorneys. I want to know if you rehearsed your testimony.

A I prepared for my testimony. I didn't rehearse my testimony.

Q How many times did you go over your testimony with anyone?

A Two or three times.

Q How many days did you spend, how many hours did you spend, reviewing your testimony with anyone, your

proposed testimony?

A Maybe an accumulation of four hours.

Q Okay. Okay.

(Pause in proceedings.)

Q Now, you -- one of the ways that you talked about "core" yesterday was in terms of core services of Sprint, correct?

A Yes.

Q And I think you said that you consider messaging -- let me back up a little bit. One of the things that you do in your position is watch over the introduction or manage the introduction of new products or services?

A Yeah, that's one of the roles that I perform.

Q Okay. And you -- what do I call it? You also manage or oversee what I will call the end of life care of products and services when they have played out their utility or turned out not to be so successful?

A Yeah, one of the -- as part of product development and management, part of the role of management is the life cycle management. So that's the introduction, the ongoing management, and then the end of life termination of a service.

Q Okay. And you've done that with some services?

A Yes, I have.

Q Okay. Now, you've been with the company since I think you said 1993?

A No, 1996.

Q 1996. I apologize. And you're aware, are you not, that the patent in this case was invented -- the invention was invented -- forgive my awkward phrasing -- was invented in 1999?

A Like I said, I wasn't familiar with the patent, but for this trial, until it was shown to me.

Q Okay. And you were working at Sprint in 1999, correct?

A Yes, I was.

Q Okay. And Sprint at the time had a cellular network, right?

A Yes, we did.

Q Okay. And the cellular network had voice -- provisions for voice services and data services, didn't it?

A In 1999, we operated voice -- primarily voice services. We had circuit switch data at that time.

Q Okay. So the answer to my question is yes?

A Yes.

Q Okay. You didn't have messaging, did you?

A You know, I don't recall in 1999 if we had

messaging. I know we had like services that were contemplating messaging and a short mail service I think is what we called it.

Q SMS?

A No, it was called short mail --

Q Short mail service?

A Yeah.

Q Okay. If you heard testimony that the company did not offer two-way SMS messaging in 1999, would you disagree with that?

A No, I wouldn't disagree with that.

Q Okay. Okay. So if you talk about what were the core elements of the cellular network in 1999, it would not have included two-way messaging?

A Okay.

Q Okay.

(Pause in proceedings.)

Q Now, you're a -- I think you said a physicist by training?

A By education.

Q By education. And you hold several patents?

A Yes, I do.

Q Okay. So you know what -- how patents work?

A Yes, I do.

Q And you understand the concept of claim

construction?

A From a high level, yeah.

Q And you understand that in construing a patent, it is construed from the standpoint of a reasonably skilled artisan at the time of the invention?

A I'm not a --

Q You don't know?

A Yeah, I --

Q All right.

A -- don't know.

Q That's fine. Now, today, as distinguished from 1999, as you've testified, SMS messaging is a -- what you call a core service?

A I'm sorry, can you repeat your question?

Q Sure.

A Yeah.

Q You've testified that today, SMS messaging is a core service --

A Yes.

Q -- of Sprint?

A Yes, SMS is a core service.

Q Okay. Indicating that it is important in a business sense to Sprint, isn't it?

A Well, overall, in explaining -- yeah, as part of a communication portfolio, voice messaging and data

are all important core services that we provide.

Q Okay. And you say as part of a portfolio. As part of a package that you offer to your potential customers?

A Yes.

Q Okay. It generates a good bit of the company's revenue?

A I can't say specifically -- our service plan generates revenue for the company.

Q Okay. Okay. And do you agree that it's essential in that if you couldn't offer it, it would be dramatically more different to sell your services?

A I --

Q If you were back in 1999 --

A Uh-huh.

Q -- when you didn't have SMS messaging, you would have a hard time competing with the people who do offer that, right?

A I'm not -- I'm not following your question.

Q Okay.

A I'm sorry.

Q If you didn't offer SMS messaging today, it would be hard -- more difficult, much more difficult, to sell your services, is that right?

A From a competitive perspective, yes, it would.

Q Okay. Okay. Now --

(Pause in proceedings.)

Q -- you were asked questions about something a little different from core -- from essential or core services. You were asked questions about the definition of the cellular network. Do you recall that?

A Not necessarily, no.

Q Okay. Okay. Now, what is in the cellular network?

A The cellular network consists of everything that -- starting with the handset to the RF connection, the spectrum that connects the handset to the bay station, the bay station to -- back in to the elements that run the overall communication path. So you would have switches, SMSCs, short message service switching centers, MMSCs, HLRs, there's data components for AAAs, PDSNs. So it's an acronym of soup that make up the cellular network.

Q So you put everything into the cellular network?

A Everything that was required for communications to occur, yeah.

Q Okay. What is an MMSC?

A An MMSC is the multi-media switching center.

Q Is it the multi-media switching center or the

multi-media service center?

A I think it can be called either, but we -- I refer to it as the switching center.

Q Well, is there something called a mobile switching center?

A Yes, there is.

Q Okay. And where does that reside? That's in the core network, isn't it?

A Yes, it does.

Q Okay. And isn't it correct that most people refer to this MMSC as a multi-media service center, rather than a multi-media switching center because it's not a switch?

A I've heard it referred to in both ways.

Q But it's not a switch?

A I've heard it referred to in both ways.

Q But it's not a switch?

A I can't answer that question.

Q You don't know?

A Huh?

Q You don't know?

A I -- my understanding of it is I've heard it referred to in both ways, as a multi-media switching center and a multi-media service center. So no, I'm not the engineer of this system, so --

Q Okay.

(Pause in proceedings.)

Q Your deposition was taken in this case?

A Yes, I believe it was.

Q And do you recall --

MR. RIOPELLE: Objection, Your Honor. I don't think he can use the deposition to impeach him unless he's got a question, and I haven't heard a foundational question yet.

THE COURT: Sustained. Sustained.

(Pause in proceedings.)

BY MR. HANGLEY:

Q I asked you earlier whether "core" was in your title.

A Yes.

Q And I think you said -- well, tell me again what you said, if you don't mind.

A My title, Director of Product Management and Development, or Development Management, for Core Services and Value-added Services.

(Pause in proceedings.)

Q But as of the time when you were deposed, that was not your title, was it?

A I don't recall.

Q Well, do you recall testifying that your title

was Director of Product Development at your deposition?

A I think my deposition was taken almost two years ago.

Q Well, it was taken on April 29, 2015.

A Okay.

Q So you think this "core" title came on later than that?

A No, I was always responsible for that space of core services, so --

Q But it --

THE COURT: Let him finish.

THE WITNESS: Yeah. So my responsibilities always included the core services. And depending on setting and where I'm discussing and who I'm meeting with, my title, to be descriptive, as I've talked about, can be Product Management and Development for Core and Value-added Services.

BY MR. HANGLEY:

Q Your title changes to suit the audience?

A My -- depending on setting --

Q Is that --

THE COURT: No, let him -- let him finish.

THE WITNESS: Yeah. In a business setting, in order to be descriptive of what I'm responsible

for, yes.

BY MR. HANGLEY:

Q Okay. But your LinkedIn profile, at the time at least, didn't say anything about core services, did it?

A I can't tell you if it did or didn't.

Q All right.

(Pause in proceedings.)

Q Now, do you recall testifying in a trial in Delaware Federal Court?

MR. RIOPELLE: Objection, one, the relevance, and two, he can't use it to impeach him until he has a foundational question again.

THE COURT: I agree. You haven't been doing that. If you're going to use transcripts, let's identify the transcript, date, then ask him a question -- ask him whether that was the answer he gave on that occasion.

BY MR. HANGLEY:

Q Don't you agree that messaging servers are not a core element of the cellular network?

A I'm -- can you repeat that question, please?

Q Don't you agree that messaging servers are not a core element of the cellular network?

A I do not agree with that statement.

Q Okay. Do you recall testifying -- do you recall testifying at a trial in Delaware?

MR. RIOPELLE: Does counsel have a copy of this transcript?

MR. HANGLEY: Yes, sir.

MR. RIOPELLE: For me. I know you have one.

MR. HANGLEY: I'm sorry.

(Pause in proceedings.)

MR. HANGLEY: Let's get Mr. Riopelle a copy.

(Pause in proceedings.)

BY MR. HANGLEY:

Q Let me ask another question.

A Sure.

Q What is a CDMA network?

A A CDMA network is a wireless cellular network.

Q Okay. And what is -- what are the elements -- I'm sorry. Do you agree that messaging is not part of the CDMA network -- messaging servers are not part?

A No, I don't agree with that statement.

MR. HANGLEY: Do we have a copy to put before the witness?

(Pause in proceedings.)

MR. HANGLEY: I haven't yet marked this, Your Honor. Should I mark it?

THE COURT: No, you can just refer to it as his deposition.

MR. RIOPELLE: Can you refer to the language (indiscernible)?

MR. HANGLEY: I will do that.

(Pause in proceedings.)

BY MR. HANGLEY:

Q Sir, I'm showing you -- I've shown you and ask you to confirm that this is a copy of your testimony in the United States District Court, Wilmington Delaware.

MR. RIOPELLE: I think you can stop there.

MR. HANGLEY: I've got the wrong one. Okay.

BY MR. HANGLEY:

Q -- Wilmington Delaware on October 8th?

THE COURT: What year?

MR. HANGLEY: 2015.

(Pause in proceedings.)

MR. HANGLEY: I'm checking the date on that.

(Pause in proceedings.)

BY MR. HANGLEY:

Q Okay. And, sir, when you take a look at page -- 2014, I apologize. By the way, were you Director of Core Services at that time?

A Yes, I was.

Q Now, take a look at page 833. At the bottom of 832 you were asked,

Question: "Can you explain to the jury what your understanding of the CDMA network is?" Do you see that question, very top of page 833?

(Pause in proceedings.)

A Hold on one second.

Q It starts at the bottom of 832.

A Okay. Yep, I see it.

Q And what was your answer? Will you read it to the jury, please?

MR. RIOPELLE: Your Honor, I'm -- I don't see how this is impeaching him, just --

THE COURT: Well, no argument. I don't -- Mr. Hangley has spent so much time coming up with one copy for the witness, I'm not going to have him delay the trial to get me a copy. So I'm going to hear what he has to say. I'll overrule the objection.

MR. HANGLEY: Thank you, Your Honor.

THE COURT: From now on, if you're going to use a deposition, very simply, copy for the witness,

you need a copy, opposing counsel needs a copy, I need a copy, and we'll need a transcript of any trial testimony as well.

MR. HANGLEY: Here are two more copies. I apologize for that, Your Honor.

THE COURT: Thank you. All right, now the question.

BY MR. HANGLEY:

Q The question is bottom of 832 and going over,

Question: "Explain to the jury what your understanding of the CDMA network is." And your answer?

A Was,

Answer: "Yes. So the CDMA network is" --

Q Slow down, please.

A I'm sorry.

Answer: "Yes. So the CDMA network is, again, a network that consists of a collection of bay stations, which provides wireless connectivity to handsets, and that is connected to the core network via another component called the bay station controller. And that bay station controller connects the core network, both circuit switch core network and packet core network, to those bay stations."

Q Okay. So it's circuit switch core network and

packet core network to those bay stations, correct?
A Yes.
Q And so the core network consists of those things? That's what you said under oath.
(Pause in proceedings.)
Q Let's go back to 832, sir. I asked you also what the Sprint network consisted of.
A You asked me that when?
Q Earlier today I thought, but you can tell me now. What does the Sprint network consist of?
A Sprint operates a wireline network and a wireless network that's --
Q Okay. So if one were to talk about the Sprint network, you would need further clarification?
A Which -- yeah, it depends on which net -- if you were talking about the wireline network or the wireless network.
Q Okay. And you -- let's -- you would also if you were going to talk about the core Sprint network would still need clarification, wouldn't you?
A If you were asking about the core network, there's commonality, but yeah, I would need further clarification of whether you were talking about the wireless network or the wireline network.
Q Okay. Now, if you were talking about the

wireless network, what would it consist of?

A As -- I think as I answered earlier, it would -- it would consist of the handset, the spectrum, the bay stations, bay station controllers, and the core, and the core network elements, in that core, the network elements necessary to operate the wireless network.

Q Okay. And do you agree that it wouldn't include the messaging servers?

A I would not agree with that, no.

Q Okay. Again, can we go back to your deposition at page 832?

THE COURT: You mean the trial testimony?

MR. HANGLEY: I'm sorry, the trial testimony.

BY MR. HANGLEY:

Q You were talking about the wireless -- Sprint wireless network, weren't you? But would you take a look at page 832, line five, where you were asked,

Question: "When you hear the term 'Sprint network' what does that mean to you?" What was your answer?

A My answer was,

Answer: "Yeah. The Sprint network is fairly -- a fairly vast network, and when I hear the

Sprint network, primarily being a wireless network, I gravitate towards and give my background towards the wireless network. That network -- that wireless network really consists of a core network that being characterized as circuit switch -- circuit switch voice network and packet data network as the core. Both these networks are then connected to the bay stations that provide, so to speak, the last mile connection to the customer in their handset."

Q Okay. So you included circuit switch, voice network, and packet data network as the core, correct?

A Yes.

Q You did not include messaging service?

A Not specifically, no.

Q Well, you didn't include them at all, did you? They either were or were not in your answer.

A Well, as it relates, voice and data messaging is implicit in there. We don't explicitly call out messaging all the time, but messaging, as a service, historically is ridden over the circuit switch network as well as the packet data network.

Q We can agree that SMS messaging travels over the circuit switch network, correct?

A Historically, yes --

Q Historically.

A -- it has.

Q Yes. It sometimes now goes over the internet, doesn't it?

A Yes.

Q Okay. And we can agree that multi-media messages go over the internet, correct?

A They went over the circuit switch network for a period of time and then over the IP network, the data network, yes.

Q Okay. And they will -- to get to the -- to operate through the cellular channels they use the circuit switch, correct?

A They use circuit switch and/or packet switch networks.

Q Okay. And to get on the internet they have to use packet switching today?

A Yes.

Q Okay. Now --

(Pause in proceedings.)

Q -- this use of "core" that you -- I mentioned 29 references. You used -- you referred to core sites. Do you recall that?

A Yes, I do.

Q Now, are there, in fact, places in the network

that you were referring to when you talked about these core sites or that -- let me rephrase the question. Are there places on the properties of Sprint, physical properties of Sprint, that you are referring to as these "core sites?"

A I'm not a network architect, but there are properties, Sprint-owned properties, that house the equipment that is part of our core network, yes.

Q They house the equipment that is part of your core network?

A That's correct.

Q Okay. And would you agree with me that they're almost never, if ever, referred to as "core sites" around Sprint?

A I'm -- can you repeat your question?

Q Sure.

A I want to make sure I understand.

Q I've been looking at Sprint documentation and I've had a hard time finding any references to "core sites" other than in your testimony yesterday, and perhaps that of other witnesses yesterday. When did Sprint start referring to these as "core sites?"

A Well, I've been as Sprint since 1996 and it's a fairly common term for us to use to talk about the core network sites.

Q And where -- can you identify one of those sites?
A A couple. I referred to one yesterday in Reston, Virginia.
Q Okay.
A There happens to be one in Lenexa, Kansas. And -- but, again, I don't know all of the locations for them.
Q Well, and people around the company, how do they refer to what you referred to yesterday as the Reston core site? They don't call it that, do they?
A They may say the -- they may say the bunker in Lenexa, Kansas or -- I don't know how they would -- else they would refer to the Reston location, but those are, you know, core locations for us.
Q Well, there's the Reston bunker, correct?
A I don't know if it's referred -- I can't say if it's referred to as the Reston bunker.
Q Is it referred to as the Reston datacenter?
A I -- again, I don't know. It could be, yes.
Q Is the north bunker, the NOB, have you heard that phrase?
A I have no heard NOB, but --

MR. HANGLEY: I'm going to ask, Your Honor, I'd like to use the ELMO to take the witness through one of defendant's exhibits.

THE COURT: You may.

MR. HANGLEY: Okay. And I'd like to ask my colleague, Andrew Erdlen, to run the ELMO in order to avoid all manner of disasters.

THE COURT: You may do that.

MR. HANGLEY: And I'm referring to DX-13. I have marked areas of it to show the phrase I want to ask the witness about. We'll put it on the screen.

(Pause in proceedings.)

THE COURT: Is PX-13 in evidence?

MR. HANGLEY: PX-13 is in evidence, Your Honor.

(Pause in proceedings.)

MR. HANGLEY: Actually, Your Honor, there's a motion to put it in evidence. I don't know whether Your Honor has approved that motion yet -- acted on that motion. We have objected -- we have agreed to it.

THE COURT: Well, we'll receive it in evidence.

(Defendant's Exhibit 13, document, is admitted into evidence.)

MR. RIOPELLE: Thank you, Your Honor.

THE COURT: Does Sprint have a motion with

respect to its exhibits?

MR. RIOPELLE: We do, Your Honor, and we just didn't want to interrupt the flow once the jury came in the room, so we were going to make it after this witness. But we're happy to make it now at the Court's pleasure.

THE COURT: Well --

MR. RIOPELLE: That may make it easier for Mr. Hangley. I believe all -- everything on the list is already agreed to, so I don't -- if we hear objections, then certainly we shouldn't proceed and waste the jury's time.

THE COURT: Well, why don't we -- let's not spend anymore time interrupting. And that was at my invitation, by the way. Let's do it at the end.

MR. RIOPELLE: Okay.

THE COURT: I don't want you to read a list of the exhibits that are being moved into evidence.

MR. RIOPELLE: Understood.

THE COURT: So Mr. Hangley can raise the question. If I ask, you can -- you can answer.

MR. HANGLEY: Show the cover page, please. I'm not seeing it. Oh, we -- I guess we have to ask somebody to turn the switch?

MR. ERDLEN: It's coming on.

MR. HANGLEY: See, aren't you glad I have all this help, Your Honor?

THE COURT: Yes. Without it, we would be here for weeks and weeks.

(Pause in proceedings.)

BY MR. HANGLEY:

Q Showing you a copy of something that's in evidence as the Defendant's Exhibit -- Defense Exhibit 13. Can you tell me what it is?

A I can read the title if you would like.

Q Okay. It's the "Next Generation Messaging and Imaging," and it's a design document? Have I got that correct?

A Yes.

Q Are you familiar with documents of this type?

A I've seen documents of this type --

Q Okay.

A -- before, yes.

Q Do you look at them as -- in your capacity as Director of -- the title?

A Yeah, although this one was written in 2008, so it would have preceded my time in my role.

Q Okay. Okay. But you recognize this type of document?

A Yes.

Q It's a typical business record?

A Yes.

Q Okay. Now, sir, when you -- when you go to page 26 --

MR. RIOPELLE: Your Honor, I'd like to object. I think he needs to establish that this witness has seen this document before he starts asking him questions about it.

MR. HANGLEY: I'm asking him how the --

THE COURT: Well, don't tell me what -- lay a foundation. You don't have to tell me what you intend to do. Lay a foundation and then do it.

MR. HANGLEY: Okay. I think I have, Your Honor. I'm asking the witness questions about how these so-called core sites that he talked about yesterday have been referred to in the business parlance of Sprint.

THE COURT: All right. Cover it as you see fit, but lay a foundation. He said -- for example, this document is dated May 6th, 2008, and he said that predated his present job title.

MR. HANGLEY: But it is a business --

THE COURT: All right.

MR. HANGLEY: -- record of Sprint.

THE COURT: That's correct.

MR. HANGLEY: And he said that too.

THE COURT: He said a lot of things. Go on, Mr. Hangley.

MR. HANGLEY: Thank you.

BY MR. HANGLEY:

Q Will you please go to page 26, sir?

A I don't --

(Pause in proceedings.)

Q Now, I'm looking at the overview of something. Can you tell what it is?

A The title reads "Section 3.2.2.4." Is that the one you're looking at?

Q Yes.

A And it says, "Post-deployment State Functionality."

Q By the way, can you tell me what doc -- what products are being brought in under this document?

A I -- sir, I would have to read the whole document in order to --

Q Well, I mean --

A -- have more familiarity with it. I mean, again, this predated me, so I, quite honestly, would want to review the document before I could really talk about what's in it.

THE COURT: Have you seen this document

before?

THE WITNESS: I have not seen this document before, no, not this specific document.

BY MR. HANGLEY:

Q You don't --

A I've seen documents of this type, but --

THE COURT: Not that one?

THE WITNESS: Not this particular one, no.

BY MR. HANGLEY:

Q But, sir, you know what the Mercury Project was, don't you?

A Yeah. Boy, you know, we've had code names for things. Yeah, I don't know that I recall what Mercury specifically was.

Q Pardon me?

A I don't know that I could recite specifically what Project Mercury was.

Q Okay. Do you recall when Acision servers were brought in for the SMS messaging?

A I don't recall the specific date for that. I know when the MMS servers were brought in, but not the SMS servers.

Q And when was -- when were the MMSs brought in?

A We started that project in 2010 when I joined the group.

Q Okay. Okay. Now, what I'm really interested in in this document is taking a look at page 26, which we have on the screen. It discusses the deployment of an SMSC?

MR. RIOPELLE: Your Honor, I'm going to object. He's testified he hasn't seen this document, and he hasn't laid a foundation for him to ask him about this document.

THE COURT: Sustained.

(Pause in proceedings.)

BY MR. HANGLEY:

Q Do you agree that with respect to these Reston and Lenexa facilities, you refer to them sometimes as datacenters?

A I think in the course of business, sure, I've heard them call datacenters, core sites. You know, in conversation there's references to our regional datacenters, our central datacenters, et cetera, yeah, so --

Q Okay. What I'm -- what I'm interested in finding though, sir, is any place where before 2012, these datacenters were referred to as core sites. Let me rephrase that again.

A Yeah.

Q Anyplace before you got into litigation, before

Sprint got into litigation with Comcast, in which the definition of "cellular network" and the term "core sites" or "core" or "core elements of the network" was involved, were people referring to these bunkers or datacenters as "core sites?"

A Well, I -- again, I've been in the company for almost coming up to 21 years in July, and --

Q But --

A Yeah. And I've had several conversations and several discussions, several ops reviews, where we've talked about the core network and core sites. I -- as far as documentation, I'm sorry, I -- you know, I don't know. It -- but --

Q You --

A -- that's a very common term for us to talk about, our "core network."

Q You've seen plenty of documentation when people write it down where Lenexa is referred to as a datacenter, haven't you?

A I can't recall specifically if I've seen that, but, again, I've heard it referred to as that as well.

Q And the North -- that is the Lenexa, referred to as a datacenter or as the north bunker?

A Again --

Q You've heard those phrase several times?
A Yes, I have heard those phrases.
Q Okay. And you've seen them many times in written documents, technical documents, prepared inside the company?
A Again, I can't recall that I've seen it many times, but I'm sure I have seen it.
Q Okay. And where is it that you in technical documents before the litigation began have seen any of these facilities referred to in writing as core sites?
A Yeah, I mean, again, I don't know. I don't have an answer for you. I -- because I don't have those documents to refer to. And, quite honestly, I mean it's passing conversation or as you see any documentation or whether it's a presentation, there is a central understanding --
Q I --
A -- there's an understanding internal to Sprint relative to where we're talking about the Reston location and the Lenexa location that we're talking about core network and core network functionality. I think even in one of my emails that I was on we talked about core network locations.
Q Okay. May I ask you, please, to look at your

deposition -- let's see if I can show him his deposition -- of --

(Pause in proceedings.)

Q -- April 29, 2015.

MR. RIOPELLE: Is there a foundational question upon which you are going to attempt to use the deposition?

MR. HANGLEY: There is indeed. The question of how the company refers to these sites. And do you need a copy for the Court?

(Pause in proceedings.)

BY MR. HANGLEY:

Q Have you gotten your dep -- well, you don't. Let me -- let me ask you, please, to go to page 136, and I'd ask you whether it was correct that people around the company referred to these as regional datacenters instead of, as what we called it yesterday, core sites. Here's the deposition.

A Thank you.

Q And before I ask the next question, I just want to confirm something. You were what we call a 30(b)(6) witness at that deposition, correct?

A I don't recall. I may have been.

Q Well, let's first confirm that fact.

(Pause in proceedings.)

A And, I'm sorry, can you repeat the page that you asked me to look at?

Q Well, we're going to get there, because first, I'll ask you to confirm that you were, in fact, the 30(b)(6) designee chosen by Sprint to testify on certain subjects at this deposition. And I'll ask you to take a look at page eight --

A Okay.

Q -- to confirm that to your own satisfaction.

(Pause in proceedings.)

A This is to confirm I was a 30(b)(6) --

Q You were a --

A -- witness?

Q -- were a 30(b)(6), yes, sir.

A Oh, yeah.

Q Okay.

A I see it right there.

Q Now, a 30(b)(6) witness, tell me if you agree with this, is somebody who was named by the company to be the company's voice with respect to those particular topics as to which that person is testifying, correct?

A Yes, that's my understanding.

Q Okay. And so when you were going to become a 30(b)(6) witness you prepared yourself and you went

out and put yourself in a position by perhaps reviewing documents, perhaps talking to other people in the company, to be the spokesperson of the company, to speak as the company in answering certain questions, correct?

A If I recall, yes.

Q Okay. Now, you were asked at that deposition at page --

MR. RIOPELLE: Objection, Your Honor. I'm sorry, you can ask a foundational question, and then if it's inconsistent I believe, then he can ask -- go to the deposition.

MR. HANGLEY: I asked the foundational question a while ago, and that has to do with whether or not Sprint people refer to this in daily parlance as the regional datacenter and not the core site. That question is why I brought this --

THE COURT: All right.

MR. HANGLEY: -- deposition here.

THE COURT: I think the foundation question has been answered and now we're getting very, very, very slowly into cross-examination. And I think we're going to turn to page 136, is that correct.

MR. HANGLEY: I think we are.

BY MR. HANGLEY:

Q Where you were asked at line 22,

Question: "Physically, where is the Acision SMSC MMSC?"

MR. HANGLEY: And, Your Honor, there was an objection at that time too. Mr. Barry objected that the question lacks foundation and assumes facts not in evidence. I guess since the objective was made, do I have -- do you need to overrule that or sustain it?

THE COURT: Facts not in evidence --

MR. HANGLEY: At a deposition.

THE COURT: -- at a deposition taken two years ago that I'm looking at for the first time?

MR. RIOPELLE: We withdraw it. Don't --

THE COURT: I suspect so.

MR. HANGLEY: Thank you, Mr. Riopelle.

THE COURT: Thank you, Mr. Riopelle.

BY MR. HANGLEY:

Q And now,

Question: "Physically, where is the Acision SMSC MMSC?" Now you may answer. Your answer is on 137, line two, and this is the company's answer, correct?

A On what page, I'm sorry? 137, line two?

Q Line two.

A What I answered in this deposition is,

Answer: "So over time, these have evolved. SMSCs used to be" --

Q Please slow down. It's -- you have a tendency to go fast when you're reading.

A Sure.

Answer: "So over time, these have evolved. SMSCs used to be located at switch sites. They may be located at regional datacenters now. I don't know specifically the physical location of the hardware. It is either in the physical MSC site, the mobile switching center site, or in what we describe as regional datacenters. I haven't kept up with the physical architecture over time as to the deployment schemes."

Q Okay. So these regional datacenters now, are these the -- for example, the Reston facility and the Lenexa facility I've been asking you about?

A That would be a regional datacenter, yes.

Q And what the company does is describe them as regional datacenters, correct?

A Yes.

Q Until yesterday when you described them as core sites?

A The regional datacenters are part of our core

network, yes.

Q Thank you, Mr. Yarkosky.

MR. HANGLEY: I have no further questions.

THE COURT: Any redirect?

MR. RIOPELLE: Your Honor, I have no need to redirect.

THE COURT: Thank you. Mr. Yarkosky, your testimony is concluded. You may step down. Thank you.

THE WITNESS: Thank you.

(Witness excused.)

MR. RIOPELLE: Your Honor, before we call our next witness, may we have a quick sidebar?

THE COURT: Yes.

(Sidebar discussion as follows.)

THE COURT: (Indiscernible).

(Pause in proceedings.)

MR. RIOPELLE: Your Honor, this was the Syniverse limiting instruction that the parties had agreed on, and I thought that it made sense to do it now since Mr. Yarkosky had testified so much about numbers.

MR. HANGLEY: I don't think so. Do you -- what do you think?

MR. RIOPELLE: I mean I thought it was a

limiting instruction the parties agreed that we were going to give --

THE COURT: Yes.

MR. RIOPELLE: -- during the course of the trial.

THE COURT: At an appropriate time. The only question is when.

MR. RIOPELLE: Okay.

THE COURT: When it's first -- it's been mentioned. And who's going to testify about this?

MR. RIOPELLE: Mr. Yarkosky just did all day yesterday.

THE COURT: Oh, all right.

MR. RIOPELLE: That's why we thought it would be appropriate now.

THE COURT: All right. That was agreed upon.

MR. HANGLEY: Yeah. Are you fine with that? Okay.

MR. RIOPELLE: Okay.

THE COURT: Anything else?

MR. RIOPELLE: Yes, just one more thing, and this is just (indiscernible). I am going to be leaving the courtroom now. I'm going to be leaving the courtroom now. I just wanted to let you know

why. I'm going home for about 24 hours to be with my family. I will be back here tomorrow. But I just wanted you to know when you saw that I wasn't there why I wasn't here.

THE COURT: Well, again, you have my condolences. You can certainly be excused.

MR. RIOPELLE: And I will be back, but I just wanted to let you know. Thank you. My friend is going to bear the burden.

MR. HANGLEY: I can help.

MR. RIOPELLE: Oh, you can help? Okay, we'll let you know.

(Sidebar discussion concludes.)

THE COURT: I've been asked to give you what is referred to as a limiting instruction. You've heard some testimony regarding the Syniverse Picture Mail servers Mr. Yarkosky testified to. You do not have to decide whether Sprint's MMS messaging using Syniverse Picture Mail servers infringes the 870 patent. However, you may consider evidence related to Syniverse Picture Mail to the extent it bears on your decision on Comcast's claim that Sprint has infringed the 870 patent through its use of messaging servers other than Syniverse Picture Mail.

I think I'll repeat that. Judging by the

expression on your faces, I better repeat it. Yesterday, Mr. Yarkosky testified regarding Syniverse Picture Mail servers. You do not have to decide whether Sprint's MMS messaging using Syniverse Picture Mail servers infringes the 870 patent. You may consider evidence related to Syniverse Picture Mail to the extent it bears on your decision on Comcast's claim that Sprint has infringed the 870 patent through its use of messaging servers other than Syniverse Picture Mail. All right.

MR. FINKELSON: Thank you, Your Honor.

THE COURT: We will proceed.

MR. FINKELSON: Sprint calls Mark Lipford to the stand, Your Honor.

(Pause in proceedings.)

MARK LIPFORD, Defendant's Witness, Sworn.

COURTROOM DEPUTY: Please be seated. Please state your full name and spell it for the record, please.

THE WITNESS: It is Mark Lipford, —A-R-K L-I-P-F-O-R-D.

THE COURT: Good morning, sir.

THE WITNESS: Good morning.

DIRECT EXAMINATION

BY MR. FINKELSON:

Q Good morning, Mr. Lipford.
A Good morning.
Q Could you please introduce yourself to the jury, sir?
A Sure. My name is Mark Lipford. I'm the Director of Global Standards and Ecosystem Development for Sprint.
Q Can you explain to the jury what that title means?
A Yes. I lead a team of engineers and we represent Sprint in wireless technology standards around the globe.
Q Okay. When did you start getting involved in standards-related activities at Sprint, Mr. Lipford?
A That was a long time ago. I actually started in 1998. I was the manager of Sprint's wireless data and messaging standards.
Q Okay. And we've heard some talk about standards and you've mentioned them. What is a standard in the telecommunications industry, sir?
A Sure. A standard defines how a feature or a service should perform, should work with other features, work with other services. The way I've always explained it to my mom, because she never understands what I do either, is if, you know, I

carry an iPhone and when I make a phone call it has to connect to a bay station that may be provided by Ericsson, connect to a switch that could be from a Cisco or another company, and it may connect to another Android phone or Samsung phone. How does all that work? Standards defines the mechanism so that these vendors will know how to build the systems so that when you place a phone call it will connect, or when you want to access the internet. So you can see that from a vendor perspective, as well as an operator perspective, standards are very important to us in the industry.

Q Thank you, sir. Let's go back to your early days at Sprint. Can you let the jury know when you first joined the company?

A Sprint was my first real job out of college. I graduated in 1985 and started working in 1987 for Sprint. And over the years, I've held a number of different technology positions within Sprint.

Q Where did you go to school?

A Sure. I went to school at North Carolina State University in Raleigh. I like to say my heart is still there, but most of my money seems to go to Kansas State these days with two boys in school there. But I graduated with a degree in electrical

engineering.

Q And what year did you obtain that degree?

A It was 1985.

Q So let's talk about when you started your standards role at Sprint in 1998 I believe you said. Were there particular groups that you were active in?

A Yes. Because Sprint's 3G network is what we call an ANSI-41 CGMA2000 network, I was working in organizations that provided that -- those standards, the specifications, specifically the -- a group called the CDMA Development Group and also Telecommunications Industry Association, and they were pretty involved in the ANSI standard setting process.

Q And can you explain in more detail to the jury what ANSI is?

A ANSI is the North American Standards Institute. They are an American-based organization that provide American-based standards. To be accredited as an ANSI standard, it's a significant amount of checks and balances. You have to prove the document has gone through the appropriate development and revision process and management processes.

Q Are you familiar with the acronym, ETSI?

A Yes, ETSI stands for the European

Telecommunications Standards Institute. They are responsible for some of the standards related to GSM technology or UMTS, GPRS. Again, it's a European base, very different from the American-based technologies. You can think of it as, you know, you take an electrical plug that you have for your phone or your lamp at home, try to plug it in to a European outlet, it doesn't fit. They're different. So --

Q You mentioned an acronym, UMTS. Is there a synonym for UMTS?

A Yes, UMTS is the technical acronym, but it stands for WCDMA, wideband CDMA.

MR. FINKELSON: Your Honor, I've got a binder of exhibits for the witness. If I may approach with a copy?

THE COURT: You may.

(Pause in proceedings.)

MR. FINKELSON: I got to -- I have to do them one at a time.

(Pause in proceedings.)

THE WITNESS: Okay.

(Pause in proceedings.)

MR. FINKELSON: Your Honor, I'd like to go ahead and move the admission of the documents that are in this binder. It contains DX-3, which is

already in evidence, but then I'd move the admission of the remaining exhibits which I understand are unobjected to, which is DX-4, 5, 6, 7, and 8.

MR. GOETTLE: No objection, Your Honor.

THE COURT: DX-4, 5, 6, 7, and 8 are received into evidence.

(Defendant's Exhibits 4, 5, 6, 7, and 8, documents, are admitted into evidence.)

MR. FINKELSON: Thank you, Your Honor.

BY MR. FINKELSON:

Q I'd like to start with DX-3.

A Okay.

Q And I'll also put it up on the screen, so whether it's easier for you to flip --

A Okay.

Q -- Mr. Lipford, or see on the screen, I leave that up to you. Have you worked with this document before, DX-3?

A Yes, I've worked with this document in the past.

Q And can you explain to the jury what it is?

A Sure, this is a copy of the ANSI-41 CDMA2000 specification. And if you'll go to one of the pages, it's on 1-IV, we can see that it's a July of 1997 version of that document.

Q We'll give Mr. Baird an opportunity to pull that

up.

(Pause in proceedings.)

Q Is that what you're referring to, Mr. Lipford?

A Yes. Yes.

Q And what are the words that appear here in the revision history?

A It is revision zero, the date is July of 1997, and it's an initial ANSI publication.

Q Let's go ahead and turn to page 1-III.

A Okay.

Q Do you have that, sir?

A Yes.

Q And if you scroll down the page -- well, first, can you identify what appears on this page?

A Yes, it's the forward to the document, which is kind of an overview of purpose and scope of the document.

Q And what does it say in the following two sentences?

A This is a series of recommendations. It's not part of the standard, but it's a series of recommendations that's entitled to cellular radio telecommunications inter-system operation. And, you know, there's a lot of other words on there, but it describes the procedures that are necessary to

provide a cellular radio telephone subscriber certain services.

Q And is -- DX-3, is the title of it "Cellular Radio Telecommunications Inter-system Operations?"

A Yes, it is.

Q Let's go ahead, if we could, and turn to page 1-24.

(Pause in proceedings.)

A Okay.

Q Can you describe for the jury, Mr. Lipford, what appears on page 1-24?

A Yes, this is a picture of the network reference model for a CDMA2000 cellular system.

Q And what does "network reference model" mean in the context of the ANSI-41 CDMA2000 standards? Does it have a meaning?

A Sure. Sure. Actually, I believe it's 1-7, if we can go to that page?

MR. FINKELSON: 1-7? Thank you, Mr. Baird.

THE WITNESS: At the bottom of the page.

BY MR. FINKELSON:

Q Is this in -- is this in the definition section?

A Yes, this is within the definitions of the document, and we can actually see the definition for "network reference model," and it's, "The functional

entities and the associated interface reference points that may logically comprise a cellular network."

Q And when it refers to "functional entities" do you have an understanding of what that means and can you provide that understanding to this jury?

A Sure. That's the hardware or the functions that provide the services, and we can actually see some examples of them in the diagram.

Q And it also makes a reference to "reference points." Can you explain to the jury what that means in the context of the ANSI-41 CDMA2000 standards?

A Yes, when we talk about the reference model it's not just what entities or functions make it up, but what are the relationships between the different entities. So how are they connected? And we provide those with the reference points that show the connections between them that -- it's a fancy word for interface.

Q All right. Let's go back to figure two, if we could, on page 1-24. And my question is, as someone who has worked with this document and with figure, can you explain to the jury what it shows to you?

A Sure. And, actually, I mean there's a good definition provided there. It presents the

functional entities and the associated reference points that may logically comprise the network. So -- and it is defined within. So if you look at it, you know, on the left side, you'll see the mobile station. You've got the bay station, or the BS, kind of in the left, center of the page. And you've got a bunch of other entities like the MC, the message center, the MSC, which is the switch, the HLR. I mean pretty much everything in this picture except for the PSTN and ISDN would compose the cellular network.

Q And why do you say except for the PSTN and the ISDN?

A These are networks and protocols that have been previously defined. I mean the PSTN is your phone company, it's the phone network. And, actually, on page 1-25 of this document, there's actually references to an NCT1 standard that defines these entities and protocols.

MR. FINKELSON: I think we're moving that up. I think it's the very last one on the page, Mr. Baird. I believe so, but I'll allow the witness to --

THE WITNESS: Yeah, it's -- that is for the PSTN, and then you'll see that ISDN, which is just

above it in 5.1.5 also has a similar reference to the NCT1 document. So these are legacy networks and protocols that shows how would a cellular network connect so you can make a phone call.

MR. FINKELSON: If we can go back, Mr. Baird, to the diagram? Thanks.

BY MR. FINKELSON:

Q I believe you made reference to the MC?

A Yes.

Q Is that right?

A Yes.

Q And what is the MC or where do you see the MC depicted in the network reference model of DX-3?

A Well, it's in the bottom, center where it says "MC," and then you'll see in the keys below it it stands for "message center."

Q And is there, in fact, a definition of the MC contained in this ANSI-41 CDMD2000 standard?

A Yes, there is, and I believe it is also on the following page, 1-25.

(Pause in proceedings.)

A 5.1.6. So the MC is an entity that stores and forwards short messages. The MC may also provide supplemental services for short message service, so --

Q And, again, do I have it right that this is a 1997 standards document in connection with an ANSI-41 CDMA2000 cellular network?

A Yes, it is.

Q According to your understanding, sir, of figure two that we've just been looking at, does the message center in the 1997 ANSI-41 CDMA2000 standard communicate with other cellular network elements?

A Yes, it does. As we talked about, the reference points show those relationships. You can see in the figure that there is a reference point N that connects up to the HLR. The reference point M that will connect over to other message centers are the short message entities, as well as Q that connects up to the MSC.

Q And as someone who worked with this 1997 standard, do you have an understanding of what the purpose of the connection is between the message center and the HLR?

A Yes, the message center when it receives a message has to do a couple of things. It has to verify that the use is subscribed to the service and allow to either initiate the service or receive messages. So it will send a query up to the HLR to make sure they are properly provisioned and allow the

service, as well as they can also request the HLR to give them delivery information as to where was the last, you know, MSC that this device was connected to so it could route the message to the correct MSC, or mobile switching center.

Q Thank you, Mr. Lipford. I'd like to turn to the next exhibit in your binder, which is DX-4.

A This might take a minute.

Q You can get rid of the -- get rid of the large one and --

A Yeah.

(Pause in proceedings.)

A Okay.

Q Do you have it?

A I've got it.

Q All right. Can you tell the jury what they're seeing on their screen in DX-4?

A Yes, this is a network reference model for a CDMA2000 Sprint Spectrum System, which is a CDMA2000 system. You'll notice it stated "Revision A," and you'll also know the version date is December 13th of 1999.

Q We were just looking at DX-3 in 1997, and now we've moved forward to 1999 in the standards for CDMA2000, is that right?

A That's correct.

Q And what is depicted or described in DX-4 at a general level?

A Just like we've talked about the network reference model in the previous DX-3 document, this is a newer version of that document, of the network reference model. It has the same meanings as previously and it is more detailed because the technology has changed in the two years it happened. So this is a more current reflection of what a CDMA2000 network is.

Q As of 1999?

A As of 1999.

Q And did you work, in fact, directly with DX-4, this network reference model, in December of 1999?

A Yes, I actually helped contribute to some of the changes that went in to this document, and so I'm very familiar with this document.

Q Did you help design certain components or entities that are described in this network reference model?

A Yes. You know, in the diagram that -- if we would look at that, I could point out the specific ones.

Q Sure, and we'll turn to that in a sec.

A Okay. Okay.

MR. FINKELSON: If I could go first to the section of the document that appears on page 4821, Mr. Baird. It's entitled "Purpose and Scope."

(Pause in proceedings.)

THE WITNESS: Yes, I have it.

BY MR. FINKELSON:

Q Okay. Mr. Lipford, can you tell this jury what this document says the purpose and scope is of the network reference model for CDMA2000 Sprint Spectrum Systems in 1999?

A Yes, the purpose and scope of this document is to provide -- this document recommends the basic 3GPP2 wireless network reference model. And with 3GPP2, it means CDMA2000.

Q Having worked with DX-4, did you understand and understand -- did you formulate an understanding back in 1999 of what "3GPP2 wireless network reference model" meant?

A Yes, it -- I had a very good understanding of what it meant. I lived it and breathed it and worked with it for a number of years.

Q And is the term "network reference model," to your understanding as someone who worked with this document, does it have the same meaning as it had in

the 1997 document?

A Yes, the meaning would carry forward to this document as well.

MR. FINKELSON: Can we call up figure 2.1, Mr. Baird, in this document?

(Pause in proceedings.)

BY MR. FINKELSON:

Q There's a lot on the page.

A Yes.

Q Can you describe -- well, first, do you have an understanding of what figure 2.1 depicts, sir?

A Yes, this is the 1999 wireless network reference model.

Q And can you describe for the jury what it depicts as someone who worked directly with this document?

THE COURT: Keep your voice up.

BY MR. FINKELSON:

Q Can you describe for the jury, Mr. Lipford, what this document depicts, as someone who worked directly with it?

A Sure. And as I mentioned, you know, I was directly involved in some of these changes. There's the PDSN kind of in the bottom, left side of it, and the AAA. These were areas of my specific involvement in the development of it, but I did have to

understand all the relationships with the components to make sure it was -- you know, these were integrated correctly into the model. So on the left side, you've got the composite entity titled "MS," which is the mobile station. It's your phone, for a simple term. You've got a composite of the BS, which is the bay station equipment. And then you've got kind of a dotted line that's called the collective, and within the collective you've got the mobile switching center, you've got the message center, the HLR, the PDSN, the AAA that I spoke of, and all of the elements that make up the CDMA2000 core network.

Q And is the collective entity designated with a dotted line box around certain components?

A Yes, it's -- it is a dotted -- the dotted lines that you'll see in the picture is the collective entity.

Q And as someone who worked directly with this document, did you understand what "collective entity" meant?

A Yes, I think I actually said it just now by mistake, but it's the core network. It is the CDMA2000 core network. And we use that term a lot in the meetings as well.

Q Does this document itself say "core?"

A It does not. It does use the term "collective," but, as I mentioned, having lived with this document and worked with this document for a number of years, without our -- my experience and the experience with the group I worked in, we used "collective" and "core" interchangeably.

Q And at this time in 1997, in the CDMA2000 standards, was the message center part of the core?

A Yes, you can actually see it just below the BS composite entity within the collective. It's titled "MC," and it is within the dotted box of the -- what's titled here as the "collective" or the "core network," "CDMA core network."

Q And does the MC have the same meaning as the meaning you read to the jury a few moments ago in the 1997 standard?

A Yes, it does.

Q Now, you referred to a composite entity when you were talking about the MS, which I believe you said was the mobile station, is that right?

A That's right.

Q Okay.

A The composite of the MS is the mobile station.

Q And is the BS also shown as a composite entity?

A It is shown as a composite entity within the

collective.

Q And is it within the dotted line box, and can you describe your understanding of why?

A Yes, the BS at the time could -- there could be parts of it and it could reside within the core network or outside of the core network, you know, and when the group came to a consensus of how best to represent it, it was just included in the composite.

Q And whether it was inside or outside of the core network, was it still part of the CDMA2000 cellular network as of 1999, according to the standards?

A Oh, it was absolutely part of the CDMA2000 network.

Q I'd ask you to look, Mr. Lipford, at the next document in your binder, which is DX-5.

(Pause in proceedings.)

Q Do you recognize DX-5, sir?

A Yes, this is revision B of the document we just looked at, which was the network reference model for CDMA2000 Sprint Spectrum System. This one is from April of 2001, so it is a newer version of what we just looked at.

Q And is it entitled "Revision B?"

A Yes, it is.

Q Did you work with this network reference model

for CDMA2000 that has been marked as DX-5 at the time?

A Yes, I've worked with this document. In fact, just a few months later in December of 2001, I became the chair of the group that had ownership of this document.

Q And what does that mean, you had ownership of the document?

A It means we were responsible for making sure this document was accurate, that it accurately reflected the updates and changes to the network. Realize this document is a blueprint. It tells how to build a CDMA2000 network, what are the components, how are they related, and this is the document that, you know, we would then, you know, internally would hand off to our design engineering teams that were specialized in the particular elements, and they would build the network with it, and the manufacturers would use. So, you know, once this document was handed off to our internal teams, you know, how they chose to implement it was outside of my scope, but this is how it was used.

Q And in this document, revision B dated April of 2001, was the message center still described as part of the collective entity that you talked about a few

moments ago in connection with the 1999 version?

A Yes, I believe if we can go to the figure -- was it figure one?

Q 2.1 I think.

A 2.1. You know, this figure probably looks very familiar to what we were just looking at. There are a few minor changes, but you'll see the message center is right where it was located in the last figure, still within the core network, CDMA core network.

MR. FINKELSON: Would you mind highlighting (indiscernible) C, Mr. Baird?

THE WITNESS: Yeah.

BY MR. FINKELSON:

Q Is that the message center, Mr. Lipford?

A Yes, that is the message center.

Q If you could actually skip ahead, Mr. Lipford, to DX-8 in your binder?

A Okay.

(Pause in proceedings.)

Q Do you recognize DX-8, sir?

A Yes, this is a multi-media messaging services requirements document dated October of 2002, and this is actually a document that Sprint was very involved in developing. You can actually see on the next page

that two of my Sprint colleagues were listed as editors of this document.

MR. FINKELSON: Do you mind highlighting the editors section?

BY MR. FINKELSON:

Q Are those the folks that you were just referring to, Mr. Lipford?

A Yes.

Q They were part of your team?

A They did not report to me at the time, but they were part of the Sprint standards team.

Q What are stage one requirements in a standards document such as this one, sir, DX-8?

A Stage one is just a term we use in standards to identify requirements and use cases, so, you know, how -- what does the feature or the service, what does it need to do, how should it work, how would it interact with other network elements or features, and what should the customers experience be? So we call that a stage one.

Q I'd ask you to flip to the very last page of the document. It's page 19. And my first question is whether you're generally familiar with what's being described on page 19 in section 6.4.2, and if so, can you share that with the jury?

A Yes, this is kind of a flexible architecture picture of how MMS can be architected in a CDMA2000 cellular network. Again, it was designed to be very flexible. If you'll look up in some of the text where it starts about on page -- line five of this document, it says, "For example, some network operators may wish to implement the MMS functionality within the core network," and it references scenarios one and two.

Q So stop there if you would.

A Uh-huh.

Q That say, "Some network operators may wish to implement the MMS functionality within the core network," e.g. scenarios one and two. Do you have an understanding of what the reference to "MMS functionality" is, as someone who worked with this document at the time?

A Yes, it would be everything required to provide the capability, so it would be your multi-media messaging server and the elements needed to provide the service.

Q Okay. And does this document actually reflect, as an example, scenario two of the MMS functionality being within the core network, and if so, can you point the jury to that?

A Yes, just down in the diagram where the little circular thing with the "2" in it is it shows the cellular network with the MMSC as part -- where the MMSC could be located. So that would be a very -- a picture of how to implement it within the CDMA2000 core network.

Q Further down, there's a reference to a scenario five. It starts with the sentence, "And still..." Can you explain what is being described there?

A Sure. It says, "And still, some network operators may wish to allow a third party MMS provider to use their network for provisioning MMS." This would allow operators, if they chose, to have an external company or service provider provide the services for them, and this is a pictorial example of what that would look like, so the actual third party service provider is not within the cellular network.

Q Last document, Mr. Lipford, DX-7.

(Pause in proceedings.)

Q Do you recognize DX-7?

A Yes, this is a -- again, a multi-media messaging service requirements document. This particular document is an updated version of the document we just looked at, and it is dated from April of 2004.

Q And does it at the very end of the document on

pages 21 and 22 contain the same text and picture that we were just looking at in the prior exhibit, DX-8?

A Yes, and section 6.2.2 of ths document is the same text as we were just reviewing in the previous document, and the picture is the same picture.

Q Mr. Lipford, are you familiar with Nokia from your standards-related work?

A Yes, I've worked with Nokia ever since I started in standards. They're very involved. Their huge focus was the ETCI, or the European GSM standards we talked about earlier. That was where most of their involvement was.

Q Have you communicated with Nokia engineers during the course of your work in standards-related bodies over the years, and if so, going back how far?

A Oh, yes, I've worked with them since I started in 1998. Still work with them today. And, you know, in fact, they provide some of our infrastructure into our networks today, and they're really good engineers.

Q Going all the way back to the beginning of your work in standards bodies in 1998 to the present, has anyone at Nokia ever raised any patent infringement concerns with you?

A No, never.

MR. FINKELSON: Your Honor, I have no further questions. Maybe it's an appropriate time --

THE COURT: Yes.

MR. FINKELSON: -- to break?

THE COURT: Yes. We'll take a ten minute recess and then begin the cross-examination of this witness.

(Jury out, 11:10 a.m.

THE COURT: We're in recess, everyone.

MR. FINKELSON: Thank you, Your Honor. So, Mr. Lipford, you can step down and just wait in the witness room.

THE COURT: I'm sorry. You can step down.

THE WITNESS: Okay.

THE COURT: You don't have to stay there. And we'll resume your testimony after the recess.

(Recess taken from 11:10 a.m. to 11:27 a.m.)

THE COURT: Be seated, everyone. You may proceed with cross-examination.

CROSS-EXAMINATION

BY MR. GOETTLE:

Q Good afternoon, Mr. Lipford.

A Good afternoon.

Q It's been a little while. I don't know if you recall. I took your deposition. My name is Dan Goettle. It's nice to see you again.

A You too.

Q Mr. Lipford, you've never read the patent in suit in this case, right?

A No, I've not.

Q You've never looked at the claim construction in this -- any claim constructions regarding that patent in this case, have you?

A No, I haven't.

Q Okay. Do you have any understanding of whether the phrase "core network elements" is of relevant importance to the jury in what they need to decide in this case?

A No, I do not.

Q Okay. But you did use the term "core" and "core network" a fair amount during your direct examination, right?

A Yes, I did.

Q Okay. But you meant "core network" within the context of the standards that you were talking about, not in the context of the patent in suit, right?

A That is correct.

Q You used the term "core network" in the context

of the standards you were talking about and not in the context of "core network elements" in the Court's construction, right?

A That is correct.

Q And you have never had occasion to consider whether any core network element of today would qualify of a core network element in a 1999 cellular network?

A I'm sorry, say that again. Can you ask that again, please? I apologize.

Q You've never had to consider what a core network element is in a 1999 cellular network, have you?

A Well, in order to --

Q The --

A -- define the core network, I would have to know what the core network elements are.

Q And you would look to the standards to see what the standards say about it?

A Well, I helped write those standards, yes.

Q That's a yes, you would --

A Yes.

Q -- look at the standards?

A Yes.

Q Okay. But you wouldn't look to the patent that you've never seen before or the Court's claim

construction that you've never seen before?

A Correct.

Q Okay. So your testimony with respect -- regarding core network is all in the context of these standards and not in the context of the patent?

A Correct.

Q Okay. You worked on functionality -- this may have before you started your work in the standards organizations. You worked on functionality called interworking function, correct?

A Yes, that was just before I started my standards role.

Q And Sprint implemented interworking function in its cellular network in 1998?

A Yes, we did.

Q And that as your work that got -- that's what go implemented in Sprint's network?

A Yes, it was.

Q That interworking function enabled a Sprint subscriber to use their cell phone to get on the internet?

A Yes, it did.

Q Sir, you testified a little bit about what standards are for. You referenced how you explained it to your mom, is that right?

A Yes.
Q Okay. And it was a good explanation, but fundamentally, the idea is so that when you take your iPhone into a network it will work?
A Yes.
Q Okay. And that way, Apple, who was the creator and developer of the iPHone, that way, Apple doesn't have to call Sprint to find out how their network works? They can just look to these standards and decide how to make their iPhone so that it will work in Sprint's network?
A Yes.
Q So the standards are about defining the interfaces, how one component, like the phone, can talk to another component, like the tower, right?
A Yes.
Q And it's how a -- one component, like a mobile switching center can be made by one company, and that mobile switching center will know how to talk to, for example, a home location register that's made by another company?
A Yes.
Q So that the mobile switching center vendor doesn't need to call the HLR vendor and say hey, how do you want to get our systems to work together,

right?
A Correct.
Q Instead, they go to the standards and they develop a creative -- they develop those interfaces according to the standard, and then they're reasonably assured it will work?
A Reasonably assured, correct.
Q It probably doesn't work smoothly, probably some tweaks, but largely, they rely on the standards?
A Yes.
Q Okay. And that's the purpose of the standards, right?
A Yes.
Q It's for inter -- they call that interoperability?
A Yes.
Q Okay. And Sprint intends to be compliant with standards?
A Yes, as a multi-vendor environment, it's imperative that we -- as close as we can.
Q Right, because if they deviate from the standard, then when someone -- one of these vendors tries to plug in their equipment it might not work?
A Correct.
Q So they rely on these vendors to apply the

standards correctly, and then they know, are reasonably assured, that it will largely work, the cellular network will largely work, when all those network components are plugged together and start -- and turn on?

A Yes.

Q Okay. Now, we're going to -- we're going to go through the documents that you referred to, but one of the documents you referred to was what you called ANSI-41?

A ANSI-41, yes.

Q And that was the first document that the jury saw?

A Yes.

Q And you don't know -- that was the one -- that was the earliest one in time, 1997?

A Correct.

Q And you don't know one way or the other whether Sprint had any involvement in developing that standard?

A That was prior to my coming onto the team, correct.

Q So you don't know one way or the other whether Sprint had any involvement in developing that standard?

A Correct.

THE COURT: Mr. Goettle, is that DX-3?

MR. GOETTLE: It is, sir.

THE COURT: Thanks.

(Pause in proceedings.)

BY MR. GOETTLE:

Q And you had zero -- zero involvement in Sprint's implementation of any of the 3GPP2 standards?

A Correct, I believe I mentioned that on my direct.

Q You had no involvement in -- with the engineers at Sprint who were charged with the responsibility of putting the network together? You had no involvement in them in how they put the network together?

A I was not directly involved. Sometimes they would ask questions to help them interpret a standard or what the meaning of the standard was, and then we would provide that interpretation for them.

Q And you never had to provide any interpretation with respect to implementing short message service?

A Not that I recall, no.

Q And you never had to provide any advice or interpretation when Sprint was implementing multi-media service?

A No, that would have been a different engineer on our team, on our standards team.

Q And you have no understanding one way or the other whether he did provide any such interpretations?

A No, I do not.

Q And, sir, you don't know -- you don't know -- you don't know about Sprint's short -- I'm sorry, you don't know about Sprint's subscriber profile system, SPS?

A No, sir, I do not.

Q And you don't know about Sprint's short message service center, SMSC?

A Not about our specific center, no.

Q And you don't know anything about Sprint's multi-media service center, MMSC?

A No.

Q And you don't even know whether Sprint uses a mobile switching center?

A I do not know if we continue to use one. We used to.

Q And, sir, you testified on your direct -- and correct me if I'm wrong, but you testified on your direct that there was a separate European standard different from the one that you talked to the jury about?

A Yes, the ENCI standard I think you're referring

to, yes.
Q It also could be known as GSM?
A The GSM standard, yes.
Q Okay. And that's a European standard in your view?
A Yes.
Q Okay. And then this CDMA standard, which is an outgrowth of ANSI-41, that's what you referred to as the American standard?
A Correct.
Q And you gave an analogy to the jury about outlets and how outlets in Europe are different than outlets in the U.S., right?
A Yes, I did.
Q And that would give the impression that you couldn't take your toaster to Europe and plug it in without some sort of adapter, right?
A Correct.
Q Okay. But there are two of the four carriers in the United States that are implementing that European standard, right?
A I believe you're mentioning T-Mobile and AT&T, yes.
Q Those are two, right?
A That's --

Q There's only four in the United States, right?
A There's many carriers in the United States.
Q Okay.
A There's four nationwide carriers.
Q Thank you. Four nation -- you caught me and --
A Yeah.
Q -- I was like oh, boy, there are? I --
A Yes, there are a lot smaller regional ones.
Q Okay. But you referred to them as nationwide?
A Yes.
Q Okay. Two of the four nationwide carriers are able to plug their toasters in here just fine using the European standard?
A They have the technology to call I guess.
Q Okay.

(Pause in proceedings.)

MR. GOETTLE: Okay. Can we put up DX-3, please, Mr. Dyer?

(Pause in proceedings.)

BY MR. GOETTLE:

Q This was the first document that you talked to the jury about, right?
A Yes.
Q Let's make sure that we understand everything that's going on in this document.

MR. GOETTLE: Can you -- Mr. Dyer, can you blow up at the top left corner that -- where it says "3GPP?"

BY MR. GOETTLE:

Q Sir, you see that -- you see where in the blowup on the first page of DX-3 it says "3GPP2N.S?"

A Yes.

Q Right?

A Yeah.

Q That S stands for "specification," correct?

A Correct. We talked about that in my deposition I think.

Q We did, yes. You educated me very well. And the other documents -- and we're going to look at them later -- other document sometimes don't use an S, they use an R?

A Correct.

Q And that stands for "reference?"

A Correct.

Q Okay. "Reference," meaning not required?

A Correct.

Q Okay. For information?

A They're informational documents, correct.

Q Okay. Okay. And then let's --

MR. GOETTLE: Can we -- Mr. Dyer, can you

just pull up the title?

BY MR. GOETTLE:

Q And all I wanted to flag in the title is it uses the term "Inter-system Operations," right, in the title?

A Yes, it does.

Q And that's what we were talking about with the vendors not having to call each other directly. They can just go to this document because it's about how do you get your stuff to work in the inner-system, right?

A Yes.

Q Okay. And that's the purpose of this document?

A Yes.

Q Okay.

(Pause in proceedings.)

MR. GOETTLE: Okay. Can we go to page 1-7?

(Pause in proceedings.)

MR. GOETTLE: Can you blow up the bottom definition, "network reference model?"

BY MR. GOETTLE:

Q You showed this definition to the jury, right?

A Yes.

Q Okay. The definition is for "network reference model," right?

A Yes.

Q And that's the diagram that you showed to the jury?

A Yes.

Q Okay. And we're going to look at that, but this says under "network reference model," this is the definition, "The functional entities and the associated interface reference points that may logically comprise a cellular network," right?

A Yes, it is.

Q Okay. So let's put down a couple markers on this. First of all, it's talking about function, functional entities, right?

A Yes, it is.

Q Okay. So it's saying these are the functions for -- the last two words in that are a "cellular network?"

A Yes.

Q The functions for a cellular network, right?

A Yes.

Q Okay. And then there's an important word in there. It says -- towards the end it says -- of the top line it says "that may logically comprise a cellular network," right?

A Yes, it does.

Q And that is saying may or may not, correct?

A Correct.

Q Okay. So putting it together, a network reference model in this document, DX-3, is laying out the functions that may comprise a cellular network?

A Yes.

Q Okay. So let's go to 1-24.

(Pause in proceedings.)

MR. GOETTLE: And just like before, can you blow up the five down through figure two?

BY MR. GOETTLE:

Q Okay. So now I'm showing you what's on 1-24 of DX-3. This is the network reference model?

A Yes, it is.

Q Okay. Okay. And we see in that first sentence, it -- now it's saying figure two presents, but after that, it's the same definition, right?

A Yes.

Q Okay. So -- just so there's no confusion, Mr. Lipford, when you look at this diagram and see those boxes, those are not hardware, that is not equipment, those boxes are its functions, right?

A They could be both because they're -- it takes equipment to do the function.

Q Certainly. They could be both. But it's -- this

diagram is not to be read as if all of these are separate computers talking to each other, right? Because these are just boxes around functions, right?

A Yes.

Q Okay. And we can't assume even though the -- it says figure two presents the functional entities that may comprise a cellular network, we can't just look at this diagram and accept that everything in here is a function of a cellular network, right?

A Well, as I testified, there are two functions that are not part of the cellular network.

Q Right.

A Right.

Q So the devil is in the details, right? Could be?

A It's in -- you know, in the hands of the experts that helped develop the document and use the document for interpretation.

Q You have to know more than just going to this document and starting to point at it? You have to apply -- you have to apply some knowledge, right?

A This is the starting point recommendation to the engineers.

Q Okay. And maybe I should back up and we should explain what we're talking about and make sure it's clear.

A Okay.

Q The PSTN, that's the wired phone system?

A Yes.

Q Okay. And the ISDN, what is that?

A That is called the integrated services digital network. It's a data network. It's also a protocol which in my experience, as we discussed in my deposition, was used for communicating between two endpoints. So I worked with it as a protocol. It can also -- it's also cons -- you know, is a network.

Q And, certainly, it would not be part of a cellular network?

A No, it would not be.

Q Okay. So you can't just look at this diagram and -- really, you can't read the first sentence in this diagram and assume everything that is in there is part of a cellular network?

A It would take someone skilled in the technology, yes.

Q Yes. And, by the way, this diagram is intended to be informative for the reader, correct?

A It is an informative document, yes.

Q It is not a requirement?

A It is a recommended starting point or guidelines, but it is not a mandatory requirement.

Q Well, you inserted the word "recommended," but I thought we already established that what this diagram is and what the network reference model is per its definition is showing the functions that may comprise a cellular network.

A It may, and because they are defined in this way, and I think there is actually words in here that says "recommends" --

Q There's words in here that say "recommend?"

A It's either this one or the next version of the document I believe it is, the PX-4.

Q Well, how about this one?

A I would have to spend some time studying it.

Q You don't know sitting here today?

A Not sitting here today.

Q And you did prepare for this testimony today, right?

A Yes.

Q Okay.

(Pause in proceedings.)

MR. GOETTLE: Okay. And let's -- let's go to the next page. And can you blow up the definition of "message center?"

BY MR. GOETTLE:

Q By the way, I want to make sure -- I forgot to

ask you a question. I want to make sure that your direct testimony is absolutely clear for this jury. Does this document anywhere refer to "hardware," the word "hardware?"

A Not to my knowledge.

Q Okay. And, again, that's consistent with what we were talking about? It's talking about the functions?

A Correct.

Q Right?

A Yeah.

Q Okay. And this is the definition of "message center" that you read to the jury, correct?

A Yes.

Q Okay. "Message center," those words do -- are not the same words as "messaging server," are they?

A They are not the same words.

Q Okay. So if a patent is talking about "messaging server," you would be best served to go to the patent to find out what it means by a "messaging server?"

A That would seem to make sense.

Q Yeah, it would make total sense, right? Okay. And if the Court has construed messaging --

THE COURT: You have to -- you have to give a verbal answer.

THE WITNESS: Oh.

MR. GOETTLE: Oh, I'm sorry. I'm sorry.

THE WITNESS: Yes, it does make sense.

MR. GOETTLE: I apologize.

THE WITNESS: Yes.

THE COURT: The witness nodded, didn't say anything.

MR. GOETTLE: Oh.

THE COURT: And you assumed he said yes.

MR. GOETTLE: I did.

THE COURT: But the record will show nothing.

MR. GOETTLE: Yes, that was --

THE COURT: He just answered the question.

MR. GOETTLE: Yes.

THE COURT: Now you may proceed.

MR. GOETTLE: Thank you, sir.

BY MR. GOETTLE:

Q And if the Court has construed "messaging server" under a patent, the interpreter or someone who might have to be applying that patent to find out if there's infringement would be best served to look at the Court's construction of "messaging server" and not look at this document's definition of "message center," right?

A Yes.

Q Okay. And in this definition of "message center" it does define -- the first part says, "The MC," which is the message center, "is an entity that stores and forwards short messages," right?

A Yes, it does.

Q Okay. That definition says nothing about sending an inquiry?

A No, it does not.

Q And let's go back to our -- to our discussion about functions. Let's look at the definition of "home location register."

A Okay.

Q Okay. I want to go to the --

MR. GOETTLE: Can you highlight the second sentence that starts, "The HLR...?" The second sentence, sorry. The middle sentence.

(Pause in proceedings.)

BY MR. GOETTLE:

Q That sentence that just got highlighted in the definition of "home location register" in DX-3 reads, "The HLR may or may not be located within and be indistinguishable from an MSC." Did I read that right?

A Yes.

Q Okay. And that go -- that, again, supports this notion of function. You can have your HLR function and your mobile switching center function, MSC function, in the same computer? They can be mushed together, right?

A They can be.

Q Okay. And it actually -- it includes that language and other definitions in here as well. Do you want me to point you to them? How about VLR, visitor location register, which is on the next page?

(Pause in proceedings.)

Q And we see in the middle sentence there, do you see that, sir, it says, "The VLR may or may not be located within and be indistinguishable from an MSC?" Do you see that?

A Yes, I see that.

Q Okay. And the visitor location register, you could -- it's safe to kind of think of that as sort of like a home location register when you're on the road? Is that safe?

A It would be of your serving MSC or serving VLR.

Q Okay. And it's storing subscriber information?

A Yes.

Q And the -- and the mobile switching center would rely on the visitor location register in order to,

you know, get information?

A That would be one place it would rely on, yes.

Q So then, sir, under this standard, it was very common back in 1997 time frame to think of these functions that are defined in here as functions, and a skilled artisan would know you can combine these functions in virtually any way you want?

A Yes.

Q Okay.

(Pause in proceedings.)

MR. GOETTLE: Okay. Can we -- can we go to DX-4?

BY MR. GOETTLE:

Q This was another document that you looked at with counsel on your direct examination?

A Yes, it was.

Q Are you -- I'm not trying to rush you. Are you caught up?

A Yeah, yeah, that's fine. I'll work from this. That's too much paper to turn.

Q Okay.

MR. GOETTLE: Can we do the same thing? Can you blow up the top corner?

(Pause in proceedings.)

BY MR. GOETTLE:

Q Okay. So here, we have what's blown up for DX-4 in the top corner, it says "3GPP2S.R." Do you see that?
A Yes.
Q Okay. And that R means "reference?"
A Correct.
Q Which means informative?
A Correct.
Q It's not to be taken as meaning required? That is not what R stands for?
A Correct.
Q Which certain lay lawyers might think that's what R stands for when they're taking a deposition?
A Yes, I think we had that discussion.
Q Okay. Now let's go to -- let's go to page three.

(Pause in proceedings.)

Q Okay. And the -- and you showed this to the jury on your direct examination, what I'm showing here on the screen?
A Yes.
Q Okay. And I think you testified -- and correct me if I'm wrong, but I think you testified that everything in the dotted line that runs around, everything in there is the core network?
A Yes, that -- when we were working back in -- what

was this -- 1999, we would use the terms interchangeably.

Q You would use the terms "core network" and "collective entity" interchangeably?

A Yes.

Q Okay. And -- but you did -- you did testify that the document nowhere refers to the word "core," let alone "core network," let alone even further "core network elements?"

A Correct.

Q No reference in this document to "core network elements?"

A No.

Q And no reference in the first document we looked at, which I don't know if the jury got the sense, which is like 1,500 pages long, no reference in there about "core," "core network," or "core network elements?"

A Not to my knowledge.

Q Okay. And what we're seeing in this dotted line here, according to you, sir, is the core network of a 3GPP2 wireless network?

A Yes.

Q Okay. 3GPP2 equals CDMA2000 for -- right?

A Yes.

Q Okay. CDMA2000 is Sprint's network?

A Yes.

Q Okay. So when we see 3GPP2 in these documents we can be thinking this is CDMA2000 network like Sprint's?

A Yes.

Q So is it your testimony, sir, today that everything in this dotted line that Sprint implements is part of Sprint's core network of its 3 -- of its 3GPP2 wireless network?

A Yes. I think we did mention that the composite of the BS, that it could be inside or outside. It depends on how it would be implemented by the vendors. But yes, everything inside of this would be part of our core -- CDMA2000 core network.

Q So now we have yet another instance where you can't just look at the diagram and know what it means, right?

A Not to the layperson, no.

Q Not to the layperson.

MR. GOETTLE: Can you -- can you pull up what's that kind of shaded box inside -- actually, I just -- hold on, I'll put an arrow on it.

(Pause in proceedings.)

MR. GOETTLE: That shaded box right there.

BY MR. GOETTLE:

Q This part is inside the collective entity in this document, right?

A Yes, it is.

Q And that part is the cellular tower and the specialized computer that hangs on the tower that controls the tower?

A As well as the equipment that controls that tower and the equipment at that tower, or the BSC, yes.

Q Okay. So -- and you're saying that somehow a skilled artisan would know well, that -- even though it's within the dotted line going around the box, a skilled artisan would know that part is not included?

A I didn't say it was not included. There are cases where it may not be included.

Q How about in Sprint's network?

A There are cases I believe where it may not be included. It depends on the vendor's implementation of the BS function.

Q So are you testifying today that the cellular network antennas in Sprint's network are part of Sprint's core network?

A No, sir, I did not say that.

Q Okay. I'm not following what you are saying. Are you saying that in Sprint's network, the bay

station controllers are within Sprint's core network?
A There are I believe -- and, again, I didn't do implementation, so I can't state for a fact for the Court, so I'd prefer not to answer --
Q That's fine.
A -- that question.
Q "I don't know" is a certainly fine answer, sir --
A Yeah.
Q -- if that's your answer.
A Yeah.
Q Okay. Sir, I didn't think the question and answer during your direct was abundantly clear on this point. Are you saying that everything within this dotted line is part of a CDMA cellular network, not a wireless network, a cellular network?
A Everything within the dotted line would be part of the CDMA cellular network.
Q Just to make that --
A You would add the mobile station to complete the picture.
Q Let me try it again. Maybe I missed my question.
A Okay.
Q I think I did. Every - is it your testimony that everything in that dotted line is part of the core network of a CDMA cellular network?

A Yes, and I would caveat that with the composite of the bay station may or may not be realized that way depending on implementations.

Q And that we have just talked about?

A Right.

Q Okay. But that bay station, BTS and BCS, that bay station system though was included in the network reference model that we looked at in DX-3, right?

A Yes.

Q Okay. So, sir --

MR. GOETTLE: Can you turn to -- can you go back to the previous page and blow up the paragraph under two reference models?

(Pause in proceedings.)

MR. GOETTLE: Yeah, actually, these --

(Pause in proceedings.)

MR. GOETTLE: Yeah, back one page, sir. There you go. Can you blow up the number two at the top and then the paragraph right under it?

BY MR. GOETTLE:

Q Sir, do you see that the heading here is "2. Reference Models," plural?

A Yes.

Q Okay. And then under that, there's a paragraph that says, "Reference models are a graphical tool

used to visualize structure and describe certain complex subjects."

A Yes.

Q Oh, I just read the rest of that and I thought boy, what's my point?

MR. GOETTLE: Can we go back and go to the next paragraph down, 2.1?

BY MR. GOETTLE:

Q In the first paragraph there under 2.1, it says, "Figure 2.1," which is the figure we were just looking at with the dotted line around it, "Figure 2.1 presents the network entities and associated reference points that comprise a wireless network." Do you see that?

A Yes.

Q Okay. Juxtapose that to what we looked at before in DX-3 where it says it was a network reference model for a cellular network, right?

A Yes. Okay.

Q Okay. Different words, right?

A Yes.

Q Okay. And then in the last sentence in this paragraph it says, "The network reference model in this document is a compilation of several reference models currently in use in 3GPP2 wireless

recommendations." Do you see that?

A Yes.

Q So figure two is a compilation of various different network reference models?

A Yes.

Q Right? So when we look at figure two and what's in that dotted line around the collective entity and are trying to figure out why it has so much more stuff in it than the network reference model we looked at in DX-3, it's because it's included other reference models, and that's why it's called a wireless reference model and not a cellular reference model, right?

A No, it's a wireless reference model because everything that 3GPP2 does is wireless. It is the CDMA2000 wireless technology, so it would be a wireless reference model.

Q So in your opinion then, or your testimony is that there's no distinction to be made between cellular and wireless?

A In the case of these documents that we're looking at that I've testified to, a wireless would be the same as CDMA2000 or ANSI-41 CDMA2000 technology.

Q I just want to make sure you're answering the question I'm asking. I'm not saying you're not --

A Okay.

Q -- but I want to make sure you're clear.

MR. GOETTLE: Actually, why don't we put them up side by side? So can you put up the next page on here with the dotted line around it? And can you put up DX-3 on -- next to it at page 1-24?

(Pause in proceedings.)

MR. GOETTLE: And can you blow up the same way you had before? Oh, sorry, can you include the paragraph above?

(Pause in proceedings.)

MR. GOETTLE: I'm sorry, Mr. Dyer, can you just get a little bit more on the busier slide -- the busier side? I want to see the figure 2.1 below. Thank you. Sorry.

BY MR. GOETTLE:

Q Okay. So what we have on the left is the network reference model from DX-3 that we talked about earlier, right?

A Yes.

Q A network reference model for a cellular network?

A Yes.

Q Okay. And then on DX-4 on the right, we have a network reference model at least in here it says for a wireless network, right?

A Yes.

Q Okay. And we see that the -- what you call the core network has vastly expanded in the period of two years, right?

A Yes.

Q Okay. What's core -- what does "core" mean in "core network" to you?

A In a wireless network it would be the entities that are the switching, the IP, the messaging, the services, it's the non-RF portions of it. So you would have the radio network and the core network, or the CDMA core network.

Q Okay. So it's basically everything in the figures that don't relate to the RF interface?

A Yes.

Q Okay. Which means everything in the figures that doesn't relate to the phone and the power?

A Yes.

Q Everything else is a core network element?

A Well, we did talk about the PSTN, the ISDN, and those -- where you connect to other networks, those entities --

Q Not included?

A -- not being part of the CDMA core network.

Q But everything else is core in your view?

A Yes, the things in the dotted line.

Q Okay. Actually, and then when you compare these diagrams we see that there are -- just to put -- just to finalize this, they're -- in addition to what's shown in the cellular network reference model on the left, what's added in the wireless network reference model on the right is the box that says "IP" at the top. Do you see that?

MR. GOETTLE: Can you highlight these as I go?

BY MR. GOETTLE:

Q Next to that is the box that says -- I think it says "SCP?"

A Uh-huh.

Q Next to that is a box that says something else. I can't read it. "SN" I think, right? That's not included in the cellular reference model.

A The one on the left?

Q Yeah, I can't read the letters on it.

A Right.

Q "SN," okay. And then --

A Yeah.

MR. GOETTLE: Can you go back?

BY MR. GOETTLE:

Q And then we have below the "IP" box, we have the

box labeled "NPDB." That's now core. Wasn't needed to describe the cellular network in 1997, but in 1999, that's now core, right, according to you?

A Yes.

Q Okay. And then we have the box in the bottom, right that says "OTAF." That's now core in 1999 and it wasn't core in 1997, right?

A Correct.

Q Okay.

(Pause in proceedings.)

MR. GOETTLE: And now, Mr. Dyer, can you leave up what you have on the right and bring up DX-5?

BY MR. GOETTLE:

Q Okay. You looked at DX-5 on your direct examination?

A Yes.

Q Okay. And this is the version -- the next subsequent version of what we're looking at on the right?

A It's revision B, yes.

Q Okay. So this one comes a little bit later in time?

A Yes.

Q In fact, this is in 2001?

A Yes.

Q Okay. And where is the -- the version on the right is 1999?

A Yes.

Q Okay. So this is two years later?

A Yes.

MR. GOETTLE: Okay. Can you go to the same diagram in there? It's page nine I think. Yeah.

BY MR. GOETTLE:

Q Okay. Now we see that the core -- the core network -- core network has expanded again in just two years. Now we have added on the -- on the left-hand side towards the top there's a box called "LPDE." That's not -- do you see it right below where you are? Nope. Yep.

THE COURT: What figure is shown on the left side of the screen?

MR. GOETTLE: That is, sir -- that is figure 2.1 of DX --

THE COURT: Of DX-5?

MR. GOETTLE: Yes, sir.

BY MR. GOETTLE:

Q We also have more core network elements added. We have a "VMS" right next to where you -- right next to the "LPDE." Do you see that, sir?

A Yes.

Q That stands for "voicemail system?"

A You might have to look at the thing, but I'll assume you -- it does.

Q Okay. So now voicemail systems are now essential components of a cellular network, right, as of -- as of 2001?

A Yes.

Q Okay. And then below, on the left we have a new box called "PCF."

MR. GOETTLE: Keep going down. Yep.

BY MR. GOETTLE:

Q Right?

A Yes.

Q Okay. So that's now core, right?

A Yes, it is.

Q Okay. And then if you go down to the other side towards the bottom, there's a box called "PDE" and "MPC" that were not included before.

(Pause in proceedings.)

Q Do you see those, sir?

A Yes, I do.

Q So the core network of a cellular network has just expanded again in the space of two years with five more functional entities?

A Yes.

Q Okay.

MR. GOETTLE: Okay. We can erase all that. Can we go to DX-8?

(Pause in proceedings.)

BY MR. GOETTLE:

Q By the way, while we're looking at these functional entities, does the standard describe that for a cellular network to be implemented according to standard, you look at the geographic implementation, where those functions are implemented?

A Just the standard specify geographical information for --

Q Does the standard require that to implement a cellular network according to this standard that geography matters?

A No.

Q Does geography have anything to do with what is part of a cellular network?

A No.

Q Does geography have anything to do with whether -- in determining whether one element is -- let me rephrase the question, if you don't mind. What about relative geography? Does the standard matter -- does the standard specify anything about

determining whether one element is part of a cellular network, you look at how close it is to another element of the cellular network?

A There are cases and standards where delay does play a role in how to specify something, and distance equals delay in some cases. It doesn't expressly use the term "distance." It just says what the delay requirements may be.

Q So it will -- in the -- I see. You're saying it will indirectly talk about distance because it's talking about how fast signals need to get from one component to another?

A Correct.

Q Okay. But you didn't talk about any of that on direct with respect to these exhibits?

A No, these exhibits we did not.

Q No, because it's not in these exhibits?

A No.

MR. GOETTLE: Okay. Can you blow up the top corner on this one?

(Pause in proceedings.)

BY MR. GOETTLE:

Q Sir, do you see in the top here we have another R, "R0064?"

A Yes.

Q "Reference," right?
A That is a reference document.
Q Informative, right?
A Correct.
Q Okay. So down below where you on direct were talking about the stage one requirements, this is -- confusingly, for some reasons, but this is for reference, right?
A A requirements document is a reference document, yes.
Q Not require, right?
A No.
Q So, confusingly, a document that is called "Stage One Requirements" is actually not required?
A Correct.
Q Okay.

(Pause in proceedings.)

MR. GOETTLE: Okay. And then let's go to the last page.

THE COURT: What page is that?

MR. GOETTLE: I'm sorry, it's page 19.

BY MR. GOETTLE:

Q This is entitled "6.4.2 MMS System Architecture Flexibility." Do you see that?
A Yes, at the top of the page.

Q Okay. And you've read -- I know you read portions of this on your direct, but you've read this paragraph?

A Yes, I have.

Q You know what it's getting at, right?

A Yes.

Q It's saying you figure out how to implement it. We're going to be flexible and you'll still be standards compliant?

A It's explaining the different ways that you can implement it based on your needs, yes.

Q And one of those ways is for the network operator, which would be, for example, Sprint, right? Sprint is a network operator?

A Yes, we are.

Q Okay. In the scenario five that you talked about, which is the second to last sentence -- let me just read it. It says, "And still some network operators may which," which I think must mean "wish," is that right? That's a typo?

A Yes, I would think so.

Q Okay. It says, "And still some network operators may wish to allow a third party MMS provider to use their networks for provisioning MMS." Do you see that?

A Yes.

Q Okay. And that -- what that's saying is you can have an -- a multi-media service center outside this -- external to the cellular network and be compliant with the standard?

A Yes, it gives you that flexibility.

Q And you've heard of Sprint's old service called Picture Mail, right?

A I'm aware of it, yes.

Q And that's exactly the scenario with Picture Mail?

A I wasn't in charge of the implementation. I can't say for sure.

Q You don't know any -- you don't know any -- one way or the other about Picture Mail?

A I mean I wasn't involved in the engineering of it, so I would not want to go on record as to the specifics of it. I've talked to people, but I have not -- I haven't seen the direct design or anything.

Q So let me ask you this. During the picture mail days, did Sprint host the MMSC?

A As I mentioned, I wasn't involved --

Q You don't know.

A -- in the implementation.

Q Okay.

(Pause in proceedings.)

Q I had forgotten you also looked at DX-7 on your -- did you look at DX-7 on your direct? I have it in my folder. I guess you did?

A I did.

Q Okay. Same as what we just looked at?

A It's an updated version.

Q Okay. All right. Thank you.

MR. GOETTLE: No further questions.

(Pause in proceedings.)

REDIRECT EXAMINATION

BY MR. FINKELSON:

Q Mr. Lipford, counsel for Comcast was just asking you some questions with respect to geography and whether that matters or not.

A Yes.

Q Were your answers with respect to those questions specific to the standards?

A Yes. Yes.

Q Because the standards is where your experience is?

A Yeah, I deal with the standards. What we do, that's another group of experts.

Q Do you know anything about Sprint's actual implementation?

A No.

Q Do you know anything about whether geography matters at Sprint when it comes to how it has actually deployed certain components either inside or outside of the cellular network?

A No, I do not.

MR. FINKELSON: No further questions. Thank you, Mr. Lipford.

MR. GOETTLE: Very brief. I just want to make sure this point is very clear, Your Honor, but I don't need to --

THE COURT: No, you may. You may.

RECROSS-EXAMINATION

BY MR. GOETTLE:

Q Sir, if you were ever asked to evaluate Sprint's network to determine whether it was standards compliant, would geography -- with respect to these standards in front of you, would geography play any role in that determination?

A No.

THE COURT: That concludes your testimony. Thank you very much.

(Witness excused.)

THE COURT: The witness asked whether he could leave. Mr. Lipford?

MS. SIMPSON: He may leave.

THE COURT: Fine. You may.

MS. SIMPSON: Sprint would like to call Mr. Patrick Wilson.

(Pause in proceedings.)

PATRICK WILSON, Defendant's Witness, Sworn.

COURTROOM DEPUTY: Please be seated. Please state your full name and spell it for the record.

THE WITNESS: Sure, it's Patrick David Wilson, W-I-L-S-O-N.

DIRECT EXAMINATION

BY MS. SIMPSON:

Q Good afternoon, Mr. Wilson.

A Good afternoon.

Q Could you please introduce yourself to the jury?

A Sure. My name is Patrick David Wilson. I'm an engineer at Sprint. Born and raised in Ohio. Currently live in Colorado. Married, three kids, all middle school age.

Q And what is your current position at Sprint?

A My current position is I'm an engineer at Sprint. I had several different positions throughout Sprint, but the majority of them being an engineer.

Q And what's your current title?

A My current title is -- I lead special projects. Special projects are those -- we kind of work with the Apples, the Samsungs of the world, with those device manufacturers, and we do things special for them that we kind of don't want the public to know in anticipation of say a device launch, something like that, the next cool phone.

Q Can you please tell the jury how you first became involved in telecommunications?

A Sure. Went to college at Mount Union College in Ohio. My undergrad was international business economics and French, nothing really computer-related. But throughout my studies, I always found myself kind of being drawn to the computer side of things. So after I graduated, I started to pursue a Master's in Computer Information Systems. At that same time I actually had to get a full-time job to pay for that master's, so I took a job with a software development company. I would say those two things together, you know, working on my master's and also working for a software development company that kind of pushed me down that career path towards the telecommunications industry.

Q And where did you get your master's degree?

A I got my master's degree in 2000 from the

University of Colorado. I was -- it was a Master's in Computer Information Systems. Basically, it taught you the end to end life cycle of how to develop an application, you know, how you capture the requirements, how you design the system, how you code the system, how do you architect the database behind the system, and, ultimately, how do you deploy a system and maintain a system.

Q What was your first position at Sprint and when?

A I was hired in Sprint roughly early 2000. Again, I was an engineer at the time. That was my first position at Sprint.

Q Okay. And then after that, what were your other positions at Sprint?

A So yeah, largely an engineer through most of my time. I've had several promotions, but largely an engineer. I was also a manager for a period of time as well, so -- but largely an engineer. And I would say my -- you know, as it pertains to why I'm here today, I was the lead design engineer over Sprint's SMS and MMS systems. That was -- I was the lead engineer roughly from 2002. It kind of coincided with the birth of my firstborn. That's kind of why I remember it well. And lasted up until -- in that position up until about 2011-2012, so just about a

decade being the lead engineer over the SMS and MMS development at Sprint.

Q Have you heard of Syniverse Picture Mail?

A I have.

Q Okay. Could you tell us what that is?

A Sure. The Syniverse Picture Mail platform is what we called it, Syniverse Picture Mail product. It was -- it was basically MMS servers. And what we did early on is that was an outsourced system. It was an application that was provided by the company called Syniverse. And what that means is they kind of controlled everything. They built a product, they sold that product to Sprint, completely outsourced outside of our core network, and it provided MMS services at the time. So that was the Syniverse Picture Mail platform.

Q And what was your specific role with respect to Syniverse Picture Mail?

A Sure. Even though it was outsourced off of our network, I was still the technical point of contact for -- you know, within Sprint to Syniverse from a network perspective. So I worked directly with Syniverse as the point of contact.

Q So you mentioned about 2012 you switched positions into your current position as --

A I did.
Q -- Special Projects?
A I did.
Q Okay. And why did you change your position?
A It was a promotion. So at the time, like I said, I had been working on the SMS and MMS systems for roughly a decade. I was presented the promotion, the opportunity to either become the manager over the messaging systems, or at the same time I could become -- it wasn't really a manager, but it was a new position that we were starting. It was called Special Projects, and one that reported directly to my director. And, again, Special Projects being, you know, those fancy, secret projects, working with Apple, working with Samsung, trying to figure out what the next cool phone was going to do and making sure, more importantly, it worked on the Sprint network. So, again, I kind of felt like I had been managing the messaging systems for a decade anyway, so I decided to take the Special Projects role. It seemed more interesting at the time.
Q Do you still keep track of messaging?
A I do. It's kind of like one of those -- you know, it was your baby for a long time, for ten years, so it's hard not to -- you know, just

completely let it go. But I do realize that I'm no longer the lead engineer over messaging. So even though the projects I work on now, so say with Apple or with Samsung, still do touch messaging, right, I defer all those design decisions to my successor, that being Sean Hoelzle. He's now the lead over those systems so --

Q I'd like to show you some exhibits, but I realize there's a huge binder in front of you from the last witness.

A There is a big binder, yes.

Q So let me move that.

MS. SIMPSON: Your Honor, may I approach the witness?

THE COURT: Yes, you may.

(Pause in proceedings.)

MR. FINKELSON: That would have made for an interesting exam (indiscernible).

THE WITNESS: Yes.

(Pause in proceedings.)

THE WITNESS: Thank you.

(Pause in proceedings.)

BY MS. SIMPSON:

Q Thankfully, this is a much smaller binder.

A Yes. I'm glad about that, yes.

Q Okay. So I'd like to take you back in time, and let's look at DX-21, if we could.

A Sure.

Q I think it's the first tab there.

A Okay. I have it.

Q Okay.

MS. SIMPSON: At this time could I move all of the exhibits into evidence? I don't believe there's an objection.

MR. GOETTLE: No objection, Your Honor.

MS. SIMPSON: Okay.

THE COURT: What exhibits exactly?

MS. SIMPSON: Oh, let me identify.

THE COURT: How many are there?

MS. SIMPSON: There are four.

THE COURT: All right.

MS. SIMPSON: And for the record, it's DX-21, DX-209, DX-214, and DX-229.

THE COURT: Those exhibits are received.

(Defendant's Exhibits 21, 209, 214, and 229, documents, are admitted into evidence.)

BY MS. SIMPSON:

Q So have you seen DX-21 before?

A DX-21 or -- oh, yeah, sorry, wrong tab. DX-21, yes, I have. This is an email from Kristi

Buckendahl. Kristi Buckendahl was a project manager on the messaging team. It's an email sent from her to myself on November 14th, 2011.

Q Okay. And what does --

THE COURT: Keep your voice up.

THE WITNESS: Okay.

BY MS. SIMPSON:

Q What does the document describe?

A Sure. So the document -- it kind of outlines a couple different projects that I had visibility to being the lead over the SMS and MMS systems. In particular, this email towards the bottom speaks to the Syniverse Picture Mail replacement project.

Q Okay. And what was your role with respect to that project?

A Sure. My role in the Syniverse Picture Mail replacement project was, again, I was the -- I was the design lead for MMS at the time. So my responsibilities were the complete end to end design of how we were going to basically take the Picture Mail platform and move that platform into our core network. We, Sprint, had purchased some MMS servers from Acision, installed those servers into our core network, and we were going to move away from the Syniverse Picture Mail outsourced platform, and we

were going to move that functionality into our core network. So I was the design lead. This was right about the time though when I talked about how I had been given a promotion opportunity. So I was the -- again, I was the design lead, so I was in charge of all requirements gathering. I designed how the system was going to be installed into our core network. And then right about the time where it came to actually move the traffic off of the Syniverse outsourced Picture Mail platform onto our network, that's when I had taken the job as the -- my new role in Special Projects. So, again, I handed that responsibility then off to Sean Hoelzle, who is now the lead over the messaging systems.

Q Why from your vantage point was Sprint looking to bring the serve -- the MMS servers into its cellular network?

A Sure. It's really two points, the first one being bringing them into our core network was consistent with our overall network design philosophy. The second point was really one of control. I've kind of touched on those two things. So the first point of, you know, kind of a consistent design philosophy, all of Sprint's core servers that provide the -- kind of the core services that you

would think of that you pay your cellular provider for, like the ability to make a call, the ability to send a message, those systems were located in our core -- in our core network, right? When the Syniverse Picture Mail platform started, again, it was an outsourced system that we paid Syniverse to provide to us. So we wanted to keep the MMS servers. We wanted to make that consistent by bringing that into our core network so it would sit alongside of our SMS servers or our voice servers, all that kind of stuff.

The second part was really about control. Again, the Syniverse Picture Mail platform was completely owned, operated, designed outside of Sprint. It was provided by Syniverse. So from a control perspective, we wanted to bring it into our network so that we could control the features that were developed, the time frame in which those features were developed, and, more importantly, if there was an outage, something was going wrong with that platform, that we had ultimate control over fixing it. It wasn't just something where we filed a ticket somewhere and hoped one day it would be fixed. So, again, control and philosophy.

Q Thank you. You can put that exhibit aside.

A Sure.

Q Could you turn, please, to DX-214? It might be your third tab there.

A Sure.

Q When you get to it just let me know if you've seen that before.

A Sure. This is a diagram that I created as part of the -- in my role as the design lead for the SMS and MMS systems.

Q Could you describe the document to the jury?

A Sure. This document is what we like to refer to as a logical diagram. It basically shows you the functions that systems do. It doesn't necessarily tell you where they're located or anything like that from -- it doesn't say like oh, this server is in Phoenix or this server is in Denver. It's a functional diagram. This diagram was created during what I refer to as the requirements phase of the Picture Mail replacement project. Again, we were moving off of the Syniverse-hosted platform and moving those servers into our core network. And so this diagram was created early on by me as an understanding of okay, what is it we have to create, what is it we have to bring in, what are the requirements? That's the intent of this diagram.

Q Okay. Can you walk us through it a little bit starting with the left side?

A Sure. So, again, the intent, this was created for the Picture Mail replacement project. That's why if you look on the left-hand side here, the large box that says "Syniverse" with the acronyms -- with the acronym "ASP" -- "ASP" stands for "application service provider." Syniverse was a vendor that provided us an application that we paid a fee for. That's what that box is. So that's essentially the Syniverse Picture Mail platform. If you look inside of that black box, if you will, you see an MMS server, and that's the main box there, the MMSC.

Now, if you look on the right of the diagram, these are the elements within Sprint's core that the Syniverse Picture Mail platform would speak to. So you see things like our SMSC. That is our SMS server. You see things such as SPS, which is our subscriber database. These elements are inside Sprint's core network and these are the elements that the Syniverse Picture Mail platform would have to speak to in order to perform its job.

Q Approximately when did you prepare this document?

A Sure.

Q I prepared this document roughly mid-2011. I

know in my deposition with the Comcast lawyers we had kind of gone back and forth as far as with the exact date this document was created. At the time of my deposition I didn't feel comfortable giving an exact date. If you remember, I had since moved on from messaging and I had seen and basically was presented this document five, six years away from being removed from its creation. So I didn't feel comfortable at the time knowing the exact date, but what I can tell you is that I know the context in which it was created, and it was created, like I said, during the requirements phase. So it was part of us trying to figure out what's in the black box at Syniverse. And knowing the context of the entire project, I can -- I feel absolutely comfortable saying that this was created mid-2011.

Q Does the drawing here accurately depict Sprint's understanding of the makeup and interaction with the Syniverse project -- product, not project?

A Yeah. It does. Again, like I said, the Syniverse Picture Mail platform was outsourced, and because it was outsourced they provided us zero documentation of what it was actually doing. We weren't privy to that information. We just paid them a fee and they gave us a service. So, again, this

document reflects my accurate understanding at the time of what was going on inside that black box within Syniverse. And so absolutely, yes, it accurately reflects this. I know, again, in my deposition with the Comcast lawyers I was asked if this document was 100 percent correct. I didn't feel at the time that I could give a label of 100 percent correct because, again, it reflected my understanding of peering in this black box of what I thought was there. In the deposition we kind of gone back and forth and he had wanted me to assign a percentage of correctness to this diagram. Again, I didn't feel comfortable giving a percentage of correctness, but I can tell you that as a Sprint engineer, we don't produce documents that are intended to be incorrect.

So this was indeed my accurate understanding of what was going on within the Syniverse Picture Mail platform at the time it was created. But even at a higher level, it absolutely depicts the correct understanding that the Syniverse Picture Mail platform was hosted outside of Sprint's core network, and the elements that were contained within Sprint's core network, that being the SMS server, that being the SPS database, yeah, those were -- those were absolutely within our core

network, so yes, it accurately represents what it was intended to do.

Q Okay. You can put that exhibit aside.

A Sure.

Q And we're going to move to DX-229.

A Okay.

Q Do you recognize this document?

A I do. Again, this is a document that I created in my role as design lead over the SMS and MMS systems at Sprint.

Q Okay. Can you walk us through the diagram and what you were trying to depict?

A Sure. Again, this diagram -- again, what we'll refer to as a logical diagram, this diagram was created as part of the Picture Mail replacement project, and, again, it was created during the requirement phase of that project. If you can remember the last diagram that we looked at, it was a little bit more basic in nature than this diagram. This has a bit more details. All that is showing you is that as we understood more and more requirements of what Syniverse was doing and what it was we had to replace, those details are now reflected in this document, right? So this is a document that would have been produced after the previous document,

right?

So, again, the main focus of this document was really understanding what was going on inside that black box within Syniverse, right? And that's why that -- if you look at the rose-colored large box in the middle, that's why it's front and center, right? That's what we're trying to understand is what's going on at Syniverse.

Now, in addition to that, when you design a system one thing is you have to understand what it's doing, but you also have to understand what is it talking to, right? And so that's the elements you kind of see around the Syniverse large box in the middle is these are the other elements that the Syniverse Picture Mail platform was talking to. In particular, if you look at the bottom of the document where you see -- where it's listed like Sprint NOB, or Sprint NOB Reston, these represent Sprint's core network. NOB is simply an acronym we use. We call our -- one of our datacenters the North Bunker. And so that's why we call it NOB. The other box kind of says "Reston." We have a Reston datacenter as well. So this starts to put some physical stuff, like where these things are located, but it's largely just a logical diagram.

So if you look at the Sprint NOB, right, Sprint's core network datacenter, you see things, again, in there like SMSC. That's our SMS servers. You see, again, SPS. That's the subscriber database. So those are the elements within Sprint's core network that the Syniverse Picture Mail platform, the -- those MMS servers would talk to. And if you look at the -- you see these clouds here, right? You see an internet cloud on the left, you see an OSSN VPN cloud. All those clouds are trying to articulate is this is -- like it's kind of a form of communication, like how are -- how is the Syniverse Picture Mail platform talking to these other elements?

So the internet -- it's just like if you would log on a computer an pull up google.com. It just goes out over the internet. Nothing fancy, just plain old internet, right? But if you look at the bottom here, especially how the Picture Mail platform talks to Sprint's core network, it's over this what we call VPN. So that's how -- you see a VPN here talking to Sprint and you see a VPN talking to other entities on the right, like it could be anyone else. Like if you see -- way on the right you see like four end carriers, that how the Picture Mail platform

would talk to other carriers say in Europe or something like that, still over VPN.

Q Does anything inside Sprint's network require a VPN?

A No, not at all. Again, VPN stands for -- it's called a virtual private network, and all it is is it is a secure, encrypted way that two networks or elements within a network can talk to each other. So it's just to prevent eavesdropping, right? So it's just like if you -- you know, if you work for a company and you go home on the weekend and you take your laptop home and you want to do something on the corporate network, you would fire up what's called a VPN client on your home laptop, and that way you could establish a secure way of talking to the home network. That's why what you see here is the Syniverse Picture Mail platform was outside of Sprint's core network, so whenever it had to speak to the elements within -- inside Sprint's core network, it had to do so via an encrypted channel because, again, these two networks weren't trusted, if you will.

Likewise, if you look within the Sprint core network, right, if you look at the SMSC or the SPS, none of those elements require a VPN when they

talk to each other because they're on the core network. It's a trusted network. We don't require an extra level of encryption or untrustedness, if you will, when those elements talk to each other because they're all within the core network.

Q Okay. You can put that exhibit aside.

THE COURT: And now we'll recess. It's 12:40. We'll recess for an hour, okay? Mid-day instructions. You know more and more about the case. Do not discuss it among yourselves, notwithstanding the temptation to do so. I told you why. You can't begin deliberating until the very end of the case, until all the evidence is received, until the attorneys have made their closing arguments and you've heard my instructions on the law. If anyone tries to talk to you about the case, do not discuss it with them. Say nothing to them and notify me of that attempted contact.

I want to remind you that you're not to have any contact, eye contact or any other contact, with any of the people who have been conducting the examination of witnesses or any of the people you see or might recognize in the courtroom. I'll have further instructions at day-end I'm sure. You now know them well enough to give them to yourselves, but

I'm going to keep giving you these instructions.

On that note, Michael, we're in recess until 1:40.

(Jury out, 12:40 p.m.)

THE COURT: We are in recess for an hour. You may step down, sir.

(Luncheon recess taken, 12:41 p.m.)

* * *

I N D E X

| DEFENDANT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mark Yarkosky | | | | |
| By Mr. Hangley | | 3 | | |
| Mark Lipford | | | | |
| By Mr. Finkelson | 44 | | 111 | |
| By Mr. Goettle | | 69 | | 112 |
| David Wilson | | | | |
| By Ms. Simpson | 113 | | | |

| DEFENDANT'S EXHIBITS | | ADMITTED INTO EVIDENCE |
|---|---|---|
| 13 | Document | 27 |
| 4, 5, 6, 7, 8 | Documents | 49 |
| 21, 209, 214, 229 | Documents | 119 |

* * *

CERTIFICATION

I, Michael Keating, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

2/7/17

Date

Michael Keating