```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                          - - -


COMCAST CABLE COMMUNICATIONS, :  CIVIL ACTION NO. 12-0859
LLC, et al.,                  :
             Plaintiffs       :
                              :
         v.                   :  Philadelphia, Pennsylvania
                              :  February 7, 2017
SPRINT COMMUNICATIONS         :  1:49 o'clock p.m.
COMPANY L.P., et al.,         :
             Defendants       :
. . . . . . . . . . . . . . . :


               AFTERNOON SESSION - DAY SEVEN
            BEFORE THE HONORABLE JAN E. DUBOIS
          SENIOR UNITED STATES DISTRICT COURT JUDGE


                          - - -


APPEARANCES:

For the Plaintiffs:      DANIEL J. GOETTLE, ESQUIRE
                         DALE M. HEIST, ESQUIRE
                         Baker & Hostetler, LLP
                         Cira Centre, 12th Floor
                         2929 Arch Street
                         Philadelphia, PA  19104-2891

                         WILLIAM T. HANGLEY, ESQUIRE
                         REBECCA SANTORO MELLEY, ESQUIRE
                         Hangley Aronchick Segal & Pudlin
                         One Logan Square, 27th Floor
                         Philadelphia, PA   19103

                         GEORGE MEDLOCK, ESQUIRE
                         Comcast Cable Communications
                         Chief Patent Counsel


              Laws Transcription Service
                48 W. LaCrosse Avenue
                Lansdowne, PA  19050
                   (610)623-4178
```

2

APPEARANCES: (Continued)

For the Defendants:      DAVID E. FINKELSON, ESQUIRE
                         BRIAN C. RIOPELLE, ESQUIRE
                         JUSTIN R. LOWERY, ESQUIRE
                         McGuire Woods, LLP
                         Gateway Plaza
                         800 East Canal Street
                         Richmond, VA  23219

                         COLLEEN H. SIMPSON, ESQUIRE
                         Harkins Cunningham, LLP
                         4000 Two Commerce Square
                         2001 Market Street
                         Philadelphia, PA  19103

                            - - -

Audio Operator:          Michael Cosgrove

Transcribed by:          Geraldine C. Laws, CET
                         Tracey Williams, CET
                         Paula Curran, CET

(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.

1          (The following occurred in open court at 1:49 p.m.)

2          THE COURT: Good afternoon, everyone.  Please be

3    seated.

4          You may proceed with the direct examination.

5          MS. SIMPSON: Thank you, your Honor.

6          PATRICK DAVID WILSON, Resumed.

7               DIRECT EXAMINATION (Continued)

8    BY MS. SIMPSON:

9    Q   Mr. Wilson, can you turn to Defense Exhibit 209, DX-209,

10   please?

11   A   Okay.

12   Q   Have you seen this document before?

13   A   I have seen this document before.

14   Q   And how did you come about seeing this exhibit?

15   A   So again my current role was special projects.  We work

16   with Apple, Samsung, and having their devices work against

17   our network.  This document is one of those systems that we

18   have those handsets work with.  So that's how I've come

19   across this document.

20   Q   And have you consulted this document?

21   A   I have, absolutely.

22   Q   Can you describe it for the jury a little bit?

23   A   Sure.  This is a design document.  It covers what's

24   called here IMS modernization.  IMS stands for IP Multimedia

25   Subsystem.  You can think of it as a collection of servers

1   that handle voice traffic.  It's kind of the new way to do

2   voice, if you will.  So this document was produced by Jason

3   Rodriguez. That's who created it.  Jason Rodriguez, long-time

4   employee of Sprint has actually reported directly to me on

5   several projects.  In addition, Charles Wilson is listed here

6   as the author and Charles is currently on my team.  So it's

7   an overall design document.  We were changing one vendor and

8   installing a new vendor, and that's what this document

9   covers.

10  Q    Could you please turn to page 58?

11  A    We're going to focus on the diagram at the top of that

12  page.

13  Q    Okay.  Could you describe the diagram to all of us?

14  A    Sure.  Once again this is a logical diagram.  Its intent

15  is to depict this IMS IP Multimedia Subsystem.  If you look

16  in the center of the diagram, the large box there, that's

17  essentially the IMS system.  And again this document seeks to

18  understand what's in the IMS system, but more importantly it

19  speaks to understand what are the other elements that speak

20  into it?  You know, what are the elements it communicates

21  with.

22       So if you look at the top here which is labeled CDMA

23  core there, you see things such as the MSC, you know, the

24  mobile switching center. You see the SMSC.  That's our SMS

25  servers and other things like HLR, Home Location Register.

Wilson - Cross                          5

1   These again are some of the elements within Spring CDMA core
2   network that speak to the IP Multimedia Subsystem.  And if
3   you look underneath those, those elements labeled the CDMA
4   core at the top. If you see the little lines there it says
5   it's hard to read but it says IS 41.  IS 41 refers to the
6   ANSI 41 standard of how we construct a CDMA network.  That
7   is, how those elements within the CDMA core speak to the IMS
8   subsystem.  So that's what's being depicted here.
9   Q    Okay.  You used the phrase logical diagram –
10  A    Sure.
11  Q    And I think you sort of hit on it, but I want to make
12  sure a they understand what the new biological is.
13  A    Yeah, sure.  Again logical, you focus on the
14  functionality.  You don't necessarily focus on where the
15  servers are or how many servers make up a certain piece of
16  functionality, or how those servers are plugged into the
17  wall, or, you know, just things like that.  They're just high
18  level logical, these are the functions, these are the logical
19  functions that the system is for.
20  Q    Okay.  Focusing on the top portion, does this diagram of
21  the CDMA core comport with your understanding?
22  A    Yeah, absolutely.  You know, as long as I worked in
23  Sprint on the messaging systems, our SMS servers, the SMSE's
24  have always been located in Sprint's core network.  The only
25  messaging servers that we've ever had outside the core

1  network were the Synoverse picture mill servers, picture mill

2  platform.  And again, those are no longer outside of our core

3  network.  We sent with that picture mail replacement project,

4  moved those into our core network.  So yeah, absolutely.

5  It's consistent with my understanding.

6           MS. SIMMONS: Thank you. I have no further questions.

7                    CROSS-EXAMINATION

8  BY MR. GOETTLE:

9  Q   Good afternoon, Mr. Wilson.  I don't know if you remember

10 me.  My name is Dan Goettle.

11 A   I remember you, Dan, from back in May of 2015, I believe.

12 Q   Yes, when I took your deposition.

13 A   Correct.

14 Q   I was the Comcast attorney you referred to a few times in

15 your direct exam, right?

16 A   Absolutely.

17 Q   Mr. Wilson, do you know how many times in your direct

18 examination you used the term core network today?

19 A   No, I don't.  I don't believe I was counting.

20 Q   Do you have any idea?

21 A   I was not counting, sir.

22 Q   Well, I counted and I think I may have missed a couple,

23 but I counted and I counted 17 times in your approximately 23

24 minutes of testimony.

25           Do you have an understanding that the phrase core

Wilson - Cross                                           7

1   network is important in this case?

2   A   I understand that – yeah, I understand that core network

3   is kind of at the basis of what we're talking about, correct.

4   Q   So it's at the basis of what we're talking about and

5   that's why you used it 17 times in your direct examination?

6   A   No.  I didn't use it – well I don't know.  I trust you.

7   If you said I used it 17 times, I used it 17 times.  I simply

8   am using core network to convey to the jury what as a Sprint

9   engineer we – that's how we talk.  This is what's our core

10  network.  These are the services, these are the functions

11  within our core network.

12  Q   So that's common parlance for you to use the term core

13  network when talking about Sprint's messaging network.

14  A   Absolutely.  And I think even engineers in other

15  companies, you know, telecom engineers would, would refer to

16  this as the core network.

17  A   So it's very common when you're describing Sprint's

18  messaging network, it would be very common for you to use

19  core network just like you did today for this jury?

20  A   We don't have a separate messaging network.  We have a

21  core network in which the messaging servers reside.  Again,

22  except for the Synoverse picture mill platform, but ...

23  Q   So my question was, it's common parlance for you when

24  talking about messaging and Sprint's network, it's common

25  parlance for you to use the term core network?

1   A   Yeah, depending on which part we're describing, but

2   absolutely.  We use core network all the time as a Sprint

3   engineer.

4   Q   And we referred to the deposition I took of you.  That

5   was a long day, right?

6   A   I do remember it being long, correct.

7   Q   And we were talking about Sprint's messaging, weren't we?

8   A   We talked about a lot of things during the deposition,

9   correct.

10  Q   We talked about Sprint's messaging during your

11  deposition, did we not?

12  A   We talked about Sprint's messaging service, correct, as

13  part of that deposition.

14  Q   And you did not one time use the term core network in

15  that entre day, did you?

16  A   I'd have to go back and read the full deposition again

17  which I have.  I don't remember it word for word so I can't

18  remember.

19  Q   So you don't know one way or the other?

20  A   I don't remember one way or the other.

21      MR. GOETTLE: You Honor, I'd like to hand up to the

22  witness and to you and to counsel Mr. Wilson's deposition

23  testimony taken in this case on May 6th, 2015.

24  Q   You've reviewed your deposition before testifying today?

25  A   I did.

1   Q    And you see in the back it has an index.

2   A    Okay.

3   Q    You see that?

4   A    Yeah. Again, I'm an engineer, I'm not a lawyer so I see

5   if you can point me to the exact page or index or acc - yeah.

6   I'm assuming this is the index again?

7   Q    Okay.  But even as an engineer you've used indexes

8   before?

9   A    I have used indexes before.  I've only given two other

10  depositions though, so I'm not totally familiar with the

11  layout of a deposition.

12  Q    So if you go to page four of the index you will find no

13  reference to the word core network; is that right?

14  A    Can you point me to the exact page you're referring to?

15  Q    Page four.

16  A    Page four, okay.  Okay.  I see core certainly referred to

17  here but I don't see necessarily the two terms together, core

18  network, correct.

19  Q    Okay.  And you've never seen one of these deposition type

20  of transcripts before, right?

21  A    Again, I've given two depositions over my tenure at

22  Sprint, this being the second one.  So I have seen one other

23  deposition prior to this.

24       MR. GOETTLE:   Your Honor, I apologize for

25  interrupting my own direct, but I don't know the Court's

1    rules.  Can I put up on the screen for the jury what we're

2    looking at in the deposition?

3            THE COURT: We're looking at something that isn't in

4    there.

5            MR. GOETTLE: Well, that's the point, your Honor, but

6    I'd like the jury to see that it's not there, and also to

7    follow along with my follow along questions in light of he

8    answers I'm getting.

9            THE COURT: I think the jury has gotten the point.

10   We're not going to show each and every page.  Is that what

11   you have in mind doing?

12           MR. GOETTLE: Not at all, your Honor.

13           THE COURT: No, I don't think we're going to go

14   there.

15   BY MR. GOETTLE:

16   Q   So you did mention, Mr. Wilson, that you did use the word

17   core?

18   A   Correct core is in this index that you're referring to,

19   I'm pretty sure.

20   Q   And do you see that there's one cite to it, on one page,

21   138:7.

22   A   I do see under core 138:7.

23   Q   Core, core, core.  I do see under Core 138:7 correct.

24   But you see the next word down is correct in the index?

25   A   I believe, I do see correct and it looks like I've used

1    that

2    extensively in the deposition, correct.

3    Q    Okay.  So you understand that for the word core it's only

4    used once in this entire day that you and I spent together,

5    you used the word core once, right?

6    A    I understand what you're saying and you're conveying of

7    what's in the index.  I understand what you're saying.

8    Q    Okay, so let's go to page 138, line 7 and see how you

9    used the word core, see if it has anything to do with what

10   you testified to today.

11   A    Sorry again, you said page number?

12   Q    It was page 138.  We'll start at line 6.

13   A    Okay, I'm there.  138 and I believe you said which line?

14   Q    Line 6.

15   A    Okay.

16   Q    It was actually a word I used in my question to you.

17          "Question: Even though you're listed on the project

18   core team on page five, you don't know one way or the other,

19   et cetera."  Do you see that?

20   A    I see core listed, yeah, there on line 7 and it does

21   appear that's a question that you asked me on that day back

22   in May.

23   Q    It has nothing to do with your testimony today in terms

24   of poor network?

25   A    Your question in MA has nothing to do with my testimony

1    today?  Okay.

2    Q    You agree.

3    A    I'm sorry, again, you said page number?

4    Q    It was page 138, we'll start at line 6.

5    A    138 -- okay, I'm there, 138 and I believe you said which

6    line?

7    Q    Line 6.

8    A    Okay.

9    Q    Okay, it was actually a word that I used in my question

10   to you.  "Question:  Even though you're listed on their

11   project core team on page 5, you don't know one way or the

12   other," et cetera.  Do you see that?

13   A    I see core listed,  yeah, there on line 7, like you said

14   and it does appear that that's a question that you asked on

15   that day back in May.

16   Q    It has nothing to do with your testimony today in terms

17   of core network?

18   A    Your question in May has nothing to do with my testimony

19   today?  Okay.

20   Q    Do you agree?

21            THE COURT:  No, the question is the reference to

22   "project core team", in your deposition on page 138.

23            THE WITNESS:  Okay.

1        THE COURT:  Does that reference have anything to do

2   with your testimony today?

3        THE WITNESS:  No, not from a network perspective,

4   again.  A core team is simply something that we take the

5   most knowledgeable people in Sprint, who are going to work on

6   a project.  We put them together and that's what we call the

7   core team, it's kind of your brain trust, if you will, that

8   work on a project.

9   Q   Again, it has nothing to do with core network as you used

10  today?

11  A   Core team does not, does not reference core network,

12  correct.

13  Q   So, when you say core network as you use today for the

14  jury, over 17 times, what do you mean?

15  A   Can you maybe be a little more specific, I guess?

16  Because you said I used it 17 times and which 17 -- so, can

17  you just give me the question one more time?

18  Q   Sir, sir, what is core networking?

19  A   Core network is the location within Sprint's CDMA network

20  where the servers reside that provide the fundamental

21  services that we charge our customers for.  So, voice, which

22  is like the MSC, the HLR in order to make a phone call, those

23  servers are located in the core.  And in order to send text

1    messages, those servers are located in our core.

2    Q    Okay, so when you say core network, you mean the voice

3    switches, which is the mobile switching center, right?

4    A    Voice, which is a mobile switching center, correct.

5    Q    Are there others in the core network?

6    A    Correct, the IT multi-media subsystem, as well.

7    Q    The HLR, you said?

8    A    I believe I referenced the HLR.  HLR is a system within

9    our core network, correct.

10   Q    Okay and then the servers you need for, I think you said

11   text messages?

12   A    Our SMS servers are in the core network, correct.  There

13   are other servers, as well.  I just gave come examples,

14   there's a lot of servers.

15   Q    Well, I'd like to know what they are.

16   A    I don't have an exhaustive list, I don't --

17   Q    You can't remember any others?

18   A    Can't remember any others, all I'm saying is from when I

19   was the lead on the messaging team, the messaging servers

20   that are located within the core network include the SMS

21   server, they include the SPS subscriber database, there are

22   certainly a lot of other, like we reference those diagrams,

23   right, have a bunch of other things, like AAG.  There was,

1    again, there's a bunch of servers within the Sprint core.

2    Q    Okay, I've got voice switches, IT multi-media subsystem,

3    HLR, SPS, AAG, SMS servers, anything else?

4    A    Absolutely.

5    Q    What else?

6    A    I can't give you the exhaustive list of every server

7    that's in our core.  There are systems that I do not work on.

8    Again, I work on the specific things within Sprint.  There's

9    thousands of employees in Sprint.

10   Q    Okay, so suffice to say you don't know of anything else

11   inside Sprint's core network?

12   A    I'm sure I can think of, if I had time, I could sit there

13   and probably label more.  I don't have an exhaustive list of

14   all the servers within our core network.  No, I do not.

15   Q    Okay, does Sprint's core network, according to you, does

16   it include Sprint's multi-media messaging servers?

17   A    Depends on when that question is asked, it may depend on

18   what time.  Was it a picture mail time or was it --

19   Q    How about right now?

20   A    How about right now, the MMS servers within Sprint are

21   located in our core network, correct.

22   Q    Okay, where are Sprint's mobile switching centers?

23   A    I do not know, I don't have an exhaustive list.

1    Q    Okay, where are Sprint's subscriber profile systems?

2    A    Again, I don't -- I don't know.  I'm not the lead on the

3    SPS system.

4    Q    Where are Sprint's SMS servers, let me rephrase that if

5    you don't mind.  Where are Sprint's SMSCs?

6    A    Again, I'm no longer the lead of the messaging systems.

7    I would probably defer that to Sean Hoelzle, who is the lead.

8    I know when I was part of the messaging team, we had servers

9    in our North Bunker and we also had servers in our Reston

10   data center.  Again, I'm not sure if that has changed or not,

11   given that I'm no longer the point on that team.

12   Q    How about Sprint's multi-media messaging servers?

13   A    Again, I would defer that to Sean Hoelzle, because like I

14   said, that's when I did the requirements and I did the design

15   and ultimately transitioned that over to Sean, so that would

16   kind of be more in line with Sean Hoelzle's understanding.

17   Q    So, let's look at, you have in front of you that binder.

18   Could you go to page DX-209?

19   A    DX-209?

20   Q    Yeah and you were on page 58, as I recall.

21   A    Okay.

22   Q    And so this is the diagram that you were referring to on

23   your direct exam?

1  A    This is the diagram to which we were speaking.

2  Q    And in 3.2.3.1, you were specifically referring to sort

3  of like the top row of boxes there next to which it says CDMA

4  core?

5  A    Okay.

6  Q    I'm sorry, that's a question.  Is that what you were

7  referring to?

8  A    Yes, we did cover that during direct.

9  Q    You did and that was it, we didn't talk about the rest of

10 the figure, right?

11 A    We talked about the stuff in the center being the fact

12 that that's the IP multi-media subsystem.

13 Q    Is everything that's shown in this figure 1-8, part of

14 Sprint's core network as you understand that phrase to mean?

15 A    No, I would say that things on the right-hand side are

16 provisioning systems.  Those are not part of -- what I would

17 consider part of Sprint's core network.  Those are kind of,

18 you know, those are provisioning systems when you, you know,

19 we have to know you're a subscriber, those subscribers do get

20 provisioned then into the core. But the provisioning systems

21 that actually do that provisioning, on the right-hand side

22 there, are not part of the CDMA core.

23 Q    You're talking about the boxes underneath the heading,

1   Packet Core Network?

2   A    Yeah, the top box is provisioning.  The bottom box is

3   kind of, you know, administration, if a box were to crash,

4   those are the systems that kind of alert people that there's

5   a crash.

6   Q    The top box being the one that's labeled IT?

7   A    Top box being labeled IT, correct.  Those are -- those

8   are provisioning systems.

9   Q    Okay and the bottom box being the one that's labeled OSS?

10  A    Correct, those boxes are what we call operational support

11  systems.

12  Q    Okay, so focusing in on the top line next to which it

13  says CDMA core, do you see that?

14  A    We're back to the top again?  I see CDMA core, okay.

15  Q    Okay, LVMS, what is that?

16  A    I don't know.  I don't know what that is.

17  Q    But you know it's in Sprint's core network, because it

18  says so in this document?

19  A    That would be my understanding, correct.  But the person

20  that generated this document does know what LVMS is and

21  accurately depicted that as being part of the core.

22  Q    So, you would just accept his word for it?

23  A    Again, Jason Rodriguez, I've worked with a long time.

1    Charles Witson is on my team, very talented engineers.  So,

2    yeah, I would take their word for it.

3    Q    Because you know them?

4    A    Because I know them, correct and they do good work.

5    Q    If you didn't know who wrote this document, would you

6    just accept that the LVMS is part of the core network, if you

7    didn't know who wrote it?

8    A    Yeah, I probably would. Again, it's one of those things,

9    as an engineer, you always -- anything you don't know, you

10   kind of trust, but verify it.  Especially, if I'm designing a

11   system that had to interact with this node, this LVMS.

12   Again, I don't know what it is.  So, yeah, on first blush,

13   absolutely I would trust that it's in the core and then as I

14   worked through the requirements phase, like we talked about

15   before, I would make sure I knew what LVMS was and what it

16   did and where it was.

17   Q    You said you would trust and then verify?

18   A    It's an engineer's mentality, you always trust and then

19   verify.

20   Q    And how would you verify?

21   A    You would start to -- first of all, you'd start to figure

22   out what LVMS was and then figure out who owned that platform

23   and then go talk to the lead engineer on that platform.

1    Q    You'd have to talk to people?

2    A    Correct, we always talk to people, correct.

3    Q    How about MPC, what is MPC, which is on the other end?

4    A    Yes.

5    Q    What is that?

6    A    It would be my understanding, again, I'm sure there's a

7    glossary in this diagram or this document somewhere, but MPC

8    for me, would be the mobile positioning center.

9    Q    Okay and you know that to be an element of Sprint's core

10   network?

11   A    Yeah, again, I'm not the lead on the MPCs, but yeah,

12   throughout my tenure at Sprint, I've known that to be part of

13   the core.

14   Q    Have you ever spoken to a gentleman named Mr. Mark

15   Lanning?

16   A    Mr. Mark Lanning, no, I have not.

17   Q    And you've never explained to Mr. Mark Lanning anything

18   about this document?

19   A    I have never spoken to Mark Lanning, so no.

20          MR. GOETTLE:  I have no other questions. Thank you,

21   your Honor.

22          THE COURT:  Thank you.

23          MS. SIMPSON:  May I redirect?

```
                          Wilson - Cross                    21
 1              THE COURT:  Yes.
 2                     REDIRECT EXAMINATION
 3    BY MS. SIMPSON:
 4    Q    If we could go back to that page you were just looking
 5    at, the IMS quarter?
 6    A    Sure, page 58, I do believe.
 7    Q    That is correct.
 8    A    Okay.
 9    Q    Okay, at the top right, what does that say?
10    A    The top right --
11    Q    Actually, above the -- I'm sorry -- above the diagram.
12    A    Above the diagram?
13    Q    Yes, above the diagram.
14    A    Well, at the very top right, there's design document.
15    Q    Exactly.
16    A    Okay, sorry.
17    Q    Can you tell the jury what a design document is?
18    A    Yeah, sure.  So, a designing document, it's the master
19    source of record for your project. We typically produce them
20    on a project basis, so whenever you're going to go do
21    something, you create a design document.  That design
22    document is your one-stop shop for understanding everything
23    from requirements to where we're going to install the
```

1    servers, who the vendor is going to be, what are the IP

2    addresses of the systems that you're installing.  It is kind

3    of your master booklet of a platform.  It's really not so

4    platform related, I guess that is more project related.

5    Q    And in your experience, do Sprint engineers intend design

6    document to be accurate to the best of their ability?

7    A    Yes, absolutely.  Like I said, it's never our intent to

8    produce an invalid document.  So, as a Sprint engineer and

9    every Sprint engineer I've worked with, within my tenure at

10   Sprint, it is absolutely our goal, our target, our desire to

11   produce and impact the right document.  If we don't, then bad

12   things happen.  So, calls get dropped, calls, you know,

13   complaints to care, all that stuffs.  If you miss something,

14   it could be bad and it could be kind of service-impacting, so

15   absolutely it is our desire to produce accurate

16   documentation.

17   Q    In all your years at Sprint, including your decade while

18   you were responsible for messaging, have you ever thought of

19   the messaging servers for SMS to be something outside of

20   Sprint's core cellular network?

21   A    Absolutely not.  From the time that I started to work on

22   SMS servers to the time that I transitioned that

23   responsibility over to Sean Hoelzle, in an even sense, the

1  SMS servers have always been part of Sprint's core network.

2  Q   And after Sprint no longer used the Synaverse picture

3  mail product, have you ever thought the messaging servers for

4  MMS to be outside of Sprint's core cellular network?

5  A   Absolutely not.  I mean, since the picture mail

6  replacement project, back to what I talked about before

7  lunch, our design philosophy is to have those core servers,

8  those core servers that provide those core services in

9  Sprint's core network.  So, yes, the MMS servers, post-

10  picture mail days, have always been within our core network.

11  Q   Thank you very much.

12  A   Yes.

                         RECROSS-EXAMINATION

14  BY MR. GOETTLE:

15  Q   Have you ever read the patent in suit in this case?

16  A   I do not believe I've read the patent in this case.

17  Q   Have you ever reviewed the Court's claim constructions,

18  his true and certain claim terms in that patent?

19  A   I have not.

20        MR. GOETTLE:  No further questions.

21        THE COURT:  That concludes your testimony.  Thank

22  you very much, Mr. Wilson.

23        THE WITNESS:  Thank you.

1          (Pause.)

2          MR. FINKELSON:  Your Honor, Sprint calls Sean

3    Hoelzle as it's nest witness.

4          (Pause.)

5          SEAN HOELZLE, Witness, Sworn.

6          THE DEPUTY CLERK:  Please state your full name and

7    spell it for the record.

8          THE WITNESS:  My full name is Sean Hoelzle, S-E-A-N,

9    last name is Hoelzle, H-O-E-L-Z-L-E.

10                         DIRECT EXAMINATION

11   BY MR. FINKELSON:

12   Q   Good afternoon, Mr. Hoelzle, how are you?

13   A   I'm good, how are you?

14   Q   Good, thanks.  Can you identify yourself for the jury,

15   please?

16   A   My name is Sean Hoelzle, I'm a telecomm engineer for

17   Sprint.

18   Q   Mr. Hoelzle, can you tell the jury what your current

19   title is at Sprint?

20   A   My current title is network engineer IV, but that doesn't

21   really tell you much about what I do.  I'm responsible for

22   SMS and MMS messaging at Sprint.  My job since 2010.

23          THE COURT:  Keep your voice up.

1          THE WITNESS:  Sorry.

2    Q    For how long have you held that position?

3    A    Since 2010.

4    Q    And for how long have you been a network engineer at

5    Sprint?

6    A    I started as a network engineer with Sprint in 2004, so a

7    little more than 12 years.  I've actually worked for Sprint

8    longer than I've been married to my wife.  It's actually our

9    ten-year anniversary this week.

10   Q    Happy Anniversary, I'm not sure this is what your wife

11   had in mind?

12   A    Not exactly.

13   Q    Prior to joining Sprint, did you work with another

14   company?

15   A    Yes, prior to Sprint, I worked with a company called

16   Unisys in Malvern, PA and I was a software engineer working

17   on telecommunication systems.

18   Q    For how long, approximately, were you with Unisys?

19   A    About four years.

20   Q    And prior to working with Unisys, did you attend college?

21   A    Yes, I did.  I graduated from Villanova University in

22   2000, with a Bachelor's Degree in computer engineering.

23   Q    Where did you grow up, Mr. Hoelzle and where do you

1   reside today?

2   A    I was born in West Chester, PA, grew up between Exton and

3   Chester Springs and currently live in Collegeville, PA with

4   my wife and three daughters.

5   Q    Do you also work from your home in Collegeville?

6   A    Yes, I do.

7   Q    So, the jury has heard some discussion about SMS and MMS

8   work at Sprint, but can you describe for the jury your

9   general responsibilities as a network engineer at Sprint,

10  that has SMS and MMS-related responsibility?

11  A    Sure, so generally, I'm responsible for architecture and

12  design of SMS and MMS within Sprint's cellular network.  That

13  includes the messaging servers that reside in Sprint's core

14  network.  Messaging servers are basically the key pieces of

15  equipment that allow Sprint to offer SMS and MMS service to

16  its customers.

17  Q    Are there acronyms that are commonly used within Sprint

18  to refer to the messaging servers?

19  A    Yes, the most common acronyms are SMSC and MMSC.  Each of

20  those each is made of a bunch of other components.  But I'll

21  spare the acronyms.  SMSC and MMSC are the main ones to

22  remember, those are the messaging servers.

23  Q    When it comes to the operation and the function of --

1   when it comes to the operation of SMS and MMS at Sprint, will

2   you give the jury a sense of what Sprint's messaging servers

3   do in action?

4   A    Sure, so they're basically the brains of the operation,

5   so they're responsible for routing and delivery of messages

6   to and from Sprint subscribers.  So, that includes messages

7   Sprint subscribers are sending to themselves, as well as

8   messages being sent to people on other carriers, like

9   T-Mobile for example.

10  Q    So, if you take the example of an SMS message being sent

11  from a Sprint subscriber to a T-Mobile subscriber, what is

12  the messaging server doing in that process?

13  A    So, for the example of a text message from Sprint to a

14  T-Mobile subscriber, the SMSC would be the last place that

15  message goes in Sprint cellular network.  And the SMSC would

16  have the job of routing that message out to the inter-carrier

17  gateway to reach T-Mobile.

18  Q    How about when it's coming the other direction?  So, say

19  an SMS message comes in to a Sprint subscriber from a

20  T-Mobile subscriber?

21  A    Sure, in the other direction from T-Mobile and to Sprint,

22  the SMSC would be the first place that message arrives at

23  Sprint's cellular network and the SMSC would have the job of

1    routing and delivering that message from there.

2    Q    Now, when you talk about routing, can you explain what

3    routing decisions Sprint's messaging servers make or maybe

4    just a few examples?

5    A    Sure, if we go back to the example of a T-Mobile user

6    sending a text message to a Sprint user, when that message

7    arrives to the SMSC, the first thing it's looking at is, is

8    that Sprint user enabled for text messaging?  So, some people

9    decide, for example, to block text messaging for their kids.

10   Fortunately, my oldest is only 9, so doesn't have a phone

11   yet.  So, after that step, the SMSC is looking at who the

12   source of the message is, so Sprint allows you to both create

13   lists of numbers that you want to block or allow specific

14   messages from.

15   Q    What would those lists be called?

16   A    Typically called black lists or white lists.

17   Q    And the SMSC, is the SMSC responsible for that?

18   A    Yes, the SMSC is responsible for enforcing black lists

19   and white lists.

20   Q    How about once -- assume there's not a white list or a

21   black list in place and the recipient is able to receive an

22   SMS or MMS message.  What does the messaging server then do?

23   A    So, the next step is the messaging server is looking at

1    the actual message itself, to see if it contains any

2    malicious content or spam and provided that all checks out,

3    it's checking of the user is available, so is their phone

4    powered on and where are they located?  So, for example,

5    Philadelphia versus New York.

6    Q    So, we've all has this experience on the airplane, we

7    turn off our phones when we were told to?

8    A    Right.

9    Q    And then we turned them back on when we land, some of us,

10   immediately when the wheels on the ground, some later.  But

11   what does the SMSC doing with respect to SMS messages in that

12   process?

13   A    So, in that scenario, when you're flying and someone's

14   sending you messages and you're phone is off, basically, as

15   soon as you land and power on your phone, the SMSC knows that

16   you're available and knows exactly where you are and

17   immediately delivers your messages to you.

18   Q    Mr. Hoelzle, who owns the messaging servers that Sprint

19   currently uses for SMS and MMS messages?

20   A    Sprint owns them, they were purchased from a supplier

21   named Ecision and installed in our core network.

22   Q    And who operates the messaging servers, is that also

23   Sprint?

1  A   Yes, also Sprint.

2  Q   And --

3  A   They're operated as part of our core network.

4  Q   Sorry, I didn't mean to interrupt you.

5  A   No problem.

6  Q   Where are those Sprint messaging servers located?

7  A   They're located at three highly secure Sprint data

8  centers.  One in Reston, Virginia and two in Kansas, outside

9  of Kansas City.  The ones in Kansas are called bunkers.  The

10  one I've been to is called the South Bunker.  It's literally,

11  the data center is literally a bunker, so it's built

12  underground.  It's covered by concrete and earth and in the

13  event of a tornado, there's big metal doors that can come

14  down and seal off the building, so that all of the core

15  network equipment inside remain undamaged.

16  Q   And today, are the SMSCs and the MMSCs both located in

17  those facilities?

18  A   Yes, today, all of our SMSCs are located at core sites.

19  Previously, they were also located at switch sites, which is

20  where the mobile switching centers are located.  And our

21  MMSCs have been located in the core sites ever since 2011

22  when they were brought into the network.

23  Q   Maybe not a fair or easy question, but can you give the

1  jury a sense of what a massaging server actually looks like?

2  A   Sure, you think of it as a collection of computer servers

3  that are organized into a rack or a cabinet.  So, the

4  cabinets are about seven feet high, two feet wide, about four

5  feet deep.  So, each of these sites has seven or eight

6  cabinets for SMS, seven or eight cabinets for MMS, at the

7  sites that have MMS.

8  Q   Where is the -- are you familiar with SPS?

9  A   Yes, I am.

10  Q   Where is the SPS located?

11  A   SPS is also located at these core sites right along side

12  the messaging servers.

13          MR. FINKELSON:  Your Honor, may I approach with a

14  binder of documents for the witness?

15          THE COURT:  You may.

16          (Pause.)

17          MR. FINKELSON:  Your Honor, I'd like to go ahead and

18  move into evidence the following exhibits to which I don't

19  believe there is any objection.  DX-12, DX-13, DX-224, 230

20  and 231.

21          THE COURT:  Are there any objections?

22          MR. GOETTLE:  No, your Honor.

23          THE COURT:  DX-12, 13, 224, 230 and 231 are received

1    in evidence.

2              (Defense Exhibits 12, 13, 224, 230, 231 received in

3    evidence.)

4              MR. FINKELSON:  Thank you, your Honor.

5    BY MR. FINKELSON:

6    Q    Mr. Hoelzle, could I have you turn to Exhibit DX-231 in

7    your binder of materials?

8    A    Okay.

9    Q    Do you recognize DX-231?

10   A    Yes, I do.  DX-231 is an e-mail from Patrick Wilson to

11   myself in 2011, containing a design document related to SMS

12   and MMS messaging.

13   Q    And do you have an understanding of why Mr. Wilson was

14   sending the design document to you, at that time?

15   A    Yes, around this time in 2011, I was taking over lead

16   responsibility on the team for SMS and MMS messaging from

17   Patrick, who was transitioning to a different role.

18   Q    What is attached to the e-mail that is the first page of

19   DX-231 and maybe we can show the next page of the document.

20   A    It's a design document.

21   Q    Is it a design document in connection with messaging?

22   A    Yes, it's a design document in connection with SMS and

23   MMS messaging.

1    Q    Could you turn to DX-13, I think is what we're actually

2    looking at now on the screen.  And once you have it, my

3    question is, is there a relationship between the attachment

4    to DX-231 that we were just looking at and DX-13?

5    A    Yes, this is just a color version of the attachment in

6    231.

7    Q    Same design document?

8    A    Correct.

9    Q    Let's use this one, can you give the jury a sense of what

10   the purpose is of a design document like this, DX-13 at

11   Sprint?

12   A    Design documents are typically used for just about every

13   project within Sprint, so they are typically the best sources

14   of information of documenting how things are designed and

15   deployed.

16   Q    Do you rely on design documents, Mr. Hoelzle, in the

17   course of doing your job as a network engineer at Sprint?

18   A    Absolutely.

19   Q    If we could turn, Mr. Baird, to page 14 and you as well,

20   Mr. Hoelzle, you can either follow along on the screen or in

21   the binder, whichever is most convenient for you.  And just

22   let me know when you're there.

23   A    Yes, I'm there.

1   Q    Can you tell the jury what is shown in Figure 3 of this

2   Sprint design document?

3   A    Figure 3 is a diagram showing the architecture of SMS and

4   MMS around the time I would have joined the messaging team in

5   2010.

6   Q    So, can we talk about SMS first and can you explain to

7   the jury what this design document shows with respect to SMS

8   at Sprint, at that time?

9   A    Sure, so you can see down at the bottom, we've got

10  MO- SMSC and NT SMSCs that are shown where it says Sprint

11  In-Network, that big box.  That indicates that they're in our

12  core network.  Back then we had separate SMSCs for mobile

13  originated SMS, so the Sprint user who is sending the text

14  message and MT-SMSC, which would be a Sprint user receiving a

15  text message.  So, those were both in our core network and

16  then back then, at this period of time, our subscriber

17  database, also shown there as messaging LDAP.  Would you --

18  Q    Wait, sorry, I was just waiting a second for that to be

19  highlighted on the screen.

20  A    Oh, sorry.

21  Q    You said messaging LDAP, can you direct Mr. Baird to

22  where that is in the document?

23  A    Yeah, the messaging LDAP is basically, well, directly

Hoelzle - Direct

1    above where it says ML-SMSC.  So that's our subscriber

2    database for messaging those also located in the core.

3    Q    So just for purposes of the record you were referring to

4    a messaging LDAP.  Where is the messaging LDAP in this

5    document?

6    A    The messaging LDAP is located, highlighted in yellow,

7    directly above MOS-SMSC.

8    Q    And is messaging shortened or abbreviated and how so?

9    A    Oh, sorry, it's shown as MSG-LDAP.

10   Q    And is the messaging LDAP and mobile-originated SMSC and

11   the mobile-terminated SMSC all shown in this Sprint-designed

12   document in the box that is labeled "Sprint in-network"?

13   A    Yes, it is, indicating it would be part of our Sprint

14   core network.

15   Q    Do you see in the lower left-hand corner of the document

16   a reference MSC?

17   A    Yes, I do.

18   Q    Is the MSC part of Sprint's core network?

19   A    Yes, it is.

20   Q    Is there a reason why it's depicted down in the left-hand

21   corner in this document as opposed to in the box that says

22   Sprint in-network?

23   A    Since this was a messaging-centric document, the areas in

24   the middle for in and off-network were focused on messaging-

25   specific components.

1   Q    And that would have -- and did that include both the

2   messaging LDAP database and the SMSCs?

3   A    Yes, it did.

4   Q    Does Figure 3 of DX-13 also show the state of MMS at

5   Sprint when you took over for Mr. Wilson?

6   A    Yes, it does.  So as you can see at this time in 2010 we

7   did not have an MMSC within our core network, we were using a

8   hosted Syniverse Picture Mail platform that sat outside of

9   Sprint's network in a Syniverse location.

10  Q    Is that reflected on this document and, if so, how?

11  A    Yes, it's reflected in the Sprint hosted off-network box

12  on the left, so you can see the MMSC right in the middle of

13  that box there.

14  Q    Now, it looks like there are a number of colors used on

15  this document DX-13, do you see those?

16  A    Yes, I do.

17  Q    Green, blue, purple, and red it appears?

18  A    Correct.

19  Q    Do the colors in this document designate whether a

20  component is internal or external to Sprint's core network of

21  its cellular network?

22  A    No.  They're just showing different types of interactions

23  between various components.

24  Q    So for example if you look at the hosted off-network box,

25  does that have green lines, blue lines and red lines?

1    A    Right.  So you can see all those colors, the red, green

2    and blue in the hosted off-network box as well as in the

3    Sprint in-network box.

4    Q    Let's look next if we could, Mr. Hoelzle, at DX-12.  Can

5    you tell the jury what DX-12 is?

6    A    DX-12 is an email I would have received as a member of

7    the ND messaging team in March 26th, 2012 containing a design

8    document related to MMS messaging.

9    Q    And did you receive this in approximately March of 2012?

10   A    Yes, I did.

11   Q    What is the design that DX-12 relates to?

12   A    So this was a period of time when we were transitioning

13   from the hosted Picture Mail platform to an in-network MMSC,

14   so this design document details that design.

15   Q    And as of this time in March, 2012 was that transition

16   underway?

17   A    Yes, it was.

18   Q    And did Picture Mail from Syniverse ever relate to SMS?

19   A    No, it did not.

20   Q    Has there ever been an SMSC at Sprint that is external to

21   Sprint's cellular network?

22   A    No, there has not.

23   Q    Can you turn, Mr. Hoelzle, to Figure 1 in this design

24   document which appears on the page ending in 414?

25   A    Okay, I'm there.

1    Q    Do you see the header on the diagram by the number 3.1?

2    A    Yes.

3    Q    And can you describe for the jury what it says and what

4    that means?

5    A    This is called a logical end-state diagram.  So this is

6    showing logical connections between various messaging

7    components, as well as the physical location of some of them

8    as well.

9    Q    Do you see the boxes that are labeled "Sprint Reston DC"

10   and "Sprint NOB"?

11   A    Yes, I do.

12   Q    Okay.  What are those?

13   A    Those are the core data centers that I mentioned earlier,

14   NOB being the North Bunker in Kansas and Reston DC being the

15   Reston data center in Virginia.

16   Q    So as of this time this document, again, sent to you by

17   email in March of 2012, what was in Sprint's North Bunker?

18   A    So at this time in 2012 we had SMSCs in the North Bunker

19   and as of this period of time also the mobile-originated and

20   mobile-terminated SMSCs have been collapsed to a single

21   platform.  And then at this point in time we had replaced the

22   messaging LDAP with a platform called SPS, so that's shown

23   right below there.

24   Q    So on the document we were looking before that had the

25   MSG-LDAP, that was the messaging LDAP?

1    A    Correct.

2    Q    And then you said that had been transitioned to something

3    called an SPS by the point in time we're looking at here in

4    DX-12?

5    A    Yes, correct.

6    Q    Can you explain to the jury what was located in Sprint's

7    Reston DC, as designated on this document, as of March of

8    2012?

9    A    Sure.  So in the Sprint Reston data center indicated by

10   Reston DC we had another set of SMSCs, as well as another SPS

11   instance.

12   Q    Each of those together in the Reston data center?

13   A    Yes, each in the Reston data center as part of the core

14   network.

15   Q    Is there also an MMSC shown at the Sprint Reston data

16   center and, if so, what is it and how did it get there?

17   A    So this would have been the MMSC that was first installed

18   in around 2011, so at this time we were in the process of

19   migrating traffic from the Syniverse-hosted MMSC onto the in-

20   network core MMSC in Reston.

21   Q    Have you ever heard the term "cap and grow"?

22   A    Yes, I have.

23   Q    Okay.  What does that term mean, cap and grow, in

24   connection in particular with this document we're looking at,

25   DX-12?

1    A    It was describing the process where we would cap putting

2    new devices onto the Syniverse Picture Mail platform and put

3    new devices onto our in-network MMSC.

4    Q    So as of the time of this document in 2012 is Syniverse

5    still depicted here and, if so, can you show the jury where?

6    A    Yes, it's still here; it's in the Syniverse-hosted box in

7    the upper left.

8    Q    And then once the transition continued, what happened to

9    the Syniverse box?

10   A    So at the conclusion of this project the Syniverse

11   Picture Mail platform was ultimately shut down.

12   Q    Mr. Hoelzle, I believe you've had the pleasure of being

13   deposed in this case, having your deposition taken?

14   A    Yes, three times.

15            (Laughter.)

16   Q    I want to show you a document that I believe you were

17   shown at one of those three depositions, it's PX-99.  Do you

18   see that in your binder of materials?

19            (Pause.)

20   A    Okay, I'm there.

21            MR. FINKELSON:  And I probably jumped the gun.  If

22   we could go back to the first page and just have the witness

23   identify it.

24   BY MR. FINKELSON:

25   Q    Do you recognize this document that has been marked as

1    PX-99, Mr. Hoelzle?

2    A    Yes, I do.

3    Q    If you could turn to the page marked PX-99-2 and can you

4    explain to the jury what is shown here on PX-99, page 2?

5    A    So PX-99, page 2 is a high-level diagram showing various

6    components in SMS and MMS messaging and how they

7    interconnect.

8    Q    And what is it entitled?

9    A    It's entitled "High-Level Architecture Diagram."

10   Q    And what type of things does it show?

11   A    So you can see it's showing subscriber devices, which

12   would be mobile phones; it's showing SMSC and MMSC, it's

13   showing subscriber databases such as the SPS and the number

14   database used by the inter-carrier providers, as well as the

15   HLR.

16   Q    Is this what you would call -- to be clear, is PX-99 what

17   you would call a Sprint design document?

18   A    No.  This is much more informal than that, just a couple

19   sketches of a few things.

20   Q    There are additional pages in this PX-99 and I want to

21   turn to those next.

22          MR. FINKELSON:  If you could just go to the next

23   page of this document, Mr. Beard?

24   BY MR. FINKELSON:

25   Q    Do you recognize what appears on this page, PX-99-3, and

1  can you explain what it is to the jury?

2  A    Yes.  So this page as well as the next several pages are

3  some basic flows for SMS and MMS messaging.  I believe I

4  commented on them during my deposition that there were some

5  inconsistencies, some errors in the actual drawings

6  themselves.

7  Q    Do these -- does this diagram show all of the steps that

8  occur in the course of sending an MMS message, in this

9  instance from the -- from a non-Sprint subscriber to a Sprint

10 subscriber?

11 A    No, it's only showing a couple of the steps.

12 Q    And are there additional message flows that appear on the

13 following pages of PX-99?

14 A    Yes, there are.  There's a couple for MMS as well as SMS.

15 Q    Would you, Mr. Hoelzle, as an engineer at Sprint rely on

16 the message flows in PX-99 to determine the number of steps

17 involved in sending an SMS message from one handset to

18 another handset?

19 A    No.  These are very much abbreviated and don't show

20 anywhere near the number of steps actually involved with the

21 sending or receiving of SMS and MMS messages.

22 Q    Now you anticipated my next question, which was with

23 respect to MMS.  Would you as an engineer at Sprint rely on

24 the message flows in PX-99 to determine the number of steps

25 involved in sending an MMS message from one handset to

1   another handset?

2   A   No, I would not.

3   Q   Let me ask you to turn, Mr. Hoelzle, to what has been

4   marked as DX-230.

5           MR. FINKELSON:  And if we could just put the first

6   page of that up on the screen.

7           (Pause.)

8           THE WITNESS:  Okay, I'm there.

9   BY MR. FINKELSON:

10  Q   Do you recognize DX-230?

11  A   Yes, I do.  DX-230 is a set of message flows that were

12  drafted by myself and my team for SMS and MMS.

13  Q   And I know there's a lot of information on here, but at a

14  high level can you tell the jury what is shown in the message

15  flows in DX-230?

16  A   So this is showing step-by-step all of the elements that

17  are involved in sending or receiving an MMS message, as well

18  as the various steps along the way that a message takes to

19  get from point A to point B.

20  Q   So if this jury wanted to know the number of steps

21  involved in sending or receiving an SMS message or an MMS

22  message from one handset to another, as a network engineer at

23  Sprint should this jury look at DX-230, in your opinion, or

24  should it look at PX-99?

25  A   Yes, DX-230 is much more detailed.  I mean, even this

1  probably doesn't show every single step, but way more

2  detailed than the other drawing.

3  Q    In DX-230 are there some steps -- or some flows rather

4  for SMS and other flows for MMS and, if so, how do they

5  appear in the document?

6  A    So in DX-230 the first four -- yeah, four flows are SMS,

7  the following three are for MMS.  And I know it's probably

8  brutal to see on your screens, but where it says VMU for the

9  MMS flows that's representative of the Virgin Mobile brand,

10 which is the prepaid brand of Sprint.

11 Q    And what page are you on when you're referring to that,

12 sir?

13 A    Oh, I'm sorry, I'm in the bottom of the page ending in

14 007.

15 Q    I'm sorry, I didn't mean to interrupt you, but can you --

16 A    No, that's fine.  See where it says VMU, that's

17 referencing Virgin Mobile.  So these flows are nearly

18 identical to the flow for a Sprint MMS sending and receiving

19 except for the charge request steps and charge response

20 shown.

21 Q    So in the very top line is that where there's a reference

22 to VMU?

23 A    Yes, correct.

24 Q    Okay.  And can you explain again the relationship between

25 VMU and Sprint and specifically how this flow relates to VMU

 1   and Sprint?

 2   A    Sure.  So VMU just stands for Virgin Mobile, so that's

 3   the prepaid brand of Sprint.  So all of these steps would be

 4   identical for a Sprint subscriber sending or receiving MMS

 5   except for the charge request and charge response steps.

 6   Q    Okay.  Let's take a look at the -- I know there's a lot

 7   of information on these, as I said --

 8                MR. FINKELSON:  -- let's take a look at the one that

 9   has the Bates number ending in 6, Mr. Beard --

10   BY MR. FINKELSON:

11   Q    -- and also, Mr. Hoelzle, if you could turn to that one?

12   A    Okay.

13   Q    Maybe we can blow it up a little bit just to get a better

14   sense of it.

15                (Pause.)

16   Q    Is this one of the message flows contained in DX-230?

17   A    Yes, this is a flow of an SMS being sent from a Sprint

18   user to another Sprint user.

19   Q    And in this flow do you see the SMSC?

20   A    Yes, I do.

21   Q    Do you see the HLR?

22   A    Yes, I do.

23   Q    And for the jury's benefit, although they've heard the

24   term more than they'd like probably, what is an HLR?

25   A    An HLR is a home location register, so it talks to our

1    SMSC and our cellular network.

2    Q    In what language does SMSC in Sprint's cellular network

3    talk to the HLR at Sprint when a Sprint subscriber sends an

4    SMS message?

5    A    It's sending what's called an SMS request and SMS request

6    response that comes back from the HLR, it's detailed in the

7    ANSI-41 standard, which would be applicable for a CDMA-2000

8    network like we have at Sprint.

9    Q    And how far back does that date, that ANSI-41 standard?

10   A    It dates back to the 1990s.

11   Q    Have Sprint's SMSCs talked to the Sprint HLRs in this way

12   since Sprint first started offering SMS?

13   A    Yes, since 1998.

14   Q    PX-174, can we talk about that for a moment, sir?

15   A    Sure.

16            (Pause.)

17   A    Okay, I'm here.

18   Q    Is PX-174 a document that you've ever seen in the course

19   -- in the ordinary course of your work as an engineer at

20   Sprint?

21   A    No, it's not.

22   Q    Is this a document that to your knowledge any engineer at

23   Sprint has ever used?

24   A    No, not to my knowledge.

25   Q    We looked earlier at Sprint design documents related to

1    messaging equipment; is this a design document?

2    A    No, it's not a design document.  It just --

3    Q    What is -- I'm sorry, go ahead.

4    A    It just appears to be a list of acronyms, some related to

5    messaging, some not.

6    Q    Are you aware of any design document at Sprint that

7    refers to a messaging network that is separate from Sprint's

8    cellular network?

9    A    No, I am not.

10   Q    Now, by a previous witness for Comcast in this case you

11   have been referred to as the head of the messaging network at

12   Sprint; have you been called that ever before?

13   A    No, not that I can recall, although it sounds pretty

14   important.

15   Q    What are you?

16   A    I'm just a technical resource on the messaging team,

17   which is part of the network core organization.

18   Q    And with respect to PX-174, is this a document that you

19   would rely on to tell you whether Sprint's messaging servers

20   are inside of Sprint's cellular network or outside of

21   Sprint's cellular network?

22   A    No.

23   Q    You talked about your three depositions in this case.

24   What was your role in those depositions?

25   A    For two of them I was the corporate designee, as the I

1  guess technical expert for messaging topics.

2  Q   Did Comcast counsel ask you about PX-174 in those

3  depositions as best you can recall?

4  A   No, not that I recall.

5  Q   In this document there's a reference to LDAP in

6  connection with messaging; do you have an understanding of

7  what that refers to?

8  A   Yeah, given the date of 2009 on this, I would assume it's

9  referring to the messaging LDAP.

10 Q   Does LDAP also refer to a protocol, a way of

11 communicating?

12 A   Yes, it does.

13 Q   Is that a way of communicating that the messaging LDAP

14 used?

15 A   Yes.  It would have been the only thing using LDAP at

16 that time.

17 Q   There is a definition in here for PDR, predestination

18 router, do you see that?

19 A   Yes, I do.

20 Q   Okay.  Can you read the first sentence where it describes

21 what the PDR is?

22 A   It says "This is an Openwave SMS router that was used on

23 the CDMA network."

24 Q   Do you have an understanding of that reference to "on the

25 CDMA network" and what that means?

1   A    Yeah, it's an indication that it's part of our CDMA

2   cellular network.

3   Q    Look at the SMSC several lines down, does that refer --

4   well, what does that refer to?

5   A    It refers to the SMSC and it indicates that "the vendor

6   for the SMSC in Sprint is Acision."

7   Q    And what is your understanding of that sentence?

8   A    It's indicating the SMSC is within Sprint's cellular

9   network.

10  Q    The last document from me at least.  I have a sneaking

11  suspicion it may not be the last one you see, but it's the

12  last one I'm going to show you on the direct examination and

13  that is DX-224.  And in the spirit of all the other

14  complicated documents I've asked you to talk to this jury

15  about, this seemed to be a fitting end.  Do you have DX-224

16  in front of you?

17  A    One second, let me get it.

18          (Pause.)

19  A    Okay, I have it.

20  Q    And I know you live and breathe these things, but for

21  someone who doesn't can you explain what DX-224 is at a high

22  level?

23  A    So DX-224 is what we engineers would call a trace.  So in

24  this case it's a trace of an SMS request and SMS request

25  response, so SMS request being sent to an HLR and the HLR

Hoelzle - Cross                                    50

1   responding back to the SMSC.

2   Q   Is that a request response like the one you were just

3   talking about a few minutes ago with respect to DX-230, that

4   document that you prepared?

5   A   Yes, it is.

6   Q   And with respect to this SMS request, is there a

7   particular protocol that it follows?

8   A   Yes.  If you go to page 2, midway down, you'll see where

9   it says "ANSI-41 invoke SMS request."  So that's again

10  indicating that this message is part of the ANSI-41 standard.

11  And then if you go to I believe it's the third page --

12  Q   I think it's two pages past there perhaps.

13  A   Oh, two pages?  Yeah.  A little more than halfway down

14  where it says "ANSI-41 return result," that would be the

15  response back from the HLR to the SMSC, again based on ANSI-

16  41 specifications dating back to the 1990s.

17  Q   Those are all the questions I have for you on direct.

18  Thank you, Mr. Hoelzle.  Please extend the same courtesies to

19  Mr. Goettle in response to his questions.

20          THE COURT:  You may cross-examine, Mr. Goettle.

21                    CROSS-EXAMINATION

22  BY MR. GOETTLE:

23  Q   Good morning, Mr. Hoelzle.  I know we've met before, but

24  just to remind you, I'm Dan Goettle, I took your deposition,

25  one -- just one now.

1    A    Yep, I remember.  Good to see you again.

2    Q    The last one, it was probably the most fun.

3           Mr. Hoelzle, you're not just some guy on the

4    messaging, team, right?  You lead the team, right?

5    A    I'm the technical lead on the team, that's correct.

6    Q    You're the technical lead on the team, the messaging team

7    for Sprint, right?

8    A    That's correct.

9    Q    And you were responsible for overarching design and

10   architecture of the messaging platforms, right?

11   A    Yes, that's correct.

12   Q    And you testified in this case as a Sprint-designated

13   witness, so as a representative of Sprint about how Sprint's

14   messaging network worked, right?

15   A    Yes.

16   Q    And that was because you are the most knowledgeable about

17   Sprint's messaging services, right?

18   A    Yes, that's what I testified to.

19   Q    But that's right, that's right today -- it was right when

20   you testified to it and it's right today, right?

21   A    Yes, it is.

22   Q    Okay.  You used the term core network a couple times

23   during your direct examination; do you recall that?

24   A    Yes, I do.

25   Q    Do you recall using the term core network in any of your

1   three depositions?

2   A   Yes, I do.

3   Q   You do remember that?  Which one?

4   A   I can't remember which one it was.

5   Q   Okay, we'll find that.

6   A   I think it was the one with -- it might have been the

7   first one I did.

8   Q   The first one?

9   A   Yeah.

10  Q   2014?

11  A   '13 would have been the first one.

12  Q   '13?  Okay.  You testified that Sprint -- you've never

13  seen a reference to messaging network of Sprint outside the

14  context of Sprint's cellular network, right?

15  A   Correct.

16  Q   Okay.  And one of the documents that you looked at on

17  your direct was DX-13, right?

18  A   Yes.

19  Q   DX-13 was the first phase of a two-phase project, right,

20  to change over Sprint's SMSCs from one vendor to another,

21  right?

22  A   Yes, that's correct.

23  Q   That was part of the project -- it wasn't the full

24  project, but that was part of the project?

25  A   Right.  Part of the project was a change in vendors, yes.

1    Q    Okay.  And that change involved removing from Sprint's

2    network SMSCs where the vendor was a company called Comverse,

3    right?

4    A    Comverse was the supplier of our previous SMSCs, yes.

5    Q    Okay.  And when Comverse supplied the SMSCs, all of the

6    SMSCs' short message service centers were located

7    geographically at the switch sites?

8    A    Yes, they were.

9    Q    And that means they were located where the mobile

10   switching centers were located?

11   A    Yes, that's correct.

12   Q    And at that time then they were not in Reston and they

13   were not in any North Bunker in Kansas, were they?

14   A    No, they were not.

15   Q    But they were still part of Sprint's core network

16   according to you?

17   A    Yes, absolutely.

18   Q    Okay.  And then so the first phase was removing the SMSCs

19   that handled traffic coming from a Sprint subscriber, right?

20   A    Yes, the MO-SMSCs were the first ones moved to the core

21   data centers.

22   Q    And then the second phase was moving the other ones, the

23   SMSCs that handled the traffic coming from other networks

24   into Sprint, right?

25   A    Yes, the MT-SMSCs.

1          MR. GOETTLE:  Okay, can we put up Exhibit 127?

2   Which is already admitted, your Honor.

3          (Pause.)

4   BY MR. GOETTLE:

5   Q   You've seen this document before, right?

6   A   Yes, I have.

7   Q   This is a document relating to the second phase of the

8   transition from Comverse to Sprint's current vendor --

9   A   Yes.

10  Q   -- right?  Okay.

11         MR. GOETTLE:  Can you go to page -- it's page 34.

12         MR. FINKELSON:  Mr. Goettle?

13         MR. GOETTLE:  Yes?

14         MR. FINKELSON:  Do you mind providing the witness?

15  I don't know --

16         MR. GOETTLE:  Oh.

17         MR. FINKELSON:  -- that he has a copy of the

18  document.

19         MR. GOETTLE:  I apologize.

20         THE WITNESS:  Yeah, I don't think I have this one.

21         MR. GOETTLE:  Sorry about that.

22         (Pause.)

23         MR. GOETTLE:  May I approach, your Honor?

24         THE COURT:  Yes.

25  BY MR. GOETTLE:

1    Q    It was page 34 on the document, the original document.

2              MR. GOETTLE:  You know what, let's -- I'm sorry,

3    let's focus on the cover page.  I apologize for that, Mr.

4    Dyer (ph), can you go back to the cover page?

5    BY MR. GOETTLE:

6    Q    The document title on this is "Next gen" -- that stands

7    for generation, right?

8    A    Yes.

9    Q    "Next generation messaging and imaging."

10   A    Yes.

11   Q    Okay.  So we're talking about Sprint's messaging, right?

12   A    It's a design document related to messaging, yes.

13   Q    And it's a design document related to messaging in terms

14   of taking out Sprint's SMSCs and replacing them with new

15   SMSCs?

16   A    Yes, these were the -- this would have been the

17   replacement of the MT-SMSCs.

18   Q    Mobile-terminated SMSCs?

19   A    Mobile-terminated, correct.

20   Q    Okay.  And that means those are the termination point for

21   the message coming for example from other networks?  Not --

22   excuse me, not termination point, but those are the SMSCs

23   that would be receiving the SMS from other networks?

24   A    Those would have been the SMSCs delivering messages to

25   Sprint devices.

1    Q    That came for example from a Verizon subscriber?

2    A    Yes, but I think at this time they weren't coming

3    directly to the MT-SMSC.

4    Q    There came a time when they were?

5    A    I'm sorry, can you --

6    Q    I thought you said at that time they were not going

7    directly to the MT-SMSC, but implying that maybe they are

8    today?

9    A    Well, today there's only one SMSC, but there's still a

10   component in front of it called the AAG.

11   Q    Oh, I see.  Okay.  But the purpose of this project, just

12   to get back on track and I apologize for that, the purpose of

13   the project was to change out the SMSCs, right?

14   A    Yes, it was a replacement of the Comverse MT-SMSCs and

15   transitioning to the -- yeah, the SMSCs supplied by Acision.

16   Q    Okay.  And can you go to now page 34?

17        MR. GOETTLE:  And, Mr. Dyer, can you blow up the

18   third paragraph down, which is the big paragraph?

19   BY MR. GOETTLE:

20   Q    And luckily we don't need to read the whole document, but

21   the second sentence, do you see the second sentence there,

22   sir, where it starts with "The gateway"?

23   A    Yes, I do.

24   Q    It says, "The gateway will translate SNPP messages and

25   commands into SMPP messages and commands for use by the core

1    Sprint messaging network."  Do you see that?

2    A    Yes, I do.

3    Q    And you wouldn't be surprised to see language like that

4    in other documents, right?

5    A    It's not a term we often use to say messaging network.  I

6    would just assume that's referring to the messaging

7    components within our core network.

8    Q    You would assume that what it means is other words than

9    what are on the page?

10   A    I'm just saying it's not a term we typically use on our

11   team.

12   Q    That wasn't my question.  My question earlier was you

13   wouldn't be surprised to see the term messaging network in

14   other documents, would you?

15   A    It's not a term I recall seeing often.

16   Q    Again, sir, that's not my question.  My question is you

17   wouldn't be surprised to see the term used in other Sprint

18   documents?

19   A    If it were used, I would just assume it was in reference

20   to messaging components within Sprint's core network.

21   Q    Oh, I see.  So if I showed you other documents where

22   messaging network were used, the context for you would always

23   mean within Sprint's cellular network?

24   A    Yes, within Sprint's core network.

25   Q    Sprint's core network of Sprint's cellular network?

1   A   Yes, that's correct.

2   Q   You understand, sir, that the main issue, the main issue

3   in this case is what is Sprint's core network and what's

4   included and what's not?

5   A   Yes, I've heard that.

6   Q   Yes.  And that's a primary motivator for you to

7   continually make sure you say core network to the jury in

8   response to my questions, right, because you know that's an

9   issue for the jury to decide?

10  A   No --

11          MR. FINKELSON:  Objection, your Honor --

12          THE WITNESS:  -- I know that's the truth.

13          MR. FINKELSON:  -- objection, your Honor --

14          THE COURT:  Yes.

15          MR. FINKELSON:  -- argumentative.

16          THE COURT:  No, no need to answer.  Objection

17  sustained.  It's argumentative.

18  BY MR. GOETTLE:

19  Q   Sir, have you ever read the patent in suit in this case?

20  A   No, I have not.

21  Q   And you haven't read the claim constructions either?

22  A   No, I have not.

23  Q   So when you say core network, you don't mean to suggest

24  to the jury that they should infer from that that when you

25  say what's included in Sprint's core network that that's what

1    the patent means, you don't mean to imply that, do you?

2    A   I've never read the patent, so I wouldn't be able to

3    comment.

4    Q   So you don't mean to imply that what you say what is

5    inside Sprint's core network, you don't mean to imply to the

6    jury that they should assume that that's what the patent

7    means by core network elements?

8    A   That was a long question.

9    Q   Do you want me to repeat it --

10   A   Yeah, please.

11   Q   -- rephrase it?  When you say, when you describe for the

12   jury what is inside Sprint's core network as you understand

13   it, okay, those elements that you say are within Sprint's

14   core network, you don't mean to imply to the jury that they

15   should assume that those elements meet the Court's

16   construction of cellular network, do you?

17   A   I wouldn't want to imply anything to the jury, I'm just

18   giving the locations and placement of the messaging servers

19   in our network.

20   Q   Okay.  So that's a no, you don't mean to imply it to the

21   jury?

22   A   Yes, I don't mean to imply it.

23   Q   Okay.  In your view, what is Sprint's core network?

24   A   In my view, it contains the mobile switching centers, the

25   HLR, messaging servers, packet data gateway notes, and so we

1    put voicemail systems in there as well.

2    Q    I missed that last part.

3    A    I'm sorry, voicemail systems.

4    Q    What about location, mobile positioning centers?

5    A    That's not really an area I'm an expert in.

6    Q    So you don't know one way or the other?

7    A    No.

8    Q    Sir, you testified about Picture Mail?

9    A    Yes, that's correct.

10   Q    Did Sprint's implementation of Picture Mail -- or I

11   should say Syniverse, Syniverse's implementation of Picture

12   Mail -- Syniverse was the supplier of the Picture Mail

13   service?

14   A    Yes, they were.

15   Q    That's the company that supplied Picture Mail for Sprint?

16   A    They were the company that ran Picture Mail.

17   Q    And the Picture Mail service supplied to Sprint was

18   compliant with the 3G-PP2 specifications, right?

19   A    I'm not sure that it was completely.

20   Q    Picture Mail, sir, started as a proprietary offering from

21   Syniverse and then ultimately evolved into an MMS standard

22   solution, right?

23   A    Yes, that sounds right.

24   Q    Okay.  So it was complying with the 3G-PP2 MMS standards?

25   A    I don't know if it was 3G-PP2 compliant necessarily.  The

1   standard I'm more familiar referring to is OMA.

2   Q   OMA?

3   A   Yes.

4           MR. GOETTLE:  Can I have PX-80?  Can I have copies

5   of that?

6           (Pause.)

7           MR. GOETTLE:  May I approach, your Honor?

8           THE COURT:  You may.

9           (Pause.)

10          THE WITNESS:  Thanks.

11  BY MR. GOETTLE:

12  Q   Have you seen PX-80 before?

13  A   No, I don't believe so, unless you showed it to me in

14  deposition.

15  Q   Do you see at the top it says "Contract Order No. 37 to

16  Master Application Service Provider Agreement"?

17          MR. FINKELSON:  Your Honor, I just would object

18  insofar as I don't believe this document is in evidence.  I'm

19  not sure if Mr. Goettle plans on publishing it or not.

20          MR. GOETTLE:  Well, I haven't published it because

21  it's not -- I don't plan to.

22          MR. FINKELSON:  Okay.

23  BY MR. GOETTLE:

24  Q   Did I read the title of the document correctly?

25  A   Yes, I believe you did.

1  Q   And do you see in the next paragraph down it's a contract

2  between Sprint and a company called Light Surf?

3              MR. FINKELSON:  Your Honor, objection.  The question

4  lacks foundation.  I don't think Mr. Goettle has established

5  that the witness has ever seen the document before.

6              THE COURT:  Well, he said unless it was shown to him

7  in deposition he hasn't seen it.  Was it shown to him?

8              MR. GOETTLE:  It was not, your Honor.

9              THE COURT:  Well, then he hasn't seen the document.

10             MR. GOETTLE:  He has not seen the document before.

11 What I'm establishing using the --

12             THE COURT:  Well, don't tell us what you're

13 establishing.

14             MR. GOETTLE:  Okay.

15             THE COURT:  If you want to share that with me, we'll

16 go to sidebar.  It's inappropriate to tell me what you're

17 trying to establish, let the jury hear it and then not

18 establish it.

19             MR. GOETTLE:  I certainly didn't mean to be

20 inappropriate.

21             THE COURT:  I know you didn't, but we're kind of

22 overwhelmed with documents and most of mine are on a lower

23 bench, it's beginning to tilt in that direction.  Bottom

24 line, are you going to continue with this document?

25             MR. GOETTLE:  I would like to elicit testimony about

1    what this document says because the witness has said he

2    doesn't know about something and this is a contract between

3    Sprint and the company that I think will clear it up.

4              THE COURT:  All right.

5              MR. GOETTLE:  I can get to the rub in one question,

6    if you want, your Honor.

7              THE COURT:  Fine, ask another question.  The last

8    question was objected to and it was sustained.

9    BY MR. GOETTLE:

10   Q   Can you read under the paragraph 1 there that says "Scope

11   of service" to yourself?

12             (Pause.)

13   A   Okay.

14   Q   So the agreement, the arrangement between --

15             THE COURT:  Well, no, the question is does that

16   refresh your recollection as to the document and specifically

17   whether you've seen the document before?

18             THE WITNESS:  No.  This is from 2004, so it would

19   have been prior to me joining Sprint.

20             MR. GOETTLE:  Can I withdraw the document, your

21   Honor?

22             THE COURT:  Fine.

23   BY MR. GOETTLE:

24   Q   Does that document refresh your recollection as to

25   whether Picture Mail's implementation -- or excuse me,

1    Syniverse's implementation of the Picture Mail was compliant

2    with the 3G-PP2 specifications?

3    A    No, it does not.

4    Q    Why not?  What else would you need to know?

5    A    Well, it's just a line in a contract, it doesn't really

6    give any details.

7    Q    So you don't know as the head of messaging at the time

8    when Picture Mail was discontinued from Sprint's network, you

9    don't know one way or the other whether the Picture Mail

10   service was compliant with the 3G-PP2 specifications?

11   A    The Picture Mail service was hosted; it was mostly a

12   black box, we didn't have a lot of visibility into how it

13   actually worked.

14   Q    But you had visibility into how it connected to Sprint's

15   network, right?

16   A    Yes, for a period of time during the transition there

17   was, yeah, some interfaces between the Picture Mail platform

18   and our in-network MMSC.

19   Q    Actually there was interfaces between the Picture Mail

20   platform and Sprint's SMSCs for the entire time it was in

21   use?

22   A    Right, an SMPP interface for notifications.

23   Q    For notifications, right?

24   A    Yes.

25   Q    Okay.  And that interface was standards compliant, right?

1    A    It was an SMPP interface, I wouldn't necessarily say it

2    was 3G-PP2 compliant.

3    Q    You don't know one way or the other?

4    A    No.  I don't think SMPP in particular is mentioned in 3G-

5    PP2.

6    Q    How did you come to the conclusion of Sprint's SMSCs and

7    MMSCs are part of Sprint's core network?

8    A    They've just always been part of Sprint's core network

9    ever since 1998 when Sprint first deployed SMS.

10   Q    Sprint's messaging servers have been part of Sprint's

11   core network of its cellular network since 1998, is that your

12   testimony?

13   A    Yes.

14   Q    And how do you know that?  You didn't work at Sprint in

15   1998, so how do you know that?

16   A    I just know that's where they've always been.  They were

17   first deployed at the mobile switching centers, which are

18   also part of the core.

19   Q    Did you come to that determination in part because of the

20   protocols that the SMSCs use?

21   A    Uh, no.

22   Q    Did you come to that determination at least in part

23   because of the wording of the patent in suit in this case?

24   A    No.  I've never read the patent in this case.

25   Q    Did you come to that conclusion that Sprint's SMSCs are

1    core network elements by looking at the 3G-PP2 standards?

2    A    No.

3    Q    Did you come to that conclusion that Sprint's SMSCs are

4    core network elements because Sprint owns them?

5    A    No, not because they own them.  I would say some of that

6    conclusion is from the ANSI-41 standards, but I think in

7    general messaging, voice and data have always been core

8    services of Sprint.

9    Q    So did you come to that conclusion after -- sorry, did

10   you come to that conclusion by looking at who is operating

11   and controlling the SMSC?

12   A    I'm not sure I understand the question.

13   Q    Did you come to that conclusion that Sprint's SMSC are

14   part of Sprint's core network of its cellular network because

15   Sprint operates and controls the SMSCs, is that why they're

16   core network elements in your view?

17   A    I don't know that that's what makes them core elements,

18   but that is true.

19   Q    It's true, but it doesn't weigh into one way or the other

20   in your conclusion that Sprint's SMSCs are core network

21   elements?

22          (Pause.)

23   A    Well, to be core network elements they would have to be

24   owned and operated by Sprint.

25   Q    Okay.  So it's because Sprint owns and operates them,

1  that's what makes them core network elements?

2  A   I think that's a stretch but, I mean, it's maybe one of

3  the reasons.

4  Q   It's a stretch of a reason?

5  A   It could be one of the reasons, it's not -- it's far from

6  the only reason what makes it core.

7  Q   Well, what makes it core it sounds like in your view is

8  because Sprint offers it as one of its three services, voice,

9  data and messaging, that's why it's core?

10 A   If I described it in laymen's terms, yes.

11 Q   Because voice, data and messaging are what Sprint does to

12 make a living, those are revenue-generating things, products

13 that Sprint provides?

14 A   Generally, it is true that Sprint tries to make a profit.

15 Q   That wasn't my question.  My question was that you are

16 telling the jury that Sprint's messaging SMSC are core

17 network elements because messaging is one of the services

18 that Sprint provides to its customers; have I summed it up

19 correctly?

20 A   Yes, it's one of the core services provided.

21             MR. GOETTLE:  Can we put up PX-99?

22             THE COURT:  No, let's take a break.  It's not quite

23 20 minutes after 3:00, we'll be in recess until 3:30.

24             (Jury out at 3:18 o'clock p.m.)

25             THE COURT:  We're in recess until 3:30.

1          (Court in recess 3:19 to 3:49 o'clock p.m.)

2          (On return from recess, the sound system was not on

3     for a brief time.)

4     Q   ...page of PX-99 that you were talking about at your

5     deposition, because it refers to an SMS message from a Sprint

6     subscriber to another Sprint subscriber.  Do you see that?

7     Page 88, the question started on line 9.

8     A   Yes, I do.

9     Q   Okay, so the question at line 9 was "Question:  And to

10    your knowledge, does this diagram accurately represent the

11    call flow for sending an SMS message from a Sprint subscriber

12    to another Sprint subscriber?

13          "Answer:  No.

14          "Question:  What's inaccurate about it?

15          "Answer:  The drawing shows an SMDPP ACK coming back

16    from the SMSC prior to address validation being done, which

17    is inaccurate.

18          "Question:  So, would it be more accurate if the

19    SMDPP ACK came back after the sub-found message that comes

20    from the SPS back to the SMSC?

21          "Answer:"  And I'm going to skip the objection.

22          MR. HANGLEY:  I have no objection to you skipping

23    the objection.

24          MR. GOETTLE:  "Answer:  It would be accurate if the

25    SMDPP ACK was shown after, after the sub-found for the MT

1   DIP."  That was the questions and the answers, right, so far?

2         THE WITNESS:  Yes.

3   BY MR. GOETTLE:

4   Q   So, it's in the basis of that Q&A to get to the point

5   where it's in the wrong spot, but it still happens, right?

6   A   There's still an SMD taking message that --

7         THE COURT:  What happened --

8         THE WITNESS:  -- comes to the SMSC and

9   acknowledgment that goes back, yes.

10         THE COURT:  Excuse me?

11         MR. GOETTLE:  Oh, I'm sorry.

12         THE COURT:  We'll see how important this testimony

13   was.  I've just been told that since our return from recess,

14   the recording equipment has not been on.

15         MR. GOETTLE:  I'm sure it's in the vault for

16   everybody in the room, your Honor. I don't know what the

17   remedy is there.

18         THE COURT:  Well, it's not going to be in the

19   record.  So, you didn't cover very much.

20         MR. GOETTLE:  We didn't.  Your Honor, I'm happy to

21   proceed the way we're proceeding.

22         THE COURT:  You don't need to repeat?

23         MR. GOETTLE:  I don't think so, your Honor.

24         THE COURT:  Go ahead.

25         MR. GOETTLE:  That would make everybody happier if I

1    did not.

2          MR. FINKELSON:  Just so I understand, is the

3    equipment operational now?

4          THE DEPUTY CLERK:  Yes.

5          MR. FINKELSON:  Okay.

6          MR. GOETTLE:  Mr. Hangley is making a good

7    suggestion to me that I just maybe do some questions just to

8    summarize where we were in like three or four questions.

9    Would that be all right with you, your Honor?

10          THE COURT:  Yes.

11          MR. HANGLEY:  With the understanding that Mr.

12   Finkelson will object if he leads in the wrong direction as

13   distinguishing after summarizing.

14          THE COURT:  No, I think you can cover it that way.

15   Is there any problem?

16          MR. FINKELSON:  I have no objection to that.  I was

17   intending to questions.

18          THE COURT:  All right.

19          (Pause.)

20          THE COURT:  Let's go.

21   BY MR. GOETTLE:

22   Q   Okay, maybe what I'll do is I'll finish this line, since

23   we're on it right now.  So, again, the deposition testimony

24   that I just read into the record indicates that the error,

25   the only error that got discussed so far is that the SMDPP

Hoelzle - Cross                                    71

1   acknowledge of message is in the wrong spot, correct?

2   A    Yes, it looks like that's the only thing I pointed out

3   during deposition.

4   Q    That's the only thing you pointed out during deposition,

5   right?

6   A    Yes.

7   Q    And then you were asked, "Question:" and this is on page

8   89, right following in this flow, page 89, line 4,

9        "Question:  Other than modification, the one that we

10  just talked about, is this diagram accurate?

11       "Answer:  Yes, the rest of it looks correct."

12       THE COURT:  And so, that makes sense, you're talking

13  about PX-99 and the diagram is at page 6.

14       MR. GOETTLE:  Yes, your Honor.

15       THE COURT:  All right, go ahead.

16       MR. GOETTLE:  Okay, so, in light of the recording --

17       THE COURT:  Was that your answer at the deposition?

18       THE WITNESS:  Yes, that was my answer at the

19  deposition.

20       THE COURT:  Fine.

21       MR. GOETTLE:  I don't know what was on the record,

22  but that the record --

23       THE COURT:  Well, what was not on the record was the

24  reference to core network in the deposition to which you've

25  just referred.  His deposition of June 5, 2014.  And his

1  answer -- the question and answer at page 35.  And then  you

2  went to this diagram.

3           MR. GOETTLE:  Okay.  Actually, you know, it's just

4  one question that I want to sum up.

5  Q   Sir, in 1998, Sprint did not offer to its subscribers the

6  ability to send and receive SMS messages, text messages,

7  correct?

8  A   In 1998, not send messages, there was just ability to

9  receive messages -- SMS messages.

10 Q   And that means that they were not receiving messages from

11 other subscribers, right?

12 A   No, I don't believe so.

13 Q   Well, if a Sprint's subscriber couldn't send, then that

14 Sprint subscriber would have nothing to receive, right?

15 A   I think in 1998, there were other mechanisms of sending

16 messages and having them delivered by SMS.

17          MR. GOETTLE:  No further questions, thank you, your

18 Honor.  Do you need any docs, Dave?

19          MR. FINKELSON:  I don't need any documents, thank

20 you.

21          MR. GOETTLE:  I'll get this binder out of the way.

22 Who gets to ask questions at a deposition, Mr. Hoelzle?

23                    REDIRECT EXAMINATION

24 BY MR. FINKELSON:

25 Q   Who gets to ask questions at a deposition, Mr. Hoelzle?

1   A    The lawyers.

2   Q    The lawyers for the party taking the deposition, correct?

3   A    Yes, correct.

4   Q    Okay, which party took your deposition three times in

5   this case?

6   A    The lawyers from Comcast.

7   Q    And did two of those depositions last for virtually the

8   entire day, until after 4:00 o'clock?

9   A    Yes, they did.

10  Q    Did one of those depositions go until almost 2:00 o'clock

11  in the afternoon?

12  A    Yes.

13  Q    Three depositions all told, is that right?

14  A    That is correct.  I only wish my kids were half as

15  interested in what I did for a living.

16  Q    In all of those hours of deposition, knowing the central

17  issues in this case, how many times did Comcast ask you

18  whether Sprint's messaging servers are part of the core

19  network of its cellular network?

20  A    I don't think I was ever asked that question.

21  Q    Do you think that's because they didn't want to know the

22  answer?

23           MR. FINKELSON:  Withdrawn, your Honor.

24           MR. GOETTLE:  No questions, your Honor.

25           THE COURT:  Thank you.  You may step down, sir,

1    thank you very much.

2             THE WITNESS:  Thank you.

3             MR. FINKELSON:  And your Honor, Mr. Hoelzle is here

4    pursuant to a subpoena.  I raised the issue with Comcast

5    whether they were prepared to release him, they've implicated

6    that they would like to hold on to the ability to potentially

7    recall him in their rebuttal case.  So, he's leaving today,

8    but will be made available should Comcast wish to present him

9    at that time.

10            THE COURT:  But you're releasing him from the

11   subpoena obligation?

12            MR. FINKELSON:  They're the subpoenaing party.  I

13   don't think they are.  They're maintaining the subpoena

14   obligations with the understanding that he would come back in

15   their rebuttal case, should they like to call him.

16            THE COURT:  Have you -- yes, he's a Sprint employee.

17   Is that a correct statement and have you so advised Mr.

18   Hoelzle?

19            MR. GOETTLE:  Yes, we have, your Honor.

20            THE COURT:  But he's still employed by Sprint?

21            MR. GOETTLE:  He is.

22            THE COURT:  And so he can be directed to return.

23            MR. FINKELSON:  Oh, absolutely and he will.  I was

24   just making clear for the record that he will be made

25   available to testify again, should --

1          THE COURT:  It wasn't necessary for Comcast to

2     subpoena.

3          MR. FINKELSON:  Well, it did.

4          THE COURT:   Fine, now you have agreed to produce

5     witnesses who are presently employed by Comcast and Sprint,

6     have you not?

7          MR. FINKELSON:  I don't know that we've reached that

8     formal agreement, but we certainly -- there's been no

9     instance where the parties have not done that.

10         THE COURT:  Fine, I don't think it's necessary to

11    subpoena -- for Comcast to subpoena Sprint employees or for

12    Sprint to have to subpoena Comcast employees.  So, I'm

13    directing with any employee witnesses who are needed, of

14    course, who have not yet testified, be produced.

15         MR. FINKELSON:  Understood, your Honor.  Your Honor,

16    may we proceed with our next witness?

17         THE COURT:  You may.

18         MR. FINKELSON:  Sprint calls Ramesh Golla.

19         (Pause.)

20         THE DEPUTY CLERK:  Please raise your right hand.

21         RAMESH GOLLA, Witness, Sworn.

22         THE DEPUTY CLERK:  Please be seated.  Please speak

23    loudly and state your whole name and spell it for the record,

24    please?

25         THE WITNESS:  My name is Ramesh Golla.  I work for

1   Sprint.

2           THE COURT:  How do you spell your name, Mr. Golla?

3           THE WITNESS:  R-A-M-E-S-H, last name is G-O-L-L-A.

4                        DIRECT EXAMINATION

5   BY MR. FINKELSON:

6   Q    Good afternoon, Mr. Golla, how are you?

7   A    Good afternoon.

8   Q    You've drawn the prized 4:00 p.m. slot.

9   A    Thank you.

10  Q    Can you introduce yourself to the jury, please, sir?

11  A    My name is Ramesh Golla.  I work for Sprint as a manager.

12  Q    And what do you do at Sprint, Mr. Golla?

13  A    I am a manager at Sprint.  I am responsible for serving

14  equipment, especially subscriber profile system, which is

15  SPS.  Which is a database that stores subscriber data.

16  Q    Do you have a technical background, sir?

17  A    Yes, I do have computer science background.

18  Q    And how did you first get into computer science?

19  A    I'm from a small village in India, around 10,000 people

20  and for India, 10,000 people is considered a small village.

21  I always wanted to be an engineer, so I went to college,

22  getting my Bachelor's in Computer Science.  And at that time,

23  computer science at very early stages, computers were scarce.

24  We used to use something called punch cards when they first

25  started computer science.  And then we had to prove ourselves

Golla - Direct                                    77

1    even to touch the computer and we didn't get to touch the

2    computer until second year of our college.  And since then, I

3    hooked on to computer science.

4    Q   Can you explain to the jury what a punch card is?

5    A   Punch card is nothing but, you know, I think in olden

6    days, we used to have timesheets, where we used to put inside

7    into the machine and it punches the, you know, time.  And

8    just similar to that, in initial stages, we used to have

9    these punch cards were needed to punch the codes on that card

10   and then feed that to the computer, so the computer can read

11   the program.  So, these are very early stages and we used to

12   use that in the beginnings.

13   Q   When did you get your college degree and in what field?

14   A   I got my college degree in 1990 in computer science.

15   Q   And what did you do after that, Mr. Golla?

16   A   My father always wanted to send somebody from the family

17   to the United States, so I was the lucky one and my father

18   sponsored me to come to United States and I went to

19   University of Mississippi to do my Master's in Computer

20   Science.  And after I completed my Master's in Computer

21   Science in '93, I moved to Macon, Virginia.

22   Q   And that was at the University of Mississippi from which

23   you got your Master's in Computer Science?

24   A   That is correct.  It is called Ole Miss.

25   Q   And you said you went to Northern Virginia, what did you

1    do in Northern Virginia once you completed your studies at

2    Ole Miss?

3    A    I went to work for a company specializing in database

4    systems and initially, since then I lived in Macon, Virginia

5    and for the last -- since I moved into Macon, Virginia, I

6    lived there until now with my family.   And I also received,

7    I applied for citizenship and ten years back, I got my U.S.

8    citizenship to became a U.S. citizen in the U.S.

9    Q    When did you first start working with Sprint?

10   A    I started working for Sprint in 2003.   Actually, I

11   started in Nextel as a project manager, working in a wireless

12   number portability project.   Then after the merging with

13   Sprint, I continued on working as a project manager in work,

14   at that time, known as Vision LDAP.   Which is a LDAP

15   database, subscriber database that is used for data

16   authentication.   Which is, this is similar to what is, at

17   that time, called messaging LDAP that is used for messaging.

18   Q    So, the LDAP for data, did you say that was called the

19   Vision LDAP?

20   A    That is correct.

21   Q    And the LDAP for messaging at that time, was that -- what

22   was that called?

23   A    It was called messaging LDAP.

24   Q    And was the messaging LDAP at Sprint used for anything

25   other than messaging, Mr. Golla?

1   A    No, only messaging servers access messaging LDAP.

2   Q    When were you first involved with the SPS?

3   A    As part of my involvement in database systems, I was

4   first given in charge of subscriber profile system and

5   initially, I was an interim manager and then I got promoted

6   to a permanent manager and since then, I've been working on

7   SPS subscriber profile system until now.  Even to today, I,

8   you know, I manage SPS system and the team.

9   Q    And over time, have certain devices been migrated to

10  access the SPS for subscriber data?

11  A    Yes, that is correct.  You know, so SPS initially, under

12  my management, we installed SPS in Sprint and then various

13  databases were migrated into SPS.  And then, from then on,

14  various climbs -- climbs is nothing but what the systems that

15  accesses SPS for subscriber authentication.  One of them was

16  Triple AAA, it is called Authentication Authorization and

17  Accounting server, which is used for date services.  And then

18  similar to that was messaging servers and messaging servers

19  later also migrated to use SPS as the subscriber databases.

20  Q    Was that after Triple AAA had migrated to use the SPS?

21  A    That is correct.  First it was Triple AAA that was

22  migrated and then after that, messaging servers were migrated

23  to use SPS.

24  Q    And I think you said and correct me if I'm wrong, that

25  today, you're the manager of the SPS?

1    A    That is correct.  I was the manager of SPS since it was

2    started and continue to be managing that platform.  I

3    fortunate to even receive -- recent in 2015 -- a subgraphics

4    (ph) excellence award in Sprint, which is a very prestigious

5    award, is given to only a very handful of people and it was

6    recommended with my teammate and it was reviewed by VPs and

7    senior VPs and was issued to very view individuals among

8    thousands of nominations.

9    Q    What is the name of the individual to whom you report at

10   Sprint?

11   A    I report to Greg O'Connor.

12   Q    And who else reports to Mr. O'Connor, to your

13   understanding?

14   A    Various people who is responsible for our core network

15   elements are reporting to Greg O'Connor, including Acision

16   team.

17   Q    Mr. Golla, where is the SPS located?

18   A    The SPS is located in three core network sites along with

19   messaging servers.

20           (Pause.)

21           MR. FINKELSON:  Your Honor, may I approach with a

22   binder for Mr. Golla and take away the other one?

23           THE COURT:  You may.

24           MR. FINKELSON:  Thank you.

25           (Pause.)

1          MR. FINKELSON:  Your Honor, may I move into evidence

2   DX-215, DX-232 and DX-233, all of which I believe are

3   unobjected to.

4          MR. GOETTLE:  No objection, your Honor.

5          THE COURT:  DX-215, 232 and 233 are received in

6   evidence.

7          (Defense Exhibits 215, 232 and 233 received in

8   evidence.)

9   BY MR. FINKELSON:

10  Q   Mr. Golla, I'd like to start by having you look at

11  DX-215, sir?

12  A   Okay.

13  Q   Are you familiar with this document?  I'll give it a

14  second to come up on the screen for everybody to see, as

15  well.  Are you familiar with DX-215, Mr. Golla?

16  A   Yes, I am familiar with this document.

17  Q   What is DX-215?

18  A   This is the design document of subscriber profile system.

19  It mainly contains the physical locations, as well as the

20  design of SPS, subscriber profile system for engineering

21  purposes and this is some version of this document has been

22  existing since 2007.

23  Q   What is the importance of the title, design document?

24  A   Design document is very important document.  Most of the

25  engineers in Sprint, who is working on SPS, rely on this

Golla - Direct                                    82

1    document as well as some of our suppliers and vendors also

2    rely on this document.

3    Q    I believe, if we turn to page 8 of the document, there's

4    a list of individuals on the project team.  Mr. Golla, were

5    you a member of this team?

6    A    Yes, my name is listed, yes.

7    Q    If we could turn to page 6, Mr. Baird.  What is shown,

8    Mr. Golla, on page 6 of this document, DX-215?

9    A    These are the three core sites where the SPS is located,

10   along with the messaging servers.  These are two listed as

11   North Bunker and South Bunker in Lanexa and Reston,

12   Reston Data Center.  This is the address that is shown in

13   Reston, is that is where I work.  The ground floor is where

14   our data center is and in the first floor, where I work.

15   Q    Now, Mr. Golla, I believe your referred to these as core

16   sites, did I understand your testimony correct?

17   A    That is correct, these are the core network sites.

18   Q    And is that, in fact, how Sprint's design document for

19   the subscriber profile system, the SPS, describes the sites?

20   A    Yes, that is correct.

21   Q    Where do you see that on the page that the jury is

22   looking at, page 6, of PX-215?

23   A    So, you can see it talks about the three core -- that I'm

24   now saying the description, it says SPS infrastructure to

25   three core sites.

1   Q    And again, what are the three core sites that are

2   identified in this design document?

3   A    So, one is called North Bunker in Lanexa, Kansas.   Second

4   one is Reston, Virginia.   Third one is South Bunker, that is

5   also in Lanexa, Kansas.

6   Q    Can we please turn, Mr. Baird and Mr. Golla to page 22 of

7   this SPS design document, DX-215?  Can you tell the jury, Mr.

8   Golla, what is shown on page 22 of DX-215?

9   A    These are the three core sites that are referred as C-1,

10  C-2 and C-3.   Like I just mentioned, they are in -- C-1 is in

11  Lanexa, which is the North Bunker.   C-2 is in Reston and C-3

12  is in South, which is found also in Lanexa, Kansas.

13  Q    And what does C stand for, according to this document,

14  sir?

15  A    It's referring as C for core site on C-1, C-2, C-3.

16  There are three core sites.

17  Q    And can you highlight that, please, Mr. Baird, where it

18  says C, core site, both there and also to the left by the C.

19  Is that what you are referring to, Mr. Golla?

20  A    That is correct.

21  Q    As manager of the SPS, Mr. Golla, are you responsible for

22  managing the equipment covered in this document?

23  A    That is correct, I was responsible.   I am still

24  responsible for this.

25  Q    Does this document accurately describe where the SPS is

1    located?

2    A    Yes, it does.

3    Q    Does it accurately use the word, core sites?

4    A    Yes, it does.

5    Q    Did you and your team put the word, core sites, in this

6    design document at Sprint for any reasons relating to this

7    lawsuit, sir?

8    A    No, this has been there from the beginning, from 2007,

9    when SPS was installed in these core sites, as well as -- and

10   in these core sites, the previously Vision LDAP was also part

11   of these in starting these core sites.  So, this has been

12   there as long as I, you know, I've been working on these

13   platforms.

14   Q    If you put the words, core site, in this document for

15   purposes of this lawsuit, if you put that in a Sprint design

16   document for purposes of this lawsuit, what would happen to

17   you, Mr. Golla, at the company?

18   A    I would not be in the company.

19   Q    You'd be fired?

20   A    I'd be fired for that, yes.  I cannot do anything for

21   this lawsuit.  Like I mentioned again, this has been there as

22   a core site from the beginning, you know, I've been -- in

23   Sprint.  These core sites have been existing since that time

24   and SPS, as well as messaging servers have been in this core

25   site all along and there is nothing, you know, the version of

1    this document has been existing since 2007.  It will clearly

2    show that all these years we have been referring these as

3    core sites and nothing has changed just because of this trial

4    or for this, you know, for the sake of just the lawsuit.

5    Q    Was there a period of time where just the AAA was

6    accessing the SPS at the core sites -- I'm sorry.  Or just

7    that -- let me ask it again.  Was there a period of time

8    where just the Triple AAA was accessing the SPS?

9    A    Triple AAA has been accessing SPS from the beginning.

10   That is, like I mentioned, Triple AAA was the first element

11   that was migrated to access SPS and SPS has been in these

12   core sites, at least, in the two core sites, C-1 and North

13   Bunker and Reston from the beginning and then there was a

14   third copy was in regional data centers and at one point,

15   that was migrated to the third core site, which is, you know,

16   South Bunker, which is the South, so since then it has always

17   been in this Triple AAA was -- Triple AAA systems were

18   accessing SPS in these three core sites.  And then, when we

19   migrated the messaging servers, messaging servers started

20   accessing SPS in these three core sites.

21   Q    So, are you familiar with versions of this document that

22   are earlier in time and that pre-date the time period when

23   Sprint's messaging servers used the SPS?

24   A    Yes, there is a version of this document, like I

25   mentioned, existed from 2007, that's when we started working

1  on SPS and it would show SPS is in the core sites.

2  Q   And would it also show that Triple AAA was there?

3  A   Triple AAA was accessing the data in these core sites.

4  Q   Would it discuss messaging at that point in time, given

5  that messaging wasn't using the SPS yet?

6  A   No, in the 2007, it would not, you know, discard Acision,

7  because if we did not start with Acision, we started with the

8  Triple AAA, you would see in the Triple AAA in the beginning

9  and then, at a later versions of the document, you would see

10 messaging accessing SPS.

11 Q   Can you turn to page 23, Mr. Golla, of DX-215?  I think

12 it's the following page.  Can you explain to the jury what is

13 shown here?

14 A   This table is showing all the network elements, what we

15 call claims, accessing the SPS in the core sites, especially

16 you can see the triple S (indiscernible) accessing SPS in the

17 code sites, as well as the messaging servers accessing SPS in

18 these three core sites.

19 Q   I believe you mentioned that one of the sites, the Reston

20 site is in the same building in which you work, do I have

21 that right, Mr. Golla?

22 A   That is correct.

23 Q   And can you just go into that Reston location any time

24 you want?

25 A   No, I cannot.  Even though I have access to the building,

1    I first -- you know, my access only I can go into the offices

2    in my second floor, but if I have to go into the data center

3    I need a special access, I need to get a special permission

4    to get into the, you know, data centers.  And also that

5    special access I need to request for that, every Sprint

6    employee need to request to get into this -- any of the core

7    sites.  And even in the access request we clearly have to

8    mention what is the purpose we are going and from what time

9    to what time we will be in that facility and why we are going

10   there.  And if you have to put any equipment in there or

11   remove any equipment, we have to get a special permission on

12   top of even getting the, you know, access.  So all of the

13   equipment that goes into these core sites is tracked and, you

14   know, we cannot do any -- we cannot remove any equipment or

15   put any equipment back without proper, you know, paperwork

16   that is completed.

17   Q    Today are Sprint's SPS databases, as well as the SMSC and

18   MMSC messaging servers located at these core sites?

19   A    Yes, that is correct.

20   Q    I'd like to ask you a few questions about a document that

21   has been already admitted into evidence by Comcast, it's

22   document PX-120 that's in your binder, sir.

23         (Pause.)

24   Q    Do you have that, Mr. Golla?

25   A    Yes, I do.

1   Q    Have you seen this document before?

2   A    Yes, I have seen this document.

3   Q    Do you recognize the names of the folks who wrote it?

4   A    Yes, I do.  They were part of my team when I wrote this

5   document.

6   Q    Did they report to you?

7   A    Yes.

8   Q    And is your name on this document as well, this document

9   PX-120?

10  A    Yes, my name is there on page 3.

11       (Pause.)

12  Q    Returning to the front page, what is the title of this

13  document and what was its purpose, Mr. Golla?

14  A    This is the interface specification document for the AAA

15  servers accessing SPS.  This lists how to place servers,

16  authentication, authorization and accounting servers can

17  access the SPS system.

18  Q    Does this document to your knowledge mention messaging?

19  A    This never mentioned messaging because this particular

20  document is primarily for AAA accessing the SPS and there is

21  no reason to mention messaging in this because messaging is

22  not part of this interface specification document.  Any

23  client -- client, what we call it is any servers that are

24  accessing SPS we call that as a client.  So here in this is

25  called a AAA is the client and AAA is accessing the SPS, so

1    that's why in this document you will only see anything

2    referring to AAA and nothing about messaging.

3    Q   What is the date of this document, Mr. Golla?

4    A   It's 2009.

5    Q   As of 2009 were the messaging servers at Sprint sending

6    queries to the SPS yet?

7    A   No.  So only AAA like I said, you know, answer

8    previously, AAA was the first element that was accessing SPS

9    and at 2009 AAA was -- I mean messaging servers were not

10   accessing SPS.

11   Q   Can you turn to page 7 of PX-120?

12        (Pause.)

13   Q   And tell the jury in this interface specification

14   document that was prepared by folks who report to you what is

15   shown on this page?

16   A   Here the main focus is on the AAA at the center of the

17   document that shows AAA accessing LDAP server, which is

18   nothing but the SPS server, and this is mainly representing

19   how the flow of, you know, various network elements are in

20   the flow for the data authentication, which is nothing but

21   how, you know, you can access Internet on your phone.  So

22   this is showing all the flow path of that, you know,

23   accessing the Internet through AAA.  Again, this is being AAA

24   interface specification document, that's why it is focusing

25   AAA in the center of the document diagram, and it is showing

1    the flow path and how various elements are involved in this

2    particular flow path.

3    Q    Thank you, Mr. Golla.  You can put PX-120 to the side and

4    I'd next ask you to turn to what has been admitted as DX-233.

5           (Pause.)

6    Q    Do you recognize DX-233, sir?

7    A    Yes, I do.

8    Q    Can you explain to the jury what DX-233 is?

9    A    This is the interface specification document, slash

10   (indiscernible) document.  Just like what we saw in PX-120,

11   that was the interface specification document for AAA and

12   this is the interface specification document for messaging

13   servers.

14   Q    Was this document prepared by one of your employees or a

15   person who reported to you?

16   A    Yes, this was also prepared by one of the employees in my

17   team.

18           MR. FINKELSON:  And can you turn, Mr. Baird, to

19   section 1.3 on page 4 that shows the project team?

20   BY MR. FINKELSON:

21   Q    Again, as we saw in the prior document, Mr. Golla, are

22   you identified as a member of the team with respect to DX-

23   233?

24   A    Yes.  My name is here as the SPS manager.

25   Q    To your knowledge, does DX-233 mention the AAA?

1    A    No, it does not mention AAA, because just like I was

2    talking about in the PX-120 it was only mentioning about AAA

3    and here we only mention about messaging because this is --

4    this document is pertaining to messaging and nothing to do

5    with AAA servers.

6    Q    Can you please turn to page 20 of the document?  And

7    we'll give Mr. Baird an opportunity -- oh, he's there before

8    me and before you I think.  Page 20.

9            (Pause.)

10   A    Okay.

11   Q    Can you describe for the jury what's being set forth here

12   in the summary section of paragraph 4.3?

13   A    These are the various credentials that are available for

14   messaging servers to access the data.  This is nothing but,

15   you know, how we access our email system, we have to use a

16   user name and password, just like that here these are

17   credentials that are available for messaging servers to

18   access SPS.  Like you can see the first one is a Pom and it

19   is used by Acision SLP, which is part of our Acision SMSC

20   systems, and then EPM is a different user credentials that is

21   used by Syniverse Picture Mail, which is our MMSC system

22   which is not part of Sprint core network.

23   Q    Let me ask you about both of those.  I think the first

24   one you said is Pom, P-o-m; did I get that right, sir?

25   A    That is correct.

Golla - Direct                                                    92

1   Q    And you mentioned the reference to Acision SLP and do you

2   understand that to be part of Sprint's Acision SMSC?

3   A    That is correct.

4   Q    And then a different credential, EPM, for Syniverse

5   Picture Mail?

6   A    That is correct.

7   Q    And why are there different credentials or different keys

8   for Sprint's Acision SMSCs as opposed to the Syniverse

9   Picture Mail?

10  A    We follow general security guidelines and any system that

11  is accessing SPS we would provide different user ID and, you

12  know, password credentials.  And also the Acision SLP and

13  Acision of SMSCs, because of they are Internet messaging

14  systems and we gave a key that is, you know, what we call it

15  as master key, which Pom is kind of a master key.  Just like,

16  you know, we give our house key to somebody who we really

17  trust and not to give it to anybody, just like that this Pom

18  is a master key that we created and that is given to only our

19  Internet messaging systems.  And whereas EPM is a separate

20  key that is created only using Syniverse Picture Mail and

21  Syniverse MMSC systems, just like, you know, if you want to

22  get access to some of the rooms, we only give a specific key,

23  you know, to that particular room, not for the whole house.

24  Q    You just used the words internal messaging systems; did I

25  hear you correctly, Mr. Golla?

1    A    That is correct.

2    Q    Can you turn to the next page of this document, page 21?

3    Do you see a reference there to Sprint's -- or, excuse me, to

4    internal messaging systems?

5    A    Yes.  You can see in section 4.4 that Acision SLP.  And

6    this is what I was mentioning, the Pom in the previous

7    diagram (indiscernible) Pom, P-o-m, is used for Acision SLP

8    and here we are referring that as internal messaging system.

9    Q    And does that include Sprint's short message service

10   centers?

11   A    That's correct, Sprint's SMSCs.

12   Q    And why do you call them at Sprint internal messaging

13   systems in this document?

14   A    The reason we call it internal messaging system is it is

15   part of our core network, they're in our core data centers

16   and they're part of our core network.

17   Q    I want you to look, please, Mr. Golla, at the last

18   document in your binder, it's the last one I'm going to show

19   you, and it is DX-232.  Do you recognize this document, sir?

20   A    Yes, I do.

21   Q    And can you tell the jury what DX-232 is?

22   A    This is the -- a Nokia-prepared document, it's called

23   functional specification document.

24   Q    Did you say Nokia prepared it, sir?

25   A    That is correct.

Golla - Direct                                                    94

1    Q    And why is this document DX-232 with respect to the SPS

2    prepared by Nokia?

3    A    Nokia is the vendor who provided the software for SPS, so

4    that is the reason.  Nokia was actively involved in initially

5    developing, as well as making sure that, you know, the system

6    is working, and that's why Nokia produced this document as

7    part of that effort.

8    Q    And what is this Nokia document called, sir?

9    A    It is called functional specification and conception data

10   model for subscriber profile system.

11   Q    Is this a formal document, Mr. Golla?

12   A    Yes, it is a formal document that is provided by Nokia.

13   Q    Can you please turn to page ending in 1101, Mr. Golla,

14   and also Mr. Baird, of DX-232, section 3.6.

15         (Pause.)

16   Q    If you use the numbers, I think it's page 34 of the

17   document.

18   A    Oh, okay.  Thank you.

19   Q    Too many numbers.

20   A    Yes.

21   Q    Can you tell the jury, Mr. Golla, what this document from

22   Nokia says in section 3.6?

23   A    Nokia is showing the various user credentials that are

24   used to access SPS, just like we talked about the internal

25   messaging system.  Nokia is referring Pom is used by internal

Golla - Direct                                    95

1    messaging systems and EPM and other user credentials are used

2    by various other messaging servers such as Syniverse Picture

3    Mail, which is MMSC at that time.

4    Q   Do you have an understanding of what this document from

5    Nokia is referring to when it says internal messaging

6    systems?

7    A   Nokia is referring to SMSCs, Sprint SMSCs that are

8    located in this core network data centers.

9    Q   Is EPM used anymore as a user ID or a key at Sprint?

10   A   EPM is not used anymore because once we migrated the MMSC

11   systems to within Sprint's internal messaging systems then

12   even MMSC started using of a master key called Pom just like

13   it was using for SMSCs, so MMSC also started using Pom as the

14   user credentials instead of EPM.  EPM is no longer in use

15   today.

16   Q   And so as of today are Sprint's SMSCs and Sprint's MMSCs

17   internal messaging systems as that term is used in DX-232

18   from Nokia to Sprint?

19   A   That is correct.

20   Q   Thank you, Mr. Golla.

21          MR. FINKELSON:  Your Honor, I have no further

22   questions for the witness at this time.

23          THE COURT:  How long do you think you'll be?

24          MR. GOETTLE:  Longer than five minutes, your Honor.

25          THE COURT:  Well, then I think we'll break.  It

96

1   really doesn't make any sense to start your cross-examination

2   and stop it.

3          MR. GOETTLE:  I do think it will be relatively quick

4   tomorrow morning, but it might feel kind of long today.

5          THE COURT:  I've heard that before and I've

6   experienced it before.  And what that means, if he has a

7   chance to prepare his cross-examination now that he's heard

8   the direct examination, hopefully it will be shorter rather

9   than longer.  So we'll recess.

10          First, you may step down, Mr. Golla.

11          Same instructions I gave you at noontime.  Don't

12   discuss the case among yourselves.  If anyone tries to talk

13   to you about the case, say nothing to them and report that to

14   me.  If anything happens to be written in any newspaper that

15   deals with the case, broadcast on radio or television, don't

16   read it, don't listen to it, don't watch it.

17          Have a safe trip home.  We'll start tomorrow morning

18   at 9:30.  It's not quite 20 of 5:00, so we're getting a

19   slightly earlier than usual start on the trip home.  See you

20   tomorrow.

21          (Jury out at 4:36 o'clock p.m.)

22          THE COURT:  Be seated, everyone.  Is there anything

23   we need to address this evening?

24          MR. GOETTLE:  Not for Comcast, your Honor.

25          MR. FINKELSON:  Your Honor, if we might just make

1   our omnibus motion to move the un-objected-to exhibits into

2   evidence.  Given the timing, some of the items on our omnibus

3   motion were dealt with in the ordinary course today, but

4   there's a number of other exhibits that have not.

5           So if I could ask Ms. Rachford to present that

6   motion to the Court.

7           THE COURT:  You may.

8           MS. RACHFORD:  So Sprint moves to admit into

9   evidence the following exhibits which are listed on --

10          THE COURT:  How many are on the list, Ms. Rachford?

11          MS. RACHFORD:  I believe it is about --

12          (Pause.)

13          THE COURT:  You don't have to --

14          MS. RACHFORD:  It's a number of them, I think it's

15   about 60 or 65 --

16          THE COURT:  Sixty?

17          MS. RACHFORD:  -- exhibits, yes.  The good news is

18   five of them were already admitted into evidence today.

19          THE COURT:  Good.  Well, what we'll do since I don't

20   want to hang around and I don't think we all ought to hang --

21   have to hang around as you read 60 numbers into the record,

22   my thought is we can -- you'll present the motion, if there's

23   no objection -- tell me the title of the motion again.

24          MS. RACHFORD:  It is Sprint Spectrum LP's omnibus

25   motion, and a proposed order is attached, to admit un-

1    objected-to exhibits into evidence.

2          THE COURT:  Fine.  If you'll hand it up, I'll sign

3    it.

4          MS. RACHFORD:  That was easy.

5          THE COURT:  I didn't mean to cut short your

6    participation.

7          MS. RACHFORD:  That's okay, I'm not offended.

8          MR. FINKELSON:  If we're going to proceed like that,

9    your Honor, maybe we should try a more substantive motion

10   while we're at it.

11         (Laughter.)

12         MS. RACHFORD:  Do you want me to state for the

13   record which ones already are in evidence or does that not

14   matter?

15         THE COURT:  I don't think it matters --

16         MS. RACHFORD:  Okay.

17         THE COURT:  -- whether they're in or are now coming

18   in.  How do you propose that we make this a matter of -- is

19   there an order?  Yes.

20         MS. RACHFORD:  Yes, the order should be attached --

21         THE COURT:  Yes, yes.

22         MS. RACHFORD:  -- at the end.

23         THE COURT:  I'm striking the word "proposed" and I'm

24   signing it.

25         (Pause.)

1          THE COURT:  I note that you haven't filled in the

2     year, did you think this trial would take --

3          (Laughter.)

4          THE COURT:  -- I mean, it's February, it's not

5     December.  Did you --

6          MR. GOETTLE:  What year is it?

7          MS. RACHFORD:  You never know.

8          THE COURT:  Oh, yes, we do know.

9          MS. RACHFORD:  Yes, I guess we do know.

10         THE COURT:  We do know, it's 2017.  All right, the

11    motion is granted.  How do you want to make this a matter of

12    record?

13         MS. RACHFORD:  We were going to electronically file

14    a copy this afternoon, if that works --

15         THE COURT:  Yes.

16         MS. RACHFORD:  -- for you?  Okay, we will do that.

17         THE COURT:  And then it's a matter of record, I

18    don't think we have to put it on the record as part of the

19    transcript.  I'll give you -- you can electronically file,

20    the original has been signed -- well, we'll docket it,

21    Michael, we'll docket the original.

22         THE DEPUTY CLERK:  Okay.

23         THE COURT:  All right.

24         MS. RACHFORD:  Thank you.

25         THE COURT:  Do I need copies of these deposition

1   transcripts, particularly the one that we didn't use much of?

2   They're all Comcast.  I don't think so.  Mr. Hoelzle, I think

3   one is Mr. Yarosky and -- I have two from Mr. Yarosky and a

4   third -- well, Mr. Wilson, I don't think I need his.  Give

5   these back.

6        We'll start tomorrow at 9:30.  How are we doing

7   schedule-wise, where is Comcast?  Comcast is -- where is

8   Sprint in its -- I'm sorry, by that I meant Comcast's case in

9   chief is completed.  Where is Sprint?

10        MR. FINKELSON:  I think we're moving along well,

11   your Honor.  Our expectation after Mr. Golla we have a short

12   video deposition and then one more witness to present live.

13   And I don't expect that last witness to take very long.

14   We'll then move forward with our expert witnesses on the

15   technical aspects of the case starting, I would expect

16   tomorrow morning before the lunch break, and I would think

17   that we would complete those by Thursday and that we would

18   start with our damages experts hopefully if we get it right,

19   at some point maybe midday or afternoon on Thursday, and that

20   continues into Friday as we raised with the Court.

21        Mr. Riopelle left today to be at home with his

22   family.  The actual services are this weekend and then on

23   Monday.  So we would still ask the Court's permission to stop

24   at the lunch hour on Friday and then have Monday be a day

25   that we're not in session so that we can return on Tuesday.

1    If we do that, we'll finish our case in chief by Tuesday, and

2    I would think that we would be on course to, you know,

3    depending on the length.  Mr. Goettle and I talked about it

4    briefly off  the record, but depending on the length of the

5    rebuttal case I still think the jury should be able to get

6    the case by Wednesday or Thursday at the latest.

7              THE COURT: Do you agree?

8              MR. GOETTLE: I do, you Honor.

9              THE COURT: The only witnesses with respect to

10   invalidity are the experts; is that correct?

11             MR. GOETTLE: Correct.  So we have our non-

12   infringement expert,  Mr. Planning, will be our first

13   technical expert tomorrow.  And then Dr. Nathaniel Polish

14   will be speaking to invalidity.  And then as Comcast did,

15   we'll have two experts speaking to damages.

16             THE COURT: Have you given any consideration to

17   working things out so that at the end of the week Friday and

18   Monday you're in liability or invalidity and infringement and

19   not damages.  You save those, well, it's a day and a half.

20             MR.GOETTLE: Not specifically, your Honor.  We didn't

21   know exactly how the case was going to go.  And Mr. Riopelle

22   is the person who is going to be handling the damages aspects

23   of the case and he now won't be returning back to

24   Philadelphia until sometime tomorrow. I'm not sure.  I would

25   think in the afternoon.

1          THE COURT: So this won't work.

2          MR. FINKELSON:  And that would be difficult for us

3     under the circumstances.  Obviously If the way the evidence

4     proceeds if some how, some way we were still doing technical

5     aspects come Friday, which I really think is very unlikely,

6     I'd certainly say to the Court let's proceed and do that.

7     I'll be the one presenting those witnesses.  But I do think

8     we'll probably be at the damages part.  That's the bad news.

9     The good news is that we'll be at the damages part and we

10    should be relatively on course for a conclusion or on course

11    for a conclusion on the time line I described.

12         THE COURT: What I'm concerned about, as you might

13    imagine, is not finishing this case while I'm still here.

14    I'm leaving town at the end of the fourth week.  I built in

15    not only an extra half week – you said two weeks to try the

16    case.  I built in two and a half weeks for the case, but have

17    not scheduled anything that I have to attend to in the

18    courtroom for the rest of the third week which will be next

19    week and the fourth week.  But I'm concerned with jury

20    deliberations.

21         I had occasion, and I can recall this not very

22    fondly, although the end result worked out, the jury got the

23    case just before I left the country, deliberated for a day

24    but didn't finish.  We provided for jury deliberations to be

25    handled by another judge.  It's a very complicated process.

1    And in this case I don't think we can do it because the other

2    judge has to certify that he or she is thoroughly familiar

3    with the case.  It just won't work.  We'll do some research

4    if we get to that.  But the bottom line is that although that

5    jury continued to deliberate and I answered all their

6    questions remotely, it wasn't a very satisfactory procedure.

7    What I'm thinking of doing if we end up that way with me

8    leaving the case not over, declaring a recess.

9           MR. FINKELMAN: Your Honor, when are you – it's just

10   that I don't have a calendar in front of me.

11          THE COURT: I do.  And maybe you think I'm being

12   overly cautious.  The jury was I think for five day, five

13   days in that other case.  It was complicated.  It involved

14   the shipment of embargoed weapons to Iran, and it wasn't as

15   complicated as this one.

16          MR. FINKELMAN: But more consequential to be sure.

17          THE COURT: I'm leaving on February 26th.

18          MR. FINKELMAN:  I think, I think, your Honor, much

19   as I understand that you've had that prior experience, I

20   think that it would be a very unusual scenario, even though

21   it's a patent case, it would be a very unusual scenario for a

22   patent case.  Let's say the jury gets the case on Thursday or

23   Friday of the next week for them to still be deliberating by

24   the following Friday, I have not seen or heard of a

25   deliberation quite that long –

1          THE COURT: Good.

2          MR. FINKELMAN:  – in a patent case in some time.

3          MR. GOETTLE: Yeah, I agree.  It seems unlikely.

4          THE COURT: Well, you've raised my comfort level a

5     bit.  I still think for example today with the constant use

6     of acronyms, I think the jury is going to have a difficult

7     time deciding the case.  I don't see this as a quick verdict.

8     But keep in mind that's my schedule, and we're going to have

9     to adhere to it.

10          MR. GOETTLE: We understand certainly, your Honor.

11          THE COURT: Well, the plan will be to charge the jury

12    next week, sooner rather than later. We'll have a charging

13    conference before the end of this week.  There are one or two

14    loose

15    ends.  I'm a little puzzled by the Comcast testimony that

16    Comcast seeks a rolling royalty.   I think I heard that

17    correctly.

18          MR. GOETTLE: The running royalty.

19          THE COURT: And yet you object to presenting that –

20    that's the real issue that's hanging me up right now with

21    respect to the charge.  The other issues I think we can

22    address very quickly.  So be prepared to discuss that when we

23    conduct the charging conference probably either Wednesday or

24    Thursday.  Maybe tomorrow.

25          All right.  Is there anything else?

1          MR. HANGLEY: May I talk to Mr.Finkelson for a

2     moment?

3          (Pause.)

4          MR. FINKELSON: Mr. Hangley was just asking me

5     whether we needed  Mr.Riopelle for the charging conference.

6     He has been responsible for those aspects but I'm happy to

7     take that on, depending on when your Honor wants to have the

8     charging conference.  Certainly Mr. Riopelle will be there on

9     Thursday.

10          THE COURT: And keep in mind that whatever we decide

11     at the charging conference is not the end of, well, changes

12     in the charge.  Hopefully we'll get it right sooner rather

13     than later, but you have until we give the charge to put your

14     objections on the record.  Nothing that we do before that

15     time will preserve your record if you have any objections to

16     the charge.  My goal will be to present a charge to the jury

17     to which you have no objections.  But you'll put your

18     objections if any on the record after I deliver the charge,

19     we'll do it at sidebar.

20          MR. GOETTLE: Yes, your Honor.

21          MR. FINKELSON: Thank you, your Honor.

22          THE COURT: All right.  See you tomorrow morning at

23     9:30.  Have a good evening.

24          ALL: Thank you, your Honor.

25          THE COURT: Thank you.  You may go about your

106

1    business.

2              (Court adjourns for the day a 4:51 o'clock p.m.)

107

```
 1                              INDEX

 2  WITNESSES                    D      C      RD     RC

 3  Patrick David Wilson

 4    By Ms. Simpson            3             21

 5    By Mr. Goettle                   6             23

 6  Sean Hoelzle

 7    By Mr. Finkelson         24             72

 8    By Mr. Goettle                  50

 9  Ramesh Golla

10    By Mr. Finkelson         76

11                              - - -

12  EXHIBITS                         RECEIVED IN EVIDENCE

13  DX 12, 13, 224, 230, 231                 32

14  DX 215, 232 and 233                      81

15                              - - -
```

CERTIFICATION


      I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET          Date 2/7/17
Laws Transcription Service