IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

```
COMCAST CABLE              : CIVIL NO. 12-859
COMMUNICATIONS, LLC,       :
et al.,                    :
              Plaintiff    :
                           :
                           :
                           :
                           :
                           :
       v.                  :
                           :
                           :
                           :
                           :
                           :
SPRINT COMMUNICATIONS      : Philadelphia, Pennsylvania
COMPANY L.P., et al.,      : February 8, 2017
              Defendant    : 9:47 a.m.
```

- - -

TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 8
BEFORE THE HONORABLE JAN E. DUBOIS
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:    WILLIAM T. HANGLEY, ESQUIRE
                      Hangley, Aronchick, Segal, Pudlin
                      & Schiller
                      One Logan Square
                      27th Floor
                      Philadelphia, PA 19103

                      DANIEL J. GOETTLE, ESQUIRE
                      Baker & Hostetler, LLP
                      Cira Center
                      12th Floor
                      2929 Arch Street
                      Philadelphia, PA 19104

2

```
 1    APPEARANCES:            (Continued)

 2    For the Defendant:      DAVID E. FINKELSON, ESQUIRE
                              BRIAN C. RIOPELLE, ESQUIRE
 3                            McGuire Woods, LLP
                              Gateway Plaza
 4                            800 East Canal Street
                              Richmond, VA 23219
 5
                              COLLEEN H. SIMPSON, ESQUIRE
 6                            Harkins Cunningham, LLP
                              4000 Two Commerce Square
 7                            2001 Market Street
                              Philadelphia, PA 19103
 8
                                      -  -  -
 9
      Audio Operator:         Michael Cosgrove
10
      Transcribed By:         Michael T. Keating
11
                                      -  -  -
12
13            Proceedings recorded by electronic sound
      recording; transcript produced by computer-aided
14    transcription service.

                                      -  -  -
15

16

17

18

19

20

21

22

23

24

25
```

Mr. Golla - Cross                    3

1          (The following was heard in open court at

2    9:47 a.m.)

3          THE COURT:  Good morning, everyone.

4          ALL:  Good morning, Your Honor.

5          THE COURT:  Please be seated.  All right.

6    We'll proceed with cross.

7          MR. FINKELSON:  Mr. Golla.

8          (Pause in proceedings.)

9          THE COURT:  Good morning, sir.

10         THE WITNESS:  Good morning.

11                    CROSS-EXAMINATION

12   BY MR. GOETTLE:

13   Q    Good morning, Mr. Golla.

14   A    Good morning.

15   Q    I know we've met before.  My name is Dan Goettle.

16   I took your deposition.  I don't know if you recall

17   that.

18   A    Yes.  Thank you.

19   Q    Mr. Golla, were you in the courtroom yesterday

20   and did you hear Judge Dubois say that sometimes when

21   an attorney has time to think about his cross-

22   examination over night it condenses his cross?

23   A    Yes, that is correct.

24   Q    Well, that's happened here, so I just want to say

25   if I had crossed you yesterday, it would have taken

Mr. Golla - Cross                    4

1    longer than five minutes.  And so I apologize that

2    you had to stay over and come back, but it is

3    condensed.

4    A    Okay.  Thank you.

5    Q    My first question for you is, sir, yesterday, you

6    talked a lot about Sprint's core network and Sprint's

7    core sites, correct?

8    A    That is correct.

9    Q    Okay.  But yesterday, you didn't talk -- you

10   didn't mention or talk at all about the patent in

11   suit in this case?

12   A    No.

13   Q    And you didn't talk at all yesterday about the

14   Court's construction of "cellular network?"

15   A    No.

16   Q    Okay.  And you didn't talk at all about whether

17   Sprint's network includes core network elements under

18   the Court's construction of "cellular network?"

19   A    I did talk about in Sprint's core sites as well

20   as Sprint's core network, and especially the

21   subscriber profile system, as well as messaging

22   centers, are part of the core network.

23   Q    But you didn't talk at all about core network

24   elements under the Court's construction of "cellular

25   network" as that term is used in the 1999 patent in

Mr. Golla - Cross                    5

1  suit?

2  A    That is correct, I did not talk about the patent

3  in suit.

4  Q    Thank you.

5          MR. GOETTLE:  No further questions, Your

6  Honor.

7          THE COURT:  I ought to do that more often.

8          MR. FINKELSON:  That's what I was going

9  to -- that was fantastic.

10          MR. GOETTLE:  Thank you.

11          THE COURT:  Is there --

12          MR. FINKELSON:  There is no redirect, Your

13  Honor.

14          THE COURT:  Mr. Golla, that concludes your

15  testimony.

16          THE WITNESS:  Thank you very much.

17          THE COURT:  Thank you very much.

18          THE WITNESS:  Thank you.

19          (Witness excused.)

20          MR. FINKELSON:  I stayed up all night

21  worrying for that?

22          MR. GOETTLE:  I do apologize for that.

23          MR. FINKELSON:  No, no, no.  No reason to

24  apologize.  And, Your Honor, we're just securing our

25  next witness.

Mr. O'Connor - Direct                    6

1           THE COURT:  Fine.

2           (Pause in proceedings.)

3           MR. FINKELSON:  Your Honor, Sprint calls

4   Greg O'Connor.

5           GREG O'CONNOR, Defendant's Witness, Sworn.

6           COURTROOM DEPUTY:  Please be seated.

7           THE WITNESS:  Thank you.

8           COURTROOM DEPUTY:  Please state your full

9   name and spell it for the record.

10          THE WITNESS:  Greg O'Connor, G-R-E-G,

11  O'Connor, O-'-C-O-N-N-O-R.

12          MR. FINKELSON:  Your Honor, may I just

13  approach to remove the binder?

14          THE COURT:  You may.  Good morning, sir.

15          THE WITNESS:  Good morning.

16          (Pause in proceedings.)

17                DIRECT EXAMINATION

18  BY MR. FINKELSON:

19  Q   Good morning, Mr. O'Connor.

20  A   Good morning.

21  Q   Can you please introduce yourself to the jury,

22  sir?

23  A   Sure.  Like I said, I'm Greg O'Connor.  I'm the

24  Vice President of Network Core and Access for Sprint.

25  Q   For how long have you worked at Sprint, Mr.

Mr. O'Connor - Direct                          7

1    O'Connor?

2    A    17 years, although for two of those I worked for

3    Sprint doing Sprint services for a different company

4    called Ericsson.

5    Q    So you started at Sprint in approximately what

6    year?

7    A    2000.

8    Q    And where did you work before joining Sprint?

9    A    So out of college I actually worked for Aetna

10   Insurance in Hartford, Connecticut.  I then worked

11   for a small insurance software company also in

12   Connecticut.  And then after that, I actually moved

13   to Washington, D.C. where I was a government

14   contractor, a government consultant, doing various

15   things for the treasury department.  And that's --

16   after that, I went to go work for Sprint and I've

17   been there since then.

18   Q    And what type of work were you doing for the

19   government in your position in D.C.?

20            THE COURT:  Keep your voice up.

21   BY MR. FINKELSON:

22   Q    What kind of work were you doing for the

23   government in your position in D.C.?

24   A    Well, mostly, for the Treasury Department, like I

25   said, but it was software systems and tools and

Mr. O'Connor - Direct                    8

1    business management consulting, specifically related

2    to something called the CFO Act, which was an act to

3    basically put more financial governance on federal

4    agencies.

5    Q    You mentioned graduating from college.  Can you

6    tell the jury what your educational background is,

7    what you -- where you went to school, what degrees

8    you obtained?

9    A    Sure, I have a Bachelor's in Business Management

10   from Southern Connecticut State University, and I

11   have a Master's Degree in Management Information from

12   Syracuse University.

13   Q    Can you talk to the jury about what your roles

14   have been over your time at Sprint?

15   A    Sure.  I started at Sprint in an IT function

16   where I was responsible for the requirements and

17   testing of our inventory and provisioning tools

18   related to our internet business.  Basically, Sprint

19   is a large part of the inner workings of the world

20   wide web.  Many companies' networks make up how the

21   internet works and we're a part of that.

22           After that, I was asked to actually lead a

23   team responsible for rebuilding our internet networks

24   outside the U.S.  We had just exited a relationship

25   with a company called Global One where we were part

Mr. O'Connor - Direct                    9

1   of a consortium.  And with that, we were left without

2   international internet assets, and we went ahead and

3   replaced those.

4            After that, I worked for -- in a -- it was

5   called Staff Manager.  It's essentially a chief of

6   staff function or an executive management training

7   function where I worked for the Vice President of

8   Network Development at the time doing staff

9   functions, so making sure -- you know, making sure

10  communications was done right, taking care of his

11  HR-type functions, helping him run meetings, and I

12  did that for approximately two years.

13  Q   Now, you mentioned a period of time where you

14  were working in connection with Sprint, but not as a

15  Sprint employee.  Can you --

16  A   Yeah.

17  Q   -- let us know what that was

18  A   Yeah, sure.  So right as I ended the job as staff

19  manager, we embarked on a project where I was one of

20  ten people who did an evaluation of whether -- if we

21  should get external help to help us run our network,

22  the operations side of our network.  And at that

23  time, at Sprint, you know, financially, we were

24  struggling, so we were looking for ways to transform

25  how we do things and obviously save a little money

Mr. O'Connor - Direct                    10

1    and do what we can to improve the business.

2              So the result of all that over two years

3    was we actually selected Ericsson to help us run the

4    operations of our network.  And then about three

5    months after we signed that contract, I decided since

6    I was one of the people who worked on that project,

7    that I should go over there and help them run it and

8    say, you know, eat my own dog food, for lack of a

9    better term.

10   Q    When did you come back to Sprint, sir?

11   A    Two years later.

12   Q    Okay.  And what year was that, approximately?

13   A    2012.

14   Q    Okay.  And once you returned to Sprint, what job

15   functions were you performing?

16   A    I was Vice President of Network Engineering, and

17   that entailed responsibility for the engineering

18   functions, basically the care and feeding for our

19   mobile network, our wireless network, and our

20   wireline network.

21   Q    Okay.  And I believe you mentioned that your

22   current title is Vice President for Network Core and

23   Access.  Do I have that right, sir?

24   A    You do.

25   Q    Why is that your title?

Mr. O'Connor - Direct                    11

1    A    It represents the core of what we do.  It

2    represents the most important things that we do.  The

3    biggest parts of my business today are related to our

4    core network, and a large part of our businesses is

5    related to things that -- the access part of the

6    business are things that we purchase from outside

7    companies, like fiber that we don't own or

8    connections to other places of the buildings or cell

9    sites.

10             THE COURT:  Keep your voice up, sir.

11             THE WITNESS:  Yes, sir.

12   BY MR. FINKELSON:

13   Q    That's good, I have an equal opportunity

14   offender.  So both you and I both need to keep our

15   voices up.

16             THE COURT:  Your voice trails off as you

17   end an answer.

18             THE WITNESS:  Okay.  I'll fix that.

19   BY MR. FINKELSON:

20   Q    "Network Core" in your title, what does that mean

21   to you?

22   A    Yeah, it's the -- it's the elements that are

23   responsible for our most critical services to our

24   customers.  So in this case when a customer buys a

25   mobile service from us they're really buying three

Mr. O'Connor - Direct                    12

1   things.  They're buying a voice service, they're

2   buying a data service, and they're buying a messaging

3   service.  And those things are core to what we do.

4   Q   Does your title, Network Core, or more formally,

5   Vice President for Network Core and Access, does that

6   have anything to do with this lawsuit?

7   A   No, not at all.

8   Q   When that title was created was it created for

9   reasons that have anything to do with this lawsuit?

10  A   No.  At the time I personally created that title,

11  I didn't even know this lawsuit existed.

12  Q   Have you been in any of Sprint's facilities that

13  contain core network elements?

14  A   Yes, I've been to some.

15  Q   Okay.  And can you describe that for the jury?

16  A   Sure, it's an interesting environment.  It's a

17  foreign environment.  The whole purpose of that

18  building is to house electronics.  It's not there for

19  human comfort at all.  As you enter the building,

20  it's highly secure.  I actually am responsible for

21  them and I can't just walk into them.  I have to -- I

22  have to get people to agree to let me in, and,

23  actually, they don't let me in alone.  They watch me

24  and make sure I don't get in trouble.

25              When you enter the building you're

Mr. O'Connor - Direct                    13

1   immediately hit with the noise of it.  It's extremely

2   loud.  The chillers are going, they're cooling the

3   air.  There's equipment hum.  It's very loud and it's

4   also very cold.  And the environment needs to be set

5   up so that this equipment operates flawlessly.  There

6   are hundreds of blinking lights at you.  As you walk

7   up and down areas, the equipment is blinking.  Green

8   lights are good, red lights are bad.  It's as simple

9   as that.  And there's fiber and copper wires

10  everywhere.  You know, it's interesting to visit the

11  first time.  It's -- but, again, it's not a

12  comfortable environment.  It's really built for those

13  machines to survive.

14  Q   Why all the security in connection with those

15  sites?

16  A   These are our most important elements.  They're

17  not only important for service, but they're -- you

18  know, in cases, store subscriber data.  So these are

19  highly secure, highly important, and very critical

20  elements for us.

21  Q   Is that where the SPS database is located?

22  A   Yes.

23  Q   And is that where the messaging servers are

24  located?

25  A   Yes.

Mr. O'Connor - Direct                    14

1    Q    What do -- in your view, what do messaging

2    servers do?

3    A    They route messages to customers.

4    Q    Would you consider that to be an important

5    function at Sprint?

6    A    Absolutely.  It's one of the -- as I said before,

7    one of three things that when people purchase a

8    service through us they rely on that.

9    Q    Okay.  Would you consider the messaging servers

10   to be critical elements?

11   A    Yes.

12   Q    Why?

13   A    Well, I think one, because, like I said, again,

14   they're a critical service.  People rely on that as a

15   form of communication.  And secondary, there's a

16   public safety component to messaging.  You can text

17   to 9-1-1.  So as something that is part of public

18   safety, it's an important, critical item.  There's

19   also the public alert system.  And I'm not sure if

20   anyone's experienced this before.  The noise that

21   your phone makes, similar to when you would get those

22   tests on the TV in the past and it would come on --

23   typically, it's a weather alert, you know, bad

24   weather is coming, take shelter.  We get a lot of

25   those in Kansas City when I'm there because there are

1    tornadoes.  It could be an Amber Alert.  So those are

2    things that, you know, have a higher obligation,

3    right?  They're -- they become more critical due to

4    public safety.

5    Q    Are there elements involved at Sprint that you

6    would consider to be non-critical elements?

7    A    Absolutely.

8    Q    Can you give the jury some examples of those?

9    A    Yeah, I think a good example would be billing,

10   right?  It's something that's important to Sprint,

11   obviously.  We don't want to lose data, we don't want

12   to not be able to bill for services.  But if a

13   billing server goes down or we have a problem with

14   the billing software, the service for the customer

15   still works.  It's just something that, you know, is

16   bad for us from a -- from a revenue perspective.

17   Q    So just talking about the core and that aspect of

18   your responsibilities.  What -- at a high level, what

19   are your responsibilities over the core network at

20   Sprint in your position?

21   A    Yeah, so I oversee a group that manages the

22   planning, the development, the engineering, and the

23   deployment for everything core network and core

24   network related.  And then on the access side, we're

25   responsible for managing dozens of agreements with

1    other companies that provide service to us.

2    Basically, either we purchase fiber from them or

3    purchase connections between buildings or connections

4    from one of our buildings to a cell site.

5    Q   And with respect to messaging servers in your

6    position as Vice President of the Network Core, do

7    the messaging servers fall within your

8    responsibility?

9    A   They do.  I think you met two of my employees,

10   Ramesh and Sean.  They work for me.

11   Q   And that's Mr. Golla and Mr. Hoelzle, who had the

12   opportunity to speak to the jury?

13   A   Yes.  Yeah.

14   Q   Each of those individuals report up through the

15   structure to you?

16   A   Up through the structure to me.

17   Q   Do your teams have any involvement with

18   standards?

19   A   We -- my team doesn't directly work to formulate

20   standards.  We have another team that does that.  But

21   we are responsible for implementing our services per

22   standards unless we have a very good reason not to.

23   And I really couldn't think of a current situation

24   where we don't use a standard.

25   Q   Thank you very much, Mr. O'Connor.  Those are my

1    questions.

2    A    Thank you.

3                    CROSS-EXAMINATION

4    BY MR. HEIST:

5    Q    Good morning, Mr. O'Connor.

6    A    Good morning.

7    Q    Is it correct you have never read the 870 patent?

8    A    That's correct.

9    Q    And you've never read the asserted claims of the

10   patent?

11   A    That's right, I have not.

12   Q    And you haven't read the Court's claim

13   construction in this case?

14   A    No, I have not.

15   Q    And is it correct that you have no engineering

16   training?

17   A    I do not have any engineering training.

18   Q    Now, the term "core" is widely used within

19   Sprint, correct?

20   A    We use it in my group because that's what we do.

21   Q    And -- but you have usually heard that term in

22   the context of organizational structure, correct?

23   A    Yes, my organization is responsible for core.

24   Q    And you were asked some questions about core

25   network elements, and when you used that term here in

1   your testimony here today you were not necessarily

2   using it in the same sense as the Court's claim

3   construction because you haven't read that, correct?

4   A   I believe that -- yeah.

5   Q   And you were asked some questions about the

6   messaging servers and whether they were critical

7   to --

8   A   Uh-huh.

9   Q   -- Sprint's business, correct?

10  A   I was.

11  Q   But you don't know, do you, whether Sprint's

12  messaging servers perform the function of connecting

13  communications from Sprint subscribers' mobile phones

14  to the public switch telephone network or vice versa,

15  correct?

16  A   That's right.  I'm not an expert on call path.

17  That's why I have Sean and -- to help me with that.

18  Q   But speaking to those types of functions of the

19  messaging server, you can't answer that?

20  A   I am not an expert on call path in that scenario.

21  Absolutely.

22  Q   Thank you very much, sir.

23  A   Thank you.

24          MR. FINKELSON:  No need for redirect, Your

25  Honor.

Mr. Tirana - Direct                    19

1          THE COURT:  Thank you very much, Mr.

2    O'Connor.

3          THE WITNESS:  Thank you.

4          (Witness excused.)

5          (Pause in proceedings.)

6          MS. RACHFORD:  Good morning.  Sprint would

7    now like to play some video clips from a deposition

8    testimony that's been designated.  The witness was

9    Plarent Tirana.  He was appearing on behalf of

10   Openwave, which is a third party to this litigation

11   pursuant to a subpoena issued by Comcast.

12         THE COURT:  Spell his name.

13         MS. RACHFORD:  Plarent is the first name.

14   It's P-L-A-R-E-N-T.  And the last name is Tirana,

15   that's T-I-R-A-N-A.

16         THE COURT:  All right.  You may proceed.

17         MS. RACHFORD:  And it looks like we need to

18   turn on the screens, if you don't mind.  Thank you.

19         (Pause in proceedings.)

20         (The video deposition testimony of Plarent

21   Tirana as follows.)

22         PLARENT TIRANA, Defendant's Witness, Sworn.

23                DIRECT EXAMINATION

24   BY MR. RIOPELLE:

25   Q   I want to see if I could just go through your

Mr. Tirana - Direct                              20

1   education at a high level --

2   A    Sure.

3   Q    -- after high school.  Can you -- could you walk

4   through that?

5   A    Sure.  I have a Bachelor in Telecommunication

6   Engineering from University of Toronto.  Then I went

7   to Italy when I did my Master's in same thing,

8   Telecommunication Engineering.  And I did a Ph.D. at

9   University of Missouri for Computer Science.

10  Q    So when did you get your bachelor's?

11  A    1993.

12  Q    And when did you get your master's?

13  A    1994.

14  Q    And the Ph.D.?

15  A    2010.

16  Q    Were the customers in Italy?

17  A    Not all of them.  I traveled to Germany, to

18  France.  I'm just trying to remember.  I have to look

19  at my passport, all the visas there, but for sure, I

20  know Germany and France and England -- and England.

21  Q    Did you remain in Italy after the merger?

22  A    Actually, I came to the States in 2000.

23  Q    When you -- do you recall referring to version

24  5.5.1?  Do you remember that?

25  A    I'm sorry, I do not.

Mr. Tirana - Direct                              21

1   Q    You referred to a version 5.5.1.

2   A    Correct.

3   Q    And that was the new version that was added or

4   implemented on the directory as part of the addition

5   of two-way messaging in Sprint's network?

6   A    Yes.

7   Q    That 5.5.1, is that Openwave directory software?

8   A    Yes.

9   Q    Okay.  And was Openwave directory software, was

10  that soft -- was that an evolution of Software.com's

11  directory software?

12  A    Yes.

13  Q    All right.  And did that -- at that time in 2003,

14  did the directory involve master and replica servers?

15  A    Yes.

16  Q    How many master servers, if you recall, were in

17  use?

18  A    There are two views here because one is the

19  physical servers and the other is a logical entity.

20  Now, let me break it down.

21  Q    Uh-huh.

22  A    It's one logical entity --

23  Q    Okay.

24  A    -- and two physical servers clustered together in

25  an HA solution.

Mr. Tirana - Direct                    22

1    Q    HA?

2    A    Yeah, for high availability.

3    Q    So would -- in general parlance, would you say

4    then that Sprint's network had one master?

5    A    Yes.

6    Q    And multiple replicas?

7    A    Very correct.

8    Q    Do you know physically where the cluster two

9    servers that form the master server, do you know

10   where they were located geographically?

11   A    Yes.

12   Q    Where were they?

13   A    Lenexa, Kansas.

14   Q    Do you have a recollection of -- at that time,

15   again, in 2003 time frame, how many replica servers

16   Sprint used?

17            (Pause in proceedings.)

18   A    Best of my knowledge would be four.

19   Q    Four?  Do you know geographically where they were

20   located?

21   A    That I know for sure.  They were in Lenexa.

22   Q    Okay.  Was the back end database for the master,

23   was that an Oracle database?

24   A    Yes.

25   Q    And were the back end master -- the back end

Mr. Tirana - Direct                                    23

1    databases for the replicas, were those Berkeley DB?

2    A    Yes.

3    Q    Were the Berkeley DBs supplied by Sleepycat at

4    that time?

5    A    Yes.

6    Q    When the new -- when the software on the

7    directory was updated to version 5.5.1 do you recall

8    who actually did that update?  In other words, would

9    it have been someone from Sprint or somebody from

10   Openwave?

11   A    I remember that.  It was the (indiscernible),

12   yeah.

13   Q    And some questions that are kind of touching on

14   the issues that you already covered.

15   A    Okay.

16   Q    Now, you talked a lot about the indexing process

17   at the LDAP directory?

18   A    Uh-huh.

19   Q    How long has the directory product that you've

20   worked with had this indexing process for getting

21   information?

22   A    Since the inception.

23   Q    And when was the inception of this LDAP directory

24   product?

25   A    The inception came from Software.com.  The time

Mr. Tirana - Direct                    24

1    frame should have been anything 1997-1998.

2    Q   And that was -- I think you described before that

3    it was generally available, like GA.  Is that about

4    when that product was generally available, in '97-

5    '98?

6    A   Correct.

7    Q   Okay.  Now, is that indexing process something

8    that's specific to the LDAP director project, or is

9    it a more general computer science concept?

10   A   It's as generic as it gets.  You want index data

11   in order to have pass through access.

12   Q   So that was around before the LDAP director --

13   A   That was --

14   Q   -- product?

15   A   -- before I was born probably, but yeah.

16   Q   Now, what about the Berkeley DB, or the

17   Sleepycat, how long has that product been around?

18   A   That has been around for a very long time.  I

19   don't know exactly.  Maybe the beginning of the 90s.

20   But I cannot be quoted.  But for sure before 1997,

21   yes.

22   Q   Okay.  So it was around before '97-'98 when --

23   A   Oh, absolutely.  Yes.

24   Q   Now, is the LDAP directory product something

25   that's specific to the telecom field or messaging

1   field, or is it just a more general product?

2   A   Very general.  Can be used in IT, can be used

3   in -- any data that need to be organized is a

4   directory service.  It can be used in medicine, it

5   can be used in any field that you can imagine.

6   Q   What other fields have you worked in with regard

7   to the LDAP directory?

8   A   Mostly, I've worked in location-based, which

9   still -- all my life -- let me put it this way.

10  Since I started working for Openwave, I've been

11  working telecommunications because our clients are

12  basically, you know, ISBs in general, like

13  (indiscernible).  So I've worked in

14  telecommunications, but directory services are

15  everywhere, you know.  It's not limited to

16  telecommunications.

17  Q   What other telecommunications companies have you

18  worked with with regard to this product?

19  A   I have worked with HHE, I have worked with

20  Verizon.  At that time it was GTE.  It was called

21  GTE.  I'm talking 1999.  I worked Telecom Italia,

22  I've worked with TIM, I worked with Deutsche

23  T-online, with Virgin in U.K., I've worked in Taiwan,

24  I've worked in Germany, I've worked in Denmark, I've

25  worked in Canada, several operators.  Yeah.

Mr. Tirana - Direct                    26

1   Q    So a lot of places?

2   A    Is that enough?  Yeah.  And Comcast as well.

3   Yeah.

4   Q    Have you worked in the messaging context with

5   respect to the LDAP directory in somebody besides

6   Sprint?

7   A    Yes.

8   Q    What other companies have you worked with?

9   A    The ones that I mentioned.

10  Q    What was the earliest that you can remember the

11  LDAP directory product being implemented in the

12  messaging context?

13  A    You want a specific date?  12th December, 1998.

14  It was the first day I started with (indiscernible)

15  and I was in Italy.  It was Telecom Italia.

16  Q    Telecom Italia --

17  A    Yeah.

18  Q    -- was the name of the company?

19  A    Yeah.

20  Q    Does -- do you know if Openwave has any

21  documentation with regard to that initial

22  implementation that happened back in 1998?

23  A    No.  Not -- at least I don't have.  And I doubt

24  it from the time would have documentation.  They are

25  not a customer any longer, so there is no point in

1  having documents, at least for me.

2  Q   Do you know -- did you work on that

3  implementation yourself?

4  A   Yes.

5  Q   Okay.  Did that LDAP directory project -- or

6  product have the similar query process that we've

7  been discussing?

8  A   Okay.  So I think we're getting the same thing,

9  but I'm going to say it one more time.  The LDAP

10  is -- the LDAP query is identical, has been

11  identical.  It is you do a query, you specify a base

12  point, you specify some filters, and you specify if

13  it's a base or a (indiscernible).  It's identical.

14  So especially whenever it comes with a classic

15  messaging product you do pretty much the same

16  queries.

17         Now, at Sprint, it was a little different

18  because this was the more custom for a two-way

19  product.  But, however, per se, the LDAP search is

20  the same.  It's just a search.

21  Q   So pretty much anywhere it would be implemented

22  it would be the same?

23  A   It would be the same here, it would be the same

24  in a medical field, it would be the same in

25  agricultural.  It would be the same.  It's just a

Mr. Tirana - Direct                              28

1   protocol.

2   Q   So and I guess this is just kind of -- might be

3   rehashing what you just said.  So with respect to the

4   Telecom Italia, which 1998 you did im -- or you

5   worked on the implementation there, there, the LDAP

6   directory, you would have queries going out which

7   would have some sort of index --

8   A   Yes.

9   Q   -- that they would use to run the search?  The

10  search would be run on the basis of that index and

11  then it would retrieve information?

12  A   Yes.

13  Q   So the same process that was described with

14  respect to how Sprint's LDAP --

15  A   The -- let me repeat it again.  The index isn't

16  the index.  It's just made to pick up the data

17  faster.  And since the first version, the index was

18  there.

19  Q   Beyond Telecom Italia, are there any other

20  companies back in that late 90s time frame when you

21  started that implemented the LDAP directory product?

22  A   Sure.  It is -- I was in Taiwan at company called

23  KIMO, like K-I-M-O, was T-online in Germany, was

24  France Telecom -- I don't have to spell this -- and

25  then was Virgin Media in U.K.

Mr. Tirana - Direct                    29

1   Q    Sure.

2   A    And also TIM, Telecom Italia Mobile.

3   Q    And that was the one you referred to before,

4   right?

5   A    Nope, that's Telecom Italia.  Telecom Italia is a

6   cable operator.  Telecom Italia Mobile is a wireless

7   operator.

8   Q    Let's see, so the one you mentioned, KIMO, is

9   that K-I-M-O?

10  A    Uh-huh.

11  Q    Do you know approximately when they implemented

12  an LDAP directory?

13  A    Give or take year-end of 1999 or beginning of

14  2000.

15  Q    What about T-online?

16  A    T-online was definitely 1999.

17  Q    What about France Telecom?

18  A    That should have been 1999.

19  Q    And what about Virgin Media?

20  A    1999.

21  Q    Do you know if Sprint ever had the LDAP directory

22  implemented on the messaging platform itself or the

23  replica -- one of the replica servers implemented on

24  the messaging platform itself?

25  A    The messaging platform -- at least whenever I

Mr. Tirana - Direct                                    30

1   arrived there in 2000, there was a messaging platform

2   and had a directory as well.  And then later on, as I

3   said, in 2003, we went to version 5.5.5.1.2, and then

4   2008, on version 6.2.1.  But always was attached

5   there and they were in Lenexa, Kansas, physically,

6   the servers.

7   Q    The servers were right next to each other in

8   Kansas?

9   A    Right next to -- however, as I responded before,

10  later on, Sprint put other servers in different

11  geographical locations where the SMSCs were the

12  Comverse SMSCs.

13  Q    Let's see.  And I asked you about the indexing

14  process and Berkeley DB.  What about the Oracle

15  database.  Was that something that was around before

16  the --

17  A    Since the inception of Oracle.  I mean just the

18  way the database works.

19  Q    So --

20  A    You have the data and you have the index.  It's

21  not anything new.

22  Q    So it's been around since before 1998 or 1997

23  when these products first were developed?

24  A    Yeah.  Yes, for sure.

25  Q    And what about with respect to the tree structure

Mr. Lanning - Direct                              31

1   that you were describing?

2   A   The B-Tree?  Yeah, the B-Tree has been there --

3   if you look at the data, the algorithm for B-Tree is

4   old.  Yeah.

5   Q   And I imagine something you learned about when

6   you were (indiscernible)?

7   A   You learn in school.  You learn in school B-Tree.

8   It's one of the forms how you present the data.

9   B-Tree is one of them.

10           (The video deposition testimony of Plarent

11   Tirana concludes.)

12           MR. FINKELSON:  Your Honor --

13           THE COURT:  Yes?

14           MR. FINKELSON:  Sprint calls as its next

15   witness Mark Lanning.

16           MARK LANNING, Defendant's Witness, Sworn.

17           COURTROOM DEPUTY:  Please be seated.

18   Please state your full name and spell it for the

19   record.

20           THE WITNESS:  Mark Reed Lanning, M—A-R-K R-

21   E-E-D L-A-N-N-I-N-G.

22           THE COURT:  Good morning, sir.  You may

23   proceed.

24           MR. FINKELSON:  Thank you, Your Honor.

25                    DIRECT EXAMINATION

Mr. Lanning - Direct                         32

1    BY MR. FINKELSON:

2    Q    Good morning, Mr. Lanning

3    A    Good morning.

4    Q    Can you please introduce yourself to the jury,

5    sir?

6    A    As you just heard, my name is Mark Lanning.  If

7    you detect a little bit of an accent, it's because my

8    wife and I have lived in Texas for over 35 years.

9    And I'm happy to be here today.

10   Q    Mr. Lanning, did you prepare a presentation to

11   assist with your discussion of the issues with the

12   jury here today?

13   A    Yes, I did.

14   Q    And do you recognize this as the present -- the

15   first page at least of the presentation that you

16   prepared?

17   A    Yes.

18           MR. FINKELSON:  Your Honor, I'm happy to

19   approach with a copy of the presentation for you at

20   this time or we could do that at the end of the

21   presentation.

22           THE COURT:  No, you can do it now.  That

23   would be best.

24           (Pause in proceedings.)

25           MR. FINKELSON:  May I approach with a copy

Mr. Lanning - Direct                    33

1    for the witness as well?

2             THE COURT:  Yes.

3             (Pause in proceedings.)

4             THE COURT:  Ladies and gentlemen, Mr.

5    Lanning is an expert witness for Sprint.  I've

6    already given you instructions on how you should

7    interpret the testimony of an expert witness.  We'll

8    first here about his qualifications.  We'll then turn

9    to Comcast and see if Comcast has any objections.

10   And we will then hear his testimony.

11            MR. FINKELSON:  Thank you, Your Honor.

12   BY MR. FINKELSON:

13   Q   Mr. Lanning, can you talk the jury through your

14   background and your experience, sir?

15   A   Sure.  After working on the family farm in both

16   Idaho and Washington State for the first 20 years of

17   my life, I decided it would be wiser to start working

18   more with my head than my back.  So I volunteered for

19   the U.S. Army when I was 20 years old in 1974, as you

20   can see by that top part.  I didn't know anything

21   about the Army.  I was interested in electronics.

22   And so I joined the Army Signal Corps because I'd

23   fooled around with radio kits, built my own radios.

24   And back then, they had you take aptitude tests for

25   which areas that you were qualified for, which what

Mr. Lanning - Direct                    34

1    they refer to as MOS, military occupational skill,

2    that you could join up for.

3            So after taking the test, they showed me

4    which electronic courses I could sign up for.  So I

5    picked the longest one that had a 30 week course,

6    five days a week for 30 weeks.  And the name was real

7    obvious that it was going to be real interesting

8    electronic training because it was name "Fix,

9    Siphoning, Repair."  I had no idea what that meant,

10   but the recruiter told me it was electronics, so I

11   chose that.

12           Fortunately, I started after my boot camp

13   or my basic training, and then advanced infantry

14   training.  This was during Vietnam, so we all had to

15   go to advanced infantry training before we would go

16   to our technical training.  I attended the 30 weeks

17   and I graduated as the top graduate out of many

18   different people in the course.  And at that time

19   they gave you the choice of picking your location for

20   where you would like to be stationed or continuing on

21   with another course.  And I chose another course, and

22   that was another 20 week course in advanced computer

23   training.  And I graduated that course as a top

24   graduate and then picked another course after that.

25           So after a period of two years of constant

Mr. Lanning - Direct                    35

1   training of five days a week, eight -- at least eight

2   hours a day, then I was stationed in Fort Devens,

3   Massachusetts.  Shortly after that, I was asked by a

4   special team to join their special team to upgrade

5   the White House communications staff.  And the type

6   of work I was doing, we were working on all the

7   equipment that was the top secure equipment through

8   voice and data communications worldwide for the

9   military, and they asked me to work on this team with

10  the White House communications staff to upgrade all

11  the White House communications for all the embassy

12  communications for voice, for data, and communicate

13  with the embassies, as well as foreign countries.

14  Q   And did some of that work involve encryption

15  technologies?

16  A   Yes, it was all encryption technology for voice

17  and for data.  So when the President would have a

18  conversation with any of the embassies or any of the

19  foreign leaders it would be over these encrypted

20  circuits, encrypted equipment that we would install.

21  Q   What did you do after the Army Signal Corps?

22  A   After the Army, I joined a company called IT&T,

23  not to be confused with AT&T.  The International

24  Telephone and Telegraph was about the same size as

25  AT&T back then, and they knew of my background and

Mr. Lanning - Direct                    36

1    they were building what we referred to back then as a

2    message store and forward system.  And that system

3    was like our current email systems or our short

4    message systems.  The embassies around the world

5    could send messages.  We also sold it to two

6    different airlines where they could send messages

7    from all their different gates and terminals.  You

8    still see some of that same type of messaging done

9    today for planes, for scheduling, for crew

10   scheduling, a lot of that.  And I was the member of

11   the five member development team that actually wrote

12   all the software for the system.

13   Q   Did you go to school why you were working at ITT?

14   A   Yes, I did.  I had a young family.  I had a son

15   and a daughter, was working full-time at IT&T, and

16   was going to school full-time at Southern Methodist

17   University.

18   Q   Did you obtain a degree from Southern Methodist

19   University?

20   A   Yes, I did, a Bachelor of Science in Computer

21   Science.

22   Q   And in what year did you obtain that?

23   A   1983.

24   Q   Okay.  After ITT, can you explain to the jury

25   what your next stop was?

1   A   As soon as I got my degree, it was time to go to

2   work for a different company.  So I joined Digital

3   Switch about a month after I got my degree.  And that

4   was Digital Switch Corporation.  It's in the Dallas

5   area.  As the name implied, they built digital

6   switches for telephone networks.  And my first

7   project was to convert the switches that they were

8   using for their landline networks -- if you remember

9   back then, there was MCI and Sprint long distance.

10  You might remember some of the pin drop commercials

11  for Sprint and all that.  Our switches were in those

12  networks for the landline systems, but then Digital

13  Switch wanted to expand into the wireless and

14  cellular, so my first project was to modify with a

15  team of people their switch so that it could be used

16  as a switch -- a mobile switching center that you've

17  seen for a lot of the different presentations.  And

18  we sold that through Motorola, and that was sold all

19  over the world.

20  Q   Did you do software development work as well?

21  A   Yes, I did.

22  Q   And how about work on standards?  Did you do any

23  standards-related work when you were with Digital

24  Switch?

25  A   Yes, a big part of my work was we were right on

1    the leading edge of the cellular standards, how all

2    the different cellular pieces of equipment would

3    communicate together.  I probably need to kind of set

4    in your minds back then, if you were thinking about a

5    phone or even seeing anyone use a phone in the 1990s,

6    the first phones we started with we refer to as bag

7    phones.  They were like a big purse that you would

8    carry around or you would have it in a car.  We

9    thought we were making major innovations when they

10   downsized it to the size of the house brick, and we

11   thought we were really doing some neat stuff back

12   then when we had a phone the size of a brick that you

13   would carry around.  It weighed about as much too.

14          So we worked on the standards.  One of the

15   key parts of the standards that I worked on was

16   referred to as SS7, another acronym for you in a week

17   or two full of acronyms.  But that's the signaling

18   protocol that the network elements used to

19   communicate with each other.

20          One of the other parts that I worked on

21   that many of you use or see everyday is the calling

22   line identity.  That was before calling line identity

23   was used, and then caller ID actually participated in

24   defining those two standards and how those would work

25   in the networks.

Mr. Lanning - Direct                          39

1    Q    And what was the standards body that you were

2    involved with in connection with that work?

3    A    The standards body we referred to as T-1, and

4    that was part of a bigger group, ANSI, the American

5    National Standards Institute, or the American

6    Standards.

7    Q    And were you doing work directly in connection

8    with ANSI?

9    A    Yes, I was attending those meetings, making

10   contributions.  Many of my contributions are adopted

11   in the standards that are still used today.  And

12   those standards were then later adopted by the

13   international committees as well.

14   Q    What did you do after your time with Digital

15   Switch Corporation?

16   A    I then joined Tandem Computers in 1997.  Tandem

17   Computers had special computer systems that were

18   being used by the stock exchange, banking systems,

19   because they were referred to as fault-tolerant

20   computers.  They could have an error or a piece of

21   equipment could fail and they would still keep

22   running.  So they were highly available or fault-

23   tolerant systems.  So my job was to take those

24   computer systems and modify those so that they could

25   provide equipment or functionality for cellular

Mr. Lanning - Direct                    40

1    networks.

2              One of the pieces of functionality you've

3    seen is an HLR, or an HLR database.  My team there --

4    and I had 200 engineers that I was responsible for.

5    I was the Vice President of Development before I left

6    Tandem.  And we built an HLR that's still in use all

7    over the world today for the home location register

8    functionality.

9    Q   Did you do standards-related work when you were

10   with Tandem Computers as well?

11   A   Yes.  You've heard about two different standards.

12   So the challenge for a product supplier back then and

13   today is to decide what size of market you want to

14   address with your equipment.  For instance, do you

15   want to just sell it to the companies that are

16   working with American standard, or do you want to try

17   to sell your product to the companies that are using

18   the European standard, do you want to sell it to

19   Asia?  Where do you want to go?

20             So the problems with the standards world is

21   there are so many of them, is what one of my bosses

22   would say.  He just -- too many standards, and so you

23   have to deal with it.  And so we decided that we

24   wanted our equipment to be capable of operating in

25   either an American-based standards system, a

Mr. Lanning - Direct                    41

1    European-based standards system, and in some cases

2    even for Asia, and they had different standards.  So

3    I had a guy that was responsible just for keeping up

4    with the standard updates.  And he had a large office

5    and he had binders of all the different standards

6    from floor to ceiling on all four walls of his

7    office.  And his full-time job was just to keep up

8    with the standards and make sure that the engineering

9    groups were updated for any new updates that we

10   needed to apply to our systems.

11   Q   And were you selling equipment both for standards

12   based on ANSI-41 as well as GSM?

13   A   Yes, the two basic standards that you could think

14   of, it would be the ANSI standards, which are

15   American -- that starts with A -- and then the

16   European standards, which is ETSI, starts with E.

17   That's the easy way.  And so those were the two main

18   standards that we had to build products, and we had

19   to provide different product software modes for each

20   of those.

21   Q   And it looks like that takes us up until about

22   1991.  What did you do at that point in your career,

23   Mr. Lanning?

24   A   At that point in my career I decided it was time

25   for me to go off on my own and start my own

Mr. Lanning - Direct                    42

1   consulting business.  IN Solutions is the first

2   company that I started as a consultant.  The IN is

3   more internal industry knowledge.  It stands for

4   "Intelligent Network" Solutions.  That was the big

5   thing back in 1991, how do we add computer systems to

6   a network that we had referred to as kind of a dumb

7   network back then?  You couldn't do very fancy things

8   with the network.  It would just place calls.

9           Shortly after I started my own business, I

10  was contacted by a senior member of British Telecom

11  that I had worked with in the past providing

12  equipment, and they had asked me if I'd be interested

13  in taking on a role as an architect and program

14  manager for their second generation network.

15  Q   And what does that mean, an architect and program

16  manager?

17  A   As the name implied, a network architect is a lot

18  like a building architect.  A building architect has

19  to be involved with all the different facets of a

20  building and how the building goes together in making

21  sure that it stands straight and stays there for an

22  unlimited amount of time after you build it.  Network

23  is the same way.  Is the network design -- we have to

24  design where the equipment would go, how much of the

25  equipment we would need, and to make sure the network

Mr. Lanning - Direct                          43

1   operated properly.

2   Q    Was this a cellular network?

3   A    Yes, this was British Telecom's second generation

4   network.   They had a first generation one with the

5   big phones that I referred to.   Their second

6   generation network was referred to as GSM.   That was

7   part of the European standards.   At that time Europe

8   was quite a ways ahead of the U.S. as far as moving

9   towards a second generation standard.   And at the

10  time that was the largest cellular network in the

11  world.

12  Q    Did -- where were they based?

13  A    In the U.K., and specifically, a lot of my work

14  was done in -- outside of London area.

15  Q    Did the British Telecom cellular network have

16  messaging?

17  A    Initially, we did not have messaging because we

18  started the network in 1993 in the design, but we

19  added messaging in 1995.   We had heard there was a

20  concept of messaging.   We really were focusing on

21  getting a good voice network, and then the

22  functionality and the product people came along and

23  said we need to add messaging, the short messaging

24  service.   So we added that in 1995.

25  Q    And what was your involvement in that process?

Mr. Lanning - Direct                    44

1   A    Again, as the architect, I had to figure out how

2   we would implement messaging to our subscribers.  And

3   so, as the architect, I had to meet with the mobile

4   phone people and make sure that their functionality

5   would be compatible with the functionality we had in

6   the network and we -- or that we supplied by the

7   network, the short message service centers.  We've

8   referred to them in this case and in the courtroom

9   I've heard them referred to as message servers.

10          So after making multiple trips to Ericsson

11  in Stockholm that was supplying one of our mobile --

12  our line of mobile phones, and Nokia, and then we met

13  with various suppliers that were supplying short

14  message service centers, then we had to figure out

15  all the messages in the network that we needed to do

16  and functionalities for it.

17  Q   And we'll talk about that a little bit more in a

18  few minutes, but before that, it looks like Telecom

19  Architects, Inc., is a company that I believe you

20  started in 1999?

21  A    Yes, after I finished with a lot of the British

22  Telecom work, then I started another company.  It's

23  my own consulting company as well.  And I did

24  consulting with companies like Nokia and Motorola,

25  both in the handset area as well as network

Mr. Lanning - Direct                    45

1   equipment.

2   Q   Have you also done expert consulting work, Mr.

3   Lanning?

4   A   Yes, I have.

5   Q   Okay.  Can you give the jury a sense of that?

6   A   I've done consulting like I'm doing here today

7   for expert cases.  Started in 2000 part-time, and for

8   seven to ten years was part-time, along with all my

9   other consulting work that I did with the different

10  companies in doing network and equipment design.

11  Q   Do you do expert consulting work for both

12  plaintiffs and defendants?

13  A   Yes.  I don't choose.  They -- I guess they

14  choose me and people call me and want me to work, so

15  I do work on both sides I guess, as we refer to it.

16  Q   And is it a substantial portion of your work in

17  the telecommunications area, sir?

18  A   Yes.

19  Q   And what led you to decide to start getting into

20  the expert consulting field?

21  A   I guess I should say, initially, I kind of got

22  pulled into the first case.  I didn't know what I'd

23  think about doing expert consulting work like this.

24  But then I found that it was a good way for me to

25  stay home and -- stay home more with the family, and

1    we also have a ranch that we produce cattle and

2    horses at the ranch.

3          To give you an idea, while I was consulting

4    and working for British Telecom on that seven year

5    period, I took -- made 77 trips between DFW and

6    London in seven years and had over 3 million miles.

7    And so I was gone most of my latter part of my

8    career, and so it's kind of nice staying home.  And

9    we have 13 grandchildren and two great grandchildren.

10   Q    Okay.

11   A    So I like to stay home.

12   Q    And I know you had an injury on the ranch about a

13   week ago or so, and I appreciate you being here

14   notwithstanding that.  Can you tell the jury what

15   your professional affiliations are, sir?

16   A    I'm a member, like the other experts you've seen,

17   of the IEEE, and I'm also a member of the ACM.  The

18   IEEE is for electrical engineers, more of the

19   hardware side of the house, and then the ACM,

20   Association of Computer Machinery, is more for

21   software and engineers.  And I'm both hardware and

22   software, so I'm a member of both those

23   organizations.

24   Q    And does -- with respect to you education, sir,

25   does the slide I have up on the screen, is that -- is

Mr. Lanning - Direct                          47

1  it accurate in terms of your education and

2  professional affiliations?

3  A   Yes.  As I've just mentioned, I've got my

4  Bachelor of Science while I was working at IT&T.

5  Q   That was a nice way of saying you were quicker

6  than I was on the clicker, so I appreciate -- I

7  appreciate that.

8          MR. FINKELSON:  Your Honor, I move to

9  qualify Mr. Lanning as an expert in the field of the

10 invention of cellular technology, including

11 messaging.

12          (Pause in proceedings.)

13          MR. GOETTLE:  No --

14          THE COURT:  Thank you.  Any objection?

15          MR. GOETTLE:  No objection, Your Honor.

16          THE COURT:  Then we will receive the

17 testimony of Mr. Lanning in the field of cellular

18 technology, including messaging.

19          MR. FINKELSON:  Thank you, Your Honor.

20 BY MR. FINKELSON:

21 Q   All right.  Mr. Lanning, can you explain to the

22 jury the scope of your current engagement in this

23 case?  Why are you here?

24 A   Well, as the -- as the slide says, they -- my

25 scope of the engagement was to determine whether the

Mr. Lanning - Direct                    48

1    Sprint SMS or MMS systems or message servers

2    infringed the asserted claims of the 870 patent.

3    Q    And was there a key issue, in particular, that

4    you wanted to address with the jury here today, sir?

5    A    And, again, as it says, and I've provided the

6    date, I was to determine whether Sprint's messaging

7    servers from 2006 forward are either internal or

8    external to Sprint's cellular network.

9    Q    Why 2006 forward?

10   A    That date is not of my choosing.  That date is

11   the date we're given that's referred to as the

12   infringing period.  So the infringing period that I

13   am to look at for Sprint's network for the period of

14   infringement starts in 2006.

15   Q    And by the period of infringement, are you

16   referring to the period in which Comcast alleges

17   infringement has occurred in this case?

18   A    Yes, I should clarify that.  That's for the

19   alleged infringement.  That doesn't just mean we're

20   saying they infringed.  That's the part where

21   they're -- Comcast is alleging infringement, starting

22   in 2006.

23   Q    Did you hear Dr. -- let me -- you were here when

24   Dr. Akl presented his testimony to the jury, sir?

25   A    Yes.

Mr. Lanning - Direct                    49

1   Q    Did you hear Dr. Akl keep referring to 1999 for

2   his analysis of this patent that issued in 2005?

3   A    Yes.

4   Q    Okay.  Is 1999 the right time to focus on, in

5   your opinion, when it comes to the issue of whether

6   Sprint infringes the Comcast patent?

7   A    No, as I said, we're directed to what the period

8   is that we're to analyze, and the period begins at

9   2006.

10  Q    And did you hear at one point in his presentation

11  Dr. Akl acknowledge that fact?

12  A    Yes, he's acknowledged that fact, and then there

13  was a lot of conversation about 1999 and networks in

14  1999.

15  Q    And is that why -- did you decide to include a

16  slide in your presentation that actually is part of

17  Dr. Akl's slide presentation?

18  A    Yes, I think it -- I think it can be confusing.

19  I've heard dates all around and about what the

20  networks were and standards, and I'll try to keep it

21  straight when I talk about dates before 2006.  But

22  for the alleged infringing period, we need to keep

23  our minds on what the Sprint network was beginning in

24  2006.

25  Q    Could Sprint have infringed a patent that didn't

Mr. Lanning - Direct                                    50

1   issue until 2005?  Could Sprint have infringed that

2   patent back in 1999?

3   A    You're asking me somewhat of a legal question,

4   but I think it's safe to say the answer to that is

5   no.

6   Q    But if we're to talk about messaging back in the

7   1990s, since it sounds like you were living and

8   breathing it, can you give the jury a sense of where

9   messaging stood at that point in time?

10  A    Okay.  Yes, they -- I was in the U.K.  I was --

11  remember, I was back and forth to London during this

12  time frame.  This message is the actual message as it

13  was sent in the Christmastime.  That's why it says

14  "Merry Christmas 1992."  This is before any of us

15  working in the field really had an idea of what

16  messaging would be.  This is the first one between

17  two Vodafone engineers where he sent "Merry

18  Christmas."  I think it was December 22nd.  That's

19  why.

20        It was first standardized for the GSM

21  networks.  As I mentioned earlier, that the European

22  networks were years ahead of the American networks

23  for GSM, and the major players in the U.K., United

24  Kingdom, at the time were Vodafone and British

25  Telecom.  And so I heard about this message within a

Mr. Lanning - Direct                          51

1   day after it was sent because our competitor had just

2   sent the message and it hit the presses and it was

3   like the question, what are you guys going to do

4   about it and how soon can you get it in?

5   Q   And what did you do, in fact, did British

6   Telecom, in terms of responding to that in the

7   mid-90s with respect to including messaging?

8   A   We first all met with our phone suppliers.  One

9   of our phone suppliers was Nokia, so they had already

10  had some of the messaging functionality.  This is a

11  Nokia phone that you see.  And we met with Ericsson.

12  Then we rapidly turned the network core design team

13  on to figure out how we would need to modify the

14  switches and all the different core network

15  components.  And then we went to decide how we would

16  procure, or use, a messaging server.  We needed a

17  messaging server.

18  Q   And, again, for the jury's benefit, the time

19  frame of that was in approximately the -- what time

20  frame?

21  A   That was in 1993.

22  Q   And so when you were faced with that problem in

23  1993 when you were at British Telecom, or the

24  question about how to incorporate messaging servers,

25  can you take the jury through what you did at British

Mr. Lanning - Direct                          52

1   Telecom?

2   A    Sure.  Again, taking you back, the concept of

3   messaging, this was the first message, short message.

4   It was somewhat of just a thought by a Nokia engineer

5   that we could send messages without needed to dial a

6   phone and making a phone call.  And the idea was this

7   could be a lot cheaper for people.  We need to go

8   back.  I shouldn't say cheaper; maybe less expensive.

9   But we need to go back and think about what kind of

10  phones we had.  This phone that you see on the

11  diagram we referred to as the candy bar phones.  They

12  were either like a Snickers candy bar or something

13  like that, (indiscernible).  Or you had the flip

14  phones that you would flip open.  They had very small

15  displays and, typically, they were four lines by 12

16  characters -- or three lines by 12 characters.  You

17  couldn't send very much.  And so we didn't really

18  know, and neither did the product people at British

19  Telecom, how this message service would be used, how

20  we would sell it.  So the idea was let's just provide

21  it to keep up with the competitor, Vodafone, and

22  let's provide it in a -- in the least expensive way.

23          So we decided to use a third party system

24  for the message server.  So we called and contacted a

25  company called Aldiscon, and they provided what we

Mr. Lanning - Direct                    53

1   referred to as a service bureau approach, and they

2   also provided the service bureau for Vodafone at the

3   same time for their messages.  And so --

4   Q   And when you -- and when you say service bureau

5   approach what does that mean in the context of your

6   testimony?

7   A   A service bureau to us was we want to call a

8   separate company that owns the system, that manages

9   the system.  We want them to do all the daily, as we

10  referred to it, care and feeding of the systems and

11  pay for the system, and then we would pay them so

12  much per message for supporting our message systems.

13  Q   So is that messaging server external to the

14  British Telecom cellular network at that point in

15  time?

16  A   Yes, it was.  It was actually housed in a

17  building that we didn't own, and all the equipment

18  was owned by the other company.

19  Q   Was there a point in time when that changed?

20  A   Yeah, we realized very quickly that this

21  messaging thing was really taking off, and one of the

22  main reasons for it is that they priced that the

23  call -- at the time a call, if you just made even a

24  short call, it was 50 cents a minute.  I don't know

25  if you can remember back that far when calls were

Mr. Lanning - Direct                    54

1   very expensive.  And they decided they would charge a

2   message ten cents a minute.  So people very quickly

3   figured out that it was a lot cheaper to send a short

4   message to communicate than even make a ten second

5   call.  And so it seemed like overnight, the message

6   systems and the messages exploded to the point in the

7   beginning of 1998 we were delivering millions of

8   messaging a day in the network.

9           So as that growth happened, we realized

10  that we could no longer keep the service bureau type

11  model, have the second company run the service

12  message service for us.  So we moved the message

13  servers.  We actually purchased two message servers

14  and moved those inside the British Telecom network.

15  Q   Was that prior to 1999?

16  A   Yes, it was around 1997.

17  Q   And by virtue of those moves, did the messaging

18  servers become part of the cellular network of

19  British Telecom?

20  A   Yes, we treated them just like any other of our

21  what I refer to as network elements or core network

22  elements.  They were operated by the same group of

23  people that our message switches were, that the HLRs

24  were, all the other key functions that we had in

25  the -- in the network.

Mr. Lanning - Direct                          55

1   Q   When you said message switches did you mean

2   mobile switches?

3   A   I mean mobile switches.  I guess the terminology

4   gets a little confusing and maybe I confuse it

5   myself.  But you have the MSC.  I guess you can think

6   of two or three things.  The MSC, the mobile

7   switching center, is for voice calls.  The messaging

8   center is for messages.

9   Q   Okay.  And is the messaging center -- is there

10  another word for messaging center that this jury has

11  heard throughout this case?

12  A   That's either a messaging server or a short

13  message service center.  Now, internally, and

14  especially with the European standards, we would

15  refer to that as an SMSC, meaning it's a short

16  message service center, it's the system that handles

17  all the short messages.

18  Q   As the network architect of British Telecom in

19  the late 1990s, prior to 1999, what would have

20  happened had British Telecom not provided short

21  message service at that time?

22  A   It would have been very bad.  I can give you an

23  idea, but when it was the early days of the service

24  we had some problems.  Within an hour of the

25  messaging service going down we would have thousands

1   of calls into our customer care center complaining

2   that they needed the message.  We become acutely

3   aware of how important messaging was to our

4   subscribers.  And so if British Telecom would have

5   stopped offering a short message service, they

6   believe that a majority of the customers would have

7   moved over to the competitor, Vodafone, that had the

8   messaging service.  So I looked at it as a critical

9   service.  We learned real fast that it was critical

10  to our users.

11  Q   Did you hear Dr. Akl talk last week about the

12  concept of essential services in connection with

13  messaging?

14  A   Yes.

15  Q   Okay.  Did you hear Dr. Akl communicate that

16  voice was essential and data was essential, but that

17  messaging was not?

18  A   Yes, I heard that.

19  Q   What do you make of that testimony, sir?  Do you

20  agree with it?

21  A   No, I don't.

22  Q   Why not?

23  A   Well, again, let's take ourselves back to the

24  1999 time frame that Dr. Akl was looking at.  If you

25  look at that phone, that was similar to a lot of the

1    phones, the size of the display.  Now, Dr. Akl says

2    voice was important.  I agree with him on that.

3    Voice was the main reason for the cellular networks,

4    initially.  Then he says data was important.  But,

5    thirdly, messaging wasn't.

6            Well, as I think back in the 1999 time

7    frame, people didn't use data very much for these

8    small displays.  You -- we think of email, we think

9    of browsing the internet on our smart phones.  Today,

10   with the big displays, they're easy to use.  Just

11   think about the difficulty of trying to browse the

12   internet with a display like that and with a keypad

13   like that.  People weren't using it very much.  There

14   were -- they weren't email and the internet very much

15   back then.  They were making voice calls when they

16   figured out that they could send message cheaper than

17   making a voice call.  The messages exploded.  So I

18   would put the order of essentiality in the 1999

19   period as voice, number one; messaging, number two;

20   and then data, number three, because until the

21   displays got bigger, the phones got easier to use,

22   data really didn't take off in the networks.

23   Q   So we're going to talk in a couple of minutes

24   about the opinions that you've reached in the case,

25   Mr. Lanning, but can you first tell the jury what you

Mr. Lanning - Direct                                58

1   looked at, what was -- what you looked at as part of

2   your analysis?

3   A   Well, the first place I start is the patent.

4   Some cases have multiple patents.  In this case what

5   we're discussing today is the 870 patent.  I read

6   through it two or three times just to get a good feel

7   for the patent, what the patent believes was the

8   invention.  And then another key part is the Court's

9   definitions for the claims in the patent.  Sometimes

10  there's terms in the claims that are disputed by the

11  parties.  They don't agree.  So the Court then

12  provides their definitions for the terms, and you've

13  seen some of those terms.  One of them is for

14  "cellular network."  And so I consider those and make

15  sure I include those in my analysis.

16          I also consider industry standards.  I've

17  talked a little bit about the industry standards.

18  I'll talk more about that.  There's many industry

19  standards, but I wanted to look at the different

20  standards, and specifically the standards that were

21  applicable to the Sprint network.

22          Then I went on to look at Sprint

23  documentation because I had to decide, as I said

24  earlier, the key question, are Sprint's messaging

25  servers either internal or external to the network?

1   So I wanted to look and see what the standard

2   recommended.  Then I wanted to look at the Sprint

3   documentation to see how they really did it.  Then I

4   looked at Sprint's witness testimony and other

5   witness testimony to help clarify any of the Sprint

6   network in the documentation.  And then a big part of

7   my work was to receive Dr. Akl's infringement report

8   because where they're -- Comcast is claiming

9   infringement and he's working on behalf of Comcast,

10  he starts by writing an infringement report and

11  includes all of the things that you've seen, plus a

12  lot more documents.  And then I receive that, review

13  that, and then I write a rebuttal report that

14  provides my opinions.

15  Q   You said you read the 870 patent two or three

16  times.  Were you referring to at the outset of the

17  engagement?

18  A   Yeah, that's just the outset.  I'm just talking

19  about the very first day or so.

20  Q   One of the items on your list is witness

21  testimony.  Have you reviewed deposition testimony

22  from numerous Sprint witnesses, Mr. Lanning?

23  A   Yes.

24  Q   Have you also been here for the testimony, either

25  live or reading the transcripts, for witnesses who

Mr. Lanning - Direct                              60

1   have testified during the course of this trial?

2   A    Yes.

3   Q    Okay.  Have you been doing this for a long time?

4   A    What do you mean by "this?"

5   Q    Work -- rendering opinions in patent infringement

6   cases.

7   A    As I stated, since 2000.  Most of my cases that I

8   work on are patent cases.  Some are other cases like

9   for contracts or for trade secrets, but most of the

10  time it's for patent infringement cases.

11  Q    Did you hear Comcast's attorneys ask one Sprint

12  witness after another whether the fact witness had

13  read the 870 patent?

14  A    Yes.

15  Q    Did you hear them keep asking whether the fact

16  witnesses from Sprint had read the Court's claim

17  constructions?

18  A    Yes.

19  Q    Is it typical in your practice to see fact

20  witnesses from the party who is the defendant

21  reviewing the patent and applying the definitions

22  applied, or given, by the Court?

23  A    No, that's not typical.  The fact witnesses, as

24  the name implies, are to provide facts.  And in this

25  case the Sprint fact witnesses are to provide facts

Mr. Lanning - Direct                            61

1    for their network.  I know as I worked on the

2    networks the last thing I wanted to do was read

3    someone's patent or do a lot of that when you're busy

4    trying to design a network and operate a network.  So

5    I don't think it would be proper.  To me, they're

6    here to provide the facts for how the network works

7    today or worked in the past.  And so I wouldn't

8    include any input from them as far as a claim

9    construction or how the patent worked.  That wouldn't

10   be proper.

11           MR. FINKELSON:  Your Honor, I have some

12   binders of materials.  If I may bring them up to the

13   Court --

14           THE COURT:  You may.

15           MR. FINKELSON:  -- and as well to Mr.

16   Lanning?

17           (Pause in proceedings.)

18   BY MR. FINKELSON:

19   Q   So, Mr. Lanning, what I'm bringing up for you

20   is -- or what Mr. Bebout is helping me bring up to

21   you is a set of four binders.

22           MR. FINKELSON:  I know there's not a lot of

23   room there, but maybe, Chad, if you can just place

24   them to be behind Mr. Lanning so that he's got --

25   they don't cover his table.

Mr. Lanning - Direct                    62

1            (Pause in proceedings.)

2            MR. FINKELSON:  As I'm sure the Court is

3   very pleased to receive, I also have a box of those

4   same binders for you, Your Honor.  Your pile seemed

5   to be getting low over there and I didn't want to --

6            THE COURT:  Yes, please, so that we --

7   other -- no, you --

8            (Pause in proceedings.)

9            THE COURT:  Those binders, ladies and

10  gentlemen, are hard copies of the exhibits that you

11  will see on the screen.

12           MR. FINKELSON:  And then I'm also bringing

13  up to Mr. Lanning all of the materials that Dr. Akl

14  reviewed and you -- Ryan, maybe if you could put

15  those down to the side.  Mr. Lanning also reviewed

16  them, of course, in his analysis.  Those are just the

17  copies of the binders that Dr. Akl presented to us.

18  And I am not bringing you another copy of those, Your

19  Honor.

20           THE COURT:  Thank you.  Thanks.  Mr.

21  Lanning, it's going to be difficult for you to leave

22  the witness stand.  Be very careful.

23           THE WITNESS:  Thank you.

24           (Pause in proceedings.)

25  BY MR. FINKELSON:

1  Q   Mr. Lanning, can you tell the jury what opinions

2  you have rendered in this case?

3  A   Yes, as it shows on the slide, is that I found

4  that from 2006 to the present, Sprint's messaging

5  servers are internal to Sprint's cellular network.

6  And because of that, I have found that Sprint's SMS

7  and MMS servers do not infringe claims one, seven,

8  and 113 of the 870 patent.

9  Q   And have you prepared a walkthrough for the jury

10  of the steps that you have done as part of your

11  analysis?

12  A   Yes.

13  Q   And is this a summary on the screen for the jury

14  of what you're going to be speaking to them about

15  during the remainder of your testimony here today?

16  A   Yes, it is.

17  Q   So it looks like the first item is "Background

18  and 870 patent."  Again, were you here when Dr. Akl

19  presented his testimony and he spoke a lot about

20  functionality?

21  A   Yes.

22  Q   Okay.  Why have you included this slide for the

23  jury?

24  A   Because I wanted to provide a contrast for the

25  analysis styles or the type of analysis that Dr. Akl

Mr. Lanning - Direct                              64

1   said that he did versus I did.  I took a holistic --

2   what I would refer to as a holistic approach to

3   determine whether the -- Sprint's messaging servers

4   were internal or external to their cellular network,

5   where Dr. Akl is really focused just on

6   functionality.  And I believe that that process of

7   analysis is flawed, but even if you use his analysis

8   just based on functionality, I believe that his

9   results or his opinions are also wrong, and I'll

10  discuss that later.  So whether you use a holistic

11  approach or a functional approach, I still believe

12  that the answer comes back to Sprint servers are

13  internal to their network.

14  Q   And by "to their network" do you mean their

15  cellular network?

16  A   Yes, I'll try to be more careful.  To Sprint's

17  cellular network.

18  Q   What is the jury looking at here, Mr. Lanning?

19  A   Well, I kind of listened to the first part --

20  listened all -- most of the week, and I feel for you

21  because if an engineer was sitting in the jury stand,

22  they might be able to understand three-quarters of

23  everything that got thrown at them by a lot of

24  different people.  So I thought and I found that it's

25  more helpful to explain this idea of whether a

Mr. Lanning - Direct                     65

1   message server is internal or external to the

2   network, to separate out all the acronym soup that

3   you've been hearing.  That kind of reminds me I sat

4   in a meeting with a guy and he said I just heard you

5   say a whole sentence and you didn't have one word in

6   that sentence; it was full of acronyms.  And that's

7   kind of what it sounds like here sometimes.

8           So I'm separating, and what I'm showing

9   here on the left is an apartment building.  And if

10  you look over on the right part of the screen,

11  there's an oasis laundromat.  And I'm going to go

12  through the idea of how you analyze a network in

13  trying to figure out -- and what I've decided is if I

14  have a laundry service or if I have a washer and a

15  dryer, those are my functions.  I have washing the

16  clothes and drying the clothes.  Those are my two

17  functions.  They're in separate logical units.  Most

18  of us realize that it's probably wise not to mix the

19  electricity for drying with the washer, so that's why

20  most of the time the washing unit is separate from

21  the dryer.  And now the challenge for the jury is to

22  determine, based on functionality, is the washer and

23  dryer, are they located in the apartment or are they

24  located external to the apartment in the laundromat.

25          So think for a second what kinds of

Mr. Lanning - Direct                    66

1    information would you need to have to determine

2    whether the washer and dry were in an apartment, or

3    internal to that apartment, or whether they were

4    external to that apartment.  Would just the functions

5    of washing and drying be enough to tell you, even

6    though both of those functions are done in both

7    places?

8              So here, I'm showing that I have the washer

9    and dryer unit in the apartment.  I also have washers

10   and dryers in the laundromat.  So if you look and you

11   say okay, with just washing and drying alone, can you

12   tell me whether the washer and dryer is located in

13   the apartment or in the laundromat?  And I think

14   you'll say no, I need more information.  Well, what

15   type of information do you need?  Well, you need to

16   understand other components, a holistic view, like

17   who owns the washer and dryer, who does the daily

18   feeding or the daily cleaning of the washer and

19   dryer, who pays for it when it breaks, who pays for

20   the water and the power for the washer and dryer?

21   And physical location is still an important part here

22   too.

23             Now, if you take the holistic view of the

24   washer and dryer, it's not hard for us to see with

25   all of that information what we refer to in

Mr. Lanning - Direct                           67

1   engineering as functional, which is the

2   functionality; logical, how do I separate the

3   functions of washing and dryer; and physical, meaning

4   how many do I have and where do I put them?  And if I

5   look at those, then I can determine where that washer

6   and dryer is at.  And that's what I've done to

7   determine whether the Sprint messaging servers are

8   internal or external to their network.  Functionality

9   alone of just handling messages, doing two things.

10  Store and forwarding the messaging and sending

11  queries is the same, just like it is for the washer

12  and dryer.

13          So, as you ask yourself to determine this

14  key question are Sprint's messaging servers internal

15  to its cellular network or are they external, think

16  about whether functionality alone, as Dr. Akl says,

17  is enough to determine that.

18  Q   And did you also look at the 870 patent and

19  another patent by the same inventor on the question

20  of whether functionality alone was enough?

21  A   So the top part is -- Ms. Aho issued, or the two

22  patents were applied for, the same day by the

23  inventor, the same inventor, of the 870 patent.  The

24  top one is the 870 patent and the -- and Ms. Aho is

25  saying, "The messaging server would properly be

Mr. Lanning - Direct                                68

1  located outside the cellular network in question, for

2  example, in the internet network."

3          Then this -- another patent that she

4  applied for the same day says, "A server, which can

5  be located, for example, in a cellular network or in

6  the internet."  So the point that I'm making by each

7  of these captions from the two patents from the

8  inventor is that it's about the location.  Now, it

9  might not be the geographic or physical location, but

10  there is a concept of a location.  Is it located

11  inside the cellular network or outside, or external,

12  to the cellular network?

13  Q   And, as you said, I believe, the top quotation

14  comes from PX-2, the 870 patent that's in the jury's

15  binders?

16  A   Yes.

17  Q   And the second, lower quotation is from Ms. Aho's

18  patent that has been marked as DX-198?

19  A   Yes, that's correct.

20          (Pause in proceedings.)

21  Q   All right.  Let's talk a little bit more about

22  the 870 patent.  Can you give the jury a brief sense

23  of the patent and what's going on in it?

24  A   Okay.  And the patent is in your binders, as he

25  just mentioned.  It's PX-2.  This is one of the

1   figures in the patent.  And there's a key component.

2   There's a rectangle on the right-hand part of the

3   diagram.  And the acronym is MMSC, that's multi-media

4   service center.  That's the messaging server.

5           Now, one of ordinary skill is -- you'll

6   hear that expression -- meaning an engineer, a

7   qualified engineer, working at the time of the patent

8   would look at this diagram and quickly understand

9   that this is a diagram that's depicting a European,

10  or GSM, network.  And you say how would an engineer

11  quickly understand that?  Well, first off, there's

12  acronyms in this -- in these boxes that are unique

13  only -- unique to European, or ETSI, networks.  Plus,

14  you see these letters, the capital letters that are

15  in these.  These are what we refer to as interface

16  definitions.  And all of those letters are unique

17  also to a GSM European network that define the

18  specific interface that's used between those network

19  elements, meaning how they communicate.  We refer to

20  it as a protocol, but that defines down to the

21  messages that they send each other all the way down

22  to the bent position and the bent values of those

23  messages.  And all of this is for a GSM network.

24  Q   And have you added the highlighting, sir, that

25  appears on this slide around the MMSC and also the

1   cellular network?

2   A    Yes.

3   Q    Do you agree that the specification of the 870

4   patent, Mr. Lanning, talks also about CDMA2000?

5   A    Yes.

6   Q    And what do you make of the discussion of the

7   CDMA2000 standard in the specification of the 870

8   patent as it relates to what the 870 patent claims in

9   claims one, seven, and 113?

10  A    Yes, so now I should be clear.  They -- the

11  diagrams that are in the patent are in relation to a

12  GSM, or ETSI, network.  But that doesn't make it only

13  apply to a GSM, or ETSI, network, because in the

14  specification of the patent it refers to CDMA2000

15  networks, and that's a Sprint network.  So I don't

16  want to mislead you that the claims don't apply just

17  because the diagrams show an ETSI network.  But Nokia

18  and Ms. Aho were focusing the diagrams and examples

19  on an ETSI network.

20  Q    And when it came time to claim, Ms. Aho set forth

21  her claimed invention in the claims the we're

22  discussing here in this case, is that right, sir?

23  A    Yes.  And so the diagrams in the specification

24  gives an option about whether the message server

25  should be internal or external to the network.

Mr. Lanning - Direct                    71

1   However, when the claims are written that option

2   turns into a rule.  And, as you can see by the

3   introduction to claim one, we refer to that as the

4   preamble, it says "the messaging server external to

5   the network."  And if you look at the bottom where

6   I've highlighted in the last limitation of the claim,

7   "the messaging server external to the cellular

8   network."  Now there is no more an option of whether

9   the messaging server is internal or external to the

10  cellular network.  All three of the asserted claims

11  require that these messaging servers be external to

12  the cellular network.

13  Q   And when it comes to the issue of infringement,

14  is it applying the claims to the accused services

15  that matters?

16  A   Yes, it's the claims that rule, along with the

17  Court's construction for the terms in the claims, not

18  the specification.  So my work has to be focused on

19  the asserted claims and what the claims say.

20          MR. FINKELSON:  Your Honor, I'm about to

21  turn to the second item on Mr. Lanning's list, which

22  is a discussion of Sprint's cellular network.  Might

23  that be a good time for a break?

24          THE COURT:  It is a good time for a break.

25  It's about 11:12.  We'll recess for ten minutes.

Mr. Lanning - Direct                      72

1          (Jury out, 11:14 a.m.)

2          THE COURT:  You may step down, Mr. Lanning.

3   And we're in recess.

4          THE WITNESS:  Thank you, Your Honor.

5          (Recess taken from 11:15 a.m. to 11:30

6   a.m.)

7          THE COURT:  Be seated everyone.  You may

8   proceed, Mr. Finkelson.

9          MR. FINKELSON:  Thank you very much, Your

10   Honor.  Before we turn to this, I'm going to ask Mr.

11   Baird to put up that slide.

12          (Pause in proceedings.)

13          MR. BAIRD:  I'm sorry, so is the slide

14   number on there, is that --

15          MR. FINKELSON:  It's associated --

16          MS. BAIRD:  -- the slide number --

17          MR. FINKELSON:  It's associated with the

18   other, yeah.

19          MR. BAIRD:  Okay.

20          MR. FINKELSON:  Slide 42.

21          MR. BAIRD:  Okay.

22   BY MR. FINKELSON:

23   Q   Mr. Lanning, I've put up on the screen the

24   definition of the "person having ordinarily skill in

25   the art" that you have utilized in this case.  Do you

Mr. Lanning - Direct                    73

1   see that, sir?

2   A    Yes.

3   Q    And is that, in fact, the definition that you've

4   utilized?

5   A    Yes.  As I explained earlier, when the experts

6   look at the patent and evaluate the patent and what

7   would have been understood we have to define a

8   hypothetical person of ordinary skill of what -- in

9   my words it would be what would a typical engineer's

10  qualifications be that would be reviewing this patent

11  and understand?  And that's the definition that I've

12  used.

13  Q    And can you provide that to the jury?

14  A    Sure.  It's at least a Bachelor's Degree in

15  Electrical Engineering, Computer Science, or related

16  field.  There's a lot of similar fields like computer

17  engineering, mathematics.  And I also feel that they

18  needed to have some experience, so at least two years

19  of experience in the operation networking standards

20  and/or design of telecommunications networks that

21  involve messaging gained through education, work, or

22  other experience.

23  Q    Do you understand that Dr. Akl has proposed a

24  different level of the person having ordinary skill

25  in the art in this case?

Mr. Lanning - Direct                              74

1    A    Yes.

2    Q    Are you at least a person of ordinary skill in

3    the art under both your definition and Dr. Akl's?

4    A    Yes, at least that.

5    Q    And your opinions that you're rendering here

6    today with respect to non-infringement by Sprint, do

7    they apply both under your definition of a person

8    having ordinary skill as well as under Dr. Akl's

9    definition?

10   A    Yes, they -- my opinions apply equally under

11   either one of our definitions.

12   Q    Thank you.

13            MR. FINKELSON:  Can we return to slide 16?

14   BY MR. FINKELSON:

15   Q    So we were about to make the turn to Sprint's

16   cellular network.

17            THE COURT:  By the way, was there a number

18   on that exhibit that was just shown on Sprint's --

19            MR. FINKELSON:  It is, Your Honor.  It is

20   slide 16 that appears -- I'm sorry, it was slide 42

21   that appears in a separate set of slides that we'll

22   be presenting with Dr. Polish later on this

23   afternoon.

24            THE COURT:  Fine.

25            MR. FINKELSON:  So you'll have a copy of

1    that.

2            THE COURT:  And it's slide?

3            MR. FINKELSON:  Slide 42.  And I'll point

4    it out, Your Honor, or at least we'll try to when I

5    get there.

6            THE COURT:  Okay.  Go ahead.

7    BY MR. FINKELSON:

8    Q    Mr. Lanning, can you explain to the jury what

9    they're looking at on their screens as well as on the

10   board we have presented to them?

11   A    May I step down?

12   Q    Sure.

13           MR. FINKELSON:  Well, I guess that's not

14   quite for me to say.  Your Honor, do you mind if the

15   witness steps down?

16           THE COURT:  Oh, I'm sorry.  I'm busy

17   looking.  You mean --

18           MR. FINKELSON:  May the witness step down

19   to look -- to --

20           THE COURT:  What is on that --

21           MR. FINKELSON:  It is the identical slide

22   17 -- it's identical to slide 17 that appears on your

23   screen.

24           THE COURT:  Fine.  Yes, the witness may

25   step down.  And, Mr. Goettle, I don't know who's

1    going to --

2            MR. GOETTLE:  It's me, Your Honor, and --

3            THE COURT:  -- conduct the cross.

4            MR. GOETTLE:  -- I'm good.  If -- I'll move

5    over there if I need to.

6            THE COURT:  You may -- you may move if you

7    need to.

8            MR. GOETTLE:  Thank you.

9            THE COURT:  Mr. Lanning.

10           THE WITNESS:  Okay.  If you look at the

11   diagram, there's two major sections.  So the bottom

12   is labeled "Sprint Cellular Network," which means

13   everything inside the large oval is part of Sprint's

14   cellular network.  And the yellow that you see is the

15   Sprint's core network.  And so, as I've shown here,

16   that what's in the cellular network would be the

17   wireless terminals.  We refer to the wireless

18   terminals -- we call them cell phones, mobile phones.

19   And I have multiple ones around.  And then the other

20   components that I have on the outside of the yellow

21   are the bay station systems.  And in technical speak,

22   a bay station system includes this antenna that

23   you've probably seen with the pole with the different

24   types of antennas.  If you look closely, there's

25   usually a small building at the bottom of every one

Mr. Lanning - Direct                    77

1   of those.  That's where all the computer equipment is

2   at.

3           So for a by station system, it needs to

4   have the box and the antenna, and that's why it

5   (indiscernible) that way.  And because it's a

6   cellular network of many cells that are all

7   represented by each of the different towers, that's

8   the cellular network.

9           Now, as I got to the yellow, or the core

10  network, within Sprint's core network, I'll start up

11  at the top left.  That's mobile switching centers.

12  As I said earlier, when you see the words "mobile

13  switching center" you can think of voice mainly, but

14  they're also very involved in messaging, delivering

15  messages -- short messages.

16          In the middle I have the messaging servers.

17  Those are both the short messages servers for the

18  short messages as well as the messaging servers for

19  the multi-media messages that I'll explain in detail

20  (indiscernible).

21          Now, a couple of the databases I have, I

22  mentioned earlier that I built one of these for

23  Tandem Computers when I worked at Tandem Computers.

24  Home location register is what that stands for.  This

25  keeps a lot of the information from the subscriber's

Mr. Lanning - Direct                          78

1    profile, what you've signed up for, where your

2    location is at.  So when somebody calls you on your

3    cell phone the mobile switching center needs to query

4    the subscriber database to find out where you're at

5    in the network.  And the home location register will

6    have your location in the registry.  That's why they

7    refer to it as the home location register.

8           Another database is the subscriber profile

9    database.  That has other information on the

10   subscriber that I'll describe more in detail, but the

11   messaging servers use a lot of that information.  And

12   the PDSN, that's the packet part of the network, the

13   packet part of the service mode.  This handles the

14   internet-type communications in the network.  And

15   internet communications are all packet-based.  That's

16   why they refer to them as packet.

17   Q   And is the core network, as you've depicted it,

18   within the Sprint cellular network?

19   A   Yes, it's all inside.

20   Q   And this is a drawing that you came up with,

21   correct?

22   A   Yes.

23   Q   Thank you.

24           (Pause in proceedings.)

25   Q   Can you -- one of the items that you referred to,

1    of course, in the course of your analysis in this

2    case is the Court's claim definitions that appear in

3    the jury's binder, is that right, sir?

4    A    Yes.

5    Q    Can you walk the jury through how the diagram

6    that you have prepared compares to the Court's claim

7    construction?

8    A    Okay.  Now, I'm using the same slide as I just

9    walked you through on the left, but now I've put up

10   the Court's definition for cellular network.  And if

11   you notice, the cellular network includes a wireless

12   terminal and a bay station system.  And those are the

13   two different types of components that are on the

14   outside -- outside of the yellow, but inside the

15   cellular network, Sprint's cellular network.

16            Then the construction goes on to state that

17   the -- again, the core network elements "which may

18   include" and then it lists the various elements that

19   it should include.  And so I've shown that each of

20   those elements that the Court's construction has are

21   all inside the Sprint core network, as I show here in

22   the yellow at the bottom of the slide.

23            (Pause in proceedings.)

24   Q    A lot of talk about SMS, a lot of talk about MMS.

25   Can you just refresh the jury on the difference

1    between the two when it comes to a more technical

2    sense?

3    A    Well, I chose the SMS example because thinking

4    back on the displays and thinking back, a lot of the

5    abbreviations people use today were created many

6    years ago with these small displays and these real

7    awkward 12-digit keypads.  For instance, if you

8    needed to do the letter C, you had to push the number

9    two button three times, if you remember, if you've

10   ever done that.  So it was real awkward sending

11   messages.  So people came up with real interesting

12   abbreviations.  So I've used that on the left.  And,

13   typically, the maximum size a message could be sent,

14   and it would all be text and characters -- we didn't

15   have emojis and all of that back that -- it would be

16   160 characters per message.

17         Now, with the success of short message

18   service, everyone wanted to have -- many people

19   wanted to have a service where they could send not

20   only text, but they could send pictures, they could

21   send video, they could send audio, and that was a

22   very different set of requirements for the network to

23   be able to supply that in for the phones.  And so

24   that's what it's called multi-media messaging

25   service.  The multi-media means that I can have, as

Mr. Lanning - Direct                                    81

1    the name implies, more than one type of media that

2    goes on the message.  And I couldn't resist putting a

3    picture of my five-year-old grandson's first fish.

4    He was pretty jazzed about it when he caught that.

5    And so the media in this case would be a picture,

6    another type of media would be the text.

7    Q    In doing your analysis in this case, have you

8    looked at both Sprint's SMS and Sprint's MMS?

9    A    Yes.

10   Q    And are we going to walk through each of those in

11   turn?

12   A    Yes.

13   Q    Okay.

14          MR. FINKELSON:  Before we do, Mr. Baird, if

15   you could go back to slide 17, please?

16   BY MR. FINKELSON:

17   Q    Mr. Lanning, slide 17 is the visual depiction of

18   the board that you just walked the jury through.  Is

19   it your opinion, sir, that Sprint's cellular network

20   and Sprint's core network look as you have depicted

21   on this slide 17?

22   A    Yes, definitely.

23   Q    Are there other core network elements as well in

24   Sprint's core network?

25   A    Yes, there's many more.  I've included the ones

Mr. Lanning - Direct                              82

1    that are relevant for this trial.

2    Q    In your opinion, sir, having listened to witness

3    testimony, having analyzed documents, having looked

4    at the standards, having looked at the patent, looked

5    at the Court's claim definitions, does Sprint's core

6    network of Sprint's cellular network include mobile

7    switching centers, packet switching nodes, messaging

8    servers, subscriber databases?

9    A    Yes.

10   Q    And does Sprint's cellular network also include

11   wireless terminals and bay station systems?

12   A    Yes.

13              (Pause in proceedings.)

14   Q    Let's start with SMS, if we could, Mr. Lanning,

15   and then we'll do MMS after that.  What have you

16   depicted, Mr. Lanning, in slide 23?  What's shown

17   here?

18   A    These are the steps, or the initial steps, that

19   occur when a user sends a short message to the

20   network.  When you key in the message and push send

21   it first goes to the bay station system that I'm

22   showing by the blue dotted arrow and line to the --

23   to the tower.  Then the tower forwards it to the

24   mobile switching center.  And remember, before, I

25   said the mobile switching center does more than just

1    voice switching.  It actually receives these short

2    messages.  So it's used to receive short messages and

3    send short messages as well as voice calls.  Once the

4    mobile switching center receives the message, it

5    forwards that short message to a messaging server.

6    In this case, it's specifically a short message

7    service center.

8    Q    And would that be an SMSC?

9    A    Yes.

10   Q    And what -- in your opinion, sir, what are the

11   functions performed or some of the functions

12   performed by Sprint's SMSCs?

13   A    The SMSC does many more functions than I've even

14   listed on the slide, but the main functions, as you

15   can see, that I've highlighted in red with the text,

16   first, it receives the message and then it needs to

17   query subscriber databases to understand what to do

18   with the message.  It also provides a screening

19   function for messages, and I'll discuss that a little

20   more in detail a little later.  Blocking a text

21   message -- in some cases it blocks the text message.

22   In other cases it routes the text message to other

23   networks, and then it does a store and forwarding of

24   messages.  And I guess I haven't mentioned that for

25   the messaging service, we refer to it as a store and

1   forward type service.  What we mean by that,

2   technically, is that if a person sends a message, the

3   recipient doesn't need to be online, meaning the

4   phone doesn't need to be on.  And so the SMSC needs

5   to save the message until the person is -- the

6   destination or recipient is ready to receive it, they

7   turn their phone on.  So that's a little different

8   than if you make a call and you're expecting someone

9   to answer the phone.  You can send a message and they

10  can pick it up when they want to or when they turn

11  their phone back on.

12  Q   Okay.  Are you familiar with the Court's

13  definition of the term "messaging server" in this

14  case that the jury has in its binders?

15  A   Yes.

16  Q   Does Sprint's messaging servers for SMS, its

17  SMSCs, perform the functions described in the Court's

18  definition?

19  A   Yes, it definitely does, plus many other

20  functions to support the whole short message service.

21  Q   I've turned to slide 25.  What are you depicting

22  for the jury here, Mr. Lanning?

23  A   This is a case where you see the stop sign in the

24  messaging server that a message is being blocked.

25  And so -- and I've given the person sending the

Mr. Lanning - Direct                          85

1    message a name, Chris, sends the message to the --

2    through the mobile switching center to the messaging

3    server, and I'm showing lines, the dotted lines, to

4    the subscriber profile databases.

5           Now, the SMSC can block a message depending

6    upon information that it receives from the subscriber

7    databases.  First, it can decide that the destination

8    or the recipient hasn't paid the subscription or they

9    don't want a subscription to messaging or their phone

10   doesn't have the capability.  They block it.  In

11   other cases it could be -- what's typically done is

12   parental controls.  So if you want to have what we

13   refer to as a white list, meaning family members that

14   can send messages to your child or -- then those are

15   accepted, but if -- then it's not on there, or, we

16   refer to it as a black list, messages that you don't

17   want to go to your child, then SMS can stop that.

18   And so that's that screening and blocking type

19   functionality.

20   Q   You just said the SMS can stop that.  What piece

21   of equipment were you referring to?

22   A   I'm sorry, the SMSC, the messaging server where

23   the stop sign is at.

24   Q   Okay.  Can the message -- does the messaging

25   server also make decisions in an instance where you

Mr. Lanning - Direct                    86

1   have somebody who is sending a text message, who is a

2   Sprint subscriber, to a recipient who is not a Sprint

3   subscriber?

4   A    Yes, as I've shown by this slide, you have the

5   messaging server, and if you send a message to

6   someone and they're not on the same network, so if

7   you're a Sprint subscriber and you're sending a

8   message to someone that has a cell phone on the

9   T-Mobile network, the SMSC, or the messaging server,

10  needs to understand that based -- and it does

11  understand that based on its queries of the

12  databases.  Then it routes that message to the

13  T-Mobile network.

14  Q    Is it the messaging server that makes that --

15  that performs that routing, sir?

16  A    Yes.

17  Q    What are you depicting for the jury, Mr. Lanning,

18  in the next slide, slide 27?

19  A    At a high level, what I'm depicting here is the

20  messaging server is doing the forwarding to Jen

21  that's over on the left-hand side of the screen, and

22  Jen is also a Sprint subscriber.  So this is what we

23  would refer to technically as a Sprint-to-Sprint SMS,

24  and the messaging server would do the forwarding.

25  Q    Do you agree with Dr. Akl, sir, that Sprint's

1    accused messaging servers are not performing

2    essential functions?

3    A    No.

4    Q    Why not?

5    A    Well, as you can see by the drawing and the

6    examples that I gave you, is the messaging server is

7    in the middle of all the messaging.  It actually

8    queries these databases.  And there's two data --

9              (Pause in proceedings.)

10   A    There's two database -- there's two databases.

11   The one on the top is "HLR," the one on the bottom is

12   labeled the "SPS."  Now, Dr. Akl has said that both

13   of those are essential and they're part of the core

14   network.  Dr. Akl has also said that the mobile

15   switching center is part of the core network.  He's

16   also said the PDSN for data is part of the core

17   network, but he has said the messaging servers are

18   not part of the core network.  And if you look,

19   they're in the center in the heart of everything

20   that's going on with messaging.  But you might ask

21   yourself the question why does he do that?  Well, Dr.

22   Akl has to show that these messaging servers are

23   external to the network in order to show

24   infringement, and I don't believe that they are or --

25   and I also believe they're essential.  If you don't

1  have a messaging server, you don't have any interface

2  to a mobile switching center, you don't have any

3  interface to these databases that he says are

4  essential, nothing is querying those.  So just kind

5  of think logically for a minute is why would a

6  database that gets queried be essential and not the

7  system that's actually sending the database the query

8  and then acting on the response once it sees the

9  query?  It just doesn't seem very logical to me.

10  Q    Let's start where you started your analysis with

11  respect to SMS.  Where was that, sir?  Where was the

12  start of you focus?

13  A    Well, coming in to the case, I didn't know where

14  the messaging servers would be.  So to me, the

15  obvious places to start would be the standard.  What

16  standard does Sprint use for their network, what set

17  of standards?  And then let's look at the standards

18  to see what the standards recommend for where those

19  servers should be in the network.  So I started with

20  the relevant standards.  The relevant standards would

21  be, I explained earlier, the American standards.  And

22  what you see on this slide here is one of the first

23  standards, the 1997 ANSI-41 standard.  It has a lot

24  of different numbers in there, but this is the

25  version of the American standard that was released in

Mr. Lanning - Direct                89

1    1997.  And this is what Sprint, when they build their

2    cellular network, they use this set of standards.

3    It's just not one -- this one document, but it's a

4    whole set of documents.

5    Q    And are you referring to what has been marked as

6    DX-3 that appears on your slide 29?

7    A    Yes.

8    Q    Why start with the standards, Mr. Lanning?

9    A    Well, I wanted to start with a foundation.

10   Usually, when -- in my experience working with

11   British Telecom designing the network, we had

12   hundreds and even thousands of different functions

13   that we had to provide in our cellular network.

14   Instead of trying to make that all up on our own, you

15   look to the standard to see how the standard divides

16   the functions and groups them together into different

17   pieces of equipment.  Now, is -- why is that?  Well,

18   that's one way of just being methodical and being

19   able to divide all the functionality.  But there's a

20   real historic reason why this is done.

21         The first generation networks were provided

22   by a single supplier and, typically, it was the

23   mobile switching center supplier.  And so the network

24   operators were somewhat held hostage by that

25   supplier.  They paid what the supplier told them to

Mr. Lanning - Direct                    90

1   pay, they got their equipment when the supplier told

2   them that they would get the equipment, and they

3   would get updates and upgrades when the supplier got

4   around to doing it.  So a lot of the network

5   suppliers said no more for second generation, we

6   definitely want to be able to mix and match and

7   create a competitive environment for suppliers

8   between these different types of nodes.  And so

9   there's a logical grouping of functionality and then

10  an interface that's standardized between these

11  logical functional entities, the functional groupings

12  that we refer to as -- or I refer to as logical

13  entities so that they can communicate together with

14  each other.

15          Now, if I'm a supplier, like I was, and

16  you're competing in an area, like I did for the HLR,

17  if I need to supply an HLR to Sprint or a Verizon or

18  an AT&T, I need to know first what standard is that

19  operator compliant with, and then I need to make sure

20  my interfaces work exactly like they're supposed to

21  so that when we move our HLR into their network, it

22  will communicate with the other network elements like

23  it should.  And so the first place you start is the

24  standard.  What does the standard recommend how these

25  functions should be divided up?

Mr. Lanning - Direct                    91

1   Q   All right.  Well, let's talk about the ANSI-41

2   standard, DX-3, can you give the jury a better idea

3   of what this standard is?

4   A   This standard is -- it was in 1997.  It's ANSI,

5   so it's for the American standards.  That means it's

6   for the network operators that are compliant with the

7   network standard.  It had previous revisions before,

8   but the first ANSI, the American National Standard

9   publication was in July 1997.

10          Now, this is not a small document.  I think

11  you saw the big binder that Dr. Akl had during his

12  testimony.  It's around 1,500 pages.  So it's not

13  like a white paper that's 20 pages that just says we

14  recommend you do this and that.  It goes into a lot

15  of detail.  1,500 pages, if it's printed one side, is

16  three reams of paper, and this is one of the

17  standards that a network operator needs to use.

18  Q   And, specifically, a network operator in what

19  type of network?

20  A   This would be for a network -- would be an

21  ANSI-41 or an -- or a CDMA2000 network, which is

22  Sprint's network.

23  Q   Are there a different set of standards for

24  GSM-based networks?

25  A   Yes.  Like I mentioned earlier, you have two

Mr. Lanning - Direct                                92

1    families to think about.  You have the European

2    family standards and you have the American family

3    standards.  So for Sprint, they follow the ANSI, or

4    the American family standards.  Other operators, like

5    AT&T, follow the ETSI standard family, or the GSM

6    family of standards.  That's one of the reasons why

7    you can't just go into a phone store and by a phone

8    at Sprint and use it on the AT&T network.  They're

9    not compatible.

10   Q   Do standards play a role in ensuring that the

11   Sprint device can speak to the AT&T device?

12   A   Well, they ensure that the Sprint phone that you

13   buy at a Sprint phone store can work on a Sprint

14   network.  They don't ensure that it works on an AT&T

15   network because AT&T is based on a different

16   standard, the GSM standards.  And so if you see it's

17   not just the phone store or the cellular operator

18   stopping you from using the phone.  It's actually a

19   real reason that the phone will not interoperate with

20   those different -- between those two standards.

21   Q   I've been told that your diagram is perhaps

22   blocking counsel's view from Mr. Goettle's side, so

23   I'm just going to move it down to the floor so it's

24   out of his way.

25              (Pause in proceedings.)

Mr. Lanning - Direct                    93

1          MR. FINKELSON:  Is that better?

2          MR. GOETTLE:  Thanks.

3  BY MR. FINKELSON:

4  Q   Continuing on in the ANSI-41 standard, what are

5  you showing on slide 31 from the standards, sir?

6  A   The standards are referred to as recommendations,

7  but why I included this slide is to give you a feel

8  of all the different information that's in this 1,500

9  page document.  So it goes into, if you look at

10  chapter five, all the different signaling protocols

11  that are required, and that means all of the

12  communication messages and the protocols that are

13  there, and for all the different procedures in

14  chapter sis --

15  Q   And --

16  A   -- as an example.

17  Q   And when you see the term "recommendation, as

18  included in the ANSI-41 standard, does it -- does

19  that mean mandatory?

20  A   It doesn't mean you must do it.  And there's some

21  parts of the recommendation that are simply that, we

22  recommend that you do it this way or that way.  Other

23  parts of the recommendation are a little more

24  stringent, and that's for the interfaces.  As I

25  explain later, you can't have interfaces that are

1  inconsistent when the different network elements are

2  communicating with each other.

3  Q   I've turned, Mr. Lanning, to slide 32 to a

4  diagram that I believe the jury has seen on a few

5  occasions in this case, but can you explain to the

6  jury what you are depicting here on slide 32 and with

7  the addition of your highlighting?

8  A   And this slide is from the standard.  It's a page

9  out of the standard.  It's figure two and they refer

10  to it as the network reference model.  So when an

11  engineer looks at this, this is what we look at to

12  figure out okay, how do I divide the functionality up

13  into different logical entities?  And they're

14  referred to in the quote, and I've highlighted,

15  "functional entities and associated interface

16  reference points that may logically comprise a

17  cellular network."  So this is a starting point.  I

18  have hundreds -- like in British Telecom, I had

19  hundreds of pages of functionality.  We then mapped

20  each of those functions into each of the different

21  boxes that you see here, and those are logical

22  entities.  We don't know where -- at this point you

23  don't know where that logical entity is at

24  geographically, there's no -- physically, you don't

25  know how many.  This is just about mapping

Mr. Lanning - Direct                    95

1    functionality to a logical collection -- logical

2    collection of functionality.

3             The other key point here is you see a

4    circle with letters in there.  Those are the

5    specifications for the interfaces.  For instance, the

6    "MC" that you see at the bottom to the HLR has the

7    interface and that is the specific interface

8    definition in this document that describes how the

9    messaging center communicates with the home location

10   register.

11   Q   In your opinion, sir, what does the network

12   reference model in the ANSI-41 standard, DX-3, show?

13   A   Well, it shows that the message center -- we've

14   used two or three different acronyms for it.  The

15   standard calls a message center an MC.  I've referred

16   to it as an SMSC.  And this is -- and it says that

17   it's an entity that stores and forwards short

18   messages.  And it also shows that it's part of the

19   network reference model or --

20   Q   Does this --  I'm sorry, sir.  Go ahead.  I

21   didn't mean to --

22   A   -- or the core network.

23   Q   Okay.  Does the message center -- excuse me, bad

24   question.  Is the definition of "message center" that

25   you show on figure -- on slide 33 directly from the

Mr. Lanning - Direct                          96

1   ANSI-41 standard?

2   A    Yes, I took this right from the standard.

3   Q    Was the same true of the definition of "network

4   reference model" that you just shared with the jury a

5   moment ago on slide 32?

6   A    Yes.

7              (Pause in proceedings.)

8   Q    Tell the jury what you tried to do with respect

9   to the network reference model, if you would, Mr.

10  Lanning, as it relates to the equipment in Sprint's

11  cellular network, as shown on the diagram that you've

12  shared with the jury.

13  A    What I've done with this slide is now you see the

14  network reference model from the standard that I've

15  included here in yellow, and then I've included each

16  of the different Sprint elements that are associated

17  with that.  And so I think there should be more.

18  Q    There are.  I'll go back one though so we can --

19  you can see the first one.

20  A    And so --

21  Q    So go ahead, sir.

22  A    Right.  So here is the reference model and you

23  see the bay station, the bay station system, to be

24  specific, because it has the box and the tower.  And

25  the next, that's the mobile terminals, or the

Mr. Lanning - Direct                    97

1    wireless terminals.  Those are the message switching

2    centers.  MSCs is the acronym we use for that.

3    Q    And you said message switching center.

4    A    I'm sorry, mobile switching centers.  I've got

5    messaging on the brain here.

6    Q    Understood.

7    A    Those are the mobile switching centers.

8    Q    And what's that?

9    A    That would be the HLR, the home location

10   register.

11   Q    And lastly?

12   A    And those are the messaging centers.

13   Q    The ANSI-41 standard in 1997, was it then

14   followed by additional standards, Mr. Lanning?

15   A    Yes, the standards are living documents.  As new

16   services and features are added to the networks and

17   new functionality, the standards are updated to

18   follow that functionality and provide recommendations

19   how that's implemented.  The previous version was

20   issued in 1997.  This is a version in 1999, two years

21   later.

22   Q    And by this, are we referring to DX-4 that has

23   been admitted into evidence?

24   A    Yes.

25   Q    And what is the title of DX-4, sir?

Mr. Lanning - Direct                              98

1    A    "Network Reference Model for CDMA2000 Sprint

2    Spectrum Systems."

3    Q    Would that be a system, in your opinion, that is

4    the -- that Sprint's cellular network is based upon?

5    A    Yes, that's Sprint's system.

6    Q    And, again, for the benefit of the jury, what is

7    the date of this network reference model, DX-4?

8    A    December 13, 1999.

9    Q    Have you highlighted that on slide 36 for the

10   ease of the jury's reference?

11   A    Yes.

12   Q    Does this network reference model include an

13   explanation of its purpose and scope spelled out in

14   DX-4?

15   A    Yes.

16   Q    And have you included some of that for the

17   benefit of the jury and can you read it to them, sir?

18   A    Yes, I have on the bottom the purpose and scope,

19   that it recommends the basic 3GPP2 wireless network

20   reference model.

21   Q    Let's spend a few minutes look at that network

22   reference model in DX-4.  Have you depicted that on

23   slide 37?

24   A    Yes.

25   Q    Okay.  And just as -- at a high level, and we'll

Mr. Lanning - Direct                    99

1   dig down a little bit deeper, what does the network

2   reference model depict from DX-4?

3   A   The network reference model for the CDMA standard

4   tries to include everything that's relevant for an

5   engineer to look at the network reference model,

6   what's inside the network and then what other

7   networks it connects to.  And then it additionally

8   defines what's in the core network, or the words that

9   it uses is the "collective entity."

10  Q   And is the definition of "network reference

11  model" that we saw in the 1997 ANSI standard carried

12  over into the same family of standards as they

13  progress over time, including in the 1999 version,

14  DX-4?

15  A   Yes, it is.  And as you heard Mr. Lipford, the

16  person at Sprint that works on the standards, he

17  explained the same thing, that it means the same

18  thing, that "network reference model" in 1999 meant

19  the same thing as the "network reference model" for

20  the 1997 standard.

21  Q   With the additional elements that are shown as

22  reflected here as compared to 1997?

23  A   And, again, it grows.  You see more -- as you go

24  on, you'll see more and more boxes and different

25  shapes, geographic sym -- or geometric symbols here

Mr. Lanning - Direct                           100

1   as you go forward.

2   Q   Now, you referred, sir, to the collective entity,

3   which we just looked at on slide 37.  That's straight

4   out of the document itself, correct, sir, without any

5   highlighting slide 37?

6   A   Yes, that's correct.

7   Q   And then I believe you've added some

8   highlighting, again, for the ease of the jury's

9   reference.  What are you showing on slide 38?

10  A   This is the -- what the standard defines as the

11  collective entity.  We commonly refer to that as the

12  core network.  Again, Mr. Lipford also explained

13  yesterday that the standards groups even call it the

14  core network, and I'm just showing what's already

15  been defined.  I'm just highlighting it there.

16  Q   Where does the 1999 CDMA2000 standard, DX-4,

17  depict the messaging center?

18  A   It's inside the core network.  So the

19  recommendation here is -- when an engineer looks at

20  that is the standard is recommending that the message

21  center be inside the core network.

22  Q   Are there items -- well, let's take them from the

23  left to the right.  What is depicted on the far left

24  side of the diagram in DX-4 under the box "MS," or

25  labeled "MS?"

Mr. Lanning - Direct                    101

1    A    The "MS" is mobile station, so what's depicted by

2    the large part of the diagram on the left side are

3    the components of the mobile station or the cellular

4    phone.

5    Q    And then is that labeled in the diagram as a

6    composite entity?

7    A    Yes.

8    Q    Is there another composite entity also shown in

9    DX-4?

10   A    Yes, if you look to the right and inside the core

11   network -- and I'll try to circle it -- there's

12   another one with the shading that is defined as a

13   composite entity, and it's labeled "BS."

14   Q    And in terms of its placement inside the dotted

15   line versus outside, were you here for Mr. Lipford's

16   testimony yesterday, sir?

17   A    Yes.

18   Q    Okay.  And what is your understanding of the

19   designations in this diagram with respect to the BS?

20   A    My understanding is the same as Mr. Lipford's, is

21   depending on the implementation, engineers can either

22   consider the bay station subsystem -- that's the

23   tower with the box -- either inside the core network

24   or outside the core network.  In this case they've

25   said it's all one composite entity, meaning it's

Mr. Lanning - Direct                    102

1   together, but in this case it could either be in the

2   core network or it could be outside the core network,

3   but it's being shown inside the core network in this

4   diagram.

5   Q    In either instance, is it part of the cellular

6   network?

7   A    Yes, in either instance, it's still part of the

8   cellular network whether it's inside or outside the

9   core network.

10  Q    And do you -- you said you listened to Mr.

11  Lipford's testimony, and he worked in the standards

12  body.  Did you -- did you take that into account in

13  your analysis?  Did anything he said change your

14  analysis in this case?

15  A    No, it's consistent with my understanding in

16  working with the standards as well.

17  Q    And then I think you did it this time in one

18  click, maybe for my benefit.  And I'll try to clear

19  out the markings.  Can you tell the jury what you've

20  done in slide 40?

21  A    Like we did before, now I'm doing the same thing

22  for the 1999 network reference model.  I'm just

23  simply putting the network elements that are in the

24  Sprint cellular network where they're at in the

25  Sprint -- or in -- sorry, in the CDMA network

Mr. Lanning - Direct                              103

1  reference model.  You'll see that all of the

2  different icons are in the core network with the

3  exception of the wireless terminal that's outside

4  with the person holding it.

5  Q   Now, we've been talking about these entities that

6  appear in the standards documentation, and I'm

7  staying here in DX-4, the 1999 CDMA standard.  What

8  does the standard say about how a device may be

9  physically implemented?

10 A   So the standard talks about physical

11 implementation here, and the entities, the boxes

12 we've looked at before, were logical.  So now the

13 standard is saying -- and it understands that maybe

14 the supplier and the network operator want to combine

15 two or more of those boxes together in one physical

16 system.  And it recognizes that that's the case, and

17 it has the recommendation or it says this is all

18 possible and it's okay as long as the implementation

19 meets the functional requirements.  You can't change

20 the functional requirements.

21        So one of the examples that I've seen quite

22 often is for the mobile switching center, the switch,

23 and there's another element named the VLR, visiting

24 location register.  Those are almost always combined

25 together.  And this says that regardless, the

Mr. Lanning - Direct                    104

1    functionality still stays the same for the logical

2    entities the way they're defined.

3    Q    Does the standard also say that you can be

4    compliant with this recommendation by having a single

5    network entity that's not combined with any other

6    one?

7    A    Yes.

8    Q    In fact, if you read starting with, "The physical

9    device..." up through "...MSC," what does it say, Mr.

10   Lanning?

11   A    Okay.  "The physical device may comprise a single

12   network entity, such as an MSC."  What that means is

13   that entity could be standalone and just provide the

14   MSC functionality, or it may comprise some

15   combination, such as an MSC, the visitor location

16   register, the home location register, and the

17   authentication center.  And this is where the

18   physical implementation would include one or more of

19   those combinations.  And as I just explained, it's

20   very common to see the MSC and the visitor location

21   register.

22            Now, this is probably a good time to take

23   you to thinking back about the laundromat and the

24   laundry example.  So this means I could have a washer

25   and a dryer separately, or if I decide to combine

Mr. Lanning - Direct                    105

1   those in the same unit, that's okay as long as the

2   functionality stays the same.  Now, you might

3   instantly think well, that's the case if you have one

4   of these units where you have a washer and dryer on

5   top of each other.  I've combined them physically,

6   but they still have the same functionality.

7   Q   Does the 1999 standard say anywhere, Mr. Lanning,

8   that the only way that a messaging server can be part

9   of the core network is if it is integrated with

10  another core network element?

11  A   No, it says the opposite.  It says that it can

12  either be standalone or combined, but it still --

13  regardless, whichever way it is, it's still part of

14  the core network.

15  Q   Let's turn to slide 42.  Can you walk the jury

16  through this slide that you've prepared, sir?

17  A   Okay.  I need to start top down.  If I look at

18  the top, along the top you see a grey bar with the

19  ANSI-based network.  That includes the two standards

20  that I just walked through, 1997, 1999.  And then on

21  the right is an ETSI-based network, the European-

22  based network, that's included in the patent, the

23  figure.  So you can see, and what I'm trying to show

24  in contrast, this is -- on the left two is what

25  Sprint's network has been imp -- the recommendation

Mr. Lanning - Direct                                    106

1    for how Sprint's network should be implemented,

2    meaning that the message center should be internal to

3    the core network, but the patent is showing that the

4    message center, or the MMSC, is external to the

5    network.  So now we have a difference in

6    recommendations.  The American recommendations say

7    put it inside the network; the European

8    recommendation says put it outside the network, or

9    external to the network.  So we're starting with two

10   different recommendations and they have differences

11   of opinion of where the messaging servers should be.

12   Q   And between these two, which would you rely on to

13   understand Sprint's cellular network?

14   A   Well, to understand the recommendation for

15   Sprint's cellular network, I need to look at the left

16   two because that's the recommendations that are used

17   by Sprint to built their network.

18              (Pause in proceedings.)

19   Q   I've turned, Mr. Lanning to slide 44.  Where did

20   you conclude that Sprint's messaging server is

21   located?

22   A   As I've shown on the slide on the left, the

23   messaging servers are inside Sprint's core network,

24   and not, as the patent requires, or the patent claims

25   to require, that it be external to the network.

Mr. Lanning - Direct                107

1  Q    After you looked at the standards as part of your

2  analysis, what did you do next to determine whether

3  the accused messaging servers in this case are inside

4  of Sprint's cellular network or external to the

5  cellular network, as the claims require?

6  A    As I mentioned, the standards are a starting

7  point.  You have to start where the recommendation,

8  but that isn't hard and fast.  An operator, based on

9  my experience, can either put the message centers

10 external to the network or internal.  I start with

11 the standards and see that it's recommended internal,

12 but that isn't sufficient.  I need to now look at how

13 Sprint implemented their short message centers.

14 Q    And in the course of that, did you review Sprint

15 technical documentation?

16 A    Yes, a lot of it.

17 Q    Did you also review Sprint fact witness testimony

18 with respect to how Sprint's cellular network

19 operates?

20 A    Yes.

21 Q    And that would be fact testimony that you would

22 think was important?

23 A    Yes, these people were -- we would call them

24 subject matter experts as engineers.  They're working

25 with these systems.  They know how they're connected

Mr. Lanning - Direct                      108

1    and all of the details.

2    Q   Well, let's start with some of that technical

3    documentation.  I have put on the screen slide 46,

4    which is DX-215.  Do you see that, Mr. Lanning?

5    A   Yes.

6    Q   And can you describe for the jury what it is,

7    sir?

8    A   This is one of the Sprint documents, as you can

9    see by the logo on the yellow top.  Specifically,

10   this is a design document that's written for the

11   subscriber profile system.  You may recall that

12   that's one of the databases, and you've heard people

13   talk about it multiple times, about this SPS.  So

14   this document is for the design of the SPS.

15   Q   Now, on slide 47, I believe you've annotated

16   DX-215 from page 22.  Can you tell the jury what

17   you're showing here for their benefit?

18   A   Yes.  Now, this page is from that document, the

19   SPS document, and I've highlighted the messaging

20   parts and where the cites are at.  Now, if I look to

21   the right of the document, down in the key, the

22   bottom, right, says "core site."  It has three

23   different core sites.  There's two in Kansas and one

24   in Reston, Virginia.  And those core sites -- and it

25   explains what equipment is going -- or is put into

Mr. Lanning - Direct                    109

1   those core sites.

2          You can see by the key on the left there's

3   a lot of different pieces of equipment that start

4   with the three letters, SPS.  That's the SPS

5   equipment.  There is some other equipment.  Then at

6   the bottom that I've highlighted in yellow is

7   "messaging."  So what I'm showing by this is that the

8   messaging equipment, the message centers, or the

9   SMSCs, are co-located with the SPS equipment and

10  other equipment as well.

11  Q   Are these the core sites that Mr. Golla talked

12  about yesterday in his testimony?

13  A   Yes, and I believe even Mr. O'Connor mentioned

14  that this morning about these core sites.  He

15  explained some of these core sties, what type of

16  buildings they are.

17  Q   And the word "core site," that's not a word

18  you've added to the document for purposes of your

19  presentation?

20  A   No, I didn't add it, and this was long before

21  this lawsuit.  This is common terminology for

22  engineers to refer to parts of the network as the

23  core network and core sites.

24  Q   Were you here when Dr. Akl talked about core

25  network equipment during the course of his testimony?

Mr. Lanning - Direct                    110

1    A    Yes.

2    Q    And have you seen fit to include a portion of Dr.

3    Akl's testimony on your slide 48?

4    A    Yes.

5    Q    And what did Dr. Akl tell this jury?

6    A    I've included some of Dr. Akl's testimony and --

7    when he's describing -- and I'll just read it.  "The

8    core network elements are the component that you

9    don't see.  Those are the ones that are in -- you

10   know, in data centers.  They're underground.  Those

11   are what perform core functionality."  So Dr. Akl has

12   defined these core network elements.  He said these

13   datacenters are core.  There's only one issue.  All

14   of the components that are relevant to this trial

15   that are in these centers, except for the messaging

16   servers, he says are core network elements or core

17   elements.  However, he excludes the messaging that

18   sits in the same building with all these other core

19   elements that he says they're core.  So, again, ask

20   yourself the question does that make sense that you

21   put an element in all three of these centers with

22   other core elements, you call all the other elements

23   core elements, but because messaging needs to be

24   external to show infringement, he moves the messaging

25   servers outside?

Mr. Lanning - Direct                          111

1    Q    Does slide 49, which I now turn to, depict

2    another one of the many Sprint technical documents

3    that you reviewed in the course of your analysis, Mr.

4    Lanning?

5    A    Yes.

6    Q    Is that DX-12?

7    A    Yes.

8    Q    And what is DX-12?

9    A    It's another Sprint document.  Specifically, this

10   is a messaging document that deals with replacing MMS

11   service for Picture Mail.  And Picture Mail was a

12   service that was provided.  I think you've heard some

13   of that, but we'll speak to it a little more later.

14   Q    And is this titled a "Detailed Design Document?"

15   A    Yes.

16   Q    Now, you've put together slide 50.  Can you

17   explain to the jury what they're looking at here?

18   A    Okay.  So I just want to be clear, this -- what

19   you see on the screen, I've created a composite from

20   two different documents, and so I've tried to show

21   the biggest part of what's on the screen comes from

22   the document on the top, DX-12, and I've showed the

23   map that I just showed you a little earlier about the

24   core sites on the bottom.  And what I'm trying to

25   depict here is more detail for what's in each of

Mr. Lanning - Direct                    112

1    these sites.  And so I'm showing by the blowups here

2    what's in each of these sites.  And I don't know if

3    the next screen has it highlighted or not.  Yes,

4    thank you.

5          If you can see the two boxes with the

6    highlighting, you'll see two different components

7    that I've highlighted.  One is the SPS, one is the

8    SMSC.  Now, the SMSC is the short message service

9    center, or the message center.  We use the same

10   terminology.  If you notice, that's in the Sprint

11   core site that's in Kansas.  Those two are also in

12   the Sprint core site in Reston.  You've also heard of

13   those referred to as bunkers because the buildings

14   were built that way, to be real secure, both

15   physically and from a people entry point of view.

16         Again, notice what's going on here, and

17   what I'm trying to point out is that you have the SPS

18   that Dr. Akl says is a core network element, sitting

19   next to an SMSC in the same sites that he says is not

20   a core network element.  And he's also said geography

21   and location doesn't matter, but I believe this adds

22   more information.  Again, going back to the laundry

23   service.  How do you really know whether the washer

24   and dryer are in the apartment or not?  You have to

25   look at more information.  This is more information.

Mr. Lanning - Direct                              113

1   Where are they at?  They're right next to each other.

2   Why should I say that the washer is a core network

3   element, but the dryer that's sitting right next to

4   it is not.

5   Q   Do you see any basis, Mr. Lanning, for Dr. Akl's

6   conclusion that the SPS database, which didn't exist

7   at the time the patent issued, is internal to

8   Sprint's cellular network, yet the short message

9   service center is external to Sprint's cellular

10  network?

11  A   Okay.  No, I don't, to answer your question, and

12  let me explain.  The SPS is a database.  It's a

13  computer system waiting there with the database and

14  information in it.  You have to query it.  When you

15  query the database it responds back with what's in

16  the database to the system.  What system queries the

17  SPS database?  It is the SMSC.  So the SMSC queries

18  the database, it gets information back from the

19  database, and performs actions on that information

20  based on what it gets.  So let's think about this

21  logically.  The database that just sits there waiting

22  for queries Dr. Akl says is an essential element in

23  the core network.  But the system that actually

24  queries the database, receives the response from the

25  database, and performs routing and forwarding based

1    on that information is not.  That just doesn't make

2    any sense to me.

3    Q    Do you see what this document is captioned at the

4    top next to the section 3.1?

5    A    Yes.

6    Q    And what does it say?

7    A    "Sprint Logical In-State Diagram."

8    Q    Is that part of your functional, logical, and

9    physical analysis?

10   A    Yes, over the years, I've spent a lot of time

11   with engineers explaining to them that the process

12   that you divide and concur, these giant problems that

13   we have, is you start with functions, group them up

14   into logical -- into a logical layer, logical

15   entities, and then you figure out the physical.  And

16   saying it in other words, you start with what, what

17   do I need to do, the logical is how am I going to do

18   it, meaning how am I going to place all these

19   functions together, and then the third step is where

20   and how many?  Then I have to figure out okay, how

21   many switches do I need, how many SPS databases do I

22   need, how many message centers do I need, and where

23   am I going to put them?

24            So now you have a component of logical

25   components with the functionality and physical of how

1  many and where am I going to put them?  So you have

2  Sprint in the north bunker in Kansas.  Then they put

3  another one is Reston.  There is multiple reasons for

4  that, but you usually want to split these real

5  important centers up so that if you lose a center,

6  whether it's a tornado or whatever, the other center

7  can keep operating so your network can keep going.

8  Q   You have used the term "message center" or

9  "messaging center" during the course of your

10 testimony today.  Do you intend for that to be

11 synonymous with the term "messaging server," as

12 defined by the Court in this case?

13 A   Yes.  The problem that I have, and I guess I've

14 created it for you or other people, there's multiple

15 acronyms for the patent and the construction of

16 the -- for the term of "messaging server."  So I

17 guess I would say to you when you hear me say

18 "messaging server," "messaging center," "SMSC,"

19 "MMSC," they all mean the same thing.

20 Q   Thank you, Mr. Lanning.  Is DX-13, which I've put

21 up on slide 52, is that another one of the Sprint

22 technical documents that you reviewed in the course

23 of your analysis?

24 A   Yes, and this document is focused on the next

25 generation messaging and imaging.  It's a design

Mr. Lanning - Direct                              116

1    document.

2    Q    Okay.  That was my next question.  Do you see

3    where it says "Design Document" up in the corner?

4    A    Yes.

5    Q    And have you heard Sprint witnesses testify in

6    deposition and in this trial with respect to the

7    importance of the designation design document?

8    A    Yes.  They are as they imply or they state.

9    They're design documents.  It's the actual design --

10   it's the blueprint that the Sprint engineers use to

11   build the system.

12   Q    Does DX-13 contain this diagram that is depicted

13   on your slide 53?

14   A    Yes.  Yes.

15   Q    And is it at what is labeled as "Figure Three" of

16   that document, sir?

17   A    Yes.

18   Q    Okay.  Am I correct that the red or pinkish

19   shading in the document is courtesy of Sprint, and

20   not you?

21   A    That's correct.

22   Q    And the yellow shading is courtesy of you?

23   A    I guess another way to say it, I believe the only

24   shading or highlighting that I added was in yellow

25   and I didn't change any of the colors of the lines.

Mr. Lanning - Direct                    117

1   Q    Thank you, sir.  What does this Spring design

2   document, DX-13, depict in figure three to you

3   understanding?

4   A    This is a document that had a date on it of 2008,

5   so this is before the lawsuit.  This is Sprint's

6   terminology.  If you see in the highlighting of the

7   top, right of the box that I've highlighted it says

8   "Sprint In Network."  So Sprint is looking at what's

9   in network, and at this time you see two highlighted

10  boxes on the bottom that are labeled "MOMSMC" and

11  "MTSMSC."  Well, add another little bit of

12  definitions for you, the mobile -- the "MO" stands

13  for mobile originate, the "MT" stands for mobile

14  terminate.  When they initially implemented it, you

15  had a messaging server that was for originated

16  messages when they would be originated at the Sprint

17  network, and you had one for terminated messages when

18  they needed to be terminated to a mobile on the

19  Sprint network.

20           You'll also see another highlighted

21  database up at the top.  That's the message LDAP.

22  That is the predecessor databases to the SPS

23  database.  That's effectively the same thing as the

24  SPS.  Again, I'm showing they're putting the SMSCs

25  and the database in the same part of the network that

Mr. Lanning - Direct                                    118

1    they label "In Network."

2    Q   Is it your understanding that it is Dr. Akl's

3    opinion in this case that the messaging LDAP depicted

4    in this diagram is inside of Sprint's cellular

5    network?

6    A   Yes.

7    Q   But you also under -- do you also understand,

8    sir, that it is Dr. Akl's opinion that the SMSCs that

9    are in this box labeled "In Network" are external to

10   Sprint's cellular network?

11   A   All right.  You may recall that Dr. Akl said

12   don't look at geography, don't look at location, that

13   all doesn't matter.  You need to ask yourself why is

14   he insisting so strongly on that?  You can probably

15   see by some of these diagrams why he's insisting you

16   just look at functionality.  Because when you look at

17   everything in a holistic sense, that the

18   functionality -- even Sprint in their diagrams before

19   had the database that Dr. Akl says is essential with

20   the SMSCs, the messaging servers, that he says are

21   not.  Again, here's more proof that they're together,

22   that they're all internal in the cellular network.

23   Q   Do you see at the bottom of the screen the

24   reference to "Figure Three?"

25   A   I see the "Figure Three" text.  Is that what

Mr. Lanning - Direct                                119

1   you're asking me?  Yes.

2   Q    It is, sir.  And what does this Sprint document

3   say is being depicted in figure three?

4   A    And what's being depicted here is referred to as

5   a post-deployment logical diagram.

6   Q    How does that relate to your opinion that, in

7   deciding whether Sprint's messaging servers are

8   internal or external, it is appropriate to consider

9   functional, logical, and physical?

10  A    Well, it shows all the functionality.  It shows

11  the logical and it shows the physical and it shows

12  they're together.

13  Q    Now, does this document represent the whole of

14  Sprint's cellular network?

15  A    No.  It's probably best to explain there are so

16  many thousands of pages of documents.  What we try to

17  do when we write separate design documents from an

18  engineering point of view is just write the document

19  and include the information that's important for the

20  service being provided.  So we looked earlier at an

21  SPS design document.  That would only include the

22  information that's important from an SPS perspective

23  or an SPS person's point of view.  You don't -- if

24  you included all the network elements every time in

25  one of these detailed design documents, it would look

Mr. Lanning - Direct                    120

1  like that diagram I showed you from the standard that

2  had 100 different diagrams on it and it would be all

3  confusing.  So they just really take out the parts of

4  the network that are not important for the subject

5  being discussed.

6  Q    Now, turning to slide 54, is this yet another

7  Sprint design document that you considered?

8         THE COURT:  I think maybe we ought to

9  recess.  It's 12:30.

10         MR. FINKELSON:  That was my next question.

11  Aren't you hungry, Mr. Lanning?

12         THE COURT:  Well done.  And we won't

13  inquire of the jury whether they wish to recess.  I

14  suspect they do.  So we'll recess.  It's 12:30.

15  We'll recess for an hour, ladies and gentlemen.

16  Remember, no talking among yourselves about the case.

17  Don't talk to anyone else about the case.  If you're

18  approached by anyone, say nothing and report that to

19  me.  Be sure you take your jury notebooks -- your

20  juror notebooks and your binders.  Leave them in the

21  jury room.  See you back in an hour.

22         MR. FINKELSON:  Thank you, Your Honor.

23         (Jury out, 12:32 p.m.)

24         THE COURT:  You may step down, Mr. Lanning.

25         (Pause in proceedings.)

Mr. Lanning - Direct                    121

1          THE COURT:  All right, we will be in recess

2     for an hour.

3          MR. FINKELSON:  Thank you, Your Honor.

4

5                         *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

<u>DEFENDANT'S WITNESSES</u>      <u>DIRECT</u>  <u>CROSS</u>  <u>REDIRECT</u>  <u>RECROSS</u>

Ramesh Golla

    By Mr. Goettle                   3


Greg O'Connor

    By Mr. Finkelson         6

    By Mr. Heist                    17


Plarent Tirana (via video deposition)

    By Mr. Riopelle          19


Mark Lanning

    By Mr. Finkelson         31

                        *  *  *

CERTIFICATION

      I, Michael Keating, do hereby certify that
the foregoing is a true and correct transcript from the
electronic sound recordings of the proceedings in the
above-captioned matter.


2/8/17
_____            _____
Date                                 Michael Keating