```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                           -  -  -

COMCAST CABLE              :  CIVIL NO. 12-859
COMMUNICATIONS, LLC,       :
et al.,                    :
              Plaintiff    :
                           :
                           :
                           :
                           :
        v.                 :
                           :
                           :
                           :
                           :
                           :
SPRINT COMMUNICATIONS      :  Philadelphia, Pennsylvania
COMPANY L.P., et al.,      :  February 9, 2017
              Defendant    :  10:24 a.m.


                           -  -  -

     TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 9
         BEFORE THE HONORABLE JAN E. DUBOIS
            UNITED STATES DISTRICT JUDGE


                           -  -  -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104
```

2

```
1    APPEARANCES:            (Continued)

2    For the Defendant:      DAVID E. FINKELSON, ESQUIRE
                             BRIAN C. RIOPELLE, ESQUIRE
3                            McGuire Woods, LLP
                             Gateway Plaza
4                            800 East Canal Street
                             Richmond, VA 23219
5
                             COLLEEN H. SIMPSON, ESQUIRE
6                            Harkins Cunningham, LLP
                             4000 Two Commerce Square
7                            2001 Market Street
                             Philadelphia, PA 19103
8
                                    - - -
9
     Audio Operator:        Michael Cosgrove
10
     Transcribed By:        Michael T. Keating
11
                                    - - -
12
             Proceedings recorded by electronic sound
13   recording; transcript produced by computer-aided
     transcription service.
14
                                    - - -
15

16

17

18

19

20

21

22

23

24

25
```

Mr. Lanning - Cross                    3

1          (The following was heard in open court at

2     10:24 a.m.)

3               THE COURT:  Good morning, everyone.

4               ALL:  Good morning, Your Honor.

5               THE COURT:  Please be seated.  Getting in

6     this morning was a little bit of a chore, but I'm

7     pleased that you all made it safe and sounds.  It's

8     better to be late than to take any chances.  So

9     although we're beginning a little late, we'll

10    continue with the cross, Mr. Goettle.

11              (Pause in proceedings.)

12              THE COURT:  We're continuing with the

13    cross-examination of Mark Lanning.

14              MR. GOETTLE:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16    BY MR. GOETTLE:

17    Q    Good morning, Mr. Lanning.

18    A    Good morning.

19    Q    Were you like me and halfway hoping for a snow

20    day today?

21    A    No.

22    Q    No?

23    A    I look forward to these experiences.

24    Q    That makes one of us.  Mr. Lanning, just so we

25    can kind of reinvigorate the brains.  Where we

Mr. Lanning - Cross                                    4

1    were -- I think where we left off yesterday is we

2    were talking about your third -- your third holistic

3    characterization -- characteristic regarding -- in

4    determining whether a network element is a core

5    network element of a cellular network, okay?

6    A    Okay.

7    Q    And just so the record is clear, do you agree

8    with me that when we -- when we get past this one

9    they're going to go -- they're going to go a lot

10   faster?

11   A    I have no idea.

12   Q    You don't know.  Okay.  Well --

13   A    You're asking the questions.

14   Q    That's true.  That's true.  How would you know?

15   Okay.  So Sprint documents -- let's look at some of

16   the Sprint documentation that you showed the jury

17   yesterday.

18               (Pause in proceedings.)

19   Q    So this was one of -- one of -- this is your

20   slide from yesterday.  Do you recall that?  It's hard

21   to see on the ELMO, but it's slide 52.  Do you rec --

22   A    Yes.

23   Q    Okay.  This was one of the Sprint documents you

24   looked at?

25   A    Yes.

1    Q   What was this document describing?

2    A   As the title says, it's describing the "Next

3    Generation Messaging and Imaging Design"  It's a

4    design document.

5    Q   It's -- that's the title of the document, but

6    what was it talking about?

7              (Pause in proceedings.)

8    Q   Would it help you to see the figure that -- I'm

9    happy to put the figure up.

10             THE COURT:  Which slide again?

11             MR. GOETTLE:  The cover page, Your Honor,

12   that we're on right now is slide 52.

13             THE COURT:  I have it.

14             THE WITNESS:  I believe I discussed this

15   document multiple times, one time for the SMS and one

16   time for the MMSC.  And what this document is

17   describing is the migration of the MMSC from the

18   Picture Mail application into the internal Sprint

19   network.

20   BY MR. GOETTLE:

21   Q   Okay, thank you.

22             THE COURT:  Let the record reflect that the

23   examination relates to DX-13, which is slide 52 in

24   the Lanning slide deck.

25   BY MR. GOETTLE:

Mr. Lanning - Cross                          6

1   Q    Okay.  So now I've put up slide 53, which also

2   relates to DX-13.  Do you see that we're on slide 53

3   now, sir?

4   A    Yes.

5   Q    Okay.  And you put this diagram up -- or you

6   showed this diagram to the -- to the jury yesterday

7   as well, correct?

8   A    Yes.

9   Q    Okay.  So I want to make sure -- and I believe

10  this was one of the areas of focus.  I've just zoomed

11  in on the box that says "Sprint In Network," right?

12  That was one of your areas of focus yesterday when

13  you were explaining this document to the jury?

14  A    Yes.

15  Q    Okay.  And when this says "Sprint In Network"

16  what do -- what network are we talking about there?

17  Is it the core network?  Are those core network

18  elements and that's the core network?  Is it the

19  cellular network?  Is that Sprint's wireless network?

20  What is it?

21          (Pause in proceedings.)

22  A    What this slide is showing is it's a comparison

23  between off network, meaning outside of Sprint's

24  cellular network on the left, as you can see on the

25  box that you're not showing on the screen.

Mr. Lanning - Cross                           7

1   Q    Let me show that.

2   A    It's the box on the left.  So the comparison is

3   the hosted off network, meaning the Picture Mail

4   implementation, meaning the Sprint in network,

5   components that are in network that are in

6   relationship to messaging.  So this would be the

7   components that are inside the core network that have

8   to deal with messaging.

9   Q    Okay.  So what's inside the box is what's a part

10  of Sprint's core network?

11  A    Not all of Sprint's core network, as I clarified.

12  And that's looking at the diagram.  This document is

13  for messaging.  It has a focus on messaging.  So the

14  box is providing a contrast between which network

15  elements are off network, off the Sprint network, and

16  which ones are in the network.

17  Q    Okay.  So just to make sure that's clear, the

18  box -- what's shown in the box are core network

19  elements, but they're not all of Sprint's core

20  network elements?

21  A    Yes.

22  Q    Okay.  So I'm going to write on here "all," and

23  I'm going to put in quotes, "core network elements."

24  And I put that in quotes because that's the claim --

25  that's the claim language, right?

Mr. Lanning - Cross                              8

1  A    Again --

2  Q    Excuse me, that's the Court's construction?

3  A    Again, I think that saying "all" is misleading.

4  It is in relationship to the messaging because --

5  Q    Well --

6  A    And I'm being careful here --

7  Q    -- you're right.

8  A    -- because there are other core network elements

9  that are outside that box that aren't specific to the

10 document or the subject matter of the document.

11 Q    Fair characterization.  So I wrote "all in the

12 box are core network elements."  Everything in that

13 box is a core network element.  There could be

14 others.

15            THE COURT:  You're writing something on the

16 ELMO.

17            MR. GOETTLE:  I am.

18            THE COURT:  We're not getting it.

19            MR. GOETTLE:  You're -- oh, I'm -- my

20 apologies, Your Honor.

21            THE COURT:  Well, now we are.

22            MR. GOETTLE:  In fact, while we're kind of

23 stalled, I'm going to write on here that this is

24 Plaintiff's Drawing -- I think we're up to Number 4.

25 BY MR. GOETTLE:

1  Q   So I'll repeat the question.  Sorry?  I'll repeat

2  the question.  All of the elements in -- shown in

3  that box are core network elements of Sprint's

4  cellular network, and Sprint has other core network

5  elements that are not shown in that box?

6  A   And as I look at it, I would agree with that

7  statement.  I need to correct my statement because

8  there are some boxes that I haven't even analyzed in

9  this box like one -- that are not relevant to the

10  case and Dr. Akl didn't identify one way or the

11  other.  For instance, I see in the top, right of this

12  box that's colored in pink or red, "Business Tools."

13  I have no idea what "Business Tools" mean.  And so

14  there's elements that may or may not be part of

15  Sprint's core network as far as the Court has

16  defined, but, as Sprint has clearly said, those are

17  in network in contrast to the Picture Mail

18  functionality that is off network.

19  Q   So suffice to say that you don't know -- when

20  Sprint writes "In Network" you don't know one way or

21  the other whether Sprint means in Sprint's -- in

22  Sprint's core network --

23  A   That's not --

24  Q   -- because some of these elem -- oh, I'm sorry.

25  A   I don't believe that's an accurate

Mr. Lanning - Cross                          10

1  characterization.  That's not what I said.

2  Q   Okay.

3  A   I'm saying that they may be, but they're not part

4  of the Court's construction.  So, for instance, the

5  Court for the cellular network and the different core

6  network elements that say "may be part of the core

7  network," "business tools" is not listed as part of

8  the "core network" definitions, "PSA" is not listed

9  as the core -- as one of the possible core network

10  elements.  Those have not been evaluated, but from

11  this document, Sprint considers those to be inside

12  their core network.  So this is a Sprint

13  documentation -- a Sprint document.  Sprint engineers

14  are saying what's in their network, what's outside

15  their network.  And so this is the definition of

16  what's there.

17  Q   So -- well, you went to the Court's claim

18  construction.

19       MR. GOETTLE:  Can -- Mr. Dyer, can you put

20  up the Court's claim construction, the one that the

21  jury has in their binder?

22       (Pause in proceedings.)

23       MR. GOETTLE:  And can you blow up "cellular

24  network?"

25       (Pause in proceedings.)

Mr. Lanning - Cross                              11

BY MR. GOETTLE:

Q    Just so the record is clear again, when the Court
writes that a core network element "may be a
messaging server," the Court is not saying one way or
the other whether a messaging server is a core
network element, correct?

A    It says it may be or that means it may not be as
well.

Q    Okay.  And you do agree also, sir, that when it
says, "The core network elements, which may include,"
the things listed, that also means that there might
be other things that are core network elements that
are not listed there, correct?

A    There may be, but as my point that I'm making is,
I don't see the words "business tools," I don't see
"PSA," I don't see "OMG," I don't see "SO."  And I
didn't evaluate those because Dr. Akl didn't claim
one way or another.  Now, it was Dr. Akl's burden to
show infringement, to identify any of the relevant
network elements or the core network elements.  Those
weren't identified.  So I'm saying those just weren't
part of my analysis.  But it clearly -- those boxes
are clearly defined as being inside the Sprint
network.

           So we're talking about -- I guess what I'm

Mr. Lanning - Cross                      12

1   trying to explain is we're talking about two very

2   different things here.  We're talking about a sprint

3   document that was written totally independent of the

4   patent and the Court's construction before the

5   lawsuit, or independent of the lawsuit I think is

6   safe to say.  So you have Sprint engineers defining

7   what components are in the network, which components

8   are off the network, and they weren't looking at this

9   list.  And when Dr. Akl did his evaluations he did

10  not include any of those nodes or those network

11  elements, so I didn't include those in my analysis

12  either.  So I simply don't know whether those would

13  be considered a core network element as per the

14  Court's construction.

15  Q   So it could be that business tools, whatever that

16  is, they could be core network elements under your

17  seven characteristic holistic analysis?

18  A   They may have been if I would have considered

19  those or if Dr. Akl would have identified those.

20  Then we would have done more research and I'd have a

21  better answer or more specific answer for you.

22  Q   Well, you keep coming back to Dr. Akl, but Dr.

23  Akl doesn't agree, right, with your seven

24  characteristic holistic analysis in the first place,

25  and he doesn't agree to -- that it's proper to just

Mr. Lanning - Cross                                    13

1   rely on documents without really understanding what

2   the documents mean, correct?

3   A   I don't recall Dr. Akl -- I think now you're

4   characterizing Dr. Akl's testimony, but, as I stated,

5   Dr. Akl was responsible for providing his

6   infringement analysis and what core networks were

7   involved and which were the infringing elements.

8   These elements weren't identified.  And so it wasn't

9   up to me to go and identify all of the other network

10  elements that weren't even relevant to this case.

11          MR. GOETTLE:  Okay.  Can we go back to

12  the -- thanks.

13  BY MR. GOETTLE:

14  Q   Okay.  Suffice to say then that you don't know if

15  all of the elements in this box are core network

16  elements under the Court's construction?

17  A   I don't know because I haven't analyzed them, so

18  my -- the most accurate answer I can give you is

19  boxes likes "Business Tools," I don't know what's in

20  that box called "Business Tools."  I haven't

21  provided -- or performed a detailed analysis, so I

22  don't know one way or another whether "business

23  tools" is part of the Court's construction for "core

24  network elements."

25          (Pause in proceedings.)

Mr. Lanning - Cross                                    14

1   Q   I just circled "Business Tools."  What about --

2   what about "Anti-spam?"  Is that a core network

3   element of Sprint's -- is that an element that

4   qual -- that is a core network element under the

5   Court's construction?

6   A   I would give you the same answer.  Again, that

7   was not applicable for my analysis.  Again, what I

8   highlighted are the nodes that are applicable, which

9   are the two SMSCs and the message LDAP database.

10  Q   Okay.  Thank you.  How about MTA?  Core network

11  element under the Court's construction?

12  A   Again, same answer, I didn't perform analysis on

13  the MTA box.

14  Q   "Tap Terminals?"

15  A   Sorry, I'm trying to -- oh, I didn't perform

16  analysis on that box either.

17  Q   "PPG?"

18  A   There were some gateways that were analyzed.  I

19  believe the PPG was considered a core network

20  element.

21  Q   What do you mean "was considered?"  I'm asking if

22  you opine that under your holistic analysis, you

23  determined that the PPG was a core network element

24  under the Court's construction.

25  A   I should have been clearer.  I was trying to

Mr. Lanning - Cross                                    15

1   recall Dr. Akl's report about what he said about

2   specific gateways.  I don't recall the specifics.  I

3   know that I did not include in the analysis for PPG,

4   again, for the same reason that Dr. Akl did not

5   accuse that as one of -- being one of the infringing

6   core network elements.

7   Q    How about "SO Server?"

8   A    That would be the same answer.

9   Q    Okay.  "OMG?"

10            (Pause in proceedings.)

11  A    That would be the same answer as well.

12  Q    Okay.  I think that says "PSA."

13  A    Same answer as well.

14  Q    "Mediation Servers?"

15            (Pause in proceedings.)

16  A    Same answer.

17  Q    Thank you.  And now I'm going to -- I'm going to

18  go outside of the box, okay?

19  A    Okay.

20  Q    Same figure, look down here.  How about is the

21  voicemail platform a core network element of Sprint's

22  cellular network?

23            (Pause in proceedings.)

24  A    And are you referring to the -- I'm making

25  sure --

Mr. Lanning - Cross                                  16

1    Q    Right where I'm pointing, sir, which is right

2    above "deployment logical" in the wording of the

3    document.

4              (Pause in proceedings.)

5    A    I don't recall whether this means the replacement

6    voicemail platform without looking through my report

7    and a lot of research.  I just don't recall whether

8    this is referring to the voicemail platform that's

9    the Picture Mail or really the replacement MMMC that

10   Sprint was using to replace the Picture Mail off

11   network solution.

12   Q    Sir, this is -- this is -- just to be -- just to

13   make sure that we're on the same page, this is

14   talking about voicemail --

15   A    Oh.

16   Q    -- not -- sorry, that says -- I know it's hard to

17   tell, but that says "voicemail platform."

18   A    Sorry.  Thank you.

19   Q    No problem.

20   A    If I'm taking time it's because I'm trying to

21   read this slide, the quality of the slide -- I was

22   trying to --

23   Q    Well, this is important, so please do take your

24   time.

25   A    Yes.  So --

Mr. Lanning - Cross                              17

1              (Pause in proceedings.)

2    A    Yes, I believe the voicemail platform or the

3    voice messaging system would have been part of the

4    Sprint's core network.

5    Q    So I would be -- it would be fair for me to label

6    that "core network element?"

7    A    Yes, it's not one of the ones that was analyzed

8    for infringement, but I believe that would be a core

9    network element.

10   Q    And it's not shown in the box that we were

11   looking at before that says "Sprint In Network?"

12   A    That's correct, because, as I explained earlier,

13   the box is in relationship to messaging, and the

14   voicemail platform would not be in relationship to

15   messaging.  Again, this document's focus is in regard

16   to the messaging components.

17   Q    How about the MSC?  Is that a core network

18   element of Sprint's cellular network?

19   A    Yes.

20   Q    Actually, going back to your last answer, your

21   testimony is that even though you don't know what

22   these boxes are doing, everything in this box that

23   says "Sprint In Network" is related to messaging?

24   A    That's my understanding for the focus of the

25   document.  As the document we covered, the title of

Mr. Lanning - Cross                    18

1    the document is "Next Generation Messaging and

2    Imaging."  So it may be associated with messaging or

3    imaging, but that's the focus of the document.

4    That's what the engineers were writing.  That's where

5    the focal points were.  And they didn't include every

6    part of the network.  They were focusing on the

7    messaging parts, messaging and imaging.

8    Q   The document is about messaging and imaging, and

9    your testimony is that even though you don't know

10   what a lot of these boxes inside "Sprint In Network,"

11   you don't know what they do, but you know that

12   they're related to messaging?

13   A   That's my understanding of the document.  Again,

14   we didn't analyze -- when I say "we," Dr. Akl and I

15   didn't analyze every node and every element in the

16   Sprint network.  There were ones that were applicable

17   to our analysis.

18   Q   Okay.  I've just put up on the ELMO the wolf

19   vision.  It's actually -- it looks like it says "wolf

20   vision."  Slide 55 from your presentation.  Do you

21   recognize that?

22   A   Yes.

23   Q   And is this showing a diagram from DX-209 at page

24   58?

25   A   Yes.

Mr. Lanning - Cross                                    19

1  Q    Okay.  And yesterday, we talked a little bit

2  about the fact witness testimony that we heard two

3  days ago, and I believe that you've testified that

4  you wouldn't just take the notion that these

5  witnesses used the term "core network" and then link

6  that up to "core network elements" in the claim

7  construction?  Did I get that right?

8  A    Yes, it -- the terminology used in Sprint's

9  documents by Sprint's employees doesn't -- it may,

10  but it doesn't necessarily match up with the Court's

11  construction because they're two independent

12  documents done at a different time.  The Sprint

13  employees were doing their design work and defining

14  what they meant as "core," which may be the same or

15  different than the Court's construction.

16  Q    Which means you shouldn't really -- it shouldn't

17  play into your analysis at all because you don't know

18  how they meant it?

19  A    I wouldn't agree with that.  It definitely played

20  into my analysis, but I had to perform an analysis to

21  see if the elements that they were identifying were

22  part of the Court's construction, or, as I showed by

23  this slide, part of the standard.  If you recall, I

24  took each one of the boxes along the top and mapped

25  those to the ANSI standard.

Mr. Lanning - Cross                20

1    Q    Okay.  And you were here for Mr. Hoelzle's

2    testimony, correct?

3    A    That's not correct.

4    Q    You missed it?

5    A    That's right.

6    Q    It was fun too.  I'm being -- I'm just kidding,

7    of course.  Okay.  So do you agree -- do you agree

8    with Mr. Hoelzle that what makes a network element a

9    part of Sprint's core network is whether the element

10   is used in offering one of Sprint's three services,

11   namely voice, messaging, or data?  It's a long

12   question.  I'm happy to repeat it.

13   A    And that -- and that's fine.  I was just

14   processing that.  And, again, from Mr. Hoelzle's

15   point of view, that's what a Sprint employee -- or an

16   engineer would define, which I would agree with from

17   a Sprint engineering point of view.  That's not what

18   the Court has given us as a construction, but working

19   with engineers, I would think that's a reasonable

20   definition.

21   Q    Well, the question isn't whether it's a

22   reasonable definition, right, sir?  The question is

23   whether -- the question is whether under the Court's

24   construction of "core network element," is what Mr.

25   Hoelzle is saying correct?

Mr. Lanning - Cross                              21

1    A    That's a different question.  You asked me -- you

2    told me what his definition was and I --

3    Q    Okay.

4    A    -- was answering your question --

5    Q    Fair enough.

6    A    -- about his definition.

7    Q    You're right.

8    A    You jumped a whole leap on me here.

9    Q    Okay.  Well, then let me -- you're right.  Let me

10   rephrase the question.  Do you agree that whether an

11   element qualifies -- excuse me, you don't like the

12   word "qualifies" -- whether an element is a core

13   network element under the Court's construction, you

14   look at whether it is used in offering one of three

15   Sprint services, namely voice, messaging, or data?

16   A    Again, that's Mr. Hoelzle's definition of what

17   Sprint defines as a core network.  I took the Sprint

18   documentation, see what the Sprint documentation

19   says, what the engineers are saying and describing

20   independent of this trial and this litigation, and

21   then I, with my understanding, apply of whether that

22   meets the requirements for the Court's construction.

23   I just can't take these directly from a Sprint

24   document and say they automatically meet the Court's

25   construction, is the point that I'm making, without

Mr. Lanning - Cross                          22

1    performing some analysis to qualify them.

2    Q    So can you answer my question yes or no?  And

3    I'll repeat it if you would like.

4    A    If you repeat it --

5    Q    Okay.

6    A    -- I'll try.

7    Q    Do you agree that to determine whether an element

8    is a core network element under the Court's

9    construction, that you look at whether that element

10   is used in offering one of three Sprint services,

11   namely voice, messaging, or data?

12   A    Well, I can't answer that question yes or no

13   because in order to understand whether it's a core

14   network elements, the first thing I have to do is

15   look at the Courts construction.  And so for the

16   Court's construction, it excludes outside the core

17   network.  The first two things that it includes are

18   wireless terminal and the bay station system.  So

19   those two are not core elements because those are the

20   first parts of the Court's construction for the

21   "cellular network."

22            Now, if a Sprint person said in their

23   documentation that a wireless terminal or a bay

24   station was part of the core network, that's what

25   they believe because that's part of offering those

Mr. Lanning - Cross                                    23

1    services, but that would not be part of Sprint's core

2    network as far as the Court's construction is.  So I

3    would need to apply that.  So the answer to your

4    question is it depends.  I would need to look at each

5    of the network elements that Sprint feels is

6    necessary to provide one of the services to see where

7    they would fit in the Court's construction.

8    Q    So you would need to do more investigation and

9    would not just accept the statement that I made as

10   correct?

11   A    Well, that's correct.  I -- and maybe I'm not

12   being clear, but in my mind, if you look at voice,

13   you look at data, and you look at messaging, there's

14   one common component to all those -- or two common

15   components.  One is the cell phone, or the wireless

16   terminal.  The next element is the bay station

17   system, the tower and the bay station controller.  So

18   if Sprint called those core because they were

19   required, I would need to back off of that and say I

20   understand they're required to provide those

21   services, but when I look at the Court's

22   construction, those are not core network elements.

23   They're part of the cellular network, but not part of

24   the core network elements.

25   Q    Are you done your answer, sir?

Mr. Lanning - Cross                                    24

1  A    Yes.

2  Q    Okay.  Okay, let's go on to your fourth holistic

3  characteristics called "Protocols and Interfaces,"

4  okay?

5  A    Okay.

6  Q    Is it fair to say that for the accused -- the

7  messaging servers that are accused in this case or

8  involved in the infringement allegations in this

9  case, those messaging servers, when you think about

10 those messaging servers protocols and interfaces

11 didn't cut one way or the other?

12 A    I can break the answer -- my answer up in two

13 parts.  For the short message service centers, the

14 interfaces and protocols have been consistent

15 throughout their history because Sprint has always

16 included the short message service centers internal

17 to their network, and the protocols and interfaces

18 are the same because they're inside the network, or

19 internal to Sprint's cellular network.  However, when

20 I look at MMSCs I have to look at interfaces and

21 protocols.  If I -- if you remember, when I was

22 discussing the Picture Mail MMSC that was external to

23 Sprint's network it had some special protocols and

24 interfaces that did catch my eye that were important,

25 specifically, the VPN, virtual private network,

Mr. Lanning - Cross                          25

1    functionality that was needed for security because

2    there was a possibility of hacking into the internet

3    connections because that system was external to

4    Sprint's network.  So for MMSCs, the interfaces and

5    connections were important for me to understand.

6    Q   Okay.  So if I understood that answer, for SMS,

7    protocols and interfaces didn't cut one way or the

8    other in your analysis?

9    A   I wouldn't say that.  I said they're in all the

10   same internal interfaces, so they all -- I think I

11   even used the words in my deposition that they

12   "scream" the word "internal" to me because they were

13   types of protocols and interfaces that are only used

14   internal to Sprint's network.

15              (Pause in proceedings.)

16   Q   Okay.  I'm going to put up -- this is slide 32

17   from your presentation.  Do you recognize that, sir?

18   A   Yes.

19   Q   Okay.  What we're looking at is figure two of

20   DX-3, okay?

21   A   Yes.

22   Q   Okay.  And you referred to your testimony at your

23   deposition about it's scream -- when an element is

24   using SS7 it screams internal?  Is that what you were

25   talking about earlier?

Mr. Lanning - Cross                           26

1   A    If it uses SS7 without the VPN capability.

2   Q    Okay.  And we -- I think we established already

3   that this PSTN is not part of the cellular network,

4   correct?

5   A    That's correct.  The N in the acronym is --

6   that's a separate network.  That's the PSTN, or the

7   landline network.  "Public switch telephone network"

8   is what the acronym stands for.

9   Q    Okay.  And the PSTN can communicate with the MSC

10  using SS7, correct?

11  A    You can use multiple protocols, but I would agree

12  that that's one of the protocols used.

13  Q    Okay.  And just to be clear, that would mean that

14  this element that's a core network element, the

15  mobile switching center, is communicating with an

16  element outside of the cellular network using SS7?

17  A    That's correct.  But -- again, for clarification,

18  but not using VPN.  So it is not -- it is a separate

19  internal-type protocol.  And when I say "internal" I

20  mean specific to networks, that it's not publicly

21  available or publicly accessible by the public.

22  These are connections and networks that are closed

23  networks from the public.

24  Q    Okay.  That's just -- I want to make sure the

25  record is clear.  It is common for elements on the

Mr. Lanning - Cross                27

1    PSTN to communicate with one another using SS7,

2    correct?

3    A   Yes, in a closed SS7 network.  Specifically,

4    there would be a direct SS7 communications link in

5    the closed network.

6    Q   I just wrote on this -- and I'm going to mark

7    this as Plaintiff's Drawing 5.  And I took some

8    banter from the back to mean I may have skipped

9    Plaintiff's Drawing 3, so just so the record is

10   clear, there may be no Plaintiff's Drawing Number 3

11   in the record.  This is Plaintiff's Drawing 5.  And

12   so I just wrote "SS7" coming off of the PSTN and --

13   A   Well, that would be the wrong place.

14   Q   Oh.  Where --

15   A   You would want to put it at the circle where it

16   says "A1."

17   Q   "A1."  Okay.  So the -- but elements -- is this

18   PSTN signifying the wired phone network?

19   A   Yes, it's signifying a lot with that small box.

20   There's hundreds of telephone switches, millions of

21   lines, a lot of millions of -- tens of millions of

22   phones.  So that box has a lot of information in it,

23   and that's why I'm being careful where you write your

24   acronym.

25   Q   Well, don't those boxes that you just referred

Mr. Lanning - Cross                              28

1   to, don't some of those boxes use SS7 to communicate

2   with one another?

3   A   Yes, they do.

4   Q   Okay.  So that's why I put the SS7 coming off

5   where it's coming off.  That's accurate, right?

6   A   No, not for me.  It might be for you, but --

7   Q   No?

8   A   -- for an engineer and for me looking at that

9   logical box, I don't accept that.  If you want to put

10  it on the interface between the MSC and PSTN, I would

11  accept that.

12  Q   Here?  SS7?

13  A   Yes.

14  Q   So elements inside a core network of a cellular

15  network can communicate with one another using SS7,

16  right?

17  A   Yes.

18  Q   Okay.  And that, to you, si a signal that they're

19  internal, right?

20  A   That it's an internal, or closed, network.

21  Q   Okay.  And elements that are internal to the core

22  network of a cellular network can also communicate to

23  elements outside the network using the very same

24  protocol, SS7.

25  A   Using the same protocol, but using the same

Mr. Lanning - Cross                                29

1    requirements of a closed network that the public

2    doesn't have access to that interface that's A1, that

3    it's a dedicated interface between the

4    functionalities.

5    Q   Okay.  Next, let's talk about -- we're going to

6    do four and -- if it's okay with you, we'll do 5 and

7    6 together when I'm -- I'm pointing to Plaintiff's

8    Drawing Number 2, which has your holistic

9    characteristics, and Number 5 is who operates the

10   element, and Number 6 is who owns the element,

11   correct?

12   A   Yes.

13   Q   Okay.  And I'm going to put those together, and

14   if it doesn't work, then we'll pull them apart again,

15   okay?

16   A   Okay.

17   Q   We'll give it a try.

18   A   Again, you're asking the questions.

19   Q   Yes, I am.

20   A   I'm just trying to answer.

21   Q   Okay.  So the idea here -- correct me if I'm

22   wrong, sir, but the idea here is, in your view, to

23   determine whether -- as a matter of technology, to

24   determine whether an element is a core network

25   element of a cellular network, you look at who

Mr. Lanning - Cross                            30

1    operates it, right?

2    A    That was one of my considerations.

3    Q    And the idea is if it's the network operator

4    that's operating it, that's an indication that the

5    element is a core network element?

6    A    That's one of the indications, yes.  And I should

7    clarify when I get to ownership, there's been many

8    times that for equipment that we use in the network,

9    that I've used in networks I've designed, is we --

10   most of us know there's a decision.  Do you buy it,

11   do you purchase, or do you lease it?  So the

12   ownership might not necessarily be owned -- the

13   equipment -- the ownership of the equipment may not

14   be the operator like Sprint, but it's in their

15   network and they're operating it.  And so you have to

16   look at both of these considerations.

17   Q    Okay.  But the patent says the exact opposite,

18   right?  The patent says that the operator can both

19   own and operate the messaging server and it would

20   still be external to the cellular network?

21   A    I don't know how you say that's opposite of what

22   I said.

23   Q    Oh.

24   A    To me, I have options as a cellular network

25   operator that I can either purchase equipment or I

1   can lease equipment.  So while I might not own the

2   equipment that's in my cellular network, I perform

3   the daily, as I refer to, care and feeding for the

4   equipment, or the operation.  So, therefore, I look

5   at that and am not bias too much whether the

6   equipment is either leased or purchased.

7            MR. GOETTLE:  Mr. Dyer, can you put up

8   PX-2, column seven?

9            (Pause in proceedings.)

10           MR. GOETTLE:  And can you blow up the -- at

11  lines four to the end of the paragraph?  Oh, you're

12  on the -- I think you might be on the re-examination

13  certificate.  If you go back, there's a --

14  confusingly, there's another column seven.  It's

15  PX -- it's page ten, sorry.

16           (Pause in proceedings.)

17  BY MR. GOETTLE:

18  Q    Okay.  Do you need a -- do you need a --

19  A    I can read it.

20  Q    Okay.

21  A    If not, just point me to where --

22  Q    So there's a sentence at line four that starts,

23  "Preferably..."  Do you see that?

24  A    Yes.

25  Q    Okay.  It reads, "Preferably" -- well, let me set

Mr. Lanning - Cross                              32

1    this back up again.  So we're talking about if a

2    cellular network operator owns or operates the

3    network element, then, to you, that would be an

4    indication that it is a core network element internal

5    to the cellular network, correct?

6    A    That would be one of the indications, yes.

7    Q    Okay.  And so the patent says at col -- at line

8    four on column seven, "Preferably, the MMSC is

9    located outside the GPRS cellular network in the IP

10   network (intranet network) of the operator that also

11   manages said default GGSN."  Do you see that?

12   A    Yes.

13   Q    Okay.  And so what that means is the operator can

14   have the messaging server inside its cellular network

15   or outside its cellular network?

16   A    Let's be specific with that sentence because

17   there are some acronyms in there that might not mean

18   something to the jury, or anything.  If you read,

19   "Preferably, the MMSC," now, that's the multi-media

20   message center, "is located outside the GPRS cellular

21   network..."  I don't -- I haven't discussed what GPRS

22   is, but that is part of the European family that is a

23   GSM network that has packet data.  It is -- the

24   acronym stands for GSM packet radio system.  So what

25   this is saying, specifically, is that the MMMC, the

Mr. Lanning - Cross                    33

1   multi-media message center, can be located outside a

2   GSM cellular network in an IP network of the operator

3   that also manages said default GGSN.  Now, what's

4   GGSN?  That's another acronym in the GSN network.

5   And so this sentence is specifically stating where an

6   MMMC could be in a G -- in relationship to a GSM

7   network.

8   Q   Okay.  So back to my question, what's that saying

9   is the cellular network operator can place its

10  messaging server either inside its cellular network

11  or outside its cellular network, correct?

12  A   Maybe I didn't explain very well.  What it's

13  really saying is that an MMMC can be internal to a

14  GSM network or external to a GSM network.  Sprint is

15  not a GSM network.  It's a CDMA2000 network.

16  Q   Okay.  But we did talk yesterday and I believe

17  the words -- I can't remember the phrase you used,

18  but we did talk yesterday about the patent covering

19  CDMA2000 networks, as well as GSM, correct?

20  A   Okay.  Again, you're jumping around.  You asked

21  me very specifically what this sentence says.  I just

22  interpreted that sentence for the jury.

23  Q   Okay.  But do you agree that the patent applies

24  equally -- those are your words -- equally to a GSM

25  network as to a CDMA network like Sprint's?

Mr. Lanning - Cross                              34

1   A    The patent applies generally, but this sentence

2   isn't a general sentence and this sentence isn't in

3   relationship to a CDMA2000 network.  This sentence is

4   very specific to a specific kind of network, and

5   that's the GSM family of protocols that are the

6   European that I explained, and not CDMA2000.

7   Q    Sir, you've been an expert witness in patent

8   litigation since 2002?

9   A    Yes.

10  Q    Okay.  So you understand that the requirement for

11  a patent is to lay out a description of an

12  embodiment, one embodiment, of the invention so that

13  a skilled artisan can make and use the invention,

14  correct?

15  A    That's correct.  We have no argument there.

16  Q    Okay.

17  A    But you asked me to look at this sentence, and

18  maybe you don't like my translation, but I'm very

19  clearly stating what this sentence says to one of

20  ordinary skill, meaning how an engineer would

21  understand this sentence.

22  Q    But you do recognize that the preferred

23  embodiment that's described in this patent, the

24  entirety of it, including what you're looking at on

25  your screen -- the entirety of the preferred

1  embodiment is described with respect to a GSM

2  network, correct?

3  A   Yes, as I covered, and in figure two, I showed

4  all these same acronyms and explained that was for

5  the European network.

6  Q   Okay.  But, again, the patent equally applies to

7  a CDMA2000 network?

8  A   It says that it equally applies, even though all

9  the examples are for a GSM network, yes.

10 Q   Thank you.  Okay.

11         (Pause in proceedings.)

12 Q   We're up to CFA number 7.  So your seventh

13 holistic characteristic is the physical location of

14 the messaging server, correct?

15 A   The physical location of the messaging servers,

16 not just what city are they in, but in relationship

17 to other components that Dr. Akl claimed were core

18 network elements.

19 Q   So is a more appropriate wording of this

20 "relative physical location?"

21 A   I think "physical location" -- "relative physical

22 location" is fine.  I looked at both.  But then, as I

23 pointed out to the jury as I looked at each location,

24 for instance, it wasn't important to me whether the

25 location was in Reston, Virginia or Lenexa, Kansas.

Mr. Lanning - Cross                          36

1    It was, I guess I would agree, the relative location

2    of where is the message server in relation to the SPS

3    that Dr. Akl said was a core network element?  And I

4    used multiple examples that they were both next to

5    each other.

6    Q   So would it be more accurate to insert the word

7    "relative" here, "relative physical location?"

8    A   I think that would be fine.

9    Q   Okay.

10   A   I probably thought of both, but at the -- at the

11   end of my analysis I think the key part, as I just

12   explained, was more the relative locations to other

13   network elements that Dr. Akl claimed were core

14   network elements.

15   Q   Okay.  So I added in the word "relative" on

16   Plaintiff's Drawing Number 2 in red.  Okay.  So just

17   so the record is clear, you showed -- this is your

18   demonstrative slide 17 from yesterday, correct?

19   A   Yes, based on the results of my analysis.

20   Q   Okay.  So you did not get this from a Sprint

21   document?  This was you -- your graphic?

22   A   Yes.

23   Q   Okay.  And just so that -- so that everybody is

24   clear, when you have this box here, this yellow box

25   that's labeled "core network" are you suggesting that

Mr. Lanning - Cross                    37

1   all of these elements that you're showing in that

2   yellow box are in the same relative location?

3   A    No, I'm saying they're all in the core --

4   Sprint's core network.

5   Q    Okay.  So the jury shouldn't look at this box as

6   sort of interpreting it as a building, a building

7   housing all of this equipment, right?

8   A    And I hope I didn't convey that because I showed

9   multiple slides that show that these buildings were

10  in different cities in different parts of the

11  country.

12  Q    Okay.  So let's go with the -- let's start with

13  the mobile switching centers.  Where are they

14  located?

15  A    In the switching centers -- now, we have to be

16  careful because you're asking me -- again, it sounds

17  like a real simple question, but there's many

18  switches in the Sprint network and there's many MSCs

19  that are used for different functions, a gateway MSC

20  versus a serving MSC.  So I would need to see the

21  whole physical network diagram.  And I -- again, I

22  didn't analyze where every MSC is at.  There's -- my

23  guess would be there's tens and probably on the order

24  of 30 to 50, but, again, I'm guessing just based on

25  my experience based on the capacity of the Sprint

Mr. Lanning - Cross                    38

1    cellular network.

2    Q   Well, then maybe I can get at it a different way

3    then.  You've heard -- you've heard the term

4    "datacenter" with respect to Sprint's network?

5    A   That's one of the terms I've heard, yes.

6    Q   And you've heard the term "core site" with

7    respect to Sprint's --

8    A   That's another term I've used for a -- or heard

9    for a site, yes.

10   Q   And do you agree with me that when the Sprint --

11   when we've heard Sprint witnesses talk about those

12   two things they're the same, they mean the same

13   thing, the same building?

14   A   I think that's correct.

15   Q   Okay.

16   A   I didn't sit there and compare every definition,

17   but from my recollection, I believe that's correct.

18   I would also add another definition that seems to go

19   with those two, and that's "bunkers."

20   Q   Is the mobile switching center -- is there any

21   Sprint mobile switching center at a datacenter, at a

22   core site, or at a bunker?

23            (Pause in proceedings.)

24   A   For the ones that I analyzed, no, there's not an

25   MSC in those boxes.

Mr. Lanning - Cross                    39

1   Q    So I'm going to -- I'm going to label this

2   Plaintiff's Drawing 6.  I think I'm up to --

3               (Pause in proceedings.)

4   Q    I put my other one away.  I'm going to say 6.

5               THE COURT:  On what slide are you writing?

6               MR. GOETTLE:  I'm writing on slide 17, Your

7   Honor.

8               THE COURT:  Okay.

9               MR. GOETTLE:  I'm going to call that

10  Plaintiff's Drawing 6 in the hopes that I had a 5.

11  BY MR. GOETTLE:

12  Q    Okay.  And so, sir, can -- would it be fair to

13  then -- to write above "mobile switching centers,"

14  "not at datacenter," "not located at datacenter?"

15  A    I don't think I would call it "datacenters."

16  Q    Okay.

17  A    My slides --

18  Q    You would rather call it "core sites?"

19  A    My slides either refer to them as "core sites" --

20  Q    Okay.

21  A    -- or "bunkers."

22  Q    Okay.  I'll do that.  "Not at core site or

23  bunker."  But you would prefer that I didn't use the

24  term "datacenter?"

25  A    I think that would be misleading.

Mr. Lanning - Cross                                40

1    Q    Okay.

2    A    "Datacenter" has -- Sprint also has datacenters

3    that are not core sites and bunkers, so I just want

4    to try to be as accurate as I can be.

5    Q    Okay.

6    A    And I should say that doesn't surprise me at all

7    because your mobile switching centers, your switches,

8    are distributed across the country, and it's based on

9    an economics.  You want your switches that control

10   switching for a specific area close to that community

11   of interest.  So the switches will be out scattered

12   across the country, typically, in the larger cites

13   that are managing their community of interest.  But

14   for the types of systems that are in the bunkers,

15   those are systems that can easily be in remote cities

16   and you don't have all of the different circuit

17   switch connections for phone calls and everything for

18   a system like an SS -- SPS or a message center

19   because those are just messages that go.

20         If you walk into a switch room, we refer to

21   it where the switch is at, you just see thousands of

22   connections coming in for that switch.  Typically, it

23   will have 50,000 to 100,000 connections that come in.

24   There's just a cable waterfall, they call it, for

25   that switch to connect to all the different places it

Mr. Lanning - Cross                    41

1    needs to.

2    Q    Are you done?

3    A    Yes.

4    Q    Okay.  How about the PDSN?  Is the PDSN located

5    at a core site or bunker?

6    A    No.

7                 (Pause in proceedings.)

8    Q    Okay.  How about the HLR?  Is the HLR located at

9    a core site or a bunker?

10   A    No, and it would be for the same reasons I

11   described for the mobile switching centers.

12   Q    Okay.

13                (Pause in proceedings.)

14   Q    Okay.  So let's now talk about what you referred

15   to and what we've seen some witnesses refer to as

16   Sprint's core site.  Is it your opinion that the

17   elements that are housed in Sprint's core site are

18   core network elements under the Sprint's -- under the

19   Court's construction?

20   A    For the same answers I gave earlier, there is

21   various boxes in a core site that I didn't perform my

22   analysis on because they just simply weren't

23   applicable to my analysis for this trial and for this

24   work on this case.  As I pointed out, there were many

25   different boxes in those core sites.  But where I'm

Mr. Lanning - Cross                           42

1    drawing the relationship to are the two boxes that

2    Mr. Goettle did not ask me about, and I've said

3    multiple times if you look at the messaging servers

4    in the center and you look at the SPS on the right,

5    those two items are located together.  That's the --

6    in the -- in the core sites.  And Dr. Akl is saying

7    the SPS is a core network element, but he's saying

8    the messaging server is not.  So the co-location of

9    those two systems is one of the indicators I used.

10   Q    But you recognize, sir, that Sprint didn't even

11   have a messaging server at the core site until 2010,

12   four years into the damages period in this case?

13   A    There was an evolution of where the short message

14   servers were at, and there was an evolution of where

15   the MMSCs were initially at and how they evolved.

16   Q    So prior to those short message service centers

17   getting moved to the "core site," they were not core

18   network elements?

19   A    No.  Matter of fact, I believe they were with

20   some of the other core network elements that you

21   asked me about, but, again, that hasn't been part of

22   my analysis.  I'm just recalling -- this has been

23   about two years ago that I did all the research and

24   the detail.  But I think some of those messaging

25   servers were actually at the switch sites along with

Mr. Lanning - Cross                    43

1    the mobile switching centers.

2    Q    Is it fair to say then that the core site houses

3    elements that are not core network elements under the

4    Court's construction?

5    A    I don't know one way or another because I haven't

6    performed an analysis on every system that's in a

7    core site.

8    Q    So it's possible?

9    A    It's possible one way or the other.

10   Q    And do you think it's probably that this

11   underground bunker that has this high security that

12   we've heard a lot about is probably housing more

13   equipment than just what are the core network

14   elements of Sprint's cellular network?

15   A    As I said, I haven't performed an analysis, and

16   so you're asking me to guess, and I don't think

17   guessing is going to be good for any of us here.

18   Q    Okay.  So you don't know?

19   A    I think I've just said that.  I don't know one

20   way or the other.

21            (Pause in proceedings.)

22   Q    Oh, I wanted to clarify.  You made -- you

23   mentioned that I didn't -- I didn't call out the

24   messaging server or the SPS as being at the core

25   site.  That was part of your answer before?

Mr. Lanning - Cross                                    44

1    A    Yes.

2    Q    So I added that in there.  I thought that came

3    through abundantly clear yesterday during your

4    testimony, but I did -- I did add it in there.  You

5    see them on Plaintiff's Drawing Number 6, correct?

6    A    Yes.

7    Q    Okay.

8              (Pause in proceedings.)

9    Q    Okay.  The last slide I'm going to -- I think the

10   last slide I'm going to show you on the location

11   factors, your slide 48.  Do you see that?

12   A    Yes.

13   Q    Do you recognize this from your presentation with

14   the jury yesterday -- from yesterday?

15   A    Yes.

16   Q    Okay.  And in this -- I'm not 100 percent sure,

17   but you -- I think you took issue with what Dr. Akl

18   said in his testimony on direct examination, right?

19   A    I don't think I took issue with it.  I just used

20   that as Dr. Akl in support of what's in one of these

21   datacenters, as he refers to it as datacenters.  And

22   he's describing that, and I'm saying the messaging

23   servers are in the same datacenter that he is

24   describing to be the housing or the place where core

25   network elements are at.

Mr. Lanning - Cross                              45

1   Q    But you do understand that Dr. Akl is not

2   ascribing to a notion that you look at a physical

3   location and trying to decide as a matter of

4   technology and this patent whether an element is a

5   core network element under the Court's construction?

6   A    I think the jury can take his statement -- my

7   interpretation is he's describing what these data

8   network centers are, and there's core network

9   elements in those.  And I was just simply saying and

10  showing that he said the SPS is a core network

11  element, it's in one of these center, but, again, a

12  system that is located with it, specifically, the

13  messaging servers, are not.  And I'm just showing the

14  inconsistency with his statement and what's really

15  the case in the Sprint network.

16  Q    Was it an inconsistency in his analysis, or is it

17  an inconsistency between what you're saying and his

18  opinion?

19  A    I think it's an inconsistency in his own

20  analysis --

21  Q    I see.

22  A    -- that's flawed.

23  Q    Well, then let's put it into context on what the

24  actual question and answer were, and we'll see if

25  there's an inconsistency.

Mr. Lanning - Cross                                    46

1              MR. GOETTLE:  Mr. Dyer, can you pull up the

2    testimony from February 2nd at page 124, starting at

3    line 12?

4              (Pause in proceedings.)

5    BY MR. GOETTLE:

6    Q   And, sir, I'm basing -- I'm pulling out surround

7    language from Dr. Akl's testimony that surrounds what

8    you pulled out in your quote that we were just

9    looking at on the slide.  Do you see that?

10   A   I see a lot of testimony, but I'll take --

11   Q   Okay.

12   A   -- your word for it.

13   Q   Okay.  You'll take my word for it?

14   A   Yes.

15   Q   Okay, thank you.

16   A   So far.

17   Q   It's a dangerous thing to take my word for it.

18   A   Well, to begin with, I'll take your word for it,

19   and --

20   Q   Okay.

21   A   -- then when you get to the specific question

22   then I'll read it more carefully.

23   Q   Okay.  So I asked him, question -- starting at

24   line 12, I asked him,

25              Question:  "Okay.  I see that you have on

Mr. Lanning - Cross                          47

1   slide 48 a picture of those switch board operators.

2   Could you explain to the jury why you have that on

3   there?"

4           Answer:  "Yeah.  So this is just my

5   analogy, trying to remind the jury the core network

6   elements -- and it's easy to visualize the cell

7   phone.  And the tower -- if you're driving on the

8   highway, you actually see sometimes -- if you're

9   looking for them, you see the cell phone towers.  The

10  core network elements are the components that you

11  don't see."  And that's where we're picking the

12  language that you -- this is where you -- we pick up

13  what you had quoted on your slide.  I lost my --

14          Answer:  "The core network elements are the

15  components that you don't see.  Those are the ones

16  that are in -- you know, the datacenters, they're

17  underground, those are what perform core

18  functionality.  And this core functionality, we have

19  to look at the definition."  So he's talking about

20  the core functionality, which is entirely what his

21  basis of his opinion is on, and you even said that

22  yesterday, right?

23  A   And that's -- and that's true.  And he's

24  identified what these datacenters, one of the

25  elements, the SPS, to be a core network element

1    that's in one of these datacenters that you don't

2    see.  And where he's inconsistent is in that same

3    datacenter where he says there's an SPS that's a core

4    network element, there's a messaging server that does

5    a lot more than that database sitting there.  It

6    performs all the messaging functions, but yet it is

7    not a core network element.

8    Q    So that's not an internal consistency in Dr.

9    Akl's analysis, it's where you -- it's an area where

10   you and he differ?

11   A    I don't think so.  I think --

12   Q    No?

13   A    -- when Dr. Akl looks at functionality he's

14   inconsistent with his analysis of using just

15   functionality and where these nodes are at.  It's a

16   continuation of inconsistencies of saying that a

17   messaging -- if you just look at functionality, a

18   messaging server that's responsible for sending a

19   query to a database, receiving the response from a

20   database, is not functionally core, but the database

21   that it is sending the query to is.  And just ask

22   yourself which one of these nodes on a functional

23   level is more important to core functionality, the

24   messaging server that's doing the routing of the

25   message, sending the queries, and storing all these

1   messages, and forwarding them down to the cell

2   phones?  Is that functionality core functionality

3   more or less than a database that that system

4   queries?  That's my point about his analysis is

5   inconsistent when just looking at functionality.

6   Q   You're done, sir?

7   A   Yes.

8   Q   Okay.

9          MR. GOETTLE:  Can we go back to the "Wolf

10  Vision?"

11  BY MR. GOETTLE:

12  Q   All right, sir, I'm actually -- I'm glad you went

13  where you went because that's where we're going to go

14  next.  So let's talk about the messaging server.  I

15  just put up slide 24 from your presentation

16  yesterday.

17  A   Yes.

18  Q   Okay.

19          MR. GOETTLE:  Zoom out a little bit.

20  BY MR. GOETTLE:

21  Q   You presented this to the -- to the jury

22  yesterday?

23  A   Yes.

24  Q   Okay.  And you had a similar slide for MMS.  This

25  one is specific to SMS, right?

Mr. Lanning - Cross                    50

1    A    That's -- that's correct.

2    Q    And I believe I looked at it and the only

3    difference between the two was instead of text

4    messages, I think you referred to multi-media

5    messages.  Does that match your understanding?

6    A    Again, I'd have to look, but --

7    Q    Okay.

8    A    -- I'm going to take a risky stance and say I'll

9    take your word for it.

10   Q    Okay.  So let's talk about these functions you

11   have written down here.

12   A    Okay.

13   Q    The Court's construction requires this, that a

14   messaging server functions be querying subscriber

15   databases, right?

16   A    Yes.

17   Q    Okay.  I'm going to call this Plaintiff's Drawing

18   Number 7.

19              (Pause in proceedings.)

20              THE COURT:  And you're writing that on

21   slide what?

22              MR. GOETTLE:  Slide 24, sir.

23              (Pause in proceedings.)

24   BY MR. GOETTLE:

25   Q    Okay.  So the construction requires that a

Mr. Lanning - Cross                              51

1   messaging server perform the function of sending an

2   inquiry?

3   A    Yes.

4   Q    Okay.  And the construction also requires the

5   functions of storing and forwarding messages?

6   A    Yes.

7   Q    Okay.  And, sir, you agree that the SMSCs, the

8   messaging servers under the patent, do not create the

9   messages themselves, correct?

10  A    Again, that sounds like a simple question, but

11  there are situations where an SMSC could create a

12  message.  But to be fair, for the scenarios I showed

13  and that we've discussed in court, the SMSC receives

14  messages that are created elsewhere.

15  Q    Yeah, they receive them and then they store them,

16  or they can store them, correct

17  A    Yes.

18  Q    Okay.  So you have receiving down here, but

19  receiving already has to happen in order for there to

20  be storing, right?  So receiving is duplicative of

21  storing?

22  A    I wouldn't say that.

23  Q    No?

24  A    I think it's implicit, but the --

25  Q    Oh.

Mr. Lanning - Cross                                    52

1   A   -- Court's construction doesn't include

2   receiving.  It just has storing without implying

3   where the message comes from.  But I would say and I

4   would agree if there's a storing function, that

5   implicitly means that the SMSC has to receive a

6   message from somewhere.

7   Q   So I'm going to write "implicitly" -- can I write

8   "implicitly covered by storing?"

9   A   Yes.  As I just explained, you have to receive a

10  message -- the SMSC has to receive a message before

11  it can store it.

12  Q   Okay.  Okay.  And then you write that the

13  messaging server also performs -- oh, actually, we

14  didn't talk about -- let me go back to forwarding.

15  Let's talk about forwarding for a second.  The

16  messaging server has two options on where to send a

17  message, right?  It either sends it to the

18  inter-carrier gateway or it sends it to the mobile

19  switching center.  Two options, right?

20  A   At a highest level, I would agree with you, but

21  it's sending -- to clarify your question, it's not to

22  just a message center.  It's one of many mobile

23  switching centers that it sends it to.

24  Q   Okay.  So fair for me to write -- I would like to

25  write -- two lines below this, I'd like to write "to

Mr. Lanning - Cross                    53

1    inter-carrier gateway or to MSC," fair?

2    A    "To a MSC."

3    Q    Okay.

4          (Pause in proceedings.)

5    Q    "To the inter-carrier gateway," or "a?"

6    A    "A."  There may be more than one.

7    Q    "To an" I guess would be proper.

8    A    Yes.

9    Q    Okay.  And those are the only -- let me number

10   them.  One, two.  Those are the only two options,

11   right?  So in order to find out which of these, the

12   messaging server queries subscriber databases, and if

13   the phone -- if the phone number is not found in the

14   subscriber profile system, the SPS, then the

15   messaging server will receive a response to its query

16   that says something to the effect of "phone not

17   found," and that's the signal for the messaging

18   server to know oh, I send this to the inter-carrier

19   gateway because this is not headed towards a Sprint

20   subscriber?

21   A    Yes, the response is that phone is not on the

22   Sprint network, so then the messaging server needs to

23   route that message to the inter-carrier gateway.  If

24   you recall the one slide I showed where it's routing

25   to T-Mobile, that would be an example where it's

Mr. Lanning - Cross                           54

1    going to a different network, "it," meaning the

2    message.

3    Q   Okay.  So I didn't -- I stupidly didn't give

4    myself enough room this way, so I'm going to go the

5    other way, but I'd like to write "finds out from

6    SPS."  For this line I'd like to --

7    A   For one -- for the one example you said, but --

8    Q   Yes.

9    A   -- that's not the only query that the messaging

10   server performs.

11   Q   And then in order to know if it's going to go to

12   a mobile switching center and which mobile switching

13   center, the messaging server finds that out from the

14   home location register, which stores the location

15   information about the phone?

16   A   Yes, and other information that's used by the

17   messaging server.  And that's the query I showed on

18   four lines of text that actually was that query

19   between an SMSC and an HLR.

20   Q   Okay.  Okay.  And then for these, where you say

21   they're screening and blocking and routing -- well,

22   actually, routing -- we just talked about routing,

23   right?  Because these are the two places where the

24   message might get routed to, and these are the -- how

25   the messaging server finds out which place to route

Mr. Lanning - Cross                                    55

1    it to.

2    A    I was waiting for the question.

3    Q    Okay.  For routing, we just talked about routing

4    when we just talked about forwarding, correct?

5    A    No, they're -- I distinguish those being two

6    different things.  Forwarding would be forwarding a

7    message to a phone on network when it's ready to

8    receive it.  So if I'm sending a message between one

9    Sprint mobile phone and another Sprint mobile phone,

10   the forwarding that the message server does is it

11   forwards that message to the serving MSC when that

12   phone is available.  Now, if that phone is available

13   when the person sends the message, it will

14   immediately go forward to the recipient phone.  But

15   if the recipient's phone is turned off, the SMSC will

16   store that message and way for a notification of when

17   that phone, the recipient phone, is turned on and

18   ready to receive.  So that's the forwarding function.

19           The routing function is the routing

20   function to the inter-carrier gateway, meaning to go

21   to other carriers.  An example I showed is routing to

22   T-Mobile.

23   Q    Okay.  So we have screening and we have blocking?

24   Those are --

25   A    Yes.

Mr. Lanning - Cross                          56

1   Q   -- the two functions?  And the way that the

2   messaging server finds out whether it's a screen or

3   whether it's a block is party of the query response

4   it receives from the SPS?

5   A   Yes.

6   Q   Okay.  So fair to write "finds out from SPS?"

7   A   If that's what you want to write, yes.  It's --

8   Q   Well, do you agree?

9   A   That's fine.  A computer doesn't find anything

10  out.  It just really responds to the -- to the

11  response, the information that's there.

12  Q   But it's pretty common for even computer

13  scientists to refer to computers as operating the way

14  humans operate because it's a way of understanding

15  how they work?

16  A   I would say there are some computer scientists

17  that think that computers have more human tendency,

18  but I would prefer to keep them as processing

19  machines.

20  Q   Okay.  And that was Plaintiff's Drawing Number 7.

21  I think I said that, but just in case the record is

22  not clear.  Okay.

23            (Pause in proceedings.)

24  Q   We also -- you also showed this.  This is your

25  slide 99.  And you talked about the call flows,

1  correct?

2  A    That's correct.

3  Q    Okay.  And you take issue with Dr. Akl relying on

4  the call flows that he relied on in terms of the step

5  counting, correct?

6  A    That's correct.

7  Q    So let's just make sure the step counting is very

8  clear to the jury about what we're -- what we're

9  talking about here.  What we're talking about, or

10  what you and Dr. Akl are disagreeing on, is step

11  counting, but it's step counting that's really used

12  by the damages experts in the case, right?

13  A    That's my understanding is the -- we provide

14  input to the damages folks, and they need to

15  determine the number of infringing steps, as I

16  explained yesterday, over the total number of steps

17  involved.  So Dr. Akl and I have a difference of

18  opinion on both the numerator, the number of

19  infringing steps, and we have a great difference of

20  opinion on the denominator, the total number of steps

21  that are involved in sending a message.

22  Q    So suffice to say for the jury's purpose, at

23  least in terms of your and my conversation right now,

24  the bigger the denominator, the lower the damages,

25  right?

Mr. Lanning - Cross                          58

1   A    That's correct.

2   Q    And so the way the -- that denominator gets

3   bigger is by having more steps in total in the

4   process of Sprint sending an SMS, for example?

5   A    I would say the way the denominator gets bigger

6   is by counting all the steps --

7   Q    All of them.

8   A    -- that are involved, just --

9   Q    Right.

10  A    -- not summarizing the high level --

11  Q    Right.

12  A    -- number of steps.  And just to remind the jury,

13  I found that the denominator for SMS messages was

14  more than two times that that Dr. Akl used.  And so

15  if you think about that for SMS messages, that

16  immediately halves the damages quotient, right,

17  because I've doubled the denominator.  For MMS

18  messages, it's more than three times bigger, so I've

19  reduced the damages number that should be used by

20  two-thirds, or it should only be a third of what

21  they're saying.  So it's very significant.

22  Q    Now I'm showing on the slide, your slide 98, this

23  is the -- these are the steps that Dr. Akl relied on,

24  correct?

25  A    That's correct.

Mr. Lanning - Cross                              59

1   Q    Okay.  But you do recognize that this is from a

2   Sprint document that three Sprint witnesses said was

3   an accurate representation of the steps involved in

4   sending an SMS message or an MMS message?

5   A    And I don't disagree that it's --

6   Q    Okay.

7   A    -- not acc -- I don't -- I didn't say it wasn't

8   accurate.  I'm saying it was used for a different

9   purpose than determining the total number of steps.

10  It's only a high level summary to focus on specific

11  areas of messaging that the document uses.

12  Q    Okay.  Last topic, speed.  In your -- if I

13  understood your direct examination, the patent is

14  going to slow things down.  If you implement the

15  invention, you'll actually slow down a network, and

16  not speed it up, is that correct?

17  A    Based on the external interfaces that are defined

18  and claimed in the patent, that's correct.

19  Q    So that, in actuality, the patent then has no

20  useful purpose, the invention of the patent has no

21  useful purpose?

22  A    No, the -- speed was not listed as one of the

23  purposes of the invention.  The purpose of the

24  invention, as stated by the patent, is to find out

25  from the network what IP address a mobile is using

Mr. Lanning - Cross                          60

1    because the IP addresses for mobiles are dynamically

2    assigned.  A lot of times when we use a computer at

3    home we have a consistent, or a static, IP address.

4    That's not the way the cellular network works.  The

5    cellular network assigns an IP address on a temporary

6    basis to a mobile phone when it needs a data

7    connection.  When that data connection for that

8    period of time is finished that data connection is

9    released and so is the IP address.  And, for

10   instance, if you check an email, you'll get an IP

11   address on a temporary -- on your phone for that

12   period of time.  Once you check your email and you're

13   not using the data channels, the data channels will

14   be released and so will that IP address.

15          Now, let's say an hour later, when we have

16   a break from court you check your email again.  You

17   may get the same IP address on your phone, but you

18   may get a different one.  Now, if a short message

19   service center or a multi-media message center is

20   external to the network, the patent explains that it

21   needs to ask the network what IP address is this

22   mobile using right now so I can send it data?  That's

23   the point of the patent.  And I'm happy to go into

24   those columns and descriptions to support what I just

25   explained if you would like.

Mr. Lanning - Cross                                    61

1    Q    Okay.  Well, I want to talk about speed.

2    A    Okay.

3    Q    So why don't we talk about what you wrote in your

4    expert report about speed?

5    A    Okay.

6    Q    In paragraph 203 of your non-infringement report,

7    you wrote, and tell me if I'm -- tell me if you

8    remember this, "As the patent itself teaches,

9    internal messaging servers do not achieve the same

10   result as external messaging servers.  As the 870

11   patent states, 'An advantage achieved from placing

12   the messaging server external is that the multi-media

13   message will not be stored on the cellular network,

14   thus, reducing a burden in terms of storage and

15   processing.'"  Do you recall writing that?

16   A    Yes, and that's very different than speed.  And I

17   recall writing it and I recall remembering exactly

18   what it is.  What I meant by that, the whole point is

19   if you're putting a message server external to the

20   network, that processing power that's required and

21   all of the disk space, the storage that's required,

22   is now outside in that external messaging server.  If

23   you put it on a messaging server internal to the

24   network, that processing power to receive and store

25   those messages and all of that disk storage space is

Mr. Lanning - Redirect                    62

1    internal to the network.  It has nothing to do with

2    processing speed or bogging down the network, as you

3    heard in openings and other witnesses say.

4    Q    Thank you.

5              MR. GOETTLE:  I have no further questions.

6              THE COURT:  Maybe we should take a very

7    short break.  We got a late start.  It's 11:45.

8    Let's take a ten minute break.

9              (Jury out, 11:45 a.m.)

10             THE COURT:  We're in recess for ten

11   minutes.

12             (Recess taken from 11:46 a.m. to 12:12

13   p.m.)

14             THE COURT:  Be seated, everyone.  You may

15   proceed with redirect examination, Mr. Finkelson.

16             MR. FINKELSON:  Thank you, Your Honor.

17             (Pause in proceedings.)

18                   REDIRECT EXAMINATION

19   BY MR. FINKELSON:

20   Q    Good afternoon, Mr. Lanning.

21   A    Good afternoon.

22   Q    I was hoping to say good morning to you.  I

23   looked up at the clock and realized I wasn't so -- I

24   wasn't so lucky, but good afternoon to you.

25   A    We both looked at the clock.  I was going to

Mr. Lanning - Redirect                              63

1   correct you if you said morning.

2   Q   I think it may have been more than just you and

3   I, to be frank, who looked at the clock.  Let's get

4   back to your analysis, Mr. Lanning.  In conducting

5   your analysis with respect to non-infringement in

6   this case, did you look at the 870 patent?

7   A   Yes.

8   Q   Okay.  Did you look at the relevant standards for

9   a CDMA2000 network?

10  A   Yes.

11  Q   Okay.  And did you look at Sprint's actual

12  implementation?

13  A   Yes.

14  Q   Okay.  Did you consider functional

15  considerations?

16  A   Yes.

17  Q   Okay.  Did you consider logical considerations?

18  A   Yes.

19  Q   And did you consider physical considerations in

20  reaching your conclusion?

21  A   Yes.

22  Q   Okay.  Now, during Comcast's counsel's analysis,

23  he took you through what he called a seven factor

24  analysis, right?

25  A   Yes.

Mr. Lanning - Redirect                                    64

1   Q   Okay.  Mr. Lanning, is this your seven factor

2   analysis or is this Comcast's counsel's seven factor

3   analysis?

4   A   This is a creation that's -- of Comcast's factor

5   analysis that started at my deposition about a year

6   ago.  But all of that analysis, if you summarize it

7   or break it down, is in the three specific areas or

8   layers: functional, logical, and physical.

9   Q   Now, there was some discussion about switch sites

10  in your cross-examination.  Do you recall that, sir?

11  A   Yes.

12  Q   Do Sprint's switch sites contain core network

13  equipment?

14  A   Yes.

15  Q   Okay.  And is that where the MSCs are?

16  A   Yes, that's why they're referred to as switch

17  sites, because the MSC is the mobile switching

18  center.

19  Q   And back when Sprint's SMSCs were at Sprint's

20  switch sites, co-located with those mobile switching

21  centers, were those SMSCs core network elements of

22  Sprint's cellular network?

23  A   Yes, because the SMSCs have always been Sprint's

24  core -- in Sprint's core network.

25  Q   You were asked a question that had a negative in

Mr. Lanning - Redirect                                65

1    it with respect to whether they were core network

2    elements at that time, and you answered no, I think

3    disagreeing with Comcast counsel.  So I just wanted

4    to be clear for the record.  But when Sprint's SMSCs

5    were co-located with the MSCs at those switch sites,

6    it's your opinion -- or is it your opinion that those

7    SMSCs were core network elements?

8    A    Yes, definitely.

9    Q    Do Sprint's core sites or bunkers also contain

10   core network equipment?

11   A    Yes.

12   Q    Is that where the SPS is that's at issue in this

13   case?

14   A    Yes.

15   Q    And when Sprint's SMSCs have been co-located at

16   the core sites or bunkers with the SPS, is it your

17   opinion that those SMSCs have been core network

18   elements of Sprint's cellular network?

19   A    Yes.

20   Q    Now, you testified yesterday, and there was some

21   discussion about it today as well, Mr. Lanning, that

22   you can't automatically -- I think was your word

23   yesterday -- you can't automatically say that when a

24   Sprint witness or document says "core network" that

25   it matches up with the Court's claim construction.

Mr. Lanning - Redirect                          66

1    Do you recall that testimony?

2    A    Yes.

3    Q    Is that because in doing your job as an expert,

4    you want to be careful to consider all of the

5    relevant evidence?

6    A    That's correct.

7    Q    Have you, in fact, in your analysis considered

8    the testimony of Sprint witnesses and considered

9    Sprint documents?

10   A    Yes.

11   Q    In your opinion, is the way in which Sprint's

12   employees, it's engineers and operational folks,

13   spoke to this jury about the Sprint core network

14   consistent with the Sprint documentation that you've

15   analyzed?

16   A    Yes, the documentation and testimony is all

17   consistent.

18   Q    Do you believe that the Sprint documents that you

19   shared with this jury talk about Sprint's core

20   network in a way that is consistent with how the term

21   "core network" is used in the Court's definition of

22   "cellular network" that is in tab two of the jury's

23   binders?

24   A    Yes.

25   Q    And is it your opinion, sir, that the way in

Mr. Lanning - Redirect                    67

1   which Sprint's employees have spoken to this jury

2   about the Sprint core network is consistent with how

3   the term "core network" is used in the Court's

4   definition of "cellular network" that is in tab two f

5   the jury's binders?

6   A    Yes, with one exception that I remember.  There

7   is some discrepancy with one witness whether the bay

8   station system and mobile station were in the core

9   network or not, but that's the only inconsistency.

10  Where the short message service centers are or the

11  multi-medica message servers are there hasn't been

12  any inconsistencies.

13  Q    And whether the bay station system is part of the

14  core network or part of the cellular network, is that

15  relevant to any determination that this jury needs to

16  make in this case, in your opinion, sir?

17  A    No, it's not.  As we discussed, the key issue is

18  to determine are the Sprint messaging servers

19  internal to the Sprint cellular network or external

20  to the Sprint network, not whether the bay station

21  system is in the core network or just in the cellular

22  network.

23  Q    And you've listened to the testimony.  Does

24  everyone seem to agree that the bay station system is

25  at least part of the cellular network?

Mr. Lanning - Redirect                    68

1    A    Yes, everyone agrees it's part of the cellular

2    network, and then even one of the standards showed

3    the bay station system as either -- they could either

4    be part of the core network or outside the core

5    network, but it's always inside the cellular network.

6    Q    Let's talk about the 870 patent for a moment.   In

7    your opinion, does the 870 patent speak primarily in

8    the language of GSM networks?

9    A    Yes, and matter of fact, I believe there's only

10   one sentence in the whole patent that mentions

11   CDMA2000 networks.   The rest of the patent is all

12   specific to GSM -- the GSM family of networks.

13   Q    Do I -- do you and Dr. Akl agree, sir, that the

14   870 patent claims require a messaging server that is

15   external to the cellular network?

16   A    I believe we agree on that, yes.

17   Q    And is it your opinion that in CDMA2000 networks,

18   the standards recommend that the messaging server be

19   internal to the core network of the cellular network?

20   A    Like I did before, I have to break that up.   For

21   an SMSC, the standards clearly say that the SMSC,

22   they recommend that it should be internal to the core

23   network.   For the MMMC, for the multi-media message

24   server, you may remember looking at that document

25   that had two different scenarios that we looked at,

Mr. Lanning - Redirect                          69

1    one that it could be inside the core network and one

2    that it could be outside the core network.  An

3    example that was used is a service bureau.

4    Q    And a -- and what would a service bureau be, if

5    you could remind me?

6    A    That would be a third party company that owned

7    and operated a separate system that would not be part

8    of the Sprint network or Sprint employees.

9    Q    And if a CDMA2000 network operator implemented

10   its messaging servers external to the cellular

11   network, whether it was contrary to the

12   recommendation or, in the case of MMS, choosing

13   between one of those two options, would the 870

14   patent apply -- the claims of the 870 patent apply to

15   that network in those circumstances?  Let me ask it

16   again.  So if you had a scenario where a CDMA2000

17   operator elected to put its messaging server external

18   to the cellular network, would the claims of the 870

19   patent and its requirement of externality apply in

20   that circumstance?

21   A    Yes.  Again, if a CDMA2000 network elected to put

22   the messaging server external to the network, then

23   that would match up with the claims that require the

24   messaging server be external to the cellular network.

25   Q    And in the case of SMS, if it elected to do that,

Mr. Lanning - Redirect                           70

1   in your opinion, would it be acting contrary to the

2   recommendation provided in the ANSI-41 CDMA2000

3   standards?

4   A    Yes, it would be contrary to the recommendation

5   for CDMA2000 to put an SMSC external to the network,

6   but an operator could elect to do that.

7   Q    And when you say that the 870 patent applies

8   equally to a CDMA2000 network, is that the

9   circumstance that you're referring to?

10  A    Yes, I should have clarified.  It would only

11  apply to the CDMA2000 network for instances where the

12  messaging server was external to the cellular

13  network.

14  Q    And other than Syniverse Picture Mail, which is

15  not for this jury to decide, in the course of your

16  analysis, did you find any evidence that Sprint

17  deviated from the CDMA2000 standard recommendations

18  with respect to placements of its messaging server?

19  A    For the short message service centers, Sprint

20  followed the CDMA2000 standards recommendation.  For

21  the multi-media message servers, Sprint followed

22  scenario two fo the MMS standard recommendation,

23  which is internal to the core network.

24  Q    And it -- and when you say it did that do you

25  mean after the transition from Syniverse Picture

Mr. Lanning - Redirect                    71

1   Mail?

2   A    Right.  You started your question "with the

3   exception of Picture Mail," so I left the Picture

4   Mail part out.

5   Q    There were some questions today, sir, about Dr.

6   Akl's step counting analysis.  Do you recall that?

7   A    Yes.

8   Q    Do you have any opinion, Mr. Lanning, on whether

9   it is proper for a damages expert to rely on a step

10  counting method?

11  A    You're getting into an area where I'm not an

12  expert, but all I know is Dr. Akl provided a step

13  analysis for the steps and there's two problems with

14  his analysis.  First off, he didn't count all the

15  steps.  As I explained, for SMS, he missed over two

16  times the number of steps, and for the MMS messages,

17  he left out over three times the number of steps.

18  The other problem that I saw is that he weighted each

19  of the steps that he counted -- he didn't count them

20  all, but for the ones that he counted, he weighted

21  those equally.  And I didn't feel that that was

22  proper because some of those steps were a lot more

23  expensive in network resource terms.

24  Q    Is it fair to say that Dr. Akl and Ms. Riley

25  relied on a step counting message and, in the course

Mr. Lanning - Redirect                    72

1   of your opinions responding to those, you did your

2   own analysis in response?

3   A    Right.  And I don't think it's a matter of

4   deciding which steps to count.  The steps are the

5   steps, and every step needs to be counted because if

6   any individual step is left out or doesn't occur, the

7   message doesn't get delivered.  That's how I looked

8   at it.  Are these steps required to deliver a

9   message?  Any one of the steps that I counted, if

10  they're left out, the message service would fail.

11  Q    Different topic.  You were asked some questions

12  yesterday about the word "essential."  Do you recall

13  that?

14  A    Yes.

15  Q    And I believe that you pointed out to the jury

16  that "essential" is not in the Court's claim

17  construction for "cellular network."  Did I heard you

18  correctly when you said that?

19  A    Yes.

20  Q    Do you understand that Dr. Akl does use the word

21  "essential" in his analysis?

22  A    Yes, that's somehow his interpretation of the

23  Court's construction, that "essential" needs to be in

24  there, but it's definitely not in the Court's

25  construction.

Mr. Lanning - Redirect                                73

1   Q   Let's assume, for the sake of argument, that you

2   accept Dr. Akl's premise that "core network" means

3   "essential."

4   A   Okay.

5   Q   Do you have that scenario in mind?

6   A   I think I understand the scenario that you're

7   giving me.  Okay.

8   Q   If you accept Dr. Akl's premise that "core

9   network" means "essential," is it your opinion that

10  messaging servers are essential elements of a

11  cellular network?

12  A   Yes, they definitely would be.  Without messaging

13  servers, you don't have messaging.  And as you've

14  heard at least one Sprint witness say, there are

15  three essential-type services that they offer: voice

16  services for calls, messaging services for the

17  messages, and data services so that you can check

18  your email or search the internet.

19  Q   Going back to your experience with British

20  Telecom that you spoke to the jury about yesterday,

21  even back in the period before 1999, were messaging

22  servers essential elements of a cellular network?

23  A   They were.  I'll never forget getting -- being --

24  the phone ringing early in the morning when the

25  messaging servers quit and we would still, at 2:00 in

Mr. Lanning - Redirect                    74

1    the morning, get thousands of calls into our customer

2    support center, and I was responsible for getting it

3    working as fast as possible.  We also knew that we

4    would lose a lot of those subscribers, or customers,

5    if we stopped offering a messaging service to our --

6    we would lose them to our competitor.

7    Q   Is it also your opinion, sir, that messaging

8    servers are essential elements of a cellular network

9    during the period that is relevant for infringement

10   in this case, from 2006 to the present?

11   A   They were very important and essential back in

12   the 1990s.  They're even more essential in the

13   infringement period, which starts in 2006.

14   Q   Mr. Lanning, what does this jury have to decide

15   with respect to Sprint's messaging servers?

16   A   As I explained earlier, this is that -- under

17   that -- this is going to be on the test.  The key

18   question that you need to decide is are the Sprint's

19   mess -- are Sprint's messaging servers internal to

20   Sprint's cellular network or are they external?

21   That's the one key question that you have to decide.

22   Q   And, Mr. Lanning, in your opinion, are Sprint's

23   messaging servers internal to Sprint's core network

24   of its cellular network or are they external?

25   A   I believe that they are definitely internal to

Mr. Lanning - Redirect                          75

1  Sprint's cellular network, as I showed you with all

2  the different evidence.

3  Q    Do you understand that Dr. Akl has advanced a

4  different position on behalf of Comcast?

5  A    Yes.

6  Q    Have you seen any Sprint document that supports

7  Dr. Akl's opinion?

8  A    No, nor has Dr. Akl provided any document in his

9  analysis that would provide that opinion in my mind.

10 Q    Have you seen any ANSI-41 CDMA2000 standards

11 document that supports Dr. Akl's position?

12 A    Again, I need to be careful because in the

13 standards, there's the standards documents for SMS

14 and then the standards document that I showed you for

15 MMS where the standard said that the messaging server

16 for MMS could either be internal to the core network

17 or external to the core network.  So it was either

18 scenario two or scenario five.

19 Q    With respect to SMS, have you seen any ANSI-41

20 CDMA2000 document that supports Dr. Akl's opinion

21 that Sprint's accused messaging servers are external

22 to its cellular network?

23 A    No.

24 Q    With respect to MMS, have you see any ANSI-41

25 CDMA2000 document that supports Dr. Akl's opinion

Mr. Lanning - Recross                    76

1   that Sprint's MMSCs, other that Syniverse Picture

2   Mail, have been implemented external to Sprint's

3   cellular network?

4   A    No.

5   Q    Have you heard or read testimony, deposition or

6   trial, from any Sprint witness that supports Dr.

7   Akl's opinion?

8   A    No, and I will put the caveat with the exception

9   of the Picture Mail application.

10          MR. FINKELSON:  I have no further

11   questions.  Thank you, Mr. Lanning.

12          MR. GOETTLE:  I have a couple more

13   questions, Your Honor.

14          THE COURT:  All right.  We'll hear from you

15   on recross.

16          (Pause in proceedings.)

17                RECROSS-EXAMINATION

18   BY MR. GOETTLE:

19   Q    Mr. Lanning, you just testified that it was

20   Comcast that came up with your -- with the holistic

21   seven characteristic analysis?

22   A    Yes, and it was, in my mind, created during

23   deposition.  I didn't start with the deposition or

24   anywhere in my report where I had listed these.  And

25   so, in my mind, it was a creation of yours to

Mr. Lanning - Recross                          77

1   characterize my analysis.

2   Q   So yesterday, when I wrote "Mr. Lanning's

3   Holistic Characteristics," you didn't point out that

4   these weren't your characteristics?

5   A   No, I think I pointed out correctly where they

6   came from and that I used those characteristics.

7   Q   Okay.  You have your deposition testimony?  I

8   handed it to you yesterday.

9   A   Yes.

10  Q   Okay.  It's your deposition from March 3rd, 2016.

11  We're going to walk through this deposition testimony

12  and see who suggested the factored analysis.  So

13  let's go to page 51 at line five.

14  A   Okay, I'm there.

15  Q   You're at 51, line five?

16  A   Yes.

17  Q   Question:  "So it's your opinion that you can

18  determine whether in this hypothetical an SMSC is

19  inside or outside a cellular network based on

20  geography?"

21          Answer:  "Not alone.  Not by a long stretch

22  alone.  I would consider that as one of six or seven

23  different factors."

24          Question:  "Okay."

25          Answer:  "And I was just going through, and

Mr. Lanning - Recross                    78

1    to my mind, you're asking me a hypothetical because

2    I've never seen" -- I, unfortunately, interrupted

3    you.  I said,

4              Question:  "Yes?"

5              Answer:  -- "such a system in my mind."

6              Question:  "Okay."

7              Answer:  "So I'm going through six or seven

8    different factors that I would look at to determine

9    is it owned by Sprint, but external to the cellular

10   network."  Did I read that correctly?

11   A    Yes.

12   Q    Okay.  Let's go to page 56, line 20 -- or, excuse

13   me, 57, line 20.  Are you there, sir?

14   A    Yes.

15   Q    Question:  "And I take it then it's for that

16   reason that interfaces and protocols is just one of

17   six or seven factors you would look at to determine

18   whether two elements are on the same network?"

19             Answer:  "Yes.  I don't believe any one

20   factor would be deterministic.  I think you have to

21   look at all six or seven different factors to

22   understand."  Did I read that correctly, sir?

23   A    Yes.

24   Q    Okay.  Let's go to page 67.

25             (Pause in proceedings.)

1   Q   67.  Let's start at line ten.  This one is going

2   to be a little bit longer, but it's important.  Line

3   ten, 67,

4           Question:  "One of those buildings is

5   only -- the only people in that building allowed to

6   be in that building are the employees of the third

7   party supplier, and in that building is where the HLR

8   is housed.  With that tweak, is that HLR inside or

9   outside the cellular network?"  Mr. Finkelson

10  objected to form, which --

11          MR. FINKELSON:  I'm going to -- just

12  because I don't want to break up the flow of what

13  you're doing, I'll waive the objection to form, Your

14  Honor.

15  BY MR. GOETTLE:

16  Q   Answer:  "Well, again, I would have to look at

17  the factors.  And I think that what we're confusing

18  here, I'm finding that this is confusing because what

19  I did for -- to determine, I -- I looked at seven

20  different factors."

21          THE COURT:  Well, you kind of --

22  BY MR. GOETTLE:

23  Q   Question:  "Yeah."

24          THE COURT:  Just a minute.  You kind of

25  misread the --

Mr. Lanning - Recross                              80

1          MR. GOETTLE:  I apologize and will not do

2    it again.

3          THE COURT:  You're not arguing now.  And I

4    might add that I think all of this cross-examination

5    is already in evidence and can be used by you in your

6    closing argument.  We've gone this route before.  I

7    don't know how much longer you're going to spend on

8    this, but we've covered this issue in cross-

9    examination, and you've made your record.

10          MR. GOETTLE:  Thank you, Your Honor.

11          THE COURT:  You can finish --

12          MR. GOETTLE:  No further --

13          THE COURT:  You can finish the sentence

14    that you were reading from without your emphasis,

15    which --

16          MR. GOETTLE:  I --

17          THE COURT:  -- I think is unfair.

18          MR. GOETTLE:  I lost my place.  I think I

19    made my point.  Thank you, Your Honor.  No further

20    questions.

21          THE COURT:  There's no redirect?

22          MR. FINKELSON:  Nothing further, Your

23    Honor.

24          THE COURT:  You may step down, Mr. Lanning.

25          (Witness excused.)

81

1           THE COURT:  Sprint's next witness is Dr.
2     Polish?
3           MR. FINKELSON:  It is, Your Honor.
4           THE COURT:  It's 12:35.  We seem to be
5     doing a lot of recessing.  That's not a goal to be
6     desired, but I don't think we should start Dr. Polish
7     now.
8           MR. FINKELSON:  Okay.
9           THE COURT:  Recess for an hour.  Be back at
10    1:35.  Usual mid-day instructions.  Don't discuss the
11    case among yourselves.  If anyone tries to talk to
12    you about the case, say nothing to them and report
13    that to me.  Have a good lunch.  See you back here at
14    1:35.
15          (Jury out, 12:35 p.m.)
16          THE COURT:  Anything we need to address
17    before we adjourn for lunch --
18          MR. FINKELSON:  Not for Sprint, Your Honor.
19          THE COURT:  -- recess for lunch?
20          MR. GOETTLE:  Not from Comcast.
21          THE COURT:  We're in recess for an hour.
22          (Luncheon recess taken, 12:36 p.m.)
23
24                      *  *  *
25

82

I N D E X


DEFENDANT'S WITNESSES     DIRECT CROSS REDIRECT RECROSS

Mark Lanning

   By Mr. Goettle                3              76

   By Mr. Finkelson                     62

* * *

1

2

3

4

5

6                           <u>CERTIFICATION</u>

7

8          I, Michael Keating, do hereby certify that

9     the foregoing is a true and correct transcript from the

10    electronic sound recordings of the proceedings in the

11    above-captioned matter.

12

13

14

      2/9/17

15    _____              _____

16    Date                          Michael Keating

17

18

19

20

21

22

23

24

25