```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                            - - -

COMCAST CABLE              : CIVIL NO. 12-859
COMMUNICATIONS, LLC,       :
et al.,                    :
                 Plaintiff :
                           :
                           :
                           :
                           :
                           :
       v.                  :
                           :
                           :
                           :
                           :
                           :
SPRINT COMMUNICATIONS      : Philadelphia, Pennsylvania
COMPANY L.P., et al.,      : February 10, 2017
                 Defendant : 9:50 a.m.


                            - - -

      TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 10
            BEFORE THE HONORABLE JAN E. DUBOIS
               UNITED STATES DISTRICT JUDGE


                            - - -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104
```

2

1    APPEARANCES:              (Continued)

2    For the Defendant:        DAVID E. FINKELSON, ESQUIRE
                               BRIAN C. RIOPELLE, ESQUIRE
3                              McGuire Woods, LLP
                               Gateway Plaza
4                              800 East Canal Street
                               Richmond, VA 23219
5
                               COLLEEN H. SIMPSON, ESQUIRE
6                              Harkins Cunningham, LLP
                               4000 Two Commerce Square
7                              2001 Market Street
                               Philadelphia, PA 19103
8
                                    - - -
9
     Audio Operator:          Michael Cosgrove
10
     Transcribed By:          Michael T. Keating
11
                                    - - -
12
           Proceedings recorded by electronic sound
13   recording; transcript produced by computer-aided
     transcription service.
14
                                    - - -
15

16

17

18

19

20

21

22

23

24

25

3

1          (The following was heard in open court at

2     9:50 a.m.)

3          THE COURT:  Good morning, everyone.  Please

4     be seated.

5          (Pause in proceedings.)

6          THE COURT:  Someone has strewn papers back

7     here.

8          MR. RIOPELLE:  Ticker tape.

9          THE COURT:  Not exactly.  But we will

10    proceed.  I'm just looking -- we have some issues to

11    address, but we'll address them this afternoon.  You

12    may proceed with your next witness.

13         MR. RIOPELLE:  The first thing I was going

14    to do, Your Honor, was read two interrogatory

15    responses into the record.

16         THE COURT:  And you may.  Interrogatories

17    are part of the discovery process about which I had

18    some comments a few days ago.  But a written

19    interrogatory is just that.  It's a written question

20    and it's responded to by a written answer, not

21    testimony.  So Sprint asked Comcast to answer some

22    questions.  Comcast did.  We'll now here the

23    questions and the answers.

24         MR. RIOPELLE:  Only the answers.  The

25    parties have agreed to only the answer because part

1    of the question was a little confusing given on some

2    of the procedural matters in this case, Your Honor.

3    So --

4            THE COURT:  Is that agreed?

5            MR. HOFFMAN:  Yes, Your Honor.

6            THE COURT:  Fine.

7            MR. RIOPELLE:  So there's two of them.

8    Comcast responds to interrogatory number three, "No

9    Comcast product or service embodies the subject

10   matter of the 870 patent."  And then Comcast's second

11   supplemental response to interrogatory number two,

12   "The inventions of the asserted claims of U.S. patent

13   number 6885870 were conceived and constructively

14   reduced to practice on December 23rd, 1999.  That is

15   the filing date of Finland application number

16   19992783, to which U.S. patent number 6885870 claims

17   priority.

18           THE COURT:  Thank you.

19           MR. RIOPELLE:  One other housekeeping

20   thing, Your Honor, is we would move into -- we would

21   ask to be received by the Court Defendant's Drawing

22   Number 1, which Mr. Finkelson used in his opening.

23   This is part of the stuff that we were getting in

24   yesterday afternoon.

25           THE COURT:  We'll address how we handle

Dr. Cox - Direct                          5

1    those this afternoon, but for now, it's received.

2              (Defendant's Drawing Number 1 is received

3    into evidence.)

4              MR. RIOPELLE:  Thank you, Your Honor.  And

5    at this point, Your Honor, Sprint would call Dr. Alan

6    Cox.

7              (Pause in proceedings.)

8              ALAN JAMES COX, Defendant's Witness, Sworn.

9              COURTROOM DEPUTY:  Please be seated.

10   Please state your full name and spell it for the

11   record.

12             THE WITNESS:  Hi, my name is Alan, A-L-A-N,

13   James Cox, C-O-X.

14             THE COURT:  Good morning, sir.

15             THE WITNESS:  Good morning, sir -- Your

16   Honor.

17                     <u>DIRECT EXAMINATION</u>

18   BY MR. RIOPELLE:

19   Q   Good morning, Dr. Cox.  Could you -- oh, get some

20   water, please.  Hopefully, you'll be doing more

21   talking than I am.

22             (Pause in proceedings.)

23   A   Sorry.

24   Q   That's all right.  Dr. Cox, could you introduce

25   yourself to the jury?

Dr. Cox - Direct                                    6

1   A    Sure.  My name is Alan Cox.  I was born in

2   Ottawa, Canada, but now I live in the San Francisco

3   Bay Area with my wife and son.

4   Q    And, Dr. Cox, have you been retained as an expert

5   witness in this case to address the issue of damages?

6   A    Yes, I have.

7   Q    And as part of your preparation, have you

8   prepared slides for the jury?

9   A    I have, yes.

10  Q    Okay.  Why don't we start with your education?

11  Can you just trace for us your educational

12  background?

13           THE COURT:  Before we go any further, can I

14  have a copy of the slide deck?

15           MR. RIOPELLE:  I'm sorry, Your Honor.

16           (Pause in proceedings.)

17           MR. RIOPELLE:  Here's a copy of the slide

18  deck.  Here is a copy of the exhibits.  You don't

19  need one?

20           THE COURT:  Thank you.

21           MR. RIOPELLE:  And may I approach just to

22  give the exhibits to the witness?

23           THE COURT:  You may.

24  BY MR. RIOPELLE:

25  Q    I don't think you'll need them, but they're right

1   there in case --

2   A    Thank you.

3   Q    All right.  Let's get back to it.

4   A    Okay.

5   Q    Education?

6   A    Right.  I got a Bachelor's Degree in -- Science

7   Degree in Environmental Science at York University in

8   Toronto.  And then I switched gears a little bit and

9   did a Master's Degree in Economics at the University

10  of British Columbia in Vancouver.  I took a job for

11  three years as a research economist at the

12  Massachusetts Institute of Technology, and then did a

13  Ph.D. in Business -- actually, in Economics, from the

14  Business School at the University of California at

15  Berkeley.

16  Q    And how long have you worked professionally in

17  the field of economics?

18  A    Well, I've been working in economics about 35

19  years.  I took a job as a research associate at the

20  University of British Columbia after I finished my

21  master's, and then I did that three year stint at

22  MIT, and then continued to do economic research while

23  I was a graduate student at the University of

24  California.

25  Q    So after you received your Ph.D., where did you

Dr. Cox - Direct                              8

1    start working?

2    A    Well, I started going into the business of

3    economic consulting, and eventually ending up in the

4    company I'm out now, NERA, or National Economic

5    Research Associates, where I started in 1994.

6    Q    And can you just explain to the jury what NERA

7    is?

8    A    Sure.  NERA is a company of financial accounting

9    and economic experts who provide assistance to

10   companies that are involved in disputes or

11   applications to the government, regulatory agencies,

12   or with each other.  So we might be participating in

13   applications for a merger, for instance, with the

14   Department of Justice's Anti-Trust Division, or

15   helping companies that are making representations to

16   a public utility commission.  And often, we're also

17   involved in disputes such as this.  In all of this --

18   these sorts of matters we write economic reports that

19   discuss the economic issues related to the disputes

20   and sometimes provide expert testimony the way I am

21   today.

22   Q    And, Dr. Cox, what is your current position at

23   NERA?

24   A    I'm a Managing Director and I'm also the Chair of

25   the company's Intellectual Property Practice.

Dr. Cox - Direct                    9

1   Q    And how did you become involved in intellectual

2   property issues?

3   A    Well, a lot of the work we do in economics is

4   valuation, including valuation of intangible assets,

5   like intellectual property.  So I was involved in

6   doing a fair amount of that sort of work.  And those

7   issues are obviously important in intellectual

8   property litigation, such as this.  And I've done a

9   lot of work in anti-trust as well, and so a lot of

10  the anti-trust issues I was dealing with was the

11  impact of intellectual property on how markets work.

12  Q    Now, have you done any teaching at universities?

13  A    Yeah, I've taught graduate level courses at

14  Northeastern University and at St. Mary's College in

15  California where I taught cases -- or taught courses

16  on business strategy and business economics, or

17  economics for managers.  And I also give lectures at

18  law schools usually on economic issues related to

19  intellectual property damages.  For instance, later

20  this semester, I'm going to be giving a seminar or a

21  class on damages and trade secret matters here at the

22  University of Pennsylvania's Law School.

23  Q    Have you published any articles in the field of

24  economics?

25  A    Yeah, I've published riff articles or papers in

1   riff journals, and I also published in various trade

2   journals and magazines or publications that relate to

3   business and policy issues.

4   Q   And have you ever given any lectures or

5   presentations on economic issues that may come up in

6   litigation?

7   A   Yeah, I do that regularly, and I've designed

8   courses for lawyers on economic issues related to

9   intellectual property and litigation.  I've given

10  seminars on valuation of intellectual property all

11  around the world, not only in the United States, but

12  in Europe and Japan and Korea.  I've done a fair

13  amount of that also in China, including giving

14  talk -- even gave a talk to some justices of the

15  Supreme Court of China on damages issues in

16  intellectual property matters and valuation of

17  intellectual property.  And last year, the United

18  States Patent Office sent me to China to talk to

19  judges some more and professionals of the various

20  intellectual property offices in China to sort of

21  move -- help move along some issues between the

22  United States and China on intellectual property

23  issues.

24  Q   Now, I notice one of the publications that you

25  called out on your slide is called "Compensatory

Dr. Cox - Direct                                      11

1   Damages Issues in Patent Infringement Cases," a

2   pocket guide for federal district court judges.  Can

3   you explain to the jury what that is?

4   A    Yeah, that was something that was arranged by

5   Justice Michel -- Judge Michel.  Michel at the time

6   was the Chief Justice of something called the Court

7   of Appeals for the Federal Circuit.  The Court of

8   Appeals for the Federal Circuit is the Appeals Court

9   that hears all patent cases, all appeals to patent

10  cases.  All appeals from district courts that go to a

11  higher court go to -- first go to the Federal

12  Circuit, one step between this court and the Supreme

13  Court.

14           Judge Michel brought together a group of

15  intellectual property professionals to write this

16  pamphlet.  I should say that visual person took a

17  little bit of liberty.  It's not quite that thick a

18  book.  But a pamphlet that would assist judges in

19  managing and thinking about how to manage

20  intellectual property cases, or, specifically, the

21  damages phase of patent cases.

22  Q    So now, obviously, this case involves

23  telecommunications.  Can you tell us a little bit

24  about your experience in telecommunications?

25  A    Sure, I've been, again, doing telecommunications

Dr. Cox - Direct                    12

1   work for about 35 years.  I started doing it when I

2   was working in -- as a consultant while I was in

3   graduate school, and that morphed over into my

4   thesis.  This was, of course, long before there was a

5   cellular network, and I was doing mostly work, of

6   course in that time on wireline issues or just the

7   old-fashioned telephone company.  But I've been --

8   continued to be involved in telecommunications issues

9   through the years, including sort of traditional --

10  dealing with traditional telephone service, as well

11  as dealing with many of the issues that come up in

12  litigation related to the cellular network, in

13  particular, dealing with some of the issues that come

14  around -- come up dealing with the thousands of

15  patents that are involved in the cellular network.

16  Q   Now, how about smart phones?  Have you done any

17  work on smart phones or cases that involve smart

18  phones?

19  A   Yeah, I've done a lot of work in smart phones.

20  For instance, I was Google's damages expert,

21  copyright damages expert, in Oracle v. Google, which

22  until Apple v. Samsung came along was the biggest and

23  sexiest smart phone case going for a while.  But I've

24  also done a lot of other cases having to do with

25  smart phones and, particularly, with the intellectual

Dr. Cox - Direct                              13

1   property issues related to smart phones.

2   Q   And can you tell us who some of your clients have

3   been?

4   A   Sure.  I mean in the high tech area they've been

5   Apple, Samsung, T-Mobile, AT&T, Verizon, Broadcom,

6   Texas Instruments.  And then sort of on the more

7   interesting, or non-high tech areas, I've also

8   done -- did an interesting case for Callaway golf

9   balls when they were dealing with some dimp -- some

10  patents that were related to the pattern of their

11  dimples on their golf balls.

12  Q   All right.  So in your previous cases, do you

13  usually testify for defendants or do you usually

14  testify for plaintiffs?

15  A   I think -- I certainly do both sides and it's

16  pretty evenly split.  I'm not really sure what the --

17  what the split is right now, but it's -- I'd say -- I

18  do do work for both sides.

19          MR. RIOPELLE:  All right.  At this time,

20  Your Honor, Sprint would tender Dr. Cox as an expert

21  in the field of economics and intellectual property

22  damages.

23          MR. HEIST:  No objection.

24          THE COURT:  We will hear Dr. Cox's

25  testimony as an expert in economics and intellectual

1   property damages.

2   BY MR. RIOPELLE:

3   Q   Okay.  So just to restate, you're here to address

4   the issue of damages in this case, correct?

5   A   Yes, that's right.

6   Q   All right.  Now, before we go any further, are

7   you asserting that Sprint has infringed the 870

8   patent?

9   A   No, I'm just assuming that for the sake of

10  argument only.  And I understand that it's you, the

11  jury, that decides whether or not Sprint has, in

12  fact, infringed a patent that you find to be valid.

13  And if -- of course, if you find that Sprint doesn't

14  infringe and the patent is not valid, then, of

15  course, you don't have to pay attention to my -- you

16  don't -- you don't have to deal with my testimony at

17  all because damages, of course, are zero.  But in the

18  event that you do find that Sprint has infringed a

19  valid patent, I'd just like to be able to tell you

20  what I think a reasonable payment would be for

21  Sprint's use of that technology.  In order to do

22  that, I have to assume that you're going to -- that

23  for that particular circumstance you do find that

24  Sprint has infringed.

25  Q   All right.  So let's turn to the work that you've

1    done in this case.  When were you retained?

2    A    About two years ago.

3    Q    And, specifically, what were you asked to do?

4    A    I was asked to review the report that was going

5    to be coming -- review and evaluate the damage claims

6    that would be made by Comcast's damages expert in

7    this case.  It turned out to be Ms. Riley.  And then

8    I was asked to opine as to whether or not I thought

9    her methodology was reliable, and if not, find --

10   undertake an independent economic analysis to

11   determine the appropriate measure that -- appropriate

12   measures and appropriate amount of money that should

13   be awarded to Comcast to be paid by Sprint for the

14   use of the intellectual property in this case.

15   Q    All right.  And so what work did you do to

16   prepare yourself to, you know, testify here today?

17   A    Well, we start off by reviewing literally

18   thousands and thousands of pages of documents related

19   to this case.  I also read the reports of Ms. Riley

20   and I also undertook some research on some of the

21   technical issues, or at least discussed some of the

22   technical issues, with people at Sprint and, of

23   course, with Mr. Mark Lanning, who is the technical

24   expert for Sprint in this matter, and also for --

25   with Dr. Christopher Dippon, who we'll be hearing

Dr. Cox - Direct                          16

1    from later about some of the cost issues.

2    Q    And --

3    A    I also undertook my own independent analysis of

4    the -- of the situation in this case.

5    Q    And do the documents and information listed on

6    the slide you prepared, does that summarize the

7    information you looked at?

8    A    Yeah, that's right.  There's Ms. Riley's report,

9    I looked at a lot of industry reports, that is

10   analyst reports and reports that discuss the various

11   aspects of the cellular network or the cellular

12   business, their sales forecast, financial documents,

13   Sprint's financial filings to the SEC, and documents

14   produced in this case, including, for instance,

15   things like the interrogatories and the answers that

16   we just heard some of this morning.  And then I

17   talked with the experts that I mentioned earlier.

18   Q    All right.  So we're not accused of burying the

19   lead, let's get -- let's get to your opinions.  What

20   are your -- can you just summarize your opinions in

21   this case?

22   A    Sure.  Basically, my opinion is that the evidence

23   in this case, again, assuming that there's an

24   infringement and the patent is valid, is consistent

25   with the payment of a reasonable royalty of $1.5

Dr. Cox - Direct                    17

1   million.  I'm also of the opinion that Ms. Riley's

2   opinion is based on unreliable methodology and

3   ignores many important facts in this case.  And to

4   put it more broadly, I don't think Ms. Riley's

5   methodology makes sense in the context of a complex

6   cellular network which is very expensive and risk to

7   build and which incorporates thousands of pieces of

8   intellectual property, including thousands of

9   patents.

10  Q   And this is the second time you've mentioned the

11  number of patents.  Do you -- do you have any sense

12  of how many patents are involved in cellular

13  networks?

14  A   Yeah, I do.  And if you would like I could

15  explain how I got that number, but I'd say there are

16  at least 10,000, probably tens of thousands, of

17  patents involved in the operation of a cellular

18  network, and we're here dealing with just one of

19  those that is being asserted as being part -- or

20  operating as part -- or operating with a cellular

21  network.

22  Q   And do some of these patents have to do with

23  standards?

24  A   Yeah, that's sort of how I know that there are a

25  lot of patents involved.  We've heard a lot in this

1  case about standards, the -- basically, the

2  compilation of methods and processes that everybody

3  agrees to so that the different components of the

4  cellular network can speak to each other, different

5  components made by different people -- different

6  companies rather, and operated by different

7  companies.

8          Each of those standards, as I said,

9  describes a whole bunch of engineering processes and

10 methods.  And the point is that a lot of those

11 methods and steps and processes are patented, they're

12 covered by patents.  And some of those patents are

13 called -- are essential to the standard.  So we --

14 and we actually know the number of patents that are

15 essential -- or have a good idea of the number of

16 patents that are essential to operating a standard,

17 and from that, can get -- infer some -- infer

18 something about the number of patents that are

19 involved in the cellular network.

20 Q   Now, has the 870 patent been listed as essential

21 to offering SMS and MMS services?

22 A   No, it's not.

23 Q   Do these patents that you were talking about, do

24 they have an impact on the operation of the -- of a

25 cellular network such as Sprint's?

1    A    Sure.  I mean they are in everything that we --

2    that it takes to make the cellular network operate.

3    It's in all the equipment, all the switching

4    equipment, all the bay stations, and it's in the

5    handsets as well.  And it's important to remember

6    also, even though we're talking about lots of

7    standards, each of which have hundreds, if not

8    thousands, of essential patents, but we're talking

9    about other components of the handset that is also --

10   that are also patented.  You know, there's a -- the

11   screen has patents associated with it, the touchpad,

12   if it's got a touchpad, has patents associated with

13   it.  Even the design of some phones are patented.

14   That was the issue that came up in Apple v. Samsung

15   that was recently decided in the Supreme Court.  So

16   there's just a lot of patents and a lot of different

17   aspects and components of the cellular network.

18   Q    Well, do all of these patents impact the cost of

19   cellular services?

20   A    Certainly.  People pay license fees for those

21   products, for the use -- to use those patents.

22   Companies like Sprint and others undertake research

23   and development so they can develop their own patent

24   portfolios that get involved in messaging and other

25   parts of the cellular network.  And research and

Dr. Cox - Direct                                    20

1    development, of course, all costs money.  And some of

2    the components, of course, that Sprint buys have

3    incorporated intellectual property that the upstream

4    supplier of that product paid for as well.  So all of

5    these costs contribute to the cost of providing

6    services on a cellular network.

7    Q   Now -- okay.  You've been talking about all these

8    patents.  What does this have to do with the

9    reasonableness of Ms. Riley's opinion?

10   A   Well, I think an easy way to think about the

11   reasonableness of Ms. Riley's opinion is just to

12   extrapolate what -- the $150 million that she claims

13   is an appropriate payment for this one patent.  Let's

14   suppose that the patent -- number of patents involved

15   in the operation of a cellular network is only

16   10,000, which I think is, you know, sort of lower

17   bound.  Well, if you multiply $150 million by 10,000,

18   you get $1.5 billion in patents that -- sorry, $1.5

19   trillion in patents that are being used by -- value

20   worth of patents that are being used by Comcast --

21   sorry, by Sprint in this -- in this case -- in the

22   operation of its cellular network.  And to scale up

23   $150 million to 10,000, you get $1.5 trillion worth

24   of patents that Sprint is using.

25            Now, Sprint only has one-seventh of the

1   market share in the United States.  It's only got

2   one-seventh of the market.  So you have to

3   extrapolate that up again to figure out what the --

4   what the value is of all the intellectual property

5   that's being used by all companies providing wireless

6   services in the United States.  When you do that you

7   get a number of $10 trillion.  Now, that is just not

8   credible.  That's just far too high a number to

9   associate with just the patents operating a cellular

10  network.

11  Q   Can you -- can you put this $10 trillion number

12  into context?

13  A   Well, sure, $10 trillion is more than half of the

14  gross national product of the United States.  And

15  back in 2010, which -- 2005, which is the relevant

16  periods that we're talking about, it represented a

17  much higher percentage of the gross national product.

18  It's truly a mind-blowing number.

19  Q   Okay.  So you calculated, didn't you, a

20  reasonable royalty in this case, right?

21  A   Yes, I did.

22  Q   All right.  So let's move on to that topic.

23  A   Okay.

24  Q   Can you just remind the jury, although I'm sure

25  they've heard it 100 times, what a reasonable royalty

Dr. Cox - Direct                                    22

1   is?

2   A    A reasonable royalty is the payment that a

3   company makes in order to have the right to use the

4   patent -- let me start again.  It's the payment that

5   a company makes to a patent owner for the right to

6   utilize that patent in its product or service.

7   Q    And how do you go about determining the amount

8   for a reasonable royalty?

9   A    Well, one method is to undertake a hypothetical

10  negotiation or model of a hypothetical negotiation.

11  Q    And can you just explain what the hypothetical

12  negotiation is?

13  A    Sure.  The hypothetical negotiation is a method

14  of trying to come down to a realistic royalty rate by

15  determining -- by modeling a negotiation between the

16  two parties who would own the -- between the two

17  parties who are going to use the intellectual

18  property and to own the intellectual property at the

19  time that the user is about to start utilizing the

20  intellectual property.

21  Q    So in this case who would be the parties sitting

22  down at the hypothetical negotiation?

23  A    It would be Nokia and Sprint.

24  Q    Is that what you put on --

25  A    Yeah, that's --

Dr. Cox - Direct                                        23

1    Q    -- on your --

2    A    That's what we're showing here on this slide,

3    Sprint sitting on one side of the bargaining table

4    and Nokia sitting on the other side of the bargaining

5    table, and they're going to negotiate what they --

6    what the -- what Sprint is going to pay for the right

7    to utilize the 870 patent.

8    Q    Now, would Comcast have participated in the

9    hypothetical negotiation?

10   A    No, Comcast is not in the negotiation at all.  It

11   didn't own the patent at the time and so -- and since

12   we're talking about the hypothetical negotiation

13   taking place in 2005, Comcast didn't own the patent

14   at the time and wouldn't be involved in the

15   negotiation at all.

16   Q    So is it fair to say that we need to concentrate

17   on what Sprint and Nokia would have been thinking

18   about?

19   A    Yes, that's right.

20   Q    All right.  Now, we call it a hypothetical

21   negotiation, but is a hypothetical negotiation

22   divorced from reality?

23   A    No, it's not.  It's supposed to come up with a

24   reasonable royalty, something that's reasonable and

25   makes business sense.  And the statute, in fact -- or

Dr. Cox - Direct                                    24

1   the various -- the law basically says that.  And

2   that, of course, makes economic common sense as well.

3   Nobody is going to make -- nobody is going to pay an

4   unreasonable amount of money to utilize a technology.

5   They're not going to use something that is -- they're

6   not -- nobody is going to pay more than the

7   technology is worth to utilize the technology.  And

8   the hypothetical negotiation is supposed to come up

9   with something that is reasonably realistic.  It's

10  true, we make some simplifying assumptions, but

11  that's in order to be able to -- able to come to a

12  conclusion about what a reasonable royalty would be.

13  Q   And so what type of evidence did you rely upon in

14  determining what the reasonable royalty would be in

15  this case?

16  A   Well, one thing I like to do is look to see what

17  happens in the market.  That's usually a good way of

18  determining what -- how a hypothetical negotiation

19  would have come out.  And so what I did is I looked

20  for comparable transactions, situations where a

21  similar license was licensed -- or a similar

22  technology rather was licensed, or in this case where

23  exactly the same technology was, actually, in this

24  case, purchased.

25  Q   All right.  Before we turn to that, just looking

Dr. Cox - Direct                                    25

1    at market transactions, is -- I know you said you

2    like to look at it.  Is this something normally

3    relied upon by economists?

4    A    Yeah, I didn't mean to imply that it was just

5    something I do.  This is some -- an accepted

6    valuation technique that all valuation professionals

7    utilize.  In fact, Ms. Riley had it as one of the

8    methodologies that is appropriate to use in coming up

9    with a hypothetical -- or with a reasonable royalty.

10   Q    Okay.  Is relying on these market transactions

11   something that this jury can do to determine a

12   reasonable royalty if they have to do that?

13   A    Yes, it is.  My understanding is that they'll be

14   given an instruction or something that is consistent

15   with that.  Here it is.  Basically, it says that one

16   of the factors that may be considered in determining

17   what a reasonable royalty is is comparable license

18   agreements such as those covering the use of the

19   claimed invention or similar technology.  So we're

20   actually going to discuss a license agreement that

21   covers -- more like, actually, a transaction that

22   covers the use of the same tech -- same invention or

23   the claimed invention in this case.

24   Q    Can you give us an example in everyday ordinary

25   life where you would use comparable transactions?

Dr. Cox - Direct                                    26

1   A    Sure.  I mean we've all purchased houses and

2   cars, and if you wanted to sell or buy a used car,

3   you would go to the Kelley Blue Book, and the Kelley

4   Blue Book gives you a compilation of -- basically,

5   their summary of a bunch of comparable transactions

6   for every make and model and year of car.  With some

7   adjustments that they make for -- or allow you to

8   make based on mileage, they give you a list of

9   comparables.  A you would not think of selling a car

10  or buying a car without referencing a comparable in

11  that way and determining the value of what it is

12  you're going to buy or sell based on those

13  comparables.

14  Q    Now, but if you're -- if you're in a transaction,

15  do you just accept the Kelley Blue Book price?

16  A    Well, no, you want to kick the tire, so to speak,

17  or if it's a -- if you see the car is in particularly

18  bad condition for a car that's only been driving

19  20,000 miles, or in particularly good condition for

20  having been driving 100,000 miles, or because it's

21  got a really beautiful color that you really want to

22  have, you might make an adjustment from the Kelley

23  Blue Book price.  But still, it would be the

24  comparable that would be your anchor, so to speak, in

25  terms of determining what price you would want.

Dr. Cox - Direct                               27

1    Q   Now, sticking with your car analogies, suppose

2    that a potential seller recently, you know, retired

3    or had a decrease in income.  Would the seller accept

4    a lower price for the car?

5    A   No.  You -- the price for the car is determined

6    by the market, and just because you have a lower

7    income because you're retiring and you don't need as

8    big a car, you don't need the car as often, it

9    doesn't mean that you're going to accept a lower

10   price.  You're going to get the best price you can

11   based on what the market is offering.

12   Q   Now, what if -- what if the buyer of the car is

13   going to use it for a different purpose?  Would that

14   affect the price?

15   A   No, if the buyer wants to use the car for some

16   uses not nearly as -- not quite as valuable as

17   represented by that particular car, and you wanted to

18   sell -- and you were the seller of the car, you

19   wouldn't sell the car to a buyer just because he had

20   a lower value use for it.  You would find another

21   buyer who would be wiling to pay you for the car

22   something similar to the Blue Book value.

23   Q   All right.  So of this comparable stuff, how does

24   all this relate to determining a reasonable royalty

25   for a patent?

Dr. Cox - Direct                                    28

1    A    Well, if you can find a transaction for the same

2    or a similar patent, then that's a pretty good

3    indication as to what the patent is worth.

4    Q    And is there such a transaction in this case?

5    A    Yes, there is.  There's a purchase by Comcast of

6    this trans -- of this patent from Nokia in 2010.

7    Q    And I think what you've put on the screen here

8    is -- is this the patent purchase agreement?

9    A    Yes, it is.  You can see it's highlighted, the

10   names of the corporations, Nokia and Comcast, and

11   there's the date, June 30th, 2010, the effective date

12   of the transaction.

13   Q    And what was the price?

14   A    Comcast agreed to pay for the patents that were

15   being sold here, which was more than just the 870 --

16   they agreed to pay for the portfolio of patents

17   $600,000.

18             MR. RIOPELLE:  And just for the record,

19   Your Honor, the exhibit that is being shown on the

20   slide, it is slide ten, is Exhibit PX-8, which has

21   been admitted already.

22             THE COURT:  Thank you.

23   BY MR. RIOPELLE:

24   Q    Now, you mentioned portfolio of patents.  On your

25   next slide you have appendix A.  Can you explain what

Dr. Cox - Direct                               29

1    that is to the jury?

2    A    Yeah, this lists all the patents and patent

3    applications that Nokia agreed to sell to Comcast

4    with this -- with this sale -- in this sale.

5    Q    And you see some of these are in foreign

6    countries.  What could Comcast do with the patents

7    issued by other countries?

8    A    Well, it could -- it could assert these patents

9    against companies in other countries -- in other

10   countries.  It could sell it to somebody who was

11   interested in asserting that patent.  And that person

12   who -- somebody who -- or if Comcast found that a

13   competitor, for instance, was making a product in

14   China and importing it into the United States in

15   competition with its own product, it could sue that

16   seller in China and make -- possibly restrict that

17   company's ability to manufacture a product or get

18   income from that manufacturer in China by forcing it

19   to agree to a patent license based on what that

20   patent is worth.

21   Q    So do these patents in other countries, do they

22   have value?

23   A    Yeah.  Yeah, for that very reason.  You can get

24   money from them or you can use them to your

25   competitive advantage.

Dr. Cox - Direct                                    30

1    Q    And you see down the right-hand column there's a

2    couple places where it says "pending."  Do you see

3    that?

4    A    Yes.

5    Q    What do you understand "pending" to mean?

6    A    Well, I think that these are applications, so

7    these are patents that have -- patent applications

8    that have been made to various patent offices around

9    the world, and they're in the process of being

10   approved or disapproved.

11   Q    And do these patent applications have value?

12   A    Yes, there's a probability that they'll -- each

13   one of them has a probability that it will be

14   approved, and certainly some of them will be

15   approved.  And if so, then they would become patents

16   that can be asserted in the manner I just described a

17   moment ago.  So they have value.

18   Q    And so what is your understanding of what Nokia

19   first offered to sell this portfolio of patents for?

20   A    I understand that their opening offer was to sell

21   this to Comcast, all of these patents to Comcast, for

22   $1.5 million.

23   Q    And what's your understanding of what the final

24   price negotiated between Nokia and Comcast was?

25   A    We saw that in the previous slide.  That was

Dr. Cox - Direct                                    31

1   $600,000 for all of these patents.

2   Q    Okay.  And when you were talking about your car

3   analogy you were talking about that you wouldn't rely

4   on the Kelley Blue Book price, you would make some

5   adjustments.  Do you need to make any adjustments

6   when you look at this price of $600,000, when you're

7   doing that in terms of the hypothetical negotiation?

8   A    Well, yeah, there are a few, one of which is the

9   fact that, of course, we're just talking about one of

10  the patents that are being listed here.

11  Q    And so how many -- how many U.S. patents were

12  sold?

13  A    There are three U.S. patents and one application,

14  but three accepted patents.

15  Q    So on those three U.S., do you have to make any

16  adjustments for the value of each one of those

17  patents?

18  A    Well, one simple thing you could do is you could

19  say well, let's say they're -- all the other patents

20  are, in fact, worth nothing, that is all the non-

21  United States patents are worth nothing, all the

22  applications are worth nothing.  That means that

23  there are only three patents that are actually worth

24  anything.  So you can just take the three patents,

25  divide that into the $600,000 price, and that would

Dr. Cox - Direct                              32

1    be $200,000 per patent.

2    Q    Now, is there anything that has to do with one of

3    the other two patents, besides the 870, that you may

4    make a further adjustment for?

5    A    Yes.  One of the patents is described as

6    "essential," "standard essential."  Another problem

7    with standard essential patents, and one reason why I

8    know how many there are, is because a standard

9    essential patent is one in which the owner has agreed

10   that the patent will only be licensed at what is

11   referred to as fair and reasonable rates.  So nobody

12   actually knows what that -- what a fair and

13   reasonable rate is.  It's actually the subject of a

14   lot of litigation by itself.  And some people -- but

15   some people assert that a fair and reasonable rate

16   for a standard essential patent is zero.  I don't

17   believe that.  I don't agree with that.  But for the

18   sake of argument, I'm going to accept that patent --

19   the worth of that patent as zero because it can't be

20   asserted for a royalty rate greater than zero.

21   Q    Okay.  So if you -- if you assume that that

22   standard essential patent is worth zero, what

23   adjustment do you need to make on the remaining two

24   U.S. patents?

25   A    Well, then instead of dividing $600,000 by three,

Dr. Cox - Direct                    33

1   I'm going to divide $600,000 by two, and that means

2   that each of the patents was worth $300,000.

3   Q   And one of those patents is the 870 patent?

4   A   That's correct.

5   Q   And -- well, why don't you go ahead and get

6   your --

7   A   Thank you.

8   Q   -- water?

9           (Pause in proceedings.)

10  A   It's always amazing how dry your mouth gets when

11  you're doing this.

12  Q   All right.  So you said -- you just mentioned the

13  number of $300,000.  Does $300,000 seem like a

14  reasonable valuation to you?

15  A   Yeah.  In my experience, that is a quite high

16  price for a patent -- single patent, but not

17  unreasonable.

18  Q   Now, does the fact that Nokia was selling this

19  have any bearing on your conclusion?

20  A   No, it -- Nokia -- well, it doesn't make much

21  difference one way or the other except Nokia is a

22  sophisticated company.  It, as you heard, has

23  contributed massively to some of the standards that

24  are involved in a cell -- in the cellular network.

25  And so I would expect that it would have made sure

Dr. Cox - Direct                                    34

1   they got -- it got a price that was fair and

2   reasonable based on its extensive experience and

3   knowledge about what the patent did and what its

4   worth was.

5   Q    Now, did Nokia consider the 870 to be a

6   relatively valuable patent?

7   A    No, the evidence indicates that it did not.

8   Q    And going on to the next slide, do you recognize

9   this as the invention report --

10          MR. RIOPELLE:  -- which has previously been

11  admitted, Your Honor, as DX-150?

12          THE WITNESS:  Yes, I do recognize this as

13  the invention report.  This is a report that was

14  filled out by the manager of the person who made the

15  invention at the time that the research that went

16  into the invention was more or less completed.  And

17  in that report, she, the manager, rated the

18  invention, which is described in field two there.

19  But she rated the invention as a -- on a scale of

20  zero to five, as a two, meaning that in her view, it

21  was modest, it had modest value, because it was easy

22  to design around, or it had only a modest potential

23  for standard specification.

24  BY MR. RIOPELLE:

25  Q    Okay.  And so what is the date of this document?

Dr. Cox - Direct                          35

1   A    It's late 1999.  It's a little hard to read in

2   the previous field, but --

3   Q    And can you remind us when Nokia sold the 870

4   patent to Comcast?

5   A    Yeah, that was in 2010.

6   Q    Okay.  So the 1999 to 2010, how do those two

7   dates compare to the date of the hypothetical

8   negotiation?

9   A    The hypothetical negotiation was halfway between

10  those two dates in 2005.

11  Q    All right.  Well, let me show you -- this is part

12  of the timeline that Ms. Riley used during her

13  testimony.  What do you conclude about the value of

14  the patent in 2005 from the fact that it was rated a

15  two in 1999 and it was sold for, as you said,

16  $300,000 in 2010?

17  A    Well, I would expect if I sort of thought of

18  the -- of this as a -- the vertical part of -- side

19  of this graph or this timeline as representing the

20  value of the patent, then I would expect that if the

21  patent was relatively low in value in 1999, as we saw

22  a moment ago -- if Nokia itself thought the patent

23  had relatively low value in 1999, and it had a value

24  of about $600,000 in 2010, I would expect that a

25  price between those two points in time would reflect

1    those two valuations around that time.

2    Q    But how does Ms. Riles's -- how would you graph

3    Ms. Riley's valuation of that between the times then?

4    A    Well, instead of, you know, a line that would

5    connect this point here, this relatively low

6    valuation 1999, and the $600,000 valuation in 2010,

7    instead of giving us a straight line between those

8    two points, Ms. Riley wants us to believe that the

9    patent value went way up around 2005 and then went

10   way back down in 2010.  And she doesn't provide any

11   explanation as to why there was such a huge

12   escalation in the value of the patent just around the

13   time of the hypothetical negotiation.

14   Q    All right.  In your analysis of the hypothetical

15   negotiation, did you take into account the popularity

16   of messaging?

17   A    Yes, I did.

18   Q    And what is your -- how did you do so?

19   A    Well, I forget what the exact numbers are, but I

20   think in December of 2005, there was something like 8

21   billion messages sent per month.  And by 2010, on the

22   other hand, the number of messages being sent was

23   many times greater than that.  It was in the hundreds

24   of billions I believe.

25   Q    All right.  Now let's -- just so we're clear,

Dr. Cox - Direct                                    37

1  what would Sprint receive as a result of the

2  hypothetical negotiation?

3  A    Sprint would receive the right -- only the right

4  to utilize -- use the patented technology on its own

5  cellular network.

6  Q    Would they receive a -- do you agree that under

7  the hypothetical negotiation, they would receive a

8  non-exclusive license?

9  A    That's correct.  They wouldn't -- other companies

10  would still be allowed to use that patent in

11  competition with Sprint if Nokia wanted to license to

12  other companies, which they presumably would.

13  Q    And as a result of the patent purchase agreement

14  between Nokia and Comcast, what did Comcast receive?

15  A    Comcast got the ownership of the patent, so

16  Comcast got the right to assert that patent not only

17  against Sprint, but against all carriers in the

18  United States who they allege would have been

19  infringing the patent --

20  Q    So --

21  A    -- with their messaging.

22  Q    So which would be more valuable, to have a

23  license or to own the patent?

24  A    Well, it would be much more valuable to own the

25  patent because you can assert against all carriers in

Dr. Cox - Direct                                  38

1    the United States, rather than just utilize it

2    yourself.

3    Q   All right.  Another thing that we heard from Ms.

4    Riley about the hypothetical negotiation is you have

5    to assume that the patent is valid and infringed.  Do

6    you agree with that?

7    A   Yes, I do agree with that.

8    Q   All right.  So do you -- did you take that into

9    account when you were doing a reasonable royalty?

10   A   Yes, I did.  I mean my reasonable royalty is many

11   times higher than the comparable transaction, and one

12   of the reasons is because you have to take into

13   account the fact that when the two parties in the

14   hypothetical negotiation or an -- rather, the two

15   parties in the real world negotiation are negotiating

16   over the patent most of them realize that there's

17   some possibility that either the Patent Office will

18   decide that it shouldn't have issued the patent in

19   the first place, or that a court will decide that the

20   patent shouldn't have been issued in the first place,

21   or that in this case Sprint doesn't infringe.  So,

22   you know, in the hypothetical negotiation, on the

23   other hand, both sides know that the patent is valid

24   and infringed.  That's one of the simplifying

25   assumptions that we make.  So you have to make an

1  upward adjustment from the comparable in order to get

2  the reasonable royalty that would arise out of the

3  hypothetical negotiation.

4  Q   All right.  And so -- just to put this in

5  context, you're comparing the hypothetical

6  negotiation to the actual trans -- Nokia-Comcast

7  transaction, correct?

8  A   That's right.  Or put another way, I'm making the

9  sorts of adjustments that you make when you buy a car

10 after you look at the Kelley Book to determine -- to

11 make sure that you're getting a fair price given that

12 the car might be sold at a slightly different time or

13 have different conditions -- it be in a different

14 condition than you expect the average car would have.

15 Q   So were there concerns about the validity of the

16 870 patent at the time of the Nokia-Comcast

17 transaction?

18 A   There were some concerns, but my understanding is

19 that Comcast felt confident -- relatively confident

20 that the patent was valid.

21 Q   Okay.  So based on all the adjustments, based on

22 the Nokia-Comcast transaction, what is your opinion

23 on what Nokia and Sprint would have agreed to in a

24 hypothetical negotiation in 2005?

25 A   It's my opinion that they would have agreed that

Dr. Cox - Direct                              **40**

1  sprint would pay a lump sum royalty to cover its

2  continued use of the patent throughout the life of

3  the patent of $1.5 million.

4  Q   Okay.  So you've just given the jury a reasonable

5  royalty calculation.  Did you do any other analysis

6  to give you a sense of what the value of the 870

7  patent was?

8  A   Yes, I did.

9  Q   And what did you call -- what is this?

10  A   Well, I undertook something that's called patent

11  citation analysis.

12  Q   Okay.  Before you explain to them -- the jury

13  what the patent citation analysis is, is your opinion

14  in this case based on the patent citation analysis?

15  A   No, it's not.  I just did this to corroborate my

16  finding on the $1.5 million reasonable royalty.

17  Q   Okay.  So can you explain to the jury what a

18  patent citation analysis is?

19  A   Yes.  One of the things that has to -- as you

20  know, one of the things -- one of the features of a

21  patent is that it describes the technology that's

22  being patented.  And another part of a patent is that

23  a reference is made to previous patents, citations

24  made to previous patents, and these previous patents

25  are related to the patent that's being issued because

Dr. Cox - Direct                    41

1    they cover a similar subject matter or very close

2    subject matter.  I think there was some discussion

3    about other patents and the -- in the -- in the --

4    what do you call it -- the validity part of this

5    case.  And you often see -- well, you do see patents

6    citing earlier patents with similar technology.

7    Q   Well, why don't we -- I think you made a slide on

8    this.

9    A    Yeah.

10   Q   And let me see if I'm smart enough to --

11              (Pause in proceedings.)

12   Q   All right.  I think on this slide is the face

13   page of the 870 patent.

14              MR. RIOPELLE:  And, Your Honor, this is

15   PX-2, which has been admitted.

16              THE WITNESS:  Yeah.  Yeah, so this is the

17   face of the patent.  And, as I said, in addition to

18   the abstract on the front page, there are references

19   made by the 870 patent to two earlier patents, the

20   347 patent and the 820 patent that are listed there,

21   both issued in 1999.

22   BY MR. RIOPELLE:

23   Q   Now, who decides what earlier patents are cited

24   on the face of a patent?

25   A   Well, in making an application to the Patent

Dr. Cox - Direct                                    42

1    Office, the inventor and the attorneys working with

2    the inventor in making the application have a legal

3    responsibility -- legal responsibility to identify

4    all patents that they think or know relate to the

5    technology at issue in the patent that is being

6    issued or the patent that is being applied for.

7    Q    Okay.

8    A    And I should also say in addition to that, patent

9    examiners -- every patent in the process of being --

10   in the application process is gone through by

11   somebody called a patent examiner, and those patent

12   examiners, who are experts, subject matter experts,

13   in their field and know a lot about what the

14   important patents in their field are, those examiners

15   may also suggest additional references be placed in

16   the patent.

17   Q    Okay.  So what we're seeing here is the patents

18   that the 870 patent cited, correct?

19   A    That's correct.

20   Q    Okay.  So how do you figure out what later

21   patents cite the 870 patent?

22   A    Basically, the short answer to that is the Patent

23   Office keeps records of that.  So you can go into the

24   Patent Office website and you can click on a button

25   and you can see every patent -- later patent that,

1   for instance, has cited the 870 patent.

2   Q    All right.  And what is the importance of these

3   patent citations?  For example, what is the

4   importance of the 870 being cited by later patents?

5   A    Well, it turns out -- and there's a lot of

6   empirical work that's been done on this, but it turns

7   out that the value of a patent is strongly

8   correlated, or there's a strong relationship, between

9   the number of times a patent is val -- is cited by a

10  later patent and the value of that patent.  So if a

11  patent is cited a relatively large amount of times,

12  that's going to -- that tends to be a relatively

13  valuable patent.

14  Q    Did you -- I think you put together a

15  demonstrative on this.

16  A    Yeah.  So this is just a way of describing this.

17  So I imagine a patent that was issued by the Patent

18  Office in 2008 in a certain technology area, which is

19  described as HO4L, which we'll maybe get into later.

20  And I've just sort of stylistically shown a lot of

21  other patents that were granted in later years that

22  cite back to the patent that's being -- that's been

23  issued in 2008.  And we can compare that with another

24  patent issued in the same technology class at about

25  the same time, and it's cited by a lot fewer later

Dr. Cox - Direct                              44

1    patents, indicating that it's probably not as

2    valuable as the other patent that I showed.

3    Q    All right.  So you're saying that there is some

4    sort of correlation between the time -- number of

5    times a patent is cited and its value.  Do you have

6    an explanation for why there's this correlation?

7    A    Sure.  And as I mentioned a moment ago, the

8    patent -- the patents have a lot of description about

9    what the invention is all about, and so -- and these

10   descriptions are published obviously when the patent

11   is published.  And so people who are working in a

12   particular field might hear about or read something

13   about a new patent that might have an original idea

14   or something that people recognize as being

15   relatively valuable.  And directors of research at

16   company research labs or at universities or

17   independent research centers will tend to start doing

18   research in the same area.  And because they're doing

19   research in the same area, they're going to have to

20   cite that patent or any patents that are similar to

21   that that describe this valuable breakthrough.

22   Q    Now, is there research being done currently that

23   is looking into this correlation between the number

24   of times a patent is cited and the value of the

25   patent?

Dr. Cox - Direct                              45

1   A    Yeah, there's a lot of research being done to

2   test that relationship, and it so -- now so will

3   establish that a lot of economic research and

4   research on the economics of innovation and

5   innovation policy actually relies on that result in

6   order to be able to help write policy papers or come

7   up with policies, rather, that will be helpful for

8   expanding technology.

9   Q    And on the slide here is -- where is some of the

10  research being done?

11  A    Oh, well, this is -- I mentioned in my -- in my

12  report, Berkeley, of course, the Massachusetts

13  Institute of Technology, the University of Texas, Yel

14  University, are all important contributors to this.

15  In my deposition, the University of Pennsylvania,

16  work being done there also came up.  But, you know,

17  the fact of the matter is these are just companies

18  that I ment -- or universities that I mentioned in my

19  report.  It's basically being done in all research

20  centers where people are studying the economics of

21  innovation, and not just in the United States, but

22  also abroad, the University of Oxford, the Max Planck

23  Institute in Munich, the University of Singapore, the

24  Organization of Economic Cooperation and Development.

25  All of those places are doing this sort of work.

Dr. Cox - Direct                                    46

1  Q   So is this correlation between the number of

2  times a patent is cited and the value of the patent,

3  is this accepted in the academic literature?

4  A   Yes, it's widely accepted and published in the

5  peer-reviewed academic literature.  And, again, in my

6  report I mentioned the RAND Journal -- a paper

7  published in the RAND Journal of Economics, which is

8  a very widely respected and highly respected journal

9  in economics.  And I also mentioned the book

10 published by the Harvard University Press.  But,

11 again, these were just two that happened to -- I

12 happened to cite in my report.  There are tons of

13 reports or papers written on this topic.  And, you

14 know, the last couple of years I've been able to

15 attend the annual meeting of the American Economics

16 Association, and both years, there were a lot of

17 papers where this methodology, or this relationship,

18 between value and the number of times a patent is

19 cited was either tested or was being relied upon for

20 other results.

21 Q   Now, are there companies out there who value

22 patents?

23 A   Yes, there are a lot of companies that

24 undertake -- will value patents for you.  In fact,

25 NERA, my firm, does that as well.

Dr. Cox - Direct                                    47

1   Q   And is NERA, your firm, and these other

2   companies, are they using this patent citation

3   analysis to value patents?

4   A   Yes, it's widely used.  I think -- I would say

5   almost all, if not all, major companies that are

6   doing patent valuation work are using citation

7   analysis.

8   Q   Okay.  So how do you use the patent citation

9   analysis in this case?

10  A   Well, I had -- I did two things with the patent

11  citation analysis.  One was just to get a general

12  sense of how valuable this patent was compared to

13  other patents issued at about the same time and in

14  the same technology area, and then I also looked at

15  the patent -- the value of the patent relative to the

16  other patents that were sold in the $600,000

17  portfolio, the other U.S. patents that were sold in

18  the -- in the $600,000 portfolio.

19  Q   All right, let's -- you mentioned two concepts.

20  Let's just -- I'd like you to explain each to the

21  jury.  Why do you want to look at patents that were

22  issued about the same time that the 870 patent was

23  issued?

24  A   Well, you have to correct for when a patent is

25  issued because obviously the older a patent, the more

1  likely it is to be cited.  A patent that was issued

2  just last year, in November say, is much less likely

3  to be cited than an equally valuable patent that was

4  issued ten years ago just because of the passage of

5  time.

6  Q   And I think you also said something about the

7  same field of technology.  Why do you want to compare

8  patents in the same field of technology?

9  A   Well, it turns out that there are -- the patterns

10  of citation are different from technology to

11  technology, so I also correct for -- or normalize for

12  technology.  You know, you don't want to compare a

13  pharmaceutical patent, for instance, with an

14  electronic patent.

15  Q   All right.  So what do -- what do you want to

16  compare the -- or how did you compare the 870 patent

17  to other patents from the same time, I think you

18  said, in the same field of technology?

19  A   Well, I have an exhibit I think that would make

20  it easier to discuss.  So, basically, what I start

21  off doing is I've got the -- I identify the patent,

22  which is shown here under column one, and that's the

23  870 patent, of course, that's at issue in this case.

24  And then I look at its publication date, which is

25  April of 2005.  That is the date that the Patent

Dr. Cox - Direct                          49

1    Office, the United States Patent Office, granted that

2    patent.  And I also look at what I call the IPC

3    subclasses, which are the technology classes, or the

4    classes of technology, that the patent examiner

5    determines this patent belongs to.  And the patent

6    can be in more than one technology.  So in this case

7    the patent examiner placed the 870 patent in

8    something called the HO4L and the HO4W.  HO4L I

9    believe has something to do with error correction and

10   data transmission, and HO4W has to do with cellular

11   networks.

12   Q    All right.  So what's in -- and what's in the

13   next column then?

14   A    So then what I do is I look for all the patents

15   in those two IPC subclasses, or technology

16   subclasses.  I find -- I identify every patent that

17   was issued between -- well, to put it simply, in the

18   year bracketing the April 26, 2005, date.  So I go

19   back to whatever that is, November of 2004 through

20   November of 2005, to get and identify all the patents

21   that were issued in that one year period around the

22   publication date of the 870.

23   Q    And how many patents did you find?

24   A    7,928 patents were issued in that time period in

25   those two subclasses.

Dr. Cox - Direct                                    50

Q    Okay.  So what did you do next then?

A    So, basically, what I then did is I compared how

many times the people -- the 870 patent was cited

compared to all the other patents in that subclass

issued about the same time.  So what this says, what

that number four says, in column five, says that the

870 patent was cited four times in -- by four later

patents.

Q    And what is the next -- what's the median for

citations?

A    Well, that compares to -- that number four

compares to the median number, which is 12.  What the

median patent is -- in this context is is the patent

that has the number -- a number of citations such

that half the patents have more citations and half

the patents have less citations.  So there are about

8,000 patents we identified.  What the median means

is that there are 4,000 patents that are cited more

often than that -- than the median patent and 4,000

patents that are cited less often than the median

patent.  So it's a -- it's an indication of the

midpoint basically.  It's the 50th percentile.

Q    So how does the eight --

A    Well, let me just finish my analogy --

Q    Sure.

1  A   -- a little bit just to -- the median would be as

2  though you took all the kids in a grade ten class and

3  sorted them by height, made them stand against the

4  wall by height.  The median height child would be the

5  one who had -- if there are 20 kids in the class --

6  well, let's make it 21 just to make it easier -- 21

7  kids in the class, the median height kid would be the

8  one that had ten children who are taller than he or

9  she was and ten children who are shorter than he or

10 she was.

11 Q   Okay.  So how does -- you said the 870 was cited

12 by four later patents?

13 A   Yes.

14 Q   So how does the 870 patent compare to other

15 patents that were issued in the same technology area

16 within the same year?

17 A   It's not very -- it's not doing very well

18 compared to other patents that were issued at the

19 same time.  It was only cited four times.  Only four

20 later patents between the date that it was issued and

21 the date that I wrote my report had ever cited this

22 patent, compared to the median, that is just the

23 middling -- midpoint of patents, it was cited 12

24 times -- cited 12 times.

25 Q   What does the number 25 there mean?

Dr. Cox - Direct                                    52

1    A    Well, that's another indication of the relative

2    number of times this patent has been cited.  What it

3    indicates is that this patent belongs to the bottom

4    quarter of the distribution of value, or certainly

5    the bottom quarter of the distribution of the number

6    of times it was cited, so not apparently a very

7    important patent.

8    Q    All right.  So you mentioned a second analysis

9    that you undertook using this patent citation

10   analysis.  And I think you said you were comparing it

11   to the other two U.S. patents that Nokia sold to

12   Comcast, is that correct?

13   A    Yes, that's right.

14   Q    Okay.  And I think you also made a slide for

15   that?

16   A    Yes, I did.

17   Q    So could you explain, again, just walk quickly

18   through?

19   A    Sure.  So, basically, what this slide shows is

20   exactly the same analysis for the 870 patent, but

21   also looked at the 323 patent and the 026 patents,

22   which were also sold in the same transaction.  And,

23   basically, I just go through the same thing.  I

24   identify the date that the patent was issued, I

25   identify the subclasses that the patent office placed

1   this patent in.  In the case of the 323, there's only

2   one.  I then look at the categorically similar

3   patents, what I call the categorically similar

4   patents, that is the ones that were issued in the --

5   either within six months before or six months after

6   the issue date.  You can see, for instance, that the

7   026 patent had 15,297 patents that fit that criteria

8   issued around that time.  And then I looked at the

9   number of forward citations that those patents

10  received, that is the number of times -- the number

11  of patents that cited the patents that are in the

12  highlighted column one, and that shows that the 323

13  patent was cited 190 times and the 026 patent was

14  cited 73 times.

15          Now, the fact that the 1999 patent is cited

16  more often is not surprising because it's much older.

17  But before we do anymore analysis, you can see that

18  the bottom patent there, the 026 patent, was issued

19  at about the same time as the -- as the 870 patent,

20  and yet it received 73 citations.

21  Q    So do you get into a valuation?

22  A    Yeah, so we have to normalize for date.  So what

23  I've done is, again, I compared the number of times

24  that the patent was actually cited with the number --

25  the median number of times the patent -- the median

1   number of times that the categorically similar

2   patents were cited.  So, you know, this is dealing

3   with the equivalent of the 12 we saw in the previous

4   slide in column six.  The median numbers are 31 and

5   ten, 31 citations for the older -- median -- 31 is

6   the median number of citations for the categorically

7   similar patents that were issued about the same time

8   as the older patent.  The younger patent has about

9   ten citations.

10  Q   So based on that, if you look at the last column,

11  is -- are you saying that the -- based on your patent

12  citation analysis, that the 870 would represent 2.4

13  percent of the $600,000 in the Nokia-Comcast

14  transaction?

15  A   Right.  That is basically the bottom line.  It's

16  obviously worth a lot less than the other two patents

17  because the number of forward citations of the other

18  two patents is much greater than the median number of

19  citations in those technology classes.

20  Q   So how does this method -- this patent citations

21  analysis method of comparing the value, how does that

22  compare to what Ms. Riley did?

23  A   Well, what this does -- this -- how -- the

24  problem with Ms. Riley's methodology is that there's

25  no -- she doesn't provide any basis for why her

1   counting up the number of steps and the correlation

2   of -- and the proportion of steps that are used

3   indicate the value of the patented technology.

4   There's no -- as far as I know, no credible peer-

5   reviewed literature that describes that as being the

6   basis of the valuation, there's no basis for

7   suggesting that just because something is used a

8   certain number of steps is a basis for the value of a

9   patent.  This, on the other hand, is based on

10  rigorous, peer-reviewed analysis that indicates that

11  the patent at issue here should not be given that

12  much value.

13  Q   All right.  So let's talk -- let's turn to Ms.

14  Riley's opinion.  What is your assessment of the

15  opinion submitted by Ms. Riley?

16  A   I don't think that her methodology can be relied

17  on -- should be relied upon as the basis for

18  calculating a reasonable royalty in this matter.

19  Q   Why not?

20  A   Well, for several reasons.  First of all, she

21  relies heavily on revenue numbers that are

22  unreliable.  She doesn't accurately calculate the

23  costs of the -- that are used in providing messaging

24  services.  And, finally, the methodology, as I said,

25  is an unreliable one and shouldn't be utilized in a

1    matter such as this.

2    Q    All right.  So you just mentioned I think what,

3    revenue, cost, and --

4    A    The methodology itself.

5    Q    -- and the methodology?  All right.  So -- and

6    didn't she use something I think she called the

7    income approach?

8    A    Yes.

9    Q    So why is her income approach not appropriate for

10   the revenues in this case?

11   A    Well, for two of the reasons I just stated.  One

12   is that -- one reason is that she can't make an

13   accurate estimate of the revenues, and the other

14   reason is because you can't -- doesn't use an

15   accurate estimate of the cost involved.

16   Q    And why can't she make an accurate estimate of

17   the revenues?

18   A    Because Sprint basically does not separately

19   track the revenue that it can attribute to its

20   messaging services.  It doesn't track it and it's not

21   possible to track the revenue that it receives from

22   its messaging services.

23   Q    All right.  And why doesn't -- why doesn't Sprint

24   know how much revenue is attributable to SMS and MMS?

25   A    Well, like other companies in this -- providing

Dr. Cox - Direct                                          57

1   cellular network services, it is now providing these

2   services in a bundle.  Basically, companies are

3   offering individual customers bundles of services for

4   a single price.  For a single price, you get to use

5   voice, date, and messaging.  And not only do

6   individuals get to do this, but you now can do it

7   across families.  So it's impossible to determine

8   what part of the bundled revenue is attributable to

9   messaging.

10  Q   Now, what about -- I think you mentioned cost.

11  What is your opinion about --

12  A   Actually, I didn't quite finish that.  And this

13  is a situation that -- not just my opinion about the

14  ability to determine what the revenue is, but, in

15  fact, recently, the Federal Communication

16  Commission -- not that recently, but the Federal

17  Communication Commission now has determined that it

18  can't determine how much -- the value, basically, of

19  messaging in the United States because all of the

20  major operators are providing these bundled services,

21  and nobody actually knows how much revenue is

22  attributable to messaging.

23  Q   Okay.  I think the second thing you had mentioned

24  was cost.  What is your opinion about Ms. Riley's

25  estimate of cost?

Dr. Cox - Direct                                    58

1    A    Well, you're going to hear more from that --

2    about that from Dr. Dippon, who is more of an expert

3    on this than I am.  But my understanding is that Ms.

4    Riley did not include all the costs in the -- that

5    are necessary to provide messaging services, and, in

6    particular, she didn't provide or include any cost

7    for the spectrum, which is one of the most costly

8    portions of the provision of cellular services.

9    Q    Do you know if Ms. Riley included network costs?

10   A    I know that there are many elements of network

11   costs that she did not include.

12   Q    And do you recall -- and I think we have it

13   here -- do you recall Ms. Riley's slide on the -- on

14   the bus?

15   A    Yeah, I do.

16   Q    And I think she was talking about this being a

17   free rider issue.  Do you have an issue with her

18   analogy here?

19   A    Well, I do.  My problem with this is that it

20   indicates what the situation may have been at the

21   time of the hypothetical negotiation.  You asked me

22   earlier about the difference between the use of

23   messaging in 2005 versus 2010, and now a few years

24   later, we know that messaging has grown even more.

25   So, in fact, when somebody is sitting down -- when

1    Sprint is sitting down thinking about what it's going

2    to need in order -- in terms of capacity it's going

3    to think about the fact that the number -- the amount

4    of messaging is going to increase from a factor of 18

5    or 20 or 25.  And so rather -- by the time -- with

6    the fullness of time, as more and more messaging is

7    being done, more and more of these bundles that Ms.

8    Riley had traveling in these buses would fill up

9    those buses or fill up the cargo space in these buses

10   and you would need to have more buses in order to

11   carry those bundles.  And once that happened, then

12   you would start having congestion and you would have

13   to either cause more -- move more buses onto the

14   lanes, which are already crowded, or you're going to

15   have to build more capacity.  And that's something

16   that needs to be taken into account when thinking

17   about the relative profitability of messaging.  What

18   are going to be your future costs, expansion costs,

19   when you're in -- providing messaging services?

20   Q    Okay.  So we've talked about revenue, we've

21   talked about cost.  I believe Ms. Riley also used a

22   methodology she called excess profits.  Do you have

23   an opinion of her use of this excess profits

24   methodology?

25   A    Yes, I do.  I think it's totally inappropriate in

Dr. Cox - Direct                          60

1    a situation like that.  I mean recall that what she

2    did was she took her estimate of the margin earned on

3    messaging, which I've already discussed I have some

4    problems with, and then she compared that to she said

5    was Sprint's normal profits on everything else that

6    Sprint provides.

7           The basic problem with that is that the

8    excess profits, and, therefore, her valuation of the

9    patents, are going to vary depending on the services

10   that Sprint offers.  They're going to go up and down.

11   Sprint's normal profit is going to go up and down

12   depending on what services Sprint offers and where it

13   offers them.  So in other words, her excess profits

14   are going to change for reasons that have nothing to

15   do with the value of providing messaging services.

16          It also has other bizarre results, like the

17   one I pointed out in my report, which is the fact

18   that if you look at SMS profitability the way she

19   calculates and MMS profitability the way she

20   calculates it, and compares each of those to the

21   so-called normal profit, it turns out that MMS is

22   less profitable than normal profits.  So that means,

23   taking her logic to the next step, that the patented

24   technology has negative value as applied to MMS.

25   Well, that can't be right because, you know, Sprint

Dr. Cox - Direct                                    61

1    is certainly earning some revenue from MMS and there

2    must be some value to the provision of that service

3    to Sprint.  And, therefore, you know, using the

4    excess methodology gives a result that is obviously

5    totally perverse.

6    Q   Is it -- on this excess profits thing, is it --

7    do you think it's acceptable to compare the profits

8    of messaging without the cost of spectrum and other

9    things like that to the average cost, which would

10   include spectrum?

11   A   Well, that's another excellent point is that, you

12   know, you have to make sure that you calculate the

13   margins in exactly the same way in order for you to

14   be able to use -- compare the margins on messaging

15   with the margins on everything else.  And Sprint's

16   normal profits, as she calculated them, include a lot

17   more elements that she excluded form the cost of

18   messaging.

19   Q   All right.  So after she did this excess profit

20   analysis, she then I think applied Dr. Akl's step

21   counting?

22   A   Yes.

23   Q   Do you have an opinion about her use of this step

24   counting methodology?

25   A   Yes, I think it's not correct and it doesn't make

Dr. Cox - Direct                              62

1   common sense even.  That valuation should be based on

2   the basis of frequency of use.

3   Q    And do you have any specific problems -- even if

4   you could use the step counting methodology, do you

5   have any specific problems with the way she did so?

6   A    Well, yes.  I mean part of the problem with this

7   whole step -- the step methodology is that, first of

8   all, there's ambiguity as to what the number of steps

9   are and professor -- or Dr. Akl testified that he did

10  not include all the steps that Ms. Riley relied --

11  did not include all the steps in getting a message --

12  or switching a message and providing messaging

13  services, so Ms. Riley's number has to be wrong.

14  But, more importantly, even if it was correct to

15  count steps and even if the number of steps was

16  correct, Ms. Riley takes no account of any other

17  things that would be going on, any other factors that

18  would be involved in taking a particular step.  So if

19  a particular step is taken using a $500,000 piece of

20  equipment and involves five or six other patents, Ms.

21  Riley doesn't take that into account at all.  She

22  doesn't have any difference in the -- it doesn't

23  provide any weighting for any other technology or any

24  other input that would be used in implementing every

25  step.

Dr. Cox - Direct                          63

1   Q   All right.  Ms. Riley said she used the income

2   method because that measured the value of Sprint's

3   use of the patent.  You would agree -- do you agree

4   that that's a proper way to measure it?

5   A   No, I don't.

6   Q   Okay.  Can you give me an example?

7   A   Well, the frequency of use, as an indicator of

8   value, to give a common sense analysis as to -- or

9   description as to why it's not appropriate, think

10  about a patent on a tire.  You know, the -- a tire on

11  a car, when it's attached to a car, is used 100

12  percent of the time that you're driving the car.  But

13  that doesn't mean that the entire profit of the car

14  should be associated with that one patent.  No,

15  you've got to make some allocation of the patent to

16  all the other intellectual property and all the other

17  engineering and all the other know-how and all the

18  other manufacturing costs that go into make the car.

19  You can't just attribute the entire profit of selling

20  a car to the tires because they're always used.

21  Q   So then how would you determine the value of the

22  tire in that instance?

23  A   Well, that's the beauty of markets.  You know, we

24  know how much a tire costs because we can go out and

25  buy one, and we know we wouldn't pay anything more

Dr. Cox - Direct                    64

1   than what we could buy a tire for than we might when

2   we go down to Big O Tires.  Markets allow us to make

3   the allocation between, you know, what in this case

4   the patent is actually worth and the overall

5   profitability, if you could calculate it, of

6   messaging.

7   Q   Okay.  Did Ms. Riley -- did Ms. Riley take into

8   account the Nokia-Comcast transaction?

9            (Pause in proceedings.)

10  A   No, she refused to take it into account.

11  Q   All right.  I think one of the things that Ms.

12  Riley testified about was Nokia's changed

13  circumstances.  I think she calls it Nokia's demise.

14  Can you just repeat what you understand her -- she

15  was talking about there?

16  A   Well, yeah, she basically said, as I understand

17  it, that Nokia was in a different financial situation

18  in 2010 than it was in 2005, that it had a different

19  patent strategy and a different strategy overall, and

20  that because of those situations, Nokia would have

21  been willing to take a discount or sell the patent

22  for a lower price.

23  Q   Now, do you think this would have had any impact

24  on the price Nokia would have been willing to sell

25  that patent for?

Dr. Cox - Direct                                    65

1   A    No, I don't think so at all.  First of all, Nokia

2   was still doing very well.  It had earnings I think

3   of 2.1 million -- billion Euros at about -- in about

4   2010.  But second of all, even if it was doing

5   relatively badly, it was certainly not in desperate

6   straits, so it could sell in an orderly manner.  And

7   it had a fiduciary responsibility to its shareholders

8   to get the best price it could.  It had a fiduciary

9   responsibility -- an obligation to the shareholders

10  to get a price that reflected the value of the

11  patent.

12  Q    Okay.  What is your understanding of Nokia's

13  financial position today?

14  A    Nokia now has -- for the last year data is

15  available, 2015, I think it had earnings of 1.7

16  million -- sorry, 1.7 billion Euros and was earning a

17  margin of about 13.5 percent.  And it had a very

18  strong balance sheet still, I think in the 20 billion

19  Euro area.  So it's still a very strong company and

20  was a strong company in 2010, led by people who are

21  very savvy about how they want to manage their

22  intellectual property, and not the sort of people who

23  are going to sell it at any sort of a discount.

24  Q    Are you aware of any recent acquisitions Nokia

25  made?

Dr. Cox - Direct                              66

1   A    Yeah, I understand that in the last year or two

2   they bought Alcatel-Lucent, which is a major European

3   technology company.

4   Q    Now, what about Ms. Riley's opinion that Nokia

5   wanted to monetize its patent portfolio? Do you have

6   an opinion about that?

7   A    Well, you know, it may have wanted to monetize

8   its patent portfolio, but what does that mean?  That

9   means you want to get -- you want to sell -- you want

10  to get money for it and it means you want to get the

11  best price you possibly can.  So, again, I think that

12  it would mean that the price that Nokia got for its

13  patent in 2010 would be reflective of the -- of

14  market price for that patent.

15  Q    I think one of the other things you said earlier

16  in your testimony is that Ms. Riley overstated the

17  value of the 870 patent.  If Ms. Riley's valuation is

18  correct, what would the effect of this be on the

19  entire industry?

20  A    Well, I think one way of thinking about that is

21  to scale up what Ms. Riley is implying about the

22  value of the patent.  So if the patent is worth $150

23  million to Sprint, and Sprint represents only

24  one-seventh of all the companies that could use this

25  patent, then that means that this patent, according

Dr. Cox - Direct                        67

1   to Ms. Riley, when applied to all the

2   manufacturers -- all the providers of cellular

3   service, that this patent is worth $1.7 billion.

4   Well, one thing that you have to wonder about is why

5   would Nokia cell for $600,000 a patent, in

6   combination of other patents, which, presumably, have

7   value -- why would it sell that patent for $600,000

8   when the patent is actually worth something like

9   2,500 or 5,000 times more than that, you know,

10  something closer to $1.7 billion?  It just doesn't

11  make sense.  And, as I implied earlier with my other

12  quest -- with the answer earlier where I was talking

13  about the large numbers that Ms. Riley is talking

14  about here, you know, if we act -- if companies have

15  to pay royalties of that size for just one patent of

16  the -- and you scale that up to the tens of thousands

17  of patents that are involved in providing cellular

18  network services, the number would be truly

19  astronomical.

20  Q   All right.  Did you attempt to make any

21  corrections to what you believe are Ms. Riley's

22  errors in her calculations?

23  A   Yeah, I did do some adjustments to some of her

24  calculations to come up with more reasonable numbers,

25  though I still didn't -- don't accept the methodology

Dr. Cox - Direct                                    68

1   as being appropriate.

2   Q    And is this -- what's on the screen now, is this

3   the schedule from your report in which you tried to

4   do this?

5   A    Yes, it is.  And you can see in the bottom of

6   column two, which is highlighted here, actually,

7   blown up here, I estimated total damages just based

8   on her methodology of $67,000.

9   Q    Okay.  Two more topics.  Did you read the

10  transcript of Ms. Riley's testimony from Monday?

11  A    I did.

12  Q    And do you recall that she mentioned a report

13  that was published by J.P. Morgan I believe?

14  A    Yes, I did.

15  Q    Have you reviewed these reports?

16  A    Yes, I have.

17  Q    Are they cost analyst studies that would be done

18  by trained economists?

19  A    No, they're not.

20  Q    And do the people who did these studies, did they

21  have access to the internal Sprint financial

22  information that you and Ms. Riley had in this case?

23  A    No, they didn't.

24  Q    And the FCC report, that was only referenced --

25  that only referenced the Morgan Stanley report, is

1    that right?

2    A    That's correct, yeah.

3    Q    And what did the Morgan Stanley report identify

4    as the three primary services offered by cellular

5    networks?

6    A    Voice, data, and messaging.

7    Q    All right.  One more quick topic here.  Ms. Riley

8    has said that the reasonable royalty should be in the

9    form of a running royalty.  Do you agree?

10   A    No, I don't.

11   Q    And what do you think the form of the reasonable

12   royalty should be?

13   A    Well, I think in keeping with business -- or

14   business practice in this industry, for this sort of

15   service a -- the royalty should be in the form of a

16   lump sum payment, that is Sprint would have agreed at

17   the hypothetical negotiation to pay the $1.5 million

18   in a single payment which would cover its right to

19   use the technology for the remainder of the life of

20   the patent.

21   Q    And have you looked at agreements in this case?

22   A    Yes, I have.  I've looked at agreements in this

23   case and many other licenses as well.

24   Q    And what does reviewing those agreements indicate

25   to you?  Should it be a lump sum or a running

1   royalty?

2   A    It should be a lump sum, based on my experience

3   looking at other licenses, and there's good reasons

4   for that.  It's very difficult to account for all the

5   transactions.  There's a lot of accounting and

6   reviewing work that has to be done in order be able

7   to calculate the royalty that is owed, the amount of

8   money that's owed at the end of every year, based on

9   trying to track trillions of -- trillions of

10  transactions and trillions of messages.

11  Q    Okay.  Could you just summarize for the jury what

12  your opinions are in this case?

13  A    Yeah, I'll just go back to the slide I had closer

14  to the opening.  That if the patent is infringed and

15  valid, if you make that finding, then the facts in

16  this case indicate that a reasonable royalty would be

17  a lump sum payment of $1.5 million.  And Ms. Riley's

18  methodology I found to be unreliable.  It's the wrong

19  approach and she did ignore many important facts and

20  comes up with an unreasonably large number.

21  Q    Dr. Cox, thank you for your time.  Please answer

22  Mr. Heist's questions.

23  A    Certainly.

24          THE COURT:  I think we'll --

25          MR. HEIST:  Sorry, Your Honor.

Dr. Cox - Direct                    71

1          THE COURT:  I was going to say it's 11:17.

2    I think we ought to have a quick recess.

3               (Jury out, 11:16 a.m.)

4          THE COURT:  Be seated, everyone.  You may

5    step down, Dr. Cox.

6          THE WITNESS:  Thank you.

7          THE COURT:  What time is your --

8          MR. RIOPELLE:  My --

9          THE COURT:  -- absolute --

10         MR. RIOPELLE:  12:00.

11         THE COURT:  -- latest?

12         MR. RIOPELLE:  12:00.

13         THE COURT:  12:00?

14         MR. RIOPELLE:  My flight that I was going

15   to take at 2:15 has already been delayed, so I

16   canceled the flight and I have a car meeting me out

17   front at 12:00, which I believe will get me to the

18   visitation about a half an hour after it starts,

19   assuming that there's no --

20         THE COURT:  You're going to drive to

21   Virginia.

22         MR. RIOPELLE:  Yeah.

23         THE COURT:  How long do you think the cross

24   will be.

25         MR. HEIST:  I would estimate an hour, Your

72

1    Honor.  I apologize for that because I'd --

2              THE COURT:  No, no need to.

3              MR. HEIST:  -- rather not have it mulled

4    over, but I don't think I could finish.  I will do my

5    very best to move along and go as far as I can.  If I

6    can finish, I will.

7              THE COURT:  Well, I thought I had to give

8    the jury a short break.  They've been at it since

9    about 9:45.  Let's stick to the ten minutes.  Let's

10   make it a little shorter than that.  And --

11             MR. RIOPELLE:  Thank you, Your Honor.

12   Again, thank you for your kindness of dealing with my

13   situation.

14             THE COURT:  Are we going to be able to

15   address the lump sum versus running royalty issue in

16   your absence?

17             MR. FINKELSON:  We are, Your Honor.

18             THE COURT:  Okay.

19             MR. RIOPELLE:  He's not just a technical

20   guy.

21             THE COURT:  Well, we'll see.  How about

22   seven minutes then?

23             (Recess taken from 11:18 a.m. to 11:26

24   a.m.)

25             THE COURT:  Be seated, everyone.  You may

Dr. Cox - Cross                           73

1    proceed with cross-examination.

2              MR. HEIST:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. HEIST:

5    Q    Good morning, Dr. Cox.

6    A    Good morning, Mr. Heist.  How are you?

7    Q    Good.  Now, you are an economist, right?

8    A    Yes.

9    Q    And you're not testifying here as a technical

10   expert?

11   A    That's correct.

12   Q    And you're not a patent lawyer?

13   A    That's correct.

14   Q    And you're not testifying as a legal expert or a

15   patent expert?

16   A    That's correct.

17   Q    And you're not an accountant?

18   A    That's correct.

19   Q    I think we may get into some issues involving

20   accounting, engineering, and law in your cross-

21   examination.  I just want to establish that.  Now, in

22   giving your opinion, you assumed -- and I know it was

23   an assumption just for the purpose of your

24   testimony -- but you assumed that the 870 patent is

25   valid and has been infringed by Sprint?

Dr. Cox - Cross                    74

1    A    Yeah, that's the simplifying assumption that we

2    make in order to be able to even come up with a

3    damage number.

4    Q    Right.  And you're not -- you're not giving an

5    opinion on the underlying issues, but everything you

6    said about your opinion starts with the assumption

7    that the patent is valid and has been infringed?

8    A    That's correct.

9    Q    Now, if the jury decides that Sprint has

10   infringed even one claim of the patent and that that

11   one claim is not invalid, as Sprint alleges, then

12   damages must be awarded, correct?

13   A    Yes, appropriate damages should -- I suppose must

14   be awarded, yes.

15   Q    And the measure of damages that must be awarded

16   is an amount of money that would compensate Comcast

17   for Sprint's infringement?

18   A    That's what the law says, yes, and that's

19   consistent with the number that I suggested.

20           MR. HEIST:  And just to remind ourselves of

21   what we looked at in Ms. Riley's testimony regarding

22   the law that the Court will instruct all of us on,

23   could we please have Ms. Riley's slide PD4.6?

24   BY MR. HEIST:

25   Q    "The damages you award must be adequate to

1  compensate Comcast for the infringement."  Do you see

2  that?

3  A   Yeah, and it's consistent with the number that I

4  suggested.

5  Q   And then it says, "Comcast is entitled to recover

6  no less than a reasonable royalty for each infringing

7  act."  Do you see that?

8  A   Yes.

9  Q   And you understand that that's our task?

10  A   That's correct.  That's consistent with the

11  number that I suggested and the lump sum royalty I

12  suggested.

13  Q   Now, the damage award in a patent case can be

14  higher than a reasonable royalty in some instances,

15  can it not?

16  A   Well, not just for the -- not just for the

17  compensatory -- not for just the compensation part of

18  the award, no, not in --

19  Q   Could --

20  A   -- my understanding.

21  Q   In some cases the damage awards are higher than a

22  reasonable royalty, but the royalty establishes a

23  floor, does it not, beneath which damages may not

24  fall?

25  A   In a reasonable royalty case or in -- are you

1   talking about loss profits cases?

2   Q   My point is that reasonable royalty is the

3   bottom.  Damages cannot go below a reasonable royalty

4   in a patent case if infringement and validity is

5   found?

6   A   I'm just trying to think of whether in lost

7   profit cases it's possible to get a reasonable

8   royalty that's higher than the lost profit, but I

9   think as a general matter, I can accept that.

10  Q   And the patent statute itself, which I think we

11  looked at at your deposition last year, says that,

12  "Damages can be no less than a reasonable royalty for

13  the use made of the invention by the infringer,"

14  correct?

15  A   That's correct, and that's consistent with my --

16  what I was doing in this case.

17          MR. HEIST:  And can we see Ms. Riley's

18  slide PD4.8?

19  BY MR. HEIST:

20  Q   And, again, that's from the instructions that we

21  will receive, I expect, from the Court, and it uses

22  that language right out of the statute that says, "A

23  reasonable royalty is defined as the amount of money

24  Nokia and Sprint would have agreed to -- agreed upon

25  as a fee for the -- for use of the invention."

Dr. Cox - Cross                          77

1    That's what we're trying to get at here, a royalty

2    for the use of the invention, correct?

3    A    That's right.  That's right.  We're looking a the

4    royalty, appropriate royalty, for a single patent in

5    a complex cellular network system, that's correct.

6    Q    And you were here when Ms. Riley testified I

7    believe, were you not?

8    A    I was here for the Friday testimony.  I was not

9    able to be here on Monday.

10   Q    And she referred to the Georgia-Pacific factors,

11   which are factors from a famous patent case that has

12   been quoted and cited again and again over the years,

13   correct?

14   A    Yes.

15   Q    And one of the factors that she mentioned that

16   she looked at was the factor, and I'm going to quote

17   it, "the extent of use by the infringer and evidence

18   probative of the value of that use?"

19   A    Yes, that's right.

20   Q    Okay.

21   A    The value of that use.

22   Q    Right.  So we have to look at the extent of use

23   by the patent by Sprint?

24   A    We have to look at the value of the extent of use

25   of that patent, not just the number of times it's

Dr. Cox - Cross                    78

1   used.

2   Q    Now, just to get a few preliminary matters out of

3   the way, you agree Comcast owns the patent?

4   A    As of today, that's my understanding, yes.

5   Q    And they acquired it from Nokia in 2010?

6   A    Yes.

7   Q    And when they acquired the patent from Nokia in

8   2010 Comcast acquired the right to collect damages

9   that arose when Nokia owned the patent, correct?

10  A    That's correct.  They could assert that patent

11  against everybody in the United States who they felt

12  was infringing that patent.

13  Q    Or they also had the right, did they not, to

14  cross-license the patent with others?

15  A    That's correct too, though that would be based --

16  that cross-licensing would be based on the value of

17  the patent.

18  Q    Understand.  Now let's talk about the damage

19  period.  If the jury finds infringement of a valid

20  claim in this case, Comcast is entitled to damages

21  running from February 17th, 2006, through -- in

22  Comcast's claim, through September 30th of last year,

23  correct?

24  A    That -- certainly the start date is consistent to

25  my understanding, and if -- to the extent that they

Dr. Cox - Cross                                    79

1    are still infringing, they would be entitled to the

2    royalty calculated through that time period.

3    Q    So --

4    A    Though, again, I'd say that an appropriate damage

5    calculation would be a lump sum payment.

6    Q    For the life of the patent?

7    A    That's correct.

8    Q    Could we call that a "paid up license?"

9    A    Could we call it that?

10   Q    Yeah, would your -- let's -- I think there may be

11   some confusion here and I think it's worth trying to

12   untangle it.  Your view is that the appropriate

13   reasonable royalty in this case is $1.5 million paid

14   up license for any and all use of the invention of

15   the 870 patent that took place between February of

16   2006 up through the date the patent expires?

17   A    Yes, that would be my estimate.  The use would

18   be -- I guess there would probably be some

19   restriction to the uses that have actually been made

20   by Sprint of the -- of the patent.

21   Q    But just so we're all clear, you're seeking --

22   your opinion would seek compensation for acts that

23   haven't even occurred yet?

24   A    Yeah, it's -- that's a common feature of

25   technology licenses for the provision of wireless

Dr. Cox - Cross                                    80

1    services, and that -- what I'm suggesting is in

2    keeping with that common practice.

3    Q   Okay.  So the last year for which we have

4    information from Sprint, there were 330 million

5    messages, approximately, SMS and MMS messages, that

6    were sent and delivered by Sprint.  Just accept my

7    number for just a moment, if you would.

8    A   Okay.

9    Q   The patent doesn't expire until 2023.  Are you

10   aware of that?

11   A   Yes.

12   Q   And so let's just call that six years from now.

13   So your opinion is that the measure of damages should

14   be $1.5 million for the 2.66 trillion messages that

15   have already been sent and delivered, and what could

16   be as many as 2 trillion messages that have yet to be

17   sent and delivered before the patent expires, is that

18   right?

19   A   Well, that's right, but it could go the other way

20   around too.  I mean Sprint's messaging could continue

21   to be threatened by the over-the-top messaging and it

22   might go down considerably --

23   Q   Right, the --

24   A   -- so the risk is all on Sprint.

25   Q   The -- no one can tell for sure what the future

Dr. Cox - Cross                          81

1    will hold, but your opinion is that the value that

2    you're seeking as a reasonable royalty is paid up for

3    the life of the patent for everything that's happened

4    in the damage period so far and everything that might

5    happen until the patent expires more than six years

6    from today?

7    A    Right, but you got to remember, we got to put

8    ourselves back at the time of the hypothetical

9    negotiation.  At that time what was going to happen

10   in the future was not known with certainty, and

11   there's always a possibility that, as I said, other

12   technologies would come in and threaten the revenue

13   stream to the extent that you could associate one

14   with text -- with messaging.  It would threaten that

15   revenue stream and eliminate messaging through the --

16   through the system.  And in that case, Sprint would

17   have been out $1.5 million for using a technology --

18   for a tech -- for the right to use a technology that

19   it never got a chance to use.

20   Q    No one's crystal ball is perfect.

21   A    That's correct, but -- and that's one thing that

22   has to be taken into account when calculating a

23   reasonable royalty.

24   Q    But just taking the two parties' damage experts'

25   theories and putting them next to one another, we're

Dr. Cox - Cross                    82

1    not really comparing apples to apples in one sense

2    because Ms. Riley's number only seeks compensation

3    through September 30th of last year.  Your number

4    would be compensation for infringement that might or

5    might not occur in the future between now and the

6    time the patent expires?  I just want to make that

7    point.  Is that correct?

8    A   Well, it's not quite as different as that.  I

9    mean her payment, her royalty, could be turned into a

10   lump sum by doing a discounted present value back to

11   2005.  But apart from that -- we could turn the

12   apples into apples except for the fact that there's

13   still some potential for ongoing infringement of the

14   patent if it's valid.

15   Q   And that potential -- if we take the last year

16   for which we have information, that potential could

17   be another 2 trillion messages?

18   A   Sure, of which this patent, if it's valid,

19   provides a very small component of the technology

20   that's necessary to do that, a minuscule portion of

21   the technology.

22   Q   All right.  Ms. Riley says that to determine a

23   reasonable royalty, one must consider a hypothetical

24   negotiation between a willing a licensor and a

25   willing licensee that would have taken place on the

1   date of first infringement.  You agree with that?

2   A   I do, yes.

3   Q   And she says that on the facts of this case, that

4   negotiation would have taken place on April 26th,

5   2005, the day the patent issued?

6   A   Yes.

7   Q   And you agree with that?

8   A   Yes.

9   Q   And she said at that time Nokia owned the patent,

10  and so the negotiation would have been between Nokia

11  and Sprint, and you agree with that?

12  A   Yes, I do.

13  Q   And she said at that negotiation, the

14  hypothetical negotiation, both parties, Nokia and

15  Sprint, would have come into the room with the

16  understanding that the patent was valid and that the

17  patent was infringed by Sprint.

18  A   That's correct, I've acknowledged all of those

19  points.

20  Q   And in that respect, the hypothetical negotiation

21  differs from any real world negotiation which -- with

22  which you are familiar, correct?

23  A   That's correct.  Those are -- those are the only

24  differences, and as I said in my direct testimony,

25  that's a set of simplifying assumptions that we use

1    so that we can come to some number, so we can

2    calculate and determine how the hypothetical

3    negotiation would have ended up, but it still has got

4    to be a realistic royalty.

5    Q    I understand that, but the law requires us to

6    start with these simplifying instructions that don't

7    really happen in the real world, correct?

8    A    That's correct.  That's one of the things we have

9    to correct for when we're using comparables.

10   Q    And the hypothetical negotiation, at that

11   negotiation, the parties must be presumed to have

12   knowledge about what turned out to be the extent of

13   infringement over the damage period, correct?

14   A    Well, maybe you can elaborate on that because I'm

15   not sure that I agree with that.

16   Q    Well, at the time of the hypothetical

17   negotiation, the parties -- let's start with -- let's

18   start with what they would have known on the date of

19   hypothetical negotiation, and look -- let's look at

20   some real world facts that they would have brought

21   into the room with them, okay?

22   A    Okay.

23   Q    Now, just before the hypothetical negotiation in

24   2004, Sprint began providing two-way text messaging,

25   correct?

Dr. Cox - Cross                                    85

1    A    Yes.

2    Q    SMS?

3    A    Yes.

4    Q    And around that time was the beginning of

5    inter-carrier interoperability, correct?

6    A    That's correct.

7    Q    And that means that a Sprint subscriber could

8    text an AT&T subscriber or Verizon subscriber and

9    vice versa?

10   A    That's correct.

11   Q    And just about that time inter-carrier

12   interoperability had also just been extended to MMS

13   messages as well?

14   A    I'll except that.

15   Q    And the introduction of inter-carrier

16   interoperability was stimulating growth in text

17   messaging, correct?

18   A    Yeah, I agree that there are a lot of other

19   factors that contributed to the SMS -- the success of

20   SMS to the extent that it's been successful, and

21   that's one of my problems with Ms. Riley's analysis.

22   She doesn't take into account all of the other

23   factors that contributed to the success of the SMS

24   technology.  This is a great point.  You know, this

25   is something that was worked out by engineers, as

Dr. Cox - Cross                              86

1   we've heard before, and it came -- is the result of

2   agreements that were worked at through many man hours

3   and person hours of engineering work that had to

4   be -- has to be taken into account in terms of -- in

5   calculating the value of this particular patent,

6   which, as I said, seems to be a relatively minor

7   component of all the things -- all the things that

8   had to happen for SMS to be successful, not just this

9   agreement, but also the fact that you can -- you have

10  more efficient keyboards now and better screens and

11  all the other things that have facilitated the

12  expansion of SMS.

13  Q    Thank you for that explanation.  My question,

14  however, was introduction of inter-carrier

15  interoperability was stimulating growth in text

16  messaging at the time of the hypothetical

17  negotiation, correct?

18  A    That's correct, quite independent of the

19  ability -- of the presence of this patent.

20  Q    I'm not asking you about the patent.  I'm asking

21  you what the parties understood when they walked into

22  that room.  And they walked into that room knowing,

23  did they not, that inter-carrier operability was just

24  coming on the scene and that it was stimulating the

25  growth in the number of messages --

Dr. Cox - Cross                                87

1   A    Right, but --

2   Q    -- before they even mentioned the patent?

3   A    They didn't -- that's right, but they didn't know

4   how much it was going to be stimulating, they didn't

5   know how many complementary factors would be

6   available to continue the growth of SMS messaging.

7   Q    Well, just before the hypothetical negotiation,

8   both parties knew that SMS and MMS were increasing in

9   use quite considerably, correct?

10  A    Right, for the reasons that you suggested, not

11  necessarily having to do with the patent.

12  Q    In fact, three years before the hypothetical

13  negotiation, the number of SMS messages doubled, and

14  then two years before, they doubled again, and the

15  year before, they doubled again, is that right?

16  A    Those are relatively -- that's true, they did

17  double in those time periods, though that's no

18  guarantee of future growth.

19  Q    I'm just trying to understand what the experience

20  was of those two parties in this meeting.  Let's

21  suppose it happened in Helsinki, Finland and Sprint

22  came in there, walked in the door, sat down at the

23  table.  Before anybody said anything, both parties

24  knew that this text messaging was doubling and

25  doubling and doubling again, before anybody mentioned

1  anything about the patent, right?

2  A    Right.  And they would be talking about all the

3  things that had come together that made that

4  possible.

5  Q    And between 2005 and 2006, the monthly volume of

6  text messaging and MMS messaging doubled again,

7  correct?

8  A    That's correct, for various reasons.

9  Q    And between the time of that meeting and

10 September 30th of last year, Sprint alone sent and

11 delivered more than 2 trillion SMS and MMS messages,

12 correct?

13 A    Well, we're talking about what was known at the

14 hypothetical negotiation, and that was not known at

15 that time.

16 Q    But it's sometimes possible to look at what

17 happened after the fact to figure out what the

18 parties would have agreed to at the negotiation,

19 correct?

20 A    I think that that's not entirely correct.

21          (Pause in proceedings.)

22 Q    Do you agree that evidence in a case like this is

23 not necessarily limited to facts predating the date

24 of the hypothetical negotiation and that in certain

25 circumstances, factual developments occurring after

1   the date of the hypothetical negotiation can inform

2   the damage calculation?

3   A    Yeah, I do agree with that.  I'm just saying you

4   have to be very careful about how you use information

5   that comes later.  You can't take, you know, the

6   actual sales that happened in 2016 and say well,

7   everybody back at the date of the hypothetical

8   negotiation would have known that would have

9   happened.  They would also have been thinking about

10  well, what the heck happens if, you know, some other

11  technology comes in or if our servers don't work

12  properly?  There are all sorts of risks that they

13  would be concerned about, including the risk that SMS

14  might not grow or that people would decide to

15  communicate in other ways.

16  Q    But you're not suggesting that it's inappropriate

17  to look at evidence that happened after the date of

18  the negotiation in determining what a reasonable

19  royalty is?

20  A    That's right.  If you don't have better

21  information, such as a comparable that we have in

22  this situation, then, you know, you might have to

23  take into account what actually happens as an

24  indicator of what was in the state of mind or what

25  would have contributed to the state of mind to the

Dr. Cox - Cross                          90

1    people in the hypothetical negotiation, just as if

2    there had been a collapse in the sale of SMS.  That

3    would give you some indication or remind you that you

4    would need to take into account the risk of making

5    any investment in providing a service like this.

6    Q    Well, Sprint at the time of the negotiation had

7    already taken the risk of providing a service like

8    this, correct?

9    A    That's correct.

10   Q    So at the date of the hypothetical negotiation,

11   they were off and running, right?

12   A    They were off and running, but they realized that

13   there was a risk and that there were things that they

14   would continue to need to do in order -- in order for

15   the texting to continue to be a service that they

16   could provide.

17   Q    Well, they were already providing it.

18   A    That's correct, but just because they were

19   already providing it doesn't mean that they were

20   ready to scale up to much larger levels of sales or

21   that they recognized that there was a possibility

22   that telecommunication services doesn't work.  I've

23   been involved in lots of cases where people have

24   developed telecommunications ideas that didn't pan

25   out, and this might have been one of them.

1   Q    Well, they already knew it was panning out to the

2   extent that they had -- were delivering billions of

3   messages in 2005, isn't that right?

4   A    Well, they were delivering lots of message in

5   2005, but they didn't know what was going to happen

6   in the future.

7   Q    And one risk that they hadn't covered was the

8   risk that they might get sued for infringement of

9   this patent, and when they walked into that room they

10  knew they were infringing the patent and so did

11  Nokia, right?

12  A    Well, technically, not because you're supposed to

13  do the hypothetical negotiation just before the --

14  before the patent becomes enforced.

15  Q    Right, so the date of this hypothetical

16  negotiation that we've been hypothesizing about is

17  the date the patent was granted, and the very day the

18  patent issued from the United States government is

19  the day that the infringement began, right?

20  A    Okay.  Well, I don't want to quibble about that.

21  That's correct.

22  Q    Now, Ms. Riley said that there were three

23  standard methods of patent valuation.  She referred

24  to them as the income approach, the market approach,

25  and the cost approach, correct?

1    A    Yes.

2    Q    And she applied, or tried to apply, the income

3    approach, correct?

4    A    That's correct.

5    Q    That approach values patents based on

6    expectations of economic income that may be generated

7    from use of the patented property, correct?

8    A    That's correct.  It's got to be tied to what the

9    patent actually contributes to the provision of the

10   services at issue here.

11   Q    So the income approach looks at the infringers

12   use of the invention, correct?

13   A    It looks at the value that is derived from the

14   infringers use of the invention, just the invention

15   itself, not the overall product.

16   Q    And, as we talked about, the patent statute says

17   that the patent owner, if infringement is shown, is

18   entitled to a reasonable royalty for the use made of

19   the invention by the infringer?  We've already talked

20   about that, right?

21   A    That's correct.  You should get whatever the

22   patent is worth, whatever --

23   Q    But you --

24   A    -- for instance, the market would show you the

25   patent is worth.

Dr. Cox - Cross                              93

1    Q    But you take exception to her use of the income

2    approach in this case?  You talked about that in your

3    direct examination, correct?

4    A    That's correct for the reasons I stated.

5    Q    Now, one reason you say that the income approach

6    would have been -- is inapplicable in this case is

7    because Sprint would have wanted a -- I think you

8    used the term "lump sum?"

9    A    No, that's not why it's inappropriate.

10   Q    You think the parties would have agreed to a lump

11   sum?

12   A    That's correct.  And you can use the income

13   method to calculate a lump sum royalty.

14   Q    All right.  I think we ought to define some terms

15   here because I'm going to talk over you I think or

16   vice versa.  There's "lump sum."  Comcast is asking

17   for a royalty that's calculated in terms of a royalty

18   per message times the number of messages?

19   A    Yes.

20   Q    Can we call that a running royalty?

21   A    Yes.

22   Q    And Ms. Riley took that running royalty and

23   converted it to a lump sum amount.  She suggested

24   that the correct amount was $153 million, correct?

25   A    That's correct.  That's her summation of a

1    running royalty.

2    Q    That's her summation?  But it's a single number

3    that is the multiplication of the royalty base times

4    the royalty amount, correct?

5    A    Right, a single number that's the royalty rate

6    times the number of messages.

7    Q    So you would call that a summation?  I just want

8    to --

9    A    Yeah.

10   Q    -- define some terms so that we can keep straight

11   the difference between a lump sum amount and a

12   running royalty amount that's converted to a single

13   number.

14   A    Yeah, sure, a summation, that's a --

15   Q    You call that --

16   A    -- that's a fine word.

17   Q    -- a summation?

18   A    Yeah.

19   Q    So she put forward a summation number that's the

20   sum of the rate times the base?

21   A    Yes.

22   Q    Now, when you turn -- use the term "lump sum" do

23   you mean paid up?

24   A    Yeah, I think that if "paid up" means that in

25   this case Sprint agrees to pay Nokia $1.5 million and

1    gives over -- and for that, gives Sprint the

2    unlimited right to use the patent in the manner that

3    it's being used in the Sprint network now, that's a

4    paid up, or lump sum, license.

5    Q   Can we call -- when we talk about lump sum let's

6    use the term "lump sum paid up amount."

7    A   Great.

8    Q   That way we're clear about the difference between

9    these two things for the jury's --

10   A   Yeah, that's --

11   Q   -- benefit.

12   A   That's good.

13   Q   All right.  So is it your opinion that Sprint in

14   the negotiation with Nokia would have preferred to

15   have paid a lump sum paid up amount for the life of

16   the patent?

17   A   I think Sprint would have preferred it and I

18   think Nokia would have preferred it also.

19   Q   You're saying Sprint and Nokia would have

20   preferred a lump sum that didn't go up and down based

21   on the amount of use of the invention, rather than a

22   royalty that fluctuated based on what might happen in

23   the future?

24   A   That's correct.  I think that based on the

25   relative value of the patent compared to the value of

1   the operation of the entire cellular network, both

2   sides would have thought that, you know, the

3   transaction's cost would have been -- just be easier

4   just to write a single check and be done with it.

5   Q    And if that single check turned out to be a fair

6   valuation of the actual use of the invention,

7   everybody would have been happy, right?

8   A    Well, the rate that they would have agreed to at

9   the time would have been one that both sides felt was

10  fair for the use of the technology as they saw it at

11  the time of the hypothetical negotiation.

12  Q    So in other words, you're saying at the

13  hypothetical negotiation, the parties would have

14  looked out into the future and made their best

15  estimate about what was going to happen in terms of

16  how much this patent would be used, and they would

17  take that usage into account in figuring out what

18  that lump sum paid up amount should be?

19  A    They would have taken that into account and they

20  would have taken into account the costs of building

21  out the system to accommodate those grow -- that

22  growth, if they was -- if they were forecasting

23  growth, the cost of the customer services and the

24  other engineering costs that might be necessary to do

25  that, and they would also take into account the risk

Dr. Cox - Cross                    97

1    that -- the risk that messaging was going to fail or

2    that something else would come in and replace it.

3    Q   But, as it turned out, it didn't fail?

4    A   Well, that's as it turned out, but that doesn't

5    mean that you don't have to take into account risk at

6    the time of the hypothetical negotiation.

7              THE COURT:  I'm looking at the clock.  I

8    think you should plan to reach a logical breaking

9    point very soon.

10             MR. HEIST:  Well, why not -- ths is as

11   good -- I'm not going to finish this topic in five

12   minutes, Your Honor.  I think maybe it would make

13   sense to break now and resume on -- next session.

14             THE COURT:  All right.

15             MR. HEIST:  Thank you.  Thank you, Doctor.

16             THE WITNESS:  Thank you.

17             THE COURT:  Let's go quickly to sidebar.

18             THE WITNESS:  Am I dismissed, Your Honor?

19             THE COURT:  You may -- you may step down.

20             THE WITNESS:  Thank you.

21             (Sidebar discussion as follows.)

22             THE COURT:  I think what we ought to do is

23   recess now, and with this witness pick up on Tuesday

24   morning.

25             MR. GOETTLE:  Your Honor, good news and bad

1    news.  The good news is --

2              THE COURT:  I only want to hear the good

3    news.

4              MR. GOETTLE:  You only want to hear the

5    good news?

6              THE COURT:  Yes.

7              MR. GOETTLE:  Okay.  Well, that's good.

8              THE COURT:  It isn't snowing.

9              MR. GOETTLE:  The good news is that in

10   talking to Mr. Finkelson, we think there's a -- that

11   the most likely outcome is this case is to the jury

12   on Thursday.  The bad news is that we do not want to

13   proceed with our rebuttal case on liability on

14   Monday.  The reason for that is because there are

15   technical aspects of the damages witnesses that

16   they're testifying to that Dr. Akl may need to be

17   responding to.  And so we feel like it will -- it

18   could prejudice us in putting on our rebuttal case

19   and putting on Dr. Akl before we've heard all of the

20   damages testimony.

21             THE COURT:  Although you could put him back

22   on.

23             MR. GOETTLE:  We could do that, and I

24   thought about that too, Your Honor, but I feel like

25   that's prejudicial as well because then it looks --

1   it just looks like we're drawing this out, and the

2   jury has been here for a long time, and I would -- I

3   would greatly prefer to put him on one more time and

4   address everything that he needs to address.  But I

5   do want to remind the Court of the good news that I

6   mentioned earlier.

7           THE COURT:  I forgot that good news.

8           MR. GOETTLE:  Yeah.

9           THE COURT:  Will you remind me again,

10  please?

11          MR. GOETTLE:  The good news, Your Honor, is

12  that under a reasonable estimate of how things have

13  been proceeding -- and we've been proceeding very

14  well -- the jury will have the case on Thursday we

15  think, and my thinking is we're going to have a

16  verdict on Friday.  But even if the deliberations get

17  pushed to the following week, I'd be surprised if it

18  went very far into the following week.  And I did do

19  a little kind of running calculation.  We are at

20  seven and a half days of the trial since we've gotten

21  a jury seated.  We're at seven and a half days, and

22  that would be right on the ten, maybe a half a day

23  more than the ten days that we had estimated.  So

24  we're doing good.

25          THE COURT:  Except I count jury selection.

100

1          MR. GOETTLE:  Okay.  So we're at 12.

2          THE COURT:  Yes.

3          MR. GOETTLE:  But it would be our

4    preference to not put on a rebuttal case before the

5    damages.

6          THE COURT:  And Finkelson agrees.  I can

7    tell you as bitterly fought as cases are, when it

8    comes to issues like this, the --

9          MR. FINKELSON:  Things tend to align or

10   there tends to be (indiscernible).

11         THE COURT:  They certainly do.  It's

12   like it's all the lawyers against the Judge.

13         MR. FINKELSON:  Well, we'll proceed however

14   makes the most sense.

15         THE COURT:  No, I --

16         MR. FINKELSON:  We have no objection to

17   what Mr. Goettle is saying.

18         THE COURT:  The case is a big one and I'm

19   not going to subject you to what might conceivably be

20   viewed as a disjointed rebuttal.

21         MR. GOETTLE:  Thank you, Your Honor.

22         THE COURT:  So what you're proposing is

23   that we recess the jury until Tuesday?

24         MR. GOETTLE:  Yes, Your Honor.

25         THE COURT:  We'll convene again -- I think

101

1    I want to do a little more reading.  We'll get

2    started on the charging conference at 2:00.

3              MR. GOETTLE:  2:00?  Okay, Your Honor.

4              THE COURT:  And you may leave, again, with

5    our condolences.

6              MR. RIOPELLE:  Thank you, Your Honor.

7              THE COURT:  My son was supposed to be

8    flying in from London.  I hope all of the flights

9    weren't cancelled.

10             MR. RIOPELLE:  I suspect what's going on is

11   that the major flights, you know, the transatlantic

12   ones and the ones that go from like L.A. to --

13   they're going.  It's those little flights that are

14   going to little places in Virginia (indiscernible) we

15   can use that equipment somewhere else.  That's what I

16   think is happening.

17             THE COURT:  Well, safe trip back to

18   Virginia.

19             MR. RIOPELLE:  Thank you.

20             THE COURT:  And we'll see you on Tuesday.

21   For the jury, we'll be in recess until 9:30 on

22   Tuesday morning.

23             MR. GOETTLE:  Thank you, Your Honor.

24             MR. RIOPELLE:  Thank you, Your Honor.

25             THE COURT:  All right.

102

1          (Sidebar discussion concludes.)

2          THE COURT:  Mr. Riopelle, you can -- you

3   can leave.

4          (Pause in proceedings.)

5          THE COURT:  Ladies and gentlemen, a word on

6   our schedule.  As the lawyers explained it to me,

7   there's good news and -- well, I think from your

8   perspective, good news and good news.  The good news

9   is the lawyers expect to finish their testimony

10  sometime Wednesday, maybe Thursday morning, which is

11  pretty close to our estimate.  And in a long case

12  it's pretty hard to estimate just how long it will

13  take to complete.  Because of situations presented by

14  the attorneys, you're going to be in recess for this

15  afternoon.  We're not sitting this afternoon.  I'll

16  be talking to the lawyers, but we won't present any

17  testimony.  And Monday, day off Monday.  We can't

18  proceed because of issues that I think are

19  appropriate.  And we'll convene again on Tuesday

20  morning at 9:30.

21          The schedule right now looks like the

22  evidence will be completed sometime Wednesday, maybe

23  Thursday morning.  We'll then hear closing arguments,

24  followed by my instructions on the law, which means

25  you should begin deliberations, as best we can

1    predict, Thursday, probably in the afternoon.  More

2    on that later.  But the good news is you can go back

3    to doing at least some of the things you ordinarily

4    would do this afternoon and Monday.

5            Day-end instructions.  Do not discuss the

6    case among yourselves.  It's getting more and more

7    tempting, but don't.  Don't discuss the case with

8    others.  The reason, you can't begin deliberating

9    until you've heard all the evidence.  That takes care

10   of talking among yourselves.  As far as others are

11   concerned, the reason why not, because you've got to

12   decide the case based on the evidence you hear and

13   see in the courtroom, and not based on what someone

14   else might tell you about the case.  As far as radio

15   and television, newspapers, don't read anything about

16   the case, don't listen to anything about the case,

17   and don't view anything on television that might be

18   broadcast.  And lastly, don't try to do any research

19   using social media.  No research.  You cannot bring

20   into the case anything that is not presented in the

21   courtroom.  With that, have a good long weekend.  Be

22   sure to leave your notebooks and your binders in the

23   jury room.  See you Tuesday morning, 9:30.  Have a

24   good weekend.

25            (Jury out, 12:05 p.m.)

104

1          THE COURT:  Be seated, everyone.  What we

2     will cover this afternoon -- and we'll start with the

3     evidentiary issues.  The issue that was presented

4     yesterday, does evidence used only on cross-

5     examination go out with the jury?  I'm talking about

6     exhibits.  Mr. Riopelle mentioned his tape used on --

7     and the transcription of the tape used in cross-

8     examination of Mr. Marcus, and compared that to the

9     demonstrative exhibits that were created by Mr.

10    Goettle in his cross-examination of Dr. -- I think it

11    was Dr. Polish, but it might have been other

12    witnesses as well.  And I think there might be a

13    difference.  I'm not ruling now.  One is a

14    demonstrative exhibit, and that's the -- those are

15    the exhibits -- I've forgotten how they were

16    identified.  I can tell you that a more simple way of

17    identifying exhibits is a goal to be desired, but I

18    think there might be a difference between that type

19    of demonstrative evidence and something used just on

20    cross-examination of a witness to impeach.  So focus

21    on that, and if you get a chance between now and

22    2:00, someone might research it.  We've started.

23          We were -- well, we decided on the Akl

24    rebuttal.  I was hopeful that we could begin that on

25    Monday, but under the circumstances presented by Mr.

105

1    Goettle with a modest objection, I decided that that

2    might put Comcast at a disadvantage, and I don't want

3    to do that, with the only goal being getting the case

4    to the jury sooner.  The good news that the case will

5    go to the jury probably on Thursday is fine, and

6    we're not really that much off schedule.  I don't

7    think there were any other issues.  Certainly, we're

8    going to have a charging conference, but we'll talk

9    first about that evidentiary issue that I've just

10   mentioned and any other issues.  Now, are there any

11   other issues that need to be presented?

12           MR. GOETTLE:  Not from Comcast.  I don't

13   think so, Your Honor.

14           MR. FINKELSON:  Nor from Sprint, Your

15   Honor.

16           THE COURT:  All right.  Well, we'll start

17   with this evidentiary issue and then get into the

18   charging conference.  I must tell you I am still

19   concerned about the running royalty and the lump sum

20   royalty and how the jury should be instructed.  And

21   that will be the focus of the charging conference.  I

22   think everything else falls into place.  I'll have a

23   copy of the standard instructions, pattern

24   instructions, of the D -- that's the D.C. Bar

25   Association.  And we'll go from there.  I must say as

106

1    I read those instructions again last night, some of

2    them are rather difficult to understand.

3            MR. FINKELSON:  I will note, Your Honor,

4    and we can talk about this at the charging

5    conference, that we had proposed one additional -- or

6    one addition to one of the instructions with respect

7    to obviousness that we just sent over to Comcast this

8    morning.  I know they're reviewing.  So that will be

9    an issue that we'll raise at the charging conference

10   as well.  All right.  Fine.  We're in recess -- yes?

11           MR. HOFFMAN:  I was going to say and, Your

12   Honor, based upon Dr. Cox's testimony, we are also

13   going to be submitted one small additional jury

14   instruction that we'll provide to counsel over the

15   lunch hour, and that's up for discussion with the

16   Court.

17           THE COURT:  Well, I think we've got to look

18   hard at the instructions on damages and royalty.

19   We've taken them from the pattern instructions.  I'm

20   not certain that that's clear enough.  I don't want

21   to re-invent the wheel, but this wheel seems to have

22   been written for driving by accomplished patent

23   lawyers.  And, unfortunately, I'm going to have to

24   explain the law to a group of jurors who are not in

25   that category.  I mean I read one phrase over and

107

1    over again and it almost defies understanding.  But

2    we'll talk about that.  And because I want you to

3    have lunch and get back and do a little work in

4    between, we're in recess until 2:00.

5              (Luncheon recess taken, 12:11 p.m.)

6

7                        *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

108

1                          I N D E X

2

3    DEFENDANT'S WITNESSES     DIRECT CROSS REDIRECT RECROSS

4    Alan James Cox

5      By Mr. Riopelle           5

6      By Mr. Heist                     73

7

8    DEFENDANT'S EXHIBITS          ADMITTED INTO EVIDENCE

9    Drawing 1                              5

10

11                          *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                    <u>CERTIFICATION</u>

7

8          I, Michael Keating, do hereby certify that

9    the foregoing is a true and correct transcript from the

10   electronic sound recordings of the proceedings in the

11   above-captioned matter.

12

13

14   2/10/17

15   _____          _____

16   Date                     Michael Keating

17

18

19

20

21

22

23

24

25