IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| COMCAST CABLE COMMUNICATIONS, LLC, et al., | : | CIVIL ACTION NO. 12-0859 |
| Plaintiffs | : | |
| | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | February 10, 2017 |
| SPRINT COMMUNICATIONS | : | 2:11 o'clock p.m. |
| COMPANY L.P., et al., | : | |
| Defendants | : | |

. . . . . . . . . . . . . . . .

AFTERNOON SESSION - DAY TEN
BEFORE THE HONORABLE JAN E. DUBOIS
SENIOR UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:          DANIEL J. GOETTLE, ESQUIRE
                             DALE M. HEIST, ESQUIRE
                             Baker & Hostetler, LLP
                             Cira Centre, 12th Floor
                             2929 Arch Street
                             Philadelphia, PA  19104-2891

                             WILLIAM T. HANGLEY, ESQUIRE
                             REBECCA SANTORO MELLEY, ESQUIRE
                             Hangley Aronchick Segal & Pudlin
                             One Logan Square, 27th Floor
                             Philadelphia, PA   19103

                             GEORGE MEDLOCK, ESQUIRE
                             Comcast Cable Communications
                             Chief Patent Counsel

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA  19050
(610)623-4178

APPEARANCES: (Continued)

For the Defendants:      DAVID E. FINKELSON, ESQUIRE
                         BRIAN C. RIOPELLE, ESQUIRE
                         JUSTIN R. LOWERY, ESQUIRE
                         McGuire Woods, LLP
                         Gateway Plaza
                         800 East Canal Street
                         Richmond, VA  23219

                         COLLEEN H. SIMPSON, ESQUIRE
                         Harkins Cunningham, LLP
                         4000 Two Commerce Square
                         2001 Market Street
                         Philadelphia, PA  19103

                              - - -

Audio Operator:          Michael Cosgrove

Transcribed by:          Geraldine C. Laws, CET
                         Tracey Williams, CET
                         Paula Curran, CET

(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.)

3

1          (The following occurred in open court at 2:11

2     o'clock p.m.)

3          THE COURT:  Be seated, everyone.

4          MR. HANGLEY:  Good afternoon, your Honor.

5          MR. FINKELSON:  Thank you, your Honor.

6          THE COURT:  All right.  The first issue that we

7     ought to address I think is the evidentiary issue raised by

8     Mr. Riopelle regarding the use of the Marcus video and

9     transcript and the Comcast demonstrative exhibits.  Any

10    agreement?

11         MR. FINKELSON:  I don't know that we have an

12    agreement, I can tell you what we discussed.  You asked us to

13    look at it some more on our side in the break, we did.  I

14    told Mr. Goettle where I thought the right breaking point

15    might be.

16         It seems to me, your Honor, we have three different

17    categories of things that we're talking about.  Category A

18    are slides that are prepared by expert witnesses and used as

19    part of their presentations.  And I believe the Court has

20    already stated and I don't think either party is asking to

21    revisit the issue that the slides will be going back with the

22    jury, consistent with your Honor's wishes.

23         The second category of evidence is what I would call

24    impeachment evidence and that is somebody's deposition

25    transcript that they're handed up, right, to be impeached on

4

1   that they're reading into the record, or a set of discovery

2   responses or the Marcus video and transcript.  And Sprint's

3   position on that is all of that just be treated equally with

4   one another.  In other words, if it's used for impeachment,

5   it either goes back or it doesn't.  But the odd thing about

6   the Marcus video is that when the video starts playing the

7   recording system stops recording.  So unlike me reading a

8   deposition response into the record, with respect to the

9   video playing it's just a blank on the transcript, we don't

10   have the actual text in the daily transcripts of the video.

11        But Sprint's position with respect to any

12   impeachment evidence is at your Honor's discretion.  We're

13   happy to do it either way provided that all such impeachment

14   evidence is treated the same for both parties.

15        And then the third category is what I would call

16   lawyer argument or what is traditionally viewed as lawyer

17   argument and in that bucket I would put anything that a

18   lawyer is drawing on during the course of an examination or

19   my picture that I introduced in opening, anything introduced

20   in closing that's of similar ilk.  I think from what we've

21   seen in the case law that is traditionally treated as lawyer

22   argument and doesn't go back with the jury.

23        And so with respect to that category Sprint's

24   position would be that it all gets received into evidence, to

25   use your Honor's words, which means it has a designation on

5

1   it for the benefits of the Court's tracking, but it doesn't

2   go back to the jury; it's not evidence in exhibit form.

3        THE COURT:  All right.  What exhibits do you put in

4   the context of lawyer argument?

5        MR. FINKELSON:  So I would put my Defendants' -- I

6   would put anything that has been marked as a drawing -- is

7   there anything else that is of similar ilk?  I don't think

8   there's been -- I think everything with a demonstrative

9   exhibit number is an actual demonstrative that an expert

10  used, I believe.  I think perhaps the opening, the Comcast

11  opening demonstrative slides would be in the same bucket as

12  my drawing.  So the pictures of their people.  I don't

13  remember what your other demonstrative was in opening, but --

14       MR. GOETTLE:  That was it, just pictures.

15       MR. FINKELSON:  Yeah.  So the pictures that were

16  introduced of the Comcast witnesses, the drawing that I made,

17  and everything that's been marked subsequently as a

18  Defendants' drawing or as a Plaintiffs' drawing, again I

19  think we should mark, as your Honor has requested, but that

20  those wouldn't go back.

21       THE COURT:  Would not?

22       MR. FINKELSON:  Would not, because that really is I

23  think traditionally viewed as lawyer argument.

24       THE COURT:  And that would include exhibits used in

25  opening.  What about Mr. Goettle's notes on the exhibits?

6

1          MR. FINKELSON:  It would include -- again, I'm just
2    stating Sprint's position --
3          THE COURT:  I understand that.
4          MR. FINKELSON:  -- it would include those as well.
5    I think those have all borne a Plaintiffs' Drawing
6    designation.  So anything marked as a Plaintiffs' Drawing or
7    a Defendants' Drawing would be -- would not go back.
8          THE COURT:  Okay.  Impeachment evidence generally
9    does not go back and you're talking about cross-examination
10   using deposition transcripts, that would not go back.  And I
11   think that would trigger a point, we'll get to that, a jury
12   instruction on impeachment.  Has there any impeachment of a
13   party?  And in this case the party would be a 30(b)(6)
14   witness, I think.  I don't recall ever ruling on that.
15         Mr. Goettle?
16         MR. GOETTLE:  On the -- I think the 30(b)(6)
17   testimony of a Comcast witness was only by video, right?  I
18   think -- I can't remember if you actually played it or -- no,
19   I think you --
20         MR. HANGLEY:  No.
21         MR. GOETTLE:  -- ended up not playing it.
22         MR. FINKELSON:  Well, I mean, 30(b)(6)s would only
23   be -- I mean, they'd only be -- I mean, I understand the
24   30(b)(6) concept just in the concept of depositions, I think
25   a party is a -- it's whatever that language is in the rules

1  that is the same type of party used in the 30(b)(6) context.

2  So has there been anybody who's been a live witness who

3  qualifies as that?

4          THE COURT:  I don't --

5          MR. FINKELSON:  Mr. Marcus may.  I'd have to look at

6  the definition.  I mean, he's chief litigation counsel at

7  Comcast, but I'd have to look at the definition to speak to

8  that.

9          MR. HANGLEY:  And Yarkosky, in impeachment him I

10  used his testimony in which he was a 30(b)(6) witness.

11          THE COURT:  Well, that's --

12          MR. HANGLEY:  No, we don't care that that goes back.

13          MR. FINKELSON:  Yeah.

14          THE COURT:  Well, it wouldn't -- it's not -- no,

15  we're not talking about going back now.

16          MR. GOETTLE:  Okay.

17          THE COURT:  It doesn't go back, does not.  What

18  we're talking about now is the jury charge and the jury

19  charge will say that with a witness, not a party, a prior

20  inconsistent statement is not independent evidence of what

21  was said, it's only to be used by you in determining the

22  believability of what the witness says on the witness stand.

23  Witness.  Party, different.  When a party is charged with a

24  prior inconsistent statement that can be considered an

25  admission.

8

1          MR. FINKELSON:  Yes, and I'd have to look.  I'm

2    familiar with your Honor's comments and I think the question

3    I would just want to have the opportunity to look at with

4    respect to Mr. Marcus is does he qualify as a party under

5    that rule.  And I'm not saying he does, I just would want to

6    look at it before I represented to you that he doesn't, and

7    were the statements he was making, were those within the

8    scope of his party-dom, and that's something I also would

9    want to do.

10          THE COURT:  All right.  I think what we'll do is

11    include a point for charge on prior inconsistent statements

12    of witnesses and parties.  We'll try to get something out to

13    you, I don't think it will go out today, but perhaps on

14    Monday.  We'll have to have another charging conference and I

15    think we ought to have it after Mr. Riopelle returns, we have

16    plenty of time, either Tuesday or Wednesday.  You can plan

17    your closings over the weekend, because I'm having a bit of

18    difficulty with the damages part of this charge.

19          I just wanted to raise the issue and now let's get

20    back to how we treat it, back to whether things go out to the

21    jury.  Impeachment evidence, we agree, does not go out.  I'm

22    having a difficult time drawing a distinction between, quote,

23    "demonstrative exhibits" and exhibits used in lawyer

24    arguments.  And you've gotten all sorts of different ways of

25    marking them.

```
 1          MR. GOETTLE:  Your Honor, in terms of the drawings

 2   that I have done on cross-examination, I'm okay with them not

 3   going back.  What I had proposed to Mr. Finkelson during the

 4   break was that none of this stuff needs to go back, putting

 5   aside the expert slides they used in their presentations, I

 6   believe you already decided they would go back.

 7          THE COURT:  I think -- well, I think that helps

 8   explain --

 9          MR. GOETTLE:  I do too.

10          THE COURT:  -- the testimony of all of the experts

11   and it's rather -- I think it's very well done.  Yeah, I

12   don't think on liability --

13          MR. FINKELSON:  I mean, I -- when you raised this

14   issue the first time, your Honor, I told you our -- I think I

15   told you our experience and view, which is that I had not

16   seen those go back before.  I understand your Honor's

17   comments about how they may be helpful.  Obviously each of

18   the witnesses has prepared a slide presentation and is, you

19   know, talking from it.  I think the justification for it

20   traditionally not going back is that it replaces the witness'

21   memory of what the actual testimony was.

22          THE COURT:  Replaces the witness' memory or --

23          MR. FINKELSON:  In the jury's -- it replaces the

24   juror's --

25          THE COURT:  The jury's memory --
```

1          MR. FINKELSON:  -- memory of what the actual --

2          THE COURT:  -- of what the witness said.

3          MR. FINKELSON:  Correct.

4          THE COURT:  Another reason it would not go back, by

5    analogy to the report of the expert who is testifying, the

6    expert testifies, the report is not received in evidence.

7          MR. FINKELSON:  Exactly.  And so that had been our

8    prior experience, but your Honor expressed a preference for

9    doing it --

10          THE COURT:  Well, I want to make the case as easy

11    for the jury to understand as possible and I want to be

12    equally fair to both sides.  I don't want to adopt a position

13    that automatically tilts in favor of one side or the other, I

14    don't want to do that.

15          MR. FINKELSON:  And I don't mean to suggest -- I

16    don't -- I think both parties have hired graphics firms, both

17    parties have had lawyers working hard and witnesses working

18    hard in putting together those presentations.  So I can't say

19    that, you know, they tilt one way or another.  However, the

20    concern would be that they become a substitute for what the

21    witness -- for what the jury actually heard from the

22    witnesses and that would be an issue.

23          THE COURT:  Well, I think the jury heard, I followed

24    I don't think for the very beginning, I don't think I had it

25    for Dr. Akl at the very -- as he testified, but I found that

1    it was very helpful for me to follow the testimony using the

2    slides.

3           Well, you know, you've presented the issue, you have

4    it now, is there agreement on the way we -- we're now talking

5    about the slide decks, is there an agreement on the slide

6    decks?

7           MR. GOETTLE:  Comcast's view is they should go back

8    for the reasons that you said.

9           MR. FINKELSON:  Sprint's view is that they should

10   not go back, but we understand that that's -- we understand

11   your Honor's preference and obviously we'll abide by that

12   should that be the direction the Court wishes to proceed.

13          THE COURT:  I don't know that -- we haven't done any

14   research on that, have we, Ian?

15          THE LAW CLERK:  No.

16          THE COURT:  We'll defer on that.  I thought the tape

17   decks were very well done.

18          MR. GOETTLE:  Thank you.

19          MR. FINKELSON:  Thank you.

20          THE COURT:  But we'll see.  I don't want to create

21   an evidentiary issue that I don't have to create.  I know I

22   won't get reversed if they don't go back, I'm just concerned

23   with what happens if they go back and --

24          (Laughter.)

25          MR. FINKELSON:  Right.

1          THE COURT:  -- the Federal Circuit says they should

2    not have gone back.  I can recall a call I got from a

3    dissenter in a Federal Circuit opinion explaining the

4    position taken by the majority -- never happened to me

5    before, never got a call from a judge on an appellate court

6    -- I shouldn't say that, it happened once before in a

7    denaturalization case of someone charged with being involved

8    in some pretty heinous crimes in Nazi German, but the Federal

9    Circuit dissenter, I couldn't believe it.  And then for

10   reasons completely unknown to me, the case disappeared; it

11   disappeared, it got resolved, but I don't want that to happen

12   in this case.

13          So on demonstrative exhibits, they will go back.

14   Then I need a charge which states that where we're talking

15   about demonstrative exhibits it's the evidence that controls.

16   They're really summary exhibits, I think, I don't remember

17   all of them.

18          MR. FINKELSON:  So is your Honor ruling that they

19   will in fact go back?

20          THE COURT:  Well, on dem -- no, I'm not talking now

21   about the tape decks, now I'm talking about those whiteboards

22   you referred to, not the lawyer -- the exhibits used in the

23   opening.  Give me an example of what you mean by

24   demonstrative exhibit.

25          MR. FINKELSON:  Sorry, because I -- and I want to

13

1    make sure our position is clear in case we were talking about

2    two different things.  So I have category 1, which are the

3    slide decks --

4            THE COURT:  Oh, I'm sorry.

5            MR. FINKELSON:  -- that we used with the experts,

6    which I thought we were -- which I thought is what you were

7    just asking about.

8            THE COURT:  Yes, I -- well, resolved slide decks

9    from your perspective.  You've told me your respective

10   positions, I've deferred.

11           MR. FINKELSON:  Oh, because you --

12           MR. HANGLEY:  I thought you had agreed.

13           MR. FINKELSON:  -- it sounded like you just said

14   they were going back, so that's why I got confused.

15           THE COURT:  No, no, no.  What I said was -- I

16   deferred --

17           MR. FINKELSON:  Okay.

18           THE COURT:  -- what I said was, if they go back and

19   the Federal Circuit decides that they shouldn't go back, I'm

20   in trouble; if they don't go back, no one can argue, I'm not

21   in trouble.  That's what I said.

22           MR. FINKELSON:  That part I heard too.  So I heard

23   that, I just --

24           THE COURT:  So I'm deferring on slide decks --

25           MR. FINKELSON:  Okay.  So number two --

1        THE COURT:  -- but there are other -- there are

2   other demonstrative exhibits, I thought, other than exhibits

3   used in lawyer argument.

4        MR. FINKELSON:  I don't -- well, lawyer argument

5   and/or created by lawyers during the course of -- they're

6   lawyer-created, so they're either created -- they're lawyer-

7   created in court.  So an example would be -- or were used for

8   opening or closing arguments.  So what I put in that second

9   category that I can think of right now that exists are

10  Plaintiffs' -- or Defendants' Drawing No. 1, which I drew in

11  opening; Plaintiffs' Opening Demonstrative, which was just a

12  picture of who the witnesses were going to be; and then each

13  of Plaintiffs' Drawings 2 through whatever non-duplicative

14  number Mr. Goettle may have marked them as which were created

15  again in court.

16       So that's what I put in that second category.  All

17  of that is lawyers writing things down as part of their

18  examinations, slash, presentations.

19       THE COURT:  And does that cover all of the -- well,

20  it covers all of the lawyer-created documents.  Were there

21  any other --

22       MR. HANGLEY:  May I throw in a thought on that?

23       THE COURT:  Pardon me?

24       MR. HANGLEY:  May I throw in a thought on that?

25  Because I think that when a lawyer is examining a witness and

1   writing down the things that the witness is telling and the

2   witness is validating what the lawyer is writing down, as

3   they did when Mr. Goettle was writing down the list for the

4   seven factors or when he was asking Mr. Lanning, putting

5   circles around the things that were or were not supposedly

6   core elements that were within the core element box, I think

7   that's evidence.  And I know personally that I have had

8   things like that that I have done while a witness was

9   testifying, and my handwriting is much worse than his, and

10  they have come in in the past.  I thought that was kind of

11  SOP to let that in.

12          THE COURT:  You and Goettle disagree on that.

13          MR. GOETTLE:  Your Honor, I was -- at the lunch

14  break what I had done with Mr. Finkelson is I offered a

15  compromise just so that we wouldn't have protracted

16  discussion about this.  My compromise was, all right, none of

17  it will go back, but if the jury asks for it, they should be

18  made known that they can ask for whatever they want and if

19  they ask for it, they should be provided it.

20          THE COURT:  I think that's what I'm going to do,

21  because although the handwritten notes by Mr. Goettle as the

22  expert test -- I guess it was Lanning and Polish testified

23  standing alone without the testimony -- I mean, they're

24  circles, they really don't -- they're not self-explanatory --

25          MR. HANGLEY:  No.

1          THE COURT:  -- they raise a lot of issues.  So I

2     think what we'll do is not allow those to go out unless the

3     jury asks for them and then we'll discuss the issue again.

4          MR. FINKELSON:  So we'll just -- if I could just --

5          THE COURT:  By agreement.  And we're talking about

6     all of the attorney-created --

7          MR. FINKELSON:  I would just note for the record,

8     your Honor, our objection -- and it sounds like it doesn't

9     need to be raised now, it could be raised, but I would just

10    note our objection to them going back even if requested, but

11    I understand your Honor's --

12         THE COURT:  It's a little early for that.

13         MR. FINKELSON:  That's what I thought.

14         MR. HANGLEY:  And I'm assuming that that presents no

15    impediment if in closing we want to point to those --

16         THE COURT:  Absolutely --

17         MR. HANGLEY:  Thank you.

18         THE COURT:  -- no impediment.

19         MR. HANGLEY:  Okay.

20         THE COURT:  So that takes care of lawyer-created

21    documents.  I've deferred on the tape decks and we agree

22    that --

23         MR. FINKELSON:  It was that -- now I remember what

24    the word was that threw me, it was tape as opposed to slide.

25    You said tape, I was thinking video of Mr. Marcus.

1          MR. HANGLEY:  Beta max is what we call it.

2          MR. FINKELSON:  That's what got me, the tape decks.

3    I'm with you now.

4          THE COURT:  You're stuck with -- I was described as

5    a 19th century gentleman struggling with technology in the

6    20th century and completely out of technology in the 21st

7    century.  That's the how come and why I got this case.

8          (Laughter.)

9          MR. FINKELSON:  I don't remember Mr. Goettle saying

10   it right just that way when he said it --

11         (Laughter.)

12         MR. FINKELSON:  In jest --

13         MR. GOETTLE:  He is being facetious --

14         MR. FINKELSON:  -- let the record reflect --

15         MR. GOETTLE:  -- yes.

16         MR. FINKELSON:  -- a hundred percent.

17         THE COURT:  I do remember now who made that

18   statement and it's been repeated quite a few times.

19         MR. GOETTLE:  Your Honor, there is one other -- I

20   hate to say it, but there's one other drawing that hasn't fit

21   into these categories and in fact I think it would fit into

22   the tape deck, slash, slide deck category --

23         THE COURT:  I'm sorry I called it a tape deck, it's

24   slide decks.

25         MR. GOETTLE:  The one is during Dr. Akl's direct

1    presentation he created a -- he wrote on the board, he talked

2    about the patent and the problems and the solutions of the

3    patent, to me that would -- that should get treated however

4    -- however we end up treating the slides prepared by experts,

5    we would ask that that get treated the same way.  That was a

6    board that he created on his direct examination.

7              THE COURT:  That's right.  That board you never

8    showed to me.  And by the way, a little lesson on boards.

9              MR. GOETTLE:  Yeah.

10             THE COURT:  If it's a Comcast board and Sprint is

11   cross-examining not on the board, you don't want the jury

12   looking at the Comcast board.  I debated about saying

13   something.  You want to flip the board so that the jury is

14   looking at the reverse side of the board, so that while

15   you're cross-examining the witness, the witness isn't being

16   reminded of what the witness said in response to the use of

17   the board.

18             MR. FINKELSON:  What's interesting is that I vividly

19   remember Comcast making that -- not moving our board, but I

20   hadn't remembered me not moving theirs and I don't think I

21   moved theirs.  So I think it was both of us did the same

22   exact thing, but I don't remember --

23             THE COURT:  I think both of you did the same thing.

24             MR. FINKELSON:  I think so.

25             THE COURT:  And --

1          MR. HANGLEY:  I'm thinking about a case that I tried

2   out in Montgomery County a couple of years ago where every

3   time my opponent would walk across the room he would move my

4   board, and then I would find an excuse to walk across the

5   room and move it back to where it was.

6          MR. FINKELSON:  So just so the record is clear, we

7   would object to that going back to the jury.

8          THE COURT:  I never saw --

9          MR. HANGLEY:  On the same basis --

10          THE COURT:  -- quote --

11          MR. HANGLEY:  -- correct?

12          THE COURT:  -- that.  It was shown to the jury and I

13   decided -- I heard the testimony and I knew what it dealt

14   with, but I never saw the board, and we're not addressing

15   that now.  Right now Comcast takes the position that, I'll

16   call it Dr. Akl's board --

17          MR. GOETTLE:  Thank you, your Honor.

18          THE COURT:  -- is dovetailing on the slide decks and

19   I've deferred on that.

20          MR. FINKELSON:  And we would just note our objection

21   for the record.

22          THE COURT:  All right.  And the only other thing

23   we've covered so far and then we'll get to the charge is the

24   instruction on prior inconsistent statements and I'll include

25   that.  My goal this afternoon -- it won't take us that long

1    until we get to royalty, I don't know how long that will

2    take, but my goal is to go through the charge, point out

3    things that we ought to discuss, and get you a charge

4    probably on Monday.

5           MR. FINKELSON:  And just so you know, your Honor, we

6    had mentioned a potential additional instruction prior to the

7    bread, we're not going to present that today, we've withdrawn

8    it.  We reserve the right to revisit it as the evidence comes

9    in.

10          THE COURT:  You don't have to --

11          MR. FINKELSON:  And similarly Comcast had presented

12   us with a potential addition, which we objected to and they

13   have agreed to not present today, reserving their same --

14          THE COURT:  Fine.

15          MR. FINKELSON:  -- rights with respect to that.

16          THE COURT:  All right.  I think what we ought do is

17   turn to the charge.  The last copy of the charge that was

18   sent to you was dated January 23rd, that's the charge that we

19   will be working with.  And I think the easiest thing for me

20   to do is to quickly review it.  You ought to have it in front

21   of you and if you don't, I have an extra -- we'll make extra

22   copies.  Do you have a copy?

23          MR. FINKELSON:  I do.  I had one quick question for

24   you:  I take it since we're going to have the -- and you've

25   said this multiple times throughout, but since we're going to

21

1    have another final charging conference today is not the day

2    to raise our final objections with respect to the charge for

3    the record, so --

4            THE COURT:  Final objections after I give the

5    charge, at sidebar.

6            MR. FINKELSON:  And reserved until then.  I just

7    wanted to -- I didn't want to belabor the proceedings --

8            THE COURT:  But I want to hear all of your

9    objections now in an effort to resolve them.  So I see no --

10   I had no comments with regard to -- I'm on page 10 -- page

11   11, stipulation of facts, was the first page on which I think

12   we have to make some changes and they're not issues that will

13   create a problem.

14           First of all, Sprint has pared down its party list,

15   so we have to take out the first and third sentences of

16   numbered paragraph 2.  And then paragraph 4 is not correct --

17   well, maybe it is, but I'm going to change it to make it --

18   have it read a little better, a little easier.

19           4, you state, "U.S. Patent Application," and then a

20   number, "was filed December 21st, 2000."  I propose saying

21   "The application for the '870 Patent," dash, "U.S. Patent

22   Application number," and that number, dash, "was filed on

23   December 21st, 2000."  I think the link between those first

24   two paragraphs needs to be made.

25           And the second sentence of paragraph numbered 4,

22

1    "The application named Auti Ahou (ph) as inventory and

2    claimed priority to Finnish application number," whatever,

3    "filed on December 23rd, 1999."  I think that's -- it just

4    makes it a little easier to understand.

5              And paragraph 6, I didn't like the phrase "and has

6    since owned the patent," I think it -- most jurors don't talk

7    that way -- "and has owned the patent since then."  Minor

8    changes that we'll make.

9              Use of deposition testimony.  There's nothing in

10   that part of the charge about use of deposition testimony to

11   cross-examine.  Does anyone think that's necessary?

12             MR. FINKELSON:  So, yes, I do, because if it's just

13   for cross-examination then it --

14             THE COURT:  Yes.

15             MR. FINKELSON:  -- seems to me it falls into a

16   different -- it falls into a different bucket.  I don't think

17   that's what we had in mind when we were doing it.  I'm trying

18   to think at the same time I'm talking as to how we might

19   correct it.  The only testimony -- there was no deposition

20   testimony presented as evidence that was read into the

21   record, all the deposition testimony that was presented as

22   evidence was done by videotape and there was very little of

23   it, less than I think I've ever seen in any case I've been

24   involved in, but nonetheless it was very little of bit.

25             But I would think that there should be a

23

1   clarification there to the extent it was just used for
2   impeachment.
3           THE COURT:  I agree.  Why don't you come back to me
4   on it since you'll have a day off, submit a proposed revision
5   of the use of deposition testimony by Monday midafternoon,
6   we'll make it 3:00 p.m., revised to distinguish between
7   deposition testimony offered as substantive evidence and
8   deposition testimony used in cross-examination.
9           I'm looking at the next charge, demonstrative
10  exhibits, toward the end, third line from the bottom.  "These
11  illustrations called demonstrative exhibits have not been
12  admitted into evidence and should not be considered as
13  evidence."  That's certainly a correct statement of the law.
14          MR. HANGLEY:  But the next statement is important.
15          THE COURT:  But we have admitted them.  And maybe
16  they should just have been marked.  Comments on that?
17          MR. FINKELSON:  And that would be reflective of our
18  position on that issue, your Honor, that they have been
19  marked because your Honor wanted everything marked, but in
20  terms of going back to the jury they would not.  I think that
21  goes back to the category one and perhaps and also the
22  category two in my examples before.
23          MR. GOETTLE:  Your Honor, maybe you could write
24  "these illustrations called demonstrative exhibits have been
25  received by the Court, but have not been admitted as evidence

1   and should not be considered as evidence."

2          MR. HANGLEY:  But the next statement remains

3   important.

4          THE COURT:  Oh, absolutely, yes, that's key.

5          MR. GOETTLE:  And then maybe in the next sentence

6   get rid of the word "received" and say "admitted" there, so

7   there's no -- so there's a distinction made between admitted

8   and received.

9          THE COURT:  "These illustrations called

10  demonstrative exhibits have been received by the Court, but

11  have not been admitted as evidence and should not be

12  considered as evidence."  I think that works.  Do you

13  disagree, Mr. --

14         MR. FINKELSON:  No, I think from an instruction

15  language, I think that is correct.

16         THE COURT:  And then the last sentence is correct:

17  "Rather, it is the underlying testimony of the witnesses and

18  the exhibits received" -- no, "admitted in evidence," I see

19  the point you were making.

20         MR. HANGLEY:  And then that last "is" should be

21  changed to an "are."

22         THE COURT:  The last -- what did I do?

23         MR. HANGLEY:  The last "is" should be an "are."

24         MR. FINKELSON:  You know --

25         MR. HANGLEY:  "The underlying testimony and the

1    exhibits are the evidence in the case."  I do my best.

2              MR. FINKELSON:  I can't argue with that.

3              (Laughter.)

4              THE COURT:  "Are," okay.  Use of notes, I decided to

5    break it with -- in the middle with the sentence, "You should

6    not share your notes."  I don't want that buried in the

7    middle of the paragraph.

8              Claims of the parties, I had no issues.

9              Summary of contentions.

10             MR. HANGLEY:  Wait, I lost --

11             THE COURT:  I'm on page 17.

12             MR. HANGLEY:  Okay.

13             THE COURT:  A minor change.  I note that the Bar

14   Association uses -- where is that?

15             (Pause.)

16             THE COURT:  Federal Circuit Bar Association uses the

17   phrase "you will then need to decide" a lot and that's

18   colloquial.  And I have a lot of comments about what they say

19   on more significant issues, but I'm going to change that to

20   read, "If you decide that any claim of the '870 Patent has

21   been infringed and is not invalid," instead of you will need

22   to, "you must decide the amount of any money damages to be

23   awarded to Comcast to compensate it for infringement."

24             Just minor cosmetic --

25             MR. HANGLEY:  Excellent, much improved.

26

1            MR. FINKELSON:  I'm sorry, what was the -- so is it

2    "you then must," or you're taking out "will then need," then

3    also --

4            THE COURT:  You must decide --

5            MR. HANGLEY:  He's taking out "you will then need."

6            THE COURT:  Minor, minor -- and you'll get a chance

7    to look at it.  Instead of "you will then need to decide," it

8    will read, "you must decide the amount of any damages."

9            Page 18 in the second paragraph, minor change.  "The

10   law says," I decided to say "The law provides."

11           MR. FINKELSON:  Can we use that against you when we

12   get to future instructions when you say the patent lawyers

13   are making it sound more complicated than it is?

14           THE COURT:  No.  How a claim defines what it covers,

15   I think that's fine.  Dependent and independent claims.  I

16   really didn't see -- I know Comcast -- that was an issue on

17   which I wanted Comcast -- well, I wanted Comcast to withdraw

18   the issue.  There must be a dramatic reason why -- no, maybe

19   it's because of damages, I hadn't thought it through, why you

20   didn't withdraw.

21           MR. GOETTLE:  It's the primary validity issue that

22   -- you'll see it next week when you hear from Dr. Akl, but it

23   relates to validity.

24           THE COURT:  Because if Claim -- well, that means

25   Claim -- but if Claim 1 is invalid, the other claims are

```
 1    invalid.

 2           MR. GOETTLE:  No, sir.  If Claim 1 is invalid, Claim

 3    7 can still be found -- Claim 7, which depends from Claim 1

 4    but it's narrower, can still be valid.

 5           THE COURT:  Okay.  And that will become clear on I

 6    guess Tuesday?

 7           MR. GOETTLE:  If I do my job right, yes.

 8           THE COURT:  Well, I've given you a lot of time, I'm

 9    holding you to a higher standard.

10           MR. GOETTLE:  Okay.

11           THE COURT:  Claim interpretation, my language.

12    Infringement generally, no problems.

13           Take a look at page 24 on infringement, second

14    paragraph.  Does that work in view of what you just said, Mr.

15    Goettle, on dependent claims?

16           MR. FINKELSON:  That works because it's the other

17    way around on infringement.  So you can't -- if you don't

18    infringe an independent claim, you can't infringe a dependent

19    claim.  But on the flip side and for the same reasons, an

20    independent claim can be invalid yet the dependent claim

21    valid --

22           THE COURT:  Can be valid --

23           MR. FINKELSON:  -- because it's changed its --

24           THE COURT:  -- okay, because of something added by

25    the dependent.
```

1          MR. FINKELSON:  -- or it's changed its scope so it's

2     narrow -- so it adds an additional limitation, for example.

3     So a piece of prior art may -- to take the example here, one

4     of the dependent claims says the same box must be doing two

5     of the functions, so you may have a piece of prior art

6     where --

7          MR. HANGLEY:  Where that's happen --

8          MR. FINKELSON:  -- where the jury finds that that

9     didn't happen in the dependent claim and that would lead to a

10    different result, which is not the case here, I note for the

11    record, but Mr. Akl may -- Dr. Akl may disagree.

12         THE COURT:  Now into invalidity and prior art, no

13    problems.

14         Anticipation.  I have an issue with respect to the

15    third paragraph that reads now, "An invention is not new if

16    it was already patented or described in a printed publication

17    anywhere in the world before December 23rd, 1999."  That

18    obviously is an incorrect statement.  It should read, I

19    submit, "On this issue the '870 Patent is not new if it was

20    already" -- and I'm not sure about "if it," we might have to

21    substitute a word for "it" like, "if the invention was

22    already patented or described in a printed publication

23    anywhere in the world before the priority date of the patent,

24    December 23rd, 1999."

25         Input from Comcast first.

1          MR. GOETTLE:  I'm sorry, your Honor, could you read

2     it again?

3          THE COURT:  Right now it says, "An invention is not

4     new if it was already patented anywhere in the world before

5     December 23rd, 1999."  It cuts too broad, it has to be

6     limited to the '870 Patent --

7          MR. GOETTLE:  Oh.

8          THE COURT:  -- because not every patent --

9          MR. GOETTLE:  Oh.

10         THE COURT:  -- is invalid.

11         MR. GOETTLE:  Maybe the invention of the '870 Patent

12    is not new?  Oh, sorry, you already have language.

13         THE COURT:  Well, what I submitted and I'm not

14    married to this language --

15         MR. HANGLEY:  I just realized what this says.

16         (Laughter.)

17         THE COURT:  I said, "On this issue" --

18         MR. FINKELSON:  I'm going to use this instruction in

19    every single case for --

20         (Laughter.)

21         THE COURT:  What, what, what?

22         MR. FINKELSON:  With any --

23         MR. HANGLEY:  But only when you have a defendant --

24         MR. FINKELSON:  -- for -- right, for exactly what

25    the -- none of us caught that, it is in fact saying that no

1    invention is new --

2              (Laughter.)

3              MR. FINKELSON:  -- as it relates to this -- as it

4    relates to that date.  Can I make a suggestion, your Honor?

5              THE COURT:  Yes.

6              MR. FINKELSON:  And I think Comcast, I'm expecting

7    they'll agree, I think if you refer to the '870 Patent

8    globally you've departed from the claims, which it really is

9    the test.  And so the prior paragraph refers to the claimed

10   inventions, so I think if you said "the claimed inventions

11   are not" --

12             THE COURT:  Yes.

13             MR. FINKELSON:  -- "new if they were already" --

14             THE COURT:  Yes, yes, that's better.

15             (Pause.)

16             THE COURT:  And maybe to make it clear, the claimed

17   inventions of the '870 Patent Claims" -- a dash -- "Claims 1,

18   7 and 113," dash, "are not new if" -- and I think "the

19   claimed inventions were already patented or described in a

20   printed publication anywhere in the world before the priority

21   date of the '870 Patent, December 23rd, 1999."  That's fine,

22   that's better.

23             A little further down, last paragraph that page,

24   there's a reference to "a prior art reference inherently

25   present or disclosed."  That hasn't surfaced in any argument.

1           MR. GOETTLE:  Right.

2           THE COURT:  It really is a concept I think the jury

3    might have a little trouble with.  What does it mean?

4           MR. GOETTLE:  Your Honor, I actually don't -- I

5    don't recall -- I don't think Dr. Polish raised inherency at

6    all yesterday, I think -- it strikes me that we don't need to

7    deal with inherency at all.

8           THE COURT:  Mr. Finkelson?

9           MR. FINKELSON:  Your Honor, that's one I'd like to

10   have an opportunity to look back at his testimony and just be

11   sure of how the evidence came in and then address it.  I

12   don't think I will have a reason to disagree with Mr.

13   Goettle, I just want to take the opportunity to be sure.

14          THE COURT:  I'm going to make a note, delete

15   inherent on page 27, Finkelson to advise by 3:00 p.m.

16          MR. HANGLEY:  Would that get rid of the whole

17   paragraph?

18          MR. GOETTLE:  Yeah, that whole paragraph is

19   inherency.

20          THE COURT:  I'm looking.

21          MR. FINKELSON:  To that I can answer yes.  In other

22   words, I still need to get back to you on whether I think the

23   evidence warrants including an inherency instruction, but I

24   agree that if it doesn't that whole in determining paragraph

25   would come out.

1          THE COURT:  Okay.  What is inherent anticipation?

2          MR. GOETTLE:  Do you want to field that or do you

3   want me to?

4          MR. FINKELSON:  It was an issue that was addressed I

5   believe, your Honor, in Comcast's summary judgment motion

6   with respect to anticipation, at least with respect to a

7   reference or two.  The language is if it's not -- I'm going

8   to butcher this, but if there's an express disclosure I think

9   the case law language is it must be -- it must necessarily

10  flow from or necessarily something from the reference.  So in

11  other words, I'm not going to try to characterize it lest it

12  be used against me in future proceedings, but that's the

13  concept.  So there's not an express disclosure, but in order

14  to practice what is set forth in the reference you

15  necessarily have to do it in a particular way, I think is the

16  way the cases --

17          THE COURT:  All right.  And you'll advise us before

18  3:00 on Monday whether we can take out that last paragraph on

19  page 27, which continues onto page 28.

20          THE COURT:  All right and you'll advise us before

21  3:00 on Monday, whether we can take out that last paragraph

22  on page 27, which continues on to page 28.

23          MR. FINKELSON:  That was not a statement of the law,

24  that was Finkelson's on-the-fly account without prejudice.

25          THE COURT:  Obviousness, I have no problem with 39,

1    but a problem on page 30.  And I have the Federal Circuit Bar

2    Association model instructions.  And when I read this

3    sentence, it's in the last paragraph.  "To find it rendered

4    the invention obvious,  you must find that the prior art

5    provided a reasonable expectation of success.  Obvious to try

6    is not sufficient in unpredictable technology."  That's the

7    sentence I had trouble with.  It's in the Federal Circuit Bar

8    Association instructions.

9          MR. FINKELSON:  So, your Honor, just first, I just

10   note and I think your Honor's already decided this, but to

11   remind your Honor of our position and we'll reserve it at the

12   final charge or after the charge for your Honor's

13   instructions.  But you'll recall on 29, in the obviousness

14   instruction Sprint had originally proposed the able

15   instruction that talked about the higher the level of skill

16   in the art, the easier it may be to establish obviousness.

17   So, that's something that we had raised previously.

18          With respect to your Honor's current question --

19          THE COURT:  And let me go there.  I know I ruled it

20   out.

21          MR. FINKELSON:  You did.

22          THE COURT:  Let me see what my notes say.

23          (Pause.)

24          THE COURT:  I know we took it out, I have a note,

25   but I'm having a little trouble understanding.

34

1          MR. FINKELSON:  And I think Comcast objection had

2     been that it was redundant and we had argued, at the time,

3     that it came straight from the Aiple instruction and we

4     didn't believe was redundant with construction.

5          THE COURT:  Well, I had trouble with this.  I didn't

6     not like the term easier to establish.  And I thought the

7     instruction without it.  We'll try -- I'm not going to hold

8     us up now.  We'll try --  okay, well, we'll come back to

9     that.  But what about --

10          MR. GOETTLE:  Your Honor, maybe for this first two

11     sentences of the last paragraph on page 30?

12          THE COURT:  Yes.

13          MR. GOETTLE:  Maybe we could defer that until Dr.

14     Akl actually testifies.  I'm having a hard time, I actually

15     find a little challenging, too and it could be that we can

16     just delete both sentences.  But that would be an easier call

17     for me to make after I've really internalized what Dr. Akl

18     was going to say on Tuesday.

19          THE COURT:  What comments do you have on that issue,

20     Mr. Finkelson?

21          MR. FINKELSON:  I don't believe it is really the

22     subject of Dr. Akl's -- I don't recall it being a position

23     that he has taken or one that's really in play by the nature

24     of the obviousness defense, so my assumption is, is it won't

25     be an issue, but it really is -- the sentence, you know,

1    those sentences are ones that a plaintiff would want to have

2    if it was a relevant issue.  So, I think it really is.

3              THE COURT:  Well, what does it mean, obvious to try?

4              MR. FINKELSON:  There's a line of cases from the

5    Federal Circuit with respect to obviousness and there was --

6    it goes to the concept of if you're in an unpredictable

7    technology, the mere fact that it is an obvious thing to

8    attempt to do doesn't render it obvious.

9              THE COURT:  Unless it's a successful attempt or

10   something like that.

11             MR. FINKELSON:  Or there's more of a reason that it

12   would be obvious that it would reach the result as opposed to

13   the trying.

14             THE COURT:  Right, I have a note.

15             MR. HOFFMAN:  That works, that works, close enough.

16             THE COURT:  Finkelson on patent instructions.

17             MR. HOFFMAN:  There you go.

18             MR. GOETTLE:  Mark that transcript, too.

19             THE COURT:  Goettle to get back by 3:00 p.m. on

20   Monday.  3:00 p.m. on Monday, on this issue.

21             MR. GOETTLE:  Okay.

22             THE COURT:  Oh, well, wait a minute.

23             MR. GOETTLE:  I was going to suggest just --

24             THE COURT:  That might not work if you're not going

25   to -- did you release Dr. Akl or is he sleeping over this

1   long week?

2          MR. GOETTLE:  Oh, no, yeah, he's here.  We have a

3   lot of work to do this weekend, so I think 3:00 p.m. on

4   Monday will be fine.

5          THE COURT:  Okay.  Level of ordinary skill, now

6   enlighten me on the law.  This definition of level of

7   ordinary skill is not much.  Is there a reason for that?  The

8   experts, for example, have given more concrete definitions of

9   it.

10          MR. GOETTLE:  Oh, yeah, this one.  This instruction

11   on 31 is how do you figure out what the level of ordinary

12   skill is.  What the  experts have testified to, in particular

13   Mr. Lanning and Dr. Polish, they've testified to what the

14   actual level of skill is in their opinion, applicable to this

15   patent.

16          THE COURT:  But we don't have a definition of a

17   person having ordinary skill in the art.

18          MR. GOETTLE:  I don't know that there's -- I know

19   that there's a difference between the two experts and what

20   they're opining, but I think it's a difference without a

21   distinction for the case.  Is Sprint taking a position on it?

22          MR. FINKELSON:  Well, I think, I mean, I think --

23   so, our experts have certainly identified in their testimony,

24   your Honor, what their position is with respect to the level

25   of skill in the art is or more appropriately, what the person

1   having the level of ordinary skill in the art is.  I believe

2   Dr. Akl also did, if I recall, in his infringement testimony.

3   I  may be mistaken.  I think all of the experts have or will

4   take the position that their opinions apply under either

5   definition, either party's definition.  But I don't think

6   that removes the issue from the case.  In other words, the

7   jury is entitled to make a determination as to what the level

8   of skill in the art is as that bears on the issues.  So, for

9   example, the jury could reasonably conclude that Sprint's --

10  Sprint's expert's definition of the level of skill, which

11  requires a greater degree of either education or experience.

12  I believe it's -- in a more specific experience, as I recall

13  and I'm not going to get this right.  Comcast can speak to it

14  more appropriately.

15        But I think Dr. Akl's definition is more generally

16  in the field of communications then I believe the Sprint's

17  expert's definitions are.  So, the jury could reasonably find

18  that Sprint's level of skill is the more appropriate one and

19  they have to apply the level the skill in deciding for

20  obviousness, for example, whether a skilled artisan would

21  have found the patent obvious.  So --

22        THE COURT:  But there's no definition.  We have what

23  is the level of ordinary skill.  Do you think that is

24  sufficient without more on determining what a person of

25  ordinary skill in the art would know?

1          MR. FINKELSON:  If I understand your correctly, I

2    think what the jury will have is two competing definitions of

3    level of skill and that this instruction is sufficient to

4    allow them to make a distinction between them should they so

5    choose.

6          THE COURT:  Do you agree, Mr. Goettle?

7          MR. GOETTLE:  Yeah, I don't remember how the levels

8    of skills between the two parties compare.  That part, I

9    don't, I'm not disagreeing.  I don't know.  But these are the

10   five factors you would look at in trying to determine what

11   the level of skill is.  So, from that perspective, I mean, I

12   think the instruction is right.

13         THE COURT:  Okay.  The next instruction, scope and

14   content of prior art appears fine.  It's based on the Federal

15   Circuit Bar Association.

16         Next, damages.  The first sentence and I'm on page

17   33, reads "If you find that Sprint infringed any valid claim"

18   and when I read it the first time, I really didn't pick up

19   the fact that valid referred to the challenged invalidity.

20   And I wondered if I'm being too sensitive to that issue and

21   what I propose, if you find that Sprint infringed any claim

22   of the '870 Patent and that any such claim was valid.  I

23   think that's a little more clear, because Ian and I read it

24   together.  He picked up the fact that validity was covered by

25   the one word.  But I think it's easy to miss.

39

1          MR. GOETTLE:  The issue I have with that is that
2   it's, by saying valid, it's making -- it sounds like we have
3   to prove it's valid.

4          THE COURT:  Any such claim was not invalid and then
5   you're getting into weird double negatives.  In which case,
6   this working would simpler and I've always -- I mean, I've
7   always that the meaning it's got to be infringed and it's got
8   to be valid.  But I'm fine, if you would rather break it
9   apart, but it should say not invalid.

10          THE COURT:  I agree with you, on that score.

11          MR. FINKELSON:  Your Honor --

12          MR. HANGLEY:  Or there are a lot of negatives in
13   that paragraph.

14          MR. FINKELSON:  -- yes.  I think the valid -- I
15   would concur with Mr. Goettle that, as written, this is how
16   I've generally seen it.

17          THE COURT:  Well, that's how it's -- that's how it
18   appears in the Federal Circuit Bar Association.  So, we'll
19   leave it as is.

20          MR. FINKELSON:  Okay.

21          THE COURT:  There's any valid claim if you find that
22   Sprint infringed any valid claim of '870 Patent.

23          Reasonable royalty, relevant factors.  There are 18,
24   you've eliminated one and there are a few as 15.  However
25   many there are, we were going to come back to the relevant

1  factors to see whether any more could be eliminated.

2          MR. GOETTLE:  Your Honor, all the testimony is not

3  in yet on this and I'm wondering if it would make sense to

4  this at the final charging conference?

5          THE COURT:  Yes.

6          MR. FINKELSON:  We agree, your Honor and just to

7  note for the record, with respect to the reasonable royalty

8  definition, Sprint would renew it's request to --

9          THE COURT:  Well, wait, we're not there yet, are we?

10         MR. FINKELSON:  I think we jumped past it.  So, I

11  think you --

12         THE COURT:  I did?

13         MR. FINKELSON:  -- went to relevant factors in

14  reasonable royalty definition --

15         THE COURT:  Okay, all right.

16         MR. GOETTLE:  -- before you get to the factors.

17  That's the one, your Honor, on the reasonable royalty

18  definition where Sprint had asked for the specific

19  instruction with respect to apportionment.  It's in --

20         THE COURT:  Let me see.

21         MR. FINKELSON:  I believe Footnotes 43 and 44 of the

22  last version from -- that the parties have submitted.

23         THE COURT:  I'm going back to what we do with

24  charges.  We put together a binder that covers the joint

25  submission and any other authority we have and that's what I

1    have -- that's this big binder and I'm just looking at it.

2    You're talking about the statement, the reasonable royalty

3    award must be based on the incremental value if the patent

4    method adds to your royal process.  And the accused methods

5    had both patented, un-patented features.  In measuring this

6    value requires a determination of the value weighed by the

7    patent.  I say the first two sentences should go out, should

8    not be used and then sentence three was withdrawn.  I think

9    you both agreed to withdraw sentence three.

10            MR. FINKELSON:  I don't have a not on that, your

11   Honor and since that's sentence three, I would just want to

12   check and confirm whether that was correct, just because I

13   don't have any kind of memory of it.

14            MR. HANGLEY:  I have a note that sentence three was

15   withdrawn, but I don't know --

16            MR. HOFFMAN:  I think sentence three --

17            MR. HANGLEY:  This is a joint submission.

18            MR. FINKELSON:  It was not a joint submission, it

19   was -- right, I understand what your Honor was saying.  So,

20   this was a Sprint proposal in the joint submission.

21            THE COURT: Well, as I know, I'm looking.

22            MR. HOFFMAN:  I don't have the joint submission, but

23   my recollection on this point, your Honor, is that we had a

24   very long discussion about it being -- this submission being

25   duplicative of Georgia-Pacific Factors Number 11 and 13.  And

42

1  I believe, your Honor, that we decided -- eventually decided

2  that it was duplicative, which is why we -- the sentence is

3  not in there.

4       MR. FINKELSON:  I understand why -- your Honor did,

5  according to the notes I have, your Honor did not include the

6  language for the reasons that Comcast argued and just

7  re-articulated and I think, I just want to note for your

8  Honor, Sprint's continuing position that it be included as

9  part of the Aiple model patent jury instructions 11.13.  And

10 I was just saying I couldn't, I couldn't say that Sprint had

11 withdrawn its desire for the ultimate combination sentence,

12 just because I don't have a note of that in my notes in front

13 of me.

14      THE COURT:  Let me read what I have.

15      MR. HANGLEY:  I can't tell what.  I have it in front

16 of me, your Honor, but I --

17      THE COURT:  Sprint's proposed language comes

18 directly from the Aiple model jury instructions, which also

19 lists the Georgia Pacific factors.  In recognition of the

20 Federal Circuit's emphasis on the importance of a

21 proportionate and patent features from the un-patented

22 features in reaching a reasonable royalty.  And the citation

23 I have is Csiro, C-S-I-R-0, and Vernatex (ph).  Comcast said

24 the additional language is duplicative of and gives unfair

25 weight to the Georgia Pacific -- which Georgia Pacific factor

1   do you think covers this?

2           MR. HOFFMAN:  11 and 13.

3           (Pause.)

4           THE COURT:  And your argument, Mr. Finkelson?

5           MR. FINKELSON:  Our argument, your Honor, is that it

6   is not duplicative and I mean the Aiple model constructions

7   include the Georgia Pacific factors and in addition, they

8   include this Section 11.13.  As we noted in the submission,

9   apportionment is and has been a focus of the Federal Circuit

10  in this line of cases and other ones and I believe that's why

11  the Aiple instruction includes it in addition to the full

12  listing.  And frankly, I think it's an issue that is -- is

13  squarely presented in this case, as well.  As your Honor has

14  heard our concerns and --

15          THE COURT:  Well, I have a concern surface with Dr.

16  Cox's testimony and it's teed up this language, it might be

17  teed up by the 11 and 13 of the Georgia Pacific factors.  The

18  language Sprint proposes, the reasonable royalty award must

19  be based on the incremental value of the patented method as

20  to the overall process.  Well, Comcast's position is that

21  that's accomplished by taking the steps of the '870 Patent

22  and determining which steps were infringed and which steps

23  were not.  And when I ruled on that issue in the Daubert

24  ruling, I did not rule that method out and said any

25  challenges are the stuff of which cross-examination is made.

1          But when I heard Dr. Cox today, something else

2     occurred to me and that is that there are -- he said tens of

3     thousands of patents in the Smart Phones.  And so, the

4     testimony of Dr. Akl and I expect you to tell me if I'm

5     wrong, didn't rule out any of the contributions of the other

6     patentees.  And assumed, after allocating expenses, that all

7     of the profits attributable to the infringed steps or based

8     on the '870 Patent or were earned as a result of the '870

9     Patent.  But there are lots of other patents that weigh into

10     the cellphone and I didn't quite understand.  Well, let me

11     back off.  The testimony, the way Akl testimony is that the

12     profits attributable to messaging or thus and such.  And she

13     accounted for costs and ended up with profits which she

14     identified to messaging and then counted steps and said the

15     steps which infringed were two out of seven, three out of

16     seven and therefore, two sevens or three sevens -- whatever,

17     she came up with a figure of 24 percent.  That assumes that

18     all the profits for messaging were derived from the '870

19     Patent.  It didn't take into consideration the contributions

20     and the many other patents on the cellphone.  Now, am I

21     missing something?

22          MR. GOETTLE:  Well, your Honor, Dr. Cox was even

23     asked on cross today if he's a technical expert and he said

24     no.  So, what you heard was from a damages expert throwing

25     out ten thousand patents.  There's no technical expert

1  backing that supposition up and we didn't get to it today,

2  but that will be a subject matter on cross.

3          THE COURT:  Well, there are other patents involved

4  in cellphones -- Smart Phones.

5          MR. GOETTLE:  There probably are, your Honor, but

6  I'm not sure why it's relevant.

7          THE COURT:  Well, it's relevant if the step

8  allocation doesn't take into account the contributions of all

9  of the other patents to the profits generated by Sprint's

10  messaging service.

11          MR. GOETTLE:  Your Honor, there is no technical

12  expert who is coming in and talking about what these other

13  patents are, it's a theoretical and I think this is what

14  we're going to be crossing Dr. Cox on.

15          THE COURT:  And you're going to cover it in your

16  rebuttal testimony?

17          MR. GOETTLE:  Well, we'll see how it comes out, but

18  if we need to we will.

19          THE COURT:  But nevertheless, the step counting

20  method, something no one argued, Sprint didn't argue it,

21  attributes all of the profit from Sprint's messaging service

22  to the '870 Patent.

23          MR. HOFFMAN:  It does not, your Honor.

24          THE COURT:  Well, the profit as adjusted, it's

25  adjusted only by costs.

1          MR. HOFFMAN:  But the whole point of the

2     apportionment method is to figure out what relates to the

3     '870 Patent and then there's an acknowledgement that most of

4     it actually doesn't relate to the '870 Patent.

5          THE COURT:  Say that again, please?

6          MR. HOFFMAN:  Okay, sure, the process of step

7     counting is to do apportionment and figure out what part of

8     the profit might relate to the '870 Patent.  And then

9     reserves the rest of the profit, that doesn't relate to the

10    '870 Patent, gives that back to Sprint.

11         THE COURT:  No --

12         MR. HOFFMAN:  So, it only looks at a portion of the

13    profit based upon the steps that are --

14         THE COURT:  But no, it doesn't address the question

15    of what steps relate to the '870 Patent.  Unless there are

16    two ways of saying the same thing.  You might be saying the

17    same thing, as I'm saying.  It says the apportionment, the

18    infringement, the alleged infringement, the Sprint Messaging

19    Servers, infringes these steps of the '870 Patent, but not

20    the other steps.  It does not state, it does not cover

21    whether the infringing steps have profits that are generated

22    by other patents.

23         MR. HOFFMAN:  There's no other evidence in the

24    record as to whether or not Sprint practices any other patent

25    with respect to the messaging.  There's no technical expert

47

1    who's opined that, in fact.  And Mr. Lanning certainly didn't

2    opine on this, that there is any other Sprint patents that

3    apply.  All we heard today from Dr. Cox, which again, we

4    didn't see his expert report on this.  Was that there are

5    some ten thousand patents out there that cover generally

6    cellphone technology.  But that's, again, he's not a

7    technical witness.  Again, we're going to get a chance to

8    cross him on that sort of assertion.

9           In terms of what's in this case, the only patent

10   that Sprint and at this point, if we're talking about

11   damages, that Sprint practices with respect to messaging is

12   the '870 Patent.

13          THE COURT:  Well, that's the only patent Comcast

14   owns that's applicable.

15          MR. HOFFMAN:  Well, in fact, I think you know, I

16   think that there was some stuff -- some suggestion in one of

17   the expert reports or actually, Dr. Cox, that there may be

18   other Sprint patents.  But there was no technical expert

19   opinion from Mr. Lanning as to whether or not Sprint actually

20   practices any other specific Sprint messaging patents that

21   it's owned.  So, for purposes of this case, we're looking at

22   one '870 Patent . And what Ms. Riley attempts to do is to try

23   to figure out what's the value of the '870 Patent as it

24   applies to messaging.  She doesn't capture all of the product

25   with respect to messaging.

48

1          THE COURT:  I thought she --

2          MR. HOFFMAN:  She doesn't, she doesn't at all.

3   She's --

4          THE COURT:  Well, how did she eliminate profit?

5          MR. HOFFMAN:  Sure, so she starts with this idea of

6   figuring out what, in general, messaging profit is, which was

7   about 53.8 percent.  She then takes out of that what was

8   called normal profit with respect --

9          MR. HOFFMAN:  I said that, she adjusts for costs.

10          MR. GOETTLE:  Well, that's adjusting --

11          THE COURT:  But not, but not for the contributions

12   of other patents.

13          MR. HOFFMAN:  She adjusts for the contributions of

14   the '870 Patent, which is how she applies -- then multiplies

15   it by 24 percent.

16          THE COURT:  That's not my point.  My only point is

17   that based on what Cox said, it occurred tom me that the

18   steps that Ms. Riley found were infringed by Sprint and she

19   took from that, that proration of the total profits

20   attributable to messaging.  She arrived at a figure.  That

21   step did not take into consideration the question whether the

22   infringed steps of the '870 Patent generated profits based on

23   the contributions, not only of the '870 Patent, but of other

24   patents.

25          MR. HOFFMAN:  I'm not following your last point,

49

1    your Honor.

2           THE COURT:  Well, his point was that tens of

3    thousands of patents in a cellphone and the Riley, it seems

4    that the Riley formula didn't account for the contributions

5    of any of those other patents to the profits of Sprint's

6    messaging service.

7           MR. HOFFMAN:  To the extent that there are any other

8    royalties that Sprint has paid with respect to its messaging

9    service and/or its entire cellphone CDMA service.  That's

10   taking into account by -- removing the 23 percent of profit

11   from --

12          THE COURT:  I meant -- right, right, say that again.

13          MR. HOFFMAN:  It's a cost.  So, when she went

14   through and did this analysis, she started with what she

15   called messaging profit and then she cut out of the

16   messaging profit, 23 percent of it, she says she got a 53

17   percent and she subtracted 23 percent.  And that 23 percent

18   represents any "profit", which of course is then based off of

19   revenues and costs that Sprint puts its -- you know, Sprint's

20   basically entire CDMA business, which would include any

21   royalties that they may -- Sprint may or may not have paid

22   with respect to any other patents that are out there.

23          MR. FINKELSON:  Yes, but --

24          MR. HOFFMAN:  But that's how she's taken that into

25   account and she's --

1          THE COURT:  But she hasn't taken into account the

2    profit that was created by the contributions of any other

3    patent to the steps that Comcast states Sprint infringed.

4          MR. FINKELSON:  And I think --

5          MR. HOFFMAN:  And there's no proof, your Honor, with

6    respect to that there are any other patents.

7          THE COURT:  You're right, except for Cox, he's not

8    specific.

9          MR. HOFFMAN:  Except for Cox, who is not a technical

10   expert and no time in this case, has Sprint asserted that it

11   has other patents that it is practicing relating to messaging

12   and with respect to the number of steps.  And even Mr.

13   Lanning, when Mr. Lanning came up to dispute Dr. Akl's

14   counting steps, he didn't say Sprint's got another patent

15   that needs to be accounted with respect to the number of

16   steps.  His only argument was that Dr. Akl didn't count

17   enough steps.  That he used the wrong document, that there's

18   another document that has twice as many steps as the document

19   that Dr. Akl used.  But Sprint has never raised and there's

20   no evidence in this case other than Dr. Cox's mere

21   speculation that there are other steps that should somehow

22   account towards the messaging profit.

23         THE COURT:  Well, you said other steps.  I'm talking

24   about other patents.

25         MR. HOFFMAN:  Or other patents that would account

1   with respect to the other steps.

2           THE COURT:  That's the issue and you're right, until

3   Dr. Cox testified, I hadn't heard anything.

4           MR. HOFFMAN:  And we hadn't heard it either from Dr.

5   Cox before that, so we were sort of surprised when he said

6   that.

7           THE COURT:  All right.

8           MR. HOFFMAN:  We'll address it -- we'll certainly

9   have to address it in cross-examination.

10          MR. HANGLEY:  It's a brand new issue in the case.

11          MR. HOFFMAN:  Right.

12          MR. HANGLEY:  That was not in any expert reports.

13          MR. FINKELSON:  May I address your Honor's question

14  in a slightly different way, because I think when your Honor

15  says, are there other patents, it is -- and I know this isn't

16  the way your Honor is asking, but when your Honor says are

17  there other patents.  It is directly tied to the issues that

18  have been raised with respect to are there other steps and it

19  is directly tied to this language that's in the second

20  sentence of the jury instruction we're talking about, that

21  your Honor said prompted your questions on this.  When it

22  says when the accused methods have both patented and

23  un-patented features, you need to do an apportionment.  That

24  means, when you have what we have here is the sending of an

25  SMS and MMS message, you have to account for portions of that

1   flow from message to message, that are allegedly attributable

2   to the '870, but you also have to account for all the rest.

3   And one of the cardinal flaws in Ms. Riley's step counting

4   analysis nd why we don't think it should be accepted and we

5   don't think it is reliable, is Ms. Riley comes up with a

6   denominator that essentially eliminates all of the

7   un-patented features.  Ms. Riley, as opposed to looking from

8   the whole flow, cellphone to cellphone sending an SMS

9   message, which would be the relevant set of steps, given the

10  allegations here in this case, she comes up with a smaller

11  set of steps that more narrowly focuses, although not

12  entirely under her own opinion, but more narrowly focuses, at

13  least, on the smaller circle of the potential alleged

14  invention.  And then she says --

15          THE COURT:  Well, that's --

16          MR. FINKELSON:  -- with that smaller circle --

17          THE COURT:  -- that's been in the case from the

18  beginning and it was certainly covered in my Daubert opinions

19  and I said it can be addressed on cross.  The issue I raise

20  is not steps that weren't counted.  The issue I raise is

21  whether other patents contributed to the profit.  And the

22  whole inquiry was based on -- my inquiry was based on what

23  Dr. Cox said.  I don't think it will serve any useful purpose

24  to continue this.  I'll look again at this statement about

25  the reasonable royalty award.

1          MR. FINKELSON:  Thank you, your Honor.

2          THE COURT:  It's page 35.  Okay, I think what

3   happened, we were on the Georgia Pacific factors when I was

4   backed into the reasonable royalty definition by Mr.

5   Finkelson.  And that's fine, that' the purpose of this, I'm

6   going to call it a rolling -- a rolling charging conference,

7   we're going to have more than one.  We'll come back to the

8   relevant Georgia Pacific factors.  And we'll come back to

9   adding Sprint's language.

10         Next, the form of reasonable royalty.  This is page

11  39 of the charge.

12         MR. FINKELSON:  And I think this was the -- one of

13  the main events, I suppose, your Honor, in terms of that.

14         THE COURT:  Yes, I would characterize it that way.

15  Although, when I addressed it that way at lunch, my

16  colleagues thought I was nuts.  Main event for the afternoon,

17  form of reasonable royalty and patent infringement case.

18  They were all dying to participate in this conference.

19         MR. FINKELSON:  I'm sure.

20         THE COURT:  Oh, boy.  Oh, boy.

21         MR. HANGLEY:  You party animal.

22         MR. FINKELSON:  So, I think your Honor has the

23  instruction that had been Sprint's proposal and --

24         THE COURT:  Well, you didn't agree.

25         MR. FINKELSON:  -- I'll start with everything, your

1  Honor has said all along this is all going to be reserved for

2  further discussion.

3           THE COURT:  Yes, yes.

4           MR. FINKELSON:  So, I think we had a Sprint proposal

5  that we took out of the Personal Audio case, which we think,

6  thought and still think goes directly to the issue.  Comcast

7  had objected to that and proposed an alternative instruction

8  to which Sprint objects.

9           THE COURT:  Is that -- and that alternative

10  instruction, I think, is the one appearing on the bottom of

11  page 39, am I correct?

12           MR. FINKELSON:  Correct, it's the one that is

13  focused on time as opposed to and I think confuses the issues

14  with respect to --

15           THE COURT:  Well, what I want to know is, since

16  we've had patent infringement cases from the get-go, how come

17  the law is so fuzzy on this key issue?  Because of one thing

18  I'm certain, in a patent infringement case, the Court has to

19  charge on damages.  How can the law be so screwed up?

20           MR. HANGLEY:  I blame the judges.

21           THE COURT:  I don't.

22           MR. GOETTLE:  Your Honor, as far as I've been

23  understanding what the issues are, it sounded to me like the

24  issue is whether the jury is awarding damages up to September

25  30th or damages through the life of the patent.  If that's

1    the issue, then the issue gets resolved by constructing on

2    the time and then putting on the verdict form, you know, what

3    sum of money do award and then say, is this award up through

4    September 30, 2016 or through the life of the patent?  That,

5    to me, resolves the issue.  If that's the challenge, that's

6    the issue.  The jury doesn't have to say whether its a lump

7    sum or a reasonable or a running royalty and we would say,

8    let's just take off the table.  The issue is whether damages

9    are being awarded through 2016 or through the life of the

10   patent.  The jury can tell us which one they gave.

11           MR. FINKELSON:  And we obviously see the issue very

12   differently, your Honor, when it comes to that.  I think we

13   have had -- we have had, throughout the case and still have

14   the evidence as shown two competing theories of what type,

15   what type, what form of royalty the parties would have agreed

16   to in the hypothetical negotiation.

17           THE COURT:  Although, your absent colleague said

18   there's a case that said the jury must determine what type of

19   royalty they're awarding.  We found no such case.

20           MR. FINKELSON:  And I will say the same thing to

21   your Honor as I said to Comcast on the side, before you came

22   in, the must language was not one that I recall Mr. Riopelle

23   using.  If he did, then I'll have to refer to him as to what

24   case he has in mind.  I don't have that case in front of me.

25   I think -- what I understand from the law I have in front of

1   me, is that <u>Lucent</u> case says that there is, in fact, a

2   difference between two types of royalties.  One is running

3   royalty, one is a lump sum and the Federal Circuit defines

4   the difference between them.  They're not just different in

5   name, they're different in substance and in timing from one

6   another.

7           And then in <u>Lucent</u>, the District Court did, in fact,

8   include in its verdict form, a choice between those two

9   things.  And that's clear form the face of the <u>Lucent</u> opinion

10  itself.  The District Court, in that case, did that.  It had

11  the jury choose between a lump versus a running, as did the

12  court in the <u>Personal Audio</u> case that is the basis for the

13  instruction we provided.  So, that' my -- that's what I know

14  about and I don't know of any more direct -- I am not aware,

15  as I stand here before your Honor -- of any statement from

16  the Federal Circuits that says you must charge the jury on

17  this.

18          What I know is you have a general principle that

19  when the parties have -- there's a competing factual issues

20  which is, in fact, for the jury to decide.  That it is

21  appropriate to have the verdict form reflect that factual

22  dispute and have the jury make a determination on it, so we

23  know what basis of damages the jury verdict, should there be

24  one on damages, is grounded in.  So, that's my understanding

25  of the law.  I think that's why the District Court in the

57

1    <u>Lucent</u>, in the case underlying the Fed Circuit opinion in
2    <u>Lucent</u>, included that in the jury verdict form.  I think it's
3    why the <u>Personal Audio</u> case has done it.

4            And given the way the evidence has presented itself
5    in this case, it's appropriate here.  There's no question the
6    parties have a disagreement as to what Nokia and Sprint would
7    have agreed to in terms of form at the hypothetical
8    negotiation.  And Sprint's position is that they would have
9    agreed to a lump sum for the life, which is what lump sum
10   means per <u>Lucent</u>.  And Comcast's position is that they would
11   have agreed to a running royalty, which is reflected in Ms.
12   Riley's slides, at PD-4, about 59 in front of me, but it's
13   essentially, you multiply the number of messages times the
14   royalty, times the royalty per message.  Slide PD-4 of about
15   62 is another.  That's what a running royalty is.  For each
16   message, there is a particular royalty amount and you apply
17   it.  And that's the factual issue that, I think, the parties
18   have been fighting about on the damages front and it's a
19   factual issue that the jury is going to be asked to decide
20   upon and the parties ought to know how the jury decided.

21           THE COURT:  Well, I'm looking at the Federal Circuit
22   Bar Association, anyone have a copy of those model
23   instructions?

24           MR. FINKELSON:  I think we have them electronically.

25           THE COURT:  I'm looking at damages and it seems to

58

1    me that the first of those instructions that might be

2    applicable, is -- I'll get the cites -- page 70 on my

3    version.  It's B --

4            MR. FINKELSON:  B-6, Number 6.5, your Honor.

5            THE COURT:  That's where I am.

6            MR. FINKELSON:  I think that just goes to the

7    entitlement to a reasonable royalty.

8            THE COURT:  Yes.

9            MR. FINKELSON:  In other words and I don't think

10   there's a dispute between the parties.  I mean, that's what

11   patent statute says.  It says that there's an entitlement to

12   no less than a reasonable royalty in the event of

13   infringement.  And I think that what the instructions don't

14   deal with is a situation or that instruction doesn't deal

15   with is the situation like the one presented here where the

16   parties actually do have a dispute as to the form of royalty.

17   And that doesn't happen.  Maybe part of the reason, your

18   Honor, it isn't more prevalent is it doesn't happen in every

19   case.  I mean it's sometimes the case where the parties agree

20   on the form.

21

22           THE COURT: Well, there are a lots of damages models.

23   This case doesn't fit into any of the damages models the are

24   identified in the table of contents under B6 damages.  No

25   lost profits and a number of the damages charges deal with

59

1   lost profits.

2          MR. FINKELSON: There's definitely no lost profits.

3          THE COURT: No collateral sales, no price erosion.  I

4   think maybe B6, as I read B5, 5 - that charge is

5   inapplicable.  It talks about proof of a claim for lost

6   profits, and that's just not at issue here.

7          MR. FINKELSON: Correct.

8          THE COURT:  The next instruction talks about

9   reasonable royalty and gives a definition.

10          MR. FINKELSON: But we do know, your Honor, if I may

11   -

12          THE COURT: But you haven't used that.  I don't think

13   6.6 is covered, although I might be -

14          MR. FINKELSON: I think we have a definition of the

15   reasonable royalty.

16          THE COURT: Let me just ...

17          MR. HOFFMAN: On page 35, your Honor, I believe.

18          THE COURT: Let me go back.

19          MR. HOFFMAN: The language from 6.6 is used -

20          THE COURT: It's in 35?

21          MR. FINKELSON: Yes, it's in 6.2.

22          THE COURT: Yes.

23          MR. FINKELSON: But I think your Honor is correct

24   that the form of the royalty issue is not in these - this set

25   of -

60

1          THE COURT: And that's what I'm looking for now.

2     It's not in – we're going to charge on 6.6 and we're going to

3     charge on Georgia Pacific factors, which is 6.7.  I've taken

4     6.7, modified it by providing an introduction between the

5     three factors set forth at the beginning of that instruction

6     and the Georgia Pacific factors.

7          And next pattern instruction on damages is entitled

8     date of commencement of damages.  And that's not applicable.

9     Well, it is.  We'll charge it differently, but not the way

10    they propose.  And that's pretty much it.

11         MR. FINKELSON: Right.  But we do know from Lucent,

12    for example.  So we know from – we don't have –

13         THE COURT: Well, why is that?  I mean why are the

14    model instructions silent on this key issue that must arise

15    in every patent?

16         MR. FINKELSON: In many cases it doesn't, your Honor.

17    In many cases the damages for precisely the reason that Dr.

18    Cox opined upon today, and I know my colleagues on the other

19    side are going to differ.  But in many cases the parties do

20    not have a dispute over whether the royalty would have taken

21    the form of a lump sum or a running royalty.  They most

22    certainly will dispute the amount of the damages but in many

23    patent cases they don't actually dispute the form.  In fact I

24    would – it may in fact be in more than many, it may be in

25    most.  But what we do know though is that the Federal Circuit

1    in Lucent, and we don't have the underlying verdict form, but

2    we know from the Federal Circuit's opinion in Lucent that in

3    that case the verdict form itself, because there was a

4    disputed issue as between whether it should be a lump or a

5    running, the verdict form listed that choice between a lump

6    or a running.  And we know that from – because the verdict

7    form is discussed in the body of the Lucent –

8         THE COURT: I'll have to read.  I think I skimmed

9    Lucent awhile ago.  I don't think I read Personal Audio, I'll

10   have to read them both.  But what I'm thinking of doing is

11   not instructing the jury separately on running versus lump

12   sum royalties.  Because the running royalty, I think Heist is

13   off to a good start in narrowing the terms.  And that told me

14   that he was only not going to finish by noon, he was not

15   going to finish by 1:00 or 2:00, but still a good start.

16        MR. GOETTLE: It's a lot to unpack, your Honor.

17        THE COURT: He used the term summation.  A running

18   royalty is converted to a single sum.

19        MR. FINKELSON: But it's still a running royalty.

20   And the Federal Circuit has said a running – I think what the

21   Federal Circuit does in Lucent, I would submit to your Honor,

22   is two things, neither of which is say to this Court you must

23   instruct the jury on this issue.  So neither of them is that.

24   But it does two things.  It tells us A, those terms have

25   meaning.  The Federal Circuit says a running royalty means

1    blank and a lump sum means something different.

2              THE COURT: Well –

3              MR. FINKELSON: And I can point to your Honor just so

4    you have the benefit of the page numbers that I'm referring

5    to.  So it does two things.  Starting on page 1326 of the

6    opinion it describes the difference between a running royalty

7    license and a lump sum license.  Those are the terms that the

8    Federal Circuit has used in discussing these issues, and I

9    would submit to your Honor that they're in Lucent for a

10   reason, notwithstanding any progress Mr. Heist may be off to

11   in his cross-examination.

12             THE COURT: Well, what about – I think I have Lucent.

13             MR. FINKELSON: But it noted the jury very form.

14             THE COURT: But what about using, because they're

15   both lump sums – yes.  Comcast wants me to instruct the jury

16   on whether their damages award if they find infringement and

17   knowing validity, it covers damages through September 30th,

18   2016, or damages for the life of the past.  Doesn't that

19   cover all of the issues that are involved both in running

20   royalties and lump sum royalties?

21             MR. FINKELSON: I don't think it does, because I

22   think it takes what is a substantive difference between the

23   type of royalties and replaces it with a timing question.

24   And that's –

25             THE COURT: What is the substantive difference?

63

1        MR. FINKELSON: The substantive difference, and

2   Lucent talks about it, there are two types of licenses at

3   least for the purposes of this discussion.  One is a license,

4   when you sit down at a hypothetical negotiation, I'm going to

5   give you a one-time payment for the life of the patent.  That

6   is a lump sum.

7        A running royalty that is turned into a summation is

8   not a lump sum.  A lump sum is a one-time payment for the

9   life of the patent.

10       THE COURT: Why can't we call it what makes sense in

11  this case and what will make sense to the jury?

12       MR. FINKELSON: I believe Dr. Cox just testified that

13  it's a lump sum.  That's been his testimony, lump sum for the

14  life of the patent.  Ms. Riley has testified that it is a

15  number of messages times a royalty rate.  That is a running

16  royalty.  That's what Lucent says is a running royalty.  And

17  so those are two substantive differences-

18       THE COURT: Why do I have to get into that?

19       MR. FINKELSON: Because I think if you just focus on

20  timing, your Honor, the jury is left confused with what

21  they're being asked to do.  The jury is then just saying,

22  well, are we just being asked to assign damages through a

23  date certain or not?  And I don't think that's the question.

24  They are being asked to decide between two substantive

25  theories of damages, two forms of royalty. Not being asked to

64

1    decide, do I just decide up to X date?  Comcast will just say

2    we've only given you evidence up to X date. Of course that's

3    all you need to decide upon.  But this is the point

4    altogether.  That is not the dispute.  The dispute is over

5    the form of royalty. And that's why it's Sprint's position,

6    and I think that's why it's explained this way in Lucent,

7    it's Sprint's position that the jury should be instructed on

8    form and should be given a verdict form that allows it to

9    tell us and you whether it is chosen what is known under

10   patent law is a lump sum or whether –

11          THE COURT: I'm looking at the Northern District of

12   California, patent jury instructions.  I think they rank

13   close to Eastern District of Texas and District of Delaware

14   in volume of patent cases.  And they don't even call it a

15   running royalty.  They call it an ongoing royalty.  And they

16   talk about what you described as a running royalty which is a

17   fixed number of dollars per unit.

18          MR. FINKELSON: And I believe the Lucent case came

19   out of the Southern District of California.  I don't have

20   their instructions nor do I remember off the top of my head

21   whether they have model jury instructions, but I'm happy to

22   look into that, your Honor.

23          THE COURT: I don't Southern District does.  That's

24   San Diego, isn't it?  I don't think they do. Certainly San

25   Francisco does.

1          MR. FINKELSON: And I'm not sure, I'd want to look at
2     the instruction.  I'm not sure there's a substantive
3     difference between ongoing and running, how they're using it.
4     But I think the important point is there are two types of
5     royalty and two forms of royalty, and that's what the parties
6     are disputing.  If the jury's just asked to decide on a date,
7     I don't think that accurately captures how the evidence is
8     coming in.  I don't think it accurately captures what the
9     nature of the dispute is and we know from at least the
10    District Court in Lucent in the Southern District of
11    California, it was put in the verdict form for that reason.
12    We know that it was put in the verdict form in the Eastern
13    District of Texas audio case that we've also presented to the
14    Court.  That's the why because it is a disputed issue.  And
15    it's a factual issue for the jury to decide.
16         THE COURT: But I'm trying to figure out whether it's
17    a distinction without a difference.
18         MR. FINKELSON: I don't believe it is. I don't
19    believe it is because, and I think – I don't believe it is
20    for exactly the reasons candidly that your Honor just
21    referred to.  Because it sounds like a distinction without a
22    difference.  When you say they've applied a running royalty
23    but just once you do the math, right, you multiply the number
24    by the rate and you get a number that suddenly it looks like
25    a lump sum, that's not a distinction without a difference.

1    Those were two entirely different methodologies for how to

2    calculate a royalty.  They're two entirely different type of

3    agreements.  And I think I'm sure they'll cross Dr. Cox on

4    this because point today was when you sit down and you decide

5    am I just going to pay you one one-time payment for the life,

6    there's a lot of decisions and choices and risks and benefits

7    that may come to both parties from doing that as

8    distinguished from a running where there's no guaranteed

9    payment at all.  The payment just flows from whether it is

10   actually made use of and how often.  Those are two very

11   different types of licenses.  And the experts in this case

12   have disputed that from the outset.  And Spring submits that

13   it's appropriate to get a jury determination on that, and

14   have it be as clear as possible for us and for you what they

15   have awarded.

16        I think Comcast has alluded to the fact that should

17   they prevail in this case and get a damages award they may

18   come back to the Court for further relief including –

19        THE COURT: Oh no, no (laughing).  As much –

20        MR. FINKELSON: You might miss us.

21        THE COURT: As much as I like you guys, you don't

22   have a running royalty on this courtroom.  Oh my gosh.

23        MR. FINKELSON: But in any event, your Honor, it will

24   give the parties clarity as to whether that, whether it be in

25   your courtroom or one of your colleague's courtrooms whether

67

1   that's even an issue.  If the jury finds damages for Comcast
2   but finds that it is a lump sum royalty for the life of the
3   patent, then it will be a one-time payment.  If the jury
4   finds for Comcast and finds that it's a running royalty, then
5   there will be future business for the Eastern District of
6   Pennsylvania to assist the parties –

7          THE COURT: I was just kidding.  If there's future
8   business for the Eastern District of Pennsylvania and I'm
9   still around, it will come to me.

10         MR. FINKELSON: But not form over substance, your
11  Honor.  It really is a substantive difference.

12         THE COURT: Well, I want to avoid any issues with
13  respect to future infringement.

14         MR. GOETTLE: Your Honor, you get there with the
15  date.
16  If the jury checks the box that this is for the life of the
17  patent, nothing going forward.  If the jury checks the box
18  that this is through September 2016, then we know for sure
19  what happened.  I still don't understand why it matters – why
20  the parties need clarity on lump sum versus running royalty,
21  and you have asked the question a lot of times and I think
22  it's confusing.  And I still don't understand why it matters
23  whether the jury has picked a lumps sum or the sum that they
24  give as running royalty.  He issue I thought was keyed up as
25  we don't know, but the date will be.  And that's easily

1    clarified.  But why it matters whether it's a lump sum or a

2    running royalty to me.  I just don't understand why that

3    matters.

4           MR. FINKELSON: And it matters, your Honor, because

5    the date is not a proxy for the methodology.  The date is not

6    a proxy for the methodology.  Ms. Riley has applied a

7    methodology. It is called the running royalty.  The date's

8    not a proxy for it.  This jury is not going to understand the

9    date to be a proxy for it.  They're just going to be given a

10   date.  That confuses the issue that they're being asked to

11   decide.  They're not being asked to decide whether damages go

12   up to X date or no. They're being asked to decide whether the

13   parties would have agreed on a running royalty or a lump sum

14   royalty.

15          And what I'm hearing Comcast saying is as long as

16   you give them the option of the date, then they're

17   essentially being asked whether they're adopting her running

18   royalty methodology.  But as I said, it's an imperfect proxy.

19   As I said, I don't think it's a proxy at all for getting a

20   jury verdict on the methodology.  It will confuse this jury

21   as to what it's being asked to do.

22          This jury can be instructed, we would submit, your

23   Honor.  There are two competing theories of what the royalty

24   would be in the event of damages.  Sprint's damages expert

25   says lump sum for life of patent.  Comcast's damages expert

1    says running royalty up through the date which he has

2    information available, and we are going to ask you to decide

3    that issue as part of your determination on damages.  That's

4    what happened – go ahead, your Honor.

5         THE COURT: The negative side of your argument is

6    that it limits the jury to damage money, and that's what your

7    proposed jargon says.  Are there more than two damages miles?

8         MR. FINKELSON: Well, I think the proposed charge

9    presents the jury with an instruction with respect to the two

10   damages models that are being presented in the case.  So if I

11   come back to your Honor at 3:00 o'clock on Monday and tell

12   you inherency can come out, that doesn't mean there's not

13   other types of anticipation such as inherency.  It means

14   we're focusing the jury on the actual positions that have

15   been taken in the case.

16        The same is true here.  The actual positions being

17   taken in the case are lump sum for the life, running royalty.

18   Those are the two positions.

19        And the proposed verdict form in its current form,

20   understanding that it is still under consideration by the

21   Court gives the jury the opportunity to award an amount but

22   also to tell the Court whether it has agreed with Comcast

23   that the amount is a reflection of a number of messages times

24   royalty rate, or whether it agrees with Sprint's experts'

25   position that it is a one-time payment lump sum for the

1    payment of that.

2        THE COURT: Telecordia, which I'm looking at, I have

3    a memo.  I've just looked at the patent involved in

4    Telecordia.  It might be as complicated as the patent

5    involved in this case.  It's on page 1370.  But let me get a

6    cite.

7        But what Telecordia says, it's unclear whether the

8    jury based its award on a lump sum, paid up license, I think

9    that's one, and that's what Heist was on when we recessed.

10   Running royalty, some variation or combination of the two or

11   some other theory.

12       And apparently it's a 2010 case, and goes on to talk

13   about discretion to interpret an ambiguous verdict form.  I'm

14   trying to avoid an ambiguous verdict form.  I don't think

15   Telecordia is very helpful, because it doesn't put its

16   imprimatur on which types of royalties are appropriate.  It

17   just drops the issue.

18       MR. FINKELSON: I'm pulling it up, your Honor.  I'm

19   looking at it as you are as well.  I think Lucent does put

20   its stamp of approval though on a method in which the verdict

21   form allows the jury to choose between a lump sum and a

22   running royalty.

23       THE COURT: Oh.  Calicordia (ph) was written by Judge

24   Rader.  He's no longer on the Federal Circuit, so ...

25   (laughter.)  I know Judge Rader.  I know Judge Michele as

71

1  well.  He's no longer on the Federal Circuit, probably

2  enjoying life.

3       MR. FINKELSON: We included Telecordia in the brief,

4  your Honor, because it points out the problems of not dealing

5  with this issue in he verdict form.  So if you don't have a

6  verdict form that puts this issue to the jury to decide, you

7  end up –

8       THE COURT: With a problem.

9       MR. FINKELSON: With a Telecordia problem.  And we

10  know from Lucent at least that the Federal Circuit doesn't

11  have a problem with including it on the verdict form at a

12  minimum.

13       (Pause.)

14       MR. FINKELSON: So Lucent, your Honor, at page 1325

15  tells what happened at the District Court which was that

16  Lucent had asked for a running royalty but Microsoft thought

17  that it should be a lump sum payment.  So it's the paragraph

18  saying before the District Court.

19       THE COURT: Yes.

20       MR. FINKELSON: So we know that there was a dispute

21  in that case as there is here whether it should be a lump sum

22  or whether it should be a running royalty.  And the verdict

23  form gave the jury the choice between those two.  There was a

24  lump sum damages line apparently and the running royalty

25  line.  And we know the Federal Circuit does not disapprove in

1   any way in Lucent in that methodology.

2          And then it goes on to explain in substantive terms

3   what the differences are between a running royalty license

4   and a lump sum license using that terminology, running

5   royalty and lump sum –

6          THE COURT: Well what went wrong in Lucent?  I'm

7   reading the sentence.  "The verdict form notes a lump sum

8   damages amount and no amount, i.e. zero or n/a on lines for a

9   running royalty.

10          MR. GOETTLE: Yeah, I think the issue in Lucent was,

11   and this is why having verdict forms that have more detail in

12   them might create problems.  As I recall, in Lucent the jury

13   had checked the box for a lump sum, okay, but the amount that

14   they gave reflected that it must have been a running royalty,

15   and it created an ambiguity in the verdict, that was the

16   issue.

17          MR. FINKELSON: Yeah ...

18          MR. GOETTLE: That doesn't sound right to you?

19          MR. FINKELSON: I think I'd characterize it slightly

20   differently, but go ahead. I didn't mean to interrupt you.

21          MR. GOETTLE: No, that's okay.

22          No, if you think I'm wrong, you should –

23          MR. FINKELSON: No, go ahead, go ahead.

24          MR. GOETTLE: I teach a class at Drexel and I haven't

25   gotten to damages this year, but this is my recollection from

1   years past.  So they created an ambiguity because the lump

2   sum amount would have been way lower.  And because they

3   checked the box for the lump sum but gave a higher award.

4   Deductive reasoning indicated it was not a lump sum.

5           THE COURT: And then they say in analyzing the

6   Georgia Pacific factors, factor two rates paid by the

7   licensee for the use of other patents comparable.  This is

8   1326.  Subsumed within this factor is the question whether

9   the licensor and the licensee would have agreed to a lump sum

10  payment or instead to a running royalty based on ongoing

11  sales or usage.

12          MR. FINKELSON: Yeah, I think the ultimate conclusion

13  was that the lump sum award wasn't supported by the

14  evidenced.  I'm not sure that that was as a result of any

15  ambiguity.  In fact I don't think it was as a result of any

16  ambiguity created by the presence of both choices on the

17  verdict.

18          THE COURT: What lesson do you want me to take from

19  Lucent?

20          MR. FINKELSON: Two lessons.  One, there is a

21  difference in the law that is not form over substance between

22  a running royalty and a lump sum for the life of the patent.

23  That's lesson one.

24          Lesson number two is that Lucent does not critique,

25  criticize or say anything negative about the District Court's

74

1   handling of the issue from a verdict form perspective in

2   terms of including on the verdict form a line item for the

3   jury to decide whether the appropriate form of a license is a

4   running royalty or a lump sum.  Those were the two lessons,

5   and I think other courts have taken that lesson –

6        THE COURT: Well it doesn't – Lucent doesn't say that

7   including the verdict form separate lines for a lump sum

8   royalty or a running royalty is appropriate.  It doesn't say

9   it's inappropriate, but it doesn't say it's appropriate.

10        MR. FINKELSON: I think that's fair.

11        THE COURT: How can we be this far along in patent

12   litigation and not have this issue clarified?

13        MR. GOETTLE: Your Honor, the issue does not matter.

14   The question here is what are the damages that are owed to

15   Comcast.  Sprint is putting into evidence that the damages

16   should be based on a lump sum, or putting into evidence that

17   the damages should be based on a running royalty.  It's up to

18   the jury to figure out what those damages are.

19        Then the jury needs to decide because this is an

20   issue that the parties have a dispute on whether that stops

21   in September 2016 or whether that goes through the life of

22   the patents.  That's an issue the jury should decide.

23   Whether it's on lump sum or running royalty is not an issue

24   that matters.  And I think that's why it's not required to be

25   on the verdict form –

75

1          THE COURT: Well, it's written about quite
2     frequently.
3          MR. GOETTLE: Well, and in Lucent it came up because
4     it was on the verdict form.  Because when they checked the
5     box lump sum, there was a substantial evidence of a lump sum
6     of whatever -it was a gargantuan amount in Lucent and there
7     wasn't evidence of a lump sum of that gargantuan amount.  It
8     came up because there was an issue.
9          It's confusing.  You have asked a number of times,
10    what is that term again, running royalty.  And I forget if
11    you had another word.
12         THE COURT: Rolling.
13         MR. GOETTLE: And it is confusing.  And I think
14    having it on the form is creating confusion, not somehow
15    eliminating it.
16         THE COURT: Well, not if we instruct on it.  And the
17    proposed instruction from Sprint is that we instruct on it.
18         MR. GOETTLE: That is - the proposed instruction from
19    Comcast is to not instruct on it -
20         THE COURT: Yes.
21         MR. GOETTLE:  - because it's confusing, and these
22    instructions are 30-some pages long.  So this is a pretty
23    dense subject matter.  So I don't think an instruction is
24    going to unconfuse it.  And I still don't understand why it
25    matters.  The date matters, the amount matters.

1    THE COURT: Well, the way it's calculated matters, so

2    saith Mr. Finkelson.

3    MR. FINKELSON: Otherwise it just becomes a dispute

4    over when we gave them message counts through.  Right?  Ms.

5    Riley stood on the stand and nobody's going to factually

6    challenge that she only has message data available to her

7    through X date, because that was the most recent data we

8    could supplement with.  Why should that be the hook on which

9    the jury makes its determination?  That's not relevant.

10   What's relevant is Ms. Riley's methodology applying a running

11   royalty by multiplying –

12   THE COURT: I thought there was an agreement that

13   because Sprint had only produced figures through September

14   30th, 2016, that that had to be made clear to the jury.

15   MR. FINKELSON: I don't disagree that it needs to be

16   made clear to the jury, and Ms. Riley has made it clear.  It

17   is not the basis on which we're asking the jury to render the

18   verdict between these two competing damages positions.  And

19   by making it the date that the jury is presented with, it

20   makes it the basis on which the jury is making the decision,

21   when it has nothing to do with the date, it has to do with

22   the methodology.

23   THE COURT: All right, let me read out loud, and you

24   can be seated, the Sprint proposal.  This is form of

25   reasonable royalty.  You must make two determinations

1  regarding a reasonable royalty.  One, the amount of the

2  royalty and two, the form of the royalty.  After you

3  determine the amount of the royalty you must determine the

4  form of the royalty.

5          Isn't that contradictory to the concept of a running

6  royalty which is based on sales and profits per sale which

7  are attributable to the acts of infringement?  You say

8  calculate the amount first.  Uh-oh.

9          MR. FINKELSON: You told me I could sit down, your

10  Honor.  Those were your exact words.

11          THE COURT: No, you can – we don't have to stand.

12          MR. FINKELSON: No, no, I'm happy to stand.

13          THE COURT: And I'm mindful of Mr. Riopolle's

14  comments that you're much more than a technical person.

15          MR. FINKELSON: Well, we'll see.  I'm just trying to

16  go back to the personal audio charge which I believe we took

17  this verbatim from, and I just want to make sure we didn't

18  change the order as it appeared there.

19          THE COURT: I'll have to read personal audio in but I

20  –

21  I don't think I have that.

22          MR. FINKELSON: I have an extra copy, your Honor, if

23  you'd like one.  I have one with me.

24          THE COURT: We can pull a copy very quickly.

25

78

1          MR. FINKELSON: And I can give you the cite if you
2    need it.
3          THE COURT: It's the first time I've read your
4    proposal out loud, and I have trouble with the first sentence
5    of the –
6          MR. FINKELSON: Yeah, the form of the amount is
7    reversed actually from what it is in personal audio, and I
8    don't think that was done intentionally.  In fact, I'm fairly
9    confident it wasn't.  So it would seem to make sense to
10   address the form and then amount.
11         In personal audio the Apple, which is Eastern
12   District of Texas 2011 Westlaw 106 209, the instruction was
13   you must make two determinations regarding a reasonable
14   royalty, the form of the royalty and the amount of the
15   royalty.
16         THE COURT: Oh, it's reversed.
17         MR. FINKELSON: Yeah, it was reversed, the form of
18   the royalty and the amount of the royalty.
19         May I approach, your Honor, with a copy?
20         THE COURT: Yes.
21         MR. FINKELSON: Don't tell Milahn.  Don't tell her,
22   don't tell her, don't tell her.
23         THE COURT: What did she do, spill water?
24         MR. FINKELSON: I did.  Don't tell her.
25

1        THE COURT: Do we have any paper towels, Michael?

2        (Pause.)

3        THE COURT: All right.  Well, we have to look at the

4   personal audio case.

5        MR. FINKELSON: Thank you, your Honor.  I do think

6   that order makes more sense for the reasons you point out.

7        MR. GOETTLE: You Honor, I just want to point out, if

8   we do go down this road, the language in the third sentence,

9   this type of language is confusing.  "A running royalty is an

10  ongoing payment made by" – the jury is going to be awarding a

11  number, and that's what we're asking the jury to do.

12       THE COURT: No, that's not – I agree with you, it's

13  not that.

14       MR. FINKELSON: Okay.

15       THE COURT: It's a payment based on –

16       MR. FINKELSON: A sum, you know, (indiscernible) the

17  firm or based on, yeah, that would be –

18       THE COURT: The licensee sales or usage of the

19  patented technology.

20       Now, is there any way if we divide it, running

21  royalty versus lump sum, and we might think of other words,

22  other terms to describe it, whether the answer would provide

23  a formula for calculating it, continued in (inaudible).

24       MR. GOETTLE: I'm wondering if we could do some

25  research on that.  I know you've asked that question before

1   about what happens going on past September 30th.

2            THE COURT: Oh, there are lots of cases that talk

3   about – big, thick cases that talk about what happens after

4   the jury returns a verdict.  You see, my goal is –

5            MR. GOETTLE: To never see us again?

6            MR. FINKELSON: To read those cases.

7            MR. GOETTLE: Yeah, not to have to read those cases

8   or see us again.

9            THE COURT: Not –

10           MR. GOETTLE: Well, maybe we could condense some down

11   and go memo.

12           THE COURT: Well, maybe you both ought to rethink

13   this and we will, too.

14           MR. GOETTLE: We will do that.

15           MR. FINKELSON: We will as well, your Honor.

16           THE COURT: I think there's a way to combine your

17   issues and make more sense than this proposal.

18           MR. FINKELSON: We're happy to take another look at

19   it and take another back.  I do think the introduction of the

20   date would be confusing and –

21           THE COURT: Do you want to try to reach agreement?

22           MR. GOETTLE: I mean we're happy to trade further

23   proposals with one another.  We have not been successful

24   because we do – our approach is focused on the different

25   types of license which is how the proof is coming in.  Theirs

1  is focused on a date.  And as long as we have that

2  difference, I don't think we will reach agreement.

3        THE COURT: Oh, I think we can combine the two.  But

4  I'm not sure how significant September 30th date, is it?

5        MR. FINKELSON: I would submit it doesn't go to the

6  parties' dispute.  In other words, Ms. Riley and Dr. Cox have

7  always disagreed on the nature of the royalty.  There hasn't

8  even been a date that is September 30th in this case until a

9  month ago when that was the most recent data we could give

10  them.  And they don't want a verdict in this case that

11  deprives them of whatever the period of damages is between

12  the last time they had data and the date the jury renders a

13  verdict.  But that's not a disputed issue between the

14  parties.  That's not the nature of the dispute.  That's just

15  a function of the data.

16        So if they had today all of our data, then their

17  position would be there'd be no reason to put any date in

18  front of the jury at all because we don't ask juries for

19  advisory verdicts about going forward.  So if they had

20  perfect data up until Wednesday and they were willing to give

21  up six hours of SMS and MMS, there'd be no data issue

22  whatsoever because they'd have a jury verdict that was up to

23  date with whatever the usage was that they're producing to

24  this jury.  And all the rest would be for future in the event

25  Sprint is found to infringe.  So it's purely an artifact of

82

1  that.  But in that circumstance we would still have the

2  factual dispute between the parties over the nature of the

3  royalty, and that would still be an issue for the jury to

4  present.  And that goes back to my point about why the date

5  is not the dispute nor is it a fair proxy for the dispute.

6       THE COURT: Maybe not the total answer, but what's

7  the - I understand the basis for your position.  The damages

8  are cut off as of September 30th.  It's based on discovery.

9       MR. GOETTLE: Well, your Honor, we heard Dr. Cox

10  today and his opinion is based through the life of the

11  patent.  So it's not September 30th per se, it's that Dr. Cox

12  was putting forth a proposal that would be for the entire

13  length of the patent.  We're only - as between the beginning

14  date of damages in this case we're only halfway through.  We

15  still have another six years until the patent expires.

16       MR. FINKELSON: What if we - I'm shooting from the

17  hip.  What if we had an instruction that was focused on the

18  dispute, lump sum versus running royalty.  So lump sum for

19  the life of the patent versus running royalty, and we

20  eliminated your September 30th issue - September 30th of 2016

21  through wherever we are, February whatever of 2017, we

22  eliminated that issue by having some sort of stipulation that

23  that period was in no way compromised by what the - I'm just

24  talking out loud.  I don't think that's going to work.

25

1          MR. GOETTLE: We'll throw spitballs at another way to

2    do it.

3          MR. HANGLEY: I can't wait to see where this comes

4    out, the sentencing and stuff.

5          MR. FINKELSON: I mean, yeah, that's why I stopped.

6    But again, I'm trying to come up with a way because I really

7    do think it's like, if you put that date in front of the

8    jury, the jury can be confused as to whether they're deciding

9    whether Comcast has been given data through that date or

10   through time immemorial.  And that's not the dispute between

11   the parties.  The dispute is not whether Comcast has been

12   given data through that date.  It's a dispute between two

13   discrete types of licenses.  They think it's one type, we

14   think it's another type.  And that's my issue with the date.

15         THE COURT:  Well you bring this back down to

16   licenses which is what is required of the hypothetical

17   negotiation, it becomes even harder to articulate.  An

18   ongoing royalty – well, maybe not.  Why don't you meet and

19   confer and try to work through this.  I'm telling you that

20   the proposal is not going to work.  And we'll work on it.

21   We're not going to wait for you, we'll work on it as well.

22         What's a reasonable time for getting back on this

23   issue?  We've talked about 3:00 o'clock on Monday.

24         MR. GOETTLE: Do you think we could have until

25   Tuesday, your Honor?  Or is that too late?

84

1          THE COURT: No, that's fine.  We'll have Tuesday

2     night.  I think we ought to schedule part two of the charging

3     conference for Tuesday evening.  So we're setting records.

4          MR. GOETTLE: So Tuesday at 3:00 o'clock?

5          THE COURT: No.

6          MR. FINKELSON: At the charging conference.

7          MR. GOETTLE: In terms of submitting –

8          THE COURT: No, I want it before the charging

9     conference.  Charging conference Tuesday evening.  You said

10    Tuesday.  I didn't think you meant –

11         MR. GOETTLE: No.

12         THE COURT:  - day end, too.

13         MR. FINKELSON: We're happy to do it whenever on

14    Tuesday.

15         MR. GOETTLE: How about noon on Tuesday?

16         THE COURT: Fine.

17         All right, I think I'm out of issues.

18         MR. FINKELSON: My paper's all sopping wet so, your

19    Honor, I can't tell you if I have anything else.

20         THE COURT: Oh, I neglected to inquire.  What got

21    damaged?  I certainly hope it wasn't our impenetrable tables.


22         MR. FINKELSON: It was neither your tables nor your

23    electronic equipment.  It was my notes and my copy of the

24    patent, which I've spilled many times outside the presence of

85

1   this room.

2           THE COURT: I think those tables, if you examine them

3   carefully, are made of laminate.

4           MR. FINKELSON: They don't seem to be buckling yet.

5           THE COURT: No, no, they won't buckle.  Well, this

6   has been a fruitful afternoon.  It's taken a little longer

7   than I anticipated.  Is there anything else we need to

8   address?

9           MR. FINKELSON: No, your Honor.

10          MR. GOETTLE: No, your Honor.

11          THE COURT: Anyone?

12          Thank you, Mr. Finkelson.  Mr. Hangley had an

13   afternoon off.  He didn't say very much.

14          MR. HANGLEY: I did, I did.

15          THE COURT: Very good.  Well, we're adjourned until

16   Tuesday at 9:30.  See you then.  Have a good weekend.

17          MR. FINKELSON: You, too, your Honor.

18          MR. GOETTLE: Thank you very much.

19          (Court adjourned for the day at 4:28 o'clock p.m.)

20                          - - -

<u>CERTIFICATION</u>

     I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET                    Date 2/10/16
Laws Transcription Service