```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                        - - -

COMCAST CABLE           : CIVIL NO. 12-859
COMMUNICATIONS, LLC,    :
et al.,                 :
             Plaintiff  :
                        :
                        :
                        :
                        :
                        :
      v.                :
                        :
                        :
                        :
                        :
                        :
                        :
SPRINT COMMUNICATIONS   : Philadelphia, Pennsylvania
COMPANY L.P., et al.,   : February 14, 2017
             Defendant  : 9:39 a.m.


                        - - -

   TRANSCRIPT OF MORNING SESSION OF JURY TRIAL DAY 11
        BEFORE THE HONORABLE JAN E. DUBOIS
           UNITED STATES DISTRICT JUDGE


                        - - -

APPEARANCES:

For the Plaintiff:   WILLIAM T. HANGLEY, ESQUIRE
                     Hangley, Aronchick, Segal, Pudlin
                     & Schiller
                     One Logan Square
                     27th Floor
                     Philadelphia, PA 19103

                     DANIEL J. GOETTLE, ESQUIRE
                     Baker & Hostetler, LLP
                     Cira Center
                     12th Floor
                     2929 Arch Street
                     Philadelphia, PA 19104
```

2

1    APPEARANCES:              (Continued)

2    For the Defendant:     DAVID E. FINKELSON, ESQUIRE
                            BRIAN C. RIOPELLE, ESQUIRE
3                           McGuire Woods, LLP
                            Gateway Plaza
4                           800 East Canal Street
                            Richmond, VA 23219
5
                            COLLEEN H. SIMPSON, ESQUIRE
6                           Harkins Cunningham, LLP
                            4000 Two Commerce Square
7                           2001 Market Street
                            Philadelphia, PA 19103
8
                                   -  -  -
9
     Audio Operator:       Michael Cosgrove
10
     Transcribed By:       Michael T. Keating
11
                                   -  -  -
12

13          Proceedings recorded by electronic sound
     recording; transcript produced by computer-aided
     transcription service.
14
                                   -  -  -
15

16

17

18

19

20

21

22

23

24

25

3

1          (The following was heard in open court at

2     9:39 a.m.)

3               THE COURT:  Good morning, everyone.

4               ALL:  Good morning, Your Honor.

5               MR. RIOPELLE:  Happy Valentine's Day, Your

6     Honor.

7               THE COURT:  No, I'm not your valentine, Mr.

8     Riopelle, but thank you.  Be seated, everyone.  I

9     have two quick issues to discuss with you, very

10    brief.  First, much to our surprise, one of the

11    jurors arrived yesterday, juror number 5.  I thought

12    the instructions were pretty clear.  I thought I'd

13    share that with you.

14               Number two, I got your letters yesterday.

15    Very helpful.  And it looks like we're going to reach

16    agreement on all of the issues.  You're very close on

17    the form of the royalty question.  Comcast is a

18    little shorter, easier to understand.  Sprint's --

19    you picked up the Western District of Pennsylvania.

20    I don't know why we didn't pick that up, but we

21    didn't.  And I think they're both very similar.  And

22    I expect you to get together, and you have two hours

23    and 16 minutes to do that.

24               MR. FINKELSON:  Understood, Your Honor.

25               THE COURT:  And since you haven't been

4

1   doing anything over this long weekend, I'm sure

2   you'll have time to attend to those matters, said in

3   just.  But I'd like to reach agreement on that issue.

4   Charging conference tonight.  Michael, remind me to

5   cancel -- make sure we cancel the conference

6   scheduled for I think 4:45.  We'll start -- take a

7   short break at the end of the trial day and then move

8   into the charging conference.  I'd like to finish the

9   charge tonight.  Now, I understand you have some

10  issue.

11          MR. HANGLEY:  I have a letter, Your Honor,

12  relating to the question of what goes into the jury

13  room and what doesn't.  You asked use to research

14  that before the charging conference.  Two copies

15  sufficient?

16          THE COURT:  Fine.  Thank you.

17          MR. HANGLEY:  Thank you.

18          MR. FINKELSON:  Your Honor, we just

19  received this letter by hand a minute or so ago as

20  well, so we're still digesting it.

21          THE COURT:  I'm glad the issue wasn't a

22  complicated one, Mr. Hangley.  I noticed you

23  stretched the pages and barely got what you had to do

24  in three pages, a little -- a little bit on page --

25          MR. HANGLEY:  There's a great deal of

5

1    (indiscernible), Your Honor.

2              THE COURT:  Thank you for informing me, Mr.

3    Hangley.  I expect you'll be wanting to write a law

4    review article on this very significant issue.  I'll

5    have one of my law clerks digest the letter and then

6    we'll talk about it.  I did not think the issue was

7    that complicated, but I'll certainly read the letter

8    and we'll put this on the agenda for the conference.

9    All right.  Were there any other issues?

10             MR. HOFFMAN:  Yes, Your Honor, we have an

11   objection to one of the demonstratives that Mr. --

12   Dr. Dippon -- or a couple of pages from the

13   demonstratives that Dr. Dippon is going to be using

14   in his direct examination.  At the final pretrial

15   conference, I believe it was day two, I had raised an

16   issue about things that would be outside the four

17   corners of his -- of the expert report, and we have a

18   situation where we have a document and an opinion

19   that are outside the four corners of the expert

20   report.

21             The slides, as provided to us by counsel,

22   contain references to a 2003 SEC filing on behalf of

23   Sprint.  That particular document is not cited,

24   commented, or discussed at all in Dr. Dippon's expert

25   report, yet it seems to be the new basis of his

1  opinion.  And so we would seek to -- we would object

2  and ask to move to exclude the two slides that deal

3  with the SEC report.  And in addition, there's a

4  third slide which appears to be a slide from Dr. --

5  Mr. Lanning's presentation, and it has a description

6  of the Sprint network and it has on it the words

7  "core network."  And, apparently, it's Mr. Lanning's

8  opinion, but not Dr. Dippon.  Dr. Dippon, of course,

9  is not a technical expert.  He's an expert here just

10 to talk about costs.  And so we would object to that

11 slide as well.

12         THE COURT:  Back to the first issue, was

13 that report mentioned -- the report that you seek to

14 exclude and references to the report that you seek to

15 exclude, was the report identified at all in the

16 discovery?

17         MR. HOFFMAN:  In the discovery?

18         THE COURT:  In the discovery.

19         MR. HOFFMAN:  During the -- during the

20 case, our expert -- our cost expert, Mr. Webber,

21 listed SEC reports from Sprint from 2003 to I believe

22 2012 as documents that he considered in his expert

23 report.  That's what's listed at the back of his

24 expert report.  Dr. Dippon doesn't make any mention

25 of any SEC report anywhere in his report.  I was the

7

1    one who deposed Dr. Dippon in his deposition.  I

2    certainly would have asked him about it if it had

3    been in his expert report, but it was certainly not

4    in his expert report.  And I've asked counsel last

5    night to identify for me exactly where it is in his

6    expert report, and they've been unable to identify

7    it.

8              THE COURT:  So, as I understand it, one of

9    your experts has identified the document --

10             MR. HOFFMAN:  Correct.

11             THE COURT:  -- which you seek to include.

12   Your expert listed it as one of the documents that he

13   considered in reaching his opinions?

14             MR. HOFFMAN:  That he reviewed, correct.

15   Just reviewed, but yes.  And Dr. -- and in response

16   to that opinion, Dr. Dippon issued an expert report.

17   His expert report makes no mention of this 2003 SEC

18   10-K, which appears, based upon the slides that we

19   have, now the complete basis for his expert opinion

20   that he's -- that he's about to --

21             THE COURT:  Of course --

22             MR. HOFFMAN:  -- disclose.

23             THE COURT:  -- I don't recall this doctor

24   ever was presented to me.  There are no -- I'm just

25   trying to recall whether there are any Daubert

1   rulings.  I've issued so many opinions in the case.

2   I don't think I've read his report.  I haven't seen

3   his slides.

4           MR. HOFFMAN:  Well, I'd be happy to hand up

5   the slides.

6           THE COURT:  You should have waited a little

7   bit later.  We could have done this after the

8   verdict.

9           MR. HOFFMAN:  I -- we got the slides last

10  night, Your Honor.

11          THE COURT:  Oh.

12          MR. HOFFMAN:  That's -- this is the

13  first they disclosed it to us, at 6:30 last night.

14  We objected.  We had a meet and confer last night.

15          THE COURT:  Okay.

16          MR. HOFFMAN:  And Dr. Dippon is --

17          THE COURT:  Well, then --

18          MR. HOFFMAN:  -- about to testify --

19          THE COURT:  -- under those circumstances, I

20  withdraw the comment about your tardiness.  All

21  right.  I might have to take this under advisement,

22  but let me hear from --

23          MR. HOFFMAN:  And I'd be happy to hand up a

24  copy of his slides.  They're actually very short.

25          THE COURT:  Fine.

9

1          MR. HOFFMAN:  And the slides -- specific

2    slides that we're talking about are slides five and

3    six with respect to the SEC filing, and slide seven

4    with respect to the core network document.  Thank

5    you, Your Honor.

6          MR. RIOPELLE:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. RIOPELLE:  The specific reference to

9    the 10-K, which is in the slides, and I believe it's

10   at slide six of Dr. Dippon's slide deck that was

11   disclosed pursuant to the pretrial arrangements last

12   night, if you recall during Mr. Webber's examination,

13   the 10-K was brought up and was shown to Mr. Webber

14   and the jury during Mr. Webber's examination.  So now

15   I'm having --

16         THE COURT:  You know what, wait a minute.

17   Say that again.  I was -- I was trying to read.

18         MR. RIOPELLE:  Yeah, I'm sorry.  During --

19         MR. HOFFMAN:  It was cross-examination,

20   right?

21         MR. RIOPELLE:  Yeah, it was cross-

22   examination.  During Mr. Webber's -- when I was

23   cross-examining Mr. Webber, who is Comcast's cost

24   expert -- and just to set the scene, Dr. Dippon is

25   Sprints rebuttal expert to Mr. Webber.  When I was

1   crossing Mr. Webber I brought up the 10-K because he

2   had listed it in his materials as something he relied

3   upon, and I asked him questions about this.  I am now

4   going to -- I plan to ask Dr. Dippon questions about

5   the same 10-K.  It is not the basis of his opinion,

6   as characterized by Comcast.  It is a piece of

7   evidence that supports his opinion on which he was

8   questioned and asked about at his deposition.  He was

9   not asked about the 10-K specifically, and the reason

10  for that is that in Mr. Webber's -- in Mr.

11  Webber's --

12          THE COURT:  You can -- you can sit down

13  now.  I'll let you respond.

14          MR. RIOPELLE:  In Mr. Webber's opening

15  report, he did say that he left out -- he omitted

16  spectrum costs, towers, switching centers, but he did

17  not tie that to the cost-causation principle in his

18  opening report.  Dr. Dippon then filed his rebuttal

19  report.  It was not until Mr. Webber's reply report

20  that Mr. Webber for the first time tied the

21  cost-causation principle to the cost that he left

22  out.  Dr. Dippon does not get a second report.  So

23  when we're preparing for -- to cross-examine Mr.

24  Webber we had his reply report and we saw the

25  documents he relied on, in Sprint's belief counters

11

1   his opinion, so that's why we presented it to him in

2   open court in front of the jury, and now all I'm

3   going to do is ask Dr. Dippon about that same piece

4   of evidence.  And that's why it's on there, because

5   he's testified -- it's been brought up in open court,

6   and I believe, as an expert, I mean one of the

7   reasons we don't exclude an expert's -- under Rule

8   615 is because they can hear the evidence or read the

9   evidence that comes in during trial and comment on

10  that evidence.  And I will note that a very noted

11  jurist in a case called <u>Bowersfield versus Suzuki</u>

12  <u>Motor Corporation</u> --

13              THE COURT:  Uh-oh.

14              MR. RIOPELLE:  -- a very noted jurist said,

15  "Testimony of an expert on matters in the expert's

16  expertise, but outside of the expert's report, is not

17  only permissible at trial, but the exclusion of such

18  testimony may be reversible error.  An expert may

19  testify beyond the scope of his report absent

20  surprise or bad faith."  There's no surprise or bad

21  faith.  I cross-examined their expert on it.  And all

22  it is, the 10-K is only evidence that supports his

23  opinion.  His opinion hasn't changed whatsoever.  The

24  other -- the one other comment.  If you look at the

25  slide deck, Your Honor, slide I believe seven --

12

1          THE COURT:  Yes, that deals with the

2     reference to the core network, which was something

3     Mr. Lanning --

4          MR. RIOPELLE:  Right.

5          THE COURT:  -- added -- did he add that to

6     the --

7          MR. RIOPELLE:  No, no, it was his -- do you

8     remember the board?  It was his -- it was his big

9     board.

10         THE COURT:  Yes.  I have his slides here.

11         MR. RIOPELLE:  Right.  All I was doing here

12    is instead of -- because Dr. Dippon is not a

13    technical expert.  Dr. Dippon is going to talk about

14    the costs, primarily the costs the Comcast left out.

15    He's just going to use this board to show which costs

16    were left out.  He's not testifying about being core.

17    And the reason we didn't do a separate demonstrative

18    is the jury has seen this one.  They're familiar with

19    it.  I'm just -- I'm just trying to cut down on the

20    number of different depictions of the network they

21    see.  He's not going to testify whether it's core or

22    not.  That's not in his opinion, that's not in his --

23    he's just going to say see the person here with the

24    phone, see the tower, that's the spectrum.  They

25    didn't include that.  I mean that's all he's --

13

1           THE COURT:  Mr. Riopelle, before you sit

2    down, can you hand -- do you have a copy of Suzuki-

3    Bowersfield there?

4           MR. RIOPELLE:  I do.  It is highlighted.

5           THE COURT:  Okay.  What year did I

6    decide -- I remember that case.  It was a Suzuki

7    rollover case and --

8           MR. RIOPELLE:  It was 2001.

9           THE COURT:  I remember also that there were

10   more motions in limine filed in that case that you

11   filed in this case.

12          MR. RIOPELLE:  How can that be?

13          THE COURT:  I think I had a total of 30.

14          MR. GOETTLE:  Mr. Riopelle, would you mind

15   just giving us the cite?

16          MR. RIOPELLE:  Yeah, it is 151 F.Supp.2nd

17   625.  It is Bowersfield versus Suzuki, and it was

18   2001.  And do you want to look at the highlights --

19          THE COURT:  All I want to see is the part

20   that --

21          MR. RIOPELLE:  I just didn't want to show

22   (indiscernible) highlighted.  They haven't seen it

23   before.

24          (Pause in proceedings.)

25          THE COURT:  I noted I cited a lot of -- a

14

1    number of rather old cases.  I haven't referred to

2    the DeMarinis case and Judge Ditter's opinion in

3    Kelley versus GAF in a long time.  I'll hear from

4    Sprint, Mr. Riopelle.  Thank you.  I'm sorry,

5    Comcast.

6            MR. HOFFMAN:  Thank you, Your Honor.  You

7    know, the purpose of the meet confer is so that we

8    can all get each side's arguments on the table, and

9    this case wasn't presented to us last night, so we

10   can't necessarily respond to the specifics of the

11   case.

12           THE COURT:  Well, the question is

13   whether -- really, the question is whether there's

14   any bad faith or whether you were caught by surprise.

15   And with a team of as many attorneys as you have,

16   surprise is a Sisyphean argument.

17           MR. HOFFMAN:  Well, Your Honor, obviously,

18   we were curious to see what Dr. Dippon was going to

19   opine on.  And on page five of his slide, which is

20   where he first references the 10-K, he says, "The

21   factual question is whether Sprint purchased the

22   radio spectrum and built the network to offer voice

23   data and SMS or MMS services, or whether Sprint

24   decided to offer SMS or MMS after building a voice

25   and data network is the factual question."  And then

1   he has the statement, "The Sprint 10-Ks are direct

2   evidence that Sprint built the network for voice,

3   data, and SMS/MMS."  And that's nowhere anywhere in

4   his expert report, and it was not a topic that we

5   deposed him on.  And this, apparently, is now -- with

6   the exception of one other quote on another subject

7   from another witness, that's the entire basis of his

8   slides is this -- is now -- is this SEC document for

9   which he has no opinion on.  And so from a surprise

10   perspective absolutely, from a prejudice perspective,

11   absolutely.  I mean this is -- it's supposed to be

12   four corners -- its four corners, Your Honor.  You're

13   under the same -- we were under the same obligations

14   and --

15         THE COURT:  Well, except Webber -- well,

16   one of your experts listed it as a document he

17   referenced, and I don't quite -- I don't quite see

18   how the 10-K can do what he's -- he's going to

19   testify live, right?

20         MR. HOFFMAN:  I assume Dr. Dippon is going

21   to testify live on this with respect to a 10-K that

22   we never -- he's never opined on.

23         THE COURT:  All right.  But you've had the

24   10-K and you relied on it.  I'm going to overrule the

25   objection without prejudice to your right to object

1   to specific questions.  He's going to have to lay a

2   foundation for the proposition that you really object

3   to, this last sentence on slide five.  And I'm

4   referring to the sentence that begins, "The Sprint

5   10-Ks are direct evidence that Sprint built the

6   network for voice, data, and SMS/MMS."  I've read a

7   lot of 10-Ks.  I don't see how a 10-K can do that.

8   But I'm sure you're adept at cross-examination, and

9   we'll see whether Mr. Riopelle can lay an appropriate

10  foundation --

11          MR. HOFFMAN:  And --

12          THE COURT:  -- for making that statement.

13          MR. HOFFMAN:  And just for clarification

14  purposes, foundation based on --

15          THE COURT:  I don't know how he can say

16  that.

17          MR. HOFFMAN:  Okay.

18          THE COURT:  He'll have to -- there will

19  have to be a foundation for that statement, the

20  statement that the 10-Ks are evidence that Sprint

21  built the network for voice, data, and SMS/MMS.

22          MR. HOFFMAN:  All right.  Then I look

23  forward to him attempting to do so.

24          THE COURT:  Well, he's not going to get the

25  opinion in unless he lays an appropriate foundation.

17

1    That's --

2            MR. HOFFMAN:  Well, I --

3            THE COURT:  That's even older than

4    Bowersfield, which is --

5            MR. HOFFMAN:  Well, that's --

6            THE COURT:  -- 16 years old.

7            MR. HOFFMAN:  Right.  And, Your Honor, I

8    would say that the foundation would be in hist expert

9    report, which -- for which there is no foundation,

10   and so --

11           THE COURT:  Well, except it all surfaced

12   during trial and you're not caught by surprise.

13   You've got the -- you referenced -- you have the

14   10-K.  Your expert referred to it in his -- in his

15   report.  And I'm sure that nothing that has been

16   developed in this case during the trial came as a

17   surprise to either side because that's my impression

18   of the way you prepared this case.  You prepared it

19   to the Nth degree, and I don't think there's any

20   prejudice and I certainly see no bad faith.  In any

21   event, the overruling of the objection is without

22   prejudice to your right to object to specific

23   questions.

24           MR. HOFFMAN:  Thank you, Your Honor.  And

25   then with respect to slide number seven, which is

18

1   the -- Mr. Lanning's slide about core network --

2           THE COURT:  Yes.  He can comment on that.

3           MR. HOFFMAN:  He can comment on that?

4   Okay.  Thank you, Your Honor.

5           THE COURT:  Well, let me -- let me qualify

6   that last statement.  Mr. Riopelle said he was going

7   to refer to that slide only in the context of his

8   testimony on damages and not in any way, shape, or

9   form to establish that that is the core network.

10          MR. HOFFMAN:  Thank you.

11          THE COURT:  All right.

12          MR. HOFFMAN:  Thank you, Your Honor.

13          THE COURT:  Mr. Riopelle, do you want to

14  take your highlighted copy of <u>Bowersfield</u> back?

15          MR. RIOPELLE:  If you would like to give it

16  back to me, relieve you of some paper.

17          (Pause in proceedings.)

18          THE COURT:  We have your copy of the --

19          MR. HOFFMAN:  Oh.

20          THE COURT:  -- slide.

21          MR. HOFFMAN:  Thank you.

22          THE COURT:  When that testimony is

23  presented Sprint will present the slides.  I'll get a

24  copy.

25          (Pause in proceedings.)

Dr. Cox - Cross                                    19

1           THE COURT:  I'm looking at my deputy.  Do

2    we have all the jurors?

3           COURTROOM DEPUTY:  We do.

4           THE COURT:  Good.

5           MR. RIOPELLE:  Would you like Mr. -- Dr.

6    Cox to take the stand now?

7           THE COURT:  Fine.  Dr. Cox?

8           THE WITNESS:  Good morning, Your Honor.

9           (Pause in proceedings.)

10          (Jury in, 10:02 a.m.)

11          THE COURT:  Good morning, everyone.  Please

12   be seated.  I hope you had a good, long weekend and

13   got to do on Friday afternoon and over the weekend

14   and yesterday some of the things that you had to put

15   off.  It's good to see all of you here so bright and

16   early.  We had two legal issues that I had to address

17   and that's been completed.  And now we will continue

18   with the cross-examination of Dr. Cox.

19          Dr. Cox, because it's been such a long

20   weekend, I remind you that you're under oath and the

21   record will show that Dr. Alan Cox is on cross-

22   examination.

23          THE WITNESS:  Thank you.

24                 CROSS-EXAMINATION

25   BY MR. Heist:

1  Q    Good morning, Dr. Cox.

2  A    Good morning, Mr. Heist.

3  Q    When we spoke on Friday I asked you whether it

4  was your opinion that in the negotiation that Nokia

5  would have had with Sprint back in 2005, that

6  Sprint -- whether Sprint would have preferred to have

7  a lump sum paid up amount for the life of the patent,

8  and you said yes, they would.

9  A    I recall that, yes.

10 Q    Now, in preparing your opinion in this case, did

11 you speak to anyone at Sprint to determine whether

12 Sprint would, in face, have preferred a lump sum?

13 A    Yes, I did.

14 Q    Who did you speak with?

15 A    I forget his name now, but I believe he was a --

16 counsel, a lawyer, a Sprint.

17 Q    Mr. Harley Ball?

18 A    That's correct.

19 Q    So one basis of your opinion that Sprint would

20 have preferred a lump sum is because Sprint's former

21 general counsel, Mr. Ball, told you so?

22 A    That was one basis.  It confirmed my previous

23 understanding of this -- these sorts of situations.

24 Q    Now, when Mr. Ball told you this he was talking

25 about this case in which Sprint is in the posture of

Dr. Cox - Cross                                    21

1   an infringer defendant, correct?

2   A   My recollection of the conversation was that his

3   comments were more general, that it applied to their

4   preference generally for a situation dealing with a

5   continuous stream of services for a relatively small

6   amount of money.

7   Q   Did he tell you when the shoe was on the other

8   foot and Sprint was a patent owner, a plaintiff in a

9   lawsuit, that it often demanded a running royalty

10   rather than a lump sum?

11   A   I don't recall him telling me that, no.

12   Q   Did he tell you that Sprint demanded and a jury

13   actually awarded a running royalty of five percent of

14   revenue against Vonage in the patent lawsuit that

15   Sprint filed against Vonage?

16   A   We didn't discuss that case, no.

17   Q   Did he tell you -- well, let me ask you this.   In

18   this case, in the earlier phase of this case, when

19   Sprint had a patent that it was asserting against

20   Comcast you were the damage expert in that phase of

21   the case, correct?

22   A   That's correct.

23   Q   And in that phase of the case you were proposing

24   a royalty that Com --

25                MR. RIOPELLE:  Your Honor, objection.  He's

Dr. Cox - Cross                           22

1    talking about matters in this case that are no longer

2    a part of this case.

3           THE COURT:  I think I know what you're

4    talking about, but let's go to sidebar.

5           (Sidebar discussion as follows.)

6           THE COURT:  I'll hear the objection, Mr.

7    Riopelle.

8           MR. RIOPELLE:  The objection was irrelevant

9    and prejudicial.  He is asking him about Sprint's

10   patents that Sprint (indiscernible) in this case to

11   which you granted summary judgment (indiscernible) --

12          THE COURT:  In Comcast's statement?

13          MR. RIOPELLE:  -- in Comcast's statement.

14   So he's bringing it up now.

15          THE COURT:  Well, the issue of whether

16   Sprint prefers or preferred a lump sum royalty versus

17   a running royalty in a case where Sprint has the

18   patent (indiscernible) being sued for infringement.

19          MR. RIOPELLE:  That is correct.  And if he

20   wants to ask him -- I don't have a problem

21   (indiscernible) for him to ask him about previous

22   opinions that Dr. Cox may have rendered, but for him

23   to go into his lead up to his explanation

24   (indiscernible) assert a patent against Comcast is

25   getting into much bigger issues here.  He can ask him

Dr. Cox - Cross                        23

1   about previous opinions.  He can ask him about his

2   previous opinions (indiscernible).  But I don't --

3   I'm concerned with getting into so much

4   (indiscernible) --

5              THE COURT:  Well, one thing that will not

6   surface in this is the fact that there was a

7   counterclaim (indiscernible) in Comcast's favor,

8   apparently.

9              MR. RIOPELLE:  (Indiscernible).

10              THE COURT:  But I'm not going to cut off

11   the inquiry on the subject, so cover it without

12   making reference to part of this litigation.

13              MR. HEIST:  The only thing I would ask,

14   Your Honor, propose to ask, is isn't it correct that

15   in the earlier phase of this case he was asking for a

16   lump sum in one case and also an alternative running

17   royalty?  He had two opinions, lump sum and running

18   royalty.  And I'd like to just establish that when

19   Sprint's (indiscernible) running royalty

20   (indiscernible).

21              THE COURT:  But you're mentioning this

22   case.

23              MR. HEIST:  Right.  I --

24              THE COURT:  You're not going to do that.

25              MR. HEIST:  Okay.

Dr. Cox - Cross                          24

1          THE COURT:  You can -- you can cover the

2    general subject, but without identifying it --

3          MR. HEIST:  As part of this case.

4          THE COURT:  -- as part of this case because

5    there's been a lot of litigation between --

6          MR. HEIST:  Well, my next question I might

7    as well ask --

8          THE COURT:  And you can leave it in there

9    by -- go ahead.

10          MR. HEIST:  Another question that I would

11    like to ask, and we might as well service it now

12    because it will come up in just another second, and

13    that is in the litigation in Kansas they're assuming

14    three companies, Comcast, Time Warner Cable, and

15    Connex, and they're seeking running royalties in that

16    case.  So whenever they're the plaintiffs, running

17    royalties are fine.  When they're defendants, the

18    argument that we've heard Dr. Cox make, he says they

19    always prefer lump sum.

20          THE COURT:  Okay.  I don't think that

21    raises the same issues, but I'll hear from you on

22    that.

23          MR. RIOPELLE:  Well, first of all, he's not

24    involved in that case, so he has no knowledge of that

25    case.  He's not involved in that case.  He's not an

Dr. Cox - Cross                    25

1    expert in that case.  He has no idea what positions

2    Sprint has taken --

3              THE COURT:  Well, we're talking about

4    questions on the subject.  I don't know whether he

5    knows or he doesn't.  But I see no prejudice to

6    Sprint, whereas I do see the potential for prejudice

7    if we talk about what is happening in this case.  Do

8    you disagree with that, Mr. Riopelle?

9              MR. RIOPELLE:  I don't disagree, but

10   doesn't he need to lay -- before he asks the

11   questions, doesn't he need to lay a foundation as to

12   whether -- because he's on direct.  No, he's on

13   cross, actually.  Okay, I'm sorry.  But doesn't he

14   need to lay a foundation (indiscernible) did he know

15   anything about (indiscernible)?

16             THE COURT:  Yes.

17             MR. RIOPELLE:  Okay.

18             MR. HEIST:  What I'm hearing is if I'm not

19   going to lay that foundation, then I might as well

20   move on?

21             THE COURT:  Maybe.

22             MR. HEIST:  I think I'll turn around and

23   smile anyway.

24             THE COURT:  That's great, Mr. Heist.  I

25   have to tell you I've done that many times.  I was

1   bleeding from mortal wounds that had just been

2   inflicted on cross-examination of my witnesses.

3              MR. RIOPELLE:  (Indiscernible).

4              MR. HEIST:  Right.  Thank you, Your Honor.

5              (Sidebar discussion concludes.)

6              THE COURT:  Counsel will proceed as

7   directed at sidebar.

8   BY MR. HEIST:

9   Q   When you have represented plaintiff patent owners

10  in the many cases that you've worked on, you've often

11  asked for a running royalty, as opposed to a lump

12  sum?

13  A   Certainly.  It depends on the situation and the

14  various factors that would go into deciding whether

15  or not a lump sum would be preferable or more

16  appropriate than a royalty.

17  Q   Now, another thing that Mr. Ball told you when

18  you spoke to him was that from his perspective, as a

19  licensee, he would have wanted to pay a lump sum

20  amount rather than a running royalty based on

21  Sprint's use of the invention because the lump sum

22  would have given him certainty, correct?

23  A   That's one of the benefits of a lump sum payment.

24  It gives certainty to both sides.

25  Q   Well, had Nokia agreed to a lump sum paid up

Dr. Cox - Cross                          27

1   amount, and if Sprint's use of the invention over the

2   life of the patent was ultimately greater than either

3   Nokia or Sprint expected at the time of the

4   hypothetical negotiations, Nokia's royalty would have

5   been capped, correct?

6   A    Sorry, could you state that again?

7   Q    Had Nokia agreed to a lump sum at the

8   hypothetical negotiation, and if over the life of the

9   patent the use of the invention was greater than

10  either Sprint or Nokia would have foreseen at the

11  time, Nokia's royalty would nevertheless have been

12  capped?

13  A    That's right, they would have made a deal and

14  they would have lived by it.

15  Q    Right.  And so in that case Nokia would not have

16  been fully compensated for all of Sprint's additional

17  infringement above and beyond what was contemplated

18  at the time, correct?

19  A    That's absolutely not correct.  Nokia would have

20  made a deal and they would have accepted it, and they

21  would have made a deal in their best interest

22  considering the situation at the time.  In that sense

23  they would have been fully compensated, just as if I

24  buy a car and -- or sell a car and somebody manages

25  to make better use of it than I had thought that they

Dr. Cox - Cross                    28

1    would be able to make of it, I would still live by --

2    I would have been compensated for the market value of

3    my car.

4    Q    But you wouldn't have been compensated -- Nokia

5    wouldn't have been compensated for each infringing

6    act that ultimately took place, correct?

7    A    Well, I'm not sure that that's true either.  I

8    mean you can go back to my example of the patent

9    that's incorporated into the tire.  If somebody

10   agreed to a lump sum payment or had agreed to a

11   royalty that was based on the use of the car rather

12   than the number of times the wheels went round and

13   round, then they would have been certainly

14   compensated for the use of the patent.

15   Q    Now let's go back again and try to put ourselves

16   in that room in 2005 with Nokia and Sprint and try to

17   think about what the parties were thinking about when

18   they walked into that room.  During your direct

19   testimony you referred to Defendant's Exhibit 150,

20   which was the evaluation form that the Nokia manager

21   filled out about this patent.  That was dated in May

22   of 1999, correct?

23   A    That's correct, and that's when they rated the

24   patent as a two out of five.

25   Q    Modest importance or modest --

1   A    That's --

2   Q    -- strategic value I believe it was, right?

3   A    That's right, modest value.

4   Q    But at that time in May of 1999, there was

5   essentially no SMS and no MMS messaging at all in the

6   United States, correct?

7   A    That's correct, though by 2010, when Nokia

8   actually did sell the patent, that situation had

9   changed.

10   Q   Well, back in '99 though, no SMS, no MMS, as a

11   practical matter in the U.S.?

12   A   Well, it wasn't widely used and commonly

13   available, that's certainly the case.

14   Q   Now, in your expert report you refer to the

15   Federal Communication Commission 2008 report on the

16   state of the mobile industry, correct?

17   A   I did say several, yes.

18           MR. HEIST:  Can we have Defendant's Exhibit

19   33, please?  I'm not sure -- I'm not sure if this is

20   (indiscernible).

21           (Pause in proceedings.)

22   BY MR. HEIST:

23   Q   Doctor, let me direct your -- this is one of the

24   Federal Communication Commission reports that you

25   looked at in preparing your opinion, correct?

1    A    Yes, this is the 12th report on wireless

2    communications.

3    Q    And it's dated February 2008, is that right?

4    A    It released -- it was released in February of

5    2008, that's correct.

6    Q    Let me direct your attention to page 90.  And we

7    see a table there.  And if we look at the sixth

8    column over, we see wireless data revenue as a

9    percent of total service revenue.  Do you see that?

10   A    I do see that, yes.

11   Q    And then we look down, we see that in 1998, the

12   year before and the last data that the parties would

13   have had at the hypothetical negotiation, the percent

14   of a monthly bill from a U.S. wireless subscriber

15   that was attributable to wireless date, which would

16   include, if I read this report correctly, messaging,

17   was N/A, not applicable, right?

18   A    Yes, that's what it says.

19   Q    And then in 1999, the year of the evaluation from

20   the Nokia manager of the strategic importance of the

21   invention, the percent of the bill rose all the way

22   up to 0.2 percent, still very small?

23   A    That's correct, though what you also observe from

24   this table is that by 2006, the attributable portion

25   of SMS and MMS that the FCC at least attributed to

1   revenue had grown to 13.5 percent.

2   Q    Right.  And in 2005, the day of the hypothetical

3   negotiation, it was at eight percent, correct?

4   A    That's right, and continued to grow after that.

5   Q    Right.  And in the -- in 2002 was the first time

6   it reached over one percent, correct?

7   A    That's correct.

8   Q    And then 2003, it doubled, correct?

9   A    As a percentage, yes.

10  Q    And then 2004, it doubled again, correct?

11  A    That's correct.  And all these numbers are baked

12  into my calculation because by 2010, of course, Nokia

13  has observed the continued growth of SMS.

14  Q    So now if we -- if we go back to 2005 in that

15  conference room in Finland at the hypothetical

16  negotiation, even if neither party would have known a

17  single thing about what might happen in the future,

18  both parties would have known that messaging by that

19  time was growing very rapidly, correct?

20  A    That's true, as they knew when they sold it in

21  2010.

22  Q    And it's possible -- and next question, there's

23  no evidence one way or the other as to what Nokia's

24  view was of the strategic importance of its patent in

25  2005, correct?

Dr. Cox - Cross                                      32

1   A    I'm not sure that I understand the question.

2   Q    Well, you pointed to the invention evaluation in

3   May of 1999 from Nokia, correct?

4   A    Yes.

5   Q    But there's no documents, no testimony, nothing

6   in this record, that would tell us what Nokia's view

7   was in April of 2005 in that conference room

8   regarding the strategic importance of this patent,

9   correct?

10  A    Well, I don't think there's any evidence that

11  I've seen that indicates that the patent made a huge

12  contribution to the improvement of SMS quality and

13  performance.

14  Q    That wasn't my question though.

15  A    Well, except -- well, okay.

16  Q    My question was there is no evidence in this

17  record at -- one way or the other from a Nokia

18  witness or a Nokia document as to what Nokia's view

19  was of the strategic importance of its patent as it

20  walked into that conference room in Finland in April

21  of 2005, correct?

22  A    Well, I guess I don't -- I'm not really sure what

23  you mean by "strategic value."  I'm only talking

24  about the contribution of the patent to SMS and to

25  anybody who provides SMS services.

Dr. Cox - Cross                              33

1   Q   I'm talking in terms of strategic value as the

2   term was used in the 1999 evaluation upon which you

3   based your opinion and that you relied upon in your

4   testimony on Friday.

5            (Pause in proceedings.)

6   A   Well, the testimony -- or the file says that the

7   value -- under "Value of the Invention," Nokia

8   described the strategic importance to Nokia as a two.

9   So --

10  Q   That was --

11  A   -- it describes --

12  Q   That was 1999, correct?

13  A   That's correct.

14  Q   And --

15  A   So under the value of the patent, it describes

16  its strategic value as modest.

17  Q   That was in 1999?

18  A   That's correct.

19  Q   And we don't have any evidence about what they

20  thought when they walked into that conference room in

21  April of 2005 with Nokia -- pardon me, with Sprint

22  sitting in the waiting room an openly admitting that

23  it was infringing Nokia's patent, do we?

24  A   Well, apart from the graph that I drew that

25  indicated that in 2010, the valuation was consistent

1   with what we see in 2009 and that a reasonable

2   inference would be to draw a straight line between

3   those two valuations.

4   Q   Is it possible that by 2005, Nokia's view of the

5   strategic importance of its patent might have been

6   different than it had been in 1999?

7   A   Well, I don't think the evidence supports that.

8   It's certainly possible, but I haven't -- there

9   hasn't been any explanation as to why it would have

10  changed so dramatically in 2005.

11  Q   Now, I'm going to change topics for a moment.

12  Let's put on our accounting hats for a moment.

13  A   Sure.

14  Q   Last Friday, you testified that Ms. Riley

15  couldn't accurately apply the income approach because

16  Sprint didn't keep adequate records from which she

17  could make an accurate estimation of Sprint's

18  revenues and costs, correct?

19  A   Well, and I think I would have went further than

20  that to say that it's not possible to come up with an

21  accurate valuation of the revenues that are generated

22  by offering SMS services because they're offered in

23  combination with all the other services that Sprint

24  offers.

25  Q   Well, you agree, do you not, that Sprint does

1    keep records that track how many messages were sent

2    and delivered over the damages period, correct?

3    A    Certainly it does that, yes.

4    Q    And there's no dispute between the parties as to

5    how many messages we're talking about?

6    A    I haven't seen any dispute to that effect, that's

7    correct.

8    Q    So they do keep track of how many messages were

9    sent and delivered that are the subject of Ms.

10   Riley's report?

11   A    That's certainly true, but that's not the basis

12   of evaluation.  The number of times something is used

13   is not the basis of evaluation.

14   Q    For that, we need to look at revenue and cost?

15   A    Well, you need to do more than that.  You need to

16   figure out what the patent provides and how much --

17   how much people are willing to pay for that

18   attribute.

19   Q    But we also -- your opinion is we at least have

20   to look at revenue and cost and then go farther?

21   A    That would be one step, yes.

22   Q    And last week, I understood you to say, last

23   Friday, that Sprint did not keep adequate records

24   from which Ms. Riley could accurately determine the

25   portion of Sprint's revenue attributable to

1   messaging.

2   A   Well --

3   Q   Was that your testimony?

4   A   -- that isn't exactly what my testimony was, or

5   certainly not what I intended to say.  I was just

6   saying that there are no adequate records to

7   determine what benefit is derived from using this

8   patent, just in the same way is when you use a

9   patent -- going back to my patent on a tire analogy,

10  there's no -- there's nothing in the record that

11  would be equivalent to determining what benefits

12  arise from incorporating the patent into the tire.  I

13  mean supposing the patent made the care go faster and

14  was more stable, you would want to know how much

15  faster or how much more stable and how much people

16  are willing to pay for that additional speed or that

17  additional stability.  There's nothing like that in

18  the record -- in Ms. Riley's report or in the record

19  here.

20  Q   Thank you for that explanation, Doctor.  My

21  question doesn't have anything to do with tires and

22  it doesn't have anything to do with the patent.  It

23  doesn't have anything to do with value.  It has to do

24  with the simple question of whether the records that

25  Sprint provided to Comcast in this case gave Ms.

Dr. Cox - Cross                                37

1    Riley the ability to determine the messaging revenue

2    that Sprint enjoyed over the damage period.

3    A    Well, I would say this case has everything to do

4    with the value, but certainly the value -- the

5    revenue that was being generated from the provision

6    of SMS is something that I do not think we really

7    know.

8    Q    And the reason that you gave on Friday was

9    because Sprint for a time -- sometimes in the damage

10   period started to provide customers with bundled

11   plans that gave them voice, data, and messaging all

12   for one price, is that right?

13   A    That's correct.  That's a manifestation of the

14   way telecommunication services are being offered now.

15   Q    And you suggested to the jury that Sprint itself

16   has no way to unbundle the revenue that it receives

17   from its subscribers so that it can isolate the

18   messaging revenue from the data revenue and the voice

19   revenue?

20   A    Well, I didn't say they have no way.  All I said

21   was that there wasn't any evidence in the case that I

22   had seen that provided an acceptable way, an

23   economically and financially acceptable way, of

24   unbundling the benefits of the messaging.

25   Q    All right.  One of the things that you considered

Dr. Cox - Cross                        38

1  in connection with your opinion was the testimony of

2  a gentleman named Sean Wilson, deposition testimony,

3  correct?

4  A    That's correct.

5  Q    And I'd like to show you Plaintiff's Exhibit 77.

6  This is one of the documents that both you and Ms.

7  Riley relied upon, or reviewed anyway, in connection

8  with your opinions, correct?

9  A    I don't recognize it, but I'll -- it certainly

10  would be -- that looks consistent with the sort of

11  thing that we looked at.

12  Q    This document was the subject of testimony from

13  Mr. Wilson, who was Sprint's corporate designee about

14  subject matter of this particular document and

15  others, correct?

16  A    Yes.

17  Q    Let me show you a transcript of Mr. Wilson's

18  deposition.

19         (Pause in proceedings.)

20  Q    And I'd like to go through this document with you

21  regarding his testimony about this document, which

22  was marked at his deposition as Deposition Exhibit

23  11.  Now, let's begin on page 171 of his transcript.

24  Line 21, Mr. -- we'll mark that as Exhibit 11, Wilson

25  Exhibit 11, and you can see that in the bottom, right

Dr. Cox - Cross                              39

1   of the exhibit, correct?

2            THE COURT:  When was the deposition taken?

3            MR. HEIST:  December 19th, 2014, I'm told.

4   My copy doesn't have the cover page.

5   BY MR. HEIST:

6   Q   So let me direct your attention starting at line

7   24 to the notes column on page one.

8   A   Of the exhibit?

9   Q   Yes.  And we went down and we -- and we -- I

10  directed the witness' attention to code LDT1007.  Do

11  you see that number there?

12  A   I see it on the screen.  Did you want me to look

13  at the transcript also?

14  Q   Well, let's keep going.  Let's look at the

15  transcript, line six,

16            Question:  "And that corresponds to a plan

17  family called EDS1500?  Do you see that?"

18            Answer:  "Yes."

19            Question:  "And what's that?"

20  A   Sorry.  What page?

21  Q   Answer -- pardon me?

22  A   I'm sorry, which page are you reading from?

23  Q   I'm at page 173.

24  A   Okay.

25  Q   And the answer was,

1         Answer:  "That's everything data share."

2         Question:  "Everything data share 1500.

3   And the MRC, that is the monthly recurring charge,

4   for that plan on this document is $149.99?"

5         Answer:  "Yes."

6         Question:  "And Sprint allocated $69.99 of

7   that amount to the voice component of the bundle,

8   correct?"

9         Answer:  "Yes."  And you see in the column

10  under "voice" $69.99.  Do you see that?

11  A   Yes, I do see that.

12  Q   And it allocated $30 to the text component of the

13  bundle, correct?

14  A   That's what it shows on the exhibit.

15  Q   Then -- and the answer is,

16        Answer:  "That's certainly the way I read

17  those first columns."

18        Question:  "And it allocated $30 to the

19  data component of the bundle, correct?"

20        Answer:  "Yes.  Yes."

21        Question:  "And it allocated $20 to the

22  premium data add on, correct?"

23        Answer:  "Correct."

24        Question:  "Then it did it in terms of

25  percentages in the next column.  It allocated 47

Dr. Cox - Cross                           41

1    percent of those amounts to the voice component of

2    the bundle, correct?"  You see the 47 percent within

3    the "Percentage" column on the exhibit?

4    A    I think you're asking me, and the answer is yes,

5    I do.

6    Q    And the witness continues,

7              Answer:  "I think it's just math at that

8    point, but yes."

9              Question:  "And 20 percent of the bundle

10   was allocated to text, correct?"

11             Answer:  "Correct."  We'll skip the

12   objections and go on to line 20.

13             Question:  "In the column under 'Text' it

14   says '20 percent' referring to LDT -- pardon me,

15   LTD1007, correct?"

16             Answer:  "Yes."  Continuing, line 25,

17             Question:  "That means Sprint allocated

18   $30, or 20 percent of the value of the bundle, to the

19   tax component, correct?"

20   A    Oh, that's what you're reading --

21   Q    That's where I'm referring you.  They allocated

22   20 percent of that $149 that they charged customers

23   under that plan to text, correct?

24   A    Yeah, that was what their allocation was based on

25   some accounting formula, not necessarily based on

Dr. Cox - Cross                                      42

1    causation.

2    Q    Let me direct you to page 175 of the transcript

3    beginning at line 12,

4              Question:  "And it did it for tax reasons?"

5              Answer:  "That's my understanding."

6              Question:  "So what tax reason would that

7    be?"

8              Answer:  "So different municipalities have

9    different taxes on the services, like mobile internet

10   is the big one, I mean and prior to creating these

11   types of plans, is a more straightforward of a mobile

12   internet would be, you know, the data add ons.  So

13   the tax rate for mobile internet in that municipality

14   would be applied against that MRC," stands for mobile

15   recurring charge.  "When we created the bundle plans

16   we certainly felt, you know, we didn't want to remit

17   too much to the state, so we didn't want to have to

18   pass -- to have our customers remit too much to

19   Sprint, so we needed to make, you know, some

20   reasonable allocations for the purposes of, you know,

21   applying that tax rate appropriately for the

22   different municipalities."  Do you see that?

23   A    Yes, I do see that.

24   Q    So when Sprint wants to unbundle its plans for

25   tax reasons so -- as Mr. Wilson testified, so it

Dr. Cox - Cross                                    43

1  doesn't remit too much money in taxes to the state,

2  it knows how to do it, doesn't it?

3  A   Well, it certainly has some method for

4  allocation.  It was based on the agreement made up

5  amongst the different people or different product

6  managers who were responsible for different

7  components of the services provided to Sprint, and

8  they came up with what they felt was reasonable for

9  tax purposes.  But that doesn't come -- rise to the

10 level of evaluating a piece of intellectual property

11 for the purposes of calculating a reasonable royalty.

12 It's just an allocation exercise, basically an

13 agreement.

14 Q   It's an agreement among Sprint's employees

15 responsible to make sure that they're complying with

16 the tax regulations of the municipalities in which

17 they do business, correct?

18 A   That's correct, though it's an agreement that

19 they come up with based on their inability to

20 calculate exactly how much revenue is derived from

21 providing SMS services, as opposed to other services.

22 Q   So when Mr. Wilson said this was a reasonable

23 allocation do you agree with him or disagree?

24 A   I don't have an opinion one way or another, but I

25 don't -- I don't know how he did the allocation, but

Dr. Cox - Cross                        44

1    if he didn't do it in the manner that would be

2    appropriate for valuation purposes, then I don't

3    think I would agree with it as being appropriate for

4    calculating a royalty in this matter.

5    Q   So you're saying it was inappropriate for Ms.

6    Riley to rely upon the allocations that Sprint makes

7    for tax purposes?

8    A   We have no testimony as to how they did that

9    allocation, whether it was putting their fingers to

10   the wind or whether there was sort of rigorous

11   statistical or economic analysis.

12   Q   You're saying Sprint put its finger to the wind?

13   A   No.  No, that wasn't what I said.  I said we

14   don't have any evidence as to what they did in order

15   to come up with this allocation.  My recollection

16   from reading the testimony of Mr. Wilson and others

17   was that it was basically an agreement that was made

18   based on their judgment, but not based on any

19   rigorous analysis.

20   Q   Now, on Friday, I also understood you to say that

21   Ms. Riley did not accurately calculate the cost

22   associated with messaging.

23   A   That's correct.

24   Q   But Sprint has produced documents in this case

25   showing that it did track some costs for messaging

Dr. Cox - Cross                          45

1  services, correct?

2  A    That's correct, and my criticism is that she

3  didn't take into account the fully -- the full cost

4  of providing SMS services in combination with all the

5  other services that Sprint provides.

6  Q    In applying the income approach, Ms. Riley

7  calculated Sprint's messaging profit margin using

8  Sprint's costs derived in the ordinary course of

9  business from Sprint's own documents, correct?

10  A    Well, I'm not sure whether she did use documents

11  that were generated in the normal course of business,

12  but if -- they also have to be examined for whether

13  or not they're complete an make economic sense.

14  Q    Whatever they were, they're complete enough for

15  Sprint to run its messaging business, correct?

16  A    That's correct.  Whether or not it's appropriate

17  for evaluation is another question.

18  Q    Now, in her opinion, the margin that she

19  calculated on messaging using the revenue that she

20  derived in part from Sprint's records and the costs

21  that were derived in part from Sprint's records, the

22  margin that she computed was 53.8 percent on

23  messaging, correct?

24  A    That's her margin, yes.

25  Q    And you say that in calculating that margin, she

1   didn't apply the correct definition of costs,

2   correct?

3   A   She didn't incorporate all the costs to either

4   calculate that margin or compare it with --

5   appropriately with Sprint's other -- the margin it

6   makes on other products.

7   Q   And you say that the costs that she relied upon

8   were too low, and, therefore, that the margin that

9   she computed was too high, correct?

10  A   That would be one of my concerns with that, yes.

11  Q   Now let's go back to Exhibit -- Defendant's

12  Exhibit 33 that we looked at a moment ago.  That's

13  this report from the Federal Communications System --

14  or Commission, excuse me, in 2008.  And let's go to

15  page 91.

16          (Pause in proceedings.)

17  Q   Paragraph 203.  The report states, "Morgan

18  Stanley further notes that wireless data services

19  often have much higher gross margins than voice and

20  that text messaging is believed to be the most

21  profitable with margins of 90 percent or more.  Do

22  you see that?

23  A   I do see that with reference to gross margins.

24  Q   So in this report prepared by the federal

25  government, the Federal Communications Commission, it

Dr. Cox - Cross                            47

1   was noted at least at this point in time in 2008 that

2   text messaging margins were believed to be 90 percent

3   or more, correct?

4   A    Remember, those are gross margins, so those do

5   not include all the costs of providing SMS services,

6   as it says right there on the -- on the text.

7   Q    Ms. Riley determined the margin for Sprint to be

8   53.8 percent.

9   A    That's correct.  So -- that's a great point.

10  Here, they're talking about gross margins without any

11  of the operating costs included -- or deducted from

12  revenue.  Ms. Riley did include some costs, not all

13  of the costs, and then compares her margins with

14  these margins.  Well, of course she came up with a

15  lower margin, 53 percent, after deducting more costs

16  than Morgan Stanley did, so of course she's going to

17  get a much lower number than Morgan Stanley came up

18  with.

19  Q    So you think her 53.8 percent margin calculation

20  was too high?

21  A    Well, I don't have an opinion as to whether it

22  was too high or not.  All I'm saying is that not all

23  the costs were used in calculating that, so,

24  therefore, it was too high.

25  Q    And you provided no alternative number, margin

Dr. Cox - Cross                                48

1   calculation, for this jury, correct?

2   A    That's correct, because I wouldn't have done an

3   evaluation in this way.

4   Q    Now, one of the main costs that you say that Ms.

5   Riley omitted was spectrum costs, correct?

6   A    That's correct.

7   Q    So let's take off our accountants hats for a

8   moment and we'll put on our engineers hats.  Could

9   you tell us what you understand spectrum to be?

10  A    Well, spectrum is the radio magnetic spectrum

11  that in this case is being allocated to the use of

12  cellular service.

13  Q    Well, electromagnetic spectrum, that's just a

14  frequency, right?

15  A    Well, that -- it's measured -- the portion of the

16  spectrum that you're taking is measured in frequency.

17  Q    And those are sometimes called the air waves,

18  right?

19  A    Yes.

20  Q    And the air waves are public property, correct?

21  A    Well, they're public property that is sold or

22  controlled by the federal government or various

23  government agencies, and then licensed out to

24  companies for their use or allocated in some cases to

25  public agencies for their use.

1  Q   So the actual spectrum is owned by the federal

2  government, but companies like Sprint can go to the

3  federal government and get the right to use a

4  particular frequency, correct?

5  A   Right.  They pay billions and billions of dollars

6  in license fees for the right to use that spectrum.

7  Q   So to put it in terms that people understand here

8  in Philadelphia -- and we have a radio station that's

9  been around as long as I've been around, KYW 1060 AM.

10 So the owners of that station go to the Federal

11 Communications System and they pay money for the

12 right to broadcast at the frequency of 1060 I think

13 it's kilocycles per second.  I forget.  But it's --

14 that frequency is what they essentially rent from the

15 government, correct?

16 A   Yeah.  I'm not exactly sure whether -- you know,

17 what -- how the portion of the band that goes to

18 radio stations is licensed, but --

19 Q   But --

20 A   -- it is certainly controlled by a federal

21 agency, yes.

22 Q   So if you're Sprint and you want to go into the

23 wireless business, you have to go down to the Federal

24 Communications System and they sell you the right to

25 use the frequency band that you want to use or they

Dr. Cox - Cross                                    **50**

1   want to use for money, correct?

2   A    Yes.  You know, it's a complicated process.  The

3   federal government auctions it off, but you can also

4   buy and sell spectrum from other people who have

5   taken licenses out of part of the -- out of part of

6   the spectrum.

7   Q    So let's put our accountants hats back on for a

8   moment.  And let's assume that we're going to start a

9   phone company, you and I, and we're going to buy the

10  rights to use some spectrum.

11            (Pause in proceedings.)

12  Q    And so we raise some money.  Let's say we raise

13  $20 billion for stock from a stock offering, so we

14  have $20 billion to start with.

15  A    Okay.

16  Q    That's a pretty good -- pretty good day to start

17  with $20 billion.  So my handwriting isn't as good as

18  my partner's, Mr. Goettle's, so I -- we prepared this

19  consolidated statement of operations.  That's a

20  balance sheet.  And --

21  A    That's an income statement.

22  Q    Or an income -- sorry, I got the wrong one.

23  Let's put the balance sheet here.  And I put FASB

24  rules.  Do you know what the FASB rules are?

25  A    It's the Federal Accounting Standards -- Federal

1    Accounting Standards Board.

2    Q    Okay.  So when we get the stock in -- the money

3    in for the stock we have current assets.  We'll put

4    down cash, $20 billion, okay?

5    A    Okay.

6    Q    And now we're going to go and we're going to get

7    some spectrum from the Federal Communications System.

8    And let's assume that the spectrum costs $18 billion.

9    So we'll cross out the 20 and we'll put in two, and

10   we got $18 billion that we're going to give to the

11   FCC, and they're going to give us a bag of spectrum.

12   It's intangible.  And we come back and we now have

13   this right that we need to get into business.  Where

14   do we put the $18 billion in spectrum on the balance

15   sheet?

16   A    Well, I guess I would put it either in property,

17   plant, and equipment or intangible assets.  I don't

18   know what the rules are.

19   Q    There -- these are accounting rules?

20   A    Right.

21   Q    So could we put it under intangible assets

22   because the spectrum, after all, isn't something that

23   we can touch or pick up or put in the bag; it's just

24   a right?

25   A    Well, you know, that's an interesting question.

Dr. Cox - Cross                                52

1   I don't know -- I mean I could -- I could think of a

2   reason why you wouldn't put it in there, something

3   that's clearly defined, something that you clearly

4   have a right to, as opposed to goodwill or know-how,

5   which is usually what we would describe as an

6   intangible asset.

7   Q   I'll put it wherever you want it.  You tell me

8   where to put it.

9   A   Well, let's put it under -- let's put it under

10  intangible assets then.

11  Q   Okay.  So I'm going to write down "Spectrum" -- I

12  apologize for my handwriting -- "$18 billion."  And

13  since we're just starting the business, we don't have

14  any liabilities, right?

15  A   Well, apart from the stockholder's equity.

16  Q   So the stockholder's equity is $20 billion,

17  right?

18  A   Yes.

19  Q   So down here, we'll put down "$20 billion."  So

20  the stockholders are still pretty happy with us

21  because they started with $20 billion and they still

22  have $20 billion, right?

23  A   Yes.

24  Q   So we've listed the spectrum under the "Assets"

25  column, right?

Dr. Cox - Cross                          53

1    A    Yes.

2    Q    And assets generally are a good thing.

3    Liabilities are the bad thing.  But at the beginning

4    of our business, all we have right now are two

5    assets, $2 billion in cash and $18 billion in

6    spectrum?

7    A    Yes.

8    Q    All right.  Now, there's another type of document

9    that accountants keep.  Sorry, I was told that you

10   couldn't see this.  So I put $20 billion under

11   shareholder's equity, and the current liabilities at

12   the moment are zero.  So there's another type of

13   document that accountants keep in addition to a

14   balance sheet called a P&L, profit and loss

15   statement, correct?

16   A    Yes.

17   Q    All right.  So I'll do this because my

18   handwriting is so poor and I realized I misspelled

19   "FASB rules," for which I apologize.  So now we're a

20   year into the business and we have revenue coming in

21   from our subscribers, and let's say that revenue

22   that's coming in is $1 billion.  So I'll put down "$1

23   billion" here in revenue.  Where do I put the cost of

24   the spectrum on the income statement, the P&L

25   statement?

1   A    Well, one thing you could do, certainly -- well,

2   in a P&L -- so these are -- when you say operating

3   expenses, just to make sure we're talking about the

4   same thing, this is more than just cost of good sold?

5   Q    Somewhere -- if there's a cost --

6   A    Uh-huh.

7   Q    -- it should show up on this statement.  I don't

8   know where you put it, but if there's a cost of the

9   spectrum, it's got to show up on there, doesn't it?

10  A    Well, if you fully depreciate it, as you should,

11  over time, then it should appear as a depreciation

12  factor that you subtract from revenue.

13  Q    Well, let's say it depreciates ten percent.

14  A    Okay.

15  Q    I'll just make it up.  So we paid $18 billion and

16  it depreciates $1.8 billion.  So we'll put -- is that

17  right?

18  A    We pay 18 -- sure, that sounds good.

19  Q    So we'll put "$1.8 billion."  That means if we

20  subtract -- the income, we received $1 billion, and

21  from that we subtract the depreciation, or the cost,

22  we're in the hole?  We've lost money?

23  A    That's correct.

24  Q    All right.

25  A    Because we still haven't -- and we still haven't

Dr. Cox - Cross                              55

1    subtracted our operating costs here --

2    Q   Right.

3    A   -- our cost of good sold.

4    Q   And there's even more costs.  So we're --

5    A   Right.

6    Q   -- in deep trouble after one year?

7    A   I should never have gone into business with you.

8    Q   Or I with you.  Well, now, let's keep our

9    accountants hats on for a moment and talk about how

10   Sprint keeps its books and records.  Sprint files a

11   document each year with the Securities and Exchange

12   Commission called a 10-K, correct?

13   A   That's correct.

14   Q   And that 10-K form that they submit every year

15   lists the results of their operations, their costs,

16   tells the people -- the public lots of things about

17   the company, right?

18   A   That's correct.

19   Q   And it's a pretty important document, isn't it?

20   A   Yes.

21   Q   Because it's a document that the public relies

22   upon, the shareholders, the investors.  Everybody

23   relies upon that document to understand how Sprint is

24   doing, correct?

25   A   That's correct.

Dr. Cox - Cross                          56

1   Q    And the documents -- the 10-K forms are prepared

2   and audited by the public accounting firms to make

3   sure they're accurate, correct?

4   A    That's right, though let's be clear about what

5   that means.  They're accurate and they're consistent

6   with accounting rules that have been set up by FASB

7   and other organizations.  They don't necessarily

8   speak to or are consistent with the way you would do

9   a valuation.

10  Q    All right.  And this is a really important point.

11  Accounting rules have to -- accountants have to file

12  accounting rules, right?

13  A    That's right, and certainly in publishing a 10-K.

14  Q    Like FASB rules, for example?

15  A    That's correct.

16  Q    Accountants have to follow those rules.

17  Economists don't, right?

18  A    That's correct.  And financial analysts as well.

19  When they're doing stock reports they frequently take

20  these reports, these 10-Ks, and realign the numbers

21  so that they are more appropriate for -- when they're

22  taking a valuation and giving advice to their

23  subscribers as to what socks to buy.

24            (Pause in proceedings.)

25  Q    I'd like to show you what we marked as

Dr. Cox - Cross                                    57

1    Plaintiff's Exhibit 908, which is the Form 10-K that

2    was filed by Sprint Nextel Corporation in 2005, the

3    year of the hypothetical negotiation.  And I think

4    it's worthwhile going through and see how well we did

5    as amateur accountants.  So let's look at the first

6    page.

7              MR. HEIST:  908?

8    BY MR. HEIST:

9    Q   So that's the 10-K and we can see that it's -- I

10   think we can see the year, December 31, 2005.  So

11   let's go to page 83.  I think that's 82.  There we

12   go.  That's the signature page, correct?

13   A   Yes.

14   Q   And this document was signed by the Chief

15   Executive Officer, the Chief Financial Officer, and

16   the Principal Accounting Officer, correct?

17   A   Yes.

18   Q   Let's go to the next page, page 84, and we'll see

19   that it was signed by what appears to be all but one

20   of the members of the board of directors of Sprint

21   Nextel, correct?

22   A   Yeah, I presume that's the entire board.

23   Q   And let's go to page 908 -- pardon me, Exhibit --

24   pardon me, page 89 of this exhibit.

25             MR. HEIST:  It's 89, Mr. Dyer.  There we

Dr. Cox - Cross                                    58

1   go.

2   BY MR. HEIST:

3   Q   And that's the report of the certified public

4   accountants that signed off on this document,

5   correct?  KMPG (sic)?

6   A   That's correct.

7   Q   All right.  Now let's go to the balance sheet.

8   That's page 94.  And here, we see assets at the top,

9   liabilities in the middle, and shareholder's equity

10  towards the bottom, correct?

11  A   Yes.

12  Q   Now let's look under the "Asset" column.  Go down

13  to intangible assets, and we see "FCC Licenses, $18

14  billion," right?

15  A   Yes, I see that number.  I can't see what the

16  heading is, but I presume that that's for December of

17  2005.

18  Q   All right.  So FCC licenses include the spectrum,

19  so we did a pretty good job in our earlier balance

20  sheet.  We got it in the right spot.  It's an asset,

21  not a liability, correct?

22  A   That's correct.

23  Q   Now, let's go to the notes to the financial

24  statement and see how they treat spectrum.  I'm going

25  to direct your attention to page 104.

Dr. Cox - Cross                                   59

1   Q    We'll blow up intangible assets, and it says, "In

2   conformity with SFAS Number 142, goodwill and other

3   intangible assets, we do not amortize our indefinite

4   life intangibles, which consists of our Federal

5   Communications Commission, or FCC, licenses."  Do you

6   see that?

7   A    I do see that.

8   Q    And amortization is sort of another word for

9   depreciation when you're talking about an intangible

10  asset like an FCC license, correct?

11  A    That's correct, though, you know, that's not the

12  only cost of having an asset.  You have to pay a

13  return on that asset.  We'll come to that in a

14  moment.  I just want to go through the accounting

15  rules.  Sprint is telling the investors and the

16  investing public and the SEC that they don't take any

17  I'll call it depreciation deduction for spectrum,

18  right?

19  A    That's correct, and they're also telling

20  investors that if you want to do an accurate

21  evaluation of the way we run our business and the way

22  we generate margins, you would have to take that into

23  account --

24  Q    Okay.

25  A    -- and make an adjustment accordingly.

Dr. Cox - Cross                                    60

1   Q    Okay.  But if we went to their depreciation line

2   in the balance sheet, there's no depreciation cost

3   associated with the license.

4   A    That's the way they interpret the accounting

5   rules.

6   Q    And that's the way AT&T and Verizon account --

7   follow the accounting rules too, isn't it?

8   A    That's right, but when they do an economic

9   evaluation of the cost of holding spectrum that's not

10  what they do.

11  Q    Right now, we have our accountants hats on,

12  Doctor, don't we?

13  A    Well --

14  Q    It's hard to keep track of which we are at the

15  moment, but right now, we're accountants, you and I,

16  and we're trying to apply the FASB rules, the

17  accounting rules, that Sprint is obligated to follow

18  when it submits its form to the SEC.  They don't list

19  spectrum, the $18 billion, as a cost and they don't

20  depreciate it.  Isn't that what this says?

21  A    That's correct.  I was just make a side comment

22  on a rule that indicates how one should properly

23  treat this information.

24  Q    Let's go to page 119 because there they tell us

25  why they don't depreciate the spectrum.  Let me

Dr. Cox - Cross                61

1   direct your attention to the sentence that begins,

2   "That spectrum is not -- is a renewable, reusable

3   resource that does not deplete or exhaust over time."

4   I guess we should highlight the previous sentence.

5   "Spectrum licenses authorize wireless carriers to use

6   radio frequency spectrum, and that spectrum is a

7   renewable, reusable resource that does not deplete or

8   exhaust over time."  Do you see that?

9   A   I see that.  Let me just read the rest of the

10  paragraph so I don't miss anything here.

11            (Pause in proceedings.)

12  A   That's what it says, certainly.

13  Q   So let's go back to our business balance sheet,

14  the one you and I created.  Let's go back to the

15  document camera.  So we put in here depreciation,

16  $1.8 billion, and that turns out to be wrong.  The

17  depreciation, according to Sprint, is zero.

18  A   Well, that's -- their amortization is zero, but

19  that doesn't mean the cost of holding that asset is

20  not more than zero.

21  Q   But what they report to the investors and the

22  shareholders and the analysts is that the

23  depreciation, or amortization, cost for that $18

24  billion in spectrum is zero, correct?

25  A   That's what they're -- that's what they're saying

Dr. Cox - Cross                                62

1  when they explain how they do their sums.  But the

2  analysts who are reading it and the shareholders are

3  expecting to get a return from the investment that

4  they made and the money that they made -- or the

5  money that they gave the telephone companies.

6  Q    Right.  They would like to get a return on that

7  money --

8  A    That's right.  There's an --

9  Q    -- but at --

10  A    -- opportunity cost to holding that spectrum.

11  Q    But at any time that Sprint wants to sell or turn

12  back its spectrum it can do it and get back its $18

13  million because it's still right there in the balance

14  sheet where it always was, isn't that right?

15  A    That's exactly my point.  There's an opportunity

16  cost to holding that spectrum.  If they've got that

17  spectrum -- $18 billion tied up in spectrum, they

18  either have to use it as they always planned to use

19  it, for texting, data, and voice, or they have to

20  sell it back to somebody else -- or they could try to

21  sell it to somebody else and keep the money for

22  themselves and give the money to their shareholders.

23  There's a cost to keeping that spectrum for use in

24  texting.

25  Q    Any economist would say that, wouldn't he?

Dr. Cox - Cross                        63

1    A    An economist.  Any accounting would tell you that

2    was the truth also, but they --

3    Q    Well, tell --

4    A    -- when they are putting on their accounting hats

5    to comply with the rules this is what they do.

6    Q    All right.

7    A    And when we do the valuation we do a more

8    comprehensive and complete analysis.

9    Q    Let's take on our economist hat and put up

10   there -- we'll put our accounting hat back on.  I'm

11   going to ask you to go through this 10-K and show me

12   where the opportunity cost is listed in the 10-K.

13   A    Well, I'm not sure if I could find that, but that

14   doesn't mean that there aren't a lot of things in the

15   10-K that may be consistent with accounting rules,

16   but which we have to make adjustments for when we're

17   figuring out what the valuation is.  After all,

18   there's a whole industry out there that does nothing

19   but convert information in 10-Ks and annual reports

20   to something that people can act on in making their

21   investments.

22   Q    Right.  And they tell the public that we don't

23   depreciate the licenses.  They're listed right there

24   and the license is listed as an asset, but the

25   opportunity cost is never anywhere listed in the

Dr. Cox - Cross                    64

1    10-Ks that are reported to the government, never

2    listed as a cost, because that is an economist's

3    view, not an accountant's view of the world, isn't

4    that right?

5    A    Well, I don't know if accountants seek

6    opportunity cost, but I would take your word for it

7    that they don't talk about it in the 10-K.

8    Q    It's not there, is it?

9    A    But that's why we have analysts to put it back

10   in.

11   Q    Let's go on to the market approach.  The market

12   approach values assets based on comparable

13   transactions, correct?

14   A    That's correct.

15   Q    And you agree that it's a possible approach for

16   valuing a patent?  In fact, it's the one that you

17   used in this case?

18   A    That's correct.

19   Q    Now, the transaction that you identified as

20   comparable to the hypothetical negotiation that would

21   have taken place in 2005, the one that you say is

22   comparable is the 2010 agreement by which Comcast

23   purchased the patent from Nokia, correct?

24   A    Yes.

25   Q    Now, on Friday, you testified that Ms. Riley

1   refused to take that patent purchase agreement into

2   account?

3   A   Well, yeah, that's correct.  That's what I

4   testified to.

5   Q   But you know that she considered it in her expert

6   report and she put a slide up regarding it in her

7   presentation, correct?

8   A   That's right, she rejected it for reasons that I

9   don't think are valid.

10  Q   But she didn't refuse to consider it?  She read

11  it and considered it, but gave it a different

12  valuation than you did?

13  A   Yes.

14  Q   By the way -- well, let's look at the

15  circumstances of those two transactions that you say

16  are comparable, the 2005 transaction between Nokia

17  and Sprint, hypothetical transaction, and the 2010

18  actual transition -- transaction between Nokia and

19  Comcast.

20  A   Yeah, I think it's appropriate to do that

21  comparison.  You have to make some adjustments.

22  Q   Now, the law requires us to assume that at the

23  time of the 2005 transaction, had Sprint come to

24  Nokia to seek a license, the parties would have

25  agreed that the 870 patent was valid, correct?

1   A    That's correct, and I adjust for that.

2   Q    And the law also requires to assume that in 2005,

3   Nokia and Sprint would have agreed that Sprint was

4   infringing the patent, correct?

5   A    That's correct.

6   Q    In contrast, when Comcast came to Nokia in 2010

7   to buy the patent neither party would have known for

8   certain whether the patent was valid or not?

9   A    That's correct.  Now, the record also indicates

10  that Comcast thought it had a good patent or the 870

11  was a good patent in those terms.

12  Q    But in 2005, the law requires us to assume that

13  the parties noted with certainty that the patent was

14  valid, whereas in 2010, there was at least a

15  possibility for a question about that?

16  A    That's right, and that's one of the things the

17  law requires us to make an adjustment for.

18  Q    And there's no fact of record that in 2010,

19  either Comcast or Nokia believed, let alone knew for

20  certain, that Comcast was infringing the patent,

21  correct?

22  A    That Comcast was --

23  Q    Yeah.

24  A    Sorry, I guess I thought you were going sort of a

25  different place with that question, so could you

Dr. Cox - Cross                    67

1    start it again?

2    Q   There are no facts of record to suggest that in

3    2010, either Comcast or Nokia believed, let alone

4    knew for certain, that Comcast was infringing the 870

5    patent, correct?

6    A   I haven't seen any reference to that in the

7    record, that's correct.

8    Q   And in 2010, when Comcast came to Nokia to

9    purchase the patent there was no certainty as to

10   whether Sprint or anyone else was infringing the

11   patent, correct?

12   A    Well, there is an appendix to the contract or the

13   purchase agreement that identified people who were

14   not licensees.  But, of course, even those people

15   being identified doesn't indicate that they knew for

16   certain that they were infringers, that's correct.

17   Q    Okay.  So one big difference between 2005 and

18   2010 is that in 2005, the hypothetical negotiation,

19   both sides knew the patent was valid and infringed

20   and Sprint needed a license, correct?

21   A   That's correct.

22   Q   And in 2010, when Comcast came to Nokia there was

23   no certainty that anybody was infringing and there

24   was no certainty as to whether the patent was valid?

25   A    That's correct.  That's always the case when

1  you're doing a comparable analysis in a patent case.

2  You have to make an adjustment for that difference

3  because that difference always exists.

4  Q    And there's no reason to believe in 2010, that

5  Comcast believed it needed a license in order to go

6  into the messaging business?

7  A    I don't remember what the record says about that.

8  Q    You can't point to any facts, sitting here today,

9  that suggest that Comcast, in 2010, was planning on

10  using the patent to go into the business?

11  A    I think that's fair.

12  Q    But in 2005, at the time of the hypothetical

13  negotiation, Sprint was already in the business and

14  it needed a license in order to stay in the business,

15  isn't that right?

16  A    Well, apart from the fact that they may have been

17  able to utilize a non-infringing alternative, they

18  certainly did need to -- as far as I know, they did

19  need to use the patent.

20  Q    There's no -- no one has testified to any

21  non-infringing alternatives in this record at this

22  trial?

23  A    That's correct.

24          (Pause in proceedings.)

25  Q    Now, there are facts of record to suggest that

1   shortly after Comcast purchased the patent, questions

2   were raised about whether the patent was valid or

3   not?

4   A    Well, I think the testimony in this case is that

5   even going into the negotiation, Comcast had some

6   concerns about that, but they acted on them after

7   they purchased the patent.

8   Q    After they patent -- they purchased the patent,

9   they went back to the Patent Office and they said,

10  ladies and gentlemen of the Patent Office, there are

11  new questions of patentability regarding this patent.

12  We would like you to consider them.

13  A    Right, though I think the record shows they were

14  confident that they were going to overcome those

15  concerns.

16  Q    Right.  But they -- their -- those concerns were

17  picked up by the Patent Office and the Patent Office

18  said to Comcast, yes, you are correct, there are new

19  questions and we're going to take another look at

20  this.

21  A    That would be my -- consistent with my

22  understanding, yeah.

23  Q    Nothing like that was on the table when the

24  parties met in 2005 or would have met in the

25  hypothetical negotiation in Finland, right?

1   A    That's correct, and that's why I made the

2   appropriate adjustment to take that into account.

3   Q    Now, Ms. Riley testified that between 2005 and

4   2010, Nokia's financial position had deteriorated due

5   to the introduction of the iPhone, and I think you

6   testified on Friday that you disagree with that?

7   A    Well, I'm not saying that their situation wasn't

8   different in 2010, and arguably worse, but they were

9   still doing very well and they were not in a

10  situation where they were being threatened with

11  insolvency or had loans coming due that they couldn't

12  pay.  They were still in a very healthy financial

13  condition and were able to take their time about

14  selling whatever assets they wanted to sell,

15  including the 870, which was negotiated over a period

16  of about two years.

17  Q    Well, Comcast's purchase was in June of 2010,

18  right?

19  A    Yes.

20  Q    And at the end of that summer are you aware that

21  Nokia left its CEO go, fired him, more or less, or

22  forced him to resign?

23  A    I wasn't aware of that, but that's certainly no

24  reason for selling anything, your assets, at a

25  discount in contravention of your obligations to your

Dr. Cox - Cross                              71

1    shareholders.

2    Q   Are you aware that the Wall Street Journal had

3    reported that Nokia had come under pressure to

4    replace the CEO because analyst investors were

5    concerned that Nokia did not have a smart phone to

6    compete with the iPhone or the Samsung?

7    A   Well, that wouldn't surprise me.

8    Q   And when the CEO was let go at the end of that

9    summer in 2010 he was replaced by a gentleman named

10   Mr. Elop, E-L-O-P.  Have you ever heard of Mr. Elop?

11   A   That name doesn't ring a bell.

12   Q   Have you ever heard of Mr. Elop's famous burning

13   platform?

14            MR. HEIST:  Can we pull up Exhibit 9 --

15   Plaintiff's Exhibit 915.  This is in evidence so

16   we'll just walk through parts of it.

17            MR. RIOPELLE:  Well, can we take it off the

18   screen and establish a foundation that he's seen it

19   before you publish it to the jury, please.  I should

20   object.  Sorry.

21            THE COURT:  Sustained on this record.

22            (Pause in proceedings.)

23   BY MR. HEIST:

24   Q   Let's put on -- you haven't heard about the

25   burning platform?

Dr. Cox - Cross                    72

1    A    No, not that I recall.

2    Q    But you do know that after Mr. Elop took over,

3    Nokia sold its phone business to Microsoft and

4    switched its focus to networking equipment?

5    A    Yeah, it started selling off its assets,

6    including its handset business which it sold for $7.1

7    billion.  It was certainly making good deals in

8    selling off its assets at the best price that it

9    could get.

10   Q    All right.  Let's put our patent lawyer's hats

11   on.

12   A    Where are you going down now?

13           THE COURT:  Maybe before we change hats --

14   it's 11:15 -- let's take a ten minute recess.

15           (Jury out, 11:14 a.m.)

16           THE COURT:  We're in recess for ten

17   minutes.  Ian, do you have a copy of this?

18           AUDIO OPERATOR:  Yes.

19           (Recess taken from 11:15 a.m. to 11:33

20   a.m.)

21           THE COURT:  Be seated, everyone.  You may

22   continue, Mr. Heist.

23   BY MR. HEIST:

24   Q    Doctor, I've put my engineering hat back on.  I

25   forgot a question.

Dr. Cox - Cross                                    73

1   A    Okay.

2   Q    You agree, do you not, with regard to messaging,

3   as far as cell towers and bay stations are concerned,

4   SMS messages are free riders?

5   A    No, I don't agree with that.

6   Q    One of the things that you considered in

7   connection with rendering your opinion were

8   proceedings before a subcommittee of the U.S. Senate,

9   correct?

10  A    I may have.  I don't recall that particular --

11  Q    You cited in your expert report, "Cell phone text

12  messaging rate increases and the state of competition

13  in the wireless marking hearing before the

14  Subcommittee on Antitrust Competition Policy and

15  Consumer Rights of the Committee of the Judiciary,

16  United States Senate, June 16th, 2009.  Does that

17  refresh your recollection?

18  A    It doesn't, but if it's in my report, I certainly

19  looked at it.

20  Q    Let me show you a document from that hearing.

21       (Pause in proceedings.)

22  Q    First of all, you see that this is a testimony of

23  Joel Kelsey (ph), Policy Analyst from the Consumers

24  Union, to the Senate Judiciary Committee --

25  Subcommittee on Antitrust Competition Policy and

Dr. Cox - Cross                              74

1   Consumer Rights?

2   A    Yes, I see that.

3   Q    And the Consumers Union, those are the people

4   that publish consumers reports?

5   A    That's right.

6   Q    Let me direct your attention to page three.  The

7   report states, "Since 2005, every major carrier has

8   at least doubled the prices for text messages from

9   ten cents to 20 cents per message.  The rising cost

10  in the service is a head scratcher to consumers

11  because text messaging uses less data than almost any

12  other service on a wireless network.  600 text

13  messages contain less data than one minute of a phone

14  call.  If we put that into dollars and cents, at 20

15  cents per text, those 600 messages would cost $120

16  for the equivalent of a one minute phone call."  Do

17  you see that?

18  A    I do see that, yes.

19  Q    And there was concern about the cost of test

20  messaging, and that's what gave rise to this

21  committee, correct?

22  A    I don't remember that, but it's certainly

23  possible.

24  Q    Let me direct your attention to the next page,

25  page four.  The last full paragraph, second sentence,

1  says, "Sprint was the first to raise its rates to 20

2  cents per message in October of 2007."  Do you see

3  that?

4  A   I'm sorry, could you just reference me to the

5  paragraph again?

6  Q   Page four, last full paragraph, second sentence.

7  "Sprint was the first to raise its rates to 20 cents

8  per message in October of 2007," correct?

9  A   Yes, that's what it says.

10 Q   And then Mr. Kelsey wrote in the first -- pardon

11 me, the second paragraph of this document, "Text

12 messaging files are very small and the price of their

13 transmission is negligible for the provider."  Do you

14 see that?

15 A   You said the second paragraph of --

16 Q   It's actually -- well, I guess it's the first

17 full paragraph.  I'm not sure.  The first sentence

18 says, on the same page, page four, says, "Text

19 messaging files are very small..."  Are you with me?

20 A   Yeah, I see that now.  Yeah.

21 Q   "...and the price of their transmission is

22 negligible for the provider."  And then he writes, "A

23 message travels as a wireless signal from the handset

24 through the wired telephone network and as a wireless

25 signal to the receiving handset.  The text message is

1   a free rider inside a so-called control channel where

2   space that is already being used to operate the

3   wireless network.  In other words, text message does

4   not use up any extra spectrum once the carrier pays

5   the cost of the underlying infrastructure and storage

6   equipment.  Thus, any revenue received by the

7   provider on an incremental text message usage is

8   merely pure profit.  Do you see that?

9   A    I do see that, yes.

10  Q    Now, do you know that SMS messages ride in the

11  control channel?

12  A    That's what I've heard, yes.

13  Q    And do you disagree with Mr. Kelsey that they are

14  a free rider in the control channel?

15  A    I do disagree.  I thought I made that clear with

16  my exhibit where we saw the packages going along and

17  what Ms. Riley used as analogy to the control channel

18  and pointed out that once more and more messages go

19  down that control channel then more spectrum is going

20  to be needed to buy that -- needed in order to be

21  able to accommodate that increased traffic in

22  addition to all the other traffic that Sprint carries

23  that it sells in a bundle to consumers.

24  Q    So you disagree with the testimony of the

25  Consumers Union that text messages are a free rider?

1   A    I do.

2   Q    Is that disagreement a technical disagreement or

3   is it an economic disagreement?

4   A    It's an economic disagreement.  You're not

5   disagreeing that the text messages run in the control

6   channel.  The question is how one characterizes it

7   from an economic perspective?

8   A    Right, and how to full account for the costs.

9   Q    Now, one other question I forgot.  That's always

10  a problem with taken breaks.  It allows me to go back

11  and remember.

12          THE COURT:  Before you go back, we've

13  talked about this document at some length, never

14  identified it on the record.  It's PX-900.

15          MR. HEIST:  I'm sorry.  I'm sorry, Your

16  Honor.  I neglected to do that.

17  BY MR. HEIST:

18  Q    At the hypothetical negotiation, if I understood

19  your testimony, Nokia and sprint would have both

20  known about the 2010 contract that was entered into

21  five years later between Comcast and Nokia?

22  A    No, I'm not alleging that.  I'm just saying that

23  the comparable -- that provides a good indication of

24  the value in 2005, but I'm not saying that they did

25  know of it.

Dr. Cox - Cross                          78

1   Q    All right.  That was one question.  No more.

2   Back to our patent lawyer hat.

3   A    Okay.

4   Q    Cross-licenses.  In patent law, a cross-license

5   is an agreement under which two parties each grant a

6   license to the other, each allowing the other to

7   practice their patents, correct?

8   A    That's correct, though I don't think that's

9   complete.  I don't -- maybe you're going to expand on

10  that a little bit, but it's also possible that the

11  two parties will -- one party will pay the other

12  party in recognition of one party's portfolio being

13  more valuable than the other.

14  Q    You saved me my next question.

15  A    Okay, great.

16  Q    Now, whether there's a payment made, a balancing

17  payment, or whether there's no payment made, in

18  either case, by cross-licensing, each party maintains

19  their freedom to design products that would otherwise

20  infringe their competitors patents, right?

21  A    That's correct.

22  Q    So when two companies have patents that block

23  each other, a cross-license allows them to break the

24  logjam?

25  A    Yeah, though that's not the only basis for a

1    cross-license, but that certainly is one of the

2    things that arises out of it or can arise out of it.

3    Q    Therefore, cross-licensing can promote

4    competition and minimize patent lawsuits, correct?

5    A    Yeah, I'll agree with that.  Reduce lawsuits, not

6    necessarily minimize them, but certainly reduce them.

7    Q    Right, if parties enter into cross-licenses, they

8    spend less time doing what we're doing here?

9    A    That's correct.

10   Q    Now, you estimated last Friday that there were

11   10,000 patents involved in the operation of a

12   cellular network.

13   A    I said that there were at least 10,000, and for

14   the purpose of a calculation I did, I used that as a

15   sort of lower bound estimate.

16   Q    And when you said operation of a cellular network

17   did you mean there were patents on the handsets?

18   A    Yes, there are --

19   Q    On these?  That's included in the -- in the

20   estimate?

21   A    Yes.

22   Q    And there are patents on the CDMA and there are

23   patents on the bay stations, et cetera?

24   A    That's correct, though, of course, some of those

25   patents, a patent on a particular part of the

1    handset, may also leak over to the equipment and the

2    bay station equipment.

3    Q    Now, as far as the actual number of patents, the

4    10,000 number, you cited no published data for that

5    estimate, correct?

6    A    Well, I cited published data about the number of

7    standard essential patents for the fourth generation

8    standard, and the number of patents, standard

9    essential patents, for that one -- just the standard

10   essential patents for that one standard is 4,000.

11   Q    Okay.  And so in the standard essential patents

12   that we're talking about, those are licensed --

13   parties to the standards body have to make their

14   patents available at -- under FRAND terms, F-R-A-N-D?

15   A    That's right, the standard central patents it's

16   understood would be made available under F-R-A-N-D,

17   FRAND, or fair and reasonable rates.

18   Q    Fair, reasonable, and non-discriminatory?

19   A    That's correct.

20   Q    And the royalty rates that are paid, if any, on

21   the FRAND patents generally are low, correct?

22   A    Well, rates paid on patents in the electronics

23   business are generally low.  I don't think that FRAND

24   patents are -- royalty rates on FRAND patents are

25   necessarily low.  A valuable FRAND patent would get a

Dr. Cox - Cross                              81

1   high reasonable rate.

2   Q    And standards bodies and the standards essential

3   to patents, many of them are cross-licensed, correct?

4   A    That's correct.

5   Q    And so a company like Sprint, who is buying

6   equipment, phones or network equipment or whatever,

7   many of the patents that are embedded in the product

8   it buys come as a consequence of the cross-licensing

9   protocols that many companies enter into, correct?

10  A    So, for instance, you're saying Ericsson and

11  Lucent, for instance, might have cross-licenses that

12  allow them to make the equipment that Sprint buys?

13  Q    Right.

14  A    Yes, I agree with that.

15  Q    And in those cases patents that are incorporated

16  into those products come without an additional

17  royalty to Sprint because they're cross-licensed up

18  above them in the supply chain?

19  A    Well, as I said in my testimony on Friday,

20  there's an implicit cost in some of those royalty --

21  or those cross-licenses because companies like Sprint

22  and all these other companies pay -- make R&D

23  expenditures which allow them to generate patents

24  which they use in cross-licenses.  So those costs do

25  get carried on to the equipment.

Dr. Cox - Cross                              82

1   Q    And in so doing, they promote the progress

2   science have used (indiscernible)?

3   A    The cross-licensing does?

4   Q    Yes.

5   A    Yes --

6   Q    Actually, the R&D does.

7   A    The R&D certainly does and I -- well, I'd go on

8   to say that the cross-licensing does also.

9   Q    Now, no technical expert in this case has

10  testified that there were 4,000 or 10,000 patents

11  directed to the operation of a cellular network,

12  correct?

13  A    I don't know.  It's just a fact that there are at

14  least that many.

15  Q    But Dr. Akl didn't say that.

16  A    I didn't hear him say that.

17  Q    And Dr. Dwoskin didn't say that.

18  A    I didn't hear him say that.

19  Q    Mr. Lanning didn't say that.

20  A    I don't remember hearing him testify to a number.

21  Q    Dr. Polish didn't say that.

22  A    I don't -- I don't recall him saying that, no.

23  Q    And you're not a technical expert or a patent

24  lawyer, correct?

25  A    No, I'm just reporting what is in the -- written

Dr. Cox - Cross                    83

1   down in plain English.

2   Q   So when you say there are 4,000 or 10,000 patents

3   directed in the operation of a cellular network

4   you're not suggesting that Sprint is infringing

5   10,000 patents, are you?

6   A   I'm saying that they're utilizing pat -- either

7   equipment that incorporates or utilizing themselves

8   as many as 10,000 patents, sure.

9   Q   You're saying they're infringing 10,000 patents?

10  A   I said they're utilizing, yeah.

11  Q   Oh.  But they're utilizing them under license?

12  A   Either implicit or explicit licenses.

13  Q   Right.  So they're free to use them as they wish?

14  They're not paying royalties on them as far as we

15  know?  There's no evidence in this record that sprint

16  has paid a royalty to anyone under a patent license,

17  correct?  You haven't pointed to any in your --

18  A   I haven't pointed to any in my testimony, but

19  they do have licenses for -- as I recall, for use of

20  patents, and a lot of the patents that they utilize,

21  of course, are incorporated into products which

22  are -- include patent technology for which they are

23  the sorts of cross-licenses that you suggested.

24  Q   Like the patents on this iPhone?

25  A   Yes.

1   Q   But they don't need a license from Apple to sell

2   these iPhones because they buy the iPhones from

3   Apple, and whatever technology is embedded in here

4   they get to use without further payment other than

5   the purchase price?

6   A   Well, yeah, that's not entirely correct because

7   they pay for the telephone, that is Sprint pays for

8   the iPhone, and that iPhone is burdened down with

9   hundreds of dollars of intellectual property

10  payments, including Apple's own research and

11  development.

12  Q   And people like me are more than happy to pay for

13  all that technology because we like our iPhones,

14  right?

15  A   Right, and Sprint is more than happy to pay for

16  it also.

17  Q   Now, you're not suggesting that there are 10,000

18  patents relating to messaging, are you?

19  A   No, but there are certainly more than the one

20  that's in this case and they have to be taken into

21  account if you want to do an accurate valuation, and

22  they haven't been taken into account by Ms. Riley.

23  They have not been taken into account.

24  Q   You have not stated either in your expert report

25  or in the testimony you've given on this stand,

Dr. Cox - Cross                                      85

1   witness stand, that Sprint is infringing any patent

2   other than the 870 patent, correct?

3   A    Sorry, could you say it again?

4   Q    You haven't stated in your expert report or your

5   deposition or here in court that Sprint is infringing

6   any patent other than the 870 patent that you've

7   assumed for purposes of your opinion, correct?

8   A    Well, I did report in my report that there were

9   other patents, for instance, that Sprint has

10  identified as being related to messaging, 23 Sprint-

11  owned patents.  But apart from that, I didn't list

12  any other patents.

13  Q    And you didn't talk about those 23 patents in

14  your direct examination, did you?

15  A    No, I covered what I thought would be adequate

16  for me to make the point that I --

17  Q    And --

18  A    -- need to make.

19  Q    And nobody has testified that any of those 23

20  patents cover anything that Sprint's doing, isn't

21  that right?

22  A    That's correct.

23  Q    Now, even if there were 10,000 patents that

24  covered messaging, you would agree, would you not,

25  that whether -- and the 870 patent was the only one

Dr. Cox - Cross                                    86

1   that's being asserted, but there were 10,000 others,

2   would you agree that whether a patented feature is

3   small or large is not the right question.  Instead,

4   the reasonable royalty analysis should seek to

5   determine the economic value generated by the

6   patented feature relative to the next best

7   non-infringing alternative?

8   A    I absolutely agree with that, and that's why it's

9   necessary, for instance, in my automobile example, to

10  determine what benefit is brought to the owner of the

11  car as a result of having the approved tire with the

12  patented technology incorporated into it.  You've got

13  to look at what the value is.  You can't just count

14  the number of times the wheel goes around.

15  Q    Or count the number of patents?

16  A    I beg your pardon?

17  Q    Or count the number of patents?

18  A    Well, you at least have to take into account the

19  number of other patents that are involved and also

20  the relative value of the other patents, the

21  engineering know-how and the equipment at the very

22  least that's necessary to make the system work.

23  Q    Now, the last slide you showed the jury last

24  Friday set a damages number of $67,000 and change,

25  but you never testified that such an amount is the

1  appropriate reasonable royalty the jury should award

2  in this case, correct?

3  A   That's correct.  I was just showing what happens

4  when you adjust Ms. Riley's calculations using some

5  more reasonable assumptions.

6  Q   In fact, your opinion is that the correct amount

7  of the reasonable royalty is $1.5 million, correct?

8  A   That's correct.

9  Q   And the reasonable royalty is the floor beneath

10  which the royalty may not fall?

11  A   It's the floor -- we -- sorry, it is the floor

12  beneath which the compensation may not fall.  The

13  royalty can be -- I think is $1.5 million --

14  Q   Okay.

15  A   -- but the payment for the use of technology

16  sometimes is based on what we call a lost profit.

17  But Comcast is not alleging lost profits in this case

18  because they're not actually in this business.

19  They're not losing any market share, for instance, to

20  Sprint.

21  Q   You're not suggesting that this jury should write

22  down $67,000 on their verdict form?  Because that

23  would be lower than what even you say is a reasonable

24  royalty.

25  A   That's correct, I am not.  I am not.

Dr. Cox - Cross                    88

1   Q    Now, you made -- in coming up with that number

2   you made some adjustments to Ms. Riley's method of

3   royalty determination, and one of the adjustments

4   that you made compared to what she did is you didn't

5   count 600 billion messages that were sent and

6   delivered by Sprint between 2014 and September 30th,

7   correct?

8   A    That's right, I didn't count the number of times

9   the wheel went around and around.  I looked at the

10  value.

11  Q    All right.  And another think you didn't count

12  were messages that were transmitted between -- all

13  the messages that were transmitted between one Sprint

14  subscriber and another, correct?

15  A    Well, I think in coming to that $67,000 number --

16  is that the one we're talking to?

17  Q    That's what -- yeah, in that $67,000 number --

18  A    Yeah.

19  Q    -- you excluded messages that were sent -- some

20  messages that were sent between a Sprint subscriber

21  and a Sprint subscriber?

22  A    I counted -- I excluded the second counting of

23  those messages.  So if it was a Sprint messenger to

24  a -- Sprint client to a Sprint client, then I counted

25  that as one transmission, that's correct.

1    Q    All right.  Now, when a Sprint subscriber sends a

2    message, an SMS message, to an AT&T subscriber Sprint

3    charges the Sprint subscriber for sending the

4    message, correct?

5    A    Yes.

6    Q    And when an AT&T subscriber sends an SMS message

7    to a Sprint subscriber Sprint charges its subscriber

8    for receiving a message, right?

9    A    I believe that's correct, yes.

10   Q    They charge coming and they charge going, right?

11   A    Yes.

12   Q    Now, when a Sprint subscriber sends an SMS to

13   another Sprint subscriber, Sprint charges the sending

14   subscriber for sending the message, correct?

15   A    Sorry, what's the predicate again?  Sorry.

16   Q    When a Sprint subscriber is sending to another

17   Sprint subscriber Sprint is charging the sender for

18   sending the message, correct?

19   A    Yes.

20   Q    And it's charging the receiving subscriber for

21   receiving the message, correct?

22   A    I believe that's correct, yes.

23   Q    Coming and going?

24   A    Yes.

25   Q    But in adjusting for Ms. Riley's number, you

1   excluded one of those two charges?

2   A    That's correct.   That was one of the adjustments

3   I made for the sake of showing an -- the corrected

4   version.

5   Q    And you did that even though Sprint earns revenue

6   on both ends of the transaction?

7   A    That's correct.

8   Q    And under Comcast's theory of the case, there's

9   an infringement and a lookup done into a database for

10  the outbound message in the SPS, correct?

11  A    I think that's correct.

12  Q    And under Comcast's theory of the case, there's

13  another infringement that takes place on the

14  receiving side when there's a lookup done in the HLR,

15  correct?

16  A    Well, I don't recall exactly what happens or what

17  we're thinking about happens, what would be the

18  contention, back when I wrote my report.

19  Q    So Comcast's theory of the case is there are two

20  lookups and two acts of infringement, but you've only

21  counted one?

22  A    That's right.   I think there were technical

23  reasons why that was a reasonable thing to do, though

24  it's not -- it's not that big a deal actually in the

25  overall calculation of damages.

1   Q    Let's put on our patent lawyer hats.  On Friday,

2   you spent a great deal of time talking about the

3   patent citation analysis, correct?

4   A    Yes.

5   Q    I went through the transcript and I counted 36

6   questions that you were asked about that topic.  Does

7   that sound about right?  You spent a lot of time on

8   it?

9   A    I spent a fair amount of time on it, yes.

10  Q    To me, the most interesting question was the

11  first one.  You were asked whether you based your

12  opinion on the citation analysis.  And you said no.

13  A    That's correct.  I used it to corroborate the

14  results -- the reasonableness of the $1.5 million

15  considering the apparent relative value of this

16  patent.

17  Q    But even if there was no citation analysis, we

18  had never even heard the term, didn't think about it,

19  your number would still be $1.5 million in this case?

20  A    I'm not sure that that's true.

21  Q    Are you --

22  A    I'm not sure --

23  Q    Are you relying on it or aren't you relying on

24  it?

25  A    Well, I said I'm relying on it for corroboration.

1    If there had not been corroborating evidence that

2    indicated that this patent was very valuable, wasn't

3    even looked at very much, then I would be less

4    confident of my number, but I'm now very confident of

5    my number as a result of that analysis.

6    Q    Well, I guess, unfortunately, that means we got

7    to send a little bit of time on the forward citation

8    analysis.  You testified that there's a correlation

9    between the number of times a given patent is cited

10   by later patents and the value of that given patent?

11   A    That's right.  There's a strong relationship

12   between those two variables.

13   Q    So -- just so we're clear, correlation means the

14   number of citations is correlated to value, correct?

15   A    Yes.

16   Q    And, conversely, value is correlated to the

17   number of citations?  It goes both ways, right?

18   A    Well, that's the causation, that's right.  As I

19   said on my analysis or my direct testimony, one of

20   the reasons why I'd expect to see this is because

21   people tend to read and look up valuable patents.

22   Q    Well, let's talk about how patents get cited

23   against later patents.  You agree that the value of a

24   patent is determined by the scope of the claims?

25   A    That's one thing that you look at, the scope of

1   the claims, and what's described over and above the

2   previous -- or what we call the prior art.

3   Q    Well, in terms of the scope of the claims, that's

4   what we've been focused on here for now going into

5   our third week.  What does this patent cover, the

6   870?  What do the claims cover?  What do they

7   embrace?  And that's really an important question for

8   this jury to decide, correct?

9   A    That's correct.

10  Q    Now, do you have any experience with the work of

11  patent examiners?

12  A    Well, I've talked to patent examiners.  I had

13  them come into my office and explain to us what it is

14  that they do so we get a better understanding of why

15  it is that this correlation exists.  It's not a

16  correlation that I discovered, but in order to help

17  me and my staff understand it better, I have talked

18  to patent examiners.

19  Q    But you were never a patent examiner?

20  A    No, I've not been one, no.

21  Q    In May, it will be 47 years since I started as a

22  patent examiner.  It's a long time ago and it's been

23  a long and winding road to come here.  Patents are

24  cited by examiners and others for what they teach?

25  A    That's right, and what they -- as I understand

1   it, what they teach that's related to the subject

2   matter of the patent that's being applied for.

3   Q   They're cited for what they teach and not what

4   they claim, correct?

5   A   That's correct, though what's in the claim and

6   what they teach are obviously related.

7   Q   They're related, but they're not the same, isn't

8   that right?

9   A   That's correct.

10  Q   And the number of forward citations, therefore,

11  is a reflection on what patents teach, and not

12  necessarily what they claim?  Do you agree with that?

13  A   Well, I'm not sure that I do agree with that, but

14  certainly what's taught is strongly related to the

15  claims, and in I'd imagine many instances it's the

16  same.

17          MR. HEIST:  Mr. Dyer, may we please have

18  deposition transcript page 213, line 14 through 18?

19          (Pause in proceedings.)

20          THE COURT:  What deposition?  When taken?

21          MR. HEIST:  This is Dr. Cox's deposition

22  taken I think it was April 1 of last year.  April 1,

23  2016.

24  BY MR. HEIST:

25  Q   But the number of forward citations, therefore,

Dr. Cox - Cross                    95

1   is a reflection on what patents teach and not

2   necessarily what they claim, is that correct?

3   A   That's consistent with my understanding.

4   Q   Now, so when a patent examiner cites earlier

5   patents against the later patent application he or

6   she cites the teachings of the specification of the

7   patent and not the claims, correct?

8   A   Yes, that's correct.

9   Q   So let's look at Plaintiff's Exhibit 2, the 870

10  patent.

11          (Pause in proceedings.)

12  Q   So we see here that the patent was granted on

13  April 26th, 2005.

14          MR. HEIST:  Can we blow it up?

15  BY MR. HEIST:

16  Q   And when this patent was granted it was

17  classified in -- if you go down to line 52 on the

18  left column, it was classified in class 455, subclass

19  466.  Do you see that?

20  A   That's true.  That's the United States Patent

21  Office classification.  Now, the United States Patent

22  Office also uses the international patent

23  classification, which is in the line above.

24  Q   Right.  But let's just focus for a moment on the

25  U.S. classification.  So what that means is there is

1    a class of technology, maybe it's messaging.  Class

2    455, I'm not sure what that is.  Subclass 466 is some

3    narrower subset of patents in that field.  And the

4    patent when it was granted on April 26th, 2005, was

5    classified in that technological field, 455/466,

6    correct?

7    A    Right, those are the two major ones that it --

8    it's classified -- it was classified in, as indicated

9    by the bolding.

10   Q    Now, today, the patents are classified in the

11   Patent Office electronically.  They have electronic

12   files.  Back when I was an examiner they put them in

13   drawers, and the drawer was labeled "455/466."

14           MR. RIOPELLE:  Your Honor, I appreciate

15   that -- objection.  I appreciate that he may have had

16   a prior career, but I believe his testimony and

17   question about how he practiced as a patent examiner

18   is irrelevant.

19           MR. HEIST:  Let me rephrase the question.

20           THE COURT:  I think it best if you stay

21   away from that reference.

22           MR. HEIST:  Okay.

23           THE COURT:  To the extent I heard an

24   objection, it is sustained.

25   BY MR. HEIST:

1   Q    Let me re -- let me rephrase that question.

2   A    sure.

3   Q    When the patent was granted it went into a file,

4   physical, electronic, whatever, classified "455/466,"

5   right?

6   A    Well, all -- that's the way it was labeled.  I

7   guess I don't know what was actually done to it in

8   that regard.

9   Q    So beginning on April 26th, 2005, if the patent

10  examiner was presented with a patent application

11  filed by somebody else and he wanted to look for

12  relevant prior art, he could go to class 455/466, and

13  from that date forward, if he looked in that file,

14  the examiner would fine the 870 patent in there,

15  correct?

16  A    That's true, though that presume -- well, I know

17  that's not the only way patents are searched for

18  prior art.

19  Q    But that's one way that the examiner could find

20  it?

21  A    I -- it certainly is one way.  I don't know

22  whether that's what they do or not.

23  Q    Now, if the examiner is looking in that class and

24  subclass for a prior art reference, what he cares

25  about is what's described in specification and

Dr. Cox - Cross                                    98

1    drawings of the patent?  That's really what he

2    focuses on, isn't that so?

3    A    Well, I would disagree with that.

4    Q    You would?

5    A    Yes.

6    Q    What does he look for?

7    A    Well, he's also looking at the claims in previous

8    patents to see what the difference is between any

9    claim in the prior art and the claims that are being

10   made in the patent application.  And frequently,

11   as -- you know, patent examiners suggesting rewarding

12   of the claim so that there is this distinction

13   between the current patent application and the

14   previous prior art.

15   Q    You're saying the examiner searches the claims of

16   the reference or does he -- does he look at the

17   claims of the pending application?

18   A    He will look at claim -- he or she will look at

19   other claims of prior patents to make sure that what

20   is being claimed in the current application is

21   different from the previous application, and they

22   will suggest changes of wording in the application in

23   order -- in the patent claim in order to make sure

24   that there is a distinction between the patent

25   application and the previous patent.

1   Q   How did you come to that understanding?

2   A   Well, I've looked at what's called the file

3   rapper, and you can see that they're letters from the

4   examiner to the applicant saying I'd suggest you

5   change this wording, otherwise, I can't grant this

6   patent.

7   Q   Wording of the application, not wording of the

8   patent?  Once the 870 patent was granted, it's claims

9   were fixed, right?

10  A   Oh, that's right, but we were talking about

11  looking at claims of prior art I thought when the 870

12  was being applied for.

13  Q   Now when you did your study, your forward

14  citation study, of the 870 patent you found that it

15  had been cited four times, correct?

16  A   That's right, just four times, compared to the

17  median which was 12 for --

18  Q   And --

19  A   -- other similar patents.

20  Q   And you did your study at the time you did your

21  expert report, which was a little more than a -- a

22  little over a year ago, correct?  I'm not sure when

23  you were --

24  A   Yeah, it was actually more like -- yeah, 18

25  months, yeah.

Dr. Cox - Cross                              100

1   Q    Have you done a -- have you tried to update that

2   analysis to see how many times the 870 was

3   patented -- was cited, if any, between the time of

4   your study and today?

5   A    Well, I haven't done any study.  I do notice that

6   there was another patent that cited the 870, but I

7   didn't have time or didn't go back and look to see

8   whether any -- if there had been any similar changes

9   to the 8,000 other patents that were generated about

10  the same time.

11  Q    But you do know that after you did your work, the

12  870 patent was cited again?

13  A    By one more patent.  And, of course, as I said,

14  presumably, the same thing happened to others.

15              (Pause in proceedings.)

16              MR. HEIST:  Could we see PX-910?

17              (Pause in proceedings.)

18  BY MR. HEIST:

19  Q    Do you see this as a -- recognize this as a

20  printout from Google Patents?

21  A    Yeah, this is a Google Patent printout --

22  Q    And --

23  A    -- not the Patent Office printout.

24  Q    No, but it's the Google Patent's printout for the

25  870 patent.  I'll represent to you that we did this

Dr. Cox - Cross                              101

1    last Thursday night.  Can we just direct your

2    attention to page 20 of the exhibit?  And you'll see

3    "cited by."  Do you see that?

4    A    Yes, I see that.

5    Q    And you see that the 870 patent has now been

6    cited seven times?

7    A    That's what the Google cite says, though two of

8    these are patent applications.  So if you go back to

9    the Patent Office cite, you will see that it's been

10   cited five times, that it's these seven minus the two

11   applications.  So it's actually only been cited one

12   more time --

13   Q    Okay.

14   A    -- by a patent, which is what the methodology

15   calls for.

16   Q    And two of those citations are by Nextel

17   Corporation, correct?

18   A    That's correct.

19   Q    And not Sprint?

20   A    That's correct.

21   Q    Now, let's go back to the 870 patent, PX-2.  And

22   let's look at line 65 in the left-hand column, "Prior

23   Publication Date."  Do you see that?

24   A    Sorry.  Yes.  I see that, yes.

25   Q    And under that is a reference, "US2001/0005675A1

1   June 28th, 2001," correct?

2   A    That's correct.

3   Q    That tells us that in 2001, the application for

4   the 870 patent was published by the U.S. government,

5   correct?

6   A    I think that's a fair way to characterize it,

7   yes.

8   Q    And that's almost four years before the patent

9   was granted, correct?

10  A    That's correct, yeah.

11  Q    Let's take a look at Defendant's Exhibit --

12  pardon me, PX-913.  It's a copy of that publication.

13          MR. HEIST:  And if we could put it up on

14  the screen side by side with the patent.

15          (Pause in proceedings.)

16  BY MR. HEIST:

17  Q    We see that the inventor's name is the same, that

18  the application number is the same.  We see the

19  publication number at the top on the right, that's

20  the number that we see in line 65 in the patent on

21  the left, correct?

22  A    Yes, I see that.

23  Q    And let's just compare the first page of the

24  drawing of the two documents.  It's going -- this is

25  the front page of the patent.  Now let's move on to

Dr. Cox - Cross                                    103

1    the drawing on the next page.

2              THE COURT:  What are the two exhibits you

3    have on the screen?

4              MR. HEIST:  PX-2, page three, on the left.

5    PX-913, page two, on the right.

6    BY MR. HEIST:

7    Q    You see that the drawings are the same?

8    A    Yeah, they are.

9    Q    And we could go through the rest of this and

10   show, could we not, that the patent on the left and

11   the publication on the right disclose the same thing,

12   right?

13   A    I'm not sure they show exactly the same thing,

14   but they would be similar.

15   Q    Very similar.  Let's go and look at the first

16   column of the specification in both.

17             (Pause in proceedings.)

18             MR. HEIST:  Let's blow up the first

19   paragraph, "Field of the invention..."

20             (Pause in proceedings.)

21   BY MR. HEIST:

22   Q    So we see the comparison between the two.  We see

23   that the publication is of the same invention as the

24   patent, correct?

25   A    Yeah, I see that.

1   Q   Now, when the publication, PX-913, the document

2   on the right, was published it was also put in the

3   class or electronic file or drawer, if you will, of

4   class 455, subclass 446.

5            MR. HEIST:  Let's go back and look at the

6   front of Plaintiff's Exhibit 913.  Let's blow up the

7   classification.

8   BY MR. HEIST:

9   Q   So if you look at line 52, you'll see that the

10  publication was classified in class 455, subclass

11  466, correct?

12  A   Well, I'm glad I raised this earlier.  There are

13  two classifications or several sets of

14  classifications, and the Patent Office usually picks

15  one or two that are the primary classification.  It's

16  actually changed in classification here in terms of

17  the primary classification.  So it's now 455/412.

18  Let me just --

19  Q   All right.

20  A   -- look at one other thing here.  And I don't

21  know what the international patent classification,

22  whether that changed also.

23  Q   Well, my point is this -- a copy of this

24  publication was found, among other places, in class

25  455/466 on June 28th, 2001, correct?

Dr. Cox - Cross                    105

1    A    Well, I don't know if "found" is the right word,

2    but it certainly was classified that way.  That

3    was --

4    Q    Was classified --

5    A    That was one of the classifications, yes.

6    Q    So between June 28, 2001, and April 26, 2005, an

7    examiner who was looking for prior art who went into

8    class 455/466 would find the publication on the

9    right, PX-913, but he wouldn't find the patent on the

10   left because the patent hadn't been granted yet?

11   A    That's correct.

12   Q    And if he wanted to cite against a late patent

13   application, he wanted to cite the invention of Ms.

14   Aho, the only thing he could cite during that period

15   was the publication on the right because the patent

16   hadn't been granted yet, correct?

17   A    That's correct, and that's why you have to do

18   that time normalization that I talked about in my

19   previous analysis.  And I looked at the issue of this

20   prior patent also and it doesn't affect my opinion.

21   Q    Well, your forward citation search or analysis

22   did not look for the number of times the publication

23   on the right was cited.  It only looked for the

24   number of times the patent on the left was cited,

25   isn't that right?

1  A    That's why I described it in my report, though

2  what you also have to do is since you -- it's like

3  basic math, right?  If you do something to the

4  left-hand side of the equation, you have to do the

5  same thing to the right-hand side of the equation.

6  And so when I looked at this I also made the time

7  calculation or the date adjustment for the earlier

8  patent and came up with the result that was very

9  similar to the one that I reported earlier in my

10 testimony.

11 Q    Let me show you Plaintiff's Exhibit 911.

12        (Pause in proceedings.)

13 Q    Do you recognize Plaintiff's Exhibit 911 as the

14 published application printed out from Google that

15 we're looking at here?  It's the same patent

16 publication as Plaintiff's Exhibit 913, right?

17 A    Well, it's the Google version of that.  It's not

18 the Patent Office version.

19 Q    But if we direct your -- if I direct your

20 attention to page 26, could you tell the jury how

21 many times the patent publication was cited?

22 A    Well, I can't tell the jury how many times the

23 patent was cited by the later patent because that's

24 not listed separately as the methodology requires.  I

25 can tell you though that what Google reports is that

Dr. Cox - Cross                                    107

1   there is a combination of patents and applications,

2   73 of those that are patented, but I will note that a

3   very large number of them are patent applications.

4   And, furthermore, I don't have any basis to know

5   whether 73, even if it was the correct number, was a

6   large number, because I need to look at what happened

7   to all the other patents that claim priority for June

8   of 2008.

9   Q    But Google Patents is reporting --

10  A    2001.

11  Q    Google Patents is reporting that this publication

12  that we just looked at, PX-913, has been cited by 73

13  subsequent patents, correct?  That's what it says?

14  A    No, it doesn't say that.

15  Q    Let's take a look at page 26.

16  A    Of 911?

17  Q    911, 26.

18  A    I'm there.

19                (Pause in proceedings.)

20  Q    This shows a citation by Ericsson on second -- on

21  page 26, second from the bottom?

22  A    Yes, I see that.

23  Q    Next page, Blackberry?

24  A    Also second from the bottom, yes.

25  Q    And the next page, Samsung?  At the very top?

1   A    Yeah, that's an application, but there's

2   Samsung's name on it.

3   Q    You mean it's a Samsung application that cited

4   this publication?

5   A    Yes.

6   Q    All right.  So let's go to that same page cited

7   by Nokia one, two, three, four, five times.

8            (Pause in proceedings.)

9   A    I see the fifth.  Yes, though, again, not all of

10  those are patents.

11  Q    No, some of them are cited by patent applicants.

12  A    Yes, which may or may not become patents.

13  Q    Right, but there -- there's Nokia telling the

14  government here is a relevant piece of prior art, Ms.

15  Aho's published patent application, correct?

16  A    That's correct.

17  Q    Take a look at it.

18  A    Yes, that's correct.

19  Q    And on the next page it's cited by Intel and

20  Openwave.  The following page, Huawei, Core Wireless,

21  Motorola?

22  A    Right, and if you look at these -- do this

23  calculation today and look at the number of patents

24  that actually cite this patent application, you'll

25  see that the number is relatively low compared to

1   other patents issued at the same time.

2   Q   Okay.  But my point is none of those citations

3   have shown up in your analysis of the 870 patent?

4   You only found four citations?

5   A   That's right, the patent that was ultimately

6   accepted by the Patent Office has only been cited

7   four times.  And I applied the methodology in the

8   manner that it's described in books or in the papers

9   I discussed, and that was the result that came up.

10  Q   Now, after your testimony on Friday, I got to

11  thinking, if the number of citations correlates to

12  value, then value must correlate to the number of

13  citations, and I think you already agreed to that,

14  right?

15  A   That's right.

16  Q   So I decided to look for some patents that we

17  could all agree to be valuable.  And one of the

18  places that I started was what I believed to be a

19  patented case that you've heard about, Kodak -- or

20  pardon me, Polaroid versus Kodak.  You've heard of

21  that case?

22  A   Yes.

23  Q   And until recently, that was the largest single

24  judgment in a patent case in the history of the

25  United States, correct?

Dr. Cox - Cross                              110

1   A    That's correct, yes.

2   Q    $926  million?

3   A    That sounds right.

4   Q    And there were several patents in that case,

5   right?

6   A    I'll take your word for it.  I can't remember,

7   actually.

8   Q    Three of the patents were granted to Edwin Land,

9   correct?

10  A    Yes.

11  Q    And those of us here who are of a certain age

12  will remember the Land camera, the Polaroid Land

13  camera, and other people don't remember cameras

14  before they were on their phone, but let's just talk

15  about Edwin Land.  He's in the Inventors Hall of

16  Fame, right?

17  A    That's right.

18  Q    And he was awarded, based on what I could tell,

19  535 patents, compared to 1,097 that were awarded to

20  Thomas Edison, about half the same number -- half the

21  number that were awarded to Edison.

22  A    Okay.

23  Q    And three of his patents were litigated in that

24  case that brought in the $926 million judgment?

25  A    I'll accept that.

1   Q   And we can go through it.  And if you want, I

2   will.  But would it surprise you to learn that Mr.

3   Land's patents, all three of them that were involved

4   in that lawsuit, were cited a grand total of 37

5   times?

6   A   Well, I would not be surprised, but, of course,

7   just looking at the raw numbers, it is not enough,

8   for one thing, because you have to make corrections

9   for the number of times all the other patents that

10  were issued about the same time.  It may well be that

11  those patents are in categories that -- in which

12  patent -- in which there's not that much citation

13  done.  And second of all, my correlation is based on

14  the value as determined by the market, rather than

15  just the outcomes of litigation.

16  Q   Okay.  Let's talk about your opinion.  $1.5

17  million paid up lump sum, life of the patent,

18  correct?

19  A   Yes.

20  Q   And the patent doesn't expire until 2023?

21  A   That's correct.

22  Q   And in reaching that opinion you made no estimate

23  of how many messages Sprint would send and deliver

24  between now and patent expiration, correct?

25  A   That's correct.

Dr. Cox - Cross                                  112

1   Q    Now, in other cases in which you have represented

2   a patent owner you did make an estimate in

3   determining a lump sum.  You made an estimate of the

4   usage over the life of the patent and discounted it

5   to present value and put it right in your expert

6   report, correct?

7   A    I probably did, yes.

8   Q    But you didn't do that here?

9   A    No, for the reasons I described earlier.

10  Q    And $1.5 million is less than what parties

11  typically spend on patent litigation just through the

12  discovery phase of the case and not including trial,

13  isn't that right?

14          MR. RIOPELLE:  Objection, relevance.

15          THE COURT:  Sustained.

16  BY MR. HEIST:

17  Q    What is the most that Sprint charged its

18  customers during the damage period to send or receive

19  an SMS message as far as you know?

20  A    I think it's in the neighborhood of 15 cents.

21  Q    Comcast isn't asking for a royalty of a penny,

22  correct?

23  A    That's correct.

24  Q    It's not asking for a royalty of a tenth of a

25  penny?

Dr. Cox - Cross                          113

1   A    That's correct.

2   Q    It's not asking for a royalty of a 100ᵗʰ of a

3   penny?

4   A    That's correct.

5   Q    Rather it's asking for a royalty of five -- a

6   little more than 5/1000ths of a penny for SMS and a

7   little more than 6/1000ths of a penny for SMS, is

8   that right?

9   A    That's right, it's asking for all of that without

10  making reference to all the other things that go into

11  making SMS messaging possible.

12  Q    And meanwhile, the royalty you're proposing is

13  about roughly 100 times smaller than what Ms. Riley

14  is proposing?  She's proposing $153 million.  You're

15  proposing $1.5 million.  So it's about a factor of

16  100 to one?

17  A    Right, though mine is several times greater than

18  what Nokia actually sold this patent for.

19  Q    Right.  Your view is that a reasonable royalty

20  here for the messages that have already been sent is

21  one-hundredth, approximately, of what -- on a per

22  message basis, one-hundredth of what Ms. Riley's

23  asking for?

24  A    That's what the comparables indicate.

25  Q    And your proposal is one in which Sprint can send

Dr. Cox - Redirect                     114

1   and deliver as many messages as it wants before the

2   patent expires in 2023 and not pay a penny, not one

3   more cent beyond $1.5 million?

4   A   That's the reasonable contract, reasonable

5   agreement, that they would have come to, yes.

6           MR. HEIST:  No further questions, Your

7   Honor.   May I mark my two drawings, the balance

8   sheet and income statement, as Plaintiff's Drawing 10

9   and 11?

10          THE COURT:  You may.

11          (Pause in proceedings.)

12          MR. HEIST:  Thank you, Your Honor.  And

13  thank you, Dr. Cox.

14          THE WITNESS:  Thank you, Mr. Heist.

15          THE COURT:  How long will your redirect be,

16  Mr. Riopelle?

17          MR. RIOPELLE:  I'd be surprised if I exceed

18  ten minutes.

19          THE COURT:  All right.

20          MR. RIOPELLE:  But never trust a lawyer on

21  his estimation of time.

22          THE COURT:  I'm trusting you.  We'll recess

23  in ten minutes.

24          MR. RIOPELLE:  Fair enough.

25                  REDIRECT EXAMINATION

Dr. Cox - Redirect                                   115

1  BY MR. RIOPELLE:

2  Q   Let's turn first to the topic of 10-Ks.  Do you

3  remember those questions from Mr. Heist?

4  A   I do.

5  Q   Okay.  What is the purpose of a 10-K?

6  A   It's a report to the Securities and Exchange

7  Commission on the balance statement and income

8  statement and other factors that would have an impact

9  on the comp -- on the profitability of the company.

10  Q   And are there certain rules that apply to filing

11  of a 10-K?

12  A   Yes, you have to comply with what's generally

13  known as GAAP, or generally accepted accounting

14  principles.

15  Q   And would a 10-K have a valuation in it for a

16  specific patent?

17  A   No.

18  Q   And would a 10-K apply the same rules that this

19  jury must apply for determining a reasonable loyalty,

20  if they have to determine a reasonable royalty?

21  A   No, they would not.

22  Q   So, for example, would a 10-K have a hypothetical

23  negotiation?

24  A   No, it wouldn't.

25  Q   And would a 10-K have in it -- would it consider

Dr. Cox - Redirect                                    116

1   what's known as the Georgia-Pacific factors?

2   A   No.

3   Q   And one more question on this.  Do you remember

4   the -- I guess a P&L statement or the -- you had the

5   spectrum listed as an asset.  Do you recall that?

6   A   Yes.

7   Q   The fact that it's listed as an asset there, does

8   that mean that it wasn't a cost to the company?

9   A   Oh, definitely not.

10  Q   I'm going to turn to another topic.  You were

11  talking -- you had questions this morning about

12  Sprint's keeping records.  Do you recall those

13  questions?  Let me -- let me try to refresh your --

14  A   Thank you.

15  Q   It was about keeping the records related to

16  messaging and voice and data as far as a bundle.

17  A   Yes.

18  Q   Do you recall that?

19  A   Yes.

20  Q   Are you saying that Sprint kept inadequate

21  records?

22  A   No, not at all.  I'm just saying that they

23  can't -- that they don't have reference -- revenue

24  that they can attribute directly to messaging, as

25  opposed to voice or data.

Dr. Cox - Redirect                                    117

1   Q    Okay.  Now I want to go back to the topic of a

2   lump sum.  And you -- to refresh, it's your opinion,

3   correct, that Sprint and Nokia would have agreed to a

4   lump sum for the life of the patent at the

5   hypothetical negotiation, correct?

6   A    That's correct.

7   Q    And your opinion is based I believe on license

8   agreements that you reviewed in this case?

9   A    Yes, and my conversation with counsel at Sprint.

10  Q    Mr. Ball?

11  A    Mr. Ball, yes.

12  Q    And didn't -- did you testify on Friday that your

13  opinion that Sprint and Nokia would have agreed to a

14  lump sum for the life of the patent was also based on

15  other license agreements that you had reviewed in

16  your experience?

17  A    Yes.

18  Q    And do you also -- did you also testify that your

19  opinion they would have agreed to a lump sum is based

20  on the industry practice, based on your experience?

21  A    Yes.

22  Q    And in preparing for your testimony in this case,

23  have you seen other Sprint agreements in preparing

24  for your testimony?

25  A    I believe I have, yes.

Dr. Cox - Redirect                                    118

1   Q    And were all of those agreements lump sum

2   payments?

3   A    I don't know if they all were, but I believe most

4   of them were --

5   Q    And --

6   A    -- if not all.

7   Q    -- have you seen any Nokia agreements in this

8   case that were not for a lump sum agreement?

9   A    No.

10  Q    And why would parties like Sprint and Nokia agree

11  to a lump sum, a lump sum agreement for the life of

12  the patent?

13  A    Well, it just is administratively a lot easier.

14  When the -- if the company can just sign a check and

15  then not have any further relations with the patent

16  owner, that makes it a lot easier for both parties.

17  Otherwise, we get into situations where the licensee

18  might have to account for all of the -- or provide an

19  accounting to the patent owner of, in this case, the

20  messages that were sent.  And then, you know,

21  sometimes those audits are -- or those accountings

22  are challenged and it just creates a lot of

23  transactions costs for an amount of money that might

24  not make those transactions costs worthwhile.

25  Q    And sometimes when there is a running royalty is

Dr. Cox - Redirect                        119

1   there sometimes what's known as an audit process?

2   A   Yes, that's what I was referring to.  You have

3   to -- you have to report what you've been doing that

4   might infringe the patent or that is covered by the

5   patent, and then frequently there are challenges to

6   what -- to those reports.

7   Q   So in this instance if there was an ongoing

8   royalty between Sprint and Nokia would it be your

9   understanding that Nokia would have the right to come

10  in and audit Sprint's books and records?

11  A   That's correct.

12  Q   And so to eliminate -- my understanding is in

13  your opinion, that to eliminate that need for

14  auditing would be one of the reasons that Sprint and

15  Nokia may agree to a lump sum payment for the life of

16  the patent.

17  A   That's correct.  That's what I was trying to say.

18  Q   And last, just going back to the hypothetical

19  negotiation -- I believe Mr. Heist just established

20  this -- it's your opinion that Sprint and Nokia would

21  have agreed to a payment for $1.5 million, correct?

22  A   That's correct.

23  Q   Now, I believe when you are looking at the

24  valuation of the patent that was sold you came up

25  with the number of $300,000, correct?

Dr. Cox - Redirect                    120

1    A    Yes, that was the highest value that you could

2    possibly infer from the $600,000 sale price for the

3    870 patent.

4    Q    And then do you remember Mr. Heist asking you

5    questions about at the hypothetical negotiation you

6    have to assume that the 870 patent is valid and

7    infringed, right?

8    A    Yes, that's right.

9    Q    And then -- but at the time that Nokia sold the

10   patent to Comcast there was no assumption at that

11   point that the patent was valid and infringed,

12   correct?

13   A    That's correct.

14   Q    So is that difference between those two

15   assumptions, is that what led you to increase the

16   valuation from $300,000 in the Nokia-Comcast

17   purchase --

18             THE COURT:  It's a great speech --

19             MR. RIOPELLE:  Oh.

20             THE COURT:  -- but it's not --

21             MR. RIOPELLE:  Sorry.

22             THE COURT:  -- but it's not a question.

23             MR. RIOPELLE:  I was getting there.  I'll

24   get there.  Okay, I'm sorry.

25   BY MR. RIOPELLE:

Dr. Cox - Recross                    121

1  Q   Why did you increase the price of $300,000 to an

2  opinion of $1.5 million that would have been agreed

3  at the hypothetical negotiation?

4  A   Well, that is in order to take into account the

5  difference between the hypothetical negotiation and

6  the situation at the actual sale price.  Because

7  there was some probability that the patent was

8  invalid and not infringed, there would have been a

9  discount at the time of the sale in 2010 to reflect

10 that possibility, and that's why I increased the

11 $300,000 estimate, which in my opinion is already way

12 to high by a factor of five in order to take into

13 account that uncertainty.

14        MR. RIOPELLE:  No further questions, Your

15 Honor.

16        MR. HEIST:  Just two, Your Honor.  I'll be

17 very quick.

18                RECROSS-EXAMINATION

19 BY MR. HEIST:

20 Q   You say that the parties to the hypothetical

21 negotiation wouldn't have agreed to a running royalty

22 because of the difficulty in auditing and figuring

23 out the compliance?

24 A   Yeah, that's one of the reasons.  I said they

25 would have agreed to a lump sum for those

Dr. Cox - Recross                        122

1    considerations, for those concerns.

2    Q    But there's no issue in this case as to the

3    number of messages sent and received, correct?

4    A    That's correct.

5    Q    And Sprint doesn't have any trouble keeping track

6    of how many messages are sent and received when they

7    want to put the charge on your bill, do they?

8    A    That's correct.  I'm just saying that it's

9    complicated -- it's a lengthy situation to try and

10   add all of that stuff together then make a

11   representation about the amount of time that you sent

12   a message.

13   Q    Yeah.  What they would have to do is take $2.66

14   trillion and multiply it by the revenue per message,

15   that's it, right?

16   A    By the royalty rate.

17           MR. HEIST:  No further questions.

18           THE COURT:  I think that means your

19   testimony is at an end, Dr. Cox.  Thank you.

20           THE WITNESS:  I'm dismissed?

21           THE COURT:  Yes -- well, not dismissed.

22   You may step down.

23           THE WITNESS:  Okay, thank you.

24           (Witness excused.)

25           THE COURT:  Ladies and gentlemen, it's

123

1    12:40.  We'll be in recess for an hour.  My noon-day

2    instructions.  Do not discuss the case among

3    yourselves.  We're getting close to the end.  Resist

4    the temptation.  I've told you why.  If anyone tries

5    to talk to you about the case, say nothing to them.

6    Report that to me.  Be sure to take your juror

7    notebooks and your binders into the jury room.  See

8    you back here at 1:40.

9              (Jury out, 12:40 p.m.)

10             THE COURT:  Be seated, everyone.  Mr.

11   Heist, I'm going to return to you the exhibits you

12   used in cross, the Wilson deposition, the two Google

13   Patent searches, and the transcript of the

14   testimony -- excuse me -- before the Senate Judiciary

15   Committee.  Anything else we have to address before

16   lunch?

17             MR. GOETTLE:  No, Your Honor.

18             MR. RIOPELLE:  No, Your Honor.

19             THE COURT:  We'll be in recess for now.  Go

20   about your business, everyone.

21             (Luncheon recess taken, 12:42 p.m.)

22

23                        *  *  *

24

25

124

1                       I N D E X

2

3   DEFENDANT'S WITNESSES    DIRECT CROSS REDIRECT RECROSS

4   Alan Cox

5     By Mr. Heist                  19              121

6     By Mr. Riopelle                       114

7

8                         *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                            CERTIFICATION

7

8          I, Michael Keating, do hereby certify that

9     the foregoing is a true and correct transcript from the

10    electronic sound recordings of the proceedings in the

11    above-captioned matter.

12

13

14       2/14/17

15    _____        _____

16    Date                       Michael Keating

17

18

19

20

21

22

23

24

25