IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                                - - -

COMCAST CABLE COMMUNICATIONS, :  CIVIL ACTION NO. 12-0859
LLC, et al.,                  :
              Plaintiffs      :
                              :
         v.                   :  Philadelphia, Pennsylvania
                              :  February 14, 2017
SPRINT COMMUNICATIONS         :  1:46 o'clock p.m.
COMPANY L.P., et al.,         :
              Defendants      :
. . . . . . . . . . . . . . . .

                   AFTERNOON SESSION - DAY ELEVEN
                 BEFORE THE HONORABLE JAN E. DUBOIS
                SENIOR UNITED STATES DISTRICT COURT JUDGE

                                - - -

APPEARANCES:

For the Plaintiffs:       DANIEL J. GOETTLE, ESQUIRE
                          DALE M. HEIST, ESQUIRE
                          Baker & Hostetler, LLP
                          Cira Centre, 12th Floor
                          2929 Arch Street
                          Philadelphia, PA  19104-2891

                          WILLIAM T. HANGLEY, ESQUIRE
                          REBECCA SANTORO MELLEY, ESQUIRE
                          Hangley Aronchick Segal & Pudlin
                          One Logan Square, 27th Floor
                          Philadelphia, PA   19103

                          GEORGE MEDLOCK, ESQUIRE
                          Comcast Cable Communications
                          Chief Patent Counsel

                   Laws Transcription Service
                     48 W. LaCrosse Avenue
                     Lansdowne, PA  19050
                        (610)623-4178

2

APPEARANCES: (Continued)

For the Defendants:      DAVID E. FINKELSON, ESQUIRE
                         BRIAN C. RIOPELLE, ESQUIRE
                         JUSTIN R. LOWERY, ESQUIRE
                         McGuire Woods, LLP
                         Gateway Plaza
                         800 East Canal Street
                         Richmond, VA  23219

                         COLLEEN H. SIMPSON, ESQUIRE
                         Harkins Cunningham, LLP
                         4000 Two Commerce Square
                         2001 Market Street
                         Philadelphia, PA  19103

                              - - -

Audio Operator:          Michael Cosgrove

Transcribed by:          Geraldine C. Laws, CET
                         Tracey Williams, CET
                         Paula Curran, CET


(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.

3

1          (The following occurred in open court at 1:47
2    o'clock p.m.)
3               (Jury in at 1:47 o'clock p.m.)
4               THE COURT:  Good afternoon, everyone.
5               ALL:  Good afternoon, your Honor.
6               THE COURT:  Please be seated.
7               Mr. Riopelle?
8               MR. RIOPELLE:  Sprint's next witness will be a very
9    short video clip of Sean Wilson.
10              (Pause.)
11              (At this time the video recording was played as
12   follows:)
13   Q    By whom are you employed?
14   A    I work for Sprint.
15   Q    And how long have you been employed by Sprint?
16   A    Coming up on 15 years.
17   Q    And what is your title?
18   A    I'm the Director of Marketing Operations.
19   Q    And how long have you held that position?
20   A    Just over two years.
21   Q    And explain what a Simply Everything Plan was?
22   A    Our Simply Everything Plan was really, you know,
23   revolutionary at the time rate plan designed shortly after
24   Dan, you know, comes on the scene as the CEO --
25   Q    Dan Hessey (ph)?

4

1   A    Dan Hessey, yes -- to, you know, dramatically simplify

2   the business all together from the experience a customer has

3   with the company.  So it was a plan that was really designed

4   to allow the customer to do anything they want to do on the

5   phone and have no bill variability.  So your bill was the

6   same month over month over month and you wouldn't have to

7   worry about the bill, because it would be the same every

8   month because everything you wanted to do on that phone was

9   included in the Simply Everything Plan.  It was really

10  designed, you know, as much to help with that bill

11  variability, a consistency message that really became part of

12  the brand where Sprint wanted to go after Dan Hessey came on.

13  Q    And the Simply Everything Plan allowed customers to for a

14  single charge get talk, text and data, possibly other things

15  as well, all for one monthly fee?

16  A    Yeah, absolutely.  We had, you know, voice, data and

17  messaging, and literally our advertising at the time had this

18  long list of ten or fifteen things that you got included in

19  the plan that cost you extra at specifically Verizon and AT&T

20  and there was a large -- I mean, I can visualize it today --

21  poster of here are the at least six or eight, if not nine or

22  ten in big checkmarks of what you get; again, voice, data and

23  messaging-related products.

24  Q    Let's talk about the costs that are shown here.  Earlier

25  you said that at this point most customers are on Everything

1   Plans, why was it a kind of methodology to exclude Everything
2   revenue from these financial documents that we're looking at?
3   A   Essentially because it's difficult to do and there wasn't
4   a lot of agreement about a methodology to allocate to
5   products is my simplest answer.
6   Q   It was easier to allocate costs, so the costs were
7   allocated to this category, but not all the revenues?
8   A   This -- again, this type of document would be the costs
9   that are easily attributable or, you know, the less
10   disagreement about, you know, the variable-cost types of
11   components for a product would show up on reports like this,
12   but this doesn't represent all of the costs that it would
13   take to run -- you know, to send a message.
14   Q   Does it include all of the variable costs?
15   A   Again, I describe it more as it's -- I'm not going to say
16   arbitrary, but it's just a listing of the costs that the
17   product team would deem worthwhile of them tracking because
18   there may or may not be some area of influence across, you
19   know, these particular rows versus other rows of costs that
20   may not show up on this report.
21           MR. RIOPELLE:  That's it, your Honor, and --
22           THE COURT:  To which exhibit was the witness
23   referring, the report?
24           MR. RIOPELLE:  I will have to verify the --
25           THE COURT:  Is that the same report that was covered

1    in the cross-examination of Dr. Cox?

2             MR. RIOPELLE:  I believe it was, but I would want to

3    look at that number, the DX or the PX number for the record

4    before --

5             THE COURT:  I think that number was 77.

6             MR. HEIST:  It was Plaintiffs' Exhibit 77 that I

7    asked Dr. Cox about.  I took this deposition, I believe this

8    testimony dealt with another document, a different one.

9             THE COURT:  Fine.  And the other document was the

10   SEC report, DX-33, I think.

11            MR. HEIST:  I think what the witness was testifying

12   to is still yet another document, a third document.

13            THE COURT:  Oh.  So you don't think this video

14   snippet related to PX-77?

15            MR. HEIST:  I don't think so, your Honor.  That was

16   Deposition Exhibit 11 and I believe this passage is in the

17   transcript --

18            THE COURT:  All right.  Well, you'll supplement --

19            MR. HEIST:  -- Plaintiffs' Exhibit 703 is what the

20   witness was referring to.

21            MS. MELLEY:  Mr. Wilson on the video just now?

22            MR. HEIST:  Mr. Wilson on the video.

23            MS. MELLEY:  That's our understanding.

24            THE COURT:  All right, thank you.

25            You may proceed.

1             MR. RIOPELLE:  Sprint calls Dr. Christian Dippon.

2             THE DEPUTY CLERK:  Please raise your right hand.

3             CHRISTIAN DIPPON, Defendants' Witness, Sworn.

4             THE DEPUTY CLERK:  Please be seated.  Can you state

5    your full name and spell your last name for the record?

6             THE WITNESS:  My name is Christian Dippon, last name

7    is spelled D-i-p-p-o-n.

8             MR. RIOPELLE:  Before we start, may I just hand up,

9    we have some slides.

10            THE COURT:  Good afternoon, sir.

11            THE WITNESS:  Good afternoon, your Honor.

12            (Pause.)

13                        DIRECT EXAMINATION

14   BY MR. RIOPELLE:

15   Q   All right.  Ready?

16   A   Yes, sir.

17   Q   Dr. Dippon, what is your occupation and title, and where

18   are you currently employed?

19   A   I am an economist, I'm a managing director at NERA

20   Economic Consulting.  If you wonder, it's the same firm as

21   Dr. Alan Cox works in.  I am based out of Washington, D.C.

22   and I co-chair the firm's communication, media and Internet

23   practice.

24   Q   And what is your specialization at NERA?

25   A   I specialize what I call the economics of

1    telecommunication, so that would be pretty much like my

2    practice name entails, communication issues, that's wire

3    line, wireless, that could be Internet issues or media

4    broadcasting issues.

5    Q    And for how long have you been doing work analysis in the

6    communications and high-tech industries?

7    A    Twenty one years.

8    Q    Can you tell the jury about your educational background?

9    A    Certainly.  I have a Bachelor's in business

10   administration from the California State University in

11   Hayward, that is near San Francisco; a Masters degree in

12   economics from the University of California at Santa Barbara;

13   and then I have a PhD in economics from Curtin University,

14   that is Western Australia.

15   Q    All right.  So in the 21 years that you've been in the

16   telecom sector, what type of topics have you addressed?

17   A    Those topics fall roughly into three categories, I

18   classify them as policy issues, regulatory issues, litigation

19   and advisory work.  So if you were to look at policy issues,

20   those would be testimony before the Federal Communication

21   Commission for instance.  I've recently testified on possible

22   regulation on set-top box, those are those black boxes that

23   you have near your TV for your cable TV.  I have on

24   regulatory issues testified a lot on cost modeling, and on

25   litigation issues anything from false advertising, trade

1  secret theft and economic damages.  And then I do advisory

2  work; the advisory work often involves the valuation of

3  spectrum.

4  Q   Is the work that you do exclusive to the United States?

5  A   No, sir.  In the last 21 years I've worked in

6  approximately two dozen countries around the world.  A lot of

7  it is North America, but Europe, Middle East, a lot of it is

8  Asia.  Those are the places I've been.

9  Q   Have you published any books or articles on

10 telecommunications?

11 A   Yes, sir, that sort of comes with the territory.  I do

12 publish in peer-reviewed journals, I have written a short

13 book on mobile virtual network operators -- an absolute page-

14 turner, I have to add --

15          (Laughter.)

16 A   -- and I've also written book chapters and reviewed

17 books.

18 Q   Have you lectured at any universities on

19 telecommunications issues?

20 A   Yes.  Every now and then I give guest lectures, some of

21 the universities I've been at is the University of California

22 in Santa Barbara, the University of San Francisco and the

23 University of Florida.

24 Q   And a moment ago you talked about your testifying, can

25 you just give us a little more insight into what testifying

1    you've done before various regulatory committees like the FCC

2    and others?

3    A   Certainly.  On the regulatory front I have testified

4    before the Federal Communication Commission, a lot of public

5    service commissions or public utility commissions in various

6    states across the United States.  I've also testified before

7    regulatory bodies abroad.  So for instance I've given

8    testimony before the Ministry of Communication in Israel.  I

9    have also submitted testimony before the antitrust commission

10   in Indonesia.  So a number of other regulatory bodies outside

11   the United States.

12   Q   And what experience do you have testifying before federal

13   and state courts?

14   A   Quite extensive.

15   Q   All right.  I believe in a previous answer you were

16   talking about mobile cost modeling experience; is that

17   correct?

18   A   Yes, or generally cost modeling, yes.

19   Q   All right.  So what experience, can you tell the jury

20   what experience you have in building cost models in the

21   mobile wireless industry?

22   A   Right.  And if I may, I'll start with wireless cost

23   modeling.  When I started in 1996, that was right after the

24   Telecommunications Act of 1996 and there was a lot of cost

25   modeling to cost -- to ascertain or to measure the cost of

1    the fixed-line network.  And so I've been doing that for --

2    you know, on and off for the last 21 years.

3          Mobile cost modeling, my mobile cost modeling work

4    started maybe ten years ago, maybe a bit more than that, and

5    I have built and reviewed many cost models.  I have for

6    instance we mentioned Israel, I've built a mobile cost model

7    in Israel and I've built cost models in Ireland, in

8    Singapore, Malaysia, South Korea, several of them in the

9    United States, and I am currently working on a matter in

10   Canada where I've also built a mobile cost model.

11   Q    And in what context have you undertaken these cost

12   models?

13   A    The context varies, but generally I would say most of the

14   mobile cost models especially outside the United States are

15   for regulatory purposes, that is to regulate wholesale prices

16   of various different services.  Then cost models come into

17   play in financial transactions and one of those would be if a

18   mobile operator wishes to participate in a spectrum option --

19   and I believe you've heard Dr. Cox talking about how spectrum

20   is being allocated -- so I've worked for bidders on those

21   options to ascertain the value of spectrum and that valuation

22   model contains the cost model -- or contains a cost model.

23   Q    All right.  So besides mobile wireless cost models, have

24   you built and reviewed cost models for fixed-line networks?

25   A    Yes.  And that goes all the way back to 1996 where a lot

1   of the principles were set into stone.

2   Q   Now, have you previously been qualified to testify as an

3   expert in federal or state court?

4   A   Yes, sir.

5   Q   And on what topics have you been qualified as an expert?

6   A   If I recall correctly and I don't really keep score on

7   what it is, but what I do recall is the areas of

8   qualifications are typically economics, econometrics,

9   statistics, telecommunications, wireless.  I've also been

10  declared as an expert in market research, that was a false

11  advertising case.  So those are the ones that I do recall.

12  Q   Now, have you testified on behalf of Sprint in other

13  matters?

14  A   Yes, sir, I have.

15  Q   What other clients have you testified on behalf of as an

16  expert?

17  A   Well, I'm lucky enough to have several other clients.  I

18  have testified for Verizon, Embark; then Nokia, Microsoft,

19  Nokia Systems, which is different from Nokia handsets.  I do

20  a lot of work in Canada.  In Canada it's typically Fortelis

21  (ph), that's a mobile operator, also Bell Canada.  I have

22  worked and done testimony for Synctel (ph), a Singaporean

23  mobile operator, and then also various Israeli mobile

24  operators.

25          MR. RIOPELLE:  At this time, your Honor, Sprint

1   would tender Dr. Dippon as an expert on the following topics:

2   economics, telecommunications industry and telecommunications

3   cost modeling.

4          THE COURT:  Any objection?

5          MR. HEIST:  No objection, your Honor.

6          THE COURT:  The testimony of Dr. Dippon will be

7   received in the areas of economics, telephone --

8   telecommunications industry -- and the third topic, cost

9   modeling in --

10          MR. RIOPELLE:  Tele --

11          THE COURT:  -- mobile what -- oh, in

12   telecommunications --

13          MR. RIOPELLE:  It was telecommunications cost

14   modeling.

15          THE COURT:  Telecommunications cost modeling.

16          MR. RIOPELLE:  Thank you, your Honor.

17   BY MR. RIOPELLE:

18   Q   All right.  Dr. Dippon, are you here to address Mr.

19   Webber's cost analysis?

20   A   Yes, sir.

21   Q   All right.  Can you briefly remind the jury what Mr.

22   Webber's cost estimates are being used for in this case?

23   A   Certainly.  As I understand it, Mr. Webber's cost

24   estimates are an integral part to Ms. Riley's damages

25   calculation, I believe she calls it the income approach.  And

1    as far as I understand it, what Ms. Riley attempts to

2    calculate is how much income or how much profit did Sprint

3    derive from offering SMS and MMS services, for that she needs

4    the revenue that is attributed to those services and she

5    needs to subtract out the costs for those services in order

6    to come up with a profit, and a part of the cost that she's

7    subtracting out comes from Mr. Webber.

8    Q    And does Mr. Webber use the term incremental cost?

9    A    Yes, I believe so, he uses that term.

10   Q    All right.  What is your understanding of what

11   incremental cost is?

12   A    Well, incremental cost is a term that's being used to

13   ascertain what the costs are for a particular decision.  So

14   if somebody undertakes a decision and that gives rise to

15   cost, then those would be the incremental cost, costs would

16   be in addition to whatever cost you have that can be

17   attributed to that particular decision.

18   Q    Now, is it your opinion that Mr. Webber did in fact

19   calculate incremental costs for SMS and MMS?

20   A    He clearly did not.

21   Q    And why not?

22   A    What Mr. Webber did is he added a number of costs

23   together, that's probably indisputable, but unfortunately

24   nothing more than that.  He misses very important cost

25   categories; he misses spectrum costs, he misses network

1    costs.  So actually it's what he capture -- attempts to

2    capture and I even have issues with that, but what he

3    attempts to capture is really just the tip of an iceberg.

4    Q    All right.  Can you -- well, let's skip that.

5           Do you believe that Mr. Webber conducted a proper

6    incremental messaging cost study?

7    A    No, sir.

8    Q    And why do you believe that?

9    A    So incremental cost studies for wireless services, that's

10   not something new.  We do not have to reinvent the wheel,

11   there are established practices, practices that were derived

12   in part by economists.  So they're not accounting models,

13   they're economic cost models.  And Mr. Webber's calculation

14   does not even closely resemble that, because he does not

15   really model anything, what he does is he adds up a number of

16   cost categories.

17   Q    So based on your review, what are the principle errors in

18   Mr. Webber's analysis?

19   A    Well, there are several, but you asked me for the

20   principle errors and I would say one definitely is the fact

21   that he intentionally omitted very large cost categories from

22   consideration, particularly spectrum cost and network cost

23   that is not directly attributable to SMS and MMS.  That's

24   probably point number one.

25           Point number two, which is a bit more puzzling, he

1   misinterprets the information that he received from Sprint

2   and he keeps calling it a incremental cost study or a study

3   that Sprint conducted and he views as if he is there to audit

4   it and then make corrections to it if necessary and that's

5   just simply not the case; it was not a cost model that was

6   presented.

7   Q   All right, so let's take these in turn.  You said that he

8   missed the largest categories; what costs does Mr. Webber

9   miss in his analysis?

10  A   So there's going to be many and I'm just thinking about

11  how I typically model mobile costs, and particularly for

12  instance one mobile cost model I'm doing right now I think I

13  have 288 asset categories.  So I'm going to talk a little bit

14  about some of the big ones that Mr. Webber misses and one of

15  them is spectrum cost.

16          Sprint has a portfolio which historical value is

17  probably around $18 billion, about nine billion of that is

18  used for the provisioning of SMS and MMS services, so that

19  clearly needs to be accounted for.  So that's currently not

20  in Mr. Webber's calculation.  But then all the towers, every

21  tower that you see on the side of the freeway, sometimes

22  disguised as pine trees, those are not taken into account.

23  The ones you see on rooftop antennas, you can step outside,

24  there's antennas everywhere you look, those are not taken

25  into account.  I understand that Sprint has some 40,000 of

1    those across the country, enormous costs.

2            Then also if you think -- so now if you think about

3    it, an SMS message or a voice call or a data transaction on

4    the network, you need spectrum to connect your wireless

5    device to the tower, that's spectrum.  Now you're on the

6    tower, so you need to take into account tower costs.  And now

7    the traffic needs to be what's called back-hauled, it needs

8    to be brought to mobile switching center.  So back-haul is

9    currently not in Mr. Webber's calculation, that's quite large

10   as well.  And then their mobile switching centers, those are

11   the pieces of electronics that routes your phone call or your

12   data transaction or your SMS.  Those subscriber switching

13   centers, I think there's about 90 of those, are also not

14   accounted for.

15           So essentially he misses all of that.

16           MR. RIOPELLE:  Your Honor, may I have Dr. Dippon

17   just step down and point out where these are on the board

18   that the jury has previously seen?

19           THE COURT:  Yes.  Identify the exhibit on the board.

20           THE WITNESS:  So you want me to come down?

21           MR. RIOPELLE:  Please.  One second, let me find --

22           THE WITNESS:  All right.

23           MR. FINKELSON:  It's slide 17 of Mr. Lanning's

24   presentation.

25           THE COURT:  You'll mark the board and the exhibit on

```
1    the board is slide --
2              MR. RIOPELLE:  Slide 17 --
3              THE COURT:  -- 17 of Mr. Lanning's presentation.
4              MR. RIOPELLE:  Mr. Cosgrove, can I get balance here
5    for a minute.
6              THE COURT:  Well, we have an easel.
7              MR. RIOPELLE:  We do?  I figured it would take me
8    longer to put the easel up than --
9              THE COURT:  What happened to it?
10             MR. COSGROVE:  It's right here.
11             (Pause.)
12             MR. RIOPELLE:  May Dr. Dippon come down again?
13             THE COURT:  Yes.
14             MR. RIOPELLE:  Thank you.
15   BY MR. RIOPELLE:
16   Q   Can you just point out to the jury the costs that you
17   were just discussing that Mr. Webber omitted from his cost
18   analysis?
19   A   Certainly.  And this is not a slide that I prepared, I
20   took it as a slide in my reports to show what the cost
21   elements are in a cost model, but I think I can do it with
22   this graphic here.  So if you think about all these
23   subscribers here, they need -- this looks like a iPhone --
24   they need to be connected to a tower.  So that connection
25   here, those are airwaves, that is spectrum, that is at least
```

Dippon - Direct                                              19

1   $9 billion worth of spectrum that Mr. Webber did not

2   consider.

3           Then here is your base station.  That's just a

4   physical structure, some antennas on top.  And then you have

5   base station controller -- there are various different terms,

6   but I'm not an engineer, so I know my terminology might be

7   slightly off.  I happen to know under the 3G world this is

8   called a node B, I have no idea why, but I call it a base

9   station controller.  But that -- those pieces of equipment

10  are not included, entirely omitted.

11          Then if you think about the traffic being in all the

12  various towers and you imagine that a tower can handle say

13  roughly 1,500 calls at a given point in time and that varies

14  depending on the technology, but I think a good gauge is

15  1,500 here.  Now think about there are all these

16  transactions, 1,500 transactions on each of those towers,

17  that traffic needs to be brought back to the mobile switching

18  center.

19          So, all that traffic flows to the mobile switching

20  center.  That is back haul, that is not considered in Mr.

21  Webber's analysis, so the traffic cannot flow back to the

22  mobile switching center.  And then, finally, you have the

23  mobile switching center, that's where, if you want to call

24  your friend, it's going to go to the mobile switching center

25  and then it's going to rout it to your friend, wherever that

1   person might be.  So, all those pieces, those are just some

2   of the larger asset batteries that I see are missed, but like

3   you said, if we do cost modelings and that be your cost

4   models for a very long time, I have something close to 300

5   asset batteries that I'm considering and the largest on this

6   by Mr. Webber.

7   Q   And does he admit that he omits these cost batteries?

8   A   Oh, yes and I guess that, for me, it's been a disturbing

9   part because everywhere you go, every cost model you look at

10  or most cost models that you looked at, include those

11  specific costs.  So, you can go into my mobile cost model

12  that I built for Israel and I think Mr. Webber downloaded at

13  least a report from the internet and used it to benchmark his

14  results again.  You can go in the cost models, there's no

15  doubt a network is in there and there's also Spectrum costs

16  in there.  Although, I have to add, Spectrum varies by

17  country -- from country to country how it's being allocated.

18  Q   Why don't you go back and take the stand.

19  A   Thank you.

20  Q   All right, so you just talked about the costs that Mr.

21  Webber did not include.  Why do these costs need to be

22  included?

23  A   I think I can give two answers to that.  One is sort of a

24  common sense answer and I'll give you a bit of a more

25  complicated answer.  But the first one is, SMS and MMS needs

1    the Spectrum, needs the tower, needs the back haul, I believe

2    to need also the mobile switching center.  Those components

3    are needed.  Those components are used by SMS and MMS and

4    Sprint and all the other mobile operators built the network,

5    in part, because of that.  So, that's what I would call the

6    simple answer.

7            The a bit more advanced answer is because of the

8    cost causation.  Meaning that SMS and MMS caused these costs

9    to arise, at least in part.  So, Sprint, in this particular

10   case, incurred Spectrum costs and network costs, in part,

11   because it wants to offer SMS and MMS.  So, therefore,

12   there's no doubt those costs have to be included.

13   Q   Okay, now, so before we get to the cost causation

14   principle and I think you mentioned this a minute ago.  In

15   mobile cost models that you have conducted and reviewed, are

16   network costs typically included?

17   A   Yes, sir.

18   Q   And can you just give us a quick example of one of those?

19   A   I can give you better than that.  I can give you several.

20   In the last year I've done three cost models in the United

21   States.  Every single time, network was included, Spectrum

22   was included.  Currently, I've built a model in Canada.

23   Spectrum is included.  Network is included.  I have built a

24   cost model in Israel.  Spectrum was included and network was

25   included and that's the very -- that's the very cost model

Dippon - Direct                          22

1    that Mr. Webber looked at, at least in terms of a report and

2    used it to benchmark his own numbers.  And I should also add

3    that if you think, well, network is included because Chris

4    Dippon built it.  If that's what your reaction is, you can

5    also look at other mobile operators.

6         So, in Canada, let's go back to there again, Bell

7    Canada and Watchers, those are two large mobile operators in

8    Canada.  Have built their cost models.  They have used

9    different people.  I was not involved in that and they have

10   all included network and Spectrum in their calculations.

11   Q   Now, Mr. Webber did add some costs to the data that you

12   received from Sprint, right?

13   A   Yes.

14   Q   And did those costs account for network costs?

15   A   No, Mr. Webber specifically excluded Spectrum and network

16   costs.

17   Q   All right, do you recall what costs he did add?

18   A   Yeah, there's an array and I have to admit that it's a

19   bit confusing, because I don't think there seems to be a

20   clear methodology to the addition.  But he certainly looked

21   at, I believe some 200 projects that he deemed were worthy to

22   look at and added some of that cost to SMS and MMS.  But

23   there was really no clear methodology behind.

24   Q   Did Ms. Riley add general shared -- shared general and

25   administrative expenses?

1          MR. HEIST:  Objection, your Honor.  This witness

2   hasn't responded to Ms. Riley's report.  This is beyond his

3   expert.

4          MR. RIOPELLE:  This witness is testifying on the

5   costs that were included in the analysis that's been

6   presented by Comcast in this case.  And those costs share

7   general administrative costs, are costs that Comcast has

8   included in its presentation to the jury.

9          THE COURT:  And his expert report?

10         MR. RIOPELLE:  His expert report was specifically

11  responding to Mr. Webber's expert report.  But Ms. Riley,

12  relying on Mr. Webber's report, says she added general shared

13  administrative costs.

14         THE COURT:  I'll overrule the objection.

15  BY MR. RIOPELLE:

16  Q   Did Ms. Riley include general shared administrative

17  costs?

18  A   It seems that way, but the story there is not quite

19  straight either.  Because when I looked at it, Mr. Webber

20  first included general and administrative costs which is

21  inconsistent, because if he really wants to only include

22  costs that are directly attributable to SMS and MMS and this

23  is what he said he wants to do, then one would certainly not

24  add general and administrative expenses.  So, he seems to

25  have added it, then he's taking out and then Ms. Riley seems

Dippon - Direct                                   24

1    to have put in.  I'm honestly a bit confused why the

2    runaround.

3    Q    All right, let's get to the cost causation principle.

4    Now, Mr. Webber said that only cost caused by a service

5    should be accounted for in calculating the costs of SMS and

6    MMS services.  Do you agree?

7    A    Yes, sir, I do agree with that.

8    Q    And why do you agree with that?

9    A    It's the cost causation principle and is one of the

10   principles that I just mentioned.  Again, it's

11   straightforward, is if a decision gives rise to cost, then

12   that decision must carry those costs.

13   Q    So, I'm a little confused then.  If you agree on the

14   principle of Mr. Webber, why do you disagree on what costs

15   should be included?

16   A    So, I think Mr. Webber and I have actually common

17   grounds.  We do agree that the cost causation principle is

18   used, that it applies, that it's used in cost modeling.

19   Where we disagree is on the particular application. It's my

20   opinion that Mr. Webber did not correctly apply that

21   principle.

22   Q    All right and you've prepared demonstratives to explain

23   this to the jury?

24   A    Yes, I have, hopefully clearing up that confusion.

25   Q    All right, so here's the first one, the cost causation

1   principle and explain this for me.  Can you explain to the
2   jury what you've put up here?
3   A    Right, so in this first slide I just want to talk a
4   little bit about what is the cost causation principle and how
5   come do you have two experts that disagree with each other,
6   when in fact, they agree on the principle?  So, number one,
7   costs are incurred as a result of a decision.  It's pretty
8   straightforward.  The cost causation principle considers
9   costs incremental to a decision if these costs and here I'm
10  quoting actually, Mr. Webber, who's done a wonderful job
11  putting this down in cross-examination.  He says, so I'm
12  going to read the full sentence, so it makes more sense.
13  "But the cost causation principle consider costs incremental
14  to Acision if these costs would be avoided, had the decision
15  or action not be taken."
16  Q    And what's your next point then?
17  A    My next point is that that's a great starting point that
18  Mr. Webber and I agree, shown as agreement between Mr. Webber
19  and I regarding that definition.  There's also this agreement
20  that this is right principle to look at.
21  Q    And then, so what is the disagreement between you and Mr.
22  Webber?
23  A    That's on point three, so the disagreement is in the
24  particular application.  So, it's the right principle, we
25  agree on the definition, but it's how it is applied.  So, Mr.

1  Webber believes that Spectrum costs and most of the network

2  costs can be ignored in calculating the incremental costs of

3  SMS and I strongly disagree with Mr. Webber on that.

4  Q    And why do you disagree?

5  A    Well, maybe just to say is -- maybe I'll lead with

6  another point first, that is point four, where we actually

7  agree, because there's no dispute that these costs exist.

8  There also does not seem to be a dispute that Sprint invested

9  heavily in its Spectrum portfolio and its network.  So, why

10  do we disagree, as I was trying to build a couple of

11  hypothetical examples to illustrate that disagreement.

12  Q    And I believe you've prepared some slide on those, is

13  that correct?

14  A    Yes, sir.

15  Q    All right, so why don't you tell the jury what your

16  hypothetical scenario one is?

17  A    So, what I find is I've created, at the risk of

18  oversimplifying, I created two hypothetical scenarios to

19  point out where the difference is.  Because all of this

20  ultimately boils down to a factual question.  Boils down to a

21  factual question whether network and Spectrum needs to be

22  included.  So, but let me explain those two hypothetical

23  examples first.  And they're just an explanation on how the

24  cost causation principle is applied.  So, this first

25  hypothetical scenario, I make the decision to take the train

Dippon - Direct                                   27

1    from Washington, D.C. to Philadelphia to attend this trial.

2    So, that's the decision.  My decision is to attend the trial,

3    therefore, I incurred the costs, I think it's $200, I

4    incurred costs to take Amtrak from Washington, D.C. to

5    Philadelphia.  So, the decision is the trial, attend the

6    trial and the cost is the train ticket.

7              Now, assume, in my spare time, I visit the

8    University of Pennsylvania and it's a beautiful campus and

9    I've been there in August. It's really nice.  So, I thought,

10   okay, so I have some extra time, I'm going to go and visit

11   UPENN.

12   Q   So, under the cost causation principle, would you include

13   UPENN as one of the costs?

14   A   That is exactly the question.  So, now what's the

15   incremental cost for my visit to UPENN?  And if you bring up

16   point number four, it provides the answer.  So, since I make

17   the decision to travel to Philadelphia for the trial,

18   remember that was the decision. So, since I make the decision

19   to travel to Philadelphia for the trial and not to visit

20   UPENN, the train ticket is not part of my incremental costs

21   of my visit to the school.  It can be ignored.  In other

22   words is had I not gone to -- had I not, the decision is the

23   trial and the UPENN is an after thought.  The UPENN visit is

24   an after thought.  So, my ticket has to be allocated to the

25   incremental cost of attending the trial not to visit UPENN.

1  Q   All right and I think you have a second hypothetical

2  then?

3  A    Yes, sir.  So, now what I do is, I changed the scenario

4  slightly.  So, I make a decision to take the train from

5  Washington, D.C. to Philadelphia to visit the Museum of Art,

6  Independence Hall and UPENN.  So, the decision is to visit

7  all three places, that's the decision or in other words, I

8  would not go if I it was only two decisions or one decision.

9  It's for all three decisions.  So, I take the train to visit

10  those three places.  So, now I visit UPENN and then the same

11  question comes up.  In this scenario, what is the incremental

12  cost of the visit to UPENN.  The answer here is different.

13  Since I make the decision to travel to Philadelphia, in part

14  to visit UPENN, the train ticket is part of the incremental

15  cost to visit the school.  It cannot be ignored.  So, right

16  now, the decision was, I go to Philadelphia to visit those

17  three places, that's the decision.  And when I visit each of

18  these individual places, each of these individual places

19  carry part of the cost for the train ticket.  That's the cost

20  causation principle.  We allocate the cost to the decision

21  and the decision here is to visit all three places together.

22  I would not have gone to Philadelphia, was it only two or one

23  location.  The decision is all three locations together.

24  Q   Okay, so you said towards your hypotheticals, how does

25  that apply to the facts in this case?

Dippon - Direct                                    29

1    A    Yes, well, let's bring this back.  We've looked at two

2    hypothetical examples, let's bring this back to this case and

3    that's what really matters.  So, Sprint made the decision to

4    buy Spectrum and build a network in order to offer voice,

5    data and SMS.  And allow me to draw up a little footnote.

6    When I say -- I'm not always repeating MMS, because MMS is

7    really just SMS and data.  So, the native services to

8    wireless network are voice, data and SMS.  So, that's why I

9    indicated it with a forward slash here.  But so the decision

10   is made by Sprint to incur heavy investments to offer voice,

11   data and SMS.

12          So, now Sprint does offer SMS and MMS services.  So

13   now, the question is again and if you may bring up point

14   number three, what is the incremental cost of offering

15   SMS/MMS services?  That's the assignment that Mr. Webber had.

16   That's the assignment that I reviewed.  And so the answer

17   here is since Sprint made the decision to build a network in

18   part to offer SMS and MMS services, the cost of Spectrum and

19   the cost of the network is part of the incremental costs of

20   offering these services.  It cannot be ignored.  That is

21   similar to hypothetical example number two.  So, it's clear

22   to me and it's clear to every case I've ever worked in around

23   the world in mobile cost models, that Spectrum and network

24   costs must be included in part.  I'm not saying all the

25   Spectrum costs is borne by SMS and MMS.  I'm also not saying

1    that all the network cost is borne by SMS and MMS.  So, but

2    it's very clear that those costs must be attributed, in part,

3    to SMS and MMS.

4    Q    All right and so what is the last point you put on the

5    slide?

6    A    So, obviously, I started out this application with point

7    number one, that's that Sprint made the decision to buy radio

8    Spectrum to build a network in order to offer voice, data and

9    SMS.  So, part of my learning in this case, was that I've

10   noticed that both Ms. Riley and Mr. Webber keep saying that

11   SMS was added to a network.  It's a free-rider and that's

12   really confusing to me.  So, in number one here, I propose to

13   you that Sprint made the decision, the decision is to offer

14   voice, data and SMS.  That's one decision altogether.  Then

15   obviously, it follows that you need to include Spectrum and

16   network costs.

17           But one might go back and say, no, wait a minute.  I

18   do not believe you that Sprint made that decision to offer

19   voice, data and SMS all at once.  And certainly from Ms.

20   Riley and Mr. Webber's testimony, it makes it sound like that

21   Sprint had a network and then added SMS and MMS on top of

22   that.  And that's simply not true, where I'm coming from, but

23   that's really a factual question.  So, this all boils down to

24   a fact, did or did Sprint not build its network for all the

25   services?  So, here is what I put down, I said whether Sprint

Dippon - Direct                                    31

1   purchased the radio Spectrum and built the network in order

2   to offer voice, data and SMS/MMS services or whether Sprint

3   decided to offer SMS after building a voice and data network

4   is a factual question.  Unfortunately, only me or Mr. Webber

5   can answer that question. It's just a fact.

6           And so, I've looked at the Sprint 10K.  Now, I can

7   tell you before that I knew the answer to this, because I've

8   built many cost models and I've looked at many, many

9   different mobile networks and it's clear to me.  But

10  apparently, that has become an issue where I was asked

11  whether I was sure that Sprint offered SMS at the same time.

12  So, I went back and looked at the 10K's.

13  Q   So, let me stop you for a second.

14          MR. HEIST:  Your Honor, 10K is not in the expert

15  report and there's no foundation at this point.

16          MR. RIOPELLE:  I was just about to start

17  establishing the foundation for the 10K.

18          THE COURT:  I would establish the foundation before

19  you get the conclusion.  You've gotten the conclusion before

20  you've established what the 10K says on this issue.  Or how a

21  10K is -- well, you've got to lay a foundation, meaning a

22  connection between the 10K and we're talking about the last

23  sentence on this slide, Slide 5 and his only conclusion.

24          MR. RIOPELLE:  Okay, I think.

25          THE COURT:  He's just said and from the 10K, I reach

1   this conclusion.  That's not going to get there.

2         MR. RIOPELLE:  Oh, actually, I believe that his

3   testimony was I knew this conclusion beforehand, the 10K

4   supports it.  I believe that's what he just testified to.

5         MR. HEIST:  Your Honor --

6         THE COURT:  And Mr. Heist is objecting on the ground

7   that there's no basis for the conclusion.

8         MR. HEIST:  -- whatever else, other information that

9   he may or may not have had, it's not in the 10K regarding the

10  timing of his decision, is not in his expert report.  He

11  should not be permitted to talk about it.

12        MR. RIOPELLE:  He was specifically asked the

13  question at his deposition on page 44 of his deposition, he

14  testified --

15        THE COURT:  I don't have that.

16        MR. RIOPELLE:  No, I'm just saying that he's

17  established.  This is not a surprise or any --

18        THE COURT:  Well, the question is, I ruled at

19  sidebar that you've got to lay a foundation that establishes

20  the connection between the 10K and what is set forth in the

21  10K and his conclusion.

22        MR. RIOPELLE:  Okay.

23  BY MR. RIOPELLE:

24  Q   Dr. Dippon, do you know what a 10K is?

25  A   Yes, sir.

1    Q    And can you explain quickly for the jury, what a 10K is?

2    A    A 10K is a financial report that is mandated by the

3    Security and Exchange Commission.  It reports financial

4    information, mostly accounting information that is then also

5    being used as a basis for shareholders and investors to make

6    their decisions.

7    Q    Does it provide other information on a yearly basis?

8    A    It provides a lot of information, yes.

9    Q    And have you reviewed 10Ks in this case?

10   A    Yes, sir.

11   Q    And are 10Ks something that someone in your position

12   ordinarily relies on?

13   A    We certainly look at it quite a lot, but for factual

14   information.  Note though that 10Ks present a lot of

15   accounting information and I'm in the business for economic

16   information.  But certainly, we look at 10Ks and routinely

17   review 10Ks for all sorts of things.

18   Q    And have you reviewed the 2003 10K issued by Sprint in

19   this case?

20   A    Yes, sir.

21   Q    And why did you review the 2003 10K?

22   A    Well, this particular one is because I was repeatedly

23   challenged on my statement that Sprint built the network or

24   dimensioned the network for voice, data and SMS.  And I was

25   asked, are you sure?  How do you know?  And I explained why I

1  think that is the case.  So, first I was challenged in

2  deposition, but then I've also read the trial transcript from

3  the last few days and particularly the one from Ms. Riley and

4  Mr. Webber.  And I noticed that both experts keep saying that

5  SMS and MMS was added to a network and that's simply not

6  true.  So, that's when I went back and looked at the 10K.

7  Q   And without answering the ultimate question, did looking

8  at the 10K provide evidence to you as to the question of

9  whether the SMS or MMS was added after the network or was

10  part of the network?

11  A   So --

12  Q   Just answer it did it support that -- did it answer your

13  question or not?

14  A   Yes, it did.

15          MR. RIOPELLE:  May I now show the 10K, your Honor?

16  I believe I've established the foundation for why he looked

17  at.

18          THE COURT:  Do you have the 10k?

19          MR. RIOPELLE:  I have it on the next slide, the

20  excerpt on the next slide.

21          THE COURT:  Let me look at it.

22          (Pause.)

23          THE COURT:  And your objection is based simply on

24  the issue, the fact that the reference to this particular 10K

25  was not covered in his report?

1          MR. HEIST:  It's not covered in his report.  It was

2    not covered in his deposition, because it wasn't disclosed to

3    us that he was going to be relying on this and now we find

4    ourselves at trial after extensive discovery, having to deal

5    with the 2003 10K.

6          MR. RIOPELLE: Just so the record is complete, your

7    Honor, the 2003 10-K was one of the document on which Mr.

8    Webber relied upon in his report and he was questioned about

9    – Mr. Webber was questioned about the 2003 10-K during his

10   testimony here.

11         MR. HEIST: Your Honor, Mr. Webber cited that as a

12   document reviewed.  He did not rely upon it in his expert

13   report.  He did not testify about it in his direct

14   examination.  He was presented with it on cross-examination,

15   which means it was not presented in evidence in Mr. Webber's

16   examination.  So it's not in this record at this time, in my

17   opinion, and was not revealed in discovery and the testimony

18   shouldn't be allowed.

19         THE COURT: But it was referenced.

20         MR. HEIST: It was referenced as something Mr. Webber

21   looked at, but it is not something he relied upon –

22         THE COURT: And Webber is your employee as to whose

23   opinions this witness – well, opinions and other testimony

24   this witness is testifying about.

25         MR. HEIST: He's not employed, but he is our expert,

Dippon - Direct                                          36

1    yes.

2              THE COURT: Webber.

3              MR. HEIST: Yes.

4              THE COURT: I see no evidence of surprise and no bad

5    faith and I'm going to overrule the objection.

6              MR. RIOPELLE: Thank you, your Honor.

7    BY MR. RIOPELLE:

8    Q   So on your next slide, Dr. Dippon, can you just tell the

9    jury what this is?

10   A   Yes, certainly.  This is an excerpt from Sprint's 2003

11   10-K.  And I'll read the entire section, but essentially what

12   this excerpt shows is that Sprint built the network for

13   voice, data and SMS.  So what it says there in 2003 Sprint

14   launched nationwide third generation 3G capability in the

15   2002 third quarter.  This capability allows more efficient

16   utilization of the network when voice calls are made using 3G

17   enabled handsets.  It also provides enhanced data services.

18   The service, marketed as PCS vision allows consumer and

19   business customers to use their vision-enabled PCS devices,

20   to exchange personal and corporate email, take, send and

21   receive pictures, exchange instant messages, play games with

22   full color graphics and polyphonic sounds and browse the

23   internet wirelessly with speeds up to 144 kilobits per

24   second, with average speeds of 50 to 70 kilobits per second.

25   Q   Okay, Dr. Dippon, you highlighted several words on there.

1   The first set is takes and then receive pictures.  What do

2   you understand takes and receive pictures to reference?

3   A    That would be certainly MMS.

4   Q    And exchange instant messages, what do you understand

5   exchange instant messages to represent?

6   A    SMS.

7   Q    So what did you conclude from reading the excerpts of the

8   2003 Sprint 10-K?

9   A    What I concluded is that my previous expert opinion can

10  be supported by factual evidence.  I've said all along that

11  Sprint dimensioned its network for voice data and SMS.  So

12  it's the hypothetical example two, not one, that applies.

13  And this particular piece of evidence shows that Sprint

14  itself make that statement.  It built a network to offer all

15  three services so the relevant decision is to offer these

16  three services all together.  Therefore, I conclude that

17  there is absolutely no doubt that spectrum and network costs

18  must be considered in the cost calculation.  It must be

19  included.

20  Q    Now, have you read any other trial testimony in this case

21  that is further evidence of your conclusion?

22  A    Yes.  I think, if I'm not mistaken, the video clip that

23  we just watched, Mr. Wilson is referring to the fact that

24  much more is needed than the few data points that were

25  submitted to Mr. Webber in order to offer those services.

1   But I think Mr. Yarkosky and Mr. Calhoun both also emphasized

2   that network and radio spectrum must be considered as part of

3   the cost for SMS an MMS services.

4   Q   Okay.  So with respect to the cost causation principle,

5   what is your conclusion with how that was applied by Mr.

6   Webber?

7   A   If you don't mind bringing up, I think there's one more

8   point under here and that's what my conclusion is.

9   Q   Indeed there is.

10  A   So the conclusion is very simple.  Radio spectrum costs,

11  in-network costs, so that would be towers, the antenna on the

12  back, all the switches, everything we looked at on the board

13  a few minutes ago, they must be apportioned to the cost of

14  SMS and MMS.  This is not a surprise. This is not new stuff,

15  we're not inventing anything here.  This is strictly in

16  accordance with international best practices.  In fact, a lot

17  of regulators would pencil that into their guidelines, to be

18  cost models, Canada being one of them.

19        So Mr. Webber failed to do so. He explicitly

20  excluded network costs.  Well, this renders his cost estimate

21  incorrect.  I mean like you said, he touches the tip off the

22  iceberg and even though he knows there's an entire iceberg

23  there, he specifically said, I'm not looking at it.  That

24  renders his calculations unusable.

25        So unfortunately, consequently if Ms. Riley relies

1   on this, then her profit calculation are equally incorrect,

2   and if I read her transcript correctly, I think Ms. Riley

3   also agrees with me on that.

4   Q   Now, all right, isn't it true that if you removed SMS and

5   SMS services from the network that that wouldn't

6   significantly change the cost?

7   A   Yes, that would be true.  It's the wrong question though

8   because that's not – that's a counterfactual.  We established

9   that the decision was to build all three services all

10  together.  So you can't do to your voided costs by splitting

11  decision now into its subpart.  So it is true if that's – if

12  it was truly the case that the network was built only for

13  voice and data and SMS was added later, then you can also

14  subtract the SMS and see what happens to costs.  And costs

15  won't change much.

16          But the decision was all three services together.

17  So if you were not to offer SMS you can't break the decision

18  apart.  Then you also don't offer voice, then you don't offer

19  data.  Therefore all costs go away.

20  Q   All right.  So let's put aside the cost causation

21  principles and move to the second point you made which I

22  believe is having the data on which Mr. Webber relied, I

23  think he said he relied on it as an incremental cost study.

24  Why do you think Mr. Webber is wrong because the data he

25  received from Sprint was incremental cost study?

1  A   Well, again, it's actually pretty straightforward.  I've

2  looked at the data that Sprint provided to Mr. Webber and I

3  read the language that goes with it and I looked at the

4  nature of the data.  The language said we don't have all the

5  costs for voice and SMS.  We don't track it in the ordinary

6  course of business.

7  But we have data points that we can attribute to SMS and MMS

8  services and they are included.  So I looked at them.  There

9  are actually only two data series.  Some customer care data

10  from 2010 to 2014, and also some vendor costs in the same

11  time frame.

12         Sprint made it very clear that it is not a cost

13  study nor does it represent those costs for those services.

14  And any expert looking at it, even without Spring saying that

15  will realize that that's just two data points that they have,

16  but any expert will realize that that is not a cost study,

17  it's not meant to represent an incremental cost study that

18  Sprint keeps in its ordinary course of business.

19         Now, Mr. Webber misinterprets that and he still

20  views it as an incremental cost study that he then sets out

21  to review and correct.

22  Q   And was there any support in the evidence that you

23  reviewed in this case that he didn't review all the – or he

24  didn't have all the necessary data.

25  A    Well, I think first of all I've reviewed the data

1   request response.  It was listed there.  I think Mr. Yarkosky

2   informed Mr. Webber.  I think Mr. Calhoun mentioned in – I

3   think it was trial testimony, but in testimony that those

4   were not the full sets of data costs.

5   Q    We don't want to misrepresent this to the jury.  You

6   don't believe it was trial testimony.  But I put on the

7   screen in one of the slides you had prepared.

8   A    Yes.

9   Q    Is this the deposition testimony for Mr. Calhoun that you

10  were trying to?

11  A    Right, right. It's the deposition testimony.  So when Mr.

12  Calhoun says with a beautiful picture on the slide, he says

13  the vendor cost has an associated cost, right?  That's here.

14  There are numerous other costs, too, for Sprint to be able to

15  offer and maintain and manage that product. Base stations -

16  RF, and I believe he means radio frequency, that spectrum.

17  Towers, data centers, you know, care advocates.  I mean the

18  list goes on and on and on.  When I say presentation layer,

19  there's six other layers, physical layer, transport layer,

20  signaling layer, your graph, graph user interface layer.

21  There's also costs associated there for the company.  This is

22  just a tiny piece of the cost to run that product.  That's

23  what Mr. Calhoun said in his deposition.

24  Q    Okay.  So you talked about how Mr. Webber was asked a new

25  implemental cost study, is there an international best

1    practice that addressed this and similar science?

2    A    Yes, I think there is one, yes.

3    Q    And can you just expand on that?

4    A    So when the world started with cost models, and that's

5    sometime in the 1990's, there was a lot of disagreement of

6    how cost models were done.  But over the years the industry

7    has fairly converged, not perfectly, but I routinely review

8    mobile cost models that are built by competitors of ours in

9    Europe.  And I can pick these up and I know exactly what

10   they're doing.  On a high level not entirely different what

11   we would be doing.  So that general standard has been

12   adopted.  And if I were to look at another consulting firm,

13   building and cost model in another country, they will include

14   spectrum costs, they will include network costs.  That's the

15   standard.  And remember the standard didn't just happen out

16   of coincidence.  There's good economic reasoning why network

17   costs and spectrum costs must be included and the cost

18   causation principle explains that well.

19   Q    And did Mr. Weber use the standard?

20   A    No, sir. I can guarantee you if he presented this study

21   to any regulator they would throw it out.

22        MR. RIOPELLE: No further questions, your Honor.

23                      CROSS-EXAMINATION

24   BY MR. HEIST:

25   Q    Good afternoon, Dr. Dippon.

1   A    Good afternoon.

2   Q    You are an economist, correct?

3   A    Yes, sir.

4   Q    And when you were qualified as an expert in this case, I

5   tried to write it down, it was on economics,

6   telecommunication industry and telecommunication cost

7   modeling, correct?

8   A    I believe that's substantive – of this qualification?

9   Yes, you're right.

10  Q    But not accounting.

11  A    Correct.

12  Q    And you're not an engineer, correct?

13  A    I'm not an engineer, that's correct.

14  Q    Now, accountants have to follow the rules and regulations

15  of the accounting profession, including the financial

16  accounting standards board; correct?

17  A    That's my understanding, yes.

18  Q    And you just mentioned that there were international best

19  practices for cost modeling for telecommunications; did I

20  understand that correctly?

21  A    I think so, telecommunications, but let me – allow me to

22  explain.  Those would be mostly wire line, wireless and maybe

23  coaxial networks.

24  Q    So these international best practices, there's some

25  regulatory body that mandates how this is done?

1    A    No, sir. That's not the case.

2    Q    So when you said there was a standard and Mr. Riopelle

3    said the standard, that's your opinion as to what the

4    standard is.  There's no rule that I can go to in your

5    profession to find out how to do a cost model in this field;

6    is that correct?

7    A    Not quite.

8    Q    Where would I go to get the rule?

9    A    So general rules are typically available or sometimes

10   available by the regulator, because the regulator will have –

11   so if the regulator has done wire line models and wants to go

12   to wireless models, they certainly do not want to go back to

13   first principles.  So they have rule.  So I can give you an

14   example.

15   Q    Well, I'd like to know the rule for this case.  What rule

16   should we use in this case according to you?

17   A    Well, I think – allow me to part response first,

18   economics.  This is incremental cause is an economic

19   question, not an accounting question.  So economic rules,

20   like the cost causation principles.

21   Q    Okay.  These are principles and rules of electronics.

22   But there's no regulatory body that I could go to or Mr.

23   Webber could go to and say please give me the rule that I'm

24   supposed to use for the cost model for this case.  Is that

25   correct or incorrect?

Dippon - Cross                                45

1    A    I would say it's a bit of both.  Mr. Webber can certainly

2    go and look at what the Federal Communication Commission did

3    on the landline side and they certainly considered the entire

4    network.  Obviously spectrum was not part of that.  So give

5    some general guidance, but you're right, there's no canned

6    solution that we can just go to and say, you know, like a

7    recipe on how to do things.  There's none in the United

8    States.

9    Q    Could we have slide PD-4, last demonstrative 4.37.

10        I just want to make sure I understand where your

11   opinion fits in here.  This is Ms. Riley's slide where she

12   calculated – the first step in calculating the apportion

13   royalty rate.  And if you'll look at the last line, she

14   determined messaging revenue and she added 17.226 billion

15   plus 641.7 million.  You're not offering an opinion about

16   that, right?

17   A    Correct.

18   Q    And then she subtracted incremental costs plus SG&A

19   costs, and if I understood your testimony, you're challenging

20   the $1.112 billion in incremental costs, correct?

21   A    Well, I challenged half but I think I have a question

22   about both components of cost here, because if Mr. Webber's

23   assignment was to calculate the incremental costs, there

24   should be no need for Ms. Riley to add anything.

25   Q    But she did add $7.145 billion in selling general and

1    administrative costs to what Mr. Webber gave her, correct?

2    A    It seems that to be the case, but Ms. Riley still did not

3    add spectrum and upper costs.

4    Q    We're coming back to that.  But you're not challenging

5    her determination of $7.145 billion in selling, general and

6    administrative costs; correct?

7    A    No, I don't think that's correct.

8    Q    You are challenging.

9    A    Well, I mean it's one cost calculation.  One cannot just

10   add certain things to it.  It's overall the cost is

11   incorrect.  One thing I say, it doesn't make it make – so

12   general and administrative expenses should be added in the

13   same exercises.  So I have a problem with both components.

14   Q    Okay.  So you offered no opinion regarding the correct

15   amount of Sprint's incremental costs; is that correct?

16   A    That's correct.  I was not asked to build a cost model in

17   this manner.

18   Q    And you offered no opinion regarding the correct amount

19   of selling general and administrative expenses; correct?

20   A    I think that would be the same answer as before because I

21   would add those costs into a cost model.

22   Q    And you offered no opinion for Sprint's profitability for

23   messaging, correct?

24   A    No, not particularly, no.

25   Q    In fact you never looked to determine whether SMS or MMS

1   were profitable to Sprint; correct?

2   A    No, not specifically.  That was not in my assignment.

3   Q    So Mr. Webber put forth a number, Ms. Riley put forth a

4   number and Dr. Cox put forth a number but you have put forth

5   no number; is that correct?

6   A    Yes.  There's no need for me to put forth a number

7   because Dr. Cox presents a number.  There's no need for me to

8   put forth a number.  I'm not quite sure why you're asking me

9   that question.

10  Q    I'm asking the question because you offered no number

11  regarding costs that this jury could rely upon in this case

12  other than to say Mr. Webber did it incorrectly.

13  Q    I have great faith in Dr. Cox, so then I would encourage

14  the jury to rely on Dr. Cox's number.

15  Q    And Dr. Cox didn't put forth a cost number either,

16  correct?

17  A    If I understand his assignment correctly, he has damages

18  numbers but not a cost number because I don't think he needs

19  that in his approach.

20  Q    So no expert on Sprint's side of the case has put forth

21  an incremental cost number that this jury could rely upon in

22  applying Ms. Riley's methodology; correct?

23  A    I think that's right but there probably might be an

24  underlying reason and this is stepping outside my scope here

25  a little bit. But if the method itself is no good, there's no

1   need to bring out the cost number.  That's not going to

2   change things.

3   Q   And you formed your opinion in this case without

4   reviewing any audited financial statements of Sprint,

5   correct?

6   A   I think that's probably right.  We're looking at in 10-Ks

7   like we talked about a few minutes ago.  Those are accounting

8   numbers.  What we need to look at is economic numbers.  So

9   for instance if there's a hundred dollar depreciation on the

10  books, that does not mean that's an accounting depreciation.

11  That does not mean that the value of the asset in the market

12  would drop by that amount.  That could be too high or too

13  little.  So we calculate economic.  Those are economic house

14  models, not accounting models.

15  Q   Right.  You're looking at this case from an economist's

16  point of view, not an accountant's point of view; correct?

17  A   Yes, sir.

18  Q   And you don't feel yourself bound by the accounting rules

19  and the rules that accountants have to follow, in your

20  opinion?

21  A   That is correct, sir.

22  Q   Now, do you agree that in estimating patent damages, one

23  principle that requires careful observance is that only costs

24  caused by extra sales should be charged against extra sales

25  revenues.  Therefore, incremental costing is the proper

1   approach.

2   A   I'm - I see you're asking me about IP damages.  That's

3   not what my specialty is so I don't feel qualified answering

4   that question.

5   Q   Do you agree that the incremental cost of a service or

6   group of services is the additional cost of providing that

7   service or group of services over and above the cost of

8   providing all the remaining services?

9   A   I think I agree with that, but I would prefer if we stick

10  with the cost causation principle.  The reason why I said I

11  think I agree with that because I think it says the same

12  thing as the cost causation principle.

13  Q   So you agree that the incremental cost of a service is

14  the additional costs of providing that service over and above

15  the costs of providing all the remaining services?

16  A   No, I think - so we have to go back to the decision,

17  right?  If several services are provided - if the decision

18  contains several services together, then your statement there

19  doesn't quite work.

20  Q   Are you familiar with a professor at Wharton here at the

21  Philadelphia University of Pennsylvania named Dr. Fallhaber?

22  A   Yes.

23  Q   Have you read his papers?

24  A   I've certainly seen some of the papers, yes.

25  Q   Do you remember you were asked at your deposition about

1    one of Professor Fallhaber's papers?

2    A    Vaguely, yes, I do.

3    Q    Do you recall being asked "And he states that the

4    incremental cost of service or group of services is the

5    additional cost of providing that service or group of

6    services over and above the cost of providing all the

7    remaining services."

8         Do you agree with that definition of incremental

9    cost?  Do you remember that question?

10   A    Yes.

11   Q    And what is your answer?

12   A    I think I said yes.

13   Q    Yes.

14         THE COURT: What was the date of that deposition?

15         MR. HEIST: And that was March 18th, 2016, and my

16   question and answer was on page 49.

17   BY MR. HEIST:

18   Q    Now one of the issues that you had with Mr. Webber's cost

19   determination – oh, before I get there.  You've looked at

20   cost models and prepared cost models in the

21   telecommunications industry, many of them, correct?  That's

22   the way I understood your testimony.

23   A    That's correct.

24   Q    And you could have taken a cost model that you're

25   familiar with and applied it in this case to come up with

Dippon - Cross                                    51

1   what you say would have been the correct number for

2   incremental costs.

3   A   Every cost model is different, so I can probably use my

4   experience and maybe some of the inputs from other cost

5   models, but these are really custom tailored jobs, because

6   cost depends on geography, number of subscribers, the

7   particular spectrum that is deployed.  There's a lot, a lot

8   of differences so that's why every country commissions their

9   own – or most countries.  I don't know about every country,

10  but most countries condition their own country specific and

11  operator specific cost studies.  I don't think I could have

12  just taken one and applied to –

13  Q   You don't have one for the U.S.?

14  A   It's not that simple, sir.

15  Q   But you weren't asked to do a model for this case?

16  A   That is correct, yes.

17  Q   Now, one of the issues that you had with Mr. Webber's

18  cost determination is that you say he improperly relied upon

19  certain data from Sprint that he got from Sprint.

20  A   I'm sorry, are you asking me a question?

21  Q   Yes.

22  A   Yes, I – that's what I said.

23  Q   And you admit that Mr. Webber relied upon Sprint cost

24  data associated with SMS and MMS that Sprint itself provided

25  in discovery in this case?

1    A    That is correct.

2    Q    And those cost data were used internally by Sprint's

3    message product group to track certain information over time

4    in the ordinary course of Sprint's business; correct?

5    A    That's correct, yes.

6    Q    But you say that the data that Sprint's message product

7    group to track certain cost information over time was not

8    complete.

9    A    That is the question.  I'm not questioning the individual

10   datapoints that were given to Mr. Webber.  What I'm saying it

11   was not complete.  And that's because Sprint doesn't track

12   those cost numbers in its ordinary course of business.

13   And Mr. Webber was repeatedly warned of that.  It was

14   written, in fact, on the data request response that was

15   submitted.

16   Q    Now, in addition to the cost that Sprint's messaging

17   product group tracked, Mr. Webber added costs that he

18   determined or estimated himself, correct?

19   A    Yes, some costs he did add, yes.

20   Q    For example, he added $87 million in SMS and MMS labor

21   costs to those costs that Sprint's messaging products would

22   regularly track?

23   A    I don't remember the number, but that sounds right and I

24   just point out he missed the $9 billion on Spectrum and

25   probably an equal amount on that part.

1    Q    By the way, that $9 billion on Spectrum, were you here

2    this morning when Dr. Cox testified?

3    A    Yes, sir.

4    Q    Is that $9 billion based on your testimony or what you

5    heard this morning, anywhere found in Sprint's audited

6    financial statements as a cost?

7    A    No, it's not and there are good reasons for that.  That

8    doesn't mean the cost doesn't exist.  It also doesn't mean

9    that Mr. Webber can ignore it.  In fact, Mr. Webber never

10   brought up that point.  He ignored it for different reasons.

11   Q    You're saying he can't ignore it even if the Federal

12   Accounting Standards Board said to ignore it?  You's say he

13   still has to consider it?

14   A    No, sir.  I disagree with you.  The Federal Accounting

15   Board, I think and I can just tell you what I heard today

16   when I was sitting here.  I think it was listed in good will,

17   it was not -- it was not ignored.  So, I want to make that

18   point, but it's not uncommon that the accounting world has to

19   report data differently.  That does not mean that reflects

20   economic costs and that's what we're here for.

21   Q    Mr. Webber added $322 million in capital and data center

22   costs, none of which were recorded in the documents that

23   Sprint's messaging product group tracked internally, correct?

24   A    That's quite possible.  I refer you back to Mr. Cahoon's

25   deposition and Mr. Cahoon explained that the information that

Dippon - Cross                                          54

1    they do track is a tiny portion, so you can triple that. You

2    can increase that tenfold or a hundredfold, that's still a

3    relatively small portion.  So, it's really not a question of

4    how much Mr. Webber added.

5    Q    But you don't know how much more in incremental costs Mr.

6    Webber should have included in his model.  You just know

7    there's some that he missed, but you can't give the jury a

8    number?

9    A    I know he missed most of the cost, not some of the cost,

10   but you're right, I cannot give the jury a number because

11   that was not my assignment.

12   Q    Now, the cost data that Sprint's messaging product group

13   tracked internally did not include any network costs for SMS

14   at all, correct?

15   A    That depends how you classify those vendor costs.  You

16   could argue that -- no, I think you're right.  I think vendor

17   costs would be third party that would not be network, I agree

18   with that.

19   Q    So, Mr. Webber did include the vendor costs that Sprint's

20   messaging product group tracked?

21   A    Some vendor costs, yes, the ones that are tracked by

22   Sprint, that's correct.

23   Q    And Sprint's messaging product group doesn't track

24   network costs.  So, it's not like they gave him the costs and

25   he ignored them.  Sprint's messaging product group doesn't

1   track network costs for SMS, correct?

2   A   That is right and they did give him the data and told him

3   the network was not included and they did tell him the

4   network should be included.

5   Q   And you provided no opinion to this jury, as to the

6   amount of Spectrum costs associated with MMS and MS-MMS that

7   you say Mr. Webber should have included, correct?

8   A   Right, I mentioned, I think an overall figure, but that

9   would need to a portion to the SMS service and then to the

10  MMS.  I'll note that MMS are really SMS with an attachment,

11  so Mr. Webber would also have to calculate the costs from the

12  data network and he hasn't done that either.

13  Q   Now, if we could look at your Slide 6.  This is your

14  reference to a 10K, so sometimes you rely on 10Ks, right?

15  A   Yes, we routinely review them and there is some useful

16  information in them.

17  Q   But you don't review them or use the information in there

18  relating to Spectrum costs, right?

19  A   I think in this particular case, yes.  Often the numeric

20  numbers in a 10K, they need to be carefully looked at because

21  they're accounting data.  But there's a lot of other

22  information, useful information in 10Ks.  So, we routinely

23  review 10Ks, but for economic cost studies we tend not to

24  rely on the numeric data in 10K too much.

25  Q   Now, looking at your slide, which refers to the 2003 10K,

1   you've highlighted this language.  "Take, send and receive

2   pictures, exchange instant messaging -- messages", excuse me.

3   So, as I understood your testimony in direct examination,

4   you're saying, there in 2003, Sprint was marketing PCS

5   Vision, that was your understanding?

6   A    Yes, it's written in the text, yes.

7   Q    And which I'm trying to understand -- I'm trying to get

8   your understanding of that sentence.  "This service marketed

9   as PCS Vision allows consumers and business customers to use

10  their Vision-enabled PCS devices to exchange personal and

11  corporate e-mail, take, send and receive pictures, exchange

12  instant messages, play games with full color graphics and

13  polyphonic sounds and browse the internet wirelessly" and

14  I'll stop.  So, how did you come to determine or come to the

15  conclusion that that sentence referred to MMS?

16  A    So, first of all, let me just remind you, I'm using this

17  to further support my expert opinion that 3G networks always

18  dimension for SMS and MMS.  But to answer your question it

19  says here, "send and receive pictures", it doesn't say in

20  e-mails.  It's clearly an MMS.  I don't see --

21  Q    What else is could be?

22  A    I'm sorry.

23  Q    You're saying you don't know what else it could be?

24  A    Yes.

25  Q    And when you say that sentence refers to SMS, what makes

1    you think exchanging instant messages refers to SMS?

2    A    Same thing, it's SMS, I mean, they don't call it SMS, but

3    it is SMS.

4    Q    Absolutely certain?

5    A    Well, I mean, as certain as I can be with the words on

6    the table.  But understand, too, is I am looking for

7    additional evidence to or factual evidence to support the

8    point that I've made, fairly early on, that these networks

9    are dimension to MMS, including SMS and MMS.

10   Q    So, this sentence there is referring, in the present

11   tense, to something that Sprint was offering in 2003, is that

12   right?

13   A    Well, not quite, I mean, it says it started offering in

14   the third quarter of 2002.

15   Q    But the next sentence, the sentence that you've

16   highlighted is talking in the present tense, as of the date

17   of the Sprint 10K, correct?

18   A    Now we're going deep into linguistic analysis.  I mean,

19   certainly using present tense, but I don't see how they would

20   -- that doesn't mean it didn't work in 2002.  I'm sorry, I

21   guess I don't understand your question.

22   Q    Let me show you Plaintiff's Exhibit 943.

23            THE COURT:  I think before we go there, we'll

24   recess.  It's not quite 20 minutes after 3:00.  We'll recess

25   for ten minutes.

1              THE DEPUTY CLERK:  All rise.

2              (Jury exits.)

3              THE DEPUTY CLERK:  All rise.

4              THE COURT:  Be seated very briefly, everyone.  The

5    exhibit was a plaintiff exhibit or a defense exhibit?

6              MR. HEIST:  The next one was a plaintiff's exhibit.

7              THE COURT:  PX-923?

8              MR. HEIST:  943.

9              THE COURT:  943.  All right, you may step down.

10             THE WITNESS:  Thank you, your Honor.

11             THE COURT:  We're in recess.

12             (Court in recess 3:17 to 3:39 o'clock p.m.)

13             THE DEPUTY CLERK:  All rise.

14             THE COURT:  Be seated, everyone.  The jury had a

15   request, they reminded me that it was Valentine's Day.  You

16   may be seated.  And they asked to be released a little early.

17   I think we ought to do that.

18             MR. GOETTLE:  I object, your Honor.  (Laughter.)

19   This is no time for love.

20             THE COURT:  Well, you're trying to cull my favor.  I

21   think we'll release them sometime between quarter after 4:00

22   and 4:30.  Probably closer to 4:30.

23             MR. GOETTLE:  15, a romantic.

24             THE COURT:  I'm not going there.  (Laughter.)

25   Ms. Hull?

1          (Pause.)

2          THE DEPUTY CLERK:  All rise.

3          (Jury enters.)

4          THE COURT:  Be seated, everyone.  I want to thank

5     the jury for reminding me that today is Valentine's Day and

6     we will recess a little early as requested.  Although, I

7     should quickly add that the lawyers are not as fortunate as

8     you jurors, because they're staying with me tonight. We're

9     going to work on the jury charge tonight and so, their

10    Valentine's Day celebration will be a little on the late

11    side.  Hopefully, yours will not be on the late side.  With

12    that, Mr. Heist?

13         MR. HEIST:  Thank you, your Honor.

14    BY MR. HEIST:

15    Q   Dr. Dippon, Sprint launched its first CDMA network in

16    1996, correct?

17    A   I think so, that's a 2G network.  I believe that's

18    correct.

19    Q   And they launched the nationwide 3G network in the third

20    quarter of 2002, correct?

21    A   Correct.

22    Q   And they launched Picture Mail in 2003, correct?

23    A   I don't think that is correct.

24    Q   Well, I guess the record will reflect what it reflects.

25    But the 1996 2G network had Spectrum, it had cell towers and

1    it had base stations, correct?

2    A    For 2G services, not for 3G, yes.  So, you're going to

3    have to change that.

4    Q    And the 3G network, third quarter 2002, that had cell

5    towers, Spectrum, base stations, correct?

6    A    Yes and some more.

7    Q    And Sprint launched two-way SMS text messaging in 2004,

8    correct?

9    A    I don't think that's right.

10   Q    I guess the record will reflect that, as well?

11   A    Right and let me just add, the importance is not when

12   Sprint went to market with it, right.  The importance is when

13   it built the network, what services did it build for.  As I

14   understand it, SMS and MMS is actually part of the 3G

15   standard.

16   Q    And you got that understanding from the 2003 10K?

17   A    I'm not sure where I got the understanding.  The 2003

18   understanding is that it offered instant messages which I

19   read as SMS and sending pictures, which I read as MMS.

20   Q    And you got that understanding from the 10K, nowhere

21   else?

22   A    There might have been other stuff that I've looked at,

23   but I can't particularly point out what it was.

24   Q    The only think you can point to, right now, is the 2003

25   10K, correct?

1    A    That is correct.

2    Q    Let me show you Plaintiff's Exhibit 943.  This is the

3    sixth report of the Federal Communications Commission,

4    adopted June 20, 2001, in a matter of annual report and

5    analysis of competitive market conditions with respect to

6    commercial mobile services.  This particular document, if I

7    could direct your attention to page 63.

8    A    Yes, I'm there.

9    Q    The second -- it's the first full paragraph that begins,

10   "At the end of 2000, Sprint PCS began offering AOL instant

11   messenger, an SMS-type service to its mobile customers.

12   Instant messaging (I am) services such as AOL instant

13   messenger enable users to send and receive messages within a

14   community of users creating a chat style atmosphere.

15   Whereas, SMS is communication between two individuals", do

16   you see that?

17   A    Yes, I do.

18   Q    So, this is telling us that in the end of 2003, Sprint

19   began using or providing something called AOL instant

20   messaging, correct?

21   A    No.  No, it says at the end of 2000, you said 2003,

22   that's a crucial difference.

23   Q    I'm sorry, I misspoke.  So, in 2000, they launched

24   instant messaging services such as AOL instant Messenger,

25   correct?

1    A   Yes, that's what it says.

2    Q   So when the 2003 10K, that's on Slide 6 of your

3    presentation, refers to instant messages, can you tell for

4    certain that that's referring to SMS as opposed to instant

5    messaging services such as AOL instant messenger?

6    A   I can't give you 100 percent certainty that's for sure.

7    But I can give you strong certainty that it refers to SMS and

8    MMS.  That is because 3G was dimension-built for voice, data

9    and SMS.  I'm not aware of any mobile network in the world,

10   that would have launched 3G without SMS.  I mean, they might

11   have delayed it by a few months, but they certainly built it

12   to do voice, data and SMS.  So, that's why I'm saying it's --

13   while it doesn't say MMS and SMS, I think we can agree on

14   that, it is a very reasonable, very likely correct

15   interpretation that this refers to SMS and MMS.

16   Q   Now, the 3G cell towers and base stations and Spectrum,

17   they're sometimes referred to as the radio network, correct?

18   A   The radio access network, RAN, yes.

19   Q   The radio access network and SMS places no load on a

20   radio network, correct?

21   A   I guess I would have to disagree with that.  You still

22   have -- you still have to have connectivity between the

23   mobile handset and the tower.  I also disagree with -- you

24   have to build a network to have enough capacity and

25   functionality to send SMS and MMS.  By the way, MMS uses

1    data, so I would not agree with that statement.

2    Q   Mr. Geyer, could you pull up page 190 of Dr. Dippon's

3    deposition at line 6 through 8?

4              (Video being played at this time.)

5              MR. HEIST:  No further questions.

6              MR. RIOPELLE:  Your Honor, I see no need to

7    redirect.

8              THE COURT:  Then that concludes your testimony, Dr.

9    Dippon, thank you very much.

10             THE WITNESS:  Thank you, your Honor.

11             (Pause.)

12             MR. RIOPELLE:  Your Honor, may we come to sidebar?

13             THE COURT:  Yes.

14             (Sidebar discussion as follows:)

15             MR. RIOPELLE:  ... never sees this, not to enter

16   into evidence.

17             MR. GOETTLE:  And so now I object, to receive?  I

18   don't now what it means.  That's exactly what we're still

19   trying to work out.

20             MR. RIOPELLE:  And we are ready to rest.  The only

21   thing I want to do is make sure the Court receives, not

22   necessarily admits into evidence this part.  But just

23   receives on the record before we rest, DX-902 and 903, which

24   are the Marcus cross-examination video and the transcript.

25   And we discussed it last Thursday, but it has not been

Dippon - Cross                                      64

1    received by the Court.  I just want to make sure it's

2    received and then we can rest and then we can fight over

3    whether it's evidence.

4              THE COURT:  It was offered in cross-examination.

5              MR. GOETTLE:  Correct and, your Honor, Mr. Riopelle

6    wasn't here but we talked about this on Friday and we thought

7    we had an agreement that anything used for impeachment was

8    not to come in.  Well, I don't know what's --

9              MR. RIOPELLE:  It's on the record.

10             MR. GOETTLE:  We haven't quite figured out what

11   receives means versus going to --

12             THE COURT:  But it's not evidence, I was just noting

13   for the record so if there's an occasion to refer to it, we

14   can refer to it.

15             MR. GOETTLE:  Okay.

16             MR. RIOPELLE:  We agree.

17             THE COURT:  So, it will be received.

18             MR. RIOPELLE:  And for the record, that's DX-902 and

19   DX-903.

20             THE COURT:  Fine.

21             MR. GOETTLE:  What is -- I don't know that anybody's

22   reviewed this.  This is supposed to be a transcript?

23             MR. RIOPELLE:  I gave it to you on Thursday.

24             MR. GOETTLE:  Okay.

25             MR. HANGLEY:  Okay, it's not ringing a bell with me,

Dippon - Cross                                    65

1    but I'll (indiscernible).

2         MR. RIOPELLE:  I gave it to Jason on Thursday.

3         MR. GOETTLE:  You gave it to Jason on -- okay.

4         MR. HANGLEY:  Would you mind holding off on actually

5    giving it to the Court until tomorrow.

6         THE COURT:  Oh, I've got a lot of reading to do, so

7    I don't mind that at all.  I'm going to start on the first

8    this.

9         MR. RIOPELLE:  I just wanted to --

10        THE COURT:  I haven't quite confirmed that's what

11   happened and I forgot it was Valentine's Day when I did this.

12   I'm sure I'm not very -- oh, I thought I knew what -- I like

13   that tie.

14        MR. HANGLEY:  Well, thank you.

15        THE COURT:  Will be received?  It's received by the

16   Court, but not into evidence.  It's just marked and there

17   will be a record of it.

18        MR. RIOPELLE:  Exactly.

19        THE COURT:  I don't where we're going to keep all

20   these exhibits.

21        MR. RIOPELLE:  This one's -- one of these boxes has

22   a little room in it.

23        MR. HANGLEY:  No, defense is going to rest now?

24        MR. FINKELSON:  We'll check with our colleagues when

25   we get back to the office.

1            MR. HANGLEY:  Okay.

2            THE COURT:  We might talk a little bit about

3     scheduling.  Sprint will rest and then we --

4            MR. HANGLEY:  We have motions, which I assume you'll

5     want to reserve until the jury is gone for the day?

6            THE COURT:  Yes.

7            MR. HANGLEY:  But we've kept our case, we haven't

8     waived it.

9            THE COURT:  No, you haven't waived.

10           MR. HANGLEY:  Okay.  Okay and then we prepare to

11    start.

12           THE COURT:  How long will your rebuttal take?

13           MR. HANGLEY:  I've got a short witness to lead.

14           MR. GOETTLE:  So, we have --

15           MR. HANGLEY:  I think it will probably take today.

16           MR. GOETTLE:  He'll be done today, then tomorrow we

17    have Dr. Akl.  I think his direct is -- probably total, he'd

18    be three hours, his direct.  I think it will be about two,

19    maybe a little bit longer, but two.  And then after that, we

20    have Ms. Riley and I'm not sure about Mr. Webber.  So, we

21    have three more witnesses to go tomorrow.  Again, I think

22    we're on schedule to do closings Thursday morning.

23           MR. FINKELSON:  We have the right to put the case on

24    invalidity.

25           MR. GOETTLE:  Oh, yes.

Dippon - Cross                               67

1            MR. FINKELSON:  And we'll assess if we need to do

2    that once we hear the testimony of Dr. Akl.  I would expect,

3    I would expect it would be in a position to close on

4    Thursday.

5            MR. HANGLEY:  Are you sure you're right about being

6    entitled to put on a rebuttal case?

7            MR. FINKELSON:  It's in the pre-trial order.

8            MR. HANGLEY:  Okay.

9            MR. GOETTLE:  Yeah, but does that matter?

10           THE COURT:  I think it's fair anyway.

11           MR. RIOPELLE:  But it is, we --

12           THE COURT:  All right, let me tell the jury.

13           (End of sidebar discussion.)

14           THE COURT:  We talked a little bit about scheduling.

15   The defense, Sprint, is resting, so its evidence, we're going

16   to move some exhibits.  We'll take care of that out of your

17   presence.  Sprint is resting.  Comcast has an opportunity to

18   present rebuttal evidence and they will do that, particularly

19   in response to the issues that were injected into the case by

20   Sprint.  The invalidity issues, anticipation and obviousness.

21   So, we've heard Sprint's case, we'll now hear Comcast's

22   response.

23           MR. FINKELSON:  As you predicted, your Honor, Sprint

24   rests.  I was just going to get to that.

25           THE COURT:  I'm clairvoyant.  Thank you.

Dippon - Cross                                68

1          MR. FINKELSON:  Thank you.

2          THE COURT:  About the schedule, I'm told Comcast

3   will probably complete its rebuttal case tomorrow.  Maybe

4   Sprint will have some, I think it's rebuttal.  It's a little

5   confusing, but Sprint might have some evidence to put in and

6   that will be done Thursday morning.  We're hopeful that

7   closing arguments will be conducted on Thursday morning and

8   afternoon.  And if I have time to charge you on the law on

9   Thursday, I will.  Otherwise, my charge will be Friday,

10  Friday morning.  So, we're pretty much on schedule.  We

11  missed a day and a half, but we're pretty much on schedule.

12  I'll advise you further if there's any change.

13          MR. GOETTLE:  Your Honor, just because Sprint rests,

14  I would just say we have motions and I --

15          THE COURT:  And you'll present them after the jury

16  leaves for the day.

17          MR. GOETTLE:  Thank you, your Honor.

18          THE COURT:  After we recess.

19          MR. HANGLEY:  Comcast calls Evan Koch.

20          EVAN KOCH, Witness, Sworn.

21          THE DEPUTY CLERK:  Please state your full name and

22  spell your last name for the record.

23          THE WITNESS:  My name is Evan Koch.  My last name is

24  spelled K-O-C-H.

25          THE COURT:  And your first name again?

1              THE WITNESS:  Is Evan, spelled E-V-A-N.

2              THE COURT:  Thank you very much.

3                      DIRECT EXAMINATION

4    BY MR. HANGLEY:

5    Q    Good afternoon, Mr. Koch.  Are you employed by Comcast?

6    A    Yes, that's correct.

7    Q    And what is your title?

8    A    It's vice president of strategic program management.

9    Q    And how long have you had that title?

10   A    I started that position on October 1, 2015.

11   Q    How long have you been employed by Comcast?

12   A    I started at Comcast in May, 2006.

13   Q    And did you -- are you in the financial department or

14   corporate department, one of the technical departments?

15   A    I'm currently in the finance department, but from 2006,

16   when I started until I took this current position, I had

17   worked in strategy and business development roles.

18   Q    I see.  Now, there's a document I'd like to put before

19   you, which is the Court's construction of the term cellular

20   network for purposes of this case.

21              MR. HANGLEY:  May I just hand this to the witness,

22   your Honor?

23              THE COURT:  You may.

24              MR. HANGLEY:  And I will also put it up on the

25   easel, if I may.  Same language as we've shown before,

Koch - Direct                                   70

1    gentlemen.

2    BY MR. HANGLEY:

3    Q    As you know, Mr. Koch, this case has to do with a patent

4    and it's the '870 Patent.  And my first question is, have you

5    ever seen the '870 Patent?

6    A    I don't believe I have.

7    Q    Are you familiar with the particular terms of that

8    patent?

9    A    I think I've heard that it's got something to do with

10   messaging service, but not the particulars, no.

11   Q    Okay.  And were you involved in any way in the

12   acquisition of the patent in 2010 by Comcast?

13   A    No, not that I'm aware of.

14   Q    Okay.

15        MR. HANGLEY:  May I have Exhibit D-16, please?

16        (Pause.)

17   BY MR. HANGLEY:

18   Q    Sir, I've shown you a document in which I believe you

19   were involved, am I right about that?

20   A    Yes, that's right.

21   Q    And this would be two years before the acquisition of the

22   '870 Patent, that date was 2010.  Is this the MVNO support

23   agreement already in evidence as Exhibit D-16 and dated May

24   7, 2008?

25   A    Yes, that's what you handed me.

Koch - Direct                                           71

1   Q    Now, sir, were you in fact involved in the negotiation

2   and formulation of that agreement?

3   A    Yes, I was part of the team that negotiated and agreed in

4   this.

5   Q    Okay.  Now, you used the word negotiated, did you have

6   direct dealings with people from Sprint and people from the

7   other participants in the agreement?

8   A    I had some.  I was -- I had some direct involvement with

9   them and some behind-the-scenes support for creating this.

10  Q    Okay.  Whom did you deal with at Sprint?

11  A    So if I'm remembering right, Scott Kalinoski was sort of

12  the main counterpart.

13  Q    Scott Kalinoski?

14  A    Yes.

15  Q    Okay.  And were there others as well?  You don't have to

16  name them, but --

17  A    Yes, there were others as well.

18  Q    Okay.  And were there other people on the Comcast team?

19  A    Yes.

20  Q    And who led the team?

21  A    Tom Nagle was head of our group.

22  Q    Now, this is called an MVNO support agreement.  Just

23  quickly for the jury and I think they've heard some of it

24  before, what is an MVNO agreement?

25  A    So it stands for mobile virtual network operator.  It's

1    an agreement where one company can buy access to a wireless

2    network from another company for purposes of creating their

3    own mobile service packages and selling them to customers

4    under their own brand.

5    Q    Okay.  So does that mean that Comcast would have been

6    offering to sell Sprint service as Sprint services?

7    A    No.  It would have meant Comcast would have bought

8    network access from Sprint, repackaged it, sort of came up

9    with its own minutes and text messages and megabytes plan,

10   and then sell that to end users, to retain customers under

11   the Comcast brand.

12   Q    Okay.  And so would the customer have even known it was

13   utilizing Sprint's network facilities?

14   A    They may not have.

15   Q    Now, sir, take a look, if you will, at the definition of

16   cellular network that is the law applicable in this case,

17   which is on that piece of paper in front of you.

18   A    I see it.

19   Q    You see it?  And I see that according to this language

20   the Court has defined a cellular network as "a network

21   comprised of a wireless terminal, a base station system and

22   core elements," which may include other items.  Do you see

23   that?

24   A    I see that.

25            MR. FINKELSON:  Objection, your Honor, leading and

1    also incomplete with respect to the construction.

2              MR. HANGLEY:  I'll be happy to read it verbatim.

3              THE COURT:  Well, it's on --

4              MR. HANGLEY:  The jury has it before it.

5              THE COURT:  -- it's on the easel.  Why don't you

6    rephrase the question?

7              MR. HANGLEY:  Okay.  Let me just ask a new question,

8    your Honor, and withdraw that one.

9    BY MR. HANGLEY:

10   Q   Taking the language that begins with, quote, "core

11   network elements," quote, can you tell me whether that

12   language is functionally identical to a phrase called "core

13   network" that's contained in the MVNO agreement?  Have you

14   got the question?

15   A   I think so.  So you said starting with where we say "core

16   network elements" in the --

17   Q   Yeah.  And actually you can use the whole thing, but yes.

18             (Pause.)

19   Q   It's at page 30 and I think we have it blown up on the

20   screen if that's --

21   A   Yes, I see it.

22   Q   -- convenient.

23   A   No, they are not functionally identical.

24   Q   And in what respects do they differ from one another?

25   A   So the definition that starts with the phrase "cellular

1    network" that I think you've got blown up over there, core

2    network elements is described as being separate and apart

3    from the base station for communicating with the wireless

4    terminal, where core network as used in the MVNO agreement

5    has a definition that I think is inclusive of both the base

6    station as well as what are called core network elements over

7    here.

8    Q    Okay.  And supposing the language of the MVNO agreement

9    had been limited to the Court definition of core network

10   elements instead of core network, would that have worked for

11   Comcast?

12   A    No.  If the services defined in the MVNO agreement

13   excluded the base stations, that would have been a problem,

14   the agreement wouldn't have done what we wanted it to do.

15   Q    And what you wanted to do you said was be able to make --

16   have customers use the wireless service?

17   A    That's right.

18   Q    Can you do that without a base station?

19   A    Not as far as I know.

20   Q    Now, sir, I notice in D-16, please go back to the cover

21   page --

22   A    Yes.

23   Q    -- that it relates to -- I'm sorry, it reflects an

24   agreement -- cover page -- among several parties.  Sprint

25   Spectrum, that's Sprint; Comcast MVNO 2, that's a Comcast

1    entity?

2    A    Yes, that's right.

3    Q    Okay.  And then there's TWC wireless; who was that?

4    A    That's Time Warner Cable.

5    Q    And then there's VHN Spectrum?

6    A    That's a Bright House network.

7    Q    Now, sir, did -- there was testimony earlier in this case

8    and I just want to make sure it's accurate, was it just

9    Comcast and Sprint that were negotiating this transaction or

10   were these other companies, these two other companies also

11   involved?

12   A    As I recall, the other companies were also involved in

13   bringing this together.

14   Q    In the negotiation, the common goal of forming an

15   agreement?

16   A    I don't recall all of the specific interactions that we

17   would have had along the way, but broadly as part of putting

18   this together, if I'm remembering right, all of the parties

19   had a role in that.

20   Q    Okay.  Now, those are four entities, were there other --

21   any other entities who participated in the dialogue and

22   discussions?

23   A    Yes.  So there was a company called ClearWire Corporation

24   that was part of the proceedings as well, as well as Google,

25   they were specifically part of this.  Intel was part of the

1    overall deal that resulted in the creation of this as well,

2    although I don't remember them having been specifically part

3    of the 3G MVNO piece of the puzzle.

4    Q    Now, were there, sir, particular capabilities, wireless

5    capabilities or facilities that Sprint had that Comcast and

6    the other contracting parties did not acquire?

7    A    Yes, there were.

8    Q    Can you tell us briefly what they might have been?

9    A    Yeah.  So at the time of the agreement Sprint had both

10   the CDMA network and the IDEN (ph) network that was sold

11   under the Nextel brand.  We didn't get access to the IDEN

12   Nextel network under this.  And then there were some other

13   capabilities, things like voice mail is the example that I

14   recall, that we didn't get sort of firm pricing and

15   availability out of, it was sort of -- kind of an agree to

16   agree or if the companies agree in the future we could

17   potentially get those.

18   Q    Okay.  Now, to what extent if any was there a

19   relationship and is there a relationship in your mind between

20   the use of the phrase core network in this agreement and core

21   network elements in the law that controls this case?

22   A    Could you ask the question again?

23   Q    To what extent if any is there a relationship between the

24   two?

25   A    I'm not aware of any relationship between the two.

Koch - Cross                                      77

1   Q    Did I ask you whether you knew who drafted the phrase

2   core network in that MVNO agreement?  If not, I do now.

3   A    I don't remember exactly who came up with those words.

4   Q    Okay.

5              MR. HANGLEY:  No further questions.

6              THE COURT:  You may cross-examine.

7              MR. FINKELSON:  Thank you, your Honor.

8                          CROSS-EXAMINATION

9   BY MR. FINKELSON:

10  Q    Good afternoon, Mr. Koch.  How are you?

11  A    Doing well, thanks.

12  Q    I believe in your testimony, sir, you indicated that as

13  part of this MVNO agreement Comcast was looking to buy access

14  to use Sprint's wireless network, is that right, sir?

15  A    That's right.

16  Q    And is wireless network a synonym for cellular network?

17  A    Not necessarily.

18  Q    Well, in the context of this MVNO agreement Comcast was

19  looking to buy the right to use Sprint's cellular network to

20  offer services to Comcast customers, correct?

21  A    We were gaining access to Sprint's CDMA network.

22  Q    And do you understand CDMA to be a cellular network?

23  A    Using sort of common terminology, yes.  I'm not sure

24  given the piece of paper sitting in front of me how that

25  relates.

1    Q    And your responsibility with respect to this agreement

2    was that you principally supported the pricing and economic

3    provisions of the agreement, correct?

4    A    That was the main thing I did for them, yes.

5    Q    You weren't involved in the technical provisions of the

6    agreement?

7    A    I wouldn't have been the leader of those.  I think -- you

8    know, it was a small -- as I said, it was a small team that

9    handled the overall process, we helped each other out from

10   time to time, but I'm not a technical expert.

11   Q    You don't in fact have a technical degree, correct, sir?

12   A    That is correct.

13   Q    You're not an engineer?

14   A    No, I am not an engineer.

15   Q    You are aware that Mr. Kalinoski from Sprint to whom you

16   referred, he is an engineer?

17   A    I hadn't been aware of that, but now I know.

18   Q    No reason to dispute that, right?

19   A    No, I do not.

20   Q    And you had no involvement yourself personally in

21   negotiating the definition of core network in DX-16, correct,

22   sir?

23   A    That is correct.

24   Q    And in fact Comcast on its team that was involved in

25   negotiating DX-16 had technical advisers, right?

Koch - Cross                                    79

1    A    We did have technical advisers, yes.

2    Q    And you talked to those technical advisers to understand

3    the technology that would be underlying DX-16, correct?

4    A    That is correct.

5    Q    And in fact the technical advisers, they were involved

6    from a network perspective on the technical aspects of the

7    agreement, right?

8    A    I'm sorry, could you ask that one more time?

9    Q    The technical advisers at Comcast, they were involved

10   from a network perspective on the technical aspects of this

11   agreement, correct?

12         MR. HANGLEY:  I object to the form of the question,

13   on the presumption that if I can't understand it, the witness

14   may not be able to either.

15         THE COURT:  No, I'm -- on that ground I'm going to

16   overrule the objection.

17         THE WITNESS:  Well, what do you mean by from a

18   network perspective?

19   BY MR. FINKELSON:

20   Q    In other words, Comcast had a number of individuals who

21   offered technical advice with respect to the negotiation of

22   DX-16, correct?

23   A    That is correct.

24   Q    And that included the technical terms that are in the

25   agreement, correct?

1  A   I believe they would have contributed on those, I don't

2  remember specifically who was commenting on which

3  definitions.

4  Q   And in fact Comcast had at least two different

5  individuals who were involved in the agreement from a

6  technical perspective, neither of which was you, correct,

7  sir?

8  A   I recall at least -- well, I recall one in there.  Who

9  are the --

10  Q   Did you -- I'm sorry, go ahead.

11  A   Who are the two people that you're referring to?

12  Q   At your deposition you referred to two, one was Mr.

13  Stevens, one was Mr. Falkenstein (ph).

14  A   Okay, yes, both of them provided help with this.

15  Q   From a technical perspective, correct?

16  A   That is correct.

17  Q   And your involvement was to help negotiate the prices

18  that Comcast would pay in order to access Sprint's cellular

19  network under this agreement, right?

20  A   That was one of the things I contributed, yes.

21  Q   And as part of that Comcast was trying to secure access

22  to Sprint's 3G data network; is that right, sir?

23  A   Yes, that's correct.

24  Q   Okay.  And as part of Comcast's desire to access Sprint's

25  cellular network, Comcast was also looking for access to

1    Sprint's 1X Voice Network, correct?

2    A    If you just mean the Sprint CDMA voice network, then yes.

3    Q    And as part of that agreement to get access to Sprint's

4    cellular network Comcast was looking to get access to

5    Sprint's SMS messaging, correct?

6    A    Yes, that's correct.

7    Q    Now, you mentioned that the term core network elements as

8    it appears in the Court's construction in this case of

9    cellular network is not functionally identical to the

10   definition of core network that appears in DX-16; did I

11   understand your testimony correctly, sir?

12   A    I believe I answered it that way, yes.

13   Q    And one of the ways in which you said it's not

14   functionally identical is that the definition of core network

15   in DX-16 includes the base station system, whereas the

16   Court's definition of cellular network includes base station

17   system, but it calls it out separately than core network

18   elements, is that fair?

19   A    Yes.  They're different in the one definition -- or the

20   definition that you are gesturing to here shows base station

21   system and core network -- core network elements as separate

22   things where the other one doesn't seem to.

23   Q    And in the Court's definition, which you've read, Mr.

24   Hangley put it up on a big piece of paper and a little piece

25   of paper for you, it does include base station system within

1    the definition of cellular network, right?

2    A    Yes.

3    Q    In what other ways, if any, does the definition of core

4    network in DX-16 not functionally identical to the Court's

5    definition or use of the term core network elements in its

6    definition of cellular network?

7              (Pause.)

8    A    I'm not quite sure how to answer.  I mean, looking at the

9    definition that was handed to me, I see core network elements

10   is described as may include subscriber -- may include some

11   other -- some items, but doesn't necessarily have a

12   definition that I think I could easily compare to what's in

13   the other document.

14   Q    But you were asked by your counsel are they functionally

15   identical; he didn't ask you whether they had the same words,

16   he asked you whether they were functionally identical, and

17   you were able to answer his question by pointing to what you

18   believe is one functional difference.  And I'm asking you,

19   can you point this jury to any other way in which the

20   definition of core network in DX-16 is not functionally

21   identical to the term core network elements as it appears in

22   the Court's definition of cellular network?

23   A    I don't think I could give you any further description of

24   the functional differences between those two other than what

25   I described.

Koch - Cross                                      83

1    Q   You do know that the Court's definition of core network

2    elements says that core network elements may include

3    messaging servers, doesn't it?

4    A   I see it.

5    Q   You understand that one example of a messaging server is

6    a short message service center, that's a term you're familiar

7    with, correct?

8    A   I've heard the term before, I don't really know what it

9    does.

10   Q   In fact the term short message service center is

11   mentioned, is used in DX-16 that you testified you were

12   involved in negotiating, correct, sir?

13   A   Where would that --

14   Q   It's under the definition of SMS, which appears on page

15   14 of the document.

16           MR. FINKELSON:  Can you call up on the screen, Mr.

17   Baird, DX-16 at page 14?

18           (Pause.)

19           THE COURT:  It's on the screen.

20           THE WITNESS:  I see it, your Honor.

21   BY MR. FINKELSON:

22   Q   Do you recognize that, Mr. Koch, as the definition of SMS

23   in DX-16, the document that you testified to this jury you

24   were involved in negotiating?

25   A   Yes, I see it.

Koch - Cross                                84

1   Q   And do you see that it says "SMS means alphanumeric or

2   binary messages using Sprint's short message gateway and

3   service center"?

4   A   Yes, I see that.

5   Q   And do you understand the reference to Sprint's short

6   message service center as being a reference to an SMSC?

7   A   Yes.

8   Q   And do you agree that an SMSC is infrastructure for

9   providing SMS?

10  A   That sounds right.

11  Q   And if you go back to the definition of core network, if

12  you would, sir, in the agreement which is on page 7, do you

13  agree that the definition of core network includes SMS

14  infrastructure?

15  A   Yes, I see that.

16  Q   Now, Mr. Koch, if you'll turn to --

17         THE COURT:  Mr. Finkelson, before you get launched,

18  it's 25 after 4:00.

19         MR. FINKELSON:  Launched was a friendly way of

20  saying what will happen to me, your Honor, if I keep us going

21  late today --

22         THE COURT:  No, it won't be what will happen --

23         MR. FINKELSON:  -- on Valentine's Day.

24         THE COURT:  Yes.

25         MR. FINKELSON:  So I will -- I expect to be done

1    within --

2            THE COURT:  I don't want to rush you.  I think the

3    case is too important.  So --

4            MR. FINKELSON:  But I expect to -- I will finish my

5    cross-examination in one minute.

6            THE COURT:  The clock is ticking.

7            (Laughter.)

8            THE COURT:  If you can't, we'll resume tomorrow.

9            MR. FINKELSON:  I can, your Honor.

10   BY MR. FINKELSON:

11   Q   If you could turn to section 17 --

12           MR. FINKELSON:  -- actually, you know what, your

13   Honor, I'll finish right there and I'll give Mr. Hangley a

14   chance to have the last word today, should he want it.

15           Thank you, Mr. Koch.

16                          REDIRECT EXAMINATION

17   BY MR. HANGLEY:

18   Q   Just quickly.  By 2008 was SMS -- had SMS become an

19   important part of wireless networks?

20   A   Yes, it had.

21   Q   Okay.  Now, you were asked a question about cellular

22   network and you reflected some reluctance to include things

23   in the cellular network, then you were asked were there other

24   questions which also had that cleared in, do you continue

25   that reluctance to say what is part of a cellular network and

86

1    what is part of a wireless network or --

2              MR. FINKELSON:  Objection, your Honor.

3              THE COURT:  Sustained.

4              MR. HANGLEY:  All right, I'll withdraw that

5    question.

6    BY MR. HANGLEY:

7    Q   Was this a business agreement, a technical agreement?

8    What kind of an agreement was this?

9    A   I considered this a business agreement.

10   Q   Thank you.

11             MR. HANGLEY:  No further questions.  Happy

12   Valentine's Day.

13             THE WITNESS:  Thank you.

14             THE COURT:  Well, it will be happier for him than

15   for the rest of you fellows.

16             (Laughter.)

17             THE COURT:  You're going to be here with me long

18   into the evening.

19             Ladies and gentlemen, it's 25 minutes after 4:00.  I

20   don't know whether that's what you meant by early dismissal,

21   but I'm dismissing you approximately 20 minutes early with my

22   best wishes and the best wishes of all of us for a happy

23   Valentine's Day.  I hope you get home in time to celebrate.

24             9:30 tomorrow morning.  Don't discuss the case among

25   yourselves.  Anyone tries to talk to you about the case, say

1   nothing, report that to me.  No radio, no television, no

2   newspaper accounts of the case.  And finally, no social

3   networking, no communicating with others via social network

4   that in any way deals with the case and do no research with

5   respect to the case on social network.

6          On that note, you're excused.  9:30 tomorrow

7   morning.

8          (Jury out at 4:25 o'clock p.m.)

9          THE COURT:  Be seated, everyone.

10         MR. FINKELSON:  I think he's going to dismiss you,

11  Mr. Koch, but you did a good job of listening when he said be

12  seated, everybody.

13         (Laughter.)

14         THE COURT:  Oh, I'm sorry.  I was busy reading PX-

15  943, this very lengthy report of the Federal Communications

16  Commission.  You may step down, Mr. Koch --

17         THE WITNESS:  Thank you.

18         THE COURT:  -- and your testimony is concluded.

19         (Witness excused.)

20         THE COURT:  I'm going to return this to, I think

21  it's you, Mr. Heist.  It's not that I don't want to read all

22  several hundred pages.

23         All right.  How much time do we need?  We'll start

24  with the brief argument on the Comcast motions, then we'll

25  address Mr. Hangley's three-plus page letter dealing with

1   what exhibits go back with the jury, and then we'll get into

2   a charging conference, unless there are other issues.

3          MR. FINKELSON:  Those are the issues of which I'm

4   aware.  With your Honor's permission, I will be here for the

5   beginning portions of that and then Mr. Riopelle will be

6   handling it solo.  In the comedy of errors that has become

7   this trial, I managed to have a crown fall out of my mouth

8   last night.  So I've played my local connections, my sister

9   who lives here has lined me up a dentist at 5:30 and I'm

10  heading to him.  So I'll be here tomorrow with all my teeth

11  in and ready to play.

12         MR. RIOPELLE:  But he was kind enough to wait to

13  drop that crown until I got back last night.

14         THE COURT:  Well, the major issue we have to discuss

15  is the form of the verdict --

16         MR. FINKELSON:  And we're prepared to --

17         THE COURT:  -- on the damages side and that's

18  primarily Mr. Riopelle.

19         MR. FINKELSON:  And he is prepared to cover the

20  other issues as well.

21         THE COURT:  All right.  How much time -- we need a

22  little bit of a break.  Ten minutes?

23         MR. GOETTLE:  Sounds good.

24         THE COURT:  By the way, have you reached agreement

25  on the -- well, there are two things really, they're related:

89

1    the form of the verdict sheet, number one, and number two,

2    the jury charge on the form of the royalty.

3          MR. GOETTLE:  We will confer during this break, your

4    Honor.

5          THE COURT:  I said earlier today that I thought the

6    -- I don't know who authored the Sprint letter, I think there

7    was a woman in John Harkins' office --

8          MR. FINKELSON:  It was Ms. Simpson.

9          THE COURT:  -- it was very well done, very well

10   done, and I hope your contribution to the case results in an

11   agreement that would make it much easier for the Court, but

12   it was a very good job on short notice.

13         Now I'm looking at you, Mr. Hangley, I wonder if I

14   should balance the compliments.

15         (Laughter.)

16         THE COURT:  Three pages on what evidence goes out to

17   the jury, I think you did it very succinctly.  I now have

18   every single case in the world that deals with what goes out

19   to the jury.  Hopefully there will be agreement on that, but

20   more important agreement on the form of the verdict, verdict

21   sheet, and on the form of the royalty.

22         So it's -- do you have to do some discussing, I

23   think?  How much time do you want?

24         MR. RIOPELLE:  Can you give us, what, 15 minutes do

25   you think, guys?

1            THE COURT:  Sure.  And if you need more time, tell

2    Michael.

3            MR. FINKELSON:  Thank you, your Honor.

4            THE COURT:  We're in recess.

5            (Proceedings concluded at 4:29 o'clock p.m.)

```
 1                          INDEX
 2    WITNESSES                  D       C      RD      RC
 3    Sean Wilson by Videotape   3
 4    Christian Dippon
 5      By Mr. Riopelle          7
 6      By Mr. Heist                     42
 7    Evan Koch
 8      By Mr. Hangley          69              85
 9      By Mr. Finkelson                 77
10                              - - -
```

<u>CERTIFICATION</u>

    I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET        Date 2/14/17
Laws Transcription Service