```
                IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                             - - -


COMCAST CABLE COMMUNICATIONS, :  CIVIL ACTION NO. 12-0859
LLC, et al.,                  :
            Plaintiffs        :
                              :
         v.                   :  Philadelphia, Pennsylvania
                              :  February 14, 2017
SPRINT COMMUNICATIONS         :  4:52 o'clock p.m.
COMPANY L.P., et al.,         :
            Defendants        :
. . . . . . . . . . . . . . . :


                  EVENING SESSION - DAY ELEVEN
                BEFORE THE HONORABLE JAN E. DUBOIS
             SENIOR UNITED STATES DISTRICT COURT JUDGE


                             - - -


APPEARANCES:

For the Plaintiffs:      DANIEL J. GOETTLE, ESQUIRE
                         DALE M. HEIST, ESQUIRE
                         Baker & Hostetler, LLP
                         Cira Centre, 12th Floor
                         2929 Arch Street
                         Philadelphia, PA  19104-2891

                         WILLIAM T. HANGLEY, ESQUIRE
                         REBECCA SANTORO MELLEY, ESQUIRE
                         Hangley Aronchick Segal & Pudlin
                         One Logan Square, 27th Floor
                         Philadelphia, PA   19103

                         GEORGE MEDLOCK, ESQUIRE
                         Comcast Cable Communications
                         Chief Patent Counsel


               Laws Transcription Service
                 48 W. LaCrosse Avenue
                 Lansdowne, PA  19050
                    (610)623-4178
```

2

APPEARANCES: (Continued)

For the Defendants:        DAVID E. FINKELSON, ESQUIRE
                           BRIAN C. RIOPELLE, ESQUIRE
                           JUSTIN R. LOWERY, ESQUIRE
                           McGuire Woods, LLP
                           Gateway Plaza
                           800 East Canal Street
                           Richmond, VA  23219

                           COLLEEN H. SIMPSON, ESQUIRE
                           Harkins Cunningham, LLP
                           4000 Two Commerce Square
                           2001 Market Street
                           Philadelphia, PA  19103

                              - - -

Audio Operator:            Michael Cosgrove

Transcribed by:            Geraldine C. Laws, CET
                           Tracey Williams, CET
                           Paula Curran, CET

(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.

1          (The following occurred in open court at 4:52
2     o'clock p.m.)
3          THE COURT:  Be seated, everyone.  Where is -- oh,
4     Ian is here.  Okay, I have what I need.
5          I think we should -- uh-oh --
6          MR. RIOPELLE:  See what happens?
7          THE COURT:  No, I think I took some things into
8     chambers.
9          (Discussion held off the record.)
10          THE COURT:  I want to hear when you start the
11    argument on the motion -- we'll start with the motions and
12    then we'll get to the -- that issue on which I deferred,
13    about which you wrote, and then we'll address the charge.
14          MR. GOETTLE:  Do you want to wait for --
15          THE COURT:  I want to wait.
16          MR. GOETTLE:  Okay.
17          (Pause.)
18          THE COURT:  All right, we'll start with argument on
19    the Comcast motions.
20          MR. LESOVITZ:  Good afternoon, your Honor, my name
21    is Jeff Lesovitz and I'll be arguing the motion for judgment
22    as a matter of law for Comcast.  May I proceed?
23          THE COURT:  You may.
24          MR. LESOVITZ:  Comcast respectfully moves for
25    judgment as Sprint failed to prove by clear and convincing

4

1   evidence that Claims 1.7 and 1.13 are invalid for both

2   anticipation and obviousness.  And I'll start on anticipation

3   and then I'll talk about obviousness.

4          So as to anticipation, we believe that no reasonable

5   jury could have found that all the limitations of the

6   asserted claims were disclosed by Senara (ph), which is

7   DX-243, and that's the only prior art reference that Sprint

8   raised for anticipation.

9          Now, in order to prove anticipation, Sprint's expert

10  Dr. Polish was required to identify specific disclosures in

11  Senara that teach the limitations of the asserted claims and

12  that did not happen here.  And specifically the claim

13  limitations that were not addressed by Dr. Polish include,

14  it's really four limitations.  The first one is the

15  limitation in Claims 1, 7 and 113, which require that there

16  be an external messaging server that sends an inquiry and

17  receives a response message; the second is the internal

18  identifier limitation of the claims; the third is the

19  indicated "with the aid of claim" language in the final step

20  of the independent claims.

21         So as to each of these limitations Dr. Polish either

22  did not point to any part of Senara that discloses or the

23  parts of Senara that Dr. Polish did point to do not disclose

24  or mention the limitations at all and, in our view, no

25  reasonable jury could have come to any other conclusion.

1          Now, we also have an additional reason for no

2    anticipation with respect to Claims 7 and 113.  Those claims

3    require that the same element perform the receiving and

4    inquiry step and the same element also perform the

5    determining step.

6          Now, Dr. Polish effectively pointed to two different

7    elements in Senara as satisfying that additional limitation

8    in Claims 7 and 113.  He nonetheless tried to argue that one

9    element performed both steps, but he did so in a way that

10   would render the additional limitation in Claims 7 and 113

11   and meaningless, and that is wrong as a matter of law.

12         Now, your Honor, I can discuss each of these

13   limitations in further detail, if you'd like, but for each of

14   the limitations we think that no reasonable jury could find

15   that Senara discloses them and for that reason Comcast

16   requests judgment of no anticipation as a matter of law.

17         So unless you have any questions, your Honor, I can

18   move on to obviousness.

19         THE COURT:  I do not have any questions and why

20   don't you move on --

21         MR. LESOVITZ:  Okay.

22         THE COURT:  -- to obviousness.

23         MR. LESOVITZ:  Now, we also think that the Court

24   should render a judgment as a matter of law as to Sprint's

25   claim of obviousness.  Dr. Polish had two arguments as to why

6

1    claims 1, 7 and 113 were allegedly obvious, and I'll address

2    both of them.

3            THE COURT:  Go ahead.

4            MR. LESOVITZ:  The first is the combination of

5    Senara with the supposed knowledge of a person of ordinary

6    skill in the art and Dr. Polish opined that it would have

7    been obvious to add the inquiry functionality of something

8    called SMS-GMC -- SMS-GMSC into an SMSC because it was

9    supposedly known to do that in what Dr. Polish referred to as

10   GSM specs and standards; however, Dr. Polish didn't show the

11   jury any of those GSM specs or standards.  As a result, we

12   think there is an insufficient factual basis for Dr. Polish's

13   opinion.

14           Now, also in order for there to be obviousness Dr.

15   Polish was required to set forth a reason or a motivation to

16   combine the prior art with Senara.  So he was required to

17   show some reason why you would take what he claims to have

18   been known in the prior art to a person of ordinary skill and

19   add that to Senara, he did not do that.  So, you know, the

20   only thing he really said was that it was known to add

21   inquiry functionality into an SMSC.  However, just because

22   it's known does not mean that there would be some motivation

23   or reason to make the combination.

24           THE COURT:  Does my charge require a motivation or a

25   reason or just that it be known?

7

1          MR. LESOVITZ:  I believe it requires a reason.  I
2     don't have the charge in front of me --
3          THE COURT:  I do.
4          (Pause.)
5          MR. LESOVITZ:  Your Honor, my colleagues have given
6     me a copy of the charge and it's on page 27.
7          THE COURT:  I'm there.
8          MR. LESOVITZ:  And it's the fourth paragraph down
9     where it says, "In considering whether a claimed invention is
10    obvious you may, but are not required, to find obviousness if
11    you find that at the time of the claimed invention there was
12    a reason that would have prompted a person of ordinary skill
13    to combine the known elements in the same way the claimed
14    invention does."  So you have to show some reason or
15    motivation to combine the elements.
16         THE COURT:  Fine.  You may proceed.
17         MR. LESOVITZ:  So that's with respect to Dr.
18    Polish's first argument for obviousness and we think there's
19    two separate reasons why he did not prove or establish
20    obviousness as a matter of law and those are the two reasons
21    I just gave.
22         Now, the second argument that Dr. Polish makes in
23    terms of obviousness is that he says that Senara combined
24    with a reference called Viaresto, and that's -- I believe
25    it's DX-242, that would render the claims obvious.  And

1   according to Dr. Polish, he said that it would have been

2   obvious to add the supposed mapping step and external

3   messaging server in Viaresto to Senara.

4         Now, we think that judgment as a matter of law is

5   warranted with respect to this argument for three different

6   reasons.

7         First of all, the parts of Viaresto, DX-242, that

8   Dr. Polish actually cites to try and show that it discloses

9   mapping and an external messaging server do not actually

10  disclose that limitation at all under any reasonable

11  interpretation.  And I can walk you through that, if you'd

12  like.  It might take a while, but I could certainly do that.

13        THE COURT:  Well, then we won't do it.

14        MR. LESOVITZ:  Okay.

15        (Laughter.)

16        MR. LESOVITZ:  So that's reason number one why the

17  second obviousness argument fails as a matter of law.

18        Now, the second reason is, even if there was

19  disclosure in Viaresto, Dr. Polish didn't explain how the

20  disclosures in Viaresto would be combined in a way with

21  Senara to arrive at the asserted claims, which is another

22  requirement in order to prove obviousness as a matter of law.

23  So that's the second reason.

24        The third reason is that again Dr. Polish did not

25  provide any motivation or reason as to why someone would add

1    the portions of Viaresto that he cites to Senara.

2          So there are three reasons why the obviousness

3    analysis is wrong as a matter of law.

4          Now, there's also an additional reason the Court

5    should render judgment as a matter of law for no obviousness

6    and that's because even if you were to combine the prior art

7    in the way that Dr. Polish suggests that you could do, the

8    prior art would still not disclose all of the claim

9    limitations of any of the asserted claims, namely the

10   limitations that I referenced with respect to Dr. Polish's

11   anticipation argument.

12          So for these reasons we ask that the Court grant

13   Comcast's motion for judgment as a matter of law as to

14   Sprint's anticipation and obviousness claims.  That's all I

15   have, your Honor.

16          THE COURT:  Thank you very much.

17          Yes, go ahead.

18          MR. LOWERY:  Yes, your Honor.  Would you like me to

19   approach the podium?

20          THE COURT:  Yes, I'd like you to argue from the

21   lectern.

22          MR. LOWERY:  Thank you, your Honor.  Justin Lowery

23   arguing on behalf of Sprint.

24          With respect to -- Sprint would obviously oppose

25   Comcast's motion for judgment as a matter of law with respect

1    to Dr. Polish's invalidity positions on 102 and 103.  With

2    respect to Section 102 in the Senara reference, Dr. Polish

3    walked through each and every limitation of the Claims 1, 7

4    and 113 and how they are disclosed in Senara, as well as how

5    the Court's claim constructions were applied, and showed with

6    specificity where those different elements were taught in

7    Senara, including a checklist of each of these elements that

8    has been taught and showing each of the steps and walking

9    through.  That is both for the limitations that Mr. Lesovitz

10   identified with respect to Claim 1, as well as the

11   limitations he identified with respect to Claims 7 and 113.

12          And if your Honor has any specific questions about

13   the limitations --

14          THE COURT:  Well, he mentioned no reference to an

15   external -- or no opinion with respect to an external message

16   server, that's the first, and no opinion with respect to an

17   internal identifier.  He mentioned a shortcoming with

18   reference to the, quote, "with the aid of," I think that's in

19   step four --

20          MR. LOWERY:  Yes, your Honor.

21          THE COURT:  -- of Claim 1.  And with respect to

22   Claims 7 and 113, he stated that the same element requires

23   both inquiring and responding, and he did not address that

24   issue.

25          I think I have barely capsuled what was argued, but

1  in any event why don't you briefly respond.

2          MR. LOWERY:  Yes.

3          THE COURT:  And if you're going to refer to the

4  slides, I started looking at them.  And I also wanted to go

5  back to Rule 50 to see what it says about reserving.

6          (Pause.)

7          MR. FINKELSON:  Your Honor, I have one copy --

8          THE COURT:  I'm sure I have a copy.  I think I --

9  yes, I have it.

10          (Pause.)

11          THE COURT:  You may proceed.

12          MR. LOWERY:  Yes, your Honor.  So with respect to

13  the external messaging server limitation, Dr. Polish

14  identified within Senara that it discloses an SMSC --

15          THE COURT:  Which slide?  Or no slide?

16          MR. LOWERY:  No, with respect to starting on slide,

17  I believe, 22 is where he lays out his overall opinions with

18  respect to the system in Senara.  He's identified the

19  messaging server there at the top, as well as the cellular

20  network elements there in gray at the bottom.

21          THE COURT:  All right.  You may proceed.

22          MR. LOWERY:  And as he indicated there and as Dr.

23  Akl did with respect to infringement, he drew a box around

24  these elements indicating they together would form the

25  messaging server, performing the two functions that are

1    required by the Court's construction of store and forward and

2    inquiry.  And then as is laid in Figure 1 and then in more

3    details he walked through for Figure 2 each of the steps as

4    disclosed, in particular the messaging server sends an

5    inquiry down, which is step one there in green, and gets a

6    response message back, which is shown there in the orange.

7              THE COURT:  Step four.  And that covers the external

8    message server issue.  The internal -- what is the internal

9    identifier?

10             MR. LOWERY:  So the internal identifier appears in a

11   couple places in his presentation.  The first place the

12   internal identifier occurs I think in some detail is in slide

13   27.  There he talks about a query using an MSISDN and a

14   result of a new MSISDN going back, talking about how that

15   meets the limitation of mapping a first identifier to a

16   specific second identifier.

17             And in slide 33 he specifically addressed as kind of

18   a group all of the identifier limitations to talk in more

19   detail about how a specific external identifier, a specific

20   internal identifier and that with the aid of the first

21   identifier limitation are all in that.

22             (Pause.)

23             THE COURT:  And the first identifier shown in box 4

24   on slide 33 is shown where on slide 22?

25             MR. LOWERY:  It's not shown on slide 22.  22 is just

1    a figure of the overall system.  The call flow that's listed

2    on slides 23 through 32 list out the steps in detail and I

3    believe, your Honor, if you look at slide 32, that shows each

4    of the specific steps of Claim 1 and how Dr. Polish

5    corresponded them to the call flow shown in Senara.

6            THE COURT:  All right.  Briefly run me through the

7    Sprint argument on obviousness.

8            MR. LOWERY:  So with respect to obvious -- I know

9    Mr. Lesovitz addressed Claims 7 and 113 and I'll just note

10   that those are also covered later in Dr. Polish's

11   presentation with respect to the service node performing both

12   those steps, just to make sure we've responded there.

13           In terms of obviousness, Dr. Polish walked through

14   the standard on obviousness.  He talked about what a person

15   of ordinary skill would know in terms of databases and in

16   terms of the background in technology of telecommunications,

17   that they would have a degree in some sort of computer field,

18   as well as two years of experience in telecommunications.

19           He then stated his opinion that in addition to what

20   Senara teaches, that that additional knowledge, background

21   knowledge of a person of ordinary in terms of databases or

22   messaging in terms of telecommunications, would render the

23   claims obvious to the extent they are not already anticipated

24   by Senara.  His opinion of course is that they are

25   anticipated, but if there anything the Dr. Akl example would

14

1  dispute, he would say they would be obvious or within the
2  knowledge of one of ordinary skill.
3        THE COURT:  What did Dr. Polish say, if anything, on
4  the reason why a person of ordinary skill in the art would
5  compare Senara and Viaresto?
6        MR. LOWERY:  In terms of the combination of Senara
7  and Viaresto, he talked about how they are dealing with the
8  same sort of problem:  they are both in GSM networks and they
9  are both about routing messages in terms of where they would
10  go, in particular messaging servers querying the network in
11  order to route messages.  So given that they are dealing with
12  the same problem, one of ordinary skill would combine them in
13  the manner that he laid forth.
14        THE COURT:  And your reason for that is the fact
15  that they're dealing with the same problems in the same
16  business?
17        MR. LOWERY:  Yes, your Honor.
18        THE COURT:  All right.  Is there anything else you
19  wish to state?
20        MR. LOWERY:  No, your Honor, unless you have any
21  other questions.
22        THE COURT:  No, I don't, I don't.
23        Do you wish to respond?  I don't really --
24        MR. LESOVITZ:  I know we're running out --
25        THE COURT:  -- need a response.

1        MR. LESOVITZ:  -- of time, but if you'd like me to,

2   I would be happy to.

3        THE COURT:  I'm looking at Rule 50, 50(b).  How does

4   Comcast want to handle this?  It looks like I can -- I just

5   haven't looked at Rule 50(b) in a while.  If I do not grant a

6   motion for judgment as a matter of law, and that would

7   include not ruling on it or denying it, I think, "The court

8   is considered to have submitted the action to the jury

9   subject to the court's later deciding the legal questions

10  raised by the motion, unless they are mooted by the jury

11  verdict."

12       Is it your understanding -- I've got a lot of people

13  on their feet --

14       (Laughter.)

15       MR. LOWERY:  So my colleague was just noting, I

16  think they're likely making a 50(a) motion before -- I don't

17  know if that affects with what you were asking Comcast's

18  counsel.

19       THE COURT:  That's what I'm -- it is a motion under

20  Rule 50(a), but 50(b) says -- it's not like 60 -- 50(b) says,

21  if the court does not grant a motion for judgment as a matter

22  of law made under Rule 50(a), that's what I'm talking about.

23       MR. LOWERY:  Oh, my apologies, your Honor.  We were

24  just making sure we knew which motion was being asserted.

25       THE COURT:  Well, I think it's -- well, I think the

1    rule covers one motion, we'll start there.  This is what

2    happens when a damages expert starts arguing matters

3    involving liability on St. Valentine's Day.

4            (Laughter.)

5            THE COURT:  If I deny the motion, Rule 60(b) doesn't

6    -- or 50(b) doesn't make much sense.  It seems to read that

7    if I do not grant the motion, "the court is considered to

8    have submitted the action to the jury subject to the court's

9    later deciding the legal questions," is that what Comcast

10   seeks, either a grant of the motion -- and I'm not going to

11   grant the motion, I'm going to let the case go to the jury,

12   but what's the difference legally if I deny the motion, is it

13   considered denied subject to submission of the case to the

14   jury and Comcast's right to later ask me to address the legal

15   questions raised by the motion?  I think the answer to that

16   is yes.

17           MR. LESOVITZ:  That's our understanding as well.

18   Obviously, Comcast would prefer that you --

19           THE COURT:  Grant the motion.

20           MR. LESOVITZ:  -- grant the motion now; however, I

21   believe that that is right, we have the opportunity to renew

22   the motion.

23           THE COURT:  Whether I rule on it or deny it, you

24   then have an opportunity to come back.

25           MR. LESOVITZ:  Yes, that's correct.  What we don't

1    want to happen is Sprint to put on their rebuttal case and

2    fill in all the gaps that they left in their case in chief.

3    I don't think -- I think, you know, the record is what it is

4    right now and I think the decision should be based on the

5    current record.  But in terms of renewing the motion, we are

6    I believe entitled to do that after the case --

7           THE COURT:  That's a very interesting issue.  I

8    really hadn't considered that, but I'm going to deny the

9    motion subject to your right to proceed under Rule 50(b).

10   I'm going to submit the case to the jury.  Some of the issues

11   might be mooted, some might not, and we'll see what happens

12   after the jury verdict.

13          It was very well argued.  I don't think you should

14   judge your advocacy skills by your success rate before me.

15   The experienced attorneys in the group have allowed the

16   younger attorneys in the group to argue these motions

17   knowing, knowing that very, very, very -- that's three verys

18   -- rarely are they granted.

19          MR. LOWERY:  That's not what he told me.  He said I

20   should have won the --

21          (Laughter.)

22          THE COURT:  Well, this time you didn't want the

23   motion granted.

24          (Laughter.)

25          THE COURT:  No, it was the last motion that you

1    wanted --

2              MR. LOWERY:  That's right.

3              MR. LESOVITZ:  You know, I think I'm 0-for-2 in

4    front of you.

5              THE COURT:  Well, you're getting a lot of experience

6    and I don't know how many young men your ages have been

7    through a patent case from start to finish.  Now, in your law

8    firms maybe you do that, but if this is your first, we share

9    that.

10             (Laughter.)

11             THE COURT:  I haven't tried a patent case before,

12   but I'm finding it very interesting.  I still need someone

13   adept at technology.  I keep going back to the technical

14   adviser -- that was a good idea -- at times in the case when

15   I really thought that was necessary, I didn't deem it

16   necessary now.  But the motion is denied.

17             All right, let's turn to the Hangley letter.  I

18   don't think there's anything controversial in the Hangley

19   letter and he points out to -- points out a spot in the

20   transcript where we addressed it, and I said what I think and

21   my view hasn't changed.  I think the slide decks are going to

22   -- the slide decks, that's what I'm talking about; that's

23   what the Hangley letter is about.  It seems to me as though

24   there's an agreement.  So it doesn't have to be argued from

25   Comcast's perspective, I have the Hangley letter.

1          Mr. Riopelle --

2          MR. RIOPELLE:  Yes, your Honor.

3          THE COURT:  -- what is your position?  Do you agree?

4          MR. RIOPELLE:  Our preference would be that no slide

5   decks go back.  However, we understand that the Court is

6   leaning towards sending the slide decks back because the

7   Court thinks that they would be helpful to the jury.  So we

8   would agree that if everybody's slide decks went back then

9   that would be --

10         THE COURT:  Well, that's good and they will go back,

11  and I'll tell you why I differentiate.  At one point I said

12  this is analogous --

13         MR. RIOPELLE:  And we will have one caveat on that,

14  there will be one caveat on that, because one of the things

15  you are going to see is that one of the issues we have are

16  slides in which attorneys have written notes on, okay?  So

17  that's a separate category.  But one of the things that

18  Comcast is trying to do is they are taking some of those and

19  they are incorporating them into Dr. Akl's slide deck, which

20  will be presented tomorrow.  So we think they're trying to

21  get around the categorization of that.

22         So we do not believe that any of the slides which

23  Mr. Goettle wrote, handwrote, and then they put into the Akl

24  deck for tomorrow, we don't think those slides should go

25  back.

1          MR. GOETTLE:  Certainly that's an issue that the

2     Court needs to address, but any notion that that was some

3     sort of underhanded sneakiness is not true.  Dr. Akl is going

4     to use those slides to explain to the jury where there is an

5     issue between the experts; it's very helpful to see that.

6     They weren't put in the slide deck with the hope that now

7     they're going to be able to go back because they're part of a

8     slide deck.  So this is an issue, I know Sprint has this

9     issue on my handwriting on exhibits, that needs to get

10    addressed.  And if the Court decides that they can't go back,

11    then certainly we would have to pull those slides from his

12    decks.

13          THE COURT:  Let me read my notes on that.  We've

14    agreed on that -- well, maybe we haven't.  I'm looking at my

15    notes on admissibility of evidence.  I know I took the issue

16    of the use of slide decks under advisement and I ruled on

17    impeachment evidence such as deposition testimony does not go

18    -- is not separately received in evidence and -- or admitted

19    in evidence, does not go out with the jury, with the

20    exception of Mr. Marcus' 30(b)(6) deposition which was

21    received, but not received in evidence.  It was identified

22    solely for the purpose of having a record of what was said in

23    that video excerpt.

24          But, Ian, do you have my memo?

25          THE LAW CLERK:  Yes.

21

1          THE COURT:  Item number one, I don't think I ruled,

2     did I?  Well, wait a minute, I did.  This is what I said,

3     this is what I said on February 10th, Friday, after we

4     excused the jury.  "Exhibits drawn by lawyers in opening

5     statements, closing arguments, cross-examination shall be

6     marked as exhibits, but not received in evidence.  They will

7     not be provided to the jury unless requested by the jury.  In

8     that event, Comcast thinks the exhibits should be shown to

9     the jury; Sprint disagrees."

10          That doesn't cover the expert witnesses' writing on

11     the slide decks, and I gather Comcast favors it and Sprint

12     does not -- I said slide decks, I misspoke.  These

13     statements, they might have been written on the slide decks,

14     the might have been written on other things.  In Goettle's

15     case -- well, they wouldn't go out, lawyers' notes would not

16     go out.

17          MR. HANGLEY:  I think we agreed that something made

18     in an opening statement or a closing statement solely for the

19     opening statement or the closing statement, scribbling during

20     an opening, should not go in except with the consent of both

21     sides.

22          I think where the issue comes up, your Honor, is

23     with respect to those four or five documents in which Mr.

24     Goettle, with the guidance of a witness on cross-examination,

25     as it turns out, took the drawing on which that witness

22

1   relied and marked it in ways -- for example, he said is this

2   inside or outside the core and, if Lanning said it's outside,

3   then would draw a circle around it and write "outside."

4           Now, that is perfectly good illustration of what the

5   witness said and my suggestion on that, and I think we gave

6   you some cases on it in my letter, is that sort of thing can

7   go to the jury in the Court's discretion, because this is all

8   in the Court's discretion, can -- but you don't get reversed,

9   which is something you talked about on Friday -- can go to

10  the jury in the Court's discretion so long as it made clear

11  that the Goettle drawing or the Goettle markup of the Lanning

12  drawing is not substantive, but demonstrative evidence.  You

13  need the cautionary instruction on that, your Honor, you've

14  already got it in the prepared jury instructions.  And what I

15  suggested was that perhaps we might tweak it a little more to

16  make that more abundantly clear.  And that's the -- where

17  you're talking about my busting the margins, I don't know why

18  we stretched the margins so low since I left half an empty

19  page on page 4, but the language I suggested is these

20  illustrations called demonstrative exhibits have been

21  admitted only as demonstrative evidence and are not

22  substantive evidence, blah, blah, blah.

23          THE COURT:  Well, I'm aware of the balancing test

24  you use for demonstrative evidence, but I don't see -- I

25  thought this was limited to -- I hadn't really thought about

23

1    this letter as covering anything other than the slide

2    presentations published to the jury and I don't see anything

3    in here that focuses on taking slides and using them in

4    cross-examination, because that's offered in many cases for

5    impeachment purposes and that evidence is out.

6         The depositions would be helpful to the jury as

7    well, depositions used only in cross-examination, and they're

8    not going out.  And other evidence used just in cross-

9    examination not going out, not received in evidence.  The

10   question and answer at the deposition is the evidence in the

11   case.  And why isn't that --

12        MR. HANGLEY:  Although the evidence here -- let's

13   take an impeachment situation, what is evidence that is

14   substantive evidence is the witness' answer once he's

15   impeached, correct?  You're asked a question on impeachment,

16   you as the witness answer the question, that's substantive

17   evidence in the case.

18        THE COURT:  Well, that depends on how you handle it.

19   Is that what you said at the deposition?  Yes.  That doesn't

20   go out.

21        MR. HANGLEY:  Correct, correct, and that's true

22   today.  Yes, that does.

23        THE COURT:  I don't know how many times that was

24   done and it's certainly -- well, I get your point.

25        I'll hear from Sprint on why that should not be

24

1    allowed and then I'll rule.

2             MR. RIOPELLE:  I agree that it is in the Court's

3    discretion.  I will say -- I will read from the transcript on

4    Friday.  I actually think you've already ruled on the

5    attorney kind of notes, for example Mr. Goettle.  And I'm

6    reading -- I don't know if you have the transcript from

7    Friday, is that what you're looking for?

8             THE COURT:  I do.  What page?

9             MR. RIOPELLE:  I believe it's at -- it's the p.m.

10   transcript at page 15, starting at line 20.

11            THE COURT:  Do I have -- I do, I have the --

12            (Pause.)

13            THE COURT:  Again the page number?

14            MR. RIOPELLE:  I have page 15.

15            THE COURT:  Line 20.

16            MR. RIOPELLE:  And it goes over to 16, line 3.  And

17   I can read it into the record or --

18            THE COURT:  I have it.

19            MR. HANGLEY:  15, line what?

20            MR. RIOPELLE:  20.

21            MR. HANGLEY:  Well, it begins with, "I think that's

22   what I'm going to do."  That doesn't sound like a ruling.

23            MR. RIOPELLE:  Now he's telling you what you're

24   thinking.

25            (Laughter.)

1        THE COURT:  "My compromise" -- this is Goettle

2   talking -- "was, all right, none of it will go back and if

3   the jury asks for it, they should be made known they can ask

4   for whatever they want and, if they ask for it, they should

5   be provided it."

6        And the Court:  "I think that's what I'm going to

7   do, because although the handwritten notes by Mr. Goettle as

8   the expert testified" -- I guess it was Lanning and Polish

9   testified -- "standing alone without the testimony -- I mean,

10  they're circles, they don't really -- they're not self-

11  explanatory."

12       Hangley:  "No."

13       The Court:  -- "they raise a lot of issues.  So I

14  think that we'll do is not allow those to go out, unless the

15  jury asks for them and then we'll discuss the issues again."

16       MR. RIOPELLE:  And I would also refer the Court to

17  page 9 on Friday's test -- sorry, Friday's p.m. transcript,

18  page 9, line 1 through 3, where I believe that Comcast

19  actually agreed that they wouldn't go back.

20       MR. HANGLEY:  Your Honor, this was only Friday, I

21  still remember it -- come back tomorrow when I may have

22  forgotten it already, but I remember this conversation.  I

23  remember frankly, and you remarked on it, that Dan Goettle

24  and I were having a slight disagreement as to whether or not

25  this stuff could go back to the jury --

26

```
 1              THE COURT:  I remember --

 2              MR. HANGLEY:  Okay.

 3              MR. GOETTLE:  And I always do what Mr. Hangley says.

 4              THE COURT:  -- Hangley, the obstructionist,

 5   disagreed.

 6              (Laughter.)

 7              MR. HANGLEY:  Pardon me?

 8              THE COURT:  Hangley, the obstructionist --

 9              MR. HANGLEY:  Hangley --

10              THE COURT:  -- disagreed --

11              MR. HANGLEY:  -- the troublemaker.

12              THE COURT:  -- with what his colleague Mr. Goettle

13   said.

14              MR. HANGLEY:  But you will also recall I think that

15   at the beginning of the colloquy there we had the agreement

16   of Sprint that all of these things should go back with the

17   jury.  Then your Honor asked --

18              THE COURT:  I don't remember that.

19              MR. HANGLEY:  -- particular questions.

20              THE COURT:  No, I don't --

21              MR. HANGLEY:  I don't know what Mr. Finkelson said.

22              MR. RIOPELLE:  No.

23              MR. HANGLEY:  Yes.

24              MR. RIOPELLE:  Mr. Finkelson's position was, if some

25   of it went back, all of it should go back, but would prefer
```

1    none of it go back.

2         THE COURT:  Well, he said none would go back --

3         MR. RIOPELLE:  Yes.

4         THE COURT:  -- and then we talked -- well, we don't

5    have to go back to each and every reference in the

6    transcript.  I don't think the handwritten notes in cross-

7    examination used for impeachment purposes should go back,

8    unless the jury asks for them and then I'll address that

9    issue.

10        MR. HANGLEY:  Okay.  And just to be clear, there's

11   no impediment to using them during closing argument?

12        THE COURT:  Absolutely, they can be used during

13   closing arguments.  Okay.

14        MR. RIOPELLE:  So I guess the one other -- the one

15   clarification then, your Honor, is that to the extent that

16   Comcast has incorporated any of the attorneys' handwritten

17   notes into Dr. Akl's slide deck tomorrow, obviously if they

18   want to use them with Dr. Akl that is fine, but they should

19   not be included in the slide deck that goes back to the jury.

20        THE COURT:  That is correct.

21        MR. RIOPELLE:  Thank you.

22        THE COURT:  All right.

23        MR. HANGLEY:  Judge, did you rule on that?

24        THE COURT:  Yes.

25        MR. HANGLEY:  Was there an "I think" attached?

1          THE COURT:  No.

2          (Laughter.)

3          THE COURT:  No.  Those exhibits, demonstrative

4  exhibits drawn by the lawyer, including your associate, your

5  colleague Mr. Goettle, will not go back to the jury, with the

6  jury, unless the jury asks for them and then we'll address

7  that issue anew.  We'll see what they have to say.

8          All right.  Now we're going to turn to the charge.

9  And I think what we'll do is quickly go over, it won't take

10  us very long, the issues that we've already addressed and the

11  changes that I made in the charge as submitted to you.  And

12  if there's anything that occurs to you as we go through the

13  charge that I haven't flagged, I want to hear about it.

14          I had no changes -- and I'm looking at the charge

15  dated February 13th -- the first changes I made were on page

16  11.  I deleted the unnecessary Sprint companies and clarified

17  numbered paragraph 4, that's a stipulation and we covered

18  that language.  And I streamlined paragraph 6 of the

19  stipulations, I don't think there are any issues.

20          I added a word in the use of deposition testimony in

21  the third paragraph.  Someone suggested that we state,

22  "Deposition testimony is entitled to the same consideration,"

23  and we added the words "as testimony presented by a live

24  witness."

25          And then we covered impeachment.  I think that was

1    covered in the Harkins letter, the February 10th letter, and

2    I don't think -- or February 13th letter, and I don't think

3    there was any objection to that.

4         MR. HOFFMAN:  No objection, your Honor.

5         THE COURT:  So that will -- and I think that

6    adequately covers the issue.

7         Demonstrative exhibits, there was agreement on that

8    charge and I think it clearly states the law.

9         The use of notes, I broke that charge into two

10   paragraphs.

11        Minor changes on page 16 in summary of contentions

12   in the last paragraph, they were just grammatical.  Page 17,

13   I changed "the law says" to "the law provides."

14        Then there were no changes until -- well, before we

15   get there, the definition of prior art, the subject of your

16   -- I think it's a verbatim -- I know it is a verbatim copy of

17   your joint instruction.

18        MR. RIOPELLE:  Are you on page 25, your Honor?

19        THE COURT:  Yes.

20        MR. RIOPELLE:  Yeah, I don't think there's any issue

21   there.

22        THE COURT:  I think that's fine.

23        Anticipation, some minor changes.  Go to page 26 in

24   the second paragraph, reference to "because the claimed

25   inventions are," there's only one invention, so I changed

1   that to "invention is."

2           MR. RIOPELLE:  Actually --

3           MR. HOFFMAN:  No, actually, your Honor --

4           THE COURT:  Pardon me?

5           MR. RIOPELLE:  Unfortunately, under the patent law

6   each -- technically, each claim --

7           THE COURT:  A claim is an invention?

8           MR. RIOPELLE:  -- is deemed a separate invention.

9           THE COURT:  That must be right because you both were

10  on your feet in unison.

11          (Laughter.)

12          MR. RIOPELLE:  I would be happy to just say claimed

13  invention is anticipated, but I think technically under the

14  law it should --

15          THE COURT:  Well, then maybe what we should say,

16  because the claimed inventions, in this case Claims 1, 7 and

17  113 --

18          MR. RIOPELLE:  You could say because each of the

19  claimed --

20          THE COURT:  All right, because -- well, yes.  So

21  we'll change it to because each of the claimed inventions,

22  dash, Claims 1, 7 and 113, dash, are anticipated.

23          MR. RIOPELLE:  I think it would be each is.

24          (Laughter.)

25          MR. RIOPELLE:  Somebody back here said that, I'm not

1    sure who it was.

2          THE COURT:  Who said that?

3          MR. RIOPELLE:  I don't know.

4          THE COURT:  You're absolutely correct.

5          MR. RIOPELLE:  That's okay, it's only because my

6    wife is a grammar Nazi.

7          THE COURT:  And that's made clear, I didn't focus on

8    this, by the next paragraph.  "The claimed inventions of the

9    '870 Patent, Claims 1, 7 and 113, are not new."  I'm going to

10   add -- take the word -- the next-to-last paragraph and add it

11   to the third paragraph.  And I'm going to delete the very

12   last paragraph because we don't have inherent anticipation,

13   we deleted that as an issue.

14         MR. RIOPELLE:  So I'm not -- I guess I'm not sure.

15   I understand that the inherent instruction has been removed,

16   I currently have three paragraphs on page 26 --

17         THE COURT:  One, two, three --

18         MR. RIOPELLE:  I know.

19         THE COURT:  Where does the sentence, "anticipation

20   must be determined on a claim-by-claim basis," where is that?

21         MR. RIOPELLE:  On the version I have that is the

22   last sentence of the third paragraph.

23         THE COURT:  Of the third paragraph.  There was a

24   fourth paragraph that read, "You must keep these requirements

25   in mind and apply them to each kind of anticipation you

32

1    consider in the case."  I thought that applied to inherent

2    anticipation and took it out.

3           MR. RIOPELLE:  It does.

4           MR. HOFFMAN:  We agree, your Honor.

5           MR. RIOPELLE:  You agree, okay.

6           THE COURT:  So you have the version, your version is

7    the way I plan to charge.

8           Next, obviousness, there was an issue.  Sprint asked

9    for reconsideration with respect to its recommended

10   additional last paragraph, "The higher the level of ordinary

11   skill, the easier it may be to establish that an invention

12   would have been obvious."  I'm not going to charge -- I'm not

13   going to reconsider, I'm not going to charge on that.

14          MR. RIOPELLE:  And I believe you said this on

15   Friday, but I was not here, I should object to that at the

16   time --

17          THE COURT:  Yes.

18          MR. RIOPELLE:  -- after the jury instructions are

19   read --

20          THE COURT:  Yes.

21          MR. RIOPELLE:  -- and before the jury goes out?

22          THE COURT:  Again, what we're doing now is trying to

23   construct a charge that will be error-free.  I can tell you

24   that in 28 years I have never been reversed on a charge.  I

25   can also tell you that I've been reversed on other things.  A

1 | judge who doesn't get reversed is not really doing his job,

2 | so I've been told.

3 | (Laughter.)

4 | THE COURT:  But the bottom line, to preserve an

5 | objection, we'll hear whatever you have to say up until the

6 | time I deliver the charge.  I'll deliver the charge, we'll go

7 | to sidebar and you'll put any objections on the record.

8 | MR. RIOPELLE:  Thank you.

9 | THE COURT:  Next is page 34.  There was a paragraph

10 | and I don't think I have the revised page, but Sprint has

11 | asked the Court to include two of the three sentences that

12 | were originally in the instruction and are not in -- Ian,

13 | correct?  I don't have that page.  They're not in --

14 | THE LAW CLERK:  Reasonable royalty definition is the

15 | instruction --

16 | THE COURT:  Are they in -- I have that, but are the

17 | two sentences that Sprint wants in?

18 | MR. RIOPELLE:  Yes, your Honor, I believe they are

19 | at the bottom of page 33.

20 | THE COURT:  Okay, they're not -- and they read, "The

21 | reasonable royalty award must be based on the incremental

22 | value that the patented method adds to the overall process.

23 | When the accused methods have both patented and un-patented

24 | features, measuring this value requires a determination of

25 | the value added by the patented method."

34

1          I think that Comcast objected to those two sentences

2    and to a third sentence that is not in the charge.  I think

3    although it might be slightly repetitive of the Georgia-

4    Pacific factors, it will help the jury, and so we're going to

5    leave it in -- well, we're not -- we're going to put it back

6    in, it's as you have it.

7          Reasonable royalty relevant factors.  You were going

8    to try to streamline that, streamline that even further.

9    Where are you on that?

10         MR. HOFFMAN:  Your Honor, I think we were a little

11   too soon, because the damages case is not finished.  We still

12   have Ms. Riley and potentially Mr. Webber coming back.  So --

13         THE COURT:  I think you know where you're going --

14         MR. HOFFMAN:  I think we know where we're going, but

15   -- and we will work and I think the -- I'm pleased to

16   announce, I think at least for the next big issue about form

17   of reasonable royalty the parties have come to an agreement.

18   So just that's the preview.  So I assume on the Georgia-

19   Pacific factors we'll also come to some sort of agreement.

20         THE COURT:  Well, I'm not so concerned about the

21   Georgia-Pacific factors because of the nature of that part of

22   the charge, I am concerned about the reasonable royalty.  So

23   we'll leave you, well, a get-out-of-jail-free card on

24   Georgia-Pacific factors, you can come back on that.

25         MR. HOFFMAN:  Thank you, your Honor.

1          THE COURT:  I have no problem with charging on all

2    of them if you believe -- well, they're not all of them, I

3    think there are a total of 15 and you've deleted one.

4          MR. RIOPELLE:  We deleted one.

5          THE COURT:  Yes.  I have no problem with keeping

6    them all in, but I don't want the jury fussing or struggling

7    with things that are not in the case.  So keep that in mind.

8          Now the form of the reasonable royalty.  Ian, I'm

9    looking for your memo.

10          (Discussion held off the record.)

11          THE COURT:  All right, form of reasonable royalty.

12          MR. HOFFMAN:  Your Honor, if I could make reference

13    to Mr. Hangley's February 13th, 2017 letter as a reference

14    point for what the form of reasonable royalty -- or actually

15    I think we'll have a separate title is on that -- from the

16    letter, I believe, that begins at the bottom --

17          THE COURT:  I have it.

18          MR. HOFFMAN:  -- it begins at the bottom of page 2.

19          THE COURT:  Yes, I have it.

20          MR. HOFFMAN:  I think the parties have come to an

21    agreement as to the text for it.  So you've got calculation

22    of reasonable royalty and you've got the first paragraph.

23    "The reasonable royalty can be calculated in different ways

24    and it is for you to determine which way is the most

25    appropriate based on the evidence you have heard."

1          We have agreement with respect to the second

2    paragraph with respect to ongoing royalty.  The change the

3    parties have agreed on is to delete the last sentence, the

4    one that says, "The total sum of an ongoing royalty may be

5    calculated through September 30th, 2016."  And so we would

6    agree to put a red line through that last sentence.

7          With respect to the third paragraph, we're going to

8    adopt it in full with the exception of deleting the words

9    "which is April 19th, 2023," which is at the end of the

10   second sentence.  And so we would delete those words.  And

11   then we would add one --

12          THE COURT:  Okay.

13          MR. HOFFMAN:  Okay.  And then we would add --

14          THE COURT:  The third paragraph delete "which is" --

15          MR. HOFFMAN:  "April 19th, 2023."  And we would add

16   one final sentence to that paragraph.

17          THE COURT:  Okay, third paragraph delete which is --

18          MR. HOFFMAN:  Wait, April 19, 2023 and we would add

19   one final sentence to that paragraph.

20          THE COURT:  Let me ... okay.

21          MR. HOFFMAN:  And we would be happy to send an

22   e-mail of the finished construction, that may be easier from

23   the Court's perspective if I were to write this all down or

24   for Ian.  How about that, we could do that as soon as we get

25   back tonight.

1          THE COURT:  Well, I don't want to keep everyone from

2    their St. Valentine's Day festivities.  I gather we have a

3    lot of bachelors in the room.  Men and women who are

4    separated from their families.

5          You're giving me the last sentence --

6          MR. HOFFMAN:  The last sentence --

7          THE COURT:  -- of the third paragraph.

8          MR. HOFFMAN:  -- correct.  So, when a one-time lump

9    sum is paid,--

10          THE COURT:  Yes.

11          MR. HOFFMAN:  -- the infringer pays a single price

12    covering both core lists for a license, covering both past

13    and future infringing sales.  Is that right?  Yes.

14          THE COURT:  Covering both past and future infringing

15    --

16          MR. HOFFMAN:  Infringing sales.  So, this entire

17    instruction, I think it's titled Calculation of Reasonable

18    Royalties and would be in place of the parties competing

19    instruction.  So, that may improve this.

20          THE COURT:  I'm reading that whole -- that entire

21    last paragraph.

22          MR. HOFFMAN:  Oh, and there's the last paragraph

23    which is, it is up to you, based on the evidence, to decide

24    the appropriate method for calculating a reasonable royalty.

25          THE COURT:  The last sentence in the third

1    paragraph, did I miss something?  When the one-time lump sum
2    is paid, the infringer pays a single price for a license
3    covering both past infringement and sales.  Should it read
4    past and future?
5            MR. HOFFMAN:  So, past and future infringing sales.
6            THE COURT:  Okay.  You can confirm that, but really,
7    I think we're going to rely on this.  Now, I have some --
8    Ian reminded me that Mr. Heist used the phrase, paid up in
9    his question.  I don't know that we have to repeat that
10   phrase.
11           MR. HOFFMAN:  Right, I mean, I believe that's the
12   same as a --
13           THE COURT:  Pays a single price for -- what you
14   said.  I think that covers it --
15           MR. HOFFMAN:  Right.
16           THE COURT:  -- as well.  Let me address some
17   questions.  We'll raise the questions, we might not answer
18   them.  But with the proposal, the running royalty, we're
19   taking out the last sentence.  So, how long does the ongoing
20   royalty run?  Supposing Comcast argues that it only covers
21   damages through the date of the trial.  I gather that's what
22   you're doing by eliminating the September 30th date.
23           MR. HOFFMAN:  Your Honor, I mean obviously our
24   preference would be that September 30th date remain in there.
25   But that, you know, in terms of what the evidence is and

1    what's been produced, it's September 30th.

2          THE COURT:  I don't think there's any evidence of

3    September 30th in the case.

4          MR. HOFFMAN:  There is, your Honor, Ms. Riley

5    testified about the fact that the -- Sprint had only produced

6    financial data in terms of the number of dates, it was

7    September 30, 2016.  That -- we haven't gotten to the verdict

8    form yet.

9          THE COURT:  We will.

10         MR. HOFFMAN:  We will, but the parties have, I

11   think, have agreed for that question number 5 is going to

12   reference that date, the September 30, 2016 date.  So, it

13   will at least be in the verdict form.  Certainly, our

14   preference is that it would actually be here in the

15   instruction to make it consistent.  I know that in terms of

16   the way we've agreed to sort of get this far, certainly we

17   would be not there, but if the Court feels that it's

18   confusing without the date, we would certainly, you know, be

19   happy with the date going back into the instruction for that

20   last sentence.  Without violating my agreement with Mr.

21   Riopelle.

22         THE COURT:  Well, my question goes beyond the

23   September 30th issue.  What happened with they find a running

24   royalty or an ongoing royalty?  Most of the cases call it a

25   running royalty.  You call it an ongoing royalty.  I guess --

40

1       MR. RIOPELLE:  The form -- the form instruction
2   called it an ongoing royalty.
3       THE COURT:  The form, you mean the pattern
4   instruction?
5       MR. RIOPELLE:  Yes, correct, from the Northern
6   District of California, as well as the Western District of
7   Pennsylvania, basically about the same instruction.
8       THE COURT:  All right, but what about royalties, if
9   they find an ongoing royalty, what about royalties after
10  whatever date?
11      MR. HOFFMAN:  And that would be an issue for a
12  separate proceeding for your Honor.
13      THE COURT:  Ah.
14      MR. HOFFMAN:  Ah, so the way it is to then happen is
15  that you would have an option.  Choose one to move for
16  injunction, a permanent injunction based on the findings of
17  the verdict against Sprint.  And so, that's an option for us
18  to do.  If your Honor would deny that motion for permanent
19  injunction and/or if we decide to not seek a permanent
20  injunction, then we have the option, at that point, to seek a
21  --
22      MR. RIOPELLE:  Takes care of that problem.
23      MR. HOFFMAN:  There you go, a royalty --
24      MR. HANGLEY:  That's what happens at 6:00 o'clock.
25      MR. RIOPELLE:  That's what the Court thinks of your

1    argument.

2           (Pause.)

3           MR. HOFFMAN:  Then a royalty, sorry, then a royalty

4    going on a going forward basis and there's a lot of case law

5    out there to just sort of walk through what that process is

6    in terms of how a Court would then make that determination.

7    Obviously, that will be part and parcel of what the jury

8    determines as to the ongoing royalty in terms of the dollar

9    amount.  And then I'm sure there will be probably another

10   round of expert reports on the issue and then it would be

11   something for the Court to decide as to what the ongoing

12   future royalties would be.  There is some law to suggest that

13   any future royalty would actually be at a higher rate then a

14   past royalty, because of the judgment -- of infringement,

15   sort of in that perspective.  But I don't want to get into

16   all of that now.  But by putting the --

17          THE COURT:  I don't really want to get into all of

18   that ever and I'm wondering whether there is a way that that

19   can be avoided.  I guess, a loan.  Some royalty might --

20          MR. RIOPELLE:  Or a finding of non-infringement.

21          MR. HOFFMAN:  Well, certainly a lump sum, if the

22   jury were to find a lump sum royalty then yes, we would not

23   be entitled to an injunction going forward or an ongoing

24   royalty, because the lump sum royalty would take that into

25   account.  The larger issue here and which is actually brought

1   up by that Lucent case that Mr. Riopelle has referenced a

2   couple of different times, is a really interesting one and

3   it's one that we're hopefully trying to avoid here.  And that

4   is --

5          THE COURT:  And that is a verdict which doesn't

6   identify whether it's lump sum or running or ongoing.

7          MR. HOFFMAN:  It's not, well, it's not that it

8   doesn't identify.  Actually, in Lucent, the issue was that

9   the jury came back with a $358 million verdict and indicated

10  on the form that it was a lump sum.  And basically, that

11  ended up being an inconsistent verdict.  Except, the Federal

12  Circuit came back and looked at it and said, well, there's no

13  substantial evidence in the record to suggest a lump sum at

14  that level, at that, you know, at the $358 million.  It

15  should have been a lower number based upon the evidence in

16  the record.  And as a result, the Federal Circuit overturned

17  the jury verdict on the damages, because there wasn't

18  substantial evidence to support a lump sum of $358 million.

19         MR. RIOPELLE:  Just so you know, I disagree with

20  that reading.

21         MR. HOFFMAN:  So, we're attempting, I think, to be

22  very careful that when the jury tells us what the jury did

23  and how the jury did the calculation, that you know, if it's

24  an ongoing royalty and it's through September 30, 2016,

25  there's a number associated with that.  And if it ends up

1    being a number that associated with a lump sum, hopefully, it

2    would be supported by the evidence for the lump sum and that

3    we won't have to get into that situation later.  But the goal

4    here is to avoid, I think, what happened in <u>Lucent</u>.  I mean

5    and to put that in perspective, I mean, we -- the submission

6    that we made in Mr. Hangley's letter actually suggested a cap

7    on the lump sum number of $1.5 million.  And the reason we

8    did that was to attempt to avoid what we saw as the problem

9    in <u>Lucent</u>.  That if the jury comes back with some verdict of

10   a lump sum that's more than $1.5 million, there's going to be

11   some question potentially as to whether or not there's

12   substantial evidence in the record to support that, given

13   that the evidence in the record to date has been, you know,

14   this is how you calculate the ongoing royalty and so mark

15   down.  And the only evidence in the record with respect to a

16   lump sum is basically, Dr. Koch saying it's, you know, some

17   other, I think, $300,000 and $1.5 million.  And he never goes

18   over that number.

19          And so, that was the suggestion that we put in.

20   Obviously, we've attempted to reach agreement with Mr.

21   Riopelle as to reduce the number of issues for the Court.

22   But the goal is to create a verdict that we can all

23   understand what happened and that hopefully, it will not be

24   an inconsistent verdict.  And that the jury has to decide it.

25          THE COURT:  I haven't really thought about whether

44

1    the evidence of Comcast's damages would be sufficient to

2    support a lump sum settlement above the million and a half

3    dollars.  What is your position on that, Mr. Riopelle?

4         MR. RIOPELLE:  Well, let me address your question

5    first.  I believe that a jury could find, based on the

6    evidence that has been presented, they could find a lump sum

7    of some number in between $1.5, you know, $153, for example.

8    If we had today put on Dr. Dippon who says that there are,

9    you know, their methodology is incorrect.

10        THE COURT:  They didn't cover all their costs.

11        MR. RIOPELLE:  Didn't cover all their costs, right.

12        THE COURT:  But that presumes, presumes that the

13   evidence put on in Comcast's damages case, supports both an

14   ongoing royalty and a lump sum payment.

15        MR. RIOPELLE:  I mean, I think the jury, I think a

16   jury could sit there and say this $153 million number is too

17   high, they didn't include the cost.  We're going to do our

18   own calculation and I'm just making this up.  And we're going

19   to come back and we're going to say, we think it should be

20   $10 million and we think that Nokia -- we don't agree with

21   Ms. Riley and we think Nokia and Sprint, after the

22   hypothetical negotiation, would have agreed to a lump sum.

23   So, we're going to award $10 million lump sum.  I believe the

24   jury can do that.

25        I also, the second point I was going to make is I

1   disagree with Mr. Hoffman's reading of <u>Lucent</u>.  The primary

2   issue -- I know we keep referring to the <u>Lucent</u> case, it's

3   talking about a lump sum and a running royalty, because it's

4   one of the places in which the Fed. Circuit has given its

5   best explanation of lump sum versus running royalty.

6   However, the primary issue in the <u>Lucent</u> case was the entire

7   market value and what happened was the -- at issue was a very

8   small feature of Outlook, you know, the Microsoft program

9   where you can send e-mails and stuff like that.  It was a

10  very small feature of that and what happened was the

11  plaintiff, <u>Lucent</u>, said here's how much Microsoft has made on

12  this -- look at this, very, very, very small percentage of

13  what we're asking for and it came out to $358 million and the

14  Fed. Circuit said no, you can't do it that way, because you

15  can't -- unless you can show that this small feature is

16  what's driving the sales for Microsoft Outlook, you cannot

17  base it on the entire value.  <u>Lucent</u> was the first in the

18  series of recent cases to force the apportionment issue and

19  say, you got to get down to what's --

20          THE COURT:  Well, Comcast says they covered a

21  portion in that, by using the step approach.

22          MR. RIOPELLE:  Agreed, I'm not disagreeing with

23  that.

24          THE COURT:  But I had a little trouble with Mr.

25  Hangley's position that the verdict sheet should cap the lump

46

1    sum payment at a million-five.  And I can't and I hear Sprint

2    arguing against that and putting myself in the position of a

3    defense lawyer and the choice is cap the damages at a

4    million-five or run the risk that they'll come back with $153

5    million.

6             MR. HANGLEY:  Why does that conversation sound

7    familiar to me, your Honor.  I'm at the mercy of the patent

8    lawyers.

9             THE COURT:  I --

10            MR. GOETTLE:  We're fine deleting the language, your

11   Honor.

12            THE COURT:  -- what?

13            MR. RIOPELLE:  The capping language.

14            MR. GOETTLE:  The capping language, yeah.

15            THE COURT:  And you want it deleted?

16            MR. RIOPELLE:  Would I like them to say that, yes, I

17   would like that.  Do I think it would be an error of law that

18   would bounce back, I think it would be.

19            THE COURT:  Not if they agree to it.  I mean, it

20   might be, I'm amazed that since a verdict sheet has to be

21   completed in every case that goes to trial, I don't know how

22   we could be 2017 with the Federal Circuit having been in

23   business for as long as it's been in business and knowing a

24   number of the judges on the Federal Circuit, including a

25   former Chief Judge, who's been mentioned in the arguments.  I

47

1    can't see how they haven't straightened out the verdict

2    issue, but they haven't.  I have one friend in the Federal

3    Circuit still, still very active and I might tell him that's

4    an issue I'd like him to address.  Not in this case.

5           Well, we got off on this, you've reached agreement.

6    We got off on to this issue because, if possible, I'd like to

7    avoid further proceedings.  And based own what I've heard,

8    avoiding further proceedings is not going to happen if the

9    jury finds that an ongoing or running royalty is appropriate.

10          MR. GOETTLE:  That's right, your Honor.

11          THE COURT:  Goettle is nodding and I'm sure --

12          MR. RIOPELLE:  I believe, I believe that's true.

13   Now, we have many ways to avoid that though, non-

14   infringement, invalidity, lump sum.

15          THE COURT:  Yes, I agree with that.  I'm just

16   raising these as issues.  What about this issue, we're

17   talking about a single verdict for the three claims that are

18   alleged to have been infringed.  What if there's error found

19   with respect to the charge, let's say hypothetically.  One of

20   the claims, it would have to be a dependent claim.  Error in

21   the charge and let's supposing that the error would warrant

22   reversal.  That would be a non-issue if the jury rendered

23   separate verdicts on each claim.

24          MR. RIOPELLE:  On infringement?

25          THE COURT:  Yes.

1          MR. RIOPELLE:  The current, as I understand it, the

2    current jury form does just that.

3          THE COURT:  Is it invalidity that we're talking

4    about?  I'm talking about damages, I'm sorry.  I don't have

5    the verdict sheet in front of me, I ought to get it.

6          MR. HOFFMAN:  I mean, your Honor, generally though,

7    under the law as long as there's one claim that's infringed

8    and not invalid, then damages apply.  And so --

9          THE COURT:  So, it doesn't matter?

10          MR. RIOPELLE:  Well, I think that's a little bit of

11    an overstatement, but I don't think it matters here and

12    here's why.  If there were different damage claims for the

13    different claims --

14          THE COURT:  And there aren't.

15          MR. RIOPELLE:  -- there are not.  My understanding

16    is both damage experts agree that the damages apply all for

17    one.  In other words, if you find only Claim 1, they want

18    $153 and we think you should only get $1.5.  If you find all

19    three claims are infringed and are valid, they get $153 and

20    we say they get $1.5.  Do you agree?

21          MR. HOFFMAN:  Yes, whether it be one claim or three

22    claims, yes.

23          MR. RIOPELLE:  There's no difference here.

24          MR. HOFFMAN:  There's no claim --

25          MR. RIOPELLE:  Right, there's no separate damage

1    claim for like 7 as opposed to 1.

2            THE COURT:  All right, so you're saying there's no

3    list or other requirement that try the case a new trial on

4    the question of damages?  Because the jury, if they return a

5    verdict on damages, those would be the damages for all three

6    acts of infringement or the infringement of the three claims,

7    the three inventions or any one of them.

8            MR. RIOPELLE:  I believe the way the evidence has

9    come in and the reports have come in, that if -- let me just

10   give a hypothetical -- if the jury returns a verdict of

11   infringement on 1, 7 and 113, also finds that the patent is

12   valid and then returns a damage award, it goes up to the Fed

13   Circuit and the Fed Circuit says no, Claim 113 is invalid or

14   claim, you know, or there was not enough evidence for

15   infringement of 113, but we're let the verdict stand for 1

16   and for 7, I do not believe that affects the --

17           THE COURT:  And the reason for that is you only need

18   to infringe one claim and the damages, in this case, at

19   least, would apply to all claims.

20           MR. RIOPELLE:  That's correct.

21           MR. HOFFMAN:  There's one exception, I just want to

22   make sure --

23           MR. RIOPELLE:  Oh, man.

24           MR. HOFFMAN:  I know, I know.

25           MR. HANGLEY:  It only takes one.

1           MR. HOFFMAN:  One exception, with respect to Claim

2    113, if 113 is the only claim that the jury comes back and

3    says, is infringed and not invalid, there is a smaller

4    damages number and that is because Claim 113 didn't come into

5    existence until the re-examination occurred.

6           THE COURT:  So, how do we handle that?

7           MR. HOFFMAN:  I, you know, in terms of if the jury

8    comes back and only finds Claim 113, then for -- you know,

9    the way Ms. Riley testified, they're going to write down a

10   smaller number.  I don't remember, it's the number over $100

11   million, I don't remember the exact number off the top of my

12   head.  But that's what they would write down because would be

13   the one claim that they found infringed and not invalid.

14          THE COURT:  We don't say anything about that in the

15   charge.

16          (Discussion off the record.)

17          MR. HOFFMAN:  Well and I think from -- to answer Mr.

18   Peterson's question, I think that's, you know, if the jury

19   comes back and says, you know, it's not $153 million, it's a

20   half it or maybe it's a third of it or maybe it's two-thirds

21   of it.  That's all within the province of the jury to figure

22   out.  I mean, in terms, you know and I would think that as

23   long as the jury comes back somewhere between $153 million

24   and zero, there's going to be substantial evidence to support

25   whatever the number is.

51

1              MR. RIOPELLE:  I think the only issue you could

2    possibly have there then is if they only found infringement

3    on 113, but came back with a verdict of $153, I think at that

4    point, we would move -- we would be forced to move for

5    remittitur, because she only put in a number that was lower.

6    But otherwise -- I don't think it's an issue.

7              MR. HOFFMAN:  We agree it's not an issue.

8              THE COURT:  All right and I don't think I have any

9    other issues and we'll turn to the verdict sheet.  The

10   verdict sheet, Ian, we haven't distributed the last verdict

11   sheet?  Do you have extra copies?  We'll make copies of the

12   verdict sheet.  You have a copy of the verdict sheet, I think

13   it's dated January 23rd.

14             MR. HOFFMAN:  Yes, your Honor.

15             THE COURT:  Turn to page three, I'm going to cover

16   the instructions.  Page three covers invalidity.  And we've

17   made changes, grammatical changes for the -- all of the

18   questions read, Did Sprint prove by clear and convincing

19   evidence, two and three, to match the requirement of question

20   one, did Comcast prove by a preponderance of the evidence.

21   These are the instructions and we'll get them to you in

22   writing.

23             Please proceed to question 4, which is the damages

24   question.  If you found at least one asserted claim of the

25   '870 Patent both infringed -- a yes for any claim in question

1    one.  And in bold, that a claim that you have found to be

2    infringed is not invalid.  And (i.e.) a no for both questions

3    two and three with respect to a claim you have found to be

4    infringed.

5         Now, it's pretty heavy duty, but I think it makes

6    sense.

7         MR. HOFFMAN:  Okay.

8         THE COURT:  And you'll get to see it in writing.

9    The second paragraph, we decided we had to talk about the

10   flip side.

11        If you have found at least one asserted claim of the

12   '870 Patent to have been infringed, (i.e.) a yes for any

13   claim, it should be in question -- in question one -- you can

14   turn to page three, the second paragraph.

15        If you have found at least one asserted claim of the

16   '870 Patent to have been infringed (i.e.) a yes for any claim

17   in question one and you have found that a claim you have

18   found to be infringed is invalid (i.e.) a yes for question

19   two or question three, with respect to a claim you have found

20   to be infringed, then you have concluded your deliberations.

21   And then your foreperson should sign the verdict sheet.

22        I think we have to say that, but it's hard --

23        MR. HOFFMAN:  Your Honor, I agree.  It's very, that

24   last -- the new paragraph takes time to proces, to sort of

25   figure it out.

53

1            THE COURT:  And I'm thinking the -- the yardstick

2    for me is Juror Number 5.

3            MR. HOFFMAN:  I mean, I --

4            THE COURT:  It's a problem for you, too and you've

5    got to close.

6            MR. HOFFMAN:  Right.

7            THE COURT:  That's your --

8            MR. HOFFMAN:  Right, but your Honor, I mean the

9    standard forms that I have seen over the years basically say,

10   you know, what you have in the first paragraph, please

11   proceed to question four only if you find X, Y and Z.

12   Otherwise, --

13           THE COURT:  And the last paragraph is the otherwise.

14           MR. HOFFMAN:  It is the otherwise, but it's

15   certainly possible after the jury reads that, they sort of

16   sit there and scratch their heads a little.  What happens if

17   I'm not under either category?

18           THE COURT:  I think you have to be.

19           MR. HOFFMAN:  I agree that you have to be, I don't

20   know if the jury will come to that same conclusion.  So, I --

21           THE COURT:  Well, what I plan to do at the end of my

22   charge, I give each juror a copy of the verdict sheet and go

23   over it.  And then I'm sure to get back all but one copy of

24   the verdict sheet, because we don't want more than one copy

25   of the verdict sheet in the jury room.

1          MR. GOETTLE:  Your Honor, I think that the struggle

2     with the paragraph that you've added in at the bottom of

3     paragraph -- in page three, is related to language that looks

4     like the Court added at Sprint's request, page two, to the

5     affect of --  I think that that paragraph we can -- maybe

6     there's a way to make a little bit more straightforward, but

7     --

8          THE COURT:  I don't remember adding anything to page

9     two.  I might have, but that was days or weeks ago.

10         MR. GOETTLE:  I don't think so, well, I've never

11    seen this language here, if you have answered no to all the

12    claims in question, then you have concluded your

13    deliberations.  I think that's language that -- I might be

14    wrong, your Honor, but I was thinking that that's language

15    that got added in light of Sprint's --

16         THE COURT:  Well, you've injected a new issue that

17    we haven't touched on.

18         MR. GOETTLE:  Well --

19         THE COURT:  It's the issue of what happens if the

20    jury finds no infringement --

21         MR. GOETTLE:  Yes.

22         THE COURT:  -- Comcast wants me to go in and present

23    to the jury the question of invalidity.  I read the Cardinal

24    case and because of the hour, Cardinal says there's a

25    difference between the counterclaim for invalidity and

1    affirmative defense of invalidity.  And it says where there's

2    a counterclaim, the jury should decide the issue of

3    invalidity, even if they find no infringement.  They

4    distinguish that from a situation where and Sprint argues,

5    like this case, the invalidity issue is offered -- is

6    presented as an affirmative defense.  Isn't that the answer?

7            MR. GOETTLE:  The answer, I think, your Honor, is it

8    is in your discretion.  Now, I have read all -- I have looked

9    at all the cases that Sprint cited and none of them say that

10   the jury cannot rule on validity even if they find

11   non-infringement.  It's your discretion, your Honor and we

12   would submit that Sprint did not -- Dr. Polish did not raise

13   this as a condition -- it is common in patent cases for the

14   invalidity case to be conditional.  Jury, if you find

15   infringement, then that stretches the claim so much that you

16   should find the claim invalid.  That's a common approach in

17   patent cases that did not happen here.  Dr. Polish sat on the

18   stand and he said, these things are invalid, irrespective of

19   infringement.  The jury already sat through all that, they've

20   already heard it and it is in your discretion to have them

21   rule on it.  And the reason that we're bringing this up,

22   because it's counter-intuitive, as the patentee, to want the

23   jury to consider invalidity.

24           THE COURT:  Oh, no, it isn't.  You want the jury to

25   consider it in order -- because you think they'll find the

1  patents are valid and you won't have validity to that again.

2          MR. GOETTLE:  That's not, that's now why I'm

3  standing up right now, your Honor.  The reason that I think

4  the jury should consider it is because there's and this case

5  demonstrates it, there is a tension, when a defendant is

6  trying to argue they don't infringe the claim, they're trying

7  to kind of narrow the claim scope.  When they're trying to

8  say that the claim is invalid, they try to broaden the claim

9  scope.  There's an inherent tension and it's come out in this

10 case where there is an inherent tension between what Dr.

11 Polish is saying in terms of what the messaging server is in

12 the prior art and where it is, inside or outside in the prior

13 art.  There's a tension between that and how Mr. Lanning is

14 arguing non-infringement.  And by this wording here, I think

15 kind of the object is, jury, don't worry about the invalidity

16 stuff and don't worry about thinking about any inconsistency

17 that may have come up, just focus on infringement.  You find

18 non-infringement, you're good to go, you can go home.  And

19 so, the jury doesn't grapple with this tension, because

20 they're not being asked to do it.

21         THE COURT:  Well, I think what you're -- first of

22 all, this is not Sprint's language, this is mine.

23         MR. GOETTLE:  Okay.

24         THE COURT:  Sprint, although it fits into the Sprint

25 argument.  We have to say something at the end of the page

57

1    and I'm not inclined, I'm looking at this jury, I've said

2    this from the beginning, I think this is a case that should

3    have been resolved.  I don't think the jury is going to get

4    it right except by accident.  I don't think they comprehend

5    the issues that have been addressed, many of the issues.

6    Some are relatively simple, most are not and I'm looking at

7    them and they seem to attentive, with the possible exception

8    of Juror Number 5 and I can't tell, he might be absorbing

9    this.  But I'm not going to overly complicate the case.

10             MR. GOETTLE:  Okay.

11             THE COURT:  I think what you're really telling me

12   and you told me at the end of that statement you just made,

13   is that with the instruction at the end, the second page, the

14   jury might take "the easy way out".

15             MR. GOETTLE:  That's not what I'm suggesting.  What

16   I'm suggesting is because they're not being asked to consider

17   validity, they won't link the two up the way they would if

18   they were --

19             THE COURT:  Well, I think the instruction will cause

20   them to link it up.  If I were arguing your case, I would

21   argue exactly what you're arguing and I hadn't really focused

22   on that.

23             MR. GOETTLE:  I will argue --

24             THE COURT:  The answer is, yes, the jurors might.

25             MR. GOETTLE:  -- okay.

58

1         THE COURT:  But I think --

2         MR. GOETTLE:  Okay, so going back to why I even

3    stood up.  On this -- it sounds like I lost that one, so then

4    to just go back to this language at the bottom of page three.

5    I would submit that you don't -- since they're not even get

6    to this page, unless they find infringement, I think you

7    might be able to just say, if you found all the claims -- you

8    know, if you found -- the claims you found infringed invalid,

9    then -- I don't know that you need the first part, because

10   they won't get to page three unless they found the claims

11   infringed.

12        MR. RIOPELLE:  At least one.

13        MR. GOETTLE:  At least one. So, just thinking on my

14   feet here, I think you could, maybe, your Honor, you could

15   start with if you have found all the claims that are

16   infringed invalid, then you have concluded your

17   deliberations.

18        THE COURT:  Well, that cuts out 7, 11 lines.

19        MR. HANGLEY:  I'm definitely suppose --

20        MR. GOETTLE:  11?  I'm not following.

21        MR. RIOPELLE:  If you say just that one, then --

22        THE COURT:  But what about the first paragraph,

23   proceed to question four?  I guess we can say proceed to

24   question four if you have found --

25        MR. GOETTLE:  Otherwise stop.

1      THE COURT:  -- any infringed claim to be valid.  Mr.

2  Riopelle?

3      MR. RIOPELLE:  I'm trying to think it out.

4      (Pause.)

5      THE COURT:  Proceed to question four if you have

6  found any infringed claim to be valid.  Your deliberations

7  are concluded if you have found all infringed claims or the

8  infringed claim or claims to be invalid.

9      MR. RIOPELLE:  That sounds right.

10      THE COURT:  I think it's right.

11      MR. HOFFMAN:  Can you repeat it, your Honor?

12      THE COURT:  Yes.  Proceed to question four if you

13  have found any infringed claim to be valid.

14      MR. GOETTLE:  (i.e.) answered no to something like

15  (i.e.) a no --

16      THE COURT:  Just what we say, (i.e.) answered no --

17  all right, we'll run this by -- we'll get another one out to

18  you.

19      MR. HOFFMAN:  Thank you, your Honor.

20      THE COURT:  And then the second sentence, your

21  deliberations are concluded if you have found the infringed

22  claim or claims to be invalid.  And we can do an (i.e.) too.

23  Let's try that.

24      MR. HOFFMAN:  Okay.

25      THE COURT:  Now go to question four.  I don't like

1    the, do you intend, for question five.  I think it should

2    read, is the sum of money identified in your answer to

3    question five, and then please check one.  The total sum is

4    an ongoing royalty for messages sent and received through

5    September 30, 2016.  Or a lump sum royalty for the life of

6    the patent.  And I really don't -- we're going to have to

7    explain the September 30th date if it stays in the jury

8    verdict sheet.

9         MR. HOFFMAN:  One -- one, I think, change that the

10   parties have agreed on, to make it consistent with the new

11   instruction, is for the lump sum royalty for life of the '870

12   Patent to read a one-time lump sum payment for the life of

13   the '870 Patent.  Which is consistent with the instruction.

14        THE COURT:  All right.

15        MR. RIOPELLE:  Wait, what did you say?

16        MR. HOFFMAN:  A one-time lump sum payment for the

17   life of '870 Patent.

18        MR. HANGLEY:  Covering the life of the '870 Patent.

19        THE COURT:  And then question five will read, is the

20   sum of money identified in your answer to question five --

21        MR. RIOPELLE:  Question four?

22        MR. HOFFMAN:  Yes, four.

23        THE COURT:  No, oh, yes, that's right, question

24   four.  And then in parens, please check one:  the total sum

25   of an ongoing royalty for messages sent and received through

1   September 30, 2016 and the second choice, a one-time lump sum

2   royalty for the life of the '870 Patent.

3          MR. RIOPELLE:  Do you want to put an "or" between

4   those two?

5          THE COURT:  A what?

6          MR. RIOPELLE:  An "or"?

7          THE COURT:  It said please check one.

8          MR. RIOPELLE:  It does say please check one, but

9   when you had read it, both times, I think you read it with

10  the "or" in between.  I wonder if we want to put that in

11  there so they read it that they have to pick one of them.  I

12  mean it does say please check one, I agree.  I'm not doing

13  this from the substantive point of view --

14         THE COURT:  All right and we can bold the "or".  All

15  right, we'll get this revised.  It's not final, we'll take a

16  look at it and we'll at least think about this.  I'm

17  wondering, one last issue and that is whether we should

18  change the order in which we address royalty.  And right now,

19  the form of the reasonable royalty, which I think is almost

20  at the end of the damages.

21         MR. RIOPELLE:  Are you back in the jury instruction,

22  your Honor?

23         THE COURT:  Yes. I want to -- I think it should go,

24  well, right now it reads -- maybe not, right now it reads

25  reasonable royalty definition.  And I think that's the first,

62

1  yes.  That following that relevant factors and following

2  that, form of -- I guess that works.

3        MR. HOFFMAN:  Yes, your Honor, we just note that the

4  proposal for the form of to  make it consistent with the rest

5  of the rest of the instruction, I think you've titled it

6  Calculation of the Royalty.  Pursuant to Mr. Hangley's

7  letter.

8        THE COURT:  Yes, it's more than the form.

9        MR. HOFFMAN:  Right, so just Calculation, at least,

10 to Royalty.

11       THE COURT:  Okay, right, I think we've covered

12 everything and it's not tomorrow morning yet, Michael.  I

13 think we ought to thank Michael for his willingness to stay

14 late.  This Court starts early and works late and he suffers

15 in silence, but we appreciate what you do, Michael.

16       AUDIO OPERATOR:  Thank you.

17       THE COURT:  Particularly since I don't know how to

18 turn the lights on at 6:00 o'clock.  Is there anything else

19 from counsel?

20       MR. GOETTLE:  Very briefly, your Honor.  I had a

21 conversation with Mr. Finkelson before he left and we were

22 trying to gauge the likelihood of closings happening tomorrow

23 versus Thursday.  I just want to make sure that we're

24 prepared and we're both of the mind that -- I don't know how

25 tomorrow is going to go.  It could go all the way up to the

1    normal stop time.  I think there's a real possibility though,

2    that we end before the real stop time or that's a potential.

3    And I was charged on behalf of Mr. Finkelson to gauge you in

4    terms of whether if we stop early, could we still plan on

5    doing the closings Thursday morning or would you want to, in

6    the event that something right just happened and we sped up,

7    would you want to proceed with them tomorrow?

8             THE COURT:  Well, I think there's a certain

9    disadvantage to splitting the closings.

10            MR. GOETTLE:  Right, yes, we were imagining that you

11   would not want to split and we do not want to split either.

12            MR. RIOPELLE:  I think there -- there would be a

13   disadvantage -- the disadvantage would be to Comcast if we

14   split.  But the fact of the matter is, I think, given all the

15   investment in time and everybody in this room and all of our

16   teammates, as well as this jury has put into it, I think to

17   have openings --

18            THE COURT:  Closings.

19            MR. RIOPELLE:  -- I mean, closings.

20            MR. GOETTLE:  Let's not do openings again.

21            MR. RIOPELLE:  Not do openings, again.  Closings in

22   the morning when people are fresher, I think is much better.

23            THE COURT:  Yes and that will enable me to do

24   something I really don't want to do tomorrow night and that

25   is, go to the opera.  (Laughter.)

1          MR. GOETTLE:  You can get a great nap at the opera,

2     I've done that.

3          MR. RIOPELLE:  We could extend if necessary, we can

4     extend the jury charge conference.

5          THE COURT:  No, that won't work.  My wife knows

6     enough about my control of the courtroom to know exactly what

7     I can do and not do and she wants me at the opera.  I think

8     that's fine.

9          MR. RIOPELLE:  Thank you, your Honor.

10          THE COURT:  I would not want to close in part.

11     Comcast would go first and I don't think we get more -- how

12     long do you think you'll be?

13          MR. GOETTLE:  I'm thinking probably about an hour,

14     an hour and 15.  I know that's long, your Honor, but it's

15     been a long trial and I think the longer -- the taking that

16     extra time to try to put some clarity to what's been a long

17     haul, I think it's worthwhile to have a little bit of a

18     longer closing.  So, I was thinking probably an hour or an

19     hour and 15.

20          MR. RIOPELLE:  I'm not doing the closing, however, I

21     have been consulting with the person who's doing the closing

22     and I have been beating up on him to keep it under an hour.

23     So, we'll see how that goes.

24          THE COURT:  Yes, that's a real challenge in this

25     case and so what we'll do, unless we finish very, very early

65

1   tomorrow and I doubt it, we're not going to finish before
2   noon.
3            MR. GOETTLE:  Right, no.
4            THE COURT:  We'll have the closings on Thursday.
5            MR. GOETTLE:  Thank you.
6            THE COURT:  Thursday morning and my charge Thursday
7   afternoon.
8            MR. GOETTLE:  Thank you.
9            THE COURT:  Anything else?
10           MR. GOETTLE:  No, sir.
11           MR. RIOPELLE:  What opera are you seeing?
12           THE COURT:  I do know it's not a well-known opera,
13   Philadelphia Opera is quite good.  Not quite as good as the
14   Met, but they're quite good.  And we know the new director
15   and he's doing a find job.  It's an opera I've not seen
16   before and I don't -- I'll tell you tomorrow.
17           MR. RIOPELLE:  Okay.
18           THE COURT:  We'll start at 9:30.  Happy Valentine's
19   Day, everybody.
20           MR. RIOPELLE:  You, too, sir.
21           MR. GOETTLE:  Thank you, your Honor.
22           THE DEPUTY CLERK:  All rise.
23           THE COURT:  We'll get copies of the revised charge
24   and revised verdict sheet to you sometime tomorrow.
25               (Court adjourned 6:39 o'clock p.m.)

CERTIFICATION


I hereby certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET            Date 2/16/17
Laws Transcription Service