```
               IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


                            - - -

COMCAST CABLE COMMUNICATIONS, :  CIVIL ACTION NO. 12-0859
LLC, et al.,                  :
            Plaintiffs        :
                              :
          v.                  :  Philadelphia, Pennsylvania
                              :  February 15, 2017
SPRINT COMMUNICATIONS         :  9:43 o'clock a.m.
COMPANY L.P., et al.,         :
            Defendants        :
. . . . . . . . . . . . . . . .

                  JURY TRIAL - DAY TWELVE
            BEFORE THE HONORABLE JAN E. DUBOIS
          SENIOR UNITED STATES DISTRICT COURT JUDGE


                            - - -

APPEARANCES:

For the Plaintiffs:     DANIEL J. GOETTLE, ESQUIRE
                        DALE M. HEIST, ESQUIRE
                        Baker & Hostetler, LLP
                        Cira Centre, 12th Floor
                        2929 Arch Street
                        Philadelphia, PA  19104-2891

                        WILLIAM T. HANGLEY, ESQUIRE
                        REBECCA SANTORO MELLEY, ESQUIRE
                        Hangley Aronchick Segal & Pudlin
                        One Logan Square, 27th Floor
                        Philadelphia, PA   19103

                        GEORGE MEDLOCK, ESQUIRE
                        Comcast Cable Communications
                        Chief Patent Counsel


            Laws Transcription Service
               48 W. LaCrosse Avenue
               Lansdowne, PA  19050
                  (610)623-4178
```

2

APPEARANCES: (Continued)

For the Defendants:        DAVID E. FINKELSON, ESQUIRE
                           BRIAN C. RIOPELLE, ESQUIRE
                           JUSTIN R. LOWERY, ESQUIRE
                           McGuire Woods, LLP
                           Gateway Plaza
                           800 East Canal Street
                           Richmond, VA  23219

                           COLLEEN H. SIMPSON, ESQUIRE
                           Harkins Cunningham, LLP
                           4000 Two Commerce Square
                           2001 Market Street
                           Philadelphia, PA  19103

                                - - -

Audio Operator:            Michael Cosgrove

Transcribed by:            Geraldine C. Laws, CET
                           Tracey Williams, CET
                           Paula Curran, CET

(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.

1              (The following occurred in open court at  9:43

2    o'clock a.m.)

3              THE DEPUTY CLERK:  All rise.

4              THE COURT:  Good morning, everyone.

5              ALL:  Good morning, your Honor.

6              THE COURT:  Please be seated.  Good morning.

7              MR. GOETTLE:  Good morning, your Honor.  Do you have

8    preliminaries or we're ready to go.

9              THE COURT:  No preliminaries, wow.  Hope everyone

10   had a safe trip home and a good Valentine's Day celebration.

11   I'm getting a lot of nods and smiles, that's good.  We

12   didn't.  We were here until about, I guess, 6:30 or so, but

13   we got a lot done.

14             All right, are we ready to proceed?

15             MR. GOETTLE:  We are, your Honor.  Comcast calls Dr.

16   Akl.

17             THE COURT:  We'll administer the oath again.

18             ROBERT AKL, Witness, Sworn

19             THE DEPUTY CLERK:  Be seated.  Please state your

20   full name and spell your last name for the record.

21             THE WITNESS:  My name is Robert Akl, A-K-L.

22                        DIRECT EXAMINATION

23   BY MR. GOETTLE:

24   Q   Good morning, Dr. Akl.

25   A   Good morning.

1    Q    Dr. Akl, you've already testified in this case, right?

2    A    Yes.

3    Q    What are you here to testify about today?

4    A    So, Comcast started, then Sprint put on their case last

5    week and Sprint had two experts, Dr. Polish and Mr. Lanning.

6    So, today I'm here to discuss what I agree and disagree with

7    Dr. Polish and Mr. Lanning.  So, I'm going to be discussing

8    validity and infringement.

9    Q    Okay and again, you and I worked together to put together

10   a presentation to try to make your testimony clear to the

11   jury?

12   A    Yes.

13   Q    And is that what we're looking at on the screen?

14   A    Yes.

15   Q    And that is Plaintiff's Demonstrative Number 6?

16   A    Yes.

17   Q    So, are you going to talk about validity first?

18   A    Yes.

19   Q    What are we looking at on Slide 3?

20   A    So, my assignment --

21             THE COURT:  Before we proceed, sir, I'd like a copy

22   of the slide.

23             MR. GOETTLE:  Oh, my apologies, your Honor.

24             (Pause.)

25             MR. GOETTLE:  May I proceed, your Honor?

                            Akl - Direct                    5

1              THE COURT:  Yes, you may.

2    Q    So, I just handed the Court what looks like a pretty

3    hefty stack of slides, did you see that, Dr. Akl?

4    A    Yes.

5    Q    Do you anticipate that your testimony today will go as

6    long as last time?

7    A    I'm really hoping it's not.

8    Q    Okay.

9              THE COURT:  So, do we, Dr. Akl.

10   Q    Okay, so what are we looking at on Slide 6?

11   A    So, my assignment with regard to validity, is to

12   determine whether Sprint has shown by clear and convincing

13   evidence, that Claims 1, 7, 113 of the patent is invalid.

14   It's Sprint's burden and so if we go to the next slide,

15   Sprint and through Dr. Polish have to show by clear and

16   convincing evidence that the patent is invalid.  And what

17   that means is, they have to use an abiding conviction that

18   the truth of the factual contention is highly probable.

19   Q    And you were here for Dr. Polish's testimony?

20   A    Yes.

21   Q    Did Dr. Polish refer to abiding conviction when he talked

22   about the clear and convincing evidence standard?

23   A    I think what he said is he has to show clear or really

24   clear, it's a little bit more higher burden than just clear

25   or really clear.

Akl - Direct                                    6

1    Q    What did you do in forming your -- doing your analysis

2    and forming your conclusions on validity?

3    A    Of course, I started with the patent.  I looked at the

4    Court's claim construction and the rulings, the prosecution

5    history of the patent, the first time it went through

6    prosecution.  The re-examination history and Dr. Polish's

7    expert report.  So, I'm rebutting his opinions.

8    Q    What are you showing on Slide 6?

9    A    So, remember that this patent was prosecuted and was

10   originally granted and then -- so there was an examiner, at

11   the patent office that thinks the patent is valid.  And the

12   patent is presumed valid once it's passed the original

13   prosecution.  It also went through the re-examination and the

14   re-examination, you have three examiners that went through

15   the patent again.  So, you have three examiners that also

16   believe that the patent is valid.  So, you now have four

17   examiners from the U.S. Patent Office and myself telling you

18   that the patent is valid.

19   Q    So, in thinking about validity, what is the perspective

20   that is applied in determining whether a patent is valid or

21   invalid?

22   A    So, you always go back to what a person of ordinary skill

23   and this is a hypothetical person and each side provides a

24   definition of what they think the qualifications of such a

25   person that can read the patent, understand it and things are

1    from his or her point of view.  And the definitions are

2    fairly close, so my definition is a BS Degree in Computer

3    Science, Computer Engineering, Electrical Engineering or a

4    related field and at least two years of experience in the

5    design or development of communication systems.

6            And last week, you saw Dr. Polish's definition.

7    It's closer, I think mine is just a little higher burden, but

8    they're fairly similar and the opinions are applicable under

9    either definition.  I was one of ordinary skill in the art or

10   more than one of ordinary skill in the art under both

11   definitions.

12   Q    You said you were, are you today?

13   A    Yes.

14   Q    And when you said you were, what are you referring to?

15   A    So, it's -- so this is a person of ordinary skill in the

16   art at the date of the invention, which is 1999.  So, this

17   is why, if you recall the first time I spoke, I concentrated

18   on two dates, 1999 and 2006.  1999 is the date of the patent,

19   so when I'm describing the patent or the invention or the

20   background, I have to look at 1999.  And then later, we're

21   going to talk about infringement, we look at the infringement

22   period, which is 2005 and forward.  So, these are the two

23   critical dates.

24   Q    And I think you may have mentioned that you, in your

25   view, you're a person of ordinary skill in the art definition

1    is slightly higher than Dr. Polish's.  Why do you say that?

2    A    Because I say, you know, two years of experience in the

3    design.  He starts out with two years of experience in the

4    operation.  He said and/or design later.  So, I think being

5    able to design something is a slightly higher burden than is

6    being able to operate something, but they're close.

7    Q    So, what are we looking at on Slide 8?

8    A    So, the first prior art that Dr. Polish brought forward

9    is the Sonera Patent or application.  The Sonera prior art,

10   it's a reference.  And so at a high level, the Sonera is

11   solving the problem of using or giving out an extension or a

12   phone number, small phone number and then people can use that

13   number, they would send you a text at that number and then it

14   gets forwarded to your actual phone number.

15   Q    So, do you think that the Sonera invention is of the --

16   is the same as the '870 Patent's invention or do you think

17   they're different and how do you think they compare?

18   A    It's really not.  I mean, if you look at what's common is

19   you're sending a text.  But the Sonera is looking at

20   forwarding that text from like a virtual number or small

21   number or an extension that you give out to people to an

22   actual phone number.  When we look at the '870 Patent, it's a

23   lot more important.  It's solving the problem really of

24   message volume and I walked through the problem solution,

25   problem solution of having a lot of messages or very large

1  messages and then you not wanting to bog the network.  So,

2  it's really they're addressing very different things.

3  Q    So, if a skilled artisan wanted to avoid practicing the

4  '870 Patent, could they then implement Sonera and get to the

5  same price?

6  A    No.

7  Q    Why not?

8  A    Because again, they're solving different problems and the

9  approaches are different and so, Sonera doesn't really

10  disclose the steps or what's taught in the '870 Patent.

11  Q    Okay, now are you going to walk through now Dr. Polish's

12  opinions?

13  A    Yes.  So, Dr. Polish provided three opinions.  He first

14  said -- so I'm going to go through the same process and we're

15  going to look at whether Sonera anticipates or not and it's

16  my opinion that it does not anticipate.  And so, if we go to

17  the next slide --

18  Q    What are you showing on Slide 10?

19  A    I'm reminding the jury what it means to anticipate.  So,

20  anticipate means you go through -- you can always go through

21  a claim by claim, but for a piece of prior art to anticipate,

22  each and every element -- each and every limitation has to be

23  present in this single piece of prior art.  And at this

24  point, you're not looking at combining more than one piece.

25  So, that's obviousness, we're going to talk about that later.

1    But if you don't have a single piece of prior art and in this

2    case, Sonera, that discloses each and every limitation, you

3    do not have anticipation.

4    Q   Okay, so what are we looking at on Slide 11?

5    A   So, this is a walk-through, but we're going to have going

6    through.  So, if you recall, the claims have all these

7    different limitations and I'm going to show what in the

8    claims, all the limitations that are missing.  And the first

9    one, sending an inquiry from an external messaging server and

10   that's required for Claims 1, 7 and 113.

11   Q   So, on Slide 12, I see that you have three claims up and

12   white and yellow writing.  What are you signifying here?

13   A   So, this is a graphical representation, if you wish, of

14   my outline.  So, the claim language for Claim 1, Claim 7 and

15   Claim 113 are shown.  And what I've highlighted in yellow are

16   the things that are missing from Sonera.  So, as we go

17   through them and I show you Sonera doesn't disclose them,

18   we're going to cross those out.  But we're going to go

19   through them one at a time.

20   Q   Okay and are you first focus on this limitation here

21   about the messaging server external to the cellular network?

22   A   Yes.

23   Q   So, what does Dr. Polish say about this?

24   A   So, Dr. Polish says that -- well, we're going to look at

25   Sonera and Sonera doesn't disclose sending an inquiry from an

1    external messaging server.  So, when we look at the inquiry,

2    we have to look at what's doing the inquiry.  And Dr. Polish

3    said that the SMS-GMSC, this is what is sending the inquiry.

4    And Dr. Polish highlights this as the messaging server,

5    because if you remember, the messaging server, you have to

6    have the two functionalities.  The storing forward and the

7    sending an inquiry.  And so, these two functionalities, Dr.

8    Polish said are done by these two elements, but the focusing

9    on the sending the inquiry, it's done here.  The SMS-GMSC

10   sends the inquiry.

11   Q   And do you agree with Dr. Polish that in Sonera it

12   discloses that?

13   A   The inquiry is sent from the SMS-GMSC, so we do agree,

14   both Dr. Polish and myself that that's what sends the

15   inquiry.  And so, the disagreement now is do we have an

16   external messaging server?  And to have an external messaging

17   server, then the inquiry must be coming from an element that

18   is not core and that's the key point.

19   Q   Okay, what are showing on Slide 14?

20   A   So, the SMS-GMSC is an MSC and we talked about MSC,

21   mobile switching center and I had an analogy where an MSC is

22   a core network element in the cellular network, because

23   that's what's doing the essential functionality.  That's

24   what's connecting the phones to the external networks and the

25   analogy that a gate was the switchboard operators.  In the

1   '50s, those are what connected the calls.  That's what an

2   MSC, a mobile switching center is doing.  And so an SMS-GMSC

3   is a core network element in a cellular network and if that's

4   what sending the inquiry, then you don't have the inquiry

5   coming from an external messaging server.  So, that

6   limitation would not be met.

7   Q   Now, how do you know that the SMS-GMSC is a core network

8   element in Sonera?

9   A   So, we go to the standard.  We go to the GSM standard, so

10  this is the GSM standard.  GSM-9.02, this is PX-465 and I'm

11  on page 32.  And there is a definition for the SMS-GMSC.  And

12  so, and the definition, it says the choice of which MSCs can

13  act as SMS gateway MSCs is the network operator's matter.

14  Example, all MSCs or some designated MSCs.  So, again, what

15  this is telling us, what the GSM standard is saying is we can

16  take a mobile switching center and we can add functionality

17  to it.  Again, we've been talking about functionality.

18  You'll be hearing a lot.  Everything relates to functionality

19  and the standards are from the point of view of

20  functionality.  And so, the GSM standard is describing how

21  you can take the MSC functionality and you can add further

22  functionality to it, to make it an SMS-GMSC.  So, the query

23  is coming from a mobile switching center, which is a core

24  network element.

25  Q   Does Dr. Polish agree with you that the SMS-GSMC is a

1    mobile switching center?

2    A    Yes.

3    Q    What are you showing on Slide 16?

4    A    Well, I think he was asked about the -- so he was asked

5    the mobile switching center is a core and he said well, I'm

6    not, I'm not really prepared to sit here and offer an opinion

7    about what's in the core network or not.  But I think the

8    MSCs are generally internal parts of the network.  And he

9    needs to make that determination, because he needs to show,

10   by clear and convincing evidence, that the query has to be

11   coming from an external messaging server which means it

12   cannot be coming from a core network element.  And I think he

13   does admit that MSC is internal part of the network or is a

14   core network element.

15   Q    So, if that's the case then, what is Dr. Polish saying

16   about where this inquiry is coming from in Sonera?

17   A    So, I think we are in agreement or I like to think we're

18   in agreement that the query cannot be coming from here or you

19   cannot have the query be from the SMS-GMSC, because you would

20   not have an external messaging server, because this item is

21   core.  Now, the store and forward is the SMSC and we've heard

22   that acronym before, that's the SMS center.  It does do

23   storing forward, but it also needs to, according to Dr.

24   Polish, he now says that the Sonera discloses taking the

25   query that's here and moving it here.  He needs to have the

1   query come from something that is not core.  So, he said my

2   argument is that the inquiry functionality can be integrated

3   with Box 1 here and that's something which the patent, which

4   Sonera talks about.  So, he wants to move the query from the

5   SMS-GMSC to the -- from here to here.

6   Q   And what does --

7            THE COURT:  From here to here means what?  Why don't

8   you put those in.

9            THE WITNESS:  So, from the SMS-GSMC to the SMS.

10  Q   Okay, from Box 2 to Box 1 as you're showing on your Slide

11  17?

12  A   Yes.

13  Q   Okay, does Dr. Polish find support for his analysis in

14  the Sonera?

15  A   He points to the patent, but --

16  Q   By patent, you mean Sonera?

17  A   -- sorry, yes, I'm sorry.  He points to the Sonera

18  reference and he points to this section and that's the

19  section that he described.  And he says that the Sonera

20  reference discloses moving functionality.  And discloses that

21  you can move the functionality from the SMS-GMSC and it talks

22  about that.  But in fact, it does not and so, this is the

23  section that Dr. Polish pointed to and he pointed to the

24  sentence which says and I am in Sonera, which is DX-243 and

25  the sentence says, "It may be implemented as a unit separates

1    from short message center", SMSC, "or it may be implemented

2    as part of the software structure of the short message

3    service center."  So, he reads that sentence or he states,

4    that's what's saying the reference discloses moving the query

5    from the SMS-GSMC.  But in fact, the "it" which is what the

6    sentence is referring to, isn't describing functionality of

7    the short message gateway, which is what he claims it does.

8    It's actually referring to something else.  It's referring to

9    the service node and the service node is what it describes.

10   So, if you look at and you read the language in Sonera, it's

11   not talking about moving any sort of functionality or inquiry

12   from an SMS-GMSC into the SMSC.

13   Q   What is it talking about?  What is the "it" modifying in

14   the paragraph that you're showing on the screen?

15   A   It's modifying a service node and it may be helpful if we

16   can go back one slide?

17   Q   To here?

18   A   Yes.

19   Q   So, we're on Slide 17.

20   A   Yes, so going back to Slide 17, what's new about Sonera

21   and what Sonera describes as a new component or part of its

22   invention, is service node 4.  Service node 4 is something

23   that they're saying is new and that's what's helping carry

24   out the invention of Sonera and that's the forwarding of like

25   a text from a virtual phone number to an actual phone number.

1    So, they're focusing on the service node and the

2    functionality of the service node.

3           And the service node is what they're describing,

4    that functionality, you can implement it in different places,

5    because they want that aspect to be brought.  So, when we go

6    back to the language, it's describing the service node it

7    implemented in the telecommunication network.  It may be

8    implemented as a unit separate and it goes on and then it

9    says, the essential part is not the form of the

10   implementation, but the functionality accomplished by the

11   service node.  So, again, it's focusing on this new part,

12   that's the service node, that's what Sonera is about.

13   Q   Okay, so have you finished your first point about Sonera?

14   A   Yes, so again, if the inquiry is not coming from an

15   external messaging server, it's not there, you don't have

16   anticipation.  So, we can stop here, but there are other

17   reasons, we're going to go through them.  But that's enough

18   to show that the patent is valid.

19   Q   What are you going to talk about next?

20   A   The next item is the mapping of an internal identifier

21   and that's for Claims 1, 7 and 113.

22   Q   What are you showing on Slide 21?

23   A   So, Dr. Polish points to the MSISDN as the internal

24   identifier and the MSISDN, it sounds very complicated, that's

25   just a phone number.  That's the actual phone number that the

1    message gets forwarded to.  So, that's someone's ordinary

2    phone number.  And so, that cannot be the internal

3    identifier, because it's not going to meet the Court's claim

4    construction.

5    Q    Are you showing that construction on Slide 22?

6    A    Yes.  So, the Court gave us a construction for what an

7    internal identifier is and it says, "An internal identifier

8    of the cellular network, means an identifier used inside the

9    cellular network to identify a specific wireless terminal

10   which may, but need not be revealed outside the cellular

11   network."  And in Sonera, a phone number is not an internal

12   identifier, because it is revealed outside the cellular

13   network.  That's what you do with phone number, you give them

14   out to people.  And so, Dr. Polish then says in order to try

15   to make a phone number an internal identifier, he says that

16   the phone number is non-published and that was his testimony

17   on direct, when he was asked.  And he said it allows you to

18   send text messages to those published numbers and then have

19   them to go to unpublished phone numbers.

20   Q    And does Sonera disclose that?

21   A    No, there is no disclosure in Sonera to anything as

22   non-published number.  So, that's a description that is not

23   in Sonera.  What Sonera discloses and what Dr. Polish points

24   to, is where it's describing having a subscriber's actual

25   number and then you're forwarding that message to another

1    mobile station or an ordinary telephone number.  So, there is

2    no disclosure in Sonera of anything being non-published or an

3    unpublished phone number.  So, again, because of that, Sonera

4    does not disclose an internal identifier and so, for that

5    reason -- that reason alone or in combination with the other

6    ones, the '870 Patent is valid.

7    Q    What is your third point about Sonera?

8    A    So, the third point is for Claims 1 and 113, you also

9    have to have information indicated with the aid of the first

10   identifier.  So --

11   Q    What does Dr. Polish say about this limitation?

12   A    So, Dr. Polish points to SRI for SM APP and but Dr.

13   Polish never really explains why this message discloses

14   information indicated with the aid of the first identifier.

15   And again, it's first by clear and convincing evidence to do

16   so.  And when he was asked, he said something to the affect

17   that yeah, so what's happening at a greater level detail than

18   I'm going through here, is all of these messages are actually

19   tagged internally and you can look in the patent, there's a

20   description of them.  It's quite technical and tedious, but

21   there is, I think, it's called a response ID.  And that's all

22   these messages have a response ID tied to them, so that links

23   all the messages together.

24           If you go to Sonera, there is no mention of response

25   ID and I went back to his expert report.  He doesn't mention

1   response ID and there is no response ID in Sonera.  So, I'm

2   not sure what he's referring to.  And again, it's his burden,

3   he has to have clear and convincing evidence.  And so,

4   looking at what he has said, I believe the patent is valid

5   because Sonera does not disclose information indicated with

6   the aid of the first identifier.

7   Q   And just to put that in perspective the claim, where is

8   that limitation in the claim, when does that come up?

9   A   I think it's the last element, the fourth -- if we go

10  back to the claim language, it's the fourth element of --

11  very quickly, if you go back to my slide that had the claim

12  language in yellow and white.  I think it's Slide 12.  Yes.

13  Q   Could you circle it on your screen, Dr. Akl?

14  A   Yes.  It's right here. So, if you recall, we were walking

15  through the claim.  We had one, you have to be able to send.

16  The second step was mapping.  The third step was determining

17  and the fourth step was sending your response message.  And

18  the fourth step, sending the response message, it says in

19  which response message the information relating to said

20  terminal is indicated with the aid of the first identifier.

21          So, as an overview, I've walked through Claim 1 and

22  I've highlighted, the yellow parts are what's missing in

23  Sonera and what we have just talked about now is related to

24  the fourth limitation in Claim 1, that's where that language

25  is.

1   Q    Thank you.  Mr. Dyer, can you go to Slide 27?  So, we're

2   now down to your fourth point about Sonera?

3   A    Yes, so the fourth point about Sonera and this is for

4   Claims 7 and 113, remember, these are dependent claims.  And

5   they talk about an inquiry sent to and the determining

6   performed by the same element.  And so, if we go to the next

7   slide --

8   Q    Before we -- I just note that you have Claim 113 up here

9   and you refer to it as a dependent claim.  Does 113 depend

10  from Claim 1 that you just walked through?

11  A    No, it depends on Claim 112, but if you recall, Claim 112

12  is very similar to Claim 1.  There is one difference, but for

13  all the reasons that the element of Claim 1 that I've

14  described aren't disclosed, they also are not in Claim 113.

15  So, my analysis for Claim 1 carries over to Claim 112 and now

16  when we look at Claim 113 and Claim 7, we can talk about them

17  together.

18  Q    Okay, so just -- so to make sure this is abundantly

19  clear, the first three bullet points that you're showing on

20  Slide 27, that you just walked through for the jury, do those

21  equally apply to Claim 112?

22  A    Yes.

23  Q    Okay.

24  A    So, focusing now on dependent Claims 7 and 113, they

25  describe, you need to have an inquiry sent to a specific

1    network element and then that same network element, said

2    network element has to be doing the determining.  So, if you

3    look at what Dr. Polish said and what the Sonera reference

4    discloses, what's receiving the inquiry is the service node.

5    And I'm going to call this, actually, I think they are

6    labeled.  I think this is Label 4 in Sonera.  And what is

7    doing the determining is the home location register.  The

8    home location register is the database and Dr. Polish points

9    to two messages that go from the service node to the home

10   location register, where it asks the home location register.

11   The home location register does the determining and then you

12   get a response back.  And so, you don't have the same network

13   element that's receiving the inquiry and this would be the

14   service node, which is 4, that's not the same as the home

15   location register, which is 6.  And so, Claims 7 and 113 are

16   not anticipated by Sonera.

17   Q    Are we ready to move on obviousness?

18   A    Sure.

19   Q    Okay, what are you going to next talk about, Dr. Akl?

20   A    Actually, can I -- can we just go back one second.

21   There's one more thing I wanted to say.

22   Q    Yes.

23   A    What Dr. Polish says is he says, well, I think the

24   service node is also doing the determining, even though the

25   home location register is what's doing the determining and I

Akl - Direct                                    22

1   think, by his logic, it would make Claim 7 and 113

2   meaningless, because then if whatever receives the couriering

3   uses something else that does the determining, which is what

4   you have for Claim 1 or Claim 112.  If that is the case based

5   on his logic then Claim 7 and 113 would be meaningless.  So,

6   I disagree with his logic that the service node is doing the

7   determining because it's the HLR that does the determining

8   and that's what he says in his report.  We can move on.

9   Q    Okay.  What are we going to talk about next, Dr. Akl?

10  A    So, the second argument that Dr. Polish makes is that if

11  Sonera doesn't anticipate, then we can go to obviousness and

12  for obviousness, he makes two arguments.  The first one is

13  you take Sonera and you take the knowledge of one of ordinary

14  skill and that's the qualifications that we talked about.

15  And then based of that knowledge, his opinion that you would

16  render the claims obvious and I disagree.

17         So, let's look at, from a legal principles, this is

18  what's an expert's -- I'm not a lawyer, Dr. Polish is not a

19  lawyer -- we follow legal principles so we can do our

20  analysis.  And for obviousness, what the law tells us that

21  you have to look at each and every element and if you have to

22  find -- because we're not doing anticipation -- it's not one

23  source.  You're going to multiple sources and it's not just

24  enough to find -- it's not a puzzle that you put together by

25  finding these pieces in different sources.  There has to be a

1   reason to combine.  There has to be a reason and a reasonable

2   expectation of success.  But what you cannot do is use

3   hindsight and one way that I think of hindsight or it's been

4   explained to me, is that if we think of the '870 Patent, the

5   invention as a recipe and it has all these different

6   elements.  And you are trying to invalidate it by saying all

7   these different ingredients are found, you can't go back and

8   say, okay, I have ingredient one in this reference,

9   ingredient two in the second reference and you have all these

10  ingredients in different places and then say, oh, then, you

11  have the recipe.  Because what you're using is you're using

12  the invention, you're using the recipe to guide you how you

13  would put all these ingredients together.  So, that's

14  hindsight, that's wrong.

15          The way you would show obviousness is you would have

16  to show that not only are these elements in multiple

17  references, but there is a reason.  Ignoring the recipe,

18  there is a reason one of ordinary skill would have a reason

19  to combine them and would have had reasonable expectation of

20  success.  So, this is a very important point to order to show

21  if there is obviousness or not.  And so, what I'm showing on

22  this slide is we've already walked through --

23  Q   Slide 31?

24  A   Yes.  On Slide 31, we've already walked through all the

25  different elements that are not in Sonera for anticipation.

1    So, even if you use Dr. Polish's arguments that you would

2    combine Sonera with the knowledge of one of ordinary skill in

3    the art and he uses that, for example, for the messaging

4    server.  There are still other elements that we've already

5    talked about that are not in that combination.  And as long

6    as one is not disclosed, the patent is valid.  So, even for

7    his secondary arguments on obviousness, my opinion is the

8    patent is still valid because the other elements are still

9    not in that combination, so it doesn't describe that.

10   Q   So, by the other elements, you're referring to the

11   elements that you have lined out?

12   A   Yes, like the mapping, the determining, the steps and the

13   aid of the first identifier and then if you have to have the

14   same element that does the determining that receives the

15   inquiry.

16   Q   Does Dr. Polish offer any analysis that those elements

17   that you have lined out, were known to one of skill in the

18   art at the time of the invention?

19   A   No, he doesn't use combination of the knowledge of one of

20   ordinary skill in the art and the Sonera reference for those.

21   Q   Okay, so what does he do with the combination?

22   A   So, yes, for the combination, he says that he was asked

23   the issue of Sonera plus the knowledge of ordinary skill and

24   he referenced some of Dr. Akl's critiques with respect to

25   things that he believes are missing.  And he was asked, have

1   you looked at those and he says yes.  There is a question of
2   whether Sonera talks about an external messaging server.  And
3   certainly, one of ordinary skill would have known that GSM
4   networks are disclosing external messaging servers.  Those
5   were in the standards and the specs for the GSM.  And someone
6   of ordinary skill would have known that.  So, he saying that
7   one, the GSN standard discloses external messaging servers
8   and one of ordinary skill would have known that and would
9   have done that combination.
10  Q   Did Dr. Polish show the jury any such GSM standards or
11  specifications?
12  A   No, he did not and I disagree that the GSN standard has
13  an external messaging server.  It has a store and forward
14  capability, but not an external messaging server as construed
15  by the Court, because as you remember, the messaging server
16  has to have the two functionalities of store and forward and
17  sending a query.  And as we've talked about the GSM standard
18  and the query is coming from the SMS-GMSC, that's what the
19  GSM standard says.  It's that functionality and the mobile
20  switching center and that's core.  So, I disagree and he
21  didn't show any GSM standards that show any external
22  messaging server.
23          In addition, Dr. Polish hasn't really identified a
24  reason why you would change Sonera.  So, ignoring the '870
25  Patent, why someone looking at Sonera would want to change

1   it.  There is no reason why you would want to change Sonera

2   so that it uses an external SMSC that's also going to be

3   sending the inquiries, because we know that the queries are

4   sent from Item 2.  And there's really no reason why you would

5   want to move it to Item 1 in Sonera.

6   Q    Okay, I think maybe you've already talked about Slide 35?

7   A    Yes.

8   Q    Are we now going to turn to Dr. Polish's third

9   conclusion?

10  A    Yes, so his second point on obviousness and third point

11  in general, was that you can combine Sonera and Viaresto, so

12  Viaresto is now a second piece of prior art we're going to

13  talk about it.  But it's my opinion that even if you combine

14  them, it does not render Claims 1, 7 and 113 obvious and

15  there's no reason to combine them.  So, let's go to Slide 37.

16  So, this is DX-242, which is the Viaresto reference and what

17  Viaresto is talking about and what it teaches or describes.

18  It talks about a completely different problem than even

19  what's in Sonera and even what's in the '870 Patent.  So,

20  Viaresto talks about profiles.  Profiles for cellphones.  So,

21  you create a profile for your cellphone and you can have

22  different numbers associated with your cellphone and with the

23  different profiles.  So, if someone calls you or texts you at

24  a different point in time, with a specific phone number,

25  depending on that profile, your phone would try and go and

1   receive a text message.  And at different points in time, it

2   would not.  So, I can have my cellphone and I can have like a

3   work profile and I can have a phone number associated with

4   work and I can give that to people and I can have like a

5   personal phone number and I can give that out to people.  And

6   then, if I'm at work, my phone would be set to like a work

7   profile.  So, when someone calls my work or texts me to the

8   number, my phone number receives it, but I don't receive

9   personal calls.  And then when I'm at home, then if someone

10  calls my work number or the number I give out, the cellphone,

11  based on that profile, would not ring.  So, it's really

12  solving a completely different issue.  It's something that we

13  haven't really looked at and it's not related to Sonera or to

14  the '870 Patent.

15  Q    Okay, what are you showing on your Slide 38?

16  A    So, this is -- so for the combination, what Dr. Polish

17  points to is it's what not crossed out in Slide 38.  That

18  that's what the combination achieves, but again, there are

19  other elements, like the determining step with the aid of the

20  first identifier in Claim 7 and Claim 113, that even if the

21  combination helps disclose an external messaging server or a

22  mapping, there are still other elements that are missing.

23  So, in any case, the patent is still valid, because as long

24  as one element is missing, then you cannot show that the

25  patent is invalid.

1   Q    Okay, so what does Dr. Polish point to as the messaging

2   server, supposed messaging server of Viaresto?

3   A    So, in Viaresto, what Dr. Polish points to is the SMSC.

4   He points to as the messaging server.  But that's not a

5   messaging server because it doesn't do the query.  It is --

6   it does store and forward, but that's only half of what a

7   messaging server needs to do.  So, you don't have an external

8   messaging server in Viaresto, because the inquiry is not

9   coming from the SMSC.  It's actually coming from something

10  else and even though he didn't talk about it, it's coming

11  from the SMSGW, the SMSGW is just like an SMSG-MSC that we

12  talked about.  So, the inquiry is coming from an internal

13  network element.  It's coming from a core element in the

14  cellular network.  And so, Viaresto does not teach or

15  disclose an external messaging server.

16  Q    Does Dr. Polish agree with you on that?

17  A    I don't think he showed why -- he just said it's there

18  and one would know that it's external.  I don't think he

19  showed any evidence.  He points to language in the Viaresto

20  to say that you could have these messages or the inquiry

21  coming from an SMSC.  But in fact, what he points to is the,

22  if you look at the Viaresto reference, the SPR and the SPR is

23  those profiles.  A database that includes those profiles.

24  So, the profiles in Viaresto send a lot querying because

25  based on the profile that you set, that's where, you know,

1   the phone is going to know, do I receive messages, do I

2   receive calls or not.  But there is no disclosure in Viaresto

3   that the SMSC is actually sending an inquiry.  So, that's

4   missing.

5   Q   Is what you're showing on Slide 40, is this the only

6   place that Dr. Polish pointed to as for support of his

7   analysis that the SMSC sends an inquiry in Viaresto?

8   A   Yes and if we go to the next slide, he also made the same

9   argument that you can move that functionality.  Like he needs

10  to have that functionality moved.  It cannot be a core

11  network element and he's trying to find a way to move it.

12  And really, there is no reason to move it.  The references

13  don't disclose it and going back to Sonera, you know, he

14  points to language in Sonera -- we're on the correct slide.

15  Q   Yeah, I'm sorry.

16  A   That you know, the "it" that we talked about, the "it"

17  was talking about the invention in Sonera that the service

18  node.  And so, there is no reason to move the inquiry to the

19  SMSC.

20  Q   Okay and how about the mapping step, what does Dr. Polish

21  point to for the mapping step?

22  A   So, for the mapping step, Dr. Polish says that Viaresto

23  is doing the mapping over first and second identifier.  One

24  of the criticisms that Dr. Akl brought was that Sonera, it

25  was mapping a phone number to another phone number.  And I

1    think that's completely legitimate and fine and it doesn't

2    raise a problem.  But just to be completely sure and if you

3    remember, the second number is a phone number, so it can't be

4    internal.  So, that's why he's trying to address it.  That

5    was the critique that I brought.

6           But just to be completely sure, if you look at

7    Viaresto, it talks about mapping and MSISDN to an IMSI.  And

8    what I'm showing on the left is the part of Viaresto and all

9    Viaresto does is you have a subscriber number and MSISDN,

10   that's a phone number and it can be connected to a subscriber

11   identifier like the IMSI.  It does not talk about mapping,

12   there is no mapping and again, the research is not disclosed

13   the mapping that Dr. Polish is saying is there.

14   Q    Okay.  And well, what are you showing on your Slide 43?

15   A    So, what I'm showing is, again, you need to have a

16   reason.  So, when Dr. Polish was asked why, in your opinion,

17   would someone in the field, a person of ordinary skill in the

18   art would have looked at Sonera and Viaresto together and he

19   says, it's the same analysis we've done before where it's

20   involving messaging being transferred, having external

21   messaging servers and a cellular network and getting routing

22   information from that network.  So, it's the same, it's the

23   same problem.  And I disagree with what he said, as I've

24   explained to you today, you know, what Sonera is talking

25   about, what Viaresto's talking about Sonera's talking about

1    like having two phone numbers, one you give out and -- like a

2    small number, like a little extension, a virtual number and

3    then your regular phone number and the text message gets

4    forwarded.  And Viaresto talks about profiles and really,

5    both of them aren't solving the same problem and definitely,

6    both of them aren't solving what the '870 Patent is solving.

7    Q    Mr. Dyer, can you go to Slide 36?  I just want to go back

8    here to go back to your road map, because are you completed

9    informing the jury about your analysis and conclusions on

10   validity?

11   A    Yes.

12   Q    Okay, could you walk through these three?

13   A    Yes, so my opinions are based on what Dr. Polish has said

14   and the analysis that I made.  Sonera does not anticipate

15   Claims 1, 7 and 113.  Sonera and the knowledge of one of

16   ordinary skill does not render Claims 1, 7 and 113 obvious.

17   And Sonera and Viaresto does not render Claims 1, 7 or 113

18   obvious.

19   Q    Thank you.  Slide 45.  Okay, are you now going to switch

20   gears and talk about Mr. Lanning's testimony?

21   A    Yes.  So, you get to see me double, because Sprint has

22   two experts and I'm doing the job of two experts.  So, now

23   we're going to switch gears and talk about Mr. Lanning's

24   opinions.  So, it's Comcast's burden to show infringement by

25   a preponderance of the evidence and Mr. Lanning came and

1    attacked me basically for a long time and you sit there and

2    you listen and now I get the chance to say where we agree and

3    where we disagree.  There are actually a lot of agreements

4    and there are some disagreements.  And so, the first thing

5    that Mr. Lanning said that I disagree with is that he said

6    the invention doesn't promote speed.  And if you recall on

7    his cross, he was asked about that and he was asked in the

8    question, counsel for Comcast read a sentence or a couple of

9    sentences from Mr. Lanning's expert report.  And the sentence

10   stated, this is what's on the record that was read.  It said,

11   in paragraph 203 of your non-infringement report, you wrote

12   and tell me if you remember this, "as the '870 Patent states,

13   an advantage achieved from placing the messaging server

14   external is that the multi-media message will not be stored

15   on the cellular network.  But reducing a burden in terms of

16   storage and processing.  Do you recall writing that?"  So,

17   this is something that Mr. Lanning wrote in his report.

18           Now, in his response, he kind of tries to walk away

19   from it.  And he said "Yes, that's very different than speed.

20   It's nothing to do with processing speed or bogging down the

21   network."  And I disagree with his answer that he provided at

22   trial.  I think in his report, he is saying it's reducing the

23   burden.  I think that is, you know, what he wrote in report,

24   I agree with that part that you would be bogging down the

25   network if you have those messages in the network.  This is

1   why you want to have an external messaging server.  This is

2   why you want to have a messaging server that is not a core

3   network element of the cellular network.  So, I disagree with

4   his response at trial.

5   Q   Dr. Akl, is reducing a burden in terms of storage and

6   processing, does that correlate to speed?

7   A   Yes.

8   Q   How?

9   A   Because the more -- if a core network element is doing

10  storing and it's doing processing, then you only have a

11  finite amount of resources.  And it's like, you know, you

12  have things that you have to do and you create a to-do list.

13  The more items that are on your to-do list, the less time you

14  have to do each item.  You have to be able to schedule your

15  time.  You have to be able to plan accordingly.  So, if I

16  take items off your to-do list, then you have more resources.

17  You have more time to do the things that you need to do.  So,

18  of course, if you reduce the burden on storage and processing

19  that correlates to speed, it helps you do the other stuff

20  faster.

21  Q   Okay and did you explain this to the jury in your

22  original direct examination?

23  A   Yes, so if you recall, when I was on the stand originally

24  and again, I was describing the invention and one of the

25  points that Mr. Lanning attacked me is why I kept going back

1    between 1999 and 2006.  And I correctly point to 1999 is the

2    patent, so when I'm describing the invention in the patent

3    and one of ordinary skill in the art, you look at 1999.  But

4    looking at the 1999 invention, the problem solution was the

5    message volume.  That's what the patent talked about and I

6    wrote that on the white board.  And the solution was, you

7    keep out the -- out of the cellular network until the phone

8    is ready to receive and that correlates to speed.

9    Q   And did you show how in the patent it was disclosing

10   that?

11   A   Yes.  And that's -- those are quotes that I had in my

12   direct where the patent, the invention, the '870 Patent, this

13   is DX-2, talks about it's expedient for the messaging server

14   to make sure by making an inquiry that the wireless terminal

15   in question is actually ready to receive the message before

16   transmitting the message.  So there is a speed factor

17   improvement when you move those messages outside.

18   Q   Okay.  What are you going to talk about next?

19   A   So what I'm going to talk about next is how Mr. Lanning

20   incorrectly disregards function of core network elements.

21          So to show infringement, again it was Comcast's

22   burden and Comcast through me, I spent a day, because I had

23   to walk through each and every element of the claims to show

24   that Sprint practices all these elements.  And it was a long

25   talk and you guys were a great audience and it was -- and I

1    had to go through all of them.  And this is when we look at

2    2006 now through the infringement period, through the

3    present, and we looked at the Sprint documents and the

4    testimony and so on.

5            The good news is Mr. Lanning does not dispute the

6    steps.  So there is the mapping step that we discussed, he

7    doesn't dispute that; the determining step, he doesn't

8    dispute that; the sending a response with the aid, he doesn't

9    dispute that.  He only has a single dispute and we're going

10   to talk about that, but that's good.

11           So as a jury you have to decide if there is

12   infringement, so you don't have to worry about all the steps.

13   There's going to be a single question regarding infringement

14   and you can answer that question, that is the only dispute

15   between the analysis that I did and Mr. Lanning's opinion.

16   So --

17   Q    Why don't we go right to the -- oh, sorry.  I thought

18   there used to be a box up there, but what --

19   A    Yeah.

20   Q    -- can you please point out to the jury where the sole

21   dispute is?

22   A    So the sole dispute is whether the messaging server is

23   external or not and what that means is whether the messaging

24   server is core.  So at this time I think we have the claim

25   construction -- can we put that up on the easel --

Akl - Direct                                    36

1   Q   Sure.

2   A   -- please?

3           MR. GOETTLE:  Your Honor, this is just the claim ct.

4           THE COURT:  Thank you.  Does that whiteboard have an

5   exhibit number?

6           MR. GOETTLE:  It does not, your Honor.  Keeping with

7   the tenor of this case, it does not have a number on it.

8           (Laughter.)

9           THE COURT:  Well, the record will reflect that the

10  whiteboard being shown to the jury is a definition of

11  cellular network --

12          MR. GOETTLE:  It's --

13          THE COURT:  -- messaging server?

14          MR. GOETTLE:  It's the Court's construction of

15  cellular network, yes, your Honor.

16          THE COURT:  Well, I said two things, it's the

17  Court's construction of cellular network, and that's in your

18  binders as well.

19          THE WITNESS:  So the only question, which is really

20  good, we've spent two weeks and for infringement we only have

21  a single dispute, is is the messaging server a core network

22  element or not.  And the Court has been very helpful -- can

23  we go to the next slide?

24          MR. GOETTLE:  Sure.

25          THE WITNESS:  -- because the Court provided a

1  construction for cellular network.  So the claim says you
2  have to have a messaging server that's external and so to
3  answer that question you need to know what a cellular network
4  is.  And the claim construction for a cellular network says
5  -- and you have seen this now so many times -- you need to
6  have a wireless terminal, so that's not the messaging server;
7  you need to have a base station system for communicating with
8  the wireless terminal and you need to have core network
9  elements, that's the only way a messaging server can be part
10 -- can be core.
11        And the Court said "may include subscriber
12 databases."  There isn't a dispute, the subscriber databases
13 are core and mobile switching centers are core and packet
14 switching nodes are core.  So those three words -- well,
15 there are three phrases, cellular network may -- and we have
16 the core network and the messaging -- those are what we have
17 to put together.
18        If the -- so let me make my point clear -- if the
19 word "may" isn't there, if the Court's construction -- and
20 this is a big if -- says core network elements include all
21 these, the messaging server is core, there is no
22 infringement, we're done, and if messaging server is not
23 core, then there is infringement.
24        And so 90 percent of the work based on this
25 definition is just determining is the messaging server core

1   or not and that's the only thing we have to deal with.  All

2   the other elements of the limitations of the claims are not

3   disputed as far as Sprint practices them.  But because the

4   claims require the messaging server to be external, which

5   means it cannot be a core network element, and I was here for

6   the two weeks and you've heard a lot of testimony, it has to

7   be core network element to the cellular network.

8           And so if we -- can we go to -- so let's start

9   looking at --

10  BY MR. GOETTLE:

11  Q    Let me ask you a question.  Dr. Akl, please explain to

12  the jury how in your opinion, in your analysis and your

13  conclusions, how should the jury go about determining whether

14  Sprint's messaging servers are a core network element of

15  Sprint's cellular network?

16  A    So we have the Court's claim construction of cellular

17  network and the Court gave us a construction as three things

18  and we have to look at core network elements.  We have to

19  have an understanding, an agreement of what core means.  And

20  when a term is not defined, you have to go by the plain and

21  ordinary meaning.  How can anybody say if it's core or not if

22  we don't have an understanding of what the core means?  And

23  without a construction, without another definition for core,

24  the Court tells us we go with the plain and ordinary meaning.

25          So I open up the dictionary and in my expert report

1  I pulled up the dictionary, and I have looked at in a regular

2  dictionary what does the word "core" mean.  And it gives you

3  multiple definitions, but it is saying it is a basic, it's

4  essential, enduring part, the essential meaning.  So when I

5  use the word essential and core as synonyms, I didn't make

6  that up; that's what the dictionary says, that is what the

7  Court says we go with the plain and ordinary meaning.

8              And, you know, Mr. Lanning didn't provide an

9  alternative definition.  He didn't say -- you know, I've

10 heard counsel attack me using the word essential because it's

11 not in the construction, the word core is in the

12 construction.  So core and essential are the same thing,

13 because that's what you do.  If you have a word, you want to

14 know what that word means, you look in the dictionary if it's

15 not construed.  Regular dictionary, plain and ordinary

16 meaning.  So core is essential.

17             So that helps this functionality of it being

18 essential is what helps in my analysis to say is the

19 messaging server core, is it essential, and it has to be

20 essential to the cellular network; not essential in general,

21 it's essential to messaging.  If you don't have a messaging

22 server, you don't have messaging.  It is essential to a

23 messaging network, it's essential to Sprint's network in

24 general, but is it essential to Sprint's cellular network?

25 And that answer is no.

1          And we're going to go through a lot of slides just

2    to show the single point that the messaging server is not

3    essential, is not a core network element in Sprint's cellular

4    network.

5    Q   So how do you go about determining that Sprint's

6    messaging servers are not essential to Sprint's cellular

7    network?

8    A   So let's go to the next slide.  So if I want to determine

9    what something is or is not, we have a construction for

10   messaging server, so the Court also helped us along.  And the

11   construction for messaging server means "the server has the

12   functionality of storing and forwarding and for sending an

13   inquiry."  So even the Court's definition of messaging server

14   is in terms of functionality.  So I have to look at these two

15   functionalities and I have to compare with the functionality

16   of what core network elements do to determine is these two

17   functionalities essential or core to a cellular network.  And

18   if you answered that question, we're done.

19   Q   So, Dr. Akl, you look at the functionality of the

20   messaging server in trying to determine whether it is a core

21   network element of Sprint's cellular network?

22          MR. FINKELSON:  Objection --

23          THE WITNESS:  Exactly.

24          MR. FINKELSON:  -- leading -- objection, leading,

25   your Honor.

Akl - Direct                                          41

1           THE COURT:  Sustained.

2           MR. GOETTLE:  I'll withdraw it, your Honor.

3           THE COURT:  And the jury will disregard the answer.

4  You can cover it --

5           MR. GOETTLE:  Thank you.

6           THE COURT:  -- with an appropriate question.

7           MR. GOETTLE:  Thank you, your Honor.

8  BY MR. GOETTLE:

9  Q    Does the patent refer to functionality?

10 A    Yes.  And so when we look at the -- so the evidence that

11 I looked at, the documents -- and we're going to walk through

12 what Mr. Lanning looked at and what I looked at and where we

13 agree and where we disagree -- my focus is on functionality

14 because that's really the question that you have to answer.

15 When we start out with the patent, the patent is describing

16 the functionality of an MMSC can also be implemented and how

17 it's implemented.  The Court's construction describes the

18 messaging server in terms of functionality.  So this is what

19 we have to do is look at functionality.  And it may seem like

20 one thing, but it's the most important thing and it's the

21 only thing that's going to matter.

22 Q    And do you -- well, what are you showing on slide 60?

23 A    So this slide is now looking at the standards.  So even

24 when we go to the standards -- and this is the CDMA 2000

25 standard that Mr. Lanning looked at, and he said it's a good

1    place to start and I agree -- so let's look at the standard

2    and let's see what the standard tell us in terms of

3    functionality.

4           So this is DX-3 and both me and Mr. Lanning looked

5    at the CDMA 2000 standard and we looked at section 5 and we

6    looked at figure 2.  The first thing in the description says

7    figure 2 presents the functional entities and it talks about

8    implementations may vary with respect to how functional

9    entities are distributed among various physical limits --

10   physical units.

11          So again the standard is describing things from the

12   point of view of functionality, that's why functionality is

13   very important, and these boxes are in terms of functionality

14   and you look at how the functionality is implemented.

15   Q    Did any other Sprint witnesses testify as to

16   functionality?

17   A    Yes.  So Mr. Lipford was asked DX-3 -- and Mr. Lipford

18   was Sprint's -- a Sprint representative or somebody that

19   Sprint put on, he works at Sprint, I think he was in charge

20   of the standards, if my recollection is correct.  And he said

21   DX-3 is laying out the functions -- he was asked, is DX-3

22   laying out the functions that may comprise a cellular

23   network, and his response is yes.  Again, I don't think it's

24   disputed the standards describe things in functionality.

25   So --

1    Q    So what are you showing on slide 64?

2    A    So when we go to the standards and the standard describes

3    mobile switching centers and it describes home location

4    registers, again -- and this is the CDMA 2000 standard, I

5    think we're still in DX-3 --

6    Q    And by the way, what does CDMA 2000 have to do with

7    Sprint's network?

8    A    CDMA 2000 -- I mean, these standards and what CDMA and

9    the network -- the accused network for Sprint is CDMA.

10   Sprint has a CDMA network, it had an iDEN network at a point

11   in time because they bought iDEN, but -- so there are -- so

12   we're focusing on CDMA because that's Sprint's network,

13   that's the accused network.

14   Q    Okay, so I interrupted you.  So what are you showing on

15   64?

16   A    So if you remember, I had my analogy of the switchboard

17   operators when I was describing the term core; I didn't just

18   make that up.  If you look at mobile switching center, this

19   is from the standard, it says "the interface for user traffic

20   between the cellular network and other public switch

21   networks."  And that's the point that I kept making is those

22   core network elements need to be able to connect the phones

23   to the outside networks and the mobile switching centers does

24   the switching, that's why it's a core network element based

25   on that functionality.

Akl - Direct                                        44

1          The home location register, it's not disputed, those

2     are core network elements because that's where the subscriber

3     database is, that's the lookup.  You need to look up to know

4     how to connect, you need to be able to connect.  So and when

5     you look at even the definition of HLR in the standard it

6     says, "the HLR may or may not be located within and be

7     indistinguishable from an MSC."

8          So again, the standards talk about functionality and

9     they talk about how you can combine functionality; you can

10    take the functionality of an HLR and put it in an MSC.  And

11    so that's important because that's how you can end up with a

12    messaging server that is core.

13         We have the core functionality -- sorry, we have the

14    functionality of a messaging server.  So this functionality

15    on its own cannot be a core network element, because we have

16    the claim construction that says "may."  So if the Court

17    answered that question and this was core, we would have been

18    done, but the only way a messaging server can be core is if

19    this functionality -- and by this functionality I mean the

20    store and forward and the sending an inquiry -- is

21    implemented in a unit that is doing core functionality.  So

22    if I take those two functionalities and I put them in a

23    mobile switching center, then I end up with an essential or a

24    core messaging server.  And that's what we've described

25    before and I'm going to have a slide on that.

Akl - Direct                                    45

1      So if you recall during my direct we talked about an

2  Ericsson patent, this was in 1999.  I'm on slide 65, this was

3  PX-547.  And if you go to the next slide, in column 3, lines

4  26 through 30, this patent which was before the '870 Patent

5  talked about how you can have a messaging switching center

6  that includes a messaging center.

7      So back in the '90s you could take that

8  functionality, because you didn't have a lot of messaging,

9  you could take the functionality of store and forward and you

10  could take the inquiry and put them in a core network

11  element.  You cannot do that in 2006 and forward because it's

12  going to bog down the network and that's what the patent, the

13  '870 Patent's invention is, you want to move them outside,

14  but in the '90s you could have had an internal messaging

15  server, you could have had an external messaging server.

16  Q   Okay.

17      MR. FINKELSON:  Your Honor, objection for the

18  record.  And I'm trying to give Mr. Goettle as much leeway as

19  possible, but this is rebuttal.  So I think we're now

20  retreading old ground that is just Dr. Akl repeating his

21  direct testimony, which as the Court acknowledged went on for

22  some time.  So I would just -- I would ask that this

23  examination be limited to actual rebuttal so that --

24      THE COURT:  That's a fair objection, Mr. Goettle.

25      The purpose of rebuttal, ladies and gentlemen, is to

1    give the plaintiff, in this case Comcast, an opportunity to

2    respond to what Sprint has said as presented in its case.

3            And so, Mr. Goettle, you are instructed to proceed

4    in that manner.

5            MR. GOETTLE:  I will, your Honor.

6    BY MR. GOETTLE:

7    Q   Dr. Akl, did Mr. Lanning take issue with your what has

8    been referred to as a snow cone diagram and where that snow

9    cone diagram came from?

10   A   Yes.  So this is Sprint doesn't -- Mr. Lanning disagrees

11   with me that Sprint even has a messaging network, somehow

12   there's no messaging network, and I have produced documents

13   that show Sprint has a messaging network.  Why?  Because you

14   have messaging.  And so you have a messaging network, you

15   have a messaging server and the messaging server is essential

16   in the messaging network, but it's not essential to the core

17   -- it's not a core network element in the cellular network.

18           So one of the disagreements were with this figure.

19   So this is a figure -- and I'm going to walk through exactly

20   what I did, because I was attacked on this figure for the

21   reasons why does Sprint have a messaging network and what I

22   did with this figure.  So what you're seeing now in slide 67

23   is the figure exactly how it appeared in the Sprint document

24   and the title of the figure was "Sprint messaging high-level

25   architecture diagram."

1   Q    Okay.  Now I'm going to click and can you please tell the

2   jury what happened?

3   A    Yes.  What I did -- and I walked through this -- what I

4   did is I just made those colors more vibrant.  So I haven't

5   changed anything yet except I just made the blue bluer and

6   the green greener.  So you see the blue is marked in the

7   legend the messages and the green was provisioning.  So

8   again, no change except highlighting the same colors that

9   were in the document.

10  Q    Okay.  And I'm going to click, what's going to happen

11  when I click?

12  A    Yes.  So what's going to happen -- and what I did was

13  three things:  the SPS, which is the subscriber database, the

14  HLR, which is the home location register, and the phones, the

15  subscriber phones I removed from this figure.  And so if you

16  click, they're gone.  And they're not gone forever, but if we

17  go to the next slide they are here.  So --

18  Q    You're circling on slide 69, what did you just circle?

19  A    Yes, so slide 69 is showing two things.  On the right

20  part of slide 69 is what has been referred to now as my snow

21  cone diagram.  The top part is Sprint's messaging network

22  that I modified by taking three things off and those three

23  things were the phones, the HLR and the SPS.  So if you

24  compare on the left, the left part is the original diagram.

25  And so this is the SPS, this is the HLR and these are the

Akl - Direct                                48

1    phones.

2          And the reason I removed them from Sprint's

3    messaging network, because based on the construction and we

4    have the construction of cellular network, the phones are in

5    the cellular network, the HLR is a core network element, and

6    the SPS is a subscriber database is a core network element.

7          So again all I did was I'm trying to help the jury

8    understand Sprint's network and there's a lot of documents,

9    and I used the figures that I thought are most helpful to

10   understand that Sprint has a messaging network and there are

11   components that were shown in Sprint's messaging network that

12   are in the cellular network.  And so I merely removed them

13   from the messaging network and showed them in the cellular

14   network where they belong based on the Court's claim

15   construction.

16   Q    Now, did Mr. Lanning or any other Sprint witness take

17   issue with the notion that Sprint has these components as

18   part of its cellular network?

19   A    No, I don't think there is a dispute that Sprint has cell

20   phones, that Sprint is in a cellular network, that Sprint has

21   an HLR that's a core network element.  And so there is no

22   dispute to what is in Sprint's cellular network.  The only

23   again dispute is the messaging server and the messaging

24   server is the MMSC and the SMSCs, those are not core network

25   elements in Sprint's cellular network, that's the only

1    question, that's the only dispute.

2    Q   Did Mr. Lanning take issue with you relying on what's

3    shown on slide 70, PX-174?

4    A   Yes.  And I was asked and he took issue with -- he said

5    one would not use this document, but it's a good document and

6    the reason -- no one has said anything is wrong with this

7    document, but they don't -- Sprint or Mr. Lanning doesn't

8    like the document because it says "messaging network

9    components."  So this is a document that helped me in my

10   analysis in saying Sprint has a messaging network, this is

11   why this is a document it shows acronyms that are used for

12   components in Sprint's messaging network.

13   Q   Did Mr. Lanning take issue with any of the acronyms and

14   the terminology that was used in the document?

15   A   No.  They didn't say anything is wrong with it, they just

16   didn't think you would rely on it.

17   Q   And did you have any other documents that actually also

18   referred to Sprint's messaging network?

19   A   Yes.  And so this document I relied upon in my report and

20   I was also -- there was also attack from Mr. Lanning that I

21   did not rely on a design document.  He pointed to the

22   importance of design document that describe Sprint messaging

23   network.  So what we're looking at is PX-127 and PX-127 is

24   titled "E4208 Next Generation Messaging and Imaging Design."

25            So this is a Sprint design document and if you look

1   at page 34 there is a section that I've pulled up, a part on

2   page 34 in Section 3.2.2.3.5.3 and it says "the core Sprint

3   messaging network."  I don't think there is any doubt in my

4   mind from the evidence that I have seen that Sprint has a

5   messaging network and it works with the cellular network.

6   That's why I put both pictures near each other:  there is a

7   cellular network, there's a messaging network.

8   Q    Now, Dr. Akl, even if Sprint does not have a messaging

9   network, quote-unquote, "messaging network," how would that

10  affect your analysis and conclusion?

11  A    It doesn't.  So, I mean, regardless of what you call it,

12  it is -- you can call it supplemental services, you can call

13  it additional services that they're providing cellular users,

14  you can call it a core services to their business model and

15  they consider messaging a core service to their business

16  model, that doesn't change the opinion and the question that

17  we have to answer, are messaging servers core network

18  elements in a cellular network.

19  Q    Okay.  And in light of the objection and the instruction

20  from the Court, Dr. Akl, we're going to jump ahead a little

21  bit to slide 75.  What are you showing on slide 75?

22  A    So Mr. Lanning -- this is a slide from Mr. Lanning's deck

23  and it's slide -- I can't read the number, 660 something --

24  Q    I think it's slide 6.

25  A    Oh, okay.  So this is a slide from Mr. Lanning and he was

1    talking about and he says -- he was talking about messaging

2    and the first text message was in 1992, it said "Merry

3    Christmas," but he made a bullet point and he said it

4    exploded in popularity and demand in the mid to late '90s,

5    and I disagree with that.  I don't think, you know, messaging

6    was big in the mid to late '90s.  I mean, Sprint didn't

7    implement two-way messaging until 2004, the phones were

8    really small in the -- you know, before Blackberry's

9    keyboards in 2002 and in 2007 with the iPhone.

10            So this is a point that he was making that I

11   disagree with.

12   Q   Okay.  How about slide 76?

13   A   So Mr. Lanning used this analogy of an apartment and a

14   washer and dryer and I think the whole analogy is very

15   misleading.  It's really not an accurate analogy because he's

16   talking about inside and outside, and you have an apartment

17   and you have walls and you can see if the washer and dryer is

18   inside or outside the apartment, that's not really what we're

19   trying to figure out.  We are looking at functionality, we're

20   looking at messaging and if messaging servers are core

21   functions in a cellular network.  And so the closest I can

22   make that analogy would be are washing and drying clothes a

23   core functionality of having an apartment?  And the answer is

24   no.  So -- but again, I think the whole analogy is

25   misleading.

1    Q    Okay.  What are you going to talk about next?

2    A    Okay.  So the next topic are -- is Mr. Lanning's holistic

3    characteristics.  So he went through a lot of characteristics

4    in order to determine or to provide an analysis and I

5    disagree with his conclusion, because the characteristics

6    that he looked at don't cut it one way or another and that's

7    what we're going to be walking through.

8    Q    Okay.  So what are you showing on slide 78?

9    A    So during Mr. Lanning's cross Counsel wrote down based on

10   Mr. Lanning's answers Mr. Lanning's holistic characteristics,

11   and there were seven that were written down that really were

12   covered during his direct under his holistic analysis, but he

13   didn't call them out point-by-point during his direct and it

14   was during his cross that Counsel wrote them down.

15   Q    And why is it helpful to have these pulled apart and

16   listed like this?

17   A    Because that's really what he bases his opinions on.  If

18   you look at all his opinions, they're really covered by these

19   points.  So if we go through these points, it makes it easy

20   to untangle his opinions.

21   Q    And what does the patent have to say about -- first of

22   all, what does he use these seven holistic characteristics

23   for?

24   A    He used it to determine whether the messaging server is

25   core or not.

Akl - Direct                                           53

1   Q    Okay.  And what does the patent say about these

2   characteristics in the determination of whether a messaging

3   server is core or not?

4   A    So the patent itself doesn't cut one way or another,

5   because, I mean, one, the patent is equally applicable to

6   CDMA and GSM, and the patent talks about how you can have a

7   messaging server functionality that's implemented in a core

8   network element or you can have it not, so you can have it

9   internal or external.  So the patent itself doesn't cut one

10  way or another and in fact the preferred embodiment, the

11  claims, the invention is you want the messaging server to be

12  external.

13  Q    I think what you just did maybe was answered a question I

14  wasn't asking yet.  I'm not focused on the first holistic

15  characteristics in this list, I'm just talking about the

16  entire list.  What does the patent have to say about these

17  holistic characteristics in determining whether a messaging

18  server is a core network element?

19  A    The patent doesn't really go through these.  These aren't

20  in the patent, these weren't -- this isn't something, you

21  know, the patent said this is what you have to look at --

22  Q    Okay.

23  A    -- this is something that Mr. Lanning came up with.  And

24  if we actually go through all of them, what I'm going to show

25  you is all of them are neutral, all of them don't cut one way

1   or the other whether the messaging server is a core network

2   element.

3   Q    Okay.  Now, in terms of the holistic characteristics,

4   where did Mr. Lanning say that these characteristics came

5   from?

6   A    So during his cross counsel for Comcast was asking him

7   and they were written down in agreement with Mr. Lanning, and

8   yet during his redirect when Sprint's counsel asked him about

9   these factors, Mr. Lanning said this is a creation that -- of

10  Comcast's factor analysis that I started at my deposition

11  about a year ago.  So he's walking away from these factors on

12  redirect.

13  Q    Okay.  And did he on his cross indicate that these seven

14  holistic factors were a creation of Comcast's counsel?

15  A    No.  These are his factors.  I mean, in his cross-

16  examination he answered -- he said I didn't have a seven-

17  factor tests, but there were seven different types of

18  characteristics -- and this is why the title isn't test, it's

19  characteristics -- that I looked at that we walked through on

20  a two-day period.  So these are his characteristics and in

21  his direct he talks about his holistic analysis.

22  Q    Okay, let's go to the first one.  So what are you showing

23  on slide 83?

24  A    Okay, so I'm going to walk through them fairly quickly,

25  there are seven points, and I'm going to show -- and you

1   already know the punch line -- that all of them don't cut one

2   way or the other, they're all going to be neutral, but we

3   have to look at the evidence.

4          So the first one is the patent.  I've already said

5   that the -- when you look at the '870 Patent it covers both

6   CDMA 2000 and -- which is what Sprint uses in GSM.  So the

7   patent doesn't inform you one way or the other.

8   Q    And did Mr. Lanning agree with that?

9   A    Yes.

10  Q    What did he say?

11  A    When he was asked if it applies equally, he said that is

12  correct.  So this is one point that we don't disagree, which

13  is good.

14  Q    Okay.  Next you're going to talk about the standards?

15  A    Yes.

16  Q    Okay.  What are you showing on slide 86?

17  A    So we have to look at do the standards cut one way or the

18  other and it was broken down into for MMS, which is the

19  multimedia messaging, and SMS, which is the text messaging.

20  So for the MMS part of the standard, the standard says some

21  network operators may wish to implement the MMS functionality

22  within the core network, and then you can have it -- you can

23  have third party.  So the MMS standard doesn't inform one way

24  or the other because it gives you two scenarios.

25  Q    And did Mr. Lanning agree with that?

Akl - Direct                                          56

1    A    Yes.

2    Q    What did he say?

3    A    When he was asked the standard isn't recommending one way

4    or the other with regard to MMS and MMSC, he said that's

5    correct.

6    Q    Okay.  Are you going to talk about the SMS?

7    A    Yes.

8    Q    What are you showing on slide 89?

9    A    So this is where we do have disagreement, because for SMS

10   Mr. Lanning seems to believe that -- it's his opinion that

11   the standard says it's internal and I disagree.

12          When we look at -- so we're looking at the 1997 CDMA

13   standard and again the standard says "the functional entities

14   and the associated interface reference points that may

15   logically comprise a cellular network."  And this is a slide

16   from Mr. Lanning's deck, this is slide 32.  And again it's

17   talking about things from the point of view of function and

18   it says it may.  So I don't think may means recommend, I

19   don't think may means you put it inside.  May doesn't help

20   you one way or the other, that's what you have to decide, the

21   same way we have may in the Court's construction of core

22   network elements.

23   Q    And what did Mr. Lanning say about that?

24   A    He said it's in the recommendation, it says it may

25   include, which also just like the construction it may not as

1   well, but he's kind of pushing it in terms of a

2   recommendation, which I disagree.

3   Q    Okay.  And what did Mr. Lipford say?  Who was Mr. Lipford

4   again?

5   A    Mr. Lipford was Sprint's standards person, witness, and

6   he was asked on network reference model in this document DX-3

7   that we've been looking at is laying out the functions that

8   may comprise a cellular network and he said yes.

9   Q    Okay.  What are you showing on slide 92?

10  A    So this was another slide from Mr. Lanning's deck, this

11  was slide 42.  And what Mr. Lanning did, he had the 1997 CDMA

12  standard, he had the 1999 CDMA standard, and he had a figure

13  from the patent, and he's comparing and contrasting the

14  standards and implying that the messaging server is core in

15  the standard, which is the messaging center, and while in the

16  patent it is external.  And he's making this distinction how

17  the patent is for GSM and CDMA uses CDMA and they're very

18  different and I disagree.

19          And so I thought it's good, let's compare both

20  standards together.  So what you have on slide 93, this is

21  DX-3, which is the CDMA standard, which is again what Sprint

22  and Verizon use, and on the right part of my slide is DX-238.

23  This is a figure from the standard, from the GSM standard,

24  and this is what AT&T and T-Mobile use.

25          And so what you see is one there is some -- there is

1    similarity.  You have a mobile station and you have a mobile

2    station that's called MT like mobile terminal in the GSM

3    standard; you have the base stations in the CDMA standard and

4    you have the base station systems in the GSM standard; you

5    have mobile switching centers and you have VLR in the CDMA

6    standard and you have mobile switching centers and VLRs,

7    those are visitor location, that's the subscriber database,

8    in the GSM; you have an HLR in the CDMA standard, you have an

9    HLR in GSM.  And then we have the messaging center and we

10   have an SMSC, the SMS center.

11            So again, the standards aren't that different.

12   There's functionality that's slightly different and there's

13   functionality that is somewhat similar.  The air interface

14   between both of them is really what's different.  But looking

15   at the CDMA standard or looking at the GSM standard, the

16   standards don't cut it one way or the other, they don't give

17   you a recommendation is the messaging center, which is what's

18   here, is that a core network element in the cellular network

19   or not, that's the point.

20   Q   Okay.  And what's the point of your slide 94?

21            THE COURT:  Before we get there --

22            MR. GOETTLE:  Yes.

23            THE COURT:  -- it's quarter after 11:00, let's

24   recess for ten minutes.

25            (Jury out at 11:13 o'clock a.m.)

 1          THE COURT:  We're in recess for ten minutes.

 2          (Court in recess; 11:13 to 11:30 o'clock a.m.)

 3          (Jury in at 11:30 o'clock a.m.)

 4          THE COURT:  Be seated, everyone.

 5          You may proceed, Mr. Goettle.

 6          MR. GOETTLE:  Thank you, your Honor.

 7  BY MR. GOETTLE:

 8  Q   Dr. Akl, I think you were about to tell us why you have

 9  Mr. Lanning's slide 34 --

10          THE COURT:  34?

11  BY MR. GOETTLE:

12  Q   -- Mr. Lanning's slide 34 on your slide 94.

13          THE COURT:  Oh.  94 is our slide?

14          MR. GOETTLE:  Yes, sir.

15          THE COURT:  Thank you.

16          MR. GOETTLE:  Dr. Akl's slide is 94, yes.

17          THE COURT:  Is 94?

18          MR. GOETTLE:  Yes.  So we're on Dr. Akl's slide 94.

19          THE COURT:  Okay, which is Mr. Lanning's slide 34?

20          MR. GOETTLE:  Yes, your Honor.

21          THE WITNESS:  So what -- I think what Mr. Lanning

22  did here was a little misleading, because he took Figure 2

23  from this standard, which as we've been talking about shows

24  functional entities, and he put like physical devices on

25  them.  So it makes it look like these are all computers or

1    stand-alone computers and that's really misleading, that's

2    the point of that.  They're not physical entities, these are

3    functional entities and you can combine the functionalities

4    of these boxes in one box or in multiple boxes, that's what

5    the standard shows.

6    BY MR. GOETTLE:

7    Q    Okay.  You're next going to talk about Sprint's

8    documentation and Mr. Lanning's opinions regarding that?

9    A    Yes.

10   Q    What are you showing on slide 97?

11   A    So on this slide, which is Mr. Lanning's slide 48, he's

12   showing, you know, a map of the U.S. and he's showing

13   Sprint's data centers, and he's saying that they hold core

14   network elements like the SPS, which is correct, but he also

15   says that because the messaging servers are right next to

16   them then that must be core.  So that's really not a

17   determining factor.

18        The SPS is a subscriber database, it's important.

19   If the SPS goes down there's a lot of things that you cannot

20   do, not just messaging; you can't do voice-over IP and you

21   can't connect to the Internet and so on.  So the SPS is a

22   core network element in the cellular network.  The messaging

23   server sits next to it, but it's not a core network element

24   in the cellular network.

25        And he had a quote, he was misquoting what I was

1    saying and he was pointing to what I was saying and he said

2    it didn't make sense.  The quote that he has of me here, I

3    was merely describing when you're driving you have the

4    phones, you know the phones, you know the towers, you can see

5    the towers, the core network elements are ones that you

6    cannot see and some of them are in data centers, and you have

7    a lot of different data centers that Sprint has.  So just

8    where something is located doesn't tell you one way or the

9    other.

10   Q   And how about the other core network elements of Sprint's

11   cellular network, can you kind of at a high level say whether

12   they're in these yellow boxes or not?

13   A   Right.  So we're going to actually have another slide on

14   that, but the HLRs, the home location registers, these are

15   not in these data centers, in these three data centers.  The

16   MMC, which is the mobile switching centers, Sprint has 90 of

17   those and they're all over the place, they're in switch

18   sites.  So as far as what core network elements are in these

19   three, the only three that we're pointing to is the SPS,

20   which originally wasn't and then they were moved.

21   Q   And how about Sprint's prior SMSCs, the Comverse SMSCs,

22   were those in the locations that are shown here with the

23   yellow boxes?

24   A   No.

25   Q   Okay.  What are you showing on slide 98?

Akl - Direct                    62

1   A    Okay, this is an important slide because this is in slide

2   53 of Mr. Lanning he pointed to this document and he was

3   making a point that on the right side of the figure it said

4   Sprint's in-network, and he took that as everything in this

5   box is now core, originally he was focusing on what he had

6   highlighted in yellow, which are the messaging servers.  And

7   so he was asked what's shown in the box are core network

8   elements, they're not all of -- but he answered yes.

9         And then when he was asked to go through them one-

10  by-one and if he in fact did an analysis, a lot of those

11  boxes he did not know.  So he says I need to correct my

12  statement, I haven't even analyzed all these boxes, and he

13  says it's not relevant to the opinion, but it's relevant to

14  the opinion that he's making.  He is rebutting my opinion and

15  he's saying that the messaging servers are core network

16  elements and he's using this to illustrate that because it

17  says Sprint in-network that tells him that it's core, when in

18  fact because it's sitting next to other boxes that says

19  Sprint in-network.  But all those other boxes, this one, this

20  one, this one, this one in the Sprint's in-network, he didn't

21  know if they're core or not.

22        So how can he come to a conclusion that this box is

23  core based on this figure when all the other boxes next to it

24  in this in-network may or may not be.  That's I think the

25  flaw in his analysis here.

Akl - Direct                                             63

1    Q    Okay.

2    A    And again he -- you know, he says, you know, this is core

3    because that's the MSC.  So this figure again isn't telling

4    you one way or the other what's core and what's not.

5              And then he looks at --

6    Q    Picture Mail?

7    A    Yes, he looks at Picture Mail.  And so on the left side

8    Picture Mail, which was hosted by Syniverse, which started in

9    2003, so this is Picture Mail and he's saying, okay, so this

10   is what makes it external and this is why everything else is

11   internal.  Again, I -- Picture Mail is an external messaging

12   server, because when we look at the functionality it is

13   external, it's not a core to the cellular network, and the

14   question is, is the messaging server core functionality or

15   essential functionality to Sprint's cellular network.  And

16   where it's hosted is not really relevant and this is not core

17   for the same reason -- the Picture Mail is not core for the

18   same reason what's -- you know, the other messaging servers

19   are not core.

20   Q    Okay.  So you agree with Mr. Lanning that the MMSC hosted

21   by Syniverse as Picture Mail is not a core network element?

22   A    I agree it's not core, but we agree for different reasons

23   why it's not core.  He thinks because it's Syniverse that's

24   what makes it not core, it's not core because of the

25   functionality, the same functionality regardless of where you

Akl - Direct                                               64

1    put it, it's not a core network element for Sprint's cellular

2    network.  So we have the same conclusion, but for different

3    reasons.

4    Q    And what are you showing on your slide 101?

5    A    So looking at the different experts and we had Patrick

6    Wilson, we had Sean Hoelzle and we have Ramesh Golla, these

7    were all Sprint testifying witnesses.  And when Mr. Lanning

8    was asked, you wouldn't just taking the notion of what these

9    witnesses used the term core network and then link that up to

10   core network elements in the claim construction, and he said,

11   yes, it doesn't necessarily match up.

12            So the point is all of Sprint's witnesses, you know,

13   other than Mr. Lanning, the engineers that worked on the

14   different components, they're looking at, you know, from a

15   Sprint point of view or from a business point of view or from

16   -- they're not looking and applying the Court's construction,

17   they're not looking from the patent's point of view and the

18   claim construction that you have in front of you and that's

19   really the only thing that matters; that's the binding

20   definition for what makes it core and that's why we have to

21   look at the functionality, not -- and so what they're looking

22   at is something that doesn't immediately match up.  So just

23   because they think of it as core, they're not applying the

24   Court's construction.

25            And so it may be important, it may be essential to

1  messaging, but it's not core network element in a cellular

2  network, that's the point.

3  Q   Okay.  What are you going to talk about next?

4  A   So next Mr. Lanning looked at protocols and he said, you

5  know, that helps him come up with a characteristics that

6  defines -- he can determine if it's core or not and it really

7  doesn't.  Because he was pointing to SS7 and he said the

8  components that are all core talk SS7 to each other and he

9  used that as an example that the messaging servers also talk

10  -- SS7 is just a protocol, I mean, it's a way two computers

11  talk, but any time you have two computers that talk you're

12  going to be using some protocol.  So the question is, is it

13  the same protocol, is it different protocols?  It really

14  doesn't matter.  And even with his point on SS7 you have the

15  MSC, which is the switching service center, which is core,

16  talking to the public switch telephone network over the same

17  protocol, SS7, that the switch is talking to the messaging

18  server.

19         So really when you look at protocols, if it's the

20  same or different, that doesn't weigh one way or the other.

21  Q   Okay.  How about Mr. Lanning's holistic characteristics 5

22  and 6, who operates it and ownership?

23  A   So again that doesn't help, because if you think of the

24  cellular network, we have to define cellular network and the

25  Court gave us a construction.  And so ask yourself, who owns

Akl - Direct                                          66

1    and operates the phones?  You do, subscribers do.  I do, I

2    have a phone.  So it's not Sprint.  So the phones that are

3    the first component of a cellular network isn't owned and

4    operated by Sprint.

5          And then when you look at the towers, a lot of times

6    the towers are leased.  And we're running out of tower space,

7    so we have super towers and you have a tower that Sprint has

8    antennas on it, AT&T has antennas on it, Verizon has antennas

9    on it.  So who operates and ownership of a device doesn't

10   tell you if this device based on who operates it and who owns

11   it is a core network element or not or is in the cellular

12   network or not, because as you see, you know, the phones are

13   in the cellular network, they're not owned by Sprint.

14         So again there is a flaw, those holistic

15   characteristics do not help determine core network elements.

16   Q   And does the patent itself address ownership and whether

17   an element is a core network element or not?

18   A   Yes, it does, and it doesn't cut one way or the other.

19   When we look at what's in the patent itself it says, you

20   know, preferably the MMSC is located outside, you know, of

21   the IP network of the operator that also, you know, manages

22   said default GGSN, and it talks about different operators and

23   who manages and can be managed by a company or managed by an

24   operator.  So whoever manages something doesn't mean that's

25   what makes it core or not, you go back to the functionality.

Akl - Direct                                    67

1   Q    Okay.  What are you going to talk about next?

2   A    So the last point is 7, which is the physical location or

3   relative physical location, and that's something I was

4   attacked on.  If we go to the next slide, where -- you know,

5   I don't think location matters, location doesn't really

6   matter, and Mr. Lanning, you know, is looking at things from

7   -- he says he's looking at things from a holistic point of

8   view and to him location matters.  But again, you look at the

9   functionality.

10          And so I disagree that physical location or location

11  -- and he kept going back to the messaging server sitting

12  next to the SPS, that in his mind makes it core, that doesn't

13  inform me one way or the other.

14  Q    And what about what he says on your slide 113 where

15  you're showing his slide 13?

16  A    Yeah, so in his slide Mr. Lanning pulled a sentence from

17  this patent and a sentence from a different patent that's not

18  even asserted in this case, but it is by the same inventor,

19  and it said, you know, the messaging servers would preferably

20  be located outside.  So he's holding onto this word located,

21  but that's not physical location, that's functional location.

22          So when we talk about function, functionally, is it

23  core or not, that's what we mean by, you know, located

24  outside the cellular network or inside the cellular network.

25  Q    What are you showing on slide 114?

Akl - Direct                                        68

1    A    And Mr. Lipford, who was Sprint's standards guy, he was

2    asked, you know, does geography have anything to do with what

3    is part of a cellular network, and his response is no.  I

4    mean, that's -- I agree with that, yes.

5    Q    Okay.  And slide 115?

6    A    Okay.  So this is Mr. Lanning's slide 17 and he created

7    this demonstrative for the jury.  And I thought it's also a

8    little bit misleading because, you know, he has this core

9    network in yellow and to me I look at it, it seems like

10   they're all together or this is the core network or one

11   location, and it's really not the case.

12        So what you see is you have data centers and you

13   have the mobile switching centers.  This is what we're

14   talking about, MSC is what does the switching and Sprint has

15   90 of those all over the U.S., and those are not in a data

16   center.  You have the HLR, the subscriber database that knows

17   the location of the phone, those are not in the data center

18   that has the messaging servers.  You have the PDSN, those are

19   the switching nodes that allow you to connect to the Internet

20   and have voice-over IP, those are not in the same data

21   centers that have the messaging center.

22        So I just thought this point, this slide is a little

23   misleading and I just wanted to clear that up for the jury.

24   Q    Okay.  And how about the computers themselves, the mobile

25   switching centers and the messaging servers in there, are

1    they drawn to scale?

2    A    I mean, no, it's -- I mean, he's trying to make the point

3    now the most important thing is the messaging servers and

4    they're in the middle and I just -- I disagree.

5    Q    Okay.  What are you showing on your slide 117?

6    A    So my conclusion and it's a very important point that he

7    -- Mr. Lanning, even though he, you know, looked at a lot of

8    things and he had this holistic review, which he had come up

9    with just for this case and he says it's based on his, you

10   know, years of experience, it's not something that you'll

11   find in a book, he didn't get it from a book or from a

12   textbook or from an article, he came up with it, and it

13   doesn't answer the question that you guys need to answer; it

14   does not address functionality and it does not answer the

15   question one way or the other is the messaging server a core

16   network element in Sprint's cellular network, in a cellular

17   network.

18   Q    Okay.  So let's talk about what Mr. Lanning said Sprint's

19   messaging servers do.  On your slide 118, what are you

20   showing?

21   A    Yes.  Now, what's interesting is the Court gave us a

22   construction for messaging server and the Court's

23   construction has the messaging server has two

24   functionalities:  one is store and forward and one is doing

25   the querying.

1          So let's start with the store and forward, which is

2     part of the Court's claim construction.  And, you know, Mr.

3     Lanning said, yes, it stores and forward and you can only

4     forward to two places, you either forward to the MSC, mobile

5     switching center, if it's going like from Sprint to Sprint,

6     or you forward to the inter-carrier gateway.  And these are

7     his points here, you see mobile switching center and inter-

8     carrier gateway.

9

10         So he admits that you can only send it to these two

11    places and I agree.  And if you're sending it to inter-

12    carrier gateway, you use the SPS; if you're sending it to the

13    mobile switching center, you use the HLR.

14         So this is the one functionality and it's in the

15    Court's claim construction, but the second functionality,

16    which is also in the Court's claim construction, is the

17    query.  The messaging servers query, you know, the HLR, they

18    send a question to the HLR and the HLR comes back with the

19    answer, and it queries the SPS.  Everything else it's like he

20    wants it to look more important.  Receiving, it's implicit in

21    storing and so -- I mean, receiving is there, it's not adding

22    anything.  The screening, it's not doing screening.  The SPS,

23    it's that database is the one that has the white lists and

24    the black lists and they check if the phone number can send

25    or receive.  Blocking, that's not done by the messaging

1   servers, they're done by the SPS.  The messaging server asks

2   the SPS a question, the SPS does the determining and it

3   brings back the answer.  The routing, the routing is the same

4   as the forwarding, it can only go to two places.

5        So when you go through his list and he's describing

6   functionality, he kind of inflates the functionality and

7   we're back down to the two functionalities that are in the

8   claim construction.  And so I found this slide to be

9   misleading because it makes the messaging server want to be

10  more important than it is.

11       And one point that he attacked me on, he kept saying

12  that the messaging server is more important than the SPS,

13  because the SPS is core and the messaging server has to be

14  core and he thought I -- you know, he didn't understand my

15  logic.  If you think about it, what is more important,

16  something that knows the answers or something that asks you a

17  question?  The messaging server asks the SPS a question, the

18  SPS is what does the determining and it does it for the

19  messaging server, it does it for a lot of other things.  When

20  you're connecting to the Internet, it answers those

21  questions.  And so when you think of what's more

22  knowledgeable, the one asking the question or the one that

23  has the answers and then give you the answer.

24       So again, his attack on my logic I found amusing

25  because I thought it was -- you know, he was taking things

1   out of context and it didn't make sense what he was saying.

2   Q    Okay.  What are going to talk about next?

3   A    So we're getting close to being done, there's only a

4   couple of points left.  The apportionment, and the

5   apportionment is important to damages, it's not really

6   related to infringement.  So if you go to the next slide.

7            Those -- this is a Sprint document and I use this

8   Sprint document to count the number of steps, I counted all

9   the number of steps in this document.  And the reason I used

10  this document, because Ms. Riley needed to use that number,

11  the Comcast damages expert, but this document is good.  It's

12  a Sprint document, there's nothing wrong with this document,

13  there was one thing, like one inconsistency in terms of one

14  message being in the wrong location, but as far as --

15  Q    Can you --

16  A    -- counting --

17  Q    -- Dr. Akl, just -- can you just circle where that error

18  was and --

19  A    Yeah, I think there was this response right here comes

20  down a little later, that's really the only point, but as far

21  as counting the number of steps, they're all correct.

22           So it didn't really affect the point that I needed

23  to make with this document, but what's really important is

24  that this document mirrors the steps in the patent, it's at

25  the same level.  The patent is describing four steps, you

1    have -- you send an inquiry, you do a mapping, you get a

2    response, and at that level of where you are in terms of what

3    you need to do with the messaging server and how it talks to

4    the cellular network, this is a good document for counting

5    steps.  So I don't see anything wrong with this document.

6    And no one pointed to -- like my counting of steps in this

7    document is correct, I counted all the steps here.

8    Q    This document though does not show any step of the phone

9    sending a message to the tower or the tower sending a message

10   to the mobile switching center, right?

11   A    Right, and that's perfectly fine, because sending a text

12   message does not put any load on the radio network.  You

13   already have control channels, you already have a cellular

14   network in place to be able to make calls.  So you have

15   traffic channels and you have signaling and control channels

16   and that was already there.  And when you send a text message

17   it uses those control channels, those signaling channels.  So

18   there is no additional load, it's a free ride.  The text

19   message on the wireless portion is riding for free and so

20   it's using those preexisting channels.  So -- and that's

21   consistent with this document, because we don't care about

22   these steps.  If they're not in the steps, it doesn't burden

23   the messaging network because it's using those radio control

24   channels that are already there.

25   Q    Okay.  You said it doesn't burden the messaging network,

Akl - Direct                                    74

1    how --

2    A    No, I'm sorry, it doesn't burden the radio network, those

3    steps on -- that's why they're not on this -- I mean, that's

4    one reason maybe they're not on this slide.

5    Q    Okay.  So what are you showing on slide 99?

6    A    Yeah, so this is another slide like an impact slide.  You

7    know, you look at it like, oh, my God, what is on this slide?

8    And it's slide 99 from Mr. Lanning.  And I've looked at these

9    documents and I have worked on this case for several years,

10   so there is no surprise.  And it's not that I'm hiding

11   something or this document is something I need to re-look at.

12   And so I am going to take a couple minutes and help the jury

13   with this slide and do what Mr. Lanning didn't do.  And he

14   used this slide and he had this quote in his direct, if we

15   can show it, he said "there's a lot of steps here and this is

16   the point of this slide."  Having a lot of steps is not a

17   point unless there is something that we need to be looking

18   at.

19        So let's look at this document for a couple of

20   seconds.  And what I've done is I've blown up -- because

21   there's a lot of things on this slide, I've blown up the top

22   row.  So this is the top row.  And now when you blow it up

23   you see, if you look at the labels, it says HSP here and this

24   is the high-speed proxy, so that's part of the messaging

25   server, and it says MMSC front end, so this is the front end

1    of the messaging server, and it says MMSC back end.  So when

2    you're building computers you have like front ends and back

3    ends and you can have functionality divided in different

4    servers and stuff, so -- but this is the same device.

5            So these three things is basically the messaging

6    server, so let me circle them here.  So that's one -- that's

7    the messaging server.  And so when you look at all these

8    steps, those are all internal steps done in the messaging

9    server.  So this is why this is not a good document to use

10   because we don't care all the little steps inside the

11   messaging server.  And so looking at you have a lot of steps

12   from the same device to itself, so it looks like there's a

13   lot of information, but it's not useful information, it's not

14   relevant information to what we need to focus on in this

15   case.

16   Q   Well, how does this internal information and these steps

17   inside the machine, how do they correlate to the claims of

18   the patent?

19   A   All these steps is basically like one step in the claim.

20   So the document that I looked at is a better document to look

21   at because it's closer to how the claims correlate.  All

22   these steps here from the same device to itself, that's not

23   in the claims.  I mean, the claims don't care that you can

24   ask yourself multiple steps and you go through different

25   steps within the same device, that's not relevant.  You have

1    the flow between the messaging server and the cellular

2    network and that's what's important.

3           And so --

4    Q   Slide 100?

5    A   Yes.  So this is another slide that Mr. Lanning used and

6    again he's incorrect in what he tried to describe to the

7    jury, because, you know, in the slide that I have used it

8    says there is a message between the handset to the messaging

9    server, so that captures how you get the message to the

10   messaging server.  And then if you recall, I know it's a

11   little gray doubt, there were two steps where the messaging

12   server asks the SPS a question, that was the MO-LDAP and then

13   you get a response back, these were the two here.  Those two

14   steps here that I did count are actually here.  So you see

15   the HSP -- remember, this is one device -- or this is one --

16   this is a messaging server, so it can be small component or a

17   subcomponent of the messaging server.  So this is the MMSC

18   front and the HSP.  That's -- the messaging server is talking

19   to the SPS and this is a step here that -- that's the step

20   right there and then this is the response.  And so these

21   steps -- so the LDAP search and the result set between the

22   messaging server, which is the HSP and the MMSC talking to

23   the SPS are there.

24          And so again, you know, he's trying to make a big

25   deal out of something that's completely unnecessary.  And it

1  looks like an overwhelming document, but this is a document

2  that I spent a lot of time looking at and it's not relevant,

3  it doesn't change the opinion, and the document that I

4  focused on is the correct document because it is analogous to

5  the steps of the claim.

6  Q   Okay.  Last, what are you going to talk about?

7  A   Yes, so one more slide.  The last point I'm going to be

8  making is the MVNO agreement.  And we heard a lot about the

9  MVNO agreement and this is the business agreement between

10 Sprint and Comcast that they entered into two years before

11 this patent, you know, years before the litigation, it has

12 nothing to do with why we're here today, but there are

13 definitions in it.  And so the question is, is it relevant?

14 Do I look at a business agreement that everybody who wrote it

15 didn't read the patent, didn't look at the Court's claim

16 construction, and do I look at that definition and do I apply

17 it, is it relevant?  And the answer is no for a couple

18 different reasons.

19        The first one, it's not a business agreement -- I'm

20 sorry, it is a business agreement, so it would not be

21 relevant.  But more importantly, even if we go to these

22 terms, there was a focus on core network, the agreement

23 itself is over-inclusive and under-inclusive.

24        MR. GOETTLE:  So, Mr. Darra (ph), could we put up

25 DX-16 instead?

Akl - Direct                                78

1          (Pause.)

2          THE WITNESS:  So this is the X-16, this is the first

3  page of the agreement.  Let's go to the page that actually

4  has core network on it, please.  And if we can zoom in at the

5  top of the page?  Actually zoom in a little more.

6  Q   Actually zoom out, right?

7  A   Yeah, so I zoom out to two things, yeah.  That's fine.

8          So there was a lot of notice on core network, and I

9  think there is agreement that it is overinclusive because

10 here it's describing the infrastructure and the bay stations

11 that according to the core's construction in front of you is

12 not part of the core network.  The base stations are

13 separate.  You have phones, base stations and core networks

14 in a cellular network.

15         So it's overinclusive because it includes that.

16 What no one seemed to look at, which I thought was also

17 important is -- let's go to the next definition.  And the

18 next definition is core network enablers in this business

19 agreement.  And it says a means --

20         MR. FINKELSON:  Your Honor, objection.  Dr. Akl's

21 offered no testimony at any point in his expert reports

22 throughout the case about the term core network enablers.

23 It's beyond the scope of his report.

24         MR. GOETTLE:  Your Honor, he's rebutting Mr. Lanning

25 and we had this very same question yesterday with Mr. Dippon.

1          THE COURT:  And the answer is the objection's

2     overruled.  I ruled in your favor on that issue yesterday

3     during the examination of Dr. Dippon, and I think that's the

4     appropriate ruling.  So same ruling.  With respect to this

5     objection it's overruled.

6          MR. FINKELSON:  Thank you, your Honor.

7     BY MR. GOETTLE:

8     Q    You were talking about core -- everyone's favorite

9     subject, core network enablers.

10    A    Yes.  So can I continue with my answer?

11    Q    Yes.

12    A    Is that -- okay.  So core network enablers means those

13    certain non-transmission element while core network talks

14    about infrastructure that provides connectivity and

15    transmission. So there is a distinction between core network

16    and core network enablers.  And what's in the enablers aren't

17    in the core network.  But what is very interesting, let's

18    look at what core network enablers are.  So if you go to

19    Schedule 3 in this document, and if you can blow up this part

20    which is under core network enablers in this document, under

21    E it talks about a home location register.  So a home

22    location register is a core network enabler,  and that is not

23    a core network.

24          Well, as we've been talking the whole time --

25    Q    Can we put that together now and go back --

1   A   Yes.  Go back to where we were with core network and core

2   network enablers.  So this document defines the home location

3   register and components associated with the home location

4   register.  Those are non-transmission elements because these

5   are databases, they don't transmit.  But they are core

6   network enablers and they're different than the core network.

7           So again this is why I would not use this document

8   in this setting.  It's a business agreement, the definitions

9   itself are overinclusive, like it includes the definition for

10  core network, includes base stations.  It's also

11  underinclusive because the HLR's which no one is disputing

12  are in the core network because they're subscriber databases

13  are not here.

14          So finally this document is written, you know,

15  there's a description of core services.  I don't disagree.

16  Sprint has core services that are voice and data and

17  messaging.  They're important from a business point of view.

18  We've heard a lot of Sprint engineers talk about that.  But

19  that's not what we're deciding.  We're not deciding if

20  messaging is important to Sprint.  We're not deciding if

21  messaging is core to Sprint's business or it's core to

22  messaging network.  Is it going back to the single thing,

23  last thing, only thing, is a messaging server core or

24  essential to Sprint's cellular network, and that answer is

25  no.

Akl - Direct                                    81

1   Q    Were you here for Mr. Hoelzle's testimony?

2   A    Yes.

3   Q    Do you recall how he described his understanding of

4   Sprint's core network?

5   A    Yes.  He was looking at -- he thinks if anything is a

6   core service, it's in the core network.  And that's his

7   understanding.  If it's important to Sprint, regardless of

8   what network we're looking at, they have, you know, a CDMA

9   network, they had an IDEN network.  Sprint is a huge

10  telecommunications company.  They have wire lined, wireless.

11  If it's core to -- if it's a core service or it's a core to

12  them, it's a core network element.  And that may be fine from

13  an engineering point of view or a business point of view, but

14  that's not we are here to decide.  And that's not, you know,

15  we have a core construction that got us 90 percent of the

16  way.  We just need to decide -- and by we I mean you.  I've

17  already made that decision -- that Sprint's messaging servers

18  are not essential.  They're not core network elements in

19  Sprint's cellular network.  That's the question.

20       And any time I get asked half of that question, is

21  the messaging server essential?  Yes.  Is the messaging

22  server essential in Sprint's network?  Maybe.  Yes.  I mean

23  you lose messaging servers, you lose messaging.  But is it

24  essential, is it a core network element in Sprint's cellular

25  network, that is the question, cellular network the answer is

Akl - Direct                                   82

1    no.

2              MR. GOETTLE:  No further questions.  Thank you,

3    Doctor.  Thank you.

4              THE COURT:  Mr. Finkelson.

5              MR. FINKELSON:  Thank you, your Honor.

6                        CROSS-EXAMINATION

7    BY MR. FINKELSON:

8    Q    Good afternoon, Dr. Akl.

9    A    Good afternoon.

10   Q    So I think much of what you just said today you already

11   said when you were talking to the jury last week and I'm not

12   going to replow old ground.

13             What I'd like to focus the jury on for starters is

14   what was known prior to the '870 patent application in 1999.

15   Is it fair to call what was known prior to the '870 patent

16   application in 1999 prior art?

17   A    Yes.

18   Q    Were cellular networks known in the prior art, Dr. Akl?

19   A    Yes.

20   Q    Mobile stations known in the prior art?

21   A    Yes.

22   Q    Were base stations known in the prior art?

23   A    Yes.

24   Q    Base station systems, were they known in the prior art?

25   A    Yes.

1    Q    How about core networks, were they known in the prior

2    art?

3    A    Yes.

4    Q    Mobile switching centers, were they known in the prior

5    art?

6    A    Yes.

7    Q    Same with subscriber databases, you'd agree they were

8    known in the prior art, correct?

9    A    Yes.

10   Q    You'd also agree that SMS was known in the prior art,

11   correct?

12   A    Yes.

13   Q    In fact, isn't it true that text messaging had already

14   become substantial by the time of the late 1990's?

15   A    I disagree with that.

16   Q    You disagree with that.  Okay.

17            Can we pull up Dr. Akl's expert report in

18   invalidity?

19            Can we turn to paragraph 81, please.

20            Dr. Akl, let me bring you up a copy of the ...

21            May I approach, your Honor?

22            THE COURT:  You may.

23   BY MR. FINKELMAN:

24   Q    Dr. Akl, do you recognize what I've passed up to you as

25   your expert report regarding validity of the 870 patent in

1    this case?

2    A    Yes.

3    Q    And this is your report, you signed it, correct?

4    A    Yes.

5    Q    It contains your opinions, right?

6    A    Yes.

7    Q    And in paragraph 81 of your report you stated SMS

8    messaging did not become substantial until the late 1990's.

9    Do you see that, sir?

10   A    Yes, in this context, yes.

11   Q    And that's the context of your expert report regarding

12   whether SMS messaging was substantial come in the late

13   1990's, right, sir?

14   A    Yes.

15   Q    So do you now wish to change your answer?  Do you agree

16   that text messaging had already become substantial come the

17   late 1990s.

18   A    This is -- I'm not referring to what's happening in the

19   US.  As you recall, Sprint didn't have two-way messaging

20   until 2004.  But based on the discussion in this section,

21   what I have in the opinion here is correct.

22   Q    SMS messaging had become substantial by the time of the

23   late 1990's, right, sir?

24   A    Yes, sir, in the context here.

25   Q    Okay.  In the context of your expert report in this case?

1        And in fact in paragraph 81 you cited a web archive

2   GSM new release, did you not, sir?

3   A    Yes.

4   Q    And in that news report, it stated that in the United

5   Kingdom along one country, there are 189,000 text messages

6   being sent in just the month of December 1999?

7   A    Yes, in Europe and here in England.  We were focusing on

8   what was happening in Europe.

9   Q    You'd agree that SMSC's were known in the prior art

10  before the '870 patent priority gate, correct?

11  A    Yes.

12  Q    Now, back when this trial began, Dr. Akl, you told this

13  jury that the inventor of the '870 patent came up with the

14  solution of keeping a message out of the cellular network

15  until the phone is ready to receive it.

16  A    Yes.

17  Q    In fact, that's what you wrote up on your board that you

18  had in front of the jury last week when you were talking to

19  them, right?

20  A    Yes.

21  Q    But as you've previously admitted in this case, Dr. Akl,

22  SMSC's existed external to the cellular network in prior art

23  GSM networks as of December 1999; correct?

24  A    We have to be -- no.  And can I explain?

25  Q    I think if I tried to stop you a higher authority would

Akl - Direct                                    86

1    tell me I couldn't.

2                THE COURT:  The answer is yes.

3    A    So the standards talk about an S -- I've shown you the

4    acronym SMSC which is the short message service center.  The

5    SMSC as a box is not a messaging server as it's construed by

6    the Court, because the Court says a messaging server needs to

7    have two functionalities of store and forward and querying.

8    The querying functionality was not -- I have not seen

9    evidence in this trial that the -- as you saw what Dr.

10   Falldish (ph) described.  The querying is coming from a core

11   network element.  And so we can't say the SMSC is a messaging

12   server on its own, because the SMSC is only doing storing and

13   forwarding.  So I agreed that the storing and forwarding

14   functionality in an SMSC is external, but that is not a

15   messaging server because it doesn't have the querying cards.

16   Q    Are you through?  I didn't ask you about messaging

17   servers.  We're going to get to those in a minute.  I just

18   asked you about MSMC's.  You've accused SMSC's in this case

19   of infringement.  I'm just talking about SMSC's.

20               My question is isn't it correct, Dr. Akl, that

21   SMSC's existed external to the cellular network in prior art

22   GSM networks as of December 1999?

23   A    Yes.  And has been seen as a box yes.

24   Q    And that box, that SMSC that existed prior to the '870

25   Patent, it was for storing and forwarding SMS messages

1  external to the cellular networks, correct?

2  A   Yes, and that's exactly what I just said.  So I

3  anticipated maybe your question.

4  Q   And the purpose of that in the prior art, was it not, Dr.

5  Akl, was to avoid overburdening the cellular network?

6  A   That could be one reason.

7  Q   In fact, it was a reason that you identified in your

8  expert report, correct?

9  A   Yes.  You keep them external and you don't burden the

10 network.

11 Q   Right.  SMSC's were typically external to the cellular

12 network as of the '870 Patent's priority date which avoided

13 overburning the cellular network.  Do those works sound

14 familiar?

15 A   Yes.

16 Q   Okay.  That's from your expert reports, correct, sir?

17 A   It's -- I've written lots of reports.  I'm sure it is if

18 you're reading it.

19 Q   And in fact the GSM standards, Dr. Akl, prior to the '870

20 patent explicitly showed an external MSSC, didn't they?

21 A   It tolled the option.  I think it's inconclusive.  It

22 shows you  the ability to maybe have it external or have it

23 internal.  I don't think it said one way or the other.

24 Q   Okay.  Not mandatory, but at least it taught that you

25 could do it externally, correct?

1   A   Yes.

2   Q   And in fact, MMSCs, they were also typically external to

3   the cellular network and the prior work GSM networks as of

4   1999, correct?

5   A   Yes.  The storing and forwarding functionality I would

6   agree is external.

7   Q   And that means that MMSC's were also typically external

8   to the cellular network in the prior art GSM networks as of

9   1999, right?

10  A   Yes.

11  Q   In fact, Dr. Akl, contrary to what you have told this

12  jury, you had previously admitted in this case that the '870

13  patent does not teach solving any problem by locating the MMS

14  messaging server outside the cellular network.  Correct?

15  A   I'm not sure I understand the question.

16  Q   The question is you had previously admitted in this case,

17  Dr. Akl, have you not, that the '870 Patent does not teach

18  solving any problem, any problem, by locating the MMS

19  messaging server outside of the cellular network.  Correct?

20  A   I'm not sure.

21  Q   Okay.  Well, let's turn to paragraph 87 of your

22  invalidity report, the same report that you have in front of

23  you, sir.  I'll give you an opportunity to take a look at it

24  when we put it up on the screen.

25          MR. FINKELSON:  Can you highlight, Mr. Baird, where

1    it starts with MMSC's and SMSC's through the word network?

2    Q    This is your expert report, correct, Dr. Akl?

3    A    Yes.

4    Q    And in your expert report you stated, "MMSCs and SMSCs in

5    the prior art were typically external to the cellular

6    network."  Have I accurately read that, sir?

7    A    Yeah.  That suggests they soar in forward capability.

8    Q    And that remains your opinion, right, sir?

9    A    Yes.

10   Q    And you then said "With that in mind, the '870 Patent

11   addresses a problem caused by the fact that such servers were

12   external rather than internal to the cellular network and

13   therefore could not communicate with mobile devices that had

14   dynamic addresses in the network."  Have I read that

15   correctly?

16   A    Yes.  That is exactly when I wrote and I wrote on the

17   board problem one, solution one, problem two, solution two.

18   This is exactly problem two, solution two.  The messaging

19   servers are external.  They cannot communicate with the

20   cellular network, so the solution to that, the problem's

21   solution is now we need to do the mapping.

22   Q    In GSM networks the storing and forwarding of SMS and MMS

23   messages was already done outside of the cellular network;

24   correct?

25   A    The storing and forwarding, there were -- yes, they were

1    -- it was indefinitive.  The senders don't say one way or the

2    other.  But if you look at the prior art, when reading the

3    prior art it's not conclusive if you want to put it inside or

4    outside.

5    Q   Okay.  But it was conclusive enough for you, sir, was it

6    not, to state MMSC's and SMSC's  when you're talking about

7    GSM in the prior art were typically external to the cellular

8    network.  It was conclusive enough for you to say that,

9    correct?

10   A   Yes.

11   Q   Ms. Aho (ph) in the '870 Patent, she didn't solve the

12   problem of keeping messages out of the cellular network, that

13   was already solved, Dr. Akl, by others in the GSM prior art,

14   correct?

15   A   No, I disagree with that.  The issue is the standards

16   didn't say one way or the other.  They said you can have it

17   inside, you can have it outside.  The invention in the '870

18   Patent, what Ms. Aho said, she made a recommendation.  This

19   is why the claims say it has to be external.  She said okay.

20   I'm going to say you are going to put it outside, and with it

21   outside that's going to cause a problem.  And now I'm going

22   to tell you the solution to that problem.

23          So the problem/solution, problem/solution that I

24   gave is Ms. Aho taking a stand saying it is going to be

25   outside versus the center that says you can have it outside,

1    you can have it inside.  But it's not really looking at the

2    issues.

3    Q    Okay.  Paragraph 87, the last sentence.  You wrote, "The

4    '870 Patent does not, however, teach solving any problem by

5    locating the MMS messaging server outside the cellular

6    network."  That was your opinion then and it's still your

7    opinion today?

8    A    Yes.

9    Q    You also agree, Dr. Akl --

10             THE COURT:  I didn't hear the answer.

11             THE WITNESS:  The answer is yes, your Honor.

12   BY MR. FINKELSON:

13   Q    You also agree, Dr. Akl, that messaging servers -- you

14   wanted to talk about messaging servers before, so let's talk

15   about those.  You also agree, Dr. Akl, that messaging

16   servers, as that term is used in the '870 Patent it existed

17   in the prior arts before the '870 Patent, correct, sir?

18   A    Yes.  The functionality of storing and forwarding and

19   querying did exist.

20   Q    Both of the functions of the messaging server that you've

21   talked to this jury about, they existed prior to the '870

22   Patent; correct?

23   A    Yes.

24   Q    Messaging servers external to the cellular network Ms.

25   Aho wasn't the first one to come up with that idea; correct?

1   A    No.  When we talked messaging server if you recall with

2   Dr. Polish, he has the messaging server as two separate boxes

3   and it straddles.  So there was not this functionality of

4   storing and forwarding and querying.  Both were not external.

5   I did not see anything that Dr. Polish presented where the

6   querying is done external.  So we can't jump the gun and say

7   the messaging server is external.

8   Q    I'm asking you about your opinions.  The opinions that

9   you've expressed in this case.  And I thought you answered my

10  question, but maybe I misunderstood you, so let me go back.

11  Do you agree, Dr. Akl, do you not -- now let me ask it

12  differently.  Don't you agree, Dr. Akl, that messaging

13  servers as that term is used in the '870 Patent and as

14  defined by the Court existed in the prior art before the '870

15  Patent?

16  A    The two functionalities of storing and forwarding and

17  querying did exist, yes.

18  Q    Not quite my question.  So you're telling me the two

19  functions existed.  My question's a little bit different.

20  You agree, do yo not, Dr. Akl, that messaging servers as that

21  term is used in the '870 Patent as defined by this Court

22  existed in the prior art before the '870 Patent?

23  A    I think I've answered the question.  The answer is yes.

24  Q    Yes, you agree that it existed, correct, sir?

25  A    In fact isn't it true, Dr. Akl, that in your report in

1  this case you said that the prior art that was before the

2  Patent Office during the prosecution of the '870 Patent

3  taught all of the limitations of the asserted claims except

4  they did not teach mapping, a first and second identifier and

5  using the second identifier to retrieve device information.

6  A    Yes.

7  Q    It was known in the prior art, correct, Dr. Akl, that you

8  could query and retrieve an associated value from a database?

9  A    Yes.

10  Q    It was also known in the prior art that you could query

11  and retrieve an associated value from a subscriber database?

12  A    Yes.

13  Q    And you would agree that determining information in

14  response to a query to a subscriber database, that, too, was

15  known in the prior art, correct?

16  A    Yes.

17  Q    Can you tell ours were known in the prior art, right, Dr.

18  Akl?

19  A    Yes.

20  Q    Identifiers external to the cellular network.  They, too,

21  were known in the prior art; correct?

22  A    Yes, people had phone numbers, that's an example.

23  Q    And identifiers internal to the cellular network, they

24  were known in the prior art, too, correct?

25  A    Yes.

1    Q    And you also agree that the Scenaro reference that you

2    talked about today to this jury, it's prior art to the '870

3    patent, isn't it?

4    A    Yes.

5    Q    And would you also agree with me that the Scenaro

6    reference maps a virtual phone number to an MS/ISDN

7    to obtain wireless terminal information?

8    A    Yes, it maps the phone number to another phone number.

9    Q    Okay.  Are MS/ISDNs and IMSIs, I-M-S-I, identifiers of a

10   wireless device?

11   A    I think we're switching gears because I don't remember

12   IMSI in Scenaro.  So is that a different context.

13   Q    Are you familiar with the term IMSI?

14   A    Yes.

15   Q    Can you explain to the jury what it is?

16   A    IMSI is like a serial number.  It is like a serial number

17   to your phone.  IMSI.

18   Q    I didn't mean to interrupt you, sir.  Is and IMSI, I-M-S-

19   I an identifier of a wireless device?

20   A    It could be.

21   Q    Is an MS/ISDN an identifier of a wireless device?

22   A    That's the phone number.  There's a lot of acronyms.  I'm

23   trying to keep those acronyms straight.  A phone number, yes.

24   Q    It's an identifier of a wireless device?

25   A    Yes.

1   Q    You also agree, Dr. Akl, that the Viaristo (ph) reference

2   is prior art to the '870 Patent?

3   A    Yes.

4   Q    You also agree that the Viaristo addresses a problem in

5   GSM networks, right?

6   A    Yes.

7   Q    You've testified at length about the Viaristo today.  I

8   take it you have a copy up there with you, sir?

9   A    No.

10  Q    You haven't had a copy the whole time you've been talking

11  about it?

12  A    I don't have a copy in front of me.  I was going by my

13  slides.

14  Q    Okay, let me bring you a copy.

15         MR. FINKELSON:  Your Honor, may I approach?

16         THE COURT:  You may.

17  BY MR. FINKELSON:

18  Q    Now you indicated, sir, that you have been going by your

19  slides during your testimony today.  Are those what you have

20  in front of you?

21  A    Yes.

22  Q    Do your slides have additional notes on them as well?

23  A    Yes.

24  Q    Are those notes you prepared before taking the stand to

25  testify?

Akl - Direct                                        96

1    A    Yes.

2    Q    If we could turn to figure one of DX-242 which is at page

3    7351 in Bates number.

4              Dr. Akl, I've got it up on the screen, but let me

5    know when you're ready.

6    A    Okay.  I'm good with the screen.

7    Q    Do you recognize this as figure one from the Viaristo?

8    A    Yes.

9    Q    And do you agree that the SMSC in the Viaristo is

10   external to the cellular network in the Viaristo.

11   A    Yes.

12   Q    Do you also agree, sir, that the SPR in the Viaristo is

13   internal to the cellular network?

14   A    Yes.

15   Q    Now, Dr. Akl, you agree, don't you, that a patent issued

16   by the United States Patent Office can be invalid?

17   A    Yes.

18   Q    In fact you've provided testimony in many cases that a

19   patent issued by the Patent Office is invalid, haven't you?

20   A    Yes.

21   Q    And that's because the Patent Office got it wrong in your

22   opinion in those cases, right?

23   A    In those cases, yes.

24   Q    In fact, you have also opined as an expert, correct, Dr.

25   Akl, that a patent was invalid even though the Government

Akl - Direct                                    97

1    issued it a first time and then found it valid a second time

2    on further review?

3    A    Yes.

4    Q    And that's because you felt like the Patent Office got it

5    wrong two times in those cases?

6    A    Yes.  There were things in the file wrapper for that case

7    that I disagreed with.

8    Q    And you also agreed that the Patent Office can get it

9    wrong even with respect to prior art that is cited to the

10   Patent Office?

11   A    Yes.

12   Q    You have talked, sir, about the PDSN or PSDN in the

13   context of your testimony -- I think it's PSDN.  Packet data

14   switching -- PDSN.  You've talked about the PDSN in the

15   course of your testimony.  Do you recall that, sir?

16   A    Yes.

17   Q    Do you agree that a Sprint subscriber today can make a

18   traditional circuit switch voice call without the PDSN?

19   A    Probably, if they still have to achieve compatibility

20   through the MSC's, yes.

21   Q    And in fact in 1999 you would agree that a Sprint

22   subscriber could make a circuit switched voice call without

23   using the PDSN, correct?

24   A    Yes.

25   Q    And it's your opinion that the PDSN is a core network

1 element, right, sir?

2 A    Yes.  Based on the patent and the date of the invention

3 and the functionality of what a PDSN does, yes.

4 Q    Let me read you something, Dr. Akl.  "The Court disagrees

5 that Mr. Lanning applied a seven-factor analysis in this

6 case.  The record is clear that Mr. Lanning only referred to

7 the factors to answer a hypothetical question asked by

8 Comcast counsel."

9           MR. GOETTLE:  Objection, your Honor.  I don't know

10 what the Court has to do with Dr. Akl's opinion.

11           MR. FINKELSON:  I'm addressing, your Honor, the

12 seven-factor analysis that Mr. Goettle asked Dr. Akl a long

13 series of questions about.

14           THE COURT:  I didn't get the lead in.  I gather

15 that's what you're talking about.

16           MR. GOETTLE:  Your Honor, I think a sidebar might be

17 in order.

18           THE COURT:  Well, I think it's time for lunch, and

19 we'll do both.

20           Ladies and gentlemen, it's 12:30.  We'll recess for

21 an hour.  Do not discuss the case among yourselves.  If

22 anyone talks to you about the case say nothing to them and

23 report that to me.  Be sure you take your juror notebooks and

24 the binders into the jury room and leave them.

25           See you back here at 1:30, one hour.

Akl - Direct                                99

1          (Jury exits the courtroom at 12:30 p.m.)

2          THE COURT:  You may step down, Dr. Akl.  Same for

3     the jury.

4          You can be seated.  The lead-in to the question was

5     objected to and I just don't see that it's necessary.  It

6     might be objectionable because of the reference to my ruling.

7          MR. HANGLEY:  Your Honor, I couldn't hear --

8          THE COURT:  I think we ought to --

9          MR. HANGLEY:  -- what you said --

10         THE COURT:  -- I think we ought to start this.

11    First of all, I thought the subject was introduced in a

12    rather unusual way, you're talking about the seven holistic

13    factors, or I think that's what Mr. Finkelson is talking

14    about.  Your objection?

15         MR. GOETTLE:  My objection is, your Honor, I believe

16    that the Counsel is inviting the jury to think that you, your

17    Honor, have disagreed that Mr. Lanning applied this holistic

18    characteristic analysis and if you are putting a stamp of

19    disapproval on my questioning of Mr. Lanning and Dr. Akl, I

20    think that is very prejudicial and I also think it's

21    irrelevant.  So I don't -- I would actually like to hear the

22    lead-in again, because it caught me a little bit off guard

23    too.

24         THE COURT:  I was waiting for something a lot less

25    argumentative and --

1          MR. GOETTLE:  From me?

2          THE COURT:  No, from Mr. Finkelson.

3          MR. FINKELSON:  Well, your Honor, Counsel has put at

4   issue the seven-factor analysis, they've given it a new name.

5   They even proceeded today, in addition to showing about 40

6   slides about it, they also put on slides where they purported

7   to say or challenged the notion that Mr. Lanning wasn't the

8   one who came up with the seven-factor analysis.  They put on

9   slides specifically going to his deposition testimony,

10  suggesting to this jury that Mr. Lanning in fact came up with

11  this seven-factor analysis in his deposition, they know that

12  -- they did that knowing full well that that's an issue --

13         THE COURT:  Well, I think the objection, Mr.

14  Finkelson, is to your leading into the question with a

15  statement as to my ruling on it and I don't think that's

16  relevant at all.  You can certainly question Dr. Akl about

17  the factors and there were -- it turns out there were seven

18  of them.  And Mr. Lanning referred to them as his holistic

19  factors, the Comcast side has described them as the seven-

20  factor test, and you can --

21         MR. GOETTLE:  I have not used the word test --

22         MR. FINKELSON:  Nor did I and --

23         MR. GOETTLE:  -- once.

24         MR. FINKELSON:  -- nor did I.  I used the word

25  analysis, which was exactly the language that your Honor used

1   when you said he didn't do a seven-factor analysis and it

2   wasn't his analysis that he came up with --

3           THE COURT:  Well, if you --

4           MR. FINKELSON:  -- it came up in cross-examination

5   at deposition.  So that was the purpose, I understand your

6   Honor's --

7           THE COURT:  You can cover it, you can certainly

8   cover them.  What we're talking about is the fact that I

9   think the first time the phrase seven-factor analysis -- and

10  pardon me for forgetting that it was an analysis and not a

11  test -- the first time it came up was via the Sprint

12  questioning on cross-examination, but when you count the

13  factors it turns out there's seven of them.  And so if you

14  think this is a subject that you have to get into, you can

15  get into it without referencing my ruling and what I said

16  about the seven-factor test.

17          So to the extent that that was the basis of the

18  objection and I think it was, the objection is sustained.

19          MR. FINKELSON:  Thank you, your Honor.

20          MR. GOETTLE:  Your Honor, because of the question

21  and that lurking, I don't know, dangling balloon hanging over

22  the jury, we would ask for some sort of instruction to the

23  jury to ignore the last question regarding the Court and what

24  the Court may or may not have determined.

25          THE COURT:  They will probably have forgotten it.  I

1 | don't think he answered it.

2 |          MR. GOETTLE:  He did not answer it, your Honor.

3 |          THE COURT:  I will so instruct them --

4 |          MR. HANGLEY:  Thank you, your Honor.

5 |          THE COURT:  -- and I will report that I've sustained

6 | the objection.

7 |          All right, we're in recess until 1:30.  You may go

8 | about your business.

9 |              (Luncheon recess at 12:34 o'clock p.m.)

1   Q   Can you highlight collective entity, Mr. Baird?  The 1991

2   CDMA 2000 network reference model includes the message center

3   for storing and forwarding short messages within the

4   dotted-line box that is the collective entity, correct?

5   A   Yes.

6   Q   It also includes within that same dotted-line box the

7   HLR, correct?

8   A   Yes.

9   Q   It also includes within that same dotted-line collective

10  entity, the mobile switching center, correct?

11  A   Yes.

12  Q   And it also includes within the same dotted-line

13  collective entity, the PDSN, correct?

14  A   Yes.

15  Q   And that's the package switching node, right?

16  A   Yes.

17  Q   But you, Dr. Akl, you can't give a definition of what the

18  author of this document meant by collective entity, can you?

19  A   I don't think the term collective entity is defined.  And

20  it's not a term that appears in the patent or is a term of

21  art that we're looking at in this case.

22  Q   And you, sir, really cannot give a definition of what the

23  author meant by collective entity, right?

1   A    Not based on what's there.  I mean, you pointed to some

2   components.  There's other components on top, like IP, which

3   is not internet protocol, it stands for other stuff.  So,

4   based on this document and what's included in the collective

5   entity, I'm not sure what they mean by collective entity.

6   It's definitely not core network, which is a term that I am

7   focusing on.

8   Q    In fact, you've had the opportunity to look at all of

9   DX-4 in the past.  You and I talked about it at your

10  deposition.  And with the benefit of having read all of DX-4,

11  it's your testimony, sir, that you're not sure what

12  collective entity means, correct?

13  A    Correct.

14  Q    You just know what it doesn't mean or at least, that's

15  your testimony, right?

16  A    Yes, I need to look at does this document inform what is

17  a core network or core network element and the answer is no.

18  There is a collective entity, I'm not sure what it is,

19  there's a lot of stuff in it.  The stuff that you pointed to

20  is in it.  There's a lot of other stuff that we know are not

21  core network elements that are also in it.  So, my opinion is

22  collective entity does not equate core network.  It also has

23  the base stations.  Whatever it is, it is something in this

1  document, but it's not a core network element.  That's my

2  opinion.

3  Q    You can't tell what it is, but you know what it isn't,

4  that's your testimony, right, sir?

5  A    And that's sufficient for the analysis that I need to

6  render, yes.

7  Q    In fact, it's your opinion in this case, sir, that the

8  collective entity in this published 1999 CDMA 2000 standards

9  document is a dotted line that has a lot of boxes in it,

10  correct?

11  A    Yes.

12  Q    But you've sat here for the entire trial, right, sir?

13  A    Yes.

14  Q    And you've heard the testimony of Mr. Lipford from

15  Sprint, who actually was responsible for managing the

16  CDMA-2000 standard network reference model as it evolved,

17  correct?

18  A    Yes.

19  Q    You even cited, I believe, Mr. Lipford, not once, but

20  twice during the course of your own testimony today, as an

21  authority when it comes to what's in standards documents,

22  correct?

23  A    I cited when he said function is important and physical

1  location is not.  So, he said some things that I agree with,

2  yes.

3  Q   Right, but also heard Mr. Lipford testify during this

4  trial, that the collective entity in the 1999 CDMA 2000

5  standard is the CDMA 2000 core network, correct?

6  A   I heard him say that, yes.

7  Q   And you also heard him say that in the CDMA 2000

8  standards group in which Mr. Lipford actually participated,

9  they used the words core and collective interchangeably,

10  correct?

11  A   I did hear him say that.

12  Q   And you also heard Mr. Lanning agree with Mr. Lipford

13  that the collective entity is commonly referred to as the

14  core network, correct?

15  A   Yes.

16  Q   And you don't have any basis, any basis to disagree with

17  Mr. Lipford's account of what was understood in the standards

18  group, do you?

19  A   No, I wouldn't phrase it that way, because when he was

20  asked, he is not looking at the claim construction.  He is

21  not looking at the definition of core network.  He's not

22  looking at the patent.  So, he is defining it based on his

23  understanding.  But again, we have the Court's construction

1    and a patent, so there is still a disconnect between the

2    opinions that he's rendered and what's the focus and what we

3    have to look at, as far as the patent and the construction

4    from the Court.

5    Q    And we're going to get to your opinions on the

6    construction, including your opinion that when it comes core,

7    it has a plain and ordinary meaning that you can look up in

8    the dictionary. We're going to get to that.  But for now, I'm

9    asking you a different question.  Mr. Lipford participated in

10   the standards bodies and my question for you, sir, is you

11   have no basis, do you, to disagree with Mr. Lipford's account

12   of what was understood in the standards group with respect to

13   a network reference model in the 1999 CDMA 2000 standard,

14   because you weren't there.

15   A    No, you asked me a question and I answered it.  I do have

16   a basis because he said he's not applying the Court's

17   construction.  That is my basis.

18   Q    I'm not asking you about the Court's construction.  I'm

19   talking to you about Mr. Lipford's testimony about what

20   collective entity in the CDMA 2000 standard meant to those

21   who actually participated in the standards body.  That's the

22   basis of my question and you didn't participate in the

23   standards body, did you, sir?

1   A    No.

2   Q    You weren't in the meetings that Mr. Lipford was in, were

3   you?

4   A    Correct.

5   Q    In fact, you've never been a member of one of the

6   technical working groups for a standards body related to SMS

7   technology, have you?

8   A    I receive their e-mails, I don't attend meetings.

9   Q    And you've never been a member of one of the technical

10  working groups for a standards body related to MMS

11  technology, have you?

12  A    Correct.

13  Q    You receive their e-mails, too?

14  A    I'm not sure if I receive the MMS e-mails, no.  I don't

15  know if there are e-mails with regard to that.

16  Q    And so you get some e-mails with respect to the standards

17  bodies, you've never responded to one of those e-mails, have

18  you, sir?

19  A    No, they're for information, so you get updates from

20  3TPP, which are standard setting bodies that tell you what

21  happened at meetings and you can follow through.  But it's a

22  way for people outside of -- in different companies,

23  researchers, to keep abreast of what's happening at those

1    meetings.

2    Q    It's an e-mail blast to relevant people?

3    A    You subscribe to the different e-mail lists, so I

4    subscribe to be on those lists.  So, they're not spamming

5    people, you actually ask to be on this mailing list, yes.

6    Q    And you've never responded to any one of those e-mails,

7    correct, sir?

8    A    Correct.

9    Q    Now, it's your testimony that for words that are not

10   defined in the Court's definition, the jury is to go by the

11   plain and ordinary meaning, right?

12   A    Yes.

13   Q    And it's your opinion, right, that the word core has a

14   plain and ordinary meaning to a person of ordinary skill in

15   the art, right?

16   A    Yes.

17   Q    And your definition of a person of ordinary skill in the

18   art is someone with a BS Degree in computer science, computer

19   engineering, electrical engineering or a related field and at

20   least two years of experience in the design or development of

21   communications systems, right?

22   A    Yes.

23   Q    You were here for the testimony of Scott Kalinoski of

1    Sprint?

2    A    Yes.

3    Q    Like this jury, you heard that Mr. Kalinoski has a degree

4    in electrical engineering, correct?

5    A    Sure, I have no reason to doubt what you're saying.

6    Q    You also heard that he started working for Sprint in

7    January of 1996, right?

8    A    Okay. I'll take your word for it.

9    Q    Okay and we've already established that you were also

10   here for the testimony of Mr. Lipford, that's the gentleman

11   we were just talking about, who participated in the standards

12   bodies, right?

13   A    Yes.

14   Q    And you heard that Mr. Lipford has a degree in electrical

15   engineering, correct?

16   A    Yes.

17   Q    You heard he started for Sprint back in 1987, correct?

18   A    I'll take your word for it.

19   Q    All right, you were also hear for the testimony of Mark

20   Yarkosky of Sprint, were you not, sir?

21   A    Yes.

22   Q    And you heard that Mr. Yarkosky has a degree in physics,

23   correct?

1   A    I think so.

2   Q    And he started for Sprint in 1996, right?

3   A    I'll take your word for it.

4   Q    You heard that Mr. Yarkosky has held the role of engineer

5   at Sprint, correct?

6   A    Yes.

7   Q    And were you also here for the testimony of Patrick

8   Wilson of Sprint?

9   A    Yes.

10  Q    Did you hear that he has a degree in computer information

11  systems?

12  A    I think so.

13  Q    And you also heard that Mr. Wilson started for Sprint in

14  2000, right?

15  A    Yes.

16  Q    And you were here for the testimony of Sean Hoelzle of

17  Sprint, weren't you, sir?

18  A    Yes.

19  Q    Do you understand that he has a degree in computer

20  engineering?

21  A    I don't remember, but okay.

22  Q    Did you hear that he had worked as a network engineer for

23  Sprint for over a decade?

1    A    Yes.

2    Q    You were also here for the testimony of Ramesh Golla of

3    Sprint, right?

4    A    Yes.

5    Q    And you heard that Mr. Golla obtained a Masters Degree in

6    computer science from the University of Mississippi in 1993,

7    right?

8    A    I think so.

9    Q    And he, too, has worked for Sprint for over a decade?

10   A    Yes.

11   Q    Would you agree with me, Dr. Akl, that there is nothing

12   in this Court's definition of cellular network that tells

13   this jury that they can't listen to what these people of

14   ordinary skill have to say about the way the cellular network

15   actually exists at Sprint and they can only listen to your

16   opinion?

17   A    Could you repeat the question?

18   Q    Sure.   I hear Mr. Hangley whispering behind me that they

19   should object, so I'll give them another opportunity.

20         MR. HANGLEY:   Thank you.

21   BY MR. FINKELSON:

22   Q    Would you agree, Dr. Akl, that there is nothing in this

23   Court's definition of cellular network that tells this jury

Akl - Direct                                    113

1    that they can't listen to what all of these people of

2    ordinary skill have to say about how the cellular network

3    actually exists at Sprint, they can only listen to your

4    opinion?

5    A    I'm not sure I'm understanding the question.  If I'm

6    going to try to answer it, the Court has provided a

7    definition for cellular network and the definition says you

8    need to have three main things, the phones, the base station

9    systems and core network elements that may include and then

10   there's a list.  This definition is based on the

11   qualifications of one of ordinary skill in the art when

12   looking at the patent and the claims and the specifications

13   of the '870 Patent.  So, the context of this definition is

14   the '870 Patent and the claims in the specification and if

15   you look at the qualifications of one of ordinary skill in

16   the art when they read this patent.  So, it's not just this

17   person in vacuum, it's this person with those qualifications

18   reading the '870 Patent and what's in the patent.  So, to the

19   extent that what I had to do, is I had to put myself in the

20   shoes of one of ordinary skill in the art, because I have

21   read the patent and look at the definition from that point of

22   view.

23           I'm not disagreeing that the witnesses that you've

1   mentioned may have the degree requirements where they could

2   be one of ordinary skill in the art, but the second part,

3   which is the important part, that you have to look at the

4   patent.  I was here and every single witness said they did

5   not read the patent, they did not apply the Court's

6   construction.  So, it's only half of what you're asking me is

7   correct, not the full picture.

8   Q   So, I'm going to get to that in a second, but I would

9   like an answer to my question.  Would you agree, Dr. Akl,

10  that there is nothing in this Court's definition of cellular

11  network, that tells this jury that they cannot listen to what

12  these people of ordinary skill in the are from Sprint, have

13  to say about the way the cellular network actually exists at

14  Sprint and they can only listen to your opinion?

15  A   I'm not sure I understand.  I think I've answered that

16  question.  To the extent that I did not, then I don't

17  understand your question.  There is a definition, it's

18  provided by the Court and it's based on the patent.  And none

19  of these witnesses that you've named have read the patent.

20          (Pause.)

21  Q   PD-6.57 is on your screen, Dr. Akl.  You just testified

22  to this jury not less than two hours ago, about this slide,

23  do you remember it?

1   A   Yes.

2   Q   And you told this jury, you didn't say anything about

3   reading the patent, you didn't say anything about reading the

4   specification.  You told the jury that when it comes down to

5   the word core in the definition of cellular network, that

6   this jury is to apply, that it has a plain ordinary meaning

7   (inaudible) based on the art, correct?

8   A   Yes and my understanding is if the words would have plain

9   and ordinary meaning to one of ordinary skill in the art in

10  light of the claims and the specifications.

11  Q   Actually, you said in light of Merriam Webster's

12  Dictionary.  You said that Merriam Webster's dictionary and

13  you made a point of it.  It's not a technical dictionary,

14  it's just an ordinary dictionary.  You said that Merriam

15  Webster's Dictionary provides the definition of core to a

16  person of ordinary skill in the art, right?

17  A   Yes, so it is a two-step process.  The first step is the

18  Court gave us a definition.  The definition is from the point

19  of view of one of ordinary skill in the art in light of the

20  claims in the specification.  If there are words that are not

21  in the claim or any word that is not -- you don't have a

22  specific definition, we go to plain and ordinary meaning of

23  those words.  So, I think I've been clear and consistent.

1    Q    And the good news is, my questions are only about one

2    word and it's about the word core.  And your testimony to

3    this jury is that the meaning of the word core, as that term

4    is used in the Court's definition of cellular network, is its

5    plain and ordinary meaning as found in Merriam Webster's

6    Dictionary, right?

7    A    Yes and that's still my opinion.

8    Q    And that's a dictionary that you can read, right?

9    A    Yes.

10   Q    And that's a dictionary that every one of these jurors

11   can read, correct?

12   A    Yes.

13   Q    And that's a dictionary that all of the engineers at

14   Sprint can also read, correct?

15   A    Yes.

16   Q    All of those individuals whose names, degrees and tenures

17   at Sprint I just went through, correct?

18   A    Sure.

19   Q    Okay, now let's turn, Dr. Akl, if we could to your Slide

20   PD-6.42.  Do you have a copy of Viaresto now in front of you?

21   A    Yes.

22   Q    And on your Slide PD-6.42, I believe that you were

23   pointing out the language in Viaresto that quote the

1  subscriber number MSISDN can be connected with the subscriber

2  identifier IMSI, right?

3  A    Yes.

4  Q    And it's your testimony to this jury, Dr. Akl, that

5  connecting the MSISDN to the IMSI is not mapping, right?

6  A    Correct, as what Viaresto defines, it's not mapping.

7  Q    It's just connecting, it's not mapping?

8  A    Correct.

9  Q    Do you have a copy of the Sonera reference in front of

10 you, that you used during your testimony earlier today, Dr.

11 Akl?

12 A    No.

13         MR. FINKELSON:  May I approach, your Honor?

14         THE COURT:  Yes.

15 Q    Here's the Sonera reference.

16 A    Thank you.

17 Q    Can we turn to Slide PD-6.26?  You provided some

18 testimony earlier today with respect to Sonera and whether or

19 not it discloses information indicated with the aid of the

20 first identifier, do you recall that?

21 A    Yes.

22 Q    And that's what you were talking about here on your Slide

23 PD-6.26?

1    A    Yes.

2    Q    Can we have the Court's interim definition jury's -- and

3    go down to the very last one with the aid of said first

4    identifier?  Is that the Court's definition that you were

5    talking about, Dr. Akl?

6    A    Yes.

7    Q    And the Court has construed or defined what the aid of

8    said first identifier to mean with the aid of the first

9    identifier where the first identifier may, but need not be

10   included in the response message, right?

11   A    Yes.

12   Q    Can we pull up PX-2, the patent, Claim 1.  Do you see

13   Claim 1 of the '870 Patent?

14   A    Yes.

15   Q    And the limitation we're talking about appears in the

16   very last, in fact, it's the very last words of Claim 1,

17   right, indicated with the aid of said first identifier?

18   A    Yes.

19   Q    And the first identifier that is talked about in Claim 1,

20   it first shows up in the very first part of the claim, the

21   sending an inquiry part of the claim, right?

22   A    Yes.

23   Q    The first identifier is actually part of the inquiry to

1  the cellular network to determine information, right?

2  A    Yes.

3  Q    And then in the last limitation, that same identifier,

4  that same first identifier is used to indicate the

5  information that has been retrieved, right?

6  A    Yes.

7  Q    And you would agree that the MSISDN in Sonera is used to

8  retrieve information, wouldn't you?

9  A    Yes.

10 Q    Now, if you can turn in Sonera to -- and we can put

11 Sonera back on the screen.  PX-243.  And if we could go to

12 page 10 of the document.  I've asked Mr. Baird to put up a

13 page from the Sonera patent application itself, do you see

14 that, sir?

15 A    Yes.

16 Q    And it indicates that the routing inquiry, that is the

17 inquiry that is sent into the cellular network contains

18 certain parameters?

19 A    Yes.

20 Q    And those parameters include something called an invoke

21 ID?

22 A    Yes.

23 Q    And if we continue on to page and you have the hard copy

Akl - Direct                                          120

1    in front of you, if we continue on to the next page, which is

2    page 11 and highlight the language above that box and that

3    box as well and right below it, also, Mr. Baird.  And Sonera

4    indicates right, Dr. Akl, that the home location register

5    then returns certain information?

6    A    Yes.

7    Q    And among the information that the home location register

8    returns is the invoke ID, correct?

9    A    I see that.

10   Q    And then the parameters, including the invoke ID are

11   transmitted unchanged from the service node back to the

12   routing center number two, correct?

13   A    Yes.

14   Q    Now, Dr. Akl, in the past five years, you've worked as an

15   expert in at least 36 cases or other legal proceedings,

16   correct?

17   A    Yes.

18   Q    And that includes cases involving wireless communications

19   networks, right?

20   A    Yes.

21   Q    Cases involving routing?

22   A    Yes.

23   Q    Telephone communication systems?

Akl - Direct                           121

1    A    Yes.

2    Q    Wireless devices?

3    A    Yes.

4    Q    And have you worked on cases involving cellphones?

5    A    Yes.

6    Q    And isn't it true, Dr. Akl, that your opinions have been

7    criticized for being impermissibly conclusory?

8    A    I don't know, I don't think so.

9    Q    Are you familiar with the Single Touch Interactive v.

10   Zoove (ph) case in which you served as an expert?

11   A    What year was that?

12   Q    I'm happy to pull up a copy of your CV and I'll provide

13   that.

14          (Pause.)

15          MR. FINKELSON:  May I approach, your Honor?

16          THE COURT:  You may.

17   Q    Dr. Akl, I've handed you a copy of your CV that you

18   provided to us in this case, listing your various engagements

19   and I'll refer you to the one identified as L-31.

20   A    Yes.

21   Q    Did you, in fact, serve as an expert in the Single Touch

22   Interactive v. Zoove case?

23   A    Yes.  So, the way I remind myself what I did, I was

1   retained by Single Touch, that's why that's underlined.  They

2   were the plaintiff.  This was in California.  It related to

3   abbreviated dialing and what I did was I wrote a declaration

4   which is a relatively short opinion.  There was a Markman

5   that I testified at for claim construction.  So, that was my

6   -- that's what I did there.

7   Q   And isn't true, Dr. Akl, that in that case, the Single

8   Touch Interactive v. Zoove case, your opinions were

9   criticized by the court as being impermissibly conclusory?

10  A   I don't know.

11  Q   Okay, let me get a copy of that for you.

12          (Pause.)

13          MR. FINKELSON:  May I approach, your Honor.

14          THE COURT:  You may.

15  Q   Do you recognize that, Dr. Akl, as the court's opinion in

16  the Single Touch Interactive v. Zoove case?

17  A   That's what it looks like.

18  Q   And if you could refer to Footnote 2 of the court's

19  opinion.  Footnote 2 makes reference, Dr. Akl, to

20  declarations that were submitted by you on behalf of Single

21  Touch Interactive, correct?

22  A   Let's see, Single Touch admitted to declarations by me as

23  Zoove, which are the defendants objects to both declarations.

Akl - Direct                                                   123

1    Yes.

2    Q    And the court in this case, found that your original

3    declaration was impermissibly conclusory, correct, sir?

4    A    Yes, that's what I see here.

5    Q    And isn't it also true, Dr. Akl, that in a different

6    matter of yours, your opinions were criticized as conclusory

7    in nature and entitled to little, if any weight by the United

8    States Patent Office?

9    A    I don't now, usually I don't get to see those, so --

10   Q    Are you familiar with the Global, Inc. v. Securas (ph)

11   case, sir?

12   A    Global -- can we look at my CV again?

13   Q    Sure.  And this one, Dr. Akl, was just in 2004, it's

14   number eight on your list.

15   A    Yes, so what -- so in this case, let's see, I was

16   retained by Securas and this is an interparty review, which

17   means both parties -- one petitioner is arguing that a

18   passage is valid or not valid in front of the board.  There

19   is no jury in that case.

20   Q    Correct, it's in front of the United States Patent

21   Office?

22   A    Correct and I believe I wrote seven declarations because

23   there were seven patents to support seven patent owner

1    responses and I gave four depositions.  So, there were seven

2    patents and I wrote seven different opinions.

3    Q    It was an important matter?

4    A    These were two companies that were really going at it,

5    that's the best way I can phrase it.

6    Q    And you were acting as an expert on behalf of Securas

7    Technologies, right?

8    A    That is correct.

9    Q    And isn't it true that in this matter, the Globel Tel,

10   Inc. v. Securas matter, your opinions were criticized as

11   conclusory in nature and entitled to little, if any weight by

12   the United States Patent Office?

13   A    I think there was one declaration that the board said

14   what you're reading.

15   Q    The board said that your opinions were conclusory in

16   nature and entitled to little, if any weight, right?

17   A    Right, so each side has an expert that they submit a

18   declaration and my understanding is they didn't necessarily

19   disagree with my opinion, but they didn't feel I provided

20   enough evidence for that opinion.

21   Q    And the way the described it was conclusory in nature and

22   entitled to little, if any weight, right?

23   A    Yes.

1    Q    And isn't it true, Dr. Akl, that in yet another matter of

2    yours, the United States Patent Office stated that your

3    testimony does not provide any persuasive facts, data or

4    analysis to support your opinion and that it is entitled to

5    no weight?

6    A    What case is that?

7    Q    That would be the ShopKick v. Novataz (ph) case.  I

8    believe that one also is just in 2014, it's number nine on

9    your CV.

10   A    So, again, this is the same process where instead of

11   going to a trial, two companies can attack each other's

12   patents at the patent office.  And there was -- there were

13   two declarations that I submitted.  I don't know what

14   happened after I submitted those.

15   Q    Okay, this is a different case than the Securas one we

16   were just talking about, right?  And this one, you were

17   representing ShopKick?

18   A    Correct, there were two patents and I wrote two --

19   ShopKick, in this case, is attacking Novataz's patents and

20   they are the petitioner.  So, they're the ones petitioning

21   that the patents be invalidated and I wrote two declarations,

22   but I don't know what happened.

23   Q    And I used the word represented, which was not the

1   correct word.  You were acting as an expert on behalf of

2   ShopKick, correct?

3   A   Yeah, I wrote a declaration to support their petition.

4   Well, I wrote two declarations to support two petitions.

5   Q   As an expert who was retained by ShopKick, right?

6   A   Yes.

7   Q   And in that matter, isn't it correct, that the United

8   States Patent Office stated that your testimony, Dr. Akl,

9   does not provide any persuasive facts, data or analysis to

10  support your opinion and that it is entitled to no weight?

11  A   I haven't seen the response, so what you're reading is

12  probably correct.

13  Q   I'm happy to show it to you.

14          MR. FINKELSON:  May I approach, your Honor?

15          THE COURT:  You may.

16  Q   Dr. Akl, I've given you the decision of the United States

17  Patent and Trademark Office patent trial and appeal board

18  issued in the ShopKick v. Novataz case and this decision was

19  entered in May of 2015.  Do you have it, sir?

20  A   Yes.

21  Q   And if you could turn to page 19.  And your testimony in

22  connection with this matter included, at least, testimony

23  with respect to language in the claims at issue in the

1   ShopKick case relating to marketing messages, right?

2   A   Yes.

3   Q   Okay and do you see that I have fairly characterized the

4   conclusion of the United States Patent and Trademark Office

5   that your declaration "does not provide any persuasive facts,

6   data or analysis to support the opinions stated."  Have I

7   read that right?

8   A   Yes, it said I'm merely repeating the argument from the

9   petition, so usually those things go up and down together.

10  Either they agree with the petition and the declaration or

11  they don't.  So, in this case, they didn't.

12  Q   Can you call up the next page, as well?  The patent and

13  trademark office continues accordingly and this is in the

14  very first sentence of the next page, "accordingly, we give

15  the testimony of Dr. Akl no probative weight."  Do you see

16  that, sir?

17  A   Yes. Petitioner's claim construction is not persuasive

18  and it goes on.  I see that.

19  Q   Now, Dr. Akl, you have never been in charge of the

20  day-to-day operations for a CDMA cellular network, have you?

21  A   No.

22  Q   And you've never been in charge of the day-to-day

23  operations for a GSM cellular network, have you?

1    A    We can take this down, yes.

2    Q    I'm happy to take it down.  Sorry, you have never been in

3    charge of the day-to-day operations for a GSM cellular

4    network, have you?

5    A    No, I've taught them in my courses.  I have not been in

6    charge of the day-to-day operations in industry.

7    Q    And you've never directly implemented any hardware

8    specific to messaging for CDMA, have you?

9    A    Correct.

10   Q    And you've never directly implemented any software

11   specific to messaging for CDMA, have you?

12   A    Correct.

13   Q    And you've never been the architect of a CDMA network

14   that implemented SMS, right?

15   A    Correct.

16   Q    And you've never been the architect of a GSM network that

17   implemented SMS, have you?

18   A    Correct.

19   Q    And am I right that you've also never been the architect

20   of a CDMA network that implemented MMS?

21   A    Correct.

22   Q    And you've never been the architect of a GSM network that

23   implemented MMS?

Akl - Direct                                    129

1    A    Correct.

2    Q    Thank you, Dr. Akl.

3             MR. FINKELSON:  I have no further questions at this

4    time.

5             THE COURT:  Mr. Goettle?

6                    REDIRECT EXAMINATION

7    BY MR. GOETTLE:

8    Q    Dr. Akl, on your cross-examination, do you recall you

9    were asked about opinions that you gave in other cases that

10   the patent office or a court has found to be conclusory in

11   nature?

12   A    Yes.

13   Q    Tell the jury what you did in this case and how much

14   you've performed in this case in performing your analysis and

15   coming up with your conclusions?

16   A    So, there is a big difference between writing a

17   declaration and writing an expert report.  It is correct that

18   I have -- I've been doing consulting for several years and I

19   enjoy it.  I do it to the extent it doesn't interfere with my

20   teaching.  It breaks up my day.  And there are cases where

21   I've worked on them for several years.  This is one of those

22   cases, where there were hundreds and hundreds of documents

23   that I had to look at.  And expert reports, where there's no

1    page limits, hundreds of pages that I had to have enough time

2    and allowed enough size of the report in order to provide a

3    very detailed opinion.

4         There are other cases like IPRs and other matters

5    that I've worked on, where you have to submit a declaration.

6    And the declaration is usually a few pages.  Sometimes there

7    are page limits.  It's a very brief, very short document that

8    I'm supposed to provide an opinion very quickly in terms of

9    the size of the amount of documentations I can use to justify

10   an opinion.  And I have submitted probably around maybe 30 to

11   40 declarations in different cases.

12        As you've seen, because of the nature of

13   declarations, sometimes there is an opinion that says, my

14   opinion and that declaration is conclusory.  And what that

15   means is, well, it can mean one of two things.  Either

16   whoever is reading it doesn't agree with it or I did not have

17   a chance in that declaration to provide enough evidence.  And

18   that's why that is the case.

19        This is not one of these cases.  This is a case

20   where we're not -- we're not submitting, it doesn't hinge on

21   a declaration, it's not a short document that I have x-number

22   of pages that I have to provide a detailed opinion.  I have

23   submitted huge reports.  I've done an analysis over three

1    years and this is where we are, so, it is -- it may sound

2    overwhelming and you see those snippets.  If there was

3    anything un-credible about me or the opinion that I rendered

4    was incorrect, I would not have a job as an expert witness.

5    Someone would not hire somebody that is not credible.  So,

6    there are no surprises.  It may be surprising to you, you see

7    those documents, but counsel are aware of such documents and

8    it really does not affect my credibility, because they know

9    the weight in a declaration and the weight in a case or

10   weight in a report are different.  So, these are things that

11   do happen unfortunately.

12        But the coming back to this case, I have spent over

13   three years.  I was retained in 2013, we're in 2017.  So,

14   I've worked on this case in 2013, '14, '15, '16.  I have

15   spent so many hours and I've looked at, you know, hundreds

16   and hundreds of documents. And I was given the opportunity to

17   write expert reports and not a declaration, so I can really

18   vet my opinion and that's why we are here.

19   Q   And we heard from Mr. Lanning in this case?

20   A   Yes.

21   Q   Did Mr. Lanning review your expert reports?

22   A   Yes.

23   Q   And Mr. Lanning criticized your analysis and opinions in

1    those reports, correct?

2    A    Yes.

3    Q    Did he, at any time, say that your opinions were

4    conclusory?

5    A    No.

6    Q    And did Dr. Polish have a chance to review your expert

7    reports?

8    A    Yes.

9    Q    And Dr. Polish had criticisms of your analysis and

10   conclusions?

11   A    Yes.

12   Q    Did Dr. Polish, at any time, say that your opinions and

13   conclusions were conclusory?

14   A    No.

15   Q    Has there been any finding in this case that your

16   opinions are conclusory?

17            MR. FINKELSON:  Objection, your Honor.  I don't

18   think counsel can get into findings of this Court based on

19   the prior objections raised today.

20            MR. GOETTLE:  I'll withdraw the question, your

21   Honor.

22            THE COURT:  That's a Court ruling.  I agree with

23   objection.

Akl - Redirect                    133

1        MR. GOETTLE:  Yes, I agree, too.  Thank you.

2   BY MR. GOETTLE:

3   Q   Can you put up Claim 1 of the patent, PX-2.  On your

4   cross-examination, do you recall being asked questions about

5   whether wireless terminals were known in the prior art and

6   base station systems and the like?

7   A   Yes.

8   Q   In reviewing Dr. Polish's opinions on invalidity, do you

9   have any reason to believe that Claim 1 of this patent, this

10  Claim 1 is invalid over the prior art?

11  A   I have not seen any evidence by Dr. Polish.  He did not

12  provide clear and convincing evidence that Claim 1 is invalid

13  and so, it's my opinion that the claim is valid.

14  Q   All right, are there elements in this claim that were in

15  the prior art?

16  A   Yes.

17  Q   That doesn't affect your opinion?

18  A   No, so for a claim -- for a claim to be invalid, every

19  single piece, every single piece and element has to be

20  disclosed in the prior art.  So, as long as one element, as

21  long as the jury, as long as you find one element is not

22  disclosed, then the claim is valid.  So, it's very common, we

23  don't reinvent the wheel every time and it's very common to

1   be asked is this small word or isn't HLR, no, yes.  Is maybe

2   mapping, no.  So, it's like using ingredients, you create

3   this great recipe and everybody loves your recipe and it's

4   the best apple pie recipe that maybe your grandmother has

5   come up with.  And someone says, you know, were apples known

6   in the prior art and was, you know, baking soda and flour,

7   but this is your recipe.  So, just because the ingredients or

8   some of the ingredients may be known, that doesn't mean that

9   the recipe is known.  That's a good analogy.  So, when we

10  look at all the limitations, when we look at every word,

11  every step exactly what the invention describes, this recipe,

12  this invention is not in the prior art.

13  Q   Mr. Dyer, do you have Dr. Akl's responses?

14        MR. FINKELSON:  Your Honor, I don't think Dr. Akl's

15  expert report itself is admissible on direct examination.

16        MR. GOETTLE:  I'm just going to put up, your Honor,

17  I was just going to put up the paragraph that counsel showed

18  Dr. Akl on cross.

19        MR. FINKELSON:  I have no objection.

20        THE COURT:  You may proceed.

21        MR. GOETTLE:  Can you pull up paragraph and only

22  paragraph 87?

23        THE COURT:  What is that, paragraph 87?

1       MR. GOETTLE:  You know, now that I said 87, I want

2  to make sure that I'm right.  Nope, that's the wrong

3  paragraph.

4       THE WITNESS:  I think I was asked on 81 and 87.

5  BY MR. GOETTLE:

6  Q   Yes, paragraph 81.  Okay, you were asked about paragraph

7  81 on your cross-examination?

8  A   Yes.

9  Q   Can you explain what you're saying in paragraph 81?

10  A   Yes, so this was the background section that I'm

11  describing, you know, SMS and I'm citing to here what was

12  happening and if you look at the website, it's in Europe and

13  I'm saying SMS messaging did not become substantial until the

14  late 1990s with prepaid phones and the numbers that we're

15  looking at there was like in the millions or I think that was

16  close to that.  But when relatively, you know, at that time,

17  that's what people were saying, is like oh, it's in the

18  millions and maybe it's good.  When you fast forward a few

19  years and now we're in the billions.  And then when we get to

20  the infringement period and we're in the trillions, we've

21  gone from millions to a factor of a thousand, another factor

22  of a thousand.  This is a factor of a million.  So, it's all

23  relative.  I don't necessarily disagree in the context of

1   what I was saying here.  But when we look at SMS messaging

2   and we look in the context of it was described here, that

3   sentence is correct.  But as I pointed out, you know, Sprint

4   had a cellular network in the late-'90s, but did not have

5   two-way texting, they did not implement so there wasn't a

6   single two-way text message in Sprint's network until 2004.

7   So, I'm not -- the context is different.

8   Q    Can you go down one paragraph to paragraph 82?

9               MR. FINKELSON:  Is that the portion that I showed

10  him?

11              MR. GOETTLE:  No, this is the next paragraph --

12              MR. FINKELSON:  I'd ask you to take it down.  Your

13  expert's report is not independently admissible on direct.

14  Feel free to ask him questions about his --

15              THE COURT:  Well --

16              MR. GOETTLE:  I can ask him without showing the

17  jury, your Honor.

18              THE COURT:  Pardon me?

19              MR. GOETTLE:  I'm sorry, I didn't mean to interrupt.

20              THE COURT:  All right, well, you can, there was an

21  objection and you can certainly reference other things in the

22  report.  This is Dr. Akl's report, my copy is not stamped

23  with an exhibit number, but the report, other paragraphs in

Akl - Redirect                                    137

1    the report which refer to paragraph -- anyone of the

2    substance of paragraph 81.

3            MR. GOETTLE:  All right.

4    BY MR. GOETTLE:

5    Q    Do you have the report in front of you?

6    A    Yes.

7    Q    What are you saying in paragraph 82, the next paragraph

8    from the one that we just showed the jury?

9            THE COURT:  Not everything in that paragraph that

10   relates to what you said in paragraph 81.

11           THE WITNESS:  In paragraph 82, I described it's

12   really not until 1999, so the very end of the '90s when 3TPP

13   was formed and they began developing primary SMS standards

14   and MMS standards.  So, MMS and SMS did not occur until 3TPP

15   was formed and this wasn't until 1999 and that's where we

16   started see increase.  So, I'm really, you know, just framing

17   background.  So, what was happening early-'90s, late-'90s, at

18   the end of '99 and then what happens in the years after that.

19   Q    Can we put up paragraph 87, that counsel showed to the

20   jury during cross-examination.  Can you highlight the last

21   sentence?  Dr. Akl, do you recall being asked about this

22   paragraph on your cross-examination?

23   A    Yes.

1   Q    And particularly, were you asked about the last sentence

2   in paragraph 87?

3   A    Yes.

4   Q    What is the last sentence saying?

5   A    The '870 Patent does not, however, teach solving any

6   problem by locating the MMS messaging server outside the

7   cellular network.

8   Q    Is that statement correct?

9   A    In the context that it's presented, yes.

10  Q    Okay, so, you can take it down.  What is the invention of

11  the patent?

12  A    The invention of the patent are the claims.  So, we try

13  to describe it in words, but the invention of the patent are

14  the claims and exactly that's what balanced the invention.

15  Those are the walls of the invention. So, we can try to

16  rephrase it and when you look at the claims, the claims start

17  where you have a messaging server that is external, but the

18  claims focus on these four steps and the four steps of

19  sending in inquiry, you have a mapping, you have a

20  determination and you have a response.  That is the

21  invention.

22  Q   Okay, and in terms of the problem, solution, problem,

23  solution that you has talked about earlier, can you put that

1    into context with what you just said about the claim?

2    A   Yes, so the preamble, the first part of the claim is

3    talking about you have an external messaging server and then

4    the limitations of the claim describe those four steps.  And

5    when I was describing to the jury the problem, solution,

6    problem, solution, I was including everything that you see

7    there, because I started there is an issue message volume,

8    MMS multi-media messages are really large and the number of

9    SMS messages is becoming, you know, exponentially large.  And

10   so, you want to have those messages outside.  That's

11   basically kind of setting up the problem solution, but the

12   next problem solution, too, is actually what was done.  And

13   that's where you now want to use an identifier because the

14   messaging server is not a core network element.  It doesn't

15   know what's happening in the cellular network.

16        And so you need to have this inquiry, you need to

17   have a mapping, you need to have a determination, you need to

18   have a response.  Those are the limitations, those are the

19   infringing steps and that's the invention.  So what I -- the

20   problem-solution, problem-solution is what I described to the

21   jury and that is correct.

22   Q   Thank you.

23        MR. GOETTLE:  No further questions.

1    MR. FINKELSON:  Brief recross, your Honor?

2    THE COURT:  Yes.

3                    RECROSS-EXAMINATION

4    BY MR. FINKELSON:

5    Q    This is your board, correct?

6    A    Yes.

7    Q    This was the board that you stood here and you told this

8    jury about and you were explaining what the invention of the

9    '870 Patent is, correct, sir?

10   A    Yes.

11   Q    And you told this jury that there were two problems, both

12   of which were solved by Ms. Ahou in the '870 Patent, that was

13   your testimony, correct?

14   A    Yes.

15   Q    Solution 1, you said she solved that, right?

16   A    Yes.

17   Q    Solution 2, you said she solved that as well, right,

18   those were both her solution?

19   A    Yes.

20   Q    Okay, but it is correct, sir, that prior to the '870

21   Patent messages were already being kept out of the cellular

22   network and GSM networks because the SMSCs and MMSCs were

23   typically external, correct?

1  A   Yes.

2  Q   She didn't solve this problem, she solved just problem 2,

3  that's your testimony now, right?

4  A   No, it's both.

5  Q   So your testimony is still that even though SMSCs and

6  MMSCs already existed, storing and forwarding short messages

7  outside of the cellular network, that she solved the problem

8  of keeping messages out of the cellular network, that's your

9  testimony?

10 A   Yes.  And the reason for that is, like I said, the

11 standards did not tell you have to put it outside or you have

12 to put it inside.  The standards describe you may -- and he

13 used the word may -- we looked at the CDMA standard, we

14 looked at the GSM standard, there was not a fixed

15 recommendation one way or the other.  And so what Ms. Ahou

16 said, she's like, okay, I am going to put my foot down in a

17 sense.  The patent describes the ability to have it outside

18 or inside, but when it came to the claims it's now a

19 requirement in the claims that it is external.  And that

20 introduced the problem of then how does the network need to

21 communicate with the messaging server, so that the messaging

22 server knows and solve it.  So there is a problem, solution,

23 problem, solution.

1  Q    And the first problem the prior art had already dealt

2  with because the prior art had already dealt with, because

3  the prior art already said you can put the messaging server

4  outside, we already established that today, correct?

5  A    The prior art -- no.  See, there is a subtlety of a term

6  that you keep using and this is why I've always been very

7  careful.  When we look at the GSM standard or when we look at

8  the CDMA standard we don't have a messaging server that is

9  external.  Remember, messaging server has to have both the

10 store and forward and the query; what we see in the prior art

11 is just the store and forward.  So the prior art says you can

12 have an SMSC that is external, that's only the store and

13 forward, not the querying part.

14         So the prior art is looking at where are we going to

15 put those messages, but they haven't solved the problem one

16 way or the other.  And so this '870 Patent said, okay, we are

17 going to not just store and forward outside, but as a result

18 of store and forward outside we're now going to have a query,

19 and both of these functionalities are the messaging server.

20         So I have not seen a piece of prior art where the

21 messaging server is external.

22         MR. FINKELSON:  Can we pull up PX-2, the patent,

23 Claim 1?

1    BY MR. FINKELSON:

2    Q    I didn't think we were going to have to go back over

3    this, but I want the jury to be clear on what your testimony

4    is, sir.

5              The external messaging server, it's referenced in

6    the preamble to Claim 1, correct, the introductory language?

7    A    Yes.

8    Q    Okay.  And then as I think you've talked about to the

9    jury today it also appears in the sending limitation, because

10   the sending limitation, the first one, has the sending of an

11   inquiry from the messaging server to the cellular network,

12   right?

13   A    Yes.

14   Q    And then it also appears in the last limitation, the

15   sending-a-response-message limitation, which says that "there

16   is a response message sent from the cellular network to said

17   messaging server external to the cellular network," right?

18   A    Yes.

19   Q    Is any of what we have just highlighted, sir, the mapping

20   step of Claim 1 or the determining step of Claim 1?

21   A    None.

22   Q    Okay.  And in your expert report in this case, this case,

23   you said that the prior art that was before the Patent Office

1    taught all of the limitations of the asserted claims except

2    they did not teach mapping a first and second identifier and

3    using the second identifier to retrieve device information,

4    correct?

5    A    Yes.

6    Q    That's because the prior art taught an external messaging

7    server as that term is used in these claims and as

8    highlighted on the screen for this jury, right?

9    A    If I say yes, can I be dismissed?  No, it is the -- I'm

10   sorry, what was the question again?  Go ahead, ask me the

11   question again.

12   Q    In your expert report, sir, you said that the prior art

13   before the United States Patent Office taught all of the

14   limitations of the asserted claims of the '870 Patent except

15   they did not teach mapping a first and second identifier, the

16   mapping step, and using the second identifier to retrieve

17   device information, right, that's your testimony, that's your

18   opinion?

19   A    Yes, that is correct.

20   Q    And that is because in the prior art it was already

21   taught that there was a messaging server, as that term is

22   used in these claims, external to the cellular network?

23   A    Yes.

1   Q   You mentioned how brief your declarations are in certain

2   matters, the ones I was asking you about, particularly in the

3   Shopkick and Securus matters that you and I discussed.  I

4   actually have your declaration from the Securus matter, it's

5   71 pages and 138 paragraphs.  Does that sound right to you?

6   A   Can I take a look at it?

7   Q   I'm happy to.

8           MR. FINKELSON:  May I approach, your Honor?

9           THE COURT:  You may.

10          (Pause.)

11  BY MR. FINKELSON:

12  Q   So you have the question fresh in mind, it's 71 pages and

13  138 paragraphs, correct?

14  A   Yes, but we have to add that in an IPR you have to use

15  double lines and font size of 14.  So the amount of words on

16  a page is really not a lot, but yes.

17  Q   I'll let the jury see it as well, I think they can have

18  it also up on the screen, and that's the size of the font?

19  A   Yes, size 14 font and double spacings.

20  Q   And in the Shopkick v. Novetas matter your declaration

21  was 84 pages long with 254 paragraphs; does that sound right?

22  A   It sounds about right, again with the same requirements I

23  believe of what you can put on a page.

1    Q    Thank you again for your time, Dr. Akl.

2              MR. FINKELSON:  No further questions.

3              MR. GOETTLE:  No more questions, your Honor.  Thank

4    you.

5              THE COURT:  That concludes your testimony, Dr. Akl.

6    You may step down.

7              THE WITNESS:  Thank you.

8              (Witness excused.)

9              THE COURT:  Yes?

10             MR. HEIST:  Your Honor, Comcast calls Michelle

11   Riley.

12             THE COURT:  Fine.

13             THE DEPUTY CLERK:  Please raise your right hand.

14             MICHELLE RILEY, Plaintiffs' Witness, Sworn.

15             THE DEPUTY CLERK:  Please be seated.  Please state

16   your full name and spell your last name for the record.

17             THE WITNESS:  Michelle Riley, R-i-l-e-y.

18                          DIRECT EXAMINATION

19   BY MR. HEIST:

20   Q    Ms. Riley, were you here listening to the testimony of

21   Dr. Cox yesterday?

22   A    I was.

23   Q    And I know there's a lot that you and Dr. Cox disagree

Riley - Direct                                    147

1   about, but is there anything upon which you and Dr. Cox

2   agree?

3   A    There actually is and you might be surprised to hear that

4   we do agree on a number of things.

5         First, he and I agree that -- we agree as to the

6   number of messages, accused messages that were sent and

7   received by Sprint customers, and we also agree that Sprint

8   charges its customers for sending and receiving messages.

9   Now, you heard this referred to yesterday as Sprint charges

10  coming and going.  So we agree on that.

11        We agree that the hypothetical negotiation has

12  certain rules, one of which is that the parties to the

13  hypothetical negotiation agree the patent is valid and

14  infringed and they understand that they have to come to a

15  deal, they have to come to an agreement, and we agree that

16  these factors are not present in real-world negotiations.

17        Finally, Dr. Cox and I agree that filings made with

18  the Securities and Exchange Commission, the 10-K documents

19  you saw some of yesterday, are important documents that are

20  relied on by investors.

21  Q    Now, so you agree on some things, how do these areas of

22  agreement affect what you're going to say today as far as

23  limiting issues?

1  A   Well, I think the fact that we have areas of agreement

2  will serve to shorten my testimony today, but there are a

3  number of areas in which we still have disagreement and I'll

4  go over those with you in hopefully what will be a brief

5  period of today.  And I want to just point out as I go

6  through them that I think there are two stories that Sprint

7  tells, one of which you're hearing here in the courtroom, but

8  there's another story that Sprint tells to the rest of the

9  world; that it tells to investors, to Wall Street and to its

10  shareholders.

11  Q   What does Sprint tell to Wall Street and its shareholders

12  that's relevant to this damage analysis in this case?

13  A   What Sprint tells --

14       MR. RIOPELLE:  Objection, your Honor.  I don't

15  believe this was in her report, I'm not sure how it's in

16  rebuttal to what Dr. Cox testified about the damages in this

17  case.

18       MR. HEIST:  Your Honor, the -- what Sprint said to

19  the SEC is throughout her report.  She has SEC reports

20  referenced throughout her expert report and this is in

21  response to what Dr. Cox testified about yesterday.

22       THE COURT:  Well, let's -- some of what you have

23  summarized I can see might be improper and it might not be

1    proper testimony.  Certainly to the extent it's linked to

2    what was said by Dr. Cox yesterday, including his reliance on

3    the 10-K, would be an appropriate subject.

4    BY MR. HEIST:

5    Q   Let's focus in on that.  What does Sprint say in its --

6             THE COURT:  So the objection is overruled without

7    prejudice to Sprint's right to object to specific questions.

8             MR. RIOPELLE:  Right.  Just to remind the Court, I

9    believe it was not Dr. Cox, it was Dr. Dippon who relied --

10            THE COURT:  You're right.  I'm sorry, I misspoke.

11   BY MR. HEIST:

12   Q   What did Dr. Cox say yesterday with regard to the 10-Ks

13   and how they account for some of the costs that are at issue?

14   A   Dr. Cox said that the Sprint documents do not account for

15   certain of the costs that are at issue that I did account for

16   and then I'll describe to you how I accounted for them.

17            Dr. Cox also told you that Sprint is unable to

18   determine its revenue associated with messaging, he said it

19   was impossible, and I will share with you how I performed

20   that calculation.  My performance of that calculation is

21   absolutely premised on the way Sprint performs it in its

22   ordinary course of business as it reports to the tax

23   authorities the revenue that it earns from its customers for

1    wireless services.

2    Q    And what documents if any have you looked at to confirm

3    the revenue and costs from Sprint?

4    A    I've looked at a number of documents, some of which I

5    have discussed with you when I sat here previously, but they

6    are documents that were produced in the litigation and there

7    are also filings that Sprint has made with the Securities and

8    Exchange Commission in the form of the 10-K documents.

9    Q    Did Dr. Cox and Dr. Dippon suggest that it was improper

10   for you and Mr. Webber to rely on Sprint documents to

11   determine revenue and SEC filings to determine costs?

12   A    Yes, they both -- well, certainly Dr. Cox said my

13   analysis was wrong, I believe you heard him say that, but the

14   way that Sprint reports its revenue and costs and

15   profitability through the documents that I used that then

16   roll into its public filings is the way Sprint reports its

17   operating results to the world.  So it's different than what

18   it's telling you here in the courtroom, it's telling

19   everybody else a different story in the form of these

20   Securities and Exchange Commission filings that it's required

21   to make, that its CEO and CFO sign, they certify, the board

22   of directors certifies that the results shown in these

23   filings are accurate and complete and represent the results

1    of operations of the corporation.  So that's what they tell

2    Wall Street, but in the courtroom here they say you can't

3    determine revenue for messaging, costs are not captured, and

4    I just want to tell the whole story.

5    Q   Let's talk about the Sprint revenue documents that Sprint

6    says you shouldn't have relied upon to determine the

7    messaging revenue.  Did you find documents in Sprint's

8    production in discovery that relate to how to determine

9    revenue for bundled services?

10   A   Yes.  And just by way of background, you recall around

11   2008 Sprint and the other carriers as well began bundling its

12   services together and charging customers one price.  And this

13   occurred around the same time as hearings that were conducted

14   in front of the Antitrust Subcommittee of the Senate

15   Judiciary Committee where they were investigating prices paid

16   by customers, consumers, for messaging and Sprint was

17   charging as much as 20 cents a message.  So Sprint began --

18   Sprint and the other carriers as well began bundling their

19   services together and charging one price.

20          So I looked at documents that Sprint maintains in

21   the ordinary course of its business to segregate the revenue,

22   the allocate the revenue from the bundles, the one payment,

23   to voice, data and messaging.

1  Q   Let's take a look, if we could, at Plaintiffs' Exhibit

2  77.  Is this one of the documents you're referring to?

3  A   Yes, and you actually saw this yesterday.  Mr. Wilson of

4  Sprint testified that this is a revenue allocation document

5  and Sprint uses this document to -- he was deposed on it, so

6  he's looking at the document and he's answering questions

7  about it and he says this is how we separate the bundled

8  revenue into the different components.

9        And if you can highlight -- bring up -- make it --

10 part of it larger.  You can see the different percentages to

11 the right of the schedule, there's a pink text column that

12 has the different percentages for text that are identified

13 with each bundled plan.  So Sprint does this because it has

14 to report to the tax authorities how much -- it wants to be

15 sure that it's paying the right amount of tax and that its

16 customers aren't paying too much tax, so it has performed

17 these allocations.  And Mr. Wilson described this in his

18 deposition as a reasonable allocation.  So this is what

19 Sprint does in the ordinary course of business.

20 Q   Is this one of the documents that you relied upon in

21 allocating revenues to come up with the revenue number that

22 formed a part of your opinion?

23 A   Yes.  So this is one of the documents I used to come up

1    with that 17-plus billion in messaging revenue.

2            MR. HEIST:  Can we look at Plaintiffs' Exhibit 145?

3    Could you blow up -- no, you have to go farther to the right,

4    Mr. Baird.

5    BY MR. HEIST:

6    Q    Is this one of the documents that you looked at in

7    preparing your expert report and that formed the basis for

8    your opinion in this case regarding revenue?

9    A    Yes.  This is another document of a similar nature and

10   Sprint had a different witness, Mrs. Miller testified about

11   this document saying that the column where you see text and

12   the percentages, very similar as the prior document where

13   Sprint uses this document to perform allocations of bundled

14   revenue to text.  So this is how it identifies which portion

15   of the bundle is attributable to text and this is a document

16   I used in calculating the revenue Sprint has earned from

17   messaging.  Again, this is a document that Sprint uses to

18   report to the tax authorities its revenue from messaging.

19           And this is why I'm saying there's a story that

20   Sprint tells to everybody else, it says, hey, everybody else,

21   we know what our revenue is, this is how we report it, but it

22   wasn't telling you this story.

23   Q    What is your response to Dr. Cox's criticism that you and

1  Mr. Webber didn't consider all of the relevant costs?

2  A   Well, I'm sure you wouldn't be surprised to know that I

3  have a response to that.  I did consider the relevant costs

4  and I want to go through briefly documents that will

5  demonstrate to you some of the costs that you've been hearing

6  about, spectrum, network costs, that I've been criticized for

7  not including and I want to show you how I accounted for them

8  in my analysis.

9  Q   Let's start with spectrum.  How much does Sprint record

10 on its books for spectrum?

11 A   Well, we can look at a 10-K filing that I analyzed in

12 preparing my report.

13        MR. HEIST:  I think -- can we have DX-71 and in

14 particular at page F-4?

15 BY MR. HEIST:

16 Q   First let's look at the cover page.  Could you explain

17 what this document is?

18 A   So this is an annual filing that Sprint is required to

19 make with the Securities and Exchange Commission.  And at the

20 top it says it is for the fiscal year ended March 31, 2015,

21 and then I'm using this particular document because it's the

22 last document, the last 10-K I reviewed in preparing my

23 expert report in this matter, which was issued some time ago.

Riley - Direct                    155

1          MR. HEIST:  Now if we could, Mr. Dyer, go forward to

2     page F-4?  And if we just blow up at the top.

3          THE WITNESS:  So here we have Sprint's consolidated

4     balance sheet for the period ended March 31, 2015.  And if

5     you can highlight the line that says "FCC licenses and

6     other," Sprint has an asset of almost $40 billion.  So that

7     is where the spectrum resides on its balance sheet and this

8     is how Sprint reports the amount of spectrum that it owns to

9     its investors, to Wall Street, to everybody -- to anyone who

10    wants to see it, because these are publicly available

11    documents.

12    BY MR. HEIST:

13    Q    So the spectrum is listed as an asset?

14    A    Yes, it is.

15    Q    Is it listed anywhere in the 10-K as cost or expense?

16    A    No, it's not.

17    Q    Or liability?

18    A    No, it's not.

19    Q    Now, does Sprint characterize the FCC licenses, the

20    spectrum, how do they characterize in terms of what kind of

21    an asset it is?

22    A    It is an indefinite-lived asset.  And I believe you heard

23    those words yesterday and I can show you in the 10-K where

Riley - Direct                    156

1    this language appears, but what that means is that it doesn't

2    wear out, it doesn't break, you can't steal it -- or it can't

3    be stolen, I guess I should say, it can't catch fire and be

4    damaged; it has an indefinite life.

5            And can we go to the page --

6    Q    Sure.

7    A    -- that describes that?

8            MR. HEIST:  Could we pull up Plaintiffs' 908 and go

9    to page 104?

10   BY MR. HEIST:

11   Q    This is an earlier 10-K, I believe this one is 2005.

12   A    Yes.  So this is just at the beginning of the period

13   where we are calculating damages.  And if you can

14   highlight --

15   Q    So I think -- there we go.

16   A    Okay.  So at the top it's saying, "In conformity with

17   statement of Financial Accounting Standard No. 142, goodwill

18   and other intangible assets, we do not amortize our

19   indefinite-life intangibles, which consist of our Federal

20   Communications Commission or FCC licenses, goodwill and the

21   Sprint and Boost Mobile trade names."

22           So spectrum being an indefinite-life intangible

23   asset means it -- and you do not amortize it, that's the

1   financial accounting rule for how you treat spectrum.  And

2   the reason, there's a nice description on another page as to

3   why you don't amortize it and take any cost for the spectrum.

4            So if we can show that next page?

5            MR. HEIST:  Page 119, please.  I think it's the

6   first full paragraph -- no, I'm sorry, down -- I think it's

7   the last paragraph.

8            THE WITNESS:  No, I think it's at the top.

9            MR. HEIST:  I apologize.  It's in the first

10  paragraph --

11           THE WITNESS:  Okay.

12           MR. HEIST:  -- "Spectrum licenses," the sentence

13  begins about three lines up from the bottom of the first

14  paragraph.

15           THE WITNESS:  Yeah, it says --

16           MR. HEIST:  "Spectrum licenses authorize" --

17           THE WITNESS:  -- "Spectrum licenses authorize

18  wireless carriers to use radio frequency spectrum."  So these

19  are the frequencies on which your calls are carried, on which

20  your messages are sent.  And then the next line is why, why

21  it does not lose its value that "spectrum is a renewable,

22  reusable resource that does not deplete or exhaust over

23  time."

1       So this is why Sprint carries the value of the

2  spectrum, the cost it paid as an asset and it does not

3  amortize or depreciate it; therefore, it bears no cost in the

4  financial statements for spectrum.

5       And further you can see there another sentence:  "At

6  present, there is no competing technology on the horizon that

7  would render spectrum obsolete."

8       So it's a really special asset because, you know,

9  there aren't that many assets like that that don't wear out,

10  don't deteriorate, don't lose value.  And again Sprint is

11  reporting to this to the outside world, but here in court

12  you've been hearing a different story.

13  BY MR. HEIST:

14  Q   Now, even though Sprint does not record spectrum as a

15  cost in its financial reporting, does it deduct spectrum from

16  its income taxes?

17  A   Well, for income tax reporting spectrum has a 15-year

18  life.  So for its financial reporting Sprint does not deduct

19  a cost for spectrum, so the cost of spectrum doesn't lower

20  its profitability, but on the income tax side Sprint can

21  amortize spectrum over 15 years.  So if it had $15 billion of

22  spectrum, it can deduct $1 billion of cost every year to

23  lower its income tax liability.  So there are differences in

1    reporting and Sprint does take advantage of that benefit of

2    the spectrum as I read in the 10-Ks.

3    Q   So the asset that spectrum is on the books and showing

4    zero cost each year, but they still get to deduct an amount

5    for income tax?

6    A   That's correct.  No cost for financial reporting, for

7    income statements that investors use, but they do deduct a

8    cost for income tax reporting.

9    Q   Do you know if AT&T and Verizon account for spectrum in

10   the same way that Sprint does?

11   A   They do.  AT&T --

12           MR. RIOPELLE:  Object --

13           THE WITNESS:  -- Verizon --

14           MR. RIOPELLE:  -- objection.  I mean, first of all,

15   it's irrelevant how AT&T and Verizon account for it, and

16   second this is definitely not in her report, nor responds to

17   anything that Dr. Cox testified about.

18           MR. HEIST:  Your Honor, I can withdraw the question

19   and move on.

20           THE COURT:  All right.  The objection is sustained,

21   the question is withdrawn.  And this is another example where

22   you must disregard the question.  The witness hasn't answered

23   it and remember, it's the question and the answer together

Riley - Direct                                    160

1    which constitute evidence.

2            You may proceed.

3    BY MR. HEIST:

4    Q    Now, what about network cost, did Dr. Cox say that you

5    didn't include network cost?

6    A    He most certainly did, but I did include them and I'll

7    walk you through the steps of what I did to ascertain what

8    those costs were and incorporate them into my analysis.

9            MR. HEIST:  Could we see Plaintiffs' Exhibit 743?

10   Can you -- maybe you should blow up just the top, Mr. Dyer,

11   if you would, so we can get a sense of what we're looking at.

12   BY MR. HEIST:

13   Q    So could you tell us what this document is?

14   A    Sure.  This certainly is a document with a lot of numbers

15   on it, but it is one of the Sprint profit-and-loss statements

16   for the CDMA network.  So when I was up here during my direct

17   testimony I discussed with you my analysis of Sprint's CDMA

18   profit-and-loss statements to determine its normal profit for

19   voice, data and messaging on the CDMA network, and that

20   normal profit came to 23 percent over the period -- over the

21   damages period.

22           So in this document, if we can scroll down, there's

23   a number of revenue categories and then there are cost

1   categories.  And you can stop.  You can see towards the four

2   or five lines down from the top there's a line called

3   "Wireless Cost of Service" and that is where -- so it's two

4   billion in the first year, 2.4 billion, three billion.  This

5   is where the network costs reside and to determine that I

6   went to a 10-K to see how Sprint is reporting what is

7   included in the wireless cost of service.

8           So again go to the public document to find out what

9   the story is, what the truth is, what's being told to

10  everybody, and --

11  Q   Before we go to the public document, this document that

12  we're looking at, this is one of many that you looked at,

13  correct?

14  A   Yes.

15  Q   And this is a Sprint document?  This isn't something you

16  prepared, this is something Sprint gave you just as we see it

17  on the screen?

18  A   Correct.

19  Q   All right.  And so you looked at the wireless cost of

20  service, and we can't see the top of this column, it's by

21  year if we go across?

22  A   Yes, it's by year, and it also is segregated into post-

23  paid CDMA and then way over to the right is prepaid CDMA.  So

Riley - Direct                              162

1   there are different categories for the different types of

2   plans.

3            MR. HEIST:  Now, could we please go to PX-900 --

4   pardon me, excuse me -- can we please go to PX-70 at page 36?

5            (Pause.)

6            MR. HEIST:  I think I've got the wrong exhibit --

7   DX-70, excuse me.

8   BY MR. HEIST:

9   Q   And we're looking here at another 10-K, I think this one

10  is 2013?

11  A   Yes.

12  Q   Yes.

13  A   This is a 10-K for the fiscal year ended December 31,

14  2013.  And so I want to show you the definition that's

15  included in Sprint's discussion of its wireless segment

16  results that details what's included in that wireless cost of

17  service that I just showed you on the CDMA P&L -- excuse me,

18  profit-and-loss statement that I used to calculate Sprint's

19  normal profit of 23 percent.

20           MR. HEIST:  So can we advance to page 36, please?

21           THE WITNESS:  So, yeah, if you can just blow that

22  up.

23  BY MR. HEIST:

Riley - Direct                                          163

1    Q    So under "Segment earnings, wireless," if we could just

2    look at that --

3    A    Yes --

4    Q    -- paragraph?

5    A    -- in the first paragraph there and it talks about how

6    "wireless segment earnings are a function of wireless service

7    revenue, the sale of wireless devices and accessories, costs

8    to acquire subscribers, network and interconnection costs to

9    serve those subscribers, and other wireless segment operating

10   expenses.  The costs to acquire our subscribers include the

11   net cost at which we sell our devices, referred to as

12   equipment net subsidies" -- and if you were paying attention,

13   those are listed on that CDMA profit-and-loss statement I

14   just showed you -- "as well as the marketing and sales costs

15   incurred to attract those subscribers.  Network costs

16   primarily represent switch and cell site costs and

17   interconnection costs, which generally consist of permanent

18   usage fees and roaming fees paid to other carriers."

19          So this is Sprint's narrative discussion of costs

20   that apply to its wireless segment and we see the same line

21   items in the CDMA profit-and-loss statement that I used in my

22   analysis.  So this is the discussion of network costs.

23   Q    So there was some question about whether your damage

1    model included the cost of cell towers and base station

2    systems; do you find that in this description of wireless

3    cost of service?

4    A    In the cell site costs.

5    Q    All right.  Now, the way that you determined damages, you

6    first found the profit -- Sprint's normal profit, correct?

7    A    Correct.

8    Q    And you accounted for -- is it correct that you accounted

9    for the network costs in connection with determining the

10   normal profit?

11   A    Well, I used -- yes, the net costs would be included in

12   the calculation of the 23 percent and that goes to the

13   concept that the messaging is a free rider, which I discussed

14   with you previously where it is transmitted in that control

15   channel that is part of the network and it rides on the bus

16   that is in the lane that's available for calls.

17   Q    So why did the wireless network bear the costs, the

18   network cost rather than messaging?

19   A    Because of the free-rider effect.

20   Q    Now, was there evidence that you heard in this case

21   relating to the free-rider effect?

22   A    Yes.  There's evidence that I heard sitting here

23   listening to testimony and there's also evidence that I had

1    shown you in my direct testimony.  So one of these items of

2    evidence or pieces of evidence was Mr. Yarkosky's testimony,

3    which I showed you in a slide from my direct testimony where

4    he talked about there was no need for additional

5    infrastructure or cell towers because networking -- excuse

6    me, messaging rides in the control channel.  So that was one

7    instance.

8            MR. HEIST:  Can we just pull that up again?  That

9    was Plaintiffs' Demonstrative 4.4.2 we looked at originally.

10   BY MR. HEIST:

11   Q    This was deposition testimony of Mr. Yarkosky, correct?

12   A    Yes, and I read this into the record when I was here

13   before.  Just to remind you, he said at the bottom "the

14   existing cell towers were already in place, the necessary

15   infrastructure at the base stations was already in place to

16   support this.  So there was no necessity to add

17   infrastructure at the cell towers or to add additional cell

18   towers to support the messaging."

19   Q    Did anyone -- was there any other evidence about the

20   free-rider notion?

21   A    Yes.  There's also testimony that you heard about

22   yesterday from Mr. Kelso (ph) -- Kelsey who spoke to that

23   Senate subcommittee that I mentioned, and he works for

Riley - Direct                                166

1    Consumer Reports magazine, and he talked about the free-rider

2    effect.  And I'd like to show you that testimony.

3              MR. HEIST:  Could we please have Plaintiffs' Exhibit

4    900?

5    BY MR. HEIST:

6    Q    And this is the testimony you're referring to?

7    A    Yes.

8              MR. HEIST:  Can you please go forward to page 4 and

9    highlight the first full paragraph, the big -- that one.

10             THE WITNESS:  So he says that "text messaging files

11   are very small and the price of their transmission is

12   negligible for the provider.  A message travels as a wireless

13   signal from the handset through the wired telephone network

14   and as a wireless signal to the receiving handset.  The text

15   message is a free rider inside a so-called control channel or

16   space that is already being used to operate the wireless

17   network.  In other words, text message does not use up any

18   extra spectrum once the carrier pays the cost of the

19   underlying infrastructure and storage equipment.  Thus any

20   revenue received by the provider on incremental text message

21   usage is nearly pure profit."

22             So that's another description of the free-rider

23   effect that you heard about yesterday.

Riley - Direct                                              167

1   BY MR. HEIST:

2   Q    Was there any other testimony about free-rider?

3   A    There was.  Dr. Dippon when he was here yesterday was

4   shown a snippet clip, a video clip from his deposition where

5   he was reading a document and the question was in reading the

6   document that "SMS messages impose no load on the network,"

7   and Dr. Dippon said, "That's what it says here."

8           And what you might not know is that he was reading

9   from a report that he wrote.  It wasn't exactly clear in the

10  clip.  But so Dr. Dippon is another source of evidence that

11  we can use to corroborate this concept of the free-rider

12  effect for messaging.

13  Q    Any other evidence that you've heard?

14  A    You also heard today Dr. Akl again confirm this concept

15  of the messages riding in the control channel as free riders.

16  Q    Now --

17          THE COURT:  Before we move to a new subject, it's

18  3:25, let's break.  Ten minutes, ladies and gentlemen.

19          (Jury out at 3:24 o'clock p.m.)

20          THE COURT:  You may step down.  We're in recess.

21          (Court in recess 3:25 to 3:43 o'clock p.m.)

22          (Jury in at 3:43 o'clock p.m.)

23          THE COURT:  Be seated, everyone.

1           Mr. Heist, you may continue your direct examination

2    of Ms. Riley.

3           MR. HEIST:  Thank you, your Honor.  Home stretch.

4    BY MR. HEIST:

5    Q   Ms. Riley, you were here yesterday when Dr. Dippon gave

6    his analogy of the train ride from Washington to

7    Philadelphia?

8    A   Yes.

9    Q   Do you have an analogy that you think is a little closer

10   to the facts of this case?

11   A   Well, just to demonstrate what I was talking about with

12   messaging being a free rider, if I were coming from

13   Washington on the train to Philadelphia, I had not had the

14   trip planned -- and my kids are teenagers now, but back when

15   they were little they could travel for free as a lap child on

16   Amtrak -- so if I had to bring one of them along, maybe

17   because my husband had to go on a trip, that child, my child

18   would be the free rider.  The train is coming to Philadelphia

19   anyway, I'm going to be on the train either way because I

20   have to make the trip, and Kevin or Lauren comes with me as

21   the free rider.  And that would be true whether or not I had

22   planned to bring them the whole time or had to bring them at

23   the last minute.

1          So that's a different -- you know, a different

2     framing of that analogy.

3     Q    So the free rider in this case is SMS?

4     A    So the free rider in this case is SMS.

5     Q    And that's because it's little?

6     A    Pardon me?

7     Q    In a way that's because it's little?

8     A    It's little, yes.

9     Q    Now, if the messaging is a free rider, at least the SMS,

10    why did you use Mr. Webber's costs --

11    A    Well, in --

12    Q    -- to determine -- costs of messaging?

13    A    Sure.  In determining the messaging profitability, Mr.

14    Webber testified that there are -- you know, there's

15    equipment and other items that are required for the

16    provisioning of messaging, so he added up those costs, those

17    incremental direct costs.  I then added in selling general

18    and administrative costs, because I know that over the years

19    I've seen Sprint advertisements for messaging plans, so those

20    are part of those selling costs.  So I did add those costs in

21    to determine the profitability for messaging, which if you

22    recall from the last time I was sitting here came out to 53.8

23    percent.

1  Q   All right, now switching topics.  Dr. Cox testified that

2  you refused to take the Nokia-Comcast purchase agreement into

3  account; did you refuse to consider it?

4  A   No.  I considered it and I discussed it with you all, and

5  I discussed the reasons why it's not comparable to the

6  hypothetical negotiation.  And two of the reasons Dr. Cox and

7  I agree on, because the parties to the hypothetical

8  negotiation agree the patent is valid and infringed and they

9  agree that they have to come to a deal, okay?  They can't

10  walk away from the table.  And the Nokia-Comcast deal they

11  could walk away and there was also no agreement as to

12  validity and infringement of the '870.

13         But a big difference, a fundamental difference

14  between the Nokia-Comcast deal and the hypothetical

15  negotiation which makes that Nokia-Comcast agreement not

16  comparable for determination of damages would be Nokia's

17  financial position in 2010 as compared to 2005.

18         And you heard Dr. Cox say yesterday that -- I don't

19  think -- I think he said he wasn't aware that the Nokia CEO

20  was pushed out or resigned very shortly after Nokia sold this

21  patent to Comcast.

22  Q   And the new CEO, his name was what?

23  A   Stephen Elop.

1   Q    And what if anything have you learned about Mr. Elop's

2   view of the company when he came on board?

3   A    So he came on board -- so the Nokia-Comcast deal took

4   place in June of 2010, Mr. Elop took his role in September,

5   so a couple months later.  And Mr. Elop went through the

6   holidays with his family and the new year and by February he

7   was ready to talk to Nokia.  And there's a speech that

8   appeared in the Wall Street Journal in February of 2011, so

9   six months after the Nokia-Comcast deal.  And in very vivid

10  language Mr. Elop talked about -- he used a story about a man

11  who was trapped on a burning platform, an oil platform in the

12  North Sea and the platform was ablaze, and there was no way

13  that the man could survive unless he jumped into the North

14  Sea, into the freezing cold waters of the North Sea.  And the

15  man knew that he had to make a decision or he would perish,

16  and he jumped and he survived.  And when he thought about why

17  he jumped, he realized that he needed to make some changes to

18  his behavior.

19          And Mr. Elop told Nokia, he said we are a burning

20  platform.  Okay?  And this is six months after this deal.  He

21  said we have threats from all around us.  We have Apple with

22  the iPhone and by the way, Nokia, we don't have a smartphone,

23  we don't have an operating system that competes with IOS,

Riley - Direct                                          172

1    which is a very attractive ecosystem for developers to write

2    apps for.  Google has developed Android as another ecosystem

3    and Google is just like a black hole attracting investment

4    and innovation to Android.  We have nothing that can compete

5    with that.

6            And we're also on fire because we look to Asia and

7    we see the Chinese handset manufacturers who can

8    conceptualize a phone, manufacture it and get it onto the

9    market before we can even prepare a PowerPoint presentation,

10   that's what he said.  So he said we've got to jump off the

11   burning platform, we've got to change the way we do things or

12   we're not going to survive, and they did change the way they

13   do things.  They sold the handset business to Microsoft and

14   they focused on network infrastructure, so their

15   manufacturing, you know, networking boxes, and they kept

16   their patents.  And I think you heard, I was asked on my

17   cross-examination about Nokia asserting some of its patents

18   against Apple, so they are doing that, but they exist now

19   just as a shell of what they once were.

20           So that burning platform is where they were when

21   this -- around the time frame of this deal with Comcast.  So

22   that's a huge difference between the hypothetical negotiation

23   in 2005 and the deal Comcast did with Nokia in 2010.

1    MR. HEIST:  Can we have Plaintiffs' Demonstrative

2  Exhibit 4.63?

3  BY MR. HEIST:

4  Q    This is a slide from your testimony in Comcast's case a

5  week or so ago.  So just to recap, after everything you've

6  heard and all the criticisms you've heard from Dr. Cox and

7  Dr. Dippon about the methodology you used, tell us today what

8  your opinion is regarding the appropriate reasonable royalty

9  the jury should award if it finds validity and infringement

10  over the damage period in this case?

11  A    My opinion is that damages to compensate Comcast for

12  Sprint's use of the '870 Patent through September 30, 2016

13  are $153,634,905.  And as you recall, that's based on the

14  number of accused messages, which Dr. Cox and I agree on,

15  times the royalty rate per message shown, which I went

16  through with you earlier.

17  Q    So there's no dispute between the parties as to the

18  number of messages on the equation on this slide, is that

19  right, is your understanding?

20  A    That's correct.

21  Q    And the royalty per message that you computed, did you

22  hear any evidence from anyone at Sprint putting up a

23  different royalty per message?

1    A    No.

2    Q    And this damage amount is through what point in time?

3    A    It's through September 30th, 2016.

4              MR. HEIST:  No further questions.  Your Honor, I

5    have some exhibits to offer, but I can wait.

6              THE COURT:  Well, first of all, is there any --

7              MR. RIOPELLE:  Cross?

8              THE COURT:  -- recross -- or cross?

9              MR. RIOPELLE:  This would be just initial cross.

10             THE COURT:  You can have initial cross.

11             (Laughter.)

12             THE COURT:  We're not going to admit exhibits today,

13   now.  And you, Ms. Riley, may step down.

14             MR. RIOPELLE:  No, I need to cross her though.

15             THE COURT:  You may step down after he finishes.

16             (Laughter.)

17             THE COURT:  It's not that we're anxious, Mr.

18   Riopelle.

19             MR. RIOPELLE:  Although I may get better answers if

20   she's not up there.

21                        CROSS-EXAMINATION

22   BY MR. RIOPELLE:

23   Q    Good afternoon, Ms. Riley.

Riley - Cross                                                    175

1    A    Good afternoon.

2    Q    How are you?

3    A    Fine, thank you.

4    Q    You were talking about the 10-K financial statements in

5    the beginning of your testimony, do you remember?

6    A    Yes.

7    Q    And you I think were saying that Sprint tells a different

8    story to the world than they have been telling in this court,

9    I think that's what you said?

10   A    I think that's fair, that's a fair characterization of

11   what I said.

12   Q    In the 10-K financial statements is there any reporting

13   of Sprint's revenue for messaging?

14   A    No.

15   Q    I think you also were talking about spectrum and how

16   spectrum is listed as an asset, correct?

17   A    Correct.

18   Q    There's no dispute, right, that Sprint paid nearly $40

19   billion for that asset?

20   A    Yeah, I'm just pointing out that they get to record an

21   asset of equivalent value and that asset doesn't deteriorate

22   or wear out or deplete over time.  But, yeah --

23   Q    But that --

1    A    -- I agree they had to pay something to get it.

2    Q    Forty billion dollars?

3    A    Exactly.

4    Q    Right.

5    A    And they book an equivalent asset.

6    Q    And then I think you were drawing distinctions, you were

7    talking about how there's certain rules for financial

8    reporting and then there's certain rules, slightly different

9    rules for the tax reporting, is that fair?

10   A    I think that's fair.

11   Q    And so they're different rules.  So you'd agree then

12   there are different rules for this jury that this Judge is

13   going to instruct them on on how they're supposed to figure

14   out damages and reasonable royalty, if they even have to

15   figure that out, right?

16   A    Yeah, they're going to get rules.

17   Q    And I don't think there's a dispute, but you relied on

18   Mr. Webber's report and his testimony?

19   A    I did.

20   Q    And Mr. Webber admitted in both his report and his

21   testimony, right, that he did not include the costs for

22   things like towers, right?

23   A    Right.

1    Q    But then you said just a couple minutes ago that you did

2    include towers?

3    A    No, I was mistaken.  Those are included in property plan

4    equipment and depreciated.

5    Q    So you -- so --

6    A    They're not included in the network costs; I was

7    mistaken.

8    Q    Okay.  So you did not -- just so that it is clear for the

9    jury, you did not include spectrum, you did not include

10   towers, you did not include base stations, you did not

11   include MSCs?

12   A    Well, I know that towers are included in property plan

13   equipment, but I don't know about MSCs.  And the other thing

14   is there is no cost for spectrum to include, we've been over

15   that.  And the other thing I would say, that the depreciation

16   for the towers comes into the wireless segment earnings,

17   which are mirrored in the CDMA P&L through depreciation

18   costs.

19   Q    Okay.

20   A    So that's incorporated in my analysis.  I just wanted to

21   point out that I misspoke.  It's not in the wireless costs of

22   service line, it's in a different line.

23   Q    Did you -- I'm not sure I understand now, I'm confused.

Riley - Cross                                        178

1    Did you include costs of spectrum in your analysis?

2    A    There's no cost.

3    Q    Did --

4    A    I did not, I did not because there's no cost.  How's

5    that?

6    Q    Did you include cost of towers in your analysis?

7    A    Yes.

8    Q    Do you remember me taking your deposition in this case?

9    A    Yes.

10   Q    And do you remember me asking you a question:  "Now, am I

11   correct that you did not include tower and switching costs,

12   is that correct?"

13   A    What did I say?

14   Q    You said, "Correct."

15            MR. RIOPELLE:  No further questions, your Honor.

16            MR. HEIST:  Your Honor, no recross.  I would like to

17   offer some exhibits.

18            THE COURT:  All right.  Well, you don't have to sit

19   while we go through exhibits, so you can step down.  Thank

20   you.

21            (Witness excused.)

22            MR. HEIST:  Your Honor, I'd like to offer

23   Plaintiffs' Exhibit 77, 145, 900, and 908.

179

```
 1          THE COURT:  Any objection, Mr. Riopelle?  The
 2   numbers were 77, 145, 900, and 908?
 3          MR. RIOPELLE:  Could they be received until I had a
 4   chance to look at them and then we could handle it a little
 5   later?  I just -- they were not disclosed to us that they
 6   were going to use these today, so I'm not --
 7          THE COURT:  All right --
 8          MR. RIOPELLE:  -- I don't think they were --
 9          THE COURT:  -- why don't we do this --
10          MR. RIOPELLE:  -- were they?
11          THE COURT:  -- I'll receive them now --
12          MR. HANGLEY:  You received them last night.
13          THE COURT:  -- Mr. Riopelle, I'll receive them now
14   so we don't have to go back over something subject to your
15   right to object and I'll hear your objections at that time.
16          (Plaintiffs' Exhibits 77, 145, 900, and 908 received
17   in evidence.)
18          THE COURT:  All right.  Is there any further
19   rebuttal?
20          MR. GOETTLE:  No, your Honor, we're done.
21          THE COURT:  Three lawyers are standing, one is
22   sitting down.  I think Mr. Hangley might be stretching, but
23   I'm not sure.
```

180

1          (Laughter.)

2          THE COURT:  Mr. Riopelle?

3          MR. RIOPELLE:  Now that they have rested, we would

4    have a motion.  Of course we would be happy to put it off --

5          THE COURT:  Fine, we'll do that out of the --

6          MR. RIOPELLE:  -- as long as there's no waiver.

7          THE COURT:  We understand that you're making a

8    motion now, we'll hear it after I excuse the jury.  There's

9    no surrebuttal?

10          MR. RIOPELLE:  No, your Honor, Sprint rests.

11          THE COURT:  I'm looking at the jury and smiling.

12   What all that means is that there's no more evidence.  I've

13   got to decide on some exhibits, but we're not going to keep

14   you here for that.

15          What happens tomorrow, we'll have closing arguments.

16   Closing arguments are not evidence, they're a summary of the

17   positions being advocated by each party.  I've been told by

18   many jurors that closing arguments, although not evidence,

19   are very important in a jury's role in the case, because it

20   causes -- among other things, it causes jurors to focus on

21   things that they might otherwise not pay much attention to.

22   So it's a very important part of the trial.

23          After the closing arguments, I will instruct you on

181

1    the law.  And you've got snippets of the law, a little bit of

2    my preliminary jury instructions, you'll get more of the law,

3    the complete law applicable to the case after the attorneys

4    complete their closing arguments.  The closing arguments will

5    proceed Comcast first, then Sprint -- we haven't really

6    talked about this and we better talk about it, because

7    Comcast has a chance, it's an opportunity to rebut.  So

8    Comcast has the last word unless there's a wrinkle in this

9    case that I'm not quite certain about now.  But closing

10   arguments hopefully will be finished tomorrow morning and I

11   will instruct you on the law beginning in the afternoon,

12   that's the tentative schedule and I see no reason why we

13   shouldn't be on track.

14        A word about tomorrow because it's a slightly

15   different type of day.  We've been recessing, oh, around

16   4:45; we might not do that tomorrow, but it will be your

17   call.  If instruct you on the law and you begin your

18   deliberations say at 2:30 or so, you may or may not be close

19   to a verdict at the end of the day.  If you are, you might

20   opt to stay.  If you decide to stay, you might opt to have

21   dinner.  I can report to you that if you have dinner, we will

22   order dinner for you.  You will not want to come back to the

23   courthouse for the cuisine, but it might be convenient -- no,

182

1    it might be convenient for you.  That's your call.  I'll

2    discuss it with counsel, but in most cases a jury close to a

3    verdict wants to stay either with or without dinner.  For as

4    long as the jury decides they want to stay we will keep you.

5           If you do that and you miss a ride or a train or a

6    bus and have a long wait, we'll see to it that you're sent

7    home in a way that avoids long waits at bus terminals or

8    train stations.  Ms. Hull takes care of that, right, Ms.

9    Hull?  So you might want to make plans accordingly.  Tell the

10   folks at home that you might not be home at the usual time,

11   but we won't know about that until tomorrow.

12          And now my day-end instructions.  Now you've heard

13   all the evidence, even more tempting to discuss it among

14   yourselves, but you've got to wait just a little longer and

15   wait until tomorrow until you hear the closing arguments and

16   my instructions on the law.  Also no radio, no television, no

17   newspapers to the extent that they deal with this case.  I

18   haven't seen any reporters, but that's not to say that they

19   haven't been in the courtroom and they can look at the

20   transcript -- not the transcripts, but the tapes of our

21   proceedings and prepare stories based on tapes.  So no

22   reading about the case, no listening to anything that deals

23   with the case on radio, no viewing anything that deals with

1   the case on television.

2           If folks at home ask you what you did today, you

3   know the answer, you can't talk about the case.

4           With that -- is there anything else Counsel thinks

5   we should say?

6           MR. HANGLEY:  No, your Honor.

7           MR. FINKELSON:  No, your Honor.

8           THE COURT:  All right, then we'll excuse you for the

9   evening.  We'll start tomorrow at 9:30.  Take your juror

10  notebooks and your binders and leave them in the jury room.

11          (Jury out at 4:04 o'clock p.m.)

12          THE COURT:  Be seated, everyone.

13          All right, minor issues on the charge and the

14  verdict sheet and I want to get those done.  First the

15  charge.  I made all of the corrections that you talked about,

16  but I'm concerned about -- well, first the easiest of the

17  things to address, the Georgia-Pacific factors -- concern is

18  not the right word -- are we going to eliminate any of them?

19          MR. RIOPELLE:  I'd like to eliminate them all, but I

20  don't think we can because I believe that Ms. Riley said in

21  her testimony that she looked at it all.  So we agreed on 12,

22  but I don't know (indiscernible) --

23          MR. HOFFMAN:  She did present testimony with respect

184

1   to --

2            THE COURT:  I haven't carefully analyzed her

3   testimony to determine the extent to which she has testified

4   with respect to each of the 14 remaining Georgia-Pacific

5   factors, but there's no harm in leaving them in.

6            MR. HOFFMAN:  Thank you, your Honor.

7            THE COURT:  So we will not reduce them.

8            I said I was concerned, but I'm not -- it's not

9   really a concern.  We've got the September 30th date in the

10  verdict sheet, until the last few questions of Ms. Riley we

11  hadn't talked about the September -- I don't recall that we

12  mentioned the September 30th date; it might have come up, but

13  it's not in the damages section of the charge.

14           And let me go to the -- it was we've adopted your --

15  it's on page 38, your charge on calculation of a reasonable

16  royalty, made all of those changes.  The statement regarding

17  the date was at the end of the second paragraph.  That was in

18  Mr. Hangley's letter of February 10th and it was removed by

19  agreement.  That sentence read, "The total sum of an ongoing

20  royalty may be calculated through September 30th, 2016."

21  That apparently was proposed by Comcast, rejected by Sprint.

22           MR. RIOPELLE:  Oh, we reached -- in an effort to

23  reach an agreement, we both -- it was give and take on both

1    sides.  We agreed --

2           THE COURT:  I understand and that was good, I

3    appreciate that.  Fine, we've got the September 30th date in

4    the verdict sheet and no reference to it in the instruction.

5           MR. RIOPELLE:  It would be Sprint's -- my position

6    and Sprint's position that we don't need a reference to it in

7    the instructions.  The September 30th date is evidence and we

8    don't need to put the evidence in the instructions.  Again,

9    the only reason it's on the verdict sheet again is part of

10   the give and take.

11          The decision that needs to be made by the jury is --

12   if they get to damages is it a running royalty or an ongoing

13   royalty that would determine reasonable -- or a lump sum and

14   then what's the amount.  That's what they have to decide.  I

15   don't think it matters to them whether they decide through

16   September 30th or not, because if they decide it's an ongoing

17   royalty then we'll be back in front of the Court determining

18   what that means.  If they decide it's a lump sum, it's a lump

19   sum for the life of the pt.

20          THE COURT:  Yes, I understand that.  I'm really -- I

21   can't wait to get this case back --

22          MR. RIOPELLE:  Oh, it's not --

23          THE COURT:  -- it will fill out my year.  It's like

186

1    a royalty on the courtroom.

2            (Laughter.)

3            MR. RIOPELLE:  No, it's not coming back.  You just

4    want to see all our shining faces again.

5            THE COURT:  Well, it's enjoyable, but I have lots of

6    other cases that are screaming for attention.

7            MR. HOFFMAN:  Your Honor, part of I think the give

8    and take on the agreement from yesterday was to make -- you

9    know, was to make sure that the date did appear someplace,

10   which it does appear in the verdict form and I don't think

11   there's any disagreement that the date is going to be in the

12   verdict form.  I do understand your concern.

13           THE COURT:  Well, I don't want to upset you.  You've

14   agreed on so much after agreeing on so little, that I don't

15   want to disturb that.  And there's another option, and that

16   is cover it in closing.

17           MR. HOFFMAN:  Well it's certainly something we will

18   address in closing.

19           MR. FINKELSON:  Are you going to say that in

20   closing?  (Laughter.)

21           MR. GOETTLE:  Yes.  Shot for an hour, yes.

22           THE COURT:  If it's addressed in the closing I think

23   that's fine.

1        I'm going to go over the verdict -- those are the

2   questions with respect to the charge.  The next set of

3   questions deal with the verdict sheet.

4        MR. RIOPELLE:  Your Honor, may I have on question on

5   the charge?

6        THE COURT:  Yes.

7        MR. RIOPELLE:  Because I know you have made the

8   change.  We will get a final edition ?

9        THE COURT:  Yes, yes.  And I'm thinking right you've

10  got versions with sources on them, and I think we can -- some

11  of the sources may be -- no, as I'm looking I think Ian has

12  added the changes in the footnotes.  Certainly I'm giving the

13  jury copies of the charge.  They will not have copies with

14  the footnotes.  But what I have in draft form that I have and

15  it's not quite finished.  We're going to have to -- well, it

16  might be because there are no changes.  I didn't distribute a

17  copy because I thought there might be a change in the Georgia

18  Pacific part of the charge.  And I thought there might be a

19  change in the calculation of the reasonable royalty part, but

20  there won't be now.

21        So we can quickly -- the Charge is done.

22        DEPUTY CLERK:  Or you can -- they can send it by

23  email when you print when we get back from law offices.  I

188

1    just wanted personally to have a copy.

2              THE COURT:  The answer is absolutely. And this one,

3    because we've had a number of them, this one will be dated

4    tomorrow, February 16.  And the verdict sheet we will use

5    will be dated tomorrow because you've had - you've gotten a

6    dress that came out an early date.  And there's one thing, we

7    don't want different copies of the charge floating around.

8    All right.  So we'll either do that today, give you a hard

9    copy today or email a copy.  There will be no problem because

10   it's all done.

11             MR. RIOPELLE:  Thank you.

12             THE COURT:  And there are no changes in the copy of

13   the charge allowed.  Only a verdict sheet.

14             I made a change -- well, I made all of the changes

15   that we discussed, but had some different thoughts, slightly

16   different thoughts with respect to the transition to the

17   bottom of page three.  And that reads, "Now".  This is after

18   they answered the questions on invalidity.  Please proceed to

19   question four if you have found any infringed claim to be

20   valid.  I.e., a note for both questions two and three as to

21   any infringed claim. I think that probably picks up how they

22   get to age 2 r 3, rather, and why they're answering the 2 and

23   3.  And so if you find no invalidity and infringement they go

189

1    to page 4.

2         We had trouble with the second paragraph.   A

3    transition paragraph at the bottom of three.   And I don't

4    know whether you've had a chance to read it.   I'll read it

5    out loud.

6         Your deliberations are concluded if you have to have

7    all unframed claims to be invalid, i.e. a yes for question

8    two or question three or both with respect to each claim for

9    which you answered yes for question one.   And then your

10   foreperson should sign and date the (indiscernible) sheet.   I

11   think that is a simple -- still more simplified way of saying

12   what has to be said, although from the smile -- smiles I'm

13   getting.   Maybe there is a better idea and if there is let's

14   hear it.

15        MR. HOFFMAN:   We don't any issues with your second

16   paragraph language.   It's with respect to the first paragraph

17   where it says found any infringed claim to be valid?   I --

18        THE COURT:   They're not finding validity.

19        MR. HOFFMAN:   To being not invalid.

20        THE COURT:   To be or not to be valid.

21        MR. HOFFMAN:   They want the double negative.

22        MR. RIOPELLE:   Not to be invalid.

23        THE COURT:   Is that what you want?

1          MR. HOFFMAN:  That would be our suggestion.

2          THE COURT:  Any infringed claim.

3          Any other suggestions with respect --

4          MR. FINKELSON:  I don't think we have any objection

5  to that language.  The only other thing I'd say and it

6  really, it's not something that I feel strongly about, but

7  I've seen it be a source of struggle in the past is kind of

8  the fact that it really is an "or" -- you know, it's either

9  or, two or three.  But I think that says that.  It says or

10  three or both.  And I think it's fine as it is.  It wouldn't

11  stun me if you ever got to that transition point, if you got

12  a note from the jury saying wait a second, do we have to

13  decide both of those even though it says in planning

14  (indiscernible) or accounts.  I've seen it done with or

15  underlined, just to emphasize the point, but I don't feel

16  strongly about that, your Honor.  I just point it out.

17          THE COURT:  You're talking about the second

18  paragraph.

19          MR. FINKELSON:  Correct.  Just the word or

20  underlined just so the jury is clear that it is in fact an

21  oar.

22          THE COURT:  And the oar between question two or

23  question three?

1    MR. FINKELSON:  That's correct, your Honor.

2    THE COURT:  Do we have any other underlining?

3    MR. FINKELSON:  Can we underline No like 5,000 times

4  and go slow --

5    THE COURT:  We haven't been emphasizing by

6  underlining.  On the last page we have all caps.  And we

7  capitalized an or.

8    MR. FINKELSON:  Yeah, it looks like we did.  I think

9  we're fine with it as is, your Honor.  I don't think any

10  further changes are necessary.

11    THE COURT:  And what I'm going to do, I started to

12  say this, at the end of the charge when I distribute the

13  verdict sheets I will to all the jurors.  So there will be

14  eight of them out there.  I'm going to go over each question

15  and emphasize that.  And then I'm going to pull back.  When I

16  first mentioned that I'd pull back all but one copy of the

17  verdict sheet one of my colleagues said, well, why do you do

18  that?  And the answer is I only want them to write on one

19  verdict sheet.  I don't want to find a second verdict sheet

20  hanging around that's inconsistent.

21    So we'll make that one change, it's well taken

22  because there's no burden on Comcast to prove validity.  So

23  that first paragraph on page three of the transition

1   paragraph will read please proceed to page four if you have

2   found any infringed claim not to be invalid, and then in

3   parens what I said in parens.

4          We'll get these out to you tonight.  They're not

5   going to be etched in stone.  And we won't make copies.

6   We're going to give the jury copies.  Your copies will go out

7   tonight.  I think I'll give the jury three copies and we'll

8   hold off until we convene in the morning.  And if there are

9   any other changes -- this is really fluid -- the written

10  charge can be changed up until the time I give it.

11  Thereafter it's hard to change, although there might be other

12  things you want me to charge, and that's one of the things

13  we'll discuss at sidebar.

14         Okay.  Anything else we have to do?

15         COUNSEL:  No, your Honor.

16         MR. FINKELSON:  We'll make some motions, your Honor.

17         MR. RIOPELLE:  We have the motions and the closing

18  of the case.

19         MR. FINKELSON:  Can we confer, your Honor, for just

20  one moment before we present our motions?

21         THE COURT:  Yes.

22         MR. RIOPELLE:  I also know, your Honor, that you are

23  facing your own, and I don't know what your deadline is.  I

1  mean we could do them earlier in the morning tomorrow if

2  you'd prefer.

3          THE COURT:  Now long do you think -- it's one thing

4  is that a new partner or associate to get his chance to argue

5  to a judge where the judge is in Texas on short re-argument.

6  And it's not fair.

7          MR. RIOPELLE:  It can be as short or as long as you

8  need or as Comcast needs to respond I guess would be the best

9  answer.

10          THE COURT:  Would it be shorter if I told you what

11  I'm going to do, although you might have an issue there.

12  (Laugher.)

13          MR. LOWERY:  I mean it would certainly shortcut

14  things.

15          THE COURT:  Mr. Riopelle, I don't have to leave the

16  courthouse until 5:00.  You're not going to go that long, I

17  can assure you.

18          MR. LOWERY:  Me?  I'm not going anywhere.  I'm

19  washing my hands and handing it over to them.

20          THE COURT:  We'll do it from the lectern.

21          MR. LOWERY:  Thank you, your Honor.  Justin Lowery

22  again for Sprint.  Sprint moves for a judgment as a matter of

23  law under Rule 50A because there is no legally sufficient

1    evidence for a reasonable jury to find for Comcast on the

2    issues of invalidity, particularly under Sections 102 and

3    103.

4            Sprint is also renewing its motion for invalidity

5    under Section 1(1) and moving for a reconsideration of that

6    that issue given all the testimony that has occurred at trial

7    here today, so the full record if necessary for appeal.

8            Finally, Sprint is renewing its motion for a

9    judgment as a matter of law on the excuse of infringement in

10   damages as were discussed last week at close of Comcast's

11   case.

12           With respect to invalidity, Dr. Polish's testimony

13   established that each and every element is taught in the

14   prior art reference Scenaro.  So all of claims 1, 7 and 113

15   are taught by Scenaro and therefore Scenaro anticipates

16   claims 1, 7 and 113 and they are (inaudible) anticipated

17   under Section 102.

18           With respect to Section 103, Dr. Polish further

19   established that one of ordinary skill looking at Scenaro

20   would consider those claims obvious, and therefore all of

21   claims 1, 7 and 113 are invalid under Section 103, and

22   further, that viewing the combination of Scenaro and Varisto

23   which one of ordinary skill would combine, claims 1, 7 and

1    113 are further obvious in view of the combination of those

2    two references.

3         And finally as I mentioned given the evidence that

4    has come out at trial with respect to the claims and their

5    everyday analogies, Sprint is renewing its motion for summary

6    judgment that was earlier made in Section 101 --

7         THE COURT:  Summary -- not summary judgment.

8         MR. LOWERY:  The summary judgment motion that this

9    Court considered with respect to Section 101, yes, your

10   Honor.  And moving primarily so that there's a full record --

11        THE COURT:  A summary judgment motion during the

12   trial?

13        MR. LOWERY:  Yes.  We're moving both for renewal and

14   for reconsideration just to make sure there's a full record

15   with respect to Section 101.  As your Honor may remember for

16   Section 101 initially the subject matter eligibility, there

17   was expert testimony and expert declarations provided with

18   respect to Section 101 that were presented to this Court.

19   This Court also --

20        THE COURT:  Doesn't that fold into the trial

21   evidence?

22        MR. LOWERY:  It folds into the trial evidence but

23   our understanding is that if we want to have a full record

1    for appeal as to what the experts have said, we need to move

2    for some sort of reconsideration at this stage so there is

3    that full record for appeal.

4              THE COURT:  I've never had that in, oh, I don't want

5    to tell you how many years.  As a lawyer for 30 and as a

6    Judge for lots, never had that issue presented to me.  But

7    certainly you can make the motion.

8              MR. LOWERY:  Yes.  I mean our understanding is that

9    the summary judgment record would be limited to what was

10   available at that stage.  We want to make sure that the trial

11   testimony that was presented by both experts, particularly

12   Dr. Apple's testimony on real world analogies and things in

13   the real world that were done before and that related to the

14   claims, his analogies there were available as part of the

15   record for appeal if necessary.  So we're moving for

16   reconsideration of that motion so that full record could be

17   made available on appeal if necessary, Judge.

18             THE COURT:  Well, all right.  Is there any authority

19   for this?  I mean, I'm sort of a student of federal practice.

20   J.W. Moore was my professor.  He probably stated he wrote the

21   treatise we used to use.  I guess I outgrew Moore.  But the

22   bottom line, is there any authority for the renewal of the

23   motion for summary judgment at the end of a trial?

1          MR. LOWERY:  Our understanding is it would be a

2     motion for reconsideration under Rule 60, I believe.

3          THE COURT:  I think you have ten days to make that

4     motion.  That's ten days from the ruling on the motion.

5          MR. LOWERY:  Yes, but our understanding is if new

6     evidence comes to light which has happened in this trial,

7     then we can move for reconsideration to review and

8     (indiscernible) this evidence.

9          THE COURT:  Well then you're moving for judgment as

10     a matter of law.

11          MR. LOWERY:  We can also style it that way.  We

12     weren't sure what the best avenue would be to present it to

13     your Honor.

14          THE COURT:  The best avenue to me would be to style

15     it as a motion under Rule 50.  Unless you have authority and

16     then I will have learned something in all the years I've been

17     around.  I've never heard that argument made.  But certainly

18     your Rule 50 motion I think preserves all of the issues that

19     you seek to preserve.

20          MR. LOWERY:  Okay, your Honor.  Then we'll make sure

21     it's under Rule 50, Section 101.

22          THE COURT:  No, you do, if you think the proper

23     procedure is a reconsideration of the motion for summary

1    judgment, then you do that as well.  I'm not dying to write

2    on this.  For now I'm not going to do much writing.  But the

3    bottom line, we'll see what happens.

4         MR. LOWERY:  Understood, your Honor.  And as I

5    mentioned with respect to infringement and damages, we are

6    renewing our motions that were presented previously with

7    respect to infringement not being proven and that a

8    reasonable jury could not find for Comcast on issues of

9    infringement or damages, particularly with respect to Dr.

10   Apple's testimony not presenting sufficient evidence for a

11   jury to find for Comcast and being conclusory in nature.

12   Those motions were made for and we're renewing them based on

13   full record as is now available and testimony of all the

14   witnesses and experts.

15        THE COURT:  Thank you.  In order to just express my

16   view if we ever litigate this, I think the single motion

17   captures all that you seek to capture is a Rule 50 motion.

18   But I, if you think otherwise, I'm not ruling on that now.

19   Less is more.  It's something I've learned.  You haven't been

20   around long enough to have learned that, but fewer motions

21   are better than more motions.  And I think Rule 50 is the

22   appropriate vehicle.  But if you think otherwise, research it

23   if you're going to file anything and present it to me.  I

1    don't want to discourage you.  I look forward to perhaps --

2    perhaps, the operative word is perhaps, learning something

3    new after all these years.

4             MR. LOWERY:  Thank you, your Honor.

5             THE COURT:  Thank you, Mr. Lowery.

6             MR. FINKELSON:  And just so the record is clear,

7    your Honor, for now we are making it under both Rule 50 and

8    as a motion for reconsideration and we --

9             THE COURT:  Oh, I understand that.

10            MR. FINKELSON:  I just wanted to make sure the

11   record was clear.

12            THE COURT:  Is that the source of your --

13   (laughter.)

14            MR. FINKELSON:  No.

15            MR. LOWERY:  Finkelson on procedure.

16            MR. FINKELSON:  It is not.  However --

17            THE COURT:  Does anyone in the courtroom remember

18   J.W. Moore?

19            MR. LOWERY:  Oh, yes.

20            COUNSEL:  Oh, yeah.

21            MR. FINKELSON:  Absolutely.

22            MR. LOWERY:  Thank you, your Honor.

23            THE COURT:  Mr. Goettle.

1      MR. GOETTLE:  Your Honor, Comcast opposes the three

2  motions.  On the motion under 101, Section 101 and the

3  renewed motion regarding infringement of damages that Sprint

4  had made when Comcast rested, I would like to incorporate and

5  reference the arguments and the briefing that we've already

6  supplied to the Court with respect to those.

7      THE COURT:  Well, I think there are questions of

8  fact raised with respect to all of the motions.  But I still

9  am back to I think one Rule 50 motion captures all of the

10  issues that need to be addressed.  I think there's been a

11  clash in the testimony.  I use the word clash not in any --

12  well, in an adversarial nature but not as an admonition to

13  anyone.  The testimony is sufficient to permit the claims,

14  Comcast claims of infringement of the inventions of claims 1,

15  7 and 113 to go to the jury.  And by the same token I think

16  the evidence, its submission is sufficient to allow the

17  claims of invalidity based on obviousness and anticipation to

18  go to the jury.  So the motions are denied.  But I heard

19  reference to three motions.

20      MR. GOETTLE:  There were.  There were three, your

21  Honor.  There was a motion for summary judgment --

22      THE COURT:  At the end.

23      MR. GOETTLE:  -- excuse me -- the (indiscernible) of

201

1  invalidity based on the testimony that we heard in court as

2  distinct from a renewed motion for invalidity under Section

3  101, which was the summary judgment motion that Sprint had

4  raised earlier that you had denied.

5        And then the third was the renewed Jaymol (ph)

6  motion regarding infringement and damages.

7        THE COURT:  Yes, but those don't have to be

8  separated.

9        MR. GOETTLE:  I just wanted to make sure I was

10  joining issue with what Sprint had come up with to the podium

11  to --

12        THE COURT:  You joined the appropriate issue, and

13  those motions are denied.

14        MR. GOETTLE:  Thank you, your Honor.

15        THE COURT:  We'll discuss further proceedings after

16  the jury verdict.

17        All right.  We'll get the charge and the verdict

18  sheet here.  It will be dated tomorrow, February 16th.  I

19  think we can start at 9:30.  If there are any additional

20  issues -- well, just call us, we'll be here.  And we can come

21  into the courtroom early.  Call opposite numbers so that we

22  can address -- but I'd like to get started as early as

23  possible tomorrow.

1          And I have your estimate, Mr. Goettle, of your

2   closing time, about an hour and 15 minutes.  And Sprint's

3   will try to keep it under an hour.  And that will enable --

4          MR. FINKELSON:  It'll be under an hour and 15

5   minutes as to Sprint.  It will not be longer than that, and I

6   hope a little bit shorter.

7          Does that allow us, for your Honor's comments I

8   think it would be helpful to agree upon a procedure.  I don't

9   know what your Honor has --

10          THE COURT:  Yeah, I'm wondering --

11          MR. GOETTLE:  Well, you have it in the pretrial

12   order, your Honor.  I know it's a thick document.  Yes.

13          THE COURT:  Yes.  I haven't memorized all the --

14   what does it say about -- and what I said as I started to

15   explain it to the jury, what I was thinking is that Sprint

16   has the burden on invalidity.  How do you close in a

17   situation like that?  What have you agreed upon?

18          MR. GOETTLE:  Well, in the pretrial order we have

19   closing arguments.  Comcast first followed by Sprint followed

20   by  Comcast's rebuttal.

21          THE COURT:  That's typical.  That's the way we'll

22   proceed then.

23          MR. FINKELSON:  That's the way we're going to

1    proceed, your Honor.  Do you have a -- sometimes rebuttal can

2    go a little bit longer than rebuttal.  Do you have a

3    preference for the length of rebuttal and is that something

4    that we can do --

5             THE COURT:  Oh, yes.

6             MR. FINKELSON:  I know you may have a preference for

7    none, which is my preference as well.  (Laughter.)

8             THE COURT:  No.  I think in a case like this --

9    well, the rebuttal is Comcast's.

10            MR. FINKELSON:  Absolutely.  And we've agreed to

11   that and they get to put on a rebuttal.  So my only question

12   was just so we'd have the procedure in line.

13            THE COURT:  Well, the rebuttal should -- first of

14   all, you asked long or short.  The answer for that for me on

15   a question like that will always be shorter is best.  It's

16   best for you, it's certainly best for the jury and I think

17   it's better for the Court.  But I don't have any view on how

18   long it should be.  A lot depends on how long you are, Mr.

19   Finkelson, in your closing.  And I'm not cutting you short.

20   It's a big case, very complicated, and I think many keys to

21   the case will be found in the closings.  You're going to have

22   to wrap up two and a half weeks of very, very technical

23   testimony, big job.  And I'm not going to sit here with an

1   hourglass.

2          MR. FINKELSON:  Nor would I expect you to.  My

3   question was a little bit more just focused on the procedure

4   and the timing that things have taken.  Do you expect that

5   we'll get through rebuttals before the lunch hour or else we

6   won't have a lunch break prior to that.

7          THE COURT:  You used the term rebuttals.

8          MR. FINKELSON:  Rebuttal.

9          THE COURT:  Fine.  One rebuttal.

10          MR. FINKELSON:  We're not -- we don't --

11          THE COURT:  We're going to try.  But maybe we won't.

12          MR. FINKELSON:  Okay.  Well, we'll do our best and

13   we'll --

14          THE COURT:  I haven't timed the charge, but I think

15   it will take close to an hour.  And I'll have a break, a

16   standup.  My voice is kind of in and out, and I'm not quite

17   certain why.  I'm having no trouble now but we might stand up

18   and break for just a few minutes during the middle of the

19   charge.

20          Okay.  Anything else?

21          MR. GOETTLE:  No, your Honor.

22          MR. RIOPELLE:  One minor housekeeping thing.  So

23   obviously tomorrow when the case goes to the jury, will you

1   be giving the exhibits back there -- I think somebody on my

2   team told me that if you put all the exhibits, the admitted

3   exhibits in a box right now, it's like five banker's boxes.

4   Does the Court have a preferred procedure?  Would you like us

5   to put them in order, put slips in them for binders and

6   (inaudible).

7          THE COURT:  Well, they've been taking notes so they

8   might -- I think the exhibits should -- are you asking me if

9   they should be in chronological order or mixed up?

10  (Laughter.)

11         MR. RIOPELLE:  We can mix all the pages up and ...

12         THE COURT:  Well, you know, you tell stories from

13  that side of the bar, and I'm thinking of what I used to do,

14  and oh, you just reminded me of a hotel room scene in New

15  York with a senior partner when we decided that very

16  question.  And I'm not going to tell you what happened.

17  (Laughter.)  What do we do with the documents we are

18  producing, and they were a big stack.  And we produced them

19  all.

20         MR. FINKELSON:  By throwing them out the window of

21  the hotel room, well done.

22         THE COURT:  No, we produced every single document.

23  But our opponents didn't stumble onto the bad documents for

1   us.

2           The bottom line, I think you should come up with a

3   way, I don't know how many documents you have in mind sending

4   out with the jury.  If we send out every document on the

5   Comcast motion and every Sprint -- was there a comparable

6   Sprint motion or no?

7           MR. FINKELSON:  There was a Sprint motion.  I'm not

8   sure -- it's not comparable in size.

9           THE COURT:  It's in length.  Well, I think we've

10  told the jury that the exhibits received in evidence will go

11  out.  I suggest they go out in banker's boxes numbered

12  consecutively.  Did you have another idea?

13          MR. RIOPELLE:  No, no, I was just asking if the

14  Court had a preference.

15          THE COURT:  As opposed to that or what?

16          MR. RIOPELLE:  Some Courts I've been in have

17  requested that these are put in binders as opposed to boxes.

18  I don't know if the other side had a preference.

19          MR. GOETTLE:  I think putting them in boxes in

20  numbered order, I think.  Otherwise, the binders just make it

21  look even more voluminous.

22          THE COURT:  I find the binders a little hard to work

23  with, particularly since the exhibits vary in thickness from

207

1    one or two pages to inches.

2          MR. RIOPELLE:  Okay.  Well, we can discuss it

3    tonight.  I'm sure we'll reach agreement on --

4          THE COURT:  And I think you should agree on a way

5    that makes it easiest for the jury to get into the exhibits

6    to the extent they need to do that.  Remind me to explain to

7    the jury how the exhibits are going to be presented.

8          MR. FINKELSON:  Thank you, your Honor.

9          THE COURT:  I can do that at the very end after the

10   charge.  Okay, anything else?

11         MR. GOETTLE:  No, your Honor.

12         MR. FINKELSON:  No, your Honor.

13         THE COURT:  All right, on that note we're adjourned

14   until tomorrow at 9:30.

15         (Court adjourned for the day at 4:37 p.m.)

16

17

18

19

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

s:/Geraldine C. Laws, CET                    Date 2/15/17
Laws Transcription Service