```
               IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                           - - -

COMCAST CABLE COMMUNICATIONS, :  CIVIL ACTION NO. 12-0859
LLC, et al.,                  :
            Plaintiffs        :
                              :
           v.                 :  Philadelphia, Pennsylvania
                              :  February 16, 2017
SPRINT COMMUNICATIONS         :  9:40 o'clock a.m.
COMPANY L.P., et al.,         :
            Defendants        :
. . . . . . . . . . . . . . .

                    JURY TRIAL - DAY 13
            BEFORE THE HONORABLE JAN E. DUBOIS
          SENIOR UNITED STATES DISTRICT COURT JUDGE

                           - - -

APPEARANCES:

For the Plaintiffs:      DANIEL J. GOETTLE, ESQUIRE
                         DALE M. HEIST, ESQUIRE
                         Baker & Hostetler, LLP
                         Cira Centre, 12th Floor
                         2929 Arch Street
                         Philadelphia, PA  19104-2891

                         WILLIAM T. HANGLEY, ESQUIRE
                         REBECCA SANTORO MELLEY, ESQUIRE
                         Hangley Aronchick Segal & Pudlin
                         One Logan Square, 27th Floor
                         Philadelphia, PA   19103

                         GEORGE MEDLOCK, ESQUIRE
                         Comcast Cable Communications
                         Chief Patent Counsel

                 Laws Transcription Service
                   48 W. LaCrosse Avenue
                   Lansdowne, PA  19050
                      (610)623-4178
```

2

APPEARANCES: (Continued)

For the Defendants:      DAVID E. FINKELSON, ESQUIRE
                         BRIAN C. RIOPELLE, ESQUIRE
                         JUSTIN R. LOWERY, ESQUIRE
                         McGuire Woods, LLP
                         Gateway Plaza
                         800 East Canal Street
                         Richmond, VA  23219

                         COLLEEN H. SIMPSON, ESQUIRE
                         Harkins Cunningham, LLP
                         4000 Two Commerce Square
                         2001 Market Street
                         Philadelphia, PA  19103

                         - - -

Audio Operator:          Michael Cosgrove

Transcribed by:          Geraldine C. Laws, CET
                         Tracey Williams, CET
                         Paula Curran, CET


(Proceedings recorded by For The Record electronic sound
recording; transcript produced by AAERT-certified
transcribers.

1            (The following occurred in open court at 9:40

2   o'clock a.m.)

3            THE COURT:  Good morning, everybody.

4            ALL:  Good morning, your Honor.

5            THE COURT:  Be seated, please.

6            I gather you have an issue you wish to address?

7            MR. RIOPELLE:  It's not an issue, just some

8   housekeeping.  At the end of the day Comcast had moved some

9   exhibits and you had given me some time to look at them to

10  see if we had any objections.  So just for the record, for

11  PX-77, PX-145 and PX-908, Sprint has no objections to those

12  exhibits coming into evidence.  For PX-900, we do have an

13  objection based on hearsay.  Now, my understanding is that

14  they have moved it off their evidence list into their

15  received list; is that correct, Mr. Hoffman?

16           MR. HOFFMAN:  That is correct.

17           MR. RIOPELLE:  The second thing, your Honor, just so

18  the record is complete --

19           THE COURT:  Let me make a note of that.

20           MR. RIOPELLE:  Yes.

21           (Pause.)

22           THE COURT:  900 is withdrawn?

23           MR. HOFFMAN:  And marked for identification

24  purposes, your Honor.

25           THE COURT:  Fine.

1          MR. RIOPELLE:  The second thing is we'd like to

2     tender for the record the transcripts of three of the video

3     depositions we played, because on the transcript it just says

4     video played.  And so just for purposes of the record we have

5     the transcripts.  They are not being marked as exhibits,

6     because they're not to go back to the jury, but we just want

7     the record to be complete.

8          THE COURT:  Fine.  And they've been marked in what

9     way?

10          MR. RIOPELLE:  The only thing they say on them right

11     now is they have the name of the deponent, Evan Koch, Sean

12     Wilson and Mr. Tirana.

13          THE COURT:  Are the videos marked as exhibits?

14          MR. RIOPELLE:  The videos were played, I don't think

15     the video itself was marked as an exhibit, no.  And we're not

16     tendering the actual video, just the transcript, just as if

17     they testified here in court they would be in the transcript.

18          THE COURT:  All right.  I think we ought to mark

19     them --

20          MR. RIOPELLE:  How about if I give them numbers DX-

21     700, 701 and 702?

22          THE COURT:  Fine.

23          MR. RIOPELLE:  So just so the record is clear, the

24     deposition transcript of Mr. Tirana will be DX-700, the

25     deposition transcript of Mr. Sean Wilson will be DX-701, and

1    the deposition transcript of Mr. Koch will be DX-702.

2              THE COURT:  Fine.  I think for both sides we want an

3    up-to-date exhibit list covering all of the exhibits, number

4    one, that have been received in evidence and, number two,

5    that have been marked but not received in evidence.

6              MR. RIOPELLE:  And then -- oh, sorry.

7              THE COURT:  Go ahead.

8              MR. RIOPELLE:  Then the last thing is, as we know

9    some of the slide -- the demonstrative slide decks are going

10   back, Comcast has noted on Dr. Akl's slide deck the changes

11   that were made and they have been very cooperative in doing

12   so, we just thought that the Court at the time it is

13   instructing the jury may want to point out that the slide

14   decks have been annotated to show what was changed, just so

15   they understand it wasn't exactly the slide deck that they

16   saw during the presentation.

17             THE COURT:  To show what was changed by the witness?

18             MR. RIOPELLE:  Correct.

19             MR. GOETTLE:  So, your Honor, the objection that

20   Sprint had raised was that Dr. Akl had taken Sprint documents

21   and had annotated them in his explanations and Sprint was

22   concerned that it wouldn't be abundantly clear to the jury

23   what Dr. Akl added versus what was in the original document.

24   And so we went through every slide and custom wrote on it

25   exactly what he added.  And so I think this is a good point

1    that the jury hasn't seen those annotations yet and so it

2    would be useful for them to be instructed that these are the

3    slides that you saw during the presentations, they have been

4    modified only to indicate what they're indicating on what was

5    added.

6              THE COURT:  Fine.

7              MR. GOETTLE:  Thank you.

8              MR. RIOPELLE:  Thank you, your Honor.

9              THE COURT:  Yesterday we discussed the way in which

10   the exhibits would be presented to the jury and we ended up

11   concluding that banker's boxes would be the best way to do

12   that.  I'm wondering whether we should give the jury exhibit

13   lists.  I can't see -- I'm picturing myself in the jury room

14   and the court officer comes in and says, here are the

15   exhibits, and there are five or six or seven cartons of

16   exhibits.

17             MR. GOETTLE:  That is fine with Comcast and I think

18   we actually have that.  You're talking so it says what the

19   exhibit number is and then like the title of what the

20   document actually is?  That's fine with Comcast.

21             MR. RIOPELLE:  I believe we would need to create

22   that.  We have right now the longer one, we would need to

23   take some off.  And then the second thing is I think both

24   sides should check the descriptions of each exhibit from the

25   other side just to make sure that --

1           THE COURT:  I think that will work, though.  This is

2     just an idea.  I've not done that, at least not recently, but

3     with lengthy trials I think looking at three or four or five

4     or more banker's boxes of exhibits is going to be formidable

5     and if they have an exhibit list, it's not exactly the

6     greatest help unless they have the number.  If they don't

7     have the number and don't have a detailed description, it

8     will be difficult.  And even if they do have a description of

9     the exhibit, it will be difficult to find it if they don't

10    have the number.

11          What has been your experience in other cases with

12    this issue?

13          MR. GOETTLE:  I think what you're suggesting is a

14    great idea.  I have not done that in another case, but I

15    think it's a great idea, I don't see any reason not to do it.

16          THE COURT:  Oh, I don't see any reason not to, I

17    wonder if there's a better idea.

18          MR. RIOPELLE:  I have done it in other cases, as a

19    matter of fact, and it was exactly like you just described.

20    We gave a -- actually it was a consolidated list, but I don't

21    think it matters here, of exhibits and the only thing is both

22    sides checked the other side's own descriptions, just so you

23    weren't bringing over descriptions you had on the original

24    exhibit list that may have been -- and both sides, I mean --

25          THE COURT:  I think we'll have time --

8

1          MR. RIOPELLE:  -- we may be guilty of it too, so --

2          THE COURT:  -- we'll have time to do this.  I don't

3    think -- well, I'm 99-percent certain I'm not going to charge

4    before lunch, we might not even get rebuttal in before lunch,

5    so you'll have time to create this exhibit list.  Good.

6          The final -- I hope final -- revisions to the

7    verdict sheet and the charge were made, we sent those

8    documents to you last night.  First the verdict sheet,

9    particularly the transition on page 3, okay?

10          MR. GOETTLE:  It looks great.  Thank you, your

11   Honor.

12          THE COURT:  Fine.

13          MR. RIOPELLE:  It's fine, your Honor.

14          THE COURT:  Charge, any changes?

15          MR. GOETTLE:  No, your Honor.

16          MR. RIOPELLE:  No changes.

17          THE COURT:  And you had that one issue regarding

18   clear and convincing evidence and the person having ordinary

19   skill in the art.  The addition that you wanted --

20          MR. GOETTLE:  The higher the level --

21          THE COURT:  -- the point that says --

22          MR. RIOPELLE:  Right.

23          THE COURT:  -- "it will be easier for you to find"?

24          MR. RIOPELLE:  Yeah, I was just going to make that

25   objection at sidebar afterwards.

9

1          THE COURT:  Fine.  Nothing else, all right.  Is my

2    secretary in the courtroom?  Ah, we can go ahead and prepare

3    the charge, the copies of the charge for the jury, I want

4    three copies in the notebook.

5          (Pause.)

6          (Jury in at 9:56 o'clock a.m.)

7          THE COURT:  Good morning, everyone.  Please be

8    seated.

9          We've heard all the evidence in the case, as I told

10   you yesterday, we'll now hear closing arguments.  Mr. Goettle

11   of Sprint will present his closing argument first and then

12   we'll hear from -- did I say Sprint?

13          MR. GOETTLE:  You did, your Honor.  I said I got

14   promoted.

15          (Laughter.)

16          THE COURT:  It's been a long trial.  Mr. Goettle of

17   Comcast will present his closing argument first, Mr.

18   Finkelson will follow for Sprint, and because Comcast has the

19   burden of proof, Mr. Goettle will have a rebuttal.  So we'll

20   hearing closing arguments in three parts.

21          You may proceed.

22          MR. GOETTLE:  Thank you, your Honor.

23                         CLOSING ARGUMENT

24          MR. GOETTLE:  A month, two months, a year ago

25   virtually everybody else in this room knew they were going to

Mr. Goettle                               10

1   be here for three weeks, you were the only people who didn't

2   know that, and I listened to you at voir dire and I knew this

3   wasn't welcome.  So it sounds trite in a closing argument to

4   thank the jury, but we thank you, Comcast thanks you, because

5   not only did you come here every day for three weeks when you

6   had other things to do, other things that no doubt for you

7   were better things to do than to sit here for three weeks,

8   you came here and you listened, or at least you looked like

9   you were listening that entire time, you took notes.  I've

10  never seen anything like this, this complicated case for this

11  duration of time to take notes.

12          So I say thank you, it comes from the heart from my

13  team, we mean it, it sounds trite, and I'm going to get to

14  the business at hand so that you can do what you need to do

15  to get out of here.

16          I made you three promises in my opening:  I told you

17  I would show you Sprint infringes this patent, I would show

18  you what the patent about and I would show you that Sprint

19  infringes it.  I promised that to you and I came through on

20  my promise.

21          I told you that I would -- the evidence would show

22  you why Comcast is suing Sprint.  Why does Comcast have the

23  patent in the first place?  Why is Comcast suing Sprint for

24  the use made of this invention for a patent that Comcast

25  bought?  I told you that I would explain that to you, I told

Mr. Goettle                                    11

1    you the evidence would show you it through Mr. Finnegan and
2    through Mr. Dellinger, and I followed through on that
3    promise.
4              The third promise I made to you is I would show you
5    the damages and why $154 million was a reasonable royalty for
6    Sprint's use made of the invention, that use made to the tune
7    of 2.6 trillion, over 2.6 trillion acts of infringement over
8    the relevant time period in this case, and the evidence came
9    in through Ms. Riley and Mr. Webber and they showed you how
10   they came up with their calculations.  And the way they came
11   up with their calculations was by relying on Sprint's
12   documents, the very same documents that Sprint uses to report
13   its taxes, that Sprint uses before the Federal Government,
14   that Sprint uses to report on how they're doing with their
15   investors, those same documents are what Ms. Riley and Mr.
16   Webber relied on.  I came through on my three promises.
17             Sprint's very first sentence to you I took as a
18   promise and I don't think they fulfilled, the very first
19   sentence to you in this case was Comcast is suing Sprint
20   because Sprint wants to get into the cell market.  Comcast is
21   suing Sprint because they want Sprint to fund that entrance
22   into the cellular network market.  That was the very
23   sentence.  Not a single witness said that, not one.  The only
24   witness to address it directly said no -- and I'm going to
25   show it to you -- said no, that's not true.  And it's not

1   true and we're going to walk through, I'm going to explain to

2   you in three parts again why we're here, why Comcast has the

3   patent, I'm going to explain to you what this invention is

4   and why Sprint infringes.  And then I'm going to explain to

5   you why Ms. Riley and Mr. Webber's calculations are a

6   reasonable, reasonably royalty for Sprint's use made of this

7   invention since 2006.

8           So here's my roadmap.  I'm going to tell you right

9   now, it's hard to do in the examinations, I tried to give you

10  signals here and there of how long things were going to take,

11  this is going to take me about an hour to walk through.  But

12  it's an hour worth spending because we just threw at you a

13  whole bunch of witnesses in a complicated technology field,

14  in a complicated damages case, it's a whole lot of

15  information to absorb and my job is to somehow put some

16  semblance to it, so that when you go back to the jury room,

17  at least from Comcast's perspective, you know how we see the

18  evidence, you know how we link this case together that was

19  very long and very complicated.  You can see it crystalize,

20  this is my chance, if I do my job right, our position should

21  be crystalized for you.  So that's my job, I think it's an

22  hour worth spending.  My goal is that when I am done this and

23  when I am done my rebuttal, my goal is that your

24  deliberations might be easier, might be quicker.

25          So let's start from the beginning.  Comcast in 2007

1    realized -- this is what Mr. Finnegan told you -- realized

2    though sophisticated in technology, though sophisticated in

3    the cable industry, was not sophisticated in the patent

4    world, they hired Mr. Finnegan to come in.  And Mr. Finnegan

5    explained this to you and Mr. Dellinger said the same thing.

6    Why does Comcast go out and buy patents?  It's simple.  Mr.

7    Finnegan's experience had been that companies like Comcast

8    get patents for defensive purposes.  It's not the only reason

9    that companies get patents.  Companies buy patents for

10   offensive purposes, to make money on patents.  These

11   witnesses came in here and they told you that's not what

12   Comcast is doing.  What they're doing is developing a drawer

13   full of patents so that when those competitors, those would-

14   be competitors come to Comcast with their patents and says,

15   Comcast, you should pay us, we think you're using our

16   invention, or worse, Comcast, you should get out of this line

17   of business, this isn't for you, we have patents that block

18   you from doing it.

19        Comcast needed the strategy that Mr. Finnegan had

20   learned through his work with other companies, needed the

21   defensive strategy.  Fill up your drawer full of patents so

22   that when they come with their patents, you open your drawer

23   up, you take those patents out and you put them on table.

24   And why do you do that?  Because you want patents to be a

25   wash.  They have their patents, we have our patents, let's

1   not talk about patents, let's not bother people like you with

2   patents; let's compete in the marketplace, let's resolve our

3   disputes at the table.  That's the strategy that Mr. Finnegan

4   put in place when he was hired in 2007-2008 and that's what

5   brings us here today and I'm going to get to that.  And it

6   works.

7           What Mr. Finnegan told you was they had looked at

8   upwards of 100,000 patents since he has started and they only

9   bought 200.  Why is that significant, why does that bolster

10  what I'm telling you what the strategy was?  It bolsters it

11  because if you're trying to buy patents to make money off of

12  patents, you don't buy 200, you buy a lot, you buy a lot so

13  that when you put them out on the table other people think,

14  oh, geez, I better pay, because there's got to be something

15  in there that I am doing that I should be paying for.  But if

16  you want to get your competitors to pay attention to you in

17  the marketplace, to pay attention to you at the business

18  table, what you do is you go out and you're selective.  You

19  get the patents that actually will matter to them, so that

20  when you sit down you say this one matters to you, the

21  patents are a wash, let's just compete.  That's why that's

22  significant testimony.  And it works.

23          Verizon is a case in point this strategy works,

24  because Verizon did come knocking, Verizon did come knocking

25  and the patents are a wash with Verizon.  And now what is

1    Comcast doing?  They're competing with Verizon in the

2    marketplace.  FiOS is released and we all have seen the

3    commercials, they go at it, they go at it in their

4    commercials.  We've all seen it, we know, Comcast and FiOS,

5    those are our options.  And I heard you at sidebar when we

6    were doing voir dire Judge DuBois asked every one of you, do

7    you use Comcast?  Some of you said yes, some of you had had

8    instances of unhappiness with Comcast, but some of you said

9    yes and some of you said no, I use FiOS.  You know about this

10   competition, it works.

11          And Mr. Marcus testified that he believes it is

12   because of -- I'm on the wrong slide -- no, I'm not -- oh,

13   I'm sorry, I confused AT&T with Verizon, but this strategy

14   worked with Verizon because they're competing in the

15   marketplace.  That's a good thing, that's a good thing for

16   all of us, because when companies compete in the marketplace

17   it lowers price and it increases innovation.  It lowers

18   prices because now they have to compete and it increases

19   innovation because now they have to kind of figure out a way

20   to tweak their service to make it a little bit more

21   attractive to their customers.  It's a good thing.

22          And AT&T -- this is what I got confused about and I

23   apologize -- Mr. Marcus testified that it's because of this

24   defensive strategy that he thinks that AT&T and Comcast are

25   leaving each other alone.  This defensive strategy works.

Mr. Goettle                              16

1        And then Mr. Dellinger testified about the patent

2   acquisition from Nokia, how did we buy the '870 Patent, and

3   he talked to you about contacting Nokia in 2008 and then

4   working through their patents and buying the patent in June

5   of 2010.

6        So why -- again, like I said in my opening, this is

7   why Comcast has the patent, now why is Comcast suing Sprint?

8   In my opening I told you that the evidence would show why

9   that is.  The short of it is, ladies and gentlemen, that we

10  didn't resolve the things at the negotiating table and Sprint

11  sued Comcast in Kansas.  That's the testimony from -- I

12  skipped ahead, sorry -- that's the testimony from -- let me

13  go to that slide so you know -- here Mr. Marcus says, that's

14  the testimony from Mr. Marcus, "They sued us in Kansas, this

15  is a lawsuit in response to that, a countersuit, a

16  counterclaim in response to that."

17       But what I skipped was that before that we had been

18  partners and that's significant, because again we're not here

19  to monetize our patents, we're not here to get funding from

20  Sprint, Comcast is not trying to get funding from Sprint to

21  get into the cellular network market, that's not why we're

22  here.  We're here because Sprint sued Comcast first and we're

23  implementing this strategy, the patent-acquisition strategy.

24  You hope it doesn't come to this, you hope that you're not

25  bothering jurors like you for three weeks on complicated

Mr. Goettle                                    17

1   technology, complicated damages law, you hope it doesn't come

2   to this, but when you have a strategy and you put it in

3   place, you have to follow through with it; that's what

4   strategies are for.

5           But before this Comcast and Sprint were partners,

6   they were partners.  And to me the single most important fact

7   of how you can know that that is true is one of the very

8   first phone calls that Mr. Finnegan made when he decided that

9   he was going to go acquire patents for defensive purposes is

10  he called Sprint, he called Mr. Harley Ball, he told you, the

11  head of IP at Sprint, and he asked Mr. Harley Ball if Comcast

12  could buy the patents.  That's significant because it shows

13  you that there was a partnership between Sprint and Comcast.

14          Comcast did not buy this patent to get Sprint to

15  fund litigation to launch Comcast into the cellular industry.

16  You don't go to your adversaries for patents.  Why?  If you

17  go to your adversaries, then they're going to think, hey,

18  maybe they do need our patents and we won't sell them our

19  patents, we'll license our patents to them.  You go to the

20  folks who you think you can trust, who aren't going to take

21  this and use it against it, that was why Mr. Finnegan called

22  Sprint.

23          And you know that there was a partnership between

24  Comcast and Sprint because you've seen it, you're going to

25  see it in Sprint's rebuttal.  You've seen this agreement

Mr. Goettle                          18

1   called the MVNO agreement that was in 2008.  So you know it's
2   true we were partners at that time; we're not now, but we
3   were partners at that time.
4           Okay.  So this is the testimony that I alluded to in
5   the very beginning of Sprint's promise.  Mr. Marcus was asked
6   point blank, "Did you hear Sprint's lawyers' remarks telling
7   this jury that this lawsuit is part of a plan to enter the
8   cellular market?"  And Mr. Marcus answered flatly, "There's
9   no truth in it."
10          Okay.  So I think if I was sitting here for three
11  weeks I would want to know kind of like why, what the
12  backdrop is, and that's why I went through that.  I'll submit
13  to you though, ladies and gentlemen, for your deliberations,
14  it's not on the verdict form, the form that you're going to
15  have to fill out, it's not a factor on the verdict form.
16  What's on the verdict form is whether Sprint is infringing
17  this patent and then, if so, what damages Comcast is owed for
18  Sprint's use made of the invention.  So let's talk about
19  Sprint's infringement.
20          I started off by explaining to you that speed is
21  what this patent is about and I followed through and showed
22  you the evidence of that.  This is right from the patent,
23  this is the clips that Dr. Akl showed to you about holding
24  the message outside the network, first confirming if the
25  phone can receive the message, and then and only then sending

1   it in.  Why?  Because now you don't have to get those core

2   network elements bogged down.  Those elements that are

3   charged with the duty of getting the phone connected to other

4   phones and to other networks, don't bog them down with also

5   having to track messages that can't get delivered, separate

6   that functionality away from those core network elements so

7   that those elements do not get distracted and slow things

8   down.

9        I think it's intuitive that if your cellular network

10  is not fast and the other provider's cellular network is

11  fast, you're going to start thinking about switching.  Speed

12  is important to us, this patent is directed to speed.  And

13  Dr. Akl said that to you, I won't read what I have up on the

14  slide, which number I can't even see, but what he's saying is

15  he gives kind of a common example of speed.  If you have a

16  lot of things on your to-do list and you have to get them all

17  done fast, well, it's harder to get them all done fast if

18  there's a lot on the to-do list.

19       So what we're doing is those elements that are

20  charged with getting the phone connected to other phones and

21  to other networks, we're reducing their to-do list, we're

22  taking away the to-do list of tracking the messages that

23  can't get delivered and we're holding them and we're

24  separating that functionality away, so that those computers

25  charged with the core functions of connecting the phone to

Mr. Goettle                          20

1   other networks can focus on the task at hand.  That's what
2   Dr. Akl's analogy was.
3          And then the other piece of the invention is, and I
4   explained this to you in the opening and Dr. Akl told you
5   about it, there's a cost though.  The invention is a little
6   bit of a balance, there's a cost to having that functionality
7   separated from those elements that are doing the connecting.
8   The cost is this:  now with that separated functionality,
9   that messaging server that is now separated away, it doesn't
10  know where the phone is, it doesn't know if the phone is on,
11  it doesn't know anything about the subscriber, whether the
12  subscriber has paid their bills, whether the phone is
13  technologically capable of receiving the message, it doesn't
14  know.
15         So the core network elements are charged with a
16  duty, they're not off the hook completely.  They don't have
17  to deal with the message, but they still have to deal with
18  the inquiry and the inquiry goes like this.  If the cellular
19  network, if these core elements charged with the connection
20  duty, if they maintain their information by something other
21  than the phone number, but instead use an internal identifier
22  for that phone, then those core network elements have to help
23  out a little bit.  They have to receive the query, the
24  inquiry from the messaging server that has the full number,
25  hey, core network elements, is this phone on, can you tell me

1   where it is?  They have to receive it, they're going to have

2   to deal with the mapping from that phone number to an

3   internal identifier, they'll have to do the lookup in the

4   database -- the databases you've heard about in this case are

5   called the home location register, the subscriber profile

6   system and before that the messaging LDAP -- they do the

7   lookup, they send the information back to the messaging

8   server.

9        The core network elements who have that -- all that

10  stuff on their to-do list to get that phone connected to the

11  other phone, the phone connected to the other networks,

12  they're not off the hook, they still have to help out.  What

13  they don't have to do under this invention is hold onto the

14  message and wait for the phone to come back on and try again,

15  that's up to the messaging server to do.  The messaging

16  server holds it away from them until it's notified that the

17  phone is back on.

18       So that's the invention and that's what Dr. Akl

19  explained to you.

20       Now, you heard from Dr. Akl yesterday and he said --

21  he gave you a piece of good news, he said Sprint isn't

22  disputing what I have checkmarked up here, they're not

23  disputing that this recipe is followed.  They're disputing

24  one and only one thing and that's whether Sprint's messaging

25  servers are core network elements of Sprint's cellular

Mr. Goettle                          22

1   network, that is the sole infringement issue that you are

2   being asked to decide.  Why?  Because over the course of that

3   what was Dr. Akl's admittedly very long testimony he walked

4   through all of the different scenarios for these various

5   different steps of the claim, he walked through and he showed

6   you how those steps are performed in Sprint's cellular

7   network.  He showed you that it was true all of those steps

8   are performed every single time over the damages period in

9   this case, every single time a Sprint subscriber sends a text

10  message or an MMS message to another Sprint subscriber.  He

11  showed you that it happens every single time when a Sprint

12  subscriber sends a text message to another network; to a

13  Verizon subscriber, to a T-Mobile subscriber, to an AT&T

14  subscriber, he showed you that it happens every time.  By it

15  I mean every one of these steps.  He showed you it over the

16  course of what was very long testimony and he showed you the

17  reverse is true, it happens every time a message comes in

18  from the other network into the Sprint subscriber.

19        So it took a while, we have the burden of proof, as

20  he explained to you, we had to prove it to you.  And the

21  important thing for you now in your deliberations is merely

22  whether Sprint's messaging servers are core network elements

23  of Sprint's cellular network, that's it, because Sprint isn't

24  disputing the rest and we have proven it to you.

25        So how do you do it?  How do you figure out if

Mr. Goettle                          23

1    Sprint's messaging servers are, in the words of the claim,

2    "external to the cellular network"?  How do you do it?  You

3    look at how the Court has defined, has construed cellular

4    network.  Ladies and gentlemen, this is a definition of

5    cellular network under this patent.  I said that to you in

6    opening and I'm saying it again.  The purpose of a

7    construction is to provide a definition under a patent.  No,

8    it's not called a claim definition, it's called claim

9    construction.  That list that you have in Tab 2 of your

10   binder is claim constructions.  Why is it called that?  It's

11   because it's a definition that applies under this patent,

12   this and only this is the definition that you apply in

13   determining the infringement issue in this case.

14        Under this patent the Court has told us what a

15   cellular network is and by doing that the Court has told us

16   what a cellular network is not.

17        In a cellular network we have the three buckets that

18   you know well by now.  You have the phone, you have the base

19   station systems, those are the antennas and the specialized

20   computers attached to the antennas, and then you have core

21   network elements.  If the messaging server doesn't fit any of

22   those three things, then Sprint's messaging servers are not

23   internal to the network, they meet this limitation of the

24   claim, external to the cellular network.  In other words,

25   there is no middle ground.  If the network element is not,

1   not a core network element, it is per se internal -- did I

2   say that right?  I said that wrong.

3          If Sprint's messaging server is not a core network

4   element, it is external to the cellular network, you find

5   infringement.  If Sprint's messaging server in your

6   determination is, is a core network element, is involved in

7   that core functionality, if you find that it is, it is a core

8   network element, you check the box no infringement down the

9   verdict sheet.  I submit to you though that the evidence has

10  shown you through Dr. Akl that Sprint's messaging servers are

11  not core network elements, and I'm going to explain that now.

12         I'm going to skip ahead to try to stay on my promise

13  to you of about an hour.  So this is Dr. Akl's testimony and

14  what he says is you look at the functionality.  And what is

15  core network functionality?  He says it's the switching, the

16  lookup that you have to do in the cellular network to connect

17  the phones to the other phones and to the outside networks

18  like the land lines and the Internet.  What is the brains

19  behind that delivery?

20         And he came up with a very useful analogy, one of

21  the only useful analogies I've heard in this whole case and

22  one of the only analogies I haven't heard attacked in this

23  whole case, and that's the switchboard operator because it

24  gives you that sense of, oh, okay, that makes sense.  If you

25  don't have -- in the '50s, if you didn't have those

1   switchboard operators sitting there, you weren't going to get
2   your phone call through.  Those switchboard operators, as Dr.
3   Akl explained it to you, have a lookup pad, they look up for
4   the right exchange, and then they plug in their wires and
5   they're making the connection, they're connecting the phone
6   at the house to other phones.  That's what a core network
7   element of a cellular network is, that's what it does.  It's
8   about connecting the phone to other phones and to other
9   networks, that's what it is, that's what Dr. Akl is telling
10  you.  You look at functionality and this is the functionality
11  you're looking for.
12          And so where did the functionality come from?  It
13  came from a number of places.  It came from the patent, the
14  patent talks about the MMSC.  That's the messaging server,
15  one of the messaging server described in the patent, the
16  MMSC.  He says you look at that functionality and it talks
17  about how you can implement it programably where you want to
18  implement it.
19          And then it's in the Court's construction.  You look
20  at the functionality, what is the functionality of a
21  messaging server?  It's the storing and forwarding -- you've
22  seen this before -- the storing and forwarding and the
23  sending an inquiry.  Where is that functionality?  Is that
24  functionality in the computers that are connecting the phone
25  to other phones and other networks or is it separated from

Mr. Goettle                              26

1    them?

2              And then Dr. Akl went through the standards and he

3    said, look, it makes sense to look at the standards.  Why?

4    Well, Sprint's network is a CDMA 2000 network.  And so when

5    you want to figure out how a CDMA 2000 network works, you

6    look at the standards.  This is what Mr. Lanning did too --

7    we disagree with how he did it and I'll explain that to you,

8    but you look to the standards, okay?  And even in the

9    standard it talks about these things being functions.  Again,

10   these things shown in this box are not computers, they're not

11   things, they're functions.  And the standard, as we showed

12   you during the examination of Dr. Akl, these functions can be

13   implemented virtually in any way you want.  It's a grab bag,

14   you put them anywhere you want.  If you want to take all

15   these functions and put them in the elements that are doing

16   the connecting, you can do that, the standard doesn't care.

17   The standard is saying these are functions that you may want

18   to include in your cellular network, it's functions.  This is

19   why Dr. Akl is focused on functionality.

20             And Mr. Lipford, Sprint's director of standards

21   testified, this is one of Sprint's many fact witnesses they

22   paraded in here, he even testified that he agreed that DX-3,

23   that's this figure we're looking at, is laying out the

24   functions that may comprise a cellular network, he agrees,

25   the director of standards.

                              Mr. Goettle                    27

1          Okay.  So now what I'm going to do is explain to you

2    how Dr. Akl figured out what Sprint's core network was in the

3    first place.  Okay?  So he didn't just look at Sprint's

4    messaging servers and tell you the messaging servers are not,

5    he first figured out what Sprint's core network was made of.

6    Okay?

7          And I wrote -- this is Dr. Akl's slide, the snow

8    cone slide that you've seen, and I wrote on there the word

9    "undisputed," because everything that he has listed in there

10   as a core network element is not disputed in this case.

11         Now, I could stop there and just say it's not

12   disputed, but the reason I'm going to show you what Dr. Akl

13   is telling you is because I'm hesitant on why it's not

14   disputed.  I didn't hear Mr. Lanning talk about why he

15   doesn't dispute any of these, because he didn't show you any

16   analysis in his seven-holistic-factor analysis, he didn't

17   walk through these things and tell you why they are core

18   network elements under that, he just said that they are.

19         So I think it's important for you to know how Dr.

20   Akl approached it.  He looked at the mobile switching center

21   and he said their core -- actually he looked at the mobile

22   switching center and the package switching nodes, both of

23   which are described in the patent and shown in the first two

24   figures of the patent.  And he said they're core, they're

25   core, they're essential because they are making the decisions

Mr. Goettle                                 28

1   of how to connect the phones in a cellular network to the

2   other phones, to the land lines and to the Internet, they're

3   involved in getting the phone connected to other phones in

4   other networks.

5           And Mr. Lanning says you can't do a lot of things if

6   you don't have the MSC.  In fact, you can't do that core

7   functionality if you have the MSC.  Those are my words.  What

8   he said was the phone can't do a bunch of things, it cannot

9   connect to the PSTN, it cannot make calls to other mobiles

10  and it cannot send or receive short messages.  I'll submit to

11  you it also -- well, I'll leave it at that.  It can't do the

12  functions of getting the phone to talk to other phones, to

13  other networks.  That's a core function, that's why the MSC,

14  the mobile switching center, is a core network element.

15          Home location register, same analysis from Dr. Akl.

16  Without the home location register, the cellular network

17  doesn't know where the phone is.  That's a pretty important

18  piece of information to connect up the phone to other

19  networks.  Cell networks, the whole purpose obviously is for

20  us to be able to move around and still get our phone calls,

21  somebody has to keep track of that.  What keeps track of

22  that?  Well, that is stored in the home location register.

23  You need to know where the phone is to connect it up to other

24  phones or other networks.  Must know, core network.

25          Subscriber profile system, same thing.  This is

Mr. Goettle                               29

1   storing the information that is used to connect that phone to

2   the Internet, to connect that phone for voice-over IP calls.

3   Without the SPS, you can't do that, Mr. Lanning admitted

4   that.  That's core functionality in the core network.

5   Undisputed, but I think it's important to walk through and

6   explain to you what Dr. Akl's analysis is.

7           So now we get to the messaging server and there's a

8   difference.  And I have a long quote up here about the

9   messaging server from Dr. Akl and he repeated this in various

10  forms a number of times.  Suffice to say, ladies and

11  gentlemen, the reason that Dr. Akl concluded that the

12  messaging server is not a core network element of Sprint's

13  cellular network is because it is not involved in connecting

14  that phone to other phones or to other networks.

15          So what happens if you don't have it?  We've heard

16  this from Mr. Lanning and from Dr. Akl.  You can't do

17  messaging, you can't do messaging.  That's a service.  If you

18  don't have a voice mail system, you can't have voice mail.

19  That's a service, it's messaging, important to Sprint for

20  sure, important to their bottom line.  You saw the numbers,

21  2.66 trillion, trillion SMS messages over the damages period.

22  That's an important service to Sprint, it's one of their core

23  services, but it's not involved in connecting the phone to

24  other phones or other networks.  Dr. Akl explained that to

25  you, that functionality of the messaging server, storing and

1  forwarding and querying databases, is not also involved in

2  connecting the phone to other phones or other networks.  Not

3  a core network element, it's that simple.  It is not a core

4  network element that makes it external to Sprint's cellular

5  network, that means you check the box infringed.  Claim 1,

6  infringed; Claim 7, infringed; Claim 113, infringed.

7          So I want to go to what Sprint said in its opening

8  statement and then talk about what Mr. Lanning -- this is Mr.

9  Lanning's slide, that's Sprint's technical expert, and I

10  think this is important.  In Sprint's opening statement

11  Sprint's attorney said that the messaging server actually

12  figures out whether I'm set up to receive text messages from

13  my wife, where I am and how that message can get to me, and

14  then what the messaging server does is it routes my wife's

15  text message to me.  That sounds like a really smart device,

16  that sounds like it's connecting the phone to other phones

17  and to other networks, and that's not true.

18          This is Mr. Lanning's slide and that's my

19  handwriting on there, I'm a little embarrassed by it, but it

20  is what it is, and you can see in the bottom part it says

21  storing and forwarding of text messages.  Storing and forward

22  text messages is the last one on the list.  That's in the

23  Court's claim construction.  Everyone agrees in this case

24  that Sprint's messaging servers do that, they store and

25  forward; that's not connecting the phone to other phones and

1   other networks.  Okay?  Also in the claims construction is

2   querying, querying subscriber databases, that's in the

3   Court's construction.  Those are the two functions of a

4   messaging server, that's not connecting the phone to other

5   phones and to other networks.

6           Now let's look at the rest of this list and see if

7   it holds water.  Receive text messages.  Mr. Lanning agreed,

8   as he had to, on cross-examination that if something is

9   storing something, of course it received it first.  You can't

10  put something in your attic if you didn't have it in your

11  house in the first place.  So that's not adding anything to

12  what a messaging server does; it's implicit, in the words of

13  Mr. Lanning.

14          The next one down, we did querying, now we have

15  screening and blocking.  That makes it sound like this

16  messaging server has a lot of brains and it's doing a lot of

17  sorting out of information, that's not true.  What the

18  messaging server does, you heard it, you saw it through Dr.

19  Akl's testimony and Dr. Dwoskin.  Dr. Dwoskin testified about

20  what's going on in the particular database, the SPS and

21  messaging LDAP.  Those core network elements are doing the

22  figuring out, they figure out because they have it in the

23  database, they're the ones figuring out is this subscriber

24  allowed to receive this text message, is this subscriber

25  allowed to send this MMS message?  That's the subscriber

Mr. Goettle                          32

1    profile system, that's the messaging LDAP, the figuring out

2    the location, that's the home location register.  All the

3    messaging server does is sends an inquiry for information

4    about the phone and it gets back all that information.  It

5    doesn't do any determining of these things, it's just sending

6    out a question and responding.

7          And I thought Dr. Akl's testimony in this was

8    interesting.  He said, what's more important, the thing that

9    has the information or the thing that's asking for the

10   information?  The thing that has the information, the SPS,

11   the messaging LDAP, the home location register, they have

12   that information because they're using it for services and

13   they're using it to connect the phone to other phones and

14   other networks.  That's core functionality, that is not in

15   the messaging server.  If the messaging server already had

16   the information, it wouldn't need to send a query in the

17   first place.  It's just a service, it's an add-on service to

18   Sprint's network that happens to involve a computer called a

19   short message service center, a multimedia service center.

20   That's a computer and what does that computer do?  Stores and

21   forwards and sends queries.

22         And then the last one I haven't touched on is

23   routing and I'm going to talk about routing, because that

24   sounds like it's very sophisticated and brainy, like

25   decision-making must be happening; it's not true.  Mr.

1    Lanning even admitted on the forwarding part of storing and

2    forwarding, the messaging server only has two options:  it's

3    either told by the SPS send it out, send it to the inter-

4    carrier gateway, because the recipient is not a Sprint

5    subscriber, send it there if it's not a Sprint subscriber,

6    that's one option, the other option is send it to the mobile

7    switching center if it is a Sprint subscriber.  It is told

8    that by the HLR.  The HLR, home location register, stores the

9    information about where the phone is, the messaging server

10   receives that information, it says right in there, send this

11   to MSC named Bob, and the messaging server receives that and

12   it just does as it's told.  It doesn't make decisions, it

13   does what it's told and it does based on the information that

14   it is provided that it doesn't have, information by the way

15   that's in the cellular network that is used by the cellular

16   network for other things.

17          So this slide is intended to dovetail with this

18   opening statement about the messaging server and the

19   messaging server being able to find out where I am and how I

20   get my messages and do routing, it's not true, it's not true.

21   And this slide intended to make it look like this messaging

22   server is performing core functions, it's just not true.  And

23   Mr. Lanning, this is Mr. Lanning's words on my cross-

24   examination, these are his words, not mine, and he admitted

25   it, he admitted what I have handwritten on this document,

                              Mr. Goettle                      34

1   what I just walked through.

2          Okay.  So now I have shown you the basis for Dr.

3   Akl's opinion of how Sprint's messaging servers are not core

4   to Sprint's cellular network.  Let's be very clear about

5   terminology, we're going to hear -- I already can feel it,

6   we're going to hear that word "core" coming around a lot.

7   You're going to get a parade of the fact witness testimony

8   from Sprint's witnesses in Sprint's opposition to my opening

9   right after -- closing right after I'm done here, you're

10  going to hear it.  Core to what is the question.  I had

11  flagged this in my opening and I'm flagging it again now,

12  core to what?

13         The Court's construction requires that a cellular

14  network have core network elements, those are core to the

15  cellular network; not core to Sprint's business, not core to

16  any other network, not core to messaging.  The question is

17  are messaging servers core to Sprint's cellular network,

18  that's the question that needs to get answered.  Dr. Akl said

19  no because Sprint's messaging servers are not involved in

20  that core function of phone to other phone, connecting phone

21  to other network.  Not involved, not core, it's that simple.

22         What does Sprint say?  I want to start off by

23  talking about kind of like where these holistic factors came

24  from, because I don't know exactly what you heard during the

25  testimony, but these holistic factors, there are seven of

Mr. Goettle                          35

1   them, they are Mr. Lanning's.  This is just one, Dr. Akl

2   showed you a different set of testimony yesterday consistent

3   with this one.  Mr. Lanning said that in response to my

4   cross-examination in front of you.

5         My question was, "Okay, this seven-factor holistic

6   analysis that you came up with, you came up with that for the

7   purposes of this litigation?"  You came up with that for

8   purposes of this litigation, that's my question to Mr.

9   Lanning.  And he responded, "That's right, based on my over

10  30 years of experience of how you determine whether something

11  is inside a cellular network or not."  This is Mr. Lanning's

12  holistic analysis.

13        And I think that it's poignant for you to think

14  about, if you can remember, whether you heard about this

15  seven factors during Mr. Lanning's direct examination.  Now,

16  I'll submit to you, I went back and read it, they're in

17  there, they're in there, but they're not pulled apart like

18  this.  And these are the factors that Mr. Lanning applied in

19  trying to determine if Sprint's messaging servers are core

20  network elements.

21        Why is that significant?  Because the way Mr.

22  Lanning presented his direct testimony to you, it wasn't

23  pieced together like this, it wasn't -- actually, I should

24  say it wasn't kind of pulled apart like this where you could

25  analyze what are the pieces of evidence he's relying on, what

1   are the factors he's applying, it wasn't pulled apart like

2   that, it was smooshed together and it was buried in there

3   what he was actually saying.

4          And so I think by pulling it apart and looking at

5   these factors individually you see and I'm going to show you

6   very quickly, I promise you, very quickly because -- I'm

7   going to show it to you quickly because Dr. Akl walked

8   through it with you yesterday and I don't want to be

9   completely persona non grata, so I'm going to go through them

10  quickly.  But when you pull them apart and look at the

11  individual factors that he said he applied and if they don't

12  cut either way, then smooshing them together doesn't get them

13  to cut either way either.  Just because they're smooshed

14  together doesn't make it somehow better analysis than when

15  you pull it apart and you look at the seven factors that he

16  said he analyzed; that's why it's important to pull it apart

17  and to look at it.

18         Factor number one was the patent and the claim

19  construction.  The patent doesn't cut one way or the other.

20  How do you know that?  Because even Mr. Lanning agrees that

21  the patent applies equally to CDMA 2000 networks like

22  Sprint's or to GSM networks.  It doesn't cut one way or the

23  other.

24         Holistic characteristic number two, the standards.

25  I broke this up into two parts the way Dr. Akl did yesterday

1   starting with the MMS standards.  The MMS standards say may

2   and Mr. Lanning admits, "So the standards then here at least

3   for MMS is agnostic in your analysis of whether an MMSC is a

4   core network element or not, the standard isn't recommending

5   one way or the other?"  He says, "That's correct."

6        What does that mean?  Looking at the MMS standard

7   doesn't help you determine, even though Sprint is

8   implementing this standard, it doesn't help you determine one

9   way or the other whether Sprint's messaging networks are core

10  network elements or not, it doesn't cut one way or the other.

11       Now, we get into a bit of a mess when we go to the

12  other standard, the -- this is the ANSI standard, DX-3, that

13  you have seen numerous times.  The plain-language wording of

14  this figure says "may comprise."  These functions that are

15  shown in this box, what the standard is saying is these are

16  functions you may include in a cellular network.  That,

17  ladies and gentlemen, is not a recommendation, it doesn't cut

18  one way or the other.

19       And I spent a little while on this with Mr. Lanning

20  to try to just nail down what he's saying.  There's a saying

21  one of my colleagues uses who has been taking testimony in

22  this case, he calls it nailing jelly to the wall, that's like

23  nailing jelly to the wall.  Picture trying to nail jelly to

24  the wall, that's what I felt like trying to understand what

25  Mr. Lanning was saying when it came down to whether when a

Mr. Goettle                                              38

1   skilled artisan reads this standard and sees that this

2   standard is saying that a cellular network may logically

3   comprise, would a skilled artisan read that as a

4   recommendation and I tried to get that crystalized.  To me,

5   if the answer is yes, the answer to the question is yes, it's

6   very simple.  If the answer is no, the answer to my question

7   is no, very simple.  Instead I got a long paragraph that's

8   very hard to pick apart and really it's about nailing jelly

9   to the wall; I didn't do it, I couldn't do it.

10          So the next best thing is I went to Sprint's

11  director of standards, and he was forthright with me and he

12  said that the network reference model that we're looking at

13  here is laying out the functions that may comprise a cellular

14  network.  It doesn't cut one way or the other, it doesn't

15  inform whether Sprint's messaging servers are core network

16  elements or not because there is no recommendation.

17          Okay, now I'm onto Sprint documentation, holistic

18  factor number three.  Why am I starting with Sprint

19  witnesses?  Because it's these witnesses and people like

20  these witnesses who are writing these documents in the first

21  place.  And this is Dr. Akl's testimony about how you should

22  take all of that fact testimony that you heard that we spent

23  about a day on, maybe even longer than a day, how are you

24  supposed to take that testimony from these engineers employed

25  at Sprint for a long time who come in here and sit on that

1    stand and use the term core, core, core over and over and

2    over again, how are you supposed to take that?

3           And I submit to you that you're not, you're not

4    supposed to take it.  You're not supposed to do word matching

5    with what these witnesses say and the issue that you are

6    asked to decide in this case, you don't match words.  You

7    look at the Court's claim construction and then you look at

8    the Sprint's network and you figure out whether Sprint's

9    messaging servers are core, core to Sprint's cellular

10   network, are they core elements to connecting the phone to

11   other phones or to other networks.  I would submit to you,

12   ladies and gentlemen, that you don't listen to fact witnesses

13   who happen to throw the word core around a lot, throw it

14   around a lot in here.  You heard me on cross-examination ask

15   them about their depositions and why wasn't it thrown around

16   a lot during the depositions when we were talking about the

17   same messaging network, the same components, the same

18   infringement case.

19          And, ladies and gentlemen, every one of those

20   witnesses told you they had never read the patent and they

21   didn't review the claim construction.  And the Court is going

22   to instruct you that your job is to apply the claim in the

23   patent, the claim construction that this Court has provided

24   to you and compare it to Sprint's network, that is your job.

25   You are not supposed to go and compare it to some words that

1    fact witnesses said on the stand, words that these fact

2    witnesses did not use at the depositions.

3          And the good news is that you don't have to take my

4    word for it, you don't have to take Dr. Akl's word for it,

5    you can take Mr. Lanning's word for it too, Sprint's expert,

6    and he said, "which may be the same" -- their terminology

7    which I have underlined on the last line -- "which may be the

8    same or different than the Court's construction."  What does

9    that mean?  It's a wash, it doesn't cut one way or the other;

10   it does not inform, it does not help you determine whether

11   Sprint's messaging network -- Sprint's messaging servers are

12   core network elements of Sprint's cellular network.

13         These are the same people writing the documents.

14   And so if what they say on the stand in here on their

15   interpretation of Sprint's network doesn't apply per Mr.

16   Lanning's very words, then what they write down is no more

17   applicable.  It doesn't matter whether there are Sprint

18   documents that refer to core network, core network elements,

19   Sprint network, Sprint in-network, or any other adjective to

20   describe things that are not in this case, it just doesn't

21   matter.

22         So let's talk about one of the documents, this one.

23   This is a slide from Mr. Lanning's presentation with notes

24   that I added to it during the cross-examination of Mr.

25   Lanning.  Why is this significant?  Well, it's significant

Mr. Goettle                                    41

1   because in his direct examination what he was telling you

2   was, do you see this box that says Sprint in-network, you

3   know what that means?  That means Sprint's core network,

4   that's what Mr. Lanning told you.  He told you, you accept --

5   you the jury, you accept that because this has a box on it

6   written by somebody that says Sprint in-network, you should

7   just accept that everything in there are core network

8   elements of Sprint's cellular network under this patent under

9   the Court's construction.  That is what Mr. Lanning is

10  inviting you to do just because this box says Sprint in-

11  network.

12          And on cross-examination I asked him about that and

13  at first he said, yes, everything in that box is a core

14  network element of Sprint's network, and then he realized

15  that was a mistake and I think it was because he knew where I

16  was going, because he didn't know what the other boxes did,

17  he did not investigate.  That's why I put question marks next

18  to them.  He didn't know and if he doesn't know that

19  everything in the box is a core network element of Sprint's

20  cellular network, if he doesn't know that then he cannot know

21  and opine and tell you that when a box says Sprint in-network

22  it matches up to the Court's construction, it matches up to

23  the patent, he can't do it.

24          And then we see that outside the box he admitted

25  that there were core network elements of Sprint's network, we

Mr. Goettle                                    42

1   see the mobile switching center, which Dr. Akl agrees is a

2   core network element of Sprint's network, that's not even in

3   the box.  And they try to wash that away by telling you,

4   well, what we're talking about here, the focus of this

5   document is on the messaging network, which is a subcomponent

6   of the cellular network, and that's why it doesn't have the

7   mobile switching center in the Sprint in-network.

8          So now let's go to the fourth holistic factor,

9   protocols and interfaces.  Here this did not come out with a

10  model of clarity on Mr. Lanning's direct examination, but on

11  cross-examination he said yes, this was one of the factors he

12  supposedly considered, again considered in deciding whether

13  Sprint's messaging servers are core network elements of

14  Sprint's cellular network.  He looks at the protocols and

15  interfaces.  Ladies and gentlemen, as Dr. Akl explained to

16  you, all computers talk to each other using protocols, they

17  all have interfaces.  Any computer that talks to any other

18  computer is going to have an interface through which it talks

19  and they're all going to speak the same language.  It is no

20  different than me speaking to you now.  I am speaking English

21  to you and you are understanding me because that's our

22  protocol.  If any of you know Chinese, I do not know Chinese,

23  and you start speaking Chinese to me, I will not understand

24  you.  I will nod politely and smile and pretend to probably,

25  but I will not understand you.

Mr. Goettle                         43

1       Computers speak protocols to each other, that's what

2   they do.  So again it doesn't cut one way or the other.  And

3   here the protocol that he's referring to is this protocol

4   called SS7.  It's just a language, you can just think of it

5   as English, it's just a way computers talk in a cellular

6   network, they speak English to each other.  The significant

7   admission from Mr. Lanning on this point is that interface,

8   the SS7 -- I'm going to walk up here and point -- your Honor,

9   can I walk up and point at the TV?

10          THE COURT:  You can.

11          MR. GOETTLE:  This has a 7?  I'll submit to you I

12  couldn't get him to admit this one, but I was going to talk

13  about it.  Is this asset 7 here on this interface?  This is

14  the mobile switching center that everyone agrees is a four-

15  network element speaking English to the regular phone

16  network, the PSPA.  That's the phone network for the phone

17  that we had hanging in our kitchen.  That's the people who

18  switched telephone network.

19          The mobile switching center might speak English

20  inside the cellular network, but it's also speaking English

21  to the PSPN.  Now Mr. Lanning took issue with me putting SS7

22  over the PSDN, but he did admit, ladies and gentlemen, that

23  that SS7, that same language, English, is spoken on the

24  PSBN2.  Why is that significant?  It means you can't look at

25  what language that people are speaking to decide if they're

Mr. Goettle                                      44

1   in the same network.  I say hide two people in the elevator

2   all the time.  They're not in my network of friends.  It just

3   doesn't matter.  It doesn't cut one way or the other.

4   Protocols and interfaces is a wash.  It will not help you

5   figure out whether Sprint's messaging service are core

6   network elements of Sprint's cellular network.

7         Then we get to holistic characteristics 5 and 6.

8   Who operates it and who owns it.  Dr. Akl said to you, well,

9   this one cannot be right.  This cannot cut one way or the

10  other because we own the cell phones, and the Court has

11  instructed us that cell phones are part of the cellular

12  network.  We own the phones and yet they're part of the

13  cellular network.  Sprint doesn't own them.  We own them.

14        And then the patent itself addresses this, and

15  numerous times it talks about the operator of the network,

16  Sprint for example, the operator can have the MMSC, which is

17  one of the messaging servers in the patent can have it, and

18  it's still talking about that messaging server being external

19  to the cellular network, being not a core element of the

20  cellular network.  Even though it is the operator, like

21  Sprint, owning and operating that messaging server.  Doesn't

22  cut one way or the other.

23        Relative physical location.  Sprint's opening

24  statement on this one.  These messaging servers at Sprint are

25  located in Sprint's most secure facility.  What are those

1   facilities called?  They're called core sites.  And what else

2   is at those core sites, these SPS databases?  They're in the

3   same building in the same facility in the same core sites as

4   the messaging servers.  I don't know.  Maybe that would make

5   sense if you don't actually drill down and look at it.

6         What does it matter what the placard over the door

7   says when what your job is to do is to compare Sprint's

8   network to the patent, Sprint's network to the core

9   construction.  Who cares what Sprint calls it?  That doesn't

10  mean that under the patent it's a core network element

11  involved in getting the phone connected to other phones in

12  other networks.

13        And then Mr. Lipford says in response to my

14  question, does geography have anything to do with what is

15  part of he cellular network, he answered no, unequivocally.

16  And by the way, I forgot to mention that Mr. Byorkofsky (ph)

17  admitted that these things that we're hearing about that are

18  being called foresights, that at S they called them data

19  centers.  Yes they have a document or two that actually

20  refers to them as core sites.  I don't think it matters one

21  way or another, but the common terminology Mr. Yarkosky told

22  you to these things is data center.  Data Center though

23  doesn't advance any ball in this case so Sprint's witnesses

24  came in and  one after another talked about this core site.

25  And what about this core site and what about this faker?  I

Mr. Goettle                                    46

1    let it go during trial, but Sprint left this figure up in

2    front of you for long durations of trial.

3           And I think you could look at this figure and think,

4    I don't know exactly what this is but we have a sidewalk

5    going around.  This look like a block. This looks like  City

6    block go ,  I think that that's subliminally what this might

7    be suggesting.  And this looks to me like, it's suggesting

8    that look, look what you have on that block.j You have the

9    home location register.  You have the subscriber profile

10   system.  You have the PSDA, all core network elements on the

11   same block.

12          And so the thing in the middle?  That must be a core

13   network element, too.  This messaging server.  Not only is it

14   in the core network, but it's in the core of the core

15   network.  It's right dab in the middle.  What is that

16   suggesting?

17          And then let's look at the relative size of

18   everything.  The messaging server looks like the smartest

19   computer there.  It's the center of everything going on and

20   it's twice the size of everything else.

21          It's not true, ladies and gentlemen, and Mr. Lanning

22   invented it.  The mobile switching center, the packet data

23   support nodes, the HLRs are not at this supposed core site.

24   They're not even at the data center.

25          I submit to you that it doesn't matter one way or

1   the other at all anyway.  It doesn't matter where these

2   things are physically located.  That's not what the patent's

3   talking about.  That's not what technology talks about.  But

4   this diagram is misleading in those two respects.  They're

5   not all on the same block and the messaging server isn't the

6   brains behind the operation at the center of the operation of

7   everything else.

8          Okay.  And I'll submit to you, ladies and gentlemen,

9   that none of those core factors even mentions function --

10  excuse me.  None of those holistic characteristics even

11  referred to the function.  And I don't think it takes a

12  computer scientist or a skilled artisan to know that if

13  you're trying to figure out if something is core, a core

14  network element of the cellular network, you look at

15  something.

16         All right.  Now, you're going to hear about the NV&L

17  agreement, I'm sure.  I want to point out that in the jury

18  instructions, the instructions that Judge Dubois was going to

19  read to you, it says "As I have previously instructed you,

20  you must accept my definition of these words in the claim as

21  correct."  What does that mean?

22         You, ladies and gentlemen, apply the Court's claim

23  construction of cellular network.  You apply the Court's

24  claim construction of cellular network.  You are not to apply

25  the MV&O agreements construction of cellular network which is

Mr. Goettle                            48

1    flawed in ways that Dr. Akl did a nice job in summarizing

2    yesterday, I thought.  It is both overinclusive and

3    underinclusive.  Overinclusive you know because that

4    definition includes cell towers, which is not what the Court

5    has told us.  The Court has told us that the cell towers are

6    not part of the core network elements because he's listed

7    them separately.

8            Number two, it's underinclusive because as Dr. Akl

9    explained to you, it excludes the home location register from

10   being part of the core network under the MVNO agreement.

11   Overinclusive and underinclusive.  But neither of those

12   things matter.  What matters is this is a business contract

13   between two technology companies where one is essentially

14   trying to rent the other one's network.  Is that contract

15   going to have technical terms in it?  Why wouldn't it?  What

16   are we talking about here, it's all technology.  Of course

17   it's going to have technical terms in it.  But what's the

18   goal of a business contract.  It's to make sure that the

19   parties to the agreement know what they're doing in the

20   agreement.  It's got nothing to do with figuring out whether

21   messaging servers are core network elements of a Sido (ph)

22   network.  Nothing to do with it.  It is to make sure that

23   Sprint and Comcast have a meeting of the minds, and not only

24   just Comcast but the other parties to that agreement, too.

25   Comcast wasn't the only one.  It's to make sure they have a

1    meeting of the minds on what their agreement is.  It's

2    irrelevant to the analysis that you're being asked to

3    perform, to these issues that you're being asked to address.

4            Okay.  I'm going to move to damages, and I'm doing

5    pretty good in terms of my commitment to you on time.  And

6    for this I have to refer to notes.  You'll notice I didn't

7    take any damages witnesses in the case.  So I need to look at

8    some notes while I walk through this.  But this is actually

9    pretty straightforward.  Number one, as with everything that

10   you're going to be asked to do in that jury deliberation

11   room, you start with the law.  We're not retreading new

12   ground.  We're not creating new things here.  We're

13   retreading old ground.

14           You start with the law and Judge Dubois is going to

15   instruct you on the law.  And what he's going to tell you is

16   when you find the claims infringed, at least one of the

17   claims and I'll submit to you that all of the claims

18   infringe, then what you are charged to do is you figure out

19   the damages you must award that are adequate to compensate

20   Comcast.  How do you figure that out?

21           Well, first of all, you figure out what a reasonable

22   warranty is.  You cannot award less, you cannot award less

23   under the law, you cannot award less than a reasonable

24   royalty.  That's what the law says.

25           And how do you figure out the reasonable royalty?

1  You figure out what Nokia, as confusing as this is in a

2  confusing case already, you have to look at what Nokia and

3  Sprint would have agreed to at the time of the hypothetical

4  negotiation.  That hypothetical negotiation occurs in the

5  imagination on the date the patent issues because that would

6  have been the date of first infringement in the case.  It's

7  confusing; that's the law.  What would Nokia and Sprint have

8  agreed to at the time of the hypothetical negotiation, at the

9  time that the patent issued which was in 2005.

10         And it's not just what they would have agreed to,

11  but it's what they would have agreed to for the use of the

12  invention.  That use has been momentous, massive.  And what

13  are we asking for?  Ladies and gentlemen, you've seen this

14  before.  We are asking for $153,634,905 for Sprint's use of

15  the invention to the tune of 2.66 trillion accident

16  infringement with respect to SMS and 61.5 billion accident

17  infringement with respect to MNS.

18         You take that number which is not disputed in this

19  case.  We don't even have to decide whether those numbers are

20  right; they're not disputed.  And you multiply that by a

21  little bit for SMS, a little bit more than five one-

22  thousandths of a penny.  For MMS it's a little bit more than

23  six one-thousandths of a penny per message.

24         Now Sprint, the evidence showed you in this case,

25  Sprint at times during -- I told you in my opening it was

1    Sprint at times had earned 15 cents per message.  What I

2    learned during the actual testimony during this case was that

3    Sprint at times had earned 20 cents per message.

4            And what we are asking you for in our reasonable

5    royalty that Ms. Riley and Mr. Webber explained to you, what

6    we're asking for is a sliver of one penny.  Five or six

7    one-thousandths of a penny.  And how did they get there?

8            You know what, before I get you focused on that side

9    I'm going to flip back and talk about what I heard in opening

10   and what I heard on Dr. Cox's examination.  Dr. Cox was

11   Sprint's damages expert.

12           In opening I heard that Ms. Riley ignored the

13   purchase price, the price that Comcast paid to Nokia in 2010,

14   not 2005, in 2010 for the patent.  Comcast paid $600,000 for

15   the patent that you heard about in this case, two other US

16   patents and then a related foreign patent, $600,000.  And in

17   Sprint's view that is the starting point.  That is the kernel

18   around which their damages case melts.

19           Ladies and gentlemen, that's not for the use of the

20   invention.  That doesn't count.  But Ms. Riley did talk to

21   you about it.  She explained why.  And her explanation is

22   very, very logical.  She's saying it doesn't matter in the

23   damages calculation under the law to figure out Sprint's use

24   made of the invention.  Why?  Because the hypothetical

25   negotiation is this legal fiction.  And at that hypothetical

Mr. Goettle                              52

1   negotiation you make assumptions -- you are required to make

2   assumptions that you don't make in the real world that

3   Comcast -- that did not apply when Comcast bought the patent

4   from sprint.

5           What are those assumptions that you have to make at

6   the hypothetical negotiation.

7           Number one, Sprint is infringing the patent.  When

8   Sprint and Nokia are in that hypothetical negotiation in

9   2005, number one, Sprint is infringing.  They're not saying

10  they don't infringe, they're not saying they might not

11  infringe, they have the parties agree that Sprint is

12  infringing.  Sprint is infringing what?  A valid patent.

13  That is two assumptions at the hypothetical negotiation that

14  do not apply to the actual negotiation between Comcast and

15  Nokia when Comcast bought the patent in 2010.  Those are two

16  of the assumptions.

17          And Sprint at that time of he hypothetical

18  negotiation, knowing it's infringing a patent, knowing that a

19  patent is valid it also knows it needs to keep infringing.

20  It needs the license to stop infringing.  It's not going to

21  stop doing the messaging altogether.  What is what Sprint

22  would pay for its use going forward for using that invention?

23  That's also a factor that does not apply to the Comcast Nokia

24  negotiations in 2010.  Why not?

25          We heard it in this case.  Sprint brought it out a

Mr. Goettle                                          53

1   lot.  Comcast doesn't practice this patent.  It didn't need

2   this patent.  It didn't apply to Comcast's business.  I

3   explained to you why we got the patent.  We got it for

4   defensive purposes.

5            Different scenario, Ms. Riley determined that the

6   purchase price of this patent is irrelevant in her analysis.

7            And then the last thing we've learned about was

8   Nokia's financial position.  2005?  Very strong.  2010?  A

9   varying platform.  And jumping off a varying platform was

10  what we heard from Ms. Riley yesterday about what was going

11  on with Nokia at the time that Comcast bought this patent.

12  Why?  The I-phone had been released.  Android operating

13  system had been released by Google.  Chinese manufacturer,

14  Samsung was putting the Android operating system on its

15  phones.  Competition was stiff and Nokia couldn't compete.

16  Why not?  They didn't have a smart phone.  They didn't have

17  an answer to it.  And that's that burning platform.  That all

18  came out in that burning platform's article that we heard

19  about that the CEO of Nokia gave this speech to Nokia

20  employees and it got picked up by the Wall Street Journal.  I

21  mean that's a remarkable speech to be seen about a company

22  that when the brand-new CEO comes in and says "We're burning,

23  guys.  We got a choice.  We stay on this burning platform or

24  we jump into the icy water and see what happens."  I didn't

25  quite understand the analogy completely.  It sounds like he

Mr. Goettle                                    54

1    jumped into the icy waters and survived.  But the point is

2    Nokia was hurting in 2010 when Comcast bought the patent.

3    That's what the evidence in this case showed.  So different

4    scenario which is why Ms. Riley did not find that the

5    purchase of the patent the circumstances of Comcast's

6    purchase of the patent match or were relevant to the

7    hypothetical negotiation back in 2005.

8         Okay.  Then the next thing I heard about -- oh.

9    Then Dr. Cox, Sprint's damages expert tells you at that

10   hypothetical negotiation the parties would have agreed to a

11   lump sum payment of $1.5 million.  That's what Dr. Cox is

12   telling you the buyers wouldn't agree to in 2005.

13        What I heard him say about 5 or 6 times doesn't fit

14   with what I've been hearing about core network elements from

15   all of those fact witnesses you heard about, you heard from.

16   What I heard from Dr. Cox was he said it a number of times

17   that hey, at that time in 2005 Sprint would not have agreed

18   to a running royalty to an ongoing royalty.  Why not?

19   Because there was a lot of uncertainty about messaging.  It

20   could have been obsolete in a day.  It could have been

21   obsolete in a year.  The parties didn't know.

22        Ladies and gentlemen, core network elements that

23   connect the phone of a cellular network to other networks and

24   to other phones don't become obsolete.  If messaging -- in

25   fact the hypothetical negotiation had put it then that

Mr. Goettle                                    55

1   messaging would become obsolete, it's a very good indication

2   that it's not a core network element of a cellular network.

3   It's a service.  And what Dr. Cox was saying is, this service

4   might be obsolete.  That was an unknown at the hypothetical

5   negotiation.  So the parties would have agreed to 1.5

6   million.  That doesn't make sense for that reason alone, but

7   it doesn't make sense for another reason.  Why not agree to

8   five one-thousandths at the hypothetical negotiation if

9   you're concerned with the servers becoming obsolete in a day,

10  in a year, in two years, why not just agree to one, five one-

11  thousandths of a penny.

12          If it's not going to amount to much because it might

13  become obsolete, why agree to pay $1.5 million if the next

14  day it could be that SMS is gone and new technology comes in.

15  And I'll submit to you, ladies and gentlemen, that $1.5

16  million, this lump sum payment, does not compensate, would

17  not compensate Comcast for Sprint's use made of the

18  invention.  That use again to the tune of 2.66 trillion SMS

19  messages and billions of MMS messages.

20          And then Ms. Riley, Sprint's damages case also

21  attacked Ms. Riley with how she allocated the messaging

22  revenue from the other revenue.

23          So the issue here is that Sprint bundles got to the

24  point, I forget what year, got to the point where they were

25  bundling their plans.  Right?  So customers are paying

Mr. Goettle                        56

1   revenue to Sprint, paying for their bill to Sprint but it's

2   for a bundled plan.  And so what Ms. Riley had to do was

3   dissect out what revenue accounted for messaging versus

4   voice.

5          And so how did she go about doing that?  Well, she

6   relied on the very same documents that Sprint generates for

7   tax purposes.  What's wrong with that?  Dr. Cox says that's

8   not right, that those are the very same documents that Sprint

9   uses when it pays its taxes.  When Sprint pays its taxes it

10  dissects out messaging revenue from the other revenue.  If

11  it's good enough for the Government, I think it's good enough

12  for this Court for Ms. Riley's determination.  It's reliable

13  because that's what Sprint is telling the Government.

14         And then we get to the spectrum.  The spectrum --

15  the spectrum costs.  And the issue that Dr. Cox raises, holy

16  cow, that spectrum was really expensive.  And Comcast's

17  damages case didn't take it into account.  But, ladies and

18  gentlemen, they didn't take it into account in the damages

19  case because it is not a cost.  It is an asset.  And not only

20  is it an asset, it is a rare asset that doesn't depreciate,

21  that requires no amortization.  It has the same value that it

22  had when it was born.  It wasn't accounted for by Sprint to

23  the SEC, to investors, to Wall Street as a cost.  And that's

24  why Ms. Riley did not include it in her damages calculation.

25  It is an asset.  That's what Sprint tells the world,

Mr. Goettle                              57

1   including what Sprint tells Ms. Riley when she's figuring out

2   would that be reasonable royalty damages in this case.

3          And then we get the network costs.  There was

4   criticism of Ms. Riley about network costs.  So again what

5   Ms. Riley did was she figured out what is Sprint's overall

6   profitability.  Profit is equal to Sprint's revenue minus

7   Sprint's costs.  What is Sprint's profit?

8          Ms. Riley determined that Sprint's profit for the

9   cellular network, voice, whatever, for the cellular network

10  was 23 percent.  And she put that aside.  She took it out of

11  her damages calculation, that profit.  Sprint got all that

12  profit.  And then she said, putting that aside, what is

13  Sprint's profit for messaging?  She figured out that profit

14  and that's the profit that she applied her damages unto.  She

15  took out all of the infrastructure costs.  It's already

16  included in the 23 percent.  Cost of the cell towers, for

17  example.  She took it all out and she was left with the

18  messaging profit and she applied the damages, the reasonable

19  royalty rate that she came up with, she applied it to that

20  percentage for messaging.

21         And she relied on Mr. Webber who determined that the

22  costs involved with just messaging was $1.112 billion for

23  just messaging.  So she figured out what the profit was from

24  the revenue minus that 1.112 billion, that's the profit from

25  which she determined the reasonable royalty.

Mr. Goettle                                    58

1          And why did she do that?  Because she said all of

2     the rest is profitable.  We saw the study, the FCC study that

3     said in messaging, the profit margin for messaging is like

4     upwards of 90 percent.  And her profit margin was lower than

5     that.  I think she was at -- I actually forgot to write it

6     down and I'm a little bit embarrassed, but I think it was

7     down to, I want to say 53 percent I think it was.  And she

8     explained the whole free rider principle.

9          And just to make sure this is abundantly clear,

10    what's going on here, where messaging, text messaging came

11    from, and Dr. Akl explained this, is when my phone -- my

12    phone has been sitting here on this podium and I haven't been

13    talking on it.  But it's been talking.  It's been

14    communicating with the cellular tower nearby on what are

15    called control towers.  There are signals going from my phone

16    to the tower and back to my phone.  Dr. Akl explained this to

17    you.  Those are called control channel signals.  Those

18    signals happen all the time.  That's how the network can

19    check where the phone is.  Hello, where are you?  The phone

20    responds.  Control channel signals when I'm not talking on

21    the phone.  Those signals happen all the time.  They have to

22    happen.  That's how the cell network tracks the phone.

23         What text messaging is, it's a free rider on those

24    waves going out to the towers, it's a free rider.  It hopes

25    onto that control channel signal that's already being sent.

Mr. Goettle                                     59

1   And it's a free rider to the towers.  That what this free

2   rider analysis has been all about.  There was no cost

3   involved in putting the messages on there.  No additional

4   costs, no additional infrastructure, no additional towers.

5   Why?  Because it free rides on what's already going on inside

6   the cellular network.  And Ms. Riley explained that that's

7   how she took that into account in coming up with her profits

8   analysis.

9            Okay.  I'm almost done.  Ladies and gentlemen,

10  you're going to receive the verdict sheet.  This is what you

11  fill out when you do your deliberations and finalize your

12  deliberations.  And I thought I would be remiss not to just

13  show you what to do.

14           Okay, thank you.  Can we go to the next page?

15           First question you're going to be asked about

16  infringement.  And you check yes if you find infringement and

17  you check no if you find no infringement.  Again, your sole

18  issue there is to determine whether Sprint's messaging

19  servers are core network elements of Sprint's cellular market

20  plan.

21           Then if you check yes to that, then you move on to

22  Sprint's invalidity case.  And you determine whether the

23  claims have been proven by clear and convincing evidence, and

24  I'll talk about that in rebuttal, have been proven by clear

25  nd convincing evidence to be valid or invalid.  And you check

Mr. Goettle                                    60

1    the appropriate boxes.  For anticipation, that's one

2    reference teaching all the limitations or obviousness, that's

3    a combination of prior art.  Teaching the limitations, you

4    check yes or no based on how you see the evidence.  If there

5    are infringed claims that you find valid, then you move on o

6    damages.

7           Question Four Is the Amount that you find damages

8    for.  You write in the amount on that line.  That's question

9    number four, the question at the top of the screen.

10          And then question number five is asking you a

11   question about the number that you just rendered  And you're

12   being asked to check one of the two selections there.  Just

13   one of the two or you might have to go back and do it again

14   if it's not clear.

15          So you either check for the total sum of an ongoing

16   royalty for messages sent, received through September 30th,

17   2016.  And I want to take just a moment to explain what that

18   means.  This is Ms. Riley's theory, that the sum -- if you

19   put a sum up here along the lies based on what Ms. Riley told

20   you and again it is in your discretion.  What we're telling

21   you what reasonable royalty is for their use, for Sprint's

22   use made of the invention is $153 million and a little bit

23   more.  You put that number up here. Or if you put what number

24   you think is right, that is in your discretion to put up

25   there.

1          This question is asking you what are you basing it

2     on.  Okay?  This total sum with an ongoing royalty for

3     messages.  And hat I want to make abundantly clear because

4     terminology here I think is a little bit confusing, even when

5     you put a whole number up here, you'd still check this box,

6     even though it's talking about an ongoing royalty.  And the

7     reason I want to flag that is the next one down says a one-

8     time lump sum royalty to the life of the patent.  This lump

9     sum royalty, that's Dr. Cox's theory.  That;s a one-time

10    payment for the life of the patent.  Okay?  What we are

11    asking for what we think is reasonable, what we think you

12    should award whatever should you find their claims infringe

13    and not invalid in other words, and valid is an award of

14    damages through September 30th 2016.  What is that date from?

15    Ms. Riley said this a few times through which we received

16    revenue numbers from Sprint, messaging number from Spin.

17    Up though September 30th, 2016. Thy stopped giving us

18    information at that point.  I'm not saying they did anything

19    wrong, but that was the last date that we got information

20    from them.

21          So I just want to make sure there's no confusion

22    about how to check these boxes.  This ongoing royalty for

23    messages still applies even if you give one number up here.

24    In other words, giving one number up here doesn't mean that

25    well, that must be a lump sum because it's one lump sum.

1   It's not a lump sum within the meaning of the verdict form.

2   I just don't know if I'm being clear on this.  But again, one

3   time lump sum royalty, that's for the life of the patent,

4   that's Dr. Cox's theory.

5           Ms. Riley's theory is whatever this number is, that

6   would be based on an ongoing royalty.  That's her theory.

7   That's her reasonable royalty calculation based on five one-

8   thousandths of a penny times the number of messages sent.

9   Okay?

10          I thank you for the time and I look forward to

11  talking to you again in rebuttal.

12          THE COURT:  Thank you, Mr. Goettle.

13          MR. FINKELSON:  May I suggest a walkabout, your

14  Honor?

15          THE COURT:  No, I think we'll have a recess.  We'll

16  not do the walkabout or the standup, we'll have a recess.

17          It's not quite 20 after.  We'll recess for 10

18  minutes.

19          (Jury exists the courtroom at 11:18 a.m.)

20          THE COURT:  You may go about your business.

21          (Court in recess 11:18 to 11:33 o'clock a.m.)

22          THE DEPUTY CLERK:  All rise.

23          (Jury enters.)

24          THE COURT:  Be seated, everyone.  Mr. Finkelson, you

25  may proceed.

                          Mr. Finkelson                    63

1           MR. FINKELSON:  Thank you very much, your Honor.

2           MR. GOETTLE:  Your Honor, would you mind if I stood

3    over there?

4           THE COURT:  Absolutely not, you can position

5    yourself so that you can see the exhibits.

6           MR. GOETTLE:  Thank you.

7           MR. FINKELSON:  Good morning, inside, not outside.

8    That's where we started together almost three weeks ago and

9    that's where this case ends today.  Sprint's messaging

10   servers are inside of Sprint's cellular network, not outside

11   as the '870 Patent requires.  As I told you when we first

12   talked to one another, inside equals no infringement.

13          And it's not just that some of the evidence has

14   shown you that.  It's not just that most of the evidence

15   shown you that.  It's overwhelming weight of the evidence in

16   this case has shown you that Sprint's messaging servers are

17   inside of the cellular network.  And for that reason, Comcast

18   cannot prevail.

19          Now, ladies and gentlemen, Mr. Goettle said it and I

20   say it in a similarly heartfelt way.  We thank you for your

21   service.  Our team thanks you for your service.  Their team

22   thanks you for your service.  We know we pulled you away from

23   your jobs and your families and your daily lives and brought

24   you into ours.  I think you've gotten a taste of now not

25   interesting that is, but we know it's an imposition and we

Mr. Finkelson                                64

1    really appreciate it and we do appreciate your attentiveness

2    throughout the course of the trial.  You've been listening to

3    us and we appreciate.

4         Let me begin today with some important things that

5    everybody agrees upon.  First, each of the claims of the '870

6    Patent requires that the messaging server be external to the

7    cellular network.  Nobody disagrees about that.  Everyone

8    also agrees that the Court's definition of cellular network,

9    the one that's in your binders, says that a messaging server

10   does not have to be external.  It does not have to be

11   external.  Instead, it can be part of a cellular network.  In

12   fact, a messaging server is one of the specific pieces of

13   equipment that Judge Dubois has already told you may be a

14   core network element.

15        Finally, nobody disagrees that if you, the jury,

16   conclude that from 2006 to the present, Sprint has installed

17   its messaging servers inside the core network of Sprint's

18   cellular network, then Claim 1 is not infringed, Claim 7 is

19   not infringed, Claim 113 is not infringed and your job is

20   done.

21        Comcast and Dr. Akl acknowledge that as well.  Here

22   is Dr. Akl's testimony.  He agrees if Sprint's messaging

23   servers are inside, there's no infringement.  Now, Comcast

24   showed you the verdict sheet that you'll be filling out in

25   your deliberations.  Here it is, here it is.  And the very

Mr. Finkelson                          65

1    first question for you to decide when you go back into the

2    deliberation room and we also think it should be the last, is

3    did Comcast prove by a preponderance of the evidence, that

4    Sprint has infringed any of the following claims of the '870

5    Patent by providing SMS and MMS messaging through messaging

6    servers other than Syniverse Picture Mail.  That's question

7    number one.  And the answer, we submit to you to question

8    number one, for Claim 1, for Claim 7 and Claim 113 is no.  Is

9    no.

10          Now, after more than two weeks of evidence, how do

11   you know that the answer to question number on infringement

12   is no?  How do you know that Sprint's messaging servers are

13   inside of the cellular network and not outside?  Well, you

14   know, because everybody including Dr. Akl, agrees that

15   Sprint's cellular network is an American Standards style

16   network, ANSI-41, CDMA 2000.  You also know, because you've

17   seen that in an American style network like Sprint's, the

18   American Standards recommend that the messaging server for

19   SMS messaging be inside the core network of the operator's

20   cellular network.  And for MMS messaging, those standards say

21   that the MMS messaging server can be inside the core network

22   of the operator or they can be made external.  How?  By using

23   a third party provider.  That's what the standards say.

24          And you also know because you have listened to the

25   Sprint witnesses and you have looked at Sprint's design

Mr. Finkelson                              66

1    documents that tell you, in line with that the standards

2    recommend, that Sprint has put it's SMS messaging servers

3    inside the core of its cellular network and it's done so for

4    its MMS messaging servers, as well, ever since it moved away

5    from Syniverse Picture Mail.  That's what you already know.

6         Let's talk about standards.  There are two witnesses

7    in this case who were actually involved in the American

8    Standards.  One is Mr. Lipford for Sprint and one is Mr.

9    Lanning.  Dr. Akl has never been involved in any ANSI-41 CDMA

10   2000 standards finding.  Never.  So, what do the folks who

11   have been involved, what did they testify about?  What did

12   they tell you that the American Standards say for SMS?  On

13   your screens, ladies and gentlemen, is DX-4.  You only see

14   DX-4 when I bring it up.  Dr. Akl never brought it up.  I

15   think I saw it once in his 248 slides and I didn't see it

16   today in Comcast's presentation.

17        This is the CDMA 2000 standard, a network reference

18   model from December of 1999.  And it says exactly what I said

19   to you in my opening statement.  It provides a

20   recommendation.  How do we know that?  Because it tells us

21   its own purpose and scope is to recommend the network

22   reference model.  It recommends it.  What does it recommend?

23   You have it up on your screens right now.  That is the

24   collective entity that dotted-line box in the 1999 standards.

25   That's the collective entity.  What's in the collective

Mr. Finkelson                    67

1    entity?  Well, for starters, the MC, that's the messaging

2    server, that's the message center for SMS messaging.  Well,

3    there's the definition, an entity that stores and forwards

4    short messages.  That's what the standards say.

5            What else is in the same collective entity with the

6    message center?  The mobile switching center, MSC.  The HLR

7    and the packet switching nodes, the PDSN.  Now, Mr. Lipford,

8    who is actually responsible for this network reference model

9    as it evolved, he testified to you that collective entity, as

10   used in the standard, means core network.  You heard Comcast

11   cite to Mr. Lipford as an authority on the standards.  You

12   heard Comcast tell you standards are important and the first

13   place you look.  Well, Mr. Lipford was involved in the

14   standards and what he told you was that in his experience,

15   working in the standards group, collective and core were used

16   interchangeably.  Collective entity means core network and

17   that's uncontradicted by any witness in this case.  Both Mr.

18   Lipford and Mr. Lanning explained, just as I said to you

19   during my opening statement, that an American Standards type

20   network like Sprint's, the messaging server is recommended to

21   be inside the core of the carrier's cellular network.

22           Now, why did Dr. Akl never talk about the 1999

23   standard except when I asked him?  Because he testified to

24   you yesterday, that he doesn't even know what collective

25   entity means in the standard.  To him, he testified to you,

1    to him that in this formal standards document that governs

2    how networks are built, the collective entity is just some

3    dotted lines and boxes.  He testified he has no basis to

4    contradict Mr. Lipford's testimony, because Dr. Akl wasn't

5    there in the standards group.  He doesn't take part.

6            Well, today, Comcast told you that the ANSI

7    standards are a bit of a mess.  They're only a mess for

8    Comcast.  They're only a mess for Comcast because that they

9    say what Comcast doesn't want you to hear.  This is the core

10   network that the American Standard from 1999 recommends.  Mr.

11   Lipford and Mr. Lanning, they do know what collective entity

12   means and everything in the Court's definition of core

13   network elements is smack dab inside the collective entity,

14   inside the recommended core of the American Standards,

15   including the messaging server for SMS.  And this is the

16   foundation, on which the evidence has shown you, Sprint's

17   network has been built.

18           So, what about MMS, what do the MMS standards say,

19   what have you heard?  Well, both Mr. Lipford and Mr. Lanning

20   explained that for MMS, the standard states and this is --

21   the document on the screen is DX-8.  You heard testimony that

22   this was offered in part by folks at Sprint, who are actively

23   involved in developing the standards.  And the standard

24   states that the messaging server for MMS can be put within

25   the core network of the operator's cellular network or it can

1    be put external to the cellular network by having a third

2    party own, operate and host the messaging server outside.

3    That third-party hosted scenario is designated in blue on the

4    slide on your screen.  It says third-party provider, third

5    party service provider.  Mr. Lanning referred to it as a

6    service bureau model.  And you will recognize it as the

7    Syniverse Picture Mail model that Sprint used to follow.

8          But as the Judge has told you, you are not being

9    asked to decide whether those Syniverse Picture Mail servers

10   infringe the '870 Patent and the verdict form that you have

11   also makes that clear you're not being asked to decide that

12   question.  You're being asked to decide on Sprint's current

13   implementation of MMS since 2014, the implementation that is

14   shown on your screens in orange.

15         So, let's talk some more about how Sprint has

16   actually set its cellular network.  What has the evidence

17   showed you and as you go through it, ask yourselves whether

18   Sprint's implementation is consistent with what the standards

19   have said.  For SMS, you heard the answer from numerous fact

20   witnesses, but Patrick Wilson, who was formerly the head of

21   MMS and SMS at Sprint, he summed it up nicely.  Here's his

22   testimony on your screens.  From the time I started to work

23   on SMS servers to the time I transitioned over that

24   responsibility to Mr. Hoelzle, the SMS servers have always

25   been part of Sprint's core network.  And Mr. Hoelzle who then

1    took over for Mr. Wilson, explained that the same has

2    remained true during his tenure.  That's what the fact

3    witnesses told you.

4           And Sprint's formal technical documents, it's design

5    documents, they tell you the same thing.  Inside, not

6    outside.  Let's go through a few of them together.  On your

7    screen is DX-209.  This is a formal Sprint design document

8    and you know that because it says design document up in the

9    corner.  What does this design document show?  It gives us a

10   picture of a network architecture.  What's in that network

11   architecture?  There is a CDMA core, a CDMA core, that's the

12   core to Sprint's CDMA cellular network.  These are some of

13   the elements the testimony shows that are part of that CDMA

14   core and it's in a Sprint formal design document.  What's in

15   there?  The mobile switching center, the short message

16   service center.  That's the messaging server for SMS and the

17   HLR.  All in the CDMA core.

18          Mr. Lanning showed you this slide.  It shows how

19   each of the elements listed there in the CDMA core and

20   Sprint's design document, they're all in the CDMA 2000

21   collective entity as that evolved over time.  You see each of

22   those colored boxes right in the dotted-line box in the

23   collective entity.  You also see how IS-41, it's a little

24   hard to see and that's what highlighted there coming out of

25   the SMSC.  What's IS-41 in the sea of acronyms that you've

1  heard in this case?  It's the same thing as ANSI-41.  This is

2  a reference back to the 1999 -- I'm sorry, to the 1997

3  ANSI-41 standards in Sprint's design documents.

4        Also in evidence for you to take back is DX-210,

5  this is another Sprint design document.  Can we go to page

6  44, can you blow that up?  Another Sprint design document,

7  you heard Comcast counsel, what is core used to refer to in

8  Sprint's document?  Check to see if it's saying core to

9  Sprint's cellular network.  Sprint's CDMA core network.  It's

10 cellular network, what does it have in it?  A mobile

11 switching center, an HLR and an SMSC, all in the box labeled

12 CDMA core network.

13       Sprint's formal design documents also show that SMS

14 and MMS messaging servers are located in what are called core

15 sites with the SPS.  You'll remember this, this is the core

16 site map and the messaging equipment is at those core sites

17 together with the SPS that Dr. Akl says is core.  How do we

18 know that?  You heard it from Mr. Golla, remember him, he's

19 the Sprint employee responsible for the SPS and he said these

20 are the three core sites where the SPS is located along with

21 the messaging servers.  We didn't write the word core sites

22 in there for purposes of this case.  That's in the document

23 itself, DX-215 and you'll see it there if you look at it.  In

24 fact, Mr. Golla was challenged on that point.  There was a

25 suggestion to Mr. Golla that somehow, he and other Sprint

Mr. Finkelson                               72

1    witnesses were just throwing around the word core site when

2    they were talking to you.  He said no, this has been there

3    from the beginning.  From 2007 SPS was installed in these

4    core sites.

5            Now, Sprint's formal technical documents, its design

6    documents, also show that its SMS messaging servers are not

7    only physically in the same facility as the SPS, they're

8    logically tied hand-in-hand with the SPS and with the

9    predecessor to the SPS, which is the messaging LDAP,

10   sometimes you've heard it as the MLDAP.  How do we know that?

11   Again, we see it in Sprint's technical documentation.  You

12   see the SPS and the SMSC located in the same spot, but also

13   logically connected.  What's this diagram called?  Logical

14   End State Diagram, it's describing logical connections, as

15   well as physical locations.

16           We also have, can we pull up DX-215, Mr. Baird.  We

17   also have and you've seen this, ladies and gentlemen, a

18   document from Nokia.  This is a functional specification

19   document that Nokia prepared for Sprint's SPS and what did

20   Nokia have to say about where Sprint's SMS messaging servers

21   are located?  What did Nokia call them?  Nokia called them

22   internal messaging systems.  Not external messaging systems,

23   internal messaging systems.  And to what internal messaging

24   systems were they referring?  Mr. Golla made that clear, as

25   well.  Nokia is referring to the SMSCs, Sprint's SMSCs that

1    are located at the core sites.

2          What other documentation do we have?  We have the

3    Sprint/Comcast contract.  And folks, you know it well by now,

4    it was entered into between Sprint and Comcast in 2008.  And

5    you're also familiar with the definitions that the parties

6    agreed to in this contract for the core network and SMS.  And

7    you heard Mr. Dellinger, who testified to you on behalf of

8    Comcast that definitions matter in contracts.  Here is Mr.

9    Dellinger's testimony.  He said I'm not a lawyer, but I would

10   say they matter.  And these defined terms matter in the

11   Sprint and Comcast contract, as well.  Sprint short message

12   service centers, its messaging servers for SMS are defined by

13   Sprint and Comcast in this contract as part of Sprint's core

14   network.  Comcast's own witness, its own witness that they

15   brought here to testify to you about this agreement, admitted

16   that to you on the stand two days ago.

17         You remember Mr. Koch, he was called to the stand by

18   Comcast.  I asked him and do you agree that an SMSC is

19   infrastructure for providing SMS.  That sounds right.  Do you

20   agree that the definition of core network includes SMS

21   infrastructure?  Mr. Koch's answer was yes.  Comcast raised

22   it.

23         You also might remember the testimony of Mr.

24   Kalinoski, Sprint's corporate representative who's been with

25   us throughout the trial.  He was the witness who explained to

Mr. Finkelson                          74

1   you he has an engineering degree and had an operations and

2   technical role on this agreement.  He was told by Comcast

3   counsel, deposition just sounded like sales.  Well, Mr.

4   Kalinoski had an operations and technical role on this

5   agreement and here is what he told you.  Why does the

6   contract between Sprint and Comcast define core network the

7   way it does?  Why?  That was reality plain and simple.  The

8   voice, data and SMS service infrastructure were all part of

9   Sprint's core.

10          He also told you, as did Mr. Koch of Comcast, that

11  Comcast had it's own team of technical advisors dedicated to

12  getting the definition of core network technically accurate

13  in this agreement to reflect what Sprint's core network

14  actually is.  What else did Mr. Kalinoski tell you? He told

15  you that these are the same messaging servers, these SMS

16  messaging servers that are in question as part of this trial.

17  And that's the truth, they're the same messaging servers that

18  are accused here.

19          You heard Comcast's counsel say that once upon a

20  time, Sprint and Comcast were partners.  Well, when we were

21  partners, Comcast told you the truth.  When we partners in

22  this agreement, Comcast told you the truth.  It admitted and

23  agreed that the very same messaging servers that Dr. Akl now

24  says are internal -- excuse me -- are external, are in fact,

25  part of Sprint's core network.  There is no escaping that

Mr. Finkelson                         75

1  fact and we submit to you that Comcast has no business saying

2  something different to you in this courtroom.

3       That's SMS.  What about MMS, well, you know by now

4  Sprint used the Syniverse Picture Mail solution once upon a

5  time.  It's shown here on DX-229.  Syniverse Picture Mail

6  hosted.  And you also know from the testimony of Mr. Lanning,

7  how did Syniverse communicate with elements within Sprint's

8  core network, it used a VPN, a virtual network.  That's what

9  you use when you're external, just like when you may log into

10  your office from your home network.  You're not on the office

11  network, you're on your home network and you use VPN to

12  communicate when you're external.  That's how Syniverse

13  Picture Mail communicated.  It's never been a Sprint's SMSCs

14  and now it's MMSCs communicate with other core network

15  elements.

16       You also heard that Sprint decided to transition

17  away from Syniverse Picture Mail.  This was the document

18  describing that process.  And what did Sprint say in this

19  document it was doing?  What was it doing?  It was

20  transitioning to the fully-owned core network Acision MMSC.

21  The fully-owned core network MMSC, that's what Sprint's

22  documents say.  Mr. Yarkosky, he testified to you.  He

23  explained to you what that meant.  It meant that something we

24  purchased, we installed in our core network and integrated

25  into that core network.  Takes us back the MMS standards.  As

Mr. Finkelson                           76

1    you understand from the testimony of Mr. Lanning and

2    engineers and personnel of Sprint, like Mr. Yarkosky, Mr.

3    Wilson, like Mr. Hoelzle, Sprint is now using scenario 2

4    that's described in this document.  The MMS messaging server

5    is within the core network, that's the language in the

6    standards.  Was in the core network of what?  Of Sprint's

7    cellular network, you see that language in bubble number two.

8    That's the standard.  That's what Sprint is now doing through

9    MMS.

10          Sprint's MMS that is accused in this case, ladies

11   and gentlemen, now looks just like its SMS and neither looks

12   like what the claims of the '870 Patent require.  They're

13   internal messaging servers.  The patent requires external

14   messaging servers.  All of the claims of the '870 Patent, 1,

15   7 and 113 make that mandatory and Sprint doesn't do it.  Mr.

16   Lanning explained to you that because all of those messaging

17   servers are internal to Sprint's cellular network, Sprint

18   doesn't infringe Claim 1 or Claim 7 or Claim 113.  That's the

19   evidence.

20          So, in the face of that evidence, this overwhelming

21   evidence that Sprint's messaging servers are inside its

22   cellular network, Comcast presents to you Dr. Akl and only

23   Dr. Akl.  He spent hours on the stand with you.  So, if you

24   sort through all of those hours, you break down everything he

25   said, what do you end up with?  You end up with one theory

Mr. Finkelson                        77

1   after another that is unsupported by any evidence.  In fact,

2   it's contrary to all of the evidence.  It's unsupported by

3   any fact witness.  In fact, it's contrary to every fact

4   witness you heard from.  It's unsupported by any literature,

5   whether written by Dr. Akl in his many papers or by anybody

6   else.  Not one piece of literature to support his theories.

7   And ultimately, it's un-supportable at all.

8        And I want to take you through each of the theories

9   that Dr. Akl presented to you and I want to look at those

10  more closely.  I want to start first with a theory that you

11  heard particularly early on in the case, that said focus on

12  1999.  You kept seeing slides of the 1999 invention.  Well,

13  not only is that not right, it's contrary to how you will be

14  instructed by Judge Dubois this afternoon with respect to the

15  issue of infringement.  What is the relevant time period for

16  alleged infringement?  You have it on your screens.  It's

17  2006 to the present, it's not 1999.

18       Mr. Baird, can you pull up the jury instruction that

19  the jury will receive with respect to this issue?  This is an

20  instruction you'll receive this afternoon, ladies and

21  gentlemen, with respect to infringement.  It says in order to

22  prove infringement, Comcast must prove that the requirements

23  for infringement are met by a preponderance of the evidence,

24  i.e. that it is more likely than not that all of the

25  requirements for infringement have been proved.  When?

1    Starting on February 17, 2006.

2           Comcast's own expert, Dr. Dwoskin agrees.  I asked

3    him, you focused on 2006 to the present, why?  He said he

4    understood that that was because that's what matters in this

5    case when it comes to the issue of whether Sprint does what

6    the '870 Patent says.  That's Comcast's own expert.  1999,

7    ladies and gentlemen, is the date that matters for

8    invalidity, not for infringement. In fact, if 1999 mattered

9    for alleged infringement, we wouldn't be here, since Dr. Akl,

10   himself, says that the SPS database that he alleges is part

11   of Sprint's core network, it didn't exist until 2010.  And as

12   Mr. Yarkosky testified, the PDSN that Dr. Akl says is core,

13   it didn't exist at all at Sprint until 2002.  2006 to the

14   present is the time period you need to consider.

15          Second, let's take a closer look at Dr. Akl's

16   functionality is all that matters theory.  Functionality is

17   all that matters.  You've seen why that theory cannot be

18   right.  Why?  For starters, it's not what the Court's claim

19   construction says.  As Dr. Akl admitted, there is nothing in

20   Judge Dubois' definition of cellular network that says core

21   functionality.  What does it say?  You have it up on your

22   screens, it's behind Tab 2 in your binders.  It doesn't say

23   core network functionality.  It doesn't say core

24   functionality.  It says core network elements, core network

25   elements.  And then it lists a series of actual components,

1    not functions, as examples of core network elements.  The

2    mobile switching centers, they're equipment, that's not a

3    function.  The packet switching nodes, a subscriber databases

4    like an HLR and messaging servers, all equipment.  In fact,

5    you heard me ask Dr. Akl about that yesterday.  He said a

6    messaging server is a computer, it's a piece of equipment, it

7    is not a function.  The Court's claim construction, it's

8    definition of cellular network talks in terms of equipment.

9    So does the patent.

10          As you now know, the words core functionality, they

11    don't appear anywhere in the '870 Patent.  You've seen the

12    '870 Patent, it's a long patent.  The words core

13    functionality are nowhere in there.  The word essential isn't

14    in there either.  Nor is the word speed.  Nor is the word

15    messaging network.  Dr. Akl's words.  Dr. Akl's words.

16    You also know now that Dr. Akl's focus on function only is

17    not the analysis that an engineer would undertake in the real

18    world if he or she was designing a cellular network.

19          Mr. Lanning gave you the example of a washer and

20    dryer.  Just telling you whether the washer and dryer,

21    remember he said, are performing the functions of washing and

22    drying.  That's all you know what their functions are.  That

23    doesn't tell you anything about whether the washer and dryer

24    are internal or external to the apartment.  You can't just

25    look at function.  As Mr. Lanning explained, you have to look

Mr. Finkelson                    80

1   at function, you have to look at logical connections and you

2   have to look at physical.  Functional, logical and physical,

3   you have to look at all three and that's what Mr. Lanning did

4   in his analysis.

5            But he also told you that if you disagree with him,

6   even if you think Dr. Akl is correct that function is the

7   place to be, function is where you need to look.  Look at

8   what the evidence shows that a messaging server does.  To

9   hear it talked about today, you'd think it was just this

10  dummy box that sat there and did nothing.  What does the

11  evidence say?  You heard Judge Dubois tell you yesterday,

12  closing arguments aren't evidence.  Where is the evidence

13  then?

14           Well, Mr. Hoelzle, who is responsible for SMS and

15  MMS at Sprint, said that the messaging servers are the brains

16  of the operation.  What are they responsible for doing?  For

17  routing and delivering the messages to and from Sprint's

18  subscribers.  You saw Mr. Lanning's presentation, Sprint's

19  messaging servers are the equipment that actually are

20  responsible for routing to external networks.  And if a

21  Sprint subscriber sends an SMS message to a T-Mobile

22  subscriber, it goes to Sprint's SMS and Sprint's SMS makes

23  the decision to rout it out towards T-Mobile, out to the

24  inner-carrier gateway.  It also does routing within Sprint's

25  network.  Mr. Lanning took you through that.  You heard today

1   that getting phones to talk to other phones, that's what a

2   core function is.  That's what Comcast counsel told you.  And

3   he told you the messaging servers aren't core because they're

4   not involved in connecting the phone to other phones or to

5   other networks.  The evidence in this case is un-disputed

6   that the messaging servers are not only involved in

7   connecting phones to other phones or other networks, they're

8   critical.  It doesn't happen without the messaging server.

9   It's the last place a text message goes before it goes out to

10  that inner-carrier gateway.  They do routing.  Dr. Akl,

11  himself, admitted it.

12          This was Dr. Akl confirming in his deposition

13  testimony, when he said, yes, the SMSC and the MMSC at Sprint

14  help in routing communications.  That was Dr. Akl's

15  admission.  That's what messaging servers do.

16          Now, related to this functional-only theory, as Dr.

17  Akl's messaging servers are not essential.  You heard that a

18  lot.  Well, Dr. Akl agreed that a messaging server is

19  essential to receiving or sending a text message.  You cannot

20  send an SMS or MMS message at Sprint without a messaging

21  server and Dr. Akl, himself, told you that.  Also, remember

22  the Court's definition says core network elements.  It

23  doesn't say essential, that's Dr. Akl.

24          I'd also ask you to put Dr. Akl's messaging is not

25  essential theory to the test, by looking at what Dr. Akl says

1    is essential.  What does Comcast say is essential?  Voice and

2    surfing the internet.  Those are both essential.  But as good

3    fortune would have it for Comcast, messaging is not.  How so?

4    How so?  Dr. Akl also says that messaging servers are not

5    essential, because they don't relate to voice and internet

6    surfing.  But the messaging LDAP database is essential.

7    That's his testimony.  The messaging LDAP is core.  All of

8    the evidence in this case, there's no contrary evidence,

9    tells you that Sprint used the messaging LDAP only for

10   messaging.  That's all it was used for.  But Dr. Akl tells

11   you that it's core and the messaging servers are not.  Here's

12   Mr. Golla's testimony, what was the messaging LDAP used for,

13   was it used for anything other than messaging?  No.

14   Messaging servers access messaging LDAPs.

15          Dr. Akl also says that the database that has

16   information, the SPS is essential, but the messaging server

17   is not.  The phone book, picture the phone book, that's

18   essential because it's where you go and look up a number, but

19   the actual thing that is doing the work, once it gets that

20   number and deciding where it goes, that's not essential.

21   That's what Dr. Akl is saying about messaging servers.  Now,

22   as Mr. Lanning told you more than once, that makes no sense

23   to an engineer who is actually designing cellular networks.

24          Finally, take a closer look at Dr. Akl's newfound

25   theory, that their existing message network that is separate

1    and apart from the cellular network.  Dr. Akl has made that

2    theory up for purposes of this case.  You heard from multiple

3    Sprint witnesses that any reference to a messaging network is

4    to a subset of the cellular network.  Just like voice network

5    and data network are commonly used to refer to the parts of

6    the cellular network.  Mr. Yarkosky was an example.  Have you

7    ever just heard anyone describe a messaging network as being

8    separate from the cellular network?  No, when you talk about

9    the network, it's really the network that's supporting voice,

10   messaging and data.  Dr. Akl, himself, was forced to admit on

11   cross-examination, that he, too, uses the words voice network

12   and data network to describe portions of the cellular

13   network.  He did it in describing his own dissertation.

14          And Dr. Akl did not point you to one book, to one

15   article, to one paper whether written by him or anybody else,

16   at any point in the history of all of the literature that's

17   been written about cellular networks and about messaging.  He

18   didn't point you to one place where one person has ever said

19   the words that messaging network means a network that is

20   separate from the cellular network as opposed to one of the

21   three legs of the cellular network stool.  And think about

22   how many pages of standards you've seen in this case alone.

23   Most of them having to do with messaging.  Never, not once,

24   do those standards ever say that there is a messaging network

25   that is something outside of the cellular network.  Dr. Akl's

1   theory is contrary to how even Mr. Koch, of Comcast,

2   understands the cellular network that Comcast leased under

3   the Sprint/Comcast contract.

4           Here's what Mr. Koch has to say about that.  As part

5   of that contract, Comcast was trying to secure access to the

6   data network, to the voice network and to SMS messaging, all

7   as part of an agreement to get access to Sprint's cellular

8   network.  That's Mr. Koch of Comcast, that's his testimony.

9           So, where does that leave us?  Comcast, not Sprint,

10  has the burden to prove infringement in this case.  Comcast

11  has the burden to prove infringement in this case.  And what

12  does Comcast have?  What does Comcast have?  Comcast has the

13  conclusory testimony of one expert witness, who was hired for

14  purposes of this case.  Conclusory opinion not supported by

15  the evidence.  All they have is Dr. Akl.  Think about the

16  hundreds of thousands of pages of documents that have been

17  produced in this case.  Think about how many you've just seen

18  in this courtroom.  Not a single one says, not a single one

19  of them says that Sprint's messaging servers are external to

20  it's cellular network.  Not a single one.  Not a single

21  standard's document from the American Standard's body says

22  that Sprint's cellular network does not include messaging

23  servers or the CDMA cellular network does not.

24          How about witnesses?  Are there witnesses that

25  support Dr. Akl's theory?  Well, let's look at the fact

Mr. Finkelson                                        85

1    witnesses who Comcast called in this case.  This was the

2    slide Comcast showed you in its opening.  First, we had Mr.

3    Finnegan.  Mr. Finnegan testified to you that Comcast is

4    focused on technology by building a very big building, I

5    think he said it was going to be the second or tallest one in

6    the world.  And by developing its own inventions internally.

7    That's what Mr. Finnegan said.  Well, the '870 Patent isn't

8    one of them.  It was bought, not developed by Comcast.  And

9    it's not even used by Comcast to provide SMS and MMS

10   messaging to its own customers.  What else did Mr. Finnegan

11   confirm?  He confirmed that Comcast wants to make a move into

12   the cellular business, just as I said to you in my opening

13   statement.

14        How about Mr. Dellinger, what did he have to say?

15   Well, he talked about the Nokia deal.  He told you Nokia's

16   opening offer, Nokia's best-case scenario for this patent was

17   $1.5 million.  That's what Mr. Dellinger had to say.  How

18   about Mr. Marcus?  Mr. Marcus came and he talked to you about

19   the re-examination.  We're going to get to that in a moment.

20   Not one of these three witnesses talked to you about the

21   issue that matters most to you in this case.  Inside or

22   outside?  Not one of them.

23        How about any Sprint fact witnesses?  Comcast didn't

24   even play a single deposition video for you of a Sprint fact

25   witness.  They didn't bring on Sprint fact witness to the

Mr. Finkelson                              86

1    stand.  All of the testimony that you heard from Sprint

2    witnesses and you saw live and on video, Sprint called them

3    to the stand.  Not one of those witnesses supported Dr. Akl's

4    position.  How about any other Comcast expert witness?  Did

5    he have any other support for his theory that the messaging

6    servers are external?  No.  Dr. Dwoskin, who you heard

7    testify, he said he had no opinion at all on the question of

8    inside or outside.

9         How about any of the Comcast technical personnel

10   that you heard about who worked on the Comcast/Sprint

11   contract, the MVNO agreement defining core network?  Not a

12   single one of them was called to the stand by Comcast to say

13   anything differently than what Mr. Kalinoski told you and

14   what Mr. Koch, of Comcast himself admitted.  How about a

15   standard's witness.  How about a standard's witness to

16   contradict what Mr. Lipford of Sprint told you about the 1997

17   and 1999 standards?  They didn't bring one.  They didn't

18   bring one.

19        How about Inventor Ahou?  How about Inventor Ahou to

20   support what Dr. Akl now says the '870 Patent is about?  They

21   didn't bring her either.  How about any Nokia person to

22   contradict what Mr. Golla showed you Nokia's own documents

23   say about Sprint's messaging servers being internal systems?

24   They didn't bring one.  Look how many people, look how many

25   people Comcast got to come to this closing argument, to

Mr. Finkelson                    87

1    listen to this closing argument in this courtroom.  When

2    Comcast wants somebody to get here, they get here.  They

3    couldn't find a single person to get on that stand and

4    support Dr. Akl's theory, not a single person.

5            Now, let's compare that to what Sprint has shown

6    you.  You heard from Mr. Lanning.  Talk about a guy who has

7    lived and breathed this stuff for his entire life.  He

8    testified to you that he, himself, was actually installing

9    messaging servers inside of cellular networks going back to

10   the 1990, including when he designed the British Telecom

11   cellular network.  He explained to you, point by point, what

12   actually goes into that determination.  Not the seven factor

13   analysis that was made up by Comcast counsel first during his

14   deposition and again here.  He showed you how Sprint's

15   messaging servers, other than Syniverse Picture Mail are

16   functionally, logically and physically inside of Sprint's

17   cellular network.  And that's the analysis we just went

18   through earlier today.

19           But Sprint didn't stop there.  We didn't stop with

20   an expert witness.  We brought you fact witnesses.  We

21   brought you fact witnesses.  Not hired for purposes of this

22   case, fact witnesses.  We talked earlier about Mr.

23   Kalinoski's testimony with respect to the Comcast/Sprint

24   contract defining core network as including messaging

25   servers.  We talk about Mr. Lipford's testimony, about the

Mr. Finkelson                                88

1    American Standards defining messaging servers inside the

2    collective entity, inside the core network.  We talked about

3    Mr. Yarkosky, he was responsible for the transition of the

4    external Picture Mail solution to an internal MMSC because of

5    all the problems that having an external caused.  And you

6    heard from Mr. Wilson and Mr. Hoelzle, the two guys

7    responsible for SMS and MMS over time.  And they each told

8    you that the messaging servers have always been inside and

9    they showed you the design documents to prove it.  And you

10   heard from Mr. Golla, the one who was challenged with respect

11   to whether he had, perhaps, doctored a document to include

12   the words core site for your benefit.  And finally, you heard

13   from Mr. O'Connor, the gentleman to whom Mr. Golla and Mr.

14   Hoelzle reports.  His title is vice president for network

15   core and access and he talked about the messaging servers

16   being critical elements, including for public safety reasons,

17   remember that?  Text to 9-1-1 and public alerts.

18          Dr. Akl told you to apply the plain and ordinary

19   meaning of core to a person of skill in the art and told you

20   that's the definition found in Merriam Webster's Dictionary.

21   Well, Mr. Kalinoski, Mr. Lipford, Mr. Yarkosky, Mr. Wilson,

22   Mr. Hoelzle, Mr. Golla, they are all persons of ordinary

23   skill in the art, under Dr. Akl's own definition.  So, how

24   these folks think of core network elements, how these folks

25   know messaging servers are core network elements at Sprint,

Mr. Finkelson                              89

1    that matters.  And each of them testified to you under oath,

2    under oath in this courtroom that Sprint's messaging servers

3    are core network elements.

4         But we didn't stop there either.  We showed you the

5    American Standards.  We didn't run away from the 1999

6    standard like Comcast has.  We showed you exactly what those

7    standards say.  The 1999 standard, the messaging servers

8    inside the core network with every other element that is set

9    forth in Judge Dubois definition of cellular network in your

10   binders.  We didn't stop there.  We showed you one Sprint

11   design document after another, DX-12, DX-13, DX-209, DX-215,

12   each of them -- each of them describing Sprint's messaging

13   servers as core.

14        We didn't stop there.  We showed you the

15   Sprint/Comcast contract.  What did the Sprint/Comcast

16   contract do?  It defined core network.  It defined core

17   network to include the SMS infrastructure, the SMS

18   infrastructure included the SMSCs, the short message server

19   centers, the messaging servers.  2008, the same messaging

20   servers that are accused in this case, the contract defined

21   them in the core network.

22        And we didn't stop there.  We also showed you the

23   Nokia Siemans SPS specification document, where Nokia, Mr.

24   Golla testified to you, described and defined Sprint's

25   messaging servers as internal messaging systems.  Sprint,

1    Nokia and Comcast those are the three companies who you've

2    heard about most in this case.  Those are the three companies

3    who matter most in this case.  And every single one of them,

4    Sprint, Comcast and Nokia has said, in writing in one way,

5    shape or another, before this lawsuit ever happened, outside

6    the context of this lawsuit, that Sprint's messaging servers

7    are internal systems that are part of Sprint's core cellular

8    network.  The only person, the only person who has ever said

9    something different is Comcast's hired expert, Dr. Akl.

10         They have the burden of proof, ladies and gentlemen,

11   they've got the burden of proof, but Sprint has shown you all

12   of the evidence.

13         Let's go back to our verdict form, remember the very

14   first question, did Comcast prove by a preponderance of the

15   evidence, that Sprint has infringed any of the following

16   claims.  A yes is a finding for Comcast.  A no is a finding

17   for Sprint and we would submit to you that all of the

18   evidence shows that the answer to that question for Claim 1

19   is no, for Claim 7 is no, for Claim 113 is no.  If you agree

20   and if you do that, that's it.  You can sign and date the

21   verdict sheet, you return it to the Court and your job is

22   done.  That's infringement.

23         Now, Comcast counsel said he would be talking about

24   invalidity on rebuttal.  Sprint has advanced the defense of

25   invalidity.  So, it's my job to talk to you about that now.

Mr. Finkelson                              91

1   I'm going to talk about invalidity, it's going to be shorter

2   than the presentation I just gave you by good measure.  And

3   then I'm going to talk to you briefly about damages.

4          So, if you find that Sprint has infringed, which you

5   submit to you, you should not.  If you find that Sprint has

6   infringed, you'll next address the question of whether the

7   '870 Patent is valid or invalid.  And when it comes to

8   invalidity, Comcast is betting that you're not going to look

9   beyond the fact that the '870 Patent made it through the

10  patent office.  But remember, I explained to you in opening

11  why is it that you, the jury, get the last word on invalidity

12  and not the Government.  It's because you get to hear and see

13  both sides of the story.  You get to see prior art, here that

14  prior art is Sonera and Viaresto that the patent office was

15  never provided.

16         You can see from the face of the '870 Patent itself,

17  that hardly any prior art was cited at all during the initial

18  examination of the patent.  Then Comcast brought Mr. Marcus

19  here to tell you that the '870 Patent that Comcast filed

20  itself, Comcast filed, that that was supposedly a cure.  But

21  you can judge for yourselves, ladies and gentlemen, how

22  credible Mr. Marcus' testimony was in this courtroom.  You

23  saw Mr. Marcus on videotape on a formal panel, where he was

24  sitting with the former chief judge of the highest patent

25  court in this country.  You heard him give you his real take

Mr. Finkelson                                    92

 1    on re-examination as chief patent counsel at Comcast.

 2              What did Mr. Marcus tell you on that videotape?  He

 3    told you, "You can always put your patent in re-exam and seek

 4    all kinds of claims.  Anytime you put a patent in ex parte

 5    re-exam, that process is very much tilted in favor of the

 6    patent owners.  Oftentimes, 150 new claims are added."  All

 7    Mr. Marcus' words.  And then what does the patent owner do,

 8    this is what Mr. Marcus says, take all the prior art, they

 9    dump everything in there and now you've got ten pages of

10    prior art, you know, that all have supposedly, supposedly

11    been considered by the examiner.  And then, again Mr. Marcus'

12    words, magically, there's the post-final examiner interview

13    and then all of a sudden, all claims are confirmed and no one

14    has any idea what happened or why.  Those are Mr. Marcus' own

15    words.  That's the ex parte re-examination process that

16    Comcast put the '870 Patent through.

17              As I told you at the outset, you are the first ones

18    to consider whether the '870 Patent is invalid in light of

19    the Sonera and Viaresto references.  You're the first ones.

20    And here is what you've been the first ones to hear and see.

21    Dr. Polish came here and he walked you through element by

22    element of the '870 Patent claims are anticipated.  That's a

23    word you're going to see on the verdict sheet, as well,

24    anticipated by the published Sonera patent reference that was

25    not considered by the Government and was not provided by

                            Mr. Finkelson                    93

1    Comcast in the re-examination.

2           Dr. Polish explained how he focused on the mapping

3    and determining steps in particular, because those looked to

4    be, to him, the ones that were primary and because Dr. Akl

5    admitted himself, in this case, that steps 1 and 4 of the

6    claims, the external messaging server and the response

7    message were already taught by the prior art.  Remember my

8    examination of Dr. Akl yesterday on this subject.  It took

9    some work, but we finally heard him concede that point here,

10   too.  Contrary to what Dr. Akl told you on his board, that he

11   wrote on, on direct examination, Ms. Ahou did not come up

12   with the idea of storing a message outside the GSM cellular

13   network.  Others came up with that idea before.

14          Dr. Akl admitted on the stand yesterday, that SMSCs

15   and MMSCs were typically external to the cellular network,

16   typically, in GSM before the '870 Patent and that messaging

17   servers meeting the Court's definition existed before the

18   '870 Patent, too.  Here is what he said.  I asked him, "that

19   is because in the prior art it was already taught that there

20   was a messaging server as that term is used in these claims,

21   external to the cellular network."  Dr. Akl's answer, "Yes."

22   Contrary to what he wrote on his board, the problem of

23   message volume, that wasn't the '870 Patent's problem to

24   solve.  It had already been solved.  And the solution of

25   keeping SMS and MMS messages out of the cellular network

Mr. Finkelson                        94

1    until the phone is ready to receive, that wasn't a solution

2    of the '870 Patent.  It was prior art in GSM networks and Dr.

3    Akl admitted that yesterday, too.

4           So, Dr. Polish focused in particular on the mapping

5    and determining steps of the '870 Patent claims.  Those were

6    the two steps that Dr. Akl said in this case, were new.  And

7    Dr. Polish explained to you how those two steps look a lot

8    like a cellular network version of walking up to a bank

9    teller and asking for your account balance.  Can we go to

10   that?

11          (Pause.)

12          MR. FINKELSON:  Before we get to this slide,

13   remember Dr. Akl explained the bank teller example and he

14   showed the steps of the bank teller side-by-side with the

15   steps of the patent claims to show you how those two things

16   look very similar to one another.  He then walked you through

17   what Sonera was all about.  And that's what the slide on your

18   screen is detailing.  A person who is trying to text, for

19   example, Dr. Polish gave 1-800-gethelp, sends it to that

20   number and what happens is, the cellular system looks up in

21   its databases and decides the actual human being with a phone

22   that should receive the text message.  The actual human being

23   who should receive the text message. Remember that was on the

24   snow day that none of got to enjoy.  It's like trying to get

25   in touch with Ms. Hull to see whether you needed to get here

Mr. Finkelson                                    95

1   or not.  And you go to a central number, which you end up

2   with the person who's actually going to answer you text

3   message and respond, unfortunately, ladies and gentlemen, you

4   must come to court today or something like that.  That's what

5   Sonera is about and Dr. Polish explained that to you.

6          And he also explained to you that Sonera is in the

7   same field as the '870 Patent.  A short message system in a

8   mobile communication network.  He also explained to you that

9   it involves the same type of network, GSM networks, the

10  European solution, that's what Sonera is coming out of.  And

11  he told you that it addresses the same problems of the '870

12  Patent.  Allowing the messaging server to be separate from

13  the cellular network, but still be able to get a short

14  message to a wireless device.  And he told you how, step-by-

15  step Sonera described the same GSM European solution to the

16  same GSM European problem confronted by the '870 Patent.

17  Mapping two identifiers to numbers together to determine the

18  information that we need.  And he took you step-by-step.  He

19  started here, you may remember this slide, this is his

20  discussion of Figure 1 of Sonera.  It shows how each of the

21  four claim steps of Claim 1 of the '870 Patent occurs in

22  Sonera.  How the mapping and determining was done.

23         Now, as I heard it yesterday, the primary criticism

24  from Comcast and Dr. Akl about Dr. Polish's approach is Dr.

25  Polish put a box around the SMSC and the SMSG-MSC together.

1   Dr. Akl said yesterday we can't do that.  One is storing, the

2   other is sending the inquiry.  You can't just put the two

3   together.  Well, Dr. Akl may not have recalled his testimony

4   from last week.  This is what Dr. Akl had to say when he was

5   on the stand last week.  "Is it common thing for skilled

6   artisans to think about the combination of two different

7   computers being the messaging server or is that uncommon?"

8        "Answer:  If you have a component that's assisting

9   or the querying is going through a component, that's

10   perfectly fine. You can draw a box or a circle around both as

11   the messaging server."  That's not Dr. Polish's testimony,

12   that's Dr. Akl's own testimony in this case.  Dr. Polish did

13   just what Dr. Akl said.  Dr. Polish also took you to Figure

14   2-A, just to show you in detail how he went step-by-step in

15   Sonera discloses each of the four elements of Claim 1 of the

16   '870 Patent.  He color-coded it so you could see how it

17   corresponded to each of the steps of the claim.

18        The patent office never considered Sonera.  Comcast

19   didn't provide Sonera to the patent office during the

20   re-examination.  Can we pull up the jury instruction with

21   respect to that?  This is an instruction that you'll receive

22   this afternoon from Judge Dubois on the scope and content of

23   the prior art.  And what he will tell you is this, in part.

24   Where the party challenging the validity of a patent is

25   relying on prior art that was not considered by the PTO

1    during examination, you may consider whether that prior art

2    is significantly different and more relevant than the prior

3    art that the PTO did consider.  If you decide it's different

4    and more relevant, you may weigh that prior art more heavily

5    when considering whether Sprint has carried it's clear and

6    convincing burden of proving invalidity.

7            Dr. Polish considered Sonera and so, too, have you

8    considered Sonera and you've seen Sonera discloses each and

9    every element of 1, 7 and 113 of the '870 Patent that it

10   anticipates.  That's anticipation.  Dr. Polish also told you

11   that if there's anything missing from Sonera, that missing

12   information would have been known to a person of ordinary

13   skill in the art, with the benefit of Sonera.  And also would

14   have been known by combining Sonera with the other patent

15   applications that he discussed with you, Viaresto.  Viaresto

16   wasn't considered by the patent office either.  Comcast did

17   not provide Viaresto in the re-examination.  And Dr. Polish

18   explained how through this combination it means that the '870

19   Patent is not only anticipated, but it's also obvious.

20           Again, another word you're going to see on the

21   verdict form.  It's obvious, he explained why.  He explained

22   to you what was known in the prior art with respect to

23   databases, how databases were common knowledge, things that

24   people had known about well before.  And Dr. Polish wasn't

25   the only one who told you that.  You also heard on video from

1   Dr. Tirana.  He told you about how indexing to look up

2   information in databases was around from before he was born

3   most likely.  Even Comcast's expert, Dr. Dwoskin, told you

4   that he didn't have to think about mapping in any special way

5   when he did his analysis in this case.  He said it was just

6   determining a correspondence between one thing and another

7   thing.

8        Dr. Polish also showed you where in the background

9   discussion of Viaresto it talks about mapping the same two

10  types of numbers that the '870 Patent talks about.  And he

11  also showed you where Viaresto depicts an external messaging

12  server, an external messaging server that receives and send

13  messages from the cellular network.  This is DX-242 Viaresto,

14  Figure 1, that Dr. Polish discussed with you.  Accordingly,

15  Dr. Polish said to you, not only is there anticipation, but

16  there is obviousness of Sonera plus Viaresto.  He showed you

17  that with a check-plus for all of the steps of the claims for

18  which that was the case -- for which he relied on Viaresto

19  for the obviousness combination.  This is Claim 1, he reached

20  the same conclusion with respect to Claim 7 and Claim 113.

21  Each is anticipated by Sonera and each is obvious over

22  Sonera, plus the knowledge of one of skill in the art and

23  Sonera plus Viaresto.  He was Dr. Polish explaining his

24  conclusions.

25        Sprint has the burden.  I talked a lot about burden

Mr. Finkelson                    99

1    on infringement.  Comcast has the burden on infringement.  On

2    invalidity, I told you in my opening, I'm going to tell you

3    again here today, Sprint has the burden of proving invalidity

4    clearly and convincingly -- by clear and convincing evidence.

5    We've owned that burden and we submit to you that we have met

6    it.

7          I showed you the infringement question on the

8    verdict form, that's Question 1.  You don't get to Question 2

9    unless you find that Sprint has infringed.  If you get to

10   Question 2, the next question for you is about invalidity.

11   There's two of them.  Question 2 is about anticipation.  Did

12   Sprint prove by clear and convincing evidence that any of the

13   following claims of the '870 Patent are invalid as

14   anticipated by a single prior art reference. Yes, for Sprint

15   and we submit to you that yes is the answer for Claim 1,

16   Claim 7 and 113.  If you get to invalidity.  The same is true

17   on Question Number 3, invalidity for obviousness.  Invalid as

18   obvious at the time of the invention.  We submit to you the

19   answer on Question 3 is yes.  Sprint has proved by clear and

20   convincing evidence that the patent is invalid.  So, yes for

21   anticipation, yes for obviousness.  And again, if you answer

22   yes to all of the claims for either Question 2 or Question 3,

23   then again, your job is done and you stop there.

24          The last page of the verdict sheet is on damages.

25   We don't believe that's an issue that you will need to get

Mr. Finkelson                    100

1   to.  The only way you get to them damages is if you find that

2   a claim has both infringed and is valid.  If you find Sprint

3   doesn't infringe, you don't get to the damages section and

4   the damages are zero.  If you find that each of the '870

5   Patent claims is invalid and you're also done.  You don't get

6   to the damages section and the damages are zero.

7          But if you do get to damages, it's going to be your

8   job to decide what damages are reasonable to award to

9   Comcast.  Reasonable.  There's going to be two issues for

10  you.  One is the type of royalty and the second is the amount

11  of the royalty.  On the type of royalty, if there is a

12  royalty in this case, all the evidence points to the fact

13  that Sprint and Nokia would have agreed to a lump sum payment

14  for the life of the '870 Patent.  Sprint and Nokia would not

15  have agreed to an ongoing royalty that every minute of every

16  day of every year since 2006 would give Comcast a little bit

17  more money each time a Sprint subscriber sends or receives a

18  SMS or MMS message.

19         You heard from Dr. Cox that it is business practice

20  in this industry to do lump sum, one-time payment agreements.

21  He reviewed the agreements produced in this case.  He

22  reviewed other agreements and he told you that all of those

23  point to a lump sum and he's not alone.  Here's the testimony

24  of Ms. Riley, Comcast's expert.  She agreed that all of the

25  agreements that she looked at in this case, were in the form

Mr. Finkelson                           101

1    of a lump sum.  All of them, including ones involving Sprint.

2    Including ones involving Nokia.  Including ones involving

3    Comcast.  All lump sum payments.  So, if you find that there

4    should be a royalty in this case, it should be in the form of

5    a lump sum.

6           Then there's the question of amount.  If you find

7    that there should be a royalty in this case, Dr. Cox has

8    given Comcast all of the reasonable benefits of the doubt and

9    he has shown you that if there was a negotiation between

10   Sprint and Nokia in 2005, those two parties would have agreed

11   on a lump sum payment of $1.5 million for Sprint to use the

12   '870 Patent for the life of the patent.  What does Dr. Cox's

13   analysis do?  It accounts for the actual value of the '870

14   Patent.  The actual value of the '870 Patent.  Where did he

15   find that value?  He started with Nokia's own valuation.

16   This is DX-150.  This is one of the exhibits that's going to

17   be back there in the deliberation room with you.  Remember,

18   this was the form that was filled out by Nokia, by Ms. Ahou's

19   manager, assessing the value of this invention in 1999 and

20   giving it a valuation of 2 on a scale of zero to 5.  A modest

21   invention.  Dr. Cox took that into account.  He also looked

22   at the other data points.  How did Nokia value it's invention

23   in the '870 Patent in 2010.  It sold it to Comcast along with

24   numerous other patents for $600,000.  Those are the hard data

25   points on which Dr. Cox relied.

Mr. Finkelson                    102

1           Ms. Riley, she testified that in between those two
2      times, on April 26, 2005, somehow, some way, Comcast says
3      that Sprint and Nokia would have agreed on a license.  Not a
4      purchase, but a license to Sprint of the '870 Patent for over
5      $153 million.  Here's what Dr. Cox had to say about Ms.
6      Riley's 2005 spike.  Ms. Riley wants us to believe that the
7      patent value went way up around 2005 and then way back down
8      in 2010.  She doesn't provide any explanation for why. The
9      fact is that Ms. Riley's spike in 2005, just at the
10     hypothetical negotiation date, ignores Nokia's own real world
11     valuation of the '870 Patent as a 2, ignores Nokia's own real
12     world valuation of at most $600,000 for the '870 Patent when
13     it sold it to Comcast as part of a whole package of patents
14     in 2010, including two other issued U.S. Patents.  And it
15     ignores Nokia's own real world, best-case scenario for the
16     '870 Patent, which you know is $1.5 million.  That's what Mr.
17     Dellinger told you was Nokia's opening offer to Comcast
18     before Comcast even countered.
19           If you're on a platform in the middle of a sea, you
20     don't give away your assets for less than they're worth.  You
21     extract as much value for those assets as you possibly can.
22     Their opening offer was $1.5 million.  That was the most that
23     Nokia thought it could sell the '870 Patent for on its best
24     day.  Ms. Riley also overstates the supposed issues with
25     Nokia's financial condition in 2010.  We heard more about

Mr. Finkelson                                103

1   that today.  The evidence shows you that Nokia has been and

2   remains a major player in the cellular industry.  $2.5

3   billion in operating profits in 2010.  The same year that

4   Comcast would have you believe it sold this patent at a fire

5   sale price.  And Nokia recently bought Alcotel-Lucent for $16

6   billion.

7          Comcast has the burden of proving the amount of

8   damages to you. Again, you'll here that in the instructions.

9   That's Comcast's burden.  If Nokia really thought that the

10  price of this patent skyrocketed in 2005, when Ms. Riley

11  spiked.  If Nokia really thought that, why hasn't Comcast

12  brought you a Nokia witness to say that?  You heard the names

13  of the individuals who were involved in the deal at Nokia.

14  Why hasn't Comcast brought you testimony from a Nokia

15  witness?  The answer is there is none.  It couldn't get a

16  Nokia witness here to support Ms. Riley's theory.

17          This is what Ms. Riley would have you accept.  The

18  '870 Patent sold to Comcast for $600,000 and it makes no

19  common sense, it makes no economic sense that Nokia and

20  Sprint would agree that Sprint would rent a room, a license,

21  rent a room in the '870 Patent house for over $153,000

22  million when you know that Nokia was willing to sell the

23  whole house and a couple of other houses in the neighborhood

24  for $600,000.  That doesn't make common sense, it doesn't

25  make economic sense.  What makes common sense and economic

Mr. Finkelson                    104

1    sense is Dr. Cox's methodology.  You look at the real world

2    $600,000 sale.  You account reasonably for the differences

3    between it and the hypothetical negotiation, including the

4    fact that the sale was for three patents and not just one.

5    Just like he explained to you, you would look at the Kelly

6    Blue Book and make adjustments if you were buying a car.

7            Judge Dubois is going to instruct you this afternoon

8    that the factors that you may consider in making your

9    determination on damages include comparable license

10   agreements such as those covering the use of the claimed

11   invention.  What that means is look at what Nokia sold the

12   '870 Patent for.  As Dr. Cox and Dr. Dippon also told you,

13   you, you have to account for the costs in the transmission of

14   an SMS and MMS message, including the Spectrum and the towers

15   and other costs that Ms. Riley and Mr. Webber omitted

16   entirely.  Dr. Dippon took you through that in detail.  He

17   told you he had done wireless telecommunication analysis like

18   these before.  Mr. Webber admitted to you that he had never

19   done them before in wireless.  Costs, so if I'm sending an

20   SMS message to you, I'm sitting here and you're sitting

21   there. All of these costs, all of them, Mr. Webber leaves

22   out.  Ms. Riley leaves out.  Then counts some costs in here

23   and then all of these steps, as I come closer to you and I'm

24   not going to go any further lest I be chastised, all of these

25   steps as they come to you phone, he doesn't count those

1   either.  None of those costs in Mr. Webber's analysis and Ms.

2   Riley's analysis depends on Mr. Webber's mistake.

3           Ms. Riley's free-rider analogy, it doesn't work for

4   the same reason.  You heard Dr. Dippon on the stand.  He

5   explained that Sprint built it's 3G network for voice, data

6   and messaging.  And he showed you the 2003 10K from Sprint to

7   confirm it.  Ms. Riley missed that and her analysis depends

8   on that mistake, too.  Dr. Cox also pointed out the mistakes

9   that Ms. Riley made in relying on Dr. Akl's step-counting

10  method.  Remember that, Dr. Akl tried to count how many steps

11  he thinks are infringing.  Well, as Mr. Lanning and Dr. Cox

12  explained, if you are going to go down that road and you're

13  asking for a royalty on each SMS and MMS message that is sent

14  and received, you have to account for all of the steps in the

15  transmission of that SMS or MMS message, not just a made-to-

16  order subset.

17          Same thing, I'm sending a text message to you, these

18  are all the steps involved in that process. Dr. Akl counts

19  just a few of those steps.  He leaves out all of the rest,

20  all of the steps that are set out in detail in Sprint's

21  documents, DX-230, that shows you all the steps.  Dr. Akl

22  didn't count them.  Ms. Riley relied on Dr. Akl and her

23  analysis depends on that mistake, as well.

24          So, last issue on the verdict form is damages. It's

25  Questions Number 4 and 5.  Questions Number 4 and 5, if you

1    reach the issue of damages, which again Sprint believes you

2    should not, the maximum royalty payment to Comcast that is

3    supported by the evidence, would be $1.5 million.  If you

4    agree with that, that would be the answer to Question 4.

5           Now, in Question 5, which asks you about the type of

6    royalty, if you believe the analysis of Dr. Cox and Dr.

7    Dippon, the evidence supports the finding of a lump sum

8    royalty for the life of the '870 Patent as opposed to an

9    ongoing royalty, should you reach the issue of royalties at

10   all.  But again, ladies and gentleman, Sprint submits to you

11   that you never get there.  You never get there, because this

12   case begins and ends with Sprint's messaging servers that are

13   inside of Sprint's cellular network.  Not outside as the '870

14   Patent requires.  It begins and it ends on Question 1 of the

15   verdict sheet with a finding of no infringement.  Thank you

16   again for your time and for your service.

17          THE COURT:  Thank you, Mr. Finkelson.

18          MR. FINKELSON:  Thank you, your Honor.

19          THE COURT:  Ladies and gentlemen, it's been a long

20   morning, it's not quite ten minutes of 1:00.  We'll recess

21   for an hour.  When we return, Mr. Goettle will give his

22   rebuttal and then I will instruct you on the law.  Remember,

23   if you're in the middle of deliberations and wish to stay

24   tonight, you can.  And request that of me and I'll discuss it

25   with counsel.  And in all probability, we'll agree and I only

1   tell this again so that you can notify friends and family at

2   home.  By the way, we're going to, Michael, we're going to

3   move this back.  I can't see half the jury and that's not a

4   good idea.

5            AUDIO OPERATOR:  Right now?

6            THE COURT:  What?

7            AUDIO OPERATOR:  Right now?

8            THE COURT:  No, no.  But notify friends and family

9   that this might be a different evening.  I'll give you these

10  instructions again later.  All right.

11           THE DEPUTY CLERK:  All rise.

12           (Jury exits.)

13           THE COURT:  Be seated, everyone.  Is there anything

14  we have to address?  I made one minor change in the charge.

15  For some reason or other, our computer did not automatically

16  change the table of contents to square it with what we did

17  with the form of reasonable royalty charge.  We changed it to

18  calculation of reasonable royalty.  We changed now in the

19  table of contents.  I thought that was done automatically.

20  In any event, recess for about an hour.  How long do you

21  think you'll be in rebuttal?

22           MR. GOETTLE:  20 minutes, your Honor.

23           THE COURT:  All right, I'm not sure how long the

24  charge will be.  But we'll get started on deliberations

25  today.  What is the timetable for the exhibit lists?

108

```
1          MR. GOETTLE:  Can I get back to you right after
2   lunch?
3          THE COURT:  Yes, we'll do that after lunch.
4          MR. RIOPELLE:  Sprint's are ready.
5          THE COURT:  All right.
6          MR. GOETTLE:  We're ready, oh, apparently we're
7   ready as well, your Honor.  We were ready before Sprint.
8          MR. FINKELSON:  If we were ready, it will be the
9   first time we're ready before them in this case.
10         THE COURT:  I'd like to see them.  First of all, I
11  want them and can I see copies.  You can hand that up, I'll
12  look at it before we commence this afternoon.  Michael, we're
13  in recess for an hour.
14         THE DEPUTY CLERK:  All rise.
15         (Court in recess 12:50 to 2:02 o'clock p.m.)
16                          _ _ _
17                     AFTERNOON SESSION
18         (The following occurred in open court at 2:02
19  o'clock p.m.)
20         THE DEPUTY CLERK:  All rise.
21         THE COURT:  Good afternoon, please be seated.  Mr.
22  Goettle, you may proceed.
23         MR. GOETTLE:  Thank you, your Honor.  I was told
24  that I was precariously close to spilling this the entire
25  time -- I'm going to put that there.
```

1      Okay, I listened to Sprint's counsel's --

2      MR. FINKELSON:  Mr. Goettle, before you get started,

3  do you mind if I move?

4      MR. GOETTLE:  Not at all.  I listened to Sprint's

5  counsel's remarks to you and I think maybe there's a way to

6  sort of summarize where we are, at least, the way Comcast

7  sees it.  We have Dr. Akl.  We have Mr. Lanning.  We have Mr.

8  Lanning.  I'll move out of the way in a second.  We have

9  Sprint employees and then we have empty chairs.  Dr. Akl

10 looked at the patent and I showed you this on my slides this

11 morning and the patent refers to functionality.  Dr. Akl

12 looked at the claim construction and claim construction

13 refers to functionality.  The claim construction of cellular

14 network, meaning four network elements and the construction

15 of messaging server refers to functionality, those two

16 functions, storing and forwarding and sending an inquiry.

17      And then Dr. Akl confirmed that functionality

18 understanding with the standard, okay.  Mr. Lanning, won

19 seven holistic factors, that was the analysis that you heard

20 when he was on the stand, that he told Comcast about at

21 deposition, those were the seven holistic factors that I

22 walked through this morning.  And then we didn't hear a

23 reference to the holistic factors during Sprint's

24 presentation to you today.  What we heard was this notion of

25 functional, logical, physical.  And there was comment about

1   how what Dr. Akl's saying is not in the patent.  Holistic

2   characteristics are not in the patent -- first of all, that's

3   not true, again, the patent talks about functions.  The claim

4   construction refers to functions.  The standard refers to

5   functions.  Dr. Akl told you there's nothing about these

6   holistic characteristics in the patent.  We talked about

7   that.  Function, logical, physical, not in the patent.

8          And then we had these Sprint employees and what

9   these Sprint employees and this came up in Sprint's

10  presentation to you just now, what they do is they look at

11  what elements needed for core services.  And we know the

12  mantra by now of what's these witnesses say the core services

13  are.  Voice, messaging, data.  These are the options that we

14  have.  We've got Dr. Akl with his analysis and then all these

15  other columns are Sprint's.  What's the empty chairs?  Those

16  are all the people that Sprint's counsel said were not here

17  to testify before you.  So, everybody else, this is everyone

18  else.  And I'm just going to put a question mark there.  I

19  don't know what they would say core network elements are and

20  I don't think it's relevant.

21         I also know that we sat here for two and a half

22  weeks already to call in more witnesses to put in front of

23  you to talk about what they think core network elements are

24  is no more advancing the ball than listening to Sprint

25  employees take up your time for a day and a half, telling you

1   what they think core network elements are.

2          Here's the point.  None of these people read the

3   patent.  None of those people applied the claim construction.

4   I can't tell you these people didn't read the patent, because

5   I don't know who they are, but I'll submit to you it doesn't

6   matter.  These people, there's only two of them, but one of

7   them has an opinion that's morphing, are the only ones that

8   read the patent.  That's what matters in a patent case, is

9   reading the patent, applying the patent to the accused

10  services.  That's what matters in a patent case.  If you

11  listen to the jury instructions today, that's what Judge

12  Dubois is going to tell you.

13         Mr. Dyer, can you put up Sprint's counsel's -- I'm

14  just going to move this out of the way so I don't knock it

15  over.

16         MR. FINKELSON:  Our Slide 7.

17         MR. GOETTLE:  Thank you.  There's a false dichotomy

18  in this case that I did not pick up until -- your Honor, can

19  I go up to the screen?

20         THE COURT:  Yes, you may.

21         MR. GOETTLE:  It's a false dichotomy in this case

22  that I did not pick up on earlier in this case.  There are

23  not two options in implementing a messaging server under the

24  MMS standard, this is the MMS standard.  There are not two

25  options.  There are five.  There are scenarios 1 and 2 and

Mr. Goettle                              112

1    there's scenario 5, okay.  But the key language here on my

2    point is what is not highlighted here.  It says some network

3    operators may wish to implement the MMS functionality within

4    the core network, scenarios 1 and 2.  And what I heard today,

5    I didn't pick up on it earlier in this trial that I heard

6    today.

7              So, there's one option, you put it in your core

8    network or the other option is you make it a third-part

9    service provider.  Those are not the only two options.  It's

10   right here.  It continues on and says, whereas others may

11   wish to place the MMS functionality on the periphery of the

12   core network.  Others may wish to have MMS functionality

13   outside the core network, unlike scenarios 1 and 2 where it's

14   implemented inside the core network.  You can have it inside

15   the core network, you can have it outside the core network,

16   it is functionality that we're talking about or you can

17   implement it as a third-party service provider.  So, there's,

18   at least, three options in here.

19             Now, I'll submit to you that what Dr. Akl is telling

20   you is when have the MMS functionality on the periphery of

21   the core network, that's when you don't implement it in the

22   core network elements.  That's what that's saying.  Mr. Dyer,

23   can you put up DX-16, the MBMO agreement.  This came up again

24   and I talked about it this morning, but I think making the

25   point a little bit more crystallized could be helpful.  The

1    MBMO agreement has a definition.  Not a construction, I
2    almost said construction.  A construction is a definition in
3    a patent for a patent claim.  This is a definition in a
4    business agreement for core network and core network element
5    enablers.  They're mutually exclusive. How do you know that?
6         Because in core network it covers transmission.
7    Infrastructure that provides transmission.  Core network
8    enablers are non-transmission elements.  So, if you're this,
9    if you're a core network enabler, you are not in the core
10   network.  Okay and now can we got to the Schedule 3, then
11   later on in that, she specifies what are core network
12   enablers?  In E, home location register.  Home location
13   register is a core network enabler.  Mr. Dyer, now go back to
14   the definitions again.  Does not include home location
15   register, which everybody in this case agrees are core
16   network elements, because they are non-transmission elements.
17   Home location registers are databases that you do look ups
18   for.  They don't receive messages and send them along, they
19   don't receive phone calls and send them along, but they're
20   core to the cellular network because you need to know where
21   the phone is in order to connect the call, just like I said
22   this morning.
23        The definition is in a business agreement, it
24   doesn't matter at all.  But even if you're inclined to go
25   look at it, what Comcast supposedly agreed to in 2008, two

1    years before it had the patent, two years before it was

2    accusing -- or years before it was accusing Sprint of

3    infringement, if you're inclined to go look at it, consider

4    that the definition is, again, over-inclusive,

5    under-inclusive and included in a business contract.  Not in

6    the patent, not in the claim construction.

7            Can you put up a slide that begins with 3.  I

8    apologize for this, I didn't realize -- this is a slide, by

9    the way, I should step back.  Because I did this and I'm

10   explaining to you why Sprint employees don't matter and I

11   explained this earlier, they don't matter -- they wouldn't

12   matter anyway in a patent case.  What fact witnesses think

13   about terms that happen to also be used in the patent, is

14   irrelevant.  What fact witnesses are for in a patent case, is

15   telling you how systems work, telling you how networks work.

16   Perfectly fine to rely on fact witnesses to tell you about

17   the accused product or services.  Fact witnesses are not fine

18   to do word matching.  You don't go to a fact witness who

19   happens to use a common work like core and then match it up

20   to the claim and say, wa-la, no infringement.

21           And I showed you Mr. Lanning's testimony.  He said,

22   I showed it to you this morning, he said could be consistent

23   with the Court's construction.  Might not be.  May or may not

24   is the words he used, may or may not.  What that means is

25   it's irrelevant what they say.  These are the same fact

1   witnesses, these types of witnesses, again, are the ones that

2   writing the documents that you saw again today.  If the

3   testimony on the stand is not informative to you on how to

4   apply to the claims to the accused products, then the

5   documents these people are writing, using the same

6   terminology about core to voice messaging and data services

7   is equally irrelevant in your analysis.

8          And then we have Mr. Hoelzle's testimony that

9   counsel showed you today and he's talking about the messaging

10  servers in Sprint's network, whatever that is and he's saying

11  they're basically the brains of the operation, so they're

12  responsible for routing and delivering of messages to and

13  from Sprint subscribers.  I showed you this morning,

14  messaging servers store and forward and make clarity.  That's

15  what they do.  Forwarding, maybe that's routing, it doesn't

16  matter.  But again, messaging servers only forward to two

17  places and they're told which place to go.  They either

18  forward to the inner-carrier gateway or the forward to the

19  MSC, that they're told by the HLR which MSC to send it to.

20  That's it.  They are not the brains of any operation.  What

21  they are is core to messaging, a service that Sprint

22  provides.  They're core for that.

23         How do you know that?  Well, if you get rid of the

24  messaging server, you can't send messages.  But that doesn't

25  mean that they're core to Sprint's cellular network, which is

1    what the claim construction and this patent is about.  What

2    is core to the cellular network.  So, this testimony is

3    irrelevant.  It's a red herring.

4           Okay and Mr. Golla's testimony -- so, this one's

5    showing to you, Mr. Golla said and was the messaging LDAP

6    that Sprint used for anything other than messaging, Mr.

7    Golla?  No, only messaging servers access messaging LDAP.

8    Not true.  And by the way -- never mind.  Here's, I've got

9    two different pieces of testimony for you.  Here is Dr.

10   Dwoskin.  Dr. Dwoskin testified on February 3, 2017, it feels

11   like a lifetime ago, at line -- page 54, line 17.

12          MR. FINKELSON:  Your Honor?

13          MR. GOETTLE:  Yes, you don't want to see it?

14          MR. FINKELSON:  Well, if it's not in evidence, I

15   don't think it's appropriate to --

16          MR. GOETTLE:  No, no, this is his testimony in this

17   case.

18          MR. FINKELSON:  I thought you were referring to a

19   prior deposition testimony.

20          MR. GOETTLE:  No, no, I'm sorry.

21          MR. FINKELSON:  Go ahead, I apologize for the

22   interruption.

23          MR. GOETTLE:  See how long ago February 3rd feels

24   like to Sprint's counsel.  I'm with them.  I asked him, yes,

25   "Question:  Okay, what similar to the question I asked you

Mr. Goettle                    117

1    about the SPS, what clients, I think you referred to them,

2    but what Sprint components or computers call to the messaging

3    LDAP for data?

4            "Answer:  So, similarly to before, there were SSMCs

5    and MMSCs that query the MLDAP, as well as other components,

6    such as Web Mail, Short Mail, Soap servers, there are a

7    number of them that make querys to the messaging LDAP."

8            Unrefuted testimony in this case.  Never cross-

9    examined on it, no other witnesses come in here and said that

10   what Dr. Dwoskin said is wrong.

11           And then similarly, Mr. Lanning testified on this

12   subject at page -- this was on February 8, 2017 at page 117,

13   line 21.  I said -- oh, no, this is his answer.  "You'll see

14   another highlighted database up at the top, that's the

15   message LDAP, that is the predecessor database to the SPS

16   database."  That's what the messaging LDAP is, just like Dr.

17   Dwoskin testified.  The predecessor to the subscriber profile

18   system that even Sprint admits is a core network element of

19   its cellular network.

20           Okay, let's go to validity in Sonera.  There were

21   two comments made during -- kind of at a higher level about

22   invalidity in this case made about -- there was an

23   implication that it is only Comcast's job or Nokia's job to

24   present prior art to the patent office during the review of

25   the patent or the patent application.  So, Nokia filed the

Mr. Goettle                                    118

1   patent application originally and again, Comcast filed for a

2   re-examination.  The patent office does its own searching.

3   That's what you were told in this case.  The patent office

4   does it's own searching.  It's not up to just the people

5   filing for the patent applications to tell the patent office

6   about all the prior art.  And I heard a number of kind of

7   comments that may have hinted at a notion, some sort of an

8   implication that Comcast didn't provide Sonera to the patent

9   office.  Nokia didn't provide something of Sonera to the

10  patent office.  But it's up to the patent office to do

11  searching.  They search prior art, so I just want to make

12  sure that's abundantly clear.

13         And then on this slide, before I talk about why

14  Sonera does not anticipate the claims.  On this slide -- your

15  Honor, can I approach the --

16         THE COURT:  You may.

17         MR. GOETTLE:  There was discussion today that you

18  were told that Dr. Akl took issue with drawing this box

19  around these two components, these two elements.  Dr. Akl

20  never took issue with that.  But counsel said that he took

21  issue with it and then he showed you testimony where Dr. Akl

22  had said last week or the week before, that it's okay to

23  think about a messaging server in terms of the functionality,

24  even if it's functionality spreading across two different

25  systems.  He never took issue with Dr. Polish doing this box

1    and counsel, when he told you that, he didn't show you any

2    testimony from yesterday when he said that that happened.  He

3    didn't show you any testimony where Dr. Akl actually did take

4    issue with that.  He never did.

5            Okay and now about Sonera, here's the rub in

6    Comcast's view as to all of the prior art.  Here's the rub.

7    The rub is this, in both Sonera and the other reference that

8    we're talking about, Viaresto, this is the component that's

9    sending the inquiry, the SMS-GMSC.  MSC here at the end, it

10   is undisputed in this case, that's a mobile switching center,

11   a core network element of a GSM network.  This patent is

12   talking in terms of the GSM network.  This is a core network

13   element of a GSM network.  This Number 1 coming down, that's

14   the inquiry.  The claim requires sending an inquiry from a

15   messaging server, the messaging server external to the

16   cellular network.  This is inside the cellular network, this

17   is how the GSM networks worked in the prior art.  It was the

18   SMS-GMSC that sent an inquiry for information about the

19   phone.  This is an, you can think of it as an internal

20   inquiry.  It's not coming from outside the network in.  It's

21   inside the network.

22           So, Dr. Akl is not taking an issue with drawing this

23   box around it.  What he's taking an issue with is this notion

24   that this query is from outside the cellular network.  It's

25   not.  And to be honest with you, I listened to Dr. Polish, I

1   don't even think he's saying otherwise.  What Dr. Polish is

2   saying is, yeah, well, okay fine. But it would have been

3   known that you could put the query from here.  You could have

4   the query coming from this stored forward component that's

5   not a core network element.  He's saying you could know this

6   -- a skilled artisan would have known that you could put the

7   inquiry here.

8          Anticipation requires that a single reference

9   disclose each and every limitation of the claim.  That's a

10  requirement of anticipation, you're going to here that in the

11  instructions today.  It's a requirement.  Sonera nowhere

12  teaches that you can have this inquiry coming from this SMSC.

13  Never says it.  Dr. Polish didn't point to anything that said

14  that.

15         And now for this notion that, well, maybe it would

16  have been obvious that you had.  As Dr. Akl explained, you

17  could think of this as a recipe.  A recipe for baking a cake,

18  your grandmom's best cake is going to use the same

19  ingredients as other cakes probably.  It's very common,

20  right?  But it's all in the mixing, it's all in the matching.

21  What you're not allowed to do in an obviousness analysis,

22  look at the claim first and then go to the prior art and mix

23  and match different pieces of the prior art and say, oh, I

24  got it.  I got all the limitations here except for one.  I

25  got it over here in this one.  If I put them together I have

Mr. Goettle                          121

1    the claimed invention.

2           That's all hindsight and Judge Dubois is going to

3    instruct that hindsight is not an obviousness analysis.  It

4    is impermissible to perform hindsight in an obvious analysis.

5    What you're supposed to do is look at these two pieces of

6    prior art and see if there is a reason for a skilled artisan

7    to put them together.  Is there a reason for grandmom to use

8    sour cream and butter?  Is there a reason to do it?  Not was

9    it known in the prior art that you could use sour cream and

10   butter in a cake and I'll probably lay out that I'm not much

11   of a baker.  I imagine that you don't put sour cream in a

12   cake, but there has to be reason to put them together.  It's

13   not enough that the elements individually are known.  Is

14   there a reason to put them together?  Dr. Polish gave you no

15   reason for why it would somehow improve Sonera to move this

16   inquiry function to this box.  None, not invalid.  Not clear

17   and convincing.  Does not provide an abiding conviction,

18   that's the standard Judge Dubois is going to present to you.

19   It's an abiding conviction that Sonera discloses the

20   elements, either alone or in combination with the other arts.

21   There's no abiding conviction.

22          Which reminds me, the other big point I wanted to

23   make, Comcast is not resting on its laurels in this

24   invalidity case because the patent got re-examined.  That's

25   what counsel for Sprint told you.  We're not resting on our

1  laurels, we're not telling you, you should just knock off

2  Sonera because the patent got re-examined.  What I'm telling

3  you, what Comcast is telling you, what Dr. Akl told you, is

4  Sonera doesn't anticipate because the inquiry is inside.  And

5  there's no reason why this would somehow be improved by

6  having the inquiry be put here.  There's no reason, except

7  it's in the claim and using hindsight to get there.

8          And Dr. Akl had other reasons why Sonera doesn't

9  anticipate either.  Sonera is about mapping, all right,

10 sending a text message to like a 1-800, I think if it as

11 sending it to 1-800GetFlowers and then it gets forwarded to

12 an employee's cellphone, that text message.  That's what

13 Sonera is about.  Well, that employee's cellphone is a phone

14 number.  The claim requires mapping from an external

15 identifier to an internal identifier.  The internal

16 identifier may, but need not be disclosed outside a cellular

17 network.  That's a claim construction term in your binder.

18 May, but need not be disclosed outside a cellular network.

19 Phone numbers are disclosed outside cellular networks, that's

20 the whole purpose of having a phone.  So, it doesn't meet

21 that limitation.

22          And as Dr. Akl explained, the claim also requires

23 indicating the information with the aid of said first

24 identifier in the response message that goes back. It's just

25 not disclosed at all in Sonera.  And Dr. Polish kind of waved

1    his hands on that and said, it's kind of there, but it's

2    super technical, so he didn't explain it.  It doesn't present

3    an abiding conviction of invalidity.

4            And just real quickly, let's go to the Viaresto,

5    which is also 40-something.  I just want to point out that

6    Viaresto suffers the same affliction as Sonera.  This is

7    what's doing the inquiry in Viaresto.  It's an internal

8    inquiry.  This is misleading.  This green arrow is not an

9    inquiry. It doesn't happen.  It's not disclosed in Viaresto.

10   That's what Dr. Akl told you.  There's no disclosure in this

11   document that there's an inquiry coming in and then

12   something, some magic happens.  Never disclosed.  This, the

13   number four is actually blocking it, but this is called an

14   SMS gateway, which the patent describes as being SMS-GMSC.

15   It's the same scenario as Sonera.  The inquiry is from here

16   and that's an internal inquiry.  So, combining this with

17   Sonera doesn't get you to the invention.  Certainly doesn't

18   get you to an abiding conviction of invalidity.

19           All right, damages, can we go back to the slide

20   deck, over on the slide deck.  At low 50s at this point.  The

21   devil is in the details, ladies and gentlemen.  Ms. Riley

22   said all of the agreements produced by Sprint in this case,

23   are lump sum payments, that's true.  And then she referred to

24   what they are, the settlements of litigation are lump sum.

25   The RPX and Allied Signal Trust are lump sums, as well.  But

Mr. Goettle                                 124

1    she never said they're comparable. It doesn't matter that

2    they're in the case, the question is whether they're

3    comparable.  Are they comparable in the hypothetical

4    negotiation?  And Ms. Riley said they are not.  Why?  Because

5    settlements of litigation are not comparable to the

6    hypothetical negotiation where Sprint is saying to Nokia, we

7    infringe, the patent is valid, we need a license, we need to

8    come to terms right now.  And in terms of these RPX and

9    Allied Signal Trust, she explained that to you.  Those are

10   entities that you kind of subscribe to, to get access to

11   patents or maybe to not have -- you get a license under the

12   patent, I'll put it that way.  Those are done for defensive

13   purposes.  Just like Comcast's patent strategy, they're done

14   for defensive purposes.  That's not comparable to the

15   hypothetical negotiations that I just described.

16          Next slide, there's no spike.  There's no

17   skyrocketing.  This is misleading.  This did not happen.

18   What happened in the hypothetical negotiation was, the

19   parties were figuring out what the license arrangement would

20   be between Nokia and Sprint.  Dr. Cox even told you that in

21   the hypothetical negotiations, they didn't know about the

22   $600,000 sale price.  He told you that.  So, why is this

23   misleading?  Because in the hypothetical negotiations, it

24   wouldn't go up and come back up.  It would go up and keep

25   going up, because message use kept going up.  This is

1   misleading, there's no spike, there's no skyrocket.  This is

2   combining the hypothetical negotiation with what happened

3   when Comcast bought the patent from Sprint, I mean, from

4   Nokia.  Two different scenarios, they don't correlate right

5   like this.  Overly simplistic and it's misleading.

6          And as for this, this number 2, value of two out of

7   five as the value of the patent.  Again, we have to think

8   about what was going on in 1999?  Dr. Akl explained it to

9   you, I said it in opening, it's hard to send a text message

10  in 1999, using cellphones that mirrored the house phones,

11  with the numbered keypad.  Hard to send an SMS message and

12  you saw the chart that said that in the late-'90s, they

13  didn't even measure revenue based on text messaging because

14  it wasn't a prevalent function.

15         So, was it easy to design around a patent in 1999?

16  Sure it was, because it was already known in the art that you

17  could have external messaging servers -- internal messaging

18  servers, excuse me.  It was already known in the prior art

19  that you could have internal messaging servers.  So, without

20  a high volume, having an internal messaging server wasn't

21  presenting a problem.  What Ms. Ahou, the inventor saw was,

22  oh, this messaging volume could go up and we should get that

23  messaging server as a rule, have it outside the cellular

24  network and deal with the problems that creates through what

25  I described earlier, through the mapping, through having the

Mr. Goettle                              126

1  core network elements have to contribute a little bit of

2  effort.

3          But in 1999, it was easy to design around because

4  messaging wasn't big.  So, it makes sense that at that time,

5  it was ranked two out of five.  And then I'm going to

6  conclude on this house -- misleading, overly simplistic.

7  Here's why, it ignores the hypothetical negotiation, the

8  terms of the hypothetical negotiation.  In the hypothetical

9  negotiation, Sprint's already in the house and Sprint's not

10 leaving.  Sprint can't go to the house next door.  It can't

11 rent a room in another town. It's got to stay in this house,

12 that's the confines of this hypothetical negotiation.

13         Comcast, in 2010, could move into this house or move

14 into another house.  Could move into no house.  Could walk

15 away from buying the patent altogether.  And well -- I'll

16 leave it at that, but then when you think about the condition

17 of Nokia again going to the burning platforms -- the burning

18 platforms art on the Wall Street Journal that we heard about.

19 In 2010, when Comcast bought it, the house was on fire and

20 somebody's got to jump.  That's not the case at the time of

21 the hypothetical negotiation.  Nokia was in very stable

22 financial condition in 2005, a strong bargaining position in

23 2005.  This is overly simplistic analysis, this analogy that

24 just doesn't fit this case.

25         So, I've concluded.  I think I've hit all the

127

1   points.  Certainly, I hit a lot of them, all the points I

2   wanted to make.  I very much appreciate your time and

3   attention as I said earlier.  Thanks.

4           THE COURT:  Thank you, Mr. Goettle.  While you're

5   up, Mr. Goettle, I wanted you to move that exhibit.  I think

6   what we'll do is stand up for a bit before I deliver my

7   charge.

8           (Pause.)

9                           JURY CHARGE

10          THE COURT:  All right.  I'm now going to instruct

11  you on the law.  You may, of course, take notes, but keep in

12  mind that I will be giving you written copies of the charge.

13  So, after I deliver it, you'll have a notebook much like

14  mine.  You'll have three notebooks.  Also the charge that I

15  will give you has a table of contents.  So, if you're

16  addressing a particular issue, either infringement or

17  invalidity and want to see what I said about the law on those

18  subjects and that's just by way of example, you can go to the

19  table of contents and see what I've said on the law.

20  Hopefully, that will answer your question, but if not, you

21  can send me a note asking the question.

22          All right, now that you've heard all the evidence to

23  be received in the trial and each of the arguments of

24  counsel, it is my duty to give you the final instructions of

25  the Court as to the law applicable to the case.  These

1  instructions will guide you in your decisions.  All of the

2  instructions of law given to you by me, those given at the

3  beginning of the case, those given to you during the trial

4  and these final instructions, must guide and govern your

5  deliberations.

6        It is your duty as jurors to follow the law as

7  stated in all of my instructions.  And to apply these Rules

8  of Law to the facts as you find them from the evidence

9  received during the trial.  Counsel have quite properly

10  referred to some of the applicable rules of law in their

11  closing arguments.  If you note any difference between the

12  law as stated by counsel than as I have stated in these

13  instructions, you should, of course, be governed by my

14  instructions.  Moreover, you are not to single out any one

15  instruction alone as stating the law.  Rather, you must

16  consider my instructions as a whole in reaching your

17  decision.

18        Neither are you to be concerned with the wisdom of

19  any Rule of Law I cover in my instructions.  Regardless of

20  any opinion you may have as to what the law ought to be, it

21  would be a violation of your sworn duty to base any part of

22  your verdict upon any other view or opinion of the law than

23  that given in these instructions.

24        Justice through trial by jury must always depend

25  upon the willingness of each individual juror to seek the

1  truth from the same evidence presented to all of the jurors

2  here in the courtroom and to arrive at a verdict by applying

3  the same Rules of Law as I am giving you now.

4       Now some instructions on your duties as a jury.  You

5  have two duties.  Your first duty is to decide the facts from

6  the evidence that you have heard and seen in the courtroom.

7  that is your job and yours alone.  I play no part in finding

8  the facts.  You should not say anything I may have said or

9  done during the trial as indicating what I think of the

10 evidence or what I think your verdict should be.

11      Your second duty is to apply the law that I give you

12 to the facts as you find the facts.  You all must agree, that

13 means your verdict must be unanimous.  My role now is to

14 explain to you the legal principles that must guide you in

15 your decisions.  You must apply my instructions carefully.

16 Each of the instructions is important and you must apply all

17 of them.  You must not substitute or follow your own notion

18 or opinion about what the law is or ought to be.  You must

19 apply the law that I give to you whether you agree with it or

20 not.  Whatever your verdict, it will have to be unanimous.

21 All of you will have to agree on it or there will be no

22 verdict.

23      In the jury room, you will discuss the case among

24 yourselves, but ultimately, each of you will have to make up

25 his or her own mind.  This is the responsibility that each of

Jury Charge                     130

1    you has and you cannot avoid.

2           During your deliberations you must not communicate

3    with or provide any information to anyone else by any means

4    about the case.  You may not use any electronic device or

5    media, such as the telephone, a cellphone, a SmartPhone,

6    IPhone, Blackberry or computer, the internet, any internet

7    service, any text or instant messaging service, any internet

8    chat room, blog or website such as FaceBook, MySpace,

9    LinkedIn, Utube or Twitter to communicate to anyone any

10   information about the case or to conduct any research about

11   the case, until I accept your verdict.  In other words, you

12   cannot talk to anyone on the phone, correspond with anyone or

13   electronically communicate with anyone about the case.  You

14   can only discuss the case in the jury room with your fellow

15   jurors during deliberations.

16          And on that note, if any of you must absent yourself

17   from the jury room, such as to the restrooms, you must stop

18   deliberating and wait until that juror has returned.  You

19   must deliberate as a jury of eight.  You can't deliberate in

20   groups.  You may not use electronic means to investigate or

21   communicate about the case, because it is important that you

22   decide the case based solely on the evidence presented in the

23   courtroom.  I must add that I have said that so many times,

24   you can probably lecture on the duty of jurors not to do what

25   I'm talking about and telling you, you cannot do.  You are

1  only permitted to discuss the case with your fellow jurors

2  during deliberations, because they have seen and heard the

3  same evidence you have seen and heard.

4         In our judicial system, it is important that you are

5  not influenced by anything or anyone outside of the

6  courtroom.  You should perform your duties as jurors fairly

7  and impartially.  Do not allow sympathy, prejudice, fear or

8  public opinion to influence you.  You should also not be

9  influenced by any person's race, color, religion, national

10  ancestry, gender, sexual orientation, profession, occupation,

11  celebrity status, economic circumstances or position in life

12  or the community.

13         I'm going to instruct you on burdens of proof.

14         In any legal action facts must be proven by a

15  required standard of evidence known as the burden of proof.

16  In a patent case such as this there are two different burdens

17  of proof, the first called preponderance of the evidence, the

18  second is called clear and convincing evidence.

19         This is a civil case in which Comcast is accusing

20  Sprint of patent infringement.  Comcast has the burden of

21  proving patent infringement by what is called a preponderance

22  of the evidence.  That means Comcast has to prove -- has to

23  produce evidence which when considered in light of all of the

24  facts leads you to believe that what Comcast claims is more

25  likely true than that.  To put it differently, if you were to

1  put Comcast's and Sprint's evidence on opposite sides of the

2  scales of justice, the evidence supporting Comcast's claims

3  would have to make the scales tip in favor of Comcast -- ever

4  so slightly, but they must tip in favor of Comcast for

5  Comcast to have met its burden of proving infringement by a

6  preponderance of the evidence.

7          Sprint asserts in this case that Comcast's '870

8  Patent is invalid.  Sprint has the burden of proving that the

9  patent in suit is invalid by clear and convincing evidence.

10 Clear and convincing evidence is evidence that produces an

11 abiding conviction that the truth of a factual contention is

12 highly probable.  Proof by clear and convincing evidence is

13 thus a higher burden than proof by a preponderance of the

14 evidence.

15         And as an example, if you get back to the jury room

16 and have an issue about the proof, you can look at the table

17 of contents, go to page 7 and there it is.

18         Finally on burden of proof.  You may have heard of

19 the term proof beyond a reasonable doubt.  That is a stricter

20 standard of proof than either standard I have just described

21 and it applies only in criminal cases.  It does not apply in

22 civil cases such as this one, so you should just put it out

23 of your mind.

24         Now I'm going to talk briefly about the evidence.

25 I'm not going to review the evidence, I'm going to talk about

Jury Charge                                133

1  categories of evidence.  The evidence from which you are to

2  find the facts in this case consists of the following:  one,

3  the testimony of witnesses; two, documents and other things

4  received as exhibits; three, any facts that are stipulated,

5  that is formally agreed to by the parties; and any facts that

6  are judicially noticed, that is facts I told you you must

7  accept as true without other evidence.  I don't think we have

8  any judicial notice issues in this case.

9          MR. RIOPELLE:  No, your Honor.

10         THE COURT:  Well, I think Comcast agrees, yes.

11         MR. GOETTLE:  Agreed, we would agree, your Honor.

12         THE COURT:  The following things are not evidence:

13  statements, arguments and questions of lawyers or the parties

14  in the case.  As I told you, it's the question and the answer

15  taken together which constitute evidence.  So if a question

16  is asked and the witness answers no, you have to take the

17  question and the answer together.

18         Objections by lawyers are not evidence.  Lawyers are

19  required to make objections if they think the question or

20  other evidence sought to be presented to you is inadmissible

21  under the Rules of Evidence.  We haven't talked much about

22  that, but the Rules of Evidence are pretty thick.  So you

23  cannot consider objections as evidence.

24         Any testimony I told you to disregard is not

25  evidence and I think there were one or two examples of that.

1   And anything you may have seen or heard about the case

2   outside the courtroom is not evidence.

3          You must make your decision based only on the

4   evidence that you see and hear in court.  Do not let rumors,

5   suspicions or anything else that you have seen or heard

6   outside of court influence your decision in any way.

7          You should use your common sense in weighing the

8   evidence.  Consider it in light of your everyday experience

9   with people and events, and give it whatever weight you

10  believe it deserves.  If your experience tells you that

11  certain evidence reasonably leads to a conclusion, you are

12  free to reach that conclusion.

13         There are rules that control what can be received in

14  evidence.  When a lawyer asks a question or offers an exhibit

15  into evidence and a lawyer on the other side thinks that it

16  is not permitted by the Rules of Evidence, that lawyer may

17  objection, and I mentioned that a moment ago.  This simply

18  means that the lawyer is requesting that I make a decision on

19  a particular rule of evidence.  You should not be influenced

20  by the fact that an objection has been made and, as I told

21  you, objections to questions are not evidence.  Lawyers have

22  an obligation to their clients to make objections when they

23  believe that evidence being offered is improper under the

24  Rules of Evidence and you should not be influenced by the

25  objection or by my ruling on it.  If the objection was

1   sustained, ignore the question; if it was overruled, treat

2   the answer like any other answer.  If you were instructed

3   that some item of evidence is received for a limited purpose,

4   you must follow that instruction.

5          Also certain testimony or other evidence may have

6   been ordered stricken from the record and you were instructed

7   to disregard the evidence.  I mentioned this a moment ago,

8   but if that occurred, do not consider any testimony or other

9   evidence that was excluded by me and do not speculate about

10  what a witness might have said or what an exhibit might have

11  shown in that situation.

12         Now, there are two general categories of evidence,

13  direct and circumstantial evidence.  An example of direct

14  evidence is when a witness testifies about something that the

15  witness knows through his own senses, something the witness

16  has seen, felt, touched, or heard or did.  If a witness

17  testified that he saw it raining outside and you believed

18  him, that would be direct evidence that it was raining.

19  Another form of direct evidence is an exhibit where the fact

20  to be proved is its existence or current condition.

21         Now, the other type of evidence is circumstantial

22  evidence.  Circumstantial evidence is proof of one or more

23  facts from which you can find another fact.  An example of

24  that, if someone walked into the courtroom wearing a raincoat

25  covered with drops of water and carrying a wet umbrella, that

1  would be circumstantial evidence from which you could

2  conclude that it was raining outside.  And direct evidence of

3  rain would be someone who was outside in the rain who

4  observed it and who told you about the rain.

5          In short, you should consider both kinds of

6  evidence.  The law makes no distinction in the weight to be

7  given to either direct or circumstantial evidence.  You and

8  you alone are to decide how much weight to give to any

9  evidence.

10         You are the sole judges of each witness' credibility

11 or believability.  You should consider each witness' means of

12 knowledge, strength of memory, opportunity to observe, how

13 reasonable or unreasonable the testimony is, whether it is

14 consistent or inconsistent, whether it has been contradicted,

15 the witness' biases, prejudices or interests, the witness'

16 manner or demeanor on the witness stand, and all

17 circumstances that according to the evidence could affect the

18 credibility or believability of the testimony.

19         If you find the testimony to be contradictory, you

20 must try to reconcile it if reasonably possible so as to make

21 one harmonious story of it all, but if you cannot do this

22 then it is your duty and privilege to believe the portions of

23 testimony that in your judgment are most believable and

24 disregard any testimony that in your judgment is not

25 believable.

1          In determining the weight to give to the testimony
2     of a witness, you should ask yourself whether there was
3     evidence tending to prove that the witness testified falsely
4     about some important fact, or whether there was evidence that
5     at some other time the witness said or did something, or
6     failed to say or do something, that was different from the
7     testimony he gave at trial.

8          You should remember that a simple mistake by a
9     witness does not necessarily mean that the witness was not
10    telling the truth.  People may tend to forget things or to
11    remember other things incorrectly or inaccurately.  If a
12    witness has made a misstatement, you must consider whether it
13    was simply an innocent lapse of memory or an intentional
14    falsehood, and that may depend upon whether it concerns an
15    important fact or an unimportant detail.

16         Moreover, the weight of the evidence to prove a fact
17    does not necessarily depend on the number of witnesses who
18    testify.  What is more important is how believable the
19    witnesses were and how much weight you think the testimony
20    deserves.

21         Now, we've heard from a number of expert witnesses
22    in the case.  When knowledge of technical subject matter may
23    be helpful to the jury, a person who has special training or
24    experience in that technical field, he is a called an expert
25    witness, is permitted to state his or her opinion on those

1   technical matters; however, you are not required to accept

2   that opinion.  As with other witnesses, it is up to you to

3   decide whether to rely upon it.

4           In weighing expert testimony, you may consider the

5   expert's qualifications, the reasons for the expert's

6   opinions, and the reliability of the information supporting

7   the expert's opinions, as well as the other factors I have

8   previously mentioned for weighing testimony of any other

9   witness.  Expert testimony should receive whatever weight and

10  credit you think appropriate given all of the other evidence

11  in the case.  You are free to accept or reject the testimony

12  of experts just as with any other witness.

13          Now, the parties in the case have stipulated, that's

14  a fancy legal word for agreed to certain facts, not very

15  many.  Those facts have been read to you during the trial and

16  are as follows:  first, the plaintiff is Comcast Cable

17  Communications, LLC, a Delaware limited liability company

18  with its principal place of business in Philadelphia,

19  Pennsylvania.  The Defendant Sprint Spectrum LP is a limited

20  partnership organized under the laws of the State of Delaware

21  with its principal place of business in Overland Park,

22  Kansas.

23          The patent at issue in this case is U.S. Patent No.

24  6,885,870, entitled "Transferring of a Message."  We will

25  refer to the patent and have consistently referred to the

1   patent in the case as the '870 Patent.

2           The application for the '870 Patent, U.S. Patent

3   Application No. 09/745, 756 was filed on December 21st, 2000

4   -- is that a correct date?

5           MR. RIOPELLE:  Yes, your Honor.

6           THE COURT:  The application named Auti Ahou as

7   inventor and claimed priority to finish Application No.

8   19992783, filed on December 23rd, 1999.

9           Five, the '870 Patent issued on April 26th, 2005 and

10  that is the date -- and you'll hear this later, but that is

11  the date on which the hypothetical negotiation will take

12  place as I instruct you on it.

13          Comcast -- 6, Comcast purchased the '870 Patent from

14  Nokia Corporation on June 30th, 2010 and has owned the '870

15  Patent since then.

16          Seven, on October 4th, 2011, the Patent and

17  Trademark Office issued an ex parte reexamination.  That

18  means only one party was involved and that was Comcast, an ex

19  parte reexamination certificate for the '870 Patent.  You

20  must treat these facts as having been proved for the purposes

21  of this case.

22          Now you've heard deposition testimony in this case.

23  It's been read to you and you've seen videos of some

24  deposition testimony, I'll now instruct you on how you should

25  consider that testimony.

1           First, a deposition is as I have explain during the

2      trial the sworn testimony of a witness taken before trial.

3      The witness is placed under oath and swears to tell the

4      truth, and lawyers for each party may ask questions.

5           A court reporter is present and records the

6      questions and the answers.  The deposition may also be

7      recorded on videotape.   During the trial certain testimony

8      was presented to you through depositions that were

9      electronically played.  This testimony must be given the same

10     consideration you would give it had the witness personally

11     appeared in court.  Like the testimony of a live witness, the

12     statements made in the deposition are made under oath and are

13     considered evidence that may be used to prove particular

14     facts.

15          Deposition testimony is entitled to the same

16     consideration as testimony presented by a live witness and is

17     to be judged, insofar as possible, in the same as if the

18     witness had been present to testify.

19          Now, deposition testimony was also used in another

20     way.  Deposition testimony has been read into the record, on

21     cross-examination of certain witnesses, that testimony was

22     used to each something the witness said during his or her

23     testimony and is not in itself evidence.

24          Examples of that.  When a witness on the witness

25     stand testified to something there were several occasions

1  during the trial when on cross-examination the examining

2  attorney would say "do you remember testifying at your

3  deposition a certain on a certain date, do you remember this

4  question and this answer."  And in some cases, and it's for

5  you to determine, the answer might have been different than

6  the answer given by the witness to the same question on the

7  witness stand.  That type of deposition testimony, the use of

8  that type of deposition testimony is to impeach or discredit

9  the witness.  And you can use that deposition testimony only

10  for that purpose, to determine whether what the witness said

11  on the witness stand was true or not, or true in part and

12  untrue in part.

13        And finally on this issue, you may rely on

14  deposition testimony used to impeach a witness to judge the

15  credibility or believability of the witness' testimony.

16        Now, during the course of the trial you've seen many

17  exhibits and many of these exhibits were admitted as

18  evidence, you will have these admitted exhibits in the jury

19  room for your deliberations.

20        And what we're going to do, we're going to present

21  them to you in cartons and because looking at a carton of

22  exhibits is not going to be very helpful, we're going to give

23  you exhibit lists, one for Comcast and one for Sprint, and

24  hopefully you'll be able to find an exhibit that you might

25  want to see by hopefully two exhibit lists.  Also you might

1    have taken notes as to certain exhibit numbers and the

2    exhibits will be arranged in chronological order.

3           Now, those are exhibits received in evidence.  Other

4    exhibits, including charts and animations presented by the

5    attorneys and witnesses, including the slides that were used

6    during the testimony of the expert witnesses, were offered to

7    help illustrate the testimony of the various witnesses and

8    exhibits received as evidence.  These illustrations are

9    called demonstrative evidence, demonstrative exhibits.

10   They've been received by the Court, but have not been

11   admitted as evidence and should not be considered as

12   evidence.  Rather, it is the underlying testimony of the

13   witnesses and the exhibits admitted in evidence that are the

14   evidence in the case.

15          Now, with respect to the slides, it's what the

16   witness said on the witness stand and not the slides

17   themselves which are the evidence.  The slides are being

18   given to you to better interpret the evidence, but if you

19   discover or if you conclude there's a disparity, a difference

20   between what is shown on the slides and what the witness

21   testifies to, it's the testimony of the witness that is the

22   evidence and not what appears on the slides.

23          Now, I've been asked to mention one other thing with

24   respect to the slides.  Several of the expert witnesses

25   marked documents, and I think this was mostly Sprint

1   documents, but some of the Sprint experts might have marked

2   Comcast documents  And the parties have added to the slides

3   an explanation of what the expert witness added to the

4   original document.

5          As an example, if a Comcast witness took a Sprint

6   document and did something with it, changed something, that

7   will be explained on the document and on the slide.  You have

8   not seen these changes -- no, changes is not the way to

9   describe what they did.  You will not see these markings or

10  these explanations, I guess would be the better way to put

11  it, on the slides.  But consider that there's not an

12  intentional changing of the underlying exhibits, just an

13  explanation by the expert witness that this was not on the

14  original document on which I relied.  That should be self-

15  explanatory.  I have not seen these explanations, but as with

16  everything else I'm telling you, if you get back to the jury

17  room, look at one of these, having a question about it, have

18  the foreperson submit that question to me and we'll answer

19  it.

20         Keep in mind with respect to demonstrative exhibits

21  that it is the underlying evidence and not the demonstrative

22  exhibit that is the evidence in the case and if you note a

23  difference between the two, you should rely on the underlying

24  evidence and not on the demonstrative exhibit.

25         Now, you may use notes taken during the trial to

1  assist your memory; however, you should use caution in

2  consulting your notes.  There is always a tendency to attach

3  undue importance to matters that you have written down.  Some

4  testimony that is considered unimportant at the time

5  presented and thus not written down takes on greater

6  importance or might take on greater importance later on in

7  the trial in light of all the other evidence presented.

8  Therefore, you are instructed that your notes are only a tool

9  to aid your own individual memory.  The notes are for your

10  own personal use.  You should not share your notes with other

11  jurors or compare notes with other jurors in determining the

12  content of any testimony or in evaluating the importance of

13  any evidence.  Your notes are not evidence and are by no

14  means a complete outline of the proceedings or a list of the

15  highlights of the trial.  Above all, your memory should be

16  the greatest asset when it comes time to deliberate and

17  render a decision in the case.

18         Those are my general instructions and now I'm going

19  to talk about the claims and defenses of the parties.

20         I will now review for you the parties in this action

21  and the positions that you will have to consider in reaching

22  your verdict.  I will then provide you with detailed

23  instructions on what each side must prove to win on each of

24  its contentions.

25         This case is an action for patent infringement

1    arising under the patent laws of the United States.  As I

2    previously told you, the plaintiff in the case is Comcast,

3    the defendant in the case is Sprint.  Comcast is the owner of

4    the '870 Patent that is the subject of this case and I'm

5    going to refer to that in my instructions by its last three

6    numbers as the '870 Patent.

7             I will now instruct you more fully on the issues you

8    must address in the case.  First a summary of the contentions

9    of the parties.  After I talk about the parties' contentions,

10   I will provide you with more detailed instructions on what

11   each side must prove to prevail on each of its contentions.

12            First, Comcast seeks money damages from Sprint for

13   allegedly infringing the '870 Patent by using methods that

14   Comcast argues are covered by Claims 1, 7 and 113 of the '870

15   Patent.  These are referred to as the asserted claims of the

16   '870 Patent.  The methods that are alleged to infringe are

17   Sprint's text messaging, which has been referred to as short

18   messaging service or SMS, and Sprint's multimedia messaging,

19   which has been referred to as multimedia messaging service or

20   MMS.

21            Sprint denies that it has infringed the asserted

22   claims of the '870 Patent.  In addition, Sprint asserts that

23   the claims relied on by Comcast, Claims 1, 7 and 113, are

24   invalid because they are anticipated by prior art, that is

25   they are not new and because they would have been obvious at

1    the time of the invention to a person of ordinary skill in
2    the art.
3          Your job is to decide whether Sprint has infringed
4    the asserted claims of the '870 Patent and whether any of the
5    asserted claims of the '870 Patent are invalid.  If you
6    decide that any claim of the '870 Patent has been infringed
7    and is not invalid, you must decide the amount of any money
8    damages to be awarded to Comcast to compensate it for the
9    infringement.
10         Now I'm going to talk about patent claims.  Before
11   you can decide many of the issues in the case you will need
12   to understand the role of patent claims.  The patent claims
13   are the numbered sentences at the end of each patent.  The
14   claims are important because it is the words of the claims
15   that define what a patent covers.  The figures and text in
16   the rest of the patent provide a description and/or examples
17   of the invention and provide a context for the claims, but it
18   is the claims that define the breadth of the patent's
19   coverage.
20         Each claim is effectively treated as if it were a
21   separate patent and each claim may cover more or less than
22   another claim.  Therefore, what a patent covers depends in
23   turn on what each of the claims cover.  And again we're
24   talking about three claims, 1, 7 and 113.
25         You will first need to understand what each claim

1   covers in order to decide whether or not there is

2   infringement of the claim and to decide whether or not the

3   claim is invalid.  The law provides that it is my role to

4   define the terms of the claims and it is your role to apply

5   my definitions to the issues that you are asked to decide in

6   the case.  Therefore, as I explained to you at the start of

7   the case, I have determined the meaning of the claims and I

8   have provided to you my definitions of certain claim terms

9   which are found in your jury notebooks, they're the white

10  binders that you've had during the trial.

11          You must accept my definitions of these words in the

12  claims as being correct.  It is your job to take these

13  definitions and apply them to the issues that you are

14  deciding, including the issues of infringement and validity.

15          Why don't we stand up?  I'm about to talk about

16  something else.  Take a stand-up and I can rest my voice.

17          (Pause.)

18          THE COURT:  All right, we can get back to work.

19          I will now explain to you how a claim defines what

20  it covers.  A claim sets forth in words a set of

21  requirements.  Each claim sets forth its requirements in a

22  single sentence.  If a device or method satisfies each of

23  these requirements, then it is covered by the claim.  There

24  can be several claims in a patent, each claim may be narrower

25  or broader than another claim by setting forth more or fewer

1  requirements.

2         The coverage of a patent is assessed by claim by

3  claim.   In patent law the requirements of a claim are often

4  referred to as claim elements or claim limitations.   When a

5  thing such as a product or a method meets all of the

6  requirements of a claim, the claim is said to cover that

7  thing and that thing is said to fall within the scope of the

8  claim.   In other words, a claim covers a product or method

9  where each of the claim elements or limitations is present in

10  that product or method.

11         Sometimes -- I'm smiling as I read it -- sometimes

12  the words in a patent claim are difficult to understand and

13  therefore it is difficult to understand what requirements

14  these words impose.   It is my job to explain to you the

15  meaning of the words in the claims and the requirements these

16  words impose.   And as I just instructed you, there are

17  certain specific terms that I have defined and you are to

18  apply the definitions that I provide to you.

19         By understanding the meaning of the words in the

20  claim and by understanding that the words in the claim set

21  forth requirements that a product or a method must meet in

22  order to be covered by that claim, you will be able to

23  understand the scope of the coverage for each claim.   Once

24  you understand what each claim covers, then you are prepared

25  to decide the issues that you will be asked to decide, such

1    as infringement and invalidity.

2           Now, there are two types, two different types of

3    claims in the patent that you will have to consider.  The

4    first type is called an independent claim.  An independent

5    claim does not refer to any other claim of the patent; an

6    independent claim is read separately to determine its scope.

7    On the other hand, a dependent claim refers to at least one

8    other claim in the patent and thus incorporates whatever that

9    other claim says.  Accordingly, to determine what a dependent

10   claim covers you must read both the dependent claim and the

11   claim or claims to which it refers.

12          Now, in this case the independent claim is Claim 1

13   and the dependent claims -- well, let me read it.  For

14   example, Claim 1 of the '870 Patent is an independent claim.

15   You know this because this claim mentions no other claim.

16   Accordingly, the words of this claim are read by themselves

17   in order to determine what the claim covers.  Claim 7, on the

18   other hand, is a dependent claim and refers to Claim 1.

19   Accordingly, the words of Claims 1 and 7 must be read

20   together in order to determine what Claim 7 covers.

21          Claim 113 is also a dependent claim and it refers to

22   Claim 112.  Accordingly, the words of Claims 112 and 113 must

23   be read together in order to determine what Claim 113 covers.

24          I will now explain to you the meaning of some of the

25   words of the claims in this case.  In doing so I will explain

1  some of the requirements of the claims.  As I have previously

2  instructed you, you must accept my definitions of these words

3  in the claims as correct.  For any words in the claim for

4  which I have not provided you with a definition you should

5  apply their common meaning.  You should not take my

6  definition of the language of the claims as an indication

7  that I have a view regarding how you should decide the issues

8  that you're being asked to decide such as infringement and

9  invalidity.  These issues are for your -- are yours to

10 decide.

11         Now, here are my definitions and they're the same

12 definitions that you have in the white binders that you've

13 been given.

14         First, a cellular network.  I defined a cellular

15 network as follows:  a cellular network means a network

16 comprised of a wireless terminal, a base station system for

17 communicating with the wireless terminal, and core network

18 elements which may include subscriber databases such as a

19 home location register, mobile switching stations, packet

20 switching nodes, and messaging servers.

21         MR. RIOPELLE:  Your Honor, I think you misread the

22 mobile switching -- it's supposed to be mobile switching

23 centers, not mobile switching stations.

24         THE COURT:  I think I did.  I'll start that

25 definition again.

1          A cellular network means a network comprised of a

2     wireless terminal, a base station system for communicating

3     with the wireless terminal, and core network elements which

4     may include subscriber databases such as a home location

5     register, mobile switching centers, packet switching nodes,

6     and messaging servers.

7          Second definition.  A messaging server means a

8     server that has functionality for storing and forwarding

9     messages and for sending an inquiry for information relating

10    to a wireless terminal.

11         The third definition.  A specific identifier

12    external to the cellular network means a specific identifier

13    used outside and inside the cellular network to identify a

14    specific wireless terminal.

15         Next I defined an internal identifier.  An internal

16    identifier of the cellular network means an identifier used

17    inside the cellular network to identify a specific wireless

18    terminal which may, but need not be revealed outside the

19    cellular network.

20         And finally, the last of my claim construction, the

21    phrase "with the aid of a first identifier" means with the

22    aid of the first identifier where the first identifier may,

23    but need not be included in the response message.

24         Now, each of these terms that I've just defined or

25    construed for you are found in the claims that are at issue

1   in this case, Claims 1, 7 and 113.  And so if you come across

2   that language in the claims, you will get the definitions by

3   referring to this part of the charge.

4            Now I'm going to talk about infringement.  I will

5   now instruct you how to decide whether or not Sprint has

6   infringed the asserted claims of the '870 Patent.

7            Infringement is assessed on a claim-by-claim basis;

8   therefore, there may be infringement as to one claim, but no

9   infringement as to another.  In this case Comcast has alleged

10  that Sprint infringes Claims 1, 7 and 113 of the '870 Patent.

11  In order to prove infringement, Comcast must prove that the

12  requirements for infringement are met by a preponderance of

13  the evidence, that is it is more likely than not that all of

14  the requirements for infringement have been proved starting

15  on February 17th, 2006.

16           In order to prove infringement, Comcast must prove

17  by a preponderance of the evidence, i.e. that it is more

18  likely than not that Sprint used within the United States a

19  method that meets all of the requirements of a claim.  You

20  must compare the method with each and every one of the

21  requirements of a claim to determine whether all of the

22  requirements of that claim are met.

23           You must determine separately for each asserted

24  claim whether or not there is infringement.  There is one

25  exception to this rule.  If you find that a claim on which

1   other claims depend is not infringed, there cannot be

2   infringement of any dependent claim that refers directly or

3   indirectly to that independent claim.  On the other hand, if

4   you find that an independent claim has been infringed, you

5   must still decide separately whether the process meets

6   additional requirements of any claims that depend from the

7   independent claim; thus, whether those claims have also been

8   infringed.  A dependent claim includes all of the

9   requirements of any of the claims to which it refers plus

10   additional requirements of its own.

11          That concludes my instruction on infringement and

12   now I'm going to talk about invalidity.

13          Sprint asserts that the claims aren't valid, again

14   Claims 1, 7 and 113, because they are anticipated by prior

15   art, that is they are not new, and because -- two, and

16   because they would have been obvious at the time of the

17   invention to a person of ordinary skill in the art.

18          I will now instruct you on the rules you must follow

19   in deciding whether or not Sprint has prove that Claims 1, 7

20   and 113 of the '870 Patent are invalid.

21          To prove that any claim of a patent is invalid,

22   Sprint must persuade you by clear and convincing evidence.

23   You must be left with a clear conviction that the claim is

24   invalid.

25          Now, I've referred to the term prior art in

1    addressing the issue of invalidity.  Prior art may include

2    items that were publicly known, or that may have been used or

3    offered for sale, or references such as publications or

4    patents, that disclosed the claim -- that disclosed the

5    claimed invention or elements of the claimed invention.  To

6    be prior art, the item or reference must have been made,

7    known, used, published, or patented before December 23rd,

8    1999, the priority date of the '870 Patent.

9         Now, there are two issues that you must address in

10   deciding invalidity, the first is referred to as

11   anticipation.  In order for someone to be entitled to a

12   patent, the invention must actually be new.  For a claim of a

13   patent to be invalid because it is not new, all of the

14   requirements of that claim must be present in a single

15   previous device or method that was known of, used or

16   described in a single previous printed publication or patent.

17   We call these things anticipating prior art.

18        To anticipate the invention, the prior art does not

19   have to use the same words as the claim, but all of the

20   requirements of the claim must have been disclosed, either

21   stated expressly or implied to a person having ordinary skill

22   in the art in the technology of the invention, so that

23   looking at that one reference that person could make and use

24   the claimed invention.

25        Sprint contends that Claims 1, 7 and 113 of the

1   patent, the '870 Patent, are invalid because the claimed

2   inventions are anticipated.  Sprint must convince you of this

3   by clear and convincing evidence and that means that the

4   evidence highly probably demonstrates that the claims are

5   invalid.

6          The claimed inventions of the '870 Patent, Claims 1,

7   7 and 113, are not new if the inventions were already

8   patented or described in a printed publication anywhere in

9   the world before the priority date of the '870 Patent,

10  December 23rd, 1999.  Anticipation must be determined on a

11  claim-by-claim basis.

12         Now, the second issue that you must decide in ruling

13  -- in reaching a verdict, rather, on Sprint's claims of

14  invalidity is referred to as obviousness.  Even though a

15  certain patent claim may not have been identically disclosed

16  or described before it was made by an inventor, in order to

17  be patentable the asserted patent claim must also not have

18  been obvious to a person of ordinary skill in the art in the

19  field of technology of the patent at the time the invention

20  was made.

21         Sprint may establish that a patent claim is invalid

22  by showing by clear and convincing evidence that the asserted

23  patent claim would have been obvious to persons having

24  ordinary skill in the art at the time the invention was made

25  in the field of the invention.  In determining whether a

1    claimed invention is obvious, you must consider the level of

2    ordinary skill in the field of the invention that someone

3    would have had at the time of the invention, at the time the

4    invention was made, the scope and content of the prior art

5    and any differences between the prior art and the claimed

6    invention.

7            Keep in mind that the existence of each and every

8    element of the claimed invention in the prior art does not

9    necessarily prove obviousness.  Most, if not all, inventions

10   rely on building blocks of prior art.  In determining whether

11   a claimed invention is obvious, you may, but are not required

12   to find obviousness if you find that at the time of the

13   claimed invention there was a reason that would have prompted

14   a person having ordinary skill in the field of the invention

15   to combine the known elements in a way the claimed invention

16   does, taking into account such factors as whether the claimed

17   invention was merely the predictable result of using prior

18   art elements according to their known functions; two, whether

19   the claimed invention provides an obvious solution to a known

20   problem in the relevant field; three, whether the prior art

21   teaches or suggests the desirability of combining elements

22   claimed in the invention; four, whether the prior art teaches

23   a way from combining elements in the claimed invention; five,

24   whether it would have been obvious to try the combinations of

25   elements such as when there is a design need or market

1   pressure to solve a problem, and there are a finite number of

2   identified predictable solutions; and, six, whether the

3   change resulted more from design incentives or other market

4   forces.

5          To find it rendered the invention obvious you must

6   find that the prior art provided a reasonable expectation of

7   success.  In determining whether the claimed invention was

8   obvious, consider each claim separately and do not use

9   hindsight, that means consider only what was known at the

10  time of the invention.

11         Now, I've used the term person of ordinary skill in

12  the art.  In deciding what the level of ordinary skill in the

13  field of the invention is you should consider all the

14  evidence introduced at trial including, but not limited to,

15  one, the levels of education and experience of the inventor

16  and other persons actively working in the field; two, the

17  types of problems encountered in the field; three, prior art

18  solutions to these problems; four, rapidity with which

19  innovations are made; and, five, the sophistication of the

20  technology.

21         Now I have a final instruction on obviousness.  In

22  considering whether the claimed invention was obvious you

23  must determine the scope and content of the prior art.  The

24  scope and content of the prior art for deciding whether the

25  invention was obvious includes at least prior art in the same

1  field as the claimed invention.  It also includes prior art

2  from different fields that a person of ordinary skill in the

3  art would have considered when trying to solve the problem

4  that is addressed by the invention.  Where the party

5  challenging the validity of the patent is relying on prior

6  art that was not considered by the Patent & Trademark Office

7  joining that examination

8          You may consider whether that prior art is

9  significantly different and more relevant than the prior art

10  that the Patent & Trademark Office did consider.  If you

11  decide it was different and more relevant, you may weigh that

12  prior art more heavily when considering whether Sprint has

13  carried its clear and convincing burden of proving

14  invalidity.

15          Now I'm going to talk on damages.  If you find that

16  Sprint has infringed any valid claim of the '870 Patent, you

17  must then consider what amount of damages to award Comcast.

18  I will now instruct you about the measure of damages.

19          By instructing you on damages, I am not suggesting

20  which party should win the case on any issue.  If you find

21  that Sprint has not infringed, any valid claims of the patent

22  then Comcast is not entitled to any damages.

23          The damages you award must be adequate to compensate

24  Comcast for the infringement, they are not meant to punish an

25  infringer.  Your damages award, if you reach this issue,

1  should put Comcast in approximately the same financial

2  position that it would have been in had the infringement not

3  occurred.

4           Comcast has the burden to establish the amount of

5  its damages by a preponderance of the evidence.  In other

6  words, you should award only those damages that Comcast

7  establishes that it more likely than not suffered.  While

8  Comcast is not required to prove the amount of its damages

9  with mathematical precision, it must prove them with

10 reasonable certainty.  You may not award damages that are

11 speculative, damages that are only possible or damages that

12 are based on guesswork.

13          In this case Comcast seeks a reasonable royalty.  A

14 reasonable royalty is defined as the amount of money Nokia

15 and Sprint would have agreed upon as a fee for use of the

16 invention at the time prior to when infringement began.  You

17 must be careful to ensure that award is no more or no less

18 than the value of the patented intention.  I will give you

19 more detailed instructions regarding damages shortly; note,

20 however, that Comcast is entitled to recover no less than a

21 reasonable royalty for each infringing act.

22          Now I'm going to define reasonable royalty.  A

23 royalty is a payment made to a patent holder in exchange for

24 the right to make, use or sell the claimed invention.  A

25 reasonable royalty is the amount of royalty payment that a

1  patent holder and the alleged infringer would have agreed to

2  in a hypothetical negotiation taking place at a time prior to

3  when the infringement began.

4        In this case the hypothetical negotiation would have

5  occurred on April 26th, 2005 and the parties to the

6  hypothetical negotiation would have been Nokia as the then-

7  patent holder or owner and Sprint.  In considering this

8  hypothetical negotiation, you should focus on what the

9  expectations of Nokia and Sprint would have been and they

10  entered into an agreement at that time and the patent, had

11  they acted in reasonably in their negotiations.

12        In determining this, you must assume that both

13  parties believed the patent was valid and infringed and that

14  both parties were enter -- were willing to enter into an

15  agreement.  The reasonable royalty you determined must be a

16  royalty that would have resulted from the hypothetical

17  negotiations and not simply a royalty either party would have

18  preferred.

19        Evidence of things that happened after the

20  infringement first began can be considered in evaluating the

21  reasonable royalty only to the extent that the evidence aids

22  in assessing what royalty would have resulted from the

23  hypothetical negotiation, although evidence of the actual

24  profits an alleged infringer made may be used to determine

25  the anticipated profits at the time of the hypothetical

1  negotiation.  The royalty may not be limited or increased

2  based on the actual profits the alleged infringer made.

3       The reasonable royalty award must be based on the

4  incremental value that the patented method adds to the

5  overall process.  When the accused methods have both patented

6  and un-patented features measuring this value requires a

7  determination of the value added by the patented method or

8  methods that were infringed.

9       Now, there are a number of factors that you can

10  consider in determining the amount of a reasonable royalty.

11  First, you should consider all of the facts known and

12  available to the parties at the time of the hypothetical

13  negotiation on April 26th, 2005.  Some of the kinds of

14  factors that you may consider in making your determinations

15  are, and there are a number of factors and you'll have them

16  all in my charge, they're referred to as the Georgia-Pacific

17  factors because they were first enunciated in a case

18  involving Georgia-Pacific as a party and these factors are as

19  follows.  One, the value that the claimed invention

20  contributes to the accused product; two, the value that

21  factors other than the claimed invention contribute to the

22  accused product; three, comparable license agreements such as

23  those covering the use of the claimed invention or a similar

24  technology,

25       In analyzing the factors I have just referenced, you

1    may consider the following.  One, the royalties received by

2    the patentee for the licensing of the patent in suit proving

3    or tending to prove an established policy; two, the rates

4    paid by the licensee for the use of other patents comparable

5    to the patent in suit; three, the nature and scope of the

6    license -- let me read that again -- three, the nature and

7    scope of the license as exclusive or non-exclusive or as

8    restricted or non-restricted in terms of territory or with

9    respect to whom the manufactured product may be sold; four,

10   the licensors established policies and marketing program to

11   maintain his or her patent monopoly by not licensing others

12   to use the invention or by granting licenses under special

13   conditions designed to preserve that monopoly; five, the

14   commercial relationship between the licensor and licensee

15   such as whether they are competitors in the same territory,

16   in the same business, or whether they are inventor and

17   promoter; sixth, the effect of selling the un-patented

18   specialty in promoting sales of other products of the

19   licensee, the existing value of the invention to the licensor

20   as a generator of sales of his non-patented items and the

21   extent of such derivative or conveyed sales; seven, the

22   duration of the patent and the terms of the license; eight,

23   the established profitability of the product made under the

24   patents its commercial success and it's current popularity;

25   nine, the utility and advantage of the patent property over

1    the old modes or devices, if any, that have been used for

2    working out similar results; ten, the nature of the patented

3    invention, the character of the commercial embodiment of it

4    as owned and produced by the licensor and the benefit to

5    those who have used the invention; 11, the extent to which

6    the infringer has made use of the invention and any evidence

7    probative of that value; and the 12th factor the parties

8    determined was not applicable in the case, so it's not

9    referenced; 13, the portion of the realizable profits that

10   should be credited to the invention as distinguished from the

11   non-patented elements, the manufacturing process, business

12   risks or significant features or improvement added by the

13   infringer; 14, the opinion and testimony of qualified

14   experts; 15, the amount that a licensor such as the patentee,

15   that's the patent owner, and a licensee such as the infringer

16   would have agreed upon the time the infringement began, if

17   both had been reasonably and voluntarily trying to reach an

18   agreement, that is the amount which a prudent licensee who

19   desired as a business proposition to obtain a license to

20   manufacture and sell a particular article embodying the

21   patented invention would have been willing to pay as a

22   royalty and yet be able to make a reasonable profit, and

23   which amount would have been acceptable by a prudent patentee

24   or patent owner who was willing to grant a license.

25            No one factor is dispositive and you can and should

1  consider the evidence that has been presented to you in this

2  case on each of these factors.  You may also consider any

3  other factors which in your mind would have increased or

4  decreased the royalty Sprint would have been willing to pay

5  and Nokia would have been willing to accept acting as

6  normally prudent business people.

7         Now, how do you calculate a reasonable royalty?  A

8  reasonable royalty can be calculated in different ways and it

9  is for you to determine which way is the most appropriate

10 based on the evidence you've heard.  One way to calculate a

11 reasonable royalty is to determine what is called an ongoing

12 royalty.

13        To calculate an ongoing royalty you must determine

14 the royalty rate that would have resulted from the

15 hypothetical negotiation.  The royalty rate would be a fixed

16 amount of money per SMS message and/or a fixed amount of

17 money for MMS message, then you would multiply the royalty

18 rate by the actual number of infringing SMS and/or MMS

19 messages to determine the total sum of an ongoing royalty.

20        Another way to calculate a royalty is to determine a

21 one-time lump-sum payment that the infringer would have paid

22 at the time of the hypothetical negotiation.  This one-time

23 lump-sum payment would be for a license covering all

24 infringing SMS or MMS messages through the life of the '870

25 Patent.  This differs from payment of an ongoing royalty

1   because with an ongoing royalty the licensee pays based on

2   the actual number of infringing SMS and/or MMS messages.

3   When a one-time lump sum is paid the infringer pays a single

4   price for a license covering both past and future infringing

5   sales.

6          It is up to you based on the evidence presented to

7   decide the appropriate method for calculating the reasonable

8   royalty.

9          Damages in a patent infringement case are limited by

10  law to a period of six years before the filing of the

11  lawsuit.  In this case Comcast filed its lawsuit against

12  Sprint on February 17th, 2012; therefore, the earliest date

13  of commencement for damages that Comcast may obtain against

14  Sprint is February 17th, 2006.

15         Now my final instructions on deliberations.  When

16  you retire to the jury room to deliberate you may take with

17  you these instructions, your notes and the exhibits that I

18  have received in evidence.  You should select one member of

19  the jury as your foreperson.  That person will preside over

20  the deliberations and speak for you here in open court.

21         You have two main duties as jurors.  The first one

22  is to decide what the facts are from the evidence that you

23  have heard and seen here in court.  Deciding what the facts

24  are is your job, not mine, and nothing that I may have said

25  or done during the trial was meant to influence your decision

1    about the facts in any way.  Your second duty is to take the

2    law that I give you, that I have just given you, and apply it

3    to the facts and decide if under the appropriate burden of

4    proof the parties have established their claims.

5          It is my job to instruct you about the law and you

6    are bound by the oath you took at the beginning of the trial

7    to follow my instructions even if you personally disagree

8    with them, this includes the instructions that I gave you

9    before the trial, during th trial and these final

10   instructions, all of the instructions are important and you

11   are to consider them together as a whole.

12         Perform these duties fairly.  Do not let any bias or

13   sympathy or prejudice that you may feel toward any one side

14   or the other influence your decision in any way.

15         As jurors you have a duty to consult with each other

16   and to deliberate with the intention of reaching a verdict.

17   Each of you must decide the case for yourself, but only after

18   a full and impartial consideration of all the evidence with

19   your fellow jurors.  Listen to each other carefully.  In the

20   course of your deliberations you should feel free to

21   reexamine your own views and to change your opinion based on

22   the evidence, but you should not give up your honest

23   convictions about the evidence just because of the opinions

24   of your fellow jurors, nor should you change your mind just

25   for the purpose of obtaining enough votes for a verdict.

1        When you start deliberating, do not talk to the jury

2    officer.  There will be someone in attendance outside the

3    jury room.  Do not talk to me or to anyone else other than

4    each other.  During your deliberations you must not

5    communicate with or provide any information to anyone by any

6    means about this case.  You may not use any electronic device

7    or media such as cell phone, smartphone, Blackberrys or

8    iPhones or computers, the Internet, any Internet service, or

9    any text or instant-messaging service such as Twitter or any

10   Internet chat room, blog, Web site or social networking

11   service, such as Facebook, MySpace -- I've mentioned these

12   earlier in the charge -- Linked In, You Tube, to communicate

13   to anyone any information about the case or to conduct any

14   research about the case, and you may do that until after I

15   accept your verdict.

16       You may not use these electronic means to

17   investigate or communicate about the case, because it is

18   important that you decide the case based solely on the

19   evidence presented in the courtroom.  Information on the

20   Internet or information available through social media might

21   be wrong, incomplete or accurate; information that you might

22   see on the Internet or on social media has not been admitted

23   to evidence and the parties have not had a chance to discuss

24   it with you.

25       You should not seek or obtain information and it

1    must not influence your decision in this case.  If you have

2    any questions or messages for me, you must write them down on

3    a piece of paper, have the foreperson sign them, and give

4    them to the person in attendance outside of the jury room.

5    That person will give them to me and I will respond as soon

6    as I can.  In most cases, probably in all cases, I'll walk to

7    talk about your notes with Counsel, so it might take me some

8    time to get back to you.

9         On more thing about messages.  Never write down or

10   tell anyone how you stand on your votes.  In other words, if

11   you voted and you're four-four or however you're decided,

12   that's for you to know, you're not to sure that with any of

13   us.

14        Your verdict must represent the considered judgment

15   of each of you and in order for you as a jury to return a

16   verdict must agree on the verdict, each juror must agree on

17   the verdict and your verdict -- that means your verdict must

18   be unanimous.

19        A form of verdict has been prepared for you.  It has

20   a series of questions for you to answer.  You're to take this

21   form to the jury room and when you've reached unanimous

22   agreement as to your verdict it should be filled in, your

23   verdict form should be filled in by your foreperson, signed

24   by the foreperson and dated, and then you will return to the

25   courtroom and your foreperson will present your verdict.

1   Unless I direct you otherwise, do not reveal your answers

2   until you are discharged.

3           After you've reached a verdict you are not required

4   to talk to anyone about the case, although you might want to

5   talk to other people.  And I think I will explain that again

6   after you reach a verdict.  I have some instructions I'll

7   give you on that issue.  But for now -- Michael? -- I'm going

8   to give you a copy of the verdict sheet.  Counsel has

9   referred to it and I'm going to cover what is set forth in

10  the verdict sheet.  It's not Michael, it's Milahn.

11          (Pause.)

12          THE COURT:  Do the two of you have one?  Okay.

13          The first question deals with infringement and it

14  asks the question, "Did Comcast prove by a preponderance of

15  the evidence that Sprint has infringed any of the following

16  claims of the '870 Patent by providing SMS and MMS messaging

17  through messaging servers other than Syniverse Picture Mail?"

18          A yes is a finding for Comcast, a no is a finding

19  for Sprint.

20          Now, if you've answered no to all of the claims, and

21  you'll see that you have to answer yes or no for each of the

22  three claims, if you've answered no to all of the claims,

23  then you have concluded your deliberations, and your

24  foreperson should sign and date the verdict slip on page 4

25  and notify the court officer.

1        If you've answered yes to any claim in Question 1,

2   you go to Question 2 and Question 3.  And those questions

3   deal with Sprint's affirmative offense of invalidity.

4        Question 2 reads as follows:  "Did Sprint prove by

5   clear and convincing evidence that any of the following

6   claims of the '870 Patent are invalid as anticipated by a

7   single prior art reference?"

8        A yes is a finding for Sprint, a no is a finding for

9   Comcast.  That question addresses the issue of anticipation.

10  And then you have to answer yes or no for each of the three

11  claims at issue in the case, Claims 1, 7 and 113.

12       And then you go to Question 3, which addresses the

13  issue of obviousness.  Question 3 reads:  "Did Sprint prove

14  by clear and convincing evidence that any of the following

15  claims of the '870 Patent are invalid as obvious at the time

16  of the invention to a person of ordinary skill in the art?"

17       A yes is a finding for Sprint, a no is a finding for

18  Comcast.  And again there's -- the three claims are listed

19  and you have to answer yes or no.

20       The instructions at the bottom of page 3:  "You

21  proceed to Question 4 if you have found any infringed claim

22  not to be invalid," i.e. a no answer for both Question 2 and

23  Question 3 as to any infringed claim, and the infringed

24  claims, if any, are decided by your answer to Question 1.

25       "Your deliberations are concluded if you have found

1    that all infringed claims are invalid," that means a yes for

2    Questions 2 -- Question 2 or Question 3, or both, with

3    respect to each claim for which you answered yes for Question

4    1.  Your foreperson should then sign and date the verdict

5    sheet on page 4 and notify the court officer.

6            And following those instructions, if you get to

7    page, the damages section.  Question 4 reads:  "What sum of

8    money, if any, do you find that Comcast has proven by a

9    preponderance of the evidence is adequate to compensate

10   Comcast for Sprint infringement of the '870 Patent?"  And

11   there's a line and you fill in an appropriate figure.

12           And then Question 5 addresses the issue of the form

13   of any royalty that you find and the question asks, "Is the

14   sum of money identified in your answer to Question 4," and

15   you have to check one, the first choice is "the total sum of

16   an ongoing royalty for messages sent or received through

17   September 30th, 2016," and the second choice, "a one-time

18   lump-sum royalty for the life of the '870 Patent."

19           Now, a word about that date, September 30th.  Sprint

20   provided Comcast with evidence of -- well, financial

21   documents would be the best way to describe it -- through

22   September 30th, 2016, and that's why that date is inserted in

23   connection with an ongoing royalty.

24           And finally, the final instructions, your

25   deliberations are concluded if you get to this point and

1   after the verdict form is completed, in accordance with the

2   instructions, the foreperson should sign and date the form

3   and should notify the person in attendance outside the jury

4   room.

5          All right.  Now, Ms. Hull, I want you to collect all

6   but one of those verdict sheets.  We'll leave you with one

7   verdict sheet.

8          I must go to sidebar and see if Counsel have any

9   comments on the charge.

10         (Sidebar discussion held as follows:)

11         THE COURT:  Pardon me?

12         MR. GOETTLE:  Jason has our objections.

13         THE COURT:  Comcast first.

14         MR. HOFFMAN:  Thank you, your Honor.  On behalf of

15   Comcast, we respectfully object to the claim interpretation

16   instruction --

17         THE COURT:  Pardon me?

18         MR. HOFFMAN:  To the claim interpretation

19   instruction.

20         MR. GOETTLE:  The claim ct.

21         MR. HOFFMAN:  Claim construction instruction --

22         THE COURT:  All right.

23         MR. HOFFMAN:  -- your claim construction instruction

24   on page 23.

25         THE COURT:  All right.

1       MR. HOFFMAN:  And specifically Comcast objects to

2  the constructions of cellular network and messaging server as

3  inconsistent with the constructions proposed and the

4  arguments made in Docket Nos. 267 and 278.

5       THE COURT:  On which I've already ruled.

6       MR. HOFFMAN:  Correct, but we're doing this to

7  preserve the record for any appeal.

8       THE COURT:  Absolutely.  And my response to that

9  objection is as set forth in my rulings.

10       MR. HOFFMAN:  Thank you, your Honor.  And in

11  addition Comcast objects to the construction for a specific

12  identifier external to the cellular network and the

13  construction for an internal identifier of the cellular

14  network as inconsistent with the constructions and the

15  arguments supporting those constructions as set forth in

16  Docket Nos. 84 and 101.

17       THE COURT:  And I've ruled on those issues before

18  and my ruling stands.  Your objections to the charge are

19  overruled on the grounds set forth in my rulings when those

20  issues were first presented.

21       MR. HOFFMAN:  In addition, your Honor, we object on

22  page 34 of your instructions with respect to the reasonable

23  royalty definition.  We object to the instruction of "The

24  reasonable" -- at the bottom -- "The reasonable royalty award

25  must be based on the incremental value and the patented

1    method adds to the overall process when the accused methods

2    have been both patented and un-patented features.  Measuring

3    this value requires a determination of the value added by the

4    patented method."  These are -- we believe these to be

5    redundant of the Georgia-Pacific factors 11 and 13, and as a

6    result they provide additional emphasis that we believe is

7    prejudicial.

8             THE COURT:  I addressed that during the charging

9    conference, I don't need to hear from Sprint on that issue.

10   It's a correct statement of the law and I thought because

11   there were so many Georgia-Pacific factors, many of which I

12   do not believe, notwithstanding what might have been said in

13   the expert reports of the damages experts, many of them were

14   inapplicable and I was concerned about not -- about the

15   possibility that the jury might not understand the

16   significance of apportionment, particularly in view of the

17   recent Supreme Court decision in Apple v. Samsung.

18            MR. HOFFMAN:  Thank you, your Honor.

19            THE COURT:  Fine.

20            MR. RIOPELLE:  Thank you, your Honor.  Sprint

21   objects also on the claim interpretation, which I believe is

22   on page 23 -- I have it on page 20 of mine (indiscernible)

23   but --

24            THE COURT:  Comcast has objected to all of my claim

25   construction, that might be a record.

1          MR. RIOPELLE:  Well, the Federal Circuit says we

2  have to do this.  So --

3          THE COURT:  Yes.

4          MR. RIOPELLE:  -- Sprint objects to the definitions

5  of messaging server, a specific identifier external to the

6  cellular network and an internal identifier of the cellular

7  network, for the reasons stated in previous briefing in this

8  case.

9          THE COURT:  And my ruling is the same.

10          MR. RIOPELLE:  Sprint's one other objection, your

11  Honor, your obviousness instruction.

12          THE COURT:  Yes.

13          MR. RIOPELLE:  Sprint objects to the extent the

14  instruction omits ABL (ph) Model Jury Instruction 5.3, it

15  addresses the higher the level of ordinary skill the easier

16  it may be to establish obviousness, specifically --

17          THE COURT:  I have that annotated here, but not

18  marked.

19          (Pause.)

20          MR. RIOPELLE:  I think it's on page 27 of the

21  annotated (indiscernible) --

22          THE COURT:  Yes -- no, it's not here.  It's out of

23  this version, but I know the instruction to which you're

24  referring.

25          MR. RIOPELLE:  I can read it into the record, if

1    you'd like me to.

2           THE COURT:  Well, it's the instruction that talks

3    about the higher the level of education --

4           MR. RIOPELLE:  Of ordinary skill.

5           THE COURT:  -- of ordinary skill, the easier it is

6    to leave the burden on Sprint to create (indiscernible) --

7           MR. RIOPELLE:  Obviousness.

8           THE COURT:  I'm sorry, obviousness by clear and

9    convincing evidence.  And I've considered that and stated

10   during the charging conference that I did not think it was

11   appropriate to charge on that issue.

12          MR. RIOPELLE:  Thank you, your Honor.

13          THE COURT:  I had another issue regarding

14   obviousness.  I don't -- there are two arguments with respect

15   to obviousness, one is Senara -- am I pronouncing that

16   properly?

17          UNIDENTIFIED SPEAKER:  You are, your Honor.

18          THE COURT:  When considered together --

19          MR. HANGLEY:  No, it's pronounced Woppanami (ph).

20          THE COURT:  -- when considered together with what a

21   person of ordinary skill in the art would know would find

22   obviousness.  And the second is that Senara in combination

23   with another patent --

24          MR. RIOPELLE:  Viaresto.

25          THE COURT:  -- would establish obviousness.  And

1   that hindsight could not be used, there would have to be a

2   reason for combining the two.  You submitted the charge on

3   obviousness, do you think both of those issues have been

4   covered?

5        MR. GOETTLE:  I think the hindsight is covered in

6   the --

7        THE COURT:  That was covered --

8        MR. GOETTLE:  Yes, sir.

9        THE COURT:  -- but what about two patents, two

10  sources, that's one issue, and the separate issue, the --

11  combining the one patent with the knowledge of a person

12  having ordinary skill in the art.  It's funny, I read this,

13  oh, I don't know, several times, but that came through to me

14  as I --

15       MR. GOETTLE:  And I just want to make sure that I

16  understand the question, your Honor --

17       THE COURT:  I'm concerned that maybe the agreed-upon

18  charge on obviousness has not covered all of the issues that

19  were presented on that.  Now, I don't think the jury is going

20  to get very far in their deliberations tonight.  My suspicion

21  is they're going to want to go home and start tomorrow

22  morning.  And if you agree with me, I think we ought to get

23  together and it doesn't matter whether the jury starts

24  deliberating, they're not going to get very far before we

25  read to them any supplemental charge on obviousness.

1              MR. RIOPELLE:  I think since this would affect

2    Sprint the most, I think Sprint believes this is broad enough

3    to cover the obviousness.

4              THE COURT:  Well, I'll let the jury go back into the

5    jury room and tell them, I want a note telling me whether

6    they're going to stay tonight or go home.  And then we'll

7    talk about it further.  When I read it, it didn't say that to

8    me.  I think -- I don't know -

9              MR. HANGLEY:  I think it's more of an agreement,

10   your Honor.  We don't have the other issue.

11             MR. GOETTLE:  So, can we, yeah, can we just look

12   real quick at this.  To me, when I read it, it's like

13   actually, I'm not sure it's covering, but I just would like

14   to read that briefly --

15             THE COURT:  Okay.

16             MR. GOETTLE:  -- just to see if --

17             THE COURT:  I marked two pages.  I called a

18   reference to the word, convoyant, yes.

19             MR. FINKELSON:  Convoyed -- convoyed sales.

20             THE COURT:  Convoyed sales.

21             MR. FINKELSON:  I think you're really just conveying

22   that --

23             THE COURT:  I don't think we have to change that.

1  They're not going to think that convoy --

2              MR. FINKELSON:  Is that a rhetorical question?

3              THE COURT:  But there was another Georgia, no, not

4  Georgia Pacific obviousness --

5              MR. HANGLEY:  Two lawyers who refer to the message

6  server as being in the opposite place from where they are.

7              THE COURT:  Does the Georgia -- no, this is not

8  Georgia Pacific, this is obviousness.  Doesn't the prior art

9  teaches away from combining elements in the claimed

10 invention?  All right, that's part of the obviousness charge,

11 we'll come back tomorrow morning.  Have I covered, Milahn,

12 the second -- the lighter color is yellow, that -- thank you.

13 So, I think we covered the exhibit list for the jury.

14 Explain the date.  I'll give you a copy of the revised page

15 two of the table of contents.  I'll have some words for the

16 jury now.

17             THE DEPUTY CLERK:  Judge, there's only one thing I

18 want to say about the jury staying late tonight.  They have

19 already indicated that they do not want to stay late tonight.

20 Two of them have plans.  On the same note, they indicated

21 that they will most likely want to stay late tomorrow night,

22 as in well after 5:00.

23             THE COURT:  Okay, we'll see that closely.  Okay,

1    anything else?

2              MR. HANGLEY:  No.

3              MR. GOETTLE:  Thank you, your Honor.

4              MR. FINKELSON:  Thank you, your Honor.

5              (End of sidebar discussion.)

6              THE COURT:  Ladies and gentlemen, that completes the

7    charge.  There is one issue that we're going to discuss with

8    counsel, so there might -- I underscore the word might -- be

9    a very, very, very -- three verys short -- addition to the

10   charge.  I'm not certain about that.  But we will not hold

11   you for that tonight.  We'll do that when we resume

12   deliberations.

13             My plan was to send you back to the jury room and

14   have you tell me whether you wished to stay tonight or you

15   wish to go home, it's now 4:20 and begin deliberations

16   tomorrow.  But that plan was thwarted by advice that you've

17   given Ms. Hull, telling her that if you have any choice,

18   you'd prefer to go home.  I don't generally poll the jury in

19   open court on issues like this.  But is there any one of you

20   who objects to going home now?  I see no, I see absolutely no

21   hands.  What I see are smiles.  That tells me that we're

22   going to adjourn for the evening.  You now have been charged,

23   there was three black notebooks that will be presented to

1   you.  The lawyers will gather their exhibits, I think they're

2   already in the appropriate part in this.  You will be given

3   your list of the exhibits with numbers and descriptions.

4   Hopefully, you'll be able to work through them.  If you have

5   any questions, you should not hesitate to submit them as I've

6   instructed you.  The foreperson writes out the question and

7   submits it to me.  I discuss it with counsel and then we

8   answer it.

9          I've just given you all of the instructions that I

10  need to give you.  We'll resume, well, we'll start

11  deliberations tomorrow morning at 9:30.  Do not begin

12  discussing the case until all of you are present.  You'll not

13  be called back into the courtroom unless we have -- well, I'm

14  glad my voice waited until I got finished -- we'll not call

15  you back into the courtroom in the morning unless I have an

16  additional instruction to give.  So, 9:30, when all of you

17  have gathered, you can begin your deliberations.  The

18  exhibits will be -- I think we'll get them into the jury room

19  tonight with the exhibit lists.  We'll leave copies of the

20  charge, they're in the black binders, three copies of the

21  charge for you.  And if there is an additional instruction,

22  I'll call you back.

23          We're going to order lunch for you.  When a jury

1    deliberates we order lunch so that you can continue your

2    deliberation over the lunchtime.  At day end, which is around

3    now, you'll tell me whether you wish to continue your

4    deliberations and you'll also tell me whether you wish to

5    stay for dinner or just work later.  If you work later and

6    you miss a bus, train, ride, we'll arrange to send you home.

7    I don't want you to think you'll be getting a stretch

8    limousine, it will be more like one of the airport services.

9    I don't think there's anything else we have to address and

10   we'll do that by note.  Once you have been in the courtroom

11   during the day, I want you to send me a note about 4:15,

12   telling me whether you wish to stay.  If not and I had

13   forgotten about it, Monday is a legal holiday.

14            MR. HANGLEY:  Yes.

15            THE COURT:  Yes.

16            MR. HANGLEY:  Yes, it is.

17            THE COURT:  Yes, it is.  Thank you, Mr. Hangley.  I

18   was waiting for confirmation.

19            MR. HANGLEY:  My permission.

20            THE COURT:  I wasn't sure and I am right, the

21   courthouse is closed.  It's Presidents Day and I don't want

22   to -- I don't know what you would ordinarily do on Presidents

23   Day.  But because it's such an important holiday and we

1    commemorate some very significant people, I'll not want to

2    call court on Monday.  So, if you don't reach a verdict on,

3    well, tomorrow, Friday night, we'll resume on Tuesday,

4    Tuesday morning.  More on that tomorrow.

5          If you have any logistical issues or other issues,

6    let Milahn know and she'll communicate those matters to me.

7    On that note, is there anything else we have to say before

8    the jury is released for the evening?

9          MR. FINKELSON:  No, your Honor.

10         MR. GOETTLE:  No.

11         THE COURT:  Well, have a safe trip home.  See you

12   back here bright and early tomorrow morning.  And again, you

13   could begin your deliberations when all of you, all eight of

14   you, are assembled.  We'll have, as I said, instructions and

15   the exhibits in the jury room.  You leave your juror

16   notebooks and the binders, the binders have some things, the

17   claim construction is both in the binder and in the

18   instructions, the jury charge.  But the binder has a quick,

19   easy to find patent -- and the glossary which is very, very

20   important.  And sentences that run on with three or four or

21   five acronyms, it helps to have the glossary right there.

22   And that note, I'll excuse you for the evening. What's that?

23         (Discussion off the record.)

1        THE COURT:  Ms. Hull wants you to give -- I'm not

2   going to give you my usual day-end instructions.  I've just

3   done it for an hour and a half.  Just one, maybe.  If your

4   family at home or any other persons at home ask you what you

5   did today, you can't tell them.  You sat in on a very

6   interesting jury trial, which you're going to have to decide

7   starting tomorrow.  You can tell them that much and that's

8   all.  On that note, thank you for the reminder, Ms. Hull.  On

9   that note, we are adjourned until tomorrow morning at 9:30.

10        THE DEPUTY CLERK:  All rise.

11        THE COURT:  Be seated, everyone.  I heard Mr.

12   Hangley say at sidebar, that well, if we agreed on something,

13   it's not an issue on appeal.  You're right.  But if this was

14   an oversight, I wanted to call it to your attention.  And I

15   think you should take a look at it.  I'm talking about the

16   obviousness charge, which begins on page 29 and continues to

17   page 30.  I've read it, at least, two or three times before

18   today, but it was only on the -- on today's last reading that

19   it occurred to me that there was a slight disconnect.  It

20   might be broad enough, as Mr. Riopelle --

21        MR. FINKELSON:  And we're investigating with respect

22   to that question, your Honor.

23        THE COURT:  It might be broad enough to cover the

1    case, but I want you to think about that.

2            MR. FINKELSON:  And that's what we're doing, we're

3    checking it right now and we'll advise the Court.

4            MR. HANGLEY:  I thought it was, but we are looking

5    at it, too.

6            THE COURT:  All right, is there anything else we

7    have to discuss?

8            MR. HANGLEY:  I don't think so, your Honor.

9            MR. FINKELSON:  Not for Sprint, your Honor.

10           THE COURT:  All right, on that note we're adjourned.

11   I think we ought -- we're going to have to convene tomorrow

12   at 9:30 to address obviousness and we're not going to require

13   that you remain in the courthouse.  We'll get contact

14   information.  You're both rather close by.  If we have jury

15   questions, it's my practice to call everyone back before

16   answering it, almost without exception.  I say almost, if

17   they ask for some equipment, a blackboard, which is always --

18           MR. HANGLEY:  Welcome.

19           THE COURT:  -- it's looked upon favorably by

20   plaintiffs.

21           MR. GOETTLE:  It sure is.

22           THE COURT:  And not so favorably by --

23           MR. FINKELSON:  It's better than a calculator, but

186

1    it's --

2            THE COURT:  -- by defendant.  But normally, I call

3    everyone back.  So, we'll get your cellphone numbers if we

4    don't already have them.  And on that note, we are in recess,

5    we are adjourned for tonight.  9:30 tomorrow morning.

6            THE DEPUTY CLERK:  All rise.

7            ALL:  Thank you, your Honor.

8            (Court adjourned 4:29 o'clock p.m.)

9                                _ _ _

187

1                          INDEX

2    Closing Argument by Mr. Goettle - Page 9

3    Closing Argument by Mr. Finkelson - Page 63

4    Rebuttal Argument by Mr. Goettle - Page 109

5    Charge of the Court - Page 127

CERTIFICATION


      I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


S:/Geraldine C. Laws, CET        Date 2/17/17
Laws Transcription Service